IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

ANTONIO McCLEMORE,

                              Plaintiff,          Civil Action No.
                                                  9:14-CV-0626 (BKS/DEP)

        v.

MAUREEN BOSCO, *et al.*,

                              Defendants.

_____

APPEARANCES:                               OF COUNSEL:

FOR PLAINTIFF:

ANTONIO McCLEMORE, *Pro Se*
01-B-1676
Clinton Correctional Facility
P.O. Box 2000
Dannemora, NY 12929

FOR DEFENDANTS:

HON. ERIC T. SCHNEIDERMAN          CHRISTOPHER W. HALL, ESQ.
New York State Attorney General    NICOLE E. HAIMSON, ESQ.
The Capitol                        Assistant Attorneys General
Albany, NY 12224

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

<u>REPORT AND RECOMMENDATION</u>

*Pro se* plaintiff Antonio McClemore, a New York State prison inmate, has commenced this action against various individuals pursuant to 42 U.S.C. § 1983, alleging the deprivation of his civil rights. While the claims set forth in plaintiff's complaint were broader, and involved events occurring at another prison facility, his claims have been narrowed as a result of the court's review, pursuant to 28 U.S.C. §§ 1915(e) and 1915A, and now involve only actions taken by persons employed at the Central New York Psychiatric Center ("CNYPC"), where he was confined at the relevant times. Plaintiff's complaint generally alleges that defendants violated his rights under the First Amendment by restricting his communication and retaliating against him, and under the Eighth Amendment by withholding clothing and access to the bathroom, using excessive force against him, and ignoring his medical needs.

Currently pending before the court is a motion brought by the defendants seeking dismissal of plaintiff's remaining claims pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. For the reasons set forth below, I recommend that the motion be denied.

I.    BACKGROUND[1]

Plaintiff is a prison inmate currently being held in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"). Dkt. No. 1. Although he is now incarcerated elsewhere, at the times relevant to this action, plaintiff was confined in either the CNYPC, a facility operated by the New York State Office of Mental Health ("OMH") and located in Marcy, New York, or the Great Meadow Correctional Facility, operated by the DOCCS and located in Comstock, New York. *See generally id.*

On or about July 11, 2011, while a patient in the CNYPC, "plaintiff . . . became a witness to a complaint filed by Security Staff Joseph Hubbert on . . . defendant Kevin Boyer[.]" Dkt. No. 1 at 11. When defendant Boyer learned that McClemore was serving as a witness against him, he allegedly began to harass plaintiff. *Id.* Among other things, defendant

---

[1]    In light of the procedural posture of this case, the following recitation is drawn principally from plaintiff's complaint, Dkt. No. 1, the contents of which have been accepted as true for purposes of the pending motion. *See Erickson v. Pardus,* 551 U.S. 89, 94 (2007) ("[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007)); *see also Cooper v. Pate*, 378 U.S. 546, 546 (1964). In addition, to the extent they are consistent with the allegations set forth in his complaint, the court's recitation of the facts is also drawn from the materials submitted by plaintiff in opposition to defendants' motion, Dkt. No. 37. *Donhauser v. Goord*, 314 F. Supp. 2d 119, 121 (N.D.N.Y. 2004) (Hurd, J.).

Boyer allegedly attempted to instigate conflicts between plaintiff and other patients and threatened plaintiff with bodily harm "on a daily basis." *Id.*

Plaintiff was transferred out of the CNYPC and into the Wende Correctional Facility ("Wende") on August 17, 2011. Dkt. No. 1 at 12. On or about September 20, 2011, while at Wende, plaintiff attempted to commit suicide. *Id.* As a result of the incident, plaintiff was returned to the CNYPC on or about September 23, 2011. *Id.* at 11-12. Upon his return, plaintiff was housed in "Ward 601," which, according to plaintiff, houses residents requiring discipline or those residents that "staff do[es] not like." *Id.* at 12-13. Plaintiff alleges that residents housed in Ward 601 are prohibited from (1) wearing shoes; (2) talking to other residents; (3) possessing any additional clothing other than what they are wearing when they arrive; (4) leaving the door to their room open; (5) possessing or requesting a pen, paper, magazine, or book; (6) accessing a telephone;[2] (7) participating in treatment programs or religious services; and (8) leaving their room at any time. *Id.* at 13-14. CNYPC residents are not

---

[2] Notwithstanding this allegation, plaintiff acknowledges that he was permitted to make a collect call on one occasion. Dkt. No. 1 at 18. Plaintiff acknowledges that he was unable to contact anyone, however, because defendant Maureen Bosco, the Director of the CNYPC, has implemented "outrageous" policies whereby residents can only make collect phone calls for $10.00-$17.00 per connection, plus $1.00 per minute. *Id.* at 18-19. According to plaintiff, these policies are designed to "deliberately deter patient[']s families from becoming to[o] involved in the treatment and care." *Id.* at 19. Plaintiff also notes that he was permitted to call his "common law wife" on or about December 12, 2013. *Id.* at 32-33.

permitted any visitors for the first thirty days of their stay, and thereafter are permitted visits only from immediate family. *Id.* at 19. According to plaintiff, all of these policies were promulgated by defendant Bosco and defendant Corey Connlley, the Chief of Security at the CNYPC. *Id.* at 9-10. In addition, plaintiff alleges that, while he was housed in Ward 601, he was precluded from using the bathroom as needed and required to sleep on a mattress on the floor. *Id.* at 18.

Defendant Michael Sacco, who was assigned as plaintiff's therapist during his confinement in the CNYPC, advised plaintiff that defendant Boyer recommended he be housed in Ward 601 and indicated that plaintiff "had made a[ ]lot of enemies upon his last admission" to the CNYPC. Dkt. No. 1 at 15. Plaintiff's request to be discharged from the CNYPC was denied by defendant Sacco on or about September 27, 2011. *Id.* at 15-16.

Plaintiff was transferred to Ward 302, another ward within the CNYPC, in early October 2011. Dkt. No. 1 at 17. He was transferred back to Ward 601 on or about October 24, 2011, however, because, according to defendant Sacco and defendant Dr. Berkinhimer, his physician, plaintiff was not eating. *Id.* at 17-18.

In November 2011, plaintiff was transferred to Ward 201, where defendant Boyer was assigned to work at the time. Dkt. No. 1 at 20-21.

Plaintiff alleges that, on or about November 17, 2011, defendant Boyer advised a CNYPC staff member, identified as Mrs. Trudy, that she could not give plaintiff a job at the facility. *Id.* at 21-22. When plaintiff asked defendant Boyer why he had issued that directive, defendant Boyer responded, "'Because I don't need another niggar [sic] working on my ward.'" *Id.* at 22. The next day, plaintiff filed a verbal complaint concerning the matter to "the unit chief," submitted a written complaint with "risk management, and wrote letters to the Legal Aid Society, Prisoner's Legal Services, and Quality of Care" regarding defendant Boyer's conduct. *Id.*

Shortly thereafter, on November 26, 2011, plaintiff was escorted by defendant Boyer and two other security staff members to a side room on Ward 202, which, according to plaintiff "is an isolation area." Dkt. No. 1 at 23. Upon arriving at the room, the two other security staff "left defendant Boyer alone with the plaintiff," and defendant Boyer then "struck the plaintiff with a closed fist, knocking him to the floor." *Id.* As a result, plaintiff suffered a cut lip and swelling to his face. *Id.* Immediately after the alleged assault by defendant Boyer, the other two security staff returned to the room and strip-searched plaintiff and then admitted him to Ward 202. *Id.* Plaintiff alleges all of this conduct was unprovoked, and that defendant

Boyer "has a long history of assaulting patients" without disciplinary consequences. *Id.*

While plaintiff was still housed in Ward 202, defendant Sacco visited him on or about December 13, 2011, to inform him that Quality of Care requested that plaintiff call regarding his complaints. Dkt. No. 1 at 24. Defendant Sacco then allegedly threatened to "make the plaintiff's life a living hell" because of the written complaints. *Id.* at 25. Plaintiff contends that defendants Berkinhimer and Sacco acted "very hostile towards" him on December 19, 2011, due to the grievacnces he had filed and told plaintiff that "if he wanted to kill himself th[e]n he would have his chance for plaintiff would be discharged from the [CNYPC] soon." *Id.* The next morning, plaintiff was discharged and transferred to Great Meadow. *Id.*

On January 10, 2012, while housed in a general population cell at Great Meadow, plaintiff again attempted to commit suicide. Dkt. No. 1 at 26-27. After he was examined by medical personnel, plaintiff was housed in the mental health unit strip cell at the direction of defendant Sacco without any clothing, aside from a smock. *Id.* at 27, 29. According to plaintiff, he was confined in the strip cell for seventy-one days. *Id.* at 28. He also alleges that, "[i]n the past 26 months, [he] has been kept in a strip cell for about nine of those months." *Id.* While in the strip cell, plaintiff

developed a full-body rash that leaked "a yellowish fluid." *Id.* Plaintiff also contends that he was not permitted to shower or otherwise clean himself and that he was sexually assaulted by unidentified staff during his stay in the strip cell. *Id.* After swallowing a twenty-four inch light bulb, wires, batteries, and paper clips, plaintiff alleges he was not provided medical treatment until he "stopped bleeding from [his] rectum." *Id.* Unidentified mental health staff also allegedly physically assaulted him in retaliation for filing written complaints against them. *Id.*

Plaintiff was returned to the CNYPC on or about December 9, 2013, and again assigned to Ward 601. [Dkt. No. 1 at 31](). While plaintiff's mattress in his cell now had a bedframe, the restrictions and conditions described above during his earlier stay remained the same. [Dkt. No. 1 at 31](). Defendant Berkinhimer visited plaintiff on this date at his cell and placed him on a finger-food diet after determining that plaintiff was suicidal, but did not provide plaintiff medical treatment "for almost two weeks" for the body rash. *Id.* at 30-31. The next day, defendant Sacco visited plaintiff and acted hostile towards him, stating that he had "no intention[] of doing anything for plaintiff." *Id.* at 32. In response to a request by plaintiff to speak to Risk Management, defendant Sacco informed him that residents were now required to file a written complaint in order to

8

communicate with Risk Management. *Id.* Because plaintiff was housed on Ward 601, however, he was prohibited from filing this complaint because of the restrictions on the use and possession of writing materials. *Id.*

On or about December 17, 2013, plaintiff informed defendant Berkinhimer that "he was hearing voices, having visions and feeling suicidal." Dkt. No. 1 at 33. Plaintiff also indicated that "he was tired of asking the nurse for med[ications] for his depression." *Id.* Defendant Berkinhimer responded by telling plaintiff he was not going to provide plaintiff with any treatment and had already prescribed plaintiff medication to help him sleep. *Id.* The next day, plaintiff attempted to kill himself "by sharp[en]ing a spoon handle to a point on both ends, th[e]n swallowing the spoon handle, and a large screw before cutting [his] wrist." *Id.* at 34.

After receiving medical treatment at an outside hospital following his suicide attempt, plaintiff was returned to the CNYPC on January 3, 2014, housed in an isolation room, and placed on twenty-four hour watch. Dkt. No. 1 at 34. Shortly thereafter, defendant Berkinhimer visited plaintiff and, according to plaintiff, said, "You tried to kill yourself on my ward. I'm going to the team meeting this morning, and we are going to discuss this little tantrum of yours. But I'm telling you right now, I'm moving you to the second floor th[e]n I'm discharging your ass." *Id.* at 35 (quotation marks

omitted). Plaintiff attempted suicide again on or about January 10, 2014. *Id.* at 36.

II.    PROCEDURAL HISTORY

Plaintiff commenced this action on or about April 28, 2014, with the filing of a complaint and accompanying application to proceed *in forma pauperis* ("IFP"). Dkt. Nos. 1, 2. Plaintiff's complaint asserts several claims pursuant to 42 U.S.C. § 1983 and names nine defendants, all of whom are individuals employed at the CNYPC, Great Meadow, or the Clinton Correctional Facility. *See generally* Dkt. No. 1. On January 7, 2015, Chief District Judge Glenn T. Suddaby issued a decision and order, pursuant to 28 U.S.C. §§ 1915(e) and 1915A, granting plaintiff's IFP application and dismissing some of the causes of action asserted against the named defendants. Dkt. No. 13. As a result of that decision, the only viable claims remaining in the action include (1) a First Amendment freedom of speech/association claim asserted against defendants Bosco, Connlley, and Sacco; (2) an Eighth Amendment conditions-of-confinement claim regarding Ward 601 asserted against defendants Bosco, Connlley, and Boyer; (3) an Eighth Amendment conditions-of-confinement regarding Great Meadow asserted against defendant Sacco (4) a First Amendment retaliation claim asserted against defendants Boyer and Sacco; (5) an

Eighth Amendment excessive force claim asserted against defendant Boyer; and (6) an Eighth Amendment deliberate medical indifference claim asserted against defendant Berkinhimer. *Id.*

The remaining defendants have filed a motion seeking dismissal of plaintiff's complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.[3] [Dkt. No. 26](). Plaintiff has submitted a response to defendants' motion, and defendants have since submitted a reply to that filing. Dkt. Nos. 37, 39. Defendants' motion, which is now fully briefed, has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See* Fed. R. Civ. P. 72(b).

III.    DISCUSSION

    A.    <u>Legal Standard Governing Motions to Dismiss Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure</u>

A motion to dismiss a complaint, brought pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, calls upon a court to gauge the facial sufficiency of that pleading using a standard which, though unexacting in its requirements, "demands more than an unadorned, the-

---

[3]    Although defendants' motion requests dismissal of plaintiff's complaint in its entirety, it does not address plaintiff's Eighth Amendment excessive force claim asserted against defendant Boyer. *See generally* [Dkt. No. 26-1](). Accordingly, while this report and recommendation will address each of the other claims asserted in the complaint, it will not discuss that particular cause of action in light of defendants' failure to place plaintiff on notice that it may be subject to dismissal.

defendant-unlawfully-harmed me accusation" in order to withstand scrutiny. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 555 (2007)). Under Rule 8(a)(2) of the Federal Rules of Civil Procedure, "a pleading must contain a 'short and plain statement of the claim showing that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. 677-78 (quoting Fed. R. Civ. P. 8(a)(2)). While modest in its requirements, that rule commands that a complaint contain more than mere legal conclusions. *See id.* at 679 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.

In deciding a Rule 12(b)(6) dismissal motion, the court must accept the material facts alleged in the complaint as true and draw all inferences in favor of the non-moving party. *Erickson v. Pardus,* 551 U.S. 89, 94 (2007) (citing *Twombly*, 550 U.S. at 555-56); *see also Cooper v. Pate*, 378 U.S. 546, 546 (1964); *Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d 292, 300 (2d Cir. 2003); *Burke v. Gregory*, 356 F. Supp. 2d 179, 182 (N.D.N.Y. 2005) (Kahn, J.). The tenet that a court must accept as true all of the allegations contained in a complaint does not apply, however, to legal conclusions. *Iqbal*, 556 U.S. at 678.

To withstand a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570); *see also Ruotolo v. City of New York*, 514 F.3d 184, 188 (2d Cir. 2008). As the Second Circuit has observed, "[w]hile *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge plaintiffs' claims across the line from conceivable to plausible.'" *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 570) (alterations omitted).

When assessing the sufficiency of a complaint against this backdrop, particular deference should be afforded to a *pro se* litigant, whose complaint merits a generous construction by the court when determining whether it states a cognizable cause of action. *Erickson*, 551 U.S. at 94 ("'[A] *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.'" (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)) (citation omitted)); *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008) ("[W]hen a plaintiff proceeds *pro se*, a court is obliged to construe his pleadings liberally." (quotation marks and alterations omitted)); *Kaminski v. Comm'r*

*of Oneida Cnty. Dep't of Soc. Servs.*, 804 F. Supp. 2d 100, 104 (N.D.N.Y. 2011) (Hurd, J.) ("A pro se complaint must be read liberally").

### B.    First Amendment Free Speech/Association

Plaintiff's complaint alleges that defendants Bosco, Connlley, and Sacco violated his rights under the First Amendment by, *inter alia*, restricting his communication with family and friends while housed in the CNYPC. Dkt. No. 1 at 10, 12, 17.

### 1.    Legal Standard

While inmates confined within prison facilities are by no means entitled to the full gamut of rights guaranteed under the United States Constitution, including the First Amendment, they do retain at least some measure of constitutional protection. A prison inmate's right to freedom of speech, however, is not without limits, and the task of defining the contours of that right in a prison setting requires striking a delicate balance between the rights of prison inmates and the legitimate interests of prison officials tasked with maintaining prison security. *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348-49 (1987); *Ford v. McGinnis*, 352 F.3d 582, 588 (2d Cir. 2003); *Benjamin v. Coughlin*, 905 F.2d 571, 574 (2d Cir. 1990).

If a prison regulation or practice "impinges on inmates' constitutional rights, the regulation [or decision] is valid if it is reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987); *accord, Beard v. Banks*, 548 U.S. 521, 528 (2006). To determine whether a regulation or decision is reasonable, a court must conduct the four-factor analysis articulated in *Turner*. *Turner*, 482 U.S. at 89-91; *Beard*, 548 U.S. at 528; *Shakur v. Selsky*, 391 F.3d 106, 113 (2004). Specifically, the court asks (1) whether there is "a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it"; (2) whether there are "alternative means of exercising the right that remain open to prison inmates"; (3) "what impact will accommodation of the asserted constitutional right have on guards and other inmates and on the allocation of prison resources generally"; and (4) whether there "are ready alternatives for furthering the governmental interest available[.]" *Beard*, 548 U.S. at 529 (alterations, quotation marks omitted); *accord, Turner*, 482 U.S. at 91-93.

    2.    Analysis

    In this case, liberally construed, plaintiff's complaint alleges that defendants Bosco and Connlley deprived him of his right to free speech under the First Amendment by creating policies that restricted all of his

outside communication. Dkt. No. 1 at 13-14. Plaintiff's complaint also alleges that defendant Sacco refused to transfer plaintiff out of Ward 601 on or about December 10, 2013, to preclude McClemore from writing any grievances or complaints against him (because residents in Ward 601 are prohibited from writing letters). *Id.* at 32. While it is true that plaintiff's complaint alleges that he was permitted to make two telephone calls at various times while housed in Ward 601, *id.* at 18, 32-33, he contends that, on one of those occasions, he could not contact anyone because defendant Bosco has implemented a policy whereby residents can only make collect calls at "outrageous" expenses. *Id.* at 18-19.

In support of their motion to dismiss, defendants argue that "it is clear that the policies on ward 601 at CNYPC were reasonably related to legitimate penological interests. They were designed to protect Plaintiff, staff and visitors by providing a therapeutic and secure setting." Dkt. No. 26-1 at 8. Importantly, plaintiff's complaint is devoid of any allegations that explain or otherwise justify the policies that restricted his ability to communicate while housed in Ward 601. While defendants' contentions may prove to be true, at this early procedural juncture, the court must restrict its consideration of defendants' motion to the four corners of plaintiff's complaint (and, to the extent they are consistent with the

complaint, any materials submitted by plaintiff in response), and accept all allegations as true. Accordingly, defendants' unsupported contention regarding the reasonableness of any policies allegedly implemented by defendants Bosco and Connlley, or perpetuated by defendant Sacco, do not detract from the plausibility of the allegations in the complaint.

In addition, with respect to the second *Turner* factor, plaintiff's complaint plausibly alleges that there are no alternatives to the policies that he challenges. For instance, he contends that Ward 601 residents are not permitted any visitors for the first thirty days following admission, with no exceptions, and after expiration of that period, residents are permitted visits only from immediate family. Dkt. No. 1 at 19. Plaintiff also alleges that residents are prohibited from talking to one another, possessing any means of written communication, or accessing the telephone. *Id.* at 13-14. Defendants have offered no reason to believe that plaintiff's descriptions of these policies are inaccurate, or that alternatives to them exist. Finally, at this juncture, there is no indication from plaintiff's complaint or defendants' motion that accommodations to the policies challenged would unreasonably impact the CNYPC or its staff and security.

Accordingly, because I find that plaintiff's complaint plausibly alleges a First Amendment free speech claim, I recommend that defendants'

motion be denied as to the First Amendment claims asserted against defendants Bosco, Connlley, and Sacco.

### C.    First Amendment Retaliation

Plaintiff's complaint also alleges that defendants Boyer and Sacco retaliated against him by, *inter alia*, punishing and harassing him when he exercised his First Amendment rights by filing complaints against them. Dkt. No. 1 at 11, 12, 24, 25.

#### 1.    Legal Standard

A cognizable section 1983 retaliation claim lies when prison officials take adverse action against an inmate that is motivated by the inmate's exercise of a constitutional right, including the free speech provisions of the First Amendment. *See Friedl v. City of N.Y.*, 210 F.3d 79, 85 (2d Cir. 2000) ("In general, a section 1983 claim will lie where the government takes negative action against an individual because of his exercise of rights guaranteed by the Constitution or federal laws."). To state a *prima facie* claim under section 1983 for retaliatory conduct, a plaintiff must advance non-conclusory allegations showing that (1) the conduct at issue was constitutionally protected, (2) the defendants took adverse action against the plaintiff, and (3) there was a causal connection between the protected activity and the adverse action – in other words, that the

protected conduct was a "substantial or motivating factor" in the prison officials' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287 (1977); *Dillon v. Morano*, 497 F.3d 247, 251 (2d Cir. 2007); *Garrett v. Reynolds*, No. 99-CV-2065, 2003 WL 22299359, at *4 (N.D.N.Y. Oct. 3, 2003) (Sharpe, M.J.).[4]

For conduct to constitute as adverse for purposes of satisfying this test, it must "deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." *Davis v. Goord*, 320 F.3d 346, 353 (2d Cir. 2003). "In order to satisfy the causation requirement, allegations must be sufficient to support the inference that the speech played a substantial part in the adverse action." *Davis*, 320 F.3d at 354 (quotation marks omitted).

  2. <u>Analysis</u>

    i. <u>Defendant Boyer</u>

In this case, plaintiff's complaint alleges that because he served as a witness against defendant Boyer, Boyer began "harass[ing him] by trying to start conflicts between other patients and plaintiff, and constantly . . . made threats of bodily harm towards plaintiff." [Dkt. No. 1 at 11](). At this

---

[4] Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

early juncture, I find that these allegations are sufficient to satisfy each of the elements of a section 1983 retaliation claim. Although it is not clear based on the complaint in what context plaintiff served as "one of the witness[es] against" defendant Boyer, liberally construed, and accepting the allegation as true, I find that it plausibly suggests that plaintiff engaged in protected activity. *See, e.g., Vazquez v. Southside United Housing Dev. Fund Corp.*, No. 06-CV-5997, 2009 WL 2596490, at *12 (E.D.N.Y. Aug. 21, 2009) ("Viewing the facts in the light most favorable to Plaintiff, the court accepts that Plaintiff's testimony is sufficient to show that she engaged in a protected activity by serving as a witness for Bonano."). As for the second element, threats of physical harm have been held to constitute adverse action for purposes of a retaliation claim. *See, e.g., Pierce v. Monell*, No. 06-CV-1290, 2007 WL 2847317, at *8 (N.D.N.Y. Sept. 26, 2007) (Kahn, J., *adopting report and recommendation by* Lowe, M.J.) (finding that the alleged death threats made by the defendant to the plaintiff were sufficient at the pleading stage to constitute adverse action for purposes of the plaintiff's retaliation claim). Finally, plaintiff contends that the incident involving defendant Boyer to which plaintiff became a witness occurred on July 11, 2011, and by approximately August 9, 2011, plaintiff requested to be transferred out of the CNYPC to avoid continued

conflict with defendant Boyer. Dkt. No.1 at 11. Thus, there are sufficient allegations to suggest that there is close temporal proximity between the protected activity and alleged adverse action, which is sufficient at this stage to satisfy the causal connection requirement of plaintiff's retaliation claim. *See, e.g., Petyan v. N.Y. City Law Dep't*, (finding that the close temporal proximity of two-and-a-half months between the protected activity and the alleged adverse action "is sufficient circumstantial evidence of causation at the motion to dismiss stage").

Accordingly, for the reasons discussed above, I find that plaintiff's complaint plausibly alleges a First Amendment retaliation claim against defendant Boyer, and therefore recommend that defendants' motion be denied as to that claim.

ii.    <u>Defendant Sacco</u>

Plaintiff's complaint also alleges sufficient facts to plausibly suggest that he can satisfy each of the three elements of a retaliation claim against defendant Sacco. In particular, plaintiff alleges that, in retaliation for plaintiff filing complaints with "Quality of Care" regarding the treatment he was receiving at the CNYPC, defendant Sacco threatened to make "plaintiff's life a living hell" and then discharged him from the CNYPC to Great Meadow after telling plaintiff that he would have an opportunity to

commit suicide at that facility. Dkt. No. 1 at 24-25. It is well established that the filing of complaints or grievances constitutes protected activity for purposes of a First Amendment retaliation claim. *Johnson v. Eggersdorf*, 8 F. App'x 140, 144 (2d Cir. 2001); *Graham v. R.J. Henderson*, 89 F.3d 75, 80 (2d Cir. 1996). In addition, while defendant Sacco's vague threat may not alone be sufficient to constitute adverse action, *see, e.g., Mateo v. Fischer*, 682 F. Supp. 2d 423, 434 (S.D.N.Y. 2010) ("The opacity of [the defendant]'s threats to [the plaintiff] – that [the plaintiff] should 'wait till he puts his hands on me,' and that 'one day he and I will part' – softens the deterrent effect considerably." (citations omitted)), in this case, when defendant Sacco's comments are considered in conjunction with the allegation that he arranged for the transfer of plaintiff to Great Meadow while aware that he might commit suicide at that facility, I find that plaintiff's complaint alleges facts plausibly suggesting that defendant Sacco engaged in adverse action. *See Lunney v. Brureton*, No. 04-CV-2438, 2007 WL 1544629, at *23 (S.D.N.Y. May 29, 2007) ("Case law reflects that verbal threats may constitute adverse action, though whether they constitute adverse action seems to depend on their specificity and the context in which they are uttered."). With respect to the causation element of the retaliation claim, plaintiff's complaint unequivocally alleges that

defendant Sacco was aware of the fact that plaintiff had filed complaints and threatened to make plaintiff's life difficult on or about December 13, 2011. Dkt. No. 1 at 24. Six days later, defendant Sacco allegedly discharged plaintiff to Great Meadow after telling him "if he wanted to kill himself th[e]n he would have his chance." *Id.* at 25. Defendant Sacco's awareness of the complaints filed by plaintiff, in conjunction with the close temporal proximity between the date on which it is clear he was aware of the protected activty and his decision to discharge plaintiff are sufficient to plausibly suggest that the complaints motivated defendant Sacco's conduct.

Accordingly, I recommend defendants' motion with respect to plaintiff's retaliation claim against defendant Sacco be denied.

### D. Eighth Amendment Conditions-of-Confinement

Plaintiff asserts conditions-of-confinement claims against defendant Sacco based on his confinement in a strip cell at Great Meadow, and against defendants Bosco, Connlley, and Boyer based on the conditions in Ward 601. Dkt. No. 1. at 9-10, 13-14, 18, 27-29.

1.    <u>Legal Standard</u>

The Eighth Amendment prohibits punishment that is "incompatible with 'the evolving standards of decency that mark the progress of a maturing society [,], or involve[s] the unnecessary and wanton infliction of pain.'" *Estelle*, 429 U.S. 102-03 (quoting *Trop v. Dulles,* 356 U.S. 86, 100-01 (1958) and *Gregg v. Georgia*, 428 U.S. 153, 169–73 (1976). While the Eighth Amendment does not mandate comfortable prisons, it does not countenance inhumane ones. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). There is not a static test to determine whether a deprivation is sufficiently serious to run afoul of the Eighth Amendment; the particular conditions alleged must be evaluated in light of modern standards of decency. *Farmer*, 511 U.S. at 832. Eighth Amendment conditions-of-confinement claims must meet a subjective and objective requirement. *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013). The subjective claim focuses on the defendant's motive for his conduct and the objective on the conduct's effect. *Wright v. Goord*, 554 F.3d 255, 268 (2d Cir. 2009).

Objectively, the claim must allege that the deprivation the inmate suffered was "sufficiently serious and he was denied the minimal civilized measure of life's necessities." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1996). To meet the objective element, an inmate must show that the

conditions, alone or in combination, "posed an unreasonable risk of serious damage to his health." *Walker*, 717 F.3d, at 125. When an inmate's "basic human needs," such as food, clothing, medical care, and safe and sanitary living conditions are not met, the prison officials violate his constitutional rights. *Id.*

Subjectively, the plaintiff must show that the defendant imposed the conditions with "deliberate indifference." *Wilson v. Seiter,* 501 U.S. 294, 297 (1991). The plaintiff must also show that the defendant acted with "more than mere negligence." *Farmer*, 511 U.S. at 835. Eighth Amendment conditions-of-confinement claims require the plaintiff to name defendants and state their "actual knowledge of the inhuman conditions" to show their personal involvement. *Gaston v. Coughlin*, 249 F.3d 156, 166 (2d Cir. 2001). The prison officials accused must have known of and disregarded an excessive risk to inmate health or safety. *Jabbar v. Fischer*, 683 F.3d 54, 57 (2d Cir. 2012).

2.   Analysis

i.   Defendant Sacco

Plaintiff alleges that defendant Sacco "told doctors to hold plaintiff in [a] strip cell [at Great Meadow] for months." Dkt. No. 1 at 29. While confined in the strip cell, he allegedly did not have access to any clothes

aside from a smock, spent twenty-four hours per day in the cell, and was not permitted to shower. *Id.* at 28. In addition, plaintiff alleges that he developed a rash, was sexually assaulted by staff, "swallowed [a] 24[-]inch light bulb, wires, batteries and paper clips" and was not provided any medical treatment until "he stopped bleeding from [his] rectum," and was assaulted by staff in retaliation for "writ[ing] complaints on them." *Id.*

Accepting the above allegations as true, I find that they suffice at this procedural juncture to satisfy the objective element of an Eighth Amendment conditions-of-confinement claim. *See, e.g., Inesti v. Hicks*, No. 11-CV-2596, 2012 WL 2362626, at *19 (S.D.N.Y. June 22, 2012) (finding the plaintiff's allegations that, *inter alia*, he spent ninety days in a special housing unit and the defendants "den[ied] him food, and perhaps water, showers, exercise or recreation, medical treatment and mental health treatment" were sufficient to survive the defendants' motion to dismiss). In addition, while I acknowledge that this is less clear, I find that the complaint contains sufficient allegations to plausibly suggest that defendant Sacco acted with the requisite deliberate indifference when allegedly instructing that plaintiff be housed in the strip cell. Plaintiff specifically alleges that someone informed him that defendant Sacco gave the directive for plaintiff to be housed in a strip cell "for months." Dkt. No. 1

at 29. Although there are no allegations to suggest that defendant Sacco worked at Great Meadow or otherwise visited plaintiff while he was confined in the strip cell, which would otherwise suggest that defendant Sacco was aware of the conditions of the strip cell, the court is reminded "that the submissions of a *pro se* litigant must be construed liberally and interpreted to raise the strongest arguments that they *suggest*." *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (quotation marks omitted) (emphasis in original). In light of the other allegations regarding defendant Sacco that suggest he acted with reckless disregard to plaintiff's health and safety, including that he arranged for plaintiff's transfer out of the CNYPC and into Great Meadow knowing that he would attempt suicide, I am compelled to conclude that plaintiff's allegation that he was confined in the strip cell at Great Meadow under deplorable conditions "for months" on defendant Sacco's instruction is sufficient to satisfy the subjective element of the Eighth Amendment claim. Whether plaintiff will be able to adduce any evidence of defendant Sacco's alleged reckless disregard for his health and safety sufficient to create an issue of fact on a motion for summary judgment is another question, which I need not, and do not, decide here.

Accordingly, I recommend that defendants' motion to dismiss the conditions-of-confinement claim asserted against defendant Sacco be denied.

ii.    <u>Defendants Bosco, Connlley, and Boyer</u>

The plaintiff alleges that, during his confinement in Ward 601 at the CNYPC, he was prohibited from (1) wearing shoes; (2) talking to other residents; (3) possessing any additional clothing other than what they are wearing when they arrive; (4) leaving the door to their room open; (5) possessing or requesting a pen, paper, magazine, or book; (6) accessing a telephone; (7) participating in treatment programs or religious services; and (8) leaving their room at any time. Dkt. No.1 at 13-14. In addition, plaintiff contends that, while he was housed in Ward 601, he was precluded from using the bathroom as needed and required to sleep on a mattress on the floor. *Id.* at 18. According to plaintiff, the policies governing Ward 601 were promulgated by defendants Bosco and Connlley, and he was housed in that ward at the direction of defendant Boyer. *Id.* at 9-10, 15.

Considered together, the allegations regarding the conditions of confinement in Ward 601 are sufficient to plausibly suggest that plaintiff's health and safety were at risk. In particular, I am persuaded by the

28

allegations that he was not permitted to use the bathroom as needed, was permitted access only to the clothing he was wearing upon entering the ward, and remained completely isolated during his confinement. Dkt. No. 1 at 13-14, 18. I note, moreover, that plaintiff alleges that he did not have a sink or toilet, and was given only a foam mattress, two sheets, and a blanket. Dkt. No. 37-1 at 18-19. In total, plaintiff spent approximately thirty-two days in Ward 601.[5] See Dkt. No. 1 at 12, 17-18, 20, 31, 33. Although the conditions of plaintiff's confinement in Ward 601 are certainly not the worst an inmate-plaintiff has alleged in support of an Eighth Amendment conditions-of-confinement claim, I find they are sufficient to survive a motion dismiss pursuant to Rule 12(b)(6). *See, e.g. Deblasio v. Rock*, No. 09-CV-1077, 2011 WL 4478515, at *16 (N.D.N.Y. Sept. 26, 2011) (McAvoy, J.) (finding that if the plaintiff's allegation regarding the denial of access to a bathroom for five hours was credited, a reasonable factfinder could find in favor of the plaintiff on his conditions-of-confinement claim).

Turning to the subjective element, again, liberally construing and taking into consideration all of the allegations in plaintiff's complaint, I am

---

[5]     Plaintiff arrived at the CNYPC on September 23, 2011, and was housed immediately in Ward 601. Dkt. No. 12. On October 6, 2011, he was transferred to Ward 302. *Id.* at 17. Plaintiff was transferred back to Ward 601 on October 24, 2011, until he was transferred again on November 1, 2011. *Id.* at 18, 20. Although plaintiff was transferred out of the CNYPC in December 2011, he arrived back at the CNYPC and was housed in Ward 601 on December 9, 2013. *Id.* at 25-26, 31. On December 16, 2013, plaintiff was transferred to Ward 501. *Id.* at 33.

persuaded that they plausibly suggest that defendants Bosco, Connlley, and Boyer acted with deliberate indifference to plaintiff's health and safety. With respect to defendants Bosco and Connlley, plaintiff alleges that they created and implemented the offending policies, Dkt. No. 1 at 12-13, from which a reasonable inference could be drawn at this early stage that they knew of the risks created by the conditions of Ward 601. As to defendant Boyer, plaintiff alleges that he gave the order to house plaintiff in Ward 601 upon his arrival back at the CNYPC in September 2011. *Id.* at 15. Accordingly, I find that the complaint contains sufficient allegations to plausibly suggest that defendants Bosco, Connley, and Boyer were at least aware of the conditions in Ward 601. *See Phelps v. Kapnolas*, 308 F.3d 180, 185 (2d Cir. 2002) ("By alleging that prison officials knew that the diet was inadequate and likely to inflict pain and suffering, [the plaintiff] has also sufficiently pleaded the subjective element.").

For all of these reasons, I recommend that defendants' motion to dismiss plaintiff's Eighth Amendment conditions-of-confinement claim regarding the conditions of Ward 601 against defendants Bosco, Connlley, and Boyer be denied.

E.     Eighth Amendment Deliberate Medical Indifference

Construed liberally, plaintiff's complaint alleges that defendant Berkinhimer violated his Eighth Amendment rights by failing to treat him for a rash, hearing voices, seeing visions, feeling suicidal, and his suicide attempts. Dkt. No. 1 at 31-34.

1.     Legal Standard

As with any other type of Eighth Amendment cause of action, a medical indifference claim alleging that prison officials have violated an inmate's Eighth Amendment rights must satisfy both objective and subjective requirements. *Wright*, 554 F.3d at 268. To satisfy the objective requirement, the alleged deprivation must be "sufficiently serious." *Farmer*, 511 U.S. at 844. Factors informing this inquiry include, "whether a reasonable doctor or patient would find it important and worthy of comment, whether the condition significantly affects an individual's daily activities, and whether it causes chronic and substantial pain." *Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006) (quotation marks and alterations omitted). When evaluating the objective element of such a claim, a court should examine the seriousness of the deprivation, and whether the deprivation may cause death, degeneration, or extreme pain. *Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011) (quotation marks

omitted). Importantly, "it's the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract, that is relevant for Eighth Amendment purposes." *Smith v. Carpenter*, 316 F.3d 178, 186 (2d Cir. 2003)

Addressing the objective prong of the governing test, the Second Circuit has said that

> [d]etermining whether a deprivation is an objectively serious deprivation entails two inquiries. The first inquiry is whether the prisoner was actually deprived of adequate medical care. As the Supreme Court has noted, the prison official's duty is only to provide reasonable medical care . . . . Second, the objective test asks whether the inadequacy in medical care is sufficiently serious. This inquiry requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner.

*Salahuddin*, 467 F.3d at 279-80 (citations omitted).

To satisfy the subjective requirement, a plaintiff must demonstrate that the defendant had "the necessary level of culpability, shown by actions characterized by 'wantonness.'" *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999). "In medical-treatment cases . . ., the official's state of mind need not reach the level of knowing and purposeful infliction of harm; it suffices if the plaintiff proves that the official acted with deliberate

indifference to inmate health." *Salahuddin*, 467 F.3d at 280. "Deliberate indifference," in a constitutional sense, "requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." *Id.* (citing *Farmer*, 511 U.S. at 837); *see also Leach v. Dufrain*, 103 F. Supp. 2d 542, 546 (N.D.N.Y. 2000) (Kahn, J.); *Waldo v. Goord,* No. 97-CV-1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J., *adopting report and recommendation by* Homer, M.J.). "Deliberate indifference is a mental state equivalent to subjective recklessness, as the term is used in criminal law." *Salahuddin*, 467 F.3d at 280 (citing *Farmer*, 511 U.S. at 839-40).

> 2.    Analysis

The allegations in plaintiff's complaint giving rise to this cause of action are as follows. On December 19, 2011, defendants Berkinhimer and Sacco visited with plaintiff while he was housed on Ward 202. Dkt. No. 1 at 25. At that time, the two defendants "acted very hostile towards the plaintiff" and "went on to explain to the plaintiff that if he wanted to kill himself th[e]n he would have his chance for plaintiff would be discharged from the hospital soon." *Id.* The next morning, plaintiff was transferred to Great Meadow and, on January 10, 2012, attempted suicide while confined in that facility. *Id.* at 27.

In December 2013, although defendant Berkinhimer placed him on a finger-food diet and restricted his access to sharp objects after determining he was suicidal, defendant did not treat a rash plaintiff had "for almost two weeks." Dkt. No. 1 at 30-32. In addition, on December 17, 2013, defendant Berkinhimer told plaintiff he "just had to deal with [hearing voices, having visions, and feeling suicidal] because he was not going to give the plaintiff any treatment." *Id.* at 33. Plaintiff alleges that he thereafter told defendant Berkinhimer that he intended to commit suicide again, but Berkinhimer only responded by indicating to plaintiff that he had already prescribed medication to help him sleep. *Id.* at 33-34.

After plaintiff's next suicide attempt and his subsequent stay in an outside hospital, he returned to the CNYPC and was placed in isolation room on or about January 3, 2014. *Id.* Defendant Berkinhimer allegedly visited plaintiff in his room the next day and "leaned over the plaintiff stating 'You tried to kill yourself on my ward. I'm going to the team meeting this morning, and we are going to discuss this little tantrum of yours, but I'm telling you right now, I'm moving you to the second floor th[e]n I'm discharging your ass.'" *Id.* at 35. Plaintiff attempted suicide again on January 10, 2014, apparently while he remained held in the isolation room at the CNYPC. *Id.* at 36.

Accepting the above-described allegations as true, I find that they are sufficient to satisfy the pleading requirements under Rule 8 and *Iqbal*. Although a failure to treat a rash is generally not sufficiently serious to give rise to a constitutional medical indifference claim, *see, e.g., Lewal v. Wiley*, 29 F. App'x 26, 29 (2d Cir. 2002) (finding that the plaintiff did not allege the existence of a serious medical condition when he complained about a persistent rash), plaintiff in this matter contends that his rash "covered his entire body" and was "leaking a yellowish fluid." Dkt. No. 1 at 28. At this early stage, I find that plaintiff's condition, as alleged by him, was sufficiently serious to satisfy the objective element of an Eighth Amendment claim. *See Harrison v. Barkley*, 219 F.3d 132, 137 (2d Cir. 2000) (finding that a tooth cavity "presents a 'serious medical need'" in light of its inclination to "degenerate with increasingly serious implications if neglected over sufficient time"). Turning to plaintiff's depression and suicidal tendencies, they are, of course, sufficiently serious and the allegations in the complaint plausibly suggest that his condition is chronic and affects his daily existence. *See, e.g., Zimmerman v. Burge*, No. 06-CV-0176, 2009 WL 9054936, at *6 (N.D.N.Y. Apr. 20, 2009) (Lowe, M.J.) (finding that depression is a sufficiently serious medical condition when it is not self-diagnosed); *accord, Barrow v. Buren*, No. 12-CV-1268, 2015

WL 417084, at *3 (N.D.N.Y. Jan. 30, 2015) (D'Agostino, J.) (finding that the plaintiff's allegation that he had been diagnosed with "Major Depressive Disorder" was sufficient to satisfy the objective element of a deliberate medical indifference claim). Finally, plaintiff's contentions regarding defendant Berkinhimer's attitude towards plaintiff during his stay at the CNYPC both in 2011 and again in late 2013 – early 2014 plausibly suggest that Berkinhimer acted with deliberate indifference in discharging plaintiff from the CNYPC in 2011 and allegedly failing to provide plaintiff with adequate treatment between December 2013 and January 2014. Accordingly, I recommend that defendants' motion to dismiss plaintiff's deliberate medical indifference claim asserted against defendant Berkinhimer be denied.

IV.    SUMMARY AND RECOMMENDATION

Although defendants have sought dismissal of all of plaintiff's remaining claims in this action, I find that the allegations contained in plaintiff's complaint plausibly suggest the existence of cognizable constitutional causes of action. Accordingly, it is hereby respectfully

RECOMMENDED that defendants' motion to dismiss plaintiff's complaint (Dkt. No. 26) be DENIED.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 86 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

Dated:     February 16, 2016
           Syracuse, New York

David E. Peebles
U.S. Magistrate Judge

Not Reported in F.Supp.2d, 2003 WL 22299359 (N.D.N.Y.)

(Cite as: 2003 WL 22299359 (N.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Troy GARRETT, Plaintiff,
v.
Edward REYNOLDS, Superintendent, Mohawk Corr.
Facility; James A. Mance, Deputy Superintendent of
Programs; John O'Reilly,[FN1] Deputy Superintendent; J.
Burge, First Deputy; M. Maher, DSS; R. Centore,
Correctional Officer, Defendants.

> FN1. In this case, the defendants maintain and the docket confirms that defendant John O'Reilly has never been served. Service must be made upon a defendant within 120 days of filing the complaint or any claims against that defendant will be dismissed. See Fed.R.Civ.P. 4(m). The original complaint, which named O'Reilly, was filed on November 26, 1999, and the amended complaint was filed on July 13, 2001. However, O'Reilly was never served. Since this defendant has never been served, this court lacks jurisdiction over him, and this court recommends the dismissal of this defendant.

No. Civ.9:99CV2065NAMGLS.

Oct. 7, 2003.
Troy Garrett, Peekskill, NY, Plaintiff, pro se.

Hon. Eliot Spitzer, Attorney General State of New York, Syracuse, NY, for the Defendants.

Maria Moran, Asst. Attorney General, of counsel.

*REPORT-RECOMMENDATION*

SHARPE, Magistrate J.
        I. *Introduction* [FN2]
        FN2. This matter was referred to the undersigned for a Report-Recommendation by the Hon.

Norman A. Mordue, United States District Judge, pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.3(c).

**\*1** Plaintiff, *pro se* Troy Garrett filed an action under 42 U.S.C. § 1983 claiming that the defendants violated his civil rights when they retaliated against him for his activities as an IGRC representative by subjecting him to verbal harassment, physical abuse and subsequently, a transfer. Garrett also claims that the supervisory defendants failed to properly investigate his complaints and failed to train/supervise their employees. This court recommends denying the motion for summary judgment in part and granting it in part.

        II. *Procedural History*

        On July 13, 2001, Garrett filed an amended complaint against the defendants claiming that they violated his civil rights under the First, Sixth Eighth, and Fourteenth Amendments.[FN3] On September 28, 2001, the defendants filed a motion for summary judgment. On January 18, 2002, this court issued an order informing Garrett of his obligation to file a response and extended his time to respond for thirty days. On April 24, 2002, this court granted an additional sixty days to respond to the defendants' motion. Despite having been given multiple opportunities to respond, Garrett has failed to file a response.

> FN3. Although Garrett claims to be raising violations under the Sixth, Eighth, and Fourteenth Amendments, the only viable claim based on this court's interpretation of the complaint is under the First Amendment for retaliation.

        III. *Facts* [FN4]

> FN4. The facts are taken from the defendants' statement of undisputed material facts since Garrett failed to file a response.

On June 17, 1999, Garrett filed a grievance against

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22299359 (N.D.N.Y.)

(Cite as: 2003 WL 22299359 (N.D.N.Y.))

Officer Kelley for verbal harassment.[FN5] This grievance was denied by the Central Office Review Committee (CORC) on July 21, 1999. On March 19, 2000, Garrett filed a grievance claiming that defendant Burge used intimidation tactics. Defendant Reynolds investigated the grievance and it was denied based on a finding that no harassment occurred. Garrett appealed to the CORC and they denied the grievance on April 5, 2000. On April 10, 2000, defendant Centore wrote a misbehavior report against Garrett for creating a disturbance and employee harassment. On April 12, 2000, Lieutenant Manell presided over Garrett's Tier 2 disciplinary hearing and he was found guilty of both charges. He was given a 21 day recreation penalty, and loss of packages and commissary. However, his recreation penalty was suspended and deferred. Garrett appealed the determination and it was affirmed on April 19, 2000.

FN5. Not a party in this suit.

On April 17, 2000, Garrett filed a grievance against Centore for harassment. Burge denied his grievance on May 4, 2000, and subsequently, the CORC denied it. On May 12, 2000, Garrett sent a letter to Burge concerning further harassment by Centore. On May 16, 2000, Garrett filed another grievance against Centore for harassment. His grievance was denied on May 26, 2000. After Garrett appealed, his grievance was again denied by the CORC. On June 22, 2000, the Superintendent's Office received a letter from Garrett alleging that Centore threw a piece of paper with a picture of a plunger and the words "always gets the job done" into his cell. He wrote a grievance against Centore for harassment due to the paper that he threw into his cell. Burge forwarded the grievance to the CORC on August 10, 2000. The CORC accepted the grievance on August 30, 2000, in order to investigate.

**\*2** On June 23, 2000, the Inspector General's Office interviewed Garrett at the Mohawk Correctional Facility regarding his complaints of Centore. That same day, Captain Naughton filed an administrative segregation recommendation. On June 29, 2000, an administrative segregation hearing was held. On July 14, 2000, Garrett was transferred [FN6] to the Mid-State Correctional Facility.

FN6. The defendants suggest that Garrett has failed to exhaust his administrative remedies concerning his transfer. They claim that he agreed to the transfer and participated in the administrative hearing which resulted in his transfer. The issue of transfer will not be addressed in this Report-Recommendation because the court has insufficient information to determine whether he exhausted his remedies.

Finally, Garrett filed a claim alleging that his property was lost or damaged on October 8, 1999. However, he was paid $75.00 for this claim and he signed a release on December 13, 1999.

IV. *Discussion*

A. *Legal Standard*

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986); *accord F.D.I.C. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994). The moving party has the burden of demonstrating that there is no genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986); *Thomas v. Roach,* 165 F.3d 137, 142 (2d Cir.1999). "When a motion for summary judgment is made and supported ... an adverse party may not rest upon the mere allegations or denials of the ... pleading, but the adverse party's response, by affidavits or as otherwise provided in [Federal Rule of Civil Procedure 56(e) ], must set forth specific facts showing that there is a genuine issue for trial." *St. Pierre v. Dyer,* 208 F.3d 394, 404 (2d Cir.2000). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment[.]" *Rexford Holdings, Inc. v. Biderman,* 21 F.3d 522, 525 (2d Cir.1994)(alternation in original) (citation omitted). However, it is well settled that on a motion for summary judgment, the court must construe the evidence in the light most favorable to the non-moving party. *Tenenbaum v. Williams,* 193 F.3d 581, 593 (2d Cir.1999).

Furthermore, in a *pro se* case, the court must view the submissions by a more lenient standard than that accorded

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22299359 (N.D.N.Y.)

(Cite as: 2003 WL 22299359 (N.D.N.Y.))

to "formal pleadings drafted by lawyers." *Haines v. Kerner,* 404 U .S. 519, 520 (1972); *see Estelle v. Gamble,* 429 U.S. 97, 106 (1976); *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)(a court is to read a *pro se* party's "supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest"). Indeed, the Second Circuit has stated that "[i]mplicit in the right to self-representation is an obligation on the part of the court to make reasonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training." *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983). Any ambiguities and inferences drawn from the facts must be viewed in the light most favorable to the non-moving party. *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990); *see LaFond v. General Physics Serv. Corp.,* 50 F.3d 165, 171 (2d Cir.1995).

**\*3** This liberal standard, however, does not excuse a *pro se* litigant from following the procedural formalities of summary judgment. *Showers v. Eastmond,* 00 CIV. 3725, 2001 WL 527484, at \*2 (S.D.N.Y. May 16, 2001). More specifically, Local Rule 7.1(a)(3) of this court specifically provides that "any facts set forth in the [moving party's] Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party." Local Rule 7.1(a)(3) further requires that the "non-movant shall file a Statement of Material Fact which mirrors the movant's statement in matching numbered paragraphs and which set forth a specific reference to the record where the material fact is alleged to arise." The courts of the Northern District have adhered to a strict application of Local Rule 7.1(a)(3)'s requirement on summary judgment motions. *Giguere v. Racicot,* 00-CV-1178, 2002 WL 368534, at \*2 (N.D.N.Y. March 1, 2002)(interalia citing *Bundy Am. Corp. v. K-Z Rental Leasing, Inc.,* 00-CV-260, 2001 WL 237218, at \*1 (N.D.N.Y. March 9, 2001)).

Furthermore, this Circuit adheres to the view that nothing in Rule 56 imposes an obligation on the court to conduct a search and independent review of the record to find proof of a factual dispute. *Amnesty America v. Town of West Hartford,* 288 F.3d 467, 470 (2d Cir.2002). As long as the local rules impose a requirement that parties provide specific record citations in support of their statement of material facts, the court may grant summary judgment on that basis. *Id.* at 470-71.

In this case, Garrett did not file a response to the motion for summary judgment. Consequently, this court will accept the properly supported facts contained in the defendants' 7.1 Statement (*Dkt. No. 49* ) as true for purposes of this motion.[FN7] With this standard in mind, the court now turns to the sufficiency of Garrett's claims.

> FN7. The court notes that this does not apply to the various conclusions of law contained in the defendants' 7.1 Statement.

B. *Eleventh Amendment*

In Garrett's complaint, he raises claims against the defendants in their official and individual capacities. The Eleventh Amendment provides that: "[t]he judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. Amend. XI. Although the Amendment does not specifically prohibit suits against a state by its own citizens, the Supreme Court has consistently applied that immunity to such cases. *See Burnette v. Carothers,* 192 F.3d 52, 57 (2d Cir.1999)(citing *Edelman v. Jordan,* 415 U.S. 651, 662-63 (1974)). Moreover, it is well established that Eleventh Amendment immunity applies not only when a state is a named defendant, but when liability must be paid from state coffers. *See New York City Health & Hosp. Corp. v. Perales,* 50 F.3d 129, 134 (2d Cir.1995)(citing *Edelman,* 415 U .S. at 665); *Dawkins v. State of New York,* 93-CV-1298, 1996 WL 156764, at \*2 (N.D.N.Y. Mar. 28, 1996).

**\*4** In this case, Garrett raises claims against the defendants in their official and individual capacities. Since the Eleventh Amendment bars official capacity claims against these state officers, this court recommends dismissal of Garrett's claims against the defendants in their official capacity.

C. *Retaliation*

In this case, Garrett claims that during the course of his appointment as an IGRC representative, he has been subjected to repeated acts of harassment, both verbal and

Not Reported in F.Supp.2d, 2003 WL 22299359 (N.D.N.Y.)

(Cite as: 2003 WL 22299359 (N.D.N.Y.))

physical, threatened with physical assaults, placed into disciplinary confinement in the SHU, and transferred.[FN8] The Second Circuit has held that retaliation against a prisoner for pursuing a grievance is actionable under § 1983. *Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir.1996). Moreover, the Second Circuit has recognized both the near inevitability of decisions and actions by prison officials to which prisoners will take exception and the ease with which claims of retaliation may be fabricated. Thus, prisoners' claims of retaliation are examined with skepticism and particular care. *See Flaherty v. Coughlin,* 713 F.2d 10 (2d Cir.1983).

> FN8. This case turns on the interpretation of the complaint. Garret's complaint is not a model of clarity and as noted, he has failed to file a response to the motion for summary judgment. Nonetheless, a careful reading of Garrett's opening paragraph under the title "Facts" compels this court to interpret this complaint as one claiming retaliation for his activities and status as an IGRC representative.

In order for a plaintiff to prevail on a First Amendment retaliation claim, a plaintiff must advance non-conclusory allegations establishing: (1) that the speech or conduct at issue was protected; (2) that the defendant took adverse action against the plaintiff; and, (3) that there was a causal connection between the protected speech and the adverse action. *See Dawes v. Walker,*[FN9] 239 F.3d 489, 492 (2d Cir.2001) (citation omitted) *overruled on other grounds, Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002). If Garrett makes these showings, DOCS may evade liability if it demonstrates that it would have disciplined or transferred him " 'even in the absence of the protected conduct." ' *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003) (citations omitted).

> FN9. Dawes' complaint was dismissed pursuant to Fed.R.Civ.P. 12(b)(6).

An inmate has a constitutional right to be protected from retaliation based upon his activities as an IGRC representative. *Alnutt v. Cleary,* 913 F.Supp. 160, 170 (W.D.N.Y.1996). However, a claim brought under "42 U.S.C. § 1983 is not designed to rectify harassment or verbal abuse." *Gill v. Hoadley,* 261 F.Supp.2d 113, 129

(N.D.N.Y.2003)(citing *Alnutt,* 913 F.Supp at 165-66)). Ordinarily, a claim for verbal harassment is not actionable under 42 U.S.C. § 1983. *Aziz Zarif Shabazz v. Picco,* 994 F.Supp. 460, 474 (S.D.N.Y.1998). Moreover, "verbal harassment or profanity alone, unaccompanied by an injury no matter how inappropriate, unprofessional, or reprehensible it might seem, does not constitute the violation of any federally protected right and therefore is not actionable under 42 U.S.C. § 1983." *Aziz Zarif Shabazz,* 994 F.Supp. at 474.

In this case, Garrett claims that defendant Centore harassed him for his activities as an IGRC representative. Garrett also claims that he was removed as an IGRC representative when he was transferred. In addition, Garrett claims that defendants Reynolds, Mance, Burger and Maher failed to properly investigate his allegations against Centore. Garrett claims that these defendants failed to properly investigate his claims in retaliation for his activities as an IGRC representative.

**\*5** More specifically, Garrett claims that Reynolds and Mance recalled IGRC passes for one day in order to interfere with an investigation inquiry into a correctional officer's conduct involving inmates who were left in the yard during inclement weather. Finally, Garrett claims that his property was destroyed while he was in the SHU.[FN10] Garrett filed grievances against Centore in April, May, and June of 2000. One of his complaints involved Centore throwing a folded piece of paper into his cell which had a picture of a plunger with the words "always gets the job done" on it. On June 23, 2000, he was placed in administrative segregation in the SHU. Three weeks later he was transferred.[FN11]

> FN10. However, the defendants provide the court with documents which show that he was paid $75.00 in settlement of this claim.

> FN11. The defendants maintain that Garrett failed to exhaust this claim. At this juncture, it is unclear whether or not he exhausted this claim. As such, this court cannot, as a matter of law, recommend dismissal because the court has insufficient information to determine this issue.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22299359 (N.D.N.Y.)

(Cite as: 2003 WL 22299359 (N.D.N.Y.))

Viewing the facts in the light most favorable to Garrett, the non-moving party, this court cannot, as a matter of law, find that Garrett fails to state a claim for which relief can be granted. He claims that he was retaliated against for his activities as an IGRC representative. As noted, verbal harassment alone will not constitute a violation of a prisoner's constitutional rights but in this case, it appears that he was transferred for his activities as an IGRC representative. The defendants rely on numerous grievances which were denied by the CORC to show that their actions were proper. They also claim that Garrett has failed to show injury, however, at this juncture of the litigation with virtually no discovery in this case, this court cannot recommend dismissal as a matter of law.

D. *Personal Involvement*

It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995)(*citation omitted* ). Since there is no respondeat superior liability, the defendant must be shown to have personal involvement in the alleged violation of rights. *Al- Jundi v. Estate of Rockefeller,* 885 F.2d 1060, 1065 (2d Cir.1989). Supervisory officials cannot be held liable under § 1983 solely for the acts of their subordinates. *See Monell v. Department of Social Serv.,* 436 U.S. 658, 690-695 (2d Cir.1978). However, a supervisory official can be held liable for constitutional violations if he or she: (1) directly participated in the violation; (2) failed to remedy the violation after learning of it through a report or appeal; (3) created a custom or policy fostering the violation after learning of it; or (4) was grossly negligent in supervising subordinates who caused the violation. *Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997) (citing *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986)).

Garrett contends that defendants Reynolds and Mance allowed staff members under their supervision to violate his rights. More specifically, Mance refused to properly investigate Garrett's complaints. Garrett also claims that defendant Burge refused to grant his request for redress against defendant Centore. Finally, Garrett claims that the defendants collectively failed to properly train and supervise their employees.

**\*6** The defendants contend that the claims against the supervisory defendants should be dismissed for lack of personal involvement. However, this court finds this contention without merit since it appears that all of the defendants were involved in the investigation process of Garrett's complaint and he accuses all of them of continuing the alleged constitutional violation by failing to properly investigate the grievances he filed. Accordingly, this court recommends denying the defendants' motion for summary judgment based on the lack of personal involvement.

WHEREFORE, for the foregoing reasons, it is hereby

RECOMMENDED, that Garrett's claims against the defendants in their official capacity under the Eleventh Amendment should be dismissed since these claims are barred; and it is further

RECOMMENDED, that defendant O'Reilly be dismissed since he was never served; and it is further

RECOMMENDED, that the defendants' motion for summary judgment be denied in all other respects; and it is further

ORDERED, that the Clerk of the Court serve a copy of this Report-Recommendation upon the parties by regular mail.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court within TEN days. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,2003.

Garrett v. Reynolds
Not Reported in F.Supp.2d, 2003 WL 22299359 (N.D.N.Y.)
END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22299359 (N.D.N.Y.)

(Cite as: 2003 WL 22299359 (N.D.N.Y.))

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Vazquez v. Southside United Housing Development Fund Corp., Not Reported in...

2009 WL 2596490

2009 WL 2596490
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

Esther VAZQUEZ, Plaintiff,

v.

SOUTHSIDE UNITED HOUSING
DEVELOPMENT FUND CORP., and Los
Sures Management Company, Defendants.

No. 06–CV–5997 (NGG)(LB).
|
Aug. 21, 2009.

**Attorneys and Law Firms**

Esther Vasquez, Kissimmee, FL, pro se.

Deborah S.K. Jagoda, Jason Steven Aschenbrand, Grissel Seijo, Winston & Strawn LLP, New York, NY, for Defendants.

**MEMORANDUM & ORDER**

NICHOLAS G. GARAUFIS, District Judge.

**\*1** *Pro se* plaintiff Esther Vazquez ("Plaintiff" or "Vazquez") asserts claims of employment discrimination on the basis of race, national origin, age, and disability under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e to 2000e–17, the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621–634, and the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12112–12117, against her former employer, defendants Southside United Housing Development Fund Corporation ("SUHDFC") and Los Sures Management Company ("Los Sures") (collectively, "Defendants" or "Southside").[1] (*See* Docket Entry # 1, Complaint.) Plaintiff alleges that she suffered unlawful termination, retaliation, and a lack of accommodation for her disability as a result of the Defendants' discrimination. (*Id* . ¶ 4.) The court further construes Plaintiff's allegations to assert a hostile work environment claim. (*See* Compl. ¶ 8 & Attachment (citing "harassment" and "threat[s]").)

Defendants have moved for summary judgment on all claims. (*See* Docket Entry # 25, Defendants' Motion for Summary Judgment; Docket Entry # 28, Defendants' Memorandum of Law in Support of Motion for Summary Judgment ("Def.Mem.").) For the reasons set forth below, Defendants' Motion is GRANTED in its entirety.

**I. BACKGROUND**

The following facts are undisputed unless otherwise noted.[2]

For thirteen years, Vazquez worked for Southside as a Property Manager, overseeing operations in its low to middle income housing properties in Williamsburg, Brooklyn. (Def. 56.1 Stmt. ¶¶ 4, 37; Docket Entry # 23, Affidavit in Opposition by Esther Vazquez, dated February 13, 2008 ("Vazquez Aff.") ¶ 2.) Vazquez is of Puerto Rican national origin, and was 64 years old at the time of her termination in November 2005. (Compl. ¶ 7 & Attachment *see* Vazquez Aff. ¶ 7; *see also* Docket Entry # 25 (Attachment 5), Affirmation of Jason Aschenbrand, dated December 21, 2007 ("Aschenbrand Aff."), Ex. L, New York State Division of Human Rights Charge of Discrimination Form dated June 6, 2006.)

Southside hired Vazquez on or about July 9, 1992. (Def. 56.1 Stmt. ¶ 4; Docket Entry # 25 (Attachment 1) Affidavit of David Pagan, dated December 12, 2007 ("Pagan Aff.") ¶ 5.) Throughout Vazquez's tenure, David Pagan served as the Administrator for Southside. (Def. 56.1 Stmt. ¶ 5; Pagan Aff. ¶ 1.) Plaintiffs immediate supervisor was Southside's Housing Director. (Def. 56.1 Stmt. ¶ 6; Pagan Aff. ¶ 7.) The position was originally held by Ana Bonano ("Bonano"), from approximately 1992–2004. (*Id.*) Bonano was succeeded by Rosemarie Pizarro ("Pizarro"), who served in the position for ten months in 2004.(*Id.*) Beginning in November 2004, Yanet Ciprian ("Ciprian") replaced Pizarro as Housing Director. (*Id.; see also* Docket Entry # 25 (Attachments 7–8), Deposition of Esther Vazquez, dated June 29, 2007 ("Vazquez Dep.") 42.)

**\*2** Plaintiff's claims center on allegations of discriminatory conduct by Ciprian from November 2004 through February 2005. Plaintiff asserts that she was "constantly harassed" by Ciprian, who pressured her "to retire so that she can replace me with someone who is younger, smarter and that could follow instructions in a faster manner."(Vazquez Aff. ¶ 3.) According to Vazquez, Ciprian called her "a stupid old woman, a [waste] of time and too old to perform my job duties," and told Vazquez that once she left Ciprian would "never hire another Puerto Rican" again.[3] (*Id* .)

Vazquez v. Southside United Housing Development Fund Corp., Not Reported in...

2009 WL 2596490

From about October 22, 2004 until November 22, 2004, Plaintiff took a personal leave to care for her sister. (Def. 56.1 Stmt. ¶ 13.) Southside approved the leave. (*Id.*) While Plaintiff was away on leave, Ciprian took over as Housing Director. (*See* Def. 56.1 Stmt. ¶ 6; Pagan Aff. ¶ 7.) When Plaintiff returned, Ciprian issued a memorandum admonishing her for "many discrepancies with the tenant's files such as expired leases, incomplete or missing recertifications, missing files or documentation, Leases given to tenants without signature from the prior Directors or Mr. Pagan" in the files for two properties. (Aschenbrand Aff. Ex. D, Ciprian Memorandum dated November 30, 2004 ("November Memo").) Ciprian immediately removed Plaintiff from her duties managing five properties. (*Id.*) Ciprian informed Plaintiff that her "new assignment is to answer all repair calls, maintain a repair log of all complaints, issue work orders & distribute to the supers & keep copies of work orders by building."(*Id.*)

Plaintiff concedes that the November Memo reflected accurate criticisms. Plaintiff testified that at the time, "[a]ll the paperwork was all over" and "[t]here were missing files" due to revisions undertaken by Ciprian's predecessor, Pizarro. (Vazquez Dep. 269–70.) Plaintiff believes that the change in her responsibilities instituted by the November Memo was based upon her age and alleged disability since Ciprian "was calling me an old lady, that I don't know nothing, that my brains are so little that I can't understand anything."(*Id.* at 277.)Plaintiff does not assert that this change in responsibilities was connected to her race or national origin. (*Id.* at 278 (Q: "What connection does [the change in responsibilities] have to your race, your being Hispanic?"A: "I don't see the connection.").) The change in Plaintiff's responsibilities did not alter her salary or title. (*Id.* at 279.)

At some point, Vazquez submitted a statement in support of Ana Bonano, one of Ciprian's predecessors, in a proceeding ostensibly against Southside. (*See id.* at 67.)Around December 2004, Vazquez claims that Ciprian called her a "traitor" because she had supported Bonano in that proceeding. (*Id.*) Vazquez stated that Ciprian said "Mr. Pagan should lay you off" because she was a "traitor." (*Id.*) At her deposition, Vazquez could not identify any adverse actions taken in retaliation against her other than the offensive comments by Ciprian. (*See id.* at 69.)

**\*3** Sometime in December 2004, Vazquez asserts that Ciprian also told her: "You fucking old lady, I'm going to

do the impossible for you to get the hell out of here."(*Id.* at 108.)Vazquez asserts that Ciprian harassed her "almost every day" with offensive comments, such as telling Vazquez that she was "too old to be working there, that they need young blood, new people, young people."(*Id.* at 53.)Vazquez alleges generally that Ciprian "called [her] a whole lot of name[s]," including a "stupid Puerto Rican" and "a fucking spick." (*Id.* at 72.)Vazquez claims that Ciprian "said she would not hire any other Puerto Rican because they're all stupid."(*Id.* at 107.)

On January 25, 2005, Ciprian issued another memorandum to Vazquez, reiterating her new responsibilities and reprimanding Vazquez for excessive personal telephone calls. (Def. 56.1 Stmt. ¶ 19; Aschenbrand Aff. Ex. E, Ciprian Memorandum dated January 25, 2005 ("January Memo").) The January Memo stated, "Be aware that I have noticed that you are not Complying with your duties," and threatened in bold, "Let this memo serve you as a warning that failure to comply with your job duties, could result in disciplinary action against you."(Aschenbrand Aff. Ex. E.) Around this time, Vazquez asserts that Ciprian called her "a fucking Puerto Rican spick." (Vazquez Dep. 65.)

On February 18, 2005, Ciprian issued a "final warning" to Vazquez regarding her job performance. (Def. 56.1 Stmt. ¶ 21; Aschenbrand Aff. Ex. F, Ciprian Memorandum dated February 18, 2005 ("February Memo"); Vazquez Dep. 288.) The February Memo admonished Vazquez for "instigat[ing] matters" amongst the tenants, failing to log all incoming calls, and spending 30 minutes that day on a personal telephone call. (Aschenbrand Aff. Ex. F.) In closing, the February Memo declared: "Let this notice serve as a final warning that this type of behavior is totally unprofessional and will not be tolerated, if satisfactory improvement is not shown immediately you may be subjected to further disciplinary action that may lead to suspension or termination."(*Id.*)

The same day that Plaintiff received this final warning, Plaintiff began a leave of absence from Southside. (Def. 56.1 Stmt. ¶ 23; Pagan Aff. ¶ 10; Vazquez Dep. 294–95.) Plaintiff asserts that Ciprian's "daily abuse took its toll on [her] health" and that she had a "nervous breakdown" after an incident in which Ciprian grabbed papers from her, threw them, and repeatedly yelled at her, "You are so stupid, fucking old lady."(Vazquez Aff. ¶ 4; Vazquez Dep. 61–62.) According to Plaintiff, she left work on February 18, 2005 and sought "the care of a medical doctor who agreed that my condition was due to the situation [she] had to endure at [her] job."(Vazquez Aff. ¶ 3; Vazquez Dep. 294–

Vazquez v. Southside United Housing Development Fund Corp., Not Reported in...

2009 WL 2596490

95.) On March 14, 2005, Plaintiff's physician, Dr. Victor Basbus noted that Plaintiff suffered from recurrent and severe depression, anxiety, insomnia, and nervousness, and declared that she was "unable to work." (Aschenbrand Aff. Ex. G, Notice and Proof of Claim for Disability Benefits Form, Def. 56.1 Stmt. ¶ 25, Vazquez Dep. 295–96.) Plaintiff remained on leave for more than eight months.

**\*4** Southside repeatedly requested further information from Plaintiff and Dr. Basbus regarding Plaintiff's ability to return to work, but received little information. (Pagan Aff. ¶ 10.) On March 30, 2005, Pagan wrote to Dr. Basbus seeking clarification as to when Plaintiff would be able to return to her job at Southside. (Def. 56 .1 Stmt. ¶ 26; Aschenbrand Aff. Ex. H, Letter dated March 30, 2005.) On April 29, 2005, Dr. Basbus advised in response that Plaintiff was "under psychiatric treatment" and was "unable to work at this time," citing her depression, insomnia, and "dizzy spells." (Aschenbrand Aff. Ex. I, Report by Dr. Basbus dated April 29, 2005; Vazquez Dep. 305–6; *see* Def. 56.1 Stmt. ¶ 27.)

In June 2005, Plaintiff visited Southside's offices and met with Aminta Hernandez, Southside's personnel officer at the time. (Def. 56.1 Stmt. ¶ 28; Vazquez Dep. 65, 317–18.) Hernandez provided Plaintiff with a letter requesting that Plaintiff authorize Dr. Basbus to notify Southside of Plaintiff s condition and the date she could be expected to return to her regular duties. (Def. 56.1 Stmt ¶ 28; Aschenbrand Aff. Ex. J, Letter from Aminta Hernandez dated June 3, 2005.) Plaintiff responded that Dr. Basbus had "put her on leave and [that she could not] come back until he gave [her] the clearance."(Def. 56.1 Stmt. ¶ 29; Vazquez Dep. 64.) Dr. Basbus never provided Plaintiff clearance to return to work, and on October 26, 2005, he again wrote in a medical report that Plaintiff suffered from depression, insomnia, and dizzy spells, along with arthritis, impaired vision, and lower back pain. (Aschenbrand Aff. Ex. K, Report by Dr. Basbus, dated October 26, 2005; Def. 56.1 Stmt. ¶¶ 31–32; Vazquez Dep. 338–40.) Dr. Basbus concluded on the form that Plaintiff was "unable to work at all." (Aschenbrand Aff. Ex. K.)

By early November 2005, Southside still did not know if and when Plaintiff would be able to return to work. (Def. 56.1 Stmt. ¶ 35; Pagan Aff. ¶ 11.) Southside viewed Plaintiff's absence as indefinite and decided that it could no longer hold the position open for her. (Def. 56.1 Stmt. ¶ 36; Pagan Aff. ¶ 11.) On November 3, 2005, Pagan terminated Vazquez's employment and sent her a letter informing her of the decision. (Def. 56.1 Stmt. ¶ 37; *see* Pagan Aff. ¶ 11, Ex. C, Letter from David Pagan to Esther Vazquez, dated November 3, 2005 ("Nov. 3 Letter").) Pagan's letter informed Vazquez that since she had been "out on disability since February 24, 2005," a span of more than eight months, Southside found that it necessary to officially terminate Vazquez and declare her position vacant. (*See* Pagan Aff. ¶ 11 & Ex. C.) Pagan attests that he acted as the sole decisionmaker who terminated Vazquez, and that her race, national origin, age, and purported disability did not factor into his decision. (Pagan Aff. ¶ 12.) Ciprian played no role in the decision. (Def. 56.1 Stmt. ¶ 38; Pagan Aff. ¶ 12.)

**\*5** Defendants concede that Ciprian "adopted a demanding management style, which occasionally led to personality clashes with certain of her subordinates," including Plaintiff. (Def. 56.1 Stmt. ¶ 8.) Defendants claim that Ciprian "inherited a department in disarray" and needed to "remedy the dire situation in the department."(*Id.* ¶¶ 7–8.)

Southside Administrator Pagan asserts that "Plaintiff never complained to me that Ms. Ciprian had ever made any racist or ageist comments to her, harassed her or otherwise discriminated against her ."(Pagan Aff. ¶ 9.) According to Pagan, "[t]he only issues that plaintiff ever raised with me concerning Ms. Ciprian involved plaintiff's dislike of Ms. Ciprian's tough management style, and personality conflicts between plaintiff and Ms. Ciprian."(*Id.; see also* Def. 56.1 Stmt. ¶ 39–40.) Vazquez claims that when she approached Pagan with her complaints, he responded that Ciprian "was the supervisor in the second floor, that she's the one who has to decide what to do."(Vazquez Dep. 118.) Southside had a written policy regarding "Equal Employment Opportunities and No Harassment" (the "EEO Policy") that was created and distributed to "All Staff" as of August 18, 2004. (Pagan Aff. Ex. B.) The policy prohibited harassment based on "race, color, sex, religion, creed, national origin, alienage, ..., age, disability or handicap ... or any other legally protected status" and established a reporting mechanism for violations. (*Id.*) The reporting mechanism allowed employees to notify their supervisors or Pagan if issues arose in violation of the policy or the law, without regard to any "chain of command." (*Id.*) The policy advised employees to speak to "whomever you feel most comfortable with among your supervisor or the Administrator."(*Id.*)

From July 1998 until her termination in 2005, Vazquez was a member of Local 1102, RWDSU UFCW ("Local 1102"), and her terms and conditions of employment were governed

Vazquez v. Southside United Housing Development Fund Corp., Not Reported in...

2009 WL 2596490

by the collective bargaining agreement ("CBA") in effect between Local 1102 and Southside. (Def. 56.1 Stmt. ¶ 9; *see also* Pagan Aff. Ex. A (attaching copies of relevant CBAs).) The CBA in effect between Plaintiff's union, Local 1102, and Southside set forth an anti-discrimination policy and a general grievance procedure. (Pagan Aff. Ex. A, Article 10 of CBA (discrimination policy), Article 5 (grievance procedure).) At some point prior to leaving Southside in February 2005, Vazquez spoke to A.J. Salgado, a Local 1102 representative, about her problems with Ciprian. (Vazquez Dep. 115–18.) Vazquez never filed a grievance regarding her treatment by Ciprian. (*Id.* at 274.)

Plaintiff asserts that as of February 2008, she was willing and able to work, but had not found gainful employment. (Vazquez Aff. ¶ 5.) She attests that she is "close to destitute and feel[s] that [she] could have been, until this day, a productive member of South Side United, a job that [she] loved with all [her] heart and gave [her] all to."(*Id.* ¶ 5.)

## II. STANDARD OF REVIEW

**\*6** Summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law."Fed.R.Civ.P. 56(c). The burden of showing the absence of any genuine dispute as to a material fact rests on the party seeking summary judgment. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).

The substantive law governing the case dictates which facts are material and "only disputes over facts that might properly preclude the entry of summary judgment."*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."*Id.* at 251–252.A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."*Id.* at 248."Therefore, summary judgment is improper if there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party."*Lucente v. Int'l Bus. Machines Corp.,* 310 F.3d 243, 254 (2d Cir.2002) (citation omitted).

In ruling on a motion for summary judgment, the court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments...."*Wevant v. Okst,* 101 F.3d 845, 854 (2d Cir.1996) (citations omitted). Further, "in *pro se* cases, the court must view the submissions by a more lenient standard than that accorded to 'formal pleadings drafted by lawyers,' and should read a *pro se* party's 'supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest.'"*Vanhorne v. New York City Transit Auth.,* 273 F.Supp.2d 209, 213 (E.D.N.Y.2003) (internal citations omitted); *accord Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 474 (2d Cir.2006).

## III. DISCUSSION

### A. *Race, National Origin, and Age Discrimination Claims*

The ADEA and Title VII set forth parallel requirements for a plaintiff to establish a prima face case of discrimination. *See Nieves v. Angelo, Gordon, & Co.,* No. 07–cv–2330, 2009 WL 1910970, at \*2 (2d Cir. July 6, 2009) (recognizing generally that "[t]he same standards and burdens apply to claims under both Title VII and the ADEA."). Under both statutes, a plaintiff must demonstrate that: 1) she belonged to a class protected by the statute; 2) she was qualified for the position; 3) she was subjected to an adverse employment action; and 4) the adverse action occurred under circumstances giving rise to an inference of discrimination. *See Terry v. Ashcroft,* 336 F.3d 128, 137–38 (2d Cir.2003) (citing *Roge v. NYP Holdings, Inc.,* 257 F.3d 164, 168 (2d Cir.2001) (enumerating elements of ADEA prima facie case) and *Collins v. New York City Transit Auth.,* 305 F.3d 113, 118 (2d Cir.2002) (setting forth elements of Title VII prima facie case)); *see also Cretella v. Liriano.* ——F.Supp.2d ——, No. 08–cv–1566(LTS)(THK), 2009 WL 1730993, at \*11 (S.D.N.Y. June 17, 2009) (applying the same four requirements to Title VII and ADEA claims). Claims under both statutes are analyzed under the burden-shifting framework of *McDonnell Douglas Corporation v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). If a plaintiff establishes a prima facie case under either statute, the burden shifts to the defendant to offer a legitimate, non-discriminatory rationale for its actions. *See Terry,* 336 F.3d at 138; *McDonnell Douglas Corp.,* 411 U.S. at 802 (setting forth burden-shifting analysis under Title VII); *Schnabel v. Abramson,* 232 F.3d 83, 87 (2d Cir.2000) (extending *McDonnell Douglas* burden-shifting analysis to the ADEA). Should a defendant offer a neutral explanation for its actions, the plaintiff may defeat summary judgment by offering evidence sufficient to show that the proffered neutral explanation was a pretext for discrimination. *See*

*Terry,* 336 F.3d at 138. The plaintiff bears the ultimate burden of persuasion to demonstrate that the adverse employment action resulted from discrimination. *See Back v. Hastings on Hudson Union Free School Dist.,* 365 F.3d 107, 123 (2d Cir.2004).

**\*7** Vazquez's age, race, and national origin discrimination claims are based on two alleged adverse employment actions: the change in her job responsibilities that occurred in November 2004, and the termination of her employment in November 2005. It is undisputed that Vazquez is a member of the classes protected by the statutes, and Defendants do not argue that she lacked any of the qualifications for her position. Nonetheless, Vazquez fails to demonstrate that a genuine issue of material fact exists that could support her claims of discrimination based upon age, race, or national origin with respect to either adverse action. As a result, the court GRANTS summary judgment to Defendants on Vazquez's claims of employment discrimination under the ADEA and Title VII.

**1. Change in Job Responsibilities**

An "adverse employment action" is one which is "more disruptive than a mere inconvenience or an alteration of job responsibilities."*Galabya v. New York City Bd. of Educ.,* 202 F.3d 636, 640 (2d Cir.2000) (*quoting Crady v. Liberty Nat'l Bank & Trust Co.,* 993 F.2d 132, 136 (7th Cir.1993)). A change in job responsibilities can constitute an adverse action where accompanied by "a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices ... unique to a particular situation."*Id.* (*quoting Crady,* 993 F.2d at 136).

Ciprian's November Memo presented the change in Plaintiff's job responsibilities and documented the reasons for the change. (*See* Aschenbrand Aff. Ex. D.) According to the November Memo, Ciprian removed Plaintiff from her duties managing five properties, and informed Plaintiff that she would "not be handling any Lease renewals, re-certifications, community room rentals, move-outs, etc."(*Id.*) Ciprian notified Plaintiff that her "new assignment is to answer all repair calls, maintain a repair log of all complaints, issue work orders & distribute to the supers & keep copies of work orders by building."(*Id.*) These were duties that Vazquez already handled as a Property Manager; the November Memo had the effect of limiting Vazquez's prior responsibilities. (*See* Vazquez Dep. 272.) Ciprian made clear that Vazquez's responsibilities had changed because her performance was

perceived to be unsatisfactory. (*See* Aschenbrand Aff. Ex. D.) Plaintiff concedes that she did not suffer any changes in her compensation, her job title, or her reporting relationship as a result of the November 2004 change in job responsibilities. (*See* Vazquez Dep. 125, 279.)

Viewing the facts in the light most favorable to Vazquez, a reasonable finder of fact could conclude that November 2004 change in responsibilities constituted an adverse action because the November Memo may have "significantly diminished [her] material responsibilities" as a Property Manager at Southside. *See Galabya,* 202 F.3d at 640. Further, the record suggests that Ciprian made the decision to change Vazquez's responsibilities. Vazquez testified at her deposition that Ciprian made numerous racist and ageist remarks to her during the course of her tenure. (*See, e.g.,* Vazquez Dep. 53, 72, 107–08.) Vazquez's testimony presents sufficient evidence of Ciprian's alleged animus for a finder of fact to conclude that Vazquez was subject to adverse action under circumstances giving rise to an inference of discrimination. *Back.* 365 F.3d at 124 (evidence of discriminatory comments can constitute "direct evidence" adequate to make out a prima facie case, even where uncorroborated).

**\*8** Southside argues that even if Plaintiff has presented a prima facie case, Southside has articulated legitimate, non-discriminatory reasons for the change in Plaintiff's responsibilities. In the November Memo, Ciprian stated that she had found "many discrepancies with the tenant's files such as expired leases, incomplete or missing recertifications, missing files or documentation, Leases given to tenants without signature from the prior Directors or Mr. Pagan" in the files for two properties. Plaintiff concedes that "[a]ll the paperwork was all over" and "[t]here were missing files." (Vazquez Dep. 269–270.) Plaintiff stated that this disorganization was due to revisions undertaken by Ciprian's predecessor, Pizarro. (*Id.* at 269.)Regardless, Southside argues that it was "entitled to make a business decision to change plaintiff s job responsibilities to remedy these problems."(Def.Mem.11.)

Since Southside has proffered a neutral justification for the change in Plaintiff's responsibilities, "the burden shifts back to the plaintiff to demonstrate by competent evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination."*Patterson v. County of Oneida,* 375 F.3d 206, 221 (2d Cir.2004) (internal quotations omitted). At the summary judgment stage, plaintiff "must establish a genuine issue of material fact either through

direct, statistical or circumstantial evidence as to whether the employer's reason for [the adverse action] is false *and* as to whether it is more likely that a discriminatory reason motivated the employer to make the adverse decision." *Gallo v. Prudential Residential Serv., Ltd.,* 22 F.3d 1219, 1225 (2d Cir.1994) (emphasis in original). Because the standards for this showing diverge under the two statutes at issue, the court considers the evidence supporting Plaintiff's Title VII and ADEA claims separately at this stage.

### i. *Title VII*

To the extent Plaintiff asserts that the change in her job responsibilities violated Title VII, Plaintiff has failed to offer evidence that could refute Southside's proffered neutral justification. At her deposition, Plaintiff appeared to retract her allegations that the November 2004 change in her responsibilities was based upon her race and national origin. (*See* Vazquez Dep. 278 (stating "I don't see the connection" between the change in her responsibilities and her race or national origin).) Plaintiff has conceded that the criticisms contained in the November Memo were accurate. (*Id.* at 269–270.) In light of Plaintiff's own concessions, the court finds itself constrained to conclude that there is no genuine dispute of fact regarding a Title VII discrimination claim for the change in Plaintiff's job responsibilities.

The court further notes that Plaintiff has not put forward any evidence to demonstrate that similarly situated individuals were treated differently, or any other indicia suggesting this particular employment action was motivated by discrimination. The only available evidence raising Title VII concerns relates to the offensive remarks allegedly made by Ciprian, which Plaintiff appears to allege began only after the November Memo and her change in responsibilities. (Compl. ¶ 5 (citing approximate dates beginning in December of 2004).)

**\*9** Summary judgment is GRANTED to Defendants insofar as Plaintiff relies upon Title VII liability for this claim.

### ii. *ADEA*

As in the Title VII context, Plaintiff must put forth "competent evidence" that Defendants' proffered justification was a pretext for discrimination to survive summary judgment on her ADEA claim. *Patterson,* 375 F.3d at 221. In addition, the Supreme Court recently held that plaintiffs bear a greater burden of persuasion at this stage on ADEA claims, in contrast to Title VII claims.[4] To establish liability under

the ADEA, a "plaintiff must prove by a preponderance of the evidence (which may be direct or circumstantial), that age was the 'but-for' cause of the challenged employer decision." *Gross v. FBL Fin. Servs., Inc.,* — U.S. ——, ——, 129 S.Ct. 2343, 2351, 174 L.Ed.2d 119 (2009).

Plaintiff's ADEA claim for the change in her job responsibilities fails to withstand summary judgment. Plaintiff concedes that the criticisms contained in the November Memo reflected legitimate concerns about the condition of the office files at the time. (Vazquez Dep. 269–270.) Plaintiff testified at her deposition that the change in job responsibilities was connected to her age because Ciprian "probably thought that I couldn't handle my position as it was" and that the change made it seem that Plaintiff "was the worse within her co-workers."(*Id.* at 276.) When asked whether she could offer any facts linking the decision to change her responsibilities to her age, Plaintiff testified simply: "That's my belief." (*Id.*) However, "a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment" in a discrimination action. *Holcomb v. Iona Coll.,* 521 F.3d 130, 137 (2d Cir.2008); *Martin v. MTA Bridges & Tunnels,* 610 F.Supp.2d 238, 251 (S.D.N.Y.2009) (plaintiff's "belief" that action was motivated by discrimination not sufficient to raise a genuine issue of fact).

The only other evidence in the record related to Plaintiff's age discrimination claims consists of offensive remarks allegedly made by Ciprian; the timing of these remarks appears to post-date the November Memo. The court finds that this evidence is insufficient to raise a genuine issue of fact as to whether Southside's stated reasons for the change in Plaintiff's responsibilities were merely a pretext concealing a motive of age discrimination. Given Plaintiff's concessions that the November Memo reflected accurate information and valid concerns, the court finds that a reasonable finder of fact could not conclude that "age was the 'but-for' cause of the challenged employer decision." *Gross,* 129 S.Ct. at 2351. The court GRANTS summary judgment to Defendants on Plaintiff's ADEA claim for the change in her job responsibilities.

### 2. Termination

Plaintiff's claims regarding her ultimate termination in November 2005 fail to set forth a prima face case of race, national origin, or age discrimination. Plaintiff has failed to raise an issue of fact that could suggest that her termination occurred under circumstances giving rise to an inference of discrimination. Southside terminated Plaintiff

Vazquez v. Southside United Housing Development Fund Corp., Not Reported in...

2009 WL 2596490

because it could no longer maintain an open position for her while she took an indefinite leave. The undisputed evidence demonstrates that Southside went to great lengths to hold Plaintiff's position open for her during an eight-month absence. Southside made multiple attempts to ascertain whether Plaintiff would be willing and able to reclaim her job at some point; those inquiries went unanswered. (*See, e.g.,* Aschenbrand Aff. Ex. H, Letter from David Pagan dated March 30, 2005; Aschenbrand Aff. Ex. J, Letter from Aminta Hernandez dated June 3, 2005.) There is no evidence that Ciprian, the sole perpetrator of the alleged discrimination, had any part in the decision to terminate Plaintiff. (*See* Pagan Aff. ¶ 12.) Plaintiff's testimony shows that she endured unprofessional and demeaning treatment by Ciprian, but nothing in the record suggests that these events—occurring from November 2004 until February 2005—infected the decision by Pagan to terminate Plaintiff nearly a year later in November 2005. The facts surrounding the circumstances of Plaintiff s termination are undisputed, and they do not raise an inference of discrimination.

**\*10** The same undisputed facts show that, even if Plaintiff could set forth a prima facie case, Southside has offered a neutral justification for Plaintiff's termination. At the time of her termination, Plaintiff had been absent on leave for over eight months, with no indication from her or her physician as to when, if ever, she would be able to return to work. (*See* Pagan Aff. ¶¶ 10–11; Vazquez Dep. 160–62.) Southside was not required to hold Vazquez's position open for her under these circumstances. *See infra* Section III.B (citing cases and analyzing issue of Plaintiff's absence). Plaintiff has not put forth any competent evidence to rebut this neutral justification. As a result, the court GRANTS summary judgment to Defendants on Plaintiff's claims that her termination violated the ADEA and Title VII.

### B. *Disability Claims*

Plaintiff also asserts that her termination constituted disability discrimination in violation of the ADA. (Compl. ¶ 4 (citing termination and failure to accommodate disability).) To establish a prima facie case of disability discrimination, a plaintiff must show that: 1) her employer is subject to the ADA; 2) she was disabled within the meaning of the ADA; 3) she was otherwise qualified to perform the essential functions of her job, with or without reasonable accommodation; and 4) she suffered adverse employment action because of her disability. *See Sista v. CDC North America, Inc.,* 445 F.3d 161, 169 (2d Cir.2006); *Brady v. Wal–Mart Stores, Inc.,* 531 F.3d 127, 134 (2d Cir.2008). Once a plaintiff establishes a

prima facie case, the court analyzes her claim under the same *McDonnell Douglas* burden-shifting framework applicable to Title VII and ADEA claims. *See Sista,* 445 F.3d at 169;*see also supra* Section III.A.

Defendants appear to concede that they are subject to the ADA. Although the evidence of Plaintiff's condition is rather general and conclusory, the court assumes *arguendo* that Plaintiff could put forth facts demonstrating that she was "disabled" within the meaning of the ADA on account of her depression and related disorders. *See, e.g., Honeck v. Nicolock Paving Stones of New England, LLC,* 247 Fed. Appx. 306, 308 (2d Cir. Sept.19, 2007) (summary order) (depression can constitute disability within meaning of the ADA where it "substantially limits one or more of the major life activities"); *see also* 29 C.F.R. § 1630.2(g) (defining "disability" under the ADA). It is clear from the undisputed evidence that Southside terminated Plaintiff because of her failure to attend work, and to represent when, if ever, she could resume her job functions. Plaintiff attributes these deficiencies to her alleged disability.

The court finds that Plaintiff has failed to set forth a prima facie case of disability discrimination because she was not qualified to perform the essential functions of her job, with or without reasonable accommodation. Attendance at work was an essential function of Plaintiff's job. *See Ramirez v. New York City Bd. of Educ.,* 481 F.Supp.2d 209, 221 (E.D.N.Y.2007) (citing myriad cases and finding that attendance is typically an essential function of employment); *Bobrowsky v. New York City Bd. of Educ.,* No. 97–cv–874(FB), 1999 WL 737919, at \*4 (E.D.N.Y. Sept. 16, 1999) (holding that the ADA does not require an employer to retain a person who fails to attend work because "attendance is an essential function of ... employment"), *aff'd,* 213 F.3d 625 (2d Cir.2000); *Mescall v. Marra,* 49 F.Supp.2d 365, 374 (S.D.N.Y.1999) (to be qualified for a job, "[i]n addition to possessing the skills necessary to perform the job in question, an employee must be willing and able to demonstrate those skills by coming to work on a regular basis.") (internal quotations omitted). Plaintiff and her physician consistently represented that she was "unable to work," and at the time of her termination, Plaintiff had not appeared for work for over eight months. (Aschenbrand Aff. Ex. I, Report by Dr. Basbus dated April 29, 2005; Aschenbrand Aff. Ex. K, Report by Dr. Basbus, dated October 26, 2005; *see* Pagan Aff. ¶ 11 & Ex. C.)

Vazquez v. Southside United Housing Development Fund Corp., Not Reported in...

2009 WL 2596490

**\*11** The ADA does not require an employer to maintain an employee's position while an employee unilaterally takes an indefinite leave of absence. *Parker v. Columbia Pictures Indus.,* 204 F.3d 326, 338 (2d Cir.2000) ("The duty to make reasonable accommodations does not, of course, require an employer to hold an injured employee's position open indefinitely while the employee attempts to recover"); *Wisenski v. Nassau Health Care Corp.,* 296 F.Supp.2d 367, 374 (E.D.N.Y.2003) (noting that "the ADA does not require an employer to grant an employee an indefinite leave of absence" and citing supporting authority from the Third, Fourth, Fifth, Seventh, and Tenth Circuits). The undisputed evidence demonstrates that Plaintiff never sought permission for a specified leave of absence, and that over the course of eight months, Southside repeatedly requested clarification as to when Plaintiff could resume her work. (*See, e.g.,* Letter from David Pagan dated March 30, 2005 (Aschenbrand Aff. Ex. H); Letter from Aminta Hernandez dated June 3, 2005 (Aschenbrand Aff. Ex. J).) Plaintiff and her physician, Dr. Basbus, neglected to respond to this question. On each occasion, Dr. Basbus simply responded that Plaintiff was "unable to work." (Report by Dr. Basbus dated April 29, 2005 (Aschenbrand Aff. Ex. I); Report by Dr. Basbus, dated October 26, 2005 (Aschenbrand Aff. Ex. K).) Southside was not obligated to accommodate this indefinite leave. *Cf. Rambacher v. Bemus Point Cent. Sch. Dist.,* 307 Fed. Appx. 541, 544 (2d Cir. Jan.22, 2009) (summary order) (where plaintiff suffering from depression took approved, limited period of medical leave and doctor opined that she would be able to return to duty "in a few months' time," question of plaintiff's qualification for job survived summary judgment).

Further, Plaintiff never requested an accommodation for her alleged disability, but instead simply left work on an indefinite leave. As Plaintiff explained: "I just went to the doctor, and the doctor sent the letter to the office stating that I cannot go to work."(Vazquez Dep. 64.) Since no accommodation was requested, Plaintiff cannot claim that she was denied reasonable accommodations for her disability. *See Rivera v. Apple Indus. Corp.,* 148 F.Supp.2d 202, 215 (E.D.N.Y.2001) (rejecting accommodation claim as a matter of law where no request was ever posed to employer); *Mazza v. Bratton,* 108 F.Supp.2d 167, 176 (E.D.N.Y.2000) (holding that a claim for disability discrimination based on a failure to accommodate a plaintiff "is not made out under the ADA unless the employee's request for a reasonable accommodation has been denied by the employer.").

The undisputed facts demonstrate that Plaintiff has failed to set forth a prima facie case of discrimination under the ADA. The court additionally notes that even if Plaintiff had demonstrated a prima facie case, Defendants have met their burden to show that Plaintiff was terminated due to legitimate, non-discriminatory reasons, and Plaintiff has failed to rebut those neutral justifications. As a result, the court GRANTS summary judgment to Defendants on Plaintiff's ADA claims.

### C. *Retaliation*

**\*12** Plaintiff further claims that Ciprian retaliated against her because she assisted a former Southside employee, Ana Bonano, in a proceeding against Southside. Although the facts are unclear from the record, Vazquez alleges that in December 2004, Ciprian discovered that Vazquez submitted a written statement in support of Bonano's case and called her a "traitor." (*See* Vazquez Dep. 67 .) According to Vazquez, Ciprian said "Mr. Pagan should lay you off, you are not supposed to be working here; you are a traitor."(*Id.*) Vazquez has not identified any adverse actions taken in retaliation against her other than these offensive comments by Ciprian. (*See* Vazquez Dep. 68–69.) Specifically, Plaintiff does not assert that the change in her responsibilities or her termination were adverse actions taken in retaliation for her support of Bonano.

To establish a prima facie case of unlawful retaliation, a plaintiff must demonstrate that "(1) she was engaged in protected activity; (2) the employer was aware of the employee's participation in the protected activity; (3) the employer took action that a reasonable employee would have found materially adverse; and (4) a causal connection existed between the employee's protected activity and the adverse action taken by the employer."*Guarino v. St. John Fisher Coll.,* 321 Fed. Appx. 55, 58 (2d Cir. Apr.8, 2009) (citing *Kessler v. Westchester County Dep't of Soc. Servs.,* 461 F.3d 199, 205–206 (2d Cir.2006)). The *McDonnell Douglas* burden-shifting analysis governing employment discrimination claims also applies to retaliation claims. *See Terry,* 336 F.3d at 140–41 (citing cases and noting application to Title VII and ADEA). Viewing the facts in the light most favorable to Plaintiff, the court accepts that Plaintiff's testimony is sufficient to show that she engaged in a protected activity by serving as a witness for Bonano.

Plaintiff's retaliation claim fails to set forth a prima facie case because a reasonable employee would not have viewed Ciprian's comments, while unprofessional and offensive, as materially adverse actions. In *Burlington Northern & Santa*

*Fe Railway Company v. White,* 548 U.S. 53, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006), the Supreme Court held that in the context of retaliation claims, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." [5] *Id.* at 68 (internal citations omitted). While the Court found that the prohibitions on retaliation expanded beyond "discriminatory actions that affect the terms and conditions of employment," it also noted that an individual is protected "not from all retaliation, but from retaliation that produces an injury or harm."*Id.* at 64, 68.Courts interpreting *Burlington Northern* have held that empty verbal threats do not cause an injury, and therefore are not materially adverse actions, where they are unsupported by any other actions. *See Harris v. South Huntington Sch. Dist.,* No. 06–cv–3879 (DGT), 2009 WL 875538, at *19 (E.D.N.Y. Mar. 30, 2009) (finding no material adverse action where supervisor allegedly asked plaintiff to resign after he complained about other employees); *Pugni v. Reader's Digest Ass'n, Inc.,* No. 05–cv–8026 (CM), 2007 WL 1087183, at *23 (S.D.N.Y. Apr. 9, 2007) (threats that plaintiff's days at company "were numbered" were not viewed as materially adverse action where threat was never executed).

**\*13** The *Burlington Northern* inquiry is highly fact-specific. As the Court explained, "[c]ontext matters" and "the significance of any given act of retaliation will often depend upon the particular circumstances."548 U.S. at 69. The heart of the inquiry is whether, under the particular circumstances, the challenged actions "might have dissuaded a reasonable worker from making or supporting a charge of discrimination."*Id.* at 68.Vazquez has presented no evidence that Ciprian's comments chilled her support of Bonano, or caused her to actually fear reprisal. The supervisor with ultimate authority to terminate Vazquez, David Pagan, was not implicated in these threats. The court finds that while these comments fit within a pattern of highly inappropriate behavior by Ciprian, there is insufficient evidence for a reasonable finder of fact to conclude that the comments would dissuade a reasonable worker from making or supporting a charge of discrimination. *See Harris,* 2009 WL 875538, at * 19; *Pugni,* 2007 WL 1087183, at *23. In fact, there is no evidence that Ciprian's comments served to dissuade Vazquez, as she ultimately filed her own complaint with the Equal Employment Opportunity Commission and eventually pursued this action. *See, e.g., McWhite v. New York City Hous. Auth.,* No. 05–cv–0991(NG)(LB), 2008 WL 1699446, at *13 (E.D.N.Y. Apr. 10, 2008) (noting that plaintiff's pursuit

of EEOC claim despite alleged retaliatory actions further indicated that plaintiff did not suffer materially adverse action).

As stated above, Plaintiff does not assert that the change in her responsibilities or her termination were retaliatory. The court notes that the record does not suggest any causal connection between the alleged protected activity undertaken by Vazquez and these adverse employment actions taken by Southside. The change in Vazquez's responsibilities was made prior to the allegedly retaliatory remarks by Ciprian, and there is no evidence that Ciprian knew of Plaintiff's alleged protected activity at that time. (*See* Aschenbrand Aff. Ex. D, November Memo.) Ciprian played no part in the decision to terminate Plaintiff, a decision that was made eleven months after Ciprian's alleged threats. (Def. 56.1 Stmt. ¶ 38; Pagan Aff. ¶ 12.) There is no evidence that Pagan, the decision-maker, even had knowledge of Plaintiff's alleged protected activity at the time of her termination.

Furthermore, even if Plaintiff could present a prima facie case of retaliation, Defendants have advanced legitimate, non-discriminatory reasons for each action, and Plaintiff has failed to rebut those neutral justifications. *See supra* Sections III.A. & III.B.

### D. *Hostile Work Environment*

The court construes Plaintiff's allegations of "harassment" and "threat[s]" by Ciprian as a hostile work environment claim. *See, e.g., McWhite,* 2008 WL 1699446, at *16 n. 7 (interpreting pro se complaint to raise hostile work environment claim in the context of Title VII and ADEA action); *Triestman,* 470 F.3d at 474 ("the submissions of a *pro se* litigant must be construed liberally and interpreted to raise the strongest arguments that they suggest.") (internal quotations omitted). To survive a motion for summary judgment on a hostile work environment claim, a plaintiff must demonstrate evidence: "(1) that the workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of his or her work environment, and (2) that a specific basis exists for imputing the conduct that created the hostile work environment to the employer."*Mack v. Otis Elevator Co.,* 326 F.3d 116, 122 (2d Cir.2003) (internal quotation marks and brackets omitted); *see also Martinez v. City of New York,* No. 08–cv–1624, 2009 WL 2171398, at *1 (2d Cir. July 22, 2009) (summary order) (a plaintiff must show that his or her "workplace was permeated with discriminatory intimidation, ridicule, and insult, that was sufficiently severe or pervasive

Vazquez v. Southside United Housing Development Fund Corp., Not Reported in...

2009 WL 2596490

to alter the conditions of the victim's employment and create an abusive working environment."(citing *Hayut v. State Univ. of New York,* 352 F.3d 733, 745 (2d Cir.2003) (internal quotation marks omitted))).

### 1. Vazquez's Work Environment

**\*14** Viewing the facts in a light most favorable to Plaintiff, it is clear that Cipriani treated Plaintiff in a derogatory manner entirely inappropriate for the workplace. The court does not condone Cipriani's actions. However, Title VII and the anti-discrimination laws set forth here do not impose "a general civility code for the American workplace."*Burlington Northern,* 548 U.S. at 68 (*quoting Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998))."[I]solated or episodic incidents involving racial slurs or other discriminatory conduct .... do[ ] not rise to the level of severity or pervasiveness needed to support a hostile work environment claim."*Smith v. New Venture Gear, Inc.,* 319 Fed. Appx. 52, 56 (2d Cir. Apr.26, 2009) (summary order). A "mere utterance of an ... epithet which engenders offensive feelings in an employee does not sufficiently affect the conditions of employment to implicate Title VII."*Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997) (internal quotation marks and citations omitted)."For racist comments, slurs, and jokes to constitute a hostile work environment, there must be more than a few isolated incidents of racial enmity, meaning that instead of sporadic racial slurs, there must be a steady barrage of opprobrious racial comments."*Id.* (internal quotation marks and citations omitted). Courts consider a host of factors to make this determination: "(1) the frequency of the discriminatory conduct; (2) its severity; (3) whether the conduct was physically threatening or humiliating, or a mere offensive utterance; (4) whether the conduct unreasonably interfered with the employee's work; and (5) what psychological harm, if any, resulted."*Richardson v. New York State Dep't of Corr. Serv.,* 180 F.3d 426, 437 (2d Cir.1999) (internal quotations omitted), *abrogated on other grounds by**Burlington Northern,* 548 U.S. at 67–68;*see also Heba v. New York State Div. of Parole,* 537 F.Supp.2d 457, 467 (E.D.N.Y.2007) (applying these factors).

Vazquez's testimony demonstrates that Cipriani's conduct was reprehensible. According to Vazquez, Cipriani harassed her "almost every day" with offensive comments, such as telling Vazquez that she was "too old to be working there, that they need young blood, new people, young people."(Vazquez Dep. 53.) Sometime in December 2004, Vazquez asserts that Cipriani also told her: "You fucking old lady, I'm going to

do the impossible for you to get the hell out of here."(*Id.* at 108.)Vazquez alleges generally that Cipriani's abuse turned racist, and that Cipriani "called [her] a whole lot of name[s]," including a "stupid Puerto Rican," "a fucking spick," and "a fucking Puerto Rican spick." (*Id.* at 65, 72.)According to Vazquez, Cipriani called her "a stupid old woman, a [waste] of time and too old to perform my job duties," and "said she would not hire any other Puerto Rican because they're an stupid."(Vazquez Aff. ¶ 3; Vazquez Dep. 107.) Defendants do not put forward any evidence to controvert this testimony. Further, it is undisputed that Cipriani was Vazquez's supervisor during the time at issue. *See Mack,* 326 F.3d at 123 ("[I]t is only when a supervisor with immediate (or successively higher) authority over the employee has engaged in the complained of conduct, that the employer may be subject to vicarious liability."(internal quotation marks and citations omitted)).

**\*15** The statements of Jose Velazquez and Adelaida Miranda, ruled inadmissible by the court because they are unsworn, *see supra* n. 3. generally corroborate the existence of serious conflict between Vazquez and Cipriani. The court finds that the exclusion of the statements does not affect the court's decision here, because the court already views the facts in the light most favorable to Vazquez on summary judgment, and the statements offer little information beyond Vazquez's own testimony. [6]

Dr. Basbus was deposed to assess the alleged psychological harm suffered by Plaintiff on account of these events at Southside, but the minimal excerpts of his testimony provided to the court offer no insight into this question. (*See* Docket Entry # 25 (Attachment 9), Deposition of Dr. Basbus, dated July 21, 2007.) His written documentation of Vazquez's condition was similarly conclusory and offered no opinion as to the cause of her depression, anxiety, and other symptoms. (Aschenbrand Aff. Exs. G, I, & K.)

Generally, the hostile work environment claims that the Second Circuit has allowed to proceed beyond summary judgment have involved "more severe, sustained, and specific instances of alleged discrimination" than those present here. *Kemp v. A & J Produce Corp.,* 164 Fed. Appx. 12, 14 (2d Cir. Dec.7, 2005) (reviewing cases where hostile work environment claims withstood summary judgment). The egregious facts underlying these precedents set a high bar for hostile work environment claims. *See, e.g., Kemp v. A & J Produce Corp.,* No. 00–cv–06050 (ERK), 2005 WL 5421296, at \*19 (E.D.N.Y. June 7, 2005), *aff'd,*164 Fed.App.

Vazquez v. Southside United Housing Development Fund Corp., Not Reported in...

2009 WL 2596490

12 (2d Cir.) (claim dismissed on summary judgment where a Caucasian supervisor "allegedly made numerous racial slurs such as calling African–Americans 'monkeys' or 'Kunta.' ").

In this case, however, Vazquez has testified that she suffered daily harassment involving the use of racial epithets by her supervisor, demonstrated that her supervisor altered her job responsibilities in a manner that could be considered a demotion, and provided documentary evidence that her supervisor explicitly threatened her job in writing on at least three occasions. Vazquez has testified that after 13 years of employment at Southside, these events traumatized her so deeply that she had a "nervous breakdown" and could no longer work. (Vazquez Aff. ¶ 4.) All of these incidents took place in the condensed time frame of three months. In light of Plaintiff's *pro se* status and the court's obligation to view the facts in the light most favorable to the Plaintiff on summary judgment, the court finds that a genuine issue of fact remains as to whether Ciprian's comments to Vazquez created a workplace so "permeated with discriminatory intimidation" that it "was sufficiently severe or pervasive to alter the conditions of his or her work environment." *Mack.* 326 F.3d at 122.

The cases cited by Defendants are distinguishable. In *Chandler v. American Eagle Airlines,* 251 F.Supp.2d 1173 (E.D.N.Y.2003), the plaintiff claimed that his supervisor and co-workers frequently made age-related comments, such as calling him "too slow" and a "fucking old man," made references to his erectile dysfunction and urination capabilities, and threatened him verbally and physically. *Id.* at 1184–85.In dismissing the claim, Judge Gershon noted that Chandler had testified that many of the comments had been "made in jest and were not discriminatory in nature" and that he had reported "no continuing fear ... nor an inability to perform his job duties" as a result of the allegedly hostile work environment he experienced over the course of four years. *Id.* at 1185–86.In the second case relied upon by Defendants, *Citroner v. Progressive Casualty Insurance Company,* 208 F.Supp.2d 328 (E.D.N.Y.2002), the plaintiff alleged that his supervisor had "mocked the Spanish language; left a Speedy Gonzalez doll on plaintiff's desk and referred to plaintiff as Speedy Gonzalez; told plaintiff either once or several times (plaintiff's testimony is inconsistent) to act more white and loose his cocky Spanish attitude; and passed gas one time near his face and made a comment about Hispanics and beans."*Id.* at 340.Despite these serious allegations, Judge Gershon found that a reasonable jury could not find for Citroner on his hostile work environment claim because, by Citroner's own account,

this alleged harassment had occurred for just one week before he was suspended for other reasons. *Id.* at 340–41.Citroner was ultimately terminated on unrelated grounds, because he had sexually harassed a coworker. *Id.* at 341.The court finds that, by contrast, the evidence presented by Vazquez is sufficient to raise a question of fact as to the severity and pervasiveness of the hostile work environment she endured.

**2. Southside's Liability**

*\*16* Even if Plaintiff can demonstrate that she was subjected to hostile work environment, she must demonstrate that these conditions can be specifically imputed to Southside. As the Second Circuit has explained:

> Where the harassment is attributed to a supervisor with immediate or successively higher authority over the employee, a court looks first to whether the supervisor's behavior culminated in a tangible employment action against the employee; if it did, the employer will, *ipso facto,* be vicariously liable. In the absence of such tangible action, an employer will still be liable for a hostile work environment created by its supervisors unless it successfully establishes as an affirmative defense that (a) it exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.

*Petrosino v. Bell Atlantic,* 385 F.3d 210, 225 (2d Cir.2004) (internal quotation marks and citations omitted) (interpreting *Faragher v. City of Boca Raton,* 524 U.S. 775, 807, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998); *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 765, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998)). Southside asserts that it is entitled to assert this latter affirmative defense under *Faragher/Ellerth.*

This defense is only available if the supervisor's behavior never "culminated in a tangible employment action against the employee."*Petrosino,* 385 F.3d at 225. Tangible employment actions include "hiring, firing,

Vazquez v. Southside United Housing Development Fund Corp., Not Reported in...

2009 WL 2596490

failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Ellerth,* 542 U.S. at 765. As set forth above, a reasonable finder of fact could conclude that the November 2004 change in Vazquez's job responsibilities constituted an adverse action. However, since this action coincided with the alleged commencement of Ciprian's harassment, it is difficult to say that the harassment "culminated" in this action. Ciprian also issued a total of three memoranda, roughly one per month, admonishing Vazquez for poor job performance, but Vazquez has conceded or at least failed to contest the accuracy of Ciprian's critiques. Further, it is questionable whether a poor performance review could qualify as a "tangible employment action." *See O'Dell v. Trans World Entm't Corp.,* 153 F.Supp.2d 378, 388 (S.D.N.Y.2001) (finding that a negative performance review could not constitute a tangible employment action for *Faragher/Ellerth* purposes).

To avail itself of the *Faragher/Ellerth* defense, Southside must show that "(a) that the employer exercised reasonable care to prevent and correct promptly any ... harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Faragher,* 524 U.S. at 807. The court finds that Southside is entitled to invoke this defense in this case to bar Plaintiff's claims. Irrespective of whether a reasonable finder of fact could conclude that Ciprian's comments to Vazquez created a workplace so "permeated with discriminatory intimidation" that it "was sufficiently severe or pervasive to alter the conditions of his or her work environment," *Mack,* 326 F.3d at 122, Vazquez's claim fails because she has not presented evidence demonstrating that she attempted to mitigate the situation by availing herself of Southside's anti-harassment procedures. *See McPherson v. NYP Holdings, Inc.,* 227 Fed. Appx. 51, 53 (2d Cir. June 27, 2007) (summary order).

**\*17** In August of 2004, prior to the alleged incidents, Southside promulgated and distributed a written policy regarding "Equal Employment Opportunities and No Harassment" (the "EEO Policy"). (Pagan Aff. Ex. B.) The policy expressly prohibited harassment based on "race, color, sex, religion, creed, national origin, alienage ... age, disability or handicap ... or any other legally protected status" and created a reporting mechanism that directed employees to notify their supervisors or Pagan if issues arose in violation of the policy or the law. (*Id.*)*Cf. Faragher,* 524 U.S. at 807

(defense unavailable where policy lacked "assurance that the harassing supervisors could be bypassed in registering complaints"). The collective bargaining agreement in effect between Plaintiff's union, Local 1102, and Southside also set forth an anti-discrimination policy and a general grievance procedure. (Pagan Aff. Ex. A, Article 10 of CBA (regarding discrimination), Article 5 (grievance procedure).)

To the extent the alleged incidents were not reported to Southside, "there is no way a reasonable trier of fact could impute these incidents" to Southside.*Smith,* 319 Fed. Appx. at 57. Vazquez claims that she approached Pagan twice with complaints, but he responded that Ciprian "was the supervisor in the second floor, that she's the one who has to decide what to do."(Vazquez Dep. 88, 118.) When asked what problems she raised with Pagan to which she did not receive a satisfactory response, Vazquez testified: "The problems there are the supervisor, that she was always on my case. I don't know."(*Id.* at 88.)Vazquez's testimony suggests that she failed to address her claims of race, national origin, and age discrimination in her complaints to Pagan. She never put her complaints in writing. (*Id.*) Southside Administrator Pagan attests that "Plaintiff never complained to me that Ms. Ciprian had ever made any racist or ageist comments to her, harassed her or otherwise discriminated against her."(Pagan Aff. ¶ 9.) Pagan acknowledges discussing conflicts between Ciprian and Vazquez, but has stated that "[t]he only issues that plaintiff ever raised with me concerning Ms. Ciprian involved plaintiff's dislike of Ms. Ciprian's tough management style, and personality conflicts between plaintiff and Ms. Ciprian."(*Id.; see also* Def. 56.1 Stmt. ¶¶ 39–40.)

Similarly, Vazquez testified that she notified A.J. Salgado, a representative of Local 1102, about her problems with Ciprian. (*Id.* at 115.)Salgado told her she had to respond to the memoranda issued by Ciprian. (*Id.*) Vazquez failed to act on Salgado's advice because she "got sick," "didn't want to bother," and "didn't go back to the office so [she] didn't answer the memorandum."(*Id.* at 116, 274.)It is unclear whether Vazquez specified that she suffered discrimination in these conversations; she testified only that "I told him about the way that she was treating me."(*Id.*) Vazquez also spoke to a Southside employee named Sonia Iglesias about the November Memo changing her job responsibilities, but she did not put forth any testimony or other evidence to show that her complaints to Iglesias raised the issue of discrimination on account of her race, national origin, or age. (*Id.* at 273.)

Vazquez v. Southside United Housing Development Fund Corp., Not Reported in...

2009 WL 2596490

**\*18** The court finds that through the creation and dissemination of the EEO Policy, coupled with the protections of the CBA, Southside exercised reasonable care to prevent and promptly correct any harassing behavior. In the absence of any evidence that Vazquez notified Pagan, Local 1102 leaders, or anyone else in a position of authority that she was suffering harassment on account of her race, national origin, or age, the court finds that Vazquez "unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Faragher,* 524 U.S. at 807. Vazquez has failed to raise a genuine issue of fact that would allow a reasonable fact finder to conclude otherwise. Accordingly, her hostile work environment claim fails to withstand summary judgment.

## IV. CONCLUSION

For the reasons set forth above, Defendants' Motion for Summary Judgment is granted in its entirety. The Clerk of Court is directed to close the case.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 2596490

## Footnotes

1    SUHDFC is a non-profit corporation "dedicated to developing, preserving and rehabilitating new and existing low to middle income housing for the Williamsburg, Brooklyn community."(Docket Entry # 26, Defendants' Statement of Material Facts Submitted Pursuant to Local Civil Rule 56.1 ("Def. 56.1 Stmt.") ¶ 1.) Los Sures is a wholly-owned subsidiary of SUHDFC that manages the daily operations of housing owned by SUHDFC. (*Id.* ¶ 2.) Defendants characterize the entities as a single unit, identified as "Southside." (*See id.* at 1.) The court adopts Defendants' terminology for these entities.

2    While Plaintiff opposes the Defendants' Motion for Summary Judgment, she does not dispute the majority of facts set forth in Defendants' Rule 56.1 Statement. Pursuant to Local Rule S6.2, Defendants provided Plaintiff with notice of the consequences of failing to comply with Rule 56 of the Federal Rules of Civil Procedure and Local Rule 56.1, and included copies of those rules. (Docket Entry # 27, Notice to Pro Se Litigant Who Opposes a Motion for Summary Judgment ("Rule 56.2 Notice").) Plaintiff did not submit a Rule 56.1 Statement or a response to Defendants' 56.1 Statement. Since Plaintiff is *pro se,* the court has nonetheless reviewed the record submitted by the parties to determine whether there are disputed issues of material fact. *See Melendez v. DeVry Corp.,* No. 03–CV–1029 (NGG)(LB), 2005 WL 3184277, at \*2 (E.D.N.Y. Nov. 29, 2005). The court will deem admitted only those facts in Defendants' Rule 56.1 Statement that are supported by admissible evidence and are not controverted by admissible evidence in the record.

3    Plaintiff has also submitted two notarized but unsworn statements, from Jose Velazquez and Adelaida Miranda, which support her allegations of verbal abuse against Ciprian. (*See* Letters from Jose Velazquez and Adelaida Miranda, attached to Vazquez Aff.) While the statements contain notary stamps, neither has a jurat "[t]he clause written at the foot of an affidavit, stating when, where, and before whom such affidavit was sworn," Black's Law Dictionary (8th ed.2004) —or any "sworn to" language. Nor do the statements declare that they were made under penalty of perjury as required for a declaration under 28 U.S.C. § 1746. Unsworn statements are inadmissible in evaluating a motion for summary judgment, but the court has nonetheless reviewed the statements and notes that the facts presented therein—assuming that Plaintiff could present them in an admissible form—do not affect the outcome of this decision. *See White v. Sears, Roebuck & Co.,* No. 07–cv–4286 (NGG)(MDG), 2009 WL 1140434, at \*2–3 & n. 3–4 (E.D.N.Y. Apr. 27, 2009).

4    In the Title VII context, the law recognizes that a plaintiff can establish a "mixed-motives" case by "convinc[ing] the trier of fact that an impermissible criterion in fact entered into the employment decision." *Tyler v. BethlehemSteel Corp.,* 958 F.2d 1176, 1181 (2d Cir.1992). To succeed in a mixed-motive showing, the plaintiff must "prove that an illegitimate factor had a 'motivating' or 'substantial' role in the employment decision."*Id.* (*quoting Price Waterhouse v. Hopkins,* 490 U.S. 228, 258, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989)). If the plaintiff demonstrates that a discriminatory motive exists, even if a legitimate motive is also present, the burden of proof passes to the defendant to establish that it would have made the same decision without considering the illegitimate factor. *See id.*Since Plaintiff has conceded that she lacks evidence supporting a claim of race or national origin discrimination, the court does not reach this issue with respect to her claim for change in job responsibilities.

5    *Burlington Northern* involved the statutory interpretation of Title VII's retaliation provisions, set forth in 42 U.S.C. § 2000e–3(a). Courts have nonetheless applied its holding to retaliation claims more generally. *See, e.g., Sekyere v. City of New York,* No. 05–cv–7192(BSJ)(DCF), 2009 WL 773311, at \*6 (S.D.N.Y. Mar. 18, 2009) (discussing *Burlington Northern* in

the context of both Title VII and ADEA retaliation claims); *accord Gomez–Perez v. Potter,* —— U.S. ——, ——, 128 S.Ct. 1931, 1945, 170 L.Ed.2d 887 (2008) (Roberts, J. dissenting) (finding the anti-retaliation provisions of Title VII "materially indistinguishable" from their counterparts in the ADEA). Given the broad nature of Plaintiff s retaliation claim, the court analyzes it under the *Burlington Northern* standard.

6    For example, the inadmissible statement provided by Adelaida Miranda asserts that Ms. Miranda saw Ciprian's "verbal abuse" of Vazquez, and specifically witnessed Ciprian insult Vazquez by saying "this fucking old lady thinks she is the boss of the unit."(Docket Entry # 23, Statement of Adelaida Miranda, dated February 8, 2008.) Jose Velazquez's statement refers generally to "insults" by Ciprian such as being called "old," and his own feelings of intimidation by Ciprian. (Docket Entry # 23, Statement of Jose Velazquez, undated.) These statements support the view that Ciprian acted rudely and inappropriately towards Vazquez, facts already accepted by the court for the purposes of this motion. The statements, however, do little to demonstrate that Ciprian specifically displayed ageist or racist animus as opposed to personal dislike.

---

**End of Document**                                      © 2016 Thomson Reuters. No claim to original U.S. Government Works.

Not Reported in F.Supp.2d, 2007 WL 2847317 (N.D.N.Y.)

(Cite as: 2007 WL 2847317 (N.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Lucas PIERCE, Plaintiff,
v.
Dave MONELL, Lieutenant, Tioga County Jail, Jessie
Howe, Corrections Officer, Tioga County Jail, and Nate
Marsh, Sergeant, Tioga County Jail, Defendants.
No. 9:06-CV-1290 (LEK/GHL).

Sept. 26, 2007.
Lucas Pierce, Auburn, NY, pro se.

Office of Frank W. Miller, Frank W. Miller, Esq., of
Counsel, East Syracuse, NY, for Defendants.

### DECISION AND ORDER

LAWRENCE E. KAHN, U.S. District Judge.

**\*1** This matter comes before the Court following a
Report-Recommendation filed on September 10, 2007 by
the Honorable George H. Lowe, United States Magistrate
Judge, pursuant to 28 U.S.C. § 636(b) and L.R. 72.3(c) of
the Northern District of New York. Report-Rec. (Dkt. No.
14). After ten days from the service thereof, the Clerk has
sent the entire file to the undersigned, including the
objections by Defendants Dave Monell, Jessie Howe, and
Nate Marsh, which were filed on September 24, 2007.
Objections (Dkt. No. 15).

It is the duty of this Court to "make a de novo
determination of those portions of the report or specified
proposed findings or recommendations to which objection
is made." 28 U.S.C. § 636(b). "A [district] judge ... may
accept, reject, or modify, in whole or in part, the findings
or recommendations made by the magistrate judge." *Id.*
Defendants claim that Judge Lowe incorrectly applied the
heightened pleading standards established by the United
States Supreme Court in *Bell Atlantic Corp. v. Twombly,*
550 U.S. ----, 127 S.Ct. 1955 (2007). In a *per curiam*
decision issued shortly after *Twombly,* the Supreme Court

reaffirmed that documents filed *pro se,* as is the case
before the Court, must still be liberally construed and held
to a less stringent standard. *Erickson v. Pardus, ---* U.S.
----, 127 S.Ct. 2197, 2200 (2007) (per curiam). In keeping
with this admonition, Judge Lowe's
Report-Recommendation properly stated and applied the
pleading standards. Accordingly, after considering the
objections and undertaking a de novo review of the record,
the Report-Recommendation should be approved for the
reasons stated therein.

Therefore, it is hereby

**ORDERED,** that the Report-Recommendation (Dkt.
No. 14) is **APPROVED** and **ADOPTED** in its
**ENTIRETY;** and it is further

**ORDERED,** that Defendants' Motion to dismiss (Dkt.
No. 6) is **GRANTED IN PART and DENIED IN
PART;** and it is further

**ORDERED,** that Plaintiff's independent state law tort
claim arising out of Defendants' alleged threats against
him is **DISMISSED;** and it is further

**ORDERED,** that Plaintiff's federal civil rights claim
alleging Defendants' negligent loss of Plaintiff's property
is **DISMISSED;** and it is further

**ORDERED,** that the remainder of Defendants'
Motion to dismiss is **DENIED** for the reasons stated in
Judge Lowe's Report-Recommendation; and it is further

**ORDERED,** that the Clerk serve a copy of this Order
on all parties.

**IT IS SO ORDERED.**

### REPORT-RECOMMENDATION

GEORGE H. LOWE, United States Magistrate Judge.

This action has been referred to me for Report and
Recommendation by the Honorable Lawrence E. Kahn,

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2847317 (N.D.N.Y.)

(Cite as: 2007 WL 2847317 (N.D.N.Y.))

Senior United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c) of the Local Rules of Practice for this Court. Generally, in this *pro se* civil rights action brought under 42 U.S.C. § 1983, Lucas Pierce ("Plaintiff"), currently incarcerated by the New York State Department of Correctional Services, alleges that, while he was an inmate at the Tioga County Jail ("the Jail"), three employees of the Jail-Lieutenant Dave Monell, Corrections Officer Jessie Howe, and Sergeant Nate Marsh ("Defendants")-violated his rights under the First and Fourteenth Amendments by negligently losing, or perhaps intentionally taking, his property and then retaliating against him for complaining about that property deprivation. (Dkt. No. 1.) Currently pending is Defendants' motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. (Dkt. No. 6.) For the reasons stated below, I recommend that Defendants' motion be granted in part and denied in part.

## I. BACKGROUND

**\*2** Liberally construing Plaintiff's *pro se* civil rights Complaint as I must, I read that Complaint as alleging that, while Plaintiff was an inmate at the Tioga County Jail during an unspecified time period, Defendants (1) "took close to $1,500.00 ... worth of jewelry" from him without recording the jewelry in the Jail's "property log" upon his admission to the Jail, did not return the jewelry to him upon his discharge from the Jail, and refused to compensate him for the loss of the jewelry despite his repeated requests for such compensation, in violation of the Fourteenth Amendment, and (2) retaliated against him by "threaten[ing] his life" and threatening to file "criminal charges" against him when he exercised his right, or attempted to exercise his right, under the First Amendment to complain about the deprivation of property through "speak[ing] his mind" to Defendants and through writing to a "third party" about the deprivation. (Dkt. No. 1, ¶¶ 6, 7.)

In their memorandum of law, Defendants assert four arguments in favor of dismissal of Plaintiff's Complaint pursuant to Rule 12(b) (6) of the Federal Rules of Civil Procedure: (1) that Plaintiff has failed to allege facts plausibly suggesting, or adduce evidence establishing, that he exhausted his administrative remedies before filing this action in federal court; (2) that Plaintiff's allegations of

threats by Defendants fail to state a claim since the allegations make no mention of physical injury, nor do the allegations even state that the threatened actions against Plaintiff were not actually taken by Defendants; (3) that Plaintiff's allegations that Defendants deprived him of his property at most state a claim for negligence by Defendants, which is not actionable under 42 U.S.C. § 1983; (4) that any claims that Plaintiff has attempted to assert against Defendants under New York State law are barred by the applicable statute of limitations, set forth in New York General Municipal Law §§ 50-e, 50-i. (Dkt. No. 6, Part 4.)

## II. APPLICABLE LEGAL STANDARDS

## A. Effect of Plaintiff's Failure to Respond to Defendants' Motion

Defendants filed their motion to dismiss on February 20, 2007. (Dkt. No. 6.) In light of Plaintiff's special status as a *pro se* civil rights litigant, on April 12, 2007, and May 22, 2007, I *sua sponte* (1) twice reminded Plaintiff that he had not yet responded to Defendants' motion to dismiss, (2) twice granted Plaintiff an extension of time in which to respond, first until May 11, 2007, and then until June 22, 2007, and (3) advised Plaintiff that his failure to so respond would be deemed consent to the relief requested in Defendants' motion. (Dkt.Nos.10, 12.) Still, Plaintiff did not respond to Defendants' motion to dismiss.

"Where a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as required by this Rule shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause be shown." N.D.N.Y. L.R. 7.1(b)(3).

**\*3** Here, Defendants' motion to dismiss has been properly filed, and Plaintiff has failed to oppose it (despite being warned of the possible consequences of that failure). Therefore, the next issue before the Court is whether Plaintiff has shown good cause as to why his failure to oppose Defendants' motion should not be deemed as "consent" to the granting of the motion.

The closest Plaintiff comes to showing such cause is

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2847317 (N.D.N.Y.)

(Cite as: 2007 WL 2847317 (N.D.N.Y.))

when he asserts, in his two verified applications for the appointment of counsel, that (1) he is "unable to fully complete paperwork on [his] own due to [a] lack of knowledge," (2) his incarceration in his correctional facility's Special Housing Unit has "greatly limit[ed] his ability to litigate" this action due in part to his limited access to the facility's law library, (3) his " 'mental' discibility [sic]" has inhibited his ability to respond to Defendants' motion, and (4) "his limited knowledge [of] law" has inhibited his ability to "investigate his case with regard to certain exhibits" filed by Defendants, and his ability to obtain "medical records" that are material to Defendants' motion. (Dkt. No. 9, Part 1, ¶ [C]; Dkt. No. 11, ¶¶ 1, 3, 4.)

After carefully considering the matter, I find that these sworn assertions by Plaintiff do not constitute good cause excusing his failure to oppose Defendants' motion. As an initial matter, I find that, rather than filing his second motion for the appointment of counsel (which totaled eight pages in length and included an affidavit of another prisoner), Plaintiff could well have simply responded to Defendants' motion. Moreover, Plaintiff needed no ability to "investigate his case" in order to respond to Defendants' motion, since the legal standard governing that motion does not permit the consideration of extrinsic evidence such as documents obtained through discovery.

However, I note that, in the cover letter to his first motion for the appointment of counsel, Plaintiff advises the Court that he is no longer incarcerated at Auburn Correctional Facility but at Southport Correctional Facility. (Dkt. No. 9, Part 2.) This change of address is also indicated implicitly in Plaintiff's second motion for the appointment of counsel. (Dkt. No. 11 at 4-6, 8.) The problem is that, because of the somewhat inconspicuous nature of this change-of-address notification, the change of address was not reflected on the docket when the Court twice extended Plaintiff's time in which to respond to Defendants' motion, and notified Plaintiff that his failure to so respond would be deemed consent to the relief requested in Defendants' motion. (Dkt.Nos.10, 12.)

Ordinarily, an uncertainty as to whether a plaintiff received such communications from the Court might undermine a finding that the plaintiff knowingly and voluntarily chose not to respond to an opponent's motion. However, here, I find no such uncertainty since it appears that mail addressed to Plaintiff at Auburn Correctional Facility has been forwarded to Plaintiff at Southport Correctional Facility. I base this conclusion on several pieces of evidence.[FN1]

> **FN1.** This evidence includes the following: (1) the fact that none of the Court's correspondence to Plaintiff at Auburn Correctional Facility has been returned to the Court as undeliverable (which is usually what happens when a prisoner has been transferred from a correctional facility without leaving a forwarding address); (2) the fact that, on or about February 9, 2007, a letter from a lawyer addressed to Plaintiff "c/o Auburn Correctional Facility" apparently reached Plaintiff at Southport Correctional Facility; and (3) the fact that an affidavit of a fellow prisoner, submitted by Plaintiff, indicates that Plaintiff received a copy of the Court's Order of April 12, 2007, despite the fact that the Order was sent to Auburn Correctional Facility while Plaintiff was actually incarcerated at Southport Correctional Facility. (Dkt. No. 9, Part 1 at 3; Dkt. No. 11 at 7.)

**\*4** Therefore, the final issue before the Court is whether Defendants have met their burden to demonstrate entitlement to dismissal for failure to state a claim, under the Federal Rules of Civil Procedure and the Local Rules of Practice for this Court.[FN2] The Court's consideration of whether a movant has met its burden "to demonstrate entitlement" to the relief requested under Local Rule 7.1(b)(3) is a more limited endeavor than a consideration of a contested motion requesting such relief.[FN3] However, such a consideration is not merely a perfunctory step but involves a review of the merits of Defendants' motion.[FN4] Obviously, the Court is not going to grant a motion that, on its face, lacks merit (especially when the motion requests dismissal of the complaint of a *pro se* civil rights litigant, who is generally afforded special solicitude due to his lack of familiarity with legal procedure and the serious nature of his claims).

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2847317 (N.D.N.Y.)

(Cite as: 2007 WL 2847317 (N.D.N.Y.))

FN2. *See* Fed.R.Civ.P. 12(b)(6) (permitting defendant to assert defense of failure to state a claim by motion); Fed.R.Civ.P. 7(b)(1) (requiring motions to, *inter alia*, "state with particularity the grounds therefor"); L.R. 7.1(a) (requiring all motions to dismiss to include a memorandum of law containing citations to legal authorities).

FN3. *See, e.g., Hernandez v. Nash,* 00-CV-1564, 2003 U.S. Dist. LEXIS 16258, at *7-8 (N.D.N.Y. Sept. 10, 2003) (Sharpe, M.J.) (before an unopposed motion to dismiss may be granted under Local Rule 7.1[b][3], "the court must review the motion to determine whether it is *facially meritorious*" ) (emphasis added) (citations omitted); *Race Safe Sys., Inc. v. Indy Racing League,* 251 F.Supp.2d 1106, 1109-1110 (N.D.N.Y.2003) (Munson, J.) (reviewing whether record contradicted defendant's arguments, and whether record supported plaintiff's claims, in deciding unopposed motion to dismiss, under Local Rule 7.1[b][3] ); *see also Wilmer v.. Torian,* 96-CV-1269, 1997 U.S. Dist. LEXIS 16345, at *2 (N.D.N.Y. Aug. 29, 1997) (Hurd, M.J.) (applying prior version of Rule 7.1 [b] [3], but recommending dismissal because of plaintiff's failure to respond to motion to dismiss *and* the reasons set forth in defendants' motion papers), *adopted by* 1997 U.S. Dist. LEXIS 16340, at *2 (N.D.N.Y. Oct. 14, 1997) (Pooler, J.); *accord, Carter v. Superintendent Montello,* 95-CV-989, 1996 U.S. Dist. LEXIS 15072, at *3 (N.D.N.Y. Aug. 27, 1996) (Hurd, M.J.), *adopted by* 983 F.Supp. 595 (N.D.N.Y.1996) (Pooler, J.).

FN4. *See, supra,* notes 2 and 3 of this Report-Recommendation.

**B. Recently Revised Legal Standard Governing Motions to Dismiss**

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a defendant may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). It has long been understood that a defendant may base such a motion on either or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under Rule 8(a)(2); [FN5] or (2) a challenge to the legal cognizability of the claim. [FN6]

FN5. *See* 5C Wright & Miller, *Federal Practice and Procedure* § 1363 at 112 (3d ed. 2004) ("A motion to dismiss for failure to state a claim for relief under Rule 12(b)(6) goes to the sufficiency of the pleading under Rule 8(a)(2).") (citations omitted); *Princeton Indus., Inc. v. Rem,* 39 B.R. 140, 143 (Bankr.S.D.N.Y.1984) ("The motion under F.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint as to whether the plaintiff has conformed to F.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement' that the pleader is entitled to relief."); *Bush v. Masiello,* 55 F.R.D. 72, 74 (S.D.N.Y.1972) ("This motion under Fed.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint, determining whether the complaint has conformed to Fed.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement that the pleader is entitled to relief.' ").

FN6. *See Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 514 (2002) ( "These allegations give respondent fair notice of what petitioner's claims are and the grounds upon which they rest.... In addition, they state claims upon which relief could be granted under Title VII and the ADEA."); *Wynder v. McMahon,* 360 F.3d 73, 80 (2d Cir.2004) ("There is a critical distinction between the notice requirements of Rule 8(a) and the requirement, under Rule 12(b)(6), that a plaintiff state a claim upon which relief can be granted."); *Phelps v. Kapnolas,* 308 F.3d 180, 187 (2d Cir.2002) ("Of course, none of this is to say that a court should hesitate to dismiss a complaint when the plaintiff's allegation ... fails as a matter of law.") (citation omitted); *Kittay v. Kornstein,* 230 F.3d 531, 541 (2d Cir.2000) (distinguishing between a failure to meet Rule 12 [b][6]'s requirement of stating a cognizable claim and Rule 8[a]'s requirement of disclosing sufficient information to put defendant on fair notice); *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.,* 379 F.Supp.2d 348, 370

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2847317 (N.D.N.Y.)

(Cite as: 2007 WL 2847317 (N.D.N.Y.))

(S.D.N.Y.2005) ("Although Rule 8 does not require plaintiffs to plead a theory of causation, it does not protect a legally insufficient claim [under Rule 12(b)(6) ].") (citation omitted); *Util. Metal Research & Generac Power Sys.,* 02-CV-6205, 2004 U.S. Dist. LEXIS 23314, at *4-5 (E.D.N.Y. Nov. 18, 2004) (distinguishing between the legal sufficiency of the cause of action under Rule 12[b][6] and the sufficiency of the complaint under Rule 8[a]); *accord, Straker v. Metro Trans. Auth.,* 331 F.Supp.2d 91, 101-102 (E.D.N.Y.2004); *Tangorre v. Mako's, Inc.,* 01-CV-4430, 2002 U.S. Dist. LEXIS 1658, at *6-7 (S.D.N.Y. Jan. 30, 2002) (identifying two sorts of arguments made on a Rule 12[b] [6] motion-one aimed at the sufficiency of the pleadings under Rule 8 [a], and the other aimed at the legal sufficiency of the claims).

Rule 8(a)(2) requires that a pleading include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). Such a statement must "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." [FN7] The purpose of this rule is to "facilitate a proper decision on the merits." [FN8] A complaint that fails to comply with this rule "presents far too a heavy burden in terms of defendants' duty to shape a comprehensive defense and provides no meaningful basis for the Court to assess the sufficiency of [plaintiff's] claims." [FN9]

FN7. *Dura Pharmaceuticals, Inc. v. Broudo,* 125 S.Ct. 1627, 1634 (2005) (holding that the complaint failed to meet this test) (quoting *Conley,* 355 U.S. at 47); *see also Swierkiewicz, 534 U.S. at 512* (quoting *Conley,* 355 U.S. at 47); *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit, 507 U .S. 163, 168 (1993)* (quoting *Conley,* 355 U.S. at 47).

FN8. *See Swierkiewicz,* 534 U.S. at 514 (quoting *Conley,* 355 U.S. at 48).

FN9. *Gonzales v. Wing,* 167 F.R.D. 352, 355 (N.D.N.Y.1996) (McAvoy, J.), *aff'd,* 113 F.3d

1229 (2d Cir.1997) (unpublished table opinion). Consistent with the Second Circuit's application of § 0.23 of the Rules of the U.S. Court of Appeals for the Second Circuit, I cite this unpublished table opinion, not as precedential authority, but merely to show the case's subsequent history. *See, e.g., Photopaint Technol., LLC v. Smartlens Corp.,* 335 F.3d 152, 156 (2d Cir.2003) (citing, for similar purpose, unpublished table opinion of *Gronager v. Gilmore Sec. & Co.,* 104 F.3d 355 [2d Cir.1996] ).

The Supreme Court has long characterized this pleading requirement under Rule 8(a)(2) as "simplified" and "liberal," and has repeatedly rejected judicially established pleading requirements that exceed this liberal requirement. [FN10] However, it is well established that even this liberal notice pleading standard "has its limits." [FN11] As a result, several Supreme Court decisions, and Second Circuit decisions, exist holding that a pleading has failed to meet this liberal notice pleading standard. [FN12]

FN10. *See, e.g., Swierkiewicz,* 534 U.S. at 513-514 (noting that "Rule 8(a)(2)'s simplified pleading standard applies to all civil actions, with limited exceptions [including] averments of fraud or mistake.").

FN11. 2 *Moore's Federal Practice* § 12.34[1][b] at 12-61 (3d ed.2003).

FN12. *See, e.g., Bell Atlantic Corp. v. Twombly,* 127 S.Ct. 1955, 1964-1974 (2007) (pleading did not meet Rule 8[a][2]'s liberal requirement), *accord, Dura Pharmaceuticals,* 125 S.Ct. at 1634-1635, *Christopher v. Harbury,* 536 U.S. 403, 416-422 (2002), *Freedom Holdings, Inc. v. Spitzer,* 357 F.3d 205, 234-235 (2d Cir.2004), *Gmurzynska v. Hutton,* 355 F.3d 206, 208-209 (2d Cir.2004). Several unpublished decisions exist from the Second Circuit affirming the Rule 8(a)(2) dismissal of a complaint after *Swierkiewicz. See, e.g., Salvador v. Adirondack Park Agency of the State of N.Y.,* No. 01-7539, 2002 WL 741835, at *5 (2d Cir. Apr. 26, 2002)

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2847317 (N.D.N.Y.)

(Cite as: 2007 WL 2847317 (N.D.N.Y.))

(affirming pre-*Swierkiewicz* decision from Northern District of New York interpreting Rule 8[a][2] ). Although these decisions are not themselves precedential authority, *see* Rules of the U.S. Court of Appeals for the Second Circuit, § 0.23, they appear to acknowledge the continued precedential effect, after *Swierkiewicz,* of certain cases from within the Second Circuit interpreting Rule 8(a)(2). *See Khan v. Ashcroft,* 352 F.3d 521, 525 (2d Cir.2003) (relying on summary affirmances because "they clearly acknowledge the continued precedential effect" of *Domond v. INS,* 244 F.3d 81 [2d Cir.2001], after that case was "implicitly overruled by the Supreme Court" in *INS v. St. Cyr,* 533 U.S. 289 [2001] ).

Most notably, in the recent decision of *Bell Atlantic Corporation v. Twombly,* the Supreme Court, in reversing an appellate decision holding that a complaint had stated a claim upon which relief could be granted, "retire[d]" the famous statement by the Court in *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." 127 S.Ct. 1955, 1968-1969 (2007).[FN13] Rather than turning on the conceivability of an actionable claim, the Court clarified, the Rule 8 standard turns on the "plausibility" of an actionable claim. *Id.* at 1965-1974. More specifically, the Court held that, for a plaintiff's complaint to state a claim, his "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]" assuming, of course, that all the allegations in the complaint are true. *Id.* at 1965 [citations omitted]. What this means, on a practical level, is that there must be "plausible grounds to infer [actionable conduct]," or, in other words, "enough fact to raise a reasonable expectation that discovery will reveal evidence of [actionable conduct]." *Id.*

FN13. The Court in *Twombly* further explained: "The phrase is best forgotten as an incomplete, negative gloss on an accepted pleading standard: once a claim has been adequately stated, it may be supported by showing any set of facts

consistent with the allegations in the complaint.... *Conley,* then, described the breadth of opportunity to prove what an adequate complaint claims, not the minimum standard of adequate pleading to govern a complaint's survival." *Twombly,* 127 S.Ct. at 1969.

**\*5** Having said that, it should be emphasized that, "[i]n reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." [FN14] "This standard is applied with even greater force where the plaintiff alleges civil rights violations or where the complaint is submitted *pro se.*"[FN15] Indeed, "courts must construe *pro se* pleadings broadly, and interpret them to raise the strongest arguments that they suggest."[FN16]

FN14. *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (affirming grant of motion to dismiss) (citation omitted); *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994).

FN15. *Hernandez,* 18 F.3d at 136 (citation omitted); *see also Deravin v. Kerik,* 335 F.3d 195, 200 (2d Cir.2003) (citations omitted); *Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 619 (2d Cir.1999) (citation omitted).

FN16. *Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000) (finding that plaintiff's conclusory allegations of a due process violation were insufficient) (internal quotation and citation omitted).

Moreover, when addressing a *pro se* complaint, generally a district court "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated."[FN17] However, "all normal rules of pleading are not absolutely suspended."[FN18] For example, an opportunity to amend should be denied where "the problem with [plaintiff's] causes of action is substantive" such that "[b]etter pleading will not cure it."[FN19]

FN17. *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2847317 (N.D.N.Y.)

(Cite as: 2007 WL 2847317 (N.D.N.Y.))

Cir.2000) (internal quotation and citation omitted); *see also* Fed.R.Civ.P. 15(a) (leave to amend "shall be freely given when justice so requires"). Of course, granting a *pro se* plaintiff an opportunity to amend is not required where the plaintiff has already been given a chance to amend his pleading.

FN18. *Stinson v. Sheriff's Dep't of Sullivan Cty.,* 499 F.Supp. 259, 262 & n. 9 (S.D.N.Y.1980) (citations omitted); *accord, Gil v. Vogilano,* 131 F.Supp.2d 486, 491 (S.D.N.Y.2001).

FN19. *Cuoco,* 222 F.3d at 112 (finding that repleading would be futile) (citation omitted); *see also Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir.1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice.") (affirming, in part, dismissal of claim with prejudice) (citation omitted).

Finally, it should be remembered that Rule 12(b)(6) motions are limited to the facts alleged in the complaint and must be converted into a motion for summary judgment if the court considers materials outside the pleadings.[FN20] However, of course, the court may, without converting the motion to dismiss into a motion for summary judgment, consider (1) any documents relied on and/or referenced in the complaint (even if those documents are not attached to the complaint, if those documents are provided by defendants in their motion to dismiss),[FN21] and (2) any documents provided by the plaintiff in opposition to defendants' motion to dismiss, to the extent those documents are consistent with the allegations in the complaint.[FN22]

FN20. *See* Fed.R.Civ.P. 12(b) ("If, on a motion asserting the defense numbered (6) o dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given

reasonable opportunity to present all material made pertinent to such a motion by Rule 56.").

FN21. *See Chambers v. Time Warner,* 282 F.3d 147, 153 & n. 3 (2d Cir.2002) (district court's consideration of certain contracts attached to defendant's motion to dismiss was appropriate where plaintiff relied on documents in drafting his complaint) [collecting cases]; *Levy v. Southbrook Int'l Invest., Ltd.,* 263, F.3d 10, 13, n. 3 (2d Cir.2001) (noting that "it was appropriate for the district court to refer to documents attached to the motion to dismiss since the documents were referred to in the complaint") [citation omitted]; *San LeandroEmergency Med. Group v. Philip Morris Co., Inc.,* 75 F.3d 801, 808 (2d Cir.1996) (a document that is "integral" to the complaint may be considered by the district court on a motion to dismiss "despite the fact that the complaint only contains limited quotations from that document") [collecting cases]; *Harsco Corp. v. Segui,* 91 F.3d 337, 341, n. 1 (2d Cir.1996) ("This letter, though cited to and described in the complaint, was not attached to the complaint. We may nonetheless review the letter in its entirety [in deciding defendants' motion to dismiss].") [citation omitted]; *Cortec Indus., Inc. v. Sum Holding LP,* 949 F.2d 42, 48 (2d Cir.1991) ("When plaintiff has actual notice of all the information in the movant's papers and has relied upon these documents in framing the complaint the necessity of translating a Rule 12(b)(6) motion into one under Rule 56 is largely dissipated."); *I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co., Inc.,* 936 F.2d 759, 762 (2d Cir.1991) ("We ... decline to close our eyes to the contents of the prospectus and to create a rule permitting a plaintiff to evade a properly argued motion to dismiss simply because plaintiff has chosen not to attach the prospectus to the complaint or to incorporate it by reference." [citations omitted].

FN22. "Generally, a court may not look outside the pleadings when reviewing a Rule 12(b)(6)

Not Reported in F.Supp.2d, 2007 WL 2847317 (N.D.N.Y.)

(Cite as: 2007 WL 2847317 (N.D.N.Y.))

motion to dismiss. However, the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider plaintiff's additional materials, such as his opposition memorandum." *Gadson v. Goord,* 96 Civ. 7544, 1997 WL 714878, *1, n. 2 (S.D.N.Y. Nov. 17, 1997) (citing, *inter alia, Gil v. Mooney,* 824 F.2d 192, 195 [2d Cir.1987] [considering plaintiff's response affidavit on motion to dismiss] ). Stated another way, "in cases where a pro se plaintiff is faced with a motion to dismiss, it is appropriate for the court to consider materials outside the complaint to the extent they 'are consistent with the allegations in the complaint.' " *Donhauser v. Goord,* 314 F.Supp.2d 119, 212 (N.D.N.Y.2004) (considering factual allegations contained in plaintiff's opposition papers) (citations omitted), *vacated in part on other grounds,* 317 F.Supp.2d 160 (N.D.N.Y.2004).

## III. DISCUSSION

### A. Exhaustion of Administrative Remedies

After reading Defendants' memorandum of law, and reviewing the applicable case law, I have no choice but to find that Defendants' exhaustion argument, on its face, lacks merit. (*See* Dkt. No. 6, Part 4, at 2-3 [Defs.' Mem. of Law].)

As an initial matter, to the extent that Defendants, during their exhaustion argument, rely on evidence outside the four corners of Plaintiff's Complaint, they straddle, or outright cross, the line between a Rule 12(b)(6) analysis and a Rule 56 analysis. (*See id .* at 2 [relying on the affidavit of Captain Paul Rhodes].) As explained above in Part II.B. of this Report-Recommendation, in certain circumstances, the Court can rely on documents not attached to a plaintiff's complaint without converting a motion to dismiss into a motion for summary judgment. One of those circumstances is when the plaintiff's complaint relies on or references a document provided by the defendant in support of its motion to dismiss.[FN23]

FN23. *See, supra,* note 21 of this Report-Recommendation.

Here, Defendants implicitly ask the Court, when evaluating Defendants' exhaustion argument, to consider (1) an excerpt of the "Tioga County Inmate Rule Book" setting forth the Jail's inmate grievance procedure, (2) four inmate grievance forms authored by Plaintiff, complaining of inadequate medical care, and (3) a letter dated September 18, 2006, from Plaintiff to one Patricia Scott (a sergeant at Tioga County Jail), complaining about the "lost and/or stolen property" at issue in this action.

**\*6** The problem with the four inmate grievance forms authored by Plaintiff is that they are nowhere relied on, or referenced, by Plaintiff in his Complaint. (*See generally* Dkt. No. 1.) Similarly, the problem with the Jail's inmate grievance procedure is that it is nowhere relied on, or referenced, by Plaintiff in his Complaint. (*See id.*)[FN24] As a result, the Court cannot consider these particular extrinsic documents without converting Defendants' motion to dismiss into a motion for summary judgment. (This I decline to do, and I urge the Court to decline to do. Plaintiff has not been given the required notice of such a conversion of Defendants' motion, nor has he been given an opportunity to present evidence to create an issue of fact, nor has he even been given an attempt to conduct discovery in this action.)

FN24. The closest that Plaintiff comes, in his Complaint, to conceivably relying on, or referencing, that procedure is when, in response to the question "Why did you choose to not present the facts relating to your complaint in the prison's grievance program?" Plaintiff stated, "The facts of the complaint do not matter in my current facility [i.e., Auburn Correctional Facility]." (*Id.* at ¶ 4[c].) However, clearly, this statement is not an attempt to rely on, or reference, the Tioga County Jail's inmate grievance procedure.

I reach a different conclusion, however, with regard to Plaintiff's letter of September 18, 2006, to Sergeant Scott about the "lost and/or stolen property" at issue in this action. This is because, in his Complaint, Plaintiff alleges, "After several request[s] ... to a third party [regarding my lost or stolen property,] I had my life threaten[e]d and had criminal charges threatened for

Not Reported in F.Supp.2d, 2007 WL 2847317 (N.D.N.Y.)

(Cite as: 2007 WL 2847317 (N.D.N.Y.))

writing to [a] third party [sic]." (*Id.* at ¶ 7.) Admittedly, I have some uncertainty as to whether this "request ... to third party" is a reference to this letter.[FN25] However, the letter is entirely consistent with Plaintiff's allegations. In addition, I am reminded that *pro se* civil rights complaints are to be liberally construed, and interpreted "to raise the strongest arguments that they suggest." *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) [citation omitted]. And, frankly, I believe that the letter in question inures to Plaintiff's benefit more than it works to his detriment, for a variety of reasons. As a result, for the purposes of Defendants' motion, I will liberally construe Plaintiff's Complaint as incorporating by reference the statements made in his letter dated September 18, 2006, to Sergeant Scott about the "lost and/or stolen property" at issue in this action. (Dkt. No. 6, Part 3, Ex. D [Rhodes Affid.].)

> FN25. *Cf. San LeandroEmergency Med. Group,* 75 F.3d at 808 (considering document because it was "integral" to the complaint and the complaint contained quotations from the document); *Harsco Corp.,* 91 F.3d at 341, n. 1 (considering letter because it was "cited to and described in the complaint").

However, even with the benefit of this letter, Defendants' exhaustion argument, when it is evaluated within the confines of a Rule 12(b)(6) analysis, lacks facial merit. This is because, for some years now, it has been the majority rule (followed by the Second Circuit) that a prisoner's fulfillment of his duty to exhaust his administrative remedies under the Prison Litigation Reform Act ("PLRA") is not a fact that the prisoner had to plead in order to state a claim under 42 U.S.C. § 1983 but a fact that may be challenged by a defendant through an affirmative defense (such as on a motion for summary judgment) established by the PLRA. *See, e.g., Jenkins v. Haubert,* 179 F.3d 19, 28-29 (2d Cir.1999). Recently, the Supreme Court upheld this interpretation of the exhaustion requirement, prohibiting circuits (such as the Sixth, Tenth and Eleventh Circuits) from using exhaustion as a heightened pleading requirement in prisoner civil rights case. *See Jones v. Block,* 127 S.Ct. 910, 914-915, 918-923 (2007). "[T]his is not to say that failure to exhaust cannot be a basis for dismissal for failure to state a claim." *Block,*

127 S.Ct. at 921. Rather, it means that a prisoner has no duty to plead facts plausibly suggesting that he exhausted his administrative remedies. If he chooses to plead facts regarding exhaustion, however, his Complaint may be dismissed for failure to state a claim if "the allegations in the complaint [taken as true] suffice to establish that [the prisoner failed to exhaust his administrative remedies]." *Id.*

**\*7** Here, the allegations in Plaintiff's Complaint, taken as true, simply do not suffice to establish that he failed to exhaust his administrative remedies. Defendants are certainly correct that, in Plaintiff's Complaint, in response to the question "Is there a prisoner grievance procedure at this facility," Plaintiff responded "Yes." (Dkt. No. 1, ¶ 4[a].) Defendants are also correct that, in response to the question "If your answer to 4(a) is YES, did you present the facts relating to your complaint in this grievance program," Plaintiff responded "No." (*Id.* at ¶ 4[b].) However, in Plaintiff's response to the next question, Plaintiff plausibly suggests that he was interpreting the words "this facility" in the previous questions as referring to his current facility at the time of the signing of his Complaint (i.e., Auburn Correctional Facility), not to the facility at which the alleged constitutional violations occurred (i.e., Tioga County Jail).[FN26] As a result, none of Plaintiff's allegations, taken as true, appear to say *anything at all* about what formal grievance procedures he did or did not avail himself of at Tioga County Jail.

> FN26. Specifically, in response to the question "Why did you choose to not present the facts relating to your complaint in the prison's grievance program," Plaintiff responded, "The facts of the complaint do not matter in my current facility." (Dkt. No. 1, ¶ 4[b].)

In any event, Plaintiff has alleged facts plausibly suggesting that he was excused from exhausting his administrative remedies under the circumstances. The Second Circuit has held that a three-part inquiry is appropriate where a defendant contends that a prisoner has failed to exhaust his available administrative remedies, as required by the PLRA. *See Hemphill v. State of New York,* 380 F.3d 680, 686, 691 (2d Cir.2004). First, "the court must ask whether [the] administrative remedies [not

Not Reported in F.Supp.2d, 2007 WL 2847317 (N.D.N.Y.)

(Cite as: 2007 WL 2847317 (N.D.N.Y.))

pursued by the prisoner] were in fact 'available' to the prisoner." *Hemphill, 380 F.3d at 686* (citation omitted). Second, if those remedies were available, "the court should ... inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it ... or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Id.* (citations omitted). Third, if the remedies were available and some of the defendants did not forfeit, and were not estopped from raising, the non-exhaustion defense, "the Court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements." *Id.* (citations and internal quotations omitted).

Here, Plaintiff has alleged facts plausibly suggesting that Defendants are estopped from asserting exhaustion as an affirmative defense since Defendant Monell threatened Plaintiff's life, and threatened to file criminal charges against Plaintiff, in response to Plaintiff's complaints to Defendants and "a third party" (apparently Sergeant Scott) about Defendants' having "lost" or "stolen" his jewelry, and the other Defendants "helped" Defendant Monell to do so. (*Id.* at ¶¶ 6-7, 9.) Moreover, Plaintiff has alleged facts plausibly suggesting that "special circumstances" exist in that (1) he tried to informally exhaust his administrate remedies at Tioga County Jail, but stopped because he was frustrated from doing so by Defendants, and (2) he did not try to grieve the issue once he was transferred from Tioga County Jail to Auburn Correctional Facility because he was laboring under the misunderstanding that he could no longer avail himself of his administrative remedies at Tioga County Jail and that Auburn Correctional Facility was not the proper forum at which to avail himself of his administrative remedies. (Dkt. No. 1, ¶¶ 4[b], 6-7.) Whether Plaintiff would be able to adduce any evidence of such estoppel or special circumstances sufficient to create an issue of fact on a motion for summary judgment is another question, which I need not, and do not, decide here.

**\*8** For these reasons, I recommend that the Court reject as facially unmerited Defendants' exhaustion

argument.

**B. Plaintiff's Allegations of Threats**

In their memorandum of law, Defendants assume that Plaintiff is attempting to assert, in part, some sort of independent claim of a "threat" against Defendants. (Dkt. No. 6, Part 4 at 3-4.) As an initial matter, Defendants do not describe the precise nature of the claim to which they are referring, for example, whether it is a claim for the tort of intentional infliction of emotional distress, the tort of assault, etc. Furthermore, even liberally construing Plaintiff's Complaint, I have trouble discerning such a claim. Plaintiff never uses the words "emotional distress," "mental or emotional injury," or "state law claim" in his Complaint. (*See* Dkt. No. 1, ¶¶ 6-7, 9.) Rather, I liberally construe Plaintiff's allegations of threats to be *inextricably tied* to his allegations of his attempts to exercise his right to "petition the Government for a redress of grievances," as articulated by the First Amendment.[FN27] Plainly stated, Plaintiff appears to be alleging that Defendants threatened him in retaliation for exercising his First Amendment right to complain.

> FN27. For example, when Plaintiff alleges that "[D]efendant [Monell] has threatened my life as well as [threatening me] with [the filing of] criminal charges," he makes that allegation immediately after alleging that "[Defendant] Monell has violated my Constitutional First Amend. rights to freedom of speech and self expression." (Dkt. No. 1, ¶ 6.) Thus, the allegation of a threat would appear to be an explanation of *how* Defendant Monell violated Plaintiff's First Amendment right. This interpretation of Plaintiff's theory of liability is confirmed by his later allegation that "I had my life threatened and had criminal charges threatened for writting [sic] to a third party [about the deprivation of my property]." (*Id.* at ¶ 7.)

In any event, assuming Plaintiff is attempting to assert such a claim, Defendants are indeed correct that, under the PLRA, any such claim by Plaintiff, to the extent that it is one "for mental or emotional injury," would be precluded by the PLRA, absent a "prior showing of physical injury." (*Id.*)

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2847317 (N.D.N.Y.)

(Cite as: 2007 WL 2847317 (N.D.N.Y.))

For these reasons, I accept as facially merited Defendants' argument that any independent state law claim by Plaintiff based on tortious threats by Defendants must be dismissed.

With regard to Plaintiff's First Amendment retaliation claim, Defendants argue, in their memorandum of law, that Plaintiff does not state a viable claim since he does not allege that Defendants actually took any "adverse action" against him. (*Id.* at 4.) More specifically, they argue that (1) the property deprivation does not constitute "adverse action" since it occurred before his exercise of his First Amendment right, and (2) the alleged threats do not constitute such "adverse action" since the threats did not actually result in physical harm or physical injury. (*Id.*) While Defendants are correct in making their first point, they are clearly incorrect in making their second point.

This is because it is clearly established that, for threats to constitute "adverse action" for purposes of a First Amendment retaliation claim, the threats need not have been actually executed, or cause any actual physical harm or physical injury to a prisoner. Rather, all that is required is that the threat was of such a nature as to "deter[ ] a reasonable inmate [from complaining]," or more specifically, to "deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights." [FN28] Here, I find that the allegations of Plaintiff's Complaint, taken as true, plausibly suggest that the threats would have deterred a similarly situated prisoner of ordinary firmness from exercising his First Amendment right to complain about the alleged property deprivation. In particular, Plaintiff alleges that the threats included a threat against his life. (Dkt. No. 1, ¶¶ 6, 7 [''[D]efendant [Monell] has threatened my life.... I had my life threatened ....''].) Plaintiff also alleges that the threats included a threat to file "criminal charges" against him. (*Id.*) Death threats may constitute "adverse action." [FN29] Indeed, even unfulfilled threats of disciplinary charges may constitute "adverse action." [FN30] Again, whether Plaintiff would be able to adduce any evidence of such threats sufficient to create an issue of fact on a motion for summary judgment is another question, which I need not, and do not, decide here.

FN28. *Gill v. Pidlypchak,* 389 F.3d 379, 381-382 (2d Cir.2004) (Scullin, J., sitting by designation) [internal quotation marks and citations omitted].

FN29. *See, e.g., Hepworth v. Suffolk County,* 02-CV-6473, 2006 WL 2844408, at *8-9 (E.D.N.Y. Sept. 29, 2006) ("continued verbal threats" that inmate "would receive another beating or be killed").

FN30. *See, e.g., Gill v. Tuttle,* 93 F. App'x 301, 303 (2d Cir.2004) (threat to "keep filing misbehavior reports" against plaintiff).

**\*9** For these reasons, I recommend that the Court (1) dismiss any independent state law tort claim by Plaintiff arising out of Defendants' alleged threats against him, and (2) reject as facially unmerited Defendants' argument with regard to Plaintiff's First Amendment retaliation claim.

**C. Plaintiff's Allegations of a Property Deprivation**

To the extent that Defendants argue that Plaintiff's claim of negligent loss of property should be dismissed because negligence is not actionable under 42 U.S.C. § 1983, I agree. (Dkt. No. 6, Part 4, at 5.) Even liberally construing Plaintiff's Complaint, I read it as asserting such a fatal claim of negligence. (Dkt. No. 1, ¶¶ 6, 9 [Plf.'s Compl., alleging that Defendants failed to "log[ ] [the taking of his jewelry] into their property log," and that his jewelry was "lost" or "stolen"].) "[M]ere negligence will not support a section 1983 claim." [FN31]

FN31. *Burgess v. County of Rensselaer,* 03-CV-0652, 2006 U.S. Dist. LEXIS 91521, at *26 (N.D.N.Y. Dec. 14, 2006) (McCurn, J.) [citation omitted]; *see also Estelle v. Gamble,* 429 U.S. 97, 106 (1976) ("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."); *Pena v. Deprisco,* 432 F.3d 98, 112 (2d Cir.2005) ("In order to establish a violation of a right to substantive due process, a plaintiff must

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2847317 (N.D.N.Y.)

(Cite as: 2007 WL 2847317 (N.D.N.Y.))

demonstrate not only government action but also that the government action was 'so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.' ... [T]he Fourteenth Amendment is not a 'font of tort law.' ... It does not provide a comprehensive scheme for determining the propriety of official conduct or render all official misconduct actionable.... '[N]egligently inflicted harm is categorically beneath the threshold of constitutional due process.' ") [citations omitted].

To the extent that Defendants argue that Plaintiff's claim of property deprivation should be dismissed because he has failed to allege facts plausibly suggesting that Defendants were personally involved in the deprivation, I reject that argument. (Dkt. No. 6, Part 4, at 5.) Plaintiff has alleged that "C.O. Howe and Sgt. [Marsh] have helped Lt. Monell to unlawfully deprive me of my personal property in violation of the 14th Amend. of the U.S. Constitution. The defendants unlawfully took close to $1,500.00$ [sic] worth of jewelry upon [my] admittenced [sic] to there [sic] facility and never returned them [sic]. In fact they [sic] never got logged into their property log." (Dkt. No. 1, ¶ 6.) Plaintiff has further alleged that he made "several request[s]" to Defendants for the replacement of, or reimbursement for, his jewelry, and that Defendants denied those requests, and indeed, threatened him in response to those requests. (*Id.* at ¶ 7.) Liberally construed, these allegations plausibly suggest that Defendants were personally involved in the deprivation at issue. Again, whether Plaintiff would be able to adduce any evidence of such personal involvement to create an issue of fact on a motion for summary judgment is another question.

Finally, to the extent that Defendants argue that Plaintiff's claim of property deprivation should be dismissed because he has failed to allege facts plausibly suggesting that Defendants intentionally stole (or "converted") his property, I reject that argument as well. (Dkt. No. 6, Part 4, at 5.) Plaintiff expressly characterizes his jewelry as "stolen" in his Complaint, as he does in his letter of September 18, 2006, to Sergeant Scott, which Defendants implicitly ask the Court to deem as incorporated into that Complaint by reference. (Dkt. No.

1, ¶ 9; Dkt. No. 6, Part 3, at 24.) Moreover, Plaintiff alleged that (1) "defendants unlawfully" took the jewelry, (2) "never ... logged [the jewelry] into their property log," and (3) "helped" each other to deprive Plaintiff of the jewelry, and (4) threatened Plaintiff when he complained about the jewelry. (*Id.* at ¶¶ 6-7.) Liberally construed, these allegations plausibly suggest that Defendants intentionally stole his property. Again, whether Plaintiff would be able to adduce any evidence of such a theft to create an issue of fact on a motion for summary judgment is another question.

**\*10** For these reasons, I recommend that the Court (1) dismiss Plaintiff's claim of negligent loss of property, and (2) reject as facially unmerited Defendants' arguments regarding Plaintiff's allegations of personal involvement and property theft.

**D. Statute of Limitations**

Defendants argue that any claims that Plaintiff is attempting to assert against Defendants under New York State law are barred by the applicable statute of limitations, set forth in New York General Municipal Law §§ 50-e, 50-i.

To the extent that Defendants argue that any independent state law claim by Plaintiff based on Defendants' alleged threats is barred by the applicable statute of limitations, such an argument is moot. As stated above, even liberally construing Plaintiff's Complaint, I have trouble discerning, in that Complaint, any independent state law claim based on Defendants' alleged threats, such as a claim sounding in tort for intentional infliction of emotional distress or assault. *See, supra,* Part III.B. of this Report-Recommendation. As a result, I have already recommended that such attempted claim by Plaintiff be dismissed because (1) it does not allege facts plausibly suggesting that such a tort occurred, and (2) any such claim would be precluded by the PLRA's "prior showing of physical injury" requirement.

Incidentally, I note that the limitations period governing civil rights claims brought in New York and asserted under 42 U.S.C. § 1983 (including Plaintiff's First Amendment retaliation claim, which involves an allegation of various threats made against him) is three years, absent

Not Reported in F.Supp.2d, 2007 WL 2847317 (N.D.N.Y.)

(Cite as: 2007 WL 2847317 (N.D.N.Y.))

evidence of a continuing violation or grounds for equitable tolling. *See Patterson v. County of Oneida,* 375 F.3d 206, 225 (2d Cir.2004); *Eagleston v. Guido,* 41 F.3d 865, 871 (2d Cir.1994).[FN32]

> FN32. *See also Wilson v. Garcia,* 471 U.S. 261, 266-268 (1985); 42 U.S.C. § 1988; N.Y. C.P.L.R. § 214(5) (personal injury statute of limitations).

To the extent that Defendants argue that any independent state law tort claims by Plaintiff for (1) misappropriation (or "conversion") of property and (2) negligent loss of property should be dismissed as untimely, it appears that Defendants are correct that the limitations period governing those state law tort claims would be the period set forth in New York General Municipal Law §§ 50-e, 50-i.[FN33] *See White v. City of Mount Vernon,* 633 N.Y.S.2d 369, 370 (N.Y.App.Div., 2d Dept., 1995); *Schwinghammer v. Sullivan W. Cent. Sch. Dist.,* 768 N.Y.S.2d 696, 696-697 (N.Y.App.Div., 3d Dept., 2003); *Bliss v. Vill. of Arcade,* 761 N.Y.S.2d 573, 573 (N.Y.App.Div., 4th Dept., 2003). However, Defendants' statute-of-limitations argument with regard to these two state law tort claims contains a fatal flaw that I cannot ignore.

> FN33. I note that I have *some* trouble construing Plaintiff's Complaint as intending to assert an independent state law claim of tortious conversion or negligence. Plaintiff never uses the words "conversion" or "state law claim" in his Complaint. (*See* Dkt. No. 1, ¶¶ 6-7, 9.) Nor does he use the words "negligence" or "careless." (*Id.*) Nor does he mention his loss of property without appearing to inextricably tie that loss to his Fourteenth Amendment deprivation-of-property claim. (*See, e.g.,* at ¶ 6 ["C.O. Howe and Sgt. [Marsh] helped Lt. Monell to unlawfully deprive me of my personal property *in violation of the 14th Amend. of the U.S. Constitution.*" ] [emphasis added], *accord, id.* at ¶ 7, "Second Cause of Action," "Third Cause of Action.") However, I am reminded that I must liberally construe Plaintiff's Complaint "to raise the strongest arguments that they suggest." *Cruz v.*

*Gomez,* 202 F.3d 593, 597 (2d Cir.2000) (finding that plaintiff's conclusory allegations of a due process violation were insufficient) (internal quotation and citation omitted). As a result, I will liberally construe Plaintiff's Complaint as intending to assert these two state law tort claims.

Because Defendants advance this statute-of-limitations argument through a Rule 12(b)(6) motion to dismiss, I am confined to the four corners of Plaintiff's Complaint for the answer to the question of whether Plaintiff complied with the relevant limitations period. Based on the allegations contained in Plaintiff's Complaint (and Plaintiff's letter of September 18, 2006, to Sergeant Scott, which, as explained above, I have deemed as incorporated into Plaintiff's Complaint by reference), it is unclear to me that the date of the incident giving rise to such a claim is in fact November of 2004. (Dkt. No. 6, Part 4, at 6; Dkt. No. 6, Part 3, at 24.) For example, if Defendants took Plaintiff's jewelry with the intent to convert it upon his admission to the Jail, then the elements of the tort of conversion were complete in November of 2004; however, if Defendants did not take Plaintiff's jewelry with the intent to convert it upon his admission to the Jail, but formed that intent at some later date (such as when Plaintiff was next discharged from the Jail and/or demanded the jewelry's return), then the elements of the tort were not complete until that later date, whenever that date was.[FN34] Due to the lack of specificity in Plaintiff's Complaint, we do not know when he is alleging that intent was formed.[FN35] (Nor is it likely that the parties will have any evidence of such a fact without the benefit of discovery.)

> FN34. *See White v. City of Mount Vernon,* 633 N.Y.S.2d 369, 370 (N.Y.App.Div., 2d Dept., 1995).

> FN35. I note that Plaintiff had no duty to plead that particular detail in order to state a claim. As with the failure to exhaust one's administrative remedies, a failure to comply with the applicable statute of limitations is an affirmative defense, which a defendant must prove and which a plaintiff need not plead. *See* Fed.R.Civ.P. 8(c);

Not Reported in F.Supp.2d, 2007 WL 2847317 (N.D.N.Y.)

(Cite as: 2007 WL 2847317 (N.D.N.Y.))

*Jones v. Block,* 127 S.Ct. 910, 920-921 (2007) ("If the allegations ... show that relief is barred by the applicable statute of limitations, the complaint is subject to dismissal for failure to state a claim; [but] that does not make the statute of limitations any less an affirmative defense ....").

**\*11** More important, we do not know, based solely on the allegations of Plaintiff's Complaint, whether he in fact complied with New York General Municipal Law §§ 50-e, 50-i. Granted, Defendants have adduced evidence that Plaintiff never filed a notice of claim within 90 days after the claim arose, as required by New York General Municipal Law § 50-e. (Dkt. No. 6, Part 3, ¶¶ 8, 10 [Rhodes Affid.].) However, as explained above, consideration of such evidence would convert Defendants' motion to dismiss to a motion for summary judgment. And such a conversion would be improper since Plaintiff has not been given the required notice of such a conversion of Defendants' motion, nor has he been given an opportunity to present evidence to create a question of fact on the issue (nor has he even been given an attempt to conduct discovery on the issue). For example, on a properly filed motion for summary judgment, Plaintiff might conceivably be able to adduce evidence that (1) he did in fact file, or diligently attempt to file, such a notice of claim, and/or (2) he was prevented by Defendants from filing such a notice of claim due to their threats against him.

Of course, the Court has the discretion to not exercise jurisdiction over any such pendent state law claims, under the principles of *United Mine Workers v. Gibbs,* 383 U.S. 715, 726 (1966) ("It has consistently been recognized that pendent jurisdiction is a doctrine of discretion, not of plaintiff's right."). However, I believe that such a decision is best left for a later time, after Defendants' inevitable motion for summary judgment has been decided, and it has been determined whether any federal civil rights claims exist to which state law claims may be appended.

For these reasons, I recommend that the Court reject as facially unmerited Defendants' statute-of-limitations argument.

**ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' motion to dismiss (Dkt. No. 6) be ***GRANTED* in part,** insofar as that motion requests the dismissal of (1) any independent state law tort claim by Plaintiff arising out of Defendants' alleged threats against him, and (2) any federal civil rights claim by Plaintiff alleging negligent loss of property by Defendants, but that the motion be **otherwise *DENIED;*** and it is further

**ORDERED** that the Clerk's Office shall change Plaintiff's address of record in this action from Auburn Correctional Facility to Southport Correctional Facility (as requested by him in Dkt. No. 9, Part 2).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15 [2d Cir.1989] ); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,2007.

Pierce v. Monell
Not Reported in F.Supp.2d, 2007 WL 2847317 (N.D.N.Y.)
END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.


Not Reported in F.Supp.2d, 2007 WL 1544629 (S.D.N.Y.)
(Cite as: 2007 WL 1544629 (S.D.N.Y.))

▷

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
George LUNNEY, Plaintiff,
v.
Lieutenant BRURETON, et al., Defendants.
**No. 04 Civ. 2438(LAK)(GWG).**

May 29, 2007.

George Lunney, Elmira, NY, pro se.

Benjamin Lee, Assistant Attorney General, New York, NY, for
Defendants.

### *REPORT AND RECOMMENDATION*

GABRIEL W. GORENSTEIN, United States Magistrate
Judge.

*TABLE OF CONTENTS*

I.          *BACKGROUND* ...................                                            2
            A.          *Facts* ......................                                  2
            B.          *Procedural History* ...............                           5

II.         *APPLICABLE LAW* ...............                                            8
            A.          *Standard of Review on Summary Judgment Motions* ................   8
            B.          *Exhaustion* ................                                  10
                        1.          *PLRA* ...............                             10
                        2.          New York's Inmate Grievance Program% i ..........  11

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1544629 (S.D.N.Y.)
(Cite as: 2007 WL 1544629 (S.D.N.Y.))

| | | | |
|---|---|---|---|
| III. | | *DISCUSSION* ................... | 12 |
| | A. | *Eighth Amendment Claim Relating to Food in the SHU* ............... | 12 |
| | B. | *Eighth Amendment Claim of Excessive Force* ........ | 16 |
| | | 1. | *Exhaustion* ................. | 16 |
| | | 2. | *Merits* .................... | 21 |
| | C. | *Eighth Amendment Claims Based on Lack of Laundry Services and Personal Hygiene Items* ...................... | 26 |
| | | 1. | *Laundry Services* ............... | 2 7 |
| | | 2. | *Plumbing Problems and Failure to Provide Personal Hygiene Items* ..... | 28 |
| | | 3. | *Personal Involvement* .................. | 30 |
| | D. | *First Amendment Retaliation Claims* .............. | 30 |
| | | 1. | *Law Governing First Amendment Retaliation* ............ | 31 |
| | | 2. | *Claims against Fischer* ............... | 32 |
| | | 3. | *Claims against Blot* ............... | 34 |
| | | | a. | Exhaustion of Claims Against Blot% i .......... | 34 |
| | | | b. | *The Merits of Lunney's Allegation that Blot Denied Him Showers, Meals, and Recreation* ........... | 37 |
| | | | | i. | Adverse Action. | 38 |
| | | | | ii. | Causal Connection. | 40 |
| | | | c. | *The Merits of Lunney's Allegation that Blot Filed a False Misbehavior Report* ............... | 41 |
| | | | d. | *The Merits of Lunney's Allegation that Blot Threatened Physical Violence* .............. | 43 |
| | | | e. | *The Merits of Lunney's Allegation of Retaliatory Assault* ..... | 45 |
| | | 4. | *First Amendment Claim Against Frazier* .......... | 47 |
| | | 5. | *First Amendment Claim Against Brereton* ........ | 47 |
| | E. | *Unfiled Grievances* ............... | 4 8 |
| | F. | *Fourteenth Amendment Due Process Claims* .......... | 50 |
| | | 1. | *Law Governing Disciplinary Proceedings* .......... | 50 |
| | | 2. | *Written Disposition of Disciplinary Hearing* .......... | 51 |

Conclusion ........................ 55

**\*1** George Lunney, currently an inmate at the Elmira Correctional Facility, has brought this suit *pro se* under 42 U.S.C. § 1983 against employees of the Sing Sing Correctional Facility ("Sing Sing"), where Lunney was previously housed. Lunney alleges that certain defendants violated his due process rights by improperly conducting a disciplinary hearing that resulted in his confinement in the Special Housing Unit ("SHU") of Sing Sing. He further alleges that various defendants were deliberately indifferent to inhumane conditions of confinement in the SHU in violation of his Eighth Amendment rights, that he was the victim of an assault, and that he was retaliated against for filing grievances with respect to conditions in the SHU in violation of his rights under the First Amendment.

Defendants now move for summary judgment. As described below, the defendants' motion should be granted, with the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1544629 (S.D.N.Y.)
(Cite as: 2007 WL 1544629 (S.D.N.Y.))

exception of the portion of their motion concerning Lunney's claim of (1) excessive force against Correction Officers Blot and Frazier and (2) his First Amendment retaliation claims (a) against defendant Officer Blot based on the allegedly retaliatory assault, threats, and deprivation of recreation and showers and (b) against Officer Frazier for his participation in the retaliatory assault.

I. *BACKGROUND*

The facts described below and later in this Report are drawn largely from Lunney's affidavit. *See* Plaintiff's Affidavit, filed June 13, 2006 (Docket # 88) ("Lunney Aff."). In many places, Lunney's affidavit cites to allegations contained in his amended complaint. *See* Amended Complaint, filed Mar. 24, 2005 (Docket # 34) ("Am.Compl."). That is, the affidavit cites the allegations of the amended complaint without repeating the substance of the incorporated matters under oath or penalty of perjury. Because defendants have not objected to this approach, we proceed as if any such incorporated matters in the Amended Complaint were admissible under [Fed.R.Civ.P. 56(e)](#).

A. *Facts*

On May 21, 2002, Lunney returned to his cell following a "medical shower" to find Correction Officer Hadzovic leaving the cell. *See* Lunney Aff. ¶ 1 (incorporating Am. Compl. at 3 ¶ 1). Hadzovic informed Lunney that he had just searched his cell. *Id.* After conducting a pat frisk on Lunney, Hadzovic reentered the cell and came out with a box of spaghetti. *Id.* Hadzovic announced that he would confiscate the box, which appeared to be altered, and locked Lunney in his cell. *Id.*

Approximately 45 minutes after Hadzovic left, Correction Sergeant Guadagno came to Lunney's cell with two other correction officers. *Id.* (incorporating Am. Compl. ¶ 2). Guadagno informed Lunney that a "shank type weapon" was discovered in the confiscated spaghetti box. *Id.* Lunney asserted that the weapon was not his and that he had merely purchased the spaghetti from the commissary. *Id.* Nonetheless, he was escorted to the SHU to await disciplinary action. *Id.*

**\*2** Lunney received a "Tier III" misbehavior report on May 22,

2002. *Id.* (incorporating Am. Compl. ¶ 3); Inmate Misbehavior Report (reproduced as Ex. A to Notice of Motion to Dismiss, filed June 10, 2004 (Docket # 15) ("Motion to Dismiss")). Following a disciplinary hearing on June 13, 2002, Lunney was found guilty of possession of a weapon and sentenced to nine months' confinement in the SHU. Lunney Aff. ¶ 2 (incorporating Am. Compl. ¶ 4). Lunney filed an administrative appeal with Donald Selsky, the Director of Special Housing/Inmate Disciplinary Program for the New York State Department of Correctional Services, who affirmed the disposition on August 22, 2002. Lunney Aff. ¶ 2; Am. Compl. at 2.

Lunney then filed a petition pursuant to Article 78 of the New York Civil Practice Law and Rules in the New York State Supreme Court, Albany County. Lunney Aff. ¶ 2. On September 16, 2002, Justice Thomas J. McNamara issued an order to show cause directing Selsky to respond to the petition. *Id.* ¶ 4. On October 3, 2002, Selsky rescinded the disciplinary determination and ordered a rehearing on the ground that Lunney had not been given adequate assistance in preparing his defense. *Id.* ¶ 5. Lunney subsequently withdrew his Article 78 petition. *Id.* ¶ 9.

The rehearing commenced on October 15, 2002. *Id.* ¶ 11; Disciplinary Hearing Transcript (reproduced as Ex. B to Motion to Dismiss) ("Transcript"). During the hearing, a dispute arose between the hearing officer, Lieutenant Brereton, [FN1] and Lunney. Lunney Aff. ¶ 11 (incorporating Am. Compl. ¶ 7); Transcript at 29-37. Lunney requested permission to leave the hearing, Brereton granted him permission to do so, and Lunney was escorted out. Lunney Aff. ¶ 11 (incorporating Am. Compl. ¶ 7); Transcript at 34-37. Lunney was again found guilty of possessing a weapon and sentenced to nine months in the SHU with a corresponding loss of all privileges. Lunney Aff. ¶ 11 (incorporating Am. Compl. ¶ 7); Transcript at 59.

> [FN1.](#) This officer is identified as Lieutenant "Brereton" in the complaint.

Lunney subsequently filed a request for discretionary review with Brian Fischer, at that time the Superintendent of Sing Sing. Lunney Aff. ¶ 13; Am. Compl. at 2. The disciplinary disposition was affirmed by First Deputy Superintendent Paul Kikendall. Lunney Aff. ¶ 13; Am. Compl. at 2. In an appeal to the Commissioner of the New York State Department of

Not Reported in F.Supp.2d, 2007 WL 1544629 (S.D.N.Y.)
(Cite as: 2007 WL 1544629 (S.D.N.Y.))

Correctional Services, Lunney argued that he had not been provided with a copy of the hearing disposition and that Selsky had no authority to order a new disciplinary hearing once the action in state court had been filed. Lunney Aff. ¶ 14 (incorporating Am. Compl. ¶ 10). The Acting Director of Special Housing rejected the appeal on November 7, 2002, although he reduced Lunney's sentence from nine to six months in the SHU. *Id.;* Review of Superintendent's Hearing (reproduced as Ex. D to Motion to Dismiss) ("Hearing Review").

Lunney filed a second Article 78 petition on November 19, 2002, with respect to the rehearing. *See* Article 78 Petition (reproduced as Ex. E to Motion to Dismiss); Lunney Aff. ¶ 15. On August 13, 2003, Justice Edward Sheridan of the Albany County Supreme Court dismissed the misbehavior report and ordered the Department of Correctional Services ("DOCS") to expunge all references to the incident from Lunney's institutional record. *See* Decision, Order and Judgment, dated Aug. 13, 2003 (reproduced as Ex. D to Combined Affirmation and Memorandum of Law in Opposition to Defendants' Motion for Dismissal, filed July 6, 2004 (Docket # 18) ("Pl. Opp. to Mot. to Dismiss")). Justice Sheridan concluded that the failure to provide Lunney with a copy of the hearing disposition was a violation of due process and that Selsky had no authority to order the rehearing once Lunney filed an Article 78 petition in state court. *Id.* at 3.

**\*3** Lunney was confined to the SHU for 180 days, Lunney Aff. ¶ 17, from May 21, 2002, to November 21, 2002. As is described in greater detail below, during this period Lunney asserts that he was served with cold, spoiled, or poorly prepared food, given inadequate laundry services, and denied hygiene items, showers, meals, and recreation by SHU staff. *Id.* ¶¶ 18, 21-23, 29 (incorporating Am. Compl. ¶ 15(a)-(d), (g)). Lunney also asserts that he was criticized and threatened by SHU staff for filing grievances related to prison conditions, and threatened with transfer by Superintendent Fischer. *Id.* ¶¶ 28, 30, 31 (incorporating Am. Compl. ¶ 15(f)-(h)). Lunney asserts that, on one occasion, he was physically assaulted by prison guards in retaliation for complaining about conditions in his cell. Lunney Aff. ¶¶ 24-25 (incorporating Am. Compl. ¶ 15(e)(1)-(2)).

B. *Procedural History*

The original complaint in this action was filed on March 29, 2004. *See* Complaint (Docket # 2) ("Compl."). It alleged the following claims: (1) violation of due process when Selsky convened a new disciplinary hearing while the Article 78 review of the first hearing was pending, Compl. at 7 (¶ 1); (2) violation of due process based on the failure to provide Lunney with a timely written disposition of the second hearing, Compl. ¶ 8; (3) that in violation of the Eighth Amendment, Lunney was subject to "overall poor" conditions of confinement in the Sing Sing SHU, *see id.* at 7 (¶ 3), including the service of cold, spoiled, and improperly prepared food; inadequate laundry services; inadequate law library services; and inadequate reading material, Compl. ¶ 16; and (4) that he was retaliated against for filing grievances with respect to conditions in the SHU, *id.* ¶¶ 17, 19; *id.* at 7 (¶ 2), in violation of his rights under the First Amendment. Lunney sought $10 million in punitive and/or compensatory damages. *Id.* at 8.

Defendants filed a motion to dismiss. *See* Defendants' Memorandum of Law in Support of Their Motion to Dismiss, filed June 10, 2004 (Docket # 16). On February 23, 2005, this Court dismissed all of Lunney's claims except for: (1) his Eighth Amendment claim against Fischer with regard to improperly prepared food; (2) his First Amendment claim against Fischer alleging that he was threatened with physical retaliation for filing grievances; and (3) his due process claim against Brereton regarding the failure to receive a written disposition of his disciplinary hearing. *See Lunney v. Brureton,* 2005 WL 121720, at \*16 (S.D.N.Y. Jan.21, 2005) ( "*Lunney I*" ), *adopted by,* 2005 WL 433285, at \*1 (S.D.N.Y. Feb.23, 2005). Lunney was given the opportunity to replead his claims. *Lunney I,* 2005 WL 121720, at \*16.

Lunney then filed an amended complaint, which restated most of the allegations included in his original complaint. *See Id.* ¶¶ 15. It also contained new claims. Significantly, Lunney amended his original complaint to include as defendants Officers Michael Blot and Parrish Frazier. *See* Am. Compl. ¶ 16(h), (i). The claims in the amended complaint are as follows: (1) Selsky deprived Lunney of his First and Fourteenth Amendment rights by ordering a new disciplinary hearing and "depriving [him] of his right to challenge the original hearing in a court of law," *see id.* ¶ 16(a); (2) Brereton violated Lunney's due process rights by failing to provide him with a written copy of the disposition for the hearing on October 17, 2002, *id.* ¶ 16(f); (3) Robert Murphy, Fischer, and Kikendall violated Lunney's due process rights by failing to remedy Lieutenant Brereton's failure to provide a copy of the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1544629 (S.D.N.Y.)
(Cite as: 2007 WL 1544629 (S.D.N.Y.))

disposition, *id.* ¶¶ 16(b)-(d); (4) Fischer violated Lunney's First Amendment rights by threatening to transfer him in retaliation for filing grievances, *id.* ¶ 16(c); (5) Fischer failed to remedy the "numerous sub-standard conditions of confinement in the S.H.U.," and subjected him to "forced labor without pay," *id.;* (6) Sean Kober violated Lunney's First and Eighth Amendment rights by failing "to operate the Sing Sing I.G.R.C. in accordance with D.O.C.S. policy and thus[ ] deprived plaintiff of his means to petition the government for the redress of grievances," *id.* ¶ 16(e); (7) Anthony Chu violated Lunney's Eighth Amendment rights by failing to remedy "the many problems that existed with the S.H.U. food service program and for failing to provide plaintiff with wholesome, nutritious and properly prepared meals," *id.* ¶ 16(g); (8) Blot violated Lunney's First, Eighth, and Fourteenth Amendment rights by (a) assaulting him, threatening and harassing him, and depriving him of showers, meals and recreation, all in retaliation for Lunney's filing of grievances; (b) by co-signing a misbehavior report against Lunney for an incident in which Blot was not involved; (c) by threatening Lunney for making complaints against other staff members; (d) by depriving Lunney of access to clean clothing and/or failing to ensure that the clothing was laundered; (e) by failing to provide Lunney with basic hygiene items; and (f) by failing to remedy the plumbing problems in Lunney's SHU cell, *id.* ¶ 16(h); and (9) Frazier violated Lunney's First and Eighth Amendment rights by assisting Blot in the aforementioned violations. *Id.* ¶ 16(i).

**\*4** On April 24, 2006, defendants moved for summary judgment on all claims. [FN2] On June 13, 2006, Lunney filed opposition papers. *See* Plaintiff's Memorandum in Opposition to Defendants' Motion for Summary Judgment (Docket # 87) ("Pl.Mem."); Lunney Aff. Lunney's papers did not include a statement made in response to the Defendants' 56.1 Statement as required by Local Civil Rule 56.1. Defendants subsequently filed reply papers. *See* Defendants' Reply Memorandum of Law in Support of Their Motion for Summary Judgment, filed July 28, 2006 (Docket # 91) ("Def. Reply Mem."); Lee Reply Declaration, filed July 28, 2006 (Docket # 92) ("Lee Reply Decl."). Lunney then submitted a sur-reply memorandum with an additional affidavit. Plaintiff's Sur-Reply Memorandum, filed Sept. 12, 2006 (Docket # 96) ("Pl.Sur-Reply"); Affidavit, dated Sept. 7, 2006 (Docket # 97) ("Sur-Reply Aff.").

FN2. *See* Notice of Motion for Summary Judgment, filed Apr. 24, 2006 (Docket # 72); Defendants' Memorandum of Law in Support of Their Motion for Summary Judgment, filed Apr. 24, 2006 (Docket #

73) ("Def.Mem."); Defendants' Rule 56.2 Statement, filed Apr. 24, 2006 (Docket # 74); Declaration of Brian Fischer, filed Apr. 24, 2006 (Docket # 75) ("Fischer Decl."); Declaration of Paul Kikendall, filed Apr. 24, 2006 (Docket # 76); Declaration of Robert Murphy, filed Apr. 24, 2006 (Docket # 77); Declaration of Michael Blot, filed Apr. 24, 2006 (Docket # 78) ("Blot Decl."); Declaration of Parrish Frazier, filed Apr. 24, 2006 (Docket # 79) ("Frazier Decl."); Declaration of Sean Kober, filed Apr. 24, 2006 (Docket # 80); Rule 56.1 Statement, filed Apr. 24, 2006 (Docket # 81) ("Def.56.1"); Chu Declaration in Support of Defendants' Motion for Summary Judgment, filed Apr. 24, 2006 (Docket # 82); Declaration of Thomas G. Eagen, filed Apr. 24, 2006 (Docket # 83) ("Eagen Decl."); Declaration of Donald Selsky, filed Apr. 24, 2005 (Docket # 84) ("Selsky Decl."); Declaration of Benjamin Lee, filed Apr. 24, 2006 (Docket # 85) ("Lee Decl.").

## II. *APPLICABLE LAW*

### A. *Standard of Review on Summary Judgment Motions*

Rule 56(c) of the Federal Rules of Civil Procedure states that summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *accord Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(c)). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In determining whether a genuine issue of material fact exists, the evidence of the nonmovant "is to be believed" and the court must draw "all justifiable inferences" in favor of the non-moving party. *Id.* at 255 (citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158-59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)). Nevertheless, once the moving party has shown that there is no genuine issue as to any material fact and that it is entitled to a judgment as a matter of law, "the nonmoving party must come forward with 'specific facts showing that there is a

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1544629 (S.D.N.Y.)
(Cite as: 2007 WL 1544629 (S.D.N.Y.))

genuine issue for trial,' " *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting *Fed.R.Civ.P. 56(e)*) (emphasis in original), and "may not rely on conclusory allegations or unsubstantiated speculation," *Scotto v. Almenas,* 143 F.3d 105, 114 (2d Cir.1998) (citing cases). In other words, the nonmovant must offer "concrete evidence from which a reasonable juror could return a verdict in his favor." *Anderson,* 477 U.S. at 256. Where "the nonmoving party bears the burden of proof at trial, summary judgment is warranted if the nonmovant fails to make a showing sufficient to establish the existence of an element essential to [its] case." *Nebraska v. Wyoming,* 507 U.S. 584, 590, 113 S.Ct. 1689, 123 L.Ed.2d 317 (1993) (quoting *Celotex,* 477 U.S. at 322) (internal quotation marks omitted) (alteration in original). Thus, "[a] defendant moving for summary judgment must prevail if the plaintiff fails to come forward with enough evidence to create a genuine factual issue to be tried with respect to an element essential to its case." *Allen v. Cuomo,* 100 F.3d 253, 258 (2d Cir.1996) (citing *Anderson,* 477 U.S. at 247-48).

B. *Exhaustion*

1. *PLRA*

**\*5** The Prison Litigation Reform Act ("PLRA") provides in relevant part:

No action shall be brought with respect to prison conditions under *section 1983* of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

*42 U.S.C. § 1997e(a).* Accordingly, "[c]omplete exhaustion of ... administrative remedies through the highest level for each claim is required." *Veloz v. New York,* 339 F.Supp.2d 505, 514 (S.D.N.Y.), *aff'd,* 178 Fed. Appx. 39 (2d Cir.2004); *see also Porter v. Nussle,* 534 U.S. 516, 524, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002) ("All 'available' remedies must now be exhausted; those remedies need not meet federal standards, nor must they be 'plain, speedy, and effective.' ") (citations omitted). In addition, the exhaustion must be "proper"-that is, "compl[y] with an agency's deadlines and other critical procedural rules because no adjudicative system can function

effectively without imposing some orderly structure on the course of its proceedings." *Woodford v. Ngo,* --- U.S. ----, ---- - ----, 126 S.Ct. 2378, 2386-87, 165 L.Ed.2d 368 (2006) (internal citation and quotation omitted). Further, "the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter,* 534 U.S. at 532. The exhaustion requirement applies even when a plaintiff seeks relief not available in prison administrative proceedings, such as monetary damages. *See Booth v. Churner,* 532 U.S. 731, 740-41, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001). Nonetheless, an inmate is not required to use this process where it "was reasonable for the inmate to conclude that his administrative remedies had been exhausted by [a] positive disposition" of some informal complaint. *Braham v. Clancy,* 425 F.3d 177, 183 (2d Cir.2005); *accord Dixon v. Goord,* 224 F.Supp.2d 739, 749 (S.D.N.Y.2002) ("The exhaustion requirement is satisfied by resolution of the matter, i.e., an inmate is not required to continue to complain after his grievances have been addressed."); *Perez v. Blot,* 195 F.Supp.2d 539, 546 (S.D.N.Y.2002).

In this Circuit, when a plaintiff advances a plausible explanation for his failure to exhaust, a court engages in a three-part analysis:

First, the court must ask: whether administrative remedies were in fact "available" to the prisoner. [Second], [t]he court should also inquire ... whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense. [Third], [i]f the court finds that administrative remedies were available to the plaintiff, and that the defendants are not estopped and have not forfeited their non-exhaustion defense, but that the plaintiff nevertheless did not exhaust available remedies, the court should consider whether *special circumstances* have been plausibly alleged that justify the prisoner's failure to comply with administrative procedural requirements.

**\*6** *Brownell v. Krom,* 446 F.3d 305, 311-12 (2d Cir.2006) (citing *Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004)) (emphasis and alterations in original); *accord Curry v. Mazzuca,* 2006 WL 250487, at \*6 (S.D.N.Y. Feb.2, 2006).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1544629 (S.D.N.Y.)
(Cite as: 2007 WL 1544629 (S.D.N.Y.))

Finally, in *Jones v. Bock,* --- U.S. ----, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007), the Supreme Court held that courts must consider claims in a § 1983 complaint that have been exhausted despite the presence of unexhausted claims. 127 S.Ct. at 923-26.

2. *New York's Inmate Grievance Program*

In New York, formal exhaustion for state prisoners generally requires complying with the three-step grievance and appeal procedure outlined in the Inmate Grievance Program. *See* N.Y. Comp.Codes R. & Regs. tit. 7 ("7 N.Y.C.R.R."), § 701.5. In brief, an inmate must first file a complaint with the Inmate Grievance Resolution Committee ("IGRC"). 7 N.Y.C.R.R. § 701.5(a). Next, after receiving a response from the IGRC, the inmate may appeal to the superintendent of the facility. *Id.* § 701.5(b). Finally, after receiving a response from the superintendent, the prisoner may seek any review of the superintendent's decision with the Central Office Review Committee ("CORC"). *Id.* § 701.5(c). *See Hemphill,* 380 F.3d at 682. Generally, "[a] prisoner has not exhausted his administrative remedies until he goes through all three levels of the grievance procedure." *Hairston v. LaMarche,* 2006 WL 2309592, at *7 (S.D.N.Y. Aug.10, 2006) (citing cases).

III. *DISCUSSION*

In his opposition papers, Lunney did not submit a statement in response to the defendants' statement under Local Civil Rule 56.1. In light of Lunney's *pro se* status, and in light of the fact that he submitted an affidavit setting forth his disagreements with the defendants' version of the facts, *see* Lunney Aff., the Court will exercise its discretion not to penalize Lunney for this failure. *See, e.g., Phoenix Global Ventures, LLC v. Phoenix Hotel Assocs., Ltd.,* 422 F.3d 72, 75 (2d Cir.2005) ("district court has inherent authority to determine when to overlook or excuse a departure from its own local rules").

We now address the claims made in Lunney's amended complaint.

A. *Eighth Amendment Claim Relating to Food in the SHU*

Lunney maintains his Eighth Amendment rights were compromised when he was served food that was "cold, spoiled and poorly prepared" on "a near daily basis" during his detention in the SHU. *See* Lunney Aff. ¶ 18; Affirmation of A. Franco, DIN # 01-A-5104, undated (reproduced in Ex. E to Lunney Aff.), ¶ 3(a) (milk often spoiled, fruits and vegetables rotten, appearance and quality of meals poor and unpalatable, inmates forced to refuse meals on numerous occasions); Affirmation of Johnny Casaigne, DIN # 04-A-2867, undated (reproduced in Ex. E to Lunney Aff.), ¶ 3(a) (same); Deposition of Johnny E. Casaigne, dated June 24, 2005 (reproduced as Ex. F to Lunney Aff.), at 27 ("I rarely ate the food because when it did come it was ... either spoiled, ice cold or wasn't even cooked right."); Deposition of Alisjandro Franco, dated June 24, 2005 (reproduced as Ex. G to Lunney Aff.), at 19 (refused meals "a few times"). Lunney states that he and other inmates "were often forced to refuse meals due to the poor quality of the food." *See* Lunney Aff. ¶ 18. Lunney also states that complaints and grievances about these problems were ignored, and that inmates "had to resort to refusing entire meals so as to get the attention of" defendants. *See id.* ¶ 19 (incorporating Am. Compl. ¶ 15(a)(1)). Finally, Lunney alleges that he suffered "[w]eight loss and muscle atrophy as a result of not receiving adequate meals." *See Id.* ¶ 18 (incorporating Am. Compl. at 18 (¶ 2)), and that on one occasion he and other inmates "became ill after eating," *see id.* ¶ 18. He states that the illness consisted of "stomach cramping, nausea, slight fever, chills and diarrhea," and that the inmates received antacid tablets for their discomfort. *See id.* (incorporating Am. Compl. at 18 (¶ 2)); Ambulatory Health Record, dated Aug. 20, 2002 (reproduced as Ex. H to Lunney Aff.) (medical records reflecting a doctor's assessment of "upset stomach," for which Lunney was given antacid tablets). Defendants note that Lunney "acknowledged that other than one alleged incident involving a dinner of rice and beans, [he] was never treated for food poisoning or spoiled food and that he did not know other inmates in the S.H.U. who were treated for food poisoning or spoiled food." *See* Def. 56.1 ¶ 20 (citing Deposition of George Lunney, dated June 23, 2005 (reproduced as Ex. A to Lee Decl.) ("Lunney Dep."), at 123).

**\*7** Defendants argue that Lunney has failed to exhaust his claim that the food in the SHU posed a threat to him and the other SHU inmates. *See* Def. Mem. at 11. With respect to this claim, Lunney does not argue that the grievance process was unavailable to him, that there is a basis for estopping defendants from relying on the exhaustion doctrine, or that there are other special circumstances excusing his failure to exhaust, *see* Pl. Mem. at 9-10-though, as described further

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1544629 (S.D.N.Y.)
(Cite as: 2007 WL 1544629 (S.D.N.Y.))

below, he does make such an argument with respect to the excessive force and other retaliation claims. *See id*. at 6-7, 12-13. Rather, to support his contention that the food claim is exhausted, Lunney cites to grievances SS-35888-02 and SS-36314-02, as well as to "a grievance dated Sept. 29, 2002 and the letters sent to D.O.C.S. officials." *See id.* at 9 (citing Ex. K to Lunney Aff.). Grievance SS-35888-02, however, complains only that SHU inmates "received only one cup of milk" and that the inmates "do not get what we're supposed to" in terms of "healthy food items." *See* Grievance SS-35888-02, dated July 20, 2002 (reproduced in Ex. K to Lunney Aff.). It mentions nothing about spoiled food or that posed an immediate health risk to the inmates. Grievance SS-36314-02 mainly states that Lunney received Rice Krispies for breakfast even though the menu called for Bran Flakes, and thus that he was not receiving the proper amount of fiber in his diet. *See* Grievance SS-36314-02, dated Sept. 24, 2002 (reproduced in Ex. K to Lunney Aff.). It then also makes a brief reference to his food being "ice cold." *Id.* Thus, neither of these grievances support the broad claims now being made in the complaint.

Lunney also provides a copy of a purported grievance dated September 29, 2002. *See* Grievance (reproduced in Ex. K to Lunney Aff.). This grievance-which defendants contend was considered as part of SS-36314-02, *see* Def. Reply Mem. at 8 n. 2-contains a fleeting reference to "spoiled or rotten food" but gives no specifics on when the serving of such food occurred. This generic and unexplained reference to "spoiled or rotten food"-included at the end of a grievance that focuses largely on whether the fiber content of the food met dietary guidelines-was not sufficient to alert the prison officials as to the claims now being made in this complaint. While inmates are held only to a standard of "notice pleading" in grievances, *see Johnson v. Testman*, 380 F.3d 691, 697 (2d Cir.2004), Lunney's grievance statement was far too vague to provide the defendants with notice of when such spoiled food was served, in what manner, and with what frequency. It is thus insufficient to have exhausted this claim.

In any event, Lunney has not met his burden of showing he made the required appeals of even this grievance or that he should be excused from having done so. Although he asserts that this grievance was denied and appealed to the Superintendent, he concedes that he did not appeal it to the CORC, stating only that, based on the Superintendent's reply, "an appeal to the C.O.R.C. was unnecessary." Pl. Sur-Reply at 14. Lunney's general allegations that his grievances "proved ineffective in correcting the problems with the food" and that

he made additional verbal complaints, *see* Lunney Aff. ¶ 19, do not excuse his failure to exhaust. *See, e.g., Curry v. Fischer, 2004 WL 766433, at \*6 (S.D.N.Y. Apr.12, 2004)* ("Since informal channels did not lead to the resolution of his complaints, Curry cannot be deemed to have informally exhausted his remedies.") (citing *Hernandez v. Coffey, 2003 WL 22241431, at \*3 n. 4 (S.D.N.Y. Sept.29, 2003)* (informal exhaustion cannot be found where no resolution is reached)); *see also Williams v. City of New York, 2005 WL 2862007, at \*10 (S.D.N.Y. Nov.1, 2005)* ("It is well settled that complaint letters to DOCS or prison officials do not satisfy the PLRA's exhaustion requirements.").

**\*8** Lunney makes general claims about the alleged mismanagement of the grievance process, *see* Pl. Mem. at 71-75, which are discussed further in section III.E below. However, there is no reason why these alleged failures should have excused his obligation to exhaust his claims regarding food. Nor has he shown that he was otherwise prevented from filing grievances on food-a fact most obviously demonstrated by the fact that he filed various food-related grievances as has just been noted. Notably, Lunney asserts that between February 2002 and March 2004 he filed "more than 100 grievances and more than a dozen complaints with outside agencies and D.O.C.S. officials regarding nearly every aspect of his confinement." Pl. Sur-Reply at 19.

In sum, Lunney's claim that his Eighth Amendment rights were violated by the failure of the prison system to provide him with safe food, *see* Am. Compl. ¶ 16(g), is unexhausted and must be dismissed.

B. *Eighth Amendment Claim of Excessive Force*

Lunney claims that he was assaulted by Officers Blot and Frazier "[d]uring his first week in the S.H.U." after he attempted to notify another officer that his sink and toilet were broken and he was missing certain personal hygiene items. *See* Lunney Aff. ¶ 24. He states that as a result of this assault, he suffered a "[s]mall cut to lip and another to left side of jaw with bruises and contusions to face and body." *See id.* ¶ 25 (incorporating Am. Compl. at 18 (¶ 1)). The defendants argue that this claim is unexhausted and that it fails on the merits. *See* Def. Mem. at 10-11, 30-32.[FN3]

FN3. Lunney has also asserted that the assault occurred in retaliation for complaints he has made. The retaliation claim with respect to the assault is discussed separately below in sections III.D.3.e (with respect to Blot) and III.D.4 (with respect to Frazier).

1. *Exhaustion*

Lunney states that he did not file a grievance against Blot and Frazier for this assault until after he was transferred to Cayuga Correctional Facility nearly two years later, because Blot threatened him with retaliation if he did so, stating that "he would receive a misbehavior report for assault on staff if he ... filed a complaint and claimed any injuries." *See* Lunney Aff. ¶ 25 (incorporating Am. Compl. ¶ 15(e)(2)). Blot also told him that if he did file a grievance, "his time in S.H.U. would be longer and harsher." *See id.* Lunney argues that under cases such as *Ziemba v. Wezner,* 366 F.3d 161 (2d Cir.2004), his failure to file a timely grievance was "justifiable." *See* Pl. Mem. at 5-7.

Defendants argue that Lunney's failure to exhaust the excessive force complaint in a timely fashion should not be excused for several reasons: (1) the grievances and appeals Lunney filed in 2004 at Cayuga were untimely, and regardless, made no reference to any excessive force by Officers Blot and Frazier, but only to the Tier III hearing and "conditions of confinement" in the SHU, *see* Def. Reply Mem. at 6; (2) Lunney never mentioned any excessive force by Officers Blot and Frazier until he filed his amended complaint, *id.* at 7; and (3) the Second Circuit excuses failures to exhaust based on threats or retaliation only where "the record contain[s] documented proof of an inmate's prior complaints about the misconduct in a form other than a grievance along with allegations that an inmate was prevented from making these same complaints in the form of a grievance." *See id.* at 6 (citing *Ziemba* and *Hemphill* ).

**\*9** The first question is whether administrative remedies were in fact "available" to Lunney. *Brownell,* 446 F.3d at 311 (citing *Hemphill,* 380 F.3d at 686). To be available, an administrative remedy must "afford the possibility of some relief for the action complained of." *Booth,* 532 U.S. at 738; *accord Abney v. McGinnis,* 380 F.3d 663, 667 (2d Cir.2004). There is no dispute that the prison "provided grievance procedures that inmates claiming excessive force could utilize," *see Hemphill,*

380 F.3d at 686-specifically, the three-step process outlined in 7 N.Y.C.R.R. § 701.5. Nor is there any dispute that Lunney used these procedures frequently both before and after the alleged incident with Blot and Frazier. *See* Eagen Decl., Exs. A & B. Indeed, Lunney concedes that he "has an extensive history of prosecuting grievances." *See* Pl. Sur-Reply at 4.

The availability inquiry does not end here, however. In *Hemphill,* the Second Circuit held that the test for deciding whether ordinary grievance procedures were "available" is an "objective one: that is, would 'a similarly situated individual of ordinary firmness' have deemed them available." 380 F.3d at 688 (citing *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003)). The court went on to note that "threats or other intimidation by prison officials may well deter a prisoner of 'ordinary firmness' from filing an internal grievance, but not from appealing directly to individuals in positions of greater authority within the prison system, or to external structures of authority such as state or federal courts." *See Hemphill,* 380 F.3d at 688.

Lunney's affidavit suggests that he failed to file a grievance regarding the assault by Officers Blot and Frazier until 2004 because Blot threatened him with retaliation if he did so. *See* Lunney Aff. ¶ 25 (incorporating Am. Compl. ¶ 15(e)(2)). Specifically, Lunney has asserted that Blot told him if he filed a grievance about the assault, "he would receive a misbehavior report for assault on staff" and that "his time in S.H.U. would be longer and harsher." *See id.* Lunney states that this threat led him to avoid seeking medical attention or filing a complaint regarding the assault by Blot and Frazier until nearly two years later, when he was transferred to Cayuga Correctional Facility. *See id.* Because on this motion for summary judgment, we accept as true the admissible evidence of Lunney, we must assume that Blot did in fact threaten Lunney in the manner Lunney has claimed.

Applying the "ordinary firmness" standard, it is certainly plausible that a reasonable factfinder could conclude that a prisoner in Lunney's situation would be deterred from complaining about an assault that had just occurred. Here, Lunney alleged that he was beaten and that the beating was followed immediately by specific threats, some impliedly physical, if he filed a grievance. *See Hemphill, e.g.,* 380 F.3d at 688-89 (remanding for determination of availability of remedies where officer told plaintiff he had "better drop" his complaint regarding injuries sustained in a beating and not seek any medical attention or the officer would "make your life a

Not Reported in F.Supp.2d, 2007 WL 1544629 (S.D.N.Y.)
(Cite as: 2007 WL 1544629 (S.D.N.Y.))

living hell"); *McCullough v. Burroughs,* 2005 WL 3164248, at *4 (E.D.N.Y. Nov.29, 2005) (plaintiff excused from failing to exhaust remedies after he was assaulted by officers in retaliation for prior grievances and during the assault, officer expressly threatened that he would "get [him]") (alteration in original); *accord Hepworth v. Suffolk,* 2006 WL 2844408, at *4-7 (E.D.N.Y. Sept.29, 2006) (exhaustion excused where inmate was threatened for filing a grievance); *Larry v. Byno,* 2006 WL 1313344, at *4 (N.D.N.Y. May 11, 2006) (inmate subject to physical assault and threats of violence excused from filing grievance); *cf. Benjamin v. Comm'r New York State Dep't of Corr. Servs.,* 2006 WL 783380, at *4 (S.D.N.Y. Mar.28, 2006) (suggesting in dictum that administrative remedies would be rendered unavailable where "the complaint specifically recounted threatening statements made by correctional officers and plaintiff's 'acquiescence' to those threats") (citing *Hemphill,* 380 F.3d at 683-84, 687). Thus, Lunney has established a genuine issue of material fact with regard to the availability of administrative remedies for his claim of excessive force.

**\*10** Defendants contend that because Lunney "has no corroborated documentation of previously complaining about unconstitutional conduct in some form," this Court should not excuse his failure to exhaust this claim. *See* Def. Reply Mem. at 7. They argue that *Hemphill* and *Ziemba* "require[ ]" this result. *See id.* at 6-7. However, neither *Hemphill* nor *Ziemba* held that a plaintiff alleging threats or retaliation in relation to an excessive-force claim is required to have "corroborated documentation of previously complaining" about such force. Each merely noted that there had been some such documentation. For example, in *Hemphill,* the plaintiff alleged that he failed to exhaust his administrative remedies with regard to an excessive-force claim because an officer had told him, "I'll make your life a living hell throughout this penal system because I have friends all over." *See* 380 F.3d at 684. The Second Circuit held that the district court was required to consider whether "some seemingly available remedies were rendered unavailable by the threats Hemphill received" or alternatively, whether the defendants' exhaustion defense was estopped by the threats the officer had allegedly made to the plaintiff. *See id.* at 688-89. While the court noted that the plaintiff had written a letter to the superintendent of the prison, *see id.* at 688, the court's holding with respect to these questions did not rely on this fact, *see id.* at 688-89, and specifically noted that his letter to the superintendent did not necessarily mean that administrative remedies were "available" to him. *Id.*

Nor does it help defendants' argument that Lunney waited until his transfer to another facility, nearly two years later, to submit a grievance of any kind. First, such a delay is consistent with the actions of someone in fear of retaliation by Blot. Second, if Lunney was justified in not filing a grievance at all, he should not be penalized for filing an untimely one.

In sum, construing the record in the light most favorable to Lunney, a factfinder could conclude that administrative remedies were not "available" to Lunney with respect to his claim of excessive force. Accordingly, summary judgment cannot be granted on this question.[FN4]

FN4. Defendants assert that "in the event that the Court finds that there is a genuine dispute of material fact concerning exhaustion, and that plaintiff's claims cannot otherwise be dismissed, the proper procedure would be to hold an evidentiary hearing," Def. Reply Mem. at 10, rather than "proceed directly to trial." *Id.* There is certainly case law that supports the view that exhaustion should be determined by the Court rather than by a jury. *See, e.g., Wyatt v. Terhune,* 315 F.3d 1108, 1119-20 (9th Cir.) (in motion to dismiss for failure to exhaust administrative remedies under PLRA, court may "decide disputed issues of fact"), *cert. denied,* 540 U.S. 810 (2003); *Priester v. Rich,* 457 F.Supp.2d 1369, 1377 (S.D.Ga.2006) (same); *see also Dukes v. Doe,* 2006 WL 1628487, at *6 (S.D.N.Y. June 12, 2006) (ordering without discussion an "evidentiary hearing" on the question of exhaustion under the PLRA); *cf. Pauling v. Sec'y of Dep't of Interior,* 71 F.Supp.2d 231, 232-33 (S.D.N.Y.1999) (issues of fact with respect to equitable tolling of statute of limitations to be decided by the court). As the Supreme Court has recently affirmed, however, exhaustion is an "affirmative defense," much like a statute of limitations defense. *See Jones v. Bock,* --- U.S. ----, ---- - ----, 127 S.Ct. 910, 919-921, 166 L.Ed.2d 798 (2007). Where there are disputed factual questions regarding an affirmative defense such as a statute of limitations defense, the Second Circuit has stated that "issues of fact as to the application of that defense must be submitted to a jury." *Katz v. Goodyear Tire & Rubber Co.,* 737 F.2d 238, 243 n. 2 (2d Cir.1984). Thus, it is not clear that factual disputes regarding the exhaustion defense should ultimately be decided by the Court.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1544629 (S.D.N.Y.)
(Cite as: 2007 WL 1544629 (S.D.N.Y.))

2. *Merits*

Lunney asserts that after he attempted to notify another officer about his plumbing problems and lack of personal hygiene items, Officer Blot approached his cell and told him to "shut the fuck up or we are coming in there and you will not like the results." Lunney Aff. ¶ 24 (incorporating Am. Compl. ¶ 15(e)(1)). After further discussion between Lunney and Officers Blot and Frazier, Blot called for Lunney's cell door to be opened, and then "rushed into [his] cell and began punching [him] in the head and body." *Id.* Frazier then entered the cell "and placed [Lunney] in a choke hold for several minutes." *See id.* Lunney adds that he sustained "some bruises" from the attack, specifically that his "throat was bruised" where Frazier had grabbed" him and that he had a "couple [of] black and blues on my side," and that "about a week later bruises, you know, swelling went down." *See id.* ¶¶ 24-25 (citing Lunney Dep. at 171-74); *see also id.* (citing Lunney Dep. at 180-81 ("I could have used [medical attention], yeah. I had some bruises. I was pretty banged up.")).

**\*11** Defendants argue that any injuries Lunney sustained were *de minimis* and thus not actionable under the Eighth Amendment. *See* Def. Mem. at 30-32; Def. Reply Mem. at 26-27.

To establish an Eighth Amendment violation based on a claim of excessive force, "an inmate must meet both an objective and a subjective requirement." *Griffin v. Crippen,* 193 F.3d 89, 91 (2d Cir.1999). To meet the objective requirement, "the alleged violation must be 'sufficiently serious' by objective standards." *See id.* (citing *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)). The objective component is "context specific, turning upon 'contemporary standards of decency.' " *See Blyden v. Mancusi,* 186 F.3d 252, 263 (2d Cir.1999) (quoting *Hudson v. McMillian,* 503 U.S. 1, 8, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992)). To meet the subjective requirement, the inmate must show that the prison officials involved "had a 'wanton' state of mind when they were engaging in the alleged misconduct." *See Davidson v. Flynn,* 32 F.3d 27, 30 (2d Cir.1994). "[T]he 'wantonness' inquiry turns on 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.' " *See Blyden,* 186 F.3d at 262 (quoting *Hudson,* 503 U.S. at 7). "Thus, [t]he key inquiry

under *Hudson* and its precedents is whether the alleged conduct involved unnecessary and wanton infliction of pain." *Sims v. Artuz,* 230 F.3d 14, 21 (2d Cir.2000) (citing *Davidson,* 32 F.3d at 30) (internal quotation marks omitted).

"However, the malicious use of force to cause harm constitutes an 'Eighth Amendment violation[ ] per se ... whether or not significant injury is evident.' " *Griffin,* 193 F.3d at 91 (quoting *Blyden,* 186 F.3d at 263). This result follows because " '[w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated.' " *Blyden,* 186 F.3d at 263 (quoting *Hudson,* 503 U.S. at 9). Nevertheless, "a *de minimis* use of force will rarely suffice to state a constitutional claim." *Romano v. Howarth,* 998 F.2d 101, 105 (2d Cir.1993). " 'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.' " *Id.* (quoting *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.1973)).

Furthermore, courts in this circuit have held that "although the subjective component is 'inherently an inquiry into [the] defendant's state of mind, plaintiff need not offer particular evidence of defendant's mental state. For purposes of opposing defendants' summary judgment motion, plaintiff has satisfied his burden on this element by merely pleading a scenario in which the use of force could not have been in good faith.' " *See Watson v. Delgado,* 2006 WL 1716869, at \*5 (S.D.N.Y. June 20, 2006) (quoting *Santiago v. Campisi,* 91 F.Supp.2d 665, 673 (S.D.N.Y.2000)); *see also Boddie v. Schnieder,* 105 F.3d 857, 861 (2d Cir.1997) ("Where no legitimate law enforcement or penological purpose can be inferred from the defendant's alleged conduct, the abuse itself may, in some circumstances, be sufficient evidence of a culpable state of mind.").

**\*12** In this case, Lunney states that Blot and Frazier first threatened him and then entered his cell and attacked him without provocation. *See* Lunney Aff. ¶¶ 24-25 (incorporating Am. Compl. ¶ 15(e)(1)). Because under Lunney's version of the facts, the officers' alleged use of force could not have been in good faith, he has provided sufficient evidence of the subjective component of an Eighth Amendment violation. *See, e.g., United States v. Walsh,* 194 F.3d 37, 50 (2d Cir.1999) ("the subjective element is satisfied in this case as there was absolutely no reasonably perceived need for the application of force"); *Santiago,* 91 F.Supp.2d at 673 ("Assuming plaintiff's story to be true, defendant's alleged conduct is clearly unrelated to any 'good-faith effort to maintain or restore discipline.' ")

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1544629 (S.D.N.Y.)
(Cite as: 2007 WL 1544629 (S.D.N.Y.))

(citation omitted).

With regard to the objective component, Lunney has alleged that as a result of the assault by Blot and Frazier, he sustained "some bruises," specifically, his "throat was bruised where Frazier had grabbed" him and he had a "couple black and blues on my side," and that "about a week later bruises, you know, swelling went down." *See* Lunney Aff. ¶¶ 24-25 (citing Lunney Dep. at 171-74); *see also id.* (citing Lunney Dep. at 180-81 ("I could have used [medical attention], yeah. I had some bruises. I was pretty banged up.")). While defendants argue that any injuries Lunney suffered were *de minimis* and not documented by medical records, *see* Def. Mem. at 30-32, they point to no case where alleged injuries of this kind were considered outside the protection or the Eighth Amendment. Indeed, *Griffin* held that an inmate's Eighth Amendment claim survived summary judgment where "the only injuries he suffered were a bruised shin and swelling over his left knee," and "the only evidence he intended to offer in support of his claims was his own testimony." *See Griffin,* 193 F.3d at 91. The court explained that although the inmate's claim of excessive force was "weak and his evidence extremely thin, dismissal of the excessive-force claim was inappropriate because there are genuine issues of material fact concerning what transpired after appellant was handcuffed and whether the guards maliciously used force against him." *See id.* Thus, one court has concluded that "bruising or equivalent injuries may be found by a reasonable fact-finder to constitute minor rather than de minimis harm." *See Watson,* 2006 WL 1716869, at *7 (citing *McCrory v. Belden,* 2003 WL 22271192, at *6 (S.D.N.Y. Mar.22, 2004)) (internal quotation omitted).

Lunney's alleged injuries-involving bruising and contusions-are quite different from the claim of the prisoner in *Boddie,* who had alleged only that he had been "bumped, grabbed, elbowed, and pushed." *See Boddie,* 105 F.3d at 862. In dismissing the claim, *Boddie* noted that the plaintiff "does not maintain that he experienced any pain or injury as a result of the physical contact," and that he did not "allege facts that show that the defendants used force 'maliciously and sadistically to cause harm,' rather than 'in a good-faith effort to maintain or restore discipline.' " *See id.* Both these circumstances are present in Lunney's case, however.

**\*13** In *Espinal v. Goord,* 2001 WL 476070 (S.D.N.Y. May 7, 2001), the court found the plaintiff's injuries to be *de minimis* where he was hit in the face two or three times, making his face turn red. 2001 WL 476070, at *13. However, the plaintiff in that case described these injuries as "really nothing." *Id.* In *Perkins v. Brown,* 285 F.Supp.2d 279 (E.D.N.Y.2003), a prisoner was not permitted to base an excessive force claim on allegations of a "broken lip," swollen nose, eye, fingers, and wrists, jaw pain, chest bruising, and "stress disorder" resulting from being struck, where the only evidence was the plaintiff's testimony and it was contradicted by prior statements of the plaintiff and medical evidence *Id.* at 284. The district court also pointed to a number of factors reflecting that such injuries were in fact *de minimis,* including the plaintiff's assertion that his pain was "nothing major" or "nothing serious." *Id.* In contrast, Lunney has stated that his throat was bruised from being put in choke hold, that he had bruises on his side as well, and that the swelling from these injuries did not subside for about a week.

To the extent the defendants argue that the lack of medical records showing treatment is grounds for dismissing Lunney's claim, the Court rejects this argument inasmuch as there is no requirement that the claim of injury be substantiated in contemporaneous medical records. *See Griffin,* 193 F.3d at 91 (Eighth Amendment claim permitted to proceed to trial even though only evidence supporting it was plaintiff's testimony). Thus, cases have frequently denied summary judgment for excessive-force violations while noting the absence of corroborating medical records. *See, e.g., Atkins v. County of Orange,* 372 F.Supp.2d 377, 399 (S.D.N.Y.2005); *Davis v. Patrick,* 2000 WL 1154065, at *1 (S.D.N.Y. Aug.14, 2000); *Baskerville v. Goord,* 2000 WL 897153, at *1-2 (S.D.N.Y. July 6, 2000).

Finally, Blot and Frazier are not protected by qualified immunity on this claim. Qualified immunity attaches where (1) a constitutional right would have been violated on the facts alleged; but (2) it would have been objectively reasonable for the defendant to have believed that his actions did not violate clearly established law. *See Saucier v. Katz,* 533 U.S. 194, 200-201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). Lunney has a constitutional right to be free from a correction officer's use of excessive force, and it could not be objectively reasonable for Officer Blot or Officer Frazier to have believed that the use of excessive force is allowed under the law. *See Calamia v. City of New York,* 879 F.2d 1025, 1036 (2d Cir.1989) ("The right of an individual not to be subjected to excessive force has long been clearly established."); *Johnson v. City of New York,* 2006 WL 2354815, at *5 (S.D.N.Y. Aug.14, 2006) (citing cases).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1544629 (S.D.N.Y.)
(Cite as: 2007 WL 1544629 (S.D.N.Y.))

C. *Eighth Amendment Claims Based on Lack of Laundry Services and Personal Hygiene Items*

**\*14** Lunney claims that prison officials violated his Eighth Amendment rights based on the existence of inadequate laundry services, plumbing problems, and the deprivation of personal hygiene items. *See* Lunney Aff. ¶¶ 20-23. While the defendants argue that these claims are unexhausted, *see* Def. Mem. at 11, it is unnecessary to reach this question because the claims fail on the merits.

The Supreme Court has held that "[t]he Constitution 'does not mandate comfortable prisons,' but neither does it permit inhumane ones." *Farmer v. Brennan, 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)* (quoting *Rhodes v. Chapman, 452 U.S. 337, 349, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981)*). The Eighth Amendment imposes an obligation on prison officials to provide "humane conditions of confinement" including "adequate food, clothing, shelter, and medical care." *Id.* To establish a violation of the Eighth Amendment on the basis of inhumane prison conditions, a plaintiff must show that the deprivation is sufficiently serious as to result in a denial of " 'the minimal civilized measure of life's necessities,' " *Wilson v. Seiter, 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)* (quoting *Rhodes, 452 U.S. at 347)*, and that the prison officials acted with "a sufficiently culpable state of mind." *Hathaway v. Coughlin, 99 F.3d 550, 553 (2d Cir.1996)* (citation omitted). In the context of conditions of confinement, the requisite mental state for the prison officials is "deliberate indifference." *Wilson, 501 U.S. at 302-03.*

1. *Laundry Services*

Lunney re-alleges the claim from his original complaint that the laundry services in the SHU were inadequate. *See* Lunney Aff. ¶¶ 20-21. In rejecting this claim on the motion to dismiss, this Court held that there "is no Eighth Amendment violation ... in instances where inmates are provided the opportunity and the supplies to wash their own clothes." *See Lunney I, 2005 WL 121720, at \*8* (citing *Green v. Ferrell, 801 F.2d 765, 771 (5th Cir.1986)* (no constitutional violation where inmates were permitted to wash their clothes in sinks and were provided with laundry detergent)); *Benjamin v. Fraser, 161 F.Supp.2d 151, 178-79 (S.D.N.Y.2001)* (availability of sinks and laundry detergent or bar soap sufficient under the Eighth Amendment), *aff'd in relevant part and vacated in part, 343 F.3d 35 (2d Cir.2003).* The Court thus concluded that "Lunney's mere allegation that his clothes were returned to him without being cleaned on various occasions does not state an Eighth Amendment claim as to inadequate laundry services." *See Lunney I, 2005 WL 121720, at \*8.* Lunney asserts that his sink was small and that he was not given soap specifically for laundry purposes. Lunney Dep. at 167. But he has not submitted evidence that would allow a reasonable to jury to conclude that he could not achieve some level of cleanliness with the materials he had. *See generally Benjamin, 161 F.Supp.2d at 178-79.* That Lunney asserts he was without soap for eight days and had a clogged sink for five, as described in the next section, shows at most that he lacked the means to clean his own clothing for a relatively brief period. As such, there was no Eighth Amendment violation.

2. *Plumbing Problems and Failure to Provide Personal Hygiene Items*

**\*15** Lunney alleges that he "was placed in a cell where the sink was clogged and there was no running water." *See* Lunney Aff. ¶ 22. He states that he made "verbal complaints" and that the sink was repaired "on about plaintiff's fifth day in S.H.U." *See id.* (incorporating Am. Compl. ¶ 15(c)). He also states that he did not receive "soap, toothpaste, a toothbrush, and other hygiene items." *See Id.* ¶ 23. While he states that his verbal complaints were ignored, he adds that the problem "was informally resolved on May 29, 2002 when C.O. Lebron of the I.G.R.C. corrected the problem." *See id.*

With regard to toiletries and hygiene items, Lunney fails to show that such a denial rose to the level of deliberate indifference to his health or safety. Courts have typically held that temporary deprivations of toiletries do not violate the Eighth Amendment. *See Trammell v. Keane, 338 F.3d 155, 165 (2d Cir.2003)* (deprivation of "verbal complaints" approximately two weeks-while perhaps uncomfortable-does not pose such an obvious risk to an inmate's health or safety to suggest that the defendants were 'aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed], and [that they also drew] the inference' ") (quoting *Farmer, 511 U.S. at 837)* (alterations in original); *Fernandez v. Armstrong, 2005 WL 733664, at \*5-6 (D.Conn. Mar.30, 2005)* (up to 16-day deprivation of toothbrush, toothpaste, soap, and shampoo did not violate the Constitution).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1544629 (S.D.N.Y.)
(Cite as: 2007 WL 1544629 (S.D.N.Y.))

With regard to Lunney's claim of no running water, defendants have pointed to evidence that Lunney filed a grievance on May 23, 2002, regarding the plumbing problems in his cell, Grievance SS-35563-02, dated May 23, 2002 (reproduced as Ex. J to Lunney Aff.), and that it was repaired the next day. *See* SHU Activity Log, dated May 24, 2002 (reproduced as Ex. D to Lee Reply Decl.). Even if Lunney's cell sink lacked running water for five days, as he claims, he does not show an Eighth Amendment violation given that there is no evidence that he was deprived of water entirely during this period. The "[l]ack of access to running water, by itself, does not constitute the denial of the minimal civilized measure of life's necessities." *James v. Monroe County Jail,* 2005 WL 2030730, at *3 (W.D.N.Y. Aug.23, 2005) (no constitutional violation where inmates claimed they lacked running water from cell sinks for several hours every night for over four months); *see also Johnson v. Comm'r of Corr. Servs.,* 699 F.Supp. 1071, 1074 (S.D.N.Y.1988) (plaintiff confined for one week in a cell with an inoperable sink did not suffer a constitutional violation because he was provided drinks with meals); *Castro v. Chesney,* 1998 WL 767467, at *4 (E.D.Pa. Nov.3, 1996) (no constitutional violation where plaintiff placed in a "dry cell" without running water for several days, given water "sometimes" when he asked for it and water was turned on every other day so he could wash his face and brush his teeth).

### 3. *Personal Involvement*

**\*16** In any event, even if some constitutional deprivation had been shown, Lunney's submission does not provide facts that would show that any particular defendant sued here was personally involved in committing the violation. As the Second Circuit has noted, "[a]n individual cannot be held liable for damages under § 1983 'merely because he held a high position of authority.' " *Back v. Hastings On Hudson Union Free Sch. Dist.,* 365 F.3d 107, 127 (2d Cir.2004) (quoting *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996)). He can only be held liable if he was "personally involved in the alleged deprivation." *Id.* While there are number of ways in which such involvement can be shown, *see, e.g., Back,* 365 F.3d at 127 (citing *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995)), Lunney has not provided evidence (as opposed to speculation) as to any of them.

In sum, defendants are entitled to summary judgment on

Lunney's claims of a temporary lack of running water, plumbing problems, and denial of personal hygiene items.

### D. *First Amendment Retaliation Claims*

Lunney asserts that he was assaulted by Blot and Frazier because he made verbal complaints about SHU conditions, *see* Lunney Aff. ¶ 24; that Blot threatened him with physical violence on several occasions for his writing of grievances, *see id.* ¶¶ 30-31; that Blot denied him recreation, meals, and showers because of his complaints, *see id.* ¶ 29; and that Fischer threatened to transfer him to Attica for writing grievances, *see id.* ¶ 28 (incorporating Am. Compl. ¶ 15(f)). He also asserts in his amended complaint that Brereton fired him from his position as a porter "as a means of retaliation." Am. Compl. at ¶ 15(g)(2). The defendants argue that these claims are unexhausted and fail on the merits. *See* Def. Mem at 9-12, 12-17; Def. Reply Mem. at 9-10, 11-15.

In its prior ruling, the Court dismissed Lunney's general allegations of threats and harassment because "comments that are merely 'insulting' or 'disrespectful' do not give rise to a constitutional violation." *See Lunney I,* 2005 WL 121720, at *11 (citations omitted). The Court also dismissed Lunney's claim that Fischer threatened to transfer him to another facility for writing grievances because, *inter alia,* Lunney did not allege that he was transferred because he filed grievances against prison officials. *See id.* However, the Court did not dismiss Lunney's claim that he was threatened with physical violence for filing grievances. *See id.* (citing *Hernandez v. Goord,* 312 F.Supp.2d 537, 545 (S.D.N.Y.2004) (threatened bodily injury and threats to inmate's life sufficient to state a claim)). Lunney's retaliation claims re-appeared in somewhat different form in his amended complaint, *see* Am. Compl. ¶ 16(c), which also contains new retaliation claims against Blot, Frazier and Brereton. *See id.* ¶¶ 15(g)(2), 16(h), (i).

### 1. *Law Governing First Amendment Retaliation*

**\*17** The First Amendment protects prisoners from retaliation for engaging in protected speech, including submitting grievances regarding prison conditions. *See Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir.1996) ("[R]etaliation against a prisoner for pursuing a grievance violates the right to petition government for the redress of grievances guaranteed

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1544629 (S.D.N.Y.)
(Cite as: 2007 WL 1544629 (S.D.N.Y.))

by the First and Fourteenth Amendments and is actionable under § 1983.") (citing *Franco v. Kelly,* 854 F.2d 584, 589 (2d Cir.1988)). "[I]ntentional obstruction of a prisoner's right to seek redress of grievances 'is precisely the sort of oppression that ... section 1983[is] intended to remedy.' " *Id.,* 89 F.3d at 80 (quoting *Morello v. James,* 810 F.2d 344, 347 (2d Cir.1987)) (alterations in original). A prisoner asserting a retaliation claim must show "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004) (citation omitted).

Moreover, in the prison context, the Second Circuit has recognized "the near inevitability of decisions and actions by prison officials to which prisoners will take exception and the ease with which claims of retaliation may be fabricated." *Colon,* 58 F.3d at 872 (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983)). Thus, courts "examine prisoners' claims of retaliation with skepticism and particular care." *Colon,* 58 F.3d at 872.

2. *Claims against Fischer*

In his affidavit, Lunney alleges that Fischer "repeatedly threatened" him "in retaliation for his filing of grievances and complaints regarding S.H.U. conditions." *See* Lunney Aff. ¶ 28 (incorporating Am. Compl. ¶ 15(f)) (Lunney "subjected to threats of being transferred to Attica" by Fischer, who "made it quite clear to plaintiff that he did not like the fact that plaintiff was writing grievances and complaints to outside agencies."). He further states that his prison records reflect that Fischer attempted to transfer him "under the reason that plaintiff's behavior in Sing Sing was unsuitable." *See* Lunney Aff. ¶ 28 (incorporating Am. Compl. ¶ 15(f)). While defendants argue that Lunney's claim should be dismissed because he did not properly exhaust the claim in accordance with the PLRA, it is not necessary to reach this question because the claim fails on the merits.

Lunney's First Amendment claim against Fischer is based on his claim that Fischer "threaten[ed]" him in response to his grievance writing. Am. Compl. ¶ 16(c); Lunney Aff. ¶ 28. But Lunney's only specific allegation on this point is that Fischer "did ... *try* to transfer plaintiff but D.O.C.S. officials in Albany,

New York cancelled the transfer." Lunney Aff. ¶ 28 (emphasis added); *see also* Pl. Mem. at 14-17.

This allegation cannot meet the requirement that the plaintiff experience an "adverse action." *Pidlypchak,* 389 F.3d at 380. While "the scope of conduct that can constitute actionable retaliation in the prison setting is broad, it is not true that every response to a prisoner's exercise of a constitutional right gives rise to a retaliation claim." *Dawes v. Walker,* 239 F.3d 489, 492-93 (2d Cir.2001), *overruled on other grounds, Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002). Only retaliatory conduct which would "deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights" may support such a claim. *Id.* at 493. The Second Circuit has "made clear that this objective test applies even where a particular plaintiff was not himself subjectively deterred; that is, where he continued to file grievances and lawsuits." *Pidlypchak,* 389 F.3d at 381 (citing *Davis v. Goord,* 320 F.3d 346 (2d Cir.2003)).

**\*18** The allegation in the complaint regarding the threats of transfer cannot be objectively viewed as deterring a person of ordinary firmness from exercising First Amendment rights. This is particularly true where Lunney's allegations are devoid of any dates or descriptions of the manner in which Fischer made the alleged threats. Moreover, the lack of dates also makes it impossible to determine whether there was a causal connection between the filing of grievances and the adverse action. Accordingly, summary judgment on this claim should be granted. It is, therefore, unnecessary to reach the question of qualified immunity. *See* Def. Mem. at 34; Def. Reply Mem. at 25. [FN5]

FN5. Lunney was transferred some time later, in 2004, to Cayuga Correctional Facility, long after the grievances and alleged threats by Fischer were made. *See* Lunney Aff. ¶ 26. Lunney has not alleged any facts regarding this transfer and also has not provided evidence that Fischer caused this transfer. Notably, there is an affidavit from Fischer stating that he was not involved in Lunney's transfer. *See* Fischer Decl. ¶¶ 5-7; *see generally Davidson v. Donnelly,* 2004 WL 1941349, at *3 (W.D.N.Y. Aug.29, 2004) (no claim for retaliatory transfer where plaintiff provided no evidence on reason for transfer and prison officials gave reasons).

Not Reported in F.Supp.2d, 2007 WL 1544629 (S.D.N.Y.)
(Cite as: 2007 WL 1544629 (S.D.N.Y.))

### 3. *Claims against Blot*

Lunney asserts that (1) Officer Blot denied him showers, meals, and recreation in retaliation for his grievances, *see* Lunney Aff. ¶ 29; (2) that Blot co-signed a misbehavior report against him stemming from an incident to which Blot was not a party; and that Blot subsequently told Lunney, "If I ever hear about you complaining about another officer you'll be sorry. You won't be so lucky next time," *see id.* ¶ 31 (incorporating Am. Compl. ¶ 15(h)); (3) that Blot threatened to harm Lunney physically if Lunney refused Blot's offer of a bribe to stop writing grievances, *see id.* ¶ 30; and (4) Blot assaulted him in retaliation for verbal complaints about the conditions in the SHU. *See id.* ¶ ¶ 24-25.

Defendants contend that each of these claims should be dismissed because Lunney failed to exhaust them and also dismissed on the merits. *See* Def. Reply Mem. at 5-7, 10. Defendants further contend that Blot is entitled to qualified immunity "from plaintiff's retaliation claim involving an alleged false misbehavior report ...." Def. Mem. at 34; Def. Reply Mem. at 29-30.

#### a. *Exhaustion of Claims Against Blot*

As to the four claims with respect to which the exhaustion defense has been raised, we have already discussed why Lunney should be excused from having failed to grieve the assault claim, *see* section III.B.1, and the same reasons that excuse the failure to grieve the assault apply equally to the claim that the motive for the assault was to retaliate for protected activity. Accordingly, there is no need to discuss exhaustion with respect to this aspect of the retaliation claim against Blot.

In addition, we conclude, for the reasons discussed in section III.D.3.c below, that Lunney's claim with respect to the false misbehavior report would fail on the merits. Accordingly, our discussion of exhaustion relates only to claims (1) and (3): that is, the claim regarding the denial of showers, meals, and recreation and the claim regarding the threat of physical violence.

Lunney alleges that Blot said: "If I ever hear about you

complaining about another officer you'll be sorry. You won't be so lucky next time." Am. Compl. ¶ 15(h). He also states that "[Blot] would come in and threaten guys and tell guys 'listen, I'm going to write you up and you will get a new charge,' " Lunney Aff. ¶ 30 (citing Lunney Dep. at 190); and generally, that Blot "threaten[ed] [Lunney] with misbehavior reports, physical beatings and deprivations of privileges if he ... continued to write grievances." Am. Compl. ¶ 15(g). More specifically, in his deposition, Lunney states that Blot became "offended and upset about my writing grievances and he said he didn't like people that wrote grievances"; that he "would complain that he didn't like people writing grievances" and would "criticiz[e]" him for it. Lunney Dep. at 187. Lunney recounts one conversation as follows:

> **\*19** [H]e came to me one day and said "listen, I want you to stop writing grievances." And I said "listen, you guys are doing a lot of things wrong down here." He said "listen, if you don't stop writing grievances I'm going to break your fuckin' neck." He said "you're going to have a hard time in the SHU."

*Id.*

As already discussed in the context of Lunney's excessive-force claim, *see* section III.B the Second Circuit has held that "seemingly available remedies [may be] rendered unavailable by threats," *Hemphill,* 380 F.3d at 688, if a "similarly situated individual of ordinary firmness" would not have "deemed them available." *Id.* (citations and quotations omitted). Likewise, the Second Circuit has held that threats by prison authorities may provide grounds for estoppel if defendants "took affirmative action to prevent [the prisoner] from availing himself of grievance procedures." *Ruggiero v. County of Orange,* 467 F.3d 170, 178 (2d Cir.2006) (citing cases).[FN6]

> **FN6.** The Second Circuit has recognized that "the case law on the PLRA's exhaustion requirement does not always distinguish clearly between (a) cases in which defendants are estopped from asserting non-exhaustion as an affirmative defense, (b) situations in which administrative remedies are not 'available' to the plaintiff ...." *Giano v. Goord,* 380 F.3d 670, 677 n. 6 (2d Cir.2004).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1544629 (S.D.N.Y.)
(Cite as: 2007 WL 1544629 (S.D.N.Y.))

Liberally construed, Lunney's argument can be read as asserting both that (1) his failure to follow the formal exhaustion process should be excused because Blot's threats rendered the formal grievance process effectively unavailable to him and (2) that Blot's exhaustion defense was estopped by Blot's alleged threats.

Lunney's general assertions regarding threats-without the specific of dates or content of threats-might not be sufficient permit a finding on these points. But his assertion that Blot stated "if you don't stop writing grievances I'm going to break your fuckin' neck," Lunney Dep. at 187, coupled with the allegation that Blot had actually assaulted him previously, would be sufficient to allow a factfinder to conclude that a "similarly situated individual of ordinary firmness" would not have deemed the inmate grievance process available with respect to grievances that involve conduct by Blot. *See, e.g., Hepworth v. Suffolk County,* 2006 WL 2844408, at *4-7 (E.D.N.Y. Sept.29, 2006) (inmate beaten and threatened with further violence after testifying against correction officers); *Larry v. Byno,* 2006 WL 1313344, at *4 (N.D.N.Y. May 11, 2006) (physical assault coupled with threat to kill inmate after inmate mailed a complaint); *McCullough,* 2005 WL 3164248, at *3-4 (assault with threat to "get [him]" if he filed another grievance). It also raises questions regarding estoppel as to any claim against Blot. Thus, a genuine issue of material fact exists as to (1) whether administrative remedies, though nominally "available," were functionally available to Lunney to grieve these claims-the deprivation of meals, showers and recreation and the threat of physical violence by Blot-against Blot and/or (2) whether Blot's alleged threats estop defendants from raising exhaustion as an affirmative defense.

We now address the merits of the four claims against Blot.

b. *The Merits of Lunney's Allegation that Blot Denied Him Showers, Meals, and Recreation*

**\*20** Lunney states that he was deprived of showers "at least twice a week." Lunney Dep. at 182. He asserts that this occurred "[b]ecause of problems I was having with Blot and my being vocal about the problems, the conditions of SHU." *Id.* at 183. He asserts that he was supposed to get three showers a week. *See* Pl. Mem. at 22. As to recreation, Lunney states that at least "three or four times a week [ ] Blot would come ... by with the list. He'd ask guys if they want recreation. We'd be

brought down for breakfast. He'd tell me 'you're staying here.' " *Id.* (citing Lunney Dep. at 185-86). Lunney makes no specific statements as to Blot's depriving him of meals. While Blot denies ever depriving Lunney of meals, showers or recreation, *see* Blot Decl. ¶ 4, we accept Lunney's assertions as true for purposes of this motion.

Defendants challenge whether Lunney has established the second and third prongs of a prima facie case of retaliation: namely, whether (1) the deprivations constitute "adverse action," and (2) there is a causal connection between these deprivations and his grievance writing. Def. Mem. at 15.

*i. Adverse Action.* As an initial matter, defendants argue that Lunney's claim lacks sufficient specificity. Def. Reply Mem. at 13. As is true in response to any motion for summary judgment, Lunney was required to provide evidence sufficient to allow a jury to find in his favor. Thus, "[c]onclusory allegations, conjecture, and speculation ... are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.,* 156 F.3d 396, 400 (2d Cir.1998). Lunney's allegations regarding denial of meals are completely lacking in any such specifics. His allegations regarding the denials of showers and recreation, however, are sufficiently detailed to allow a trier of fact to conclude that such denials occurred. Accordingly, we limit our discussion to the issue of whether the denial of showers and recreation constitute "adverse action."

As noted, the Second Circuit has held that while "the scope of conduct that can constitute actionable retaliation in the prison setting is broad, it is not true that every response to a prisoner's exercise of a constitutional right gives rise to a retaliation claim." *Dawes,* 239 F.3d at 492-93. Only retaliatory conduct which would "deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights" may support such a claim. *Id.* at 493. Thus, the conduct must be "specifically directed at plaintiff[ ] and substantial enough to deter legitimate grievances against prison officers." *Salahuddin v. Mead,* 2002 WL 1968329, at *5 (S.D.N.Y. Aug.26, 2002). Conduct that is *de minimis* does not provide this deterrent effect and does not give rise to actionable retaliation. *Dawes,* 239 F.3d at 493; *see also Davidson v. Chestnut,* 193 F.3d 144, 150 (2d Cir.1999) (citing *Bart v. Telford,* 677 F.2d 622, 625 (7th Cir.1982) ("[S]ince there is no justification for harassing people for exercising their constitutional rights [, harassment] need not be great in order to be actionable. Yet, ... [i]t would trivialize the First Amendment to hold that harassment for

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1544629 (S.D.N.Y.)
(Cite as: 2007 WL 1544629 (S.D.N.Y.))

exercising the right of free speech was always actionable no matter how unlikely to deter a person of ordinary firmness from that exercise ....")) (alterations in original). What is *de minimis* varies according to context. *See Dawes,* 239 F.3d at 493 ("[p]risoners may be required to tolerate more than public employees, who may be required to tolerate more than average citizens, before a[ retaliatory] action taken against them is considered adverse") (alteration in original) (citing *Thaddeus-X v. Blatter,* 175 F.3d 378, 398 (6th Cir.1999)). Thus, in the prison context, not all harms constitute legally sufficient grounds for retaliation claims. *See Salahuddin,* 2002 WL 1968329, at *4-5 (citing cases).

**\*21** Case law suggests that the isolated or sporadic denial of privileges do not suffice to state a claim of actionable retaliation. *Chestnut,* 193 F.3d at 150 (remanding to district court on interlocutory appeal where "there [was] a serious question as to whether ... [plaintiff's] asserted one-day denial of an opportunity to exercise, w[as] more than *de minimis"* ); *Snyder v. McGinnis,* 2004 WL 1949472, at *11 (W.D.N.Y. Sept.2, 2004)* (deprivation of meal on two occasions is *de minimis* and does not state a claim for retaliation); *Lyons v. Wall,* 2006 WL 2945256, at *5 (D.R.I. Oct.13, 2006)* (sporadic cold showers are *de minimis* ). Here, however, Lunney alleges a routine denial of showers and recreation such that he regularly had one shower a week instead of two, and three to four hours of recreation a week instead of the normal seven. Pl. Mem. at 22 (citing Lee Decl. Ex. J §§ 304.2, 304.3, 304.5; Lunney Aff. Ex. M at 140-142); *see also Ortiz v. McBride,* 380 F.3d 649, 655 (2d Cir.2004)* (discussing normal conditions of the SHU as two showers a week and one hour of recreation a day). Defendants have pointed to no case where a constant denial of showers and recreation, in the proportions alleged here, was deemed to be *de minimis* as a matter of law.[FN7]

FN7. While defendants argue that "the alleged denial of meals, recreation and showers did not deter the exercise of plaintiff's rights as evidenced by his many grievances," Def. Mem. at 15, as noted, the test for adverse action is an "objective test [which] applies even where a particular plaintiff was not himself subjectively deterred; that is, where he continued to file grievances and lawsuits." *Pidlypchak,* 389 F.3d at 381 (citing *Davis,* 320 F.3d at 353).

In sum, defendants are not entitled to summary judgment on this point.

*ii. Causal Connection.* Lunney must also show that there was "a causal connection between the protected speech and the adverse action." *Pidlypchak,* 389 F.3d at 380. *Colon* discusses a number of factors relevant to whether a causal connection exists, including: (i) the temporal proximity between the protected activity and the alleged retaliatory act; (ii) the inmate's prior good disciplinary record; (iii) vindication at a hearing on the matter; and (iv) statements by the defendant concerning his motivation. 58 F.3d at 872-73; *accord Sloane v. Mazzuca,* 2006 WL 3096031, at *14 (S.D.N.Y. Oct.31, 2006); *Baskerville v. Blot,* 224 F.Supp.2d 723, 732 (S.D.N.Y.2002).

Here, a reasonable factfinder might view Blot's decision to deny Lunney recreation and shower privileges as being prompted by Lunney's grievance writing. Lunney states that upon arrival to the SHU, he immediately complained about the conditions of his cell, both verbally and through the filing of written grievances. Lunney Aff. ¶ 24 (incorporating Am. Compl. ¶ 15(c)-(e)). On his third day in the SHU, Officers Blot and Frazier assaulted him, and Blot warned him that he would suffer consequences if he filed a grievance. *Id.* (incorporating Am. Compl. ¶ 15(e)(1)-(2)). Nonetheless, Lunney continued to file grievances in the SHU. *See, e.g.,* Ex. K to Lunney Aff. Blot stated to him that he "didn't like people that wrote grievances" and told him "listen, I want you to stop writing grievances" and that "if you don't stop writing grievances I'm going to break your fuckin' neck" and that "you're going to have a hard time in SHU." Lunney Dep. at 187. At the same time, Lunney states that he was routinely denied showers and recreation. Lunney Aff. ¶ 29. Thus, the evidence for causation centers on (1) the fact that there is no explanation provided for the denial of showers and recreation and (2) the evidence that Blot complained to Lunney about his writing grievances and specifically threatened Lunney about them during the same time period that the denial of showers and recreation was taking place. Lunney Dep. at 186-87. While it may also be reasonable to infer, as defendants argue, that the deprivations, if they did occur, were a result Lunney's "extensive disciplinary history," Def. Mem. at 15, on a motion for summary judgment, the Court must draw "all justifiable inferences" in favor of the non-moving party. *Anderson,* 477 U.S. at 255. Thus, Lunney has raised a genuine issue of material fact as to whether Blot denied showers and recreation in retaliation for Lunney's grievances.[FN8]

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1544629 (S.D.N.Y.)
(Cite as: 2007 WL 1544629 (S.D.N.Y.))

FN8. Defendants have made only a conclusory argument as to qualified immunity on this point, *see* Def. Mem. at 33-34, and thus we do not consider it here.

c. *The Merits of Lunney's Allegation that Blot Filed a False Misbehavior Report*

**\*22** The filing of a false misbehavior report in response to constitutionally protected activity can constitute actionable retaliation. *See Graham,* 89 F.3d. at 79-81 (allegation that defendants filed false misbehavior reports against plaintiff in retaliation for his leadership in filing a grievance to protest the removal of workshop showers); *Jones v. Coughlin,* 45 F.3d 677-78, 680 (2d Cir.1995) (per curiam) (allegation that defendants, in retaliation for plaintiff's filing administrative complaint, filed a false misbehavior report that led to 120 days of punitive segregation).

Lunney asserts that a misbehavior report dated June 22, 2003–approximately six months after he left the SHU-"stemmed from plaintiff having sent letters to several facility staff members"-not including Blot-"complaining about being harassed by another staff member, C.O. Davis." *See* Am. Compl. ¶ 15(h); *see also* Misbehavior Report (reproduced in Ex. G. of Lee Decl.). Officer Gary, one of the officers to whom Lunney had sent the letter, wrote the misbehavior report because Lunney's letters violated facility correspondence rules that prohibit "correspond[ence] with dep[artment] employees [without] the express permission of the superintendent." *See* Lee Decl. Ex. G (citing DOCS Directive 4422). Blot "endorsed" the misbehavior report. *See* Def. 56.1 ¶ 22. Lunney was subsequently found guilty of this charge based on "[his] admissions that [he] willfully wrote to a total of 15 officers including officer Gary," *see* Lee Decl. Ex. G, and sentenced to 30 days' keeplock, loss of packages, loss of commissary, and loss of phone privileges.<sup>FN9</sup> *See id.* Defendants argue that Lunney has not met the elements of a retaliation claim. Def. Mem. at 16-17; Def. Reply Mem. at 14.

FN9. This finding of guilt was "apparently overturned," or at least "modified" on appeal, though to what extent and the reason for such action is not clear from the record. *See* Def. Mem. at 16 (citing Lee Decl. Ex. I).

Lunney's claim is simply disposed of based on the evidence that the misbehavior report had a legitimate justification. The Second Circuit has held that, "[r]egardless of the presence of retaliatory motive, ... a defendant may be entitled to summary judgment if he can show dual motivation, *i.e.,* that even without the improper motivation the alleged retaliatory action would have occurred." *Scott v. Coughlin,* 344 F.3d 282, 287-88 (2d Cir.2003) (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977)). Thus, where a plaintiff has met his "initial burden of showing that an improper motive played a substantial part in defendant's action," the defendant may still obtain summary judgment if the defendant can "show it would have taken exactly the same action absent the improper motive." *Id.; see also Lowrance v. Achtyl,* 20 F.3d 529, 535 (2d Cir.1994) (affirming dismissal on summary judgment because correction officer's actions were of mixed motives and "would have been issued on proper grounds alone."); *see also Sher v. Coughlin,* 739 F.2d 77, 81-82 (2d Cir.1984) (affirming summary judgment dismissal of prisoner's retaliation claim where dual motivation existed for prisoner's transfer to another facility).

**\*23** Assuming without deciding that Lunney had met his initial burden of showing that an improper motive played a substantial part in the decision to discipline him, Lunney concedes that the misbehavior report "stemmed from" a letter he wrote to Officer Gary. Am. Compl. ¶ 15(h). It is undisputed that writing letters to prison guards violates DOCS's policy. *See* DOCS Directive 4422. Lunney has provided no evidence of instances in which prisoners wrote letters to prison guards without receiving disciplinary action. Based on the evidence in the record, it would be purely speculative for a factfinder to conclude that the prison would not have taken the same action against Lunney regardless of any motive it had to punish him for writing grievances. Accordingly, defendants are entitled to summary judgment on this claim.

d. *The Merits of Lunney's Allegation that Blot Threatened Physical Violence*

Lunney states that Blot threatened him physically, both generally in response to his continued filing of grievances, *see* Lunney Aff. ¶¶ 29-30, and specifically in response to his complaint about another officer. *See id.* ¶ 31. Lunney's most specific allegations consist of two statements: (1) "If I ever hear about you complaining about another officer you'll be sorry. You won't be so lucky next time," Am. Compl. ¶ 15(h),

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1544629 (S.D.N.Y.)
(Cite as: 2007 WL 1544629 (S.D.N.Y.))

and (2) "[I]f you don't stop writing grievances I'm going to break your fuckin' neck." Lunney Aff. ¶ 30 (citing Lunney Dep. at 186-87). He also states more generally that Blot "threaten[ed] [Lunney] with misbehavior reports, physical beatings and deprivations of privileges if he [ ] continued to write grievances." Am. Compl. ¶ 15(g). Defendants do not address this claim in their papers, although they argue that Blot is entitled to qualified immunity on it. *See* Def. Reply Mem. at 30.

Case law reflects that verbal threats may constitute adverse action, though whether they constitute adverse action seems to depend on their specificity and the context in which they are uttered. *Compare* Hepworth, 2006 WL 2844408, at *8-9 (denying summary judgment where "continued verbal threats" that inmate "would receive another beating or be killed" was sufficient "evidence ... such that a reasonable jury could find that the officers unconstitutionally retaliated against [inmate] ... for exercising his First Amendment"); Brown v. Coughlin, 965 F.Supp. 401 (W.D.N.Y.1997) (threat to inmate that when officers were "done with him" he would not want to "file any more complaints" sufficient for First Amendment retaliation claim); Thaddeus-X, 175 F.3d at 396, 398 ("In the prison context ... [h]arassment, physical threats" would "certainly be adverse" action), *with* Bartley v. Collins, 2006 WL 1289256, at *6 (S.D.N.Y. May 10, 2006) (threats such as "we going to get you, you better drop the suit," do not rise to the level of adverse action); Alicea v. Howell, 387 F.Supp.2d 227, 237 (W.D.N.Y.2005) ("[Defendant's] alleged statements to plaintiff about there being 'no secrets in prison' and that plaintiff would 'have to pay the consequences' for filing a grievance against [defendant] do not give rise to a First Amendment retaliation claim," especially considering the fact that the threat was never carried out); Cruz v. Hillman, 2002 WL 31045864, at *7 (S.D.N.Y. May 16, 2002) (allegation that correction counselor expressed his dislike for inmates who file civil lawsuits, and later came to plaintiff's cell and said "Green Haven is an open battlefield, so be careful," insufficient to state a retaliation claim). Given the directness and specificity of the alleged threats here, a factfinder could permissibly decide that the threats were such that it would deter an inmate of "ordinary firmness" from engaging in protected activity.

**\*24** Nor should Blot be entitled to qualified immunity. It would not have been "objectively reasonable" for Blot to have believed that it did not violate "clearly established" law regarding retaliation to tell Lunney that he would "break [his] fuckin' neck" if Lunney continued to write grievances. In other words, the contours of the right to be free from First Amendment retaliation were "sufficiently clear that [Blot] would [have] underst[ood] that what he [was] doing violate[d] that right." Hope v. Pelzer, 536 U.S. 730, 739, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002) (quoting Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)).

e. *The Merits of Lunney's Allegation of Retaliatory Assault*

We have already discussed Lunney's claim that the assault by Blot and Frazier constituted an Eighth Amendment violation. *See* section III.B above. In addition, Lunney asserts that this same assault occurred "because of a verbal complaint he made to another officer regarding his not having hygiene items and the problems with his sink and toilet." Lunney Aff. ¶ 24 (incorporating Am. Compl. ¶¶ 15(e)(1)-(2)). In his amended complaint, Lunney specifically pleads this as a First Amendment claim as well. *See* Am. Compl. at ¶ 16(h).

Defendants do not make any arguments regarding this claim specifically. Nonetheless, because they moved for summary judgment as to "plaintiff's First Amendment retaliation claim" generally on the ground that there is no "causal relationship between protected activity and adverse action," Def. Mem. at 2, Lunney was obligated to "come forward with admissible evidence supporting [his] claim" on this point. Feurtado v. City of New York, 337 F.Supp.2d 593, 599 (S.D.N.Y.2004) (citing cases) (internal quotation marks omitted).[FN10]

FN10. Because defendants' motion does not contend that verbal complaints cannot constitute constitutionally protected activity, it is unnecessary to reach this question. The Court notes that some case law indicates that a prisoner's oral complaints to prison guards may provide the basis for a retaliation claim under § 1983. *See* Smith v. Woods, 2006 WL 11312347, at *10 (N.D.N.Y. Apr. 24, 2006), *aff'd*, 2007 WL 756410, at *1 (2d Cir. Mar.12, 2007); Gill v. Riddick, 2005 WL 755745, at *10 (N.D.N.Y. Mar.31, 2005) (citing cases); Gaston v. Coughlin, 81 F.Supp.2d 381, 386 (N.D.N.Y.1999); Malik'El v. New York State Dept. of Corr. Servs., 1998 WL 187459, at *4 (N.D.N.Y. Apr.8, 1998); *but see* Garrido v. Coughlin, 716 F.Supp. 98, 101 (S.D.N.Y.1989) ("verbal confrontation" not protected activity).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1544629 (S.D.N.Y.)
(Cite as: 2007 WL 1544629 (S.D.N.Y.))

Lunney details that after "attempting to inform another officer, who was confined to a control room at least 45 feet away from plaintiff's cell," *see* Am. Compl. ¶ 15(e), that he lacked certain hygiene items,

> [d]efendants Blot and Frazier approached plaintiff's cell and began to state that plaintiff had better "shut the fuck up or we are coming in there and you will not like the results." After attempting to explain his problems to [them] Officer Frazier appeared to become calm and attempted to resolve plaintiff's complaints. However, defendant Blot stated "I don't give a shit about your fucking problems. File a fucking grievance." Defendant Blot then proceeded to yell to the officer in the control booth to have plaintiff's cell opened.

Lunney Aff. ¶ 24 (incorporating Am. Compl. ¶¶ 15(e)(1)-(2)). According to Lunney, Blot then entered Lunney's cell and assaulted him, *id.,* though Blot denies that this assault ever took place. Blot Decl. ¶ 3.

Here, the sequence of events-a complaint followed by an immediate assault, accompanied by remarks referring to his complaint-would be sufficient for a jury to find that there was a causal connection between Lunney's complaints and the assault. Accordingly, summary judgment cannot be granted to defendants on this claim.[FN11]

FN11. Defendants make no arguments with respect to qualified immunity on this claim or with respect to the First Amendment claim against Frazier (discussed in the next section), and thus we do not consider the doctrine's applicability with respect to these claims.

### 4. First Amendment Claim Against Frazier

**\*25** Lunney alleges that Frazier assisted Blot "in assaulting plaintiff in retaliation for plaintiff making complaints." Am. Compl. ¶ 16(i). Once again, defendants argue only generally that plaintiff's First Amendment retaliation claim should be dismissed for failure to establish a causal relationship. Def. Mem. at 2. As to Frazier's particular actions, Lunney claims that he "entered the cell and placed [Lunney] in a choke hold

for several minutes." Am. Compl. ¶ 15(e)(1). Frazier, like Blot, denies Lunney's allegations of unnecessary physical force. Frazier Decl. ¶ 3. For the same reasons just stated, Lunney's allegations are sufficient to allege a causal connection between his complaints and the assault. Thus, defendants must be denied summary judgment as to the claim against Frazier.

### 5. First Amendment Claim Against Brereton

Lunney's amended complaint states that he "filed a formal grievance complaint with the I.G.R.C. arguing that he had been fired [from his job as a porter] as a means of retaliation by defendant Brureton." Am. Compl. ¶ 15(g)(2). No further information is provided on this issue. While Lunney makes reference to it in his memorandum of law, Pl. Mem. at 30, he does not address it in his affidavit. Given the conclusory reference in the amended complaint, there is no admissible evidence before the Court that would allow a jury to conclude that Lunney had made out each of the elements of a retaliation claim.

Accordingly, this claim must be dismissed.

### E. *Unfiled Grievances*

Lunney claims that defendant Kober violated his First and Eighth Amendment rights by denying him "access to an effective Inmate Grievance Program," *see* Lunney Aff. ¶ 32, and thus that Kober "deprived plaintiff of his means to petition the government for the redress of grievances." *See* Am. Compl. ¶ 16(e). Specifically, he alleges that "[g]rievances were not timely filed or they were completely ignored," and that Kober stated they "were never received by his office." *See* Lunney Aff. ¶ 32 (incorporating Am. Compl. ¶ 15(i)). He adds that the Sing Sing IGRC "was not operating in accordance with policy," that grievances "were not being timely filed and responded to," that "investigations were biased and or incomplete," and that "appeals were not timely filed." *See* Am. Compl. ¶ 15(i). While defendants argue that this claim is unexhausted, *see* Def. Reply Mem. at 10, it is unnecessary to reach that issue because the claim fails on the merits.

It is well established that a claim of violation of a state grievance procedure is not cognizable in an action under 42

Not Reported in F.Supp.2d, 2007 WL 1544629 (S.D.N.Y.)
(Cite as: 2007 WL 1544629 (S.D.N.Y.))

U.S.C. § 1983. *See* Cancel, 2001 WL 303713, at *3 ("inmate grievance procedures are not required by the Constitution and therefore a violation of such procedures does not give rise to a claim under § 1983"); *accord* Davis v. Castleberry, 364 F.Supp.2d 319, 323 (W.D.N.Y.2005); Fernandez, 2005 WL 733664, at *9; Mahotep v. DeLuca, 3 F.Supp.2d 385, 390 n. 3 (W.D.N.Y.1998) (citing Buckley v. Barlow, 997 F.2d 494, 495 (8th Cir.1993)).

**\*26** It does not help Lunney's claim if it is construed as one for denial of access to the courts. To state a claim for denial of access to the courts under § 1983, Lunney must demonstrate that defendants "took or [were] responsible for actions that hindered [plaintiff's] efforts to pursue a legal claim." Davis v. Goord, 320 F.3d 346, 351 (2d Cir.2003) (internal quotation marks omitted). Only those actions which rise to the level of " 'deliberate and malicious interference' " and which " 'actually impeded his access to the court or prejudiced an existing action' " are sufficient to present a claim. Green v. Phillips, 2006 WL 846272, at *11-12 (S.D.N.Y. Mar.31, 2006) (quoting Cancel v. Goord, 2001 WL 303713, at *4 (S.D.N.Y. Mar.29, 2001)); *accord* Rivera v. Pataki, 2005 WL 407710, at *17-18 (S.D.N.Y. Feb.7, 2005). The evidence presented by Lunney, however, does not satisfy this standard. The operation of the grievance process is relevant to any access-to-the-courts claim only insofar as the procedure is a prerequisite for the filing of a civil suit under the PLRA. Lunney has not shown how the operation of the grievance procedure denied him such access. Moreover, in light of the fact that prisoners are excused from filing grievances where prison officials prevent them from doing so or make the grievance process not "available," *see, e.g.,* Brownell, 446 F.3d at 311-12, any such actions-even if they had been demonstrated-could not be shown to have deprived Lunney of his ability to bring any lawsuit. Thus, this claim too must be dismissed.

F. *Fourteenth Amendment Due Process Claims*

As in his original complaint, Lunney asserts that his right to due process was violated by two separate actions. First, Lunney claims that Selsky improperly ordered a second disciplinary hearing after the Article 78 proceeding had been filed with respect to the first hearing. *See* Lunney Aff. ¶ 14 (incorporating Am. Compl. ¶ 10). Second, he argues that defendants' failure to provide him with a timely written disposition of his disciplinary hearing was a violation of his due process rights. *See* Am. Compl. ¶¶ 10, 12. This first claim is identical to one

the Court dismissed on the merits in its original ruling, *see* Lunney I, 2005 WL 121720, at *14, and thus the Court will not reconsider it here. Accordingly, we address only the second claim.[FN12]

> **FN12.** The defendants and Lunney discuss the matter of "hearing officer bias" in their summary judgment papers. *See* Def. Mem. at 23-24; Pl. Mem. at 50-52; Def. Reply Mem. at 21-22. However, Lunney did not raise this claim in his amended complaint or in his affidavit and thus we do not consider it.

1. *Law Governing Disciplinary Proceedings*

A party asserting a due process claim "must establish (1) that he possessed a liberty interest and (2) that the defendant(s) deprived him of that interest as a result of insufficient process." Ortiz, 380 F.3d at 654 (quoting Giano v. Selsky, 238 F.3d 223, 225 (2d Cir.2001)). Prisoners subject to disciplinary proceedings can show a liberty interest only if "disciplinary punishment 'imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' " *See* Hanrahan v. Doling, 331 F.3d 93, 97 (2d Cir.2003) (per curiam) (quoting Sandin v. Conner, 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995)). "Factors relevant to determining whether the plaintiff endured an 'atypical and significant hardship' include 'the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions' and 'the duration of the disciplinary segregation imposed compared to discretionary confinement.' " Palmer v. Richards, 364 F.3d 60, 64 (2d Cir.2004) (quoting Wright v. Coughlin, 132 F.3d 133, 136 (2d Cir.1998)).

**\*27** There is no bright-line rule in determining whether a particular period of confinement in a SHU meets the *Sandin* standard of an "atypical and significant" hardship thereby implicating due process protection. *See id.* (citations omitted). However, as in the original motion, defendants do not argue that Lunney's liberty interests were not implicated by his nine-month sentence of confinement to the SHU-which was later reduced to six months-under the standard established in *Sandin.* It is assumed, therefore, that Lunney's sentence of confinement did implicate a liberty interest for purposes of this motion. Consequently, we consider whether Lunney was denied due process when he was not provided with a written disposition of his disciplinary hearing and when the second

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1544629 (S.D.N.Y.)
(Cite as: 2007 WL 1544629 (S.D.N.Y.))

hearing was scheduled.

2. *Written Disposition of Disciplinary Hearing*

As noted above, *see* section I.A, Lunney's first disciplinary hearing, in June 2002, resulted in a finding of guilt for which he was sentenced to nine months in the SHU. Lunney appealed this ruling, which was affirmed in August 2002. Lunney then filed an Article 78 petition in the state Supreme Court, which led to an order to show cause directing Selsky to respond to the petition. In October 2002, Selsky rescinded the disciplinary determination and ordered a rehearing on the ground that Lunney had not been given adequate assistance in preparing his defense. The rehearing was held in October 2002, and Lunney was again found guilty and sentenced to nine months in the SHU. He again appealed, arguing this time that he had not received a copy of the hearing disposition. His appeal was denied, although his sentence was reduced to six months because the original sentence had exceeded the guidelines "without further justification." *See* Memorandum, dated Nov. 7, 2002 (reproduced in Ex. J to Selsky Decl., filed July 12, 2005 (Docket # 84) ("Selsky Decl.")). Lunney filed a second Article 78 petition with respect to the rehearing, and in August 2003, a judge of the State Supreme Court dismissed the original misbehavior report and concluded that the failure to provide Lunney with a copy of the hearing disposition was a violation of due process.

With regard to the timing and manner of notifying Lunney about the hearing disposition, Lunney acknowledges that he received oral notification of the result on October 17, 2002. *See* Def. 56.1 ¶ 12; Lunney Aff. ¶ 12. It is undisputed that he also received a tape recording of the hearing on this date, and that the tape "contained all [of] the information contained in the written decision including the evidence relied upon and reasons for the penalty imposed." *See* Def. Reply Mem. at 23.[FN13]

FN13. Lunney wrote a letter to Donald Selsky, *see* Letter, dated Nov. 14, 2002 (reproduced in Ex. K to Selsky Decl.), stating that the original tape he received was defective, and requesting a new one. Defendants state, and Lunney does not dispute, that he received a new tape around that time. *See* Def. Mem. at 24.

The written disposition stated that it was based on "the written report by Officer Hadzovic and because it was recovered in the locker which was lock [sic]. Also from the testimony of Sgt. Guadagno who stated that the showers are normally completed by 7:15-7:30 PM." *See* Superintendent Hearing Disposition Rendered, dated Oct. 17, 2002 (reproduced in Ex. H to Selsky Decl.). It noted the reasons for the disposition as: "to impress upon this person the seriousness of this act and to act a[s] a deterrent to other[s]. Also that the possession of illegal weapons in a correctional facility is very detrimental to the safety and security of all those that work and live [h]ere, and this will not be tolerated." *See id.* Lunney makes no allegations regarding what was or was not on the tape. Nor does he allege that the written decision contained any information that was not on the tape.

**\*28** In its original ruling on this claim, this Court allowed Lunney's claim regarding his failure to receive a written disposition of his disciplinary hearing to proceed because "the right to receive a 'written statement of the disposition' [is] a requirement that has been in place since the Supreme Court's decision in *Wolff v. McDonnell* [418 U.S. 539, 563 (1974) ]." *See Lunney I,* 2005 WL 121720, at \*13 (citing *Luna v. Pico,* 356 F.3d 481, 487 (2d Cir.2004)); *see also Kalwasinski v. Morse,* 201 F.3d 103, 108 (2d Cir.1999); *McCann v. Coughlin,* 698 F.2d 112, 121-22 (2d Cir.1983); *Higgins v. Coombe,* 2002 WL 362776, at \*2 (S.D.N.Y. Mar.6, 2002); *Silva v. Sanford,* 1998 WL 205326, at \*6 (S.D.N.Y. Apr.24, 1998). The Court noted at that time that the defendants might be able to defeat the due process claim based upon additional facts (not contained in the complaint) showing, for example, that Lunney was informed of the disposition or was otherwise given the opportunity to obtain it. *Lunney I,* 2005 WL 121720, at \*13. In addition, the Court left open the possibility that the defendants could show entitlement to qualified immunity. *Id.*

Prison disciplinary hearings are subject to a harmless error analysis. *See Powell v. Coughlin,* 953 F.2d 744, 750 (2d Cir.1991) ("If a person may be convicted and obliged to serve a substantial prison sentence notwithstanding a constitutional error determined to be harmless, surely the conditions of confinement of a sentenced prisoner may be made temporarily more severe as discipline for a prison rules infraction despite a harmless error in adjudicating the violation.") (internal citations omitted); *Louis v. Ricks,* 2002 WL 31051633, at \*11 (S.D.N.Y. Sept.13, 2002) (citing *Powell,* 953 F.2d at 750). Defendants now argue that any failure to provide Lunney with a written disposition of the result of his disciplinary hearing in

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1544629 (S.D.N.Y.)
(Cite as: 2007 WL 1544629 (S.D.N.Y.))

a timely fashion was harmless, because: (1) "there was no information contained in the written hearing decision not provided to plaintiff before his final challenge to the hearing decision and penalty," *see* Def. Reply Mem. at 23; (2) after receiving a tape recording of the hearing which contained the rationale, "he did not add any new substantive arguments related to the rationale ... because he had already made the best arguments possible," *see* Def. Mem. at 26; and (3) his sentence was reduced for exceeding the guidelines, despite his failure to raise the issue on appeal. *See* Def. Reply Mem. at 23. Thus, defendants argue, the claim must fail. *See* Def. 56.1 ¶¶ 12, 35; Def. Mem. at 22-23; Def. Reply Mem. at 25-27.

Lunney does not contradict any of the relevant facts asserted by defendants on this point. Rather, he states that although his punishment at the second disciplinary hearing was in the end reduced for exceeding the guidelines, he never made this challenge on appeal. *See* Pl. Mem. at 57. He uses this fact to argue that "[p]erhaps if plaintiff had received a copy of the disposition paperwork, he could have argued on appeal that the penalty ... exceeded the guidelines." *See id.* This is the only harm Lunney points to based on his not having received the written disposition.

**\*29** Lunney's argument fails for two reasons. First, he was aware of his nine-month sentence following the disciplinary hearing. *See* Def. 56.1 ¶ 12 (citing Lunney Dep. at 93, 100-101). Thus, nothing prevented Lunney from raising the alleged illegality of the nine-month sentence even without a copy of the actual written disposition. Second, Lunney has not shown that there was any potential for any other outcome had he been provided with a copy of the written disposition. For example, he makes no argument that he could have received an even greater sentence reduction had he had access to the written hearing disposition. Given that the error in the sentence was remedied in November 2002 prior to his serving six months in confinement, any failure on his part to raise the argument that his sentence was incorrect was necessarily harmless.

*Conclusion*

For the foregoing reasons, defendants' motion should be granted, with the exception of the portion of their motion concerning Lunney's claim of (1) excessive force against Blot and Frazier and (2) his First Amendment retaliation claims (a)

against defendant Blot based on the allegedly retaliatory assault, threats, and deprivation of recreation and showers (b) against defendant Frazier for his participation in the retaliatory assault. [FN14]

> **FN14.** Lunney asserts in his amended complaint that Fischer subjected him to "forced labor without pay" while he was in the SHU, *see* Am. Compl. ¶ 16(c). However, this claim is not explained in his affidavit. Nor is any evidence supplied to support it. Accordingly, it is too vague to constitute the basis for a claim and it has not been discussed herein.

### PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have ten (10) days from service of this Report and Recommendation to serve and file any objections. *See also* Fed.R.Civ.P. 6(a), (e). Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with copies sent to the Hon. Lewis A. Kaplan, 500 Pearl Street, New York, New York 10007, and to the undersigned at the same address. Any request for an extension of time to file objections must be directed to Judge Kaplan. If a party fails to file timely objections, that party will not be permitted to raise any objections to this Report and Recommendation on appeal. *See Thomas v. Arn,* 474 U.S. 140, 144-45, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).

S.D.N.Y.,2007.
Lunney v. Brureton
Not Reported in F.Supp.2d, 2007 WL 1544629 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

2012 WL 2362626
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Mark INESTI, Plaintiff,

v.

James HICKS, Acting Clinical Dir; Michael
Hogan, Ph D; Steven Rabinowitz, Dir. of Kirby
and (MPC); Michael Kunz, of Clinical Services;
Tom Tuzel, M.D.; Lucy Borges–Smith, Acting
Counsler (MPC); Dunbar, Capt. at GRVC; Presseley,
Capt. at GRVC & Gareen Hamilian, Defendants.

No. 11 Civ. 2596(PAC)(AJP).
|
June 22, 2012.

*REPORT AND RECOMMENDATION*

ANDREW J. PECK, United States Magistrate Judge.

 **\*1 To the Honorable Paul A. Crotty, United States
District Judge:**

Pro se plaintiff Mark Inesti (a/k/a Hector Ortiz) brings this
§ 1983 action alleging violations of his federal constitutional
rights by New York City and New York State officials.
Inesti raises claims against two correction Captains, Sherma
Dunbar and Anna Pressley ("City defendants"), arising out
of alleged conditions of his confinement and failure to treat
his mental illness while he was held in the George R. Vierno
Center ("GRVC"), a facility operated by the New York City
Department of Correction ("DOC") on Rikers Island. (Dkt.
No. 38:2d Am. Compl. ¶¶ 5–6, 16–40, 79–84, 86, 90–92, 94–
96, 104–05, 138, 143–44.) [1] Inesti also raises claims against
defendants James Hicks, Michael Hogan, Steven Rabinowitz,
Michael Kunz, Tom Tuzel, Lucy Borges–Smith and Gareen
Hamilian ("State defendants"), arising from his treatment in
the Manhattan Psychiatric Center ("MPC") and the Kirby
Forensic Psychiatric Center ("Kirby"), facilities operated by
the New York State Office of Mental Health on Wards Island.
(2d Am.Compl.¶¶ 3–4, 7–11, 41–74, 81, 85–89, 106–37,
139–40, 142–44.) Presently before the Court are defendants'
motions to dismiss. (Dkt.Nos.40, 42.)For the reasons stated
below, defendants' motions to dismiss should be *GRANTED
IN PART AND DENIED IN PART.*

*FACTS*

*Inesti's Allegations*

*The City Defendants*

Inesti's allegations begin with him being examined,
diagnosed with "schizoaffective one disorder" and prescribed
medication while detained at Rikers Island on an unspecified
date. (Dkt. No. 38: Compl. ¶¶ 12, 37.) [2] Inesti alleges that
because of and despite his mental illness, he was given a
misbehavior report, a disciplinary hearing was conducted
and he was sentenced to ninety-days in the GRVC's special
housing unit ("SHU"). (Compl.¶¶ 13–19, 30–31.) Inesti
alleges that during that period, he was locked in his cell for
twenty-four hours a day, was not allowed to shower, and
while Captains Sherma Dunbar and Anna Pressley were on
duty, was denied meals by correction staff. (Compl. ¶¶ 15–
16 .) Inesti alleges that he complained about these conditions,
but his requests for meals, out-of-cell recreation time and
a shower were denied. (Compl.¶ 17.) Inesti alleges that
while Captains Dunbar and Pressley were on duty, there was
constant flooding of toilets and "banging" where he was
held. (Compl.¶¶ 21, 34.) Inesti alleges that he began "hearing
voices" and would bang on his cell door "to dispel[ ] demonic
activity" while asking for mental health treatment and to be
taken out of his cell. (Compl.¶ 22.) Although Inesti's legs
and ankles swelled as a result of his banging on his cell
door, he received no medical treatment or medication for
the associated pain. (Compl.¶ 25.) Inesti alleges that Captain
Pressley came to his cell and told him, " 'I run this shit,' "
and " 'You['re] never going to eat.' " (Compl.¶ 23.) Captain
Dunbar ordered correction officers to perform strip searches
on Inesti daily without justification, but no contraband was
found. (Compl.¶ 24.) Inesti was held in a "strip cell" without
sheets, towels, hygiene products, writing materials or other
personal property. (Compl.¶ 26.) Inesti appears to allege that
Captains Dunbar and Pressley ordered correction staff to shut
off the water supply in the SITU to deter SITU prisoners from
causing toilets to flood or punish them for banging on their
cell doors. (Compl.¶ 36.) At the end of Inesti's ninety-day
SITU sentence, he was transferred to the MPC and Kirby.
(Compl.¶ 40.)

*The State Defendants*

 **\*2** Inesti was brought to the MPC by a court order. (Dkt.
No. 38: Compl. ¶ 41.) At the MPC, Inesti was diagnosed
with "schizoaffective one disorder," a diagnosis that he was

given previously while held in Kirby; he does not indicate when and under what circumstances he had been brought to Kirby. (Compl.¶ 43.) While at the MPC, Inesti was prescribed the medications Risperdol and Colozapean. (Compl.¶ 42.) Inesti was placed in a "Stair Residential" in-patient program for twenty-four months, but he verbally objected to this treatment to Steven Rabinowitz, the director of the MPC and Kirby. (Compl.¶¶ 3, 45–46.) Inesti requested a transfer to a "transitional unit," but instead he was transferred to a housing area within the MPC for "violent assaultive" patients who received electroshock therapy or injections due to their behavior. (Compl.¶¶ 47–49.) Inesti received injections due to his confrontations with MPC staff. (Compl.¶ 50.) After being injected with a sedative, Inesti lost control of his torso and legs, was left in a room without a bed and had to sleep on the floor. (Compl.¶¶ 51–52.) Because Inesti could not control his torso or legs, he urinated on himself. (Compl.¶ 53.) Inesti alleges that MPC and Kirby staff give such injections as a means to discipline disruptive patients. (Compl.¶ 54.) Throughout Inesti's time at the MPC, he made written complaints to Rabinowitz about his treatment by staff. (Compl.¶¶ 44, 55.)

Inesti was transferred to a "transitional service unit" within the MPC, but while there, he refused to take his medication and became delusional, believing that the staff were giving him "poison pills." (Compl.¶¶ 55–59.) As a result of Inesti's delusions, he struck a nurse. (Compl.¶ 60.) Lucy Borges–Smith, the MPC's acting counselor, called for an ambulance that took Inesti from the MPC to the Bellevue Hospital Center. (Compl.¶¶ 11, 61–62.) Inesti alleges that BorgesSmith failed to inform the EMTs of Inesti's mental health status and medications or provide them with appropriate medical records. (Compl.¶¶ 63–64.) Inesti was released from Bellevue without any mental health treatment or medications and was allowed to wander the streets of New York City in a delusional state until he returned to the MPC. (Compl.¶¶ 66–68.)

When Inesti arrived at the MPC, Borges–Smith had him arrested on assault charges and he was brought to a Rikers Island facility. (Compl.¶ 69.) At that facility, Inesti received mental health treatment and medication, but after a court hearing he was released from DOC custody without further treatment or medication. (Compl.¶¶ 71–72.) Inesti again wandered the streets of New York City until he returned to the MPC. (Compl.¶ 73.) Inesti alleges a "revolving door" cycle between 2006 and 2008 in which he was arrested and brought to a Rikers Island facility where he was either treated or not

treated, then released until he returned to the MPC, where he was either treated or not treated, then arrested and taken back to a Rikers Island facility. (Compl.¶¶ 75–98.)

**\*3** On August 8, 2008, while released, Inesti suffered a delusion in which he believed that people were trying to kill him and steal real property that he had inherited. (Compl.¶ 100.) Inesti was arrested as a result of acts committed while delusional and was ordered by a court to be examined at Bellevue. (Compl. ¶¶ 101–02.) At Bellevue, Inesti struck an officer and was injected with medication. (Compl.¶ 103.) From August 8, 2008 to November 21, 2008, Inesti was housed in a GRVC mental health SHU housing area, and Captains Dunbar and Pressley denied him food, clothing, recreation time, showers and mental health treatment. (Compl.¶ 104–05.) Inesti was found not fit to proceed in a criminal trial and, on November 21, 2008, was transferred to Kirby. (Compl.¶ 106.)

Kirby physician Dr. Tom Tuzel prescribed the medication Risperodol for Inesti. (Compl.¶¶ 9, 107.) Dr. Gareen Hamilian, acting clinical director James Hicks, and director of clinical services Michael Kunz all interviewed Inesti and diagnosed him as suffering from "schitzoeffective one disorder." (Compl.¶¶ 7–8, 10, 108.) Inesti struck a Kirby staff member while suffering a delusion, believing that the staff member "was part of a team to[ ] kill him and steal his home."(Compl.¶ 112.) Dr. Tuzel ordered Inesti injected with a sedative to stabilize him. (Compl.¶ 113.) Dr. Tuzel also ordered Inesti injected with "psycotropic medication [sic]" on multiple occasions. (Compl.¶ 122.) Inesti states that he never consented to any injections he received at Kirby, and that Kirby staff would restrain him when he was given "psychtropic medication." (Compl.¶¶ 120, 123–26.) Inesti further alleges that he was strip searched by unknown Kirby employees. (Compl.¶ 127–28.)

On January 5, 2009, Kunz and Hamilian "filed a 'Model Report in Support of Competency Restoration' made pursuant to"C.P.L. § 730.60(2). (Compl.¶ 109.) Inesti claims that the report indicates that he was diagnosed previously as suffering from "obsessive compulsive disorder, schitzoeffective disorder and has been hospitalized on several occasions for impulsive violent behavior."(Compl.¶ 110.) Inesti also claims that the report describes him as displaying "erratic and unp[re]dictable out-burst, and [he] has been unable to consist [e]ntly engage with examiners."(Compl.¶ 111.)

On January 8, 2009, Kunz "filed a Change of Status Ap[p]lication ... claiming [Inesti] was fit to proceed with criminal charges," and Hicks also found Inesti fit to proceed to trial. (Compl.¶¶ 115–16.) Inesti claims that Dr. Tuzel gave him "a false diagnosis and [he was] found fit to proceed with trial[,]" and that Rabinowitz "did not want to treat" him. (Compl.¶¶ 117, 136.) Inesti further claims that due to this "false diagnosis," Dr. Tuzel and Kunz caused him to be sentenced to a twenty year-to-life term of imprisonment "for a crime that was propelled by [his] mental illness ...." (Compl.¶ 140.)

**\*4** Inesti claims that he "felt threatened and helpless at the hands of" Dr. Tuzel and filed a written complaint about him with Rabinowitz, but that Rabinowitz ordered Inesti transferred back to Rikers Island without further treatment. (Compl.¶ 121.) Inesti alleges that he was "lab[e]led a nuis[a]nce and troublemaker."(Compl.¶ 118.) Inesti also alleges that Dr. Tuzel discontinued his medication despite Inesti's "problems dealing with reality." (Compl.¶ 132.) Inesti alleges that when transferred from one facility to another, his medication was discontinued automatically and it would have to be prescribed again after examination by a physician in the new facility, a process that took days to weeks. (Compl.¶ 133.) This caused Inesti to suffer the mental illness consequences of being without his medication. (Compl.¶ 133.)

### Procedural History

Inesti filed his original complaint by mail from the Clinton Correctional Facility, although he listed his address as the Downstate Correctional Facility. (Dkt. No. 2: Orig. Compl. at 1.) Inesti's original complaint was signed on April 20, 2010 (*id.* at 14), but the envelope in which it was mailed was postmarked on April 7, 2011. Inesti does not indicate the date he gave his original complaint to prison officials for delivery to the Court. The Court received Inesti's original complaint on April 12, 2011. (Orig. Compl. at 1.) [3]

Inesti's second amended complaint seeks compensatory and punitive damages, and declaratory and injunctive relief. (Dkt. No. 38: Compl ¶¶ 136–44.)

The State and City defendants have moved to dismiss Inesti's second amended complaint. (Dkt.Nos.40, 42.)

The State defendants' motion to dismiss argues that: (1) Inesti's claims are barred by the statute of limitations;

(2) defendants Hogan and Rabinowitz were not personally involved in any alleged deprivation of Inesti's rights; (3) the second amended complaint does not state facts alleging a violation of any constitutional right or any federal law; (4) Inesti's claims against the State defendants in their official capacities are barred by the Eleventh Amendment; and (5) Inesti lacks standing to seek injunctive relief and the claim is moot. (Dkt No. 43: State Defs. Br.; Dkt. No. 55: State Defs. Reply Br.)

The City defendants' motion to dismiss argues that: (1) all of Inesti's claims before his alleged August 9, 2008 incarceration are barred by the statue of limitations; (2) Inesti fails to allege the personal involvement of either City defendant in his remaining claims; (3) Inesti's remaining claims as to his medical needs and conditions of confinement do not satisfy even the lenient pro se pleading standards; and (4) Inesti fails to state a claim for municipal liability. (Dkt. No. 41: City Defs. Br.) The City defendants' reply adds that: (1) Inesti admits that no considerations justify tolling the statute of limitations for his claims against the City defendants that accrued before April 2008; and (2) Inesti does not oppose the City defendants' arguments for dismissal of the claims against them in their official capacities. (Dkt. No. 54: City Defs. Reply Br.)

### ANALYSIS

## I. THE STANDARDS GOVERNING A MOTION TO DISMISS

### A. The Twombly–Iqbal "Plausibility" Standard

**\*5** In two decisions in 2007 and 2009, the Supreme Court significantly clarified the standard for a motion to dismiss, as follows:

> Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."As the Court held in *Twombly,* the pleading standard Rule 8 announces does not require "detailed factual allegations," but it *demands more than an unadorned, the-defendantunlawfully-harmed-me accusation.*A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do."Nor does a complaint suffice if it tenders "naked assertion[s] devoid of "further factual enhancement."

To survive a motion to dismiss, *a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face."* A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.' "

Two working principles underlie our decision in *Twombly.*First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. *Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.*Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions. *Second, only a complaint that states a plausible claim for relief survives a motion to dismiss.*Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not "show[n]"-"that the pleader is entitled to relief."

In keeping with these principles a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

**\*6** *Ashcroft v. Iqbal,* 556 U.S. 662, 677–79, 129 S.Ct. 1937, 1949–50 (2009) (citations omitted & emphasis added) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 556–57, 570, 127 S.Ct. 1955, 1965–66, 1974 (2007) (retiring the *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102 (1957), pleading standard that required denying a Rule 12(b)(6) motion to dismiss "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.")). [4]

Even after *Twombly* and *Iqbal,* the Court's role in deciding a motion to dismiss "is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof."*Bison Capital Corp. v. ATP Oil & Gas Corp.,* 10 Civ. 0714, 2010 WL 2697121 at \*5 (S.D.N.Y. June 24, 2010) (Peck, M.J.) (quotations omitted), *report & rec. adopted,* 2010 WL 3733927 (S.D.N.Y. Sept. 16, 2010); *accord, e.g., Saunders v. Coughlin,* 92 Civ. 4289, 1994 WL 88108 at \*2 (S.D.N.Y. Mar. 15, 1994) (quoting *Geisler v. Petrocelli,* 616 F.2d 636, 639 (2d Cir.1980)).

Even after *Twombly* and *Iqbal,* when reviewing a pro se complaint, the Court must use less stringent standards than if the complaint had been drafted by counsel and must construe a pro se complaint liberally. *See, e.g., Harris v. Mills,* 572 F.3d at 72; *LaBounty v. Adler,* 933 F.2d 121, 123 (2d Cir.1991); *Watson v. McGinnis,* 964 F.Supp. 127, 131 (S.D.N.Y.1997) (Kaplan, D.J. & Peck, M.J.); *Saunders v. Coughlin,* 1994 WL 88108 at \*2 (citing *Hughes v. Rowe,* 449 U.S. 5, 101 S.Ct. 173 (1980)). However, "[d]ismissal under Rule 12(b)(6) is proper if the complaint lacks an allegation regarding an element necessary to obtain relief...." 2 *Moore's Federal Practice* § 12.34[4] [a], at 12–72.7 (2005). Thus, the " 'duty to liberally construe a plaintiff's complaint [is not] the equivalent of a duty to re-write it.' " *Id.,* § 12.34[1] [b], at 12–61; *see also, e.g., Joyner v. Greiner,* 195 F.Supp.2d 500, 503 (S.D.N.Y.2002) (action dismissed because pro se plaintiff "failed to allege facts tending to establish" that defendants violated his constitutional rights).

**B.** *Consideration Of Documents Attached Or Referred To In The Second Amended Complaint*

A Rule 12(b)(6) motion to dismiss challenges only the face of the pleading. Thus, in deciding such a motion to dismiss, "the Court must limit its analysis to the four corners of the complaint."*Vassilatos v. Ceram Tech Int'l, Ltd.,* 92 Civ. 4574, 1993 WL 177780 at \*5 (S.D.N.Y. May 19, 1993) (citing *Kopec v.. Coughlin,* 922 F.2d 152, 154–55 (2d Cir.1991)). [5] The Court, however, may consider documents attached to the complaint as an exhibit or incorporated in the complaint by reference. *E.g., ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir.2007); *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 153 (2d Cir.2002) ("Because this standard has been misinterpreted on occasion, we reiterate here that a plaintiff's *reliance* on the terms and effect of a document in

drafting the complaint is a necessary prerequisite to the court's consideration of the document on a dismissal motion; mere notice or possession is not enough."); *Rothman v. Gregor,* 220 F.3d 81, 88 (2d Cir.2000) ("For purposes of a motion to dismiss, we have deemed a complaint to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference ...."). [6]

**\*7** "However, before materials outside the record may become the basis for a dismissal, several conditions must be met. For example, even if a document is 'integral' to the complaint, it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document. It must also be clear that there exists no material disputed issue of fact regarding the relevance of the document."*Faulkner v. Beer,* 463 F.3d at 134 (citations omitted). In this case, documents to which Inesti referred in his second amended complaint and attached to his opposition papers (Dkt. No. 52) may be considered on the motions to dismiss, subject to the *Faulkner v. Beer* proviso.

## II. *DEFENDANTS' MOTIONS TO DISMISS ON STATUTE OF LIMITATIONS GROUNDS SHOULD BE DENIED*

### A. *The Statute Of Limitations For § 1983 Actions*
The statute of limitations for a § 1983 action is three years. *See, e.g., Donaldson v. N.Y.C. Dep't of Educ.,* 442 F. App'x 601, 602 (2d Cir.2011) (Plaintiff's "complaint falls well outside the three-year statute of limitations for section 1983 claims brought in New York."(citing *Patterson v. Cnty. of Oneida,* 375 F.3d 206, 225 (2d Cir.2004))); *Harper v. City of N.Y.,* 424 F. App'x 36, 39 (2d Cir.2011) (statute of limitations for § 1983 claims is three years, which begins to run when plaintiff knows or has reason to know of the harm); *Storman v. Klein,* 395 F. App'x 790, 792 (2d Cir.2010); *Warren v. Altieri,* 59 F. App'x 426, 427 (2d Cir.2003) (Plaintiff's " § 1983 action is governed by New York's three-year statute of limitations as set out in N.Y. C.P.L.R. § 214, the provision applicable to actions for personal injury."). [7]

"[F]ederal law governs the determination of the accrual date (that is, the date the statute of limitations begins to run) for purposes of the statute of limitations in a section 1983 action."*Ormiston v. Nelson,* 117 F.3d 69, 71 (2d Cir.1997); *accord, e .g., Cantor Fitzgerald Inc. v. Lutnick,* 313 F.3d 704, 710–11 (2d Cir.2002); *Eagleston v. Guido,* 41 F.3d 865, 871 (2d Cir.1994), *cert. denied,*516 U.S. 808, 116 S.Ct. 53 (1995).

In general, under federal law, "the time of accrual [is] that point in time when the plaintiff knows or has reason to know of the injury which is the basis of his action."*Covington v. City of N.Y.,* 171 F.3d 117, 121 (2d Cir.) (quotations omitted), *cert. denied,*528 U.S. 946, 120 S.Ct. 363 (1999). [8]

Normally, the Court would assume that, under the "prison mailbox rule," Inesti's original compliant was "filed" on April 20, 2010, the date that he signed it while he was incarcerated in Downstate Correctional Facility. *See, e.g., Flemming v. New York,* 421 F. App'x 42, 43 (2d Cir.2011); *Tafari v. McGinnis,* 328 F. App'x 21, 22 (2d Cir.2009); *Hardy v. Conway,* 162 F. App'x 61, 62 (2d Cir.2006) ("[I]n the absence of contrary evidence, district courts in this circuit have tended to assume that prisoners' papers were given to prison officials on the date of their signing".(citing cases)); *Walker v. Jastremski,* 430 F.3d at 562–63; *Rosario v. Bennett,* 01 Civ. 7142, 2002 WL 31852827 at \*14 (S.D.N.Y. Dec. 20, 2002) (Peck, M.J.) (under the "federal 'prisoner mailbox rule,' " incarcerated pro se litigants are deemed to have filed their federal civil complaints and federal habeas petitions on the date the papers were handed to prison officials for mailing (citing *Houston v. Lack,* 487 U.S. 266, 276, 108 S.Ct. 2379, 2385 (1988))). [9]

**\*8** The original complaint, however, was mailed from the Clinton Correctional Facility in an envelope postmarked April 7, 2011. Because Inesti does not indicate specifically when he gave his original complaint to prison officials for its delivery to the Court, the Court assumes that Inesti gave his original complaint to prison officials at Clinton Correctional Facility on April 7, 2011. *See, e.g., Smolen v. Berbary,* No. 08–CV–6144, 2011 WL 5978926 at \*3 (W.D.N.Y. Nov. 29, 2011) (Court uses the postmark date on the envelope as the date of filing); *Andolina v. Kenny,* No. 09–CV–0379, 2010 WL 786302 at \*3 (N.D.N.Y. Mar. 3, 2010) (using postmark date for the date of filing of the complaint); *Diallo v. N.Y. Hotel & Motel Trades Council,* 05 Civ. 0430, 2007 WL 510099 at \*2 (S.D.N.Y. Feb. 16, 2007) (using the postmark date as the filing date of a complaint; *Moreno–Castillo v. United States,* 2003 WL 23109747 at \* 1 n. 1 (adopting the postmark date as the date of filing when there is no indication of when the prisoner gave his complaint to prison officials for its delivery to the court). Absent tolling, the § 1983 claims that accrued before April 7, 2008 would be untimely.

### B. *Statutory Tolling Of The Statute Of Limitations Under C.P .L.R. § 208*

"Although federal law determines when a section 1983 claim accrues, state tolling rules determine whether the limitations period has been tolled, unless state tolling rules would 'defeat the goals' of section 1983." *Abbas v. Dixon,* 480 F.3d 636, 641 (2d Cir.2007) (quoting *Pearl v. City of Long Beach,* 296 F.3d 76, 80 (2d Cir.2002), *cert. denied,* 538 U.S. 922, 123 S.Ct. 1574 (2003)); *accord, e.g., Singleton v. City of N.Y.,* 632 F.2d 185, 191 (2d Cir.1980), *cert. denied,* 450 U.S. 920, 101 S.Ct. 1368 (1981). New York law provides a toll for "insanity," as follows:

> If a person entitled to commence an action is under a disability because of infancy or insanity at the time the cause of action accrues, and the time otherwise limited for commencing the action is three years or more and expires no later than three years after the disability ceases, ... the time within which the action must be commenced shall be extended to three years after the disability ceases ....

C.P.L.R. § 208. This tolling provision has been held not to defeat § 1983's goals. *See Shonowsky v. City of Norwich,* No. 10–CV–0745, 2011 WL 4344028 at *3 (N.D.N.Y. Apr. 18, 2011) (C.P.L.R. § 208 held not to be inconsistent with the policy underlying § 1983 in an unlawful arrest, excessive force and deprivation of due process case), *report & rec. adopted,* 2011 WL 4344039 (N.D.N.Y. Sept. 14, 2011); *Keitt v. City of N.Y.,* 09 Civ. 5663, 2010 WL 3466175 at *7 (S.D.N.Y. Aug. 9, 2010), *report & rec. adopted,* 2010 WL 3466079 (S.D.N.Y. Sept. 2, 2010).

C.P.L.R. § 208's "toll for insanity [is] to be narrowly interpreted" to apply "to only those individuals who are unable to protect their legal rights because of an over-all inability to function in society." *McCarthy v. Volkswagen of Am., Inc.,* 55 N.Y.2d 543, 548, 450 N.Y.S.2d 457, 459–60 (1982). [10] "[T]he disability of insanity must [be] continuous during the relevant period." *Washington v. Doe,* 2011 WL 679919 at *2. [11] "Plaintiff bears the burden of establishing the applicability of section 208." *Shonowsky v. City of Norwich,* 2011 WL 4344028 at *3. [12]

**\*9** Because § 208 provides no definition for the term "insanity," "an individual's mental capacities is largely a factual question." *McCarthy v. Volkswagen of Am., Inc.,* 55 N.Y.2d at 548, 450 N.Y.S .2d at 459. [13] Under New York

law, psychiatric hospitalization is not a per se basis for a toll under § 208. *See, e.g., McAdoo v. Jagiello,* No. 10–CV–0355, 2011 WL 1577236 at *4 (N.D.N.Y. Apr. 26, 2011). [14] The "insanity [disability] need not have been adjudicated at the time the cause of action accrued." *McCarthy v.. Volkswagen of Am., Inc.,* 55 N.Y.2d at 547, 450 N.Y.S.2d at 459. But it must be more than mere mental illness. *E.g., Reyes v. City of N.Y.,* 2000 WL 1505983 at *6 ("Indeed, 'apathy, depression, post-traumatic neurosis, psychological trauma and repression therefrom or metal illness alone have been held to be insufficient' without a demonstrated inability to function."); *Swartz v. Berkshire Life Ins. Co.,* 2000 WL 1448627 at *5 ("Difficulty in functioning is not sufficient to establish insanity for the purpose of § 208; rather, the plaintiff must be totally unable to function as a result of a 'severe and incapacitating' disability."). [15]

**C.** *Application Of C.P.L.R. § 208 to Inesti*

Inesti appears to argue that the limitations period should be tolled because he has been "dealing with a[n] ... ongoing mental illness that caused" his action's untimeliness. (Dkt. No. 52: Inesti Opp. Br. ¶¶ 2, 31.) Inesti's second amended complaint alleges that during or before January 2008, he "hear[d] voices" while detained on Rikers Island and would bang on his cell door "to dispel[ ] demonic activity" while asking for mental health treatment. (*See* pages 2–3 above.) Inesti alleges that he was hospitalized eventually in the MPC pursuant to a court order. (*See* page 3 above.) In both the MPC and in Kirby, Inesti was diagnosed with "schizoaffective one disorder." (*See* page 3 above.) When Inesti was transferred eventually to an MPC "transitional service unit," he refused to take his medication, became delusional, believed that the staff were giving him "poison pills" and struck a nurse. (*See* page 4 above.) Inesti was taken to Bellevue, but was released to the streets until he returned to the MPC. (*See* page 4 above.). At the MPC, Inesti was arrested, brought to Bellevue, did not receive mental health treatment and was released to wander the streets. (*See* page 4 above.) Inesti wandered the streets until he returned to the MPC. (*See* page 4 above.) Inesti alleges a continuous cycle between 2006 and 2008, in which he was arrested, brought to a Rikers Island facility, where he was either treated or not treated, then released until he returned to the MPC, where he was either treated or not treated and then arrested and taken back to a Rikers Island facility. (*See* pages 4–5 above.)

In addition, in support of his claim of "insanity" tolling, Inesti attaches to his opposition brief a "CPL Article 730

Examination" report ("Weissman Report") about him dated October 13, 2008 by psychologist Erica Weissman, and a "Model Report in Support of Competency Restoration made pursuant to CPL § 730.60(2)" ("Kunz Report") about him, dated January 5, 2009, by Kunz. (Inesti Opp. Br. Ex. A.) In October 2008, and in the context of recommending whether Inesti was fit to proceed in a criminal trial pursuant to C.P.L. § 730, Weissman diagnosed Inesti as having a "Mood Disorder Not Otherwise Specified (NOS)" and a "Personality Disorder NOS with Borderline and Antisocial Features."(Weissman Report at 4.) Weissman opined that while Inesti "may be exaggerating some of his symptoms in the hope of receiving more lenient treatment by the criminal justice system[,] ... he is, in fact, currently incapacitated ... [and] would benefit from further inpatient care, including ... psychotropic medications and cognitive-behavioral psychotherapy."(Weismann Report at 4.) By order dated November 21, 2008, Inesti was found unfit to proceed to trial and was transferred from City custody to Kirby. (Dkt. No. 44: Buskin Aff. Ex. A; seeDkt. No. 38: Compl. ¶ 106.) In January 2009, Kunz found that Inesti was not impaired or was impaired minimally with regard to his orientation "as to person, place and time," perception, memory, "thinking/communicating," mood, understanding of the criminal trial process, ability to establish a working relationship with his attorney, "intelligence/judgment," and his ability to withstand the stresses of trial. (Kunz Report at 4–7.) Kunz further opined that Inesti was "[m]alingering," or "faking signs and symptoms of mental illness for secondary gain."(Kunz Report at 8.) By order dated January 15, 2009, Inesti was found fit to proceed to trial. (Buskin Aff. Ex. B; Compl. ¶ 116.)

**\*10** There is a factual question for purposes of C.P.L.R. § 208 tolling as to whether Inesti was suffering from "insanity" during the running of the limitations periods of his claims that arose from events prior to April 7, 2008. Accordingly, the City and State defendants' motions to dismiss certain claims as untimely should be *DENIED*.

## III. *CLAIMS AGAINST THE STATE DEFENDANTS*

### A. *Defendants' Motions To Dismiss Claims Against Hogan, Rabinowitz, Dunbar And Pressley For Lack Of Personal Involvement Should Be Denied As To Personal Capacity But Granted As To Their Official Capacity* [16]

#### 1. *Personal Involvement*

"It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994); *accord, e.g., Ashcroft v.. Iqbal,* 556 U.S. 662, 676, 129 S.Ct. 1937, 1948 (2009) ( "Because vicarious liability is inapplicable to ... § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."); *Warheit v. City of N.Y.,* 271 F. App'x 123, 126 (2d Cir.2008); *Dyno v. Vill. of Johnson City,* 240 F. App'x 432, 434 (2d Cir.2007), *cert. denied,*552 U.S. 1310, 128 S.Ct. 1874 (2008); *Farrell v. Burke,* 449 F.3d 470, 484 (2d Cir.2006); *Gill v. Tuttle,* 93 F. App'x 301, 302 (2d Cir.2004); *Back v. Hastings on Hudson Union Free Sch. Dist.,* 365 F.3d 107, 1. 122 (2d Cir.2004); *Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003), *cert. denied,*543 U.S. 1093, 125 S.Ct. 971 (2005). [17]

In 1995, the Second Circuit held that:

> [t]he personal involvement of a supervisory defendant may be shown by evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d at 873. [18] However, in 2009, the Supreme Court held that:

> In a § 1983 suit ...—where masters do not answer for the torts of their servants—the term "supervisory liability" is a misnomer. Absent vicarious liability, each Government official, his or her title not withstanding, is only liable for his or her own misconduct. In the context of determining whether there is a violation of clearly established right to overcome qualified immunity, purpose

rather than knowledge is required to impose ... liability on the subordinate for unconstitutional discrimination; the same holds true for an official charged with violations arising from his or her superintendent responsibilities.

**\*11** *Ashcroft v. Iqbal,* 556 U.S. at 677, 129 S.Ct. at 1949. Although the Second Circuit has not weighed in on what remains of *Colon* after *Iqbal,* several decisions in this district have concluded that by specifically rejecting the argument that "a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution,"*id., Iqbal* effectively nullified several of the classifications of supervisory liability enunciated by the Second Circuit in *Colon. See, e.g., Bellamy v. Mount Vernon Hosp.,* 07 Civ. 1801, 2009 WL 1835939 at \*6 (S.D.N.Y. June 26, 2009) ("Only the first and part of the third *Colon* categories pass *Iqbal* 's muster—a supervisor is only held liable if that supervisor participates directly in the alleged constitutional violation or if that supervisor creates a policy or custom under which unconstitutional practices occurred. The other *Colon* categories impose the exact types of supervisory liability that *Iqbal* eliminated—situations where the supervisor knew of and acquiesced to a constitutional violation committed by a subordinate."), *aff'd,*387 F. App'x 55 (2d Cir.2010).[19] While *Colon* permitted supervisory liability in situations where the supervisor knew of and acquiesced in a constitutional violation committed by a subordinate, these post-*Iqbal* district court decisions reason that *Iqbal* 's "active conduct" standard imposes liability only where that supervisor directly participated in the alleged violation or had a hand in creating a policy or custom under which the unconstitutional practices occurred.

These decisions may overstate *Iqbal*'s impact on supervisory liability.*Iqbal* involved allegations of intentional discrimination. *Ashcroft v. Iqbal,* 556 U.S. at 686, 129 S.Ct. at 1942. Where the alleged constitutional violation involved "invidious discrimination in contravention of the First and Fifth Amendments,"*Iqbal* held that "plaintiff must plead and prove that the defendant acted with discriminatory purpose," whether the defendant is a subordinate or a supervisor. *Ashcroft v. Iqbal,* 556 U.S. at 676–77, 129 S.Ct. at 1948–49. It was with intent-based constitutional claims in mind, specifically racial discrimination, that the Supreme Court rejected the argument that "a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution."*Ashcroft v. Iqbal,* 556 U.S. at 677, 129 S.Ct. at 1949. Where the constitutional claim does not require a showing of discriminatory intent,

but instead relies on the unreasonable conduct or deliberate indifference standards of the Fourth, Eighth or Fourteenth Amendments, the personal involvement analysis set forth in *Colon* may still apply. [20]

### 2. *Application Of The Personal Involvement Standard To State Supervisory Defendants Hogan and Rabinowitz*

#### a. *Hogan*

Inesti alleges that he made "numerous unresolved complaints" to both Hogan and Rabinowitz, who "deferr[ed] to and allow[ed] Defendants Tom Tuzel, James Hicks, Gareen Hamilian and Micha[e]l Kunz to over rule past pr[escr]iptions and orders of doctors ...." (Dkt. No. 38: Compl. ¶ 135.) Inesti also alleges that Hogan and Rabinowitz "fail[ed] to properly investigate [Inesti's] concerns .... " (Compl.¶ 135.) Inesti further alleges that Hogan and Rabinowitz "created, approved and implemented a practice where unconstitutional acts occurred and allowed the continuation of that practice." (Compl.¶ 135.) In addition, Inesti alleges that Hogan and Rabinowitz "fail[ed] to properly investigate plaintiff's complaints and order[ed Inesti] to be returned to Rikers Island Correctional Facility (DOCS) with no medication or mental health treatment...." (Compl.¶ 139.) These allegations appear to assert claims under the Fourteenth Amendment for deliberate indifference to Inesti's medical needs. *See Caiozzo v. Koreman,* 581 F.3d 63, 71, 72 (2d Cir.2009) (An "injured state pretrial detainee, to establish a violation of his Fourteenth Amendment due process rights, must prove, *inter alia,* that the government-employee defendant disregarded a risk of harm to the plaintiff of which the defendant was aware," *i.e.,* the standard is the same whether the claim is brought under the Eighth or Fourteenth Amendments.); *Kelsey v. City of N.Y.,* 306 F. App'x 700, 702 (2d Cir.2009) ("An official may be found liable for violating a detainee's due process rights if the official was deliberately indifferent to the medical need of a detainee to be protected from himself."); *Bryant v. Maffucci,* 923 F.2d 979, 983 (2d Cir.), *cert. denied,*502 U.S. 849, 112 S.Ct. 152 (1991); *Henry v. N.Y.C. Hosp. & Health Corp.,* 00 Civ. 2537, 2000 WL 858345 at \*1 (S.D.N.Y. June 28, 2000) (Peck, M.J.) Inesti's allegations as to Hogan appear to satisfy all of the *Colon* categories and at least certain claims also appear to satisfy an *Iqbal*-limiting standard. *See, e.g., Sulehria v. City of N.Y.,* 670 F.Supp.2d 288, 325 (S.D.N.Y.2009) ("In *Iqbal,* the High Court emphasized that liability under section 1983 required proof that the defendant was directly involved in

the misconduct, either by participating in it or ordering or authorizing it.").

**\*12** Accordingly, the State defendants' motion to dismiss Inesti's claims against Hogan in his individual capacity should be *DENIED*.

**b. Rabinowitz**

Inesti's allegations as to Rabinowitz indicate Rabinowtiz's personal involvement in constitutional violations. In addition to the allegations involving both Rabinowtiz and Hogan (*see* above), Inesti alleges that Inesti "made numerous complaints concerning the cruel and mali[c]ious treatment to his person ... to ... Rabinowitz[,]" that he objected to treatment verbally to Rabinowitz, that he "continued to make written complaints to ... Rabinowitz [,]" that Rabinowitz "did not want to treat" him and that Rabinowitz "ordered [Inesti] to ... be sent back to Rikers Island[,] denying [Inesti] mental health treatment."(Dkt. No. 38: Compl. ¶¶ 44, 55, 117, 121.) These allegations appear to assert Fourteenth Amendment deliberate indifference and First Amendment retaliation claims. *See* cases cited on pages 26–31 below; *see also, e.g., Gill v. Pidlypchak,* 389 F.3d 379, 383–84 (2d Cir.2004) (retaliation against a prisoner based on his grievance gives rise to a First Amendment retaliation claim); *Roseboro v. Gillespie,* 791 F.Supp.2d 353, 366–69 (S.D.N.Y.2011) (Peck, M.J.) (same). Inesti's claims against Rabinowitz fall into all of the *Colon* categories discussed above and at least some of these allegations fall within an *Iqbal*-limiting standard.

Accordingly, the State defendants' motion to dismiss Inesti's claims against Rabinowitz, in his individual capacity, should be *DENIED*.

**B. *Inesti Has Alleged Facts Sustaining Two Causes Of Action Against Rabinowitz***

**1. *Inesti's Fourteenth Amendment Denial Of Mental Health Treatment Claim Against Rabinowitz Should Not Be Dismissed***

Inesti's second amended complaint can be read to allege a cause of action against Rabinowitz for the denial of mental health treatment while Inesti was hospitalized in Kirby and/ or the MPC. (Dkt. No. 38: Compl. ¶¶ 117, 121, 139; *see* pages 1–2 above.) Because Inesti's claim appears to have arisen while he was a pretrial detainee, his claim is analyzed under the Due Process Clause of the Fourteenth Amendment rather than the Eighth Amendment. *See, e.g., City of Revere*

*v. Mass. Gen. Hosp.,* 463 U.S. 239, 244, 103 S.Ct. 2979, 2983 (1983); *Youngberg v. Romeo,* 457 U.S. 307, 315, 102 S.Ct. 2452, 2457 (1982) ("The mere fact that [the patient] has been committed under proper procedures does not deprive him of all substantive liberty interests under the Fourteenth Amendment."); *Caiozzo v. Koreman,* 581 F.3d 63, 69 (2d Cir.2009); *Weyant v. Okst,* 101 F.3d 845, 856 (2d Cir.1996); *Grant v. N.Y.C. Dep't of Corr.,* No. 96–2469, 104 F.3d 355 (table), 1996 WL 734052 at \*1 (2d Cir. Dec. 23, 1996); *Bryant v. Maffucci,* 923 F.2d 979, 983 (2d Cir.) (citing *Bell v. Wolfish,* 441 U.S. 520, 535 n. 16, 99 S.Ct. 1861, 1872 n. 16 (1979)), *cert. denied,*502 U .S. 849, 112 S.Ct. 152 (1991). [21]

**\*13** The Second Circuit has held that:

> while the Supreme Court has not precisely limned the duties of a custodial official under the Due Process Clause to provide needed medical treatment to a pretrial detainee, it is plain that an unconvicted detainee's rights are at least as great as those of a convicted prisoner.... Thus, the official custodian of a pretrial detainee may be found liable for violating the detainee's due process rights if the official denied treatment needed to remedy a serious medical condition and did so because of his deliberate indifference to that need.

*Weyant v. Okst,* 101 F.3d at 856;*see also, e.g., Cnty. of Sacramento v. Lewis,* 523 U.S. 833, 849–50, 118 S.Ct. 1708, 1718 (1998); *Caiozzo v. Koreman,* 581 F.3d at 70–72; *Grant v. N.Y.C. Dep't of Corr.,* 1996 WL 734052 at \*1; *Wicks v. Qualtere,* Nos. 95–CV–425, 95–CV–426, 1997 WL 176338 at \*3 (N.D.N.Y. Apr. 4, 1997) (Pooler, D.J.); *Landy v. Irizarry,* 884 F.Supp. 788, 801 n. 20 (S .D.N.Y.1995). The standard for such a claim is the same as one brought by a convicted prisoner under the Eighth Amendment. *Caiozzo v. Koreman,* 581 F.3d at 72.

As the Second Circuit has explained, "the deliberate indifference standard embodies both an objective and a subjective prong."*Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996). [22] "Objectively, the alleged deprivation must be 'sufficiently serious'...."*Id.* at 553; *Smith v. Carpenter,* 316 F.3d at 183–84 ("The objective 'medical need' element measures the severity of the alleged deprivation ...."). [23] " 'The

Constitution does not command that inmates be given the kind of medical attention that judges would wish to have for themselves ....' " *Dean v. Coughlin,* 804 F .2d 207, 215 (2d Cir.1986). "[O]nly those deprivations denying 'the minimal civilized measure of life's necessities' are sufficiently grave to form the basis of an Eighth [or Fourteenth] Amendment violation." *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 2324 (1991) (citation omitted); *see also, e.g., Dean v. Coughlin,* 804 F.2d at 215 (" '[T]he essential test is one of medical necessity and not one simply of desirability.' "). Thus, the constitutional protection is limited to " 'a condition of urgency' that may result in 'degeneration' or 'extreme pain.' " *Chance v. Armstrong,* 143 F.3d at 702;[24] *accord, e.g., Fransua v. Vadlamudi,* 2008 WL 4810066 at * 1; *Harrison v. Barkley,* 219 F.3d 132, 136 (2d Cir.2000) ("A serious medical condition exists where 'the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain.' ").

The Second Circuit has stated that determining whether a deprivation is objectively serious entails two inquiries:

> Determining whether a deprivation is an objectively serious deprivation entails two inquiries. *The first inquiry is whether the prisoner was actually deprived of adequate medical care.* As the Supreme Court has noted, the prison official's duty is only to provide reasonable care. Thus, "prison officials who act reasonably [in response to an inmate health risk] cannot be found liable ..." and, conversely, failing "to take reasonable measures" in response to a medical condition can lead to liability.

**\*14** Second, the objective test asks whether the inadequacy in medical care is sufficiently serious. This inquiry requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner. For example, if the unreasonable medical care is a failure to provide any treatment for an inmate's medical condition, courts examine whether the inmate's medical condition is sufficiently serious. Factors relevant to the seriousness of a medical condition include whether "a reasonable doctor or patient would find [it] important and worthy of comment," whether the condition "significantly affects an individual's daily activities," and whether it causes "chronic and substantial pain." In cases where the inadequacy is in the medical treatment given, the seriousness inquiry is narrower. For example, if the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in that treatment, the seriousness inquiry "focus[es] on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone." Thus, although we sometimes speak of a "serious medical condition" as the basis for [such a] claim, such a condition is only one factor in determining whether a deprivation of adequate medical care is sufficiently grave to establish constitutional liability.

*Salahuddin v. Goord,* 467 F.3d at 279–80 (citations omitted, emphasis added); *see, e.g., Hale v. Rao,* 768 F.Supp.2d 367, 378 (N.D.N.Y.2011) ( "Mental illness can constitute a serious medical need." (citing *Langley v. Coughlin,* 888 F.2d 252, 254 (2d Cir.1989)).

Where the plaintiff alleges delay or interruption in treatment rather than failure to receive treatment, "the serious medical need inquiry can properly take into account the severity of the temporary deprivation alleged by the prisoner." *Smith v. Carpenter,* 316 F.3d at 186. "[I]t's the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract, that is relevant for [these] purposes." *Id.* (citing *Chance v. Armstrong,* 143 F.3d at 702–03). "The absence of adverse medical effects or demonstrable physical injury is one ... factor that may be used to gauge the severity of the medical need at issue. Indeed, in most cases the actual medical consequences that flow from the alleged denial of care will be highly relevant to the question of whether the denial of treatment subjected the prisoner to a significant risk of serious harm." *Id.* at 187 (citations omitted).

"Subjectively, the charged official must act with a sufficiently culpable state of mind." *Hathaway v. Coughlin,* 99 F.3d at 553; *accord, e.g., Fransua v. Vadlamudi,* 2008 WL 4810066 at *1; *Salahuddin v. Goord,* 467 F.3d at 280–81; *Smith v. Carpenter,* 316 F.3d at 184 ("[T]he subjective 'deliberate indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind."); *Selby v. Coombe,* 17 F. App'x. at 37; *Chance v. Armstrong,* 143 F.3d at 702. "The required state of mind, equivalent to criminal recklessness, is that the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998) (quotations omitted, quoting *Hathaway v. Coughlin,* 99 F.3d at 553 (quoting *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 1979 (1994)));

*see, e.g., Caiozzo v. Koreman,* 581 F.3d at 71 (to establish a violation of his Fourteenth Amendment due process rights, a plaintiff "must prove, *inter alia,* that the government-employed defendant disregarded a risk of harm to the plaintiff of which the defendant was aware"). [25]

**\*15** Deliberate indifference may be "manifested by prison doctors in their response to the prisoner's needs or by prison [officials or] guards in intentionally denying or delaying access to medical care."*Estelle v. Gamble,* 429 U.S. 97, 104–05, 97 S.Ct. 285, 291 (1976) (fn.omitted). However, an "inadvertent failure to provide adequate medical care" does not constitute "deliberate indifference." 429 U.S. at 105–06, 97 S.Ct. at 292;*accord, e.g., Burton v. N.Y.S. Dep't of Corr.,* 93 Civ. 6028, 1994 WL 97164 at *2 (S.D.N.Y. Mar. 21, 1994) (Sotomayor, D.J.)."Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim ...." *Estelle v. Gamble,* 429 U.S. at 106, 97 S.Ct. at 292. [26] As the Supreme Court has stated, "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Id.; accord, e.g., Smith v. Carpenter,* 316 F.3d at 184 ("Because the Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law, not every lapse in prison medical care will rise to the level of a constitutional violation."); *Hathaway v. Coughlin,* 99 F.3d at 553; *Burton v. N.Y.S. Dep't of Corr.,* 1994 WL 97164 at *2.

Inesti has adequately pled that he suffered from a serious mental illness that required treatment. His allegations regarding his mental health history, including when he was without medication and harmed others, buttress this determination. In addition, he has adequately pled that at some point, possibly on or after January 8, 2009, after he was found fit to proceed to trial, Rabinowitz, though aware of Inesti's condition, decided that Inesti was to be no longer treated and had him transferred to a Rikers Island facility, possibly due to a perception of him as a "nuis[a]nce and a 'troublemaker.'" (Compl.¶¶ 116–18, 121.)

## 2. *Inesti's First Amendment Retaliatory Transfer To Rikers Island Claim Against Rabinowitz Should Not Be Dismissed*

To prove a First Amendment retaliation claim, "a prisoner must show '(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection

between the protected speech and the adverse action.' " *Espinal v. Goord,* 558 F.3d 119, 128 (2d Cir.2009). [27]

For the adverse action prong, the plaintiff must show that the defendant's "retaliatory conduct ... would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights.... Otherwise, the retaliatory act is simply *de minimis,* and therefore outside the ambit of constitutional protection."*Dawes v. Walker,* 239 F.3d 489, 493 (2d Cir.2001) (citations omitted), *overruled on other grounds by Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992 (2002). [28]

To establish a causal connection between the protected speech and the adverse action, a court may consider a number of factors, including "any statements made by the defendant concerning his motivation" and "the temporal proximity between the protected activity and the defendant's adverse action."*Williams v. Muller,* 98 Civ. 5204, 2001 WL 936297 at *3 (S.D.N.Y. Aug. 17, 2001); *see, e.g., Espinal v. Goord,* 558 F.3d at 129; *Gill v. Jones,* 95 Civ. 9031, 2001 WL 1346012 at *6 (S.D.N.Y. Nov. 1, 2001); *Walker v. Keyser,* 2001 WL 1160588 at *6; *Rivera v. Goord,* 119 F.Supp.2d at 339. Prisoners' claims of retaliation, of course, must be examined with skepticism and particular care because they are " 'prone to abuse' since prisoners can claim retaliation for every decision they dislike."*Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (quoting *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983)); *accord, e.g., Gill v. Pidlypchak,* 389 F.3d 379, 385 (2d Cir.2004) (Scullin, C.D.J., concurring); *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003); *Davis v. Goord,* 320 F.3d 346, 352 (2d Cir.2003); *Dawes v. Walker,* 239 F.3d at 491; *Jackson v. Johnson,* 15 F.Supp.2d 341, 364 (S.D.N.Y.1998) (Kaplan, D.J. & Peck, M.J.) ( & cases cited therein).

**\*16** Inesti satisfies his burden with respect to the first prong of the First Amendment retaliation analysis: that the speech or conduct at issue was protected. "It is well settled that the filing of a prison grievance is a protected activity."*Mateo v. Fischer,* 682 F.Supp.2d at 433. [29]

Inesti also satisfies the second prong by alleging that the adverse action that he suffered was a transfer from one facility to another. *E.g., Davis v. Kelly,* 160 F.3d 917, 920 (2d Cir.1998) ("prison authorities may not transfer an inmate in retaliation for the exercise of constitutionally protected rights"); *Meriwether v. Coughlin,* 879 F.2d 1037, 1045–46 (2d Cir.1989) ("Prison officials have broad discretion

to transfer prisoners. They may not, however, transfer them solely in retaliation for the exercise of constitutional rights."(citations omitted)).

As to the third prong, Inesti alleges a causal connection between the protected speech and the adverse action in light of his allegations that he wrote grievances to Rabinowitz, Rabinowitz "did not want to treat [Inesti] with mental health treatment," Inesti was "lab[e]led a nuis[a]nce and [a] troublemaker" and Rabinowitz ordered Inesti sent back to a Rikers Island facility. (Dkt. No. 38: Compl. ¶¶ 44, 55, 117, 118, 121.) Construing Inesti's second amended complaint liberally, Inesti adequately alleges that Rabinowitz retaliated against him for filing grievances. (Compl.¶¶ 44, 55, 118.) The State defendants' motion to dismiss this claim should be *DENIED.*

### C. *Kunz, Hamilian, Hicks And Tuzel Are Immune From Suit For Damages*

Inesti's claims for damages against Kunz, Hamilian, Hicks and Tuzel arising out of what appears to be court-ordered examinations and reports concerning Inesti's competency to proceed in a criminal trial, should be dismissed. Because such actions are court-ordered, federal district courts accord quasi-judicial immunity from suit for damages to those medical professionals who facilitate such examinations and who prepare such reports. *See, e.g., Henderson v. Heffler,* No. 07–CV–0487, 2010 WL 2854456 at *3 (W.D.N.Y. July 19, 2010); *Mills v. Luplow,* No. 04–CV0005, 2009 WL 2606240 at *28 (W .D.N.Y. Mar. 31, 2009), *report & rec. adopted,* 2009 WL 2591762 (W .D.N.Y. Aug. 20, 2009), *aff'd,*391 F. App'x 948 (2d Cir.2010); *Hunter v. Clark,* No. 04–CV–0920, 2005 WL 1130488 at *2 (W.D.N.Y. May 5, 2005). Thus, such claims for damages against defendants Kunz, Hamilian, Hicks and Tuzel should be dismissed.

### D. *Inesti's Claims Against Dr. Tuzel Should Not Be Dismissed*

Inesti's claims against Dr. Tuzel appear to state a claim under the Fourteenth Amendment for deliberate indifference to his need for proper mental health treatment, including a claim that Dr. Tuzel injected him with psychotropic medication on multiple occasions without Inesti's consent and while Inesti was physically restrained. Because Inesti is pro se and this is a motion to dismiss, the Court should deny the State defendants' motion to dismiss these claims so that the facts can be developed through discovery, which is not likely to be expanded by allowing these claims. *See, e.g., Speedmark*

*Transp., Inc. v. Mui,* 778 F.Supp.2d 439, 444 (S.D.N.Y.2011) (Peck, M.J.); *Sudler v. City of N.Y.,* 08 Civ. 11389, 2010 WL 68095 at *12 (S.D.N.Y. Jan. 8, 2010) (Peck, M.J.), *report & rec. adopted,* 2010 WL 726964 (S.D.N.Y. Feb. 19, 2010); *William A. Gross Constr. Assocs., Inc. v. Am. Mfrs. Mut. Ins. Co.,* 600 F.Supp.2d 587, 590 (S.D.N.Y.2009) (Peck, M.J.) (collecting cases).

### E. *Inesti's Claims Against Borges–Smith Should Be Dismissed Because His Allegations About Her Fail To State A Claim For Deliberate Indifference*

**\*17** Inesti's § 1983 claims against Borges–Smith, an MPC counselor, appear to arise out of her failure to inform the EMTs of Inesti's mental health status and medications when Inesti was taken by ambulance to Bellevue after striking a nurse. (Dkt. No. 38: Compl. ¶¶ 60–65.) Inesti appears to allege that because of Borges–Smith's failure to inform the EMTs of Inesti's condition, Inesti received no mental health treatment while at Bellevue and was released while still needing mental health treatment. (Compl.¶¶ 65–68.) This allegation does not satisfy the Fourteenth Amendment deliberate indifference standard, and thus all claims against Borges–Smith should be dismissed. *See, e.g. Harriman v. Hancock Cnty.,* No. Civ. 08–122, 2009 WL 902073 at * 19 (D.Me. Mar. 31, 2009) (summary judgment in favor of county jail officials because, *inter alia,* correction officers' failure to report to their supervisor and emergency medical technicians a prisoners' prior seizures did not constitute deliberate indifference), *report & rec. adopted,* 2009 WL 2508160 (D.Me. Aug. 17, 2009), *aff'd,*627 F.3d 22 (1st Cir.2010); *Jackson v. Epps,* No. 04CV384, 2006 WL 1674301 at * 1, *4 (S.D. Miss. June 14, 2006) (granting summary judgment in favor of a correction official who allegedly failed to inform a prison nurse that the prisoner-plaintiff was experiencing "dry mouth," a purported heart attack symptom).

### IV. *THE CITY DEFENDANTS' MOTION TO DISMISS SHOULD BE DENIED, EXCEPT AS TO OFFICIAL CAPACITY CLAIMS*

Inesti's allegations against Captains Dunbar and Pressley can be construed as claiming that they unlawfully punished Inesti, a pretrial detainee, by denying him food, and possibly access to water, recreation time, showers, medical treatment and mental health treatment when they were on duty. (*See* pages 2–3 above.)

## A. Personal Involvement Of City Defendants Captains Dunbar And Pressley

Captains Dunbar and Pressley allegedly "did not consider [Inesti's] mental illness and simply stored ... [him] like livestock in a dirty cell for long periods of time with no out of cell relief or mental health treatment."(Dkt. No. 38: Compl. ¶ 16.) Captain Pressley allegedly told Inesti that he was " 'never going to eat.' " (Compl.¶ 23.) Inesti also alleges that he "was denied food[,] clothing[,] recreational out of cell time[,] showers[, water] and mental health treatment" by Captains Dunbar and Pressley. (Compl.¶¶ 36, 105.) These allegations adequately allege Captain Dunbar's and Captain Pressley's personal in involvement in actions and inaction that are the basis for and conditions of confinement claims under the Fourteenth Amendment. *See, e.g., Smith v. Hogan,* No. 09–CV–0554, 2011 WL 4343978 at *7 (N.D.N.Y. Aug. 1, 2011) (analysis of alleged denial of life's necessities of a civilly committed plaintiff under the Due Process Clause of the Fourteenth Amendment), *report & rec. adopted,* 2011 WL 4343 809 (N.D.N.Y. Sept. 14, 2011); *Nolley v. Cnty. of Erie,* No. 07–CV–0488, 2008 WL 859165 at *6 (W.D.N.Y. Mar. 31, 2008) (pretrial detainee conditions of confinement claim analyzed under the Fourteenth Amendment); *Curry v. Kerik,* 163 F.Supp.2d 232, 235–36 (S.D.N.Y.2001) (pretrial detainee conditions of confinement). Accordingly, the City defendants' motion to dismiss claims against Captains Dunbar and Pressley in their individual capacities for lack of personal involvement should be *DENIED.* [30]

## B. Legal Standard As To Conditions Of Confinement Of Pretrial Detainees

**\*18** The Supreme Court has held that because:

> [a] person lawfully committed to pretrial detention has not been adjudged guilty of any crime[,] ... the Government ... may detain him to ensure his presence at trial and may subject him to the restrictions and conditions of the detention facility so long as those conditions and restrictions do not amount to punishment, or otherwise violate the Constitution.

*Bell v. Wolfish,* 441 U.S. 520, 536–37, 99 S.Ct. 1861, 1872–73 (1979); *see, e.g., Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 2300 (1995); *Schall v. Martin,* 467 U.S. 253, 269, 104 S.Ct. 2403, 2412 (1984); *Caiozzo v. Koreman,* 581 F.3d 63, 69 (2d Cir.2009) (pretrial detainees are protected by the Due Process Clause of the Fourteenth Amendment, not the Eighth Amendment, because pretrial detainees cannot be punished); *Benjamin v. Fraser,* 264 F.3d 175, 188 (2d Cir.2001). [31]

> Not every disability imposed during pretrial detention amounts to "punishment" in the constitutional sense.... And the fact that such detention interferes with the detainee's understandable desire to live as comfortably as possible and with as little restraint as possible during confinement does not convert the conditions or restrictions of detention into "punishment."

*Bell v. Wolfish,* 441 U.S. at 537, 99 S.Ct. at 1873.
In regard to the demonstration of punishment,

> [a]bsent a showing of an expressed intent to punish, the determination whether a condition is imposed for a legitimate purpose or for the purpose of punishment "generally will turn on whether an alternative purpose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it]."

*Benjamin v. Fraser,* 264 F.3d at 188 (quoting *Bell v. Wolfish,* 441 U.S. at 538, 995 S.Ct. at 1874) (alteration in original). This has been applied in the context of the distribution or allowances of food, water, showers, periods of exercise, medical treatment and mental health treatment to pretrial detainees. *See, e.g., Azor v. City of N.Y.,* No. 08–CV–4473, 2012 WL 1117256 at *4 (E.D.N.Y. Mar. 30, 2012) (food and bathing); *Felmine v. City of N.Y.,* No. 09–CV–3768, 2011 WL 4543268 at *22 (E.D.N.Y. Sept. 29, 2011) (food); *Waters v. Luxama,* 09 Civ. 4728, 2011 WL 1226421 at *2 (S.D.N.Y. Mar. 24, 2011) (food); *Smart v. City of N.Y.,* 2009 WL 862281 at *9 (food, water and bathroom); *Ruffino v. Lantz,* No. 08–CV–1521, 2009 WL 3571306 at *3 (D.Conn. Oct. 28, 2009) (recreation); *Webster v. City of N.Y.,* 333 F.Supp.2d 184, 200 (S.D.N.Y.2004) (food and water); *Curry v. Kerik,* 163 F.Supp.2d 232, 235–36 (S.D.N.Y.2001) (unsanitary and hazardous showering); *Heisler v. Kralik,* 981 F.Supp. 830, 838 (S.D.N.Y.1997) (showers and recreation), *aff'd,*No. 97–2869, 164 F.3d 618 (table), 1998 WL 636985 (2d Cir. July 21, 1998); *Davidson v. Coughlin,* 968 F.Supp. 121, 134 (S.D.N.Y.1997) (exercise); *Cuoco v. Hershberger,* 93 Civ. 2806, 1996 WL 648963 at *8 (S.D.N.Y. Nov. 6, 1996) (medical care); *Irrizarry v. Kenny,* 92 Civ. 1511, 1995 WL 678747 at *4 (S.D.N.Y.1995) (medical care); *see*

*also, e.g., Silvera v. Conn. Dep't of Corr.,* 726 F.Supp.2d 183, 190 (D.Conn.2010) (discussion of the adequacy of mental health treatment in the context of a pretrial detainee Fourteenth Amendment analysis); *Atkins v. Cnty. of Orange,* 372 F.Supp.2d 377, 407–10 (S.D.N.Y.2005) (discussion of the deprivation of mental health treatment), *aff'd on other other grounds,* 248 F. App'x 232 (2d Cir.2007); *Burke v. Warren Cnty. Sheriff's Dep't,* No. 90–CV–0597, 1994 WL 675042 at *5 (N.D.N.Y. Nov. 25, 1994) (mental health treatment).

**\*19** Punishment has been found when a correctional official denies a prisoner a necessity of life over a period of several months whenever that official was working. *See, e.g., Robles v. Coughlin,* 725 F.2d 12, 15 (2d Cir.1983) ("While no court has explicitly held that denial of food is a per se violation of a prisoner's Eighth Amendment rights, under certain circumstances a substantial deprivation of food may well be recognized as being of constitutional dimension."(citation omitted)); *Cunningham v. Jones,* 567 F.2d 653, 659–60 (6th Cir.1977) (remanding for a determination of nutritional adequacy where a prisoner alleged he was served only one meal per day for fifteen days); *Murphy v. Andrews,* No. 10–CV–0508, 2011 WL 5878351 at *4 (E.D.Tex. Oct. 11, 2011), *report & rec. adopted,* 2011 WL 5878347 (E.D.Tex. Nov. 23, 2011); *Cruz v. Church,* No. 05–CV–1067, 2008 WL 4891165 at *12 (N.D.N.Y. Nov. 10, 2008) ("If ... meals[ ] are withheld from a prisoner on an isolated basis, such conduct, though not necessarily to be condoned, does not typically rise to a level of constitutional significance."); *Beckford v. Portuondo,* 151 F.Supp.2d 204, 213 (N.D.N.Y.2001) ("When a prison guard deprives a prisoner of two of the regularly three meals served each day, the objective prong of the Eighth Amendment may be met if the defendants do not satisfy their burden of showing that the one meal served is nutritionally adequate."); *Moss v. Ward,* 450 F.Supp. 591, 594, 596–97 (W.D.N.Y.1978) (deprivation of all of a prisoner's meals for four days and giving him only one meal each day for the next three days was grossly disproportionate punishment under the Eighth Amendment).

Absent a demonstration of an intent to punish, allegations of deprivation of the life necessities of a pretrial detainee are subject to the deliberate indifference analysis discussed above. (*See* cases on pages 38–40 above.) *See, e.g., Cruz v. Reiner,* No. 11–CV–2131, 2011 WL 6204101 at *4 (E.D.N.Y. Dec. 12, 2011); *Lesane v. City of N.Y.,* 11 Civ. 2104, 2011 WL 5242721 at *2 (S.D.N.Y. Nov. 3, 2011); *Felmine v. City of N.Y.,* 2011 WL 4543268 at *21; *Kondziela v.*

*Cnty. of Erie,* No. 09–CV–0601, 2011 WL 4055163 at *3 (W.D.N.Y. Sept. 12, 2011); *Dilworth v. Goldberg,* 10 Civ. 2224, 2011 WL 3501869 at *19 (S.D.N.Y. July 28, 2011), *report & rec. adopted,* 2011 WL 4526555 (S.D.N.Y. Sept. 30, 2011); *Waters v. Luxama,* 2011 WL 1226421 at *2; *Bourdon v. Roney,* No. 99–CV–0769, 2003 WL 21058177 at *10 (N.D.N.Y. Mar. 6, 2003); *Curry v. Kerik,* 163 F.Supp.2d at 236.

## C. *Application Of The Conditions Of Confinement Legal Standard To Inesti's Complaint*

Inesti alleges that during his ninety-day stay in SHU, Captains Dunbar and Pressley intended to deny him food, and perhaps water, showers, exercise or recreation, medical treatment and mental health treatment while each of these defendants were on duty. (*See* pages 2–3 above.) Intent can be inferred from the allegation that over a period of ninety days (not a period of mere hours or days), Inesti allegedly was denied food, and perhaps other necessities of life, during each of the eight-hour shifts that these defendants worked. (Dkt. No. 38: Compl. ¶¶ 17–21, 33.) Captain Pressley's intent to punish is additionally and more overtly demonstrated by Inesti's allegation that Captain Pressley "would come to [Inesti's] cell and torment [Inesti] with statements and remarks [like,] 'I run this shit' [and] 'You['re] never going to eat.' " (Compl.¶ 23.) In the alternative, Inesti has pled that Captains Dunbar and Pressley denied him of at least one of life's necessities—food—and perhaps water, bathing, exercise, medical treatment and mental health treatment during each of their shifts during the time period mentioned above and did so with deliberate indifference. (Compl.¶¶ 17–22, 25, 33–34, 36.) Inesti's allegations adequately allege that both Captains Dunbar and Pressley were deliberately indifferent to the deprivations of Inesti's life necessities such as food, and the City defendants' motion to dismiss therefore should be *DENIED.*

## V. *INESTI'S CLAIMS FOR INJUNCTIVE RELIEF AND DECLARATORY RELIEF SHOULD BE DISMISSED AS HE LACKS STANDING*

**\*20** Inesti seeks injunctive relief from the Court directing the State defendants "to promptly follow all policy[,] procedures[,] laws and ordinances that protect the mentally ill from negligence and [to] place [Inesti] in a psyc [hi]atric hospital."(Dkt. No. 38: Compl. ¶ 142.) Inesti also seeks declaratory relief with respect to his claims against both the City and State defendants. (Compl.¶¶ 136–40.)

**A.** *The Court Cannot Overturn Inesti's Conviction And Order His Placement In A Mental Health Facility*

The Supreme Court has held "that when a state prisoner is challenging the very fact or duration of his physical imprisonment, and the relief he seeks is a determination that he is entitled to immediate release or a speedier release from that imprisonment, his sole federal remedy is a writ of habeas corpus." *Preiser v. Rodriguez,* 411 U.S. 475, 500, 93 S.Ct. 1827, 1841 (1973); *see, e.g., Jenkins v. Haubert,* 179 F.3d 19, 22–23 (2d Cir.1999); *see also, e.g., Wilkinson v. Dotson,* 544 U.S. 74, 81–82, 125 S.Ct. 1242, 1248 (2005) ("a state prisoner's § 1983 action is barred (absent prior invalidation)—no matter the relief sought (damages or equitable relief), no matter the target of the prisoner's suit (state conduct leading to conviction or internal prison proceedings)—*if* success in that action would necessarily demonstrate the invalidity of confinement or its duration"). Therefore, to the extent that Inesti seeks to have his conviction overturned in an effort to be placed in a mental health facility, his claims for injunctive relief should be dismissed.

**B.** *Inesti Lacks Standing To Raise Claims For Injunctive And Declaratory Relief*

Inesti's claims for injunctive relief and declaratory relief should be dismissed because he lacks standing to raise such claims. "To establish standing in federal court, any party bringing a lawsuit must allege an actual case or controversy." *Deshawn E. by Charlotte E. v. Safir,* 156 F.3d 340, 344 (2d Cir.1998). "Specifically, a plaintiff must demonstrate that (1) he or she has suffered an injury; (2) the injury is traceable to the defendants' conduct; and (3) a federal court decision is likely to redress the injury." *Id.* "A plaintiff seeking injunctive or declaratory relief cannot rely on past injury to satisfy the injury requirement but must show a likelihood that he or she will be injured in the future." *Id.* Inesti filed his original complaint after he had been convicted and was incarcerated in a state prison. At that point, he was no longer in the custody of any of the named State defendants or City defendants. Inesti has not alleged any facts demonstrating that he is likely to be in the GRVC, MPC or Kirby in the future. Therefore, Inesti's claims for injunctive and declaratory relief should be dismissed as he lacks the standing to seek such relief. *See, e.g., Prins v. Coughlin,* 76 F.3d 504, 506 (2d Cir.1996) ("It is settled in this Circuit that a transfer from a prison facility moots an action for injunctive relief against the transferring facility."); *Fletcher v. U.S. Parole Comm'n,* 550 F.Supp.2d 30, 46 (D.D.C.2008) (former prisoner "is not likely to suffer a future injury from continued

implementation of the challenged federal reparole regulation. Hence, he lacks standing to pursue prospective injunctive or declaratory relief."); *Schwartz v. Snohomish Cnty.,* No. 05–732, 2006 WL 692024 at *8 (W .D. Wash. Mar. 17, 2006) ("Because Plaintiff is no longer an inmate at the [correctional facility], his [§ 1983] claims for declaratory relief are moot."); *Slade v. Gates,* No. 01–8244, 2002 WL 31357043 at *3–4 (C.D.Cal. Oct. 2, 2002) (dismissing former prisoner's claims for injunctive relief with respect to illegal police actions because he did not allege that he faces "a realistic threat of future constitutional violations by [police] officers"); *Newman v. Holder,* 101 F.Supp.2d 103, 107 (E.D.N.Y.2000) (injunctive relief claims arising from Brooklyn federal prison dismissed as moot because prisoner-plaintiffs were no longer incarcerated there).

## *CONCLUSION*

**\*21** For the reasons stated above, the State defendants' and City defendants' motions to dismiss (Dkt.Nos.40, 42) should be *DENIED,* except as follows:

1. Inesti's official capacity claims for damages against the State defendants and the City defendants should be dismissed.

2. Inesti's individual capacity claims for damages against Kunz, Hamilian, Hicks and Tuzel arising out their court-ordered examinations and reports concerning Inesti's competency to proceed in a criminal trial should be dismissed.

3. Inesti's claims against Borges–Smith should be dismissed.

4. Inesti's claims for injunctive and declaratory relief should be dismissed.

## *FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION*

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections. *See also* Fed.R.Civ.P. 6. Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable 45 Paul A. Crotty, 500 Pearl Street, Room 735,

and to my chambers, 500 Pearl Street, Room 1370. Any requests for an extension of time for filing objections must be directed to Judge Crotty (with a courtesy copy to my chambers). Failure to file objections will result in a waiver of those objections for purposes of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466 (1985); *IUE AFLCIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1054 (2d Cir.1993), *cert. denied,* 513 U.S. 822, 115 S.Ct. 86 (1994); *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.), *cert. denied,* 506 U.S. 1038, 113 S.Ct. 825 (1992); *Small v. Sec'y of Health & Human Servs.,* 892 F.2d 15, 16 (2d Cir.1989); *Wesolek v. Canadair Ltd.,* 838 F.2d 55, 57–59 (2d Cir.1988); *McCarthy v. Manson,* 714 F.2d 234, 237–38 (2d Cir.1983).

## SCHEDULING ORDER

The Court will hold a conference on July 6, 2012 at 11:00 a.m. to discuss the appropriate sequence and timing of discovery. Counsel for the State defendants shall arrange for Inesti's telephonic participation (by his calling 212–805–0036) at the conference.

## All Citations

Not Reported in F.Supp.2d, 2012 WL 2362626

## Footnotes

1   Defendants Dunbar and Pressley were incorrectly named in the Second Amended Complaint as "Dubar" and "Presseley." (Compl. at 1.)

2   All references in this Report and Recommendation to "Compl." are to the Second Amended Complaint, unless otherwise noted.

3   In addition to the "Received" date stamp from the Court's Pro Se Office indicating that the original complaint was received on April 12, 2011, there is another date stamp on the original complaint indicating that it was received at the "Office of the Appellate Defender" on February 28, 2011. (Orig. Compl. at 1.)

4   *Accord, e.g., Harris v. Mills,* 572 F.3d 66, 71–72 (2d Cir.2009); *Jones v. N.Y. Dep't of Corr. (DOC) Jail,* 11 Civ. 4477, 2011 WL 5865143 at *1–2 (S.D.N.Y. Nov. 22, 2011) (Peck, M.J.), *report & rec. adopted,* 2012 WL 1232963 (S.D.N.Y. Apr. 12, 2012) (Crotty, D.J.); *Lindner v. IBM Corp.,* 06 Civ. 4751, 2008 WL 2461934 at *3 (S.D.N.Y. June 18, 2008); *Joseph v. Terrence Cardinal Cooke Health Care Ctr.,* 07 Civ. 9325, 2008 WL 892508 at *1 (S.D.N.Y. Apr. 2, 2008); *Elektra Entm't Grp., Inc. v. Barker,* 551 F.Supp.2d 234, 237 (S.D.N.Y.2008); *Edison Fund v. Cogent Inv. Strategies Fund, Ltd.,* 551 F.Supp.2d 210, 216–17 (S.D.N.Y.2008); *Diana Allen Life Ins. Trust v. BP P.L.C.,* 06 Civ. 14209, 2008 WL 878190 at *3 (S.D.N.Y. Mar. 31, 2008) (Crotty, D.J.).

5   *Accord, e.g., Faulkner v. Beer,* 463 F.3d 130, 134 (2d Cir.2006); *Aniero Concrete Co. v. N.Y.C. Constr. Auth.,* 94 Civ. 3506, 2000 WL 863208 at *31 (S.D.N.Y. June 27, 2000); *Six W. Retail Acquisition, Inc. v. Sony Theatre Mgmt. Corp.,* 97 Civ. 5499, 2000 WL 264295 at * 12 (S.D.N.Y. Mar. 9, 2000) ("When reviewing the pleadings on a motion to dismiss pursuant to Rule 12(b)(6), a court looks only to the four corners of the complaint and evaluates the legal viability of the allegations contained therein.").

   When additional materials are submitted to the Court for consideration with a 12(b)(6) motion, the Court must either exclude the additional materials and decide the motion based solely upon the complaint, or convert the motion to one for summary judgment under Fed.R.Civ.P. 56. *See* Fed.R.Civ.P. 12(b); *Friedl v. City of N.Y.,* 210 F.3d 79, 83 (2d Cir.2000); *Fonte v. Bd. of Managers of Cont'l Towers Condo.,* 848 F.2d 24, 25 (2d Cir.1988).

6   *See also, e.g., Yak v. Bank Brussels Lambert,* 252 F.3d 127, 130 (2d Cir.2001) (citing *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47 (2d Cir.1991), *cert. denied,* 503 U.S. 960, 112 S.Ct. 1561 (1992)); *Paulemon v. Tobin,* 30 F.3d 307, 308–09 (2d Cir.1994); *Brass v. Am. Film Techs., Inc.,* 987 F.2d 142, 150 (2d Cir.1993); *Maniolos v. United States,* 741 F.Supp.2d 555, 560 (S.D.N.Y.2010) (Peck, M.J.), *aff'd* No. 10–4933–CV, 2012 WL 1522003 (2d Cir. May 2, 2012).

7   *See also, e.g., Corona Realty Holding, LLC v. Town of N. Hempstead,* 382 F. App'x 70, 72 (2d Cir.2010); *Mancuso v. Hynes,* 379 F. App'x 60, 61 (2d Cir.2010); *Walker v. Jastremski,* 430 F.3d 560, 561 (2d Cir.2005), *cert. denied,* 547 U.S. 1101, 127 S.Ct. 1887 (2006); *Patterson v. Cnty. of Oneida,* 375 F.3d at 225; *Pearl v. City of Long Beach,* 296 F.3d 76, 79 (2d Cir.2002), *cert. denied,* 538 U.S. 922, 123 S.Ct. 1574 (2003); *Paige v. Police Dep't,* 264 F.3d 197, 199 n. 2 (2d Cir.2001); *Connolly v. McCall,* 254 F.3d 36, 40–41 (2d Cir.2001); *Jones v. N.Y. Dep't Corr. (DOC) Jail,* 11 Civ. 4477, 2011 WL 5865143 at *2 (S.D.N.Y. Nov. 22, 2011) (Peck, M.J.), *report & rec. adopted,* 2012 WL 1232963 (S.D.N.Y. Apr. 12, 2012) (Crotty, D.J.); *Robinson v. Fischer,* 09 Civ. 8882, 2010 WL 5376204 at *5 (S.D.N.Y. Dec. 29, 2010) (Peck, M.J.); *Cotto v. Pabon,* 07 Civ. 7656, 2008 WL 4962986 at *5 (S.D.N.Y. Nov. 20, 2008) (Peck, M.J.); *Denis v. N.Y. S.*

*Dep't of Corr. Servs.,* 05 Civ. 4495, 2006 WL 217926 at *11 (S.D.N.Y. Jan. 30, 2006) (Peck, M.J.), *report & rec. adopted,* 2006 WL 406313 (S.D.N.Y. Feb. 22, 2006).

8    *See also, e.g., Assegai v. Bloomfield Bd. of Educ.,* 165 F. App'x 932, 934 (2d Cir.2006); *Washington v. Cnty. of Rockland,* 373 F.3d 310, 317 (2d Cir.2004); *Ormiston v. Nelson,* 117 F.3d at 71; *Eagleston v. Guido,* 41 F.3d at 871; *Singleton v. City of N.Y.,* 632 F.2d 185, 191 (2d Cir.1980), *cert. denied,* 450 U.S. 920, 101 S.Ct. 1368 (1981).

9    *See also, e.g., United States v. Montoya,* 335 F.3d 73, 75–76 (2d Cir.2003); *Noble v. Kelly,* 246 F.3d 93, 97 (2d Cir.), *cert. denied,* 534 U.S. 886, 122 S.Ct. 197 (2001); *Jones v. N.Y. Dep't of Corr. (DOC) Jail,* 2011 WL 5865143 at *3; *Pitterson v. Lee,* 10 Civ. 7289, 2011 WL 3370393 at *4 (S.D.N.Y. July 29, 2011), *report & rec. adopted,* 2011 WL 4595197 (S.D.N.Y. Sept. 26, 2011); *Cordova–Diaz v. Brown,* 10 Civ. 5133, 2011 WL 723575 at *1 n. 1 (S.D.N.Y. Feb. 8, 2011); *Devison v. Cunningham,* 09 Civ. 1031, 2010 WL 5060728 at *1 n. 1 (S.D.N.Y. Dec. 8, 2010); *Giles v. Smith,* 10 Civ. 5322, 2010 WL 4159468 at *2 n. 2 (S.D.N.Y. Oct. 8, 2010); *Hill v. Melvin,* 05 Civ. 6645, 2006 WL 1749520 at *6 (S.D.N.Y. June 27, 2006) (Peck, M.J.), *aff'd,* 323 F. App'x 61 (2d Cir.2009); *Denis v. N.Y.S. Dep't of Corr. Servs.,* 2006 WL 217926 at *11; *Hill v. Senkowski,* 409 F.Supp.2d 222, 229 (W.D.N.Y.2006); *Bordas v. Greiner,* 04 Civ. 8904, 2005 WL 3071461 at *2 (S.D.N.Y. Nov. 14, 2005); *Shomo v. City of N.Y.,* 03 Civ. 10213, 2005 WL 756834 at *3 (S.D.N.Y. Apr. 4, 2005); *Dawkins v. Jones,* 03 Civ. 0068, 2005 WL 196537 at *8 (S.D.N.Y. Jan. 31, 2005) (Peck, M.J.); *Coble v. Stinson,* No. 97–CV–0717, 2004 WL 1454392 at *1 n. 4 (W.D.N.Y. June 23, 2004); *Moreno–Castillo v. United States,* 02 Civ. 2858, 2003 WL 23109747 at *1 n. 1 (S.D.N.Y. Dec. 31, 2003).

10   *Accord, e.g., Steinberg v. Proctor,* Nos. 99–9332, 99–9334, 213 F.3d 626 (table), 2000 WL 687710 at *1 (2d Cir. May 25, 2000); *Washington v. Doe,* No. 08–CV–4399, 2011 WL 679919 at *2 (E.D.N.Y. Feb. 16, 2011); *Estate of Mandarino v. Mandarino,* 699 F.Supp.2d 646, 654 (S.D.N.Y.2010), aff'd, 408 F. App'x 428 (2d Cir.2011); *Swartz v. Berkshire Life Ins. Co.,* 99 Civ. 9462, 2000 WL 1448627 at *4 (S.D.N.Y. Sept. 28, 2000).

11   *Accord, e.g., Carter v. Doe,* 05 Civ. 8432, 2006 WL 2109461 at *3 (S.D.N.Y. July 26, 2006); *de los Santos v. Fingerson,* 97 Civ. 3972, 1998 WL 740851 at *3 (S.D.N.Y. Oct. 23, 1998).

12   *Accord, e.g., Washington v. Doe,* 2011 WL 679919 at *2; *Marshall v. Downey,* No. 09–CV–1764, 2010 WL 5464270 at *6 (E.D.N .Y. Dec. 27, 2010); *Reyes v. City of N.Y.,* 00 Civ. 1050, 2000 WL 1505983 at *7 (S.D.N.Y. Oct. 6, 2000); *de los Santos v. Fingerson,* 1998 WL 740851 at *3; *Dumas v. Agency for Child Dev.-N.Y.C. Head Start,* 569 F.Supp. 831, 833–34 (S.D.N.Y.1983); *Graboi v. Kibel,* 432 F.Supp. 572, 580 (S.D.N.Y.1977); *Doe v. Holy See (State of Vatican City),* 17 A.D.3d 793, 794, 793 N.Y.S.2d 565, 567 (3d Dep't 2005), *appeal denied,* 6 N.Y.3d 707, 812 N.Y.S .2d 443 (2006).

13   *Accord, e.g., Matthews v. Town of Jewett,* No. 09–CV–1267, 2011 WL 2973618 at *2 (N.D.N.Y. July 21, 2011); *Shonowsky v. City of Norwich,* No. 10–CV–0745, 2010 WL 4609305 at *1 (N.D.N.Y. Nov. 4, 2010); *dePoel v. City of N.Y.,* 772 F.Supp. 106, 108 (E.D.N.Y.1991).

14   *See also, e.g., Washington v. Doe,* 2011 WL 679919 at *3; *Shonowsky v. City of Norwich,* 2010 WL 4609305 at *1; *Joseph S. v. Hogan,* 561 F.Supp.2d 280, 315 (E.D.N.Y.2008); *dePoel v. City of N.Y.,* 772 F.Supp. at 108 ("Mere mental illness is insufficient.").

15   *See also, e.g., de los Santos v. Fingerson,* 1998 WL 740851 at *4; *dePoel v. City of N.Y.,* 772 F.Supp. at 108; *Dumas v. Agency for Child Dev.-N.Y.C. Head Start,* 569 F.Supp. at 833; *Burgos v. City of N.Y.,* 294 A.D.2d 177, 178, 742 N.Y.S.2d 39, 40 (1st Dep't 2002) ("vague and conslusory" description of plaintiff's " 'dementia and psychotic disorder' " is insufficient for toll); *Davis v. Reed,* 191 A.D.2d 348, 348, 596 N.Y.S.2d 4, 5 (1st Dep't) ("The conclusory assertion of repressed memory due to 'posttraumatic neurosis' is insufficient to invoke the tolling provisions of CPLR 208."), *appeal denied,* 82 N.Y.2d 749, 602 N.Y.S.2d 807 (1993).

16   The Eleventh Amendment bars suit in federal court against the State defendants in their official capacities for damages. *E.g., Brown v. DeFrank,* 06 Civ. 2235, 2006 WL 3313821 at *16 (S.D.N.Y. Nov. 15, 2006) (Peck, M.J.) ( & cases cited therein); *Freeman v. Strack,* 99 Civ. 9878, 2000 WL 1459782 at *1 (S.D.N.Y. Sept. 29, 2000) (Peck, M.J.) (" 'It is black letter law that a suit against a state official in his official capacity seeking damages is barred by the Eleventh Amendment ....' ") (quoting *Jackson v. Johnson,* 30 F.Supp.2d 613, 618 (S.D.N.Y.1998)) (Kaplan, D.J. & Peck, M.J.) ( & cases cited therein); *accord, e.g., Dunn v. Carrier,* 137 F. App'x 387, 389 (2d Cir.2005); *Ford v. Reynolds,* 316 F.3d 351, 354 (2d Cir.2003); *Davis v. New York,* 316 F.3d 93, 101 (2d Cir.2002). Accordingly, Inesti's damages claims against all of the State defendants in their official capacities are barred by the doctrine of sovereign immunity, and the State defendants' motion to dismiss the official capacity claims should be *GRANTED.*

17   *See, e.g., Blyden v. Mancusi,* 186 F.3d 252, 264 (2d Cir.1999); *Fischl v. Armitage,* 128 F.3d 50, 55 (2d Cir.1997); *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995); *Allan v. Woods,* No. 05–CV–1280, 2008 WL 724240 at *5 (N.D.N.Y. Mar. 17, 2008) ("Personal involvement is a prerequisite to the assessment of damages in a section 1983 case, and *respondeat superior* is an inappropriate theory of liability."); *Tafari v. Annets,* 06 Civ. 11360, 2008 WL 2413995 at *10 (S.D.N.Y. June

*12, 2008)* (Peck, M.J.), *report & rec. adopted,* 2008 WL 4449372 (S.D.N.Y. Oct. 2, 2008), aff'd, *363 F. App'x 80 (2d Cir.),* cert. denied,*130 S.Ct. 3475 (2010); Zamakshari v. Dvoskin,* 899 F.Supp. 1097, 1109 (S.D.N.Y.1995) (Sotomayor, D.J. & Peck, M.J.) ("In order to maintain a cause of action [under § 1983] against any official, a plaintiff must show that the defendant was personally involved in the alleged deprivation of his constitutional rights, since the doctrine of *respondeat superior* does not apply to § 1983 actions.").

18    *Accord, e.g., Ziemba v. Clark,* 167 F. App'x 831, 833 (2d Cir.2006); *Samuels v. Selsky,* 166 F. App'x 552, 556 (2d Cir.2006); *Patterson v. Cnty. of Oneida,* 375 F.3d 206, 229 (2d Cir.2004); *Back v. Hastings on Hudson Union Free Sch. Dist.,* 365 F.3d at 127; *Hayut v. State Univ. of N.Y.,* 352 F.3d 733, 753 (2d Cir.2003); *Hernandez v. Keane,* 341 F.3d at 145; *Wright v. Smith,* 21 F.3d at 501;*see also, e.g., Poe v. Leonard,* 282 F.3d 123, 140 (2d Cir.2002).

19    *Accord, e.g., Joseph v. Fischer,* 08 Civ. 2824, 2009 WL 3321011 at *14 (S.D.N.Y. Oct. 8, 2009) ("[U]nder *Iqbal,*... [a] defendant is not liable under section 1983 if the defendant's failure to act deprived the plaintiff of his or her constitutional right."); *Newton v. City of N.Y.,* 640 F.Supp.2d 426, 448 (S.D .N.Y.2009) ("[P]assive failure to train claims pursuant to section 1983 have not survived the Supreme Court's recent decision in *Ashcroft v. Iqbal.*").

20    *See, e.g., Hodge v. Sidorowicz,* 10 Civ. 0428, 2011 WL 6778524 at * 16 (S.D.N.Y. Dec. 20, 2011), *report & rec. adopted,* 2012 WL 701150 (S.D.N.Y. Mar. 6, 2012) (Crotty, D.J.); *Sash v. United States,* 674 F.Supp.2d 531, 544 (S.D.N.Y.2009) (Peck, M.J .); *see also, e.g., Chao v. Ballista,* 630 F.Supp.2d 170, 178 n. 2 (D.Mass. July 1, 2009) (noting that the "state of mind required to make out a supervisory claim under the Eighth Amendment—i.e., deliberate indifference—requires less than the discriminatory purpose or intent that Iqbal was required to allege in his suit ...."); Michael Avery et al., *Police Misconduct: Law & Litigation* § 4:5 (2009) (discussing the impact of *Iqbal* on supervisor liability in § 1983 and *Bivens* actions); *cf. Caiozzo v. Koreman,* 581 F.3d 63, 66 (2d Cir.2009) (the standard is the same for Eighth Amendment and Fourteenth Amendment deliberate indifference claims).

21    *See also, e.g., Silvera v. Dep't of Corr.,* No. 09–CV–1398, 2012 WL 877219 at *8 (D.Conn. Mar. 14, 2012); *Smith v. Hogan,* No. 09–CV–0554, 2011 WL 4343978 at *7 (N.D.N.Y. Aug. 1, 2011), *report & rec. adopted,* 2011 WL 4343809 (N.D.N.Y. Sept. 14, 2011); *Hanrahan v. Menon,* No. 07–CV–0610, 2010 WL 6427650 at *6–12 (N.D.N.Y. Dec. 15, 2010), *report & rec. adopted,* 2011 WL 1213171 (N.D.N.Y. Mar. 31, 2011), *aff'd,*No. 11–1367, —— F. App'x ——, 2012 WL 1764196 (2d Cir. May 18, 2012); *Estate of Rodriguez v. Simon,* No. 06–CV–0125, 2007 WL 2154238 at *8 (D.Vt. Mar. 30, 2007), *report & rec. adopted,* 2007 WL 2107542 (D.Vt. July 19, 2007).

22    *Accord, e.g., Fransua v. Vadlamudi,* No. 05–1715, 2008 WL 4810066 at *1 (2d Cir. Nov. 3, 2008); *Salahuddin v. Goord,* 467 F .3d 263, 279–81 (2d Cir.2006); *Smith v. Carpenter,* 316 F.3d 178, 183–84 (2d Cir.2003); *Selby v. Coombe,* 17 F. App'x. 36, 37 (2d Cir.2001); *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998).

23    *See also, e.g., Fransua v. Vadlamudi,* 2008 WL 4810066 at *1; *Salahuddin v. Goord,* 467 F.3d at 279–81; *Selby v. Coombe,* 17 F.App'x. at 37; *Chance v. Armstrong,* 143 F.3d at 702.

24    The Second Circuit in *Chance v. Armstrong* identified several factors that are relevant in determining whether a serious medical condition exists, including " '[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain.' " *143 F.3d at 702.*

25    *See also, e.g., Sinkov v. Americor, Inc.,* 419 F. App'x 86, 89 (2d Cir.2011) ("evidence 'that [a defendant] *should have* been aware that [the detainee] was in immediate danger' was insufficient") (alterations and emphasis in original); *Mayo v. Cnty. of Albany,* 357 F. App'x 339, 341 (2d Cir.2009) ("A plaintiff bringing a deliberate indifference claim must therefore demonstrate that the defendant deliberately disregarded knowledge of the harm he knew he could cause as a result of his actions."); *Ross v. Westchester Cnty. Jail,* 10 Civ. 3937, 2012 WL 86467 at *5 (S.D.N.Y. Jan. 11, 2012) ("Deliberate indifference is a mental state akin to 'recklessness,' and is measured using a 'subjective test' that discerns whether the defendant was 'actually aware of an excessive risk to an inmate's health or safety,' and therefore 'act[ed] with a sufficiently culpable state of mind.' " (citation omitted)); *Mercado v. City of N.Y.,* 08 Civ. 2855, 2011 WL 6057839 at *4 (S.D.N.Y. Dec. 5, 2011).

26    *Accord, e.g., Salahuddin v. Goord,* 467 F.3d at 280; *Hathaway v. Coughlin,* 99 F.3d at 553; *Felipe v. N.Y.S. Dep't of Corr. Servs.,* No. 95–CV–1735, 1998 WL 178803 at *3 (N.D.N.Y. Apr. 10, 1998) (Pooler, D.J.).

27    *Accord, e.g., Kotler v. Donelli,* 382 F. App'x. 56, 57 (2d Cir.2010); *Henderson v. Sommer,* 08 Civ. 3440, 09 Civ. 0611, 2011 WL 1346818 at *5 (S.D.N.Y. Apr. 1, 2011); *Bilal v. N.Y.S. Dep't of Corr.,* 09 Civ. 8433, 2010 WL 2506988 at *14 (S.D.N.Y. June 21, 2010) (Peck, M.J.); *Garcia v. Watts,* 08 Civ. 7778, 2009 WL 2777085 at *9 (S.D.N.Y. Sept. 1, 2009).

28    *Accord, e.g., Zherka v. Amicone,* 634 F.3d 642, 644–45 (2d Cir.2011); *Davidson v. Chestnut,* 193 F.3d 144, 150 (2d Cir.1999); *Thaddeus–X v. Blatter,* 175 F.3d 378, 396–98 (6th Cir.1999) (to be actionable, retaliation against a prisoner must be likely to "chill a person of ordinary firmness from continuing to engage" in activity protected by the First

Amendment); *Henderson v. Sommer,* 2011 WL 1346818 at *5; *Bilal v. N.Y.S. Dep't of Corr.,* 2010 WL 2506988 at *14; *Mateo v. Fischer,* 682 F.Supp.2d 423, 433 (S.D.N.Y.2010); *Walker v. Keyser,* 98 Civ. 5217, 2001 WL 1160588 at *6 (S.D.N.Y. Oct. 2, 2001) (Chin, D.J.), *aff'd,*131 F. App'x. 775 (2d Cir.2005); *Wagnoon v. Gatson,* 00 Civ. 3722, 99 Civ. 5872, 2001 WL 709276 at *6 (S.D.N.Y. June 25, 2001); *Rivera v. Goord,* 119 F.Supp.2d 327, 340 (S.D.N.Y.2000).

29    *See, e.g., Kotler v. Donelli,* 382 F. App'x. at 57 ("There is no dispute that [plaintiff's] activities on the grievance committee were protected."); *Gill v. Pidlypchak,* 389 F.3d at 384 ("[Plaintiff] has sufficiently alleged ... participation in protected activity: the use of the prison grievance system ...."); *Dawes v. Walker,* 239 F.3d at 492 (filing of internal prison complaint against a correction officer is protected by the First Amendment); *Ayers v. Roberts,* No. 05–CV–0889, 2008 WL 2079921 at *6 (W.D.N.Y. May 15, 2008) ("The filing of formal prisoner grievances is among the conduct protected by the First Amendment and thus actionable under § 1983."); *Smith v. Woods,* No. 03–CV–480, 2006 WL 1133247 at * 10 (N.D.N.Y. Apr. 24, 2006) (extending First Amendment protection to prisoner plaintiff's oral complaints to correction officers), *aff'd,*219 F. App'x. 110 (2d Cir.2007), *cert. denied,*552 U.S. 1248, 128 S.Ct. 1485 (2008).

30    Official capacity claims against municipal officials are treated as raised against the municipality itself. *See e.g., Brandon v. Holt,* 469 U.S. 464, 471–72, 105 S.Ct. 873, 878 (1985) ("a judgment against a public servant 'in his official capacity' imposes liability on the entity that he represents"); *Coon v. Town of Springfield,* 404 F.3d 683, 687 (2d Cir.2005) ("a § 1983 suit against a municipal officer in his official capacity is treated as an action against the municipality itself"); *Curley v. Vill. of Suffern,* 268 F.3d 65, 72 (2d Cir.2001) ("the claim against defendants ... in their official capacity is essentially a claim against the village"). It is well established that a municipality may not be held liable under Section 1983 for alleged unconstitutional actions by its employees below the policy-making level solely upon the basis of respondeat superior. *E.g., Monell v. Dep't of Soc. Servs. of City of N.Y.,* 436 U.S. 658, 694, 98 S.Ct. 2018, 2037–38 (1978); *Patterson v. Cnty. of Oneida,* 375 F.3d 206, 226 (2d Cir.2004); *DeCarloi v. Fry,* 141 F.3d 56, 61 (2d Cir.1998); *Zahra v. Town of Southold,* 48 F.3d 674, 685 (2d Cir.1995); *Ricciuti v. N.Y.C. Transit Auth.,* 941 F.2d 119, 122 (2d Cir.1991). Rather, in order to hold a municipality liable under § 1983 for the unconstitutional acts of its employees, the plaintiff must plead and prove that the violation of constitutional rights resulted from a municipal custom or policy. *See, e.g., Pembaur v. City of Cincinnati,* 475 U.S. 469, 478–83, 106 S.Ct. 1292, 1297–300 (1986); *Costello v. City of Burlington,* 632 F.3d 41, 49 (2d Cir.2011); *Dwares v. City of N.Y.,* 985 F.2d 94, 100 (2d Cir.1993), *overruled on other grounds by Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992 (2002); *Batista v. Rodriguez,* 702 F.2d 393, 397 (2d Cir.1983). The plaintiff need not identify an explicit, official policy or practice. *See, e.g., Patterson v. Cnty. of Oneida,* 375 F.3d at 226; *Sorlucco v. N.Y.C. Police Dep't,* 971 F.2d 864, 870 (2d Cir.1992). It is sufficient to show a widespread pattern of behavior that constitute a "custom or usage with the force of law" or "the constructive acquiescence of senior policy-making officials."*Patterson v. Cnty. of Oneida,* 375 F.3d at 226 (quotations omitted); *see, e.g., Belpasso v. City of N.Y.,* 07 Civ. 3627, 2008 WL 2676579 at *5 (S.D .N.Y. July 2, 2008); *Gorton v. Gettel,* 04 Civ. 0236, 2007 WL 2154193 at *9 (S.D.N.Y. June 22, 2007), *aff'd,*554 F.3d 60 (2d Cir.2009)."A policy, custom, or practice may also be inferred where 'the municipality so failed to train its employees as to display a deliberate indifference to the constitutional rights of those within its jurisdiction.' " *Patterson v. Cnty. of Oneida,* 375 F.3d at 226. Any analysis of an allegation of municipal liability under § 1983 begins with "the question whether there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *City of Canton v. Harris,* 489 U.S. 378, 385, 109 S.Ct. 1197, 1203 (1989).

   Inesti's second amended complaint alleges no facts demonstrating a policy or custom of the City of New York, nor can such a policy or custom that is associated with the alleged violations of his federally protected rights be inferred. Therefore, the City defendants' motion to dismiss Inesti's official capacity claims against them should be *GRANTED.*

31    *See also, e.g., Woodward v. Morgenthau,* 740 F.Supp.2d 433, 438 (S.D.N.Y.2010); *Banks v. Stewart,* 08 Civ. 7463, 2010 WL 2697075 at *9–10 (S.D.N.Y. July 6, 2010); *Walker v. Shaw,* 08 Civ. 10043, 2010 WL 2541711 at *8 (S.D.N.Y. June 23, 2010); *Davis v. Shaw,* 08 Civ. 0364, 2009 WL 1490609 at * 1 (S.D.N.Y. May 20, 2009); *Smart v. City of N.Y.,* 08 Civ. 2203, 2009 WL 862281 at *9 (S.D.N.Y. Apr. 1, 2009).

---

**End of Document**      © 2016 Thomson Reuters. No claim to original U.S. Government Works.

Not Reported in F.Supp.2d, 2011 WL 4478515 (N.D.N.Y.)

(Cite as: 2011 WL 4478515 (N.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Philip DeBLASIO, Plaintiff,
v.
David ROCK, et al., Defendants.
No. 9:09–CV–1077 (TJM/GHL).

Sept. 26, 2011.
Philip Deblasio, Romulus, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General for the State of New York, Adele M. Taylor–Scott, Esq., of Counsel, Albany, NY, for Defendants.

### MEMORANDUM DECISION AND ORDER

THOMAS J. McAVOY, Senior District Judge.

**\*1** In this *pro se* prisoner civil rights action, filed pursuant to 42 U.S.C. § 1983, Plaintiff Philip DeBlasio alleges that twenty-three employees of the New York Department of Corrections and Community Supervision ("DOCCS") violated his constitutional rights by denying him adequate medical care, interfering with his right to exercise his religion, subjecting him to excessive force, and subjecting him to unconstitutional conditions of confinement. (Dkt. No. 1.) Currently pending is Defendants' motion for summary judgment. (Dkt. No. 55.) Plaintiff has not opposed the motion, despite having been advised of the consequences of failing to do so and having been granted four extensions of the deadline by which to do so. (Dkt. No. 55 at 3; Jan. 19, 2011, Text Order; Feb. 16, 2011, Text Order; Mar. 31, 2011 Text Order; June 27, 2011, Text Order.) For the reasons that follow, Defendants' motion for summary judgment is granted in part and denied in part.

### I. BACKGROUND

Plaintiff, an inmate currently in DOCCS custody at Five Points Correctional Facility, complains in this action of a series of events that occurred at Great Meadow Correctional Facility in 2006 and 2009. (Dkt. No. 1.)

### A. Incidents in 2006

In his verified complaint, Plaintiff alleges that on December 28, 2006, Defendant Physician Assistant Fisher Nesmith stopped at his cell during sick-call rounds. (Dkt. No. 1 at 11.) Plaintiff told Defendant Nesmith that he needed to see the doctor for his chronic back pain and herniated discs. *Id.* Defendant Nesmith would not allow Plaintiff to see the doctor. *Id.* at 12. This happened "several times" again after December 28, 2006. *Id.*

Plaintiff alleges that on December 28, 2006, Defendant Correction Officer Kevin Holden was assigned to pack Plaintiff's personal belongings because Plaintiff was moving to a new cell. (Dkt. No. 1 at 12.) Thereafter, pages were missing from each of Plaintiff's three copies of the Koran. *Id.* One of the three Korans had to be destroyed because it was missing so many pages. *Id.* Plaintiff alleges that Defendant Holden is "defin[i]tely responsible" for the missing pages because he "was the only person to pack [P]laintiff's property ..." *Id.*

### B. Incident with Extraction Team

Plaintiff alleges that one night in early August 2009 [FN1], he complained of sharp pains in his left ribcage area and blood in his urine.[FN2] (Dkt. No. 1 at 12.) Defendant Correction Officer Kelsey Lenney told Plaintiff he would call a nurse.[FN3] *Id.* After speaking with Defendant Nurse Della Howley, Defendant Lenney returned twenty minutes later and asked Plaintiff if he had requested a sick call. *Id.* at 12–13. Plaintiff was enraged and started banging the gate and asking to see a sergeant. *Id.* at 13. When Defendant Sergeant John Busse responded to the scene, Plaintiff explained the situation and Defendant Busse said he would take care of it. *Id.* Two hours after Plaintiff had first complained of the pain, Defendant Howley arrived at his cell "with a very negative attitude." *Id.* Plaintiff "was so mad she wouldn't help him [that] he threw water at her and hit [Defendant] Lt. Richard Juckett as well." *Id.*

FN1. Plaintiff's allegations about the precise dates on which the incidents in the complaint

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 4478515 (N.D.N.Y.)

(Cite as: 2011 WL 4478515 (N.D.N.Y.))

occurred are contradictory. Early in the complaint, he alleges that he complained of the pain in his ribcage on "8–7–09." (Dkt. No. 1 at 12.) Later in the complaint, he says that "the next day" after the event was "9–7–09" and refers to it as "Friday morning of the same day." (Dkt. No. 1 at 14.) September 7, 2009, was a Monday. August 7, 2009, was a Friday. These discrepancies need not be resolved because the precise dates are irrelevant to the issues in this case.

FN2. Defendant Lenney declares that Plaintiff complained to him of pain in his side but did not mention anything about blood in his urine. (Dkt. No. 55–9 ¶¶ 4–5.)

FN3. Defendant Lenney declares that he did, indeed, call Defendant Howley about Plaintiff. (Dkt. No. 55–9 ¶ 4.) Defendant Howley declares that she does not recall having a conversation with "the Correction Officer on duty" but that she remembers receiving a telephone call from Defendant Juckett asking her to check on Plaintiff. (Dkt. No. 56 ¶¶ 6–7.)

**\*2** After Plaintiff threw the water, an extraction team was mobilized to remove him from his cell. (Dkt. No. 1 at 13.) This team included Defendant Juckett, Defendant Busse, Defendant Correction Officer Adam Rivers, Defendant Lenney, Defendant Correction Officer Richard Dempster, and Defendant Correction Officer Richard Buell. *Id.*

According to Plaintiff, Defendant Juckett told Plaintiff that "he was going to OBS FN4 one way or the other" even if Defendant Juckett "had to drag [P]laintiff out of the cell himself." *Id.* Plaintiff told Defendant Juckett that he was "not suicidal and should be sent to F–Block" as originally scheduled. *Id.* Defendant Juckett "was then just about to spray [P]laintiff in the face when [P]laintiff pleaded with him to take him out without gas[s]ing him ..." *Id.* In the complaint, Plaintiff alleges that the extraction team moved him to an observation room and then beat him with sticks, their fists, and their feet. *Id.* At his deposition, Plaintiff testified that the members of

the extraction team beat him with their fists for about a minute. (Dkt. No. 55–16 at 84:17–24, 86:24–87:10.)

FN4. The Residential Crisis Treatment Program, often referred to as "OBS", is a special observation area for inmates who cannot be controlled by security officers or who become unmanageable, suicidal, or homicidal. (Dkt. No. 55–2 ¶¶ 4–5.)

Defendants assert that they did not use any force on Plaintiff. Defendant Dempster declares that the only physical contact that any member of the extraction team had with Plaintiff during the cell extraction was when Defendant Buell placed Plaintiff's wrists and legs in restraints. (Dkt. No. 55–5 ¶ 10; Dkt. No. 55–8 ¶ 18.) Defendant Dempster declares that Plaintiff "voluntarily complied with [a] strip frisk, which is standard procedure for inmates being processed into" the mental health unit. (Dkt. No. 55–5 ¶ 12; Dkt. No. 55–8 ¶¶ 20–21.) After that was done, the team "escorted [P]laintiff to an observation cell," which was "accomplished without incident." (Dkt. No. 55–5 ¶¶ 13–14.) Defendant Juckett declares that "[t]he only physical contact that I or any member of the extraction team had with Inmate DeBlasio that day was to place him in restraints, conduct a pat frisk, and be present when the inmate was subject to strip frisk." (Dkt. No. 55–8 ¶ 25.) Defendant Lenney declares that he "had no physical contact with inmate DeBlasio at all." (Dkt. No. 55–9 ¶ 20.) Defendant Rivers declares that he "had no physical contact with inmate DeBlasio during this engagement." (Dkt. No. 55–11 ¶ 13.)

After Plaintiff was secured in the observation cell, the extraction team members left the area, returned to their regular duties, and did not see Plaintiff again that day. (Dkt. No. 55–5 ¶¶ 15–16; Dkt. No. 55–3 ¶¶ 13–14; Dkt. No. 55–8 ¶ 22; Dkt. No. 55–9 ¶ 21; Dkt. No. 55–1 ¶ 12.) No paperwork was prepared documenting a use of force. (Dkt. No. 55–11 ¶ 14.) It is standard procedure to prepare a Use of Force Report when force is used on an inmate. *Id.*

Plaintiff alleges that after the extraction team left, he remained in the observation cell all night without any medical attention or treatment. (Dkt. No. 1 at 13.) At his deposition he testified that he suffered only from

Not Reported in F.Supp.2d, 2011 WL 4478515 (N.D.N.Y.)

(Cite as: 2011 WL 4478515 (N.D.N.Y.))

"discomfort [and] bruises" as a result of the incident. (Dkt. No. 55–16 at 83:6–8.) About twenty-four hours after the incident, Plaintiff complained to an officer of chest pains. (Dkt. No. 56 at 2 ¶ 15, 5.) Plaintiff allowed Defendant Howley to examine him. *Id.* Plaintiff told Defendant Howley only that he had indigestion. *Id.* Defendant Howley found that Plaintiff had "no signs of distress." *Id.*

**C. Incident at Conference Room**

**\*3** The day after the incident with the extraction team, Defendant Correction Officer Scott Hamel escorted Plaintiff to a conference room to be interviewed by Defendant Dr. Battu[FN5] and Defendant Social Worker Sarah Wetherell.[FN6] (Dkt. No. 1 at 14.) Dr. Battu had been asked to see Plaintiff to "possibly prescribe medications to control his behavior or adjust medications that were already prescribed." (Dkt. No. 55–2 ¶ 9.) Dr. Battu often performs such interviews alone, but was accompanied by Defendant Wetherell "[b]ecause of the violent nature of this inmate." *Id.* ¶ 10. Defendant Wetherell had "worked with [P]laintiff for a number of years ... and [was] familiar with his history and patterns of behavior." (Dkt. No. 55–20 ¶ 3.) Defendant Wetherell declares that the RCTP Coordinator was also present. (Dkt. No. 55–20 ¶ 13.)

>    FN5. The parties spell this defendant's name in a variety of ways. In his declaration, he refers to himself as Kalyana Battu. (Dkt. No. 55–2 at 1.) Therefore, I have used that spelling.

>    FN6. The parties spell this defendant's name in a variety of ways. In her declaration, she refers to herself as Sarah Wetherell. (Dkt. No. 55–20 at 1.) Therefore, I have used that spelling.

Defendant Sergeant Crispin Murray declares that he supervised Defendant Hamel as he escorted Plaintiff to the appointment. (Dkt. No. 55–10 ¶ 5.) Once Plaintiff was in the conference room, Defendant Murray moved to a desk several feet away from the door to the room. (*Id.* ¶ 6; Dkt. No. 55–2 ¶ 11.)

Plaintiff alleges that he told Defendants Battu and Wetherell about the incident with the extraction team. (Dkt. No. 1 at 14.) He alleges that Defendant Battu said that it was none of his concern because he was just "there

to handle medications and suicide prevention" and that because Plaintiff threw water at Defendant Howley he "may have deserved" what happened. *Id.* Plaintiff alleges that Defendant Wetherell "refused to comment or help [Plaintiff] in any way at all." *Id.* Plaintiff alleges that he called Defendant Wetherell "a snake sellout C.O. bitch" and she stormed out of the room and talked to Defendant Correction Officer Scott Stemp. *Id.* Dr. Battu declares that Plaintiff "became verbally abusive to Sarah Wetherell, nearly bringing her to tears, and when I tried to calm him down, [P]laintiff became abusive toward me." (Dkt. No. 55–2 ¶ 14.) Dr. Battu declares that Plaintiff's behavior "brought the interview to an end. The officer waiting outside moved in and escorted [P]laintiff out." (Dkt. No. 55–2 ¶ 15.) Defendant Wetherell declares that when "the session started to get hostile, the RCTP Coordinator stood up, and in doing so triggered a prearranged signal to security personnel to move in." (Dkt. No. 55–20 ¶ 19.)

Plaintiff alleges that Defendant Hamel entered the conference room and rushed Plaintiff into a cell. (Dkt. No. 1 at 14.) Defendant Hamel declares that he entered the conference room because "I believe I observed [Plaintiff] stand up during the interview in disobedience of my direct order to him not to do so. When the inmate stood up, I automatically moved in, took control of the restraints, and escorted him out of the room and back to his observation cell." (Dkt. No. 55–7 ¶ 9.) Defendant Murray declares that when a "problem occurred in the interview room," he supervised Defendant Hamel as Defendant Hamel escorted Plaintiff back to his cell and Defendant Stemp joined them "to provide additional security coverage." (Dkt. No. 55–10 ¶¶ 7–9.)

**\*4** The parties dispute what happened next. Defendant Hamel declares that before he placed Plaintiff in his cell, he asked him if he wanted to take a shower because inmates in the observation unit generally take showers on Mondays, Wednesdays, and Fridays. (Dkt. No. 55–7 ¶ 10.) Defendant Hamel declares that Plaintiff declined and then turned and head-butted him, hitting Defendant Hamel's forehead just over his left eye and splitting the skin open. *Id.* ¶ 11. Defendants Murray and Stemp also declare that Plaintiff head-butted Defendant Hamel. (Dkt. No. 55–10 ¶ 10; Dkt. No. 55–19 ¶ 6.) Defendant Hamel declares that he "instinctively" pushed Plaintiff "forward

Not Reported in F.Supp.2d, 2011 WL 4478515 (N.D.N.Y.)

(Cite as: 2011 WL 4478515 (N.D.N.Y.))

and down to the floor with my left hand" and that Plaintiff banged his head on the way down. (Dkt. No. 55–7 ¶ 12.) Defendant Hamel declares that Plaintiff did not stay down and kept kicking and trying to bite Defendant Hamel. *Id.* ¶ 13. Defendant Murray declares that he ordered Defendant Stemp to "go in and pull the inmate out of the cell so they could get control of him." (Dkt. No. 55–10 ¶ 13.) Defendant Hamel declares that he and Defendant Stemp "used the wrist restraints to lift [Plaintiff] out of the cell and onto the floor in the hallway." (Dkt. No. 55–7 ¶ 16.) Defendant Hamel declares that once Plaintiff was on the floor in the hallway, he took control of Plaintiff's legs while Defendant Stemp took control of Plaintiff's upper body. *Id.* ¶ 17. Defendant Stemp declares that he took control of Plaintiff's upper body by putting one knee on his back and the other on his head until he calmed down. (Dkt. No. 55–19 ¶ 10.) Defendant Hamel declares that Plaintiff calmed down and they all remained that way until Defendant Hamel and Defendant Stemp were relieved by other staff. (Dkt. No. 55–7 ¶ 18.)

Defendant Stemp declares that he "used only such force as was necessary to subdue the inmate. Nobody kicked, punched or otherwise asserted unnecessary force against" Plaintiff. (Dkt. No. 55–19 ¶ 11.) Defendant Murray declares that he "personally did not have any physical contact with the inmate." (Dkt. No. 55–10 ¶ 16.) Defendant Murray declares that given Plaintiff's "unprovoked assault on the escorting officer, his attempts to further assault the officer during the course of the take-down, and his refusal to comply with staff direction, I do not believe that ... the actions of the men under my supervision violated any of [P]laintiff's federally protected rights." *Id.* ¶ 21.

Plaintiff's version of this incident is quite different. In his verified complaint, Plaintiff alleges that after Defendant Hamel escorted him to his cell, Defendants Stemp and Murray came into the cell. (Dkt. No. 1 at 14.) Plaintiff alleges that Defendant Murray removed Plaintiff's handcuffs, said "how tough are you now disrespecting Nurse Howley and Wetherell and Dr. Battu," and slapped Plaintiff on the left side of his face with an open hand. *Id.* All of the officers then beat Plaintiff, got him onto his stomach, handcuffed him, and kicked him several more times in the face, head, and body. *Id.* at 14–15. At his

deposition, Plaintiff testified that he did not do anything to any of the officers until Defendant Murray removed his handcuffs and punched him in the face. Plaintiff testified that it was only then that "I put my hands up and I started fighting with him." (Dkt. No. 55–16 at 99:12–100:17.)

**\*5** When the relief officers arrived, Defendants Murray, Stemp, and Hamel escorted Plaintiff to the clinic to be examined for injuries. (Dkt. No. 55–10 ¶ 17.) Plaintiff and the officers were examined and photographed and Defendant Murray completed a Use of Force Report. (Dkt. No. 55–10 ¶ 18.) Medical records show that Plaintiff suffered bruises on his right shoulder, red cheeks, a quarter-sized bump on his scalp, two raised areas on the back of his scalp, and a bruised ear. (Dkt. No. 55–7 at 7.)

### D. Conditions of Confinement

Plaintiff alleges that after this incident he was subjected to various harsh conditions of confinement. (Dkt. No. 1 at 15.)

1. *Handcuff Incident with Defendant Segovis*

Plaintiff alleges that on August 18, 2009, Defendant Correction Officer Roswell Segovis handcuffed Plaintiff to take him to the shower. (Dkt. No. 1 at 15.) Defendant Segovis noticed that Plaintiff was wearing socks and refused to let him shower. *Id.* He then left Plaintiff handcuffed in his cell for five hours. *Id.* Plaintiff pleaded with Defendant Segovis to remove the handcuffs so that he could use the bathroom. *Id.* Defendant Segovis refused and after several hours Plaintiff "had no choice but to wet his pants and then defecate on himself." *Id.* Defendant Segovis declares that he left Plaintiff handcuffed because Plaintiff "took the handcuffs hostage and refused to put his hands through the feed-up slot so that they could be removed." (Dkt. No. 55–18 ¶ 4.)

Later, Defendant Segovis issued a misbehavior report charging Plaintiff with committing an unhygienic act. (Dkt. No. 1 at 15.) The hearing officer sentenced Plaintiff to seven days of restricted diet. *Id.* Defendant First Deputy Superintendent Jeffrey Tedford "co-signed" the order for restricted diet. *Id.* The punishment "was brought to the attention" of Defendant Sergeant David Winchip, who "was going along with the entire [charade]." *Id.*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 4478515 (N.D.N.Y.)

(Cite as: 2011 WL 4478515 (N.D.N.Y.))

2. *Hot Water*

Plaintiff alleges that he was not able to get hot water because he was not given a bucket. (Dkt. No. 1 at 17.) On August 19, 2009, Plaintiff asked Defendant Sergeant Peter DePalo for hot water. (Dkt. No. 1 at 17.) Defendant DePalo said "Muslims don't deserve hot water. You'll get that when you get to hell." *Id.* On August 24, 2009, Plaintiff told a watch commander, in the presence of Defendant Winchip, that he was not receiving hot water. *Id.* at 18. Defendant Winchip said he would see to it that Plaintiff got a bucket for hot water. *Id.* Later that day, Defendant Winchip came to Plaintiff's cell and said "You won't get that bucket[ ] today you dirty white Muslim wigger." *Id.*

3. *Drinking Water*

Plaintiff alleges that he once went without water for a week. (Dkt. No. 1 at 15.) He alleges that during the week that he went without water, Defendant Correction Officer William Powers was responsible for turning on Plaintiff's water and failed to do so. (Dkt. No. 1 at 6.) At his deposition, Plaintiff testified that Defendant Segovis was also responsible. (Dkt. No. 55–16 at 150: 2–5, 6–9.)

4. *Food*

**\*6** Plaintiff alleges that on August 18, 2009, Defendant Correction Officer Alan White and Defendant Segovis played with Plaintiff's breakfast tray and Plaintiff had to plead with them in order to get it. (Dkt. No. 1 at 16.) At lunch [FN7] Defendant White gave Plaintiff only a quarter cup of juice to drink and no lunch tray. *Id.* Later, Defendant DePalo came to Plaintiff's cell asking for the empty lunch tray. *Id.* Plaintiff told him that he was never given a lunch tray. *Id.* Defendant DePalo looked under Plaintiff's bed and did not see a tray. *Id.* That night at dinner an officer served Plaintiff a special diet loaf instead of regular food and told him that he would receive it for seven days as punishment for not giving back his lunch tray. *Id.* This punishment was ordered by Defendants White and Segovis and "co-signed" by Defendant DePalo. *Id.* at 17. Plaintiff asserts that Defendants White and Segovis "have a history" with him and "blatantly harass[ed]" Plaintiff "to disturb his Fast of Ramadan." *Id.* at 16–17.

[FN7.] It is unclear when Plaintiff went to lunch on August 18, 2009, because, as discussed above, he alleges that he was handcuffed in his cell from 8:00 a.m. to 1:00 p.m. (Dkt. No. 1 at 15.)

Plaintiff alleges that on one occasion, Defendant Segovis gave Plaintiff pork instead of the special diet loaf. *Id.* Defendant Segovis said "You know you want to eat some swine." *Id.* at 18.

5. *Recreation and Movement*

Plaintiff alleges that he was not allowed to move outside his cell at all when Defendant Segovis was assigned to his block. (Dkt. No. 1 at 17.)

6. *Showers*

Plaintiff alleges that on one occasion, Defendant Segovis would not allow Plaintiff to shower. *Id.* When Plaintiff reported this to Defendant DePalo, he said "That's life in F-block for Muslims." *Id.*

7. *Bibles*

Plaintiff alleges that on August 31, 2009, a chaplain came to Plaintiff's cell to deliver two Bibles. (Dkt. No. 1 at 16.) Defendants Powers and Segovis told the chaplain to leave the Bibles and that they would give them to Plaintiff when they were not busy. *Id.* Defendant Powers came to Plaintiff's cell and "said [he] was banging all day." *Id.* Plaintiff said it was not him who was banging. *Id.* Defendant Powers said he would investigate and that Plaintiff would not be getting his Bibles. *Id.* On or about September 8, 2009, Defendant Powers came to Plaintiff's cell, told him he had discovered that it was not Plaintiff who was banging, and apologized. *Id.* However, he did not give Plaintiff his Bibles. *Id.* The record shows that Plaintiff received the Bibles on September 12, 2009.[FN8] (Dkt. No. 55–6 at 28.)

[FN8.] Plaintiff signed the complaint in this action on September 10, 2009. (Dkt. No. 1.) Thus, he had not received the Bibles when he wrote the complaint. Because Plaintiff has not opposed the motion for summary judgment, it is unclear whether he wishes to continue asserting the claim regarding the Bibles.

**E. Restrictions on Religious Practice**

Not Reported in F.Supp.2d, 2011 WL 4478515 (N.D.N.Y.)

(Cite as: 2011 WL 4478515 (N.D.N.Y.))

Plaintiff claims that Defendant Superintendent David Rock and Defendant CORC Director Karen Bellamy violated his religious rights in three ways. (Dkt. No. 1 at 18.) First, he alleges that he was not allowed to demonstratively pray in the BHU recreation pen. *Id* . Plaintiff alleges that Defendant Rock allows Christians to pray but "is obviously discriminating against the Muslims" by prohibiting demonstrative prayer. *Id.* at 18–19. Second, he alleges that BHU and SHU inmates are not allowed to have razors, which prevents Muslims from shaving their pubic and armpit hair as required by their faith. *Id.* at 19. Third, Plaintiff alleges that he is not given Halal food. *Id.*

**F. Procedural History**

**\*7** Plaintiff filed his complaint in this Court on September 23, 2009. (Dkt. No. 1.) Plaintiff's complaint sets forth three causes of action: (1) religious discrimination; (2) "assault and cruel and unusual punishment at the hands of DOCS workers"; and (3) a request that Plaintiff receive "proper medical attention at all times." (Dkt. No. 1 at 20.) Plaintiff requests injunctive relief (being allowed to pray in the recreation pen, being allowed to shave his pubic hair, and given Halal food) and damages. *Id.* at 21.

Defendants now move for summary judgment. (Dkt. No. 55.) Plaintiff has not opposed the motion.

## II. APPLICABLE LEGAL STANDARDS

### A. Legal Standard Governing Unopposed Motions for Summary Judgment

Under Federal Rule of Civil Procedure 56, summary judgment is warranted if "the movant shows that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin v. Goord,* 467 F.3d 263, 272–73 (2d Cir.2006). The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v.*

*Zenith Radio Corp.,* 475 U.S. 574, 585–86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Rather, a dispute regarding a material fact is *genuine* "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In determining whether a genuine issue of material [FN9] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino,* 542 F.3d 290, 309 (2d Cir.2008).

> FN9. A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson,* 477 U.S. at 248.

When a plaintiff fails to respond to a defendant's motion for summary judgment, "[t]he fact that there has been no [such] response ... does not ... mean that the motion is to be granted automatically." *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996). Rather, the Court must (1) determine whether any facts are disputed in the record presented on the defendants' motion, and (2) determine whether, based on the *undisputed* material facts, the law indeed warrants judgment for the defendants. *See Champion,* 76 F.3d at 486; *Allen v. Comprehensive Analytical Grp., Inc.,* 140 F.Supp.2d 229, 232 (N.D.N.Y.2001); N.D.N.Y. L.R. 7.1(b)(3).

### B. Legal Standard Governing Motions to Dismiss for Failure to State a Claim

To the extent that a defendant's motion for summary judgment under Federal Rule of Civil Procedure 56 is based entirely on the allegations of the plaintiff's complaint, such a motion is functionally the same as a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). As a result, "[w]here appropriate, a trial judge may dismiss for failure to state a cause of action upon motion for summary judgment." *Schwartz v. Compagnise Gen. Transatlantique,* 405 F.2d 270, 273 (2d Cir.1968) (citations omitted); *accord, Katz v. Molic,* 128 F.R.D. 35, 37–38 (S.D.N.Y.1989) ("This Court finds that ... a conversion [of a Rule 56 summary judgment motion to a Rule 12(b)(6) motion to dismiss the complaint] is proper with or without notice to the parties."). Accordingly, it is appropriate to summarize the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 4478515 (N.D.N.Y.)

(Cite as: 2011 WL 4478515 (N.D.N.Y.))

legal standard governing Federal Rule of Civil Procedure 12(b)(6) motions to dismiss.

**\*8** A defendant may move to dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6) on the ground that the complaint fails to state a claim upon which relief can be granted. In order to state a claim upon which relief can be granted, a complaint must contain, *inter alia,* "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). The requirement that a plaintiff "show" that he or she is entitled to relief means that a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face.' " *Ashcroft v. Iqbal,* ––– U.S. ––––, ––––, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)) (emphasis added). "Determining whether a complaint states a plausible claim for relief ... requires the ... court to draw on its judicial experience and common sense ... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Id.* at 1950 (internal citation and punctuation omitted).

"In reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor ." *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (citation omitted). Courts are "obligated to construe a *pro se* complaint liberally." *Harris v. Mills,* 572 F.3d 66, 72 (2d Cir.2009). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 129 S.Ct. at 1949.

## III. ANALYSIS

### A. Failure to Exhaust Administrative Remedies Regarding Claims Against Defendants Nesmith and Holden

Plaintiff alleges that Defendant Nesmith would not allow Plaintiff to see a doctor for back pain and that Defendant Holden ripped pages from Plaintiff's Korans. (Dkt. No. 1 at 11–12.) Defendants argue that these claims should be dismissed because Plaintiff failed to exhaust his administrative remedies. (Dkt. No. 55–23 at 13–14.) Defendants are correct.

Under the Prison Litigation Reform Act ("PLRA"), "[n]o action shall be brought with respect to prison conditions under section 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002). In order to properly exhaust administrative remedies under the PLRA, inmates are required to complete the administrative review process in accordance with the rules applicable to the particular institution to which they are confined. *Jones v. Bock,* 549 U.S. 199, 218, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007). In New York state prisons, the Department of Corrections and Community Supervision ("DOCCS") has a well-established three-step inmate grievance program. N.Y. Comp.Codes R. & Regs. tit. 7, § 701.7 (2010).

**\*9** Generally, the DOCCS Inmate Grievance Program ("IGP") involves the following procedure for the filing of grievances. First, an inmate must file a complaint with the facility's IGP clerk within twenty-one calendar days of the alleged occurrence. N.Y. Comp.Codes R. & Regs. tit. 7, § 701.5(a) (2010). A representative of the facility's inmate grievance resolution committee ("IGRC") has sixteen calendar days from receipt of the grievance to informally resolve the issue. *Id.* at (b)(1). If there is no such informal resolution, then the full IGRC conducts a hearing within sixteen calendar days of receipt of the grievance, and issues a written decision within two working days of the conclusion of the hearing. *Id.* at (b)(2).

Second, a grievant may appeal the IGRC decision to the facility's superintendent within seven calendar days of receipt of the IGRC's written decision. If the grievance involves an institutional issue (as opposed to a DOCCS-wide policy issue), the superintendent must issue

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 4478515 (N.D.N.Y.)

(Cite as: 2011 WL 4478515 (N.D.N.Y.))

a written decision within twenty calendar days of receipt of the grievant's appeal. Grievances regarding DOCCS-wide policy issues are forwarded directly to the central office review committee ("CORC") for a decision under the process applicable to the third step. *Id.* at (c).

Third, a grievant may appeal to CORC within seven working days of receipt of the superintendent's written decision. CORC is to render a written decision within thirty calendar days of receipt of the appeal. *Id.* at (d).

If a prisoner has failed to properly follow each of the applicable steps prior to commencing litigation, he has failed to exhaust his administrative remedies. *Woodford v. Ngo,* 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006).

Here, Jeffrey Hale, the Assistant Director of the Inmate Grievance Program for DOCCS, declares that there "are no CORC appeal records that correspond to the December 28, 2006, events as alleged in [P]laintiff's complaint regarding back pain or the loss of personal or religious property at the Great Meadow Correctional Facility." (Dkt. No. 55–6 ¶ 7.) CORC records show that Plaintiff did not file any CORC appeals between October 2006 and October 2008. (Dkt. No. 55–6 at 5.) Indeed, Plaintiff admitted at his deposition that he did not properly exhaust his administrative remedies regarding Defendant Holden's alleged desecration of the Korans.[FN10] (Dkt. No. 55–16 at 57:17–58:5.) Therefore, Plaintiff failed to exhaust his administrative remedies regarding his claims against Defendants Nesmith and Holden.

> FN10. Plaintiff was not able to recall any of the details about the incident with Defendant Nesmith. (Dkt. No. 55–16 at 37–41.)

Plaintiff's failure to exhaust, however, does not end the inquiry. The Second Circuit has held that a three-part inquiry is appropriate where a prisoner has failed to exhaust his available administrative remedies. *Hemphill v. New York,* 380 F.3d 680, 686, 691 (2d Cir.2004).[FN11] First, "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner." *Hemphill,* 380 F.3d at 686 (citation omitted). Second, if those remedies were available, "the court

should ... inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it ... or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Id.* (citations omitted). Third, if the remedies were available and some of the defendants did not forfeit, and were not estopped from raising, the non-exhaustion defense, "the court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements." *Id.* (citations and internal quotations omitted).

> FN11. The Second Circuit has not yet decided whether the *Hemphill* rule has survived the Supreme Court's decision in *Woodford,* 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368. *Chavis v. Goord,* No. 07–4787–pr, 2009 U.S.App. LEXIS 13681, at *4, 2009 WL 1803454, at *1 (2d Cir. June 25, 2009).

**\*10** Here, as discussed above, an administrative remedy was available to Plaintiff. Defendants preserved the exhaustion defense by asserting it in their answer to the complaint. (Dkt. No. 39 ¶ 18.) The record before the Court on this unopposed motion for summary judgment indicates neither that Defendants should be estopped from asserting the defense nor any special circumstances justifying Plaintiff's failure to exhaust his administrative remedies. Therefore, the Court grants Defendants' motion for summary judgment dismissing the claims against Defendants Nesmith and Holden.

**B. Claims Regarding Failure to Provide Medical Care**

Plaintiff alleges that Defendants Buell, Busse, Dempster, Howley, Juckett, Lenney, and Rivers[FN12] failed to provide him with adequate medical care. (Dkt. No. 1 at 11–14.) Defendants argue that there are "neither objective nor subjective facts to support Plaintiff's conclusory medical indifference claim." (Dkt. No. 55–23 at 14–17.) Defendants are correct.

> FN12. Defendants characterize the complaint as asserting Eighth Amendment medical care claims

Not Reported in F.Supp.2d, 2011 WL 4478515 (N.D.N.Y.)

(Cite as: 2011 WL 4478515 (N.D.N.Y.))

against only Defendants Nesmith, Howley, and Battu. (Dkt. No. 55–23 at 14.)

1. *Defendants Lenney, Busse, and Howley*

Plaintiff alleges that Defendants Lenney, Busse, and Howley failed to adequately respond to his complaints of ribcage pain and blood in his urine. (Dkt. No. 1 at 12–13.)

There are two elements to a prisoner's claim that prison officials violated his Eighth Amendment right to receive medical care: "the plaintiff must show that she or he had a serious medical condition and that it was met with deliberate indifference." *Caiozzo v. Koreman,* 581 F.3d 63, 72 (2d Cir.2009) (citation and punctuation omitted). "The objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberate indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind." *Smith v. Carpenter,* 316 F.3d 178, 183–84 (2d Cir.2003).

The undisputed facts show that Plaintiff did not suffer from a serious medical condition. A "serious medical condition" is "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J. dissenting) (citations omitted), *accord, Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1996), *cert. denied,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995); *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). Relevant factors to consider when determining whether an alleged medical condition is sufficiently serious include, but are not limited to: (1) the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; (2) the presence of a medical condition that significantly affects an individual's daily activities; and (3) the existence of chronic and substantial pain. *Chance,* 143 F.3d at 702–03. Here, Plaintiff alleges that he complained to Defendants Lenney, Busse, and Howley of "sharp pains in his left ribcage area and the pissing of blood." (Dkt. No. 1 at 12.) Defendant Lenney declares that Plaintiff complained to him of pain in his side but did not mention anything about blood in his urine. (Dkt. No. 55–9 ¶¶ 4–5.) When Plaintiff allowed Defendant Howley to examine him the next day, he stated only that he had indigestion. (Dkt. No. 56 at 5.) There is

no evidence that Plaintiff's ribcage pain and the blood he reported in his urine significantly affected his daily activities or caused him chronic and substantial pain. The record before the Court, therefore, does not reflect that Plaintiff suffered from "a condition of urgency, one that may produce death, degeneration, or extreme pain."

**\*11** Even if Plaintiff had raised a triable issue as to the objective prong of his Eighth Amendment medical care claim against Defendants Lenney, Busse, and Howley, the Court would grant summary judgment on this claim because Plaintiff has not raised a triable issue of fact that any of these Defendants were deliberately indifferent to his medical needs. Medical mistreatment rises to the level of deliberate indifference only when it "involves culpable recklessness, i.e., an act or a failure to act ... that evinces 'a conscious disregard of a substantial risk of serious harm.' " *Chance,* 143 F.3d, 698, 703 (quoting *Farmer v. Brennan,* 511 U.S. 825, 835, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)).

Defendants Lenney and Busse are correction officers, not medical staff members. (Dkt. No. 1 at 8; Dkt. No. 55–9 ¶ 1.) "Non-medical personnel engage in deliberate indifference where they intentionally delayed access to medical care when the inmate was in extreme pain and has made his medical problem known to attendant prison personnel." *Baumann v. Walsh,* 36 F.Supp.2d 508, 512 (N.D.N.Y.1999). Here, as discussed above, there is no evidence that Plaintiff was in "extreme pain." Moreover, the undisputed facts show that neither Defendant Lenney nor Defendant Busse intentionally delayed Plaintiff's access to medical care. Defendant Lenney declares that he called Defendant Howley regarding Plaintiff's complaints of pain. (Dkt. No. 55–9 ¶ 4.) By Plaintiff's own admission, Defendant Howley came to his cell two hours after he first complained of pain. (Dkt. No. 1 at 13.) A two-hour wait for medical care is not the type of delay that indicates deliberate indifference. *See Baumann,* 36 F.Supp.2d at 512 (denying defendants' motion to dismiss where plaintiff alleged that correction officer delayed care for his injured arm for three weeks). Therefore, the Court grants Defendants' motion for summary judgment and dismisses the Eighth Amendment medical care claims against Defendants Lenney and Busse.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 4478515 (N.D.N.Y.)

(Cite as: 2011 WL 4478515 (N.D.N.Y.))

Regarding Defendant Howley, to establish deliberate indifference on the part of medical staff, an inmate must prove that (1) a prison medical care provider was aware of facts from which the inference could be drawn that the inmate had a serious medical need; and (2) the medical care provider actually drew that inference. *Farmer,* 511 U.S. at 837; *Chance,* 143 F.3d at 702–703. The inmate then must establish that the provider consciously and intentionally disregarded or ignored that serious medical need. *Farmer,* 511 U.S. 825, 835, 114 S.Ct. 1970, 128 L.Ed.2d 811; *Ross v. Giambruno,* 112 F.3d 505 (2d Cir.1997). The undisputed facts show that Defendant Howley came to Plaintiff's cell to tend to his pain but that Plaintiff threw toilet water on her before she could examine him. (Dkt. No. 1 at 13; Dkt. No. 56 ¶ 11.) Thus, the undisputed facts show that the failure to provide immediate care to Plaintiff was the result of his own conduct rather than any conscious and intentional disregard on the part of Defendant Howley. Therefore, the Court grants Defendants' motion for summary judgment and dismisses the Eighth Amendment medical care claim against Defendant Howley.

2. *Defendants Buell, Busse, Dempster, Juckett, Lenney, and Rivers*

**\*12** Plaintiff alleges that the members of the extraction team (Defendants Buell, Busse, Dempster, Juckett, Lenney, and Rivers) violated his Eighth Amendment rights by leaving him in a cell all night without any medical attention or treatment. (Dkt. No. 1 at 13).

The undisputed facts show that Plaintiff did not suffer from any serious medical condition as a result of the incident with the extraction team. Plaintiff testified that he suffered from "discomfort [and] bruises" from the incident. (Dkt. No. 55–16 at 83:6–8.) Superficial injuries such as bruises are not "serious medical conditions." *Tafari v. McCarthy,* 714 F.Supp.2d 317, 354 (N.D.N.Y.2010). Therefore, the Court grants Defendants' motion for summary judgment and dismisses the Eighth Amendment medical care claims against Defendants Buell, Busse, Dempster, Juckett, Lenney, and Rivers.

**C. Excessive Force Claim Against the Extraction Team**

Plaintiff claims that the members of the extraction team (Defendants Buell, Busse, Dempster, Juckett, Lenney, and Rivers) used excessive force. (Dkt. No. 1 at 13.) Defendants do not explicitly address Plaintiff's Eighth Amendment excessive force claim regarding the extraction team, although their memorandum of law requests "that [P]laintiff's complaint be dismissed, *in its entirety,* and without leave to replead" and states, in the section regarding medical care, that "the extraction team did not use any force against [P]laintiff." (Dkt. No. 55–23 at 16 and 30, emphasis added.) The Court finds that Plaintiff has, just barely, raised a triable issue of material fact on this issue.

When prison officials are "accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is ... whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian,* 503 U.S. 1, 6–7, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). The extent of any injury suffered by the inmate "is one factor that may suggest whether the use of force could plausibly have been thought necessary in a particular situation or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur." *Id.* at 7 (citation and quotation marks omitted).

In determining whether the use of force was wanton and unnecessary, it may also be proper to evaluate the need for application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by responsible officials, and any efforts made to temper the severity of a forceful response. The absence of serious injury is therefore relevant to the Eighth Amendment inquiry, but does not end it.

*Id.* (citation and quotation marks omitted). In other words, not "every malevolent touch by a prison guard gives rise to a federal cause of action. The Eighth Amendment's prohibition of cruel and usual punishments necessarily excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Id.* at 9.

**\*13** Here, Plaintiff's verified complaint alleges that

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 4478515 (N.D.N.Y.)

(Cite as: 2011 WL 4478515 (N.D.N.Y.))

the members of the extraction team beat Plaintiff with sticks, their fists, and their feet. (Dkt. No. 1 at 13.) At his deposition, Plaintiff testified that the members of the extraction team beat him with their fists for about a minute. (Dkt. No. 55–16 at 84:17–24, 86:24–87:10.) If Plaintiff's version of events is credited, Defendants' use of force was more than *de minimis* despite the fact that Plaintiff suffered only bruises and discomfort as a result. *Cf. Aziz Zarif Shabazz v. Pico,* 994 F.Supp. 460, 471 (S.D.N.Y.1998) (kicking an inmate's ankles and feet during a pat frisk is *de minimis* and insufficient to rise to the level of a constitutional violation); *Show v. Patterson,* 955 F.Supp. 182, 192–93 (S.D.N.Y.1997) (pushing inmate against wall with hands and no use of weapons *de minimis* use of force); *Anderson v. Sullivan,* 702 F.Supp. 424, 425–27 (S.D.N.Y.1988) (pushing inmate's face into a bar while applying handcuffs not significantly disproportional to the goal of handcuffing plaintiff).

Defendants flatly contradict Plaintiff's version of events. The members of the extraction team declare that the only physical contact any of them had with Plaintiff was to place him in restraints, pat frisk him, and strip frisk him. (Dkt. No. 55–8 ¶ 25; Dkt. No. 55–9 ¶ 20; Dkt. No. 55–11 ¶ 13.)

Given these conflicting versions of events, the Court is called upon to weigh the parties' credibility. In general, of course, "[c]redibility determinations ... are jury functions, not those of a judge." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). *See also Rule v. Brine, Inc.,* 85 F.3d 1002, 1011 (2d Cir.1996) ("Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment."). There is, however, a "narrow exception" to the general rule that credibility determinations are not to be made on summary judgment. *Jeffreys v. City of New York,* 426 F.3d 549, 554 (2d Cir.2005); *Blake v. Race,* 487 F.Supp.2d 187, 202 (E.D.N.Y.2007). Under this exception, in the "rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete" and the plaintiff's evidence is contradicted by evidence produced by the defendants, the court may appropriately conclude at the summary judgment stage that no reasonable jury would

credit the plaintiff's testimony. *Jeffreys,* 426 F.3d at 554.

Here, although Plaintiff is relying exclusively on his own testimony and his evidence is contradicted by evidence produced by Defendants, the *Jeffreys* exception does not apply because Plaintiff's testimony is not "contradictory and incomplete." The complaint and deposition testimony are moderately contradictory. In the complaint, Plaintiff alleges that the extraction team members beat him with sticks, their fists, and their feet. (Dkt. No. 1 at 13.) However, at his deposition, Plaintiff testified that the team members hit him only with their fists. (Dkt. No. 56–16 at 84:17–19.) However, this is far less contradictory than the plaintiff's statements in *Jeffreys.* There, the plaintiff, who alleged that a group of police officers beat him and threw him out a third-floor window, confessed on at least three occasions that he had jumped rather than having been thrown. *Jeffreys,* 426 F.3d at 552. The plaintiff did not publicly state that he had been thrown out of a window by police officers until *nine months* after the incident. *Id.* The plaintiff could not identify any of the individuals whom he alleged participated in the attack or describe their ethnicities, physical features, facial hair, weight, or clothing on the night in question. *Id.* Plaintiff's deposition and complaint are also far less contradictory than cases in which courts have applied *Jeffreys* to make credibility determinations at the summary judgment stage. *See Butler v. Gonzalez,* No. 09 Civ.1916, 2010 U.S. Dist. LEXIS 108244, at *24–26, 2010 WL 3398156, at *8 (S.D.N.Y. May 18, 2010) (collecting cases).[FN13] Therefore, although this is a very close question, the Court finds that Plaintiff has raised a triable issue of fact that Defendants Buell, Busse, Dempster, Juckett, Lenney, and Rivers used excessive force against him. Accordingly, the Court denies Defendants' motion for summary judgment dismissing this claim.

> FN13. The Court will provide Plaintiff with a copy of this unpublished decision in accordance with the Second Circuit's decision in *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009). [Editor's Note: Attachments of Westlaw case copies deleted for online display.]

**D. Claims Against Defendants Battu and Wetherell**

Not Reported in F.Supp.2d, 2011 WL 4478515 (N.D.N.Y.)

(Cite as: 2011 WL 4478515 (N.D.N.Y.))

**\*14** Plaintiff alleges that he reported the incident with the extraction team to Defendants Battu and Wetherell, that they refused to get involved, and that Defendant Battu told him that he may have deserved the way he was treated. (Dkt. No. 1 at 14.) Defendants move to dismiss these claims, arguing that Plaintiff has failed to allege that Defendants Battu and Wetherell were personally involved in any constitutional violation. (Dkt. No. 55–23 at 11–12.) Plaintiff's allegations against Defendant Battu and Wetherell are properly analyzed as a failure-to-intervene claim. On that claim, summary judgment in favor of Defendants is appropriate.

Law enforcement officials can be held liable under § 1983 for not intervening in a situation where another officer is violating an inmate's constitutional rights. *Jean–Laurent v. Wilkinson,* 540 F.Supp.2d 501, 512 (S.D.N.Y.2008) (citation omitted). A state actor may be held liable for failing to prevent another state actor from committing a constitutional violation if "(1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer does not take reasonable steps to intervene." *Id.* (citation omitted). Whether an officer can be held liable on a failure to intervene theory is generally a question of fact for the jury to decide. *See Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir.1994) ("Whether an officer had sufficient time to intercede or was capable of preventing the harm being caused by another officer is an issue of fact for the jury unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise.").

Here, a reasonable jury could not conclude that Defendants Battu and Wetherell failed to intervene with an ongoing constitutional violation. The undisputed facts show that Plaintiff did not tell Defendants Battu and Wetherell about the incident with the extraction team until several hours after it was over. (Dkt. No. 1 at 13–14.) Even if one fully credits Plaintiff's version of events, Defendants Battu and Wetherell did not have any realistic opportunity to intervene and prevent the harm. Therefore, Defendants' motion for summary judgment dismissing the claims against Defendants Battu and Wetherell is granted.

**E. Excessive Force Claim Against Defendants Hamel, Murray, and Stemp**

Plaintiff contends that Defendants Hamel, Murray, and Stemp subjected him to excessive force as directed by Defendants Battu and Wetherell. (Dkt. No. 1 at 14–15; Dkt. No. 55–16 at 93:14–95:3.) Defendants' memorandum of law does not address this excessive force claim.

As discussed above in Section I(C), the parties dispute what happened when Plaintiff was removed from the conference room. Plaintiff alleges that Defendants Hamel, Murray, and Stemp beat him and then kicked him while he was handcuffed. (Dkt. No. 1 at 14–15.) Defendants contend that Plaintiff head-butted Defendant Hamel without provocation and that they used only enough force to bring him under control. (Dkt. No. 55–7 ¶ 11; Dkt. No. 55–10 ¶ 10; Dkt. No. 55–19 ¶ 6.) Medical records show that Plaintiff suffered bruises on his right shoulder, red cheeks, a quarter-sized bump on his scalp, two raised areas on the back of his scalp, and a bruised ear. (Dkt. No. 55–7 at 7.)

**\*15** Given the parties' conflicting versions of events and Defendants' failure to address the claim, the Court finds that the excessive force claim against Hamel, Murray, and Stemp survives summary judgment.

However, there is no competent evidence that Defendants Battu and Wetherell were involved in the incident. Although Plaintiff claims that they ordered the use of force, he does not have any personal knowledge to support that opinion. To be sufficient to create a factual issue for purposes of a summary judgment motion, an affidavit (or verified complaint) must, among other things, be based "on personal knowledge." Fed.R.Civ.P. 56(e) ("A supporting or opposing affidavit must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated."). "Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Oil,* 196 F.3d 435, 452 (2d Cir.1999) (citations omitted). Therefore, the claim that Defendants Battu and Wetherell ordered Defendants Hamel, Murray, and Stemp to beat Plaintiff is dismissed.

**F. Conditions of Confinement Claims**

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 4478515 (N.D.N.Y.)

(Cite as: 2011 WL 4478515 (N.D.N.Y.))

Plaintiff alleges that Defendants DePalo, Powers, Segovis, Tedford [FN14], White, and Winchip subjected him to cruel and unusual punishment by subjecting him to harsh conditions of confinement.[FN15] (Dkt. No. 1 at 15–18.) Defendants argue that Plaintiff has "failed to allege a plausible Eighth Amendment claim" regarding the conditions of his confinement. (Dkt. No. 55–23 at 17–20.)

FN14. Defendants do not address the claim against Defendant Tedford.

FN15. Plaintiff does not assert that Defendants subjected him to these conditions of confinement in retaliation for any protected conduct. (Dkt. No. 1 at 20.) Therefore, I will address the conditions of confinement claims solely under Eighth Amendment standards.

1. *Handcuff Incident with Defendant Segovis*

Plaintiff alleges that Defendant Segovis violated his Eighth Amendment rights by leaving Plaintiff handcuffed in his cell for five hours while Plaintiff pleaded to be un-handcuffed so he could use the bathroom. (Dkt. No. 1 at 15.) Defendants argue that this claim should be dismissed because there is "neither an objective nor a subjective basis for assigning Eighth Amendment liability. Leaving [P]laintiff in the cell handcuffed behind his back for several hours was a much safer alternative than having to perform a cell extraction to retrieve [the handcuffs]." (Dkt. No. 55–23 at 19.) Defendants are not entitled to summary judgment on this claim because Plaintiff's verified complaint raises a triable issue of fact that Defendant Segovis subjected him to unconstitutional conditions of confinement.

The Eighth Amendment to the United States Constitution prohibits "cruel and unusual" punishments. The word "punishment" refers not only to deprivations imposed as a sanction for criminal wrongdoing, but also to deprivations suffered during imprisonment. *Estelle v. Gamble,* 429 U.S. 97, 102–03, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). Punishment is "cruel and unusual" if it involves the unnecessary and wanton infliction of pain or if it is incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Estelle,* 429 U.S. at 102. Thus, the Eighth Amendment

imposes on jail officials the duty to "provide humane conditions of confinement" for prisoners. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). In fulfilling this duty, prison officials must "ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.' " *Farmer,* 511 U.S. at 832 (quoting *Hudson v. Palmer,* 468 U.S. 517, 526–27, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984)).

*16 To satisfy the objective component of an Eighth Amendment conditions of confinement claim, "the deprivation alleged must be, objectively, 'sufficiently serious.' " *Farmer,* 511 U.S. at 834 (quoting *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)). To prove the objective component of an Eighth Amendment conditions of confinement claim, a prisoner must show that the defendant's "act or omission ... result[ed] in the denial of the minimal civilized measure of life's necessities." *Farmer,* 511 U.S. at 834. Therefore, "extreme deprivations are required to make out a conditions-of-confinement claim." *Hudson v. McMillian,* 503 U.S. 1, 9, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992).

To satisfy the subjective component of an Eighth Amendment conditions of confinement claim, a prisoner must show that the defendant acted with "deliberate indifference." *Wilson v. Seiter,* 501 U.S. 294, 302–03, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). A prison official demonstrates deliberate indifference to inhumane conditions of confinement where he "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837.

Defendants' extremely spare argument regarding Plaintiff's claim against Defendant Segovis states, in full:

Plaintiff alleges that on August 18, 2009, he presented himself for shower in socks and was left locked in the cell with handcuffs on for several hours by Defendant Segovis. The only reason security staff would leave an inmate handcuff[ed] in their cell is if they "kidnapped"

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 4478515 (N.D.N.Y.)

(Cite as: 2011 WL 4478515 (N.D.N.Y.))

the cuffs, and [P]laintiff refused to put his hand and wrists through the modified feed-up slot to allow the officer Segovis to remove the cuffs. Once again, [P]laintiff's refusal to comply with staff direction and facility procedures resulted in a reasonable and foreseeable deprivation. These facts, moreover, provide neither an objective nor a subjective basis for assigning Eighth Amendment liability. Leaving [P]laintiff in the cell handcuffed behind his back for several hours was a much safer alternative than having to perform[ ] a cell extraction to retrieve them, for both [P]laintiff and staff. Plaintiff was not subjected to a serious risk of harm, and the circumstance was not the result of deliberate indifference to inmate health or safety such as to give rise to an Eighth Amendment cause of action. *Gaston v. Coughlin,* 249 F.2d at 16.

(Dkt. No. 55–23 at 19, citations to record omitted.) Defendants do not address Plaintiff's allegation that he pleaded with Defendant Segovis to release him from his handcuffs so that he could use the bathroom or his allegation that he ultimately urinated and defecated on himself.

Defendants cite only *Gaston v. Coughlin,* 249 F.3d 156 (2d Cir.2001) [FN16] to support their argument. In that case, the Second Circuit held that a triable issue of fact existed on a conditions of confinement claim where the prisoner alleged that, *inter alia,* the area directly in front of his cell was filled with human feces, urine, and sewage water for several days. Although it is not entirely clear, Defendants may be arguing that Plaintiff's claim should be dismissed because his allegations are not as dire as those asserted by the plaintiff in *Gaston.* However, a reasonable juror, if he or she credited Plaintiff's version of events, could find that being handcuffed for five hours while pleading to be released in order to use the bathroom is an extreme deprivation. Similarly, a reasonable juror who credited Plaintiff's version of events could find that Defendant Segovis was deliberately indifferent. Therefore, Defendants' motion for summary judgment dismissing the claim against Defendant Segovis regarding the handcuffing incident is denied.

FN16. As noted in the block citation, Defendants cite this case as "249 F.2d at 16." (Dkt. No.

55–23 at 19.)

**2. *Hot Water***

**\*17** Plaintiff alleges that he was denied hot water on several occasions. (Dkt. No. 1 at 17.) Defendants move for summary judgment, arguing that the claim should be dismissed. (Dkt. No. 55–23 at 20.) Defendants are correct. The denial of hot water in an inmate's cell fails to state an Eighth Amendment claim because it does "not constitute [a] serious deprivation[ ] of basic human needs." *Graham v. Perez,* 121 F.Supp.2d 317, 323 (S.D.N.Y.2000). Therefore, Defendants' motion for summary judgment dismissing Plaintiff's claim that Defendants violated his Eighth Amendment rights by failing to provide him with a bucket for hot water is granted.

**3. *Drinking Water***

Plaintiff's complaint alleges that he was denied drinking water in his cell for a week. (Dkt. No. 1 at 15.) In his complaint and at his deposition, Plaintiff alleged that Defendant Powers was responsible for this deprivation because he failed to turn Plaintiff's water on. (Dkt. No. 1 at 16; Dkt. No. 55–16 at 152:18–19.) At his deposition, Plaintiff testified that Defendant Segovis was also responsible. (Dkt. No. 55–16 at 150:3–5, 9–12.) Defendants' memorandum of law does not discuss this claim.

Where a prisoner alleges that he or she was denied drinking water in his or her cell, the resolution of the claim hinges on whether the prisoner received fluids at other times or suffered any adverse effects. *Compare Johnson v. Comm'r of Corr. Servs.,* 669 F.Supp. 1071, 1074 (S.D.N.Y.1988) (prisoner confined for one week in a cell with an inoperable sink did not suffer a constitutional violation because he was provided drinks with meals) *with Atkins v. County of Orange,* 372 F.Supp.2d 377, 406 (S.D.N.Y.2005) (inmate raised triable issue of fact that the defendants subjected her to unconstitutional conditions of confinement by depriving her of water in her cell for almost one month despite fact that they provided her with fluids at meals where medical records showed inmate suffered adverse effects from water deprivation). Here, Plaintiff received juice at meals. (Dkt. No. 55–16 at 152:9–13.) There is no evidence that Plaintiff suffered any adverse effects from water deprivation. Therefore, the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 4478515 (N.D.N.Y.)

(Cite as: 2011 WL 4478515 (N.D.N.Y.))

Court *sua sponte* dismisses Plaintiff's claims regarding the deprivation of drinking water.

### 4. *Food*

Plaintiff alleges that Defendants interfered with his food on several occasions. Specifically, he alleges that (1) Defendants White and Segovis forced Plaintiff to plead with them before they gave him his breakfast tray on August 18, 2009 (Dkt. No. 1 at 16); (2) Defendant White gave Plaintiff only juice for lunch one day (Dkt. No. 1 at 16); Defendants White, Segovis, DePalo, and Tedford punished him by restricting him to a special loaf diet (Dkt. No. 1 at 15, 16–17); and (4) Defendant Segovis gave him pork instead of his special diet on one occasion (Dkt. No. 1 at 18). Defendants move for summary judgment dismissing these claims, arguing that "such deprivations are *de minimis* and do not rise to a level of constitutional significance ..." (Dkt. No. 55–23 at 18.) Defendants are correct.

**\*18** Plaintiff's allegations that he was denied food at lunch one day, given a diet he did not like as punishment, and given food that his religion does not allow him to eat on one occasion are insufficient to raise a triable issue of fact that Defendants violated his Eighth Amendment rights. *See Gill v. Hoadley,* 261 F.Supp.2d 113, 129 (N.D.N.Y.2003) (finding that complaint failed to state Eighth Amendment claim where prisoner alleged he was denied one meal); *Shakur v. Selsky,* 391 F.3d 106 (2d Cir.2004) (prisoner stated *First Amendment* claim where he alleged that he was denied one religiously significant feast). Therefore, the Court dismisses Plaintiff's Eighth Amendment claims regarding the denial of food.

To the extent that Plaintiff claims that the imposition of the loaf diet violated his right to due process, the claim is *sua sponte* dismissed. In order to state a claim for violation of his procedural due process rights, a plaintiff must allege facts plausibly suggesting that he was deprived of a liberty interest without due process of law. *Tellier v. Fields,* 280 F.3d 69, 79–80 (2d Cir.2000). An inmate has a liberty interest where (1) the state has granted its inmates, by regulation or statute, an interest in remaining free from that particular confinement or restraint; and (2) the confinement or restraint imposes "an atypical and significant hardship on the inmate in relation to the

ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995); *Tellier,* 280 F.3d at 80; *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996). The Second Circuit has held that the imposition of a loaf diet does not impose an atypical and significant hardship on inmates, even where the inmate alleges that the diet caused severe stomach pain and weight loss. *McEachin v. McGuinnis,* 357 F.3d 197 (2d Cir.2004). Therefore, any due process claim regarding the loaf diet is dismissed.

### 5. *Recreation and Movement*

Plaintiff alleges that he was not allowed "any recreation or any movement outside his cell" when Defendant Segovis was assigned to his block. (Dkt. No. 1 at 17.) Defendants do not address this claim in their memorandum of law.[FN17]

> **FN17.** Although Defendants do not discuss the issue in their memorandum of law, Defendant Segovis declares that inmates in the Special Housing Unit have one recreation period per day, for which they are required to sign up in advance. (Dkt. No. 55–18 ¶ 16.) Defendant Segovis escorts any inmates who sign up to recreation. *Id.* ¶ 17. Defendant Segovis declares that Plaintiff "rarely signed up for recreation" during his shift. *Id.* ¶ 18.

Prisoners have the right under the Eighth Amendment to be allowed "some opportunity for exercise." *Williams v. Greifinger,* 97 F.3d 699, 704 (2d Cir.1996). Plaintiff's complaint, however, does not plausibly allege facts suggesting that this right was violated. Interference with prisoners' recreation must be quite severe in order to state an Eighth Amendment claim. *See Branham v. Meachum,* 77 F.3d 626, 630–31 (2d Cir.1996) (officers who denied inmate outdoor exercise for twenty-two days did not violate Eighth Amendment). Therefore, the Court *sua sponte* dismisses Plaintiff's claims regarding the denial of recreation and movement.

### 6. *Showers*

Plaintiff alleges that Defendant Segovis would not allow him to shower on August 19, 2009. (Dkt. No. 1 at

Not Reported in F.Supp.2d, 2011 WL 4478515 (N.D.N.Y.)

(Cite as: 2011 WL 4478515 (N.D.N.Y.))

17.) Plaintiff alleges that when he told Defendant DePalo that he had not been allowed to shower, Defendant DePalo said "That's life in F-block for Muslims." *Id.* Defendants do not address this claim in their memorandum of law.[FN18]

> FN18. Although Defendants' memorandum of law does not address this claim, Defendant DePalo declares that at "no time did I derogate [P]laintiff's religion or act in an unprofessional manner toward him ." (Dkt. No. 55–4 ¶ 23.)

**\*19** The denial of one shower does not violate the Eighth Amendment. *McCoy v. Goord,* 255 F.Supp.2d 233, 260 (S.D.N.Y.2003) ("a two-week suspension of shower privileges does not suffice as a denial of 'basic hygienic needs' "). Therefore, the Court dismisses Plaintiff's claim *sua sponte.*

### 7. *Bibles*

Plaintiff alleges that Defendants Segovis and Powers refused to give Plaintiff two Bibles that a chaplain delivered for him. (Dkt. No. 1 at 16.) Defendants' memorandum of law does not address this claim.

The allegation about the Bibles fails to state an Eighth Amendment claim because Plaintiff does not plausibly allege that he was denied "the minimal civilized measure of life's necessities" as a result of the deprivation. The Court can find no authority suggesting that even a permanent deprivation of the Bibles would rise to that level. Here, Plaintiff received the Bibles twelve days after the chaplain originally delivered them. (Dkt. No. 55–6 at 28.) Therefore, Plaintiff's Eighth Amendment claim regarding the Bibles is *sua sponte* dismissed.

The allegation about the Bibles also fails to state a procedural due process claim. "[A]n unauthorized intentional deprivation of property by a state employee does not constitute a violation of the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful postdeprivation remedy for the loss is available." *Hudson v. Palmer,* 468 U.S. 517, 533, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984) (emphasis omitted). This Circuit has held that "confiscation ... [does] not constitute a Fourteenth Amendment violation for loss of property because of the availability of state court post-deprivation remedies" in the New York Court of

Claims. *Koehl v. Dalsheim,* 85 F.3d 86, 88 (2d Cir.1996); *Jackson v. Burke,* 256 F.3d 93, 96 (2d Cir.2001); *see also Parratt v. Taylor,* 451 U.S. 527, 544, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981) ("Although the state remedies may not provide the respondent with all the relief which may have been available if he could have proceeded under § 1983, that does not mean that the state remedies are not adequate to satisfy the requirements of due process."), *overruled in part on other grounds by Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986). Therefore, Plaintiff's claim regarding the deprivation of the two Bibles is dismissed.

### 8. *Verbal Abuse*

Defendants argue that, to the extent that Plaintiff alleges that his constitutional rights were violated by comments by Defendants DePalo and Winchip regarding Muslims, such claims should be dismissed. (Dkt. No. 55–23 at 20.) Defendants are correct. Verbal harassment, in and of itself, does not rise to the level of a constitutional violation. *Tafari v. McCarthy,* 714 F.Supp.2d 317, 364 (N.D.N.Y.2010); *Ramirez v. Holmes,* 921 F.Supp. 204, 210 (S.D.N.Y.1996) ("Allegations of threats or verbal harassment, without any injury or damage, do not state a claim under 42 U.S.C. § 1983."). Therefore, Defendants' motion for summary judgment dismissing these claims is granted.

### G. Religion Claims

**\*20** Plaintiff alleges that Defendants Rock and Bellamy[FN19] violated his right to exercise his religion. (Dkt. No. 1 at 18–19.) Defendants move for summary judgment of these claims. (Dkt. No. 55–23 at 20–28.)

> FN19. Plaintiff alleges that Defendants Rock and Bellamy are responsible for violating his religious rights. (Dkt. No. 1 at 18.) Defendant Rock, who was the Superintendent of Great Meadow when Plaintiff was incarcerated there, was "responsible for the overall administrative functioning of the facility." (Dkt. No. 55–12 ¶ 3 .) He was therefore personally involved in the implementation of the Directive at Great Meadow. The evidence does not show, however, any personal involvement by Defendant Bellamy with implementation of the Directive at Great

Not Reported in F.Supp.2d, 2011 WL 4478515 (N.D.N.Y.)

(Cite as: 2011 WL 4478515 (N.D.N.Y.))

Meadow. Defendant Bellamy is the Director of the Inmate Grievance Program. (Dkt. No. 55–6 ¶ 12.) Therefore, Defendants' motion for summary judgment dismissing the claims against Defendant Bellamy for lack of personal involvement (Dkt. No. 55–23 at 12) is granted. Hereafter, I will refer to Plaintiff's religion claims as being brought solely against Defendant Rock.

## 1. *Meals*

Plaintiff alleges that Defendant Rock violated his right to exercise his religion because Great Meadow Correctional Facility does not provide a Halal diet. (Dkt. No. 1 at 19.) Defendants move for summary judgment dismissing this claim, arguing that the religious alternative meals provided at Great Meadow meet Plaintiff's religious dietary requirements. (Dkt. No. 55–23.) Defendants are correct.

The Second Circuit has "clearly established that a prisoner has a right to a diet consistent with his or her religious scruples." *Ford,* 352 F.3d at 597. However, "[a]ll that is required for a prison diet not to burden an inmate's free exercise of religion is the provision of a diet sufficient to sustain the prisoner's good health without violating [his religion's] dietary laws." *Muhammad v. Warithu–Deen Umar,* 98 F.Supp.2d 337, 344 (W.D.N.Y.2000)* (citing *Abdul–Malik v. Goord,* No. 07 Civ. 4584, 1997 U.S. Dist. LEXIS 2047, 1997 WL 83402, at *6 (S.D.N.Y. Feb. 27, 1997)).[FN20]

> [FN20.] Defendants served a copy of this unpublished decision on Plaintiff with their moving papers. (Dkt. No. 55–23 at 105.)

Defendant Rock declares that DOCCS "has proscribed the use of what is called a [ ] Religious Alternative Meal program to accommodate non[-]Kosher religious dietary requirements." (Dkt. No. 55–12 ¶ 47.) He further declares that the alternative meal "provides a nutritionally adequate diet and meets Islamic requirements regardless of sect." *Id.* ¶ 50. Courts have consistently held that DOCCS' Religious Alternative Meal is sufficient to sustain Muslim prisoners' good health without violating dietary laws and that a strictly Halal diet is not required.

*Muhammad,* 98 F.Supp.2d at 343–44 (collecting cases). Therefore, Defendants' motion for summary judgment dismissing Plaintiff's claim regarding the failure to provide Halal meals is granted.

## 2. *Restrictions on Demonstrative Prayer*

DOCCS Directives limit prisoners' freedom to demonstratively pray. Specifically, DOCCS Directive 4202(k) states that "[i]ndividual demonstrative prayer by inmates will only be allowed in the privacy of their own living quarters and in designated religious areas whenever feasible as determined by the Superintendent." (Dkt. No. 55–12 ¶ 9.) Plaintiff argues that the Directive as implemented at Great Meadow violates his right to practice his religion. (Dkt. No. 1 at 18, 20.) Defendants argue that this claim should be dismissed. (Dkt. No. 55–23 at 25–26.) The Court will address this claim under both the Free Exercise Clause of the First Amendment and the Religious Land Use and Institutionalized Persons Act ("RLUIPA").

### a. *First Amendment*

Prisoners retain some measure of the constitutional right to the free exercise of religion guaranteed by the First Amendment. *Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir.2003). However, due to the unique concerns of the prison setting, prisoners' free exercise rights must be balanced against the interests of prison officials engaged in the complex duties of administering the penal system. *Id.* Thus, a prison regulation that denies a prisoner the ability to engage in a religious exercise "is judged under a reasonableness test less restrictive than that ordinarily applied [to burdens on fundamental rights]: a regulation that burdens a [prisoner's] protected right passes constitutional muster if it is reasonably related to legitimate penological interests." *Salahuddin v. Goord,* 467 F.3d 263, 274 (2d Cir.2006) (quoting *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 349, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987) (punctuation omitted).

**\*21** To establish a free exercise claim, a prisoner "must show at the threshold that the disputed conduct substantially burdens [FN21] his sincerely held religious beliefs." *Salahuddin,* 467 F.3d at 274–75 (citing *Ford,* 352 F.3d at 591). A religious belief is "sincerely held" when the plaintiff subjectively, sincerely holds a particular

Not Reported in F.Supp.2d, 2011 WL 4478515 (N.D.N.Y.)

(Cite as: 2011 WL 4478515 (N.D.N.Y.))

belief that is religious in nature [FN22]. *Ford,* 352 F.3d at 590. Here, there is no dispute that Plaintiff sincerely believes that his religion requires him to demonstratively pray several times each day.

> FN21. Although the Second Circuit has applied the "substantial burden" test in its most recent prison free exercise cases, it has done so while explicitly refusing to adopt or endorse the test. "The *Ford* court noted that the Circuits apparently are split over whether prisoners must show a substantial burden on their religious exercise in order to maintain free exercise claims. Nevertheless, the *Ford* court held that since the plaintiff had not challenged the application of the substantial burden requirement, the court would proceed as if the requirement applied. Likewise, the *Salahuddin* court noted that '[r]esolution of this appeal does not require us to address Salahuddin's argument that a prisoner's First Amendment free-exercise claim is not governed by the 'substantial burden' threshold requirement,' because defendants 'never proceed to argue that we should find any particular burdened religious practice to be peripheral or tangential to [plaintiff's] religion.' The court then proceeded as if the substantial burden requirement applied." *Pugh v. Goord,* 571 F.Supp.2d 477, 497 n. 10 (S.D.N.Y.2008) (citations and some punctuation omitted).

> FN22. However, in some cases "an asserted belief might be so bizarre, so clearly nonreligious in motivation, so as not to be entitled to protection." *Frazee v. Illinois Dept. Of Employment Security,* 489 U.S. 829, 834 n. 2, 109 S.Ct. 1514, 103 L.Ed.2d 914 (1989).

A prisoner's sincerely held religious belief is "substantially burdened" "where the state puts substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Jolly v. Coughlin,* 76 F.3d 468, 477 (2d Cir.1996) (punctuation omitted) (holding that Rastafarian prisoner's sincerely held religious belief that he was prohibited from submitting to a test for latent tuberculosis was "substantially burdened" where he was

forced to choose between "submitting to the test or adhering to [his] beliefs and enduring medical keeplock.").

Defendants argue that the Directive does not substantially burden Plaintiff's sincerely held religious beliefs because Plaintiff "has also admitted that prayer times do not always coincide with recreation times and that he is only forced to choose occasionally." (Dkt. No. 55–23 at 26, citing Dkt. No. 55–16 (Plaintiff's deposition) at 164–65.)

Defendant Rock declares that:

> An inmate housed at Great Meadow who wishes to pray during his recreation period has alternatives to demonstrative prayer in the yard. First, the inmate can make silent, non-demonstrative prayers while in Great Meadow's recreation yard. In addition, an inmate may choose to remain in his cell during the recreation period and, while in his cell, the inmate may pray demonstratively as he wishes. An inmate may choose to go back to his cell during a designated "go back," whereby inmates may return to their cells from the recreation yard under the supervision of staff at a scheduled time. "Go Back" periods, however, are limited, and may not coincide with the exact point in time that an inmate wishes to perform the Salaah, inasmuch as inmates must be escorted while they are transported from the recreation yard to their cells, and vice versa, and [ ] only a finite number of correction officers work at Great Meadow at any time.

(Dkt. No. 55–12 ¶¶ 24–28.)

Defendant Rock asserted the same argument in *Smith v. Artus,* No. 9:07–CV–1150, 2010 U.S. Dist. LEXIS 104660, 2010 WL 3910086 (N.D.N.Y. Sept.30, 2010). [FN23] There, Judge Mordue found that:

> FN23. Defendants served a copy of this unpublished decision on Plaintiff with their moving papers. (Dkt. No. 55–23 at 120.)

The question therefore becomes whether having to choose between attending recreation ... or fulfilling his obligation to pray Salaah in a demonstrative manner

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 4478515 (N.D.N.Y.)

(Cite as: 2011 WL 4478515 (N.D.N.Y.))

would substantially burden plaintiff's religious rights. Although facts produced at trial may show otherwise, the present record, when viewed in the light most favorable to plaintiff, shows that plaintiff's free exercise rights were substantially burdened by defendants' policy of requiring plaintiff to either forego his Salaah prayer or give up other privileges accorded him as an inmate.

**\*22** *Smith,* 2010 U.S. Dist. LEXIS 104660, at \*36–37, 2010 WL 3910086, at \*12. Judge Mordue's analysis is persuasive and thus the Court finds that there is a triable issue of fact that the Directive substantially burdened Plaintiff's sincere religious beliefs.

Once a plaintiff establishes that a sincerely held religious belief has been substantially burdened,"[t]he defendants then bear the relatively limited burden of identifying the legitimate penological interests that justify the impinging conduct." *Salahuddin,* 467 F.3d at 275.

Defendant Rock's declaration discusses, at length, the penological interests on which the Directive is based. Specifically, he declares that:

Demonstrative prayer singles individuals out as members of a particular religious group. This is particularly true of Muslim inmates performing the Salaah, which includes, among other things, kneeling down, bending forward, touching the forehead to the ground, and motioning with the hands and arms. When inmates of a particular faith are involved in an incident, other inmates of the same faith are likely to involve themselves in the incident to protect someone from "their group." Identification of inmates' religious affiliation has also been known to lead to conflicts between different faith groups or different sects within a faith group. These conflicts can escalate rapidly placing staff and other inmates at serious risk of physical injury or death, and threaten the facility's overall security. In the recreation yard, where hundreds of inmates are gathered at one time, this easily could lead to large-scale violent incidents. During the confusion brought forward by such incidents, an inmate may attempt to escape from the facility or inmates may attempt to take over the prison.

Demonstrative prayer in the yard also negatively

impacts staff's ability to control inmates. When an inmate is engaged in demonstrative prayer in the recreation yard, that inmate is likely to ignore legitimate direct orders from staff. The inmate praying demonstratively may view the interruption as an insult to his or her religion, and the perceived insult may lead to conflict between staff and the inmate. Staff may be hesitant to interrupt an inmate engaged in demonstrative prayer out of respect for the religious significance of the prayer, and thus be impeded in their attempt to communicate necessary information to the inmate or carry out direct orders or tasks associated with that inmate. This, in turn, disrupts the order of the facility and may adversely impact related safety concerns. As noted above, because the inmate's religion has been identified by his demonstrative prayer, when these conflicts occur, other inmates may join in the conflict, rapidly escalating the situation. Whether the inmate ignores a direct order or staff is unwilling to disrupt prayer, the end result is a diminution of staff's control over the recreation yard and an increased risk to the safety and security of the facility.

**\*23** I am informed by my attorneys that plaintiff is asserting that these security concerns do not apply to inmates housed in the Behavioral Health Unit (BHU) because they are isolated during recreation periods. However, the fact that inmates in BHU and the Special Housing Unit (SHU) [ ] take recreation in isolated recreation yards does not significantly alter these security and staffing concerns. The recreation yards adjacent to the BHU and SHU are small pens designed for use by one inmate at a time. They abut one another, and although solitary, they are not private and may be observed by other members of the inmate population. Thus, the religious preferences of inmates engaging in demonstrative pray[er] in the BHU and SHU recreation yards would still be identifiable by other inmates, and staff would still have diminished control over inmates praying demonstratively. Moreover, from an administrative perspective, it is better to require staff to apply Directive 4202 across the board to all members of the inmate population without exception. In this way, both staff and inmates know exactly what is allowed and what is not allowed. There are no errors of discretion, no favors, no favoritism, and no room for inmates in

Not Reported in F.Supp.2d, 2011 WL 4478515 (N.D.N.Y.)

(Cite as: 2011 WL 4478515 (N.D.N.Y.))

general population to become disruptive as a result of their belief that inmates in BHU or SHU are receiving special privileges.

(Dkt. No. 55–12 ¶¶ 11–34.)

Judge Mordue concluded in *Smith* that the security concerns identified by Defendant Rock satisfied the burden of showing that legitimate penological interests supported the Directive's ban on demonstrative prayer in the recreation yards at Great Meadow. *Smith,* 2010 U.S. Dist. LEXIS 104660, at *41–42, 2010 WL 3910086, at * 14. The undersigned agrees. "Prison security and penological institutional safety goals are indeed a most compelling governmental interest ..." *Campos v. Coughlin,* 854 F.Supp. 194, 207 (S.D.N.Y.1994) (Sotomayor, J.); s*ee also Orafan v. Goord,* 411 F.Supp.2d 153, 160 (N.D.N.Y.2006), *rev'd on other grounds, Orafan v. Rashid,* 249 Fed. App'x 217 (2d Cir.2007).

Therefore, the burden shifts to Plaintiff to show that the concerns articulated by Defendant Rock are irrational. *Salahuddin,* 467 F.3d at 275. When determining whether the burden imposed by the defendants is reasonable rather than irrational, a court evaluates four factors: (1) whether the action had a valid, rational connection to a legitimate governmental objective; (2) whether the prisoner has an alternative means of exercising the burdened right; (3) the impact on guards, inmates, and prison resources of accommodating the right; and (4) the existence of alternative means of facilitating the plaintiff's exercise of the right that have only a *de minimis* adverse effect on valid penological interests. *Salahuddin,* 467 F.3d at 274–75.

Defendant Rock declares here, as he did in *Smith,* that the Directive's ban on demonstrative prayer in recreation yard at Great Meadow is rational because:

**\*24** Great Meadow's "big recreation yard is approximately 5 acres, and during a typical recreation period, between 100 and 400 inmates are present in the yard, depending on the weather. In the morning, one sergeant and six correction officers are assigned to the yard to supervise the inmates during recreation. In the afternoon, one sergeant and eight correction officers are

assigned to the yard and in the evening, one sergeant and twelve correction officers are assigned to the yard. In these large areas of a facility such as the yard or the mess hall, prisoners substantially outnumber staff, and these are areas of a facility where unusual incidents such as serious fights and assaults will typically occur. BHU and SHU recreation periods run on parallel schedules. Fewer staff are assigned because BHU and SHU inmates are released to the yard individually but must be escorted by at least two officers. BHU and SHU populations, even though isolated from the general population, tend to be more unpredictable and difficult to control. These populations often present greater safety and security risks for staff. When an inmate becomes involved in a conflict situation in one area of the facility, staff must be diverted from other areas of the facility to back up the staff assigned to the location where the incident is occurring. During recreation periods the diversion of staff away from more populated areas or escort responsibilities to address incidents with BHU or SHU inmates can be dangerous, and creates critical security concerns. During such incidents, inmates and staff are placed at risk of sustaining serious physical injury or death. Further, during the confusion created by such incidents, an inmate may attempt to escape from the facility or inmates may attempt to take over the prison. It is imperative, therefore, that rules and regulations designed to minimize the potential for conflict, and the drain on human resources be implemented, across the board, without exception. This is particularly true in the current economic climate as, upon information and belief, there are no resources available to hire additional facility staff, and DOCS is being encouraged to reduce the number of hours that staff may work overtime.

(Dkt. No. 55–12 ¶¶ 36–45.)

In *Smith,* the plaintiff opposed the defendants' motion for summary judgment. In his opposition, the plaintiff argued that the Directive's ban on demonstrative prayer in the recreation yard at Great Meadow was an irrational response to the concerns articulated by Defendant Rock because (1) the Directive contains other provisions explicitly allowing religious behaviors that single out members of particular faith groups, such as wearing

Not Reported in F.Supp.2d, 2011 WL 4478515 (N.D.N.Y.)

(Cite as: 2011 WL 4478515 (N.D.N.Y.))

distinctive head coverings and facial hair and being served on different colored trays in the mess hall; (2) officers are just as likely to lose control over inmates praying non-demonstratively, which is allowed under the Directive, as they are over inmates praying demonstratively; (3) other activities in the recreation yard—such as sports—also lead to conflict but are permitted; and (4) demonstrative prayer is allowed in the recreation yards at other facilities. *Smith,* 2010 U.S. Dist. LEXIS 104660, at *42–26, 2010 WL 3910086, at *14–15. Judge Mordue found that the plaintiff had raised a triable issue of fact that the Directive was an irrational response to the facility's legitimate penological interests. *Smith,* 2010 U.S. Dist. LEXIS 104660, at *47–48, 2010 WL 3910086, at *16.

**\*25** In *Smith,* the plaintiff asserted that the alternatives that the facility offered to praying in the recreation yard—namely, non-demonstrative prayer or staying in his cell at recreation time to pray-were not reasonable. *Smith,* 2010 U.S. Dist. LEXIS 104660, at *48–53, 2010 WL 3910086, at *16–17. Judge Mordue found that the plaintiff had raised a triable issue of fact regarding the reasonableness of the facility's alternatives. *Id.*

In *Smith,* Judge Mordue found that the same issues that raised a triable issue of fact regarding the rationality of the Directive also raised a triable issue regarding the third *Turner* factor, which considers the impact on guards, inmates, and prison resources. *Smith,* 2010 U.S. Dist. LEXIS 104660, at *53–54, 2010 WL 3910086, at *17.

Finally, in *Smith* the plaintiff proposed alternatives to the Directive's ban on demonstrative prayer in the recreation yard-for instances, adding an additional "Go Back" period for Muslim inmates or setting aside an area of the recreation yard for prayer. *Smith,* 2010 U.S. Dist. LEXIS 104660, at *54–56, 2010 WL 3910086, at *18. Judge Mordue found that Plaintiff had raised a triable issue of fact that the facility could accommodate Muslims' need to demonstratively pray by designating an area of the recreation yard for prayer. *Smith,* 2010 U.S. Dist. LEXIS 104660, at *57–58, 2010 WL 3910086, at *19.

Thus, in *Smith,* Judge Mordue found that there was a

triable issue of fact that the very policy challenged by Plaintiff in this case-Great Meadow's implementation of DOCCS Directive 4202(k) banning demonstrative prayer in the recreation yard-violated Muslim inmates' free exercise rights.

However, unlike the plaintiff in *Smith,* Plaintiff here has not opposed Defendants' motion for summary judgment. Thus, Plaintiff here has not met his burden of showing that the concerns articulated by Defendant Rock are irrational.

Even if Plaintiff had opposed the motion and met his burden, Defendants would be entitled to summary judgment on Plaintiff's free exercise claim because (1) the doctrine of qualified immunity shields them from liability for damages; and (2) Plaintiff's request for injunctive relief is moot.

The affirmative defense of qualified immunity "shields government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Stephenson v. Doe,* 332 F.3d 68, 76 (2d Cir.2003) (quoting *McCardle v. Haddad,* 131 F.3d 43, 50 (2d Cir.1997)). A qualified immunity inquiry in prisoner civil rights cases generally involves two issues: (1) "whether the facts, viewed in the light most favorable to the plaintiff, establish a constitutional violation"; and (2) "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation confronted." *Sira v. Morton,* 380 F.3d 57, 68–69 (2d Cir.2004) (citations omitted); accord, *Higazy v. Templeton,* 505 F.3d 161, 169 n. 8 (2d Cir.2007) (citations omitted). In the context of religion claims, the Supreme Court and the Second Circuit have "expressly cautioned against framing the constitutional right at too broad a level of generality." *Redd v. Wright,* 597 F.3d 532, 536 (2d Cir.2010) (citing *Wilson v. Layne,* 526 U.S. 603, 615, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999)). The Second Circuit imposes a " 'reasonable specificity' requirement for defining the contours of a constitutional right for qualified immunity purposes." *Id.* Thus, conduct does not violate clearly established rights unless the Supreme Court or the Second Circuit has quite specifically held that conduct is unconstitutional. *Id.*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 4478515 (N.D.N.Y.)

(Cite as: 2011 WL 4478515 (N.D.N.Y.))

**\*26** Here, neither the Second Circuit nor the Supreme Court has held that the policy against demonstrative prayer in the solitary recreation pen at Great Meadow Correctional Facility violates prisoners' rights under the First Amendment or RLUIPA. Indeed, *Smith* appears to be the only case on the issue. Even if *Smith* was sufficient to create "clearly established statutory or constitutional rights," it would have no effect here because it was decided after Plaintiff filed this action. Moreover, Judge Mordue dismissed the plaintiff's action in *Smith* on the basis of qualified immunity because "it still does not appear well established that an inmate has the right to pray demonstratively in the recreation yard." *Smith,* 2010 U.S. Dist. LEXIS 104660, at \*88, 2010 WL 3910086, at \*29. Therefore, Defendants are entitled to qualified immunity on Plaintiff's claim for money damages regarding demonstrative prayer.

Defendants argue that Plaintiff's claims for injunctive relief are moot because he is no longer housed at Great Meadow. (Dkt. No. 55–23 at 10–11.) Defendants are correct. "It is settled in this Circuit that a transfer from a prison facility moots an action for injunctive relief against the transferring facility." *Prins v. Coughlin,* 76 F.3d 504, 506 (2d Cir.1996) (per curiam). Plaintiff has not been housed at Great Meadow since October 2009. (Dkt. No. 7.) Therefore, his request for injunctive relief is moot.

Accordingly, Defendants' motion for summary judgment dismissing Plaintiff's First Amendment claim regarding the ban on demonstrative prayer is granted.

b. *RLUIPA*

RLUIPA provides that "[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution [FN24] ... unless the government demonstrates that imposition of the burden on that person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc–1(a).

> FN24. An "institution" is any facility or institution that is "owned, operated, or managed by, or provides services on behalf of any State"

and is, *inter alia,* "for persons who are mentally ill, disabled, or retarded, or chronically ill or handicapped" or "a jail, prison, or other correctional facility." 42 U.S.C. § 1997(1) (2010).

In *Smith,* Judge Mordue found that the plaintiff had raised a triable issue of fact that Great Meadows' ban on demonstrative prayer violated RLUIPA for the same reasons that he articulated regarding the First Amendment. *Smith,* 2010 U.S. Dist. LEXIS 104660, at \*58–62, 2010 WL 3910086, at \*19–20. However, he found that the defendants were entitled to qualified immunity. *Smith,* 2010 U.S. Dist. LEXIS 104660, at \*89, 2010 WL 3910086, at \*29.

Here, even if Plaintiff had raised a triable issue of fact, Defendants would be entitled to summary judgment dismissing the RLUIPA claim for two reasons. First, money damages are not available under RLUIPA. *Sossamon v. Texas,* ——U.S. ——, 131 S.Ct. 1651, 179 L.Ed.2d 700 (2011). Second, as discussed above, Plaintiff's claims for injunctive relief are moot. Therefore, Defendants' motion for summary judgment dismissing Plaintiff's RLUIPA claim regarding the ban on demonstrative prayer is granted.

3. *Access to Personal Razor*

**\*27** Plaintiff alleges that Defendants violated his religious rights by refusing to allow him a razor or clippers to shave his pubic hair and armpits. (Dkt. No. 1 at 19.) Defendants argue that their refusal to give Plaintiff a personal razor is supported by legitimate health and safety concerns because inmates in the SHU and BHU, where Plaintiff resided at Great Meadow, "are there because they have threatened to ... commit suicide, inflict self harm, or because they have assaulted staff or other inmates." (Dkt. No. 55–23 at 27.) Even if Plaintiff had raised a triable issue of fact regarding the merits of this claim, Defendants are entitled to summary judgment on the basis of qualified immunity. The Court can find no Supreme Court or Second Circuit authority holding that prisoners are entitled to possess a personal razor or clippers to perform grooming mandated by their religion. Additionally, as discussed above, Plaintiff's requests for injunctive relief

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 4478515 (N.D.N.Y.)

(Cite as: 2011 WL 4478515 (N.D.N.Y.))

are moot because he is no longer housed at Great Meadow. Therefore, Defendants' motion for summary judgment dismissing this claim is granted.

**H. Claim Against Defendant Karandy**

Defendants argue that complaint fails to state that Defendant Karandy was personally involved in any of the alleged constitutional violations. (Dkt. No. 52–33 at 11–12.) Defendants are correct.

Under Second Circuit precedent, " 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). In order to prevail on a § 1983 cause of action against an individual, a plaintiff must show some tangible connection between the unlawful conduct and the defendant. *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986). Here, the complaint includes Defendant Karandy in the list of defendants but does not contain any allegations about any acts or omissions by Defendant Karandy. (Dkt. No. 1 at 9.) Therefore, I grant Defendants' motion for summary judgment and dismiss the claim against Defendant Karandy.

**ACCORDINGLY,** it is

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 55) is *GRANTED IN PART AND DENIED IN PART.* All claims are dismissed with the exception of: (1) the excessive force claim against Defendants Buell, Busse, Dempster, Juckett, Lenney, and Rivers; (2) the excessive force claim against Defendants Hamel, Murray, and Stemp; and (3) the claim against Defendant Segovis regarding the handcuffing incident; and it is further

**ORDERED** that the Clerk provide Plaintiff with a copy *Butler v. Gonzalez,* No. 09 Civ.1916, 2010 U.S. Dist. LEXIS 108244, 2010 WL 3398156 (S.D.N.Y. May 18, 2010) in accordance with the Second Circuit's decision in *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009).

IT IS SO ORDERED.

N.D.N.Y.,2011.

DeBlasio v. Rock
Not Reported in F.Supp.2d, 2011 WL 4478515 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.


Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

**C** Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Jerome WALDO, Plaintiff,
v.
Glenn S. GOORD, Acting Commissioner of New York
State Department of Correctional Services; Peter J.
Lacy, Superintendent at Bare Hill Corr. Facility;
Wendell Babbie, Acting Superintendent at Altona Corr.
Facility; and John Doe, Corrections Officer at Bare Hill
Corr. Facility, Defendants.
**No. 97-CV-1385 LEK DRH.**

Oct. 1, 1998.

Jerome Waldo, Plaintiff, pro se, Mohawk Correctional
Facility, Rome, for Plaintiff.

Hon. Dennis C. Vacco, Attorney General of the State of
New York, Albany, Eric D. Handelman, Esq., Asst.
Attorney General, for Defendants.

DECISION AND ORDER

KAHN, District J.

**\*1** This matter comes before the Court following a
Report-Recommendation filed on August 21, 1998 by the
Honorable David R. Homer, Magistrate Judge, pursuant to
28 U.S.C. § 636(b) and L.R. 72.3(c) of the Northern
District of New York.

No objections to the Report-Recommendation have been
raised. Furthermore, after examining the record, the Court
has determined that the Report-Recommendation is not
clearly erroneous. See Fed.R.Civ.P. 72(b), Advisory

Committee Notes. Accordingly, the Court adopts the
Report-Recommendation for the reasons stated therein.

Accordingly, it is

ORDERED that the Report-Recommendation is
APPROVED and ADOPTED; and it is further

ORDERED that the motion to dismiss by defendants is
GRANTED; and it is further

ORDERED that the complaint is dismissed without
prejudice as to the unserved John Doe defendant pursuant
to Fed.R.Civ.P. 4(m), and the action is therefore dismissed
in its entirety; and it is further

ORDERED that the Clerk serve a copy of this order on all
parties by regular mail.

IT IS SO ORDERED.
HOMER, Magistrate J.

REPORT-RECOMMENDATION AND ORDER [FN1]

> [FN1.] This matter was referred to the undersigned
> pursuant to 28 U.S.C. § 636(b) and
> N.D.N.Y.L.R. 72.3(c).

The plaintiff, an inmate in the New York Department of
Correctional Services ("DOCS"), brought this pro se
action pursuant to 42 U.S.C. § 1983. Plaintiff alleges that
while incarcerated in Bare Hill Correctional Facility
("Bare Hill") and Altona Correctional Facility ("Altona"),
defendants violated his rights under the Eighth and
Fourteenth Amendments.[FN2] In particular, plaintiff alleges
that prison officials maintained overcrowded facilities
resulting in physical and emotional injury to the plaintiff

© 2010 Thomson Reuters. No Claim to Orig. US Gov.
Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

and failed to provide adequate medical treatment for his injuries and drug problem. Plaintiff seeks declaratory relief and monetary damages. Presently pending is defendants' motion to dismiss pursuant to Fed.R.Civ.P. 12(b). Docket No. 18. For the reasons which follow, it is recommended that the motion be granted in its entirety.

FN2. The allegations as to Bare Hill are made against defendants Goord, Lacy, and Doe. Allegations as to Altona are made against Goord and Babbie.

### I. Background

Plaintiff alleges that on August 21, 1997 at Bare Hill, while he and two other inmates were playing cards, an argument ensued, and one of the two assaulted him. Compl., ¶ 17. Plaintiff received medical treatment for facial injuries at the prison infirmary and at Malone County Hospital. *Id.* at ¶¶ 18-19. On September 11, 1997, plaintiff was transferred to Altona and went to Plattsburgh Hospital for x-rays several days later. *Id.* at ¶ 21.

Plaintiff's complaint asserts that the overcrowded conditions at Bare Hill created a tense environment which increased the likelihood of violence and caused the physical assault on him by another inmate. *Id.* at ¶¶ 10-11. Additionally, plaintiff contends that similar conditions at Altona caused him mental distress and that he received constitutionally deficient medical treatment for his injuries. *Id.* at ¶¶ 21-22. The complaint alleges that Altona's lack of a drug treatment program and a dentist or specialist to treat his facial injuries constitutes cruel and unusual punishment under the Eighth and Fourteenth Amendments. *Id.* at ¶¶ 22, 27-28.

### II. Motion to Dismiss

**\*2** When considering a Rule 12(b) motion, a court must assume the truth of all factual allegations in the complaint and draw all reasonable inferences from those facts in favor of the plaintiff. *Leeds v. Meltz,* 85 F.3d 51, 53 (2d Cir.1996). The complaint may be dismissed only when "it

appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Staron v. McDonald's Corp.,* 51 F.3d 353, 355 (2d Cir.1995) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). "The issue is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims. Indeed, it may appear on the face of the pleading that a recovery is very remote and unlikely, but that is not the test." *Gant v. Wallingford Bd. of Educ.,* 69 F.3d 669, 673 (2d Cir.1995) (citations omitted). This standard receives especially careful application in cases such as this where a pro se plaintiff claims violations of his civil rights. *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.), *cert. denied,* 513 U.S. 836, 115 S.Ct. 117, 130 L.Ed.2d 63 (1994).

### III. Discussion

### A. Conditions of Confinement

Defendants assert that plaintiff fails to state a claim regarding the conditions of confinement at Bare Hill and Altona. For conditions of confinement to amount to cruel and unusual punishment, a two-prong test must be met. First, plaintiff must show a sufficiently serious deprivation. *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (citing *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)); *Rhodes v. Chapman,* 452 U.S. 347, 348 (1981)(denial of the "minimal civilized measure of life's necessities"). Second, plaintiff must show that the prison official involved was both "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]" and that the official drew the inference. *Farmer,* 511 U.S. at 837.

### 1. Bare Hill

In his Bare Hill claim, plaintiff alleges that the overcrowded and understaffed conditions in the dormitory-style housing "resulted in an increase in tension, mental anguish and frustration among prisoners, and dangerously increased the potential for violence." Compl.,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

¶ 11. Plaintiff asserts that these conditions violated his constitutional right to be free from cruel and unusual punishment and led to the attack on him by another prisoner. The Supreme Court has held that double-celling to manage prison overcrowding is not a per se violation of the Eighth Amendment. *Rhodes,* 452 U.S. at 347-48. The Third Circuit has recognized, though, that double-celling paired with other adverse circumstances can create a totality of conditions amounting to cruel and unusual punishment. *Nami v. Fauver,* 82 F.3d 63, 67 (3d Cir.1996). While plaintiff here does not specify double-celling as the source of his complaint, the concerns he raises are similar. Plaintiff alleges that overcrowding led to an increase in tension and danger which violated his rights. Plaintiff does not claim, however, that he was deprived of any basic needs such as food or clothing, nor does he assert any injury beyond the fear and tension allegedly engendered by the overcrowding. Further, a previous lawsuit by this plaintiff raised a similar complaint, that double-celling and fear of assault amounted to cruel and unusual punishment, which was rejected as insufficient by the court. *Bolton v. Goord,* 992 F.Supp. 604, 627 (S.D.N.Y.1998). The court there found that the fear created by the double-celling was not "an objectively serious enough injury to support a claim for damages." *Id.* (citing *Doe v. Welborn,* 110 F.3d 520, 524 (7th Cir.1997)).

**\*3** As in his prior complaint, plaintiff's limited allegations of overcrowding and fear, without more, are insufficient. *Compare Ingalls v. Florio,* 968 F.Supp. 193, 198 (D.N.J.1997) (Eighth Amendment overcrowding claim stated when five or six inmates are held in cell designed for one, inmates are required to sleep on floor, food is infested, and there is insufficient toilet paper) *and Zolnowski v. County of Erie,* 944 F.Supp. 1096, 1113 (W.D.N.Y.1996) (Eighth Amendment claim stated when overcrowding caused inmates to sleep on mattresses on floor, eat meals while sitting on floor, and endure vomit on the floor and toilets) *with Harris v. Murray,* 761 F.Supp. 409, 415 (E.D.Va.1990) (No Eighth Amendment claim when plaintiff makes only a generalized claim of overcrowding unaccompanied by any specific claim concerning the adverse effects of overcrowding). Thus, although overcrowding could create conditions which might state a violation of the Eighth Amendment, plaintiff has not alleged sufficient facts to support such a finding here. Plaintiff's conditions of confinement claim as to Bare

Hill should be dismissed.

2. Altona

Plaintiff also asserts a similar conditions of confinement claim regarding Altona. For the reasons discussed above, plaintiff's claim that he suffered anxiety and fear of other inmates in the overcrowded facility (Compl., ¶¶ 21-22) is insufficient to establish a serious injury or harm.

Plaintiff's second claim regarding Altona relates to the alleged inadequacies of the medical treatment he received. The government has an "obligation to provide medical care for those whom it is punishing by incarceration." *Estelle v. Gamble,* 429 U.S. 97, 103, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). The two-pronged *Farmer* standard applies in medical treatment cases as well. *Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998). Therefore, plaintiff must allege facts which would support a finding that he suffered a sufficiently serious deprivation of his rights and that the prison officials acted with deliberate indifference to his medical needs. *Farmer,* 511 U.S. at 834.

Plaintiff alleges that the medical treatment available at Altona was insufficient to address the injuries sustained in the altercation at Bare Hill. Specifically, plaintiff cites the lack of a dentist or specialist to treat his facial injuries as an unconstitutional deprivation. Plaintiff claims that the injuries continue to cause extreme pain, nosebleeds, and swelling. Compl., ¶¶ 22 & 26. For the purposes of the Rule 12(b) motion, plaintiff's allegations of extreme pain suffice for a sufficiently serious deprivation. *See Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996).

Plaintiff does not, however, allege facts sufficient to support a claim of deliberate indifference by the named defendants. To satisfy this element, plaintiff must demonstrate that prison officials had knowledge of facts from which an inference could be drawn that a "substantial risk of serious harm" to the plaintiff existed and that the officials actually drew the inference. *Farmer,* 511 U.S. at 837. Plaintiff's complaint does not support, even when liberally construed, any such conclusion. Plaintiff offers

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

no evidence that the Altona Superintendent or DOCS Commissioner had any actual knowledge of his medical condition or that he made any attempts to notify them of his special needs. Where the plaintiff has not even alleged knowledge of his medical needs by the defendants, no reasonable jury could conclude that the defendants were deliberately indifferent to those needs. *See Amos v. Maryland Dep't of Public Safety and Corr. Services,* 126 F.3d 589, 610-11 (4th Cir.1997), *vacated on other grounds,* 524 U.S. 935, 118 S.Ct. 2339, 141 L.Ed.2d 710 (1998).

**\*4** Plaintiff's second complaint about Altona is that it offers "no type of state drug treatment program for the plaintiff." Compl., ¶ 22. Constitutionally required medical treatment encompasses drug addiction therapy. *Fiallo v. de Batista,* 666 F.2d 729, 731 (1st Cir.1981); *Inmates of Allegheny County Jail v. Pierce,* 612 F.2d 754, 760-61 (3d Cir.1979). As in the *Fiallo* case, however, plaintiff falls short of stating an Eighth Amendment claim as he "clearly does not allege deprivation of essential treatment or indifference to serious need, only that he has not received the type of treatment which he desires." *Id.* at 731. Further, plaintiff alleges no harm or injury attributable to the charged deprivation. Plaintiff has not articulated his reasons for desiring drug treatment or how he was harmed by the alleged deprivation of this service. *See Guidry v. Jefferson County Detention Ctr.,* 868 F.Supp. 189, 192 (E.D.Tex.1994) (to state a section 1983 claim, plaintiff must allege that some injury has been suffered).

For these reasons, plaintiff's Altona claims should be dismissed.

B. Failure to Protect

Defendants further assert that plaintiff has not established that any of the named defendants failed to protect the plaintiff from the attack by the other inmate at Bare Hill. Prison officials have a duty "to act reasonably to ensure a safe environment for a prisoner *when they are aware* that there is a significant risk of serious injury to that prisoner." *Heisler v. Kralik,* 981 F.Supp. 830, 837 (S.D.N.Y.1997) (emphasis added); *see also Villante v. Dep't of Corr. of City of N.Y.,* 786 F.2d 516, 519 (2d

Cir.1986). This duty is not absolute, however, as "not ... every injury suffered by one prisoner at the hands of another ... translates into constitutional liability." *Farmer,* 511 U.S. at 834. To establish this liability, *Farmer's* familiar two-prong standard must be satisfied.

As in the medical indifference claim discussed above, plaintiff's allegations of broken bones and severe pain from the complained of assault suffice to establish a "sufficiently serious" deprivation. *Id.* Plaintiff's claim fails, however, to raise the possibility that he will be able to prove deliberate indifference to any threat of harm to him by the Bare Hill Superintendent or the DOCS Commissioner. Again, plaintiff must allege facts which establish that these officials were aware of circumstances from which the inference could be drawn that the plaintiff was at risk of serious harm and that they actually inferred this. *Farmer,* 511 U.S. at 838.

To advance his claim, plaintiff alleges an increase in "unusual incidents, prisoner misbehaviors, and violence" (Compl., ¶ 12) and concludes that defendants' continued policy of overcrowding created the conditions which led to his injuries. Compl., ¶ 10. The thrust of plaintiff's claim seems to suggest that the defendants' awareness of the problems of overcrowding led to knowledge of a generalized risk to the prison population, thus establishing a legally culpable state of mind as to plaintiff's injuries. Plaintiff has not offered any evidence, however, to support the existence of any personal risk to himself about which the defendants could have known. According to his own complaint, plaintiff first encountered his assailant only minutes before the altercation occurred. Compl., ¶ 17. It is clear that the named defendants could not have known of a substantial risk to the plaintiff's safety if the plaintiff himself had no reason to believe he was in danger. *See Sims v. Bowen,* No. 96-CV-656, 1998 WL 146409, at *3 (N.D.N.Y. Mar.23, 1998)(Pooler, J.)("I conclude that an inmate must inform a correctional official of the basis for his belief that another inmate represents a substantial threat to his safety before the correctional official can be charged with deliberate indifference"); *Strano v. City of New York,* No. 97-CIV-0387, 1998 WL 338097, at *3-4 (S.D.N.Y. June 24, 1998) (when plaintiff acknowledged attack was "out of the blue" and no prior incidents had occurred to put defendants on notice of threat or danger, defendants could not be held aware of any substantial risk

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

of harm to the plaintiff). Defendants' motion on this ground should, therefore, be granted.

## IV. Failure to Complete Service

**\*5** The complaint names four defendants, including one "John Doe" Correctional Officer at Bare Hill. Defendants acknowledge that service has been completed as to the three named defendants. Docket Nos. 12 & 13. The "John Doe" defendant has not been served with process or otherwise identified and it is unlikely that service on him will be completed in the near future. *See* Docket No. 6 (United States Marshal unable to complete service on "John Doe"). Since over nine months have passed since the complaint was filed (Docket No. 1) and summonses were last issued (Docket entry Oct. 21, 1997), the complaint as to the unserved defendant should be dismissed without prejudice pursuant to Fed.R.Civ.P. 4(m) and N.D .N.Y.L.R. 4.1(b).

## V. Conclusion

WHEREFORE, for the reasons stated above, it is

RECOMMENDED that defendants' motion to dismiss be GRANTED in all respects; and

IT IS FURTHER RECOMMENDED that the complaint be dismissed without prejudice as to the unserved John Doe defendant pursuant to Fed.R.Civ.P. 4(m) and N.D.N.Y.L.R. 4.1(b); and it is

ORDERED that the Clerk of the Court serve a copy of this Report-Recommendation and Order, by regular mail, upon parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. *Roldan v.*

*Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,1998.
Waldo v. Goord
Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

2009 WL 9054936
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Nicholas ZIMMERMAN, Plaintiff,

v.

John W. BURGE, et al., Defendants.

No. 9:06–CV–0176 (GLS/GHL).
|
April 20, 2009.

**Attorneys and Law Firms**

Nicholas Zimmerman, Auburn, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General for the State of New York, Heather R. Rubinstein, Esq., of Counsel: Syracuse, NY, for Defendants.

### *REPORT–RECOMMENDATION*

GEORGE H. LOWE, United States Magistrate Judge.

**\*1** This *pro se* prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has been referred to me for Report and Recommendation by the Honorable Gary L. Sharpe, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). Plaintiff Nicholas Zimmerman alleges that Defendants Joe Wolczyk, Donald Selsky, Captain Rourke, Harold Graham, and Thomas Eagen [1] violated his Eighth Amendment rights by sentencing him to ten years of solitary confinement in the Special Housing Unit ("SITU") and refusing to allow him to participate in the Intermediate Care Program [2]. Currently pending before the Court is Defendants' partial motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. (Dkt. No. 42.)Defendants seek dismissal of (1) Plaintiff's claims against Defendants in their official capacities; and (2) Plaintiff's Eighth Amendment medical care claim. Defendants do not seek dismissal of Plaintiff's Eighth Amendment claim regarding his ten-year SITU confinement. For the reasons that follow, I recommend that Defendants' motion be granted.

## I. BACKGROUND

### A. Summary of Plaintiff's Complaint

Plaintiff's complaint is quite cursory. Regarding his Eighth Amendment medical care claim, Plaintiff alleges that:

> On October 25, 2005, Defendant[ ] Captain Rourke violated Plaintiff's Eighth Amendment rights to adequate medical care by refusing to allow Plaintiff to seek mental health by participating in the Intermediate Care Program.

> On November 10, 2005, Defendant Superintendent Graham violated Plaintiff's Eighth Amendment rights to adequate medical care by affirming Captain Rourke's decision to deny Plaintiff's admittance to the Intermediate Care Program.

> On December 14, 2005, Defendant Thomas Eagen violated Plaintiff's rights to adequate medical care by affirming Superintendent Graham's decision to deny Plaintiff's admittance to the Intermediate Care Program.

(Dkt. No. 1 at 5, ¶¶ 16–18.)

Plaintiff sues Defendants "in their individual capacities and in their official capacities as officials of the New York State Department of Corrections."(Dkt. No. 1 at 2.)

In his prayer for relief Plaintiff requests (1) a declaration that Defendants violated Plaintiff's constitutional rights; (2) an injunction requiring Defendants to place Plaintiff in the Intermediate Care Program; (3) the reversal and expungement or reduction of Plaintiff's ten-year SITU sentence; (4) $1 million in compensatory damages; (5) $200,000 in punitive damages from each Defendant; and (6) costs and attorney fees. (Dkt. No. 1 at 8.)

### B. Summary of Grounds in Support of Defendants' Motion

Defendants argue that (1) the Eleventh Amendment bars Plaintiff's claims against Defendants in their official capacities; (2) Plaintiff does not allege sufficient personal involvement on the part of Defendants Rourke, Graham, or Eagen; (3) Plaintiff cannot prevail on his Eighth Amendment medical care claim because Defendants were not deliberately indifferent to a serious medical need; and (4) Defendants are entitled to qualified immunity. (Dkt. No. 42–4.)

### C. Summary of Plaintiff's Response to Defendants' Arguments

**\*2** In response, Plaintiff argues that (1) even if the Eleventh Amendment bars his claims against Defendant in their official capacities, he has also sued them in their individual capacities; (2) Defendants were personally involved because they failed to remedy a wrong after learning of it; (3) Plaintiff suffered from depression and suicidal tendencies and Defendants' refusal to allow him to participate in the Intermediate Care Program constituted deliberate indifference; and (4) Defendants are not entitled to qualified immunity. (Dkt. No. 43.)

## II. APPLICABLE LEGAL STANDARDS

### A. Legal Standard Governing Motions for Summary Judgment

Under *Federal Rule of Civil Procedure 56*, summary judgment is warranted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."*Fed.R.Civ.P. 56(c)*. The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. *Major League Baseball Properties, Inc. v. Salvino,* 542 F.3d 290, 309 (2d Cir.2008). Only after the moving party has met this burden is the non-moving party required to produce evidence demonstrating that genuine issues of material fact exist.*Salahuddin v. Goord,* 467 F.3d 263, 272–73 (2d Cir.2006). The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." [3] Rather, "[a] dispute regarding a material fact is *genuine* if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." [4] In determining whether a genuine issue of material [5] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. [6]

### B. Legal Standard Governing Motion to Dismiss for Failure to State a Claim

To the extent that a defendant's motion for summary judgment under *Federal Rule of Civil Procedure 56* is based entirely on the plaintiff's complaint, such a motion is functionally the same as a motion to dismiss for failure to state a claim under *Federal Rule of Civil Procedure 12(b)(6)*. As a result, "[w]here appropriate, a trial judge may

dismiss for failure to state a cause of action upon motion for summary judgment."*Schwartz v. Compagnie General Transatlantique,* 405 F.2d 270, 273–74 (2d Cir.1968) [citations omitted]; *accord, Katz v. Molic,* 128 F.R.D. 35, 37–38 (S.D.N.Y.1989) ("This Court finds that ... a conversion [of a *Rule 56* summary judgment motion to a *Rule 12(b)(6)* motion to dismiss the complaint] is proper with or without notice to the parties."). Moreover, even where a defendant has not advanced such a failure-to-state-a-claim argument on a motion for summary judgment, a district court may, *sua sponte,* address whether a *pro se* prisoner has failed to state a claim upon which relief may be granted. [7] For these reasons, it is appropriate to briefly summarize the recently clarified legal standard governing *Federal Rule of Civil Procedure 12(b)(6)* motions to dismiss.

**\*3** Under *Federal Rule of Civil Procedure 12(b)(6)*, a defendant may move to dismiss a complaint for "failure to state a claim upon which relief can be granted."*Fed.R.Civ.P. 12(b)(6)*. It has long been understood that a defendant may base such a motion on either or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under *Federal Rule of Civil Procedure 8(a)(2)*; [8] or (2) a challenge to the legal cognizability of the claim. [9]

*Rule 8(a)(2)* requires that a pleading contain "a short and plain statement of the claim *showing* that the pleader is entitled to relief."*Fed.R.Civ.P. 8(a)*(2) [emphasis added]. By requiring this "showing," *Rule 8(a)(2)* requires that the pleading contain a short and plain statement that "give[s] the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." [10] The main purpose of this rule is to "facilitate a proper decision on the merits." [11] A complaint that fails to comply with this rule "presents far too heavy a burden in terms of defendants' duty to shape a comprehensive defense and provides no meaningful basis for the Court to assess the sufficiency of [plaintiff's] claims." [12]

The Supreme Court has long characterized this pleading requirement under *Rule 8(a)(2)* as "simplified" and "liberal," and has repeatedly rejected judicially established pleading requirements that exceed this liberal requirement. [13] However, it is well established that even this liberal notice pleading standard "has its limits." [14] As a result, several Supreme Court and Second Circuit decisions exist, holding that a pleading has failed to meet this liberal notice pleading standard. [15]

Most notably, in *Bell Atlantic Corporation v. Twombly,* the Supreme Court, in reversing an appellate decision holding that a complaint had stated an actionable antitrust claim under 15 U.S.C. § 1, "retire[d]" the famous statement by the Court in *Conley v. Gibson,* 355 U.S. 41, 45–46 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." 127 S.Ct. 1955, 1968–69 [16] (2007). [17] Rather than turning on the *conceivability* of an actionable claim, the Court clarified, the Rule 8 "fair notice" standard turns on the *plausibility* of an actionable claim. *Id.* at 1965–74.

More specifically, the Court reasoned that, by requiring that a pleading "show [ ] that the pleader is entitled to relief," Rule 8(a)(2) requires that the pleading give the defendant "fair notice" of (1) the nature of the claim and (2) the "grounds" on which the claim rests. *Id.* at 1965, n. 3 [citation omitted]. While this does not mean that a pleading need "set out in detail the facts upon which [the claim is based]," it does mean that the pleading must contain at least "some factual allegation[s]." *Id* .[citations omitted]. More specifically, the "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]," assuming (of course) that all the allegations in the complaint are true. *Id.* at 1965 [citations omitted]. What this means, on a practical level, is that there must be "plausible grounds to infer [actionable conduct]," or, in other words, "enough fact to raise a reasonable expectation that discovery will reveal evidence of [actionable conduct]." *Id* .

**\*4** As have other Circuits, the Second Circuit has repeatedly recognized that the clarified plausibility standard that was articulated by the Supreme Court in *Bell Atlantic* governs *all* claims, not merely antitrust claims brought under 15 U.S.C. § 1 (as were the claims in *Bell Atlantic* ). [18] The Second Circuit has also recognized that this *plausibility* standard governs claims brought even by *pro se* litigants (although the plausibility of those claims is be assessed generously, in light of the special solicitude normally afforded *pro se* litigants). [19]

It should be emphasized that Rule 8's plausibly standard, explained in *Bell Atlantic,* was in no way retracted or diminished by the Supreme Court's decision (two weeks later) in *Erickson v. Pardus,* in which the Court stated, "Specific facts are not necessary" to successfully state a claim under Rule 8(a) (2). *Erickson v. Pardus,* 127 S.Ct. 2197, 2200 (2007) [citation omitted]. That statement was merely an abbreviation

of the often-repeated point of law-first offered in *Conley* and repeated in *Bell Atlantic*-that a pleading need not "set out in detail the facts upon which [the claim is based]" in order to successfully state a claim. *Bell Atlantic,* 127 S.Ct. 1965, n. 3 (citing *Conley v. Gibson,* 355 U.S. 41, 47 [1957] ). That statement in no way meant that all pleadings may achieve the requirement of giving a defendant "fair notice" of the nature of the claim and the "grounds" on which the claim rests without ever having to allege any facts whatsoever. [20] There must still be enough facts alleged to raise a right to relief above the speculative level to a plausible level, so that the defendant may know what the claims are and the grounds on which they rest (in order to shape a defense).

Having said all of that, it should also be emphasized that, "[i]n reviewing a complaint for dismissal under Fed.R.Civ.P. 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor."? [21] "This standard is applied with even greater force when the plaintiff alleges civil rights violations or where the complaint is submitted *pro se.* [22] In other words, while all pleadings are to be construed liberally under Rule 8(e), *pro se* civil rights pleadings are to be construed with an *extra* degree of liberality.

For example, the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider a plaintiff's papers in opposition to a defendant's motion to dismiss as effectively amending the allegations of the plaintiff's complaint, to the extent that those factual assertions are consistent with the allegations of the plaintiff's complaint. [23] Moreover, "courts must construe *pro se* pleadings broadly, and interpret them to raise the strongest arguments that they suggest." [24] Furthermore, when addressing a *pro se* complaint, *generally* a district court "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." [25] Of course, an opportunity to amend is not required where the plaintiff has already amended his complaint. [26] In addition, an opportunity to amend is not required where "the problem with [plaintiff's] causes of action is substantive" such that "[b]etter pleading will not cure it." [27]

**\*5** However, while this special leniency may somewhat loosen the procedural rules governing the form of pleadings (as the Second Circuit has observed), [28] it does not

completely relieve a *pro se* plaintiff of the duty to satisfy the pleading standards set forth in Rules 8, 10 and 12. [29] Rather, as both the Supreme Court and Second Circuit have repeatedly recognized, the requirements set forth in Rules 8, 10 and 12 are procedural rules that even *pro se* civil rights plaintiffs must follow. [30] Stated more plainly, when a plaintiff is proceeding *pro se,* "all normal rules of pleading are not absolutely suspended." [31]

## III. ANALYSIS

### A. Claims Against Defendants in Their Official Capacities

Plaintiff's complaint names Defendants "in their individual capacities and in their official capacities as officials of the New York State Department of Corrections."(Dkt. No. 1 at 2.) Defendants argue that Plaintiff's claims against them in their official capacities are barred by the Eleventh Amendment. (Dkt. No. 42–4 at 3.) Defendants are correct.

The Eleventh Amendment has long been construed as barring a citizen from bringing a suit against his or her own state in federal court, under the fundamental principle of "sovereign immunity." *See* U.S. Const. amend XI ("The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."); *Hans v. Louisiana,* 134 U.S. 1, 10–21 (1890); *Idaho v. Coeur d'Alene Tribe of Idaho,* 521 U.S. 261, 267 (1997); *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 100 (1984). State immunity extends not only to the states, but to state agencies and to state officers who act on behalf of the state. *See Puerto Rico Aqueduct & Sewer Auth. v. Metcalf,* 506 U.S. 139, 142–47 (1993); *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 101–06 (1984). DOCS employees are state officials for the purposes of the Eleventh Amendment. *See e.g. Davis v. New York,* 316 F.3d 93, 101 (2d Cir.2002); *Tolliver v. N.Y. State Correctional Officers,* No. 99 CIV 9555, 2000 WL 1154311, at *2 (S.D.N.Y. Aug. 14, 2000) ("All of the defendants in this case are state officials because they are employees of the New York State Department of Correctional Services."). Where it has been successfully demonstrated that a defendant is entitled to sovereign immunity under the Eleventh Amendment, the federal court lacks subject matter jurisdiction over the case, and "the case must be stricken from the docket." *McGinty v. State of New York,* 251 F .3d 84, 100

(2d Cir.2001) (citation omitted); *see also* Fed.R.Civ.P. 12(h) (3).

Here, the face of the complaint alleges that Defendants are each "officials of the New York State Department of Corrections."(Dkt. No. 1 at 2.) Therefore, any claims against Defendants in their officials capacities are barred by the Eleventh Amendment. Accordingly, I recommend that the Court grant Defendants' motion and dismiss all claims against Defendants in their official capacities [32].

### B. Medical Care Claims

**\*6** Plaintiff alleges that Defendants violated his Eighth Amendment right to adequate medical care by refusing to allow him to participate in the Intermediate Care Program. (Dkt. No. 1 at 5.) The Intermediate Care Program is a program for prisoners with mental health issues that provides treatment, medication, group therapy, and other counseling. (Dkt. No. 42–5, P's Depo. at 35:22–36:6.)

To prevail on an Eighth Amendment claim of inadequate medical care, a plaintiff must show two things: (1) that the plaintiff had a *sufficiently serious* medical need; and (2) that the defendant was *deliberately indifferent* to that serious medical need. *Estelle v. Gamble,* 429 U.S. 97, 104 (1976); *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998).

Defendants argue that Plaintiff can establish neither that he suffered from a sufficiently serious medical need nor that Defendants were deliberately indifferent. (Dkt. No. 42–4 at 5–8.)I find that Plaintiff suffered from a sufficiently serious medical need but that Defendants were not deliberately indifferent to that need.

### 1. Serious Medical Need

Defendants argue that Plaintiff cannot establish that he suffered from a sufficiently serious medical need because "Plaintiff acknowledges that his allegations are only with regard to his mental health treatment and not medical treatment."(Dkt. No. 42–4 at 6–7 .)

To be sufficiently serious for purposes of the Constitution, a medical condition must be "a condition of urgency, one that may produce death, degeneration, or extreme pain."*Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J. dissenting) [citations omitted], *accord, Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1996), *cert. denied,* 513 U.S. 1154 (1995); *Chance,* 143 F.3d at 702.

Neither Defendants nor Plaintiff have provided the Court with any of Plaintiff's medical records to establish the precise nature of Plaintiff's mental health diagnosis. The evidence before the Court establishes that Plaintiff was initially prescribed the medication Celexa in February 2005 and has been compliantly taking it. (Dkt. No. 42–5, P's Depo. at 33:18–34:3; Dkt. No. 42–6 at 3, Intermediate Care Program Referral form.) Celexa is prescribed to treat major depression. *The PDR Pocket Guide to Prescription Drugs* 275 (Bette LaGow, ed., 7th ed.2005). Plaintiff states that he began having suicidal thoughts sometime prior to October 25, 2005. (Dkt. No. 43 at 3.) He attempted suicide on July 5, 2008, and October 12, 2008.*Id.* I find, based on the limited information in the record before me, that Plaintiff suffered from major depression with suicidal ideation at the time he was denied entrance into the Intermediate Care Program in September 2005.

Neither party has cited any case law discussing whether depression, either with or without suicidal ideation, is a "sufficiently serious" medical condition for Eighth Amendment purposes. I have independently researched the issue and located limited published case law on the subject. The First Circuit has found that depression combined with severe anxiety attacks or suicide attempts is a serious medical need. *Mahan v. Plymouth County House of Corrections,* 64 F.3d 14, 16, 18 (1st Cir.1995); *Torraco v. Maloney,* 923 F.2d 231, 235 n. 4 (1st Cir.1991). A District Court in Delaware has presumed that a combination of depression, anxiety, and post-traumatic stress disorder is a serious medical need. *Simpson v. Penobscot County Sheriff's Dept.,* 285 F.Supp.2d 75 (D.Me.2003). A District Court in North Dakota has held that self-diagnosed depression with suicidal ideation is not a serious medical condition for Eighth Amendment purposes, but depression that actually manifests in attempted suicide is sufficiently serious. *White v. Crow Ghost,* 456 F.Supp.2d 1096, 1102–03 (D.N.D.2006).

*7 Here, Plaintiff was not merely self-diagnosed: prison officials prescribed Celexa to treat his depression. Although he did not attempt suicide until three years after he was denied admission to the Intermediate Care Program, these later attempts illustrate that his suicidal thoughts in 2005 were not ephemeral. In light of these facts, and because the summary judgment standard requires the Court to resolve all ambiguities and draw all reasonable inferences against the moving party, I will assume that Plaintiff suffered from a sufficiently serious medical need.

**2.** *Deliberate Indifference*

Defendants argue that even if Plaintiff had a serious medical need, they were not deliberately indifferent to it. (Dkt. No. 42–4 at 7–8.)Defendants are correct.

Defendants Rourke, Eagen, and Graham are not medical personnel. (Dkt. No. 42–5, P's Depo. at 45:25–46:7.) "Non-medical personnel engage in deliberate indifference where they intentionally delayed access to medical care when the inmate was in extreme pain and has made his medical problem known to attendant prison personnel."*Baumann v. Walsh,* 36 F.Supp.2d 508, 512 (N.D.N.Y.1999) (Scullin, J., adopting Report–Recommendation of Sharpe, M.J.). Here, Plaintiff was not denied access to mental health care. Beginning in February 2005, Plaintiff was seen by mental health providers once a month. (Dkt. No. 42–5, P's Depo. at 18:7–20:14.) As discussed above, he was also prescribed Celexa, an anti-depressant. While Plaintiff may have preferred to receive his mental health treatment through the Intermediate Care Program, he was not constitutionally entitled to his preferred care. "It is well established that mere disagreement over the proper treatment does not create a constitutional claim."*Chance v. Armstrong,* 143 F.3d 698, 703 (2d Cir.1998). Therefore, I find that there is no genuine issue of material fact showing that Defendants Rourke, Eagen, or Graham were deliberately indifferent to Plaintiff's serious medical need. Accordingly, I recommend that Defendants' motion for summary judgment dismissing Plaintiff's Eighth Amendment medical care claim be granted.

In light of my finding that Defendants are entitled to summary judgment dismissing Plaintiff's Eighth Amendment medical care claim on the constitutional merits, I decline to address Defendants' arguments regarding personal involvement and qualified immunity.

**ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' motion for partial summary judgment (Dkt. No. 42) be ***GRANTED.***It is recommended that the Court (1) dismiss Plaintiff's claims against all Defendants in their official capacities; and (2) dismiss Plaintiff's Eighth Amendment medical care claim against Defendants Rourke, Eagen, and Graham, thus terminating those Defendants from this litigation; and it is further

**RECOMMENDED** that this matter be set for a pretrial conference on Plaintiff's Eighth Amendment conditions of confinement claim against Defendants Wolczyk and Selsky.

**\*8** Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.* Roldan v. Racette, 984 F.2d 85 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

### All Citations

Slip Copy, 2009 WL 9054936

## Footnotes

1  The caption of Defendants' moving papers refers to this Defendant as "Egan." The body of Defendants' papers refer to him as "Eagan." In light of this discrepancy, I have used the spelling provided by Plaintiff in the complaint.

2  Plaintiff's complaint contained additional claims against additional Defendants. Those claims were dismissed on March 28, 2008. (Dkt. No. 35.)

3  *Matsushita,* 475 U.S. at 585–86; *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48 (1986); *see also* Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made [by a defendant] and supported as provided in this rule, the [plaintiff] may not rest upon the mere allegations ... of the [plaintiff's] pleading....").

4  *Ross v. McGinnis,* 00–CV–0275, 2004 WL 1125177, at *8 (W.D.N . Y. Mar. 29, 2004) [internal quotations omitted] [emphasis added].

5  A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986).

6  *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997) [citation omitted]; *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) [citation omitted].

7  The authority to conduct this *sua sponte* analysis is derived from two sources: (1) 28 U.S.C. § 1915(e)(2)(B)(ii), which provides that "the court shall dismiss [a] case [brought by a prisoner proceeding *in forma pauperis* ] at any time if the court determines that ... the action ... is frivolous or malicious[,] ... fails to state a claim on which relief may be granted[,] ... or ... seeks monetary relief against a defendant who is immune from such relief"; and (2) 28 U.S.C. § 1915A(b), which provides that, "[o]n review, the court shall ... dismiss the [prisoner's] complaint, or any portion of the complaint, if the complaint ... is frivolous, malicious, or fails to state a claim upon which relief may be granted ...."

8  *See* 5C Wright & Miller, *Federal Practice and Procedure* § 1363 at 112 (3d ed. 2004) ("A motion to dismiss for failure to state a claim for relief under Rule 12(b)(6) goes to the sufficiency of the pleading under Rule 8(a)(2).") [citations omitted]; *Princeton Indus., Inc. v. Rem,* 39 B.R. 140, 143 (Bankr.S.D.N.Y.1984) ("The motion under F.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint as to whether the plaintiff has conformed to F.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement' that the pleader is entitled to relief."); *Bush v. Masiello,* 55 F.R.D. 72, 74 (S.D.N.Y.1972) ("This motion under Fed.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint, determining whether the complaint has conformed to Fed.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement that the pleader is entitled to relief.' ").

9  *See Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 514 (2002) ( "These allegations give respondent fair notice of what petitioner's claims are and the grounds upon which they rest.... In addition, they state claims upon which relief could be granted under Title VII and the ADEA."); *Wynder v. McMahon,* 360 F.3d 73, 80 (2d Cir.2004) ("There is a critical distinction between the notice requirements of Rule 8(a) and the requirement, under Rule 12(b)(6), that a plaintiff state a claim upon which relief can be granted."); *Phelps v. Kapnolas,* 308 F.3d 180, 187 (2d Cir.2002) ("Of course, none of this is to say that a court should hesitate to dismiss a complaint when the plaintiff's allegation ... fails as a matter of law.") [citation omitted]; *Kittay v. Kornstein,* 230 F.3d 531, 541 (2d Cir.2000) (distinguishing between a failure to meet Rule 12 [b][6]'s requirement of stating a cognizable claim and Rule 8[a]'s requirement of disclosing sufficient information to put defendant on fair notice); *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.,* 379 F.Supp.2d 348, 370 (S.D.N.Y.2005) ("Although Rule 8 does not require plaintiffs to plead a theory of causation, it does not protect a legally insufficient claim [under Rule 12(b)(6) ].") [citation omitted]; *Util. Metal Research & Generac Power Sys.,* 02–CV–6205, 2004 U.S. Dist. LEXIS 23314, at *4–5 (E.D.N.Y. Nov. 18, 2004) (distinguishing between the legal sufficiency of the cause of action under Rule 12[b][6] and the sufficiency of the complaint under Rule 8[a] ); *accord, Straker v. Metro Trans. Auth.,* 331 F.Supp.2d 91, 101–102 (E.D.N.Y.2004); *Tangorre v. Mako's, Inc.,* 01–CV–4430, 2002 U.S. Dist. LEXIS 1658, at *6–7 (S.D.N.Y. Jan. 30, 2002)

(identifying two sorts of arguments made on a Rule 12[b][6] motion-one aimed at the sufficiency of the pleadings under Rule 8 [a], and the other aimed at the legal sufficiency of the claims).

10    *Dura Pharm., Inc. v. Broudo,* 125 S.Ct. 1627, 1634 (2005) (holding that the complaint failed to meet this test) [citation omitted; emphasis added]; *see also Swierkiewicz,* 534 U.S. at 512 [citation omitted]; *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 168 (1993) [citation omitted].

11    *Swierkiewicz,* 534 U.S. at 514 (quoting *Conley,* 355 U.S. at 48); *see also Simmons v. Abruzzo,* 49 F.3d 83, 86 (2d Cir.1995) ("Fair notice is that which will enable the adverse party to answer and prepare for trial, allow the application of res judicata, and identify the nature of the case so it may be assigned the proper form of trial.") [citation omitted]; *Salahuddin v. Cuomo,* 861 F .2d 40, 42 (2d Cir.1988) ("[T]he principle function of pleadings under the Federal Rules is to give the adverse party fair notice of the claim asserted so as to enable him to answer and prepare for trial.") [citations omitted].

12    *Gonzales v. Wing,* 167 F.R.D. 352, 355 (N.D.N.Y.1996) (McAvoy, J.), *aff'd,*113 F.3d 1229 (2d Cir.1997) (unpublished table opinion); *accord, Hudson v. Artuz,* 95–CV–4768, 1998 WL 832708, at *2 (S.D.N.Y. Nov. 30, 1998), *Flores v. Bessereau,* 98–CV–0293, 1998 WL 315087, at *1 (N.D.N.Y. June 8, 1998) (Pooler, J .). Consistent with the Second Circuit's application of § 0.23 of the Rules of the U.S. Court of Appeals for the Second Circuit, I cite this unpublished table opinion, not as precedential authority, but merely to show the case's subsequent history. *See, e.g., Photopaint Technol., LLC v. Smartlens Corp.,* 335 F.3d 152, 156 (2d Cir.2003) (citing, for similar purpose, unpublished table opinion of *Gronager v. Gilmore Sec. & Co.,* 104 F.3d 355 [2d Cir.1996] ).

13    *See, e.g., Swierkiewicz,* 534 U.S. at 513–514 (noting that "Rule 8(a)(2)'s simplified pleading standard applies to all civil actions, with limited exceptions [including] averments of fraud or mistake.").

14    2 *Moore's Federal Practice* § 12.34[1][b] at 12–61 (3d ed.2003).

15    *See, e.g., Bell Atlantic Corp. v. Twombly,* 127 S.Ct. 1955, 1964–1974 (2007) (pleading did not meet Rule 8[a][2]'s liberal requirement); *accord, Dura Pharm.,* 125 S.Ct. at 1634–1635, *Christopher v. Harbury,* 536 U.S. 403, 416–422 (2002), *Freedom Holdings, Inc. v. Spitzer,* 357 F.3d 205, 234–235 (2d Cir.2004), *Gmurzynska v. Hutton,* 355 F.3d 206, 208–209 (2d Cir.2004). Several unpublished decisions exist from the Second Circuit affirming the Rule 8(a)(2) dismissal of a complaint after *Swierkiewicz. See, e.g., Salvador v. Adirondack Park Agency of the State of N.Y.,* No. 01–7539, 2002 WL 741835, at *5 (2d Cir. Apr. 26, 2002) (affirming pre-*Swierkiewicz* decision from Northern District of New York interpreting Rule 8[a][2] ). Although these decisions are not themselves precedential authority, *see*Rules of the U.S. Court of Appeals for the Second Circuit, § 0.23, they appear to acknowledge the continued precedential effect, after *Swierkiewicz,* of certain cases from within the Second Circuit interpreting Rule 8(a)(2).*See Khan v. Ashcroft,* 352 F.3d 521, 525 (2d Cir.2003) (relying on summary affirmances because "they clearly acknowledge the continued precedential effect" of *Domond v. INS,* 244 F.3d 81 [2d Cir.2001], after that case was "implicitly overruled by the Supreme Court" in *INS v. St. Cyr,* 533 U.S. 289 [2001] ).

16    All references to *Bell Atlantic* will cite the Supreme Court Reporter rather than the United States Reports. The United States Reports version of the case does not include page numbers at this time.

17    The Court in *Bell Atlantic* further explained: "The phrase is best forgotten as an incomplete, negative gloss on an accepted pleading standard: once a claim has been adequately stated, it may be supported by showing any set of facts consistent with the allegations in the complaint....*Conley,* then, described the breadth of opportunity to prove what an adequate complaint claims, not the minimum standard of adequate pleading to govern a complaint's survival."*Bell Atlantic,* 127 S.Ct. at 1969.

18    *See, e.g., Ruotolo v. City of New York,* 514 F.3d 184, 188 (2d Cir.2008) (in civil rights action, stating that "To survive a motion to dismiss, a complaint must plead 'enough facts to state a claim to relief that is plausible on its face.'") [citation omitted]; *Goldstein v. Pataki,* 07–CV–2537, 2008 U.S.App. LEXIS 2241, at *14 (2d Cir. Feb. 1, 2008) (in civil rights action, stating that "*Twombly* requires ... that the complaint's '[f]actual allegations be enough to raise a right to relief above the speculative level ....'") [internal citation omitted]; *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98, n. 2 (2d Cir.2007) ( "We have declined to read Twombly's flexible 'plausibility standard' as relating only to antitrust cases.") [citation omitted]; *Iqbal v. Hasty,* 490 F.3d 143, 157–58 (2d Cir.2007) (in prisoner civil rights action, stating, "[W]e believe the [Supreme] Court [in *Bell Atlantic Corp. v. Twombly* ] is ... requiring a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible.*") [emphasis in original].

19    *See, e.g., Jacobs v. Mostow,* 281 F. App'x 85, 87 (2d Cir. March 27, 2008) (in pro se action, stating, "To survive a motion to dismiss, a complaint must plead 'enough facts to state a claim to relief that is plausible on its face.'") [citation omitted] (summary order, cited in accordance with Local Rule 32.1[c][1] ); *Boykin v. KeyCorp.,* 521 F.3d 202, 215–16 (2d Cir.2008) (finding that borrower's *pro se* complaint sufficiently presented a *"plausible* claim of disparate treatment,"

under Fair Housing Act, to give lenders fair notice of her discrimination claim based on lenders' denial of her home equity loan application) [emphasis added].

20 For example, in *Erickson,* a district court had dismissed a *pro se* prisoner's civil rights complaint because, although the complaint was otherwise factually specific as to how the prisoner's hepatis C medication had been wrongfully terminated by prison officials for a period of approximately 18 months, the complaint (according to the district court) failed to allege facts plausibly suggesting that the termination caused the prisoner "substantial harm." *127 S.Ct. at 2199.* The Supreme Court vacated and remanded the case because (1) under *Fed.R.Civ.P. 8* and *Bell Atlantic,* all that is required is "a short and plain statement of the claim" sufficient to "give the defendant fair notice" of the claim and "the grounds upon which it rests," and (2) the plaintiff had alleged that the termination of his hepatitis C medication for 18 months was "endangering [his] life" and that he was still in need of treatment for [the] disease." *Id. at 2200.* While *Erickson* does not elaborate much further on its rationale, a careful reading of the decision (and the dissent by Justice Thomas) reveals a point that is perhaps so obvious that it did not need mentioning in the short decision: a claim of deliberate indifference to a serious medical need under the Eighth Amendment involves two elements, i.e., the existence of a sufficiently serious medical need possessed by the plaintiff, and the existence of a deliberately indifferent mental state possessed by prison officials with regard to that sufficiently serious medical need. The *Erickson* decision had to do with only the first element, not the second element. *Id.* at 2199–2200. In particular, the decision was merely recognizing that an allegation by a plaintiff that, during the relevant time period, he suffered from hepatis C is, in and of itself, a factual allegation plausibly suggesting that he possessed a sufficiently serious medical need; the plaintiff need not *also* allege that he suffered an independent and "substantial injury" as a result of the termination of his hepatis C medication. *Id.* This point of law is hardly a novel one. For example, numerous decisions, from district courts within the Second Circuit alone, have found that suffering from hepatitis C constitutes having a serious medical need for purposes of the Eighth Amendment. *See, e.g., Rose v. Alvees,* 01–CV–0648, 2004 WL 2026481, at *6 (W.D.N.Y. Sept. 9, 2004); *Verley v. Goord,* 02–CV–1182, 2004 WL 526740, at *10 n. 11 (S.D.N.Y. Jan. 23, 2004); *Johnson v. Wright,* 234 F.Supp.2d 352, 360 (S.D.N.Y.2002); *McKenna v. Wright,* 01–CV–6571, 2002 WL 338375, at *6 (S.D.N.Y. March 4, 2002); *Carbonell v. Goord,* 99–CV–3208, 2000 WL 760751, at *9 (S.D.N.Y. June 13, 2000).

21 *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (affirming grant of motion to dismiss) [citation omitted]; *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994).

22 *Hernandez,* 18 F.3d at 136 [citation omitted]; *Deravin v. Kerik,* 335 F.3d 195, 200 (2d Cir.2003) [citations omitted]; *Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 619 (2d Cir.1999) [citation omitted].

23 "Generally, a court may not look outside the pleadings when reviewing a *Rule 12(b)(6)* motion to dismiss. However, the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider plaintiff's additional materials, such as his opposition memorandum." *Gadson v. Goord,* 96–CV–7544, 1997 WL 714878, at *1, n. 2 (S.D.N.Y. Nov. 17, 1997) (citing, *inter alia, Gil v. Mooney,* 824 F.2d 192, 195 [2d Cir.1987] [considering plaintiff's response affidavit on motion to dismiss] ). Stated another way, "in cases where a pro se plaintiff is faced with a motion to dismiss, it is appropriate for the court to consider materials outside the complaint to the extent they 'are consistent with the allegations in the complaint.' " *Donhauser v. Goord,* 314 F.Supp.2d 119, 212 (N.D.N.Y.2004) (considering factual allegations contained in plaintiff's opposition papers) [citations omitted], *vacated in part on other grounds,* 317 F.Supp.2d 160 (N.D.N.Y.2004). This authority is premised, not only on case law, but on *Rule 15 of the Federal Rules of Civil Procedure,* which permits a plaintiff, as a matter of right, to amend his complaint once at any time before the service of a responsive pleading-which a motion to dismiss is not. *See Washington v. James,* 782 F.2d 1134, 1138–39 (2d Cir.1986) (considering subsequent affidavit as amending *pro se* complaint, on motion to dismiss) [citations omitted].

24 *Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000) (finding that plaintiff's conclusory allegations of a due process violation were insufficient) [internal quotation and citation omitted].

25 *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) [internal quotation and citation omitted]; *see also* Fed.R.Civ.P. 15(a) (leave to amend "shall be freely given when justice so requires").

26 *Yang v. New York City Trans. Auth.,* 01–CV–3933, 2002 WL 31399119, at *2 (E.D.N.Y. Oct. 24, 2002) (denying leave to amend where plaintiff had already amended complaint once); *Advanced Marine Tech. v. Burnham Sec., Inc.,* 16 F.Supp.2d 375, 384 (S.D.N.Y.1998) (denying leave to amend where plaintiff had already amended complaint once).

27 *Cuoco,* 222 F.3d at 112 (finding that replading would be futile) [citation omitted]; *see also Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir.1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice.") (affirming, in part, dismissal of claim with prejudice) [citation omitted]; *see, e.g., See Rhodes v. Hoy,* 05–CV–0836, 2007 WL 1343649, at *3, 7 (N.D.N.Y. May 5, 2007) (Scullin, J., adopting Report–Recommendation of Peebles, M.J.) (denying *pro se* plaintiff opportunity to amend before dismissing

his complaint because the error in his complaint-the fact that plaintiff enjoyed no constitutional right of access to DOCS' established grievance process-was substantive and not formal in nature, rendering repleading futile); *Thabault v. Sorrell,* 07–CV–0166, 2008 WL 3582743, at \*2 (D.Vt. Aug. 13, 2008) (denying *pro se* plaintiff opportunity to amend before dismissing his complaint because the errors in his complaint-lack of subject-matter jurisdiction and lack of standing-were substantive and not formal in nature, rendering repleading futile) [citations omitted]; *Hylton v. All Island Cob Co.,* 05–CV–2355, 2005 WL 1541049, at \*2 (E.D.N.Y. June 29, 2005) (denying *pro se* plaintiff opportunity to amend before dismissing his complaint arising under 42 U.S.C. § 1983 because the errors in his complaint-which included the fact that plaintiff alleged no violation of either the Constitution or laws of the United States, but only negligence-were substantive and not formal in nature, rendering repleading futile); *Sundwall v. Leuba,* 00–CV–1309, 2001 WL 58834, at \*11 (D.Conn. Jan. 23, 2001) (denying *pro se* plaintiff opportunity to amend before dismissing his complaint arising under 42 U.S.C. § 1983 because the error in his complaint-the fact that the defendants were protected from liability by Eleventh Amendment immunity-was substantive and not formal in nature, rendering repleading futile).

28  *Sealed Plaintiff v. Sealed Defendant # 1,* No. 06–1590, 2008 WL 3294864, at \*5 (2d Cir. Aug. 12, 2008) ("[The obligation to construe the pleadings of *pro se* litigants liberally] entails, at the very least, a permissive application of the rules governing the form of pleadings.") [internal quotation marks and citation omitted]; *see also Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983) ("[R]easonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training ... should not be impaired by harsh application of technical rules.") [citation omitted].

29  *See Prezzi v. Schelter,* 469 F.2d 691, 692 (2d Cir.1972) (extra liberal pleading standard set forth in *Haines v. Kerner,* 404 U.S. 519 [1972], did not save *pro se* complaint from dismissal for failing to comply with Fed.R.Civ.P. 8 ); *accord, Shoemaker v. State of Cal.,* 101 F.3d 108 (2d Cir.1996) (citing *Prezzi v. Schelter,* 469 F.2d 691) [unpublished disposition cited only to acknowledge the continued precedential effect of *Prezzi v. Schelter,* 469 F.2d 691, within the Second Circuit]; *accord, Praseuth v. Werbe,* 99 F.3d 402 (2d Cir.1995).

30  *See McNeil v. U.S.,* 508 U.S. 106, 113 (1993) ("While we have insisted that the pleadings prepared by prisoners who do not have access to counsel be liberally construed ... we have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel."); *Faretta v. California,* 422 U.S. 806, 834, n. 46 (1975) ("The right of self-representation is not a license ... not to comply with relevant rules of procedural and substantive law."); *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006) (*pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law") [citation omitted]; *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983) (*pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law") [citation omitted]; *cf. Phillips v. Girdich,* 408 F.3d 124, 128, 130 (2d Cir.2005) (acknowledging that *pro se* plaintiff's complaint could be dismissed for failing to comply with Rules 8 and 10 if his mistakes either "undermine the purpose of notice pleading [ ]or prejudice the adverse party").

31  *Stinson v. Sheriff's Dep't of Sullivan Cty.,* 499 F.Supp. 259, 262 & n. 9 (S.D.N.Y.1980).

32  It is not clear from Defendants' papers whether they intended to move for summary judgment dismissing the claims against *all* of the remaining Defendants in their official capacities or whether they moved solely on behalf of Defendants Rourke, Eagen, and Graham. To the extent that Defendants neglected to explicitly move on behalf of Defendants Wolcyzk and Selsky, I recommend that the Court *sua sponte* dismiss any claims against those Defendants in their official capacities pursuant to 28 U.S.C. § 1915(e)(2)(B).

---

**End of Document**                                        © 2016 Thomson Reuters. No claim to original U.S. Government Works.



Slip Copy, 2015 WL 417084 (N.D.N.Y.)
**(Cite as: 2015 WL 417084 (N.D.N.Y.))**

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Vincent BARROW, Plaintiff,
v.
Diane Van BUREN, Deputy Commissioner; Brian
Fischer, Commissioner; Bryan Hilton, Superintend-
ent of Programs; Charles Kelly, Jr., Superintendent,
Marcy Correctional Facility; Dr. Farago, Psychiat-
rist; Anthony Devitto, Executive Director of Spe-
cial Programing; BOB Lewis, OMH Therapist; Lisa
Kalies, Unit Chief, OMH, Residential Mental
Health Unit; Joseph Bellnier, Deputy Commission-
er of Program Service; Lucien Lechaire, Assistant
Commissioner; Maureen E. Boll, Deputy Commis-
sioner and Counsel; E. Lindquist, Assistant Com-
missioner; Karen Ballamy, Director, Inmate Griev-
ance Program; Jeff McKoy, Deputy Commissioner;
Maureen Bossco, Executive Director, Central New
York Psychiatric Center, Office of Mental Health;
B. McArdle, Deputy Superintendent of Marcy Cor-
rectional Facility; Donald Selskey, Deputy Com-
missioner, Captain Harper, Lieutenant Cory; Holan-
chuck, Defendants.

No. 9:12–cv–01268 (MAD/CFH).
Signed Jan. 30, 2015.

Vincent Barrow, Romulus, NY, pro se.

Office of the New York State Attorney General,
Gregory J. Rodriguez, AAG, of Counsel, Albany,
NY, for Defendants.

**MEMORANDUM–DECISION AND ORDER**
MAE A. D'AGOSTINO, District Judge.
**I. INTRODUCTION**
**\*1** Plaintiff *pro se* Vincent Barrow, an inmate
in the custody of the New York State Department
of Corrections and Community Supervision
("DOCCS"), brought this action pursuant to 42
U.S.C. § 1983, alleging violations of his constitu-

tional rights under the First, Eighth and Fourteenth
Amendment, as well as under Title II of the Amer-
ican with Disabilities Act ("ADA"), 42 U.S.C. §
12101 et seq. and section 504 of the Rehabilitation
Act ("RA"), 29 U.S.C. § 794. *See* Dkt. No. 50. De-
fendants, twenty DOCCS employees, have moved
to dismiss Plaintiff's Second Amended Complaint
pursuant to Federal Rule of Civil Procedure
12(b)(6). *See* Dkt. No. 67. Defendants have also
moved to dismiss pursuant to Federal Rule of Civil
Procedure 12(b)(1). *Id.* In a Re-
port–Recommendation and Order dated September
25, 2014, Magistrate Judge Hummel recommended
that the Court grant in part and deny in part De-
fendants' 12(b)(6) motion and deny the Defendants'
12(b)(1) motion. *See* Dkt. No. 70.

Currently before the Court are Plaintiff's objec-
tions to Magistrate Judge Hummel's September 25,
2014 Report–Recommendation and Order. *See* Dkt.
No. 73.

**II. BACKGROUND**
The following facts are not in dispute. At all
relevant times, Plaintiff was incarcerated at Marcy
Correctional Facility ("Marcy"). Dkt. No. 50 at ¶ 2.
During this time, the Residential Mental Health
Unit ("RMHU") at Marcy implemented "The Lewd
Conduct Program" for inmates who engage in lust-
ful and inappropriate behaviors. Dkt. No. 50 at ¶
25. Inmates subject to the program are required to
wear a control suit, which consists of a neon-green
jumpsuit that has its only opening along the back, is
laced with a heavy string, and is fastened with a
padlock at the neck. *Id.* Another component of the
program requires that a fiberglass sign displaying
the word "Exposer" be hung above the inmate's cell
door at all times. Dkt. No. 50 at ¶¶ 26, 30.

Plaintiff was required to wear the jumpsuit on
several occasions following the issuance of numer-
ous misbehavior reports for lewd conduct. *See id.* at
¶¶ 29–31. Plaintiff alleges that several inmates and
staff have verbally insulted and ridiculed him for

© 2015 Thomson Reuters. No Claim to Orig. U.S. Gov. Works.

wearing the jumpsuit. *See id.* at ¶¶ 32–33. As a result, Plaintiff has refused to wear the jumpsuit out of his cell and has thus been unable to attend programs and medical appointments. *See id.* at ¶ 36. Contrary to Defendants' contentions that the lewd conduction program has been implemented for security measures, Plaintiff argues that the program is specifically targeted to humiliate and lower the self esteem of inmates at Marcy. *See id.* at ¶¶ 34–35, 43.

Plaintiff commenced this civil rights action on August 13, 2012. *See* Dkt. No. 1. Upon leave of court, Plaintiff filed an Amended Complaint to include a description of new events that had taken place since the complaint's initial filing. *See* Dkt. No. 11, 12. On April 1, 2014, Plaintiff was permitted to submit a Second Amended Complaint for review. *See* Dkt. No. 50. In response, Defendants moved to dismiss the complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. *See* Dkt. No. 67. Plaintiff subsequently opposed the motion. *See* Dkt. No. 69.

**\*2** On September 25, 2014, Magistrate Judge Hummel filed a Report–Recommendation and Order recommending that Defendants' Motion to Dismiss be granted in part and denied in part. *See* Dkt. No. 70 at 40. Plaintiff filed written objections on October 10, 2014, objecting to Magistrate Judge Hummel's recommendations in full. *See* Dkt. No. 73 at 7.

### III. DISCUSSION

**A. Standard of Review**

When objections to a magistrate judge's report-recommendation and order are made, the district court makes a *"de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). If, however a party files "[g]eneral or conclusory objections or objections which merely recite the same arguments [that he presented] to the magistrate judge," the magistrate judge's recommendations are reviewed for clear error. *O'Diah v. Mawhir,* No. 9:08–CV–322, 2011 WL 933846, \*1 (N.D.N.Y. Mar. 16, 2011)

(citations and footnote omitted). The court will "ordinarily refuse to consider argument[s] that could have been, but [were] not, presented to the magistrate judge in the first instance." *Mosley v. Superintendent of Collins Corr. Facility,* No. 9:11–CV–1416, 2015 U.S. Dist. LEXIS 6985, \*5, 2015 WL 277133 (N.D.N.Y. Jan. 22, 2015) (citations omitted). Upon review, "the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1).

**B. Analysis**

*1. Misapplication of Case Law*

Plaintiff contends that the cases cited in Magistrate Judge Hummel's Report–Recommendation and Order "could have been used in favor of Plaintiff" and "should be used in his favor." *Id.* Upon careful review, the Court finds that Magistrate Judge Hummel applied the appropriate legal standards, accurately recited the facts as presented by Plaintiff, and correctly applied the law to those facts.

Accordingly, Plaintiff's objection regarding the misapplication of case law is rejected.

*2. Misapplication of Rule 12(b)(6)*

Plaintiff further contends that Rule 12(b)(6) "should have been used in his favor" and that "legal conclusions," in these circumstances, should be sufficient to survive a motion to dismiss. *See* Dkt. No. 73 at 1. When a defendant files a 12(b)(6) motion to dismiss, the court must "accept all factual allegations as true and draw every reasonable inference from these facts in plaintiff's favor." *La. Wholesale Drug Co. v. Shire LLC,* 754 F.3d 128, 133 (2d Cir.2014) (internal quotation marks and citations omitted). Nevertheless, "this indulgence does not relieve the plaintiff from alleging 'enough facts to state a claim to relief that is plausible on its face.' " *Id.* (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)).

Plaintiff admits that "the complaint is not

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

without error," and that he "did his best to inform the court" of the alleged violations despite having been denied counsel. *See* Dkt. No. 73 at 6–7. The Second Circuit has stated, however, that "*pro se* status does not exempt a party from compliance with relevant rules of procedure and substantive law." *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006) (internal quotation marks and citations omitted). Upon review, the Court finds that Magistrate Judge Hummel correctly applied Rule 12(b)(6) and surrounding case law to the facts presented. In his thorough and well-reasoned Report–Recommendation and Order, Magistrate Judge Hummel correctly determined that the allegations in the Second Amended Complaint were insufficient to plausibly suggest the personal involvement of Defendants Bossco, Fischer, Harper, McArdle, VanBuren, Holanchuck, Perlman, LeClaire, Boll, McKoy, Bellamy, and Lindquist. Additionally, Magistrate Judge Hummel also correctly determined that the Court should grant Defendants' motion as to Plaintiff's First Amendment claims because some of the speech was not constitutionally protected and, even when it was, Plaintiff's allegations regarding the alleged retaliation are entirely conclusory.

**\*3** As to Plaintiff's Eighth Amendment conditions of confinement claim, Magistrate Judge Hummel correctly determined that the alleged deprivations were not sufficiently serious to amount to an " 'excessive risk' to his safety and health.' " Dkt. No. 70 at 24 (citing *Farmer,* 511 U.S. at 837; *Jabbar v. Fischer,* 683 F.3d 54, 57 (2d Cir.2012)). The report also properly determined that Plaintiff has failed to plausibly allege claims of deliberate medical indifference regarding the denial of treatment for his foot arches and exhibitionism.

The Court has reviewed Plaintiff's remaining claims and finds them to be without merit; and, therefore, Magistrate Judge Hummel's September 25, 2014 Report–Recommendation and Order is adopted in its entirety.

### 3. Deliberate Indifference

Lastly, Plaintiff reiterates his concerns regarding the denial of necessary medical and mental health care. Dkt. No. 73 at 5. In this respect, the Court wholly agrees with Magistrate Judge Hummel's analysis governing Plaintiff's Eighth Amendment claim for medical indifference related solely to the denial of treatment for depression. *See* Dkt. No. 70 at 29. In order to have a valid claim under the Eighth Amendment for cruel and unusual punishment arising out of a claim for medical indifference, a plaintiff must show "that his medical condition is objectively a serious one" and that "[each] defendant acted with deliberate indifference to [the plaintiff's] medical needs." *Brock v. Wright,* 315 F.3d 158, 162 (2d Cir.2003) (citations omitted). A finding of deliberate indifference requires the plaintiff "to prove that the prison official knew of and disregarded the prisoner's serious medical needs." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998).

Plaintiff states that at the time he was admitted to RMHU he was diagnosed with "Major Depression Disorder." Dkt. No. 50 at ¶ 46. The Court is mindful that depression, in some circumstances, has been objectively deemed a serious medical need. *See Zimmerman v. Burge,* No. 06–CV–0176, 2009 U.S. Dist. LEXIS 88344, \*34–35, 2009 WL 9054936 (N.D.N.Y. Apr.20, 2009) (finding that depression is a "sufficiently serious" medical condition when it is not self-diagnosed). In light of these facts, the Court is satisfied that Plaintiff has met its burden under the first prong.

In or around May 2011, Plaintiff states that Defendant Farago stopped providing Plaintiff with depression medication and was instead "pretending" to treat him. Dkt. No. 50 at ¶¶ 47–48. Plaintiff had been taking this medication to treat his depression for over fifteen years. Dkt. No. 50 at ¶ 47. In his objections, Plaintiff attempts to substantiate his need for the medication by alleging "many 'crisis' situations,' " including two "attempted suicides" and a single occasion of hospitalization. Dkt. No. 73 at 4. Plaintiff does not, however, provide any

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

specific dates or documentation regarding these events. Nevertheless, the Court agrees that "a complete ... cessation of medication that [Plaintiff] had been taking for fifteen years could pose a risk of serious harm to his mental well-being." Dkt. No. 70 at 29 (citing *Brock,* 315 F.3d at 162–63).

**\*4** Accordingly, the Court finds that Magistrate Judge Hummel correctly determined that the Court should deny Defendants' motion to dismiss as to this claim.

### IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that the September 25, 2014 Report–Recommendation and Order by Magistrate Judge Hummel is **ADOPTED** in its entirety for the reasons set forth therein; and the Court further

**ORDERS** that Defendants' motion to dismiss Plaintiff's Second Amended Complaint for lack of subject matter jurisdiction is **DENIED;** and the Court further

**ORDERS** that Defendants' motion to dismiss Plaintiff's Second Amended Complaint for failure to state a claim is **GRANTED** in part and **DENIED** in part; and the Court further

**ORDERS** that Plaintiff's following claims are **DISMISSED;** (1) all First Amendment claims; (2) all Eighth Amendment claims insofar as they allege inadequate prison conditions, inadequate treatment, and deliberate indifference to Plaintiff's exhibitionism and foot condition; (3) all Fourteenth Amendment claims; (4) the ADA claim; and (5) the RA claim; and the Court further

**ORDERS** that Defendants' motion to dismiss is **DENIED** with respect to Plaintiff's Eighth Amendment claim insofar as it alleges deliberate indifference to Plaintiff's depression; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum–Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED**

**REPORT–RECOMMENDATION AND ORDER**
FN1

> **FN1.** This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

CHRISTIAN F. HUMMEL, United States Magistrate Judge.

Plaintiff pro se Vincent Barrow ("Barrow"), an inmate currently in the custody of the New York State Department of Correctional and Community Supervision ("DOCCS"), brings this action pursuant to 42 U.S.C. § 1983 alleging that defendants, twenty DOCCS employees, violated his rights under the First, Eighth and Fourteenth Amendments as well as Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq. and section 504 of the Rehabilitation Act ("RA"), 29 U.S.C. § 794. Second Am. Compl. (Dkt. No. 50), at 1–16. Presently pending is defendants' motion to dismiss pursuant to FED. R. CIV. P. 12(b)(6) and FED. R. CIV. P. 12(b)(1). Dkt. No. 67. Barrow opposed. Dkt. No. 69. For the following reasons, it is recommended that (1) defendants' motion to dismiss under FED. R. CIV. P. 12(b)(6) be granted in part and denied in part and (2) defendants' motion to dismiss under FED. R. CIV. P. 12(b)(1) be dismissed.

### I. Background

The facts are related herein in the light most favorable to Barrow as the non-moving party. *See* subsection II(A) infra. At all relevant times, Barrow was an inmate at the Marcy Correctional Facility ("Marcy").

#### A. Lewd Conduct Program

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

**\*5** At Marcy, the Residential Mental Health Unit ("RMHU") had implemented "The Lewd Conduct Program" for inmates who had engaged in lewd behaviors. Second Am. Compl. ¶ 25. The program included use of a control suit, a neon-green jumpsuit that is laced up the back—its only opening—with heavy string and secured with a padlock at the neck. *Id.* Another component of the program is the placement of a sign that says "Exposer" above the inmate's cell door. *Id.* ¶¶ 26, 30.

Although Barrow was advised by defendants Joseph Bellnier, Deputy Commissioner of Program Service; Lieutenant Cory; Captain Harper; Bryan Hilton, Superintendent of Programs; Lisa Kalies, Unit Chief, Office of Mental Health, Residential Mental Health Unit; and B. McArdle, Deputy Superintendent of Marcy, that the lewd conduct program was imposed for security reasons, Barrow contends that he was discriminated against because other inmates who had smuggled in contraband by concealing it in their groin area were not placed into the program. Second Am. Compl. ¶¶ 27–28. Barrow has informed Bellnier; Hilton; and Bob Lewis, OMH Therapist of this claim. *Id.* ¶ 35. Barrow further alleges that the program participants are disproportionately minority inmates. *Id.* at 15. Hilton advised Barrow that the lock prevents him from ripping off the jumpsuit, but also serves to humiliate and "change" his "cognizence [sic]." *Id.* ¶¶ 42–43. Barrow argues that a lock at one's neck is a symbol of hate and oppression of minorities harkening back to times of slavery and racial segregation. *Id.* ¶ 42. Thus, Barrow states that the lewd conduct program is imposed not for security purposes, but to humiliate inmates and deter future exhibitionist conduct. *Id.* ¶¶ 34–35, 43.

On March 28, 2011, Barrow was made to the wear the jumpsuit after being issued a misbehavior report for lewd conduct. Second Am. Compl. ¶ 29. A disciplinary hearing was not held in connection with that report. *Id.* On or about November 10, 2011, Barrow was again ordered to wear the jumpsuit and have the exposer sign hang on his door for

thirty days. *Id.* ¶ 30. A disciplinary hearing was held regarding this alleged violation. *Id.* More recently, Barrow was ordered to wear the jumpsuit in January 2013 and from July 17, 2013 to August 17, 2013. *Id.* ¶¶ 31, 71.

In December, 2011, Barrow notified RMHU staff that he had not had a hearing for the March 28, 2011 lewd conduct allegations. Second Am. Compl. ¶ 38. After submitting this complaint, Barrow began to receive more misbehavior reports for lewd conduct. *Id.* ¶ 39. Between September 2008 and May 2011, Barrow had received eighteen misbehavior reports for lewd conduct. Dkt. No. 50, at 23 (CORC Grievance Denial), 26 (same). Barrow also contends that he was issued misbehavior reports for repeatedly requesting a prison transfer and filing sexual harassment charges against staff members. Second Am. Compl. ¶ 41.

**\*6** Barrow complained to defendants Anthony Devitto, Executive Director of Special Programming; Hilton; Michael Hoagan, Deputy Commissioner, Office of Mental Health, DOCCS; Kalies; Charles Kelly, Jr., Superintendent of Marcy; and Lewis that the lewd conduct program violated his rights under the Eighth Amendment and the ADA. FN2 Second Am. Compl. ¶ 33. Barrow contends his condition, which he claims to be exhibitionism, is confidential, and only inmates being treated for this condition should be privy to this information. *Id.* He suggests that the sign and jumpsuit deprive him of confidentiality. *Id.*

> FN2. Barrow also alleges that his rights were violated under the Patients' Bill of Rights. Second Am. Compl. ¶ 33. However, a violation of state law does not implicate a federal right for purposes of a section 1983 action. *Hanrahan v. Menon,* No. 07–CV–610, 2010 WL 6427650, at \*13 (N.D.N.Y. Dec.15, 2010) (citations omitted) (finding claim of a violation under the Patients' Bill of Rights is not cognizable in a section 1983 action).

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Barrow is also upset that other inmates and staff ridicule and use racial epithets against him when he is in the jumpsuit. Second Am. Compl. ¶¶ 32–33. Barrow alleged that, on one occasion, in Hilton and Bellnier's presence, several inmates verbally insulted him regarding the jumpsuit, but neither defendant intervened. *Id.* ¶ 32.

Barrow alleges that the lewd conduct program, as applied to him, is over broad because he is required to wear the jumpsuit even when there are no females present, despite the fact that he has no history of lewd conduct toward male employees. Second Am. Compl. ¶ 34. Because Barrow is made to wear the jumpsuit when no females are present, Barrow claims that the jumpsuit is not a security measure. *Id.*

Because he is embarrassed by the jumpsuit, Barrow refused to wear it out of his cell. Second Am. Compl. ¶¶ 39, 42. Barrow is concerned that his absence from programming has adversely affected his parole release date. Second Am. Compl. ¶ 39. He informed defendant Kenneth S. Perlman, Deputy Commissioner of Program Services, of his parole concerns. *Id.* ¶ 59. Due to his refusal to leave his cell in the jumpsuit, Barrow was unable to attend programs or his medical appointments. *Id.* ¶ 36; *see* Dkt. No. 50 at 17–26 (prison documents pertaining to grievances filed and rulings on them). Barrow also contends that because he lacks arches in his feet, he requires the use of a lift in his right shoe, "otherwise [he] is in severe pain up and down the right side of his back." Reply (Dkt. No. 69), at 2. Barrow has been unable to receive medical treatment for his foot because he would not go to his appointments while wearing the jumpsuit. *Id.*

### B. Mental Diagnoses and Treatment

Barrow first arrived at RMHU with diagnoses of major depression and anti-social disorder and has since been diagnosed with poly-substance abuse. Second Am. Compl. ¶ 46. Three of Barrow's urine tests came back positive for cannabis, but he has never tested positive for any other substance; thus, he does not believe that poly-substance abuse is an accurate diagnosis. *Id.* Barrow contends that defendant Dr. Farago, his psychiatrist, attempts to "intellectually badger" him into wearing the jumpsuit; thus, he "only wished to talk about issues related to his profession" during their sessions. *Id.* ¶ 47. Shortly after telling Dr. Farago that he did not wish to discuss the lewd conduct program, Barrow's depression medication, which has been administered to him for approximately fifteen years, was terminated. *Id.* Barrow has since been "begging" for medication. *Id.* ¶ 48.

**\*7** In or around May or June of 2011, Barrow filed a complaint against Dr. Farago to Kalies, stating that Dr. Farago was conducting meetings outside of his cell in violation of his right to privacy. *Id.* ¶ 49.[FN3] Although Barrow was told that in the future Dr. Farago would hold meetings in private, Dr. Farago would arrive at Barrow's cell, wait for him to get up, then walk away. *Id.* ¶ 50. Kalies indicated that the log book indicates that Barrow was seen by Dr. Farago; however, she did not permit Barrow review of the videotapes of those meetings. *Id.* ¶ 51. Barrow contends that, rather than treat him, Dr. Farago would turn away from the camera and make comical faces at him when he asked for his depression medication. *Id.* ¶ 52. Barrow alleges that defendants Devitto, Hoagan, Kalies, and Lewis were aware of his concerns regarding Dr. Farago because he wrote to them and spoke with them. *Id.* ¶¶ 53–56.

> FN3. To the extent that it can be inferred that Barrow asserts a violation of the physician-patient privilege, such a claim cannot be sustained. Because Barrow commenced this case as a section 1983 action, federal law applies. As federal law does not recognize the physician-patient privilege, this claim would also fail. *Barnes v. Glennon,* 9:05–CV–0153, 2006 WL 2811821, at *4–*5 (N.D.N.Y. Sept.28, 2006).

Barrow alleges that the remaining defendants were involved in the alleged constitutional violations in various ways. Bellnier and Hilton initiated

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

the Lewd Conduct Program at Marcy. Second Am. Compl. ¶ 57. Brian Fisher, Commissioner; Holanchuck; and Perlman were aware of Barrow's situation because he sent them letters and spoke with them. *Id.* ¶¶ 58–59, 71. Boll and LeClaire were aware of Barrow's concerns because he talked with them about the lewd conduct program. *Id.* ¶¶ 60, 61. E. Lindquist, Assistant Commissioner in charge of the programs at RMHU, knew about the program. *Id.* ¶ 62. Bellamy affirmed grievance determinations. *Id.* ¶ 63. Maureen Bossco, Executive Director of Central New York Psychiatric Center, and Jeff McKoy, Deputy Commissioner, were aware of the alleged constitutional violations because they spoke with him about the sign. *Id.* ¶ 64. Diane Van-Buren, Deputy Commissioner, knew of Barrow's issues at RMHU because of her supervisory status. *Id.* ¶ 70.

Most of the misbehavior reports issued against Barrow were written for exhibitionism, but Barrow was refused treatment for such. Second Am. Compl. ¶¶ 66–68. RMHU had demanded that Barrow attend a sex offender program, but Barrow thinks it is inappropriate for his disorder because the sex offender program focuses on pedophiles and rapists—conduct of which he was never convicted. *Id.* ¶ 69.

Barrow seeks both compensatory damages and injunctive relief. Second Am. Compl. at 16.

## II. Discussion [FN4]

> [FN4]. Barrow does not specify which defendants have personal knowledge of each alleged constitutional violations. It appears that Barrow intends to argue that each defendant had personal knowledge of each alleged constitutional violation (*see* Second Am. Compl. at 15 ("All defendants mentioned in these papers ... has [sic] caused Plaintiff ... to be deprived of the 14th and 8th amendment rights secured by the U.S.A. [C]onstitution. Also, the A.D.A. [t]itle II and section 504 of the Rehabilita-

tion Act")). Where Barrow does not identify which defendants he brings each cause of action against, unless otherwise indicated, this report assumes that Barrow is alleging personal involvement of each constitutional violation upon each defendant.

Barrow contends that defendants violated his: (1) First Amendment rights by retaliating against him for his expression of protected speech; (2) Eighth Amendment rights by (a) subjecting him to cruel and unusual punishment, and (b) denying him medical treatment; (3) Fourteenth Amendment rights by (a) failing to provide him due process prior to imposing the lewd conduct program, (b) treating him differently from similarly-situated inmates, and (c) violating his right to privacy regarding his exhibitionism. Barrow also argues that defendants have violated the ADA and section 504 of the Rehabilitation Act. [FN5]

> [FN5]. All unpublished decisions are attached to this Report and Recommendation.

### A. Legal Standard
**\*8** Under FED. R. CIV. P. 12(b)(6), a defendant may move to dismiss a complaint for a plaintiff's "failure to state a claim upon which relief can be granted." When considering such a motion, a court must "construe plaintiff['s] complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in plaintiff['s] favor." *Selevan v. N.Y. Thruway Auth.,* 584 F.3d 82, 88 (2d Cir.2009). However, this "tenet is inapplicable to legal conclusions, and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Harris v. Mills,* 572 F.3d 66, 72 (2d Cir.2009) (quoting *Ashcroft v. Iqbal,* 556 U.S. 662, 664, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)) (internal quotation marks and alterations omitted).

Accordingly, to survive a motion to dismiss, a complaint must state a claim for relief that is "plausible on its face." *Iqbal,* 556 U.S. at 678

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

(citing *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (explaining that the plausibility test "does not impose a probability requirement ... it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal [conduct] .")); *see also Arar v. Ashcroft,* 585 F.3d 559, 569 (2d Cir.2009) (holding that "[o]n a motion to dismiss, courts require enough facts to state a claim to relief that is plausible ....") (internal citations omitted). Determining whether plausibility exists is "a content specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal,* 556 U.S. at 680.

Where, as here, a party seeks judgment against a pro se litigant, a court must afford the non-movant special solicitude. *See Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006) . As the Second Circuit stated,

> [t]here are many cases in which we have said that a pro se litigant is entitled to special solicitude, that a pro se litigant's submissions must be construed liberally, and that such submissions must be read to raise the strongest arguments that they suggest. At the same time, our cases have also indicated that we cannot read into pro se submissions claims that are not consistent with the pro se litigant's allegations or arguments that the submissions themselves do not suggest that we should not excuse frivolous or vexatious filings by pro se litigants, and that pro se status does not exempt a party from compliance with relevant rules of procedural and substantive law ....

*Id.* (internal quotation marks, citations, and footnote omitted); *see also Sealed Plaintiff v. Sealed Defendant # 1,* 537 F.3d 185, 191–92 (2d Cir.2008) ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds pro se, ... a court is obliged to construe his pleadings liberally." (internal citations omitted)).

**B. Personal Involvement**

"[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). Thus, supervisory officials may not be held liable merely because they held a position of authority. *Id.; Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). However, supervisory personnel may be considered "personally involved" if:

**\*9** (1) [T]he defendant participated directly in the alleged constitutional violation;

(2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong;

(3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;

(4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or

(5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citing *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986)).[FN6] Assertions of personal involvement that are merely speculative are insufficient to establish a triable issue of fact. *See e.g., Brown v. Artus,* 647 F.Supp.2d 190, 200 (N.D.N.Y.2009).

> FN6. Various courts in the Second Circuit have postulated how, if at all, the *Iqbal* decision has affected the five *Colon* factors which were traditionally used to determine personal involvement. *Pearce v. Estate of Longo,* 766 F.Supp.2d 367, 376 (N.D.N.Y.2011), *rev'd in part on other*

*grounds sub nom., Pearce v. Labella,* 473 F. App'x 16 (2d Cir.2012) (recognizing that several district courts in the Second Circuit have debated *Iqbal's* impact on the five *Colon* factors); *Kleehammer v. Monroe Cnty.,* 743 F.Supp.2d 175, 182 (W.D.N.Y.2010) (holding that "[o]nly the first and part of the third *Colon* categories pass *Iqbal's* muster ...."); *D'Olimpio v. Crisafi,* 718 F.Supp.2d 340, 347 (S.D.N.Y.2010) (disagreeing that *Iqbal* eliminated *Colon's* personal involvement standard).

**1. Bossco and Fischer**

Here, Barrow alleged in a conclusory fashion that Bossco and Fischer were (1) aware at all times of his issues at Marcy and (2) that he spoke to them and sent several letters to them about such issues. Second Am. Compl. ¶¶ 58, 65. The gravamen of Barrow's complaints against these defendants is that they were in a position of power, thus, they were involved with all aspects of his incarceration. Nevertheless, attempts to establish personal involvement based upon the supervisory role that these defendants occupied is inappropriate. *Richardson v. Goord,* 347 F.3d 431 (2d Cir.2003), quoting *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985) ("[M]ere 'linkage in the prison chain of command' is insufficient to implicate a state commissioner of corrections or a prison superintendent in a § 1983 claim.").

To the extent that Barrow seeks to establish defendants' knowledge of his complaints through letters, such an attempt must also fail. Until recently, a plaintiff's claim that he or she sent a letter or grievance to a defendant, where the defendant did not take action on the letter or respond, was generally insufficient at the pleading stage to establish notice and personal involvement. *Smart v. Goord,* 441 F.Supp.2d 631, 643 (S.D.N.Y.2006) ( "Commissioner ... cannot be held liable on the sole basis that he did not act in response to letters of protest sent by [plaintiff] ...."; *but see Boddie v.*

*Morgenthau,* 342 F.Supp.2d 193, 203 (S.D.N.Y.2004) ("While mere receipt of a letter from a prisoner is insufficient to establish individual liability ... [p]ersonal involvement will be found ... where a supervisory official receives and acts on a prisoner's grievance or otherwise reviews and responds to a prisoner's complaint."). However, the Second Circuit recently concluded that,

[a]t the pleading state, even if [plaintiff] had no knowledge or information as to what became of his Letter after he sent it, he would be entitled to have the court draw the reasonable inference—if his amended complaint contained factual allegations indicating that the Letter was sent to the Warden at an appropriate address and by appropriate means—that the [defendant] in fact received the Letter, read it, and thereby became aware of the alleged conditions of which [plaintiff] complained

**\*10** *Grullon v. City of New Haven,* 720 F.3d 133, 131 (2d Cir.2013); *see also Toliver v. City of New York,* 530 F. Appx. 90, 93 (2d Cir.2013) (citing *Grullon,* 720 F.3d at 141–42); *Ferrer v. Fischer,* No. 9:13–CV–0031, 2014 WL 1763383 (N.D.N.Y. May 1, 2014). Barrow does not provide sufficient factual detail to support his claim that the letters establish personal involvement. He does not allege that he sent the letters to the proper addresses by appropriate means or that defendants received the letters and read them. Thus, he has not established personal involvement through the sending of letters. *Grullon,* 720 F.3d 133 at 141–42.

Further, although Barrow alleged that he had spoken with the defendants, Barrow does not state when these conversations took place. *Eldridge v. Kenney,* No. 11–CV–6459, 2014 WL 2717982, at *3 (W.D.N.Y. June 16, 2014) ("While Plaintiff's Response ... contains references to the ... *Colon* factors, they suffer from the same fatal flaw: they contain nothing more than conclusory statements and formulaic recitations of the *Colon* factors and are wholly unsupported by facts."). Moreover, Barrow presents no factual allegations to support a

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

claim that defendants created a policy or custom under which unconstitutional practices occurred, were grossly negligent in their supervision of subordinates, or exhibited deliberate indifference to Barrow's rights. *Colon,* 58 F.3d at 873. Thus, Barrow has failed to plausibly allege that Bossco or Fischer had personal knowledge of the alleged constitutional violations.

Accordingly, defendants' motion on this ground should be granted.

### 2. Harper, McArdle, and VanBuren

Barrow has also failed to establish personal involvement of Harper, McArdle, and VanBuren in the alleged constitutional violations. Barrow states that VanBuren was aware of the violations because she "was at all times aware of the actions and functions ... at the RMHU." Second Am. Comp. ¶ 70. Similarly, Barrow alleged that Harper knew about all programs at RMHU and, during a conversation, Harper told him that the lewd conduct program was implemented as a security measure. *Id.* ¶¶ 23, 27. Barrow contends that McArdle, as a "higher-up," advised him that the jumpsuit was imposed for security and failed to issue him a review notice for the lewd conduct program. *Id.* ¶¶ 27, 44.

With respect to the alleged conversations with Harper and McArdle, Barrow fails to provide details such as the date and manner of such conversations, rendering his claim insufficient to establish the requisite knowledge for personal involvement. *See Eldridge,* 2014 WL 2717982, at *3 (conclusory allegations are insufficient). Instead, Barrow merely contends that the lewd conduct program was discussed. *See Barnes v. Prack,* No. 11–CV–857, 2012 WL 7761905, at *5 (N.D.N.Y. Sept. 7, 2012) (same). To the extent that Barrow's complaint may suggest that Harper, McArdle, and VanBuren allowed for the continuance of a unconstitutional policy or custom, he does not demonstrate that defendants had investigated the program, were aware of his specific concerns and complaints regarding the jumpsuit and sign, or that they otherwise participated in decision making, policy making, or had

any input relating to the alleged constitutional violations.

**\*11** Furthermore, as noted, personal involvement cannot be established solely upon a defendant's supervisory role. *Wright,* 21 F.3d at 501. As such, Barrow has failed to plausibly allege the personal involvement of either Harper, McArdle, or VanBuren. Accordingly, defendants' motion on this ground should be granted.

### 3. Holanchuck, Perlman, LeClaire, Boll, and McKoy

Barrow has similarly failed to demonstrate the personal involvement of Holanchuck, Perlman, LeClaire, Boll, and McKoy. Barrow essentially argues that these defendants had personal knowledge of the alleged constitutional violations because (1) he spoke with them about the lewd conduct program and/or its negative effect on him and (2) they held supervisory positions at Marcy yet failed to address his concerns. Specifically, Barrow argues that Holanchuck had personal knowledge of the alleged violations because Barrow "had many talks with Defendant about the violation of plaintiff['s] rights, all to no avail." *Id.* ¶ 71. In response, Holanchuck told him that the lewd conduct program "was being done in other states." *Id.* Barrow also indicates that Holanchuck, as Deputy Commissioner, "was aware of all actions and functions here at the RMHU," and, thus, responsible due to his supervisory position. *Id.*

Barrow contends that LeClaire knew of the alleged violations because "Plaintiff talked to him about the "outright shocking racist presentment of this Lewd Conduct Program." Second Am. Compl. ¶¶ 22, 60. However, Barrow's reference to a conversation with LeClaire wherein he expressed his belief that the lewd conduct program was implemented in a racially-discriminatory manner does not demonstrate that LeClaire was aware of the personal affect the program had on Barrow.

Barrow states that Perlman "knew at all times [about the] situation" as he spoke to Perlman of

"the need of programs to gain parole" and, in response, Perlman told him that "he should program in spite of the Control suit." Second Am. Compl. at 59. Barrow also argues that he spoke with Boll "upon visiting the RMHU" and that, as Deputy Commissioner, she "was in [a] position to stop and had the duty to stop the violation of plaintiff['s] 14th and 8th Amendments [sic]" *Id.* ¶ 61. Barrow additionally alleges that he spoke with McKoy about the "exposer" sign, yet McKoy allowed the sign to remain. *Id.* ¶ 64.

Barrow's passing references to conversations he alleges to have had with Holanchuck, Perlman, LeClaire, Boll, and McKoy are insufficient to establish their personal involvement. Barrow fails to specify when he had such discussions with defendants. Further, Barrow's attempts to establish personal involvement based upon the supervisory role the defendants occupied must fail. *Wright,* 21 F.3d at 501.

Accordingly, defendants' motion on this ground should be granted.

### 4. Bellamy

Barrow argues that Bellamy, as Director of the Inmate Grievance Program, violated and was "in gross deliberate indifference to [his] 8th and 14th Amendments [sic]." Second Am. Compl. ¶ 63. He contends that defendant Bellamy was aware of these alleged violations because he "appealed many grievances" to her, which she affirmed. *Id.* Merely affirming the denial of a defendant's grievance is insufficient to establish personal involvement, without more. See *Thomas v. Calero,* 824 F.Supp.2d 488, 505–11 (S.D.N.Y.2011) (concluding that affirming *and modifying* the penalty imposed in an allegedly constitutionally infirm disciplinary proceeding can satisfy the second Colon factor). Moreover, insofar as Barrow appears to claim personal involvement based on defendant's status as a director, this does not establish that she was personally involved with the alleged Eigth Amendment violations. *Wright,* 21 F.3d at 501.

*12 Accordingly, defendant's motion on this ground should be granted.

### 5. Lindquist

Barrow argues that Lindquist, due to his supervisory role as Assistant Commissioner, was aware of the Lewd Conduct Program and "the grave harm it was doing" to him. Second Am. Compl. ¶ 62. Inasmuch as Barrow suggests that Lindquist was aware of the alleged violations because of his supervisory position, as noted, attempts to establish personal involvement based upon the supervisory role defendant occupied is inappropriate. *Wright,* 21 F.3d at 501. Barrow further argues that the fourth *Colon* factor is implicated. He contends that Lindquist "was grossly negligent in that he did not adequately supervise the subordinates who violated Plaintiff['s] 14th and 8th Amendment [rights]." Second Am. Comp. ¶ 62. However, Barrow does not provide any support for his claim that Lindquist negligently supervised his subordinates. Such a conclusory reference to a *Colon* factor is insufficient to support a claim of personal involvement. *Pettus v. Morgenthau,* 554 F.3d 293, 300 (2d Cir.2009) ("To the extent that the complaint attempts to assert a failure-to-supervise claim ... [that claim is insufficient where] it lacks any hint that [the supervisor] acted with deliberate indifference to the possibility that his subordinates would violate [plaintiff's] constitutional rights." (internal citations omitted)). Inasmuch as Barrow suggests that defendant was aware of the alleged violations because of his supervisory position, as noted, an attempt to establish personal involvement based upon the supervisory role defendant occupied is inappropriate. *Wright,* 21 F.3d at 501.

Accordingly, defendant's motion on this ground should be granted.

### C. Eleventh Amendment

Barrow brings all claims against all defendants in their official and individual capacities. The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or

prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. AMEND. XI. "[D]espite the limited terms of the Eleventh Amendment, a federal court [cannot] entertain a suit brought by a citizen against his [or her] own State." *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 98, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984) (citing *Hans v. Louisiana,* 134 U.S. 1, 21, 10 S.Ct. 504, 33 L.Ed. 842 (1890)). Regardless of the nature of the relief sought, in the absence of the State's consent or waiver of immunity, a suit against the State or one of its agencies or departments is proscribed by the Eleventh Amendment. *Halderman,* 465 U.S. at 100. Section 1983 claims do not abrogate the Eleventh Amendment immunity of the states. *See Quern v. Jordan,* 440 U.S. 332, 340–41, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979).

A suit against a state official in his or her official capacity is a suit against the entity that employs the official. *Farid v. Smith,* 850 F.2d 917, 921 (2d Cir.1988) (citing *Edelman v. Jordan,* 415 U.S. 651, 663, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974)). "Thus, while an award of damages against an official in his personal capacity can be executed only against the official's personal assets, a plaintiff seeking to recover on a damages judgment in an official-capacity suit must look to the government entity itself," rendering the latter suit for money damages barred even though asserted against the individual officer. *Kentucky v. Graham,* 473 U.S. 159, 166, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985). Insofar as Barrow demands money damages against defendants in their official capacities for acts occurring within the scope of their duties with DOCCS, these claims are barred by the Eleventh Amendment. *Id.* at 169.

**\*13** Accordingly, Barrow's claims for money damages pursuant to section 1983 against all defendants in their official capacities should be dismissed.

### D. First Amendment

Barrow argues that expressing his concern over the lewd conduct program, requesting prison trans-

fers, and filing sexual harassment charges against staff members is protected speech, and defendants filed false misbehavior reports against him in retaliation for his exercise of this speech.

Courts are to "approach [First Amendment] retaliation claims by prisoners with skepticism and particular care." *See e.g., Davis v. Goord,* 320 F.3d 346, 352 (2d Cir.2003) (citing *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001), *overruled on other grounds by Swierkiewicz v. Sorema, NA,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002)). A retaliation claim under section 1983 may not be conclusory and must have some basis in specific facts that are not inherently implausible on their face. *Ashcroft,* 556 U.S. at 678; *South Cherry St. LLC v. Hennessee Group LLC,* 573 F.3d 98, 110 (2d Cir.2009). However, a retaliation claim may survive a defendant's motion to dismiss if a plaintiff alleges facts tending to establish that "(1) the speech or conduct that led to the allegedly retaliatory conduct is the sort of speech or conduct that is protected by the Constitution; (2) defendant(s) took adverse action against the plaintiff; and (3) there is a causal connection between the protected speech or activity and the adverse action." *See Jones v. Harris,* 665 F.Supp.2d 384, 398 (S.D.N.Y.2009). Adverse action has been defined objectively as retaliatory conduct "that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights." *Gill v. Pidlypchak,* 389 F.3d 379, 381 (2d Cir.2004). Further, an inmate has no general constitutional right to be free from being falsely accused in a misbehavior report. *Boddie v. Schenider,* 105 F.3d 857, 862 (2d Cir.1997). Thus, to the extent that a plaintiff seeks damages because "he was subjected to an accusation that turned out not to stand up under scrutiny," such would not be an actionable claim under section 1983. *Jones v. Harris,* 665 F.Supp.2d 384, 400 (S.D.N.Y.2009).

Thus, Barrow fails to present a prima facie claim for a violation of his First Amendment rights.

First, it does not appear that Barrow's transfer

requests were constitutionally-protected speech as an inmate has no constitutional right to be housed in a facility of his choosing. *See generally, McMahon v. Fischer,* 446 Fed. Appx. 354 (2d Cir.2011) ("A prisoner has no right to housing in a particular facility"). Although complaining about the lewd conduct program and filing good-faith sexual harassment charges are constitutionally-protected activities ( *Carl v. Dirie,* No. 9:09–CV–724, 2010 WL 3338566 at *5 (N.D.N.Y. Mar.29, 2010) (quoting *United Mine Workers of Am., Dist. 12 v. Illinois State Bar Ass'n,* 389 U.S. 217, 222, 88 S.Ct. 353, 19 L.Ed.2d 426 (1967) ("The Supreme Court has noted that the right to petition government for redress of grievances is 'among the most precious of the liberties safeguarded by the Bill of Rights' ")), Barrow's claim is wholly conclusory. He does not state which of the named defendants filed misbehavior reports against him, when most of these alleged misbehavior reports were filed, the temporal proximity between the constitutionally-protected behaviors and the misbehavior reports, the prison rule violations with which he was charged, or whether any action was taken as a result of the misbehavior reports filed against him. Second Am. Compl. ¶ 41; *cf. Shaheen v. McIntyre,* No. 9:05–CV–0173, 2007 WL 3274835 at *9 (N.D.N.Y. Nov.5, 2007) (plaintiff demonstrated adverse action was taken by contending misbehavior reports were filed against him in retaliation of his exercise of speech, resulting in several days of keeplock confinement); *see also Mateo v. Fischer,* 682 F.Supp.2d 423, 435 (S.D.N.Y.2010) (filing of misbehavior report one day after prisoner filed sexual harassment grievance against corrections officer was sufficiently close in time to support causation element in retaliation claim). Furthermore, because Barrow does not specify which charges were filed against him in the misbehavior reports, he fails to demonstrate that the issuance of misbehavior reports was causally connected to his protected speech rather than an actual violation of prison rules.[FN7] *See Lowrance v. Achtyl,* 20 F.3d 529, 535 (2d Cir.1994) (When it is undisputed that an inmate committed the prohibited conduct, no retaliat-

ory discipline claim can be sustained)).

> FN7. Indeed, Barrow concedes that he has had incidents of exposure while incarcerated. Dkt. No. 50, at 18.

**\*14** Although Barrow contends that, "[w]hen and if [he] gets his day in Court, records of inmates misbehavior reports can easily inform the Courts of any information it may need," his conclusory claims as presented in his complaint are insufficient to withstand a motion to dismiss. Reply, at 3; *DeLeon v. Wright,* No. 10–CV–863, 2012 WL 3264932, at *7 (N.D.N.Y. July 5, 2012) (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) ("[A] complaint which alleges retaliation in wholly conclusory terms may safely be dismissed on the pleadings alone")).

Accordingly, defendants' motion on this ground should be granted.

**E. Eighth Amendment**

The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment." U.S. CONST. AMEND. VIII. The prohibition against cruel and unusual punishment includes the right to be free from conditions of confinement that impose an excessive risk to an inmate's health or safety. *Farmer v. Brennan,* 511 U.S. 825, 834 & 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994). A viable Eighth Amendment claim is twofold; the plaintiff must demonstrate both objective and subjective components. The objective question asks whether the deprivation of which the inmate complains was sufficiently serious. *Farmer,* 511 U.S. at 834. This component "requires a court to assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk. Thus, the prisoner must show that "the risk of which he complains is not one that today's society chooses to tolerate." *Helling v. McKinney,* 509 U.S. 25, 36, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993). The subjective component requires the in-

mate to show that the defendant demonstrated deliberate indifference by having knowledge of the risk and failing to take measures to avoid the harm. *Farmer,* 511 U.S. at 834.[FN8] Deliberate indifference exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837.

> FN8. The United States Supreme Court has held that "[w]hether one characterizes the treatment received by [the prisoner] as inhumane conditions of confinement, failure to attend to his medical needs, or a combination of both, it is appropriate to apply the 'deliberate indifference' standard articulated in *Estelle [v. Gamble]." Wilson v. Seiter,* 501 U.S. 294, 303, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991).

The Supreme Court has held that "[p]rison administrators ... be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security ." *Whitley v. Albers,* 475 U.S. 312, 321–22, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986) (internal quotation marks and citation omitted). However, although "the determination of what punishment is effective and fair considering the nature of the offense and the character of the offender ordinarily should be left to the informed judgment of prison authorities ... [d]isciplinary measures that violate civilized standards of human decency are proscribed." *LaReau v. MacDougall,* 473 F.2d 974, 978 (2d Cir.1972).

### 1. Conditions of Confinement

**\*15** Addressing the objective component of the analysis, the alleged deprivation Barrow raises appears to raise is his denial of right to be free from humiliation, shaming, and verbal harassment from other inmates and staff. Barrow argues that he was subjected to cruel and unusual punishment because

defendants forced him to wear the jumpsuit and have the exposer sign positioned above his cell door as a means to humiliate him and to perpetuate racism, rather than for genuine security concerns. Second Am. Compl. ¶¶ 34, 43, at 15. Barrow also contends that the jumpsuit makes him a target for verbal assaults and racially-fueled remarks from other inmates and staff. *Id.* at 15; Reply at 4. Barrow appears to argue that because the lock symbolizes oppression of African–Americans, being forced to wear it causes him grave harm, such as stress, reduced self-esteem, and "depression brought on top of [the] normal depression Plaintiff suffers from." Second Am. Compl. ¶ 40. Finally, Barrow states that the weight of the lock on the back of the jumpsuit requires him to continuously adjust the collar of the jumpsuit to "keep from being slowly choked." Reply at 1–2.

Barrow does not provide the names of any staff members who have verbally assaulted him while he was in the jumpsuit. Although Barrow states that defendants Bellnier and Hilton failed to intervene on one occasion where he was being harassed by inmates in their presence (Second Am. Compl. ¶ 32), there is no constitutional right to be free from verbal assault. *Lunney v. Brureton,* No. 04–Civ.–2438, 2005 WL 121720, at \*11 (S.D.N.Y. Jan.21, 2005) ("general allegations of threats and harassment are insufficient to state a claim because comments that are merely insulting or disrespectful do not give rise to a constitutional violation") (internal citations and quotation marks omitted); *see also Cuoco v. Mortisugu,* 222 F.3d 99, 109 (2d Cir.2000). Thus, although infliction of mental anguish may sometimes rise to the level of cruel and unusual punishment (*see e.g. Hudson v. McMillian,* 503 U.S. 1, 16, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992) (Blackmun, J., concurring)), it appears that the racially-fueled harassment Barrow has faced from fellow inmates and some staff while wearing the jumpsuit—even if it impacts his depression and lowers his self-esteem—does not amount to a disregard of an "excessive risk" to his safety and health. *Farmer,* 511 U.S. at 837; *Jabbar v. Fischer,*

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

683 F.3d 54, 57 (2d Cir.2012).

Further, the physical discomfort of the lock pulling on the collar of the jumpsuit appears to be little more than an annoyance that is easily alleviated by adjusting the collar. There is no evidence that the padlock poses an excessive risk of serious injury. A *de minimus* discomfort is not a violation of an inmate's Eighth Amendment rights. *See e.g.* Kearney v. N.Y.S. D.O.C.S., No. 9:11–CV–1281, 2013 WL 5437372, at *12–13 (N.D.N.Y. Sept.27, 2013) (a long walk to recreational yard, which caused discomfort for mobility-impaired inmate, along with bathroom facilities that required the plaintiff to lean in uncomfortable manner while using them, were not sufficient to rise to Eighth Amendment violations).

**\*16** Accordingly, defendants' motion to dismiss on this ground should be granted.

### 2. Medical Indifference

Next, Barrow appears to contend that he was denied access to adequate medical care because (1) he was denied treatment for exhibitionism, (2) Dr. Farago refused to provide him with treatment for depression, (3) he was refused his depression medication, and (4) he was unable to attend medical appointments for a foot condition.

The Eighth Amendment extends to the provision of medical care. Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir.1994). " 'Because society does not expect that prisoners will have unqualified access to healthcare,' a prisoner must first make [a] threshold showing of serious illness or injury" to state a cognizable claim. Smith v. Carpenter, 316 F.3d 178, 184 (2d Cir.2003) (quoting Hudson v. McMillian, 503 U.S. 1, 9, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992)). What constitutes a serious medical condition is determined by factors such as "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, and (3) the existence of chronic and sub-

stantial pain." Brock v. Wright, 315 F.3d 158, 162–63 (2d Cir.2003) (quoting Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir.1998)). The severity of the denial of care should also be judged within the context of the surrounding facts and circumstances of the case. Smith, 316 F.3d at 185. In claims for inadequate medical care, to satisfy the subjective component, the plaintiff must prove that defendant acted with deliberate indifference. Deliberate indifference requires the plaintiff "to prove that the prison official knew of and disregarded the prisoner's serious medical needs." Chance, 143 F.3d at 702. Thus, prison officials must be "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." Estelle v. Gamble, 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). "Mere disagreement over proper treatment does not create a constitutional claim" as long as the treatment was adequate. Chance, 143 F.3d at 703.

#### a. Denial of treatment for Exhibitionism

Barrow contends that, despite the fact that most of the misbehavior reports filed against him are for exhibitionism, defendants have "refused to treat Plaintiff for the disorder." Second Am. Comp. ¶ 67. Assuming Barrow can establish that he suffers from exhibitionism, he must demonstrate that "a reasonable doctor or patient would find it important and worthy of comment," that the condition significantly affects his daily activities, or the condition causes him chronic and substantial pain. Chance, 143 F.3d at 702 (internal quotation marks and brackets omitted). Although Barrow alleges that being made to wear the jumpsuit significantly impacts his daily activities, he does not demonstrate that the condition of exhibitionism itself significantly affects his daily activities or causes him chronic and substantial pain. *Id.* Although Barrow suggests that exhibitionism is "a living hell," he alleges that he was able to attend medical appointments without having any incidents of exposure; does not display exhibitionist tendencies toward males, and notes that there are often no females near him; and that he functions in the prison community for months at a

time without lewd conduct infractions. Second Am. Compl. ¶¶ 34, 41–42; Dkt. No. 50, at 17; *Id.* at 25. Moreover, Barrow does not contend what harm, if any, the alleged inadequacy in treatment has caused or will likely cause him, beyond noting that a lack of programming has negatively impacted his parole date.[FN9] *Salahuddin v. Goord,* 467 F.3d 263, 280 (2d Cir.2006) (in determining whether a condition is sufficiently serious, a court is to examine how the omission in medical treatment has caused, or will likely cause, harm to inmate).

> FN9. Barrow did not include a claim regarding any of his parole concerns in the instant complaint. Even if he had, such claims should be dismissed. The Supreme Court has held that
>
> > while there is no constitutional or inherent right of a convicted person to be conditionally released before the expiration of a valid sentence, a state's authority scheme, if it uses mandatory language, creates a presumption that parole release will be granted when or unless certain designated findings are made, and thereby gives rise to a constitutional liberty interest.
>
> *Robles v. Dennison,* 745 F.Supp.2d 244, 263 (W.D.N.Y.2010) (citing *Greenholtz v. Inmates of the Nebraska Penal and Corr. Complex,* 442 U.S. 1, 7, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979); *Board of Pardons v. Allen,* 482 U.S. 369, 371, 107 S.Ct. 2415, 96 L.Ed.2d 303 (1987)). The Second Circuit has determined that because New York's parole scheme delegates discretion to the Parole Board in granting an inmate parole, that scheme does not create a due process liberty interest in parole. *Barna v. Travis,* 239 F.3d 169, 170–71 (2d Cir.2001) (citing *Greenholtz,* 442 U.S. at 11–13). Because Barrow cannot allege that he has a liberty interest in his parole, to the extent

that he has attempted, he has failed to state a due process claim.

**\*17** Even assuming exhibitionism is a sufficiently serious medical condition, Barrow fails to demonstrate that defendants acted with deliberate indifference to his exhibitionism. Although Barrow contends that he was intentionally denied programming and treatment for exhibitionism, as he was only offered sex offender programming, he did not demonstrate that the programming offered had no relevance to his alleged conditions. Further, insofar as could be discerned, at some point, defendant Farago attempted to discuss the jumpsuit and lewd conduct program with Barrow, but Barrow refused to discuss it. *Id.* ¶ 47. Disagreement over the appropriate programming is an insufficient basis for a section 1983 claim, so long as the treatment offered is adequate. *Chance,* 143 F.3d 698 at 703. Moreover, to the extent that Barrow contends that he was denied access to all programming at Marcy, Barrow refused to leave his cell because of the jumpsuit. Second Am. Compl. ¶ 39, 42. Thus, any denial of programming was a direct result of his refusal to leave his cell.

Accordingly, defendants motion, insofar as it seeks to dismiss the claim of medical indifference to Barrow's exhibitionism should be granted.

**b. Denial of treatment for depression**

Barrow also contends that he was denied treatment for depression in violation of the Eighth Amendment. Little case law exists discussing whether depression is a sufficiently serious medical condition for Eighth Amendment purposes; however, it appears that mental disorders are considered serious medical needs. *See generally Zimmerman v. Burge,* No. 06–CV–80, 2009 WL 9054936, at \*6 (N.D.N.Y. Apr. 20, 2009), "treatment of mental disorders of mentally disturbed inmates is ... a serious medical need"; *Hamilton v. Smith,* No. 06–CV–805, 2009 WL 3199531, at \*14 (N.D.N.Y. Jan. 13, 2009) (same). Although Barrow provides little insight into the severity of his depression and how it impacts his

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

daily activities, he contends that he received treatment and was medicated to alleviate these mental health symptoms for fifteen years. Second Am. Compl. ¶ 47. Taking these allegations as true, Barrow has alleged a sufficiently serious medical need as it necessitated medical and pharmacological intervention for a sustained and continuous period of time. Such a condition was clearly "perceived by a reasonable physician as important and worthy of comment ...." *Randle v. Alexander,* 940 F. Supp 2d 457, 481 (S.D.N.Y.2013) (internal quotation marks and citation omitted). Thus, Barrow has satisfied the first prong of the Eighth Amendment analysis.

Next, Barrow must demonstrate defendants' deliberate indifference to his depression. Barrow states that he was denied therapy because defendant Farago pretended to treat him cell-side. Farago would "come to [Barrow's] cell, wait for [him] to get up to come to the gate and then walk away." Second Am. Compl. ¶¶ 50–51. Further, Barrow states that Farago "changed" his diagnosis of Major Depressive disorder and Anti-social disorder to poly-substance abuse, despite having only three positive urinalysis tests for cannabis in the past 15 years. *Id.* at 46. Farago also stopped providing Barrow's depression medication, which he had been taking for over 15 years. *Id.* ¶ 46. When Barrow "begged" for his medication, Farago would make "comical faces" at him while facing away from the camera. *Id.* ¶ 52. Assuming Barrow has a current diagnosis of depression and that the allegations against Farago are true, a complete denial of therapy and sudden cessation of medication that he had been taking for fifteen years could pose a risk of serious harm to his mental well-being. *Brock,* 315 F.3d at 162–63.

**\*18** Accordingly, defendants' motion to dismiss the medical indifference claim relating to the denial of treatment for depression, should be denied.

### 3. Denial of treatment for foot arches
Insofar as Barrow argues that defendants denied his access to medical treatment for his foot arches, this claim must fail. Even assuming Bar-

row's need for use of a shoe lift is a serious medical condition, Barrow was not denied medical treatment for his foot condition due to defendants' deliberate indifference to the condition, but for his choice to remain in his cell, rather than attend his appointment in the jumpsuit. *See generally Hardy v. Diaz,* No. 9:08–CV–1352, 2010 WL 1633379, at *6 n. 12 (N.D.N.Y. Mar.30, 2010) (noting that skipping medical appointments and failing to comply with treatment directions can undermine an Eighth Amendment medical indifference claim).

Accordingly, any claim against defendants for a denial of treatment for Barrow's foot condition should be dismissed.

### F. Fourteenth Amendment
#### 1. Procedural Due Process Claim
Barrow argues that he was denied procedural due process because he was required to wear the jumpsuit after a lewd conduct misbehavior report was filed against him, but before a disciplinary hearing was held. Insofar as can be ascertained from his complaint, although a disciplinary hearing was held on at least one of the misbehavior reports, the lewd conduct program was never discussed as a part of his punishment. Second Am. Comp. ¶ 30.

To prevail on a procedural due process claim, "a plaintiff must demonstrate that he possessed a protected liberty or property interest, and that he was deprived of that interest without due process." *Hynes v. Squillace,* 143 F.3d 653, 658 (2d Cir.1998). However, the Supreme Court has held that such liberty interests protected by the Fourteenth Amendment "will be generally limited to freedom from restraint which ... imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995); *Marino v. Klages,* 973 F.Supp. 275 (N.D.N.Y.1997).

Here, Barrow fails to demonstrate that he was deprived of a cognizable liberty interest. Although Barrow states that he was held in his cell for a col-

lective period of at least three months, he concedes that he independently made the conscious decision to refuse to leave his cell even though defendants permitted him to leave his cell in the jumpsuit. Barrow does not allege that he was otherwise restrained while wearing the jumpsuit. Similarly, defendants did not prevent him from attending programs while he was wearing the jumpsuit. In his grievance, which is incorporated by reference, Barrow states that he was offered the option of being "bonded to the restart chair, in 4 points" as an alternative to attending programming in the jumpsuit; however, he rejected this option as a "baric [sic] medieval form of bondage and sadism." Dkt. No. 50, at 25. Any lack of access to programming or services was self-imposed.FN10 Thus, although Barrow was embarrassed by the jumpsuit and faced verbal harassment when he wore it, defendants were not physically restraining or otherwise limiting Barrow's movement. Therefore, Barrow failed to demonstrate that the jumpsuit imposed an "atypical and significant hardship ... in relation to the ordinary incidents of prison life." *Sandin,* 585 U.S. at 484.

> FN10. Insofar as Barrow complains that his failure to attend programming negatively impacted his parole date, as noted ( *supra* n. 8), even if this statement were sufficient to raise a denial of a liberty interest claim, such claim must fail, as there is no due process interest in parole. *See Barna,* 239 F.3d at 170–71.

**\*19** Additionally, although Barrow may not have been granted a hearing before the imposition of the lewd conduct program, it appears that the jumpsuit and sign were implemented as a necessary security measure. Here, defendants are charged with the responsibility of ensuring the safety of the prison staff, personnel, visitors, and inmates. "A prison regulation that inadvertently impinges on prisoners' constitutional rights is valid " 'if it is reasonably related to legitimate penological interests,' such as 'deterrence of crime, rehabilitation

of prisoners, and institutional security' " *Davis v. City of New York,* 142 F.Supp.2d 461, 463 (S.D.N.Y.2001) (quoting *Turner v. Safley,* 482 U.S. 78, 79, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987)). Because the jumpsuit and sign serve to prevent inmates with a history of exposure and public masturbation from committing such acts, and Barrow has an extensive history of such conduct, Barrow fails to create an issue of fact as to whether defendants were deliberately indifferent to a serious risk of harm when requiring his participation in the lewd conduct program. *Whitley,* 475 U.S. at 319. Barrow admitted that he has exposed himself repeatedly, and that this is a "compolsive [sic] habit." Dkt. No. 50, at 25. Thus, even assuming that Barrow had a protected liberty interest, legitimate security concerns outweigh this interest. *Id.; Turner,* 482 U.S. at 79.

Accordingly, defendants motion to dismiss the complaint on these grounds should be granted.

## 2. Right to Privacy

Finally, Barrow argues that defendants violated his right to privacy. The basis for Barrow's claim on this ground is that the jumpsuit and sign expose his medical condition to other inmates, visitors, and prison personnel. It is not clear whether he raises this claim under the Eighth or Fourteenth Amendment. Second Am. Compl. ¶ 33; Reply, at 4. Generally, the right to privacy is based on the "Fourteenth Amendment's concept of personal liberty and restrictions upon state action," (*Whalen v. Roe,* 429 U.S. 586, 598 n. 23 (1977); *Nolley v. County of Erie,* 776 F.Supp. 715, 729 (W.D.N.Y.1991)); however, claims relating to the disclosure of confidential medical information have also been reviewed under the Eighth Amendment.FN11 *See generally Rodriguez v. Ames,* 287 F.Supp.2d 213, 218–21 (S.D.N.Y.2003). The Supreme Court has recognized "that there exists in the United States Constitution a right to privacy protecting 'the individual interest in avoiding disclosure of personal matters,' " including " 'the right to protection regarding information about the state of one's health.'

" *Powell v. Schriver,* 175 F.3d 107, 111 (2d Cir.1999) (quoting *Whalen,* 429 U.S. at 599). An inmate may prove a constitutional entitlement to protection from needless disclosure of a private medical condition if he demonstrates that (1) he suffers from an unusual or sensitive medical condition; and (2) if such condition were disclosed unnecessarily, he could be subjected to discrimination, intolerance, or violence. *Id.* at 111. The interest an inmate has in the privacy of his or her medical condition varies, depending on the condition. *Williams v. Perlman,* No. 9:06–CV–00936, 2009 WL 1652193, at *10–11 (N.D.N.Y. Feb.5, 2009) (citing *Rodriguez,* 287 F.Supp.2d at 229 (holding no qualified right to privacy in inmate's psychiatric condition and treatment)). Although disclosure of such a medical condition may, in some circumstances, be viewed as reasonably related to legitimate penological concerns, gratuitous disclosure may be a violation of privacy. *Id.* at 111–12 (discussing that disclosure of private medical condition for purpose of humor and gossip serves no legitimate penological interest and violates inmate's constitutional right to privacy).

> FN11. To avoid repetition or confusion, to the extent Barrow may raise privacy claims under both the Eighth and Fourteenth Amendment, they will both be discussed in this section of the Report.

### a. Fourteenth Amendment Right to Privacy

**\*20** Here, assuming Barrow can prove that he has been diagnosed with exhibitionism, he fails to demonstrate that exhibitionism is a condition on-par with HIV or transsexualism—conditions that other courts have found sufficient to trigger a constitutional right to privacy. *Compare Powell,* 175 F.2d at 112–13 (transsexualism protected); *Doe v. City of New York,* 15 F.3d 264, 266–67 (2d Cir.1994) (HIV-positive status protected); *Fleming v. State Univ. of New York,* 502 F.Supp.2d 324, 343 (E.D.N.Y.2007) (sickle cell amenia protected), *with Hamilton v. Smith,* No. 9:06–CV–805, 2009 WL 3199531, at *15 (N.D.N.Y. Jan.13, 2009), *adopted*

*as modified by* 2009 WL 3199520 (N.D.N.Y. Sept.30, 2009) (Hepatitis A not protected), *and Wilson v. Brock,* No. 9:06–CV–528, 2008 WL 4239564, at *5 (participation in drug or alcohol rehabilitation not protected). Further, Barrow has not plausibly demonstrated that the prison community's knowledge of this condition could lead to discrimination, intolerance, or violence. *Powell,* 175 F.3d at 111. Although Barrow contends that he has suffered discrimination, harassment, and intolerance from fellow inmates, as noted, his complaint attributes this disparate treatment to the racist sentiment that the lock on the jumpsuit triggers, not the condition of exhibitionism itself. Second Am. Compl. at 15. Thus, although exhibitionism could arguably be considered sensitive medical information due to the nature of the condition, because Barrow has not demonstrated that he faced or would likely face harm as a direct result of public knowledge of his alleged condition, he has failed to plausibly argue that defendants violated a constitutional right by revealing this condition to others through use of the lewd conduct program. *Cf. Powell,* 175 F.3d at 112 (disclosure of inmate's status as transsexual and HIV positive could place inmate at risk "especially given that, in the sexually charged atmosphere of most prison settings, such disclosure might lead to inmate-on-inmate violence.").

Additionally, although the lewd conduct program reveals to the prison community the fact that the Barrow exposes himself, Barrow does not demonstrate that the program is needless. Defendants have demonstrated that there are significant penological interests in the sign and jumpsuit—to prevent Barrow from exposing himself and to warn others of his proclivity to do so, which, as Barrow stated, is a compulsive behavior. Dkt. No. 50, at 25. When a prison regulation impinges on inmates' constitutional rights, the regulation is valid if reasonably related to legitimate penological interests. *Turner,* 482 at 89. *Turner* identified four factors to consider in making this determination:

First, there must be a "valid, rational connection"

between the prison regulation and the legitimate governmental interest put forward to justify it .... Moreover, the governmental interest must be a legitimate and neutral one .... A second factor ... is whether there are alternative means of exercising the right that remain open to prison inmates .... A third consideration is the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally .... Finally, the absence of ready alternatives is evidence of the reasonableness of a prison regulation .... By the same token, the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable ....

**\*21** 482 U.S. at 89–90 (quoting *Block,* 468 U.S. at 586).

Under the *Turner* analyis, it is clear that there is a valid and logical connection between mandating that offending inmates wear the jumpsuit—the inhibition and prevention of an inmate's ability to expose himself—and the prison's interest in maintaining institutional safety and security—preventing offending inmates from engaging in hostile, harassing, or sexually abusive behaviors in the prison community. *Id.* Next, there does not appear to be a less restrictive alternative to the jumpsuit. Absent the jumpsuit, in order to control compulsive acts of exposure and public masturbation, prisons would presumably have to resort to segregation or isolation of these inmates. *Id.* Segregation and isolation is not preferable to the lewd conduct program, which allows inmates to remain a part of the general prison population. In addition, the lewd conduct program as a *de minimus* impact on participating inmates. Although there exists a relatively minor discomfort for inmates, as discussed *supra,* the inmates are not restricted in their movement. Further, this ability to manage the conduct of inmates who demonstrate exhibitionist behavior, prison guards and other inmates would remain at risk of being subjected to this sexual misconduct. *Id.* Thus, for the reasons previously discussed, because the lewd

conduct program is reasonable and there are no less restrictive "ready alternatives," the lewd conduct program is valid. *Id.* at 90.

Accordingly, defendants' motion to dismiss under the due process clause of the Fourteenth Amendment should be granted.

### b. Eighth Amendment Right to Privacy

Barrow also appears to argue that he was denied his right to privacy of his exhibitionism under the Eighth Amendment. As noted, it does not appear that Barrow's claim of exhibitionism demonstrates a sufficiently serious medical need. However, even if this condition constituted a serious medical need, the disclosure of the fact that Barrow exposes himself does not constitute deliberate indifference. As these measures were put in place to restrict Barrow's ability to expose himself and warn and protect others from being victimized this conduct, the lewd conduct program was limited enough in scope and purpose. *See generally Hamilton,* 2009 WL 3199531, at \*15 (disclosure of medical condition was not deliberate indifference where disclosures were limited in scope and purpose and were necessary to investigate a grievance).

Accordingly, defendants motion to dismiss should be granted on this ground.

### 2. Equal Protection

Barrow argues that he was denied equal protection because (1) inmates who have smuggled in drugs or weapons in their groin did not have to wear the jumpsuit, (2) inmates who kick or spit on staff are not made to wear relevant restrictive devices, and (3) a disproportionate number of minorities were made to participate in the lewd conduct program.

**\*22** To establish an equal protection violation, a plaintiff must show that "he was treated differently than others similarly situated as the result of intentional or purposeful discrimination." *Phillips v. Girdich,* 408 F.3d 124, 129 (2d Cir.2005). Bar-

row fails to demonstrate that similarly-situated inmates are treated differently. Despite Barrow's contention, inmates who have smuggled in drugs or weapons in their groin-area are not similarly situated to Barrow. Similarly, inmates who spit on or kick staff are also not similarly situated to him. Although inmates who smuggle in contraband by concealing it in their groin may pose a security risk, this risk differs from that presented by an inmate who compulsively exposes his genitals to staff, visitors, and other inmates. As such, those inmates do not necessarily require the same security measures to be taken. Because Barrow does not argue that other inmates who have exposed themselves were excused from participation in the lewd conduct program, he has failed to state a claim for an equal protection violation. *See Id.*

Finally, Barrow fails to plausibly argue that the lewd conduct program is intentionally made up of a disproportionate number of minorities. Reading the facts in the light most favorable to him, Barrow presents no evidence to support his argument that racial minorities who have exposed themselves are being treated differently from Caucasian or other inmates who have committed the same lewd conduct infractions. *See Id.* at 129 (2d Cir.2005) ("[t]o prove a violation of the Equal Protection Clause ... a plaintiff must demonstrate that he was treated differently than others similarly situated as a result of intentional discrimination").

Accordingly, defendants' motion to dismiss on this ground should be granted.

### G. Americans with Disabilities Act and Rehabilitation Act

Barrow argues that defendants violated the ADA and RA because the lewd conduct program improperly exposes his medical condition—exhibitionism—to members of the prison community. Second Am. Compl. ¶ 33. He contends that the lack of confidentiality regarding his exhibitionism has resulted in "scorn and ridicule and verbal assaults of all kind [sic]." *Id.* It appears that Barrow contends that the denial of programming or

treatment for his exhibitionism also violates the ADA and RA.

The ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of ... a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. To state a claim under Title II of the ADA, an inmate must demonstrate that:

> (1) he or she is a "qualified individual with a disability"; (2) he or she is being excluded from participation in, or being denied the benefits of some service, program, or activity by reason of his or her disability; and (3) [the facility that] provides the service, program or activity is a public entity

**\*23** *Byng v. Campbell,* No. 907–CV–471, 2010 WL 681374, at * 17 (quoting *Clarkson v. Coughlin,* 898 F.Supp. 1019, 1037 (S.D.N.Y.1995)); 42 U.S.C. § 12132. Similarly, the RA applies to any "qualified individual with a disability" and protects that individual from being "excluded from the participation in, ... [or] denied the benefits of," any federally-funded program "solely by reason of his or her disability ...." 29 U.S.C. § 794(a); *see also Clarkson,* 898 F.Supp. at 1037–38 ("The requirements for stating a claim under the ADA are virtually identical to those under § 504 of the Rehabilitation Act").

For multiple reasons, Barrow fails to plausibly state a claim. First, Barrow cannot satisfy the first prong of the analysis. Barrow contends that his disability is exhibitionism; however, Barrow presents no evidence that his exhibitionism is anything other than self-diagnosed. The complaint provides that his diagnosed conditions were major depressive disorder, anti-social disorder, and poly-substance abuse. Second Am. Compl. ¶ 46. Moreover, exhibitionism is specifically excluded from consideration as a disability under the ADA. 42 USC § 12211(b)(1). Thus, Barrow is not a qualified individual with a disability.

Further, Barrow does not establish the second prong—he does not allege that he was excluded from a service or program at Marcy due to his alleged exhibitionism or any of his diagnosed conditions. *Carrasquillo v. City of New York,* 324 F.Supp.2d 428, 443 (S.D.N.Y.2003). As noted, Barrow states that he was not denied access to programming and medical trips because of lewd conduct, but because he refused to leave his cell while wearing the jumpsuit. Second Amend. Compl. ¶ 39. FN12 Barrow's choice not to participate in the programming and services made available to him cannot now be transformed into unlawful acts by defendants serving as a basis for liability.

> FN12. Even assuming Barrow alleged sufficient facts to state a claim under the ADA or RA, the individual defendants cannot be held liable for a violation of the ADA or RA. *See Lee v. City of Syracuse,* 603 F.Supp.2d 417, 448 (N.D.N.Y.2009).

Accordingly, defendants' motion to dismiss on these grounds should be granted.

### III. Conclusion

**WHEREFORE,** based on the findings set forth above, it is hereby:

1. **RECOMMENDED,** that Defendants' motion to dismiss for failure to state a cause of action (Dkt. No 67) be **GRANTED** as to plaintiff's:

a. First Amendment claims;

b. Eighth Amendment claim insofar as it alleged inadequate prison conditions;

c. Eighth Amendment claim insofar as it alleged inadequate treatment and deliberate indifference to plaintiff's exhibitionism and foot condition;

d. Fourteenth Amendment claims;

e. ADA claim;

f. RA claim; and

g. 11th Amendment claim;

2. Further **RECOMMENDED** that Defendants' motion to dismiss for failure to state a cause of action (Dkt. No. 7) be **DENIED** as to plaintiff's:

a. Eighth Amendment deliberate indifference claim, regarding the condition of depression;

3. Further **RECOMMENDED,** that Defendants' motion to dismiss for lack of subject matter jurisdiction (Dkt. No. 67) be dismissed as no arguments were made in support of this motion.

**\*24 ORDERED,** that copies of this Report–Recommendation and Order be served on the parties in accordance with the Local Rules.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 6(a), 6(e), 72.

**SO ORDERED.**

Dated: September 25, 2014.

N.D.N.Y.,2015.
Barrow v. Buren
Slip Copy, 2015 WL 417084 (N.D.N.Y.)

END OF DOCUMENT