IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

ANTONIO McCLEMORE,

                    Plaintiff,

    v.

MAUREEN BOSCO, *et al.*,

                    Defendants.

Civil Action No.
9:14-CV-0626 (BKS/DEP)

APPEARANCES:                  OF COUNSEL:

FOR PLAINTIFF:

ANTONIO McCLEMORE, *Pro Se*
01-B-1676
Green Haven Correctional Facility
P.O. Box 4000
Stormville, NY 12582

FOR DEFENDANTS:

HON. ERIC T. SCHNEIDERMAN      SHANNON COLLIER
New York State Attorney General   KRASNOKUTSKI, ESQ.
The Capitol                     Assistant Attorney General
Albany, NY 12224

DAVID E. PEEBLES
CHIEF U.S. MAGISTRATE JUDGE

ORDER, REPORT, AND RECOMMENDATION

Plaintiff Antonio McClemore, a New York State prison inmate who is proceeding *pro se* and *in forma pauperis*, has brought this civil rights action pursuant 42 U.S.C. § 1983 against individuals employed by the New York State Office of Mental Health ("OMH") and stationed at the Central New York Psychiatric Center ("CNYPC") at the times relevant to his claims. In his complaint, plaintiff alleges that those defendants that remain in the action violated his rights under the First Amendment by restricting his communication and retaliating against him, and under the Eighth Amendment by causing him to be subjected to unconstitutional conditions of confinement at both the CNYPC and a prison facility, using excessive force against him, and ignoring his serious medical needs.

Currently pending before the court is a motion filed by defendants requesting the entry of summary judgment dismissing plaintiff's remaining claims on a variety of grounds. For the reasons that follow, I recommend that defendants' motion for summary judgment be granted in part, but otherwise denied.

## I.    BACKGROUND[1]

Plaintiff is currently being held in the custody of the New York State

Department of Corrections and Community Supervision ("DOCCS"). *See*

---

[1]     Defendants' motion papers properly included a statement of undisputed material facts, as required under Local 7.1(a)(3) of this court. Although plaintiff controverted many paragraphs in defendants' Local Rule 7.1(a)(3) Statement, in many instances he failed to set forth a specific citation to the record where a factual issue arises, as the rule requires. *See generally* Dkt. No. 84. By its terms, Local Rule 7.1 provides, in part, that "[t]he Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert." N.D.N.Y. L.R. 7.1(a)(3) (emphasis in original). Courts in this district have routinely enforced this rule in the event of a non-movant's failure to properly respond to a Local Rule 7.1(a)(3) Statement. *See, e.g., Elgamil v. Syracuse Univ.*, No. 99-CV-0611, 2000 WL 1264122, at *1 (N.D.N.Y. Aug. 22, 2010) (McCurn, J.) (listing cases). Although plaintiff is not represented by counsel, that does not excuse his failure to comply with the court's local rules. *Robinson v. Delgado*, No. 96-CV-0169, 1998 WL 278264, at *2 (N.D.N.Y. May 22, 1998) (Pooler, J., adopting report and recommendation by Hurd, M.J.); *see also Latouche v. Tompkins*, No. 09-CV-0308, 2011 WL 1103045, at *1 (N.D.N.Y. Mar. 23, 2011) (Mordue, J.) ("a pro se litigant is not relieved of his duty to meet the requirements necessary to defeat a motion for summary judgment.")

In this case, it is not clear whether plaintiff was specifically warned of the consequences of his failure to properly respond to defendants' Local Rule 7.1 Statement. It does not appear from the docket sheet that plaintiff received a courtesy copy of either the court's Local Rules of Practice or the District's Pro Se Handbook. *See generally* Docket Sheet. In addition, while defendants declare that plaintiff was provided a copy of this district's "Notification of the Consequences of Failing to Respond to a Summary Judgment Motion," that notification was not filed with the court with defendants' motion, and thus the court is unable to assess the sufficiency of the notice. Dkt. No. 79-16.

As a result, and contrary to defendants' urging otherwise, *see* Dkt. No. 85 at 6, the court will overlook plaintiff's procedural deficiency in light of his other submissions in opposition to the motion and in deference to his *pro se* status. *See The Travelers Indemnity Co. of Ill. V. Hunter Fan Co.*, No. 99 CIV 4863, 2002 WL 109567, at *7 (S.D.N.Y. Jan.28, 2002) (citing *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001) (indicating that a court has broad discretion whether to overlook a party's failure to comply with its local rules). Accordingly, the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in the non-movant's favor. *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).

*generally* Dkt. No. 1. He is presently confined in the Green Haven

Correctional Facility, although he has been incarcerated at various other

facilities, including the CNYPC, at the times relevant to his claims. *See*

*generally id.*

The CNYPC is a maximum security, inpatient mental health facility

operated by the OMH and located in Marcy, New York. *See generally id.*;

Dkt. No. 79-1 at 2; Dkt. No. 84-3 at 2; *see also* N.Y. Correct. Law § 402.

The CNYPC provides care and treatment to inmates in the custody of

DOCCS who suffer from serious mental or behavioral disorders. Dkt. No.

79-1 at 2; Dkt. No. 84-3 at 2.

In 2010, the staff at the CNYPC launched a pilot intensive treatment

unit, which on September 6, 2012 formally became known as the Acute

Care Ward ("ACW"). Dkt. No. 79-1 at 2-3; Dkt. No. 79-2 at 2. The ACW is

housed in the space that was formerly occupied by the CNYPC's "Ward

601." Dkt. No. 79-1 at 2-3. According to defendants, the ACW was

designed to provide "a spectrum of care that allows for the least restrictive

environment while simultaneously advancing the treatment of the patient

and preserving the safety of the patient, other patients, visitors, and staff

throughout the hospital." Dkt. No. 79-2 at 2. A placement in the ACW is

determined by the inmate's treating physician, and is based on a variety of factors including an inmate's diagnosis and symptoms, current stability level, and interactions with other patients and staff. *Id.*

From September 6, 2012 until December 2, 2013, subject to adjustment based upon a patient's individual mental health needs, the ACW was generally governed by the following treatment guidelines:

- ACW patients generally receive daily interaction with their treatment team.
- Patients spend the majority of the day on the ward.
- Each dorm room will have a bed, a chair, and a shelving unit.
- Clothing and linen will be provided by staff on a daily basis
- Standard clothing issued on the ACW will be limited to those garments devoid of zippers (e.g., fleece wear, t-shirts, elastic waist pants without zippers, etc.)
- No additional clothing or linens will be kept in the patient rooms.
- There is no commissary while patients reside on the ACW.
- Visitation schedule – per existing CNYPC policy.
- Phone calls – Limited pay phone access is available for those not on constant observation; phone calls are limited to one (1) call daily. This call shall be for five (5) minutes ONLY. In the event a patient is unable to connect initially, they may make one (1) attempt per shift, based on staff availability.

- Meals – will be delivered to each patient's room at mealtime.
- Showers – per existing CNYPC policy.
- Bathroom access is one patient at a time.
- Shaving – Razors will not be issued; all shaving will be performed by the barber.
- Writing material/pens – The utilization of writing materials/pens will be closely evaluated by the treatment team on a case-by-case basis.
- Reading material – One (1) item at a time permitted at staff discretion.
- Once per shift Security Staff provide a progress note in each patient's medical record.

Dkt. No. 79-2 (errors in original); *see also* Dkt. Nos. 79-3, 79-4; Dkt. Nos. 79-5 (the CNYPC patient mail policy); 79-6 through 79-8 (the CNYPC patient visitation policies).

After December 2, 2013, the telephone policy at the facility was changed to reflect that instead of a once daily phone call, phone calls "[s]hall be offered as clinically indicated" to patients. Dkt. No. 79-4 at 4. Defendants acknowledge that the pay phones available to inmate were "subject to a phone contract that provided relatively expensive rates for calls[.]" Dkt. No. 79-1 at 7.

The CNYPC visitor policy, which applies to the ACW as well as the remainder of the facility, provides that in the interest of "achieving a level

of clinical stability," no patient is permitted to receive visitors during his first thirty days of admission. Dkt. No. 79-7 at 2. Thereafter, a patient may receive visitors from only immediate family members that have undergone a screening process. *Id.*; *see also* Dkt. No. 79-2; Dkt. No. 79-3; Dkt. No. 79-4.

In some contrast, plaintiff characterizes the ACW as a "[d]isciplinary ward" or "behavioral unit" for patients that the staff does not like. Dkt. No. 79-13 at 27, 28, 78. According to plaintiff, as a patient of the ACW, he was prohibited from (1) wearing shoes; (2) talking to other residents; (3) possessing any additional clothing other than what he wore upon arrival; (4) leaving the door to his room open; (5) possessing or requesting a pen, paper, or reading materials; (6) accessing a telephone; (7) participating in treatment programs or religious services; and (8) leaving his room at any time. Dkt. No. 1 at 13-14, 18, 31; *see generally* Dkt. No. 79-14; Dkt. No. 84-5 at 5-8. In addition, plaintiff complains that he was not permitted to have visitors at any time, which is inconsistent with the CNYPC's visitor policy for the facility. *Compare* Dkt. No. 79-13 at 44-45 *with* Dkt. Nos. 79-2 through 79-4; Dkt. Nos. 79-6 through 79-8. Plaintiff alleges that these policies, which resulted in various infringements on his constitutional

7

rights, were promulgated at the direction of defendant Maureen Bosco, the director of the CNYPC at the relevant times, and defendant Corey Conley,[2] the Chief of Security at the facility. Dkt. No. 1 at 9-10; Dkt. No. 79-13 at 48.

Plaintiff has a long history of suffering from, *inter alia*, major depressive disorder and anti-social personality disorder. Dkt. No. 79-9 at 2; Dkt. No. 80-1 at 15; Dkt. No. 84-4 at 5. Plaintiff also suffers from suicidal tendencies, and has a documented history of suicide attempts by hanging, ingesting potentially fatal objects, refusing food, and self-cutting. Dkt. No. 1 at 34; Dkt. No. 79-13 at 20; Dkt. No. 80-2 at 2. In addition, plaintiff has a lengthy history of "endorsing psychiatric symptoms and making threats of suicide to make various demands from [O]MH and [DOCCS]." Dkt. No. 80-1 at 64

Since 2005, while a sentenced DOCCS inmate, plaintiff has been admitted to the CNYPC on at least ten occasions for varying lengths of time. Dkt. No. 84-5 at 15-16. Plaintiff complains generally about the policies that governed the ACW during each of his admissions, and more specifically regarding several incidents that occurred while he was

---

[2] Defendants' motion papers reflect that the proper spelling of this defendant's name is "Corey Conley, rather than "Corey Connlley," the name under which he was sued. Dkt. No. 79-4 at 8. The clerk of the court will respectfully be directed to modify the court's records to reflect this change.

confined to the CNYPC and the Great Meadow Correctional Facility

("Great Meadow C.F."), *see generally* Dkt. No. 1. He also complains of the

medical treatment that he received from health care professionals at those

facilities. *Id.* Those incidents and plaintiff's medical treatment are

summarized below.

     A.    December 6, 2010 Admission to the CNYPC[3]

On December 6, 2010, plaintiff was transferred into the CNYPC from

the Wende Correctional Facility ("Wende C.F.") after he attempted suicide

by hanging. Dkt. No. 80-1 at 10, 60; Dkt. No. 84-5 at 15. Plaintiff was sent

to the CNYPC "with an alternate placement request" by officials at the

Wende C.F. Dkt. No. 80-1 at 10.

Plaintiff alleges that on or about July 11, 2011, Joseph Hubbard, a

security employee at the CNYPC, filed a complaint against defendant

Kevin Boyer, a Senior Security Hospital Treatment Assistant at the

CNYPC. Dkt. No. 79-13 at 69-73; Dkt. No. 79-10 at 1. As a result of

Hubbard's complaint, plaintiff was called upon to provide information

against defendant Boyer in the subsequent investigation of Hubbard's

complaint. Dkt. No. 79-13 at 69-72; Dkt. No. 84-1 at 14. Plaintiff alleges

---

[3]    The court notes that the ACW did not exist at the time of plaintiff's December 6, 2010 admission. Dkt. No. 84-5 at 15.

that when defendant Boyer discovered plaintiff's role in the investigation,

defendant Boyer caused him to suffer a litany of abuses over the ensuing

months, which included (1) recommending that plaintiff be admitted to the

ACW; (2) physically assaulting him; (3) denying him access to participate

in work programs; (4) inciting other "patients to attack" him; (5) threatening

to harm him physically; and (6) failing to serve plaintiff meals.[4] Dkt. No.

79-13 at 103-112; Dkt. No. 84-5 at 5-8; *see also* Dkt. No. 1 at 21-22. For

his part, defendant Boyer categorically denies plaintiff's allegations. Dkt.

No. 79-10.

Plaintiff alleges that as a result of defendant Boyer's campaign of

harassment, he requested that he be prematurely discharged from

CNYPC. Dkt. No.79-13 at 73; *but see* Dkt. No. 84-5 at 5-6. Plaintiff was

discharged on August 17, 2011, and was returned to the Wende C.F. Dkt.

No. 84-5 at 15.

B.    September 23, 2011 Admission to the CNYPC

---

[4]    Although plaintiff alleges in his memorandum that in retaliation for his role in the
investigation defendant Boyer "intentionally ignore[d p]laintiff's requests" to use the
bathroom, Dkt. No. 84-1, the complaint's allegations are framed as an Eighth
Amendment conditions of confinement claim. Dkt. No. 1 at 18. Moreover, although
plaintiff testified that defendant Sacco, not defendant Boyer, denied his request to use
the bathroom, Dkt. No. 79-13 at 52, his complaint does not contain any allegations
regarding defendant Sacco withholding plaintiff's bathroom access.

On September 20, 2011, plaintiff again attempted suicide by hanging, and was thereafter admitted to the CNYPC on September 23, 2011, with another "[a]lternate placement request" by officials from the Wende C.F. Dkt. No. 79-13 at 73-74; Dkt. No. 80-1 at 12; Dkt. No. 84-1 at 16. Plaintiff expressed to staff that he had unspecified "stressor[s] with the security staff at Wende [C.F.] . . . . [and] that he cannot stay at Wende [C.F.] and wants a new facility." Dkt. No. 80-1 at 10. Plaintiff stated that he would "end his life when he is released from [the CNYPC] back to DOCCS." Dkt. No. 80-1 at 63.

Upon his admission into the CNYPC, plaintiff was housed in Ward 601, the precursor to the ACW, for fourteen days. Dkt. No. 84-1 at 16. He initially refused to either eat or take his prescribed medication. Dkt. No. 80-1 at 3, 10, 11, 32. Plaintiff was briefly transferred to another ward when he began to comply, but was later returned to Ward 601 for nine days after he "declared a hunger strike." Dkt. No. 80-1 at 63-64; Dkt. No. 84-5.

During the period of this admission and at all remaining relevant times that plaintiff was housed at the CNYPC, his treatment team consisted of, among others, defendant Michael Sacco, a social worker who worked under the supervision of defendant Harold Berkheimer,

11

plaintiff's attending psychiatrist. Dkt. No. 79-9 at 2; Dkt. No. 79-11 at 1-2.

On September 27, 2011, plaintiff met with defendant Sacco at which point

Sacco informed him that defendant Boyer recommended his admission to

the ACW and that it was "obvious [that he] made enemies" during his prior

admission to the CNYPC. Dkt. No. 79-13 at 76-77; Dkt. No. 84-1 at 16;

Dkt. No. 1 at 15.

On November 26, 2011, plaintiff was transferred between wards by

defendant Boyer and two unidentified members of the security staff. Dkt.

No. 84-5; Dkt. No. 1 at 16-17. Plaintiff alleges that during this transfer, the

security staff left him alone with defendant Boyer, who struck him in the

face with a closed fist, knocking him to the floor. Dkt. No. 79-13 at 107-

110. Although plaintiff allegedly suffered a swollen lip and face as a result

of the alleged assault, he did not request medical intervention. *Id.* On the

day that followed the alleged assault, a progress note was entered in

plaintiff's medical records, which stated that

> [another patient] reported to this writer to watch out
> for [plaintiff] this morning. [Plaintiff] was making
> threats of physical harm to [Boyer and other
> members of the staff. Plaintiff] was stating that he
> is going to get back and take staff down with him.
> [Plaintiff] had been the center of bartering and
> making deals for food and other items. There
> appears to be tension and a nervous atmosphere

amongst the peer group with his presence.
[Plaintiff] has been upset over not being able to
pass food and TV monitoring.

Dkt. No. 80-1 at 37.

In addition to the foregoing, plaintiff alleges that on October 6, 2011,

he filed complaints with a variety of entities, including the CNYPC's "Risk

Management," the Legal Aid Society, Prisoner's Legal Services, Disability

Advocates, and "Quality of Care" regarding his treatment as a patient of

the ACW. Dkt. No. 1 at 15; Dkt. No. 79-13 at 51-52; *see also* Dkt. No. 84-5

at 2. Defendant Sacco learned of plaintiff's complaint to "Quality of Care"

on December 13, 2011. Dkt. No. 1 at 24-25. Defendants Sacco and

Berkheimer visited the plaintiff on December 19, 2011. Dkt. No. 79-13 at

124; Dkt. No. 1 at 25. At that time defendant Sacco threatened to "make

[plaintiff's] life a living hell." Dkt. No. 79-13 at 51; Dkt. No. 1 at 25. During

that meeting Dr. Berkheimer acted in a hostile manner toward plaintiff and

explained that if plaintiff wanted to kill himself, he would have that chance

since he would soon be discharged from the CNYPC. Dkt. No. 1 at 25;

Dkt. No. 79-13 at 124. Plaintiff was transferred into the Great Meadow

C.F. on the following day. Dkt. No. 80-1 at 60-68; *see* Dkt. No. 84-5 at 15.

C.    January 10, 2012 Transfer to Observation Cell at the Great
      Meadow C.F.

13

When plaintiff arrived at the Great Meadow C.F., he was initially "placed on a 1:2 suicide watch with minimal cell items" due to his "history of suicidal attempts/gestures." Dkt. No. 84-5 at 10-12. Plaintiff was returned to the general prison population at some unspecified point, and again attempted suicide by hanging on January 10, 2012. Dkt. No. 79-13 at 99; Dkt. No. 80-4 at 3-4.

Following his suicide attempt, plaintiff was moved to an observation cell, where he was openly hostile and uncooperative. Dkt. No. 80-4 at 7-8. At one point, plaintiff was informed by medical staff that "if he continued to eat [he] could work toward getting . . . out to his cell," and he thereafter stopped eating.[5] *Id.* at 7-10. Plaintiff was briefly moved from the observation cell, but he was returned soon after he swallowed sporks and pieces of a Styrofoam tray. *Id.* at 7, 11.

On January 19, 2012, a planning meeting was held among plaintiff's treatment teams at the Great Meadow C.F. and the CNYPC, including Dr. Berkheimer and Defendant Sacco. Dkt. No. 80-4 at 5-6. The parties to that session observed that plaintiff's behavior appeared to be "motivated to

---

[5]     As the medical staff prepared to go to court to obtain a force feed order, plaintiff began to eat of his own volition. Dkt. No. 80-4 at 9.

return to [the] CNYPC." *Id.* at 6; *see also id.* at 7 ("[Plaintiff's] behavior is volitional and not due to serious Axis I mental illness. [Plaintiff] is highly motivated to return to [the] CNYPC.").

Plaintiff remained in the observation cell at the Great Meadow C.F. for nearly two months. Dkt. No. 79-13 at 81-82, 100; *see generally* Dkt. No. 80-4. While plaintiff asserts that his seventy-one-day stay was the result of defendant Sacco's retaliatory recommendation, plaintiff's medical records indicate that he told medical staff that he would "kill himself when discharged" to the general population at the Great Meadow C.F. Dkt. No. 79-13 at 88-89; Dkt. No. 80-4 at 10. In addition, the medical staff observed that while plaintiff was housed in the observation cell, he did not "act[] out." He did, however, express suicidal threats, swallow objects, and refuse to eat during that time period. Dkt. No. 79-13 at 88-89, 91; Dkt. No. 80-4.

D.    December 9, 2013 Admission to the CNYPC

At some unknown point, plaintiff was transferred from the Great Meadow C.F. into the Clinton Correctional Facility ("Clinton C.F."), where he resumed his self-harming behaviors. Dkt. No. 84-5 at 15; Dkt. No. 80-2 at 41. On September 29, 2013, plaintiff ingested "potentially dangerous objects, with the intent to die." Dkt. No. 80-2 at 41. Plaintiff also refused to

15

shower and began to express feelings of hopelessness. *Id.*

Plaintiff was re-admitted to the CNYPC on December 9, 2013, where he was assigned to the ACW. Dkt. No. 84-5 at 15. For the first few days of his admission, plaintiff repeatedly expressed that he wished to be moved to a different floor or be "sen[t] . . . back to prison." Dkt. No. 80-2 at 22, 41, 43. Defendant Sacco's notes indicate that the assignment to the ACW was based on plaintiff's "impulsiveness to harm himself and take advantage of peers."[6] *Id.* at 41.

On December 25, 2013, Dr. Berkheimer met with plaintiff and noted that he denied suicidal ideation, auditory hallucinations, and visual hallucinations. Dkt. No. 80-2 at 33. Dr. Berkheimer observed that plaintiff "states to me that he feigned much of his suicidal behavior that led to this admit to [the] CNYPC just to get an alternate placement so he could be closer to his family." *Id.* Dr. Berkheimer recommended that the medical team continue to plan for plaintiff's discharge. *Id.*; *see also id.* at 66 ("Assigned therapist will review and discuss with patient all aspects of

---

[6]    The record indicates that plaintiff was "transferred" on December 16, 2013 to Ward 501, *see* Dkt. No. 84-5 at 15. Plaintiff alleges that the transfer was due to construction and that the same policies that applied to the ACW were also in effect in Ward 501. Dkt. No. 1 at 33; Dkt. No. 79-13 at 135. This allegation is consistent with references in plaintiff's medical records. *See e.g.*, Dkt. No. 80-2 at 55.

discharge planning and aftercare services."), 63 ("The team is considering

him for possible [discharge] back to his facility in 2-3 weeks.").

At approximately 1:30 p.m. on December 27, 2013, the staff noted

that plaintiff appeared to "be [a] little upset." *Id.* at 69. Later that day,

plaintiff told CNYPC staff members that he would "swallow something if he

was not transferred" to another area. Dkt. No. 80-2 at 6. Plaintiff then

ingested a spoon handle and screws to an outlet cover. Dkt. No. 79-13 at

134; Dkt. No. 80-2 at 6, 22-23. Plaintiff aspirated the screws, and required

surgical intervention in the form of a bronchoscopy at the St. Elizabeth

Medical Center in Utica, New York for their removal. Dkt. No. 80-2 at 22.

Plaintiff returned to the CNYPC on January 2, 2014, at which point

he again met with Dr. Berkheimer. *Id.* at 35-36, 71. Plaintiff alleges that Dr.

Berkheimer "leaned down [to plaintiff's] face" and said "yo, you tried to

commit suicide on my ward? I'm going to [the] treatment team and we are

going to talk about this little tantrum you are having and I'm going to

discharge your ass[.]" Dkt. No. 79-13 at 135-36. Dr. Berkheimer's notes

indicate that plaintiff denied suicidal ideation and admitted that his recent

behavior was calculated to effect his transfer to another correctional facility

or floor at the CNYPC. Dkt. No. 80-2 at 35-36, 71. Dr. Berkheimer placed

plaintiff on constant observation, which included "[n]o sheets/pillow case, [n]o sharps/razor/pen, heavy blanket only. Finger food diet[.]" *Id.* at 71, 74. Constant observation was discontinued on January 6, 2014. *Id.* at 37.

On January 12, 2014, plaintiff informed the staff that he had "been saving staples [that] he got from magazines in the library and on the ward and that during the dayshift . . . he decided to swallow them." Dkt. No. 80-2 at 75. Plaintiff complained that he had pain in the "lower left quadrant of his abdomen," but his complaint was deemed to be clinically inconsistent with the timing of his reported swallowing behavior. *Id.* at 76. Plaintiff was returned to constant observation. *Id.*

Defendant Sacco and plaintiff met on January 13, 2014 to discuss his swallowing behavior. Dkt. No. 80-2 at 76. The progress note from that session stated:

> [Sacco] had discussions with [the CNYPC's] security staff in regard to [plaintiff]. It was reported that [Mental Hygiene Legal Services] told [plaintiff] that his court date to challenge his admission was terminated due to his approval for discharge. [Plaintiff] also had reported to staff that he has been 'mad' at the writer and Dr. Berkhemier because an alternate placement was not being sought. Historically, [plaintiff] has used such behaviors for secondary gain. The current team, CBO team, and past [inpatient] treaters have worked with [plaintiff] when he has utilized such behaviors. The current

> and past [inpatient] treaters agree that his reported swallowing of objects was done with purposeful volition and aimed at extending his admission at the facility to obtain an alternate placement, as he had learned of his planned discharge. His release from the facility will proceed. Clinton CF contacted about the reported behavior. PCM will be held at 1130 on 1/14/14."

*Id.* at 35.

Because the treatment team believed that plaintiff was engaging in certain behaviors to manipulate his placement, and that he was no longer realizing a therapeutic benefit from his continued admission at the CNYPC, plaintiff was discharged back to DOCCS custody on or about January 15, 2014. Dkt. No. 80-2 at 5-23.

II.    PROCEDURAL HISTORY

This action was commenced on or about May 29, 2014, with the filing of a complaint and accompanying application to proceed *in forma pauperis* ("IFP"). Dkt. Nos. 1, 2. Plaintiff's complaint asserted several causes of action pursuant to 42 U.S.C. § 1983 and named nine defendants, all of whom were employed at the relevant times at the CNYPC, the Great Meadow C.F. or the Clinton C.F. *See generally* Dkt. No. 1.

On January 7, 2015, Chief District Judge Glenn T. Suddaby issued a

decision and order pursuant to 28 U.S.C. §§ 1915(e), 1915A, in which he

granted plaintiff's IFP application and *sua sponte* dismissed plaintiff's

claims against several defendants altogether, and certain other of

plaintiff's claims. Dkt. No. 13. Following service of the summons and

complaint, defendants filed a motion on March 13, 2015, seeking dismissal

of plaintiff's complaint pursuant to Rule 12(b)(6) of the Federal Rules of

Civil Procedure. Dkt. No. 26. On February 16, 2016, I issued a report

recommending that defendants' motion be denied in its entirety. Dkt. No.

47. On March 15, 2016, District Judge Brenda K. Sannes issued an order

adopting my report and recommendation in its entirety. Dkt. No. 50.

      As a result of the foregoing, the only viable claims and defendants

that remain for consideration are (1) a First Amendment freedom of

speech/association claim asserted against defendants Bosco, Conley, and

Sacco; (2) an Eighth Amendment conditions of confinement claim

regarding the ACW asserted against defendants Bosco, Conley, and

Boyer; (3) an Eighth Amendment conditions of confinement claim

regarding the Great Meadow C.F. asserted against defendant Sacco; (4) a

First Amendment retaliation claim asserted against defendants Boyer and

Sacco; (5) an Eighth Amendment excessive force claim asserted against

defendant Boyer; and (6) an Eighth Amendment deliberate medical indifference claim asserted against defendant Dr. Berkheimer. *See generally* Dkt. Nos. 13, 47, 50.

On March 7, 2017, following the close of discovery, defendants filed a motion for summary judgment seeking dismissal of plaintiff's remaining claims in the action. Dkt. No. 79. In their motion, defendants argue that (1) no reasonable factfinder could conclude that plaintiff's First Amendment rights were violated; (2) the conditions of confinement experienced by plaintiff during his various confinements at the CNYPC did not rise to the level of inhumane conditions; (3) plaintiff has failed to adduce credible evidence to support his retaliation claims; (4) there is no corroborating evidence to plaintiff's excessive force claim; and (5) Dr. Berkheimer was not deliberately indifferent to plaintiff's serious medical needs. *See generally* Dkt. No. 79-14. In addition, defendants argue that certain defendants lack the requisite personal involvement in the conduct giving rise to plaintiff's claims and that, in the alterative, they are shielded from liability on the basis of qualified immunity. *See generally id.*

Plaintiff has responded in opposition to the motion,[7] which is now

---

[7]     The court notes that although plaintiff's memorandum of law is denominated "Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment," plaintiff

fully briefed, and has been referred to me for the issuance of a report and

recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern

District of New York Local Rule 72.3(c). *See* Fed. R. Civ. P. 72(b).

III.    DISCUSSION

    A.    Legal Standard Governing Motions for Summary Judgment

        1.    The Standard Generally

Summary judgment motions are governed by Rule 56 of the Federal

Rules of Civil Procedure. Under that provision, the entry of summary

judgment is warranted "if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a

matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S.

317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247

(1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391

F.3d 77, 82-83 (2d Cir. 2004). A fact is "material" for purposes of this

inquiry if it "might affect the outcome of the suit under the governing law."

*Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of N.Y.*, 426 F.3d 549,

553 (2d Cir. 2005). A material fact is genuinely in dispute "if the evidence

is such that a reasonable jury could return a verdict for the nonmoving

---

has not formally cross moved for such relief. Dkt. No. 84-1.

party." *Anderson*, 477 U.S. at 248.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson*, 477 U.S. at 250 n.4; *Sec. Ins. Co.*, 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the non-moving party. *Anderson*, 477 U.S. at 255; *Jeffreys*, 426 F.3d at 553; *Wright v. Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998). The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Emp'rs' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507-08 (2d Cir. 2002); *see also Anderson*, 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

## 2.    The *Jeffreys* Exception

It is well established that "[a]ssessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996); *see Globecon Group, LLC v. Hartford Fire Ins. Co.*, 434 F.3d 165, 174 (2d Cir. 2006). In their motion, defendants have invited the court to invoke a limited exception to this principle that would allow the court to enter summary judgment after making a credibility determination. That exception was recognized by the Second Circuit Court of Appeals in *Jeffreys v. City of New York*, 426 F.3d 549 (2d Cir. 2005), in which that court observed that in very "rare circumstance[s,]" a credibility issue is appropriately resolved on summary judgment. *Id.* at 554. To qualify for the *Jeffreys* exception, a moving defendant must satisfy each of the following three requirements: (1) "the plaintiff must rely 'almost exclusively on his own testimony,'" (2) the plaintiff's testimony must be "'contradictory or incomplete,'" and (3) the plaintiff's testimony must be contradicted by evidence that is produced by the defense. *Benitez v. Ham*, No. 04–CV– 1159, 2009 WL 3486379, at *20–21 (N.D.N.Y. Oct. 21, 2009) (Mordue, J., *adopting report and recommendation* by Lowe, M.J.) (quoting *Jeffreys*,

24

426 F.3d at 554); *see Cruz v. Church*, No. 9:05-CV-1067 (GTS/DEP), 2008 WL 4891165, at *4 (N.D.N.Y. Nov. 10, 2008).[8]  Although not insurmountable, the moving defendants' burden to show a basis to apply the *Jeffreys* exception is considerable. *Jeffreys*, 426 F.34 at 554.

    B.    <u>Plaintiff's First Amendment Free Speech/Association Claim</u>

In support of their motion, defendants argue that summary judgment is appropriate because the record belies plaintiff's assertion that he was deprived of First Amendment rights and that, in any event, there were legitimate penological reasons for any limitations that were imposed on plaintiff. Dkt. No. 79-14 at 18-24. In opposition to defendants' motion, plaintiff contends that the CNYPC failed to employ a less restrictive means to further legitimate penological interests. Dkt. No. 84-1 at 3-8.

    1.    <u>Legal Standard Governing First Amendment Claim</u>

While inmates confined within prison facilities are by no means entitled to the full panoply of rights guaranteed under the United States Constitution, including the First Amendment, they do retain at least some measure of constitutional protection. *Pell v. Procunier*, 417 U.S. 817, 822 (1974). A prison inmate's First Amendment right, however, is not without

---

[8]    Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

25

limits, and the task of defining the contours of that right in a prison setting requires striking a delicate balance between the rights of prison inmates and the legitimate interests of prison officials charged with maintaining prison security. *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348-49 (1987); *Ford v. McGinnis*, 352 F.3d 582, 588 (2d Cir. 2003); *Benjamin v. Coughlin*, 905 F.2d 571, 574 (2d Cir. 1990).

If a prison regulation or practice "impinges on inmates' constitutional rights, the regulation [or decision] is valid if it is reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987); *accord, Beard v. Banks*, 548 U.S. 521, 528 (2006). The determination of whether a regulation or decision is reasonable is informed by the four factors articulated in *Turner*. *Turner*, 482 U.S. at 89-91; *Beard*, 548 U.S. at 528; *Shakur v. Selsky*, 391 F.3d 106, 113 (2d Cir. 2004). Specifically, in making that determination the court asks (1) whether there is "a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it"; (2) whether there are "alternative means of exercising the right that remain open to prison inmates"; (3) "what impact will accommodation of the asserted constitutional right have on guards and other inmates and on the

allocation of prison resources generally"; and (4) whether there "are ready alternatives for furthering the governmental interest available[.]" *Beard*, 548 U.S. at 529 (alterations, quotation marks omitted); *accord, Turner*, 482 U.S. at 91-93.

2.    Analysis

Plaintiff's verified complaint, which is the functional equivalent of an affidavit and may be relied upon by the plaintiff to oppose defendants' motion for summary judgment, challenges a host of policies and procedures to which he was subjected during the times that he was housed as a patient of the ACW, ranging from his ability to (1) write or receive letters, (2) make or receive phone calls, (3) read or possess books, magazines, and newspapers, (4) participate in educational and vocational programming, (5) communicate freely with other patients, and (6) have access to visitors.[9]  *See generally* Dkt. No. 1. Plaintiff alleges that these practices infringed upon his First Amendment rights to free speech

---

[9]      Plaintiff further alleges that he was also denied opportunities to avail himself of recreational and exercise opportunities, listen to the radio, watch television, or play board games, purportedly in violation of his First Amendment rights. Dkt. No. 84-1 at 34; *see also* Dkt. No. 1 at 44; *but see* Dkt. No. 80-2 at 6 (observing that plaintiff was "interacting with his peers playing chess and visiting.").

and free association.[10] *Id.* at 9-10. Many of plaintiff's allegations regarding the deprivations that he suffered are generally consistent with the policies that governed inmates designated to the ACW during the relevant time period. Dkt. Nos. 79-2 through 79-4.

   a. <u>Correspondence Policy</u>

  In their motion, defendants argue that no one at the CNYPC told plaintiff he could not write nor receive letters while confined in the ACW and that, to the contrary, ACW patients were subject to the mail policy that applies to the CNYPC generally, under which patients are encouraged to correspond with family, friends and legal representatives by mail. Dkt. No. 79-1 at 7-8; Dkt. No. 79-5 at 2-8. Defendants further note that plaintiff's medical chart contains no evidence showing that he was restricted from sending or receiving mail. Dkt. No. 79-9 at 4. Indeed, defendants note that according to plaintiff's chart he did receive mail from friends and family during his time at the CNYPC. Dkt. No. 79-9 at 4; Dkt. No. 80-2 at 55, 72.

---

[10] Plaintiff's allegations concerning which of the defendants are implicated in this claim have been inconsistent. In his complaint, for example, he attributes the actions alleged to have resulted in infringement of his First Amendment rights to defendants Bosco, Conley, Berkheimer, Sacco, and Gonzales, *see* Dkt. No. 1 at 38. In his memorandum in opposition to defendants' motion, however, he attributes the offending policies and procedures only to defendants Bosco, Conley, and Sacco. Dkt. No. 84-1 at 4.

By contrast, plaintiff alleges that during the time he was a patient in the ACW, he was not permitted to send or receive correspondence "of any kind" because he was not given access to paper or writing instruments. Dkt. No. 1 at 9-10, 13; Dkt. No. 79-13 at 131. In opposition to defendants' motion, he has provided an affidavit from a fellow patient of the ACW, who indicates that he too was "not allowed to receive mail, nor to write letters" and that he was "not allowed to have paper or pens." Dkt. No. 84-5 at 7.

Defendants concede that plaintiff was not permitted to have access to a pen during the period of his confinement in the ACW because he was governed by a policy which provided that "[t]he utilization of writing materials/pens will be closely evaluated by the treatment team on a case-by-case basis," Dkt. Nos. 79-2 through 79-4, noting further that plaintiff was known to use common household items to engage in acts of self-harm. Dkt. No. 79-13 at 46-47.

Defendants point to plaintiff's medical records, which make frequent reference to plaintiff sending or receiving of letters. *See e.g.*, Dkt. No. 80-1 at 12; Dkt. No. 80-2 at 55, 72; *see also* Dkt. No. 84-5 at 2 ("Last month you wrote to this office[.]"). In addition, defendants indicate that the CNYPC has staff available to assist patients with letter writing where, as here,

there is a safety concern related to a patient's access to writing implements. Dkt. No. 79-1 at 8-9; *see also* Dkt. No. 79-5. Plaintiff testified, however, that he "never asked" anyone to assist him because he "wanted to write a letter to [his] family [himself]." Dkt. No. 79-13 at 42-43.

The restriction upon plaintiff to the access of pens, which allegedly resulted in an obstruction to his outgoing mail, was rationally related to the CNYPC's patient safety concerns. However, there exists a question as to whether plaintiff had an alternative means of exercising his right, particularly in light of plaintiff's remaining First Amendment allegations. *See Davis v. Goord*, 320 F.3d 346, 351 (2d Cir. 2003) (noting that prisoners have a right to "the free flow of incoming and outgoing mail."); *Zimmerman v. Seyfert*, No. 03-CV-1389, 2007 WL 2080517, at *30 (N.D.N.Y. July 19, 2007) (McAvoy, J.). Given these circumstances, however skeptical the court may be that plaintiff ultimately will be able to establish that his First Amendment rights were infringed by the CNYPC's correspondence policy, genuine issues of material fact remain that must be resolved before this claim can be adjudicated. Accordingly, because such a dispute may only be resolved by a jury at trial, I recommend against the granting of

defendants' motion for summary judgment on this issue.[11]

###### b.    Telephone Policy

Plaintiff also alleges that he was denied access to use the telephone as a patient housed in the ACW. Dkt. No. 1 at 14; Dkt. No. 79-13 at 40, 43. At the same time, plaintiff concedes in his verified complaint that he was able to make at least two collect phone calls, but alleges that he was unable to complete one of the calls due to the prohibitive cost associated with the facility's call policy. Dkt. No. 1 at 18-19, 32-33. Moreover, although plaintiff testified that he was not permitted to use the telephone "[a]t any time," Dkt. No. 79-13 at 43-45, he conceded in opposition to defendants' motion for summary judgment that he made at least one phone call to a family member on December 12, 2013, at a time when he was housed in the ACW. Dkt. No. 84-1 at 7; Dkt. No. 84-5 at 15. In addition, plaintiff's medical records make multiple references to plaintiff's ability to make phone calls. Dkt. No. 80-1 at 34, 39, 42, 43, 65; Dkt. No.

---

[11]    Plaintiff alleges that defendant Sacco was responsible for the practices resulting in an infringement of his First Amendment rights by planning to keep the plaintiff confined to the ACW, where he could not write letters. Dkt. No. 1 at 32. In their motion, defendants argue that because defendant Sacco neither developed policies for the ACW nor made patient placement decisions with respect to that unit, he lacks the requisite personal involvement in the conduct giving rise to plaintiff's First Amendment claim, which should therefore be dismissed as against him. Dkt. No. 79-14 at 23-24. The issue of personal involvement will be addressed further on in this decision. *See* pp. 40-42, *post*.

80-2 at 5-6, 41, 48, 53, 55.

To the extent that plaintiff complains that the cost of collect calls restricted his ability to freely communicate with his family, that claim is not actionable. *Byrd v. Goord*, 2005 WL 2086321 (S.D.N.Y. Aug. 29, 2005) (dismissing constitutional challenge to "collect-call-only aspect of the telephone system"); *see Ahlers v. Townsend*, 9:12-CV-0575, 2014 WL 4365277, at *5 (N.D.N.Y. Aug. 28, 2014) (Hurd, J. *adopting report and recommendation by* Dancks, M.J) (citing *Edwards v. Horn*, No. 10 Civ. 6194(RJS)(JLC), 2012 WL 473481, at *4 (S.D.N.Y. Feb. 14, 2012) (other citations omitted).

The record is clear that while at the CNYPC, plaintiff did not have regular, unobstructed access to a telephone, despite his apparent wishes to the contrary. Although "there is no constitutionally guaranteed right of a prisoner to unrestricted use of a telephone," *Ahlers*, 2014 WL 4365277, at *5, if the use of a telephone is restricted or prohibited altogether, an inmate must be provided with an alternative means of communication. *See Pitsley v. Ricks*, No. 96–CV–0372, 2000 WL 362023, at *5 (N.D.N.Y. Mar. 31, 2000) (dismissing prisoner's section 1983 suit alleging improper denial of telephone access where an inmate had alternate means of

communication available). Since plaintiff alleges he was not afforded the right to freely communicate with the outside world by mail, a triable issue of fact exists as to this claim.

Much like plaintiff's allegations regarding the correspondence policy, I am also skeptical that plaintiff will ultimately be able to establish that his First Amendment rights were infringed by the telephone policy in place at the CNYPC. Nonetheless, genuine issues of material fact surrounding this claim remain that are not appropriately resolved on a motion for summary judgment. Accordingly, I recommend against the granting of defendants' motion for summary judgment on this issue.

c.    Reading Material Policy

Plaintiff alleges that he was not allowed to possess or access any reading materials, including books, magazines, and newspapers while at the CNYPC. Dkt. No. 1 at 14, 18; Dkt. No. 79-13 at 40, 57-58; Dkt. No. 84-5 at 7. Despite this claim, plaintiff's medical records indicate that he had frequent access to both books and magazines. *See e.g.*, Dkt. No. 80-1 at 22, Dkt. No. 80-2 at 7, 48, 61, 63, 65, 69, 72. Those records further reflect that plaintiff also had access to a library containing magazines. Dkt. No. 80-2 at 6.

In this instance, I conclude that plaintiff's allegation is unsupported by any record evidence, thereby providing a basis upon which I may conclude that no genuine dispute of material fact exists for trial. *See Ying Jing Gan v. City of N.Y.*, 996 F.2d 522, 532 (2d Cir. 1993) (concluding that the non-moving party may not defeat a motion for summary judgment based "simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible"). Although I would ordinarily conclude that plaintiff's verified complaint and his deposition testimony presented a triable issue of fact that turns on the credibility of witnesses, which would preclude the entry of summary judgment, this is one of the rare instances where the requirements for invoking the *Jeffreys* exception are satisfied.

The only evidence suggesting that plaintiff was not permitted to have access to reading materials is plaintiff's verified complaint and deposition testimony, neither of which provides specific details about the purported denial. Dkt. No. 1 at 14; Dkt. No. 79-13 at 40, 57-58. While, in support of his opposition to the pending motion, plaintiff has submitted an affidavit from a fellow inmate concerning access to reading materials, that affidavit addresses the fellow inmate's access, not plaintiff's access. Dkt. No. 84-5

34

at 7. Moreover, in response to the portion of defendants' statement of undisputed material facts, submitted pursuant to Local Rule 7.1(a)(3) stating "[p]laintiff frequently read books and magazines while on the ACW," plaintiff denied the statement without any citation to the record where the fact was disputed. Dkt. No. 84 at 4. Under these circumstances, where the only record evidence that exists to support plaintiff's allegation is his verified complaint and self-serving, incomplete deposition testimony, no reasonable factfinder could conclude that plaintiff was denied access to reading materials. *See Anderson*, 477 U.S. at 252 ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."); *Jeffreys*, 426 F.3d at 554; *McMahon v. Fura*, No. 10–CV–1063, 2011 WL 6739519, at *10 (N.D.N.Y. Dec. 23, 2013) (Lowe, M.J. (on consent)) (applying the *Jeffreys* exception where the only evidence supporting the plaintiff's version of events was his testimony that "he 'must have' been tased by 'an officer,'" and the defendants offered testimony from the only officer involved who had a taser that he did not use it). Accordingly, I recommend that defendants' motion for summary judgment be granted on this issue.

d.    Education and Vocational Programming

In opposition to defendants' summary judgment motion, plaintiff continues to maintain that he was denied access to various educational and vocational programming in violation of the First Amendment. Dkt. No. 84-1 at 3-4; *see* Dkt. No. 1 at 14, 18. That claim was previously dismissed upon the court's initial review pursuant to 28 U.S.C. §§ 1915(e), 1915A, and therefore will not be addressed by the court. *See* Dkt. No. 13 at 24-25.

e.    Communication Among Patients

Although I acknowledged plaintiff's allegations regarding his inability to communicate with other patients in my February 16, 2016 Report and Recommendation, Dkt. No. 47 at 17, defendants have not addressed this specific allegation in their motion for summary judgment beyond a fleeting reference in their reply memorandum of law. Dkt. No. 84 at 7. Nonetheless, because defendants' motion purports to seek summary judgment as to the entirety of plaintiff's First Amendment claim, and plaintiff has raised the issue in his opposition papers, I will address the allegation.

Plaintiff's claims with respect to this issue are unsupported by any record evidence. Accordingly, there is no basis upon which I may conclude

a genuine dispute of material fact exists for trial. *See Ying Jing Gan*, 996 F.2d at 532. The only evidence that suggests that plaintiff was not permitted to speak with other patients is his verified complaint and his deposition testimony neither of which provides any specific details about instances where he was prohibited from freely communicating. Dkt. No. 1 at 13-14; Dkt. No. 79-13 at 40. The affidavit submitted by plaintiff addresses his fellow inmate's ability to freely communicate, but not McClemore's ability to communicate. Dkt. No. 84-5 at 7. In contrast to the plaintiff's allegations, defendants have submitted evidence revealing that he frequently had contact with other patients, often bullying them or bartering with them for food. Dkt. No. 80-1 at 37; Dkt. No. 80-2 at 5-6, 55.

Under these circumstances, where the only record evidence that exists to support plaintiff's allegation is plaintiff's verified complaint and self-serving, incomplete deposition testimony, I find that no reasonable factfinder could conclude that plaintiff was denied the ability to communicate with other patients. *See Anderson*, 477 U.S. at 252; *Jeffreys*, 426 F.3d at 554; *McMahon*, 2011 WL 6739519, at *10. Accordingly, I recommend that defendants' motion for summary judgment be granted on this issue.

f.    Visitor Policy

Plaintiff complains that patients confined in the ACW, unlike patients

housed in other areas of the CNYPC, are not permitted to have visitors at

any time. Dkt. No. 1 at 14, 19; Dkt. No. 39-40, 44-45. The visitation policy

for the CNYPC provides as follows:

> [the] CNYPC is an acute care in-patient hospital.
> Due to the compromised condition of our patients
> upon arrival, visitation is restricted for a period of 30
> days following admission. During this period of time
> the patient is evaluated and efforts are made to
> stabilize the patient. In anticipation of achieving a
> level of clinical stability and the eventual receiving of
> visitors, the patient's treatment team will work with
> the patient to identify family members that will be
> screened and approved for visitation.

Dkt. No. 79-7 at 2. (emphasis removed). The policy also states that

"[v]isitors are limited to immediate family only," and that visitors must be

screened prior to being approved for visits. *Id.*; *see also* Dkt. Nos. 79-2

through 79-4. According to defendants, this visitor policy applies to the

entire facility, inclusive of the ACW. Dkt. No. 79-1 at 9.

On September 23, 2011, plaintiff was admitted directly to the ACW

where he remained for fourteen days. Dkt. No. 84-5 at 15. Plaintiff was

also admitted directly to the ACW on December 9, 2013, where he

remained for twenty-six days. Dkt. No. 84-5 at 15. Consistent with the

CNYPC's broad policy covering visitors for newly-admitted patients, plaintiff would not have been permitted to have visitors during either period regardless of whether or not he was admitted directly to the ACW. "It is well-settled law that inmates do no[t] enjoy an absolute right to visitation." *Mateo v. Martuscello*, Civ. No. 9:10-CV-1254 (MAD/RFT), 2012 WL 2178931, at *3 (N.D.N.Y. May 15, 2012), *report and recommendation adopted by* 2012 WL 2178928 (N.D.N.Y. Jun. 13, 2012) (citing *Block v. Rutherford*, 468 U.S. 576, 589 (1984)); *see Overton v. Bazzetta*, 539 U.S. 126, 132 (2003). The reason proffered by defendants for limiting visitors during a patient's initial admission to the facility – to allow for stabilization of a patient's mental health, *see* Dkt. No. 79-1 at 9 – is rationally related to legitimate interests, particularly in a facility that exists for the purpose of providing care and treatment to inmates with serious mental or behavioral disorders.

This leaves one time period during which plaintiff could have been denied visitors as a patient of the ACW – a nine-day period from October 24, 2011 through November 1, 2011. Dkt. No. 84-5 at 15. Although plaintiff conceivably could have been denied visitors during this timeframe, which would be inconsistent with the CNYPC's visitor policy, defendants have

submitted evidence that indicates that there is no record of any family member attempting to visit plaintiff during any period of his admission, including this nine-day period. Dkt. No. 79-1 at 9. As a result, on this record, I find that no reasonable factfinder could conclude that plaintiff was impermissibly denied visitors while he was patient of the ACW, and I recommended that defendants' motion on this issue be granted.

g.  Personal Involvement of Defendant Sacco

It is well settled that "[p]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [section] 1983." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (citing *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991); *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir. 1977)). As the Supreme Court has noted, a defendant may only be held accountable for his actions under section 1983. *See Ashcroft v. Iqbal*, 556 U.S. 622, 683 (2009) ("[P]etitioners cannot be held liable unless they themselves acted on account of a constitutionally protected characteristic."). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show "a tangible connection between the acts of a defendant and the injuries suffered." *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986). "To

40

be sufficient before the law, a complaint must state precisely who did what and how such behavior is actionable under law." *Hendrickson v. U.S. Attorney Gen.*, No. 91-CV-8135, 1994 WL 23069, at *3 (S.D.N.Y. Jan. 24, 1994).

Here, it is uncontested that defendant Sacco was not involved with the promulgation of polices that govern the CNYPC, and the ACW in particular. However, the placement of a particular patient in the ACW is governed by a variety of factors, which include the patient's diagnosis, stability level, and interactions with other patients and staff, *see* Dkt. No. 84 2, and defendant Sacco, as plaintiff's treating therapist, was responsible for discussing patient treatment with the supervising physician. Dkt. No. 79-11 at 2. Although defendant Sacco lacked the authority to make the final placement decisions, he did discuss and make recommendations regarding care and treatment of a particular patient. Dkt. No. 79-11 at 2. This includes, *inter alia*, patient placement decisions at the CNYPC. *Id.*

Defendant Sacco categorically denies recommending that plaintiff be placed on the ACW "based on any factor other than optimum patient care," Dkt. No. 79-11 at 2.   This, of course, is at odds with the allegations in

plaintiff's verified complaint. Dkt. No. 1 at 32.   However tempting it may be to resolve the factual discrepancies presented and find, based upon the somewhat convincing record now before the court, that no reasonable fact finder could conclude that defendant Sacco was personally involved in plaintiff's placement on the ACW, I nonetheless recommend denial of that portion of defendants' summary judgment.

C.   First Amendment Retaliation

Plaintiff's complaint, which is comprehensive, appears to set forth twenty separate claims against various of the defendants in the action. *See* Dkt. No. 1 at 38-43. None of the claims articulated in those paragraphs of plaintiff's complaint purports to assert a retaliation cause of action grounded in the First Amendment. Notwithstanding this failure, construing plaintiff's complaint with lenity, the court has considered certain of the allegations contained within it as asserting First Amendment retaliation claims against defendants Boyer and Sacco. Dkt. No. 13 at 23-24; Dkt. No. 47 at 18-23. In his complaint, for example, plaintiff alleges that defendant Boyer began "harass[ing him] by trying to start conflicts between other patients and plaintiff, and constantly . . . made threats of bodily harm towards plaintiff." Dkt. No. 1 at 11. He further alleges that

42

defendant Boyer retaliated against him by subjecting him to excessive force and denying him programing. *Id.* at 15-16, 20-23. With regard to defendant Sacco, plaintiff alleges that in December 2011, defendant Sacco told plaintiff that he would make his life "a living hell" because of the complaints lodged by the plaintiff and that thereafter, at defendant Sacco's direction, plaintiff was subjected to cruel and unusual conditions of confinement at the Great Meadow C.F.[12] Dkt. No. 1 at 24-25, 27-29.

In their motion defendants argue that even assuming plaintiff can establish that he engaged in conduct protected under the First Amendment, he cannot show that he suffered an adverse action that would support a First Amendment retaliation claim. Dkt. No. 79-14 at 32-35. In opposition, plaintiff contends that as a direct result of his complaints regarding his treatment while housed at the CNYPC, defendants Boyer

---

[12]    Ambiguity associated with this claim is furthered by virtue of the following statement made in plaintiff's complaint after describing defendant Boyer's harassment upon learning that plaintiff would be a witness against him with regard to a complaint made by another inmate:

> Plaintiff do [sic] not set forth a claim for relief in paragraphs 1 and 2. It is important that this court know that paragraphs 1 and 2 is [sic] only to provide this court with insight on incidence [sic] and the fact that the first two named Defendants were already in a court dispute with the staff whom Plaintiff had become a witness for. It is upon this information and belief, that lead up to the following facts.

Dkt. No. 1 at 12.

and Sacco subjected him to a retaliatory "campaign of harassment." Dkt. No. 84-1 at 13-20.

1.    <u>Legal Standard</u>

An inmate's rights are violated when a prison official takes adverse action against him, motivated by the inmate's exercise of a constitutional right, including the free speech provisions of the First Amendment. *See Friedl v. City of New York*, 210 F.3d 79, 85 (2d Cir. 2000) ("In general, a section 1983 claim will lie where the government takes negative action against an individual because of his exercise of rights guaranteed by the Constitution or federal laws."); *Franco v. Kelly*, 854 F.2d 584, 588-90 (2d Cir. 1988). As the Second Circuit has repeatedly cautioned, however, because such claims are easily incanted and inmates often attribute adverse action, including the issuance of misbehavior reports, to retaliatory animus, courts must approach such claims "with skepticism and particular care." *Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001), *overruled on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002); *accord, Davis*, 320 F.3d at 352.

To establish a *prima facie* claim under section 1983 for retaliatory conduct, a plaintiff must prove that (1) he engaged in protected conducted,

(2) the defendants took adverse action against him, and (3) there was a

causal connection between the protected activity and the adverse action –

in other words, that the protected conduct was a "substantial or motivating

factor" in the prison officials' decision to take action against the plaintiff.

*Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287

(1977); *Dillon v. Morano*, 497 F.3d 247, 251 (2d Cir. 2007); *Garrett v.*

*Reynolds*, No. 99-CV-2065, 2003 WL 22299359, at *4 (N.D.N.Y. Oct. 3,

2003) (Sharpe, M.J.). For conduct to qualify as adverse for purposes of

satisfying this test, it must "deter a similarly situated individual of ordinary

firmness from exercising his or her constitutional rights." *Davis*, 320 F.3d

at 353. "In order to satisfy the causation requirement, allegations must be

sufficient to support the inference that the speech played a substantial part

in the adverse action." *Id.* at 354 (quotation marks omitted).

If the plaintiff carries this burden, then to avoid liability the

defendants must show by a preponderance of the evidence that they

would have taken action against the plaintiff "even in the absence of the

protected conduct." *Mount Healthy*, 429 U.S. at 287. If taken for both

proper and improper reasons, a defendant's action may be upheld if it

would have been taken based on the proper reasons alone. *Graham v.*

*Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) (citations omitted).

Analysis of retaliation claims thus requires thoughtful consideration of the protected activity in which the inmate plaintiff has engaged, the adverse action taken against him, and the evidence tending to link the two. When such claims, which are exceedingly case-specific, are alleged in only conclusory fashion, and are not supported by evidence establishing the requisite nexus between any protected activity and the adverse action complained of, a defendant is entitled to the entry of summary judgment dismissing plaintiff's retaliation claims. *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983), *overruled on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002).

2.    Analysis

a.    Defendant Boyer

In July 2011, an employee of the CNYPC, Joseph Hubbard, filed a complaint against defendant Boyer. Dkt. No. 79-13 at 69-73; Dkt. No. 79-10 at 1. As a result, plaintiff was called upon to act as a witness against defendant Boyer in the subsequent investigation of Hubbard's complaint. Dkt. No. 79-13 at 69-72; Dkt. No. 84-1 at 14. Viewing the facts in the light most favorable to plaintiff, the court accepts that plaintiff's testimony

against defendant Boyer during an investigation is sufficient to show that he engaged in protected activity.[13]  *See, e.g., Vazquez v. Southside United Housing Dev. Fund Corp.*, No. 06-CV-5997, 2009 WL 2596490, at *12 (E.D.N.Y. Aug. 21, 2009).

Proceeding to the second and third prongs of the governing test, plaintiff asserts five separate instances of retaliatory conduct, claiming that defendant Boyer (1) recommended that plaintiff be admitted to the ACW; (2) physically assaulted him; (3) denied him access to work programs; (4) incited other patients to attack him; and (5) threatened to physically harm him.[14] Dkt. No. 79-13 at 103-112; Dkt. No. 84-5 at 5-8; *see also* Dkt. No. 1 at 21-22. Boyer denies engaging in the conduct that plaintiff alleges. Dkt. No. 79-10.

Plaintiff alleges that the various conduct about which he complains

---

[13]    Plaintiff also alleges that he made various complaints regarding defendant Boyer to the CNYPC's "Unit Chief," the CNYPC's "Risk Management," the Legal Aid Society, Prisoner's Legal Services, and "Quality of Care." *See* Dkt. No. 1 at 22; Dkt. No. 79-13 at 58, 115-117. Such complaints also constitute protected activity. *See e.g.*, *Graham*, 89 F.3d at 80.

[14]    Plaintiff also alleged during his deposition that defendant Boyer tampered with his food by taking "everything and blend[ing] it up" and serving him "slop." Dkt. No. 79-13 at 70, 74-76. The court notes, however, that there is no allegation regarding food tampering contained in plaintiff's complaint.   *See generally* Dkt. No. 1.

occurred between September 2011 and November 2011. Accordingly, there is close temporal proximity between plaintiff's cooperation in the investigation of defendant Boyer, July 2011, and the conduct allegedly undertaken by defendant Boyer. *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995) (citing *Flaherty*, 713 F.2d at 14). This temporal proximity could lead a reasonable factfinder to determine that the requisite nexus between protected conduct and adverse action has been established. Accordingly, analysis of the portion of defendants' summary judgment motion challenging plaintiff's retaliation claim as against defendant Boyer turns upon the issue of adverse action.

i.     Plaintiff's ACW admission

Plaintiff alleges that he was informed by other personnel that defendant Boyer recommended plaintiff be placed in the ACW when he returned to the CNYPC on September 23, 2011.[15] Dkt. No. 79-13 at 111-112; Dkt. No. 84-5 at 15. Plaintiff concedes, however, that placement decisions are informed by a variety of factors, including the patient's diagnosis and symptoms, current level of stability, and interactions with

---

[15]     Although this was plaintiff's first admission into the ACW, the ACW was not formally launched until September 2012. Dkt. No. 79-1 at 2-3. Thus, although plaintiff had multiple prior admissions to the CNYPC, the ACW did not exist at the time of those prior admissions. Dkt. No. 84-5.

other patients and staff on the wards. Dkt. No. 84 at 2. Defendants

contend that defendant Boyer "had no authority with respect to placement

of patients in the ACW (or any other ward), and such decisions were made

by medical doctors at [the] CNYPC." Dkt. No. 79-14 at 34; *see* Dkt. No.

80-2 at 48.

Defendant Boyer is a Senior Security Hospital Treatment Assistant,

and in that capacity is responsible for maintaining the safety and security

of patients and staff at the CNYPC. Although he may not have had the

medical authority to order a specific placement for a patient, given his

position, defendant Boyer certainly was in a position potentially to

influence the decision to assign plaintiff to the ACW. Dkt. No. 79-9 at 2;

Dkt. No. 79-15 at 29.

In light of the fact that the ACW is governed by a more restrictive set

of policies than those that apply to the CNYPC generally, I conclude a

reasonable factfinder could determine that placement in the ACW would

"deter a similarly situated individual of ordinary firmness from exercising

his or her constitutional rights." *Davis*, 320 F.3d at 353. Although I am

skeptical that plaintiff will ultimately prevail on this issue, given the volume

of record evidence demonstrating that plaintiff was admitted to the newly-

formed ACW as a result of a recent suicide attempt, it is not for this court to resolve this factual issue at this stage. Accordingly, I recommend that defendants' motion for summary judgment be denied on this issue.

ii.    Access to Work Programs

Plaintiff also alleges that he was denied access to the CNYPC's work program in November 2011. Dkt. No. 79-13 at 70, 104-106. It is well settled that job reassignments and terminations can, under the appropriate circumstances, constitute adverse action for purposes of the retaliation analysis. *Baker v. Zlochowon*, 741 F. Supp. 436, 439 (S.D.N.Y.1990) ("a claim for relief can be stated under section 1983 for job for reassignments or terminations which were in retaliation for an inmate's efforts to seek vindication of his [or her] legal rights ..."); *see also Jackson v. Cain*, 864 F.2d 1235, 1248-49 (5th Cir. 1989); *Gill v. Mooney*, 824 F.2d 1235, 1248-49 (2d Cir. 1987). This is so because "any 'otherwise routine administrative decision,' made in retaliation for the exercise of constitutional rights could give rise to a cause of action." *Baker*, 741 F. Supp. at 439, (quoting *Gill*, 824 F.2d at 194). Here, there is sufficient evidence from which a reasonable factfinder could conclude that the plaintiff's inability to participate in the CNYPC's work program was

sufficiently adverse to deter a similarly situated person of ordinary firmness from exercising rights guaranteed under the First Amendment. *Davis v. Artuz*, 133 F.3d 906, 1998 WL 29763 at *1 (2d Cir. 1998) ("While a prisoner may not have a constitutional right to a specific job assignment, this Circuit has recognized that retaliation against a prisoner for pursuing a grievance violates the right to petition government for the redress of grievances guaranteed by the First and Fourteenth Amendments and is actionable under § 1983."). Accordingly, I recommend that defendants' motion for summary judgment be denied on this ground.

### iii.    Threats and Physical Assault

Plaintiff next alleges that defendant Boyer subjected him to verbal harassment, threats, and an eventual assault after Boyer learned of McClemore's cooperation in connection with the investigation into his conduct. Dkt. No. 79-13 at 70, 104-105. In general, "[i]nsulting or disrespectful comments directed at an inmate generally do not rise to" the level of an adverse action of the kind that is required to support a First Amendment retaliation claim. *Davis*, 320 F.3d at 353. However, a verbal threat may constitute adverse action if that threat is sufficiently specific. *Barrington v. New York*, 806 F. Supp. 2d 730, 746 (S.D.N.Y. 2011); see

*Ford v. Palmer*, 539 Fed. Appx. 5, 5 (2d Cir. 2013) (summary order) (finding that a verbal threat constituted adverse action where corrections officer threatened to poison the plaintiff in retaliation for filing grievances). In any event, a threat of physical violence, when followed by an alleged assault, as is alleged by the plaintiff to have occurred, plainly rises to the level of an adverse action for purposes of a retaliation claim. *See, e.g., Barrington v. New York*, 806 F. Supp. 2d 730, 748 (S.D.N.Y. 2011).

Although the parties dispute whether the assault occurred as alleged by the plaintiff, at this procedural stage I recommend denial of that portion of defendants' motion challenging plaintiff's retaliation claim on this ground.

b.    Defendant Sacco

Plaintiff alleges that on December 13, 2011, he received a telephone call from "Quality of Care" concerning complaints lodged regarding his treatment. Dkt. No. 1 at 24-25; Dkt. No. 79-13 at 51-52. Defendant Sacco, who relayed the message to plaintiff, warned McClemore that if he "wanted to complain so much, that he [would make plaintiff's] life a living hell." Dkt. No. 1 at 24-25; Dkt. No. 79-13 at 51-52. Plaintiff alleges that within several days, Sacco told plaintiff that he would have an opportunity

to commit suicide before discharging him from the CNYPC to the Great

Meadow C.F. Dkt. No. 1 at 24-25; Dkt. No. 79-13 at 51-52. Sacco denies

these allegations. Dkt. No. 79-11 at 2.

Viewing the facts in the light most favorable to plaintiff, the court

accepts, and defendants do not seriously dispute, that plaintiff's complaint

to Quality of Care constituted a protected conduct for purposes of

plaintiff's First Amendment retaliation claim. *Johnson v. Eggersorf*, 8 F.

App'x 140, 144 (2d Cir. 2001); *Graham*, 89 F.3d at 80. In addition,

plaintiff's discharge from the CNYPC into the Great Meadow C.F. could

properly be regarded as an adverse action for purposes of plaintiff's First

Amendment retaliation claim. *Davis v. Kelly*, 160 F.3d 917, 920 (2d

Cir.1998) (noting that while "[a] prisoner has no liberty interest in

remaining at a particular correctional facility," prison authorities "may not

transfer an inmate in retaliation for the exercise of constitutionally

protected rights."); *Hendricks v. Coughlin*, 114 F.3d 390, 393-94 (2d Cir.

1997).

The question then becomes whether plaintiff's protected activity was

a "substantial or motivating factor" in defendant Sacco's recommendation.

Although defendant Sacco asserts that he does not have "final authority"

over placement decisions at the CNYPC, Sacco was a member of plaintiff's treatment team, and he concedes that he occasionally made recommendations regarding patient care and treatment. Dkt. No. 79-11 at 2; Dkt. No. 80-1 at 13. What is fatal to plaintiff's retaliation claim, however, is that his medical records reveal his treatment team was recommending his discharge prior to the date that defendant Sacco learned of plaintiff's complaint. Dkt. No. 80-1 at 42-43 ("In regard to his plan, the team will be presenting him to the discharge committee on 12/6/11."). Because the adverse action upon which this potion of plaintiff's retaliation claim is predicated preceded defendant Sacco's awareness of plaintiff's complaint, no reasonable factfinder could conclude that defendant Sacco's recommendation was motivated by plaintiff's exercise of his First Amendment right. Accordingly, I recommend that defendants' motion on this ground be granted.[16]

### D.    Eighth Amendment Conditions of Confinement Claim

In his complaint, plaintiff asserts conditions of confinement claims against defendant Sacco, based upon his confinement in a strip cell at the

---

[16]    Because I recommend that plaintiff's motion be granted on the merits, I will not address defendants' alternative argument regarding defendant Sacco's personal involvement in connection with this claim.

Great Meadow C.F., and against defendants Bosco, Conley, and Boyer, based upon conditions to which he was exposed at the CNYPC. In their motion, defendants argue that plaintiff's claims are inconsistent with the record evidence, and further that even if the conditions were as plaintiff describes, those conditions did not seriously threaten plaintiff's health or safety. Dkt. No. 79-14 at 24-28. Plaintiff responds in opposition by arguing that the conditions he experienced were sufficiently serious to constitute a deprivation of his Eighth Amendment rights. Dkt. No. 84-1 at 8-12.

1.   Legal Standard

The Eighth Amendment prohibits punishment that is "incompatible with 'the evolving standards of decency that mark the progress of a maturing society[,]' or 'involve[s] the unnecessary and wanton infliction of pain[.]'" *Estelle v. Gamble*, 429 U.S. 97, 102-03 (1976) (quoting *Trop v. Dulles*, 356 U.S. 86, 100-01 (1958) and *Gregg v. Georgia*, 428 U.S. 153, 169-73 (1976) (citations omitted)). While the Eighth Amendment "'does not mandate comfortable prisons,' neither does it permit inhumane ones." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981)); *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013).

55

A claim alleging that prison conditions have violated the Eighth

Amendment must satisfy both an objective and a subjective requirement.

*Walker*, 717 F.3d at 125; *Jolly v. Coughlin*, 76 F.3d 468, 480 (2d Cir.

1996). To meet the objective element, "the plaintiff must demonstrate that

the conditions of his confinement result in 'unquestioned and serious

deprivations of basic human needs.'" *Jolly*, 76 F.3d at 480 (quoting

*Anderson v. Coughlin*, 757 F.2d 33, 35 (2d Cir. 1985)); *see also Walker*,

717 F.3d at 125 ("To meet the objective element, the inmate must show

that the conditions, either alone or in combination, pose an unreasonable

risk of serious damage to his health."). In a prison setting, basic needs

include "food, clothing, medical care, and safe and sanitary living

conditions." *Walker*, 717 F.3d at 125 (citing, inter alia, *Rhodes*, 452 U.S. at

347). As to the subjective requirement, "the plaintiff must demonstrate that

the defendants imposed those conditions with 'deliberate indifference.'"

*Jolly*, 76 F.3d at 480 (quoting *Wilson v. Seiter*, 501 U.S. 294, 297 (1991));

see also *Walker*, 717 F.3d at 125; *Waldo v. Goord*, No. 97-CV-1385, 1998

WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J., adopting report and

recommendation by Homer, M.J.). Deliberate indifference exists if an

official "knows of and disregards an excessive risk to inmate health or

safety; [he] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837; see also *Walker*, 717 F.3d at 125; *Waldo*, 1998 WL 713809, at *2.

> 2.    Analysis

>> a.    Sacco and Great Meadow C.F.

Plaintiff's claim regarding the conditions of confinement he experienced while at the Great Meadow C.F. is premised on the allegation that defendant Sacco single-handedly orchestrated his nearly two-month confinement in an observation cell within that facility. Dkt. No at 1 at 28-29. Plaintiff admits, however, that he was initially housed in the general population at that prison facility, and was only later transferred to an observation cell after attempting suicide on January 10, 2012. Dkt. No. 79-13 at 99.

According to defendant Sacco, he has no "role in the placement of [inmates] within the DOCCS facility." Dkt. No. 79-11 at 3. Nevertheless, as part of plaintiff's treatment team, defendant Sacco did participate in two patient care management telephone conferences with the medical staff at the Great Meadow C.F. Dkt. No. 79-11 at 4. During each of those

conversations, plaintiff's CNYPC treatment team recommended that McClemore be placed in a transitional intermediate care program ("TrICP") of the type located at certain DOCCS facilities. Dkt. No. 80-4 at 13, 45, 65. Beyond plaintiff's conclusory allegation, however, there is nothing in the record to suggest defendant Sacco recommended that plaintiff be specifically placed in an observation cell.

The record also reveals that while plaintiff was housed in the observation cell, he was openly hostile and uncooperative, declining to speak with the medical staff or to have his vitals taken, and refusing to eat or take his medication. Dkt. No. 80-4 at 7-10. Although plaintiff indicated to staff that he wanted to be discharged from the observation cell, he also expressed that he would "kill himself when discharged to [general population]." *Id.* at 10-12. During the times when plaintiff was taken off of one-to-one watch in the observation cell, he ingested three plastic sporks, as well as parts of his Styrofoam meal tray. *Id.* at 7, 11.

Given these uncontested facts, no reasonable factfinder could conclude that defendant Sacco was responsible for plaintiff's nearly two-month confinement in an observation cell, and the conditions that resulted from that confinement. Plaintiff's suppositions are supported by only his

bare, speculative, self-serving, and unsubstantiated allegations and ignore compelling documentary evidence revealing a proper basis for his confinement in an observation cell. In short, plaintiff's placement in the Great Meadow C.F. observation cell was the result of his suicide attempt, self-harming, and other concerning behaviors, and no reasonable factfinder could conclude otherwise. Accordingly, I recommend that defendants' motion be granted with respect to plaintiff's Eighth Amendment claim against defendant Sacco.

b.    Defendants Bosco, Conley, and Boyer

Many of plaintiff's allegations regarding his conditions of confinement in the ACW overlap with his First Amendment claims. He complains of a litany of conditions in the ACW, contending that he was prohibited from (1) wearing shoes; (2) talking to other residents; (3) possessing any additional clothing other than what he was wearing when he arrived;[17]  (4) leaving the door to his room open; (5) possessing or requesting a pen, paper, magazine, or book; (6) accessing a telephone; (7) participating in treatment programs or religious services; (8) leaving his room at any time; and (9) using the bathroom as needed. Dkt. No.1 at 9-10, 13-14, 18, 27-

---

[17]  Plaintiff testified during his deposition, however, that he was provided with clean clothing "[m]aybe every other day[.]" Dkt. No. 79-13 at 64.

29; Dkt. No. 79-13 at 61-68. In addition, plaintiff complains that during the

time he was housed in the ACW, he was forced to sleep on a mattress on

the floor. Dkt. No. 1 at 18; Dkt. No. 79-13 at 65. Plaintiff alleges that these

policies governing the ACW were promulgated by defendants Bosco and

Conley, and that he was housed in that ward at the direction of defendant

Boyer. *Id.* at 9-10, 15; Dkt. No. 79-13 at 66-70.

Having carefully reviewed the record now before the court, I find that

no reasonable juror could conclude that the conditions of plaintiff's

confinement, either alone or in combination, posed an unreasonable risk

of serious damage to his health. *Walker*, 717 F.3d at 125. Although the

conditions that he experienced may been unpleasant, "society does not

expect or intend prison conditions to be comfortable, [and] only extreme

deprivations of basic human needs are sufficient to sustain a [conditions of

confinement] claim." *Blyden v. Mancusi*, 186 F.3d 252, 263 (2d Cir. 1999).

I also note, moreover, that although plaintiff was not permitted to

freely use the bathroom due to the CNYPC's bathroom access policy,

which often required him to wait up to forty-five minutes, "[i]ndividuals in

custody do not have a constitutional right to use the bathroom or to

shower whenever they please." *Treat v. Cent. New York Psychiatric Ctr.*,

No. 12-CV-602, 2013 WL 6169746, at *2 (N.D.N.Y. Nov. 20, 2013) (Sharp, J. *adopting report and recommendation in its entirety* from Peebles, M.J.) (citing *Odom v. Keane*, No. 95-CV-9941, 1997 WL 576088, at *4-*5 (S.D.N.Y. Sept. 17, 1997)); *see Whitted v. Lazerson*, 96 Civ. 2746, 1998 WL 259929, at *3 (S.D.N.Y. May 21, 1998) ("temporary deprivation of the right to use the toilet, in the absence of serious physical harm or a serious risk of contamination, simply does not rise to the level of an Eighth Amendment violation"). Similarly, although a deprivation of clothing could be sufficient to state an Eighth Amendment conditions of confinement claim, plaintiff was not deprived of clothing because it was provided at least every other day. Dkt. No. 79-13 at 64-65. Plaintiff's remaining allegations simply do not reveal conditions posing an excessive risk to his health or safety, given the clinical objectives of the staff on the ACW, as well as plaintiff's well-documented history of suicide attempts.

With respect to the subjective element, there is also no evidence in the record before the court from which a reasonable factfinder could conclude that defendants Bosco, Conley, and Boyer subjected the plaintiff to unsatisfactory conditions of confinement with deliberate indifference.[18]

---

[18]    Because I recommend dismissal on the merits, I will not address defendants' alternative argument regarding defendant Boyer's lack of personal involvement with

In sum, because I conclude no reasonable factfinder could find that the objective and subjective elements of the controlling Eighth Amendment test could be satisfied by plaintiff, I recommend that the portion of defendants' motion for summary judgment addressing this issue be granted, and that plaintiff's conditions of confinement claim be dismissed.

E.    Eighth Amendment Excessive Force Claim

In his complaint, plaintiff alleges that on November 26, 2011, defendant Boyer escorted him into a side room where he was punched and then knocked to the floor. Dkt. No. 1 at 21-22. Defendants argue that plaintiff's excessive force claim lacks sufficient corroboration, once again invoking the *Jeffreys* exception. Dkt. No. 79-14 at 35-37. In opposition, plaintiff responds by generally repeating and elaborating on his allegations, contending that he was subjected to an unwitnessed assault by defendant Boyer. Dkt. No. 84-1 at 21-22.

1.    Legal Standard

A plaintiff's constitutional right against cruel and unusual punishment is violated by an "unnecessary and wanton infliction of pain." *Whitley v. Albers,* 475 U.S. 312, 319 (quotation marks omitted); *Griffin v. Crippen,*

---

respect to this claim. Dkt. No. 79-14 at 28.

193 F.3d 89, 91 (2d Cir. 1999). "A claim of cruel and unusual punishment in violation of the Eighth Amendment has two components – one subjective, focusing on the defendant's motive for his conduct, and the other objective, focusing on the conduct's effect." *Wright v. Goord*, 554 F.3d 255, 268 (2d Cir. 2009) (citing *Hudson,* 503 U.S. at 7-8; *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999)). To satisfy the subjective requirement in an excessive force case, the plaintiff must demonstrate that "the defendant had the necessary level of culpability, shown by actions characterized by wantonness in light of the particular circumstances surrounding the challenged conduct." *Wright*, 554 F.3d at 268 (quotation marks omitted). This inquiry turns on "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Hudson v. McMillian,* 503 U.S. 1, 6 (1992) (quotation marks omitted); *accord*, *Blyden*, 186 F.3d at 262. The Supreme Court has emphasized that the nature of the force applied is the "core judicial inquiry" in excessive force cases – not "whether a certain quantum of injury was sustained." *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010) (per curiam). Accordingly, when considering the subjective element of the governing Eighth Amendment test, a court must be mindful that the

absence of serious injury, though relevant, does not necessarily negate a finding of wantonness. *Wilkins*, 559 U.S. at 37; *Hudson*, 503 U.S. at 9.

Additionally, courts must bear in mind that "[n]ot every push or shove, even if it later may seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights." *Romano v. Howarth*, 998 F.2d 101, 105 (2d Cir. 1993) (quotation marks omitted); *see also Griffin*, 193 F.3d at 91. "The Eighth Amendment's prohibition of cruel and unusual punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Hudson*, 503 U.S. at 9-10 (quotation marks omitted).

"The objective component [of the excessive force analysis] . . . focuses on the harm done, in light of 'contemporary standards of decency.'" *Wright*, 554 F.3d at 268 (quoting *Hudson*, 503 U.S. at 8); *see also Blyden*, 186 F.3d at 263 (finding the objective component "context specific, turning upon 'contemporary standards of decency'"). In assessing this component, a court must ask whether the alleged wrongdoing is objectively harmful enough to establish a constitutional violation. *Wilson v. Seiter*, 501 U.S. 294, 303 (1991); *accord Hudson*, 503 U.S. at 8; *see also*

*Wright*, 554 F.3d at 268. "But when prison officials use force to cause harm maliciously and sadistically, 'contemporary standards of decency always are violated. This is true whether or not significant injury is evident.'" *Wright*, 554 F.3d at 268-69 (quoting *Hudson*, 503 U.S. at 9) (alterations omitted)). The extent of an inmate's injury is but one of the factors to be considered in determining whether a prison official's use of force was "unnecessary and wanton" because "injury and force . . . are imperfectly correlated[.]" *Wilkins*, 559 U.S. at 38. In addition, courts consider the need for force, whether the force was proportionate to the need, the threat reasonably perceived by the officials, and what, if anything, the officials did to limit their use of force. *Hudson*, 503 U.S. at 7; *Whitley*, 475 U.S. at 321; *Romano*, 998 F.2d at 105.

Finally, on a motion for summary judgment, where the record evidence could reasonably permit a rational factfinder to find that a corrections officers has used force maliciously and sadistically, dismissal of an excessive force claim is inappropriate. *See Wright*, 554 F.3d at 269 (reversing summary dismissal of the plaintiff's complaint, though suggesting that prisoner's evidence of an Eighth Amendment violation was "thin" as to his claim that a corrections officer struck him in the head, neck,

shoulder, wrist, abdomen, and groin, where the "medical records after the .
. . incident with [that officer] indicated only a slight injury") (citing *Scott v.
Coughlin*, 344 F.3d 282, 291 (2d Cir. 2003)).

    2.   <u>Analysis</u>

As was noted above, plaintiff alleges that during the course of his
transfer between wards on November 26, 2011, he was left alone with
defendant Boyer, who then assaulted him, causing him to suffer swelling
of his lip and face. Dkt. No. 1 at 22-23; Dkt. No. 79-13 at 69, 107-11. In
support of the portion of their motion seeking dismissal of this claim,
defendants submit a declaration from defendant Boyer, in which he
categorically denies assaulting the plaintiff. *See generally* Dkt. No. 79-10.
Defendants have also provided plaintiff's medical records, which contain a
progress note from the day after the assault is alleged to have occurred. In
relevant part, that progress note reflects that the plaintiff "was making
threats of physical harm to [Boyer and other members of the staff and that
plaintiff] . . . was stating that he is going to get back and take staff down
with him." Dkt. No. 80-1 at 37.

Despite defendants' protestations to the contrary, plaintiff's version
of the relevant events is not necessarily inconsistent with the evidence in

the record, a fact which counsels against invoking the *Jeffreys* exception.

The record substantiates that the plaintiff was in fact transferred between

wards on November 26, 2011, as he has alleged. Dkt. No. 84-5 at 15. A

progress note in plaintiff's medical record from the following day indicates

that plaintiff was complaining that he was going "to get back and take staff

down with him." Dkt. No. 80-1 at 37. Regardless of how tempting it may be

to resolve the factual discrepancies presented and find, based upon the

somewhat convincing evidence now before the court, that no reasonable

factfinder could credit plaintiff's version and find that the alleged assault

did not occur, the evidence, when viewed in a light most favorable to the

plaintiff, counsels against the grant of summary judgment. It is for the

factfinder, having heard all of the evidence, to make that pivotal credibility

determination and resolve the issues of fact surrounding whether the

assault incident occurred, as claimed by the plaintiff.

Defendants also argue that plaintiff's excessive force claim is subject

to dismissal because plaintiff's medical records fail to reference an assault

or injury. Dkt. No. 79-14 at 35-37. This argument fails to take into account

the well-established principle that the absence of any serious injury from

an alleged assault by prison personnel, while relevant, does not

67

necessarily negate a finding that force has been applied wantonly and maliciously. *Wilkins*, 559 U.S. at 37; *Hudson*, 503 U.S. at 9. Put another way, the proper inquiry is not whether an inmate's injuries are *de minimis*, but whether the use of force is *de minimis. Id.*

Based on the present record, there exists a dispute of fact with respect to whether plaintiff was assaulted by defendant Boyer on November 26, 2011. Given the conflicting accounts provided by the parties, this case squarely presents an issue of credibility that is not appropriately resolved on a motion for summary judgment. *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996). Accordingly, I recommend that defendants' motion be denied to the extent that it seeks dismissal of this claim.

F.    Eighth Amendment Deliberate Medical Indifference Claim

Plaintiff's complaint contains allegations against defendant Berkheimer accusing him of deliberate medical indifference to his serious medical needs. Dkt. No. 1 at 29-30, 32-34. Those allegations concern an alleged failure to treat plaintiff for a rash, and to provide appropriate treatment for his mental illness and suicidal ideations. *Id.* In their motion, defendants argue that Dr. Berkheimer rendered adequate and appropriate

mental health care and that plaintiff received appropriate medical treatment for his rash. Dkt. No. 79-14 at 37-40. In opposition, plaintiff does not address his allegations regarding the rash, but contends that the mental health treatment that he received from Dr. Berkheimer was "unreasonable" and "inadequate." Dkt. No. 84-1 at 22-25.

      1.   <u>Legal Standard</u>

As in the case with regard to plaintiff's other Eighth Amendment claims, the assertion that prison officials have been deliberately indifferent to his serious medical needs must satisfy both objective and subjective requirements. *Wright*, 554 F.3d at 268; *Price v. Reilly*, 697 F. Supp. 2d 344, 356 (E.D.N.Y. 2010). To meet the objective requirement, the alleged deprivation must be "sufficiently serious." *Farmer*, 511 U.S. at 844; *see also Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006) ("[T]he objective test asks whether the inadequacy in medical care is sufficiently serious."). Factors informing this inquiry include "whether a reasonable doctor or patient would find it important and worthy of comment, whether the condition significantly affects an individual's daily activities, and whether it causes chronic and substantial pain." *Salahuddin*, 467 F.3d at 280 (quotation marks and alterations omitted). Determining whether a

deprivation is sufficiently serious requires a court to examine the seriousness of the deprivation, and whether the deprivation represents "a condition of urgency, one that may produce death, degeneration, or extreme pain[.]" *Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011) (quotation marks omitted). Importantly, it is "the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract, that is relevant for Eighth Amendment purposes." *Smith v. Carpenter*, 316 F.3d 178, 186 (2d Cir. 2003).

To satisfy the subjective element, the plaintiff must demonstrate that defendant Berkheimer had "the necessary level of culpability, shown by actions characterized by 'wantonness.'" *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999). "In medical-treatment cases . . ., the official's state of mind need not reach the level of knowing and purposeful infliction of harm; it suffices if the plaintiff proves that the official acted with deliberate indifference to inmate health." *Salahuddin*, 467 F.3d at 280. "Deliberate indifference," in a constitutional sense, "requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." *Id.*; *see also Farmer*, 511 U.S. at 837 ("[T]he

official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."). "Deliberate indifference is a mental state equivalent to subjective recklessness, as the term is used in criminal law." *Salahuddin*, 467 F.3d at 280 (citing *Farmer*, 511 U.S. at 839-40).

    2.  <u>Analysis</u>

        a.  <u>Plaintiff's Rash</u>

Plaintiff's complaint alleges that upon his admission to the CNYPC on December 9, 2013, he was suffering from a rash, which "covered his entire body" and was "leaking yellowish fluid." Dkt. No. 1 at 30. Plaintiff's medical records, however, fail to substantiate those allegations. Although the record does reflect that plaintiff suffered from, *inter alia*, "dermatitis" or "pruritus" on December 9, 2013, they also show that it was limited to his forearms. Dkt. No. 80-2 at 26, 31. In addition, there is no indication from plaintiff's medical records that the rash was "leaking yellowish fluid." In the absence of evidentiary support, plaintiff has "failed to produce sufficient evidence that [his skin condition] . . . qualified as a 'serious medical need.'" *Sledge v. Kooi*, 564 F.3d 105, 108 (2d Cir. 2009); *see Gillard v. Rovelli,* No. 9:09–CV–0860, 2010 WL 4905240, at *11 (N.D.N.Y. Sept. 29, 2010),

*report and recommendation adopted by* 2010 WL 4945770 (N.D.N.Y. Nov. 24, 2010) (holding that, *inter alia*, a facial rash did not plausibly suggest the existence of a serious medical condition); *Gonzalez v. Wright,* No. 9:06–CV–1424, 2010 WL 681323, at * 11 (N.D.N.Y. Feb. 23, 2010) (holding that a rash is not sufficiently serious to support a claim for deliberate indifference to serious medical needs). Moreover, although plaintiff alleges that he failed to receive medical treatment for the rash for nearly two weeks, his medical records reveal that the medical staff took note of his condition, but concluded that it should be "monitor[ed]." Plaintiff did not otherwise complain about the rash again until December 19, 2013, at which point he was prescribed Eucerin, Lidex, and Benadryl. Dkt. No. 80-2 at 57. The fact that plaintiff may have preferred a different course of treatment upon intake does not give rise to an Eighth Amendment violation. *Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998).

b.    Plaintiff's Mental Health Treatment

Addressing the objective element of plaintiff's claim that his mental health treatment was deficient defendants assume, for purposes of this motion, that his mental health condition constituted a serious medical need. Dkt. No. 79-14 at 38-39. Indeed, cases from within this circuit have

observed that mental disorders can represent serious medical needs,

particularly when those disorders are accompanied by suicidal ideations

and attempts. *See, e.g.*, *Loadholt v. Lape*, No. 09-CV-0658, 2011 WL

1135934, at *3 (N.D.N.Y Mar. 3, 2011) (Treece, M.J.); *Zimmerman v.*

*Burge*, No. 9:06–CV–0176 (GLS/GHL), 2009 WL 3111429, at *8 (N.D.N.Y.

Sept. 24, 2009) (collecting cases); *Hamilton v. Smith*, No. 06-CV-805,

2009 WL 3199531, at *14 (N.D.N.Y. Jan. 13, 2009) (Homer, M.J.)

(plaintiff's claimed history of suicidal thoughts were sufficient to raise a

question of fact as to serious medical need); *Guglielmoni v. Alexander*,

583 F. Supp. 821, 826 (D. Conn. 1984) ("Treatment of mental disorders of

mentally disturbed inmates is . . . a 'serious medical need' under *Estelle*.").

        With respect to the subjective element, plaintiff alleges that Dr.

Berkheimer was deliberately indifferent to his serious medical needs when

he (1) prematurely discharged plaintiff from the CNYPC in December

2011; and (2) failed to provide adequate medical treatment between

December 2013 and January 2014. Having carefully reviewed the record, I

find that no reasonable factfinder could conclude in either instance that Dr.

Berkheimer's treatment was inadequate or, to the extent it could be

construed as inadequate, that it was sufficiently serious. Plaintiff's

allegations boil down to a disagreement regarding the course of treatment that Dr. Berkheimer chose. The Eighth Amendment does not afford prisoners a right to medical treatment of their choosing, and prison medical personnel are vested with broad discretion to determine what method of care and treatment to provide to their patients. *Estelle*, 429 U.S. at 107.

### i.    December 2011 Discharge

Plaintiff alleges that Dr. Berkheimer was deliberately indifferent to his serious medical needs because he prematurely discharged plaintiff back into DOCCS custody on December 20, 2011. According to plaintiff, on the day before the discharge, December 19, 2011, Dr. Berkheimer visited him and stated, "if you want to commit suicide, you will have your chance. I'm going to discharge you." Dkt. No. 79-13 at 124; *see* Dkt. No. 1 at 25. Dr. Berkheimer does not address this allegation, but indicates that the plaintiff's discharge from the CNYPC was based on his professional judgment that plaintiff "was sufficiently stable for discharge back to DOCCS custody at that time." Dkt. No. 79-9 at 9.

Plaintiff's medical records reveal that Dr. Berkheimer signed plaintiff's discharge plan December 16, 2011. Dkt. No. 80-1 at 60-68. That

included the following observation:

> [plaintiff] is invested in staying in the facility and is future oriented to remain here, despite his requests to be discharged [from CNYPC]. . . . His interests in participating in numerous activities above are not indicative of someone who actively wants to die, but one who is comfortable, fully engaged, and invested in improving his skills for the future. It should also be noted that [plaintiff] was more invested in recreational activities than engaging in [treatment] services. *He has reached the maximum benefit from the inpatient service. . . .* [Plaintiff] has a long [history] of endorsing psychiatric symptoms and making threats of suicide to make various demands from [OMH] and [DOCCS] staff.

Dkt. No. 80-1 at 64 (emphasis added). Plaintiff's records further reflect that

although plaintiff was continuing to express that he wanted to end his life,

these "reports of suicide [were] directly related to his wanting to stay at

[the] CNYPC." Dkt. No. 80-1 at 12.

Plaintiff's discharge summary indicates that his treatment team at the

CNYPC, which included defendant Berkheimer, was advocating for

plaintiff to have continuing mental health treatment in the form of

placement in the TrICP program at the Great Meadow C.F. Dkt. No. 80-1 at 65. The discharge summary also indicates that although plaintiff

appeared to be angry, was cooperative, maintained good eye contact, and

denied suicidal and homicidal ideations and denied auditory and visual

hallucinations. *Id.* at 67.

Even assuming that Dr. Berkheimer made the callous statements that plaintiff attributes to him, plaintiff has not adduced evidence that his discharge from the CNYPC deviated from reasonable medical practice, much less that Dr. Berkheimer acted with a culpable state of mind in making that decision. Further assuming that Dr. Berkheimer "knew" that plaintiff was suicidal, as he alleges, Dkt. No. 79-13 at 123, the medical records indicate that plaintiff had received the maximum therapeutic benefit from treatment at the CNYPC. Dkt. No. 80-1 at 64. At best, plaintiff's allegations would rise to a level sufficient to support a claim of negligence or malpractice, neither of which is an actionable under section 1983. *See Estelle*, 429 U.S. at 107; *see Clark v. Westchester Cnty.*, No. 96 CIV. 8381(DLC), 1998 WL 214772, at *4 (S.D.N.Y. May 1, 1998) (dismissing the plaintiff's deliberate indifference claim where the plaintiff failed to identify "any serious medical need that went unaddressed because of the discharge"). Accordingly, I recommend that defendants' motion for summary judgment be granted on this issue.

    ii.    December 2013 to January 2014 Treatment

Lastly, plaintiff alleges that Dr. Berkheimer was deliberately

indifferent to his serious medical needs because he failed to provide adequate mental health treatment between December 2013 to January 2014. Dkt. No. 1 at 30-36; Dkt. No. 79-13 at 135-138. Plaintiff's medical records indicate that at the time he was admitted to the CNYPC on December 9, 2013, following the ingestion of a potentially fatal object, plaintiff expressed to medical staff that he "had no intention of ending his life" and that he "was getting sick of Clinton C.F. and wanted to get out of there." Dkt. No. 80-2 at 5; *see id.* at 24-31 (admission summary). Although medical staff believed that plaintiff was engaging in behaviors to manipulate his placement, Dr. Berkheimer nevertheless placed plaintiff on finger food diet and limited his access to sharp objects. *Id.* at 19; Dkt. No. 79-13 at 131; Dkt. No. 1 at 31-32. Several days into his placement at the CNYPC, when plaintiff reported suffering insomnia and sleeplessness, Dr. Berkheimer also prescribed him "STAT" medications.[19] Dkt. No. 80-2 at 47.

Plaintiff alleges that following an attempt at self-harm requiring surgical intervention and an eight-day hospital admission, Dr. Berkheimer

---

[19]    While plaintiff alleges that he was "hearing voices and stuff like that," his medical records indicate that he denied auditory and visual hallucinations to medical staff during that time period. *Compare* Dkt. No. 79-13 at 133 *with* Dkt. No. 80-2 at 4, 9, 33.

approached him and stated "you tried to commit suicide on my ward? I'm going to [the] treatment team and we are going to talk about this little tantrum you are having and I'm going to discharge your ass[.]" Dkt. No. 79-13 at 135-36. Nevertheless, Dr. Berkheimer placed plaintiff on constant observation upon his return to the CNYPC. *Id.* at 35-36, 71, 74. Although plaintiff was eventually removed from constant observation, Dr. Berkheimer returned to him to constant observation for a short period when he told the medical staff that he intended to ingest staples that he had been hoarding. *Id.* at 75-76.

Plaintiff characterizes Dr. Berkheimer's treatment as unreasonable and contends that he was deprived of needed medical treatment. Even assuming that Dr. Berkheimer made the callous statements that plaintiff again attributes to him, plaintiff has not adduced evidence that the treatment that he received deviated from reasonable medical practice, much less that Dr. Berkheimer acted with a culpable state of mind in making that decision. Plaintiff's allegations, at best, reflect his disagreement with Dr. Berkheimer's course of treatment, and could potentially give rise to claims negligence or malpractice, neither of which is an actionable section 1983 claim. *See Estelle*, 429 U.S. at 107; *see Clark*

*v. Westchester Cnty.*, No. 96 CIV. 8381(DLC), 1998 WL 214772, at \*4 (S.D.N.Y. May 1, 1998) (dismissing the plaintiff's deliberate indifference claim where the plaintiff failed to identify "any serious medical need that went unaddressed because of the discharge"). Accordingly, I recommend that defendants' motion for summary judgment be granted on this issue.

      F.    <u>Qualified Immunity</u>

As an alternative ground for dismissal of plaintiff's claims, defendants assert their entitlement to qualified immunity from suit. Dkt. No. 79-14 at 41-42. Plaintiff opposes defendants' request for dismissal based upon qualified immunity. Dkt. No. 84-1 at 25-26. Unhelpfully, this portion of defendants' motion does not single out or identify any specific defendants as potentially qualifying for immunity, but instead appears to request dismissal of all of plaintiff's First and Eighth Amendment claims on this ground. *Id.*

"Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012); *see also Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *Sudler v. City of N.Y.*, 689 F.3d 159, 174 (2d

Cir. 2012). The law of qualified immunity seeks to strike a balance between "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson*, 555 U.S. at 231. Government officials are shielded from liability by qualified immunity when making "reasonable mistakes" concerning the lawfulness of their conduct. *Sudler*, 689 F.3d at 174 (citing *Saucier v. Katz*, 533 U.S. 194, 206 (2001), *abrogated on other grounds by Pearson*, 555 U.S. 223)).

Because qualified immunity is "an immunity from suit rather than a mere defense to liability," *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985), the Supreme Court has "repeatedly . . . stressed the importance of resolving immunity questions at the earliest possible stage in the litigation," *Pearson*, 555 U.S. at 231 (quoting *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (per curiam)).

In the event the above recommendations are adopted, the following causes of action remain for an analysis regarding qualified immunity: (1) a First Amendment freedom of speech/association claim against defendants Bosco, Conley, and Sacco regarding plaintiff's access to writing

instruments and the telephone; (2) a First Amendment retaliation claim asserted against defendant Boyer with respect to plaintiff's ACW admission, physical threats and assault; and (3) an Eighth Amendment excessive force claim asserted against defendant Boyer. At this juncture, I am unable to conclude that these remaining individuals are entitled to qualified immunity. Instead, as was discussed above, there are issues of fact that must be resolved with respect to both the question of whether plaintiff's constitutional rights were violated, and whether a reasonable person in the defendants' respective positions would have understood that their conduct violated plaintiff's constitutional rights.

IV.    <u>SUMMARY AND RECOMMENDATION</u>

Defendants seek dismissal of plaintiff's remaining claims based on the merits, lack of personal involvement for certain defendants, and qualified immunity. In light of my conclusion that reasonable factfinders could render differing determinations on certain portions of plaintiff's First Amendment free speech and expression claim, First Amendment retaliation claims, and Eighth Amendment excessive force claim, I am unable to recommend dismissal of those claims at this juncture. Defendants are, however, entitled to the entry of summary judgment

dismissing all other remaining claims set forth in plaintiff's complaint. Accordingly it is hereby respectfully

ORDERED that the clerk of the court is respectfully directed to modify the court's records to change defendant Corey Connlley's name on the docket to "Corey Conley"; and it is further respectfully

RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 79) GRANTED, in part, and DENIED, in part, and that all claims in plaintiff's complaint except the following, which will remain for trial, be DISMISSED:

(1)    a First Amendment free speech and expression claim against defendants Bosco, Conley, and Sacco, arising out of plaintiff's access to writing instruments and the telephone;

(2) a First Amendment retaliation claim asserted against defendant Boyer with respect to plaintiff's ACW admission, physical threats and assault; and

(3) an Eighth Amendment excessive force claim asserted against defendant Boyer; and it is further hereby

ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report.[20]  FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

David E. Peebles
U.S. Magistrate Judge

Dated:      February 2, 2018
             Syracuse, New York

---

[20]     If you are proceeding *pro se* and are served with this order, report, and recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the order, report, and recommendation was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. P. 6(a)(1)(C).



Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

**C**

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Henry BENITEZ, Plaintiff,
v.
HAM, et al., Defendant.
No. 9:04-CV-1159.

Oct. 21, 2009.
Henry Benitez, Malone, NY, for Plaintiff.

Hon. Andrew M. Cuomo, Attorney General for the State of New York, Timothy P. Mulvey, Esq., of Counsel, Syracuse, NY, for Defendants.

***ORDER***

NORMAN A. MORDUE, Chief Judge.

**\*1** The above matter comes to me following a Report-Recommendation by Magistrate Judge George H. Lowe, duly filed on the 30th day of September 2009. Following ten days from the service thereof, the Clerk has sent me the file, including any and all objections filed by the parties herein.

After careful review of all of the papers herein, including the Magistrate Judge's Report-Recommendation, and no objections submitted thereto, it is

ORDERED that:

1. The Report-Recommendation is hereby adopted in its entirety.

2. Defendants' motion for summary judgment (Dkt. No. 92) is GRANTED IN PART AND DENIED IN PART. The following claims are dismissed pursuant to Defendants' motion for summary judgment: (1) the Eighth Amendment claims against Defendants Weissman and Richards arising from their treatment of Plaintiff's severe body itch, left wrist, and right ankle; (2) the claims against Defendant Ham; (3) the claims against Defendants Brousseau and Donelli for their handling of Plaintiff's grievance regarding Defendant Ham; (4) the retaliation claim against Defendants Nephew, Desotelle, and Snyder based on their filing of misbehavior reports against Plaintiff; (5) the claims against Defendants Brousseau, Donelli, Girdich, and Eagen regarding their handling of Plaintiff's grievances regarding the events of January 2 and 3, 2003; (6) the claim against Defendant LaClair; (7) the claims against Defendant Bullis; and (8) the Eighth Amendment claim against Defendants Weissman and Girdich for approving the imposition of the loaf diet.

It is further ordered that the following claims are dismissed sua sponte pursuant to 28 U.S.C. § 1915(e)(2)(B): (1) Plaintiff's retaliation claim against Defendants Weissman and Richards; and (2) the claim against Defendant Selsky.

It is further ordered that the following claims survive summary judgment and sua sponte review and proceed to trial: (1) the conspiracy claim against Defendants Wright, Snyder, and Duprat; (2) the excessive force claim against Defendants Snyder, Duprat, Bogett, and Wright; (3) the retaliation claim against Defendants Snyder, Duprat, Bogett, and Wright arising from the use of excessive force; (4) the retaliation claim against Wright arising from his filing of a misbehavior report against Plaintiff; (5) the failure to intervene claims against Defendants Bezio and Duprat; (6) the retaliation claim against Defendant Bezio; and (7) the Eighth Amendment claims against Defendants Hensel, Goodwin, Kuhlman, and Costello.

3. The Clerk of the Court shall serve a copy of this Order upon all parties and the Magistrate Judge assigned to this case.

**IT IS SO ORDERED.**

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 2

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

***REPORT-RECOMMENDATION AND ORDER***

GEORGE H. LOWE, United States Magistrate Judge.

This *pro se* prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has been referred to me for Report and Recommendation by the Honorable Norman A. Mordue, Chief United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). Plaintiff Henry Benitez alleges that 21 employees of the New York Department of Correctional Services ("DOCS") violated his constitutional rights by subjecting him to excessive force, denying him medical care, falsifying misbehavior reports, denying him assistance to prepare for a disciplinary hearing, and imposing a loaf diet on him as punishment. Currently pending before the Court is Defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. (Dkt. No. 92.) For the reasons that follow, I recommend that Defendants' motion be granted in part and denied in part.

**I. FACTUAL AND PROCEDURAL SUMMARY**

*\*2* Unless otherwise noted, the facts in this summary are taken from Plaintiff's verified complaint [FN1]. Plaintiff, a New York state prisoner, was transferred to Upstate Correctional Facility on September 14, 2002. (Dkt. No. 1 ¶ 8.) Plaintiff alleges that he was suffering from "ongoing severe pain in his left hand wrist and right foot ankle due to nerve damage." (Dkt. No. 1 ¶ 9.) From the time he arrived at Upstate, he made "numerous requests" to Defendant Drs. Evelyn Weissman and Richards to receive a medication called Atarax that had been prescribed to him previously at Auburn Correctional Facility, an MRI of his left wrist and right ankle, and a referral to an orthopedist. (Dkt. No. 1 ¶ 12.) Plaintiff alleges that Defendants Weissman and Richards refused his requests for Atarax, the MRI, and the referral "in retaliation for his having filed numerous formal grievances against them [and other Upstate medical staff members] within a period of two years, and for the purpose of preventing [Plaintiff] from demonstrating in a civil rights action against prison officials the extent of the injuries of his left hand and right foot." (Dkt. No. 1 ¶ 12-13.) Plaintiff alleges that, as a result, he continues to experience severe pain in his left

wrist and right ankle, numbness in different areas of his left hand and right foot, an inability to walk or stand for longer than ten minutes, and ongoing severe body itch. (Dkt. No. 1 ¶ 14.)

> FN1. Only two of the named Defendants filed affidavits supporting Defendants' motion for summary judgment. Only one of those affidavits-the affidavit of Defendant Dr. Evelyn Weissman-contradicts Plaintiff's version of events.

Regarding Plaintiff's requests for Atarax, Dr. Weissman declares that Atarax is

non-formulary, which means we do not regularly stock that medication, and special approval must be obtained to issue that medication. However, Vistaril and Hydroxyzine is the substitute we use for the same purpose as Atarax. Hydroxyzine is the generic form of Atarax. I prescribed Vistaril for [P]laintiff on October 2, 2002 ... Dr. Richards requested approval for Atarax in April 2004 and it was suggested that [P]laintiff try Claritin, which had become a formulary (regularly stocked) drug. Dr. Richards requested approval for Atarax again in June 2004, and the response was that if the generic (Hydroxyzine) had not worked, it was unclear that the branded drug Atarax would work ... Plaintiff's complaints of itching were not ignored, and he [was] constantly given medication for itching.

(Weissman Aff. ¶¶ 4-10.)

As to Plaintiff's other claims, Dr. Weissman declares:

Regarding [P]laintiff's claim that his request for an MRI was denied, Dr. Richards and I felt, in our medical judgment, an MRI was not warranted. However, because his pain and numbness was improving with time, Dr. Richards requested, and I approved, physical therapy for [P]laintiff beginning in January 2003. Regarding [P]laintiff's claim that his request for an orthopedic consult was denied, that is incorrect. Dr. Richards requested an orthopedic consult for [P]laintiff on August 19, 2003 and [P]laintiff saw an orthopedist

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

on September 4, 2003. The orthopedist ... did not suggest an MRI and determined that [P]laintiff was improving and "... there is not much else that I can suggest for Henry to improve or accelerate his healing. For the time being, I am just going to suggest that he be patient."

**\*3** (Weissman Aff. ¶¶ 11-13.)

Plaintiff was transferred to Elmira Correctional Facility Reception Center on November 7, 2002, for a court appearance. Upon arrival, Plaintiff informed Defendant Correction Officer Ham that he suffered "ongoing severe pain in his left hand wrist and right foot ankle due to nerve damage, and that the handcuffs and leg irons ... were too tight and causing him swelling and enormous pain." Ham observed that Plaintiff's hands were swollen. However, he refused to remove or loosen the restraints. Plaintiff remained in the restraints, suffering enormous pain and swelling, until he was transferred to Five Points Correctional Facility three hours later. (Dkt. No. 1 ¶ 9.)

Plaintiff was returned to the Elmira Correctional Facility Reception Center on November 14, 2002. At that time, Plaintiff again informed Defendant Ham that the restraints were too tight and were causing him swelling and extreme pain. Defendant Ham "again verbally acknowledged that [Plaintiff]'s hands were ... swollen" but refused to remove the restraints. Plaintiff remained in the restraints, suffering enormous pain and swelling, until he was transferred out of the facility three hours later. (Dkt. No. 1 ¶ 10.)

On January 2, 2003, Defendant Correction Officers Nephew and Desotelle strip-frisked Plaintiff [FN2] in preparation for transferring Plaintiff for a court appearance. Defendant Sgt. Snyder was also in the room. When they had completed the search, Defendant Nephew ordered Plaintiff to put on his coat. Plaintiff told Nephew that wearing the coat would "severely aggravate his continuing body itch stemming from his hepatitis virus." (Dkt. No. 1 ¶ 15.) Defendant Snyder called Plaintiff a "spick" and threatened to forcibly put the coat on Plaintiff.

Plaintiff told Defendants Snyder, Nephew, and Desotelle that he would sue them if they used force. (Dkt. No. 1 ¶ 15.)

FN2. Plaintiff does not allege that the strip-frisk violated his constitutional rights. Even if he did, I would find that such a claim would not survive *sua sponte* review under 28 U.S.C. § 1915(e)(2)(B). Strip searches conducted in a prison setting are constitutional if they are reasonably related to a legitimate penological goal and are conducted in a reasonable manner. *Frazier v. Ward,* 528 F.Supp. 80, 81 (N.D.N.Y.1981). "However, a strip search is unconstitutional if it is unrelated to any legitimate penological goal or if it is designed to intimidate, harass, or punish. *See, e.g., Iqbal v. Hasty,* 490 F.3d 143, 172 (2d Cir.2007) (pretrial detainee alleged Fourth Amendment violation where he was subjected to repeated strip and body cavity searches that were not related to legitimate government purposes and designed to punish); *Covino,* 967 F.2d at 80 (strip search accompanied by physical and verbal abuse is unconstitutional); *Hodges v. Stanley,* 712 F.2d 34, 35-36 (2d Cir.1983) (second strip search performed soon after a first strip search served no legitimate interest when prisoner was under continuous escort); *Jean-Laurent v. Wilkerson,* 438 F.Supp.2d 318, 323 (S.D.N.Y.2006)." *Miller v. Bailey,* No. 05-CV-5493, 2008 U.S. Dist. LEXIS 31863, at \*1, 2008 WL 1787692, at \*9 (E.D.N.Y. Apr. 17, 2008). Plaintiff does not allege, and the evidence does not show, that Defendants conducted the strip-frisk with an intent to intimidate, harass, or punish Plaintiff.

Shortly thereafter, Defendant Lt. Wright approached Plaintiff and asked him if he had spit at staff. Before Plaintiff could respond, Defendant Wright ordered several guards to get a video camera and put a "spittle mask" on Plaintiff. After the guards did so, Defendant Wright escorted Plaintiff to his cell. He asked Plaintiff to explain what had happened in the frisk room. Plaintiff said that

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

Defendant Wright would not believe his account of the incident, accused Defendant Wright of interfering with his court trip and unjustifiably putting a spittle mask on him, and said he would sue Defendants Wright and Snyder. Defendant Wright told Plaintiff that "transportation vans don't have cameras. You're going to learn not to spit ... [at] staff and ... threaten us with lawsuits." (Dkt. No. 1 ¶ 16.)

After Defendant Wright left Plaintiff's cell, Defendant Capt. Bezio approached and asked Plaintiff to explain what happened in the frisk room. Plaintiff told Defendant Bezio what had happened, denied that he had threatened to spit at a staff member, and asked Defendant Bezio to protect him while he was being transported to court. Defendant Bezio told Plaintiff to be "up and ready to go to court" and that "people don't like to get spat ... on."[FN3] (Dkt. No. 1 ¶ 19.)

> FN3. In their motion for summary judgment, Defendants argue that Plaintiff cannot maintain a claim against Defendant Bezio for these statements because (1) Plaintiff did not exhaust his administrative remedies regarding the statements; and (2) threats are not actionable constitutional violations. (Dkt. No. 92-10 at 35-36.) In his opposition to the motion, Plaintiff states that he did not intend to maintain a separate claim against Defendant Bezio based on the statements. Rather, he included this allegation in his complaint to provide relevant information for his failure to intervene claim. (Dkt. No. 109 at 48.) Therefore, I will not address Defendants' arguments regarding these statements.

*4 On January 3, 2003, Defendant Correction Officer Duprat escorted Plaintiff to the transportation van. Defendant Duprat told Plaintiff to "remember what we told you about the van."[FN4] As they were walking, Plaintiff saw Defendant Bezio and told him that Defendant Duprat had threatened to "employ physical abuse" against him in the van. Defendant Bezio shrugged his shoulders. (Dkt. No. 1 ¶ 20.) Defendant Duprat drove Plaintiff in a van to a different building, where he called Defendant

Snyder "to arrange a beating" of Plaintiff. After the phone call, Defendant Duprat drove Plaintiff back to the first building. When they arrived, Defendant Snyder entered the rear section of the van and told Plaintiff that "you like ... suing us. Wright, my boss, doesn't like that and sent this as a reminder." Defendant Snyder then punched and slapped Plaintiff, who was in handcuffs and leg irons, in the face and the back of his head, knocking him unconscious. When Plaintiff revived, Defendants Duprat and Correction Officer Bogett entered the rear section of the van and punched and slapped Plaintiff several times in the head, chest, and right ear. When Plaintiff began to bleed from his right inner ear, Defendants Duprat and Bogett tied a spittle mask on Plaintiff's head. (Dkt. No. 1 ¶¶ 21-22.)

> FN4. In their motion for summary judgment, Defendants argue that Plaintiff cannot maintain a claim against Defendant Duprat for this statement because (1) Plaintiff did not exhaust his administrative remedies regarding the statement; and (2) threats are not actionable constitutional violations. (Dkt. No. 92-10 at 35-36.) In his opposition to the motion, Plaintiff states that he did not intend to maintain a separate claim against Defendant Duprat based on the statement. Rather, he included it in his complaint to provide relevant information for his excessive force claim. (Dkt. No. 109 at 48.) Therefore, I will not address Defendants' arguments regarding these statements.

When Plaintiff arrived at Five Points Correctional Facility later that day, he notified Defendant Nurse Hensel that he had been bleeding from his inner right ear due to a beating by Upstate officials, that he was suffering severe pain in his head and right ear, and that he wanted to be examined by a doctor. Defendant Hensel refused to examine Plaintiff, made no record of his complaints, and refused to schedule Plaintiff to see a doctor.[FN5] (Dkt. No. 1 ¶ 23.)

> FN5. The medical records produced by Defendants in support of their motion for

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

summary judgment do not reflect that Plaintiff saw Nurse Hensel on January 3, 2003. However, as the Court has noted previously (Dkt. No. 99 at 3), a SHU log book entry for January 3, 2003, indicates that Plaintiff was "taken to strip frisk room for pictures and to be assessed by R/N Hensel." (Defs.' Resp. to P.'s 1st Req. for Prod. of Docs., Ex. E at 11.) This document corroborates Plaintiff's claim that he saw Defendant Hensel on January 3, 2003. I note, however, that none of the parties included the log book entry in their moving or opposing papers.

Plaintiff's medical record from Five Points indicates that on January 3, 2003, the day he arrived, Plaintiff was seen by Nurse Nancy O'Connor Ryerson. She noted that Plaintiff arrived via van with cuffs and chains and spit net, and that he complained of pain and itching. "It was noted that he takes Naprosyn and Benadryl, and he was escorted to 12 Building. Apparently Naprosyn was not sent with him and it is a medication for which he would need a prescription from a doctor. Since this was not an emergency, the procedure is to place the inmate on the regular physician call-out list for an appointment. Nurse Ryerson also noted that he was Hepatitis C positive." (Bannister Aff. ¶ 5.)

On January 4, 2003, Plaintiff notified Defendant Nurse Goodwin [FN6] that he needed emergency medical treatment because of severe pain in his liver, left wrist, and right ear, and that he wanted medicine for his severe body itch. Defendant Goodwin refused to examine Plaintiff, made no record of his complaints, and did not provide any treatment to Plaintiff. (Dkt. No. 1 ¶ 24.)

> FN6. The complaint refers to this defendant as Nurse "Good." However, Defendants state that her name is actually Goodwin. (Dkt. No. 92-10 at 1 n. 1.) I will refer to her as Nurse Goodwin.

Plaintiff's medical records from Five Points indicate that on January 4, 2003, Plaintiff was seen by Nurse "Goon" at his cell after security staff told the nurse that Plaintiff stated his asthma was acting up. Nurse "Goon" 's

note indicated that Plaintiff never acknowledged shortness of breath and that she checked Plaintiff's transfer form and the computer and found that he had no history of asthma. (Bannister Aff. ¶ 6.)

**\*5** On January 5, 2003, Plaintiff alleges that he informed Defendant Nurse Kuhlman [FN7] that he had been bleeding from his inner right ear and that he was suffering from an ongoing, extreme body itch due to his hepatitis C and B virus. Defendant Kuhlman told Plaintiff that she would review his medical chart and return to him. Defendant Kuhlman refused to examine Plaintiff, made no record of his medical complaints, and refused to provide treatment. (Dkt. No. 1 ¶ 25.)

> FN7. The complaint refers to this defendant as Nurse Coleman. As discussed further below, Plaintiff did not serve this defendant. In his opposition to the motion for summary judgment, Plaintiff states that he ultimately learned through discovery that her name is actually Nurse Kuhlman. (Dkt. No. 109 at 6 n. 2.) I will refer to this defendant as Nurse Kuhlman.

Plaintiff's medical records from Five Points show that Defendant Kuhlman saw Plaintiff on January 5, 2003. Her note indicates that she went to his cell for his 4:00 p.m. medications and he complained about the way she distributed the medication [FN8]. He stated that the nurse would be getting a grievance. He was uncooperative and argumentative. (Bannister Aff. ¶ 7.)

> FN8. It is not clear what medications Nurse Kuhlman was distributing, since the Affidavit of Linda Bannister establishes that "nurses cannot give medications until they verify allergies and prescription orders" and that as of January 6, the day after Nurse Kuhlman saw Plaintiff, this verification had not been completed. (Bannister Aff. ¶ 8.)

On January 6, 2003, Plaintiff informed Defendant Nurse Costello that he needed treatment due to great pain in his right ear and his ongoing severe body itch.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

Defendant Costello refused to examine Plaintiff's right ear, made no record of his medical complaint, and refused to promptly provide medical treatment. (Dkt. No. 1 ¶ 26.)

Plaintiff's medical records from Five Points show that Defendant Costello saw him on January 6, 2003. She noted that he was complaining that he needed an emergency prescription for severe headache and severe itching. She noted that he requested a prompt examination by a physician. She instructed him that she would have to find the chart or the transfer paperwork because nurses cannot give medications until they verify allergies and prescription orders. (Bannister Aff. ¶ 8.)

Plaintiff's medical records from Five Points show that he was seen again the next day by Defendant Costello. Plaintiff's chart was still not available, and he again requested a prescription for itching, Hepatitis C, and a physical exam. Defendant Costello again noted that she would have to verify his requests and then possibly schedule an appointment. (Bannister Aff. ¶ 9.)

Plaintiff's medical records from Five Points show that he was seen later that day by non-defendant Nurse Gardner at the request of security staff. Plaintiff stated "I was knocked out and beaten everywhere" and claimed that he had a lump on his head. Nurse Gardner examined him and noted no redness, bruising, or bump on head. (Bannister Aff. ¶ 10.)

Plaintiff alleges that Wright, Nephew, Desotelle, and Snyder retaliated against him for his threat to sue them by filing false misbehavior reports. (Dkt. No. 1 ¶¶ 17-18.) Defendant Correction Officer LaClair was assigned to assist Plaintiff with preparing for the subsequent disciplinary hearing. (Defs.' Ex. 14.)

According to a misbehavior report filed by Defendant LaClair, when he went to Plaintiff's cell to assist him, Plaintiff "stated ... that [LaClair] was to get him what he wanted." Defendant LaClair "informed him that what he needed had to be pertained (sic) to the misbehavior report. [Plaintiff] then stated "Get what I want or I'll fuck you up." Defendant La Clair "informed him the interview was

over and left the area." (Defs.' Ex. 15 at 2-3.) Plaintiff alleges that Defendant LaClair "falsified [the] misbehavior report against [Plaintiff] in order to refrain" from assisting Plaintiff. (Dkt. No. 1 ¶ 35.)

**\*6** On January 15, 2003, Defendant Bullis arrived at Plaintiff's cell and informed him that he would conduct the disciplinary hearing that day. He asked Plaintiff whether he wanted to attend the hearing. Plaintiff said that he did not because Defendant LaClair had not assisted him, but asked Defendant Bullis to interview Defendant LaClair and an inmate witness about the events leading to Defendant LaClair's refusal to provide assistance. Plaintiff asked Defendant Bullis not to impose a loaf diet as a punishment if he found Plaintiff guilty because the loaf diet caused Plaintiff severe abdominal pains and constipation due to his hepatitis. (Dkt. No. 1 ¶ 36.)

Defendant Bullis did not interview Defendant LaClair or the inmate witness. He found Plaintiff guilty and imposed a penalty of 21 days of the loaf diet. (Dkt. No. 1 ¶ 37.) Plaintiff alleges that Defendants Weissman and Girdich "maliciously" approved the penalty in "reckless disregard" of the pain it would inflict on Plaintiff. (Dkt. No. 1 ¶ 38.) Plaintiff alleges that "[d]ue to the danger that the ... loaf diet posed" to his well-being, he refused to eat it. As a result, he lost 33 pounds and suffered severe abdominal pains and emotional distress that exacerbated his hepatitis. (Dkt. No. 1 ¶ 39.)

Plaintiff alleges that Defendants Brousseau, Donelli, Selsky, Girdich, and Eagen mishandled the grievances and appeals he filed or attempted to file regarding his claims. (Dkt. No. 1 ¶¶ 28-34, 40.)

Plaintiff filed this lawsuit on October 6, 2004. The parties proceeded to discovery, which proved contentious. Plaintiff successfully moved to compel responses to his discovery requests, and thereafter filed four motions for sanctions seeking Defendants' compliance with the order compelling discovery. (Dkt.Nos.56, 73, 94, 103.) I granted each of those motions in part. (Dkt. Nos.62, 79, 99, 107.) As is relevant here, I ruled that because not all of the pages of the Five Points Movement and Control Log Book

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

for November 14, 2003, had been provided to Plaintiff before the original was destroyed, Plaintiff could ask the Court to draw factual inferences favorable to him. (Dkt. No. 99 at 2.) I ruled that because Defendants could not locate the SHU log book for January 2003, Plaintiff could "ask the Court to draw factual inferences favorable to him based upon the missing pages for January 14, 2003" in opposition to Defendants' motion for summary judgment. (Dkt. No. 99 at 1-2.) I noted that Defendants had told Plaintiff that photographs taken of him on January 10, 2003, would be produced but that, without explanation, Defendants could no longer find the photographs. Accordingly, I ruled that Plaintiff could ask the Court to draw factual inferences favorable to him based upon the missing photographs. (Dkt. No. 99 at 2-3.) I ordered that if photographs taken of Plaintiff on January 3, 2003, no longer existed, Plaintiff could similarly request favorable inferences. (Dkt. No. 99 at 3.)

*7 On March 16, 2009, Plaintiff again moved for sanctions. (Dkt. No. 103.) I noted that the photographs from January 3 and 10, 2003, were still missing. (Dkt. No. 107 at 1.) I reiterated that Plaintiff could ask the Court to draw factual inferences favorable to him based upon the missing photographs. (Dkt. No. 107 at 2.)

Currently pending before the Court is Defendants' motion for summary judgment. (Dkt. No. 92.) Plaintiff has opposed the motion. (Dkt. No. 109.)

## II. APPLICABLE LEGAL STANDARDS

### A. Legal Standard Governing Motions for Summary Judgment

Under Federal Rule of Civil Procedure 56, summary judgment is warranted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact

exists. *Major League Baseball Properties, Inc. v. Salvino, Inc.,* 542 F.3d 290, 309 (2d Cir.2008). Only after the moving party has met this burden is the non-moving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin v. Goord,* 467 F.3d 263, 272-73 (2d Cir.2006). The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." [FN9] Rather, "[a] dispute regarding a material fact is *genuine* if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." [FN10] In determining whether a genuine issue of material [FN11] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. [FN12]

FN9. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585-86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also* Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is properly made [by a defendant] and supported [as provided in this rule], the [plaintiff] may not rely merely on allegations ... of the [plaintiff's] pleading ....").

FN10. *Ross v. McGinnis,* No. 00-CV-0275, 2004 U.S. Dist. LEXIS 9367, at * 20-21, 2004 WL 1125177, at *8 (W.D.N.Y. Mar.29, 2004) (internal quotations omitted) (emphasis added).

FN11. A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

FN12. *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997) (citation omitted); *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) (citation omitted).

### B. Legal Standard Governing Motion to Dismiss for Failure to State a Claim

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

To the extent that a defendant's motion for summary judgment under Federal Rule of Civil Procedure 56 is based entirely on the allegations of the plaintiff's complaint, such a motion is functionally the same as a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). As a result, "[w]here appropriate, a trial judge may dismiss for failure to state a cause of action upon motion for summary judgment." *Schwartz v. Compagnise Gen. Transatlantique,* 405 F.2d 270, 273-74 (2d Cir.1968) (citations omitted); *accord, Katz v. Molic,* 128 F.R.D. 35, 37-38 (S.D.N.Y.1989) ("This Court finds that ... a conversion [of a Rule 56 summary judgment motion to a Rule 12(b)(6) motion to dismiss the complaint] is proper with or without notice to the parties."). Moreover, even where a defendant has not advanced such a failure-to-state-a-claim argument on a motion for summary judgment, a district court may, *sua sponte,* address whether a *pro se* prisoner has failed to state a claim upon which relief may be granted. [FN13] For these reasons, it is appropriate to briefly summarize the legal standard governing Federal Rule of Civil Procedure 12(b)(6) motions to dismiss.

FN13. The authority to conduct this *sua sponte* analysis is derived from two sources: (1) 28 U.S.C. § 1915(e)(2)(B), which provides that "the court shall dismiss [a] case [brought by a prisoner proceeding *in forma pauperis* ] at any time if the court determines that ... the action ... is frivolous or malicious[,] ... fails to state a claim on which relief may be granted[,] ... or ... seeks monetary relief against a defendant who is immune from such relief"; and (2) 28 U.S.C. § 1915A(b), which provides that, "[o]n review, the court shall ... dismiss the [prisoner's] complaint, or any portion of the complaint, if the complaint ... is frivolous, malicious, or fails to state a claim upon which relief may be granted ...."

**\*8** Under Federal Rule of Civil Procedure 12(b)(6), a defendant may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). It has long been understood that a defendant may base such a motion on either or both of two

grounds: (1) a challenge to the "sufficiency of the pleading" under Federal Rule of Civil Procedure 8(a)(2); [FN14] or (2) a challenge to the legal cognizablity 14 of the claim. [FN15]

FN14. *See* 5C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1363 at 112 (3d ed. 2004) ("A motion to dismiss for failure to state a claim for relief under Rule 12(b)(6) goes to the sufficiency of the pleading under Rule 8(a)(2).") (citations omitted) *Princeton Indus., Inc. v. Rem,* 39 B.R. 140, 143 (Bankr.S.D.N.Y.1984) ( "The motion under F.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint as to whether the plaintiff has conformed to F.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement' that the pleader is entitled to relief."); *Bush v. Masiello,* 55 F.R.D. 72, 74 (S.D.N.Y.1972) ("This motion under Fed.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint, determining whether the complaint has conformed to Fed.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement that the pleader is entitled to relief.' ").

FN15. *See Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 514, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) ("These allegations give respondent fair notice of what petitioner's claims are and the grounds upon which they rest.... In addition, they state claims upon which relief could be granted under Title VII and the ADEA."); *Wynder v. McMahon,* 360 F.3d 73, 80 (2d Cir.2004) ("There is a critical distinction between the notice requirements of Rule 8(a) and the requirement, under Rule 12(b)(6), that a plaintiff state a claim upon which relief can be granted."); *Phelps v. Kapnolas,* 308 F.3d 180, 187 (2d Cir.2002) ("Of course, none of this is to say that a court should hesitate to dismiss a complaint when the plaintiff's allegation ... fails as a matter of law.") (citation omitted) *Kittay v. Kornstein,* 230 F.3d 531, 541 (2d Cir.2000) (distinguishing

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

between a failure to meet Rule 12[b][6]'s requirement of stating a cognizable claim and Rule 8[a]'s requirement of disclosing sufficient information to put defendant on fair notice); *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.,* 379 F.Supp.2d 348, 370 (S.D.N.Y.2005) ( "Although Rule 8 does not require plaintiffs to plead a theory of causation, it does not protect a legally insufficient claim [under Rule 12(b)(6) ].") (citation omitted); *Util. Metal Research & Generac Power Sys., Inc.,* No. 02-CV-6205, 2004 U.S. Dist. LEXIS 23314, at *4-5, 2004 WL 2613993, at *1-2 (E.D.N.Y. Nov. 18, 2004) (distinguishing between the legal sufficiency of the cause of action under Rule 12[b][6] and the sufficiency of the complaint under Rule 8[a] ); *accord, Straker v. Metro Trans. Auth.,* 333 F.Supp.2d 91, 101-102 (E.D.N.Y.2004); *Tangorre v. Mako's, Inc.,* No.01-CV-4430, 2002 U.S. Dist. LEXIS 1658, at *6-7, 2002 WL 313156 (S.D.N.Y. Jan. 30, 2002) (identifying two sorts of arguments made under a Rule 12(b)(6) motion-one aimed at the sufficiency of the pleadings under Rule 8(a), and the other aimed at the legal sufficiency of the claims).

Rule 8(a)(2) requires that a pleading contain "a short and plain statement of the claim *showing* that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2) (emphasis added). By requiring this "showing," Rule 8(a)(2) requires that the pleading contain a short and plain statement that "give[s] the defendant *fair notice* of what the plaintiff's claim is and the grounds upon which it rests." [FN16] The main purpose of this rule is to "facilitate a proper decision on the merits." [FN17] A complaint that fails to comply with this rule "presents far too heavy a burden in terms of defendants' duty to shape a comprehensive defense and provides no meaningful basis for the Court to assess the sufficiency of [plaintiff's] claims." [FN18]

FN16. *Dura Pharm., Inc. v. Broudo,* 544 U.S. 336, 125 S.Ct. 1627, 1634, 161 L.Ed.2d 577 (2005) (holding that the complaint failed to meet this test) (citation omitted; emphasis added); *see*

*also Swierkiewicz,* 534 U.S. at 512 (citation omitted); *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 168, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993) (citation omitted).

FN17. *Swierkiewicz,* 534 U.S. at 514 (quoting *Conley,* 355 U.S. at 48); *see also Simmons v. Abruzzo,* 49 F.3d 83, 86 (2d Cir.1995) ("Fair notice is that which will enable the adverse party to answer and prepare for trial, allow the application of res judicata, and identify the nature of the case so it may be assigned the proper form of trial.") (citation omitted); *Salahuddin v. Cuomo,* 861 F.2d 40, 42 (2d Cir.1988) ("[T]he principle function of pleadings under the Federal Rules is to give the adverse party fair notice of the claim asserted so as to enable him to answer and prepare for trial.") (citations omitted).

FN18. *Gonzales v. Wing,* 167 F.R.D. 352, 355 (N.D.N.Y.1996) (McAvoy, J.), *aff'd,* 113 F.3d 1229 (2d Cir.1997) (unpublished table opinion); *accord, Hudson v. Artuz,* 95-CV-4768, 1998 WL 832708, at *2 (S.D.N.Y. Nov.30, 1998), *Flores v. Bessereau,* No. 98-CV-0293, 1998 U.S. Dist. LEXIS 8750, 1998 WL 315087, at *1 (N.D.N.Y. June 8, 1998) (Pooler, J.). Consistent with the Second Circuit's application of § 0.23 of the Rules of the U.S. Court of Appeals for the Second Circuit, I cite this unpublished table opinion, not as precedential authority, but merely to show the case's subsequent history. *See, e.g., Photopaint Technol., LLC v. Smartlens Corp.,* 335 F.3d 152, 156 (2d Cir.2003) (citing, for similar purpose, unpublished table opinion of *Gronager v. Gilmore Sec. & Co.,* 104 F.3d 355 (2d Cir.1996)).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter ... to 'state a claim to relief that is plausible on its face.' A claim has facial plausibility when the plaintiff pleads factual content that

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal,* --- U.S. ----, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 556-57, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). Accordingly, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but has not *shown*-that the pleader is entitled to relief." *Iqbal,* 129 S.Ct. at 1950 (emphasis added).

It should also be emphasized that, "[i]n reviewing a complaint for dismissal under Fed.R.Civ.P. 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." [FN19] "This standard is applied with even greater force where the plaintiff alleges civil rights violations or where the complaint is submitted *pro se.*"[FN20] In other words, while all pleadings are to be construed liberally under Rule 8(e), *pro se* civil rights pleadings are to be construed with an *extra* degree of liberality.

FN19. *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (affirming grant of motion to dismiss) (citation omitted); *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994).

FN20. *Hernandez,* 18 F.3d at 136 (citation omitted); *Deravin v. Kerik,* 335 F.3d 195, 200 (2d Cir.2003) (citations omitted); *Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 619 (2d Cir.1999) (citation omitted).

For example, the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider a plaintiff's papers in opposition to a defendant's motion to dismiss as effectively amending the allegations of the plaintiff's complaint, to the extent that those factual assertions are consistent with the allegations of the plaintiff's complaint.[FN21] Moreover, "courts must construe *pro se* pleadings broadly, and interpret them to raise the strongest arguments that they suggest." [FN22] Furthermore, when addressing a *pro se* complaint, *generally* a district court "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." [FN23] Of course, an opportunity to amend is not required where the plaintiff has already amended his complaint.[FN24] In addition, an opportunity to amend is not required where "the problem with [plaintiff's] causes of action is substantive" such that "[b]etter pleading will not cure it."[FN25]

FN21. "Generally, a court may not look outside the pleadings when reviewing a Rule 12(b)(6) motion to dismiss. However, the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider plaintiff's additional materials, such as his opposition memorandum." *Gadson v. Goord,* No. 96-CV-7544, U.S. Dist. LEXIS 18131 1997 WL 714878, at *1, n. 2, 1997 (S.D.N.Y. Nov.17,1997) (citing, *inter alia, Gil v. Mooney,* 824 F.2d 192, 195 [2d Cir.1987] [considering plaintiff's response affidavit on motion to dismiss] ). Stated another way, "in cases where a pro se plaintiff is faced with a motion to dismiss, it is appropriate for the court to consider materials outside the complaint to the extent they 'are consistent with the allegations in the complaint.' " *Donhauser v. Goord,* 314 F.Supp.2d 119, 212 (N.D.N.Y.2004) (considering factual allegations contained in plaintiff's opposition papers) (citations omitted), *vacated in part on other grounds,* 317 F.Supp.2d 160 (N.D.N.Y.2004). This authority is premised, not only on case law, but on Rule 15 of the Federal Rules of Civil Procedure, which permits a plaintiff, as a matter of right, to amend his complaint once at any time before the service of a responsive pleading-which a motion to dismiss is not. *See Washington v. James,* 782 F.2d 1134, 1138-39 (2d Cir.1986) (considering subsequent affidavit as amending *pro se* complaint, on motion to dismiss) (citations omitted).

FN22. *Cruz v. Gomez,* 202 F.3d 593, 597 (2d

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

Cir.2000) (finding that plaintiff's conclusory allegations of a due process violation were insufficient) (internal quotation and citation omitted).

FN23. *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir.2000) (internal quotation and citation omitted); *see also* Fed.R.Civ.P. 15(a) (leave to amend "shall be freely given when justice so requires").

FN24. *Yang v. New York City Trans. Auth.*, No. 01-CV-3933, 2002 U.S. Dist. LEXIS 20223, 2002 WL 31399119, at *2 (E.D.N.Y. Oct.24, 2002) (denying leave to amend where plaintiff had already amended complaint once); *Advanced Marine Tech. v. Burnham Sec., Inc.*, 16 F.Supp.2d 375, 384 (S.D.N.Y.1998) (denying leave to amend where plaintiff had already amended complaint once).

FN25. *Cuoco*, 222 F.3d at 112 (finding that repleading would be futile) (citation omitted); *see also Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir.1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice.") (affirming, in part, dismissal of claim with prejudice) (citation omitted); *see, e.g., See Rhodes v. Hoy*, No. 05-CV-0836, 2007 U.S. Dist. LEXIS 48370, 2007 WL 1343649, at *3, 7 (N.D.N.Y. May 5, 2007) (Scullin, J., adopting Report-Recommendation of Peebles, M.J.) (denying *pro se* plaintiff opportunity to amend before dismissing his complaint because the error in his complaint-the fact that plaintiff enjoyed no constitutional right of access to DOCS' established grievance process-was substantive and not formal in nature, rendering repleading futile); *Thabault v. Sorrell*, No. 07-CV-0166, 2008 U.S. Dist. LEXIS 62919, 2008 WL 3582743, at *2 (D.Vt. Aug. 13, 2008) (denying *pro se* plaintiff opportunity to amend before

dismissing his complaint because the errors in his complaint-lack of subject-matter jurisdiction and lack of standing-were substantive and not formal in nature, rendering repleading futile) (citations omitted); *Hylton v. All Island Cab Co.*, No. 05-CV-2355, 2005 WL 1541049, at *2 (E.D.N.Y. June 29, 2005) (denying *pro se* plaintiff opportunity to amend before dismissing his complaint arising under 42 U.S.C. § 1983 because the errors in his complaint-which included the fact that plaintiff alleged no violation of either the Constitution or laws of the United States, but only negligence-were substantive and not formal in nature, rendering repleading futile); *Sundwall v. Leuba*, No. 00-CV-1309, 2001 U.S. Dist. LEXIS 737, 2001 WL 58834, at *11 (D.Conn. Jan.23, 2001) (denying *pro se* plaintiff opportunity to amend before dismissing his complaint arising under 42 U.S.C. § 1983 because the error in his complaint-the fact that the defendants were protected from liability by Eleventh Amendment immunity-was substantive and not formal in nature, rendering repleading futile).

**\*9** However, while this special leniency may somewhat loosen the procedural rules governing the form of pleadings (as the Second Circuit has observed), [FN26] it does not completely relieve a *pro se* plaintiff of the duty to satisfy the pleading standards set forth in Rules 8, 10 and 12. [FN27] Rather, as both the Supreme Court and Second Circuit have repeatedly recognized, the requirements set forth in Rules 8, 10 and 12 are procedural rules that even *pro se* civil rights plaintiffs must follow. [FN28] Stated more plainly, when a plaintiff is proceeding *pro se*, "all normal rules of pleading are not absolutely suspended." [FN29]

FN26. *Sealed Plaintiff v. Sealed Defendant # 1*, No. 06-1590, 2008 U.S.App. LEXIS 17113, 2008 WL 3294864, at *5 (2d Cir Aug.12, 2008) ("[The obligation to construe the pleadings of *pro se* litigants liberally] entails, at the very least, a permissive application of the rules governing the form of pleadings.") [internal quotation

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

marks and citation omitted]; *see also* Traguth v. Zuck, 710 F.2d 90, 95 (2d Cir.1983) ("[R]easonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training ... should not be impaired by harsh application of technical rules.") (citation omitted).

FN27. *See* Prezzi v. Schelter, 469 F.2d 691, 692 (2d Cir.1972) (extra liberal pleading standard set forth in Haines v. Kerner, 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972), did not save *pro se* complaint from dismissal for failing to comply with Fed.R.Civ.P. 8); *accord,* Shoemaker v. State of Cal., 101 F.3d 108 (2d Cir.1996) (citing Prezzi v. Schelter, 469 F.2d 691) (unpublished disposition cited only to acknowledge the continued precedential effect of Prezzi v. Schelter, 469 F.2d 691, within the Second Circuit); *accord,* Praseuth v. Werbe, 99 F.3d 402 (2d Cir.1995).

FN28. *See* McNeil v. U.S., 508 U.S. 106, 113, 113 S.Ct. 1980, 124 L.Ed.2d 21 (1993) ("While we have insisted that the pleadings prepared by prisoners who do not have access to counsel be liberally construed ... we have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel."); Faretta v. California, 422 U.S. 806, 834, n. 46, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975) ("The right of self-representation is not a license ... not to comply with relevant rules of procedural and substantive law."); Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir.2006) (*pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law") (citation omitted); Traguth v. Zuck, 710 F.2d 90, 95 (2d Cir.1983) (*pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law") (citation omitted); *cf.* Phillips v. Girdich, 408 F.3d 124, 128, 130 (2d Cir.2005)

(acknowledging that *pro se* plaintiff's complaint could be dismissed for failing to comply with Rules 8 and 10 if his mistakes either "undermine the purpose of notice pleading [ ]or prejudice the adverse party").

FN29. *Stinson v. Sheriff's Dep't of Sullivan County,* 499 F.Supp. 259, 262 & n. 9 (S.D.N.Y.1980).

**III. ANALYSIS**

**A. Weissman/Richards Health Care**

Plaintiff alleges that Defendant Drs. Weissman and Richards violated his Eighth Amendment right to adequate medical care by prescribing an ineffective medication for his body itch, refusing to order an MRI of his left wrist and right ankle, and refusing to refer him to an orthopedist. (Dkt. No. 1 ¶ 12.) Defendants move for summary judgment of these claims, arguing that (1) Plaintiff did not suffer from a serious medical need; and (2) Defendants were not deliberately indifferent. (Dkt. No. 92-10 at 13-14.)

*1. Eighth Amendment Standard*

The Eighth Amendment to the United States Constitution prohibits "cruel and unusual" punishments. The word "punishment" refers not only to deprivations imposed as a sanction for criminal wrongdoing, but also to deprivations suffered during imprisonment. Estelle v. Gamble, 429 U.S. 97, 102-03, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). Punishment is "cruel and unusual" if it involves the unnecessary and wanton infliction of pain or if it is incompatible with "the evolving standards of decency that mark the progress of a maturing society." Estelle, 429 U.S. at 102. Thus, the Eighth Amendment imposes on jail officials the duty to "provide humane conditions of confinement" for prisoners. Farmer v. Brennan, 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). Thus, prison officials must "ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

guarantee the safety of the inmates.' " *Farmer,* 511 U.S. at 832 (quoting *Hudson v. Palmer,* 468 U.S. 517, 526-27, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984)).

A viable Eighth Amendment claim must contain both an objective and a subjective component. *Farmer,* 511 U.S. at 834. To satisfy the objective component, "the deprivation alleged must be, objectively, 'sufficiently serious.' " *Id.* (quoting *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)). Analyzing the objective element of an Eighth Amendment medical care claim requires two inquiries. "The first inquiry is whether the prisoner was actually deprived of adequate medical care." *Salahuddin v. Goord,* 467 F.3d 263, 279 (2d Cir.2006). The word "adequate" reflects the reality that "[p]rison officials are not obligated to provide inmates with whatever care the inmates desire. Rather, prison officials fulfill their obligations under the Eighth Amendment when the care provided is 'reasonable.' " *Jones v. Westchester County Dept. of Corr. Med. Dept.,* 557 F.Supp.2d 408, 413 (S.D.N.Y.2008).

**\*10** The second inquiry is "whether the inadequacy in medical care is sufficiently serious. This inquiry requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner." *Salahuddin,* 467 F.3d at 280. The focus of the second inquiry depends on whether the prisoner claims to have been completely deprived of treatment or whether he claims to have received treatment that was inadequate. *Id.* If "the unreasonable medical care is a failure to provide any treatment for an inmate's medical condition, courts examine whether the inmate's medical condition is sufficiently serious." *Id.* A "serious medical need" is "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J. dissenting) (citations omitted), *accord, Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1996), *cert. denied,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995); *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). Relevant factors to consider when determining whether an alleged medical condition is sufficiently serious include, but are not limited to: (1) the existence of an injury that a reasonable doctor

or patient would find important and worthy of comment or treatment; (2) the presence of a medical condition that significantly affects an individual's daily activities; and (3) the existence of chronic and substantial pain. *Chance,* 143 F.3d at 702-03.

If the claim is that treatment was provided that was inadequate, the second inquiry is narrower. *Salahuddin,* 467 F.3d at 280. For example, "[w]hen the basis for a prisoner's Eighth Amendment claim is a temporary delay or interruption in the provision of otherwise adequate medical treatment, it is appropriate to focus on the challenged *delay* or *interruption* in treatment rather than the prisoner's *underlying medical condition* alone in analyzing whether the alleged deprivation" is sufficiently serious. *Smith v. Carpenter,* 316 F.3d 178, 185 (2d Cir.2003).

To satisfy the subjective component of an Eighth Amendment medical care claim, the defendant's behavior must be "wanton." What is considered "wanton" must be determined with "due regard for differences in the kind of conduct against which an Eighth Amendment objection is raised." *Whitley v. Albers,* 475 U.S. 312, 320, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986). Where a prisoner claims that a defendant provided inadequate medical care, he must show that the defendant acted with "deliberate indifference." *Estelle,* 429 U.S. at 105; *Wilson v. Seiter,* 501 U.S. 294, 302-03, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991).

Medical mistreatment rises to the level of deliberate indifference only when it "involves culpable recklessness, i.e., an act or a failure to act ... that evinces 'a conscious disregard of a substantial risk of serious harm.' " *Chance,* 143 F.3d at 703 (quoting *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996)). Thus, to establish deliberate indifference, an inmate must prove that (1) a prison medical care provider was aware of facts from which the inference could be drawn that the inmate had a serious medical need; and (2) the medical care provider actually drew that inference. *Farmer,* 511 U.S. at 837; *Chance,* 143 F.3d at 702-703. The inmate then must establish that the provider consciously and intentionally disregarded or

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

ignored that serious medical need. *Farmer,* 511 U.S. at 835; *Ross v. Giambruno,* 112 F.3d 505, at *2 (2d Cir.1997).* An "inadvertent failure to provide adequate medical care" does not constitute "deliberate indifference." *Estelle,* 429 U.S. at 105-06. Moreover, "a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim ... under the Eighth Amendment." *Id.* Stated another way, "medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Id.; Smith v. Carpenter,* 316 F.3d 178, 184 (2d Cir.2003) ("Because the Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law, not every lapse in prison medical care will rise to the level of a constitutional violation."). However, malpractice that amounts to culpable recklessness constitutes deliberate indifference. Accordingly, "a physician may be deliberately indifferent if he or she consciously chooses an easier and less efficacious treatment plan." *Chance,* 143 F.3d at 703 (citation omitted). Medical decisions that are contrary to accepted medical standards may constitute deliberate indifference if "the doctor has based his judgment on something other than sound medical judgment." *Stevens v. Goord,* 535 F.Supp.2d 373, 385 (S.D.N.Y.2008) (citation omitted). For instance, a doctor may be deliberately indifferent if he opts for an easier and less efficacious treatment plan "not on the basis of [his or her] medical views, but because of monetary incentives." *Chance,* 143 F.3d at 704.

### 2. *Atarax*

**\*11** Plaintiff claims that Defendants Weissman and Richards violated his Eighth Amendment rights by refusing to prescribe *Atarax.* (Dkt. No. 1 ¶¶ 1, 12.) Defendants move for summary judgment, arguing that Plaintiff's claim regarding the *Atarax* medication fulfills neither the objective nor the subjective prong of a viable Eighth Amendment claim. (Dkt. No. 92-10 at 13-14.)

Regarding the objective prong, the parties' briefs focus entirely on whether Plaintiff suffered from a serious medical need.[FN30] Applying the analytical framework described above, I must first address whether Plaintiff was

actually deprived of adequate medical care. I find that there is a triable issue of fact that the refusal to prescribe *Atarax* constituted a denial of adequate or reasonable care. I base this finding on the fact that Defendant Dr. Richards twice requested approval to prescribe *Atarax,* noting that he had already tried treating Plaintiff with *Hydroxyzine,* Vistril, *Allegra,* and Zytrec "all of which worsened [Plaintiff's] condition." (Weissman Aff. Ex. A-9.)

> **FN30.** Defendants argue that Plaintiff's severe body itch was not a serious medical need because it was not a "condition of urgency, one that may produce death, degeneration, or extreme pain". (Dkt. No. 92-10 at 13.) Plaintiff argues that severe body itch was a symptom of his Hepatitis C, which is a serious medical need. (Dkt. No. 109 at 28-30.)

Because Plaintiff alleges that he was provided with inadequate treatment, rather than completely deprived of treatment, the next inquiry is whether the *deprivation* was sufficiently serious. This requires an analysis of what harm, if any, the failure to prescribe *Atarax* caused or will cause Plaintiff. Here, there is simply no evidence before the Court that being deprived of *Atarax* harmed or threatened to harm Plaintiff. Rather, the evidence shows that Plaintiff suffered from a severe body itch. While this condition is undoubtedly unpleasant, it simply does not rise to the level of an Eighth Amendment violation. Therefore, I find that Plaintiff has not raised a triable issue of fact regarding the objective prong of his Eighth Amendment claim regarding Defendant Weissman and Richards' failure to prescribe *Atarax.*

Having found that there is not a triable issue of fact as to the objective prong, it is not necessary to analyze the subjective prong. However, I will briefly address the parties' contentions for the sake of completeness. Defendants argue that the refusal by Defendants Weissman and Richards to prescribe *Atarax* was not deliberate indifference because the decision of "which medicine to prescribe for a particular condition amount[s] to nothing more than a disagreement with the course of treatment-not deliberate indifference." (Dkt. No. 92-10 at

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

13-14.) Defendants' argument regarding deliberate indifference is based entirely on the affidavit of Dr. Weissman. [FN31] Interestingly, in contrast to her statements regarding Plaintiff's orthopedic care (discussed below), Dr. Weissman does *not* state that the decision not to prescribe Atarax was based on her medical judgment. Rather, she states that Atarax is a "non-formulary" medication and "special approval must be obtained to issue that medication." (Weissman Aff. ¶ 4.) Dr. Weissman does not say who was authorized to approve the use of non-formulary drugs. Dr. Richards twice requested approval to prescribe Atarax to Plaintiff. (Weissman Aff. ¶¶ 7-8, Ex. A-9 and A-10.) In one of these requests, he stated that the other medications he had tried "worsened" Plaintiff's condition. (Weissman Aff. Ex. A-9.) His requests were denied. (Weissman Aff. ¶¶ 7-8, Ex. A-9 and A-10.) This sequence of events raises two interesting and related issues: does the acquiescence of Dr. Weissman and Dr. Richards to a course of treatment for Plaintiff with which they disagreed constitute deliberate indifference? [FN32] Or does the fact that the decision not to prescribe Atarax was made by someone other than Dr. Weissman and Dr. Richards indicate that they were not personally involved with, and thus not liable for, the decision? *See Johnson v. Wright,* 412 F.3d 398 (2d Cir.2005) (claims against administrators who refused to approve treatment requested by treating physicians survived summary judgment; treating physicians were not named as defendants). The parties have not addressed these issues, and, due to my finding that there is no triable issue of fact as to the objective prong and in the absence of briefing, I decline to do so.

> FN31. Dr. Richards did not file an affidavit supporting Defendants' motion for summary judgment.

> FN32. *See Sulton v. Wright,* 265 F.Supp.2d 292 (S.D.N.Y.2003) (holding that a prisoner stated an Eighth Amendment claim against a doctor and physician's assistant who pursued less vigorous treatment than they had originally recommended when their request for approval of knee surgery was denied).

### 3. *MRI and Orthopedic Referral*

**\*12** Plaintiff claims that Defendants Weissman and Richards violated his Eighth Amendment rights by refusing to take MRIs of his left wrist and right ankle or to refer him to an orthopedist who could determine if medical footwear was necessary to correct his right foot problem. (Dkt. No. 1 ¶ 12.) Defendants argue that (1) any deprivation was not sufficiently serious to trigger Eighth Amendment scrutiny; and (2) they were not deliberately indifferent. (Dkt. No. 92-10 at 13-14.) Defendants are correct.

Even if one assumes that the deprivation was sufficiently serious to trigger Eighth Amendment scrutiny, the evidence does not raise a triable issue of fact that Defendants were deliberately indifferent. Regarding the MRIs, Dr. Weissman declares that "Dr. Richards and I felt, in our medical judgment, an MRI was not warranted." Because Plaintiff's "pain and numbness was improving with time, Dr. Richards requested, and I approved, physical therapy for [P]laintiff beginning in January 2003." (Weissman Aff. ¶ 11.) In September 2003, Dr. Richards referred Plaintiff to an orthopedist for treatment of his left wrist because, after completing physical therapy, Plaintiff was "still having [a] considerable amount of pain." (Weissman Aff. Ex. A-13.) The orthopedist examined Plaintiff and reported that Plaintiff "seems to be improving at this point and unfortunately, there is not much else I can suggest for Henry to improve or accelerate his healing." (Weissman Aff. Ex. A-14.)

Plaintiff filed a grievance a year after seeing the orthopedist complaining that Dr. Richards and Dr. Weissman "willfully refused to examine my injuries, to provide medical treatment for said injuries, and to order an MRI test of said injuries conducted ... in an attempt to prevent me from proving the precise nature and extent of my injuries in a court of law and, thus, to dissuade me from suing." (P.'s Decl. in Opp'n to Aff. of Evelyn Weissman, Ex. D.) Plaintiff argues that this grievance proves that he "continued to complain to these defendants about continuing severe pain in his left wrist and right ankle for more than one year after he had been evaluated

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

by the orthopedist." (Dkt. No. 109 at 24-25.) The grievance Plaintiff cites does not mention any "continuing severe pain in his left wrist and right ankle." Therefore, I recommend that the Court grant Defendants' motion for summary judgment and dismiss Plaintiff's Eighth Amendment claims against Defendants Weissman and Richards.[FN33]

> FN33. Plaintiff's complaint also asserts a retaliation claim against Defendants Weissman and Richards on these facts. (Dkt. No. 1 ¶ 12.) Defendants have not addressed this claim. I find that it is subject to *sua sponte* dismissal pursuant to 28 U.S.C. § 1915(e) (2)(B) because the evidence does not establish that Defendants took adverse action. While the denial of medical care may establish adverse action, *see e.g. Odom v. Poirier,* No. 99 Civ. 4933, 2004 WL 2884409, at * 4 (S.D.N.Y. Dec.10, 2004), I have found that Defendants Weissman and Richards did not deny Plaintiff medical care. Therefore, I recommend that the Court dismiss this claim.

**B. Ham/Grievances**

Plaintiff alleges that Defendant Ham violated his Eighth Amendment rights by refusing to loosen or remove his restraints on November 7 and 14, 2002. (Dkt. No. 1 ¶¶ 9-10.) He further alleges that Defendants Brousseau and Donelli violated his constitutional rights by refusing to forward his grievance regarding Defendant Ham for an investigation. (Dkt. No. 1 ¶¶ 28-29.) Defendants argue that (1) Plaintiff failed to exhaust his administrative remedies regarding his claims against Defendant Ham; (2) Plaintiff's allegations are not "sufficiently serious" to implicate the Eighth Amendment; and (3) Plaintiff's allegations regarding the handling of his grievance do not raise a constitutional claim. (Dkt. No. 92-10 at 21-23, 38.)

1. *Exhaustion of Administrative Remedies*

**\*13** Defendants argue that Plaintiff failed to exhaust his administrative remedies regarding his claims against Defendant Ham. (Dkt. No. 92-10 at 21-23.) I find that there is a triable issue of fact that Plaintiff's failure to

receive a final decision on the merits of his grievance regarding Defendant Ham was justified.

The Prison Litigation Reform Act ("PLRA") requires that prisoners who bring suit in federal court must first exhaust their available administrative remedies: "No action shall be brought with respect to prison conditions under § 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." [FN34] "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." [FN35] The Department of Correctional Services ("DOCS") has available a well-established three-step inmate grievance program.[FN36]

> FN34. 42 U.S.C. § 1997e.

> FN35. *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002).

> FN36. 7 N.Y.C.R.R. § 701.7.

Generally, the DOCS Inmate Grievance Program ("IGP") involves the following procedure for the filing of grievances.[FN37] First, an inmate must file a complaint with the facility's IGP clerk within twenty-one (21) calendar days of the alleged occurrence. If a grievance complaint form is not readily available, a complaint may be submitted on plain paper. A representative of the facility's inmate grievance resolution committee ("IGRC") has sixteen (16) calendar days from receipt of the grievance to informally resolve the issue. If there is no such informal resolution, then the full IGRC conducts a hearing within sixteen (16) calendar days of receipt of the grievance, and issues a written decision within two (2) working days of the conclusion of the hearing. Second, a grievant may appeal the IGRC decision to the facility's superintendent within seven (7) calendar days of receipt of the IGRC's written decision. The superintendent is to issue a written decision within twenty (20) calendar days of receipt of the grievant's appeal. Third, a grievant may appeal to the central office review committee ("CORC") within seven

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

(7) working days of receipt of the superintendent's written decision. CORC is to render a written decision within thirty (30) calendar days of receipt of the appeal. It is important to note that any failure by the IGRC or the superintendent to timely respond to a grievance or first-level appeal, respectively, can be appealed to the next level, including CORC, to complete the grievance process.[FN38] If a prisoner has failed to properly follow each of the applicable steps prior to commencing litigation, he has failed to exhaust his administrative remedies. *Woodford v. Ngo,* 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006).

> FN37. 7 N.Y.C.R.R. §§ 701.5, 701.6(g), 701.7; *see also White v. The State of New York,* No. 00-CV-3434, 2002 WL 31235713, at *2 (S.D.N.Y. Oct.3, 2002).

> FN38. 7 N.Y.C.R.R. § 701.6(g) ("[M]atters not decided within the time limits may be appealed to the next step."); *Hemphill v. New York,* 198 F.Supp.2d 546, 549 (S.D.N.Y.2002), *vacated and remanded on other grounds,* 380 F.3d 680 (2d Cir.2004); *see, e.g., Croswell v. McCoy,* 01-CV-0547, 2003 U.S. Dist. LEXIS 3442, at *12, 2003 WL 962534, at *4 (N.D.N.Y. March 11, 2003) (Sharpe, M.J.) ("If a plaintiff receives no response to a grievance and then fails to appeal it to the next level, he has failed to exhaust his administrative remedies as required by the PLRA."); *Reyes v. Punzal,* 206 F.Supp.2d 431, 433 (W.D.N.Y.2002) ("Even assuming that plaintiff never received a response to his grievance, he had further administrative avenues of relief open to him."); *Nimmons v. Silver,* 03-CV-0671, Report-Recommendation, at 15-16 (N.D.N.Y. filed Aug. 29, 2006) (Lowe, M.J.) (recommending that the Court grant Defendants' motion for summary judgment, in part because plaintiff adduced no evidence that he appealed the lack of a timely decision by the facility's IGRC to the next level, namely to either the facility's superintendent or CORC), *adopted by* Decision and Order (N.D.N.Y. filed Oct. 17,

2006) (Hurd, J.).

Here, Plaintiff declares that on the day of the first incident with Defendant Ham, he asked a Five Points Correctional Facility officer for a grievance form. (P.'s Decl. in Opp'n to Aff. of Karen Bellamy ¶ 17.) The officer did not give Plaintiff a form and told Plaintiff that he would need to file his grievance at Elmira Correctional Facility, where the incident had occurred. *Id.* Although an April 16, 2004, revision to the inmate grievance procedure specified that grievances "may only be filed at the facility where the inmate is housed even if it pertains to another facility," (*Id.,* at Ex. A), the procedures in effect at the time Plaintiff asked for a form to file a complaint against Defendant Ham were silent as to which facility should handle a particular grievance. Even if one assumes that the Five Points officer's advice was correct under DOCS practice at the time, it is difficult to see how Plaintiff could have filed a grievance at Elmira. Plaintiff was only at Elmira Correctional Facility for a few hours after receiving these instructions from the officer, during which time he was handcuffed and shackled. (Dkt. No. 1 ¶ 10.)

**\*14** On December 8, 2002, Plaintiff filed a grievance at Upstate Correctional Facility regarding Defendant Ham's actions. (Dkt. No. 92-4, Ex. 4.) Defendant Brousseau, the IGP supervisor, returned the grievance to Plaintiff because Plaintiff failed to submit it within fourteen days of the incident.[FN39] *Id.*

> FN39. The inmate grievance procedures in place at the time of the incident required inmates to file grievances within 14, rather than 21, days.

On December 18, 2002, Plaintiff submitted a grievance complaining that Defendant Brousseau's refusal to accept the previous grievance violated his constitutional right of access to the courts because it prevented him from exhausting his claims against Defendant Ham. (Dkt. No. 92-4, Ex. 4.) The IGRC denied Plaintiff's grievance on December 26, 2002. *Id.* The IGRC stated that Defendant Brousseau's refusal was proper because Plaintiff "did not present any mitigating circumstances that would warrant accepting the [untimely] complaint ... [Plaintiff] had been

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

back at the facility since 11/15/02 and had filed one grievance during this time period, this shows he had ample opportunity to file this complaint in a timely manner." *Id.* The grievance to which the IGRC's decision referred was a grievance regarding Defendant Richards' denial of Atarax. (Dkt. No. 92-4, Ex. 3.) Because that event occurred at Upstate Correctional Facility, there was no ambiguity about where Plaintiff's grievance should be filed.

Plaintiff appealed the IGRC's determination to the Superintendent. (Dkt. No. 92-4, Ex. 4.) Defendant Donelli affirmed the IGRC's determination on January 15, 2003. *Id.*

Defendants assert that Plaintiff "did not appeal [Defendant Donelli's decision] to the CORC." (Dkt. No. 92-3, Stmt. Pursuant to Rule 7.1(a)(3) ¶ 8.) For this proposition, they cite Exhibit 4 and to the Affidavit of Karen Bellamy. *Id.* Exhibit 4 shows that Plaintiff signed an "Appeal Statement" stating that he wished to appeal Defendant Donelli's decision to CORC. (Dkt. No. 92-4, Ex. 4.) The Appeal Statement was signed by a grievance clerk. *Id.* That exhibit also shows that Defendant Brousseau responded to an inquiry regarding the status of the grievance by stating that the grievance had been received by CORC and was being processed. *Id.* However, the record before the Court does include any final disposition from CORC of Plaintiff's appeal. The appeal does not appear in a list provided in the Affidavit of Karen Bellamy of grievances on which Plaintiff received a final decision from CORC. (Bellamy Aff. Ex. B.) Thus, Plaintiff never received a decision from CORC and did not exhaust his administrative remedies. *See Mendez v. Artuz,* No. 01 CIV. 4157, 2002 U.S. Dist. LEXIS 3263, at * 4, 2002 WL 313796, at * 2 (S.D.N.Y. Feb.27, 2002). Even if CORC had acted on Plaintiff's appeal, I assume that CORC would have upheld the IGRC's finding and denied Plaintiff's grievance as untimely. In that event, I would find that Plaintiff had not exhausted his administrative remedies because "courts consistently have found that CORC's dismissal of a grievance appeal as untimely constitutes failure to exhaust available administrative remedies." *Soto v. Belcher,* 339 F.Supp.2d 592, 595 (S.D.N.Y.2004).

**\*15** Plaintiff's failure to exhaust, however, does not end the inquiry. The Second Circuit has held that a three-part inquiry is appropriate where a prisoner has failed to exhaust his administrative remedies.[FN40] First, "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner."[FN41] Second, if those remedies were available, "the court should ... inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it ... or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense."[FN42] Third, if the remedies were available and some of the defendants did not forfeit, and were not estopped from raising, the non-exhaustion defense, "the Court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements."[FN43] Justification "must be determined by looking at the circumstances which might understandably lead ... uncounseled prisoners to fail to grieve in the normally required way." *Giano v. Good,* 380 F.3d 670, 678 (2d Cir.2004). Here, the silence of the regulations regarding which facility was the proper venue for Plaintiff's grievance, the bad advice that Plaintiff received from the officer at Five Points, and Plaintiff's inability to follow that advice because he was shackled during his entire tenure at Elmira create a triable issue of fact that Plaintiff's failure to file a timely grievance regarding Defendant Ham's actions was justified. I therefore find that summary judgment is not appropriate on the grounds that Plaintiff failed to exhaust his administrative remedies.

FN40. *See Hemphill v. State of New York,* 380 F.3d 680, 686, 691 (2d Cir.2004). The Second Circuit has not yet decided whether the *Hemphill* rule has survived the Supreme Court's decision in *Woodford. Chavis v. Goord,* No. 07-4787-pr, 2009 U.S.App. LEXIS 13681, 2009 WL 1803454, at *1 (2d Cir. June 25, 2009).

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

FN41. *Hemphill,* 380 F.3d at 686 (citation omitted).

FN42. *Id.* (citations omitted).

FN43. *Id.* (citations and internal quotations omitted).

2. *"Sufficiently Serious"*

Defendants argue that there is not a triable issue of material fact regarding Plaintiff's Eighth Amendment claim against Defendant Ham because "Plaintiff's alleged 'enormous pain' is nothing more than *de minimis* for Constitutional purposes." (Dkt. No. 92-10 at 22-23.)

Claims that prison officials applied restraints too tightly are analyzed under the Eighth Amendment as claims of excessive force. *See Davidson v. Flynn,* 32 F.3d 27 (2d Cir.1994). When prison officials are "accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is ... whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian,* 503 U.S. 1, 6-7, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). The extent of any injury suffered by the inmate "is one factor that may suggest whether the use of force could plausibly have been thought necessary in a particular situation or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur." *Id.* at 7 (citation and quotation marks omitted).

**\*16** In determining whether the use of force was wanton and unnecessary, it may also be proper to evaluate the need for application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by responsible officials, and any efforts made to temper the severity of a forceful response. The absence of serious injury is therefore relevant to the Eighth Amendment inquiry, but does not end it.

*Id.* (citation and quotation marks omitted). In other words, not "every malevolent touch by a prison guard gives rise to a federal cause of action. The Eighth Amendment's prohibition of cruel and usual punishments necessarily excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Id.* at 9 (officers who punched and kicked handcuffed and shackled inmate used unconstitutional force although inmate required no medical attention) (citations omitted); *Davidson,* 32 F.3d at 30 n. 1 (officers who placed handcuffs too tightly on inmate in retaliation for filing lawsuits used unconstitutional force where inmate suffered permanent scarring and numbness); *compare Warren v. Purcell,* No. 03 Civ. 8736, 2004 U.S. Dist. LEXIS 17792, at \*24, 2004 WL 1970642 (S.D.N.Y. Sept.3, 2004) (officers who placed prisoner in tight restraints did not violate constitution where prisoner suffered temporary pain, numbness and swelling and no improper or wanton motive was suggested for the officers' actions).[FN44]

FN44. Defendants served this unpublished case on Plaintiff with their moving papers as required by Local Rule 7.1(a)(1). (Dkt. No. 92-11.)

Plaintiff does not allege that he was permanently injured as a result of Defendant Ham's actions. Plaintiff states that he suffered "enormous pain" and "severe swelling" as a result of being shackled so tightly. (Dkt. No. 109 at 38.) Although this would not end the Eighth Amendment inquiry if Defendant Ham's actions had been more egregious, there is simply no evidence in the record that Defendant Ham applied restraints to Plaintiff "maliciously and sadistically to cause harm" or in a way that was "repugnant to the conscience of mankind." Therefore, I recommend that the Court grant Defendants' motion and dismiss Plaintiff's claims against Defendant Ham.

3. *Grievances*

Plaintiff alleges that Defendants Brousseau and Donelli "refused to forward" his complaint regarding

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

Defendant Ham's actions "for an investigation" (Dkt. No. 1 ¶¶ 28-29), thus violating his First Amendment right to petition the government. (Dkt. No. 109 at 50-51.) Defendants argue that Plaintiff's allegation fails to state a constitutional violation. (Dkt. No. 92-10 at 38.) Defendants are correct.

The First Amendment protects a prisoner's right to meaningful access to the courts and to petition the government for the redress of grievances. *See Bill Johnson's Rest., Inc. v. NLRB,* 461 U.S. 731, 741, 103 S.Ct. 2161, 76 L.Ed.2d 277 (1983). However, inmate grievance programs created by state law are not required by the Constitution and consequently allegations that prison officials violated those procedures does not give rise to a cognizable § 1983 claim. *Cancel v. Goord,* No. 00 Civ.2042, 2001 WL 303713, *3 (S.D.N.Y. Mar. 29, 2001). If prison officials ignore a grievance that raises constitutional claims, an inmate can directly petition the government for redress of that claim. *See Flick v. Alba,* 932 F.2d 728, 729 (8th Cir.1991). "Therefore, the refusal to process an inmate's grievance or failure to see to it that grievances are properly processed does not create a claim under § 1983." *Cancel,* 2001 WL 303713, at *3; *see also Torres v. Mazzuca,* 246 F.Supp.2d 334, 342 (S.D.N.Y.2003); *Mahotep v. DeLuca,* 3 F.Supp.2d 385, 390 (W.D.N.Y.1998).

**\*17** *Shell v. Brzezniak,* 365 F.Supp.2d 362, 369-370 (W.D.N.Y.2005). Therefore, I recommend that the Court grant Defendants' motion for summary judgment and dismiss the claims against Defendants Brousseau and Donelli for their handling of Plaintiff's grievance regarding Defendant Ham.

**C. Frisk Room Incident/Aftermath/Grievances**

Plaintiff alleges that he threatened to sue Defendants Nephew, Desotelle, and Snyder if they used force to put on his coat. (Dkt. No. 1 ¶ 15.) Plaintiff alleges that, in retaliation for this threat, (1) Defendant Wright conspired with Defendant Snyder to subject Plaintiff to excessive force; (2) Defendants Duprat, Snyder, and Bogett used excessive force on Plaintiff; (3) Defendants Wright,

Nephew, Desotelle, and Snyder falsified misbehavior reports against Plaintiff; and (4) Defendant Bezio failed to intervene to prevent the use of excessive force.^FN45 (Dkt. No. 1 ¶¶ 16-22.) He further alleges that Defendants Brousseau and Donelli would not allow Plaintiff to file a grievance regarding these events. (Dkt. No. 1 ¶¶ 30-31.) Finally, he alleges that Defendants Girdich and Eagen denied the grievance he filed regarding Defendant Brousseau and Donelli's refusal to process Plaintiff's grievance. (Dkt. No. 1 ¶¶ 32-34.)

FN45. The complaint contains some language that could, very liberally construed, assert a claim against these Defendants for denial of Plaintiff's right of access to the courts on the theory that, at the time of these events, Plaintiff was being transported for a court appearance. Defendants addressed this possible claim in their motion for summary judgment. (Dkt. No. 92-10 at 40-42.) In his opposition to the motion, Plaintiff states that he did not intend to assert a claim for denial of access to the courts. (Dkt. No. 109 at 55.) I have therefore not addressed Defendants' arguments.

*1. Exhaustion of Administrative Remedies*

Defendants argue that Plaintiff failed to exhaust his administrative remedies regarding any of these claims. (Dkt. No. 92-10 at 25-26, 31.) Plaintiff declares that on January 13, 2003, he attempted to submit a grievance to Defendant Brousseau regarding the claims. (P.'s Decl. in Opp'n to Aff. of Karen Bellamy ¶ 26.) Plaintiff declares that Defendant Brousseau "refused to file and process the grievance ... in order to prevent me from suing the officials named in the grievance." *Id.* ¶ 27.

On April 3, 2003, Plaintiff submitted a grievance complaining that Defendant Brousseau had refused to accept his January 13 grievance. (Dkt. No. 92-4, Ex. 8.) Plaintiff requested "[t]hat Ms. Brousseau submit the grievance complaint in question to the IGRC. Alternatively, that I be allowed to resubmit a copy of the grievance complaint in issue to the IGRC before moving for judicial intervention." *Id.* CORC denied the grievance on May 28, 2003, stating that it had "not been presented

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

with sufficient evidence to substantiate any malfeasance" by Defendant Brousseau. *Id.*

As discussed above, Second Circuit precedent holds that a defendant may be equitably estopped from raising the exhaustion defense if he or she engaged in conduct that hindered the plaintiff's ability to pursue his or her administrative remedies. *Ziemba v. Wezner,* 366 F.3d 161, 163-64 (2d Cir.2004). A prison official's refusal to accept or forward a prisoner's grievance is conduct that hinders a plaintiff's ability to pursue administrative remedies. *Sandlin v. Poole,* 575 F.Supp.2d 484, 488 (W.D.N.Y.2008). Thus, Plaintiff's declaration that Defendant Brousseau refused to accept his grievance raises a triable issue of fact that Defendants are estopped from asserting the exhaustion defense. Therefore, I recommend that the Court reject Defendants' argument that they are entitled to summary judgment as a result of Plaintiff's failure to exhaust his administrative remedies.

**2.** *Conspiracy*

**\*18** Defendants move for summary judgment of Plaintiff's conspiracy claim. [FN46] They argue that (a) Plaintiff has not shown that there was any meeting of the minds; and (b) the claim is barred by the intracorporate conspiracy doctrine.[FN47] (Dkt. No. 92-10 at 31-32.)

> FN46. Defendants characterize Defendants Wright and Snyder as the only defendants to the conspiracy claim. Read broadly, the complaint also alleges that Defendant Duprat conspired with Defendants Wright and Snyder by calling Snyder "to arrange a beating" of Plaintiff. (Dkt. No. 1 ¶ 21.) I will include Defendant Duprat in my analysis of Plaintiff's conspiracy claim.

> FN47. Defendants also argue that to the extent Plaintiff's conspiracy claim is brought under 42 U.S.C. § 1985, he has not shown that Defendants were motivated by any class-based animus. (Dkt. No. 92-10 at 31-32.) In his opposition to Defendants' motion, Plaintiff states that he did not intend to raise a claim under 42 U.S.C. § 1985. (Dkt. No. 109 at 44 n. 15.) Therefore, I

have not addressed Defendants' argument regarding class-based animus.

a. *Meeting of the Minds*

Defendants argue that Plaintiff has not provided any factual basis for a finding that Defendants had a "meeting of the minds" as required for a conspiracy claim. (Dkt. No. 92-10 at 31-32.) I find that Plaintiff has raised a triable issue of fact.

"To prove a § 1983 conspiracy, a plaintiff must show: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culbertson,* 200 F.3d 65, 72 (2d Cir.1999) (citations omitted).

Plaintiff has raised a genuine issue of material fact as to all of the elements of his § 1983 conspiracy claim. Plaintiff states in his verified complaint that Defendant Wright told him that " '[t]ransportation vans don't have cameras. You're going to learn not to spit ... [at] staff and not threaten us with lawsuits.' " (Dkt. No. 1 ¶ 16.) The next day, Defendant Duprat called Defendant Snyder "to arrange a beating" of Plaintiff. (Dkt. No. 1 ¶ 21.) Defendant Snyder entered the transportation van in which Plaintiff was sitting, said "Wright, my boss, doesn't like [you suing us] and sent this as a reminder," and then punched and slapped Plaintiff until Plaintiff lost consciousness. (Dkt. No. 1 ¶¶ 21-22.) A reasonable jury could, if it found Plaintiff's testimony credible, return a verdict for Plaintiff on his conspiracy claim based on this evidence.

b. *Intracorporate Conspiracy Doctrine*

Defendants argue that Plaintiff's conspiracy claim is barred by the intracorporate conspiracy doctrine. (Dkt. No. 92-10 at 32.) Under that doctrine, employees of a single corporate entity are legally incapable of conspiring together. *Bond v. Board of Educ. of City of New York,* 97-cv-1337, 1999 U.S. Dist. LEXIS 3164, at *5, 1999 WL 151702, at *2 (W.D.N.Y. Mar.17, 1999). "This doctrine

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

applies to public entities and their employees." *Lee v. City of Syracuse,* 603 F.Supp.2d 417, 442 (N.D.N.Y.2009) (citations omitted). Although the Second Circuit has recognized the doctrine in the context of 42 U.S.C. § 1985, *see Herrmann v. Moore,* 576 F.2d 453, 459 (2d Cir.1978); *Girard v. 94th and Fifth Avenue Corp.,* 530 F.2d 66, 72 (2d Cir.1976), it has not extended its application of the doctrine to conspiracy claims under § 1983. Several district courts in the Second Circuit have, however, applied the doctrine to § 1983 cases.[FN48] The district court cases cited in the footnote applied the intracorporate conspiracy doctrine to § 1983 without discussing whether it was appropriate to do so. In *Anemone v. Metropolitan Transportation Authority,* 419 F.Supp.2d 602, 604 (S.D.N.Y.2006), the Southern District squarely held that the intracorporate conspiracy doctrine should be applied to § 1983 cases because "the doctrine's logic is sound" and not "a single case within the Second Circuit [has] held the doctrine inapplicable to Section 1983 claims." I will assume that the doctrine applies in § 1983 cases.

FN48. *See Green v. Greene,* No. 9:07-CV-0351 (GTS/DEP), 2009 U.S. Dist. LEXIS 68186, 2009 WL 2424353 (N.D.N.Y. Aug.5, 2009); *Sebast v. Mahan,* No. 09-cv-98 (GLS/RFT), 2009 U.S. Dist. LEXIS 64712, 2009 WL 2256949, at *3 (N.D.N.Y. July 28, 2009); *Lee v. City of Syracuse,* 603 F.Supp.2d 417 (N.D.N.Y.2009); *Lukowski v. County of Seneca,* No. 08-CV6098, 2009 U.S. Dist. LEXIS 14282, 2009 WL 467075 (W.D.N.Y. Feb.24, 2009); *Perrin v. Canandaigua City School Dist.,* No. 08-CV-61536, 2008 U.S. Dist. LEXIS 95280, 2008 WL 5054241 (W.D.N.Y. Nov.21, 2008); *Rodriguez v. City of New York,* --- F.Supp.2d ----, No. 05-CV-5117, 2008 U.S. Dist. LEXIS 9966, 2008 WL 420015 (E.D.N.Y. Feb.11, 2008); *Crews v. County of Nassau,* No. 06-CV-2610, 2009 U.S. Dist. LEXIS 38354, 2007 WL 4591325 (E.D.N.Y. Dec. 27, 2007); *Little v. City of New York,* 487 F.Supp.2d 426 (S.D.N.Y.2007); *Clark v. City of Oswego,* No. 5:03-CV-202 (NAM/DEP), 2006 U.S. Dist. LEXIS 95769, 2007 WL 925724 (N.D.N.Y.

March 26, 2007); *Malone v. City of New York,* No. CV-05-2882, 2006 U.S. Dist. LEXIS 61866, 2006 WL 2524197 (E.D.N.Y. Aug. 30, 2006); *Caidor v. M & T Bank,* No. 5:05-CV-297 (FJS/GJD), 2006 U.S. Dist. LEXIS 22980, 2006 WL 839547 (N.D.N.Y. Mar.27, 2006).

**\*19** Even where the intracorporate conspiracy doctrine applies, there is an exception to the doctrine where "individuals pursue personal interests wholly separate and apart from the entity." *Orafan v. Goord,* 411 F.Supp.2d 153, 165 (N.D.N.Y.2006) (citation and quotation marks omitted), *vacated and remanded on other grounds, Orafan v. Rashid,* No. 06-2951, 249 Fed. Appx. 217 (2d Cir. Sept.28, 2007). I have previously found that a triable issue of fact exists regarding whether officers acted pursuant to their personal interests where a prisoner alleges that officers assaulted him in retaliation for participating in a federal lawsuit. *Medina v. Hunt,* No. 9:05-CV-1460, 2008 U.S. Dist. LEXIS 74205, 2008 WL 4426748 (N.D.N.Y. Sept.25, 2008). Other courts have found that the personal interest exception applies, and thus allowed conspiracy claims to proceed, where it was alleged that officers conspired to cover up their use of excessive force. *Hill v. City of New York,* No.03 CV 1283, 2005 U.S. Dist. LEXIS 38926, 2005 WL 3591719, at *6 (E.D.N.Y. Dec. 30, 2005). I find that the exception applies here because, as in *Medina,* Defendants allegedly conspired to retaliate against Plaintiff for his exercise of his right to access the courts. Therefore, I recommend that the Court deny Defendants' motion for summary judgment of the conspiracy claim against Defendants Wright, Snyder, and Duprat.

3. *Excessive Force*

Defendants move for summary judgment of Plaintiff's excessive force claims. They argue that there is no "objective evidence" that any excessive force was used. (Dkt. No. 92-10 at 33-35.) Specifically, Defendants argue that:

[P]laintiff alleges that ... [D]efendants Snyder, Bogett, and Duprat punched him, slapped him, knocked him unconscious, and caused his ear to bleed. There is no

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

objective evidence to support this conclusory allegation. An unusual incident report was generated because of [P]laintiff's behavior on January 3, 2003, but the report specifically states that no force was used on [P]laintiff. To the extent [P]laintiff is claiming the alleged force was used in the van, after the incidents described in the unusual incident report, there is no objective evidence to support this conclusion either. Plaintiff's medical records for January 3, 2003, upon arrival at Five Points C.F. indicate "arrived via van with cuffs & chains and spit net-complains of pain and itching," that [P]laintiff was escorted to 12 building, and that [P]laintiff was given Naprosyn and Benadryl. There is no indication of bleeding, or that [P]laintiff reported being assaulted in the January 3, 2003 entry, or the entries for January 4, 5, and 6, 2003. Plaintiff does report being "knocked-out and beaten everywhere" on January 7, 2003, while still at Five Points C.F., but without any record of reporting this type of conduct for the four (4) days prior to January 7, 2003, it is not credible that the incident to which [P]laintiff is referring occurred on January 3, 2003. Moreover, the January 7, 2003, entry does not indicate whether [P]laintiff was claiming to have been "knocked out and beaten everywhere" by staff or other inmates. Plaintiff has no objective evidence to support his claim of excessive force.

**20** (*Id.* at 34-35, citations omitted.)

Defendants refer to Plaintiff's allegations as "conclusory." "Conclusory" means to "express[ ] a factual inference without stating the underlying facts on which the inference is based." *Black's Law Dictionary* 284 (7th ed.1999). Plaintiff's allegations are not conclusory. Rather, Plaintiff describes the incident in detail. The ultimate determination of whether or not Defendants used excessive force, then, will rest largely on the finder of fact's judgment regarding Plaintiff's credibility.

Defendants, naturally, do not find Plaintiff credible. In general, of course, "[c]redibility determinations ... are jury functions, not those of a judge." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). *See also* Rule v. Brine, Inc., 85 F.3d 1002, 1011 (2d Cir.1996) ("Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment."). Although Defendants do not explicitly say so, their argument that "Plaintiff has no *objective* evidence" is apparently an attempt to invoke a "narrow exception" to the general rule that credibility determinations are not to be made on summary judgment. *Jeffreys v. City of New York,* 426 F.3d 549, 554 (2d Cir.2005); *Blake v. Race,* 487 F.Supp.2d 187, 202 (E.D.N.Y.2007). In *Jeffreys,* the Second Circuit held that in the "rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete," the court may appropriately conclude at the summary judgment stage that no reasonable jury would credit the plaintiff's testimony. *Jeffreys,* 426 F.3d at 554.

The narrow holding of *Jeffreys* is not applicable here for three reasons. First, in order for the *Jeffreys* exception to apply, the plaintiff must rely "almost exclusively on his own testimony." *Jeffreys,* 426 F.3d at 554. Here, Plaintiff is not relying "almost exclusively on his own testimony." Rather, because of Defendants' conduct during discovery, Plaintiff is relying on his own testimony plus adverse inferences drawn in his favor. As a consequence of Defendants' conduct during discovery, I ordered that Plaintiff could "ask the Court to draw factual inferences favorable to him based upon the missing photographs of January 3 and 10, 2003." (Dkt. No. 107 at 2.) Plaintiff requests that the Court draw the following inference in his favor: "That were the Defendants to provide the Court with the missing photographs taken of [Plaintiff] at Five Points C.F. on January 3, 2003, such photographs would reveal that [Plaintiff] had bruises and lacerations on his face, right ear, and chest." (Dkt. No. 109 at 46-47 n. 15.) The Court grants Plaintiff's request and draws the inference in his favor.

Second, in order for the *Jeffreys* exception to apply, Plaintiff's testimony must be "contradictory or incomplete." *Jeffreys,* 426 F.3d at 554. Here, Plaintiff's testimony is neither contradictory nor incomplete. In *Jeffreys,* the plaintiff, who alleged that police officers had

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

beaten and defenestrated him, confessed on at least three occasions that he had jumped out of a third-story window rather than having been thrown. *Id.* at 552. The plaintiff did not publicly state that he had been thrown out of a window by police officers until *nine months* after the incident. *Id.* The plaintiff could not identify any of the individuals whom he alleged participated in the attack or describe their ethnicities, physical features, facial hair, weight, or clothing on the night in question. *Id.* Here, in contrast, Plaintiff has never given a contradictory account of the events in the transportation van on January 3, 2003. Although Defendants stress that Plaintiff's medical records do not show that Plaintiff reported the incident upon arrival at Five Points, Plaintiff states in his verified complaint that he informed Defendant Hensel on the day of the incident that he had been beaten by Upstate guards. He further alleges that Defendant Hensel made no record of his complaint. (Dkt. No. 1 ¶ 23.) Plaintiff's claim regarding Nurse Hensel is corroborated by the log book entry that shows that he was taken to see Nurse Hensel on January 3, 2003, and the fact that Defendants did not provide the Court with a medical record of that visit with Plaintiff's other Five Points Medical Records. (Defs.' Resp. to P's 1st Req. for Produc. of Docs., Ex. E at 11; Bannister Aff.) As Defendants admit, Plaintiff's medical records show that within four days of the incident he reported that he had been "knocked-out and beaten everywhere." (Bannister Aff. ¶ 10.) In addition, unlike in *Jeffreys,* Plaintiff has specifically identified the officers whom he alleges beat him.

**\*21** Third, the *Jeffreys* exception is most applicable where the plaintiff's version of events is contradicted by defense testimony. In *Jeffreys,* for instance, one of the arresting officers declared that, contrary to the plaintiff's version of events, he was the only officer who entered the room where the plaintiff was allegedly beaten and that he saw the plaintiff jump out the open window. *Jeffreys,* 426 F.3d at 551-52. Here, Plaintiff's version of events has not been contradicted by an affidavit from any of the officers whom he alleges used excessive force because Defendants' motion for summary judgment is not supported by any affidavit from Defendants Snyder, Duprat, or Bogett. The only proof offered by Defendants that they did *not* use

excessive force is a notation on a January 3, 2003, unusual incident report stating "Use of Force: No." (Dkt. No. 92-5, Ex. 16.)

Accordingly, I find that Plaintiff has presented sufficient "objective evidence" to raise a triable issue of fact that Defendants Snyder, Duprat, and Bogett subjected him to excessive force.[FN49] I therefore recommend that the Court deny Defendants' motion for summary judgment of this claim.

> FN49. Read broadly, the complaint also asserts an excessive force claim against Wright and retaliation claims against Defendants Snyder, Duprat, Bogett, and Wright. Defendants have not addressed these potential claims. I find that the claims are sufficient to withstand *sua sponte* review under 28 U.S.C. § 1915(e)(2)(B).

4. *False Misbehavior Reports*

Plaintiff alleges that Defendants Nephew, Desotelle, Snyder, and Wright filed false misbehavior reports against him "in retaliation for his having threatened to sue them." (Dkt. No. 1 ¶¶ 17-18.) Defendants argue that (a) Plaintiff forfeited his claim by refusing to attend the disciplinary hearing on the charges; and (b) they would have issued the misbehavior reports regardless of any alleged retaliatory motive. (Dkt. No. 92-10 at 25-29.)

a. *Forfeiture*

Defendants argue that Plaintiff "cannot establish a prima facie case of retaliation, because although he claims the misbehavior report[s were] 'falsified,' he has forfeited his opportunity to present any evidence calling into question the truth of the misbehavior report[s] by refusing to attend the disciplinary hearing." (Dkt. No. 92-10 at 26.) Defendants cite *Brewer v. Kamas,* 533 F.Supp.2d 318 (W.D.N.Y.2008). In order to analyze *Brewer,* a review of Second Circuit precedent governing prisoners' allegations regarding false misbehavior reports is required.

A prisoner's claim that a correctional officer filed a false misbehavior report may implicate two separate constitutional provisions: (a) the Fourteenth Amendment

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

right to procedural due process; or (b) the right not to be retaliated against for exercising First Amendment rights such as the right of access to the courts or the right to petition the government for redress of grievances.

In the procedural due process context, the Second Circuit has held that while a prisoner "has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest," he *does* have "the right not to be deprived of a protected liberty interest without due process of law." *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986). Where a prisoner is falsely accused of violating disciplinary rules, and a hearing is held on the allegedly false charges that comports with the procedural due process standards set forth by the Supreme Court in *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), and any resulting guilty finding is based on "some evidence," the correctional officer's filing of unfounded charges does not give rise to procedural due process liability. *Freeman,* 808 F.2d at 953-54.

**\*22** Two years after its *Freeman* opinion, the Second Circuit addressed the second variety of false misbehavior claim-a claim that an officer filed a false misbehavior report in retaliation for the exercise of constitutionally protected rights-in *Franco v. Kelly,* 854 F.2d 584 (2d Cir.1988). In *Franco,* a prisoner alleged that correction officers filed a false misbehavior report against him in retaliation for his cooperation with an investigation by the state Inspector General into incidents of inmate abuse at Attica Correctional Facility. *Franco,* 854 F.2d at 586. The defendants moved for summary judgment, arguing that Plaintiff could not state a claim because he had received a disciplinary hearing that complied with *Wolff v. McDonnell* and resulted in a guilty finding based on "some evidence." *Id.* The trial court granted the defendants' motion, relying on *Freeman. Id.* The trial court noted, however, "that under [t]his reading of *Freeman,* the mere provision of procedural due process could eliminate all liability in any case in which prison officials had intentionally filed false and unfounded charges." *Id.* The Second Circuit settled "the substantial and troublesome questions raised in th[e] case" by holding

that "[a]lthough our decision in *Freeman* accords prison officials wide latitude in disciplining inmates as long as minimum constitutional procedures are employed, that latitude does not encompass conduct that infringes on an inmate's substantive constitutional rights" such as the prisoner's First Amendment rights of access to the courts and to petition for redress of grievances. *Id.* at 590 (citations omitted). Accordingly, the Second Circuit reversed the trial court's judgment and remanded the matter for further proceedings. *Id.* at 590-91.

In *Jones v. Coughlin,* 45 F.3d 677 (2d Cir.1995), the Second Circuit again clarified that the holding in *Freeman* is doctrinally different and distinct from the type of retaliation claim discussed in *Franco.* In *Jones,* a prisoner alleged that correction officers filed a false misbehavior report against him in retaliation for filing an administrative complaint against one of their colleagues. *Jones,* 45 F.3d at 678. At his disciplinary hearing, the prisoner was denied the opportunity to call witnesses. *Id.* He was found guilty and sentenced to serve 120 days in the SHU. *Id.* After he had served his SHU sentence, DOCS official Donald Selsky reversed the decision and expunged it from the prisoner's record. *Id.* at 679. The prisoner filed suit. *Id.* The trial court granted the prison officials' motion for summary judgment, finding that the prisoner's allegations against the corrections officers failed to state a claim under *Freeman* and that the prisoner's allegations against the hearing officer failed because any procedural due process defects in the hearing had been cured by Selsky's reversal of the decision. *Id.*

**\*23** On appeal, the Second Circuit stated that *Freeman* did not provide the "proper framework" for a decision in the case for both "factual and doctrinal reasons." *Jones,* 45 F.3d at 679. Factually, the case was distinguishable "if, as alleged, Jones was unfairly denied the right to call key witnesses in defense of the charges against him." *Id.* Doctrinally, the Second Circuit stated that "we have held that a prisoner has a substantive due process right not to be subjected to false misconduct charges as retaliation for his exercise of a constitutional right such as petitioning the government for redress of his grievances, and that this right is distinct from the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

procedural due process claim at issue in *Freeman." Id.* at 679-80. The Second Circuit vacated the trial court's judgment and remanded for further proceedings. *Id.* at 680.

This brings us to *Brewer.* In *Brewer,* a prisoner alleged that correction officers filed false misbehavior reports against him in retaliation for filing grievances. *Brewer,* 533 F.Supp.2d at 323. The prisoner refused to attend his disciplinary hearing and was found guilty. *Id.* He sued the officers in federal court. *Id.* at 324. The officers moved for summary judgment. *Id.* The court granted the motion, finding that the prisoner could not establish that the disciplinary charges were false because (1) he refused to attend his disciplinary hearing; (2) he offered no "explanation as to why he chose not to attend the hearing so as to rebut the charges, or why it was otherwise constitutionally deficient"; and (3) he did not "offer ..., in opposition to [d]efendants' motion, any evidence calling into question the truth of the ... charges." *Id.* at 330. (citation omitted). Based on these three factors, the court stated that the plaintiff "was provided with the requisite opportunity to rebut the alleged false disciplinary charges, as required by due process, and Plaintiff, by failing to do so, has waived his right to further challenge the validity" of the misbehavior report. *Id.* (citation omitted).

*Brewer* is not applicable here for three reasons. First, the case is factually distinguishable. In *Brewer,* the prisoner did not offer any explanation for his refusal to attend the hearing, did not explain why the hearing was constitutionally deficient, and did not offer any evidence calling into question the truth of the charges. *Brewer,* 533 F.Supp.2d at 330. Here, Plaintiff has explained that he did not attend the hearing because Defendant LaClair refused to assist him prepare a defense, has argued that the hearing was constitutionally deficient because Defendant Bullis did not call Defendant LaClair and an inmate as witnesses, and has offered his own testimony under penalty of perjury to rebut Defendants' version of the events leading to the misbehavior reports.

Second, Defendants overstate the holding of *Brewer.*

The court did not hold that the prisoner had forfeited his opportunity to present evidence calling into question the truth of the misbehavior report simply by refusing to attend the disciplinary hearing. Rather, the court held that the prisoner had waived his right for three reasons, with the refusal to attend being only one of them. *Brewer,* 533 F.Supp.2d at 330.

**\*24** Third, because the prisoner in *Brewer* asserted a retaliation claim rather than a procedural due process claim, the precedent relied upon by the *Brewer* court is puzzling. The portion of the decision cited at length by Defendants relies on (1) *Freeman,* which is a procedural due process case; (2) language from *Jones* that discusses the ways in which *Jones* was *factually* distinguishable from *Freeman,* rather than the language in *Jones* clarifying that a retaliation claim is *doctrinally* different from the type of procedural due process claim at issue in *Freeman;* and (3) quotes from *Franco* that summarize the procedural due process holding in *Freeman,* rather than quotes from *Franco* discussing the proper analysis of a retaliation claim. Thus, although the prisoner in *Brewer* raised a retaliation claim, the court analyzed it as a procedural due process claim.

Because I find that *Brewer* is factually distinguishable from Plaintiff's case, that the holding in *Brewer* is not as broad as Defendants suggest, and that *Brewer's* legal analysis rests on a line of cases to which the Second Circuit has referred as the improper framework for analyzing a retaliation claim, I recommend that the Court reject Defendants' argument that Plaintiff waived his claim regarding the allegedly false and retaliatory misbehavior reports by failing to appear at his disciplinary hearing.[FN50]

> FN50. I note that *Howard v. Wilkerson,* 768 F.Supp. 1002 (S.D.N.Y.1991) holds that "[a]n inmate's refusal to attend a disciplinary hearing waives his *due process objections* ... only when it occurs through no fault of prison officials." *Howard,* 768 F.Supp. at 1006 (citation and quotation marks omitted) (emphasis added). *Howard* is cited in *Nance v. Villafranca,* No. 91-CV-717, 1994 U.S. Dist. LEXIS 11114

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

(N.D.N.Y. June 20, 1994), which Defendants cite for a different proposition. (Dkt. No. 92-10 at 39.)

**b.** *Regardless of retaliatory motive*

Defendants argue that there is "ample evidence" that Defendants "would have issued the misbehavior report[s] regardless of whether [P]laintiff threatened to sue them." (Dkt. No. 92-10 at 28, 30.)

"An allegation that a prison official filed false disciplinary charges in retaliation for the exercise of a constitutionally protected right ... states a claim under § 1983. A plaintiff alleging retaliatory punishment bears the burden of showing that the conduct at issue was constitutionally protected and that the protected conduct was a substantial or motivating factor in the prison officials' decision to discipline the plaintiff. The burden then shifts to the defendant to show that the plaintiff would have received the same punishment even absent the retaliatory motivation. The defendant can meet this burden by demonstrating that there is no dispute that the plaintiff committed the most serious, if not all, of the prohibited conduct charged in the misbehavior report." *Gayle v. Gonyea,* 313 F.3d 677, 682 (2d Cir.2002) (citations and quotation marks omitted).

Here, the misbehavior reports by Defendants Nephew, Desotelle, and Snyder charged Plaintiff with creating a disturbance, committing an unhygenic act, refusing a direct order, and making threats. (Dkt. No. 92-5, Ex. 11.) As the Second Circuit explained in *Hynes v. Squillace,* 143 F.3d 653 (2d Cir.1998), the "most serious charge" in a misbehavior report that includes charges of creating a disturbance, making threats, and refusing a direct order is the direct order charge. *Hynes,* 143 F.3d at 655, 657. Here, Plaintiff admits that he did not put on his coat when Defendant Nephew ordered him to do so. (Dkt. No. 1 ¶ 15.) Thus, Defendants have met their burden of showing that Plaintiff would have received the same punishment even absent the allegedly retaliatory motive by demonstrating that there is no dispute that Plaintiff committed the most serious of the prohibited conduct charged in the misbehavior report. Therefore, I

recommend that the Court grant Defendants' motion for summary judgment and dismiss the retaliation claims against Defendants Nephew, Desotelle, and Snyder arising from the January 2, 2003, misbehavior reports.

**\*25** The misbehavior report by Defendant Wright charged Plaintiff with committing an unhygenic act, harassment, and threats.[FN51] (Dkt. No. 92-5, Ex. 11.) The most serious of these charges was the threat charge.

> FN51. Although Defendants assert that Wright charged Plaintiff with disobeying a direct order, the evidence before the court does not support that assertion. (Dkt. No. 92-5, Exs.11-12.)

Plaintiff admits that when Defendant Wright asked him to explain what happened in the frisk room, Plaintiff "responded that Wright would not believe his account of the incident, that Wright had unjustifiably interfered with [his] court trip ... and that [Plaintiff] would sue Wright and Snyder for their unlawful acts and actions." (Dkt. No. 1 ¶ 16.) This is certainly an admission to the harassment charge. DOCS Rule 107.11 provides as follows: "An inmate shall not harass an employee or any other person verbally or in writing. Prohibited conduct includes, but is not limited to, using insolent, abusive, or obscene language or gestures." N.Y. Comp.Codes R. & Regs., tit. 7, § 270.2(B)(8)(ii). However, it is not an admission to the threat charge, which requires that "[i]nmate[s] shall not ... make any threat, spoken, in writing, or by gesture." N.Y. Comp.Codes R. & Regs., tit. 7, § 270.2(B) (3)(I). Therefore, I recommend that the Court deny Defendants' motion for summary judgment regarding the retaliation claim against Defendant Wright.

**5.** *Failure to Intervene*

Plaintiff alleges that Defendant Bezio violated his constitutional rights by failing to intervene to protect Plaintiff from Defendants Duprat, Bogett, and Snyder. (Dkt. No. 1 ¶¶ 19-20.) Defendants move for summary judgment, arguing that there was no underlying constitutional violation with which to intervene. (Dkt. No. 92-10 at 36-37.)

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

Law enforcement officials can be held liable under § 1983 for not intervening in a situation where another officer is violating an inmate's constitutional rights. *Jean-Laurent v. Wilkinson,* 540 F.Supp.2d 501, 512 (S.D.N.Y.2008) (citation omitted). A state actor may be held liable for failing to prevent another state actor from committing a constitutional violation if "(1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer does not take reasonable steps to intervene." *Id.* (citation omitted); *see also Ricciuti v. N.Y.C. Transit Auth.,* 124 F.3d 123, 129 (2d Cir.1997) ("Failure to intercede to prevent an unlawful arrest can be grounds for § 1983 liability."). Whether an officer can be held liable on a failure to intervene theory is generally a question of fact for the jury to decide. *See Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir.1994) ("Whether an officer had sufficient time to intercede or was capable of preventing the harm being caused by another officer is an issue of fact for the jury unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise.").

Here, a jury could determine that Defendant Bezio failed to intervene to protect Plaintiff. Plaintiff's verified complaint states that on the day before the incident he asked Defendant Bezio to protect him while he was being transported to court. (Dkt. No. 1 ¶ 19.) Plaintiff alleges that Defendant Duprat made a threatening comment as he escorted Plaintiff to the transportation van and that Plaintiff informed Defendant Bezio of the threat before they reached the van. (Dkt. No. 1 ¶ 20.) Defendant Bezio merely shrugged his shoulders. *Id.* None of the defendants has filed an affidavit contradicting Plaintiff's version of events. As discussed above, there is a triable issue of fact that a constitutional violation occurred with which Defendant Bezio could have intervened. Therefore, I recommend that the Court deny Defendants' motion for summary judgment regarding the failure to intervene claim against Defendant Bezio.[FN52]

FN52. Read broadly, the complaint asserts a retaliation claim against Defendant Bezio based

on these same events and a failure to intervene claim against Defendant Duprat because he was present when Defendant Snyder initially beat Plaintiff. (Dkt. No. 1 ¶ 21.) Defendants have not moved for summary judgment of these claims. I find that these claims are sufficient to withstand *sua sponte* review under 28 U.S.C. § 1915(e)(2)(B).

6. *Grievances*

**\*26** Plaintiff alleges that Defendants Brousseau, Donelli, Girdich, and Eagen violated his constitutional rights by refusing to allow him to file a grievance regarding the events of January 2 and 3, 2003. (Dkt. No. 1 ¶¶ 30-34.) Defendants move for summary judgment, arguing that Plaintiff has not stated a constitutional claim. (Dkt. No. 92-10 at 38.) As discussed above in Section III(B)(3), Defendants are correct. Therefore, I recommend that the Court grant Defendants' motion and dismiss the claims against Defendants Brousseau, Donelli, Girdich, and Eagen regarding the handling of Plaintiff's grievances.
**D. Disciplinary Hearing/Sentence**

Plaintiff raises several claims regarding the conduct of his disciplinary hearing, his disciplinary sentence, and his appeal of the sentence. Specifically, he claims that (1) Defendant LaClair violated his right to due process by falsifying a misbehavior report against Plaintiff to avoid serving as Plaintiff's pre-hearing assistant (Dkt. No. 1 ¶ 35); (2) Defendant Bullis violated his due process rights by failing to call an inmate and Defendant LaClair as witnesses (Dkt. No. 1 ¶¶ 36-37); (3) Defendant Bullis violated his Eighth Amendment rights by sentencing him to a 21-day loaf diet (Dkt. No. 1 ¶ 36-37) and Defendants Weissman and Girdich violated his Eighth Amendment rights by approving the loaf diet (Dkt. No. 1 ¶ 38); and (4) Defendant Selsky violated Plaintiff's right to due process by affirming Defendant Bullis' disposition (Dkt. No. 1 ¶ 40).

1. *LaClair*

Plaintiff alleges that Defendant LaClair falsified a misbehavior report against him in order to avoid serving

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

as Plaintiff's pre-hearing assistant "and for the purpose of depriving Benitez of due process." [FN53] (Dkt. No. 1 ¶ 35.)

> FN53. The only version of the events between Defendant LaClair and Plaintiff in evidence before the Court is Defendant LaClair's misbehavior report. According to that report, when Defendant LaClair went to Plaintiff's cell to assist him, Plaintiff "stated ... that [LaClair] was to get [him] what he wanted." Defendant LaClair "informed him that what he needed had to be pertained (sic) to the misbehavior report. [Plaintiff] then stated "Get what I want or I'll fuck you up." Defendant LaClair "informed him the interview was over and left the area." (Dkt. No. 92-5, Ex. 15 at 2-3.) Although Plaintiff states in his verified complaint that Defendant LaClair "intentionally and maliciously falsified" the report, he does not offer any other version of what happened. (Dkt. No. 1 ¶ 35.) He alleges that he asked Defendant Bullis to "interview inmate Rolan and LaClair regarding the acts and actions of LaClair that caused him not to provide Benitez pre-hearing assistance," but he does not provide any information about what those interviews might have revealed. (Dkt. No. 1 ¶ 36.) Due to Defendants' failure to provide Plaintiff with pages of the SHU log book for January 14, 2003, Plaintiff asks the Court to draw an adverse inference that "were Defendants to provide the Court with the missing pages of the ... log book ... such pages would not support any of the allegations of misconduct set out in the misbehavior report that LaClair filed against Benitez on that date." (Dkt. No. 109 at 41 n. 14.) Plaintiff does not explain, however, why such an inference is logical.

In order to state a claim for violation of his procedural due process rights, a plaintiff must allege facts plausibly suggesting that he was deprived of a liberty interest without due process of law. *Tellier v. Fields,* 280 F.3d 69, 79-80 (2d Cir.2000).

Punishment implicates a protected liberty interest where (1) the state has granted its inmates, by regulation or statute, an interest in remaining free from that particular punishment; and (2) the punishment imposes "an atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 483-84, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995); *Tellier,* 280 F.3d at 80; *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996).

Here, no liberty interest is implicated. As a result of being found guilty of the disciplinary charges, Plaintiff was sentenced to a loaf diet. The Second Circuit has held that the imposition of a loaf diet does not impose an atypical and significant hardship on inmates, even where the inmate alleges that the diet caused severe stomach pain and weight loss. *McEachin v. McGuinnis,* 357 F.3d 197 (2d Cir.2004). Therefore, I recommend that the Court dismiss Plaintiff's due process claim against Defendant LaClair.[FN54]

> FN54. Although Defendants argue, in regard to Plaintiff's other claims regarding his disciplinary hearing, that due process was not required because no liberty interest was implicated by the imposition of the loaf diet, they did not assert that argument regarding the claim against Defendant LaClair. Rather, Defendants argue that Plaintiff waived Defendant LaClair's assistance by threatening him. (Dkt. No. 92-10 at 38-39.) Due process requires that prison officials provide pre-hearing assistance to a prisoner facing disciplinary charges who is confined to the SHU. *Eng v. Coughlin,* 858 F.2d 889 (2d Cir.1988). "An assistant's role is to act as merely a surrogate for the inmate, not a legal advisor or advocate. [A]n assistant's role is to perform tasks like interviewing witnesses that the inmate would perform himself if her were in the general population." *Jackson v. Johnson,* 30 F.Supp.2d 613, 619 (S.D.N.Y.1998) (citations and punctuation omitted). The assistance "must be provided in good faith and in the best interests of the inmate." *Ayers v. Ryan,* 152 F.3d 77, 81 (2d Cir.1998) (citation omitted). An "assigned

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

assistant who does nothing to assist a ... prisoner ... has failed to accord the prisoner his limited constitutional due process right of assistance." *Eng*, 858 F.2d at 898. Defendants cite several cases holding that an inmate may waive his right to assistance by remaining silent when assistance is offered or by refusing to sign a form requesting assistance. (Dkt. No. 92-10 at 39, citing *inter alia, Jackson,* 30 F.Supp.2d at 619.) However, Defendants have not cited any cases holding that an inmate waives his right to assistance by threatening his assistant. In light of my finding that Plaintiff was not deprived of a liberty interest, it is not necessary to reach this issue.

2. *Failure to Call Witnesses*

**\*27** Plaintiff alleges that Defendant Bullis violated his right to due process by failing to call the witnesses that Plaintiff requested. (Dkt. No. 1 ¶ 37.) Defendants move for summary judgment, arguing that Plaintiff cannot state a due process claim because he was not deprived of a liberty interest. (Dkt. No. 92-10 at 39-40.) As discussed above, Defendants are correct. *McEachin,* 357 F.2d at 200. Therefore, I recommend that the Court grant Defendants' motion for summary judgment and dismiss this claim.

3. *Imposition of Loaf Diet*

Plaintiff alleges that Defendant Bullis violated his Eighth Amendment rights by imposing the loaf diet on him and that Defendants Weissman and Girdich violated his Eighth Amendment rights by approving the punishment. (Dkt. No. 1 ¶¶ 37-38.) Defendants move for summary judgment of the claim, arguing that (a) Plaintiff failed to exhaust his administrative remedies; and (b) Defendants were not deliberately indifferent. (Dkt. No. 92-10 at 14-20.)

a. *Exhaustion of Administrative Remedies*

Defendants argue that Plaintiff did not exhaust his administrative remedies regarding his Eighth Amendment claims against Defendant Bullis because he did not appeal

the grievance he filed regarding Defendant Bullis' imposition of the loaf diet to the CORC. (Dkt. No. 92-10 at 14.) Defendants argue that Plaintiff failed to exhaust his administrative remedies regarding his Eighth Amendment claim against Defendants Weissman and Girdich because he did not file a grievance at all. (*Id.* at 15.)

DOCS has a separate and distinct administrative process for inmates to appeal the result of disciplinary hearings, which is not referred to as a "grievance" process. N.Y. Comp.Codes R. & Regs. tit.7, § 701.3(e)(1)-(2). For Tier III superintendent hearings, such as Plaintiff's, the inmate must file an appeal with Donald Selsky, DOCS Director of Special Housing/Inmate Disciplinary Program, pursuant to New York Compilation of Codes, Rules and Regulations, title 7, section 254.8. The appeal must be filed within 30 days of the inmate's receipt of the hearing officer's written disposition. N.Y. Comp.Codes R. & Regs. tit.7, § 254.8. Plaintiff raised the issue of the loaf diet in his appeal of the disciplinary sentence. (P.'s Decl. in Opp'n to Aff. of Karen Bellamy, Ex. D.) Defendant Selsky denied the appeal. *Id.* at Ex. E. Therefore, Plaintiff exhausted his administrative remedies as to his claim against Defendant Bullis.

Plaintiff declares that on January 18, 2003, he submitted a grievance to Defendant Brousseau complaining about Defendant Bullis' imposition of, and Defendants Weissman and Girdich's approval of, the loaf diet. (P.'s Decl. in Opp'n to Aff. of Karen Bellamy, ¶ 26.) He declares that Defendant Brousseau "deliberately refused to file and process the grievance ... in order to prevent me from suing the officials named in the grievance." *Id.* ¶ 27. Therefore, as discussed above, there is a question of fact that Defendants are estopped from asserting the exhaustion defense.

b. *Deliberate Indifference*

**\*28** Defendants argue that Plaintiff has not raised a triable issue of fact that Defendants Bullis, Weissman, and Girdich acted with deliberate indifference when they ordered and approved that the loaf diet be imposed on Plaintiff. (Dkt. No. 92-10 at 15-20.) Defendants are correct.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

Where a prisoner claims that punishment imposed following a disciplinary hearing violates his Eighth Amendment rights, the proper analysis of the subjective prong of the claim requires the court to "consider whether the [o]rder was reasonably calculated to restore prison discipline and security and, in that ... context, whether the officials were deliberately indifferent to [the prisoner's] health and safety." *Trammell v. Keane,* 338 F.3d 155, 163 (2d Cir.2003).

Here, the order imposing the loaf diet on Plaintiff was reasonably calculated to restore prison discipline and security. DOCS regulation allow the imposition of the loaf diet as punishment where, *inter alia,* the inmate is found guilty of committing unhygenic acts in the SHU or the inmate is a long-term SHU inmate who is disruptive and who has lost all other available privileges. (Dkt. No. 92-8, Bezio Aff., ¶ 5.) Here, Plaintiff was found guilty of committing unhygenic acts in the SHU. Moreover, Plaintiff is a long-term SHU inmate (he will remain in the SHU until June 3, 2021, and in keeplock until July 1, 2025) who has lost package, commissary, and phone privileges and has lost 11 years of good time credits. (Bezio Aff., ¶ 6.) Therefore, the imposition of the loaf diet was reasonably calculated to restore prison discipline.

There is no evidence that Defendants Bullis, Weissman, and Girdich acted with deliberate indifference when they imposed and approved the loaf diet. To establish deliberate indifference, an inmate must prove that (1) the defendant was aware of facts from which the inference could be drawn that the inmate had a serious medical need; and (2) the defendant actually drew that inference. *Farmer,* 511 U.S. at 837; *Chance,* 143 F.3d at 702-703. Here, although Plaintiff told Defendant Bullis that the loaf diet would cause him severe abdominal pains and constipation due to his hepatitis (Dkt. No. 1 ¶ 36), his medical record did not support his assertion. Dr. Weissman declares that "there is nothing in his medical record that indicates that [Plaintiff] is medically unable to receive the restricted diet penalty ... [T]he fact that [P]laintiff is Hepatitis C positive does not mean he cannot receive the restricted diet because Hepatitis C is not a

contraindication for the restricted diet." (Weissman Aff. ¶¶ 14-15.) Thus, there is no evidence in the record indicating that Defendants Bullis, Weissman, and Girdich were aware of facts from which the inference could be drawn that the loaf diet would harm Plaintiff or that they drew that inference. Moreover, Plaintiff admits that he refused to eat the loaf diet. (Dkt. No. 1 ¶ 39.) Accordingly, any weight loss and pain that he experienced could not have resulted from the loaf diet itself. Accordingly, I recommend that the Court grant Defendants' motion and dismiss Plaintiff's Eighth Amendment claims against Defendants Bullis, Weissman, and Girdich.

4. *Selsky*

**\*29** Plaintiff alleges that Defendant Selsky affirmed Defendant Bullis' "disciplinary determination, even though he knew or should have known that Bullis violated [Plaintiff]'s clearly established due process rights." (Dkt. No. 1 ¶ 40.) Defendants' motion for summary judgment does not directly address this claim. However, I find that it is subject to *sua sponte* dismissal pursuant to 28 U.S.C. § 1915(e)(2)(B) because, as discussed above, Defendant Bullis did not violate Plaintiff's due process rights. Therefore, I recommend that the Court dismiss the claim against Defendant Selsky.

**E. Five Points Health Care**

Plaintiff alleges that Defendants Hensel, Goodwin, Kuhlman, and Costello violated his Eighth Amendment rights by failing to provide adequate medical care at Five Points Correctional Facility following the alleged beating by Defendants Snyder, Duprat, and Bogett. (Dkt. No. 1 ¶¶ 23-26.) Defendants move for summary judgment, arguing that (1) Plaintiff failed to serve Defendant Kuhlman; and (2) Plaintiff cannot raise a triable issue of fact that these Defendants violated his Eighth Amendment rights because Plaintiff did not suffer from a serious medical need and Defendants were not deliberately indifferent. (Dkt. No. 92-10 at 6, 20.)

1. *Failure to Serve Defendant Kuhlman*

Defendants argue that the claim against Defendant Kuhlman must be dismissed because she was not served

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

within 120 days of the filing of the amended complaint on October 6, 2004. (Dkt. No. 92-10 at 6.) Under the Federal Rules of Civil Procedure, a defendant must be served with the summons and complaint within 120 days [FN55] after the filing of the complaint. Fed.R.Civ.P. 4(m). The court "must" extend the time for service for an appropriate period if the plaintiff shows good cause for the failure to serve. *Id.*

> FN55. This 120-day service period is shortened, or "expedited," by the Court's Local Rules of Practice (and the Court's General Order 25), which provide that all defendants must be served with the summons and complaint within sixty (60) days of the filing of the complaint. N.D.N.Y. L.R. 4.1(b) (emphasis added).

Here, on June 24, 2005, the summons was returned unexecuted as to Defendant "Coleman." (Dkt. No. 21.) On May 22, 2007, the Clerk's office sent Plaintiff a letter informing him that the Marshals Service had not been able to serve the defendant because there was no one by that name at Five Points Correctional Facility. The Clerk's office provided Plaintiff with another USM-285 form and asked for more information about the defendant. (Dkt. No. 54.) Plaintiff states that he was not able to ascertain Defendant Kuhlman's correct identity until after I issued orders on May 2, 2007, and October 3, 2007, compelling defendants to respond to discovery. (Dkt. No. 109 at 7-8.) The docket shows that on January 31, 2008, Plaintiff attempted to file an amended complaint "correctly identif[ying] defendant Kuhlman by substituting the name 'Coleman' ... for 'Kuhlman.'" (Dkt. No. 74.) On February 4, 2008, I ordered Plaintiff's motion stricken from the record because the deadline for filing motions to amend had expired on January 30, 2006. (Dkt. No. 75.) I find, therefore, that Plaintiff has demonstrated good cause for his failure to serve Nurse Kuhlman.

2. *Merits*

**\*30** Plaintiff claims that Defendants Hensel, Goodwin, Kuhlman, and Costello violated his Eighth Amendment rights by refusing to treat him for head pain, pain in his liver, pain in his left wrist, and severe body

itch. Plaintiff also alleges that he informed Defendant Hensel that "he had ... lost blood from within his right ear." (Dkt. No. 1 ¶¶ 23-26.) Defendants argue that Plaintiff has not raised a triable issue of fact as to either the objective or subjective prong of his Eighth Amendment medical care claim. (Dkt. No. 92-10 at 20.)

As discussed above, the objective prong of an Eighth Amendment medical claim requires the court to determine whether the prisoner was deprived of adequate medical care and, if so, whether the inadequacy was sufficiently serious. *Salahuddin,* 467 F.3d at 279-80. Where the prisoner alleges that he was completely deprived of treatment, the court must examine whether the inmate's medical condition is sufficiently serious. *Id.* at 280. Here, because Plaintiff alleges that he was totally deprived of medical care, I must consider whether the bleeding in his inner right ear, head pain, pain in his liver, pain in his left wrist, and severe body itch are "serious medical conditions," in other words, whether they are conditions "of urgency that may produce death, degeneration, or extreme pain." *Id.; Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J. dissenting).

Defendants argue, without analysis, that none of Plaintiff's "conditions constitute a condition of urgency, one that may produce death, degeneration, or extreme pain." (Dkt. No. 92-10 at 20.) As discussed above in regard to Plaintiff's claims against Defendant Weissman and Richardson, I agree that Plaintiff's severe body itch is not a serious medical condition. However, Plaintiff's bleeding inner ear, head pain, and liver pain, as alleged, appear urgent and capable of producing extreme pain. *See Bjorkstrand v. DuBose,* No. CIV. S-08-1531, 2008 WL 5386637, at * 3 (E.D.Cal. Dec.24, 2008) (finding that dried blood in ear was not a serious medical condition because "there was no emergency problem with the left ear, such as active bleeding."). I therefore find that Defendants have not met their burden of showing that they are entitled to judgment as a matter of law on the issue of whether Plaintiff suffered from a serious medical condition.

Defendants argue that Plaintiff cannot raise a triable issue of material fact as to deliberate indifference because

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 33

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

the issue of "[w]hether or not [P]laintiff needed treatment or to be seen by a physician amounts to nothing more than a disagreement with the course of treatment-not deliberate indifference." (Dkt. No. 92-10 at 20.) As Plaintiff notes (Dkt. No. 109 at 37), none of the named Five Points Defendants has filed an affidavit supporting Defendants' motion for summary judgment. They have therefore not established that their treatment of Plaintiff was based on their medical judgment. The evidence, when viewed in the light most favorable to Plaintiff, indicates that he arrived at Five Points on January 3 complaining of severe pain inflicted through excessive force and that he received absolutely no treatment for his injuries until Nurse Gardner examined him on January 7. Therefore, I find that Plaintiff has raised a triable issue of fact that Defendants Hensel, Goodwin, Kuhlman, and Costello violated his Eighth Amendment right to adequate medical treatment.

**\*31 ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 92) be **GRANTED IN PART AND DENIED IN PART;** and it is further

**RECOMMENDED** that the following claims be dismissed pursuant to Defendants' motion for summary judgment: (1) the Eighth Amendment claims against Defendants Weissman and Richards arising from their treatment of Plaintiff's severe body itch, left wrist, and right ankle; (2) the claims against Defendant Ham; (3) the claims against Defendants Brousseau and Donelli for their handling of Plaintiff's grievance regarding Defendant Ham; (4) the retaliation claim against Defendants Nephew, Desotelle, and Snyder based on their filing of misbehavior reports against Plaintiff; (5) the claims against Defendants Brousseau, Donelli, Girdich, and Eagen regarding their handling of Plaintiff's grievances regarding the events of January 2 and 3, 2003; (6) the claim against Defendant LaClair; (7) the claims against Defendant Bullis; and (8) the Eighth Amendment claim against Defendants Weissman and Girdich for approving the imposition of the loaf diet; and it is further

**RECOMMENDED** that the following claims be

dismissed *sua sponte* pursuant to 28 U.S.C. § 1915(e)(2)(B): (1) Plaintiff's retaliation claim against Defendants Weissman and Richards; and (2) the claim against Defendant Selsky; and it is further

**RECOMMENDED** that the following claims survive summary judgment and *sua sponte* review and proceed to trial: (1) the conspiracy claim against Defendants Wright, Snyder, and Duprat; (2) the excessive force claim against Defendants Snyder, Duprat, Bogett, and Wright; (3) the retaliation claim against Defendants Snyder, Duprat, Bogett, and Wright arising from the use of excessive force; (4) the retaliation claim against Wright arising from his filing of a misbehavior report against Plaintiff; (5) the failure to intervene claims against Defendants Bezio and Duprat; (6) the retaliation claim against Defendant Bezio; and (7) the Eighth Amendment claims against Defendants Hensel, Goodwin, Kuhlman, and Costello; and it is further

**ORDERED** that the Clerk provide Plaintiff with Form USM 285 for service on Defendant Kuhlman; and it is further

**ORDERED** that the Clerk serve copies of *Miller v. Bailey,* No. 05-CV-5493, 2008 U.S. Dist. LEXIS 31863, 2008 WL 1787692 (E.D.N.Y. Apr. 17, 2008); *Odom v. Poirier,* No. 99 Civ. 4933, 2004 U.S. Dist. LEXIS 25059, 2004 WL 2884409 (S.D.N.Y. Dec.10, 2004); *Warren v. Purcell,* No. 03 Civ. 8736, 2004 U.S. Dist. LEXIS 17792, 2004 WL 1970642 (S.D.N.Y. Sept.3, 2004); *Bond v. Board of Educ. of City of New York,* 97-cv-1337, 1999 U.S. Dist. LEXIS 3164, 1999 WL 151702 (W.D.N.Y. Mar.17, 1999); *Medina v. Hunt,* No. 9:05-CV-1460, 2008 U.S. Dist. LEXIS 74205, 2008 WL 4426748 (N.D.N.Y. Sept.25, 2008); *Hill v. City of New York,* No.03 CV 1283, 2005 U.S. Dist. LEXIS 38926, 2005 WL 3591719 (E.D.N.Y. Dec. 30, 2005); and *Mendez v. Artuz,* No. 01 CIV. 4157, 2002 U.S. Dist. LEXIS 3263, 2002 WL 313796 (S.D.N.Y. Feb.27, 2002) on Plaintiff in accordance with the Second Circuit's decision in *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009).

**\*32** Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten days within which to file written objections to the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.* Roldan v. Racette, 984 F.2d 85 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,2009.

Benitez v. Ham
Slip Copy, 2009 WL 3486379 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in F.Supp.2d, 2008 WL 4891165 (N.D.N.Y.)
(Cite as: 2008 WL 4891165 (N.D.N.Y.))

**C**
Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Herman CRUZ, Plaintiff,
v.
M. CHURCH, Corr. Officer, et al., Defendants.
**No. 9:05-CV-1067 (GTS/DEP).**

Nov. 10, 2008.

Herman Cruz, pro se.

Hon. Andrew M. Cuomo, Office of the Attorney General
State of New York, Stephen M. Kerwin, Esq., of Counsel,
Albany, NY, for Defendants.

*MEMORANDUM-DECISION and ORDER*

GLENN T. SUDDABY, District Judge.

**\*1** Plaintiff Herman Cruz, a New York State prison
inmate, filed this *pro se* civil rights action pursuant to 42
U.S.C. § 1983, against six correctional officials employed
by the New York State Department of Corrections.
Generally, in his Complaint, Plaintiff alleges that
Defendants violated his rights under the Constitution
when, between approximately June and July of 2005, at
Upstate Correctional Facility, they (1) used excessive
force against him, (2) issued a retaliatory misbehavior
report against him, and (3) denied him meals on isolated
occasions. (Dkt. No. 1, ¶ 6 [Plf.'s Compl.].) Currently
before the Court is Defendants' motion for summary
judgment, and a Report-Recommendation that the motion
be granted in part and denied in part. For the reasons set
forth below, the Report-Recommendation is adopted in its
entirety.

**I. BACKGROUND**

On April 23, 2007, Defendants moved for summary
judgment with regard to Plaintiff's entire Complaint. (Dkt.
No. 53.) The motion was referred to Magistrate Judge
David E. Peebles for a Report-Recommendation. On June
17, 2008, Magistrate Judge Peebles issued a
Report-Recommendation that the Court grant Defendants'
motion with regard to Plaintiff's retaliation and
food-deprivation claims, but that the Court otherwise deny
the motion. (Dkt. No. 80.) On June 27, 2007, Plaintiff
filed what he characterized as a "response," but "not [an]
objection," to the Report-Recommendation. (Dkt. No. 83.)
In that submission, Plaintiff takes issue with certain
findings of fact made by Magistrate Judge Peebles with
regard to Plaintiff's fooddeprivation and his
excessive-force claims. (*Id.*) On July 7, 2008, Defendants
filed an objection to the Report-Recommendation with
regard to Plaintiff's excessive force claim. (Dkt. No. 85.)

**II. STANDARD OF REVIEW**

When specific objections to a Report-Recommendation
are made, the Court makes a "de novo determination of
those portions of the report or specified proposed findings
or recommendations to which objection is made." 28
U.S.C. § 636(b)(1)(C). When only general objections are
made, the Court reviews for clear error or manifest
injustice. *Brown v. Peters,* 95-CV-1641, 1997 WL
599355, at \*2-3 (N.D.N.Y. Sept.22, 1997) (Pooler, J.)
[collecting cases], *aff'd,* 175 F.3d 1007 (2d Cir.1999).
Similarly, when no objection is made, the Court reviews
for clear error or manifest injustice. *See Batista v. Walker,*
94-CV-2826, 1995 WL 453299, at \*1 (S.D.N.Y. July 31,
1995) (Sotomayor, J.) [citations omitted]. After conducing
the appropriate review, the Court may "accept, reject, or
modify, in whole or in part, the findings or
recommendations made by the magistrate judge." 28
U.S.C. § 636(b) (1)(C).

**III. ANALYSIS**

**A. Plaintiff's Retaliation Claim**

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4891165 (N.D.N.Y.)
(Cite as: 2008 WL 4891165 (N.D.N.Y.))

Since neither party filed an objection to Magistrate Judge Peebles' Report-Recommendation with regard to Plaintiff's retaliation claim, the Court reviews that portion of the Report-Recommendation for clear error or manifest injustice. After careful review, the Court concludes that the Magistrate Judge Peebles' Report-Recommendation with regard to Plaintiff's retaliation claim is well-reasoned and not clearly erroneous. Magistrate Judge Peebles employed the proper legal standard, accurately recited the facts, and reasonably applied the law to those facts. As a result, the Court adopts that portion of the Report-Recommendation.

**B. Plaintiff's Food-Deprivation Claim**

**\*2** As stated above, in his "response" to Magistrate Judge Peebles' Report-Recommendation, Plaintiff takes issue with certain findings of fact made with regard to his food-deprivation claim. (Dkt. No. 83.) Regardless of whether the Court construes Plaintiff's response as a specific objection or a general objection, the Court finds no error (clear or otherwise) in Magistrate Judge Peebles' findings of fact and recommendation regarding Plaintiff's food-deprivation claim. Plaintiff simply has not adduced record evidence establishing that Defendants subjected him to food deprivations that were sufficiently serious to rise to the level of an Eighth Amendment violation. (*See* Dkt. No. 80, at 19-20 [Report-Recommendation, citing cases] .) *See also* Cagle v. Perry, 04-CV-1151, 2007 WL 3124806, at \*14 (N.D.N.Y. Oct.24, 2007) (McAvoy, J., adopting on *de novo* review Report-Recommendation) (two meal deprivations not sufficiently numerous, prolonged or severe to rise to level of Eighth Amendment violation). As a result, the Court adopts this portion of the Report-Recommendation.

**C. Plaintiff's Excessive Force Claim**

Defendants make two objections to Magistrate Judge Peebles' recommendation with respect to Plaintiff's excessive force claim. First, Defendants argue that Magistrate Judge Peebles should not have disregarded Plaintiff's failure to comply with Local Rule 7.1(a)(3)'s requirement that a party opposing a motion for summary

judgment file a response to the movant's Statement of Material Facts that admits or denies each of the movant's assertions in matching numbered paragraphs, supporting each denial with a specific citation to the record. (Dkt. No. 85, Part 1, at 1-5.) Second, Defendants argue that Magistrate Judge Peebles should have followed the established precedent in this Circuit holding that issues of credibility may be resolved by the Court on a motion for summary judgment when one of the parties has offered conflicting statements, some of which are consistent with the opposing party's version of events. (*Id.* at 5-6.)

**1. Plaintiff's Failure to Comply with Local Rule 7.1(a)(3)**

As an initial matter, it is questionable whether Defendants' purported "Notice Under Local Rule 56.2" satisfies the requirements of Local Rule 56.2. Local Rule 56.2 provides, in pertinent part: "When moving for summary judgment against a *pro se* litigant, the moving party shall inform the *pro se* litigant of the consequences of failing to respond to the summary judgment motion." N.D.N.Y. L.R. 56.2. While Local Rule 56.2 does not state in detail what the substance of the defendant's Rule 56.2 Notice shall be, it does state that "[a] sample notice can be obtained from the Court's webpage at 'www.nynd.uscourts.gov.' " *Id.* That sample notice provides, in pertinent part: "Pursuant to Local Rule 7.1 ..., you are required to submit the following papers in opposition to this motion: ... a short and concise statement of material facts as to which you claim there are genuine issues in dispute.... *If you do not submit a short and concise statement of material facts as to which you claim there are genuine issues in dispute,* all material facts set forth in the statement filed and served by the defendant(s) shall be deemed admitted." *See* N.D.N.Y. Rule 56.2 Notification, http://www.nynd.uscourts.gov/pdf/ftasumjd.pdf [last visited Oct. 20, 2008] [emphasis deleted and added].

**\*3** Here, Defendants' purported "Notice Under Local Rule 56.2" did not specifically notify Plaintiff that, *if he did not submit a response to Defendants' Statement of Material Facts,* all material facts set forth in Defendants' Statement of Material Facts would be deemed admitted. (Dkt. No. 53, Part 5.) Rather, Defendants' notice advised Plaintiff that "if you do not respond to the motion for summary judgment on time *with affidavits or documentary evidence*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4891165 (N.D.N.Y.)
(Cite as: 2008 WL 4891165 (N.D.N.Y.))

contradicting the facts asserted by the defendants, the court may accept the defendants' factual assertions as true." (*Id.* at 2 [emphasis added]). Defendants' warning is, of course, true. However, it is not complete in that it neglects to advise Plaintiff that he must also submit a written response to Defendants' Statement of Material Facts. Simply stated, such a notice potentially leaves a *pro se* plaintiff with the misimpression that it is permissible to not submit a written response to a defendant's statement of material facts so long as he submits affidavits or documentary evidence, because the Court will necessarily conduct a *sua sponte* review of those affidavits or documentary evidence for evidence contradicting the facts asserted by the defendants. This misimpression is only exacerbated by the fact that Defendants' notice also states that "[a]n affidavit is a sworn statement of fact ..." (Dkt. No. 53, Part 5, at 1.) This statement is true but (under the circumstances) potentially leaves a *pro se* plaintiff with the misimpression that an affidavit and a response to a Statement of Material Facts are the same thing. *Compare* N.D.N.Y. L.R. 7.1(a)(2) (describing an "affidavit") *with* N.D.N.Y. L.R. 7.1(a)(3) (describing a "response to the Statement of Material Facts" as distinct from an "affidavit[ ]").[FN1]

> [FN1.] In addition to appearing to fall short of the requirements of Local Rule 56.2, it would appear that Defendants' notice falls short of the notice requirements contemplated by the Second Circuit in *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996) (finding a notice provided by the New York State Attorney General's Office adequate because, in part, it "expressly warned [the *pro se* plaintiff] that ... if he did not provide the court with a short statement of any material facts as to which he contended there existed a genuine issue, the court would accept the assertions of the State's ... statement [of material facts] as true....").

In any event, the Court need not hold that Defendants' notice fails to comply with Local Rule 56.2. This is because, even assuming Defendants' notice were adequate (and Plaintiff's Rule 7.1 Response were not adequate), "[a] district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules [including the a local rule requiring a response to a statement of material facts]." *Holtz v. Rockefeller & Co.,*

*Inc.,* 258 F.3d 62, 73 (2d Cir.2001) (affirming district court's exercise of discretion to overlook *pro se* civil rights plaintiff's failure to comply with local rule requiring response to statement of material facts on defendant's motion for summary judgment) [citations omitted]. While Defendants cite numerous cases in which this Court has exercised this discretion by refusing to overlook a violation of Local Rule 7.1(a)(3),[FN2] other cases exist in which this Court has exercised this discretion by overlooking such a violation. [FN3] The reason for these differing decisions is that it is within the Court's broad discretion (based on the circumstances) whether or not to shoulder the burden of performing an independent review of the record to find proof of a factual dispute.[FN4]

> [FN2.] It is worth noting that, in none of the cases cited by Defendants did this Court hold that, by requiring that a non-movant file a response to the movant's Statement of Material Facts, Local Rule 7.1(a)(3) confers upon the movant some sort of absolute right to have its factual assertions deemed admitted. This is because the primary purpose of requiring a *response* to a Statement of Material Facts (which can be followed by only a brief reply by the movant under the Local Rules) is to aid *the Court* in determining whether a question of material fact exists based on the record evidence before it. *See Holtz v. Rockefeller & Co., Inc.,* 258 F.3d 62, 73 (2d Cir.2001); *Kilmer v. Flocar, Inc.,* 212 F.R.D. 66, 69 (N.D.N.Y.2002) (Munson, J.); *Washington v. Niagara Mohawk Power Corp.,* 103 F.Supp.2d 517, 520 (N.D.N.Y.2000) (Kahn, J.).

> [FN3.] *See, e.g., Johnson v. Tedford,* 04-CV-0632, 2007 WL 4118284, at *2 (N.D.N.Y. Nov.16, 2007) (Sharpe, J., adopting Report-Recommendation); *Bost v. Bockelmann,* 04-CV-0246, 2007 WL 527320, at *2 (N.D.N.Y. Feb.20, 2007) (Sharpe, J., adopting Report-Recommendation); *Colida v. Sony Corp.,* 93-CV-0573, 1994 WL 806088, at *2, n. 4 (N.D.N.Y. Dec.16, 1994) (Cholakis, J.), *vacated in part on other grounds,* No. 95-1375, 70 F.3d 130 (Fed.Cir. Nov. 16, 1995).

> [FN4.] *See Monahan v. City of N.Y. Dept. of*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4891165 (N.D.N.Y.)
(Cite as: 2008 WL 4891165 (N.D.N.Y.))

Corr., 214 F.3d 275, 292 (2d Cir.2000) ("[T]he trial court has discretion to conduct an assiduous review of the record [despite the filing of a faulty statement of material facts required by a local rule] in an effort to weigh the propriety of granting a summary judgment motion ....") [citations omitted]; Gill v. Frawley, 02-CV-1380, 2006 WL 1742738, at *9 (N.D.N.Y. June 22, 2006) (McAvoy, J., adopting, on de novo review, Report-Recommendation) ("[T]he Court certainly retains the discretion to conduct ... an independent review [of the record for proof of a factual dispute .")), accord, Dawkins v. Williams, 511 F.Supp.2d 248, 255 (N.D.N.Y.2007) (Kahn, J., adopting, in pertinent part, Report-Recommendation) [citations omitted]; Doe v. Nat'l Bd. of Podiatric Med. Exam'rs, 03-CV-4034, 2004 WL 912599, at *4, n. 4 (S.D.N.Y. Aug.29, 2004) ("In deciding a motion for summary judgment, a district court is not constrained to rely on assertions made in a Local Rule 56.1 statement but may instead, at its discretion, perform an independent review of the record to determine how the motion for summary judgment should be decided.") [citations omitted].

**\*4** Here, the Court finds no error in Magistrate Judge Peebles' decision to conduct such a review. As Magistrate Judge Peebles alluded to in his thorough Report-Recommendation, Plaintiff filed what he intended to be a response to Defendants' Statement of Material Facts. (Dkt. No. 80, at 9, n. 6.) The problem with that response was that it did not comply with Local Rule 7.1(a)(3) in that it did not (1) mirror each of the thirteen paragraphs of Defendants' Statement of Material Facts, (2) expressly admit or deny each of Defendants' factual assertions, and (3) support each denial with a specific citation to the record. (Dkt. No. 55, Part 1, at 3-6 [Plf.'s "Statement of Facts," containing twelve paragraphs, only seven of which were supported by citations to the record].) However, the record evidence adduced by Plaintiff was not particularly copious, consisting of some thirty-eight (38) pages of exhibits and affidavit testimony. (Dkt. No. 55, Part 1, at 7-21; Dkt. No. 55, Part 3, at 1-5; Dkt. No. 55, Part 3, at 6-24.) Moreover, before he filed his papers in opposition to Defendants' motion in this action on May 4, 2007, Plaintiff was not so experienced at federal court litigation that the special leniency normally afforded to pro se litigants because of their experience should have been diminished.[FN5]

FN5. In particular, before May 4, 2007, Plaintiff had filed five other federal court actions. See Cruz v. Senkowski, 90-CV-0289 (W.D.N.Y.) (habeas corpus proceeding); Cruz v. Wead, 97-CV-0846 (W.D.N.Y.) (prisoner civil rights action); Cruz v. Hillman, 01-CV-4169 (S.D.N.Y.) (prisoner civil rights action); Cruz v. Thompson, 04-CV-1497 (N.D.N.Y.) (prisoner civil rights action); Cruz v. Lashway, 06-CV-0867 (N.D.N.Y.) (prisoner civil rights action). It appears that, as of May 4, 2007, he had filed only one response to a motion for summary judgment in federal court, and it is unclear whether that response included response to a Statement of Material Facts. See Cruz v. Wead, 97-CV-0846 (W.D.N.Y.) (Plaintiff filed a "response" to defendants' motion for summary judgment on June 20, 2001).

For these reasons, the Court is not persuaded by Defendants' argument that Magistrate Judge Peebles erred by excusing Plaintiff's failure to comply with Local Rule 7.1(a)(3).

**2. Plaintiff's Inconsistent Statements as to the Source of His Injury**

In support of their argument that it is the established precedent in this Circuit that issues of credibility may be resolved by the Court on a motion for summary judgment when one of the parties has offered conflicting statements and some of those statements are consistent with the opposing party's version of events, Defendants cite Jeffreys v. City of New York, 426 F.3d 549 (2d Cir.2005). (Dkt. No. 85, Part 1, at 5-6.) Defendants need to appreciate the narrowness of the exception discussed in Jeffreys, and the circumstances necessary to trigger that narrow exception.

It is well established that issues of credibility are almost never to be resolved by a court on a motion for summary judgment.[FN6] Granted, there is a narrow exception to this

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4891165 (N.D.N.Y.)
(Cite as: 2008 WL 4891165 (N.D.N.Y.))

well-established rule. *Blake v. Race,* 487 F.Supp.2d 187, 202 (E.D.N.Y. March 29, 2007). In *Jeffrey,* the Second Circuit explained that this narrow exception is for testimony by a non-movant that possesses the following two characteristics: (1) it constitutes almost the exclusive basis for a disputed issue of fact in the case (or, expressed differently, it is largely unsubstantiated by any other direct evidence); and (2) it is so lacking in credibility (because the testimony is incomplete and/or replete with inconsistencies and improbabilities) that, even after drawing all inferences in the light most favorable to the non-movant, no reasonable jury could find for the non-movant.[FN7] Again, it must be remembered that the circumstances giving rise to this exception are "rare."[FN8]

FN6. *See Globecon Group, LLC v. Hartford Fire Ins. Co.,* 434 F.3d 165, 174 (2d Cir.2006) ("[C]redibility, in the ordinary course of things, is for a fact-finder to evaluate."); *Stichting v. Schreiber,* 407 F.3d 34, 55 (2d Cir.2005) ("[T]o resolve at the summary judgment stage, and before Mead testifies, the question of whether a reasonable jury might believe Mead would, we think, amount to a credibility determination that we are not entitled to make."); *Weyant v. Okst,* 101 F.3d 845, 854 (2d Cir.1996) (at the summary judgment stage, the court "is ... to eschew credibility assessments"); *accord, Amnesty Am. v. Town of W. Hartford,* 361 F.3d 113, 122 (2d Cir.2004); *Rule v. Brine, Inc.,* 85 F.3d 1002, 1011 (2d Cir.1996) ("Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment."); *accord, Jeffreys v. City of New York,* 426 F.3d 549, 554 (2d Cir.2005); *see also Hayes v. N.Y. City Dep't of Corr.,* 84 F.3d 614, 619 (2d Cir.1996) ("In applying [the summary judgment] standard, the court should not weigh evidence or assess the credibility of witnesses."); *accord, U.S. v. Rem,* 38 F.3d 634, 644 (2d Cir.1994).

FN7. *See Jeffreys v. City of New York,* 426 F.3d 549, 554-55 (2d Cir.2005) ("[I]n the rare circumstances where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine

whether ... there are any 'genuine' issues of material fact, without making some assessment of the plaintiff's account.... In the circumstances presented in the instant case-where (1) the District Court found nothing in the record to support plaintiff's allegations other than plaintiff's own contradictory and incomplete testimony, and (2) the District Court, even after drawing all inferences in the light most favorable to the plaintiff, determined that no reasonable person could believe Jeffreys' testimony, ... we hold that the District Court did not err by awarding summary judgment. Because no reasonable person would undertake the suspension of disbelief necessary to give credit to the allegations made in the complaint, ... conclude that summary judgment was appropriate.") [internal quotation marks and citations omitted]; *cf. Argus, Inc. v. Eastman Kodak Co.,* 801 F.2d 38, 42-46 (2d Cir.1986) (affirming grant of summary judgment to defendants in part because plaintiffs' deposition testimony regarding an alleged defect in a camera product line [1] was "unsupported by documentary or other concrete evidence," and indeed was contradicted by the other record evidence, and [2] was "conclusory" and "inconsistent" with plaintiffs' present representations); *Olle v. Columbia Univ.,* 332 F.Supp.2d 599, 612-15 (S.D.N.Y.2004) (plaintiff's deposition testimony was insufficient evidence to oppose defendants' motion for summary judgment where that testimony [1] recounted specific allegedly sexist remarks that "were either unsupported by admissible evidence or benign," and [2] were inconsistent with plaintiff's other statements and claims), *aff'd,* 136 F. App'x 383 (2d Cir.2005) (unreported decision, cited not as precedential authority but merely to show the case's subsequent history, in accordance with Second Circuit Local Rule § 0.23).

FN8. *Jeffreys,* 426 F.3d at 554; *Caraballo v. City of New York,* 05-CV-8011, 2007 WL 1584202, at *6 (S.D.N.Y. May 31, 2007); *Blake,* 487 F.Supp.2d at 202; *Dove v. City of New York,* 03-CV-5052, 2007 U.S. Dist. LEXIS 18341, at *16, 2007 WL 805786 (E.D.N.Y. March 15, 2007); *Chapel Park Villa, Ltd. v. The Travelers*

Not Reported in F.Supp.2d, 2008 WL 4891165 (N.D.N.Y.)
(Cite as: 2008 WL 4891165 (N.D.N.Y.))

*Ins. Co., Inc.,* 02-CV-0407, 2006 WL 2827867, at *7 (W.D.N.Y. Sept.29, 2006); *Allah v. Greiner,* 03-CV-3789, 2006 WL 357824, at *2 (S.D.N.Y. Feb.15, 2006).

**\*5** Here, Defendants argue that Magistrate Judge Peebles should have discredited Plaintiff's statement (made on June 16, 2005) that his physical injuries had been caused by an assault by Defendants (on June 5, 2005), because that statement was inconsistent with his earlier statement to a health care provider (made on June 5, 2005) that his physically injuries had been caused by a fall in a shower. (Dkt. No. 85, Part 1, at 5.) Defendants are correct that the two statements are inconsistent. However, it is not true that the statement of June 16, 2005, constitutes the exclusive, or almost the exclusive, basis for a disputed issue of fact in the case. Magistrate Judge Peebles correctly observed that the statement of June 16, 2005, was corroborated by (1) Plaintiff's later sworn statements to the same effect (see Dkt. No. 1, ¶¶ 6 [6]-6[8] [Plf.'s Verified Compl.]; Dkt. No. 1, at 15, ¶¶ 12-13 [Plf.'s Decl. in Support of his Compl.]; Dkt. No. 55, Part 3, ¶¶ 13, 15, 26 [Plf.'s Decl.] ), and (2) a modicum of medical evidence substantiating that, at or about the time of the alleged assault, Plaintiff suffered physical injuries that are plausibly consistent with his claim (see Dkt. No. 53, Part 11 [Ex. E to Viglucci Affid., attaching Plf.'s medical records]; Dkt. No. 55, Part 3, at 12-19 [Exs. 6-13 to Plf.'s Decl., attaching Plf.'s medical records].) *See Murray v. Palmer,* 03-CV-1010, 2008 WL 2522324, at *20 (N.D.N.Y. June 20, 2008) (Hurd, J., adopting, on *de novo* review, Report-Recommendation (finding that the plaintiff's affidavit testimony was not so unsubstantiated as to be incredible under exception created by *Jeffreys v. City of New York,* 426 F.3d 549 [2d Cir.2005] ).

It should be noted that, contrary to Defendants' argument, Magistrate Judge Peebles did not "discount[ ]" Plaintiff's statement of June 5, 2005, "in favor of" his statement of June 16, 2006. (Dkt. No. 85, Part 1, at 6.) Magistrate Judge Peebles merely recognized that Plaintiff's statement of June 16, 2006, was not so unsubstantiated by other evidence as to trigger the narrow exception discussed in *Jeffreys.* Defendants remain free to use Plaintiff's statement of June 5, 2005, to try to persuade a jury that no assault occurred. It should also be noted that conspicuously missing from Defendants' motion papers are affidavits from Defendants Church and Vann denying their involvement in the alleged assault on Plaintiff. (*See generally* Dkt. No. 53.)

Because the Court finds that the first prong of the two-part test set forth by *Jeffrys* has not been satisfied, there is no need to proceed to the second prong of that test (e.g., examining the statements' inconsistencies and improbabilities). The Court notes that, even if it were to proceed to that prong, it would be have difficulty concluding that Plaintiff's statement of June 5, 2005, and his statement of June 16, 2005, are wholly irreconcilable, given his proffered explanation that he made the statement of June 5, 2005, out of fear of retribution by Defendants. (Dkt. No. 1, ¶ 6[8] [Plf.'s Verified Compl.]; Dkt. No. 55, Part 1, ¶ 5 [Plf.'s "Statement of Facts"].) *See Langman Fabrics v. Graff Californiawear, Inc.,* 160 F.3d 106, 112 (2d Cir.1998) ("If there is a plausible explanation for discrepancies in a party's testimony, the court considering a summary judgment motion should not disregard the later testimony because of an earlier account that was ambiguous, confusing, or simply incomplete.") [emphasis added]. As a result, the Court adopts this portion of the Report-recommendation.

**\*6 ACCORDINGLY,** it is

**ORDERED** that the Report-Recommendation (Dkt. No. 80) is hereby ***ADOPTED*** in its ***ENTIRETY;*** and it is further

**ORDERED** that Defendants' First Motion for Summary Judgment (Dkt. No. 53) is ***GRANTED IN PART*** in that the Second and Third Causes of Action of Plaintiff's Complaint (Dkt. No. 1), asserting claims of retaliation and food deprivation, are ***DISMISSED*** with prejudice; and it is further

**ORDERED** that First Motion for Summary Judgment (Dkt. No. 53) is otherwise ***DENIED,*** and that the First Cause of Action of Plaintiff's Complaint (Dkt. No. 1), asserting a claim of excessive force, shall be ***SET DOWN FOR TRIAL.***

*REPORT AND RECOMMENDATION*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4891165 (N.D.N.Y.)
(Cite as: 2008 WL 4891165 (N.D.N.Y.))

DAVID E. PEEBLES, United States Magistrate Judge.

Plaintiff Herman Cruz, a New York State prison inmate who is proceeding *pro se* and *in forma pauperis,* has commenced this action pursuant to 42 U.S.C. § 1983 against various corrections officials employed by the New York State Department of Correctional Services ("DOCS"), complaining of the alleged deprivation of his civil rights occurring during the period of his incarceration. In his complaint, plaintiff claims that he was assaulted by the six named defendants, was denied meals on isolated occasions, and was issued a misbehavior report in retaliation for having filed a grievance complaining of actions on the part of certain corrections officials. As relief, plaintiff seeks recovery of compensatory and punitive damages.

Currently pending before the court is a motion by defendants seeking the entry of summary judgment dismissing plaintiff's complaint in its entirety. In their motion, defendants urge the court to reject the plaintiff's version of the relevant events as facially incredible and determine that no reasonable factfinder could find in his favor on the three claims asserted.

Having carefully reviewed the record now before the court, informed by the arguments raised by the defendants, I conclude that dismissal of plaintiff's excessive force claims is precluded by the existence of genuine, triable issues of material fact, but that defendants are entitled to dismissal of plaintiff's retaliation and food deprivation claims, and therefore recommend that defendants' motion be granted, in part, but otherwise denied.

I. *BACKGROUND*[FN1]

> FN1. In light of the procedural posture of the case the following recitation is derived from the record now before the court, with all inferences drawn, and ambiguities resolved, in favor of the plaintiff. *See Wells-Williams v. Kingsboro Psychiatric Ctr.,* No. 03-CV-134, 2007 WL 1011545, at *2 (E.D.N.Y. Mar. 30, 2007)

(citations omitted). It should be noted, however, that many if not most of plaintiff's allegations are sharply contested by the defendants.

Plaintiff is a prison inmate entrusted to the custody of the DOCS. Complaint (Dkt. No. 1) at p. 1. At the times relevant to his claims plaintiff was designated to the Upstate Correctional Facility, located Malone, New York. [FN2] *Id.*

> FN2. Upstate is a maximum security prison comprised exclusively of special housing unit ("SHU") cells in which inmates are confined, generally though not always for disciplinary reasons, for twenty-three hours each day. *See Samuels v. Selsky,* No. 01 CIV. 8235, 2002 WL 31040370, at *4 n. 11 (S.D.N.Y. Sept. 12, 2002).

On June 5, 2005, while confined within the special housing unit ("SHU") at Upstate, plaintiff intentionally started a fire in his cell. Complaint (Dkt. No. 1) at p. 6. The avowed purpose for setting the fire was plaintiff's desire to either commit suicide or be transferred out of the Upstate SHU. *Id.; see also* Cruz Decl. (Dkt. No. 55-3) ¶ 16. Once the fire was extinguished by prison officials, Cruz was transferred into the facility's mental health unit and placed on special watch. Complaint (Dkt. No. 1) at p. 6; *see also* Cruz Decl. (Dkt. No. 55-3) Exh. 4-A. At approximately 6:30 pm on that date plaintiff was examined for physical injuries; during that inspection no injuries were discerned, and plaintiff denied having suffered any. Viglucci Aff. (Dkt. No. 53-6) Exh. E; *see also* Cruz Aff. (Dkt. No. 553) Exh. 4-A.

**7** It is at this point that the parties' versions of the relevant events diverge. Plaintiff maintains that after his admission into the mental health unit and ensuing medical examination, defendants Baker, Russell, Patterson, Gill, Church and Vann came into his room and assaulted him, punching and kicking him and causing him to suffer a broken rib. Complaint (Dkt. No. 1) at p. 6; *see also* Cruz Decl. (Dkt. No. 55-3) ¶ 13. Defendants Baker, Gill, Patterson and Russell, by contrast, have submitted affidavits in which they deny having assaulted the plaintiff.[FN3] *See* Baker Aff. (Dkt. No. 53-12) ¶¶ 8-9; Gill Aff. (Dkt. No. 53-13) ¶ 6; Patterson Aff. (Dkt. No. 53-14)

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4891165 (N.D.N.Y.)
(Cite as: 2008 WL 4891165 (N.D.N.Y.))

at ¶¶ 6-7; Russell Aff. (Dkt. No. 53-15) ¶¶ 3-5.

> FN3. Conspicuously absent from among defendants' motion submission are affidavits from the remaining two defendants, including Corrections Officer Church and Corrections Officer Vann, denying their involvement in any alleged assault of the plaintiff.

Plaintiff's ambulatory health record entries for the relevant period reflect complaints of back and rib pain registered by the plaintiff at 7:30 pm on June 5, 2005, one hour after having been initially examined for injuries resulting from the fire; during the course of that examination, plaintiff attributed his injuries to having slipped and fallen in the shower. Viglucci Aff. (Dkt. No. 53-6) Exh. E., repeated at (Dkt. No. 55-3) Exhs. 6A12A. X-rays taken on June 6, 2005 confirmed that at some point plaintiff suffered a rib fracture. Viglucci Aff. (Dkt. No. 53-6) Exh. E. Plaintiff's health records reveal that plaintiff's injuries were treated during the ensuing days with analgesics. *See id.*

On June 16, 2005, for the first time, he reported that he was attacked by prison officials on June 5, 2005, at that point blaming his injuries, including the rib fracture, upon the assault rather than a fall in the shower, as previously reported. Viglucci Aff. (Dkt. No. 53-6) Exh. E; Cruz Decl. (Dkt. No. 55-3) Exh. 12-A. An examination conducted on that date disclosed the existence of a "baseball size" bruise on plaintiff's right lower back, though no marks were found on his face.[FN4] *Id.* Plaintiff maintains that he initially made a false report regarding the cause of his injuries out of fear of retribution. *See, e.g.,* Plaintiff's Response to Defendants' Summary Judgment Motion (Dkt. No. 55) ¶ 5.

> FN4. As will be seen, defendants claim that plaintiff's broken rib and subsequent inquiries were self-inflicted, based upon reports that upon his entry into the mental health unit on June 5, 2006 plaintiff was seen standing on his bunk and jumping onto the floor, throwing himself on his back and flailing. *See* Plaintiff's Response to Defendants' Summary Judgment Motion (Dkt. No. 55) Exh. D.

Plaintiff was issued a misbehavior report on June 5, 2005 by defendant Megan Church, a corrections officer, accusing Cruz of arson, in violation of disciplinary rule 118.10, based upon the fire which occurred on that date in his cell. Viglucci Aff. (Dkt. No. 53-6) Exh. D. A second misbehavior report was issued as a result of the incident, also on that same date, by Corrections Officer J. Kissane, charging plaintiff with destruction or loss of property, in violation of disciplinary rule 116.10. A Tier III disciplinary hearing was conducted on June 16, 2005 in connection with those charges, resulting in a finding of guilt on both counts, and the imposition of a penalty which included one hundred eighty days of disciplinary confinement in the facility's SHU, with a corresponding loss of package, commissary and telephone privileges and an order that plaintiff pay restitution in the amount of $241.00, with an additional recommended loss of good time credits.[FN5] *Id.*

> FN5. The DOCS conducts three types of inmate disciplinary hearings. Tier I hearings address the least serious infractions, and can result in minor punishments such as the loss of recreation privileges. Tier II hearings involve more serious infractions, and can result in penalties which include confinement for a period of time in the Special Housing Unit (SHU). Tier III hearings concern the most serious violations, and could result in unlimited SHU confinement and the loss of "good time" credits. *See Hynes v. Squillace,* 143 F.3d 653, 655 (2d Cir.), *cert. denied,* 525 U.S. 907, 119 S.Ct. 246, 142 L.Ed.2d 202 (1998).

**\*8** Plaintiff was issued yet another misbehavior report on June 5, 2005, charging him with harassment (Rule 107.11), making threats to staff (Rule 102.10), and violating facility correspondence regulations (Rule 180.11). Viglucci Aff. (Dkt. No. 53-6) Exh. C. Those charges stemmed from a letter allegedly sent by the plaintiff to Corrections Officer Church, containing derogatory statements concerning her. *See id.* Following a Tier III hearing in connection with that misbehavior report, plaintiff was found guilty of two of the three charges, but acquitted of making threats. *Id.* As a consequence, disciplinary confinement, with corresponding lack of package, commissary and telephone privileges, was imposed for a period of ninety days, with

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4891165 (N.D.N.Y.)
(Cite as: 2008 WL 4891165 (N.D.N.Y.))

an additional recommended loss of good time credits. *Id.*

In addition to complaining of the June 5, 2005 alleged staff assault, plaintiff's complaint also makes allegations, although bereft of specifics, to the effect that in response to his filing of a grievance on July 11, 2005, regarding the assault and actions taken by defendant Church toward him, Cruz was issued another misbehavior report. Complaint (Dkt. No. 1) at p. 10. Neither plaintiff's complaint, the accompanying supporting affidavit, nor his papers in opposition to the defendants' summary judgment motion provide elaboration regarding this claim, including to identify the issuing officer, recite the infraction charged, or provide information regarding its disposition.

Similarly, in his complaint plaintiff alleges having been denied "chow" on numerous occasions. Complaint (Dkt. No. 1) Third Cause of Action at p. 12; Cruz Decl. (Dkt. No. 55-3) ¶ 10. Plaintiff does not indicate the dates, or on how many occasions, his meals were not served, nor once again does he identify the individuals to whom that deprivation is attributable.

## II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on August 25, 2005. Dkt. No. 1. As defendants, plaintiff's complaint names six DOCS employees, including Corrections Officers M. Church, A. Baker, Patterson, and R. Russell, as well as Corrections Sergeant R. Gill and Corrections Lieutenant Vann, all of whom are employed at Upstate. *Id.* Plaintiff's complaint contains three causes of action, asserting the use of excessive force, unlawful retaliation, and cruel and unusual punishment based upon the alleged deprivation of meals. Issue has since been joined by the defendants' filing of an answer in which they deny the bulk of the material allegations of plaintiff's complaint and set forth various affirmative defenses. *See* Dkt. Nos. 23, 73.

On April 23, 2007, following the close of discovery, defendants filed a motion for summary judgment. Dkt. No. 53. In their motion, defendants argue that no reasonable factfinder could credit plaintiff's version of the relevant events and find liability on the part of any of the defendants with respect to plaintiff's three separate claims.

*Id.* Plaintiff has since responded in opposition to defendants' motion by the filing on May 4, 2007 of several documents, including an affidavit.[FN6] *See* Dkt. No. 55. Defendants' motion, which is now ripe for determination, has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c); *see also* Fed.R.Civ.P. 72(b).

FN6. Plaintiff's submission does not include a statement formally responding to defendants' Local Rule 7.1(a)(3) statement of material facts not in issue. While the plaintiff's failure to include such a responsive statement among his opposition papers has significant potential adverse consequences, *see* N.D.N.Y.L.R. 7.1(a)(3); *see also* *Elgamil v. Syracuse Univ.,* No. 99-CV-611, 2000 WL 1264122, at *1 (Aug. 22, 2000)* (McCurn, S.J.) (listing cases); *Monahan v. New York City Dep't of Corr.,* 214 F.3d 275, 292 (2d Cir.2000), and the importance of this requirement should not be trivialized, I have chosen to overlook this procedural deficiency in light of the plaintiff's other submissions in opposition to the motion and in deference to his *pro se* status. See The *Travelers Indemnity Co. of Ill. V. Hunter Fan Co.,* No. 99 CIV 4863, 2002 WL 109567, at *7 (S.D.N.Y. Jan.28, 2002)* (citing *Holtz v. Rockefeller & Co., Inc.,* 258 F.3d 62, 73 (2d Cir.2001) (indicating that a court has broad discretion whether to overlook a party's failure to comply with its local rules).

## III. *DISCUSSION*

### A. *Summary Judgment Standard*

**\*9** Summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, summary judgment is warranted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see* *Celotex Corp. v. Catrett,* 477 U.S.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4891165 (N.D.N.Y.)
(Cite as: 2008 WL 4891165 (N.D.N.Y.))

317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986);
Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106
S.Ct. 2505, 2509-10, 91 L.Ed.2d 202 (1986); Security Ins.
Co. of Hartford v. Old Dominion Freight Line, Inc., 391
F.3d 77, 82-83 (2d Cir.2004). A fact is "material", for
purposes of this inquiry, if it "might affect the outcome of
the suit under the governing law." Anderson, 477 U.S. at
248, 106 S.Ct. at 2510; see also Jeffreys v. City of New
York, 426 F.3d 549, 553 (2d Cir.2005) (citing Anderson
). A material fact is genuinely in dispute "if the evidence
is such that a reasonable jury could return a verdict for the
nonmoving party." Anderson, 477 U.S. at 248, 106 S.Ct.
at 2510. Though pro se plaintiffs are entitled to special
latitude when defending against summary judgment
motions, they must establish more than mere
"metaphysical doubt as to the material facts." Matsushita
Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586,
106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); but see
Vital v. Interfaith Med. Ctr., 168 F.3d 615, 620-21 (2d
Cir.1999) (noting obligation of court to consider whether
pro se plaintiff understood nature of summary judgment
process).

When summary judgment is sought, the moving party
bears an initial burden of demonstrating that there is no
genuine dispute of material fact to be decided with respect
to any essential element of the claim in issue; the failure to
meet this burden warrants denial of the motion. Anderson,
477 U.S. at 250 n. 4, 106 S.Ct. at 2511 n. 4; Security Ins.,
391 F.3d at 83. In the event this initial burden is met, the
opposing party must show, through affidavits or otherwise,
that there is a material issue of fact for trial. Fed.R.Civ.P.
56(e); Celotex, 477 U.S. at 324, 106 S.Ct. at 2553
Anderson, 477 U.S. at 250, 106 S.Ct. at 2511.

When deciding a summary judgment motion, a court must
resolve any ambiguities, and draw all inferences from the
facts, in a light most favorable to the nonmoving party.
Jeffreys, 426 F.3d at 553; Wright v. Coughlin, 132 F.3d
133, 137-38 (2d Cir.1998). Summary judgment is
inappropriate where "review of the record reveals
sufficient evidence for a rational trier of fact to find in the
[non-movant's] favor." Treglia v. Town of Manlius, 313
F.3d 713, 719 (2d Cir.2002) (citation omitted); see also
Anderson, 477 U.S. at 250, 106 S.Ct. at 2511 (summary
judgment is appropriate only when "there can be but one
reasonable conclusion as to the verdict").

B. Excessive Force

*10 The centerpiece of plaintiff's complaint in this action
is his contention that he was assaulted by the defendants
following his transfer into the Upstate mental health unit
on June 5, 2005, causing him to suffer injuries which
included a broken rib. Despite plaintiff's sworn statements
to the effect that the assault occurred, with some modicum
of potential corroboration provided by medical records
substantiating that at or about that time plaintiff did in fact
suffer injuries which are plausibly consistent with his
claim, defendants nonetheless request that the court find
plaintiff's version of the events to be incredible as a matter
of law, and thus conclude that no reasonable factfinder
could find in his favor with regard to that cause of action.

A plaintiff's constitutional right against cruel and unusual
punishment is violated by an "unnecessary and wanton
infliction of pain." Whitley v. Albers, 475 U.S. 312, 319,
106 S.Ct. 1076, 1084 (1986) (citations and quotations
omitted); Griffen v. Crippen, 193 F.3d 89, 91 (2d
Cir.1999). The lynchpin inquiry in deciding claims of
excessive force against prison officials is "whether force
was applied in a good-faith effort to maintain or restore
discipline or maliciously and sadistically for the very
purpose of causing harm." Hudson v. McMillian, 503 U.S.
1, 6-7, 112 S.Ct. 995, 998, 117 L.Ed.2d 156 (1992)
(applying Whitley to all excessive force claims); Whitley,
475 U.S. at 320-21, 106 S.Ct. at 1085 (quoting Johnson v.
Glick, 481 F.2d 1028, 1033 (2d Cir.) (Friendly, J.), cert.
denied sub nom., John v. Johnson, 414 U.S. 1033, 94
S.Ct. 462, 38 L.Ed.2d 324 (1973)).

This is not the typical excessive force case, in which
defendants argue that while force may have been exerted
by corrections officials against an inmate, it was
proportionate to the need to further legitimate penelogical
interests and protect the safety and integrity of the facility,
or that when utilizing force they did not act with a
sufficiently culpable state of mind. In this instance,
defendants assert that the assault, as claimed by the
plaintiff, simply did not occur. Ordinarily, such a disparity
between the parties' versions of the relevant events would
present a classic example of an issue of material fact of the
type which would preclude the entry of summary
judgment. Despite this defendants nonetheless argue that
plaintiff's version of the events is simply not supportable,

Not Reported in F.Supp.2d, 2008 WL 4891165 (N.D.N.Y.)
(Cite as: 2008 WL 4891165 (N.D.N.Y.))

inviting the court to make the required credibility assessment and find, as a matter of law, that no reasonable factfinder could conclude he was subjected to excessive force at the hands of the defendants.

While resolution of genuine issues of material fact are ordinarily best left for resolution by a jury, in certain rare circumstances where conflicting versions of the relevant events are presented in the record a court may nonetheless resolve the inconsistencies and grant summary judgment, particularly where a plaintiff relies exclusively on his or her version of the relevant events, without corroboration, and in circumstances where there are inconsistencies, contradictions or incompleteness in the plaintiff's version. See *Jeffreys,* 426 F.3d at 554-55; *see also Shabazz v. Pico,* 994 F.Supp. 460, 468-71 (S.D.N.Y.1998); *see also Dove v. City of New York,* No. 03-CV-5052, 2007 WL 805786, at *5 (E.D.N.Y. Mar. 15, 2007). This, however, is not one of those cases.

**\*11** Despite defendants' protestations to the contrary, plaintiff's version of the relevant events is not necessarily inconsistent with the evidence in the record, including that concerning his medical injuries. Plaintiff's health records reveal that at 6:30 pm on June 5, 2005, following a fire in his cell, he was examined, with no signs of injury. Cruz Decl. (Dkt. No. 55-3) at Exh. 6A. One hour later, Cruz was again examined, after reportedly having slipped and fallen in the shower, with complaints of rib and back pain. *Id.* While at that time there did not appear to be any visible signs of injury, x-rays ordered on June 6, 2005 revealed the existence of a broken rib. *Id.; see also* Viglucci Aff. (Dkt. No. 53-6) Exh. E. While defendants theorize that the broken rib was self-inflicted as a result of plaintiff's antics, observed by prison officials on June 5, 2005-and there is considerable potential plausibility to that theory-only a jury, having heard all of the evidence, can make that pivotal credibility determination and resolve the issues of fact surrounding whether the assault incident occurred, as claimed by the plaintiff.

In sum, while at different points in time the plaintiff has undeniably offered conflicting versions of the relevant events of June 5, 2005, he has also provided an explanation for having done so, and his claim of having sustained injury on that date as a result of an assault is potentially somewhat corroborated by the existence of a

visible bruise and x-rays revealing a broken rib. Under these circumstances I recommend against invoking the *Jeffreys* exception, and in favor of denying the portion of defendants' motion challenging the sufficiency of plaintiff's excessive force claims.

C. *Retaliation*

In his complaint plaintiff also asserts a claim of retaliation, based principally upon his filing of a grievance on July 11, 2005, allegedly resulting in the subsequent issuance of a misbehavior report. Complaint (Dkt. No. 1) at p. 10. Observing that such claims are "prone to abuse", see *Flaherty v. Cohen,* 713 F.2d 10, 13 (2d Cir.1983), and that the record is lacking in specifics regarding the grievance and ensuing misbehavior report, defendants seek dismissal of this claim as well.[FN7]

> FN7. Plaintiff's complaint, generously construed, could be interpreted as also alleging that defendants Gill and Church retaliated against him for filing grievances and complaints against him by their issuance of false misbehavior reports on June 5, 2005. While the mere filing of false misbehavior reports, without more, is not actionable, *see Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997); *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986), *cert. denied,* 485 U.S. 982, 108 S.Ct. 1273, 99 L.Ed.2d 484 (1988)), such conduct, if committed in retaliation for an inmate having engaged in protected activity, is potentially actionable under the First Amendment. *Franco v. Kelly,* 854 F.2d 584, 589 (2d Cir.1988). In this case, however, plaintiff is not well-positioned to argue that the misbehavior reports contained false allegations since Tier III hearings conducted in connection with both misbehavior reports issued on June 5, 2005 resulted in at least partial findings of guilt.

In order to state a *prima facie* claim under section 1983 for retaliatory conduct, a plaintiff must advance non-conclusory allegations establishing that 1) the conduct at issue was protected; 2) the defendants took adverse action against the plaintiff; and 3) there was a causal connection between the protected activity and the adverse

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4891165 (N.D.N.Y.)
(Cite as: 2008 WL 4891165 (N.D.N.Y.))

action-in other words, that the protected conduct was a "substantial or motivating factor" in the prison officials' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977); *Dillon v. Morano,* 497 F.3d 247, 251 (2d Cir.2007); *Dawes v. Walker,* 239 F.3d 489, 492 (2d Cir.2001), *overruled on other grounds, Phelps v. Kapnolas,* 308 F.3d 180 (2d Cir.2002). If the plaintiff carries this burden, the defendants must show by a preponderance of the evidence that they would have taken action against the plaintiff "even in the absence of the protected conduct." *Mount Healthy,* 429 U.S. at 287, 97 S.Ct. at 576. If taken for both proper and improper reasons, then, state action may be upheld if the action would have been taken based on the proper reasons alone. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (citations omitted).

**\*12** As can be seen, evaluation of claims of retaliation is a particularly fact-laden exercise, since such claims generally revolve around both the engaging in protected conduct, and establishment of a nexus between that conduct and adverse action later taken. In this instance plaintiff's retaliation claims have been alleged in only conclusory form, and are not supported by evidence in the record establishing a nexus between protected activity and the adverse actions complained of. The specific instance cited, for example, fails to disclose the temporal relationship between the July 11, 2005 grievance and the ensuing misbehavior report, nor does it identify the corrections official who issued the report.[FN8] Since, in response to defendants' motion, plaintiff has not come forward with evidence to support his retaliation claim, I recommend that it be dismissed as a matter of law.

FN8. Since personal involvement in conduct resulting in a constitutional violation is a pre-requisite to a finding of liability, plaintiff's failure to allege their participation in the issuance of a misbehavior report could provide a separate, independent basis for dismissal of plaintiff's retaliation claims against the six named defendants. *See Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991) and *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978)).

D. *Food Deprivation*

In his third and final cause of action plaintiff alleges, once again in wholly conclusory form, that he was denied food by the defendants while at Upstate. Defendants seek dismissal of this claim based upon plaintiff's failure to demonstrate the facts from which a reasonable jury could conclude that his Eighth Amendment rights were violated.

Undeniably, the Eighth Amendment requires that prisoners receive food that is adequate to maintain health; it need not, however, be either tasty or aesthetically pleasing. *LeMaire v. Maass,* 12 F.3d 1444, 1456 (9th Cir.1993) (citing *Cunningham v. Jones,* 567 F.2d 653, 659-60 (6th Cir.1977)). When corrections officials deny a prison inmate the measure of food necessary to maintain health, the Eighth Amendment's prohibition against cruel and unusual punishment is implicated. *Robles v. Coughlin,* 725 F.2d 12, 15-16 (2d Cir.1983). If, on the other hand, meals are withheld from a prisoner on an isolated basis, such conduct, though not necessarily to be condoned, does not typically rise to a level of constitutional significance. *See Cunningham,* 567 F.2d at 659-60 (remanding case for a determination of nutritional adequacy where complaint alleging that prisoners were served only one meal per day had been dismissed); *Moss v. Ward,* 450 F.Supp. 591, 596-97 (W.D.N.Y.1978) (indicating that "being deprived of one or two meals might not be cruel and unusual punishment", but finding in this case that deprivation of food for four consecutive days was an unconstitutionally disproportionate punishment for violation of a disciplinary rule).

In the face of defendants' pending motion for summary judgment, plaintiff has failed to come forward with anything of evidentiary value establishing that he was in fact deprived of food, not by his own actions but rather those of prison officials, nor has he identified the prison officials involved and the frequency with which the deprivation occurred. Indeed, as defendants assert, the only specifics alleged in plaintiff's complaint in connection with his third cause of action is that Cruz filed a grievance asserting that he was told by another corrections officer that defendant Church would not feed him. *See* Complaint (Dkt. No. 1) at p. 6. Plaintiff does not follow that

Not Reported in F.Supp.2d, 2008 WL 4891165 (N.D.N.Y.)
(Cite as: 2008 WL 4891165 (N.D.N.Y.))

allegation with any claim that defendant Church actually denied him any meals, nor does he identify the persons responsible for withholding the other meals to which he makes reference in connection with that claim.[FN9]

> FN9. The parties' versions regarding the denial of food are to a degree in conflict. Plaintiff asserts, as one of the reasons why he opted to light a fire in his cell, that he was not being fed. *See, e.g.,* Complaint (Dkt. No. 1) at p. 15. Defendants counter that the fact that plaintiff may not have received certain meals stems from plaintiff's refusal to obey an order to retreat to the back of his cell in order to be served his food. *See, e.g.,* Viglucci Aff. (Dkt. No. 53-6) Exh. C, 6/5/05 recommendation from Lt. Martin to Sgt. Gill. This fact dispute is not material, however, since in response to defendants' motion the plaintiff has failed to allege food deprivation of sufficient proportions to support an Eighth Amendment claim. *See, e.g., Robles* ("While no court has explicitly said that denial of food is a per se violation of a prisoner's Eighth Amendment rights, under certain circumstances a substantial deprivation of food may well be recognized as being of constitutional dimension.") (citations omitted); *Moss,* 450 F.Supp. at 596-97.

**\*13** Under these circumstances I conclude that no reasonable factfinder could determine that defendants have violated plaintiff's Eighth Amendment right to be free from cruel and unusual punishment by denying him meals.

IV. *SUMMARY AND RECOMMENDATION*

Having carefully reviewed the record in light of defendants' arguments, I find that there are genuine issues of material fact which must be resolved by a jury before plaintiff's excessive force claim against the six named defendants can be adjudicated, and therefore recommend against dismissal of that claim at this procedural juncture. I further recommend, however, that the remaining portions of defendants' summary judgment motion be granted and that plaintiff's second and third causes of action, alleging retaliation and food deprivation, respectively, be

dismissed as a matter of law.[FN10] Based upon the foregoing, it is hereby

> FN10. Large segments of plaintiff's complaint and submissions to the court in opposition to defendants' summary judgment focus upon allegations of verbal harassment of the plaintiff by the six named defendants and other corrections employees at Upstate. Such allegations, without more, do not rise to the level of constitutional significance required to support a claim under 42 U.S .C. § 1983. *See Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986); *Beckles v. Bennett,* No. 05 Civ.2000, 2008 WL 821827, at \*23 (S.D.N.Y. Mar. 26, 2008).

RECOMMENDED, that defendants' motion for summary judgment (Dkt. No. 53) be GRANTED, in part, and that plaintiff's second and third causes of action be DISMISSED, but that defendants' motion otherwise be DENIED, and that plaintiff's excessive force claim be set down for trial.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72.

The clerk is directed to promptly forward a copy of this order to the plaintiff by regular mail and defendant via electronic means.

N.D.N.Y.,2008.
Cruz v. Church
Not Reported in F.Supp.2d, 2008 WL 4891165 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4891165 (N.D.N.Y.)
(Cite as: 2008 WL 4891165 (N.D.N.Y.))

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Zimmerman v. Seyfert, Not Reported in F.Supp.2d (2007)
2007 WL 2080517

2007 WL 2080517
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Nicholas ZIMMERMAN, Plaintiff,
v.
George SEYFERT, et al., Defendants.

No. 9:03-CV-1389 (TJM).
|
July 19, 2007.

**Attorneys and Law Firms**

Nicholas Zimmerman, Auburn, NY, pro se.

Jeffrey M. Dvorin, Office of Attorney General, Department of Law, The Capitol, Albany, NY, for Defendants.

**MEMORANDUM-DECISION and ORDER**

THOMAS J. McAVOY, Senior United States District Judge.

*1 In this amended civil rights complaint,[1] Plaintiff alleges a variety of Due Process; First Amendment; and Eighth Amendment claims allegedly committed by the Defendants, and resulting from an incident in which Plaintiff was being investigated for an escape attempt at Sing Sing Correctional Facility (Sing Sing). (Dkt. No. 36). Presently before the Court is Plaintiff's motion for partial summary judgment and Defendants' cross motion for summary judgment pursuant to FED. R. CIV. P. 56. (Dkt.Nos.105, 121). Plaintiff has responded in opposition to Defendants' cross-motion. (Dkt. No. 128).

**DISCUSSION**

**1.** *Summary Judgment*
Summary judgment may be granted when the moving party carries its burden of showing the absence of a genuine issue of material fact. FED. R. CIV. P. 56; *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) (citations omitted). "Ambiguities or inferences to be drawn from the facts must be viewed in the light most favorable to the party opposing the summary judgment motion." *Id.* However, when the moving party has met its burden, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585-86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

At that point, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Id. See also Burt Rigid Box v. Travelers Prop. Cas. Corp.,* 302 F.3d 83, 91 (2d Cir.2002) (citations omitted). However, only disputes over facts that might affect the outcome of the suit under governing law will properly preclude summary judgment. *Salahuddin v. Coughlin,* 674 F.Supp. 1048, 1052 (S.D.N.Y.1987) (citation omitted).

**2.** *Facts*

**A. Due Process**
Although Plaintiff begins his complaint with a discussion of his May 15, 2003 transfer from Sing Sing to Shawangunk Correctional Facility (Shawangunk) and his subsequent placement in Administrative Segregation (Ad Seg) at Shawangunk, there is additional background necessary for an understanding of the facts surrounding Plaintiff's claims. A great deal of material has been submitted by both Plaintiff and Defendants in support of their motions, and the court will attempt to summarize these submissions. Plaintiff's deposition was taken on April 8, 2006,[2] and many of the Defendants have submitted affidavits. Plaintiff has filed transcripts of portions of the criminal trial at which he as convicted of attempted escape based upon many of the facts that underlie the claims in this case. (Dkt. No. 128, Plaintiff's Exhibits, Pt. 1).

On May 7, 2003, a corrections officer at Sing Sing advised Defendant Darren Daughtry, an Investigator with the New York State Police, that an unknown individual had entered Sing Sing, dressed in a correction uniform and had presented false identification, indicating that he was Corrections Officer Anthony White. Daughtry Aff. ¶ 2. Defendant Daughtry traveled to Sing Sing to obtain more information about the incident. *Id.*

**\*2** Defendant Daughtry learned that the officers had questioned the man's credentials and had escorted him to the executive offices for further investigation. *Id.* The man was carrying a bag containing additional corrections uniforms. *Id.* After being escorted to the executive offices, the man asked to use the bathroom and managed to leave the prison without being detected. *Id.* As a result of this incident, the New York State Police, with the assistance of other agencies, began a search for this individual. *Id.*

Defendant Daughtry states that the next day, he learned that the Ossining Police Department had interviewed people who were in the area of the prison following the incident. *Id.* ¶ 3. Defendant Daughtry reviewed the names and descriptions of those interviewed, and one person, Tony Dubose, matched the description of the individual who had entered the facility with false credentials. *Id.* The New York State Police located Mr. Dubose, arrested him on May 12, 2003, and questioned him about the incident.

Mr. Dubose told Defendant Daughtry that a woman named Jatanya offered to pay Dubose $15,000.00 to help a man, known as "Puzz," escape from Sing Sing. *Id.* ¶ 4. The plan was that Mr. Dubose would dress as a corrections officer, enter the prison with the false credentials, and arrange for the escape. *Id.* Mr. Dubose stated that he attempted to carry out the plan, but failed and left the prison after he asked to use the bathroom. *Id.* Mr. Dubose told Defendant Daughtry that Jatanya and another woman, named Tamara, were waiting for him in a rental car. *Id.*

Defendant Daughtry states that he contacted an officer at Sing Sing who informed him that Plaintiff's nickname was "Puzz" and regularly received visits from Jatanya Belnavis and Tamara Johnson. *Id.* ¶ 5. The New York State Police located the two women. *Id.* When questioned, Jatanya Belnavis identified Corrections Officer Quangtrice Wilson as having been involved in the plan. *Id* . ¶ 6. Officer Wilson was also interviewed and admitted that she agreed to provide Plaintiff with information about the daily operation and lay-out of the facility and allowed a digital picture to be taken of her shield and identification card. *Id.* Defendant Daughtry believed that Plaintiff's friend, Latrina Boyd, also assisted in obtaining the false credentials. *Id.* ¶ 7.

During his investigation, Defendant Daughtry communicated with Department of Correctional Services

(DOCS) Deputy Inspector General (IG), Defendant George Seyfert. *Id.* ¶ 8. Defendant Daughtry states that his investigation of this incident began on May 7, 2003 and "in view of the number of people involved in the conspiracy," the investigation remained open until the end of January 2004, when the matter was submitted to a Grand Jury. *Id.* ¶ 9. Plaintiff was indicted, and on April 8, 2005, a jury found him guilty of various offenses connected with the escape attempt. [3] *Id.* at ¶ 10. Plaintiff was sentenced on June 7, 2005. *Id.* Plaintiff, however, claims that Defendant Daughtry supplied false information to the officials at Shawangunk regarding the incident and then, on February 10, 2004, violated Plaintiff's due process rights by arresting him without probable cause to believe that Plaintiff had attempted to escape. AC ¶¶ 46-47.

**\*3** Defendants have also submitted the affidavit of Deputy IG Seyfert. Seyfert Aff. The affidavit includes a description of the Office of the IG and its functions. Seyfert Aff. ¶¶ 1-4. Defendant Seyfert states that among other functions, the IG is responsible for investigating allegations of violations of DOCS rules and regulations, and the New York State Penal Law by both staff and inmates. *Id.* at ¶ 3. The IG is also responsible for assisting other law enforcement agencies outside of DOCS and making sure that substantiated incidents are referred to the appropriate agency for review, possible disciplinary action, and/or criminal prosecution. *Id.* ¶¶ 3-4.

In his affidavit, Defendant Seyfert states that his office was notified a short time after the May 7, 2003 incident. *Id.* ¶ 7. The case was referred to Defendant Seyfert in his capacity as a Deputy IG for one of the Internal Affairs Units of the office. *Id* . Defendant Seyfert assigned two senior investigators to the case and immediately sent them to Sing Sing. *Id.* The New York State Police and the local police were notified. *Id.* Defendant Seyfert states that on May 14, 2003, he and one of his senior investigators met with investigators of the New York State Police, and during that meeting, Plaintiff was identified by the New York State Police as a suspect in the May 7, 2003 escape attempt. *Id.* ¶ 9.

On May 15, 2003, Plaintiff was transferred to Shawangunk. In an affidavit, Defendant Joseph Smith, Superintendent of Shawangunk, states that prior to Plaintiff's arrival at Shawangunk, Smith spoke with Defendant Seyfert. Smith Aff. ¶ 5. During that conversation, he and Defendant Seyfert discussed various

issues regarding Plaintiff, including the potential security risk that he posed in light of the attempted escape from Sing Sing. *Id.* Defendant Smith states that, during that conversation, he learned the information surrounding the escape attempt and Plaintiff's potential involvement. *Id.* ¶ 6.

It was based on the information provided by Defendant Seyfert that Defendant Smith decided that Plaintiff should be placed in administrative segregation upon his arrival at Shawangunk, and to then be given a hearing regarding the administrative segregation placement. *Id.* Defendant Smith states that he based his decision on the information that the escape attempt involved "accomplices outside the facility, who breached Sing Sing's security by concealing their identities using fake DOCS officials uniforms and credentials." *Id.* Defendant Smith also stated that he took into account the information that Plaintiff had developed a personal relationship with a corrections officer who provided Plaintiff with information regarding the daily operation and lay-out of the facility. *Id.*

Defendant Smith states that it was because of this "sophisticated scenario" that he believed Plaintiff posed a threat to the safety and security of the facility, warranting administrative segregation. *Id.* ¶ 7. Administrative segregation involves restricted privileges [4] and close monitoring of inmates. *Id.* Defendant Smith states that if Plaintiff had been given all of the privileges in general population, he could have potentially abused those privileges by smuggling contraband or by contacting potential witnesses and interfering with the criminal investigation. *Id.* ¶ 8. Defendant Smith states that he was also concerned that Plaintiff could attempt to plan another escape, and the additional restrictions were necessary to prevent Plaintiff from contacting any potential accomplices. *Id.*

**\*4** Defendant Smith states that based on all the above information, he ordered Plaintiff's placement in administrative segregation, pending a hearing. *Id.* ¶ 9. Defendant Smith specifically states that Defendant Seyfert did not order Defendant Smith to place Plaintiff in Ad Seg. *Id.* Defendant Sergeant Lutz prepared Plaintiff's Ad Seg report based on Defendant Smith's order, and Defendant Deputy Superintendent for Security (DSS) Maly authorized the Ad Seg report. Smith Aff. ¶ 9 & Ex. A. However, it was ultimately Defendant Smith's decision

to place Plaintiff in segregation. *Id.* Plaintiff received the Ad Seg report on May 17, 2003. *Id.*

The Amended Complaint alleges that Defendant Seyfert "directed" Defendant Smith to place Plaintiff in administrative segregation without due process. AC ¶ 30. Plaintiff further alleges that Defendant Lutz prepared an insufficient Ad Seg report, which failed to inform Plaintiff of the date, time, and place of the "incident." AC ¶ 31. Plaintiff states that Defendant Maly authorized the report and "failed to cure" the violations.

On May 22, 2003, Plaintiff was afforded his first hearing on the administrative segregation recommendation. The documents associated with this hearing have been submitted as Dvorin Declaration, Ex. B. The hearing ended on May 25, 2003. The hearing officer was Defendant Squillace, and Plaintiff's chosen employee assistant was Defendant Wilkins. *Id.* Ex. B at 9, 11. Plaintiff has included as an exhibit the list of documents and witnesses that he requested from Defendant Wilkins, together with Defendant Wilkins's responses to those requests. Plaintiff's Ex. B (Attached to Dkt. No. 105). Plaintiff alleges that Defendant Wilkins violated Plaintiff's due process rights by failing to obtain the documents and witnesses requested by Plaintiff.

Plaintiff also alleges that Defendant Squillace violated Plaintiff's due process rights at the May 22-25, 2003 Ad Seg hearing by failing to call requested witnesses, failing to order the production of documents, and making a decision that was not supported by sufficient evidence. AC ¶¶ 34-36. A transcript of the hearing has been included as Dvorin Declaration, Ex. E. Defendant Maly was the only witness at the hearing. (5/25/03 Hearing Transcript at 10-14).

Defendant Squillace upheld Plaintiff's placement in Ad Seg, and Plaintiff appealed the decision. On August 25, 2003, Defendant Selsky reversed the administrative determination based on insufficiency of evidence and sent the matter back to the facility for a new hearing. Plaintiff argues that Defendant Selsky violated Plaintiff's due process rights by allowing a second hearing rather than simply reversing the determination and expunging the records. AC ¶ 38.

After Selsky's administrative reversal for insufficient evidence, another hearing was scheduled, and Defendant

Chapperino was assigned as Plaintiff's employee assistant. Dvorin Declaration Ex. C at 16. Once again, Plaintiff requested a series of documents and witnesses, some of which were refused due to the "ongoing investigation." *Id.* at 19-22. Plaintiff's second hearing began on August 29, 2003 and ended on September 4, 2003. *Id.* at 7. Defendant Pico was the hearing officer, and a transcript of the hearing has been filed as Dvorin Declaration Ex. F.

**\*5** At the second hearing, Plaintiff maintained that he did not attempt to escape on May 7, 2003 because he was in the visiting room with 17 corrections officers and 65 visitors when the "code blue" was announced in the jail. (8/29/03 Hearing Transcript at 13). Plaintiff told the hearing officer that although he did not receive the requested documents from his assistant, he had already seen the documents because his attorney and his private investigator had obtained these documents, so Plaintiff already knew what the facts of the alleged escape were. *Id.* at 12-13, 19. Plaintiff's focus was to convince Defendant Pico that Plaintiff did not "go to the door ... intend to open the door [or] ... try to run out the door." *Id.* at 20.

Defendant Lutz testified at Plaintiff's second hearing. *Id.* at 23-26. Defendant Lutz testified that he wrote the administrative segregation recommendation because he was told to do so by Defendant Maly, and that Defendant Lutz had not personally reviewed any of the paperwork in the case. *Id.* at 23, 25. Defendant Chiapperino also testified at the hearing and stated that he did not provide many of the requested documents because there was an investigation pending and the "information was not available." *Id.* at 26. At the hearing, Plaintiff produced a newspaper clipping that outlined a great deal of the facts of the investigation which Defendant Pico read into the record. *Id.* at 39. Defendant Pico stated at Plaintiff's hearing that Pico would obtain the UI (Unusual Incident) package from Sing Sing Correctional Facility and would review it, share the information that could be shared with Plaintiff, and maintain the confidentiality of the rest. *Id.* at 42.

Later during the hearing, Defendant Pico asked Plaintiff why he wished to call witnesses to prove that Plaintiff was in the visiting room on May 7, 2003, and Plaintiff stated that he believed that corrections officials were trying to accuse Plaintiff of attempting to escape from the visiting room. *Id.* at 43. Defendant Pico allowed Plaintiff to call another inmate to testify that he and Plaintiff were in

the visiting room together on May 7, 2003 when the "code blue" was announced. *Id.* at 48-50. Defendant Pico eventually obtained the UI report and stated on the record that he reviewed the information contained in the report. *Id.* at 53. Defendant Pico also discussed parts of the report with Plaintiff. *Id.* at 54-55.

Defendant Seyfert also testified at Plaintiff's second hearing, however, Plaintiff did not hear that testimony, and the tape recording of that testimony has been maintained as confidential.[5] Plaintiff objected to Defendant Pico's refusal to allow Plaintiff to hear the "confidential" tape, arguing that nothing on the tape was confidential, and that "most of the stuff is already in the newspapers." *Id.* at 62. Plaintiff also stated that he had already spoken to Defendant Seyfert and that "he explained everything to me that's going on in the case." *Id.* Plaintiff stated that he only wished to hear the tape so that if Defendant Seyfert were stating something that was not true regarding the investigation, Plaintiff could controvert the statement with documents in Plaintiff's possession. *Id.* at 62-63.

**\*6** Plaintiff requested that his attorney and his private investigator be called as witnesses, but Defendant Pico denied those requests because the individuals did not have any connection to the incident. *Id.* at 56-58, 62. After Defendant Pico denied Plaintiff his attorney and private investigator as witnesses, Plaintiff made a very lengthy statement regarding the incidents of May 7, 2003. Plaintiff cited federal case law to the hearing officer, arguing that Plaintiff should not be found "guilty" of the attempted escape. *Id.* at 64-65, 66.

Defendant Pico found, based upon the evidence, including the confidential tape, that Plaintiff should be kept in administrative segregation, but specifically told Plaintiff that he was not finding him "guilty" of committing any particular misbehavior in the visiting room on May 7, 2007. *Id.* at 85-86. Defendant Pico stated that Plaintiff was still under investigation for the alleged escape attempt from Sing Sing. *Id.* at 86. Defendant Selsky affirmed the continuation of administrative segregation. Dvorin Decl. Ex. D at 1.

Defendants have also submitted the periodic administrative review documents. Maly Decl. Ex. B. The initial reviews indicated that administrative segregation was being continued because Plaintiff was under

investigation for an escape attempt at Sing Sing. *Id.* at 9-11. [6] The review dated March 5, 2004 states that the Plaintiff was "criminally charged" for an escape attempt at Sing Sing Correctional Facility. *Id.* at 8. All these review documents also state that Plaintiff was exhibiting a positive attitude and good behavior while in Ad Seg. *Id.* at 8-11.

The next review, dated May 3, 2004 stated that although Plaintiff was following staff directions in Ad Seg and showed an "overall positive attitude," he was also caught attempting to smuggle a personal communication concealed in legal work. *Id.* at 6, 7. The review document stated that Plaintiff had a hearing regarding this conduct and received a thirty day Special Housing Unit ("SHU") sanction as a result of the guilty finding. *Id.* It was also stated, as had been stated in the previous reports, that his presence in general population could jeopardize the security of the facility. *Id.*

The periodic review report dated July 1, 2004 stated exactly the same reasons for maintaining Plaintiff in administrative segregation. *Id.* at 5. The December 25, 2004 review was identical to the previous report. *Id.* at 4. The February 22, 2005 periodic review document stated that Plaintiff had been "criminally charged" for the escape attempt, and that he was "currently standing trial" for those charges. *Id.* at 3. The recommendation was to continue Plaintiff in Ad Seg. *Id.* On April 22, 2005, the review document states that Plaintiff was found guilty after trial in Westchester County for attempted escape, first degree, among other charges. *Id.* at 2. Again, the recommendation was to continue Ad Seg. *Id.*

**\*7** In addition to Plaintiff's placement in administrative segregation, a "mail watch" was requested by Defendant Maly and approved by Defendant Smith for all of Plaintiff's mail between May 16, 2003 until June 22, 2005, with a review every two months. All the mail watch orders have been submitted as an exhibit to the Defendants' cross-motion. Smith Decl. Ex. F. The mail watch request states that Plaintiff was under investigation by DOCS and by the New York State Police for attempting to escape from Sing Sing. *Id.* at 3.

Incoming mail was to be reviewed for any plans for criminal activity and information which, if communicated, would create a security threat. *Id.* Outgoing mail was going to be reviewed because there was reason to believe that DOCS rules or regulations had been violated. *Id.* Defendant DSS Maly was chosen to monitor the mail, and the mail watch form indicates that legal mail was included. *Id.* Finally, there is a "note" at the bottom of the page stating that as the mail is received, it should be "immediately" distributed to the inmate unless it contained contraband. *Id.*

Plaintiff also claims that the Defendants responsible for the misbehavior report and disciplinary hearing held against Plaintiff on April 7, 2004 [7] violated his due process rights. On March 27, 2004, Defendant Stokes issued a misbehavior report against Plaintiff for having "authorized articles in an unauthorized area" and "smuggling." Kimler Decl. Ex. A (misbehavior report). Defendant Stokes stated that he was working in the SHU on March 27, 2004 and was helping to escort Plaintiff to the second floor infirmary for a visit. *Id.* While going through the legal mail that Plaintiff was taking to the visit, Defendant Stokes found three pages of a personal letter, hidden in a "law firm envelope." *Id* . The letter was confiscated, and a contraband receipt was issued. *Id.* Defendant Kimler was chosen by Plaintiff as his employee assistant. Dvorin Decl. Ex. D at 12, 15. Plaintiff was charged with attempting to smuggle a personal letter into the visiting area inside a legal envelope. The three page letter was an exhibit at the disciplinary hearing and has been submitted as part of the April 7, 2004 hearing packet in this case. *Id.* at 8-10, 22-24 (duplicate).

At the disciplinary hearing, Plaintiff complained that the hearing was not held within seven days of the incident, and was therefore, untimely. Dvorin Decl. Ex. G at 4. The hearing officer, Defendant Gardner, explained to Plaintiff that because he was not "confined" based on the misbehavior report, [8] prison officials had fourteen days to commence the hearing, and the hearing was timely. *Id.* Plaintiff's defense to the charge was that he gave the legal envelope in which the letter was found, to Defendant Stokes when Plaintiff was in his cell, but that Defendant Stokes did not look in the envelope until they got to the visiting room. [9] Thus, Plaintiff contends that Defendant Stokes was responsible for bringing the letter into an unauthorized area. *Id.* Plaintiff claimed that if Defendant Stokes had looked inside the legal envelope when they were still in Plaintiff's cell, he would never have been charged with this misbehavior. *Id.* Plaintiff later claimed that he did not even know that the letter to his mother

2007 WL 2080517

was in the envelope, and that this was a copy of a letter that Plaintiff had already mailed to his mother, using the regular procedures. *Id* . at 8-9.

**\*8** Defendant Stokes testified at Plaintiff's disciplinary hearing. *Id.* at 6-10. Defendant Stokes testified that when he found the letter, he initially told Plaintiff that he would just put the pages back in Plaintiff's cell, but "then I thought better of it and I said well, I'll let the Sergeant review it. Let her make the call." *Id.* at 10. Defendant Kimler was the sergeant involved, and she also testified at Plaintiff's disciplinary hearing. *Id.* at 11-13. Sergeant Kimler admitted that when she went over the incident with Plaintiff, she stated that he "forgot it was in there." *Id.* at 13. Defendant Gardner found Plaintiff guilty of the misbehavior and imposed a penalty of thirty days SHU confinement and loss of various privileges. *Id.* at 17. Plaintiff appealed the decision, and Defendant Selsky affirmed this disciplinary determination on July 15, 2004.

#### B. Cruel and Unusual Punishment

Plaintiff claims that between September 26, 2003 and October 10, 2004, Defendant Karamanos harassed Plaintiff by kicking Plaintiff's cell door every half hour while Plaintiff was trying to sleep. AC ¶ 55. Plaintiff claims that at unspecified times during this period, Defendant Karamanos also refused to give Plaintiff soap, writing paper, and tissue. *Id.* Plaintiff also claims that Defendant Karamanos spit in Plaintiff's food and threatened to kill Plaintiff. *Id.* Plaintiff alleges that Defendant Smith violated Plaintiff's right to be free of cruel and unusual punishment by failing to protect Plaintiff against Defendant Karamanos's conduct. AC ¶ 62.

Plaintiff claims that Defendant Smith further violated Plaintiff's Eighth Amendment rights by refusing to return Plaintiff's typewriter and reading lamp after learning of "excessive pains" in Plaintiff's hands due to the great deal of writing that Plaintiff had to do "because of his confinement" and after learning of Plaintiff's "eye pains." AC ¶¶ 63-64. Defendant Smith is also alleged to have forced Plaintiff to shave with a razor instead of an electric shaver; denied Plaintiff adequate laundry services and refused to provide Plaintiff with a "reasonable alternative" to the prison laundry. AC ¶¶ 65-66. Plaintiff blames Defendant Smith for causing Plaintiff's mild stroke on November 4, 2003. AC ¶ 53. Plaintiff claims that Defendant Smith caused a "stressful situation" when he

prevented Plaintiff from proving his innocence at his "disciplinary hearing" and by directing Defendant Maly to conduct "sham" reviews of Plaintiff's placement in administrative confinement.

Plaintiff alleges that on March 2, 2004, Defendant Koemm violated Plaintiff's Eighth Amendment rights by forcing Plaintiff to come out of his cell at 7:00 a.m. and demanding that Plaintiff walk more than 100 feet in the cold while wearing only underwear in front of other inmates and female officers. AC ¶ 57. Plaintiff claims that Defendant Koemm also violated Plaintiff's Eighth Amendment rights on July 27, 2004 by refusing to feed Plaintiff for more than eleven hours and keeping Plaintiff in shackles for more than eleven hours. AC ¶ 58.

**\*9** Plaintiff claims that prior to August 23, 2003, he asked Defendant Smith several times to transfer Plaintiff from the SHU area due to threats he had received from other inmates. AC ¶ 51. Plaintiff states that Defendant Smith refused to move Plaintiff, and because of Defendant Smith's failure to protect Plaintiff, he was assaulted by another inmate who threw urine and feces at Plaintiff on August 23, 2003. AC ¶ 51. Plaintiff also claims that Defendant Lutz subjected Plaintiff to cruel and unusual punishment after this incident because Defendant Lutz did not allow Plaintiff to shower for forty five minutes after the assault. AC ¶ 52.

#### C. Visitation and Access to Courts/Counsel

Plaintiff alleges that on May 25, 2003, Defendant Smith violated Plaintiff's right to "visitation of choice" by denying Plaintiff a visit with his clergyman, Minister James Willis. [10] AC ¶ 47. Plaintiff also alleges that Defendant Smith denied Plaintiff a visit with his attorney on June 18, 2003. AC ¶ 48. Plaintiff claims that Defendant Smith violated Plaintiff's attorney-client privilege by initiating the mail watch and opening all of Plaintiff's legal mail. AC ¶ 49. Plaintiff claims that Defendant Smith denied Plaintiff a legal telephone call on an unspecified date. AC ¶ 50. Plaintiff also alleges that Defendant Koemm violated Plaintiff's rights by "not allowing Plaintiff to speak with his attorney in private." AC ¶ 74.

#### D. Retaliation

Plaintiff claims that Defendant Kimler retaliated against Plaintiff for filing legal claims against her peers by taking

Plaintiff's legal books and refusing to return them to him. AC ¶ 67. Defendant Kimler has filed an affidavit in which she states that on August 3, 2004, Corrections Officer Cusack [11] performed a routine cell search of Plaintiff's SHU cell. Kimler Aff. ¶ 5. As a result of that search, Officer Cusack confiscated, among other things, books and magazines that were "in excess of the number of items allotted SHU inmates." *Id.*

Defendant Kimler states that the excess books and magazines were placed in Plaintiff's personal property box according to DOCS Directives. *Id.* ¶ 5 & Ex. B. One of the books, entitled Prisoner Self-Help Litigation Manual, was returned to the facility Law Library, and a bible was returned to Plaintiff. *Id.* Officer Cusack did not issue a misbehavior report, but Plaintiff complained about the confiscation of materials, so Defendant Kimler investigated the matter. *Id.* Defendant Kimler states that she asked the Law Library Officer what books were signed out to Plaintiff. *Id.* The Law Library Officer sent Defendant Kimler a memorandum listing two books signed out by Plaintiff, neither of which was the Self-Help Manual. *Id.*

Although Plaintiff claims that the Self-Help Manual was sent to him by his mother, Defendant Kimler states that the book was clearly stamped "SHU" in large letters on the front and on the binding of the book. *Id.* ¶ 6. Defendant Kimler asserts that the items were not confiscated because they posed a threat to security or because Plaintiff sued other officers in the facility, but rather because the items were in excess of the amount allowed in an SHU cell. *Id.* ¶¶ 6, 7.

### E. Grievances

**\*10** Plaintiff's amended complaint also names Thomas Eagen, Director of the Inmate Grievance Program. Plaintiff filed grievances regarding Defendant Smith's alleged refusal of the telephone call to Plaintiff's lawyer, and the denial of Minister Willis's visit. Plaintiff also filed a grievance regarding Defendant Karamanos's alleged behavior, although in Plaintiff's claims against Defendant Eagen, he does not mention Eagen's affirmance of the denial of the Karamanos grievance.

Defendant Eagen has submitted an affidavit in support of the Defendants' cross-motion for summary judgment. In the affidavit, Defendant Eagen states that although he

is the Director of the Inmate Grievance Program (IGP), he has no vote in the Central Office Review Committee's (CORC) determination of specific grievances. Eagen Aff. ¶ 6. Defendant Eagen is responsible "solely for the administrative functions of the IGP and CORC." *Id.*

### 3. *Due Process*

Plaintiff in this case has five distinct due process claims. First, Plaintiff alleges that his placement in administrative segregation violated due process. Second, Plaintiff alleges that the periodic reviews conducted while he was in administrative segregation were "shams" and violated due process. Third, Plaintiff alleges that the Defendants involved in his disciplinary hearing for smuggling violated his due process rights in connection with that hearing. Fourth, Plaintiff alleges that Defendant Eagen violated due process when affirming the denial of Plaintiff's grievances regarding his legal call, legal visit, and his visit from Minister Willis. Finally, Plaintiff alleges that Defendant Daughtry violated Plaintiff's due process rights by falsely reporting to Defendant Smith that Plaintiff was under investigation for escape, and later by arresting Plaintiff without probable cause.

#### A. Administrative Segregation Placement

In order to begin a due process analysis, the court must determine whether Plaintiff had a protected liberty interest in remaining free from the confinement that he challenges and then determine whether the Defendants deprived Plaintiff of that liberty interest without due process. *Giano v. Selsky,* 238 F.3d 223, 225 (2d Cir.2001); *Bedoya v. Coughlin,* 91 F.3d 349, 351 (2d Cir.1996). In *Sandin v. Conner,* the Supreme Court held that although states may still create liberty interests protected by due process, "these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force ..., nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 483-84, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995).

The Second Circuit has *implied* that whether a deprivation is atypical and significant involves fact finding. *See Frasier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996) ("[t]he extensive fact-finding of the district court permits us to measure Frasier's SHU claim by the standard of *Sandin*

); *Samuels v. Mockry,* 77 F.3d 34, 38 (2d Cir.1996) (assessment as to whether inmate had a protected liberty interest may require fact finding). The Court in *Sandin* determined that the inmate's discipline in segregated confinement for 30 days did not present the type of atypical, significant deprivation in which the state might create a liberty interest. *Id.*

**\*11** The Second Circuit has discussed the duration element of the *Sandin* analysis. *Colon v. Howard,* 215 F.3d 227 (2d Cir.2000). In *Colon,* the court discussed whether it was appropriate to have a "bright line" rule regarding the maximum length of confinement in the Special Housing Unit (SHU) before a liberty interest might be created. *Id.* The court concluded that 305 days in SHU would meet the standard. *Id.* at 231. Although Judge Newman believed that the court should articulate a bright line rule, holding that any SHU confinement less than 180 days would not create a liberty interest, the panel disagreed. *Id.* at 234. The court also noted that the longest confinement in SHU that did not meet the atypical requirement was 101 days. *Id.* at 231 (citing *Sealey v. Giltner,* 197 F.3d 578, 589-90 (2d Cir.1999)).

In this case, there appears to be no question that Plaintiff had a liberty interest in remaining free of the confinement to which he was subjected. Plaintiff states in his motion for summary judgment that he was in Ad Seg in SHU from May 15, 2003 until July 20, 2005, over two years. Plaintiff's Declaration ¶ 25 (Dkt. No. 105). Thus, the question to be determined is whether Plaintiff was afforded the process he was due prior to, and during the continued imposition of this confinement. Plaintiff argues that he was not afforded due process.

In *Hewitt v. Helms,* 459 U.S. 460, 469-76, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983), the Supreme Court held that when a liberty interest is created, an inmate must be afforded procedural protections prior to being transferred into the more restrictive confinement. [12] Under *Hewitt,* an inmate placed in administrative segregation must receive some notice of the charges and an opportunity to present his views to the prison official charged with deciding whether to transfer the inmate to administrative segregation. 459 U.S. at 476.

Prison officials must conduct an "informal nonadversary evidentiary review" of the information supporting the inmate's administrative segregation, and this review must

take place within "a reasonable time following an inmates' transfer." *Id.* at 486 & n. 8. *Hewitt* also requires that there be periodic reviews after an inmate's placement in administrative segregation, such that the placement is not "a pretext" for indefinite confinement. *Id* . at 477. A "pretextual" administrative confinement may be raised as a separate constitutional violation. *See Soto v. Walker,* 44 F.3d 169, 173 n. 4 (2d Cir.1995) (citing *Hewitt,* 459 U.S. at 477 n. 9).

The DOCS regulations provide that the substantive predicate for an inmate's transfer to administrative segregation is that the inmate's presence in the general population would pose a threat to the safety and security of the facility. NEW YORK CODE RULES & REGS. tit. 7, § 301.4(b) (N.Y.CRR). The regulations also require that administrative segregation inmates receive the same type of hearing as those inmates who are transferred to SHU for disciplinary reasons. 7 NYCRR 301.4(a). The hearing must take place within 14 days of the inmate's admission to SHU, after issuance of the administrative segregation recommendation "made by the employee who ascertained the facts or circumstances." *Id.*

**\*12** There are several state law requirements for the hearing. The inmate must receive written notice of the reason for his confinement; he must be afforded an employee assistant if he is confined to SHU pending the hearing; the hearing officer must be impartial; the inmate must be allowed to attend the hearing; and he must be permitted to submit documents and call witnesses unless the hearing officer finds that they are redundant or irrelevant. 7 NYCRR §§ 254.1, 251-4.1, 254.5, 254.6(a)(3). The hearing must be electronically recorded and must be completed within 14 days. *Id.* §§ 251-5.1(b), 254.6(b). Finally, the hearing officer must render a written decision, setting forth the basis for his determination; the inmate must receive a copy of the determination and must be told of his right to appeal. *Id.* §§ 254.7(a)(5), 254.8.

In this case, Plaintiff claims that Defendant Seyfert violated Plaintiff's due process rights by ordering Defendant Smith to place Plaintiff in administrative segregation. As stated above, Defendant Smith takes full responsibility for Plaintiff's placement, and Defendant Seyfert was only involved to the extent that he informed Defendant Smith of the facts of the case and the pending investigation. Although Plaintiff continues to maintain

that this was false information, it is clear that the information regarding the investigation was correct.

Plaintiff makes the same claim against Defendant Daughtry. The "false" information allegedly conveyed by Defendant Daughtry was the fact that an escape was being investigated and it was believed that Plaintiff may have been involved in the plan. Clearly, the information was not "false" since Plaintiff was ultimately convicted of participation in the escape plan. It was based on this information that Defendant Smith instructed Defendant Lutz to prepare an "Administrative Segregation Recommendation," approved by Defendant Maly, and served on Plaintiff on May 17.2003. Smith Decl.¶ 9 & Ex. A.

Defendant Smith outlines the basis for his decision to transfer Plaintiff to Ad Seg pending a hearing. Smith Decl. ¶¶ 6-8. Because the escape attempt involved a visitor, smuggling of uniforms, falsifying credentials, and the development of a relationship with a corrections officer in furtherance of the escape attempt, Defendant Smith believed that it would be important to be able to supervise Plaintiff more closely and to restrict his access to potential accomplices, visitors, and other forms of communication. *Id.* These concerns are valid bases for imposing administrative segregation pending a formal hearing.

Plaintiff was served with the Ad Seg report, clearly indicating that he was under investigation for an escape attempt at Sing Sing. Smith Decl. Ex. A. Thus, Plaintiff was informed of the basis for his confinement, and the Ad Seg Recommendation specifically informed Plaintiff that he would have a full hearing with the due process rights afforded to inmates facing disciplinary proceedings within 14 days of the Ad Seg recommendation. *Id.* The recommendation further states that "[i]f restricted pending a hearing on this recommendation, you may write the Deputy Superintendent for Security or his/her designee prior to the hearing to make a statement on the need for continued confinement." *Id.*

**\*13** Thus, in accordance with *Hewitt,* Plaintiff received notice of the administrative segregation placement, together with the reason for the placement and was afforded the opportunity to be heard even prior to the hearing if he chose to avail himself of the opportunity. Thus, Plaintiff's due process rights were not violated in

conjunction with his initial placement in administrative segregation. Plaintiff was afforded a hearing which commenced on May 22, 2003, well within the 14 days from the service of the Ad Seg Recommendation on Plaintiff. Any due process claims relating to Plaintiff's initial placement in SHU pending his hearing must be dismissed.

Plaintiff also argues that he was denied due process at both administrative segregation hearings. AC ¶¶ 68. With respect to the first hearing, (May 22-25, 2003), Plaintiff alleges that Defendant Wilkins failed to properly assist Plaintiff by refusing to provide him with requested documents. Plaintiff also alleges that Defendant Squillace denied Plaintiff the right to call witnesses, denied him the right to view documentary evidence, denied Plaintiff a fair hearing, and upheld the administrative segregation recommendation without sufficient evidence. Plaintiff also alleges that Defendant Selsky denied Plaintiff due process when he allowed a second hearing to take place after reversing the first one.

A review of the May 22-25, 2003 hearing transcript shows that Plaintiff was attempting to present evidence that would show his "innocence" of the escape charge, and Defendant Squillace was trying to explain that he was not determining whether Plaintiff was innocent or guilty of the attempted escape, but rather whether Plaintiff should be confined to administrative segregation because of a security threat. May 22-25, 2003 Hearing Transcript at 16, 18. The fact that the investigation was still pending was Defendant Squillace's basis for upholding the recommendation. *Id.* at 17. At the continuation of his hearing on May 25, 2003, Plaintiff stated that his family and his attorney were doing their own investigation into the allegations, and Plaintiff stated that his name was not listed anywhere in the "reports." *Id.* at 20. Plaintiff appeared to be aware of a great deal more information than the hearing officer. *Id.* at 21.

Plaintiff was clearly afforded the ability to respond to the Ad Seg recommendation at the hearing. Plaintiff argued that he had not "done anything wrong" or broken any departmental rules, so he should not be placed in administrative segregation. *Id.* at 23. Plaintiff attempted to argue that he was not an escape risk and that it would be impossible to escape from the facility, whether he were in general population or in SHU. *Id.* at 24. He also argued that he could be placed in Involuntary Protective Custody

2007 WL 2080517

(IPC), and that if so, he could get additional visitation rights and could conduct his own investigation into the escape attempt. *Id.* at 25.

**\*14** For the May 22-25, 2003 hearing, Plaintiff had requested various documents from Defendant Wilkins. Plaintiff's Ex. B at 1 (attached to Dkt. No. 105). Plaintiff requested copies of, among other things, the Unusual Incident Report; all "To and From" reports; the name of the individual who authorized Plaintiff's cell search; copies of his own records; copies of DOCS Directives; the investigative reports of the attempted escape; any "confidential reports" from staff and inmates; statements of anyone arrested as a result of the incident; "[a]ll log book entries;" copies of Plaintiff's visiting, clothing, sneaker, and commissary lists; and Plaintiff wished to know whether he was on a "mail watch" and why his visitors were being denied access to the facility. *Id.*

Defendant Wilkins responded by providing some documents, such as Plaintiff's own disciplinary history, the DOCS Directives, and Plaintiff's visiting list. *Id.* at 2. The documents relating to the investigation of the escape attempt were denied to Plaintiff because they were "confidential" to the on-going investigation. *Id.* Although there were witnesses listed on this exhibit, Defendant Wilkins stated that the witness requests would be handled by the hearing officer. *Id.* at 1-2. The hearing officer, Defendant Squillace, did not call any of Plaintiff's proposed witnesses which included his criminal attorney and various other individuals. *Compare* Plaintiff's Ex. B at 1 *with* Dvorin Decl. Ex. E (May 22-25, 2003 Hearing Transcript) at 14-15.

Defendant Squillace found that Plaintiff should remain in administrative segregation because his presence in general population would present a risk to the facility order and security based upon the fact that Plaintiff was under investigation for an escape attempt at Sing Sing. May 22-25, 2003 Hearing Transcript at 29. Plaintiff was clearly told of his right to appeal. *Id.*

On Appeal, Defendant Selsky reversed this determination based on insufficiency of evidence, but remanded the case for a new hearing. Plaintiff alleges that the reversal shows that he was subjected to constitutional violations by Squillace and Wilkins, and also argues that Defendant Selsky violated Plaintiff's due process rights by remanding

the case for a new hearing rather than reversing the matter outright.

The standard for sufficiency of evidence in the prison administrative or disciplinary context is "some" or "a modicum" of evidence to support the hearing officer's decision. *Johnson v. Goord,* 04 Civ. 5919, 2007 U.S. Dist. LEXIS 22992, *10 (S.D.N.Y. March 28, 2007) (citing *Superintendent v. Hill,* 472 U.S. 445, 455, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985)). The state law standard for sufficiency of evidence is whether the hearing officer's determination is supported by "substantial evidence." *Foster v. Coughlin,* 76 N.Y.2d 964, 563 N.Y.S.2d 728, 565 N.E.2d 277 (1990). This stricter standard is not applicable to federal due process claims, and it has been held that the reversal of a disciplinary ruling on administrative appeal for insufficient evidence does not necessarily establish a plaintiff's federal due process claim. *See Sira v. Morton,* 380 F.3d 57, 76 n. 9 (2d Cir.2004).

**\*15** In this case, while it is true that the evidence before Defendant Squillace was minimal, there certainly was evidence that Plaintiff was under investigation for an escape attempt at Sing Sing. Thus, the fact that Defendant Selsky sent the case back for a second hearing does not show that Plaintiff's due process rights were violated by Defendant Squillace, and it does not show that Defendant Selsky's remand for a second hearing in any way violated Plaintiff's due process rights.

With respect to the denial of documentary evidence and witnesses, the Court notes that Plaintiff was attempting to call witnesses who would testify that Plaintiff had a pending challenge to his criminal case [13] and, therefore, he would not try to escape and "ruin" his life. These witnesses were not relevant to the issue of whether Plaintiff was a danger to the security of the institution, and, therefore, were properly denied by Defendant Squillace. Additionally, it is clear that the documentary evidence was part of a continuing criminal investigation, and thus, was not available for Plaintiff to examine.

Although Plaintiff claims that Defendant Maly testified "falsely" that Plaintiff was under investigation, there is no basis for this claim. Plaintiff might be attempting to claim that Maly, and in the second hearing, Defendant Lutz, had no "personal" knowledge of the investigation and had only signed the administrative segregation recommendation because they were told to do so by

2007 WL 2080517

Defendant Smith. However, it is clear that Plaintiff was under investigation for his involvement in the attempted escape at all times relevant to the incidents in this case. In any event, as argued by Defendants, Plaintiff has no due process right to be free from false accusations as long as the hearing comports with due process. *Freeman v. Rideout,* 808 F.2d 949, 953 (2d Cir.1986), *cert. denied,* 485 U.S. 982, 108 S.Ct. 1273, 99 L.Ed.2d 484 (1988).

At the second hearing, additional evidence was presented to support the administrative segregation determination. Defendant Seyfert testified outside of Plaintiff's presence. A transcript of Defendant Seyfert's testimony has been submitted as a confidential exhibit to Defendants' motion for summary judgment. (Dkt. No. 125). A review of the exhibit shows that there was substantial evidence of Plaintiff's connection to the escape that was never completed because the individual who entered the prison to assist in the escape left before completing his task.

The additional confidential materials alone would have justified Plaintiff's placement in administrative segregation. Once again, Plaintiff claims that the hearing officer, Defendant Pico, and Plaintiff's employee assistant, Defendant Chiapparino, violated Plaintiff's due process rights. Defendants have submitted both the transcript of the August 29, 2003 rehearing and the Hearing Packet containing all the documents associated with the re-hearing and Plaintiff's appeal of the determination made at the re-hearing. Dvorin Decl. Exs. C (hearing packet) & F (hearing transcript).

**\*16** Although Plaintiff claims that Defendant Chiapparino violated Plaintiff's rights by refusing to obtain documentary evidence for him, Defendant Chiapparino would have been unable to obtain confidential investigation documents from either the New York State Police, any other law enforcement agency, or from the District Attorney's Office that was handling the criminal investigation and prosecution.

The Court also notes that the purpose of the employee assistant is to obtain documents for an inmate who would otherwise be unable to obtain the documents himself. *See Eng v. Coughlin,* 858 F.2d 889, 897-98 (2d Cir.1988). Plaintiff was afforded a substantial second hearing in this case. The transcript is ninety pages long. At the beginning of the hearing, Defendant Pico carefully reviewed Plaintiff's request for documents and witnesses

from Defendant Chiapparino. August 29, 2003 Hearing Transcript at 4-5. Defendant Pico also indicated which requests were refused. A review of these requests shows that Plaintiff was completely aware of what was alleged to have happened on May 7, 2003 since Plaintiff requested the name of the man who allegedly attempted to enter Sing Sing. *Id.* at 4.

Plaintiff complained at the hearing that he was denied documents. *Id.* at 11. Defendant Pico then asked Plaintiff to state why the documents would be relevant. Plaintiff told Defendant Pico that he had a lawyer who was investigating the case and that he had a private investigator also investigating the case. *Id.* at 12. Plaintiff stated that his lawyer and private investigator already had all the documents that Plaintiff requested from his employee assistant. *Id.* Plaintiff also stated at the hearing that his attorney came to the facility and showed Plaintiff the documents. *Id.*

Defendant Pico pointed out to Plaintiff that if Plaintiff had already seen the documents in question, the only thing missing was for the hearing officer to see them, because if the documents had been produced by Defendant Chiapparino, Plaintiff would simply be presenting the documents to Defendant Pico to "prove [his] point." *Id.* Defendant Pico sent Plaintiff back to his cell to obtain documents that he had been given. *Id.* at 15-16. Plaintiff argued that the documents showed that on the day of the attempted escape, he was in the visiting room in front of 17 corrections officers, and that Plaintiff did not try to escape. *Id.* at 17. Plaintiff then stated that he wished to call the corrections officers that were working on that date to testify that Plaintiff did not attempt to escape, and thus, there was no need to put Plaintiff in administrative segregation. *Id.* Later, however, Plaintiff implied that as long as Defendant Pico saw the documents, Plaintiff did not need the witnesses. *Id.*

Based on the testimony at the second hearing, it is clear that Plaintiff was well aware of the information that he needed to respond to the administrative segregation recommendation. Regardless of whether Defendant Chiapperino was able to obtain the documents requested, Plaintiff had the opportunity to defend himself because he had access to the documents himself.[14] Thus, Defendant Chiapperino did not deny Plaintiff due process prior to the second hearing in failing to produce confidential documents at Plaintiff's request.

**\*17** Defendant Chiapperino was called as a witness at the hearing. *Id.* at 26-28. Plaintiff argued that during a conversation with Plaintiff, Defendant Chiapperino implied that the outcome of the hearing was prejudged against Plaintiff. *Id.* at 26. However, Defendant Chiapperino testified that he and the Plaintiff did not have "a conversation to that effect." *Id.* Defendant Chiapperino also testified that he could not obtain the documents that Plaintiff requested because they were part of an ongoing investigation. *Id.* Plaintiff was allowed to call other witnesses to testify at the hearing, *id.* at 36-38, including another inmate who allegedly heard a conversation between Defendant Chiapperino and Plaintiff. The Court also notes that Defendant Pico agreed to get the Unusual Incident Report from Sing Sing and review it himself, even if Plaintiff was not allowed to see it. *Id.* at 42-43. Defendant Pico also agreed to share any non-confidential portions with Plaintiff. *Id.* Plaintiff continued to be confused that Defendant Pico was going to find Plaintiff "guilty" of the attempted escape, and continued to argue that he was innocent of the attempted escape because he did not commit any misbehavior in the visiting room on the day in question. *Id.* at 65-67.

Defendant Pico initially denied two witnesses who would have allegedly testified that Plaintiff did not commit any misbehavior in the visiting room on May 7, 2003. There was no reason to call these witnesses because Defendant Pico agreed that Plaintiff did not commit any misbehavior in the visiting room, although he did eventually call one of the officers because he was available, and "it didn't hurt." *Id.* at 82-85. Defendant Pico later read his findings into the record. *Id.* at 85-86. Defendant Pico repeated his reasons for refusing to call Plaintiff's attorney and private investigator based on lack of relevance, and found that Plaintiff's presence in general population would be a threat to the safety and security of the facility. *Id.* at 86.

Plaintiff was informed of his right to appeal. *Id.* at 89. Defendant Pico also informed Plaintiff that his status in Administrative Segregation would be reviewed every sixty days. *Id .* at 88. The hearing concluded on September 4, 2003. *Id.* at 89. Plaintiff appealed Defendant Pico's determination, and on November 13, 2003, the determination was affirmed by Defendant Selsky. Dvorin Decl. Ex. C (8/29/03 Hearing Packet) at 1.

Based on all the evidence presented, this Court finds that no due process violations occurred at the re-hearing of Plaintiff's administrative segregation status. Plaintiff was given notice of the reason for the hearing, and during the several day hearing, he was given the opportunity to call witnesses and to present evidence on his behalf. The fact that Defendant Chiapperino could not obtain some of the documents because they were confidential investigative documents did not deny Plaintiff due process, particularly in view of the fact that Plaintiff stated himself that he had an attorney and an investigator who had obtained documents for him.

**\*18** Defendant Pico was justified in denying some of Plaintiff's witnesses as irrelevant. Plaintiff requested that his criminal defense attorney and his private investigator be called to testify. Plaintiff was confused, however, regarding the purpose of the hearing. The issue was not whether Plaintiff was guilty or innocent of the escape attempt, but rather whether he was a risk to the safety and the security of the facility. Thus, there was no purpose in calling these witnesses. [15] In any event, as stated above, the required constitutional due process for administrative segregation is only that Plaintiff be given some notice and opportunity to be heard. *Hewitt, supra.* Although New York State law affords an individual who is admitted to administrative segregation the same rights as an individual who is being charged with a disciplinary infraction, the Court need only consider whether the minimum constitutional due process was provided. A review of the evidence in this case shows that the minimum due process was provided by Defendants Chiapperino, Pico, and Selsky in connection with Plaintiff's second administrative segregation hearing.

Finally, Plaintiff alleges that his hearings were not "impartial ." An inmate is entitled to a hearing officer who does not "prejudge the evidence and who cannot say ... how he would assess evidence he has not seen yet." *Allen v. Cuomo,* 100 F.3d 253, 259 (2d Cir.1996) (citing *inter alia Patterson v. Coughlin,* 905 F.2d 564, 570 (2d Cir.1990)). Prison hearing officers, however, "are not held to the same standard of neutrality as adjudicators in other contexts." *Id.* (citing *inter alia Russell v. Selsky,* 35 F.3d 55, 60 (2d Cir.1994)).

Plaintiff attempted to show that the outcome of the hearing had been prejudged. Dvorin Decl. Ex. F at 26-32. Defendant Chiapperino was called as a witness and asked

2007 WL 2080517

whether he had ever had a conversation with Plaintiff, stating that the officials would "probably ... keep reversing this," and implying that the decision had already been made regarding Plaintiff's status. *Id.* at 27. Defendant Chiapperino denied that the conversation took place as Plaintiff stated. *Id.* at 29. Corrections Officer Stokes was called as a witness and asked whether he heard such a conversation between Defendant Chiapperino and Plaintiff. *Id.* at 29. Officer Stokes was present at the meeting between Defendant Chiapperino and Plaintiff but testified that he did not hear any such conversation between the two. *Id.*

There is no evidence from which a fact finder could reasonably conclude that the hearing officers in this case were not impartial or had in some way prejudged the evidence. It was clear at the first hearing that Defendant Squillace did not know very much about the case at all, and at the second hearing Defendant Pico went out of his way to obtain evidence in order to make an informed decision. Thus, Plaintiff's claims that he did not have impartial hearing officers or impartial hearings are dismissed.

**\*19** The Court finds that Plaintiff's initial placement in administrative segregation was proper and any due process claims against any Defendants in connection with Plaintiff's initial placement in administrative segregation, whether in relation to the first hearing or to the rehearing are dismissed. This includes claims against Defendants Seyfert, Daugherty, Lutz, Maly, Wilkins, Squillace, Chiapperino, Pico, Selsky, and Goord.

### B. Periodic Review of Ad Seg

In addition to the requirement that the inmate be given notice and an opportunity to be heard prior to being placed in administrative segregation, prisoners confined to administrative segregation must be given periodic reviews of their confinement so that administrative segregation is not used as a pretext for indefinite confinement of the inmate. *Hewitt,* 459 U.S. at 477 n .9. Those periodic reviews must be "meaningful." *See Doe v. Simon,* 221 F.3d 137, 139 (2d Cir.2000) (a fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner) (citing *Mathews v. Eldridge,* 424 U.S. 319, 333, 96 S.Ct. 893, 47 L.Ed.2d 18 (1979)). The question of periodic review is a due process claim, separate from the claim for the initial placement in administrative segregation. *See e.g. Blake v. Coughlin,* 92-CV-1351, 2006

U.S. Dist. LEXIS 55319, \*14-17 (N.D.N.Y. Aug. 8, 2006) (although it had been determined that Plaintiff's initial placement in administrative segregation was lawful, the constitutionality of the periodic reviews was an issue at trial).

Plaintiff in this case claims that the periodic reviews of his administrative confinement conducted by Defendant Maly were a "sham ." AC ¶ 70. Defendant Maly's declaration states that an inmate's periodic review in administrative segregation is now governed by a formal procedure, conducted every sixty days. Maly Decl. ¶ 4 (citing DOCS Directive 4933). This procedure was established in November of 2002, and was made part of the regulations appearing at 7 N.Y.C.R.R. § 301.4(d).

According to the regulations, the periodic reviews are made by a three-member panel, consisting of a representative of the facility executive staff, a security supervisor, and a member of the guidance and counseling staff. *Id.* § 304.1(d)(1). The panel examines the inmate's institutional record and submits a recommendation to the Superintendent, who makes the final determination. *Id.* § 301.4(d)(2).

In making the recommendation, the panel considers the reasons why the inmate was initially determined to be appropriate for administrative segregation; information on the inmate's subsequent behavior and attitude; and any other factors that the panel believes would weigh either in favor of or against keeping the inmate in administrative segregation. *Id.* § 301.4(d)(1)(i)-(d)(1) (iii).

In this case, the periodic reviews of Plaintiff's administrative segregation status have been submitted as Exhibit B to the Maly Declaration. As stated above, the reviews initially state that Plaintiff was under investigation for the escape attempt, then they state that Plaintiff had been charged criminally for the escape attempt, that he was later on trial, and finally that he was convicted of the criminal charges. In the May 3, 2003 review, the panel included the information regarding Plaintiff's disciplinary charge for smuggling. Regardless of Plaintiff's good behavior in administrative segregation/ SHU, the reviewers continued to find that Plaintiff was a threat to security.

**\*20** The fact that the reports contain similar language does not necessarily mean that the reviews were a

2007 WL 2080517

"sham." In any event, Defendant Maly was only one of three individuals who considered Plaintiff's case at each review, in addition to the Superintendent making the final determination. The initial reason for Plaintiff's placement in administrative segregation was that he was suspected of being involved in the attempted escape. As time passed, the investigation continued to the point where Plaintiff was criminally charged with the attempted escape. His security risk did not change. If anything, as more information surfaced, the security risk may have increased, and the fact that he was found guilty after a trial indicates that the risk was real. Thus, the fact that the initial reason for Plaintiff's placement in administrative segregation was used later as a reason to keep Plaintiff in administrative segregation did not make the panel's review a "sham."

In his response, Plaintiff submits a decision by state trial court Justice Robert DiBella. Plaintiff's Ex. Y. Prior to his criminal trial on the escape charges, Plaintiff moved to suppress a recorded statement that he gave to Defendant Daughtry in which Plaintiff admitted his involvement in the escape attempt. Justice DiBella suppressed the statement, finding that the continuation of Plaintiff's administrative segregation could have been coercive, and that the People had not met their burden of proof beyond a reasonable doubt that the statement was voluntary. *Id.* at 4-7.

Justice DiBella also found that evidence was "lacking" with respect to the decisions made to continue Plaintiff in administrative segregation. *Id.* at 6. Judge DiBella did state that it was "clear that in the days and weeks following the attempted escape, prison authorities had a clear and legitimate need to segregate Defendant from the general inmate population for investigative and security purposes.... However, the People failed to establish the continued institutional need for Defendant's Ad Seg status in the months after the attempted escape." *Id.* Justice DiBella also found that although courts generally defer all matters of internal security to prison authorities, the evidence of extended confinement was relevant to show that Plaintiff's confession was coerced through undue deprivation and promises to release Plaintiff from that deprivation. *Id.* at 7.

In making these findings, Judge DiBella also found that "on balance" the prosecutor's witnesses were "more credible" than the Plaintiff's witnesses, however, there were gaps in the testimony and gaps in the recording of Plaintiff's statement. *Id.* Thus, the prosecution had not shown that Plaintiff's statement was voluntary beyond a reasonable doubt. *Id.*

Although Plaintiff may be attempting to argue that Judge DiBella's decision shows that the Plaintiff's reviews were merely a "sham" to keep Plaintiff in administrative segregation until he confessed to the attempted escape, the Court does not agree. The standard of proof for determining whether Plaintiff's statement was voluntary is completely different than the standard of proof to determine whether Plaintiff was afforded due process relating to his administrative segregation review. Judge DiBella had to find that the Plaintiff's statement was voluntary beyond a reasonable doubt, whereas the standard to uphold a continuing administrative segregation is merely whether the review was "meaningful," including whether the reviewers were unbiased.

**\*21** In *Tellier v. Scott,* the court stated that if the reason for Plaintiff's placement in administrative segregation was his escape risk at the time of his placement, then the periodic review must consider any information relating to a change in petitioner's risk of escape. *Tellier v. Scott,* 94 Civ. 3459, 2004 U.S. Dist. LEXIS 1493, *28-29 (S.D.N.Y. Feb. 5, 2004). The court stated that officials are not permitted to ignore relevant information as it becomes available. *Id.* at *29.

Defendant Maly's affidavit notes that the periodic reviews are performed by a panel, and the panel in this case relied upon the "changing circumstances" of the investigation as it progressed until Plaintiff was charged, and later, convicted of his involvement in the attempted escape. Maly Decl. ¶ 10. The panel also considered Plaintiff's disciplinary conviction for the attempted "smuggling" of the personal letter in his legal mail. *Id.* While Plaintiff argues that the charge was unnecessary, that he had placed the personal letter in the legal envelope by mistake, and that the officer should have searched the envelope prior to arriving at the visiting room, it must be remembered that Plaintiff was being investigated for a sophisticated scheme to escape from the facility. The scheme involved smuggling information and contraband in and out of the facility. The fact that Plaintiff could have been attempting to smuggle a personal letter, whether harmless or not, would impact

upon a determination of whether the inmate was still a threat to security.

The Court finds that Defendants have shown that there is no question of fact regarding whether they conducted a "meaningful" review of Plaintiff's administrative segregation status, and Plaintiff's due process claims regarding the periodic administrative segregation review must be dismissed as against Defendant Maly.

### C. Contraband Smuggling Charge

Plaintiff also alleges due process violations in connection with the charge that he attempted to smuggle a personal letter in a legal envelope. Plaintiff claims that Defendant Stokes filed a false misbehavior report, Defendant Kimler violated Plaintiff's due process rights by "directing" Defendant Stokes to file the false report, and Defendant Gardner violated Plaintiff's due process rights by finding Plaintiff guilty of the allegedly false charge based upon insufficient evidence. Plaintiff received a thirty-day SHU disciplinary sentence for the violation.

Based on *Sandin, supra,* Plaintiff's thirty-day disciplinary sentence in SHU does not rise to the level of an atypical and significant deprivation sufficient to create a liberty interest. Nevertheless, Plaintiff was afforded all the process he was due. Kimler Decl. Exs. A, B, Dvorin Decl. Ex. G (4/8/04 Hearing Transcript); *see Bedoya,* 91 F.3d at 352. Although Plaintiff alleges that the misbehavior report was "false," [16] a review of the testimony at Plaintiff's hearing shows that Plaintiff claimed that "there's really no intent here to smuggle." 4/8/04 Hearing Transcript at 4. Plaintiff does not claim that there was no letter or that the personal letter was not found in his legal envelope, but rather claims that he had a defense to the charge of smuggling because he did not mean to have the personal letter in the legal envelope. Plaintiff also argues that he would have gotten as far as the visiting room with the letter if Defendant Stokes had done "his job," seen the letter sooner, and simply told Plaintiff that he could not take it to the visiting room. *Id.* Plaintiff also argues that there was nothing "bad" in the letter, and that there was nothing "threatening the facility in this letter." *Id.* at 9. Plaintiff later explained to the hearing officer that it would not make sense for Plaintiff to try to smuggle a letter because he was well aware that his papers would be searched, and that it was just an honest mistake. *Id.* at 13-15. Thus, Plaintiff's claim appears not that the misbehavior report

was "false," but rather merely that he had a justifiable defense to the allegation, namely, that he did not intend to smuggle the letter that was, in fact, in his legal envelope.

**\*22** It is not for the court to re-weigh the evidence or the witnesses' credibility at prison disciplinary hearings. *Johnson v. Goord,* 2007 U.S. Dist. LEXIS 22992 at \*21 (citing *Superintendent v. Hill,* 472 U.S. at 455. Because the standard for sufficiency of evidence in a prison disciplinary hearing is "some" or "a modicum" of evidence, [17] it is clear that in this case, the evidence before the hearing officer, Defendant Gardner, met the constitutional standard. Thus, the due process claims against Defendants Stokes, Kimler, and Gardner relating to the April 8, 2004 disciplinary hearing and prior misbehavior report are dismissed.

### D. Grievances

Plaintiff alleges that Defendant Eagen violated Plaintiff's due process rights when he upheld the Superintendent's decision "not to grant Plaintiff a legal call" and to deny Plaintiff's visitation without a hearing.

Prison grievance procedures do not confer any substantive rights that would require due process protection. *Torres v. Mazzuca,* 246 F.Supp.2d 334, 342 (S.D.N.Y.2003) (citing *inter alia Mahotep v. Deluca,* 3 F.Supp.2d 385, 390 n. 3 (W.D.N.Y.1998)). Thus, to the extent that Plaintiff alleges that his "due process" rights were violated because Defendant Eagen affirmed the denial of his grievances, the claim must be dismissed.

### E. False Arrest

Finally, Plaintiff alleges that Defendant Daughtry violated Plaintiff's "due process rights" when he arrested Plaintiff without probable cause to believe that he was involved in an escape. AC ¶ 46B. A claim of false arrest is not properly brought under the general due process protection, rather it is brought under the Fourth Amendment right to be free from unreasonable searches and seizures. *Weyant v. Okst,* 101 F.3d 845, 852 (2d Cir.1996) (citing *inter alia Lennon v. Miller,* 66 F.3d 416, 423 (2d Cir.1995)). A section 1983 claim for false arrest is substantially the same as a claim for false arrest under New York law. *Id.* (citing *inter alia Singer v. Fulton County Sheriff,* 63 F.3d 110. 118 (2d Cir.1995), *cert. denied,* 517 U.S. 1189, 116 S.Ct. 1676, 134 L.Ed.2d 779 (1996)).

2007 WL 2080517

Under New York law, the action for false imprisonment was derived from the common-law action of trespass and "protects the personal interest of freedom from restraint of movement." *Broughton v. State,* 37 N.Y.2d 451, 456, 373 N.Y.S.2d 87, 93 335 N.E.2d 310, 314 (1975), *cert. denied sub nom. Schenbarger v. Kellogg,* 423 U.S. 929, 96 S.Ct. 277, 46 L.Ed.2d 257 (1975). A Plaintiff asserting a false arrest claim must show that the Defendant intended to confine Plaintiff; that Plaintiff was conscious of the confinement and did not consent; and finally, that the confinement was not otherwise privileged. *Martinez v. Schenectady,* 97 N.Y.2d 78, 85, 735 N.Y.S.2d 868, 872-73 761 N.E.2d 560, 564-65 (2001) (citing *Boughton,* 37 N.Y.2d at 458, 373 N.Y.S.2d 87, 335 N.E.2d 310).

In this case, Plaintiff alleges that Defendant Daughtry "arrested" Plaintiff on February 10, 2004, without probable cause to believe that Plaintiff attempted to escape. AC ¶ 46B. Since the concept of false arrest deals with "restraint" of movement, Plaintiff cannot under any circumstances present in this case, make a claim for false arrest. Plaintiff was already in prison pursuant to a criminal conviction. Regardless of his "arrest" on additional charges on February 10, 2004, Plaintiff would still have been incarcerated. There was no additional restraint on his liberty, other than the administrative segregation that the court has determined was properly imposed.

**\*23** Additionally, there is no indication that probable cause for Plaintiff's arrest on charges of attempted escape was lacking. If an individual is convicted of the crime for which he was arrested, the conviction is a defense to an action asserting that the arrest was made without probable cause. *Cameron v. Fogarty,* 806 F.2d 380, 388-89 (2d Cir.1986), *cert. denied,* 481 U.S. 1016, 107 S.Ct. 1894, 95 L.Ed.2d 501 (1987). Because Plaintiff was convicted of the charges, there can be no cause of action for false arrest against Defendant Daugherty.

### 4. *Cruel and Unusual Punishment*

Plaintiff claims that conduct by various Defendants rose to the level of cruel and unusual punishment. The Eighth Amendment protects inmates against cruel and unusual punishment. U.S. CONST . amend. 8. Cruel and unusual punishment takes the form of "unnecessary and wanton infliction of pain" by prison officials. *Wilson v. Seiter,* 501 U.S. 294, 297, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991); *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285,

50 L.Ed.2d 251 (1976). Under the Eighth Amendment, an inmate has the right to be free from conditions of confinement that impose an excessive risk to the inmates health or safety. *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).

The Eighth Amendment places "restraints" on prison officials, including prohibiting the use of excessive force against inmates. *Id.* at 832. The Eighth Amendment also imposes affirmative duties on prison officials to provide humane conditions of confinement in terms of shelter, adequate food, clothing, and medical care, *id.,* and, in certain circumstances, protect inmates from violence by other inmates. *Id.* at 833.

There is an objective and a subjective prong to the Eighth Amendment analysis. *Wilson v. Seiter,* 501 U.S. at 297. Under the objective prong, the Plaintiff must show that the deprivation was "sufficiently serious," and the subjective prong is satisfied by showing a sufficiently culpable state of mind on the part of the official responsible for the deprivation. *Id.* at 297. In order to be sufficiently serious, the prison official's act or omission must result in the denial of the minimal civilized measure of life's necessities. *Farmer,* 511 U.S. at 834. In order to have the required state of mind, an official must be "deliberately indifferent" to a substantial risk of serious harm to the inmate. *Farmer,* 511 U.S. at 828.

An inmate's claim that a defendant was deliberately indifferent in protecting him from the violence of other inmates states a claim under section 1983. *Hayes v. New York City Dep't of Corrections,* 84 F.3d 614, 620 (2d Cir.1996). To state an Eighth Amendment claim for failure to protect an inmate, the Plaintiff must show that he was incarcerated under conditions posing a substantial risk of serious harm, and prison officials acted with deliberate indifference to that risk and the inmate's safety. *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). The Plaintiff must show that prison officials actually knew of and disregarded an excessive risk of harm to the inmate's health and safety. *Id.* at 837. The Defendant must be aware of the facts from which the inference can be drawn that a substantial risk of serious harm exists and the Defendant must also draw that inference. *Id.*

**\*24** In this case, Plaintiff alleges Eighth Amendment violations against Defendants Smith, Koemm,

2007 WL 2080517

Karamanos, and Lutz. The Court will consider each Defendant separately.

### A. Smith

Plaintiff alleges that Defendant Smith violated Plaintiff's Eighth Amendment rights when he failed to protect Plaintiff from another inmate's attack; when he failed to protect Plaintiff against Defendant Karamanos's harassment; when he created a "stressful situation" for Plaintiff; when Smith refused to provide Plaintiff with an alternative to the facility laundry; when Defendant Smith refused to return Plaintiff's typewriter after learning that Plaintiff had pain in his hands from having to write a great deal; when he refused to return Plaintiff's reading lamp after Smith learned that Plaintiff had eye pain, and when he "forced" Plaintiff to shave with a regular razor rather than allowing him to use "electronic clippers."

With respect to the failure to protect, Plaintiff alleges that on August 25, 2003, another inmate assaulted Plaintiff by throwing a cup of urine and feces on him. AC ¶ 51. Plaintiff claims that Plaintiff asked Defendant Smith "several" times to be transferred "from the SHU area" because of threats that Plaintiff had received from other inmates. Id. Plaintiff claims that he was assaulted due to Defendant Smith's failure to act on those requests. Id.

In Defendant's Smith's declaration, he states that he does not recall Plaintiff ever informing him of any threat by a specific inmate, however, Defendant Smith states that he does recall Plaintiff having an "altercation" with another inmate in the SHU recreation yard, at which time Plaintiff was moved to a separate SHU area. Smith Decl. ¶ 10. Plaintiff was deposed in this action on April 18, 2006. A transcript of the deposition has been included in Defendants' submissions in support of summary judgment. During the deposition, Plaintiff was asked what he told Defendant Smith about the threats, and Plaintiff stated that he specifically told Defendant Smith that the way that the visiting room was set up was dangerous. Deposition Transcript (DT) at 74. Plaintiff stated that although he told Defendant Smith that he was receiving threats, he did not tell Defendant Smith which inmates were threatening him or the nature of those threats. Id. at 74-75.

Plaintiff also claims that he told Defendant Smith that he would like to be moved to the hospital or moved to the "other side" of SHU because "certain inmates" were

stating that if they "landed in the visiting room" with Plaintiff, they would "cut him" or beat him up. Id. at 76. Plaintiff then explained that the August 25, 2003 assault took place in the SHU recreation yard (not in the visiting room). Id. Plaintiff then states that an inmate began a conversation with Plaintiff, but Plaintiff did not respond. Plaintiff states that the inmate then kicked the gate that separated him from Plaintiff, [18] and when Plaintiff looked up, the inmate threw the cup of urine and feces through the gate at Plaintiff. Id. at 77.

**\*25** When Plaintiff was asked who the inmate was that threw the urine and feces, Plaintiff stated that he had "[n]ever seen him before," and that he never saw him again because he was "moved to the other side after the incident." Id. (emphasis added). From Plaintiff's own description of the incident, it cannot reasonably be concluded that Defendant Smith was deliberately indifferent to a serious risk of harm to Plaintiff. Plaintiff states that he told Defendant Smith about a risk to him in the visiting room generally. Additionally, he never told Defendant Smith about any danger from specific inmates, and Plaintiff admitted at the deposition that he had never before seen the inmate who assaulted him. Finally, Plaintiff also admits that as soon as the assault occurred, he was "moved to the other side." This statement is consistent with Defendant Smith's declaration. Thus, this court finds that Plaintiff has not raised an issue of fact regarding Defendant Smith's alleged failure to protect Plaintiff from the assault.

Plaintiff also claims that Defendant Smith violated Plaintiff's Eighth Amendment rights by denying him a typewriter, a lamp, and his electric clippers. Defendant Smith states that these items were denied Plaintiff due to administrative segregation regulations and not due to any desire to deprive Plaintiff of any constitutional rights. Smith Decl. ¶¶ 19-21. Defendant Smith states that Plaintiff's typewriter, reading lamp, and electric clippers were not among the "standard issue" items or otherwise permissible property in SHU, and they were confiscated and stored upon Plaintiff's admission to SHU. Id. ¶ 20.

Defendant Smith does, however, state that Plaintiff was "provided with reasonable alternatives" to his requests. Id. ¶ 21. He was provided unlimited writing materials, his cell was adequately lighted to permit reading and writing, and he was issued a razor at each shower upon request. Id. ¶ 21. Finally, Defendant Smith states that no inmates

2007 WL 2080517

are given the privilege of laundering their clothing "in their own fashion." *Id.* ¶ 22. Defendant Smith states that he told Plaintiff that any concerns regarding his laundry had to be addressed to the area supervisor and not to the Superintendent's office. *Id.*

None of the "deprivations" alleged by Plaintiff rise to the level of constitutional violations. There is no constitutional right to a typewriter,[19] a particular lamp, to electric clippers, or to an "alternative" to the facility laundry. Although Plaintiff makes conclusory allegations of "hand pain" from excessive writing and "eye pain" from the lack of his personal lamp, he does not allege deprivations of the "minimal necessities" of life or serious injury. He does not indicate that he suffered any particular damage from these alleged denials. He does not even explain why he needed an alternative to the facility laundry. Although he complains about razor "bumps," there is no claim of a serious medical need relating to these bumps.

**\*26** Plaintiff also alleges that Defendant Smith caused a "stressful situation," resulting in Plaintiff suffering a stroke. Plaintiff claims that this "stressful" condition violated Plaintiff's Eighth Amendment rights. Since this court has found that Plaintiff's placement and retention in administrative segregation comported with due process, and Plaintiff does not allege any other reason for his "stress," there is no merit to the claim that Defendant Smith "caused" Plaintiff's alleged stroke. Moreover, there is no evidence of causation linking Plaintiff's Ad. Seg. placement with his stroke. Plaintiff does not claim that he was denied proper medical care.

During Plaintiff's deposition, he stated that the doctor[20] told Plaintiff that he was "faking" the stroke. DT at 87. However, Plaintiff stated that the next morning, the nurse told the doctor that Plaintiff's blood pressure was "way over," and that the doctor "agreed with the nurse" and put Plaintiff on Procardia for "high blood pressure." DT at 87-89. There is no indication that Defendant Smith caused Plaintiff's medical condition.

**B. Koemm**
In addition to other claims, Plaintiff alleges that Defendant Koemm violated Plaintiff's right to be free from cruel and unusual punishment on March 2, 2004 when Plaintiff was transported to court. Plaintiff alleges

that Defendant Koemm forced Plaintiff out of his cell at 7:00 a.m., demanded that he only wear his underwear, and forced him to walk more than 100 feet in the cold in front of other inmates and female officers. Plaintiff also claims that on July 27, 2004, during another trip to court, Defendant Koemm refused to feed Plaintiff and kept him in shackles for more than eleven hours.

Defendant Koemm states in his declaration that he did arrive at Plaintiff's cell early in the morning without advance notice that Plaintiff was being transported to court. Koemm Decl. ¶ 13. The purpose of this procedure is so that the inmate would not be able to smuggle items out of his cell and would not have the opportunity to contact other inmates, friends, or family regarding the logistics of his transportation. Due to the fact that Plaintiff was under investigation for attempted escape, he was considered a "high risk" inmate. *Id.* ¶ 11.

Defendant Koemm further states that Plaintiff was wearing boxer shorts and a t-shirt and was given shower shoes to walk to the frisk area. *Id.* ¶ 13. Plaintiff was escorted by Defendant Koemm and other officers to a separate part of the facility where Plaintiff was strip frisked and issued clothing to wear to court. *Id.* Again, the purpose of this procedure was to prevent the inmate from concealing items in clothing that was kept in his cell. *Id.* Finally, Defendant Koemm states that the area from Plaintiff's cell to the frisk area is completely enclosed, and Plaintiff did not have to leave the building to enter the transportation van until he was fully clothed. *Id.* ¶ 14.

**\*27** Plaintiff's claim that he was not given notice of his transportation to court or that he had to walk 100 feet in the cold does not rise to the level of cruel and unusual punishment. Plaintiff was given shower shoes, and he was wearing boxer shorts and a t-shirt. There is no indication that Plaintiff suffered any "unnecessary or wanton infliction of pain" in violation of the Eighth Amendment. It has been held that using restraints during transportation of an inmate is necessary to protect staff, other inmates, and the public. *See Richardson v. Castro,* 97-CV-3772, 1998 U.S. Dist. LEXIS 7457, \*16-17 (E.D.N.Y. April 24, 1998). In *Richardson,* the court held that there was no due process violation as a result of the use of shackles, and that there was no evidence that the prison officials caused the "unnecessary or wanton infliction of pain" in violation of the Eighth Amendment in using the shackles. *Id.* at \*17.

Case 9:14-cv-00626-BKS-DEP    Document 86    Filed 02/02/18    Page 150 of 359
Zimmerman v. Seyfert, Not Reported in F.Supp.2d (2007)
2007 WL 2080517

Defendant Koemm also states that all high risk inmates are shackled during transportation, and upon arrival at the courthouse, the presiding judge makes the determination of whether the shackles should be removed, and in this case, the judge did not order that Plaintiff's shackles be removed. [21] Koemm Decl. ¶ 16. The Court will assume that Plaintiff was shackled for the eleven hours that he claims, but Plaintiff does not allege that he suffered "unnecessary or wanton infliction of pain" or any damage whatsoever from the extended restraint.

Finally, it is true that the Eighth Amendment prevents prison officials from depriving inmates of their "basic human needs" such as food, clothing, shelter, medical care, and reasonable safety. *Phelps v. Kapnolas,* 308 F.3d 180, 185 (2d Cir.2002) (quotation omitted). With respect to nutrition, the Eighth Amendment requires that inmates be served nutritionally adequate food that is prepared under conditions that do not present an "immediate danger to the health and well being of the inmates who consume it." *Id.* (citing *Robles v. Coughlin,* 725 F.2d 12, 14 (2d Cir.1983) (per curiam) (internal quotation marks omitted)). The court in *Robles* stated that under certain circumstances, a substantial deprivation of food may rise to the level of a constitutional violation. 725 F.2d at 15 (citation omitted).

The deprivation of food, as any other deprivation, must be tested by the same Eighth Amendment analysis. In order to rise to the level of an Eighth Amendment claim, the deprivation must be sufficiently serious and the Defendant must have been deliberately indifferent to the inmate's health or safety. *Farmer v. Brennan,* 511 U.S. at 834. In this case, even assuming that Plaintiff was delayed in appearing before the Grand Jury, and that as Defendant Koemm states, Plaintiff was not given an evening meal, the fact that Plaintiff did not eat until he returned to the facility and may have gone eleven hours without eating does not rise to the level of a constitutional claim against Defendant Koemm. Thus, the Eighth Amendment claim of denial of food is dismissed.

### C. Karamonos

**\*28** Plaintiff alleges that between September 26, 2003 through October 10, 2003, Defendant Karamonos violated Plaintiff's right to be free from cruel and unusual punishment by kicking Plaintiff's cell door every half hour

while Plaintiff slept, by refusing to give Plaintiff toilet tissue, writing paper, soap, and toothpaste, by spitting in Plaintiff's food, and by threatening Plaintiff. AC ¶¶ 55, 79.

Inmates have no constitutional right to be free from harassment. *Greene v. Mazzuca,* 2007 U.S. Dist. LEXIS 30923, \*5-6 (S.D.N.Y. April 26, 2007(citing *Shabazz v. Pico,* 994 F.Supp. 460, 474 (S.D.N.Y.1998)). [22] It is well settled that verbal harassment, inexcusable as it may be, does not rise to the level of a constitutional violation. *Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986); *Ramirez v. Holmes,* 921 F.Supp. 204, 210 (S.D.N.Y.1996).

As in other Eighth Amendment claims, in order for harassment to rise to the level of a constitutional violation, the alleged harassment must be "objectively and sufficiently serious," denying the Plaintiff the "minimal civilized measure of life's necessities." *Greene v. Mazzuca,* 2007 U.S. Dist. LEXIS 30923 at \*6. Additionally, the Defendant must have exhibited deliberate indifference to the inmate's health or safety. *Id.* Finally, the Plaintiff must show that the alleged harassment resulted in some injury or damage. *Id.* (citations omitted).

In this case, Plaintiff filed grievances regarding Defendant Karamonos's alleged behavior. The grievance documents have been submitted as Exhibits B and C to Defendant Smith's declaration. Plaintiff's main complaint appeared to be the denial of his magazines. Although the federal complaint alleges that Defendant Karamonos kicked Plaintiff's cell door "every half an hour while he slept," the grievances state that most of Defendant Karamonos's alleged kicking occurred at 3:00 p.m. in the afternoon, and at the latest by 11:00 p.m. [23] At his deposition, Plaintiff stated that if Plaintiff wanted to sleep during Defendant Karamonos's shift, this Defendant would kick the bottom of the gate and wake Plaintiff up. DT at 96-97.

While it is true that Plaintiff alleged in his grievances that Defendant Karamonos denied Plaintiff tissue, pens, and other items in order to harass Plaintiff, Plaintiff does not allege that he did not receive these necessities from other officers at other times or that he was unable to maintain his hygiene for any length of time. In fact, at his deposition, he stated that Defendant Karamonos worked only the 3-11 shift on Monday through Friday, and Plaintiff was able to get "tissue" and he was able to get writing paper on the weekends. DT at 99-100. It has been held that a temporary denial of toiletries, while

perhaps uncomfortable, does not create such an "obvious risk to an inmate's health and safety" to show deliberate indifference by Defendant. *Chavis v. Kienert,* 2005 U .S. Dist. LEXIS 41920, 66-67 (N.D.N.Y. Sept. 30, 2005).

**\*29** With regard to Plaintiff's claim that Defendant Karamonos tampered with or "spit" in his food, there is insufficient evidence of such before to the Court to sustain the claim. *Chavis,* 2005 U.S. Dist. LEXIS 41920, \*65-66. While claims of unsanitary, spoiled or contaminated food may be sufficient to raise an Eighth Amendment claim, the allegations in the Amended Complaint that Defendant Karamonos "spit" in Plaintiff's food and poked his finger in Plaintiff's food are conclusory and unsubstantiated. *See* AC ¶ 55. [24] Plaintiff provides no factual support for the contention and, therefore, the claim in subject to dismissal. *See Chavis,* 2005 U.S. Dist. LEXIS 41920, \*65-66. Plaintiff's Eighth Amendment claims against Defendant Karamonos are dismissed.

### D. Lutz

Plaintiff's last Eighth Amendment claim states that Defendant Lutz would not allow Plaintiff to shower for forty five minutes after another inmate attacked Plaintiff with feces and urine. AC ¶ 52. In his declaration, Defendant Lutz states that on August 25, 2003, he was a Sergeant, and the SHU Supervisor at Shawangunk. Lutz Decl. ¶ 4. Defendant Lutz was apparently not present in the SHU at the specific time that this incident occurred. Defendant Lutz states that he was told that Plaintiff had been involved in a disturbance in the yard, and on the way to the yard, Defendant Lutz stopped at Plaintiff's cell "for about a minute" to inquire what had happened, but that Plaintiff would not tell him. *Id.* ¶ 5.

Defendant Lutz then went to the yard. *Id.* Defendant Lutz arrived at the yard thirty minutes after the incident. *Id.* ¶ 6. When Defendant Lutz arrived at the yard, he was told that the incident involved another inmate throwing feces and urine on Plaintiff. *Id.* ¶ 7. Defendant Lutz states that he requested that an officer photograph the area where the incident took place. *Id.*

Defendant Lutz also stated that following the incident, there was considerable commotion in the SHU unit, which could have caused a threat to security, and that after remaining in the yard for a few minutes, Defendant Lutz returned to Plaintiff's cell to again ask what had occurred.

*Id.* ¶¶ 9-10. However, Plaintiff declined to respond and refused any medical treatment. *Id.* ¶ 10. Plaintiff was then moved to the protective custody side of SHU for his own safety. *Id.* ¶ 11. Defendant Lutz states that he brought Plaintiff to the shower "within approximately 10 minutes of arriving at his cell for the second time." *Id.* ¶ 13. Although Plaintiff alleges that Defendant Lutz threatened that he would not take Plaintiff to shower until Plaintiff told Defendant Lutz what happened, Defendant Lutz states that any delay in bringing Plaintiff to the shower was to ascertain what had happened, assess the situation and the resulting commotion in SHU, and move Plaintiff for his own protection. *Id.* ¶ 14.

Plaintiff alleges that he was not allowed to shower "until forty-five minutes after the assault in the SHU recreation yard." AC ¶ 52 (emphasis added). While this fact may be accurate, there is no dispute that Defendant Lutz did not arrive at the SHU yard until thirty minutes after the incident, so any delay caused by Defendant Lutz could only have been approximately fifteen minutes, which is completely consistent with Defendant Lutz's statement. Based on the undisputed facts, no reasonbale fact finder could conclude that the deprivation imposed on Plaintiff by this Defendant [25] was "sufficiently serious," or that Defendant Lutz was deliberately indifferent to a serious risk of harm to Plaintiff. Thus, all of Plaintiff's Eighth Amendment claims are dismissed.

### 5. *First Amendment*

**\*30** Plaintiff alleges various other claims. These claims relate to his ability to receive mail, his visitation, and his right to confer privately with counsel. Interference with mail, in general, implicates an inmate's First Amendment right to free speech, and interference with an inmate's legal mail also implicates the Plaintiff's First Amendment right to access to courts.

An inmate has the First Amendment right to the free flow of incoming and outgoing mail. *Johnson v. Goord,* 445 F.3d 532, 534 (2d Cir.2006). Regulations limiting the right to send and receive mail are valid if "reasonably related to legitimate penological interests." *Id.* (citing *Rodriguez v. James,* 823 F.2d 8, 12 (2d Cir.1987) (quoting *Turner v. Safely,* 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987)). When courts consider competing interests, they have consistently afforded greater protection to an inmate's legal mail in comparison to an inmate's personal

mail. *Id.* (citation omitted). Claims regarding legal mail are often tied to claims of the denial of access to courts. *Moore v. Gardner,* 199 F.Supp.2d 17, 33 (W.D.N.Y.2002).

In *Turner,* the Supreme Court held that the court should determine whether the government objective is legitimate and neutral, and then whether there is a valid, rational connection between the prison regulation or the official action and the legitimate governmental interest that justifies that action. *Turner v. Safely,* 482 U.S. at 89. Finally, the court must determine whether there are alternative means for the inmate to exercise that constitutional right. *Id.* at 90.

With respect to visitation, it has been generally held that there is no First Amendment right to visitation in prison, [26] however, the Supreme Court has analyzed restrictions on visitation under the *Turner* standard. *See Overton v. Bazzetta,* 539 U.S. 126, 137, 123 S.Ct. 2162, 156 L.Ed.2d 162 (2003). Finally, inmates have no "per se" constitutional right to use a telephone. *Charles v. Maleh,* 02-CV-1341, 2006 U.S. Dist. LEXIS 9878, *26-27 (D.Conn. Mar. 8, 2006) (citing *inter alia Bellamy v. McMickens,* 692 F.Supp. 205, 214 (S.D.N.Y.1988) (holding that inmates have no right to unrestricted telephone use)).

### A. Smith

Plaintiff alleges that Defendant Smith improperly instituted a mail watch in violation of Plaintiff's First Amendment rights. Plaintiff also claims that Defendant Smith denied Plaintiff telephone calls to his attorney and a visit with his attorney, as well as a visit with his clergyman.

Defendant Smith concedes that he placed a mail watch on Plaintiff's mail. Smith Decl. ¶ 16. Defendant states that the order was based upon DOCS Directive No. 4421, § 721.3(c)(1)-(4) [27] and a request from the Inspector General's Office. The mail watch order, the reasoning for that order, and the extensions of that order have been submitted as an exhibit to Defendant Smith's declaration. [28] Smith Decl. Ex. F. Defendant Smith states in his declaration that the basis for the order was the determination that because of the ongoing criminal investigation of Plaintiff for the attempted escape, his mail, including his legal mail, posed a threat to facility security. Smith Decl. ¶ 16.

**\*31** Directive No. 4421 which governs privileged correspondence provides that even privileged or legal mail may be opened outside the presence of the inmate if the Superintendent makes a written determination that the mail poses a threat to the security or order of the facility. Smith Decl. Ex. E, DOCS Directive 4421, § 721.3(c) (1)-(4). The directive does provide that if the Superintendent authorizes an inmate's privileged mail to be read, it may only be read by the Superintendent, a deputy Superintendent (DSS), or Central Office Staff. *Id.* § 721.3(c)(2). The orders in this case properly provided that the mail was to be "detained" (not opened) and sent to the DSS Office. *See* Smith Decl. Ex. F at p. 2. The mail would only be read by the DSS or the Superintendent. The mail watch was initiated on May 16, 2003 and was extended every 60 days until June 22, 2005. *Id.* at p. 1.

Although Plaintiff complains about the procedures that were used when he was in administrative segregation, he must remember that he was being investigated for his involvement in an attempted escape, and this involvement included communications with individuals both inside and outside of the prison. The reasonableness of the mail watch is clear. Although Plaintiff attempts to justify his arguments by bitterly maintaining that he never did anything and did not attempt to escape, this is true only because the attempt was thwarted before Plaintiff had the opportunity to participate. The fact that he did not actually do anything does not mean that he was not involved in planning the escape that never occurred. Thus, Plaintiff's First Amendment claim regarding his mail watch are dismissed.

To the extent that Plaintiff is attempting to raise a First Amendment denial of access to courts claim based upon the interference with his legal mail, he must show actual injury as a result of the deficient access to courts. *Lewis v. Casey,* 518 U.S. 343, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996). The cause of the injury must be inadequacy of the access. *Id.* at 351. Plaintiff must show that a non-frivolous legal claim was frustrated or impeded due to the actions of prison officials. *Warburton v. Underwood,* 2 F.Supp.2d 306, 312 (W.D.N.Y.1998) (quoting *Lewis v. Casey,* 518 U.S. at 353).

In this case, Plaintiff has not made the requisite showing. The fact that he was convicted of the criminal charges does not indicate that the "cause" of the injury was Plaintiff's mail watch. Plaintiff has made an inadequate showing

that the mail watch somehow caused or contributed to his conviction. Plaintiff cites no other case that was hindered or lost because of the mail watch. Thus, any First Amendment claim of denial of access to courts based upon the mail watch must be dismissed.

Plaintiff alleges that Defendant Smith denied Plaintiff a visit from Minister James Willis on May 25, 2003 and a visit from Plaintiff's attorney on June 18, 2003. Defendant Smith states in his declaration that he did not personally deny Plaintiff a visit from Minister Willis, [29] but rather handled the grievance that Plaintiff filed as a result of that denial. [30] Smith Decl. ¶ 14. Plaintiff filed a grievance regarding the denial of the Minister's visit. (Dkt. No. 105, Plaintiff's Ex. J). In the grievance, Plaintiff alleged that the Minister Willis was not allowed to visit Plaintiff because he did not have "official I.D.," and that his identification was confiscated so that the facility could verify that he was a "real chaplain."

**\*32** Again, there is no question that Minister Willis was not initially allowed to visit Plaintiff. However, during Plaintiff's deposition, he admitted that Minister Willis was allowed to visit Plaintiff a few weeks later, and was allowed to visit Plaintiff various times after the only time that he was questioned about his identity. [31] DT at 49-51. Given the facts surrounding the investigation of Plaintiff, and the fact that the individual who entered the facility to assist Plaintiff in escaping was impersonating a corrections officer and had false identification, it is quite reasonably related to the safety and the security of the facility that anyone visiting Plaintiff thereafter would be subject to a verification procedure.

The same is true for the one denial of Plaintiff's visit with Attorney Robert Horne. Defendant Smith states that Plaintiff was denied a visit with Attorney Horne on June 3, 2003. [32] Smith Decl. ¶ 15. Defendant Smith states that the reason for this denial was that Attorney Horne was not properly listed for visiting purposes, but that upon further review, a visit with Attorney Horne was authorized. *Id.* During his deposition, Plaintiff testified that Attorney Horne was coming to visit Plaintiff to discuss representing him on the potential criminal case against him relating to the escape attempt. (DT at 52).

When he first attempted to visit Plaintiff, Attorney Horne was not actually representing Plaintiff. *Id.* However,

Plaintiff conceded during his deposition that Attorney Horne was allowed to visit Plaintiff a month later. (DT at 52-53). Plaintiff stated at his deposition that the attorney told Plaintiff that he was not allowed to visit Plaintiff the first time because "they" did not want Plaintiff to know what was "going on." (DT at 53). However, apparently this was not a problem the following month when Attorney Horne was allowed his visit. Plaintiff stated that Attorney Horne did not ultimately represent Plaintiff at the criminal trial, thus, no harm to Plaintiff's criminal case could have been caused by the denial of one visit. (DT at 53). The failure to allow Attorney Horne to visit Plaintiff on one occasion did not violate any of Plaintiff's First Amendment rights.

Plaintiff claims that Defendant Smith denied Plaintiff the opportunity to call another attorney on the telephone. On June 1, 2003, Plaintiff filed a grievance regarding this denial. (Dkt. No. 105, Plaintiff's Ex. L). Plaintiff's rationale for requesting the telephone call was that he was under investigation, and could have "future" charges brought against him. *Id.* Plaintiff also stated that he could not write to his attorney because "all of [his] legal and personal mail [was] being held by the Inspector General and DSS Maly, so there is no other way for me to contact my lawyer." *Id.*

Contrary to Plaintiff's claims, he was under a "mail watch." His mail was not being "held." The grievance was denied because telephone calls in administrative segregation were prohibited, "except for emergency calls and legal telephone calls as approved by the superintendent." (Dkt. No. 105, Plaintiff's Ex. N). The Central Office Review Committee upheld Defendant Smith's determination that allowing Plaintiff to make telephone calls would compromise security, and advised Plaintiff that he could write to his attorney. *Id.*

**\*33** Notwithstanding this denial, Plaintiff was later allowed to make the emergency telephone call at the request of his attorney. Defendants have submitted a letter from Plaintiff's attorney dated September 2, 2003 thanking the facility for arranging an emergency telephone conference regarding Plaintiff's appeal. Smith Decl. ¶ 18 & Defendants' Ex. G (letter from Ronald L. Kuby). Attorney Kuby's letter requested that another telephone call be scheduled for the following week, prior to oral argument on Plaintiff's appeal. *Id.* Plaintiff does

not indicate that he suffered any injury as the result of the inability to telephone his attorney from the facility.

### B. Eagen

Plaintiff also names Defendant Eagen as being responsible for the First Amendment violations because Defendant Eagen affirmed the denial of Plaintiff's grievances. As stated above, Defendant Eagen states in his declaration that he actually has no vote in the resolution of the grievance appeals, and in any event, this court has found that there were no First Amendment violations in the first instance. Thus, Plaintiff's First Amendment claims regarding visitation and legal mail may be dismissed as to Defendant Eagen.

### C. Koemm

Plaintiff alleges that he was denied the right to confer in private with his attorney on February 10, 2004 and on March 2, 2004. AC ¶ 56. Plaintiff alleges that he was effectively prevented from speaking with his attorney prior to his appearance in court. *Id.* During Plaintiff's deposition, he stated that he was not prevented from conferring with counsel, but that there was a corrections officer present during the conversations. (DT at 105-107). Plaintiff also conceded at the deposition that he was able to speak with his attorney in court at counsel table, and that his attorney visited him at Shawangunk. (DT at 105-106).

In his declaration, Defendant Koemm states that because Plaintiff was "high risk" status, the security threat required that there be at least one officer standing "at a reasonably close distance" to Plaintiff while he conferred with counsel. Koemm Decl. ¶¶ 6-7. Defendant Koemm states, however, that the officer remained at an "optimal distance" in order to "balance the competing interests of security and privacy." *Id.* ¶ 7.

Plaintiff only alleges these two instances in which he was allegedly prevented from conferring "privately" with counsel. Clearly, because Plaintiff was being charged with escape, it was reasonable to consider him a "high risk" inmate. The restriction on Plaintiff's privacy on these two occasions, particularly since Plaintiff was able to confer with his attorney at counsel table, was rationally related to legitimate security interests. Thus, even assuming that Defendant Koemm or one of his officers needed to stand in close proximity to Plaintiff, doing so did not violate any

of his constitutional rights. Plaintiff does not claim that he was harmed in any way by this alleged invasion of his privacy on these two isolated occasions. Thus, Plaintiff's constitutional claims against Defendant Koemm may be dismissed.

### 6. *Retaliation*

**\*34** In order to establish a claim of retaliation for the exercise of a constitutional right, Plaintiff must show first, that he engaged in constitutionally protected conduct, and second, that the conduct was a substantial motivating factor for adverse action taken against him by Defendants. *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003) (citing *Gayle v. Gonyea,* 313 F.3d 677 (2d Cir.2002); *Hendricks v. Coughlin,* 114 F.3d 390 (2d Cir.1997)). The court must keep in mind that claims of retaliation are "easily fabricated" and thus, Plaintiff must set forth non-conclusory allegations. *Id.* (citing *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001), *overruled on other grounds, Swierkiewicz v. Sorema, N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002)). [33]

The court in *Dawes* stated that in order to survive summary dismissal, the Plaintiff's "non-conclusory" allegations must establish

> (1) that the speech or conduct at issue was protected, (2) that the Defendant took adverse action against the Plaintiff, and (3) that there was a causal connection between the protected speech [or conduct] and the adverse action.

239 F.3d at 492 (citations omitted). Although it is sometimes argued that in order to establish that an act was sufficiently "adverse," a Plaintiff must allege an actual chill of his or her First Amendment rights, the Second Circuit has held that in a prison context, all that is required is that the adverse conduct by Defendant would have deterred a similarly situated individual of ordinary firmness from exercising his First Amendment rights. *See Gill v. Pidlypchak,* 389 F.3d 379, 381 (2d Cir.2004). In *Gill,* the court held that this objective test applied, even where a particular Plaintiff was not subjectively deterred and continued to file grievances and lawsuits. *Id.*

In this case, Plaintiff's final argument is that Defendant Kimler retaliated against Plaintiff for filing a lawsuit

Case 9:14-cv-00626-BKS-DEP    Document 86    Filed 02/02/18    Page 155 of 359
Zimmerman v. Seyfert, Not Reported in F.Supp.2d (2007)
2007 WL 2080517

against "her peers." AC ¶ 67. Plaintiff claims that Defendant Kimler took Plaintiff's legal books and refused to return them. *Id.* Defendant Kimler states in her declaration that on August 3, 2004, Corrections Officer Cusack performed a routine cell search of Plaintiff's SHU cell and confiscated "among other things, books and magazines that were in excess of the number of items allotted SHU inmates." Kimler Decl. ¶ 5. Defendant Kimler states that the excess books and magazines were simply placed in Plaintiff's personal property box according to DOCS Directive 4933. *Id.* Defendant Kimler states that one book, entitled "Prisoner Self-Help Litigation Manual" was returned to the Law Library, and a bible was returned to Plaintiff. *Id.* Defendant Kimler also states that Officer Cusack did not issue a misbehavior report, but that Plaintiff complained so much that Defendant Kimler investigated the situation further. *Id.*

Defendant Kimler contacted the law library staff and determined that although two books had been signed out by Plaintiff, they were both Federal Reporters, and not the Prisoner Self-Help Litigation Manual. *Id.* Defendant Kimler states that although Plaintiff may argue that his mother sent him the manual in question, Defendant Kimler noted that the book was "clearly stamped 'SHU' in large letters on the front and on the binding of the book." *Id.* ¶ 6. Defendant Kimler concedes that the books were not taken because they were a "threat" to facility security, rather they were simply confiscated because Plaintiff had too many books in his SHU cell. *Id.*

**\*35** In the amended complaint, Plaintiff's claim against Defendant Kimler is mentioned in two paragraphs, both stating in a conclusory fashion that Defendant Kimler took Plaintiff's legal books in retaliation for his filing "a" lawsuit. AC ¶¶ 67, 84. There is absolutely no explanation of why Plaintiff believes this to be true, and this is the type of conclusory allegation that cannot withstand a motion for summary judgment.

It is unclear to which lawsuit Plaintiff is referring. The original complaint in this case was filed on November 17, 2003. The original complaint did not name Defendant Kimler as a Defendant. (Dkt. No. 1). The amended complaint was filed on October 15, 2004. (Dkt. No. 36). The books mentioned in Defendant Kimler's declaration were confiscated on August 3, 2004, and they were not confiscated by Defendant Kimler. The search was conducted by Officer Cusak, and he decided not to issue a misbehavior report for the unauthorized number of books. Kimler Decl. ¶ 5. Plaintiff does not respond to Defendant Kimler's assertions of fact.

Without more, Plaintiff's conclusory allegations of retaliation cannot survive. There is no relationship between the confiscation of books in 2004 by Officer Cusak and Defendant Kimler's refusal to return a book that did not belong to Plaintiff and Plaintiff's lawsuit. Defendant Kimler has asserted a valid reason for the confiscation of the books, and Plaintiff does not challenge this assertion of fact. Thus, Plaintiff's final claim is dismissed.

**WHEREFORE,** based on the findings above, it is

**ORDERED,** that Plaintiff's motion for partial summary judgment (Dkt. No. 105) is **DENIED,** and it is

**ORDERED,** that Defendants' cross-motion for summary judgment (Dkt. No. 121) is **GRANTED** and the amended complaint is **DISMISSED IN ITS ENTIRETY.**

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2007 WL 2080517

---

Footnotes

1    This is Plaintiff's third amended complaint. The original complaint was filed on November 17, 2003. (Dkt. No. 1). The Court ordered Plaintiff to file an amended complaint because the original did not comply with FED. R. CIV. P. 8 & 10. (Dkt. No. 9). Plaintiff's first amended complaint also did not comply with the Federal Rules, so the Court ordered the first amended complaint stricken and ordered Plaintiff to file another amendment. (Dkt.Nos.8, 9). Plaintiff filed a second amended complaint that was accepted by the Court. However, Plaintiff was later granted a motion to amend, and filed his third amended complaint which is now under consideration. (Dkt.Nos.26, 35, 36).

2    Dvorin Declaration, Exs. A(1) & A(2).

2007 WL 2080517

3   Defendant Daughtry states that Plaintiff was convicted of bribery, promoting prison contraband, attempted escape, and conspiracy. Daughtry Aff. ¶ 10.

4   These restrictions include restricted movement around the facility, access to telephones, visitation, and packages. Smith Aff. ¶ 7.

5   A transcript of Defendant Seyfert's testimony has been filed under seal for the Court's review. (Dkt. No. 125).

6   These reviews were dated July 9, 2003; October 31, 2003; and January 5, 2004.

7   Although the Defendants Exhibits refer to an April 8, 2004 disciplinary hearing, the transcript of the hearing indicates that the hearing took place on April 7, 2004. Dvorin Decl. Ex. G.

8   Plaintiff was already "confined" to the SHU under administrative segregation, thus, he was not "confined" pursuant to the misbehavior report.

9   The court notes that "visiting room" in this particular situation was the second floor infirmary, where Plaintiff was being taken "for his SHU visit." 4/8/04 Hearing Transcript at p. 11.

10  Plaintiff also claims that Defendants John Doe 1 and John Doe 2 harassed Minister Willis when he attempted to visit Plaintiff. AC ¶ 47. Although the claim that Plaintiff's rights may have been violated by denial of his visitor may be actionable, to the extent the amended complaint could be read as alleging the harassment of his visitor, Plaintiff cannot raise or recover for the rights of others in this action. *See Nguyen Thang Loi v. Dow Chem. Co.,* 373 F.Supp.2d 7, 50 (E.D.N.Y.2005) (citing *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc. ,* 454 U.S. 464, 474, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982)). In any event, Plaintiff has neither identified nor served either John Doe.

11  Officer Cusack is not a Defendant in this case.

12  Although the standard for determining whether a liberty interest is created is now governed by *Sandin,* rather than by *Hewitt,* the standard for determining the process that is due after a liberty interest has been created remains the same. *See Wilkinson v. Austin,* 545 U.S. 209, 229, 125 S.Ct. 2384, 162 L.Ed.2d 174 (2005) (stating that although *Sandin* abrogated the methodology for establishing the liberty interest articulated in *Hewitt* and in *Greenholtz v. Inmates of Nebraska Penal and Correctional Complex,* 442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979), those cases "remain instructive for their discussion of the appropriate level of procedural safeguards").

13  The criminal case to which Plaintiff is referring is the conviction for which he was incarcerated at the time of the escape attempt, not the prosecution for the escape attempt.

14  Plaintiff also had a newspaper clipping relating the facts of the incident at Sing Sing. *Id.* at 22.

15  Defendant Pico did call some of the witnesses requested by Plaintiff who were corrections officers in the visiting room. Dvorin Decl. Ex. F at 83. Lieutenant Seward did not remember whether Plaintiff was in the visiting room on May 7, 2003, although Lt. Seward did know who the Plaintiff was. *Id.*

16  A false misbehavior report, in itself, does not rise to the level of a due process violation. *Freeman v. Rideout,* 808 F.2d 949, 953 (2d Cir.1986), *cert. denied,* 485 U.S. 982, 108 S.Ct. 1273, 99 L.Ed.2d 484 (1988).

17  *Superintendent v. Hill,* 472 U.S. at 455.

18  Plaintiff stated that the two inmates were separated by wire fencing. DT at 77.

19  *See Taylor v. Coughlin,* 29 F.3d 39 (2d Cir.1994) (there is no constitutional right to a typewriter as incident to the right of access to courts). A typewriter is not considered one of the minimal necessities of life and thus would not be related to the Eighth Amendment in any event.

20  Dr. Forte was initially named as a Defendant, but is now deceased and there has been no substitution. (DT at 87).

21  The court also notes that in Plaintiff's response to the cross-motion for summary judgment he has included portions of the memorandum in his state court motion to set aside the verdict. (Dkt. No. 128, Exhibits Pt. 2). In this memorandum, Plaintiff argues that DOCS had nothing to do with Plaintiff remaining in shackles during his Grand Jury testimony, that it was the prosecutor's decision, and that the prosecutor "managed to manipulate Judge Walker in an exparte [sic] hearing...." Exhibits, Pt. 2 at p. 1. This is completely consistent with Defendant Koemm's statement that it was the presiding judge's decision to maintain the restraints on Plaintiff. Plaintiff cannot make one argument in his state court papers and make the opposite argument in this case.

22  *Shabazz v. Pico* was vacated in part on other grounds unrelated to the harassment issue. *See Shabazz v. Pico,* 205 F.3d 1324 (2d Cir.2000), *reported in full,* 2000 U.S.App. LEXIS 3404 (2d Cir. Feb. 24, 2000).

23  Plaintiff states in his grievance that Defendant Karamonos worked the 3:00-11:00 p.m.

24  Plaintiff's claim does not appear to be based upon an allegation of daily food tampering, but rather upon isolated incidents during the 2 week period. *See* Smith Decl. Ex. B & C.

25  This Defendant cannot be responsible for a delay prior to the time that he arrived and was in a position to remedy the situation.

2007 WL 2080517

26    *See Calderon v. Dzurenda,* 2006 U.S. Dist. LEXIS 55831, *8-10 (D.Conn. July 24, 2006).

27    Although Defendant Smith refers to this provision as a section of the DOCS Directive, the regulation is also contained in Title 7 of the New York Code of Rules and Regulations. N.Y. COMP.CODES R. & REGS., tit. 7, § 721.3. (7 NYCRR).

28    The court does note that the mail watch orders themselves reference DOCS Directive 4422 which governs general, rather than privileged correspondence. The Superintendent's handwritten order, however, states that the order includes legal mail. Smith Decl. Ex. F at p. 3.

29    Plaintiff claims that the "John Doe" Defendants harassed Minister Willis when he attempted to visit Plaintiff. These John Doe Defendants were never identified or served. Because the court is finding that there was no First Amendment violation in the initial denial of visitation, this court would have dismissed the action as against these John Doe Defendants in any event.

30    There is no question that Plaintiff was initially denied the opportunity to visit with Minister Willis.

31    It was during that later visit that Minister Willis told Plaintiff that the minister had been "harassed" at the front gate and had his identification confiscated. (DT at 50).

32    Defendant Smith states that although Plaintiff alleges that the denial took place on June 18, 2003, the facility records indicate that the denial occurred on June 3, 2003.

33    The court would note that *Dawes* did not create a "heightened pleading standard", and to the extent that it did create such a standard, the Second Circuit held that *Dawes* was inconsistent with *Swierkiewicz v. Sorema, N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002). *See Phelps v. Capnolas,* 308 F.3d 180, 187 (2d Cir.2002). The decision in *Phelps* resulted from a motion to dismiss for failure to state a claim under FED. R. CIV. P. 12(b)(6), and the court was considering only the face of the complaint. This case comes before the court upon a motion for summary judgment, thus, this case is distinguishable from a situation in which only the complaint is being examined.

---

**End of Document**                                                                                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2005 WL 2086321
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Mary BYRD, et al., Plaintiffs,
v.
Glen S. GOORD, Commissioner, New York State
Department of Correctional Services, in his official
capacity, Eliot L. Spitzer, Attorney General,
New York State, in his official capacity, H. Carl
McCall, Comptroller, State of New York, in his
official capacity, MCI Worldcom, Inc., a Georgia
Corporation, and MCI Telecommunications
Corporation, a Delaware Company, Defendants.

No. 00 Civ. 2135(GBD).
|
Aug. 29, 2005.

*MEMORANDUM OPINION AND ORDER*

DANIELS, J.

**\*1** Recipients of collect telephone calls made by
state prison inmates bring suit against the New York
State Department of Corrections, state officials ("state
defendants") and the telephone companies ("MCI")
alleging that the exorbitant rates plaintiffs are charged,
the exclusive services contract between the state and
the telephone companies, and its collect-call-only aspect
violate their constitutional rights. Defendants move
to dismiss pursuant to Fed.R.Civ.P. 12(b)(6). State
defendants' motion to dismiss plaintiffs' challenge to the
exclusive services contract is granted. State defendants'
motion to dismiss plaintiffs' challenge to the collect-
call-only aspect of the contract is also granted. State
defendants' motion to dismiss plaintiffs' constitutional
challenge to the imposition of a sixty percent state
commission charge is denied. Defendant MCI's motion to
dismiss is granted in its entirety.

INTRODUCTION

Plaintiffs, a group consisting of family members, legal
counsel and others who receive collect phone calls

from prison inmates, allege that the exclusive services
contract between the New York State Department of
Corrections ("DOCS") and MCI Worldcom, Inc. and
its subsidiary MCI Telecommunications Corporation
(collectively, "MCI") [1] resulted in excessively high
telephone rates to the recipients of inmate collect calls. [2]
Under this contract, DOCS granted to MCI the exclusive
right to provide telephone services to all of its prison
facilities. Neither inmates nor the recipients of their calls
are permitted to use other telephone providers or other
billing methods. On October 30, 1995 DOCS circulated
its Request for Proposals which "required a minimum
commission of at least forty-seven percent of the gross
revenues" to be returned to the state. Compl. ¶ 28. In
its successful bid, MCI guaranteed DOCS a commission
of sixty percent of the gross revenues from accepted and
completed telephone calls, in addition to a "significant
bonus" that is "over and above the cost of administration
and operation of the telephone system." [3] Compl. ¶¶
28-29. The telephone system restricts inmates to making
collect calls to persons on a pre-approved list. Inmates
cannot receive telephone calls from outside the facility.

Plaintiffs challenge these three aspects of the telephone
system: MCI's position as the sole provider of all
telephone services to DOCS; the fact that the system
allows inmates to make only collect calls; and the sixty
percent commission guaranteed and paid by MCI to
DOCS. Specifically, plaintiffs assert violations of: (1)
their equal protection and due process rights under the
Fourteenth Amendment; (2) their right to freedom of
association under the First Amendment; (3) their right to
Contract under the First Amendment, antitrust violations
under the Sherman Act and the Donnelly Act; and a
common law claim for tortious interference with contract.

Plaintiffs allege that each collect call made by an inmate
is assessed a surcharge that is approximately sixty percent
greater than the normal connection fee charged for exactly
the same service for regular non-inmate collect calls,
allowing MCI to pass onto plaintiffs the cost of the
guaranteed sixty percent commission. Plaintiffs contend
that this surcharge violates their due process and equal
protection rights under the Fourteenth Amendment. [4]
Plaintiffs also challenge the collect-call-only aspect of the
telephone system, arguing that the ensuing high cost of the
collect calls restricts plaintiffs' ability to communicate with
their family members in prison in violation of their First

Amendment right to freedom of speech and association. Lastly, plaintiffs argue that the exclusive services contract prevents them from contracting with a telephone service provider of their choice, which they argue could yield a lower price for each call. They contend that the exclusive services contract violates both federal and state antitrust statutes. Plaintiffs seek a declaratory judgment that the telephone system is illegal, a permanent injunction disallowing the use of that system, and restitution and damages in the amount of ninety-three million dollars, plus attorneys' fees. [5]

**\*2** Defendant MCI moved to dismiss pursuant to Fed.R.Civ.P. 12(b)(6). The state defendants also moved to dismiss pursuant to Fed.R.Civ.P. 12(b)(6).

### DISCUSSION

The court must decide a motion to dismiss under Rule 12(b)(6) accepting all allegations in the complaint as true and drawing all reasonable inferences in the plaintiff's favor. *See Hartford Courant Co. v. Pellegrino,* 380 F.3d 83, 89-90 (2d Cir.2004). In order to avoid dismissal, a plaintiff must do more than plead mere "conclusory allegations or legal conclusions masquerading as factual conclusions." *Gebhardt v. Allspect, Inc.,* 96 F.Supp.2d 331, 333 (S.D.N.Y.2000). The point at which "conclusory allegations" become valid pleadings lies where the plaintiff has asserted sufficient facts that, when construed liberally, allow the inference of a violation. *See, e.g., Gregory v. Daly,* 243 F.3d 687, 692 (2d Cir.2001). The court must not dismiss, however, "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [her] claim that would entitle [her] to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46, 2 L.Ed.2d 80, 78 S.Ct. 99 (1957). This principle is to be applied "with particular strictness when the plaintiff complains of a civil rights violation." *Branum v. Clark,* 927 F.2d 698, 705 (2d Cir.1991). "In adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration 'to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken.' " *Leonard F. v. Israel Discount Bank,* 199 F.3d 99, 107 (2d Cir.1999) (quoting *Allen v. Westpoint-Pepperell, Inc.,* 945 F.2d 40, 44 (2d Cir.1991)).

I. *Single Provider System Claims*
Plaintiffs argue that the single provider system, where MCI is the exclusive telephone services provider to all DOCS prison facilities, implicates their right to contract under Article 1, § 10 of the United States Constitution, and violates Sections 1 and 2 of the Sherman Act.

#### A. *Contracts Clause*
Plaintiffs challenge this single provider feature as a violation of their freedom to contract. It is alleged that "each of [the] [p]laintiffs and class members have an ongoing contract with a chosen telephone company for the provision of long distance telephone service. Those contracts specify the services to be provided, the charges for different types of calls and the calling options." Compl. ¶ 94.

Article I, Section 10, Cl. 1 of the U.S. Constitution provides that "[n]o State shall ... pass any ... Law impairing the Obligation of Contracts." By its terms, the clause "is aimed at the legislative power of the State, and not at ... the acts of administrative or executive boards or officers." *New Orleans Waterworks v. Louisiana Sugar Refining Co.,* 125 U.S. 18, 30 (1888). In other words, whether a statute violates the contracts clause "must be determined by examining the statute itself and asking whether it breached or substantially impaired a contract or whether it required state officials to do so." *Association of Surrogate's & Supreme Court Reporters v. New York,* No. 92 Civ. 4004, 1995 WL 555777, at *2 (S.D.N.Y. Sept. 19, 1995).

**\*3** To state a claim for violation of the Contracts Clause, a plaintiff must allege facts sufficient to demonstrate that a state law has "operated as a substantial impairment of a contractual relationship." *General Motors Corp. v. Romein,* 503 U.S. 181, 186 (1992) (quoting *Allied Structural Steel Co. v. Spannaus,* 438 U.S. 234, 244 (1978)). There are three components to this inquiry: (1) "whether there is a contractual relationship"; (2) "whether a change in law impairs that contractual relationship"; and (3) "whether the impairment is substantial." *Id.* Even if a state law constitutes a substantial impairment, however, it will survive a Contracts Clause challenge if it serves "a significant and legitimate public purpose" and "the adjustment of 'the rights and responsibilities of contracting parties [is based] upon reasonable conditions and [is] of a character appropriate to the public purpose

Byrd v. Goord, Not Reported in F.Supp.2d (2005)
2005 WL 2086321

justifying [the legislation's] adoption." *Energy Reserves Group, Inc. v. Kansas Power & Light Co.,* 459 U.S. 400, 411-12 (1983) (quoting *United States Trust Co. v. New Jersey,* 431 U.S. 1, 22 (1977)).

Plaintiffs' contract clause claim has no merit as the Contract Clause is not intended to be used for the purpose alleged here.

Historically, it is crystal clear that the Contract Clause was not intended to embody a broad constitutional policy of protecting all reliance interests grounded in private contracts. It was made part of the Constitution to remedy a particular social evil-the state legislative practice of enacting laws to relieve individuals of their obligations under certain contracts-and thus was intended to prohibit States from adopting "as [their] policy the repudiation of debts or the destruction of contracts or the denial of means to enforce them." *Allied Structural Steel Co. v. Spannaus,* 438 U.S. 234, 256, 98 S.Ct. 2716, 2728, 57 L.Ed.2d 727 (1978)(Brennan, J. dissenting)(citing *Home Building & Loan Assn. v. Blaisdell,* 290 U.S. 398, 439, 54 S.Ct. 231, 240, 78 L.Ed. 413 (1934)).

Although the Contracts Clause is no longer limited to 'debtor relief' cases, it "has been regarded as implicated by any measure which dilutes or nullifies a duty created by a contract." *Id.* (citing e.g., *El Paso v. Simmons,* 379 U.S. 497, 85 S.Ct. 577, 13 L.Ed.2d 446 (1965)).

Moreover, a contract cannot be impaired by a law in effect at the time of the making of the contract, for that is the law which binds the contract. *See Home Building & Loan Assn.,* 290 U.S. at 429-30, 54 S.Ct. 231. Plaintiffs, therefore, have not and cannot show that a change in law impaired their contractual relationship. In order to do so, they would have to allege that they had a contractual expectation that "in the event someone they knew might some day go to prison in [New York], they would be able to communicate with that individual by telephone in accordance with the rates and service options of their choice." *McGuire v. Ameritech Services, Inc.,* 253 F.Supp.2d 988, 1006 (S.D.Ohio 2003). Furthermore, as a practical matter, in most circumstances, including those alleged here, recipients of collect calls cannot necessarily select the carrier handling the call. Rather, the carrier is chosen either by that caller, by the owner of the payphone, or in this instance, DOCS, who runs the prison system. Plaintiffs' Contract Clause claim is therefore dismissed.

## B. *The Sherman Act*

**\*4** Plaintiffs also challenge the single provider system on the basis that it violates Sections 1 and 2 of the Sherman Act. Specifically, plaintiffs allege that the system constitutes a "combination and conspiracy to restrain trade in the overall market for inmate-initiated telephone service." Compl. § 102. Furthermore, in granting MCI the exclusive right to provide telephone service, it is alleged that the state defendants "have willfully and intentionally acquired, exercised, and maintained monopoly power in the markets for inmate-initiated telephone service at [DOCS] facilities." Compl. § 110.

The Sherman Antitrust Act makes unlawful "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 1. The Act also makes it unlawful to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations." 15 U.S .C. § 2.

MCI's exclusive provision of telephone service to the entire New York State prison system arose from the public bidding process. MCI, along with other telephone service providers, responded to DOCS' request for proposals. This competitive bidding process resulted in an exclusive contract being awarded to MCI. The resulting contract outlines the services MCI is to provide to the state and the rates to be charged. Moreover, as discussed *infra,* these rates are set and filed with the FCC and the PSC. Under these circumstances, plaintiffs' Sherman Act challenges to the exclusive services contract are barred under the state action doctrine. Elucidated by the Supreme Court in *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed.315 (1943), the doctrine grants immunity from liability under the Sherman Act to any restraints imposed by a state in the exercise of its sovereign powers. *Id.* at 352. The Court found that the Sherman Act was not intended to restrain states from conducting their affairs as they see fit. *Id.* at 351.

Moreover, even if the state action effectively serves as a monopolistic restraint of trade, a Sherman Act violation will not be found if the restraint stems from a clearly articulated and affirmatively expressed state policy, that is actively supervised by the state itself. *See California Retail Liquor Dealers Assoc. v. Midcal Aluminum, Inc.,*

445 U.S. 97, 105, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980); *see also Federal Trade Comm'n v. Ticor Title Ins. Co.,* 504 U.S. 621, 633 112 S.Ct. 2169, 2176-77, 1219 L.Ed.2d 410 (1992) (finding that a policy "may displace competition with active state supervision if the displacement is both intended by the [s]tate and implemented in its specific details."). Lastly, *Parker* immunity also extends to the private parties acting pursuant to and in conformity with the state policy. *See Southern Motor Carriers Rate Conference, Inc. v. United States,* 471 U.S. 48, 56-57, 105 S.Ct. 1721, 85 L.Ed.2d 36 (1985).

**\*5** This case is precisely the type for which *Parker* immunity must be extended. *See McGuire,* 253 F.Supp.2d at 1009 (dismissing plaintiffs' antitrust claims because "the state action doctrine must apply with its greatest vigor in a case ... where a state government has contracted with an outside vendor to provide a service on behalf of the state itself."). DOCS, as an agency of New York State, is charged with the administration of New York State's prison system. It is within DOCS' authority to award a government contract to an outside vendor. It is undisputed that the awarding of this contract was borne out of a public and competitive bidding process. Numerous bids were considered and there is no allegation that any provider who wanted to submit a competitive bid was not allowed to do so. The exclusive contract between New York and MCI, therefore, cannot be subject to Sherman Act scrutiny since it enjoys *Parker* immunity. "States and other public agencies do not violate the antitrust laws by charging fees or taxes that exploit the monopoly of force that is the definition of government." *Arsberry v. Illinois,* 244 F.3d 558, 566 (7th Cir.2001) (finding that the single provider system is similar to the "way that an airport will charge a fee to concessionaires eager to sell to the captive market.... The concessionaires will pass on much of the fee to their customers, who will thus pay a higher than competitive price."). "It would be pioneering indeed for a federal court to hold that Congress, in enacting the Sherman Act, intended to prohibit states from entering into exclusive services contracts necessary and efficient to their own operations." *McGuire,* 253 F.Supp.2d at 1010. Plaintiffs' Sherman Act claim is therefore dismissed.

#### C. *State Law Claims*

Plaintiffs further allege that defendants, through their imposition of the single provider collect call system, have tortiously interfered with their contractual relations with their individual telephone service providers. In order to state a claim for tortious interference with contract under New York law, a plaintiff must show that there existed a valid contract between the plaintiff and a third party, the defendant knew of the contract, and the defendants intentionally and unjustifiedly procured a breach, thereby causing damages. *See Lama Holding Co. v. Smith Barney Inc.,* 88 N.Y.2d 413, 424, 646 N.Y.S.2d 76, 82, 668 N.E.2d 1370 (1996). Although plaintiffs have alleged that they have existing contracts with their individual phone companies, and that defendants were aware of these contracts, plaintiffs cannot show that defendants intentionally procured the breach of said contracts. Plaintiffs have insufficiently alleged how any actions by the defendants induced a breach of their existing contracts. Primarily, plaintiffs cannot sufficiently allege what breach occurred. The fact that use of their own individual phone service provider is not available in state prisons does not constitute a breach of contract. Having insufficiently alleged facts in support of their claim, plaintiffs' cause of action for tortious interference with contract is dismissed.

### II. *Collect-Call-Only System*

**\*6** Plaintiffs also challenge the collect-call-only aspect of the telephone system, alleging that it "unlawfully burdens [their] rights of familial association by impeding communication with their spouses, children and relatives who are [DOCS] inmates concerning matters of health care, marriage, procreation, pregnancy, parenting and other critical family issues" in violation of the First Amendment.[6] Compl. ¶ 76.

The Supreme Court has held that a prison regulation impinging on inmates' constitutional rights "is valid if it is reasonably related to legitimate penological interests." *Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct., 2254, 2261, 96 L.Ed.2d 64 (1987). Such a deferential standard is necessary, where:

" 'prison administrators ..., and not the courts, [are] to make the difficult judgments concerning institutional operations.' Subjecting the day-to-day judgments of prison officials to an inflexible strict scrutiny analysis would seriously hamper their ability to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration."

*Id.* (citation omitted) (quoting *Jones v. North Carolina Prisoners' Labor Union, Inc.,* 433 U.S. 119, 128, 97 S.Ct. 2532, 2539, 53 L.Ed.2d 629 (1977)). Moreover, it is well settled in the Second Circuit that "great deference" must be afforded to prison officials who are responsible for maintaining order in prisons. *Fromer v. Scully,* 874 F.2d 69, 73 (2d Cir.1989); *Young v. Coughlin,* 866 F.2d 567, 570 (2d Cir.1989).

Defendants argue that the rational basis standard set forth in *Turner v. Safley* applies and that under this standard, plaintiffs' claim must be dismissed. Plaintiffs argue, however, that this standard should not apply. They claim that because they are not inmates, they should not be subjected to this deferential standard. However, "[b]ecause inmates initiate the calls, the recipients are necessarily constrained by whatever security measures are appropriate to place on the inmates themselves." *Deleure v. Kentucky,* 119 F.Supp.2d 683, 691 (W.D.Ky.2000). Since a prisoner's right to telephone access is "subject to rational limitations in the face of legitimate security interests of the penal institution," so too are the recipients. *See Strandberg v. City of Helena,* 791 F.2d 744, 747 (9th Cir.1986). "The connection between the inmates and the recipients of their calls cannot be severed.... If security precautions affect the telephone services that are available to inmates, this will inevitably impact the inmate call recipients." *Deleure,* 119 F.Supp.2d at 691. The collect-call-only system has a rational basis in the prison context. Courts have found that collect call telephone systems can help to avert fraud by inmates, block access to restricted telephone numbers of crime victims and prevent inmates from monopolizing available telephones. *See Clark v. Plummer,* 1995 WL 317015, *1 (N.D.Cal. Jan. 9, 1995). Because of these types of concerns and risks, "[t]he exact nature of telephone service to be provided to inmates is generally to be determined by prison administrators, subject to court scrutiny for unreasonable restrictions." *Fillmore v. Ordonez,* 829 F.Supp. 1544, 1563-64 (D.Kan.1993), aff'd, 17 F.3d 1436 (10th Cir.1994). Accordingly, plaintiffs' constitutional challenge to the collect-call-only aspect of the telephone system is dismissed.

III. *Sixty Percent Commission*

**\*7** Plaintiffs finally allege that the sixty percent commission guaranteed by MCI to DOCS, pursuant to the exclusive agreement between the two parties, violates

their constitutional rights under the First Amendment, and the equal protection and due process clauses of the Fourteenth Amendment.

A. *Claims against MCI*

MCI moved to dismiss on the basis that the filed rate doctrine precludes this Court from considering plaintiffs' claims. [7] The filed rate doctrine (also referred to as the filed tariff doctrine) is the central principle of the regulatory scheme for interstate telecommunications carriers. The doctrine is derived from the tariff-filing requirements of the Federal Communications Act, *see* 47 U.S.C. § 203(a) and "forbids a regulated entity to charge rates for its services other than those properly filed with the appropriate federal regulatory authority." *Arkansas Louisiana Gas Co. v. Hall,* 453 U.S. 571, 577, 101 S.Ct. 2925, 2930, 69 L.Ed.2d 856 (1981). "Unless and until suspended or set aside, this rate is made, for all purposes, the legal rate, as between carrier and [customer]. The rights as defined by the tariff cannot be varied or enlarged by either contract or tort of the carrier." *Keogh v. Chicago & Northwestern Ry. Co.,* 260 U.S. 156, 163, 43 S.Ct. 47, 49, 67 L.Ed. 183 (1922); *see also Louisville & Nashville R.R. Co. v. Maxwell,* 237 U.S. 94, 97, 35 S.Ct. 494, 495, 59 L.Ed. 853 (1915). Further, it has been held that under this rule the tariff binds "both customers and carriers with the force of law." *ICOM Holding, Inc. v. MCI Worldcom, Inc.,* 238 F.3d 219, 221 (2d Cir.2001) (quoting *Lowden v. Simonds-Shields-Lonsdale Grain Co.,* 306 U.S. 516, 520, 59 S.Ct. 612, 83 L.Ed. 953 (1939)). The filed rate doctrine is motivated by two principles (1) preventing carriers from engaging in price discrimination between ratepayers and (2) preserving the exclusive role of federal agencies in approving rates for telecommunications services that are "reasonable" by keeping courts out of the rate-making process. *Marcus v. Am. Tel. and Telegraph Corp.,* 138 F.3d 46, 58 (2d Cir.1998).

Plaintiffs, however, emphasize that they do not seek to challenge the rates filed by MCI with the FCC. In a letter to the Court dated October 19, 2001, counsel for plaintiffs wrote "[t]ime and again, we have made clear that ours is not a case about rates.... Rather, this case is about the single provider/collect call-only system imposed by the Defendants *barring the bill payer recipients from using their chosen private provider"* (emphasis in original). Despite plaintiffs' contention, cloaking their rate challenge in constitutional cloth is insufficient to defeat the fact

Case 9:14-cv-00626-BKS-DEP    Document 86    Filed 02/02/18    Page 163 of 359

that plaintiffs' claims against MCI, at heart, question the reasonableness of the rates charged by MCI. *See Daleure,* 119 F.Supp.2d at 689-90 (dismissing suit by recipients of inmate collect calls under the filed rate doctrine, finding that "[a]t bottom, [plaintiffs' complaint] is a rate discrimination claim"). Plaintiffs' constitutional claims against MCI are therefore dismissed.

### B. *Claims against State Defendants*

**\*8** Plaintiffs also assert constitutional claims against the state defendants, arguing that DOCS' contract requirement, and its receipt and retention of the sixty percent commission violates their rights. Unlike their claims against MCI, plaintiffs' claims against the state defendants concerning the sixty percent commission are not simply a challenge to the rates. They cannot be, for the rates are set by MCI, not by DOCS. Rather, plaintiffs' claims against the state defendants challenge the sixty percent commission that DOCS receives from MCI, which artificially inflates the rate in a manner unrelated to the service provided. These claims, therefore, are not properly dismissed under the filed rate doctrine as "[s]uch an attack does not seek to invalidate any tariff, but merely to create an environment in which the regulated firm is more likely to file a tariff that contains terms more favorable to customers." *Arsberry,* 244 F.3d at 563.

Similarly, plaintiffs' First Amendment challenge to the state defendants' receipt of a sixty percent commission should not be dismissed at this stage of the proceedings. "Inmates do not lose all First Amendment protections once they enter the prison gates, and as Plaintiffs point out prisoners are entitled to reasonable telephone access." *McGuire,* 253 F.Supp.2d at 1002 (citing *Washington v. Reno,* 35 F.3d 1093, 1100 (6th Cir.1994)). Moreover, non-inmates lose none of their First Amendment protections. Here, plaintiffs complain that they are charged unreasonable, excessive, and prohibitive charges over and above MCI's regular rates, namely through the sixty percent commission DOCS receives.[8] This Court must accept the facts as pled for purposes of ruling on defendants' motion to dismiss. At this stage in the litigation, the Court cannot conclude that there is "no set of facts" upon which relief under the First Amendment might be granted. "For example, if Plaintiffs could show that the costs are so exorbitant that they are unable to communicate ... then relief might be warranted."[9] *Id.* Unlike the collect-call-only aspect, the sixty percent

commission charge has no obvious penological interest. State defendants' motion to dismiss plaintiffs' First Amendment claim involving the sixty percent commission aspect of the telephone system is therefore denied.

Plaintiffs also allege that defendants' operation of the current telephone system violates their due process rights by "imposing regulatory fees for telephone services and prohibiting less costly alternatives for inmate calls," thereby constituting "a confiscation ... of property"[10] violative of the Fourteenth Amendment. Compl. ¶ 78. In order to establish that a due process violation has occurred, the plaintiffs must show that they had a property or liberty interest as contemplated by the Fourteenth Amendment and that they were deprived of such interest in a manner inconsistent with the safeguards of the Fourteenth Amendment. *See Board of Regents v. Roth,* 408 U.S. 564, 569, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972) (stating that "[w]hen protected interests are implicated, the right to some kind of prior hearing is paramount" before the state can deprive one of said interest). Protected property interests are defined under state law. *Id.* at 576-78. Here, plaintiffs' allege that the sixty percent commission illegally deprives them of their money (Compl.¶ 78)-a well recognized property interest. *See, e.g., McGuire,* 253 F.Supp.2d at 1004. However, "[t]he prospective recipient of a collect call is in complete control over whether she chooses to accept the call and thereby relinquish her money to pay for it. There is no taking of which to speak, such as where the government confiscates property or forecloses its commercial use by fiat or legislation, and any argument that the State has created a property interest in free or cheap collect calls would not be well taken." *Id.* (dismissing plaintiffs' procedural due process claim because defendants "did not take their money in a constitutionally infirm way").

**\*9** Rather than stating a due process claim with a procedural dimension (i.e. that they have been denied their right to challenge the additional telephone charges), plaintiffs' due process claim is more appropriately construed as substantive. Plaintiffs allege that the telephone system "unlawfully burdens [their] rights of familial association by impeding communication with their spouses, children and relatives who are [DOCS] inmates concerning matters of health care, marriage, procreation, pregnancy, parenting and other critical family issues.[11] As a result, [d]efendants' actions, policies and practices violate [p]laintiffs' due process rights under

the First and the Fourteenth Amendments." Compl. ¶ 76-77. This right to intimate association with family members "stems from both the First Amendment's right of association, and the substantive due process protections of the Fourteenth Amendment." *Lee v. State of New York Dep't of Correctional Services,* 1999 U.S. DIST. LEXIS 13214 (S.D.N.Y.1999). At this stage in the litigation, the Court cannot conclude that there is "no set of facts" upon which relief under the Due Process Clause might be granted. State defendants' motion to dismiss plaintiffs' due process claims involving the sixty percent commission aspect of the telephone system is therefore denied.

Plaintiffs further assert that the sixty percent commission violates their equal protection rights under the Fourteenth Amendment. State defendants contend that the standard set forth in the Supreme Court's decision in *Turner v. Safley* also governs this Court's analysis of plaintiffs' equal protection challenge to the sixty percent commission. Although under *Turner,* prison regulations are upheld, despite their infringing character, if they are "reasonably related to legitimate penological interests." 482 U.S. at 89, the sixty percent commission here is not such a prison regulation. It does not involve matters of security or safety, which have traditionally been held to the *Turner* standard. Receiving an alleged "kickback" from an additional fee added to the reasonable rate for collect calls, [12] made by inmates to family members and those individuals providing counseling and professional services, is neither a rule nor regulation related to the functioning of a prison. [13] Courts that have analyzed similar equal protection claims have found that plaintiffs' position is inextricably tied to their relationship to the inmate, and as such, plaintiffs are subject to the standard applicable to inmates. [14] However, the state defendants have offered no rational basis to justify placing the burden of this additional commission solely on the friends and families of inmates, and those individuals providing counseling and professional services, thereby charging them more per call than similarly situated collect call recipients. [15] Accordingly, the state defendants' motion to dismiss plaintiffs' equal protection claims is denied.

CONCLUSION

**\*10** State defendants' motion to dismiss plaintiffs' claims challenging the exclusive services contract between the state and MCI is granted. State defendants' motion to dismiss plaintiffs' claims challenging the collect-call-only system is granted. The state defendants' motion to dismiss plaintiffs' claims challenging the sixty percent commission is denied. Defendant MCI's motion to dismiss is granted in its entirety.

**All Citations**

Not Reported in F.Supp.2d, 2005 WL 2086321

Footnotes

1  On May 1, 2000 MCI Worldcom, inc. changed its name to Worldcom, Inc. and on May 7, 1999, MCI Telecommunications Corp. was renamed MCI Worldcom Network Services, Inc. Plaintiffs filed their amended complaint on May 22, 2000. On July 26, 2002, defendant MCI Worldcom, Inc. filed a notice of bankruptcy, which automatically stayed these proceedings. The stay was lifted once notice was received that defendant MCI had emerged from bankruptcy.

2  The exclusive services contract arose from a public 'request for proposal' distributed by DOCS in 1995 seeking providers for their prison telephone system.

3  The gross revenue accumulated from this system in Fiscal Years 1996-1999 exceeded $155 million. Over $93 million, or approximately sixty percent, was paid by MCI as a commission back to DOCS.

4  Plaintiffs allege that "the typical station-to-station connection toll for a collect call from Ulster County to New York City is $1.80. On the other hand, for each station-to-station collect call by inmates from NYSDOCS's Eastern Correctional Facility in Ulster County to New York City, Defendant MCI charges a $3.00 toll .... which is 60 percent higher than the standard connection fee...." Compl. ¶ 36. It is uncontested that state and federal regulatory agencies approved all of the rates charged by MCI. MCI filed all intrastate surcharges and per minute rates for intrastate calls with the New York Public Service Commission. These rates were approved on December 16, 1998. MCI also filed all interstate rates with the FCC, who also approved all relevant rates.

5  In addition to the case before this Court, another group of plaintiffs, including many of those in this case, filed a state action alleging the same constitutional claims under the New York State Constitution. The Court of Claims dismissed

  
plaintiffs' complaint as untimely. The Appellate Division, Third Department, affirmed the lower court's findings and held, inter alia, that the filed rate doctrine, *discussed infra,* barred plaintiffs' claims which arose directly from their payment of the filed rate. *Bullard v. State of New York,* 763 N.Y.S.2d 371 (N.Y.App.Div.2003).

6    Plaintiffs do not allege that the content of their speech is restricted by the collect-call-only system. Nor is there any allegation that their right to correspond by mail or their right to visit the inmates has been hampered by DOCS.

7    Defendant MCI also argues that the primary jurisdiction doctrine warrants dismissal of plaintiffs' claims against them. The doctrine of primary jurisdiction bars a claim "involving a regulated firm but not brought under the regulatory statute itself, [where] an issue arises that is within the exclusive original jurisdiction of the regulatory agency to resolve." *Arsberry v. Illinois,* 244 F.3d 558, 563 (7th Cir.2001). However, because the Court dismisses plaintiffs' claims against MCI under the filed rate doctrine, it need not address MCI's arguments regarding the primary jurisdiction doctrine.

8    Plaintiff Mary Byrd, a seventy-nine-year-old woman, suffers from severe chronic lung disease and is therefore unable to visit her two sons who have been incarcerated since 1983. The only way she can speak with them is by accepting their collect calls. Compl. ¶ 8. Because of the high cost of these calls, "Ms. Byrd has at times been unable to pay her telephone bills when they became due. When the telephone company received one payment late, it cut off her long distance. Ms. Byrd now receives calls from her sons through her sister's account, makes installment payments on her past bills and struggles to pay the $150 per month that she is currently billed ... As a result, Ms. Byrd and her sons ... have not been able to keep in close contact." Compl. ¶ 43.

Similarly, plaintiff Wanda B., a full-time college student who provides financial assistance to both her daughter and her two young grandchildren while subsisting on a low salary, has telephone bills which average $300 to $350 per month due to the collect calls placed by her incarcerated husband. Compl. ¶ 42.

9    Plaintiff Cora W. is homebound and unable to travel to visit her incarcerated son due to her "severe arthritis and the chronic effects of a brain aneurysm." "Moreover ... [she] often cannot grip a pen to write to her son. Thus, she is only able to communicate with [him] by accepting his collect calls." By limiting the duration of his calls, Cora W. keeps her phone bills down to $70 to $80 per month-however her sole source of income is the $563 per month she receives from Social Security and Disability benefits. "Frequently, she must forego purchasing needed medication so that she can pay her telephone bill and keep in contact with [her son]." Compl. ¶ 46.

10    In their opposition to defendants' motion, plaintiffs allege that the sixty percent commission constitutes a "taking of private property for public use without just compensation" in violation of the Fifth Amendment. The Court will not address this argument here as it was not properly pled in plaintiffs' complaint; and will therefore address this claim only as it relates to plaintiffs' Fourteenth Amendment due process claim.

11    Plaintiff Mary M. who is disabled and subsists on "a limited disability income through the Social Security system" of $535 has two sons who are incarcerated. Her health problems prevent her from visiting her sons and therefore she can only speak to them by accepting their collect calls, which cost an average of $200 to $250 per month. Compl. ¶ 9, 43. In 1996, her grandson whom she cared for fell out of a window. "He was hospitalized for a long time, battling for his life. During this crisis, [the boy's incarcerated father] called home frequently. Because [she] could not pay the additional expense of these calls, her telephone service was terminated approximately six times." Compl. ¶ 43.

Plaintiff Carole B. has been prevented from visiting her incarcerated husband due to "certain medical risks in her pregnancy," so she must accept his collect calls in order to speak with her husband. Compl. ¶ 10. She tries to speak to her husband "as frequently as possible so that they can make important family decisions together." Compl. ¶ 45. Phone communication is important since "[l]etter writing is neither a reliable nor expeditious means of communication." With an annual income of only $20-25,000, her monthly phone bills of $400 to $500 are a "strain to manage" since "she must [also] cover all living and healthcare expenses." Compl. ¶ 45.

Plaintiff Alison C. is faced with a similar dilemma since she is ill with cancer and her husband is incarcerated. They too need to communicate "on an urgent basis so that they can make important family decisions together ... [which require] an immediate exchange of information." With an annual income of just $14,000, her $70 to $80 monthly phone bills are a "burden" since "she must [also] cover all living and health care expenses." Compl. ¶ 47.

12    Indeed, "[f]or the purposes of this motion defendants *admit the possibility*" of plaintiffs' allegations that DOCS could have forgone these commissions and induced the phone company to establish a lower fee for the collect calls, "thus passing the 'savings' on to the prisoners' families." They contend, however, that this possibility does not mean that their decision to instead guarantee the receipt of the sixty percent commission constitutes the imposition of an unconstitutional "fee" or "tax." Reply Memorandum of Law In Further Support of State Defendants' Motion to Dismiss at 11 (citation omitted) (emphasis added).

13   The originally stated purpose of this commission was to fund a legislatively established family benefit program. However, the state defendants' refer to the commission as "providing funds which *could* be used for inmate services." Reply Memorandum of Law In Further Support of State Defendants' Motion to Dismiss at 10 (emphasis added).

14   "The connection between the inmates and the recipients of their calls cannot be severed. It is the relationship to inmates alone that defines the group. If security precautions affect the telephone services that are available to inmates, this will inevitably impact the inmate call recipients. Thus, the real question is whether inmates and non-inmates are similarly situated. This court finds that they are not.... Because the recipients of inmate calls are not similarly situated with the recipients of non-inmate calls, [p]laintiffs would have to allege they were discriminated against as compared to other recipients of inmate calls to state a supportable claim." *Daleure,* 119 F.Supp.2d at 691; *see also Gilmore v. County of Douglas,* 406 F.3d 935, 938 (8th Cir.2005).

15   As a minister for her church, plaintiff Norma B. serves as a spiritual counselor to inmates and their families. "To the extent that she is financially able to do so, as part of her ministry, [she] accepts calls from inmates and passes on information to their loved ones, who often cannot afford to receive the collect calls directly." Compl. ¶ 48. She "frequently cannot ... provide the counseling and contact services that she usually provides" given the high cost of the collect calls. In addition, these prohibitive costs also often prevent her from speaking with her husband, who is incarcerated. Compl. ¶ 48.

Plaintiff Elizabeth F., who is the Director and Lead Counsel for the Attica Brothers Legal Defense Fund, accepts collect calls from her incarcerated clients in order to effectively communicate with them. Compl. ¶ 17. She is thus forced to pay the high cost of the collect calls from her incarcerated clients so that she can represent them as effectively as her non-incarcerated clients.

---

End of Document                                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2018 Thomson Reuters. No claim to original U.S. Government Works.   9

2014 WL 4365277
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Karl AHLERS, Plaintiff,
v.
Mia TOWNSEND, Defendant.

No. 9:12–CV–0575 (DNH/TWD).
|
Signed Aug. 28, 2014.

**Attorneys and Law Firms**

Karl Ahlers, CNY PC, Marcy, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General for the
State of New York, C. Harris Dague, Esq., Ass't Attorney
General, of Counsel, Albany, NY, for Defendant.

### DECISION and ORDER

DAVID N. HURD, District Judge.

 **\*1** Pro se plaintiff Karl Ahlers brought this action
pursuant to 42 U . S.C. § 1983. On July 30, 2014,
the Honorable Thérèse Wiley Dancks, United States
Magistrate Judge, advised by Report–Recommendation
that defendant's motion for summary judgment pursuant
to Federal Rule of Civil Procedure 56 be granted and
plaintiff's complaint be dismissed. No objections to the
Report–Recommendation were filed.

Based upon a careful review of the entire file and the
recommendations of the Magistrate Judge, the Report–
Recommendation is accepted in whole. *See* 28 U.S.C. §
636(b)(1).

Therefore, it is

ORDERED that

1. Defendant's motion for summary judgment is
GRANTED;

2. Plaintiff's complaint is DISMISSED in its entirety; and

3. The Clerk is directed to serve a copy of this Decision and
Order upon plaintiff in accordance with the Local Rules
and close the file.

### REPORT–RECOMMENDATION and ORDER

THÉRÈSE WILEY DANCKS, United States Magistrate
Judge.

This pro se civil rights action, commenced pursuant to
42 U.S.C. § 1983, has been referred to me for Report
and Recommendation by the Honorable David N. Hurd,
United States District Judge, pursuant to 28 U.S.C. §
636(b) and Local Rule 72.3(c). Plaintiff Karl Ahlers claims
that he was deprived of his rights regarding telephone
communication by Defendant Mia Townsend. (Dkt. No.
5.) Currently pending before the Court is Defendant's
motion for summary judgment pursuant to Federal Rule
of Civil Procedure 56. (Dkt. No. 19.) For the reasons
discussed below, I recommend that Defendant's motion be
granted.

### I. FACTUAL AND PROCEDURAL SUMMARY

Plaintiff, a former prisoner of the State of New York, was
civilly committed following his sentence and has been in
the custody of the Central New York Psychiatric Center
("CNYPC") since 2009. (Dkt. No. 5 at 2, 6.)

As a patient at CNYPC, Plaintiff was issued a phone
card which could be used to make phone calls from
the facility, provided that there were sufficient funds on
the account. (Dkt. No. 5 at 6.) From February 2012 to
late July or August 2012, Plaintiff's phone card account
was suspended by CNYPC staff because they believed
Plaintiff owed money related to his account. *Id.* at 8–
9. During this time, Plaintiff alleges that Defendant, the
primary therapist on Plaintiff's ward, "repeatedly without
explanation nor due process, refused to permit Plaintiff
to make and/or delayed permission to telephone Plaintiff's
attorneys as well as refusing to permit Plaintiff (without
explanation or due process[) ], to make collect calls ... to
friends, family, and/or his support group members." *Id.* at
11–12.

Plaintiff elaborates in his opposition to the motion for
summary judgment that between February 2 and July 26,
2012, he requested a slip to speak with an attorney forty-
five times. (Dkt. No. 21 ¶¶ 32–33.) He was granted twenty-

two attorney phone calls, and denied twenty-three. *Id.* Of the twenty-four dates on which he requested attorney call slips, on sixteen days he made multiple call requests. *Id.* On all but nine days, Plaintiff was granted permission to speak with an attorney at least once. *Id.* In addition, Plaintiff claims that all eighteen of the collect calls to family or friends which he requested were denied. *Id.*

**\*2** Defendant's role is unclear. Plaintiff claims that it was Defendant who granted or denied permission to call attorneys or to make collect calls. (Dkt. No. 5 at 11–12.) Jeffrey Nowicki, the Chief of Mental Health Treatment at CNYPC, declares to the contrary that Defendant Townsend did not have the authority to deny telephone request slips. (Dkt. No. 19–3 ¶ 35.)

Telephone usage is governed at CNYPC by the internal policy numbered 5.1. (Dkt. No. 19–4 at 17–30.) That policy declares that calling card use is a privilege that can be suspended on the basis of treatment, safety, or security issues. *Id.* at 17, 21, 26. The policy states, however, that "[r]esidents will retain their collect call privileges should they lose the ability to participate in the Calling Card Program." *Id.* The policy states that "residents *shall* be permitted to make calls during non-program, non-meal times from 8:00 a.m. until 10:30 p.m." *Id.* at 18, 22, 27 (emphasis added). Residents' phone privileges may be restricted "[o]n rare occasions" if such a restriction is supported by a physician's order and documented in a medical record progress note. *Id.*

Plaintiff first filed this action on April 4, 2012. (Dkt. No. 1.) Although Plaintiff's initial complaint and amended complaint included claims regarding improper behavior on the part of the CNYPC staff with regard to the funds in Plaintiff's phone card account and a Fourth Amendment claim regarding the seizure of his legal paperwork, all claims except those pertaining to Defendant Townsend's alleged restrictions on Plaintiff's telephone use were dismissed with prejudice upon this Court's initial reviews. (Dkt.Nos.4, 7.) As such, only those facts which pertain to the remaining claims are outlined above. Defendant now moves for summary judgment. (Dkt. No. 19.) Plaintiff has opposed the motion. (Dkt. No. 21.)

## II. APPLICABLE LEGAL STANDARDS

### A. Legal Standard Governing Motions for Summary Judgment

Under Federal Rule of Civil Procedure 56, summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. *Salahuddin v. Goord,* 467 F.3d 263, 272–73 (2d Cir.2006). Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist. *Id.* at 273. The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 & n. 11 (1986). Rather, a dispute regarding a material fact is *genuine* "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). In determining whether a genuine issue of material [1] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.,* 542 F.3d 290, 309 (2d Cir.2008).

### B. Legal Standard Governing Motions to Dismiss for Failure to State a Claim

**\*3** To the extent that a defendant's motion for summary judgment under Federal Rule of Civil Procedure 56 is based entirely on the allegations of the plaintiff's complaint, such a motion is functionally the same as a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). As a result, "[w]here appropriate, a trial judge may dismiss for failure to state a cause of action upon motion for summary judgment." *Schwartz v. Compagnie Gen. Transatlantique,* 405 F.2d 270, 273 (2d Cir.1968); *accord Katz v. Molic,* 128 F.R.D. 35, 37–38 (S.D.N.Y.1989) ("This Court finds that ... a conversion [of a Rule 56 summary judgment motion to a Rule 12(b)(6) motion to dismiss the complaint] is proper with or without notice to the parties."). Accordingly, it is appropriate to summarize the legal standard governing Federal Rule of Civil Procedure 12(b)(6) motions to dismiss.

A defendant may move to dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6) on the ground that the complaint fails to state a claim upon which relief

can be granted. In order to state a claim upon which relief can be granted, a complaint must contain, *inter alia*, "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). The requirement that a plaintiff "show" that he or she is entitled to relief means that a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)) (emphasis added). "Determining whether a complaint states a plausible claim for relief ... requires the ... court to draw on its judicial experience and common sense .... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Id.* at 679 (internal citation and punctuation omitted).

"In reviewing a complaint for dismissal under Rule 12(b) (6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor ." *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (citation omitted). Courts are "obligated to construe a pro se complaint liberally." *Harris v. Mills,* 572 F.3d 66, 72 (2d Cir.2009) (citation omitted). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 556 U.S. at 678 (citing *Twombly,* 550 U.S. at 555).

## III. ANALYSIS

Construing Plaintiff's complaint liberally, Plaintiff has alleged a First Amendment violation regarding telephone contact with family, a First Amendment violation regarding access to courts, and a Fourteenth Amendment due process violation concerning these telephone rights. (Dkt. No. 5.) Defendant argues that Plaintiff has not stated cognizable First Amendment claims and has shown no protected liberty interest for the Fourteenth Amendment claim, and moves for summary judgment on those grounds. (Dkt. No 19–5.) For the reasons below, I recommend that Defendant's motion be granted.

### A. First Amendment Contact with Family

**\*4** Construing the complaint liberally, Plaintiff alleges that Defendant Townsend restricted his access to the telephone in violation of his First Amendment rights to contact his family. (Dkt. No. 5 at 11–12.) Defendant argues that Plaintiff has not stated a claim for a First Amendment violation or raised a triable issue of fact. (Dkt. No. 19–5 at 4–5. [2]) For the reasons stated below, Defendant is correct.

First, it is necessary to comment on Plaintiff's status as a civilly committed individual. While the majority of § 1983 case law involving telephone access concerns prisoners, Plaintiff has completed his criminal sentence and is no longer a prisoner. Nevertheless, the same analyses for alleged civil rights violations apply here. In *Youngberg v. Romeo,* 457 U.S. 307, 319–24 (1982), the Supreme Court made clear that civilly committed persons retain various constitutional rights, but that these rights must be tempered by the relevant state interest and the (presumably correct) opinions of trained professionals. *See also DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.,* 489 U.S. 189, 199–200 (1989) ("[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being.").

More specifically, for First Amendment claims by civilly committed individuals involving access to telephones, the Second Circuit has affirmed district court rulings which apply the *Turner* standard (originally for prisoners) to the rights of the civilly committed. *See, e.g., Yeldon v. Hogan,* No. 9:08–CV–769 (NAM/RFT), 2010 U.S. Dist. LEXIS 23821, at \*19–22, 2010 WL 983819, at \*6–7 (N.D.N.Y. Feb. 22, 2010 [3]), *aff'd,* 400 F. App'x 580 (2d Cir.2010). [4] The aforementioned standard, from *Turner v. Safley,* 482 U.S. 78, 89–91 (1987), is a balancing test pursuant to which courts analyze prohibitions on prisoners' exercise of their constitutional rights by considering the following four factors: (1) whether prohibiting an inmate from exercising a constitutional right is rationally related to a legitimate governmental interest; (2) whether there are alternative means of exercising that right; (3) what effect accommodation of the interest would have on guards, other inmates, and the allocation of prison resources; and (4) whether there are ready alternatives available that continue to serve the prison's interest without impinging constitutional rights. *Turner,* 482 U.S. at 89–91. The Second Circuit Court of Appeals has not yet addressed the issue of telephone access for the civilly committed in a reported decision.

2014 WL 4365277

It is well settled that a prisoner retains the right under the First Amendment to communicate with family and friends. *See Procunier v. Martinez,* 416 U.S. 396, 408–09 (1974); *Morgan v. La Vallee,* 526 F.2d 221, 225 (2d Cir.1975). However, such right is not limitless. *See Jones v. N.C. Prisoners' Labor Union, Inc.,* 433 U.S. 119, 125–26 (1977); *Pell v. Procunier,* 417 U.S. 817, 822 (1974).

**\*5** While a prisoner has a constitutional right to communicate with the outside world, this right does not include a guarantee of a specific means of communication. Thus, for example, there is no constitutionally guaranteed right of a prisoner to unrestricted use of a telephone. *See Banks v. Argo,* No. 11 Civ. 4222(LAP), 2012 U.S. Dist. LEXIS 141853, at *14–17, 2012 WL 4471585, at *5–6 (S.D.N.Y. Sept. 25, 2012); *Bellamy v. McMickens.* 692 F.Supp. 205, 214 (S.D.N.Y.1988). A prisoner's access to family and friends via telephone may be restricted so long as the prisoner has some other avenue to communicate, even if less than ideal. *See Edwards v. Horn,* No. 10 Civ. 6194(RJS)(JLC), 2012 U.S. Dist. LEXIS 18424, at *17–18, 2012 WL 473481, at *4 (S.D.N.Y. Feb. 14, 2012) (denial of free telephone calls to prisoner is not actionable claim); *Henry v. Davis,* No. 10 Civ. 7575(PAC)(JLC), 2011 U.S. Dist. LEXIS 84100, at *7, 2011 WL 3295986, at *2 (S.D.N.Y. Aug. 1, 2011) ("Phone restrictions do not impinge on a prisoner's constitutional rights where an inmate has alternate means of communicating with the outside world."). Furthermore, phone restrictions have generally been upheld so long as the individual could still communicate with his family via mail. *Pitsley v. Ricks,* No. 96–CV–0372 (NAM)(DRH), 2000 U.S. Dist. LEXIS 5402, at *18, 2000 WL 362023, at *5 (N.D.N.Y. Mar. 31, 2000). This is treated as an element of the claim, and it is Plaintiff's burden to make a showing that he did not have access to other avenues, such as via mail. *See Riddick v. Arnone,* No. 3:11–cv–631 (SRU), 2012 U.S. Dist. LEXIS 94718, at *16, 2012 WL 2716355, at *6 (D.Conn. July 9, 2012).

Here, neither Plaintiff's complaint nor his memorandum of law refer in any way to a restriction on access to mail. (Dkt.Nos.5, 21.) There is no evidence from which to draw the inference that Plaintiff was also restricted in his access to mail. The phone restrictions at issue therefore do not constitute a First Amendment violation. As such, I recommend that the Court grant Defendant's motion for summary judgment and dismiss Plaintiff's First Amendment claim regarding phone contact with his family and friends.

### B. First Amendment Access to Courts

Construing the complaint liberally, Plaintiff also alleges that Defendant Townsend violated his First Amendment right to access the courts by denying attorney phone calls. (Dkt. No. 5 at 11–12.) Defendant argues that Plaintiff has not stated a claim for or raised a triable issue of fact as to a First Amendment violation for denial of access to courts. (Dkt. No. 19–5 at 5–6.) For the reasons stated below, Defendant is correct.

As with contact with family, a prisoner's access to counsel via telephone may be restricted so long as the prisoner has some other avenue to communicate, even if less than ideal. *Pino v. Dalsheim,* 558 F.Supp. 673, 675 (S.D.N.Y.1983) (restrictions on telephone calls permitted where prisoner had other means to communicate with attorney). Here, Plaintiff does not allege that he was denied the opportunity to communicate with his attorney altogether, but rather that his ability to communicate was sometimes delayed and intermittently denied. Conceivably, Plaintiff could have met with his attorney via mail or in person as well. As discussed above, his complaint is silent with regard to these other forms of communication. Plaintiff has thus not stated a First Amendment claim.

**\*6** Furthermore, to state a claim for deprivation of access to the courts, a plaintiff must allege facts plausibly suggesting that (1) the defendant acted deliberately and maliciously, and (2) the plaintiff suffered an actual injury. *Lewis v. Casey,* 518 U.S. 343, 353 (1996); *Howard v. Leonardo,* 845 F.Supp. 943, 946 (N.D.N.Y.1994) (Hurd, M.J.). Here, while Plaintiff has alleged a restriction on his ability to contact his attorney by telephone, he has not commented on any underlying action, nor has he shown that he has suffered any legal injury. Accordingly, on these grounds as well, Plaintiff's allegations fail to rise to the level of a First Amendment violation. Therefore, I recommend that the Court grant Defendant's motion and dismiss Plaintiff's First Amendment claim regarding telephone contact with his attorney.

### C. Fourteenth Amendment Due Process

Read liberally, Plaintiff's complaint also alleges that Defendant deprived him of his phone privileges without due process, in violation of the Fourteenth Amendment.

(Dkt. No. 5 at 11–12.) Defendant argues that there is no protected liberty or property interest at issue which could support a § 1983 claim. (Dkt. No. 19–5 at 6–7.) For the reasons stated below, Defendant is correct.

To establish a due process violation, Plaintiff must show (1) that he had a property or liberty interest, and (2) that he was deprived of such interest without due process of law. *See Bd. of Regents of State Colls. v. Roth,* 408 U.S. 564, 569–70 (1972); *McKithen v. Brown,* 626 F.3d 143, 151 (2d Cir.2010). In considering whether a civilly committed individual's Fourteenth Amendment rights have been violated, courts must "show deference to the judgment exercised by ... qualified professional[s]," whose decisions are entitled to a presumption of correctness. *Youngberg,* 457 U.S. at 322–23. The rights of such individuals must be balanced with the legitimate State interests, bearing in mind the constraints under which State facilities operate. *Id.* at 321. While "[p]ersons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish" (*id.* at 321–22), "the Constitution only requires that the courts make certain that professional judgment in fact was exercised ... [i]t is not appropriate for the courts to specify which of several professionally acceptable choices should have been made." *Id.* at 321. This district in particular presumes restrictions on liberty interests by medical professionals at CNYPC as correct for the purposes of deciding Fourteenth Amendment claims. *See Yeldon,* 2010 U.S. Dist. LEXIS 23825, at *10, 2010 WL 983819, at *5.

Here, Plaintiff alleges in his complaint that "Defendant Townsend ... repeatedly and without explanation or due process, refused to permit Plaintiff to make and/or delayed permission to telephone Plaintiff's attorneys as well as refusing to permit plaintiff ... to make collect calls to friends, family, and/or his support group members." (Dkt. No. 5 at 11–12.) Defendant does not cite, and this Court cannot find, case law specifically addressing telephone restrictions as liberty interests in the context of civilly committed individuals. However, in the analogous context of prisoner liberty interests, "the loss of phones, packages, and commissary privileges does not give rise to a protected liberty interest under New York law." *Smart v. Goord,* 441 F.Supp.2d 631, 640 (S.D.N.Y.2006); *Johnson v. Enu,* No. 08–CV–158 (FJS/DRH), 2011 U.S. Dist. LEXIS 86831, at *34–35, 2011 WL 3439179, at *12 (N.D.N.Y.

July 13, 2011) (suspension of recreation, commissary, and phone privileges did not give rise to a protected liberty interest); *Edelkind v. Killian,* No. 09 Civ. 5835(SHS)(MHD), 2011 U.S. Dist. LEXIS 157207, at *46, 2011 WL 10599973, at *16 (S.D.N.Y. Aug. 31, 2011) ("[L]oss of telephone privileges is plainly a common incident of prison life and hence does not itself reflect a circumstance that implicates the loss of a liberty interest."); *Husbands v. McClellan,* 990 F.Supp. 214, 217 (W.D.N.Y.1998) (holding temporary loss of various privileges—telephone, package, commissary, and recreation—did "not represent the type of deprivation which could reasonably be viewed as imposing an atypical and significant hardship on an inmate").

**\*7** Even if there were a protected liberty interest in this case, Defendant Townsend, as a primary therapist, is a medical professional, and her decisions concerning restrictions on Plaintiff's rights are presumed to be correct insofar as she has rendered her professional judgment. *Yeldon,* 2010 U.S. Dist. LEXIS 23825, at *10, 2010 WL 983819, at *5. Plaintiff has not provided any evidence to rebut this presumption, and therefore a due process claim under the Fourteenth Amendment must be dismissed.

### C. Policy 5.1

Defendant argues that, in absence of the three constitutional rights violations discussed above, Plaintiff has only alleged conduct which violates CNYPC Policy 5.1. (Dkt. No. 19–5 at 6–7.) Because Plaintiff did not establish the source of his rights explicitly in his complaint, he did not specifically discuss Policy 5.1 prior to his opposition to the pending motion. Defendant moved for summary judgment in part because a violation of Policy 5.1 is not alone sufficient to establish a § 1983 claim. *Id.* Plaintiff admits in opposition to this motion that Defendant Townsend violated his rights under CNYPC Policy 5.1 by restricting his telephone access, but maintains his claim. (Dkt. No. 21 at 6.) For the reasons discussed below, I recommend that Defendant's motion be granted.

Mr. Nowicki declares that the only restrictions on Plaintiff arose from his suspended calling card, which does not affect residents' ability to make collect calls. (Dkt. No. 19–3 ¶¶ 7, 24.) Nevertheless, Plaintiff maintains that Defendant Townsend denied his collect calls. (Dkt. No. 21 ¶¶ 32–33.)

Insofar as Defendant restricted his access to the telephone to contact his attorney or to make collect calls, this conduct is a violation of Policy 5.1, which states that residents who do not have a calling card may still call collect. (Dkt. No. 19–4 at 17, 21, 26 .) However, a violation of state procedural requirements does not give rise to § 1983 liability, as such liability only comes from violations of rights secured by the Constitution or the laws of the United States. *LaBoy v. Coughlin,* 822 F.2d 3, 4 (2d. Cir1987) (per curiam) (citing *Parratt v. Taylor,* 451 U.S. 527, 535 (1981)). Therefore, because I have already determined above that Plaintiff has not established any independent constitutional violation, a violation of Policy 5.1 does not alone give rise to the requisite constitutional harm to support Plaintiff's § 1983 claim. For the foregoing reasons, I recommend that Defendant's motion be granted, and Plaintiff's complaint be dismissed.

**ACCORDINGLY,** it is

**RECOMMENDED** that Defendant's motion for summary judgment (Dkt. No. 19) be *GRANTED,* and it is further

**ORDERED** that the Clerk provide Plaintiff with copies of *Banks v. Argo,* No. 11 Civ. 4222(LAP), 2012 U.S. Dist. LEXIS 141853, 2012 WL 4471585 (S.D.N.Y. Sept. 25, 2012); *Edwards v. Horn,* No. 10 Civ. 6194(RJS)(JLC),

2012 U.S. Dist. LEXIS 18424, 2012 WL 473481 (S.D.N.Y. Feb. 14, 2012); *Henry v. Davis,* No. 10 Civ. 7575(PAC)(JLC), 2011 U.S. Dist. LEXIS 84100, 2011 WL 3295986, (S.D.N.Y. Aug. 1, 2011); *Yeldon v. Hogan,* No. 9:08–CV–769 (NAM/RFT), 2010 U.S. Dist. LEXIS 23821, 2010 WL 983819 (N.D.N.Y. Feb. 22, 2010); *Johnson v. Enu,* No. 08–CV–158 (FJS/DRH), 2011 U.S. Dist. LEXIS 86831, 2011 WL 3439179 (N.D.N.Y. July 13, 2011); *Riddick v. Arnone,* No. 3:11–cv–631 (SRU), 2012 U.S. Dist. LEXIS 94718, 2012 WL 2716355 (D.Conn. July 9, 2012); and *Pitsley v. Ricks,* No. 96–CV–0372 (NAM)(DRH), 2000 U.S. Dist. LEXIS 5402, 2000 WL 362023 (N.D.N.Y. Mar. 31, 2000).

**\*8** Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15 (2d Cir.1989) (per curiam)); 28 U.S.C. § 636(b)(1) (Supp.2013); Fed.R.Civ.P. 72, 6(a).

Dated: July 30, 2014.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 4365277

---

Footnotes

1    A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson,* 477 U.S. at 248.

2    Page numbers in citations to Defendant's memorandum of law refer to the page numbers in the original document rather than to the page numbers assigned by the Court's electronic filing system.

3    Lexis and Westlaw list different dates for this decision. This Court has used the date from the Lexis version, which refers to the date of the magistrate judge's Report–Recommendation.

4    The Court will provide Plaintiff with a copy of all unpublished decisions cited herein in accordance with the Second Circuit's decision in *Lebron v. Sanders,* 557 F.3d 76 (2d Cir.2009) (per curiam). [Editor's Note: Attachments of Westlaw case copies deleted for online display.]

---

End of Document                                              © 2018 Thomson Reuters. No claim to original U.S. Government Works.



Slip Copy, 2012 WL 760172 (S.D.N.Y.)

(Cite as: 2012 WL 760172 (S.D.N.Y.))

Only the Westlaw citation is currently available.
United States District Court,

S.D. New York.
William EDWARDS, Plaintiff,
v.
Martin HORN, et al., Defendants.
No. 10 Civ. 6194(RJS)(JLC).

March 8, 2012.
*ORDER ADOPTING REPORT AND
RECOMMENDATION*

RICHARD J. SULLIVAN, District Judge.

**\*1** *Pro se* Plaintiff William Edwards brings this action pursuant to 42 U.S.C. §§ 1983, 1985, and 1986, alleging that at various times, Defendants violated his constitutional rights under the First, Fourth, Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments during his incarceration at five different facilities on Rikers Island. By Order dated September 1, 2010, this matter was referred to the Honorable James L. Cott, Magistrate Judge. On April 4, 2011, Defendants moved to dismiss the Complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure. On March 3, 2011, Judge Cott set a deadline of March 4, 2011 for Plaintiff to submit an opposition to Defendants' motion. Although Judge Cott thrice extended this deadline—on May 18, 2011, June 8, 2011, and June 29, 2011—Plaintiff never submitted an opposition. Accordingly, Judge Cott properly considered Defendants' motion fully submitted.

On February 14, 2012, Judge Cott issued the attached forty-six page Report and Recommendation (the "Report"), recommending that the motion to dismiss be granted except as to Plaintiff's retaliatory termination claim against Defendant Rosa to the extent that Plaintiff seeks nominal or punitive damages. In the Report, Judge Cott advised the parties that failure to file timely objections to the Report would constitute a waiver of those objections. *See* 28 U.S.C. § 636(b)(1)(C); Fed.R.Civ.P. 72(b). No party has filed objections to the Report, and the

time to do so has expired. *Cf. Frank v. Johnson,* 968 F.2d 298 (2d Cir.1993).

When no objections to a report and recommendation are made, the Court may adopt the report if there is no clear error on the face of the record. *Adee Motor Cars, LLC v. Amato,* 388 F.Supp.2d 250, 253 (S.D.N.Y.2005); *La Torres v. Walker,* 216 F.Supp.2d 157, 159 (S.D.N.Y.2000). After reviewing the record, the Court finds that Judge Cott's well-reasoned and careful Report is not facially erroneous. Accordingly, the Court adopts the Report in its entirety and, for the reasons set forth therein, grants Defendants' motion to dismiss as to all but one of Plaintiff's claims. The court denies the motion as to Plaintiff's retaliatory termination claim against Defendant Rosa, and only to the extent that Plaintiff seeks nominal or punitive damages against her. The Clerk of the Court is respectfully directed to terminate the motion located at Doc. No. 88.

SO ORDERED.

*REPORT & RECOMMENDATION*

JAMES L. COTT, United States Magistrate Judge.
**To The Honorable Richard J. Sullivan, United States District Judge:**

Plaintiff William Edwards, proceeding pro se, brings this action pursuant to 42 U.S.C. §§ 1983, 1985, and 1986 alleging that Defendants violated his constitutional rights under the First, Fourth, Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments during his incarceration in various facilities on Rikers Island. Edwards also alleges that he was discriminated against in violation of the Americans with Disabilities Act. Defendants move to dismiss the Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. For the reasons discussed below, I recommend that the motion to dismiss be granted except as to Edwards' retaliatory termination claim against Defendant Rosa.

**I. BACKGROUND**

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 760172 (S.D.N.Y.)

(Cite as: 2012 WL 760172 (S.D.N.Y.))

**A. Factual Background**

**\*2** The following facts are taken from the Complaint and are accepted as true for purposes of this motion. (*See* Complaint, dated June 23, 2010 ("Compl.") (Dkt. No. 2)). Edwards brings this suit pursuant to 42 U.S.C. §§ 1983, 1985, and 1986 and Title II of the Americans with Disabilities Act (the "ADA"), 42 U.S.C. § 12101 *et seq.,* against 44 current and former New York City employees and two John Doe Defendants: Commissioner Martin Horn, Warden Bailey, Warden J. Davis, Warden E. Duffy, Warden Michael Hourihan, Warden Riordan, Warden Robert Shaw, Correctional Officer ("CO.") Dinolfo, CO. Grima, CO. Hernandez, CO. Holmes, CO. Lagos, CO. Lewis, CO. Maynard, CO. Morales, CO. Noon, CO. Reyes, CO. Richardson, CO. Rosa, CO. Smalls, CO. Smith, CO. Sumpter, Captain Alleyve, Captain Bethacourt, Captain Calle, Captain G. Davis, Captain Polak, Marybeth Campfield, Ms. Carrera, Mrs. M. Cattafesta, Mr. K. Guerrant, Cook Hannah, Deputy Hill, Florence Hunter, Ms. Jenkins, Ms. K. Johnson [FN1], Ms. G. Lee, Ms. P. Mimms, Mr. R. Mulvena, Ms. B. Musmacher, Ms. R. Padmore, Karen Powell, James Robinson, and Ms. Steven (together, "Defendants"). (*See* Compl. at 1–5).[FN2]

> **FN1.** In the case caption on the first page of the Complaint, Edwards mistakenly identifies Defendant Johnson as "Ms. K. Jonhson." (Compl. at 1).

> **FN2.** In Section I.b of the Complaint, Edwards lists 38 Defendants. Six additional Defendants—Carrera, Cattafesta, Duffy, Grima, Powell, and Steven—do not appear on this list, but are named in the case caption on the first page of the Complaint.

Edwards alleges that Defendants deprived him of his constitutional rights under the First, Fourth, Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments during his incarceration at several facilities on Rikers Island: the Anna M. Kross Center ("AMKC"), the Eric M. Taylor Center ("EMTC"), the George Motchan Detention Center ("GMDC"), the George R. Vierno Center ("GRVC"), and the Robert N. Davoren Complex ("RNDC"). At the time he filed his Complaint, Edwards was an inmate at the Clinton Correctional Facility, and he is currently on parole. (*See* Letter, dated Dec. 11, 2011 (Dkt. No. 135)).

Throughout his roughly 100 paragraph, single-spaced, 25–page Complaint, Edwards does not present his allegations by cause of action, nor does he clearly articulate exactly what causes of action he is asserting, as many allegations appear to overlap and lack clarity.[FN3] Several of Edwards' allegations deal with Defendants' actions in relation to a separate lawsuit Edwards brought in the Northern District of New York, *Edwards v. Selsky,* No. 04 Civ. 493(FJS)(DRH), 2008 WL 190385 (N.D.N.Y. Jan. 22, 2008) ("*Selsky*" or the "NDNY action"), which was dismissed for failure to prosecute. The Court has made every effort to identify and address all possible claims asserted in the Complaint.[FN4] The Court is able to identify 12 potential causes of action spanning separate dates from July 25, 2007 to April 5, 2010. Specifically, Edwards asserts the following claims: (1) verbal harassment; (2) deprivation of access to free telephone calls; (3) deprivation of access to legal services; (4) mail tampering; (5) denial of required food portions; (6) unconstitutional strip search; (7) violation of due process rights within the prison's disciplinary and grievance system; (8) excessive force and denial of medical treatment; (9) deprivation of access to the prison's grievance system; (10) retaliation; (11) conspiracy; and (12) disability discrimination under the ADA. Edwards seeks $75,000,000 in damages, attorneys' fees, a reimbursement of penalties incurred due to two allegedly false infractions, injunctive relief in the form of expunging those false infractions, injunctive relief terminating Defendants from their positions in the New York City Department of Correction ("DOC") and permanently enjoining them from city, state, or federal employment, and a permanent restraining order to prevent Defendants from committing any future similar violations. (Compl.¶ V). Edwards does not present these allegations in a narrative fashion, but instead describes dozens of grievance letters that he has submitted to DOC staff at the various Rikers Island facilities over the course of nearly three years. To avoid repetition, the Court will describe the factual background relating to Edwards' specific allegations in the context of the relevant legal discussion below.

> **FN3.** Accordingly, while Defendants do not argue as much, the Complaint could also be

Slip Copy, 2012 WL 760172 (S.D.N.Y.)

(Cite as: 2012 WL 760172 (S.D.N.Y.))

dismissed under Rule 8(a)(2), which requires a pleading to contain "a short and plain statement" of the claims.

FN4. Edwards has attached more than 300 pages of documents to his Complaint, consisting of grievance letters, notices of infraction, and inmate grievance committee decisions. These materials can be properly considered in deciding Defendants' motion to dismiss. *See, e.g., Sira v. Morton,* 380 F.3d 57, 67 (2d Cir.2004) (citations omitted). However, while the Court will consider these materials in support of the claims asserted in the Complaint—indeed, nearly every paragraph advises the reader to "see attached exhibit" but fails to cite to a specific page—the Court will not attempt to identify the potentially innumerable causes of action that could be construed from the hundreds of allegations contained solely in the attachments.

**B. Procedural Background**

**\*3** Edwards filed the Complaint on August 18, 2010. (Dkt. No. 2). On October 29, 2010, the United States Marshals executed service of the Summons and Complaint on 32 of the 44 named defendants.FN5 Over the course of the next several months, with the assistance of the Office of Corporation Counsel, the United States Marshals, and the Court, Edwards has attempted to serve the remaining 12 named defendants. (*See* Dkt. Nos. 56, 62, 69, 70, 75, 119, 120, 129). To date, Edwards has successfully served nine additional Defendants and appears to have served a number of Defendants twice.FN6 Accordingly, there are three named Defendants who have not been served—Bethacourt, Davis, and Johnson-and two John Doe Defendants who have not been identified.FN7

FN5. This set of defendants consists of Sumpter (Dkt. No. 11), Horn (Dkt. No. 12), Cattafesta (Dkt. No. 13), Hunter (Dkt. No. 15), Guerrant (Dkt. No. 17), Lagos (Dkt. No. 18), Shaw (Dkt. No. 19), Campfield (Dkt. No. 20), Reyes (Dkt. No. 21), Davis (Dkt. No. 22), Hernandez (Dkt. No. 23), Holmes (Dkt. No. 24), Rosa (Dkt. No. 25), Smith (Dkt. No. 26), Mulvena (Dkt. No. 27), Polak (Dkt. No. 28), Noon (Dkt. No. 29),

Duffy (Dkt. No. 31), Dinolfo (Dkt. No. 32), Mimms (Dkt. No. 34), Bailey (Dkt. No. 35), Lewis (Dkt. No. 36), Alleyve (Dkt. No. 37), Calle (Dkt. No. 39), Hannah (Dkt. No. 41), Hourihan (Dkt. No. 43), Jenkins (Dkt. No. 44), Maynard (Dkt. No. 45), Padmore (Dkt. No. 48), Richardson (Dkt. No. 49), Riordan (Dkt. No. 50), and Smalls (Dkt. No. 51).

FN6. Since October 29, 2010, Edwards has served the following Defendants: Lee (service executed on Dec. 2, 2010 (Dkt. No. 61)); Powell (service executed on Mar. 29, 2011 (Dkt. No. 98)); Steven (service executed on Feb. 24, 2011 (Dkt. No. 110); service executed on Mar. 31, 2011 (Dkt. No. 99)); Grima (service executed on Mar. 2, 2011 (Dkt. No. 107); service executed on Mar. 14, 2011 (Dkt. No. 100)); Robinson (service executed on Mar. 29, 2011 (Dkt. No. 101)); Musmacher (service executed on Mar. 14, 2011 (Dkt. No. 102)); Hill (service executed on Feb. 24, 2011 (Dkt. No. 112); service executed on Mar. 14, 2011 (Dkt. No. 103)); Horn (service executed on Mar. 31, 2011 (Dkt. No. 97)); and Carrera (service executed on Oct. 6, 2011 (Dkt. No. 131)).

FN7. As to Defendant Bethacourt, the Office of Corporation Counsel advised the Court by letter dated June 8, 2011 that it is unable to locate records that would assist in identifying Bethacourt. Accordingly, as stated in the Court's Order dated June 9, 2011 (Dkt. No. 120), it does not appear that any further action can be taken to identify this Defendant. As to Defendant Davis, the Office of Corporation Counsel advised the Court by letter dated February 16, 2011 that the Legal Bureau of the DOC would accept service on his behalf. By Order dated September 1, 2011, the Court directed Edwards to serve Davis by September 26, 2011 (Dkt. No. 129), but the docket sheet does not reflect any attempt to effect service. Lastly, on October 31, 2011, Edwards attempted to serve Defendant Johnson but was unsuccessful because she was not located at the address provided by the Office of

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 760172 (S.D.N.Y.)

(Cite as: 2012 WL 760172 (S.D.N.Y.))

Corporation Counsel. (*See* Order, dated Dec. 12, 2011 (Dkt. No. 134), at 1). Edwards was directed to again attempt to serve Johnson by January 27, 2012 (*Id* .), but no proof of service has been filed.

During the pendency of his lawsuit, Edwards has submitted several requests to the Court. By Order dated November 1, 2010, the Court denied Edwards' request for an order prohibiting certain employees at the Southport Correctional Facility, where Edwards was incarcerated at the time, from tampering with his legal and personal mail. (Dkt. No. 8). By Orders dated November 30, 2010 and April 14, 2011, the Court denied Edwards' motions for default judgment against certain Defendants (Dkt.Nos.56, 92), and Edwards' interlocutory appeal of the November 30 Order was denied by the Second Circuit on May 26, 2011. (Dkt. No. 118). By Orders dated February 9, 2011, I declined Edwards' request that I disqualify myself from this action and also denied his motion for the appointment of counsel. (Dkt.Nos.73–74). Lastly, on March 8, 2011, I denied Edwards' request for sanctions in connection with Corporation Counsel's providing Edwards with service addresses for Defendants. (Dkt. No. 81).

On April 4, 2011, Defendants moved to dismiss the Complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure. (*See* Defendants' Memorandum of Law in Support of Motion to Dismiss, dated Apr. 4, 2011 ("Def.Mem.") (Dkt. No. 89)).[FN8] Defendants assert that Edwards has failed to state a claim as to his verbal harassment, deprivation of telephone access, unconstitutional strip search, mail tampering, denial of food, denial of legal services, due process, grievance processing and protocol, excessive force and medical treatment, conspiracy, and retaliation causes of action. (Def. Mem. at 16–45). In addition, Defendants argue that Edwards' claims against Defendants Bailey, Cattafesta, Davis, Hill, Horn, Hourihan, Powell, and Riordan fail for lack of personal involvement, all defendants are entitled to qualified immunity, and Edwards' claims are barred by the Prison Litigation Reform Act (the "PLRA").[FN9] (*Id*. at 14–16, 45–48). Pursuant to the Court's Order dated March 3, 2011, Edwards' deadline to submit an opposition to Defendants' motion was May 4, 2011. (Dkt. No. 80). However, despite receiving several extensions—first to

May 18 (Dkt. No. 90) then to June 8 (Dkt. No. 116) and June 29 (Dkt. No. 122)—Edwards has not submitted any opposition. Accordingly, the Court considers Defendants' motion fully submitted.

FN8. Although the motion to dismiss was not filed on behalf of any of the unserved Defendants (*see* Def. Mem. at 2–3 n. 2), Counsel has stated that the arguments raised apply equally to all Defendants. Accordingly, in light of my recommendation to dismiss all claims against all Defendants except the retaliatory termination claim against Defendant Rosa, *see infra* Section ILK, the Court should *sua sponte* dismiss the Complaint as to Defendants Bethacourt, Davis, John Doe # 1, John Doe # 2, and Johnson.

FN9. Defendants have not moved to dismiss any of Edwards' claims on the ground that he has failed to exhaust his administrative remedies, as he is required to have done under the PLRA. *See* 42 U.S.C. § 1997e(a) ("No action shall be brought with respect to prison conditions under [Section 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."). While exhaustion under Section 1997e(a) is mandatory, *see Porter v. Nussle,* 534 U.S. 516, 524, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002), non-exhaustion "is an affirmative defense that is waiveable." *Handberry v. Thompson,* 446 F.3d 335, 342 (2d Cir.2006) (citations, alterations, and quotation marks omitted); *see also Jones v. Bock,* 549 U.S. 199, 216, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007); *Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004). Here, because Defendants have not argued that Edwards failed to exhaust his administrative remedies, the non-exhaustion defense has been waived. *See, e.g., Ortiz v. Dep't of Corr. of the City of N.Y.,* No. 08 Civ. 2195(RJS)(HBP), 2011 WL 2638137, at *4 (S.D.N.Y. Apr. 29, 2011) (defendant's failure to raise non-exhaustion constitutes waiver) (Report and Recommendation), *adopted,* 2011 WL 2638140

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 760172 (S.D.N.Y.)

(Cite as: 2012 WL 760172 (S.D.N.Y.))

(S.D.N.Y. Jul.5, 2011); *Hobson v. Fischer,* No. 10 Civ. 5512(SAS), 2011 WL 891314, at *2 n. 22 (S.D.N.Y. Mar.14, 2011) (finding waiver even where grievance "appears not to have been fully exhausted" under PLRA).

## II. *DISCUSSION*

### A. Applicable Legal Standards

**\*4** A plaintiff's failure to oppose a 12(b)(6) motion does not by itself merit dismissal of a complaint. *See Goldberg v. Danaher,* 599 F.3d 181, 183–84 (2d Cir.2010); *McCall v. Pataki,* 232 F.3d 321, 322–23 (2d Cir.2000). "[T]he sufficiency of a complaint is a matter of law that the court is capable of determining based on its own reading of the pleading and knowledge of the law. If a complaint is sufficient to state a claim on which relief can be granted, the plaintiff's failure to respond to a Rule 12(b)(6) motion does not warrant dismissal." *Id.* Consequently, as with all Rule 12(b)(6) motions, in deciding an unopposed motion to dismiss, a court is to "assume the truth of a pleading's factual allegations and test only its legal sufficiency" according to the principles below. *Id.* at 322.

A complaint will not survive a 12(b)(6) motion to dismiss if it "fail[s] to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). Although "a complaint attacked by a 12(b) (6) motion does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 554, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (quotation marks and citations omitted). "To survive a motion to dismiss, the complaint must set out only enough facts to state a claim to relief that is plausible on its face." *Hollander v. Copacabana Nightclub,* 624 F.3d 30, 32 (2d Cir.2010) (citing *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009)). "Determining whether a complaint states a plausible claim for relief [is] ... a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal,* 129 S.Ct. at 1950 (citation omitted). A complaint thus may only survive a 12(b) (6) motion to dismiss if it has "facial plausibility" and pleads enough facts to allow the court to "draw the reasonable inference that the defendant is liable for the

misconduct alleged." *Id.* at 1949.

Given that Edwards is proceeding *pro se,* the Court must "construe [his Amended Complaint] broadly and interpret it to raise the strongest arguments it suggests." *Sharpe v. Conole,* 386 F.3d 482, 484 (2d Cir.2004) (citation omitted). Furthermore, "when the plaintiff proceeds pro se ... a court is obliged to construe his pleadings liberally, particularly when they allege civil rights violations." *McEachin v. McGuinnis,* 357 F.3d 197, 200 (2d Cir.2004) (citation omitted). Nevertheless, "a *pro se* litigant [is] bound by the same rules of law ... as those [litigants] represented by counsel." *Fertig v. HRA Med. Assistance Program,* No. 10 Civ. 8191(RPP), 2011 WL 1795235, at *4 (S.D.N.Y. May 6, 2011) (quotation marks and citation omitted).

### B. Verbal Harassment

Edwards asserts that several Defendants, in violation of Section 1983, used harassing, threatening, and profane language towards him on 17 separate occasions taking place between July 25, 2007 and September 1, 2008. (Compl.¶¶ III, 2, 6, 8, 17, 19, 22, 24, 30, 33, 37, 38, 53, 55, 61, 83, 91(b)). In separate allegations, he claims that Defendants Campfield, Dinolfo, Grima, Hannah, Hernandez, Holmes, Lewis, Maynard, Morales, Noon, Reyes, Richardson, Smalls, and Smith, called him a "snitch" in front of other inmates, mocked his disability, falsely informed him that he had a visitor when in fact he did not have a visitor, and directed racial slurs and profane language toward him. (*Id.*). These claims should be dismissed. The Eighth Amendment prohibits the imposition of cruel and unusual punishment, *Estelle v. Gamble,* 429 U.S. 97, 102, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), but its protection does not extend to verbal harassment of an inmate by correction officers without any resulting "appreciable injury." *Roseboro v. Gillespie,* 791 F.Supp.2d 353, 373 (S.D.N.Y.2011) (quoting *Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986)).

**\*5** Verbal harassment, by itself, is not a constitutional violation. *See, e.g., Tafari v. McCarthy,* 714 F.Supp.2d 317, 364 (N.D.N.Y.2010) ("[v]erbal harassment itself does not rise to the level of a constitutional violation [,]" and "[v]erbal abuse, vulgarity, and even threats are insufficient to rise to the level of constitutional

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 760172 (S.D.N.Y.)

(Cite as: 2012 WL 760172 (S.D.N.Y.))

violations") (quotation marks and citation omitted); *Davidson v. Bartholome,* 460 F.Supp.2d 436, 446 (S.D.N.Y.2006) (no relief to inmate "simply because [an officer] made a hostile or derogatory comment"); *Lunney v. Brureton,* No. 04 Civ. 2438(LAK) (GWG), 2005 WL 121720, at *11 (S.D.N.Y. Jan. 21, 2005) (no claim because merely "insulting" or "disrespectful" comments "do not give rise to a constitutional violation") (quotation marks and citations omitted) (Report and Recommendation), *adopted,* 2005 WL 433285 (S.D.N.Y. Feb.23, 2005). Absent any appreciable injury, courts routinely dismiss claims of verbal harassment brought under Section 1983. *See, e.g., Felder v. Filion,* 368 F. App'x 253, 256 (2d Cir.2010) (verbal harassment did not violate Eighth Amendment where plaintiff did not present evidence of resulting injury); *Johnson v. Eggersdorf,* 8 F. App'x 140, 143 (2d Cir.2001) ("allegations of verbal harassment are insufficient to base a [ Section] 1983 claim if no specific injury is alleged"). Because Edwards does not allege any injury whatsoever, let alone one that could be considered "appreciable," Defendants' alleged threats, verbal harassment, or profane language do not give rise to constitutional violations and should therefore be dismissed.

**C. Denial of Required Telephone Calls**

Edwards alleges that since his incarceration began on January 23, 2008, he has not been provided with a free telephone call as required by the "DOC Telephone System." (Compl.¶ 46).[FN10] Edwards further alleges that he submitted a grievance on June 3, 2008 regarding his deprivation of free telephone calls. (*Id.*). However, "[p]hone restrictions do not impinge on a prisoner's constitutional rights where an inmate has alternate means of communicating with the outside world." *Henry v. Davis,* No. 10 Civ. 7575(PAC)(JLC), 2011 WL 3295986, at *2 (S.D.N.Y. Aug. 1, 2011) (citing cases) (Report and Recommendation), *adopted,* 2011 WL 5006831 (S.D.N.Y. Oct.20, 2011). Because inmates "have no right to unlimited telephone calls[,]" *Bellamy v. McMickens,* 692 F.Supp. 205, 214 (S.D.N.Y.1998) (citation omitted), Edwards must, but fails to, allege that he was stripped of alternate methods of communication to state a violation of his constitutional rights. *See, e.g., Paulino v. Menifee,* No. 00 Civ. 5719(RCC)(KNF), 2001 WL 243207, at *2 (S.D.N.Y. Mar. 9, 2001) (refusing to issue injunction

restoring phone privileges where inmate did not allege that alternate means of communication were inadequate). Edwards' claim regarding the denial of free telephone calls should therefore be dismissed.

FN10. In the context of his claim for the denial of free telephone calls, Edwards provides different dates for the start of his incarceration, stating January 23, 2008 in his Complaint and January 24, 2008 in an attached exhibit. (Compl. ¶ 46; Dkt. No. 2–3 at 4). These cited dates, however, appear to be inconsistent with the commencement of Edwards' incarceration, as his earliest allegation in this lawsuit takes place on July 25, 2007 while he was housed at the AMKC. (*Id.* ¶ III). In any event, regardless of whether Edwards has been denied free telephone calls since July 2007 or January 2008, his cause of action should be dismissed because he has failed to state an actionable claim.

**D. Deprivation of Access to Legal Services**

**\*6** Edwards alleges numerous deprivations of access to legal services by Defendants Campfield, Musmacher, and Smalls. As to Campfield, Edwards alleges that in March 2008 she denied him a legal manila envelope, lost his legal documents pertaining to the NDNY action, and denied him legal services. (Compl. ¶¶ 31, 36). As to Musmacher, Edwards asserts that she denied him legal services for more than a month around August 2008 and discriminated against him by providing legal services to Latino detainees when Edwards was "next ... on line" to receive such services. (*Id.* ¶¶ 56–57). As to Smalls, Edwards claims that she denied him extra time in the prison facility's law library in August 2008. (*Id.* ¶ 61). Each of these claims should be dismissed.

The Supreme Court has recognized that an inmate does not have "an abstract, freestanding right to a law library or legal assistance." *Lewis v. Casey,* 518 U.S. 343, 351, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996). Rather, a prison facility must ensure that its inmates have " 'a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts.' " *Id.* (quoting *Bounds v. Smith,* 430 U.S. 817, 825, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977)). Accordingly, for a defendant's conduct to provide a basis for an inmate to

Slip Copy, 2012 WL 760172 (S.D.N.Y.)

(Cite as: 2012 WL 760172 (S.D.N.Y.))

invoke his right of access to the courts, it must cause "actual injury" or "materially prejudice[ ]" the inmate. *Salvatierra v. Connolly,* No. 09 Civ. 3722(SHS)(DF), 2010 WL 5480756, at *21 (S.D .N.Y. Sept. 1, 2010) (citations and quotation marks omitted) (Report and Recommendation), *adopted,* 2011 WL 9398 (S.D.N.Y. Jan.3, 2011).

Here, Edwards does not state sufficient facts to constitute any injury or material prejudice. He does not claim any injury suffered because of Defendants' alleged denials of legal services, legal supplies, extra time in the law library, or alleged discrimination in favor of Latino detainees. While he asserts that Campfield's losing his legal documents in connection with the NDNY action prevented him from "prosecuting" that action (Compl.¶ 36), he fails to provide any specifics as to his purported inability to prosecute. He does not elaborate on, for example, what documents he believes were lost and what actions he was prevented from taking in his litigation, which is especially relevant since Edwards appears to have participated in the NDNY lawsuit in some capacity, but failed to keep the court apprised of his mailing address. *See Selsky,* 2008 WL 190385, at *1–3. Accordingly, because Edwards has not identified any injury or material prejudice as a result of his alleged deprivation of access to legal services, these claims should be dismissed.

**E. Mail Tampering**

Edwards' mail tampering claims are based on allegations of interference with his outgoing non-legal mail and his incoming and outgoing legal mail at the EMTC and AMKC. Specifically, Edwards first alleges that on November 1, 2007 he wrote a letter to Michael Caruso at the DOC that was never sent from the EMTC. (Compl.¶ 16). Second, Edwards alleges that his "legal mail" addressed to Caruso never left the EMTC and was returned to him on November 27, 2007. ( *Id.¶ 27*). Next, Edwards submitted a grievance on September 8, 2008 alleging that his "personal and legal mail" addressed to a co-defendant never left the AMKC because it was returned for insufficient postage despite being marked with a postage stamp. ( *Id.¶ 70*). Edwards' fourth claim of mail tampering relates to the NDNY action. He asserts that Defendant Davis failed to forward his incoming legal mail to the correct address, despite Edwards' instruction for him

to do so, and that as a result, his NDNY lawsuit was dismissed. ( *Id. ¶ 47*). Lastly, Edwards alludes to an allegation of tampering with his outgoing "legal and personal mail" against unnamed AMKC staff, which he documented in a November 18, 2008 grievance letter. ( *Id. ¶ 94*). None of these claims should withstand a motion to dismiss.

**\*7** Both legal and non-legal mail are protected by the First Amendment's "right to the free flow of incoming and outgoing mail." *Davis v. Goord,* 320 F.3d 346, 351 (2d Cir.2003). "[A] prison official's interference with an inmate's mail may violate his First Amendment right to free speech, which includes the 'right to be free from unjustified governmental interference with communication.' " *Cancel v. Goord,* No. 00 Civ.2042(LMM), 2001 WL 303713, at *5 (S.D.N.Y. Mar.29, 2001) (citation omitted). In addition, "the Supreme Court has recognized that 'the implications of outgoing correspondence for prison security are of a categorically lesser magnitude than the implications of incoming materials.' " *Id.* (quoting *Thornburgh v. Abbott,* 490 U.S. 401, 413, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989)).

With these principles in mind, Edwards' allegations as to outgoing non-legal mail-non-legal mail being afforded less protection than legal mail, *Davis,* 320 F.3d at 351–fail to state a claim because he does not assert that Defendants actually tampered with his mail, only that his mail never left the facility. Moreover, instead of establishing plausible mail tampering claims for his outgoing non-legal mail, Edwards' alleged facts make mail tampering an unlikely possibility. For example, Edwards' allegation that his November 1, 2007 letter to Michael Caruso never left the EMTC is based solely on the fact that Caruso never answered the letter. (Compl.¶ 16). Caruso's failure to respond to Edwards' letter, of course, does not necessarily suggest that it was never sent by EMTC staff. Absent any allegations that Defendants opened the letter, withheld it from being sent, or otherwise took any adverse action to make it plausible that EMTC staff tampered with Edwards' outgoing mail, Edwards' claim is merely speculative. Similarly, Edwards' allegation in his September 8, 2008 grievance that a letter to a co-defendant was returned to him for insufficient postage despite having a postage stamp does not suggest mail tampering, but rather that

Slip Copy, 2012 WL 760172 (S.D.N.Y.)

(Cite as: 2012 WL 760172 (S.D.N.Y.))

Edwards had failed to affix sufficient postage. (*Id.* ¶ 70). In any event, an isolated failure to mail an inmate's letter does not state a constitutional violation. *See, e.g., Battice v. Phillip,* No. 04 Civ. 669(FB)(LB), 2006 WL 2190565, at *6 (E.D.N.Y. Aug. 2, 2006) (defendant's failure to deliver plaintiff's mail, even if intentional, is "simply *de minimis* and therefore outside the ambit of constitutional protection") (citation and quotation marks omitted). Finally, Edwards' claim regarding mail tampering in November 2008 is devoid of any facts that could state a cause of action. (Compl.¶ 94).

As to Edwards' claims regarding interference with his incoming and outgoing legal mail, the Court notes that such interference "implicates a prison inmate's rights to access to the courts and free speech as guaranteed by the First and Fourteenth Amendments to the U.S. Constitution." *Davis,* 320 F.3d at 351. To survive a motion to dismiss, a plaintiff must allege that correction officers "regularly and unjustifiably" interfered with his mail, depriving him of his constitutional rights. *Shepherd v. Fisher,* No. 08 Civ. 9297(LTS)(RLE), 2011 WL 3278966, at *2 (S.D.N.Y. July 27, 2011) (citations and quotation marks omitted). To assert such a claim, a prisoner must allege that the defendant's actions (1) were "deliberate and malicious" and (2) "resulted in actual injury" to the plaintiff. *Cancel,* 2001 WL 303713, at *4 (quoted in *Davis,* 320 F.3d at 351). Actual injury exists where interference with legal mail results in "the dismissal of an otherwise meritorious legal claim." *Id.* However, "[m]ere delay in being able to work on one's legal action or communicate with the courts does not rise to the level of a constitutional violation." *Id.* at 352 (citations and quotation marks omitted).

**\*8** None of Edwards' claims of interference with his legal mail—both those related to incoming and outgoing mail—sufficiently states an actual injury. Edwards fails to allege that he suffered any injury in connection with DOC staff's alleged failure to send his outgoing legal mail on November 27, 2007, September 8, 2008, or November 18, 2008, assuming that Edwards' "legal mail" is in fact legal mail. (Compl.¶¶ 27, 70, 94). For the same reason, Edwards' claim pertaining to incoming mail from the NDNY does not state a constitutional violation. This claim is based on Defendant Davis' alleged failure to adhere to

Edwards' request to have his mail sent to a forwarding address. For support, Edwards appears to rely on language in Judge Scullin's order that the magistrate judge's report and recommendation was returned to the Court marked "unable to forward." (Compl.¶ 47). The NDNY action, however, was not dismissed solely because certain documents were returned to the Court. Rather, the case was dismissed for Edwards' failure, for more than one year, to prosecute the action, which included his failure to keep the court and defendants apprised of his address, appear for a deposition, or pay a sanction, despite being aware of the pending litigation. *See Selsky,* 2008 WL 190385, at *1–3. Even if Davis had complied with Edwards' forwarding request, the court's decision to dismiss the complaint for Edwards' "repeated and ongoing failures to fulfill his obligations to notify the [c]ourt and counsel of his address and to cooperate in discovery" would likely have remained unchanged. *Id.* at *3. The alleged failure to forward did not, therefore, cause "the dismissal of an otherwise meritorious legal claim." *Cancel,* 2001 WL 303713, at *4 (citation omitted).

Moreover, Edwards does not plead that Defendants blocked his outgoing legal mail in connection with the NDNY action. Indeed, Edwards could not assert such an argument, since, as Judge Scullin noted, he had previously mailed documents to the court during the pendency of his lawsuit. *See Selsky,* 2008 WL 190385, at *1–2. Accordingly, Edwards cannot establish the requisite injury needed to state a cause of action for the deprivation of his constitutional right of access to the courts. Edwards' mail tampering claims should therefore be dismissed.

**F. Denial of Required Food Portions**

Edwards alleges that on several occasions Defendants Lagos, Lewis, and Richardson deprived him of required food portions, including "prescribed therapeutic diet 'soy milk' " on April 19, 2008 (Compl.¶ 38), a second chicken patty on or around May 2008 ( *Id.* ¶ 43), a "morning meal" on July 31, 2008 ( *Id.* ¶ 53), and an "afternoon meal" on or around October 2008. ( *Id.* ¶ 90). Each of these claims should be dismissed. The Eighth Amendment requires that prisoners be provided with "nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it." *Robles v. Coughlin,* 725

Slip Copy, 2012 WL 760172 (S.D.N.Y.)

(Cite as: 2012 WL 760172 (S.D.N.Y.))

F.2d 12, 15 (2d Cir.1983) (per curiam) (quotation marks and citation omitted). Courts have found the Eighth Amendment to be implicated only where a prisoner's allegations involve a serious and continued deprivation of nutritionally adequate food. *See, e.g., Reeder v. Artus,* No. 09 Civ. 575(DNH)(DRH), 2010 WL 3636138, at *11 (N.D.N.Y. July 27, 2010) (seven out of twelve days without meals constituted sufficient deprivation to survive motion to dismiss) (Report and Recommendation), *adopted,* 2010 WL 3636132 (N.D.N.Y. Sept.9, 2010).

**\*9** Edwards does not allege that the alleged denials of food placed his health and well being in any immediate danger. *See, e.g., Martinez v. Lape,* No. 09 Civ. 0665(TJM)(RFT), 2011 WL 4527943, at *9 (N.D.N.Y. Mar. 28, 2011) (Report and Recommendation), *adopted,* 2011 WL 4528980 (N.D.N.Y. Sept.28, 2011) (no Eighth Amendment claim where inmate failed to allege how expired food and juice posed an immediate risk to health); *Bee v. Krupp,* No. 08 Civ. 10141(SHS)(KNF), 2009 WL 2981910, at *3 (S.D.N.Y. Sept. 15, 2009) ("visible globs of spit" in food did not violate Eighth Amendment). Nor do the allegations, which are alleged to have taken place on four separate dates over a span of six months, suggest that Edwards was in any danger. Accordingly, Edwards' claims regarding deprivation of meals should be dismissed.

**G. Unconstitutional Strip Search**

Edwards alleges that an unspecified officer subjected him to an "institutional" strip search on an unspecified date in violation of the Fourth Amendment. (Compl.¶ 13). Edwards argues that this strip search was unconstitutional because he was convicted of a misdemeanor and not a felony. (*Id.*). While the Fourth Amendment prohibits "unreasonable searches," *Bell v. Wolfish,* 441 U.S. 520, 558, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979) (citation omitted), it is not unreasonable for prison officials to perform routine random strip searches on prison inmates. *See N.G. v. Connecticut,* 382 F.3d 225, 230–32 (2d Cir.2004). Edwards' reliance on the distinction between inmates convicted of misdemeanors and those convicted of felonies is misplaced, as that distinction is only relevant as to pre-trial detainees. *See Shain v. Ellison,* 356 F.3d 211, 214 (2d Cir.2004) ("clearly established Fourth Amendment precedent ... preclude[s] jails from strip

searching misdemeanor arrestees absent a reasonable suspicion that weapons or other contraband were concealed"); *Walsh v. Franco,* 849 F.2d 66, 70 (2d Cir.1988) ("indiscriminate strip-searching of misdemeanor arrestees is unconstitutional"). Here, Edwards admits that he was convicted at the time of his strip search. (Compl.¶ 13). *See, e.g., Castro–Sanchez v. NY. State Dep't of Corr. Servs.,* No. 10 Civ. 8314(DLC), 2011 WL 6057837, at *8 (S.D.N.Y. Dec.6, 2011) (strip search claim dismissed because routine random searches of inmates are constitutional). Accordingly, Edwards' claim should be dismissed.

**H. Deprivation of Due Process Rights Within Prison's Disciplinary System**

Edwards alleges that he was denied certain rights during two disciplinary proceedings heard by Defendant Davis on September 30, 2008, which can be broadly construed as a claim asserting a deprivation of procedural due process under the Fourteenth Amendment. (Compl.¶¶ 86, 87b, 89, 95, 97–99). The disciplinary hearings appear to relate to Edwards' alleged violations of "numerous [ ] rules within the inmate misbehavior rule book" on September 20, 2008 and September 24, 2008. (*Id.* ¶¶ 86, 87). Edwards takes issue with several aspects of the disciplinary hearings, including that: (1) Davis found him guilty of the infraction without conducting an investigation into Edwards' claim that he never received a copy of the rule book ( *Id.* ¶ 86); (2) Davis failed to provide him with certain documentary evidence that "could have help [ed]" Edwards defend himself, including Edwards' "orange detention card," his "injury report," and a video tape of the alleged infraction (*Id.* ¶¶ 86, 87b); (3) no witnesses to Edwards' violations "endor[s]e[d]" the infraction against him ( *Id.* ¶ 87); and (4) Edwards never received responses to notices of appeal and letters submitted to Horn, Hourihan, Hunter, and Robinson regarding his fine and punitive segregation. (*Id.* ¶¶ 86, 87b, 89, 94–99). In addition, Edwards appears to challenge his resulting discipline, which included a $25.00 "surcharge" and 30 days of punitive segregation. (*Id.* ¶¶ 87, 87b).

**\*10** Edwards' cause of action for deprivation of his procedural due process rights fails because he does not allege sufficient facts to state an actionable claim. "In evaluating due process claims, the threshold issue is always whether the plaintiff has a property or liberty interest protected by the Constitution." *Perry v.*

Slip Copy, 2012 WL 760172 (S.D.N.Y.)

(Cite as: 2012 WL 760172 (S.D.N.Y.))

*McDonald,* 280 F.3d 159, 173 (2d Cir.2001) (citation and quotation marks omitted). Prisoners subject to disciplinary proceedings can show a liberty interest only where "an institution's disciplinary decision results in an 'atypical and significant hardship ... in relation to the ordinary incidents of prison life.' " *Luna v. Pico,* 356 F.3d 481, 487 n. 3 (2d Cir.2004) (quoting *Sandin v. Connor,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995)). In determining whether an inmate endured atypical and significant hardship during punitive segregation, the Second Circuit instructs courts to consider both the duration and conditions of the confinement. *See Palmer v. Richards,* 364 F.3d 60, 64 (2d Cir.2004) ("[f]actors relevant to determining" whether inmate endured atypical hardship include "the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions and the duration of the disciplinary segregation imposed compared to discretionary confinement") (quotation marks and citation omitted).

The Second Circuit has expressly declined to provide a bright-line rule as to what length of time in punitive confinement implicates a prisoner's constitutional rights; however, general guidelines have been defined. *See id.* Confinement for 101 days or fewer under typical punitive segregation conditions "generally do[es] not constitute 'atypical' conditions of confinement." *Bunting v. Nagy,* 452 F.Supp.2d 447, 456 (S.D.N.Y.2006) (quoting *Sealey v. Giltner,* 197 F.3d 578, 589 (2d Cir.1999)); *Colon v. Howard,* 215 F.3d 227, 231 (2d Cir.2000). By contrast, 305 days or more of confinement has been deemed an atypical and a significant hardship. *Id.* at 231–32. Even if an inmate is segregated for fewer than 101 days, a violation of his liberty interest may be implicated if "the conditions were more severe than the normal [punitive segregation] conditions ... or a more fully developed record showed that even relatively brief confinements under normal [punitive segregation] conditions were, in fact, atypical." *Davis v. Barrett,* 576 F.3d 129, 133 (2d Cir.2009) (quoting *Palmer,* 364 F.3d at 65); *see also Ortiz v. McBride,* 380 F.3d 649, 654–55 (2d Cir.2004). Indeed, " 'the conditions of confinement are a distinct and equally important consideration' in determining whether the prisoner has suffered a due process violation." *Sales v. Barizone,* No. 03 Civ. 6691(RJH), 2004 WL 2781752, at *6 (S.D.N.Y. Dec.2, 2004) (quoting *Palmer,* 364 F.3d at 64–65).

Here, Edwards claims that he was confined to punitive segregation for 30 days. Several courts have concluded that, absent unusual conditions, 30 days of segregation is not an atypical or significant hardship under *Sandin. See, e.g., Sandin,* 515 U.S. at 486 (30 days' disciplinary segregation not atypical and significant hardship); *Duncan v. Keane,* No. 95 Civ. 1090(SHS), 1997 WL 328070, at *2 (S.D.N.Y. June 13, 1997) (30 days in keeplock not atypical or significant hardship) (citation omitted); *Harris v. Keane,* 962 F.Supp. 397, 404 (S.D.N.Y.1997) (23 days in keeplock not atypical or significant hardship as "[t]he Second Circuit's post-*Sandin* decisions are unanimous that keeplock of 60 days or less in New York prisons is not an atypical hardship") (quotation marks and citations omitted); *Zamakshari v. Dvoskin,* 899 F.Supp. 1097, 1108 (S.D.N.Y.1995) (60 days in confinement does not implicate liberty interest). Given the duration of his segregation and Edwards' failure to allege that the conditions of his confinement were atypical and significant, Edwards' punishment does not implicate a liberty interest. Similarly, Edwards' $25.00 "surcharge" was not an atypical hardship. *See, e.g., Byrd v. Cornell Corr., Inc,* 60 F. App'x 191, 193–94 (10th Cir.2003) ( $50 fine and 30 days' segregation not atypical and significant hardship). Thus, neither Edwards' punitive segregation nor his $25 fine implicates the requisite liberty interest to state a due process claim.[FN11] Because of the absence of any protected liberty interest—and because Edwards' allegations cannot be construed to allege a protected property interest—any failures by the hearing officer to conduct a thorough investigation of Edwards' claims, including the provision of certain documentary evidence and witnesses, do not support a cause of action for the denial of due process. *See, e.g., Torres v. Mazzuca,* 246 F.Supp.2d 334, 341–42 (S.D.N.Y.2003) (inmate cannot claim due process violations at hearing where 12–day disciplinary confinement did not implicate protected liberty interest). Edwards' procedural due process claims should therefore be dismissed.

> FN11. Edwards also alleges a claim for the deprivation of his procedural due process rights in connection with a September 24, 2008 disciplinary hearing. This claim fails because

Slip Copy, 2012 WL 760172 (S.D.N.Y.)

(Cite as: 2012 WL 760172 (S.D.N.Y.))

Edwards cannot establish the requisite liberty interest, as he does not allege that he was subject to any discipline as a result of Davis' finding him guilty on September 24, 2008. (Compl.¶ 86).

Even if Edwards had alleged disciplinary confinement resulting from the September 28 hearing, and assuming that that confinement implicated a liberty interest under the Fourteenth Amendment, Edwards still cannot state a claim for deprivation of due process. Citing to the Notice of Disciplinary Disposition Form # 6500D attached to the Complaint (Dkt. No. 2–7 at 1), Edwards alleges that he was "never called down" for the hearing and that the hearing officer, Defendant Davis, was biased in favor of finding him guilty of the underlying infraction. (Compl.¶ 86). While an inmate "has a right to a fair and impartial hearing officer [,]" *Kalwasinski v. Morse,* 201 F.3d 103, 108 (2d Cir.1999) (citation omitted), and one who "does not prejudge the evidence[,]" *Patterson v. Coughlin,* 905 F.2d 564, 570 (2d Cir.1990), Edwards fails to plead any specific facts, beyond his conclusory allegation of bias, to suggest that Davis was predisposed to finding him guilty. Moreover, despite Edwards' claim that he was never called down for a disciplinary hearing, Edwards' signature appears next to a notation on the Form # 6500D that the hearing was adjourned by Edwards himself.

**I. Excessive Force and Denial of Required Medical Treatment**

**\*11** Edwards asserts two allegations of physical injury, which the Court construes as excessive force claims, and a related allegation that he was denied medical treatment. (Compl.¶¶ 91, 91b). Edwards asserts that on November 1, 2008, Defendant Grima hit him in the head with a "pushdraw" and then refused Edwards' request for medical treatment. (*Id.* ¶ 91). He also argues that Grima inflicted "personal physical harm" upon him after Grima pressed the "emergency personal alarm device." (*Id.* ¶ 91b). Neither of these claims should survive Defendants'

motion to dismiss.

The constitutional basis for Edwards' excessive force and deliberate indifference to medical needs claims is the Eighth Amendment's ban on cruel and unusual punishment. *See Graham v. Connor,* 490 U.S. 386, 394, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989); *Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998) (per curiam). Any actionable claim under the Eighth Amendment consists of a subjective component, which focuses on the defendant's motive for his conduct, and an objective component, which focuses on the conduct's effect. *See, e.g., Wright v. Goord,* 554 F.3d 255, 268 (2d Cir.2009). The subjective component "requires a showing that the defendant had the necessary level of culpability, shown by actions characterized by wantonness ..." *Id.* (citations and quotation marks omitted). In the excessive force context, this means "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian,* 503 U.S. 1, 6–7, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). In the medical needs context, the defendant must act with a "sufficiently culpable state of mind[,]" *Wilson v. Seiter,* 501 U.S. 294, 297, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991), which means that he must "know[ ] of and disregard[ ] an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). The Eighth Amendment's objective component "focuses on the harm done, in light of contemporary standards of decency" and whether "the alleged wrongdoing was objectively harmful enough to establish a constitutional violation." *Wright,* 554 F.3d at 268 (citations and quotation marks omitted). For deliberate indifference claims, "the alleged deprivation must be sufficiently serious ... that a condition of urgency, one that may produce death, degeneration, or extreme pain exists." *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996) (citations and quotation marks omitted).

Edwards' allegations of excessive force and denial of medical treatment fail to meet either the subjective or objective components under the Eighth Amendment. Both claims of excessive force are devoid of any specific information regarding the extent of a temporary or

Slip Copy, 2012 WL 760172 (S.D.N.Y.)

(Cite as: 2012 WL 760172 (S.D.N.Y.))

permanent injury, if any, and the level of pain that Edwards endured. The entirety of Edwards' first allegation of excessive force is that Grima "hit [him] in [the] head with the pushdraw that's part of the officers [sic] station" (Compl.¶ 91), which falls far short of what is needed to state a claim of excessive force. As to his second allegation, Edwards states only that Grima "caused [him] personal physical harm" after Grima pressed his "emergency personal alarm device[,]" but he fails to elaborate on what exactly Grima did, how and where it harmed Edwards, and what injury Edwards suffered. (*Id.* ¶ 91b). Edwards' medical treatment claims are similarly deficient, as he alleges only that Grima "said 'no' " after Edwards requested medical assistance and then sent Edwards away to pack up his belongings. (*Id.* ¶ 91). These allegations do not shed light on whether any injury that Edwards suffered was sufficiently serious to warrant medical attention, whether Grima knew of and disregarded an excessive risk to Edwards' health, or even whether there was any risk to Edwards' health. Accordingly, Edwards has failed to state claims for excessive force and denial of medical treatment, and those claims should be dismissed.

**J. Deprivation of Access to Prison Grievance System**

*\*12* Throughout the Complaint, Edwards claims that he submitted several grievance letters and complaints to numerous Defendants, who he alleges denied, ignored, never answered, and/or improperly processed his grievances on various dates from July 2007 through February 2009. (Compl.¶¶ 1–15, 17–20, 21–33, 36–39, 41–45, 48–51, 54–85, 88, 90, 91b, 92–94, 96). As one example, Edwards states that on September 18, 2007, he wrote a complaint letter to Defendant Horn about Defendant Rosa's use of her cellular phone while on duty, which caused a "security breach." (*Id.* ¶ 7). Edwards alleges that he was denied access to the grievance system because Defendant Mulvena failed to file that grievance (or any of his other grievances) and Defendant Horn did not follow up regarding the complaint. (*Id.*).

While a plaintiff has a right "to meaningful access to the court and to petition the government for the redress of grievances" under the First Amendment, *Shell v. Brzezniak,* 365 F.Supp.2d 362, 369–70 (W.D.N.Y.2005) (citation omitted), the failure to process a grievance does not rise to the level of a constitutional violation. *See, e.g.,*

*id.* at 370 ("inmate grievance programs created by state law are not required by the Constitution and consequently allegations that prison officials violated those procedures does not give rise to a cognizable [Section] 1983 claim") (citation omitted); *Torres,* 246 F.Supp.2d at 342 ("Prison grievance procedures do not confer any substantive right upon an inmate requiring the procedural protections envisioned by the Fourteenth Amendment.") (citations omitted); *Cancel,* 2001 WL 303713, at \*3–4 (violation of grievance procedures does not give rise to claim under First Amendment). Courts regularly dismiss claims brought to remedy alleged violations of inmate grievance procedures. *See, e.g ., id.; Muhammad v. McMickens,* No. 86 Civ. 7376(SWK), 1988 WL 7789, at \*3 (S.D.N.Y. Jan.25, 1998). Accordingly, because Edwards' claims for alleged violations of the inmate grievance process have no constitutional basis, those claims should be dismissed.[FN12]

FN12. Related to the allegations about the grievance system, Defendants also assert that Edwards' failure to allege personal involvement for Defendants Bailey (*Id.* ¶¶ 37, 41, 48, 52), Caruso (*Id.* ¶¶ 16, 27), Cattafesta ( *Id.* ¶ 80), Davis (*Id.* ¶¶ 13, 26, 47), Hill ( *Id.* ¶ 63), Horn (Compl.¶¶ 7, 9, 10, 12, 14–16, 21, 23, 25, 28, 29, 32–35, 39, 41–43, 45, 52, 59, 79, 97), Hourihan (*Id.* ¶¶ 50, 61, 66, 68, 77, 95, 98), Powell (*Id.* ¶¶ 57, 78), and Riordan ( *Id.* ¶ 6) provide an independent basis for dismissal. (Def. Mem. at 14–16). "It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [Section] 1983." *Farrell v. Burke,* 449 F.3d 470, 484 (2d Cir.2006) (citation and quotation marks omitted). An official's failure to respond to a prisoner's letter of protest and request for an investigation, as Edwards is alleging in his Complaint, "is insufficient to hold that official liable for the alleged violations." *Johnson v. Wright,* 234 F.Supp.2d 352, 363 (S.D.N.Y.2002) (citation and quotation marks omitted). Accordingly, Edwards' claims against these Defendants should be dismissed on this ground as well.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 760172 (S.D.N.Y.)

(Cite as: 2012 WL 760172 (S.D.N.Y.))

**K. Retaliation**

Edwards alleges that on 17 separate occasions between July 2007 and November 2008, Defendants Campfield, Grima, Hannah, Holmes, John Doe # 1, John Doe # 2, Lagos, Lee, Maynard, Polak, Richardson, Rosa, Shaw, Smalls, and Sumpter retaliated against him in response to his submitting, or informing Defendants that he intended to submit, grievance letters. Edwards' allegations of retaliation include the use of verbal threats or harassment, issuance of infractions, transfers between prison facilities, denials of meals, loss of legal documents, and termination from part-time employment he had while on Rikers Island.

To prove a First Amendment retaliation claim under Section 1983, a prisoner must show "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Dawes v. Walker,* 239 F.3d 489, 492 (2d Cir.2001) (citations omitted), *overruled on other grounds, Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002). For a retaliation claim to survive a motion to dismiss, it must be "supported by specific and detailed factual allegations, not stated in wholly conclusory terms." *Friedl v. City of New York,* 210 F.3d 79, 86 (2d Cir.2000) (citation and quotation marks omitted). An "unsupported, speculative, and conclusory" allegation of retaliatory conduct may be dismissed on the pleadings. *Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997) (citations and quotation marks omitted).

**\*13** In reviewing Edwards' retaliation claims, the Court is mindful that "[v]irtually every prisoner can assert such a claim as to every decision which he or she dislikes." *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983). Indeed, while the "First Amendment protects prisoners from retaliation for filing grievances[,]" *Quezada v. Ercole,* No. 09 Civ. 2832(DLC), 2011 WL 3251811, at *5 (S.D.N.Y. Jul.29, 2011) (citations omitted), the Court recognizes "the near inevitability of decisions and actions by prison officials to which prisoners will take exception and the ease with which claims of retaliation may be fabricated." *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) (citing *Flaherty,* 713 F.2d at 13). Moreover, courts should

carefully scrutinize an inmate's claims of retaliation because such allegations "pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration." *Hodges v. Wright,* No. 10 Civ. 0531(GLS)(GHL), 2011 WL 5554866, at *9 (N.D.N.Y. Sept. 29, 2011) (quoting *Dawes,* 239 F.3d at 491) (citations omitted) (Report and Recommendation), *adopted,* 2011 WL 5554880 (N.D.N.Y. Nov.15, 2011). Therefore, courts reviewing an inmate's retaliation claims should do so "with skepticism and particular care." *Colon,* 58 F.3d at 872 (citation omitted).

Edwards' allegations, in chronological order, are as follows: (1) in retaliation for submitting a grievance against Defendant Morales on July 25, 2007, Morales called Edwards' housing unit on August 1, 2007 and informed other officers that Edwards had a visitor, when in fact he did not, which caused him to wait in the inmate visitor process area for two hours (*Id.* ¶¶ 2, 4); (2) in retaliation for an incident where Defendant Hannah said she was made to apologize to Edwards for "making fun of [his] phsical [sic] disability/and deformity[,]" Hannah threatened Edwards on September 5, 2007 by saying "I'm going to get you back for that" (*Id.* ¶ 6); (3) in retaliation for filing a grievance against Defendant Rosa on September 18, 2007, Rosa fired Edwards from his job as a Suicide Prevention Aide and issued an infraction against him on October 31, 2007 (*Id.* ¶¶ 14–16); (4) on or around November 1, 2007, after Edwards informed Defendant Holmes that he intended to submit a grievance against her, Holmes caused Edwards to be transferred to another housing facility (*Id.* ¶ 17); (5) in retaliation for filing a grievance against Holmes on November 2, 2007, Holmes came to Edwards' housing unit and verbally abused him by "ridicul[ing] and mak[ing] fun of [his] physical disability and deformity" (*Id.* ¶ 19); (6) on or around November 15, 2007, in retaliation for filing a grievance against Rosa, Rosa informed John Doe officers that Edwards "like[s] to utilize the grievance mechanism against staff [,]" subsequent to which Edwards was subjected to an unauthorized transfer from "6–Lower" to "7–Lower" in the EMTC (*Id.* ¶ 20); (7) on or around November 25, 2007, in retaliation for Edwards' filing a grievance against Rosa, Defendants Hernandez and Smith retaliated against Edwards by informing another inmate that Edwards was a "snitch," which "cause[d] [Edwards] physical harm by

Slip Copy, 2012 WL 760172 (S.D.N.Y.)

(Cite as: 2012 WL 760172 (S.D.N.Y.))

other inmate's [sic] within [the] housing unit" (*Id.* ¶¶ 24, 26); (8) in retaliation for submitting a grievance against Defendants Campfield and Reyes on or around March 22, 2008, Defendant Shaw had Edwards transferred out of the GRVC on March 25, 2008 ( *Id.* ¶ 34); (9) on or around April 1, 2008, in retaliation for submitting a grievance against her, Campfield intentionally lost Edwards' legal documents relating to the NDNY action ( *Id.* ¶ 36); (10) after filing a grievance on June 27, 2008, Edwards was transferred out of the GMDC that same day, which he says was approved by Defendant Bailey (*Id.* ¶¶ 48, 52); (11) after Edwards informed Defendant Richardson that he planned to file a grievance against her because she refused to turn off the lights in his jail cell on July 30, 2008, Richardson retaliated by denying Edwards his "morning meal" on July 31, 2008 ( *Id.* ¶ 53); (12) in retaliation for filing a grievance against him, Richardson put a "hit out" by offering 20 boxes of Frosted Flakes cereal to any inmate that physically assaulted Edwards, for which Edwards filed a grievance on August 7, 2008 ( *Id.* ¶ 55); (13) on August 18, 2008, in retaliation for informing a supervisor that Defendant Smalls was "only providing certain detainees with options on the hour every hour" in the law library, Smalls verbally abused Edwards (*Id.* ¶ 61); (14) on or around August 25, 2008, in retaliation for Edwards' use of the grievance mechanism against her, Defendant Smalls retaliated against Edwards through verbal abuse, threatening to have Edwards transferred, and informing other inmates that Edwards uses the grievance process ( *Id.* ¶ 66); (15) on or around September 24, 2008, in retaliation for filing numerous grievances against them, Defendants Maynard and Musmacher conspired to retaliate against Edwards by threatening physical violence and issuing an infraction, which resulted in a disciplinary hearing on September 30, 2008 (*Id.* ¶¶ 83, 87, 87b); (16) after Edwards informed Defendant Lagos on October 17, 2008 that he planned to file a grievance against her because of alleged racial discrimination, Lagos retaliated by denying Edwards his "afternoon meal" on October 18, 2008 ( *Id.* ¶ 90); and (17) after Edwards informed Defendant Grima that he intended to submit a grievance about his alleged physical assault with a "pushdraw" on November 1, 2008, Grima retaliated by threatening physical harm, pressing his "emergency personal alarm device," issuing an infraction, and causing Edwards to be transferred to a new housing unit (*Id.* ¶¶ 91, 91b).

## 1. Protected Activity

**\*14** It is well-established that "retaliation against a prisoner for pursuing a grievance violates the right to petition government for the redress of grievances" and is therefore actionable under Section 1983. *Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir.1996) (citation omitted); *see, e.g., Mateo v. Fischer,* 682 F.Supp.2d 423, 433–34 (S.D.N.Y.2010) (filing of a grievance is a protected activity). However, expressing an intent to engage in a constitutionally protected activity—in this case, filing a grievance—is not protected activity. *See Henry v. Dinelle,* No. 09 Civ. 0456(GTS)(DEP), 2011 WL 5975027, at *7 n. 12 (citing cases) & n. 13 (N.D.N.Y. Nov. 29, 2011) ("Hoping to engage in constitutionally protected activity is not itself constitutionally protected activity. At most, petitioner's actions could be construed as a 'threat' to assert his rights but that is not enough.") (citing *McKinnie v. Heisz,* No. 09 Civ. 0188(BBC), 2009 WL 1455489, at *11 (W.D.Wis. May 7, 2009)). In light of these principles, Edwards' allegations of retaliation in response to his submitting grievance letters constitute protected activities. However, Edwards' allegations of retaliatory conduct arising from his expressing an intent to file a grievance—those allegations occurring on or about November 1, 2007 (Compl.¶ 17), July 31, 2008 ( *Id.* ¶ 53), October 18, 2008 ( *Id.* ¶ 90), and November 1, 2008 (*Id.* ¶¶ 91, 91b)-are not protected activities and therefore cannot form the basis of a claim for retaliation.[FN13]

> FN13. Moreover, of the four allegations of retaliation that are not based on protected activities, two cannot be considered adverse actions-concerning Defendant Richardson on July 31, 2008 (Compl.¶ 53) and Defendant Lagos on October 18, 2008 ( *Id.* ¶ 90)-because both of these allege that these Defendants retaliated against Edwards by denying him a meal. The denial of meals on two occasions, separated by more than three months, is *de minimis* and not actionable. *See, e.g., Snyder v. McGinnis,* No. 03 Civ. 0902E (WMS), 2004 WL 1949472, at *11 (W.D.N.Y. Sept.2, 2004) (denial of food to plaintiff two times would not chill First Amendment activity).

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 760172 (S.D.N.Y.)

(Cite as: 2012 WL 760172 (S.D.N.Y.))

## 2. Adverse Actions

Having determined that four of Edwards' allegations of retaliation fail because he was not engaged in a constitutionally protected activity, the Court now considers whether the remaining 13 allegations meet the adverse action requirement. "[I]n the prison context [the Second Circuit has] defined 'adverse action' objectively, as retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights." *Gill v. Pidlypchak,* 389 F.3d 379, 381 (2d Cir.2004) (citations and quotation marks omitted). An inmate can meet this requirement by "alleging a serious injury that is independent of a possible First Amendment chill, or by alleging that he has been chilled from engaging in the First Amendment activities that triggered the retaliation." *Smith v. Maypes–Rhynders,* No. 07 Civ. 11241(PAC)(MHD), 2009 WL 874439, at *4 (S.D.N.Y. Mar. 31, 2009). "Otherwise, the retaliatory act is simply *de minimis* and therefore outside the ambit of constitutional protection." *Dawes,* 239 F.3d at 493 (citation omitted). "[T]his objective test applies even where a particular plaintiff was not himself subjectively deterred; that is, where he continued to file grievances and lawsuits." *Gill,* 389 F.3d at 381. In applying this objective test to determine whether conduct is *de minimis,* the Court must consider that "[p]risoners may be required to tolerate more ... than average citizens, before a [retaliatory] action taken against them is considered adverse." *Davis,* 320 F.3d at 353 (citation and quotation marks omitted).

### a. Retaliatory Verbal Abuse

**\*15** Several of Edwards' allegations of retaliation are based on verbal harassment, abuse, or threats. (*See* Compl. ¶¶ 2, 4, 6 ("I'm going to get you back for that."), 19, 24 (calling Edwards a "snitch"), 26, 55 (putting a "hit out" on Edwards to any inmate that "fucks Edwards up"), 61 (calling Edwards a "crackhead" and "one arm faggot"), 66). While "some verbal threats, even if not serious enough to implicate the Eighth Amendment, can constitute an adverse action[,]" *Mateo,* 682 F.Supp.2d at 434 (citations omitted), "[n]on-specific verbal threats, harassing comments and hostile behavior do not constitute adverse actions sufficient to state a retaliation claim." *Ross v. Westchester Cnty. Jail,* No. 10 Civ. 3937(DLC), 2012 WL 86467, at *7 (S.D.N.Y. Jan.11, 2012). "[V]erbal threats may constitute adverse action, though whether they

constitute adverse action seems to depend on their specificity and the context in which they are uttered." *Hofelich v. Ercole,* No. 06 Civ. 13697(PKC), 2010 WL 1459740, at *2 (S.D.N.Y. Apr.8, 2010) (citation and quotation marks omitted).

Here, Edwards' claims of retaliatory verbal abuse do not include any allegations of harm, nor are they alleged with any specificity to suggest that they would deter others from exercising their constitutional rights. Several of his claims allege only that Edwards was forced to endure verbal abuse, but do not explain what was said and why that abuse was in any way adverse. And where Edwards has detailed the nature of the verbal abuse, his allegations are either *de minimis*—for example, in the case of being told he had a visitor when he in fact did not—amount to name-calling, or are insufficiently direct or specific to be adverse. *See, e.g., Dawes,* 239 F.3d at 492–93 (referring to plaintiff as an "informant" and "rat" in presence of other inmates not an adverse action); *Cuoco v. Moritsugu,* 222 F.3d 99, 109 (2d Cir.2000) (referring to transsexual inmate as "he/she" was "rudeness and name-calling" but not a constitutional violation); *Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986) (per curiam) (name-calling, without any appreciable injury, not a constitutional violation); *Kemp v. LeClaire,* No. 03 Civ. 844S (WMS), 2007 WL 776416, at *15 (W.D.N.Y. Mar.12, 2007) (threats of "your day is coming," "you'll be sent to your mother in a black box," and "you'll get your black ass kicked" not adverse actions); *Battice,* 2006 WL 2190565, at *6–7 (defendant's making fun of plaintiff's disability does not constitute adverse action). Accordingly, Edwards' charges of retaliation that allege only retaliatory verbal abuse—on August 1, 2007 (Compl.¶¶ 2, 4), September 5, 2007 (*Id.* ¶ 6), November 2, 2007 (*Id.* ¶ 19), November 25, 2007 (*Id.* ¶¶ 24, 26), August 7, 2008 (*Id* . ¶ 55), August 18, 2008 (*Id.* ¶ 61), and August 25, 2008 (*Id.* ¶ 66)—should be dismissed.

### b. Retaliatory Loss of Legal Documents

**\*16** Courts have held that theft, confiscation, or destruction of an inmate's legal documents may constitute an adverse action. *See, e .g., Smith,* 2009 WL 874439, at *5 (theft of legal papers is adverse action). However, "mere delays in the transfer of [an inmate's] legal papers, even if motivated by retaliation, is not the type of adverse

Slip Copy, 2012 WL 760172 (S.D.N.Y.)

(Cite as: 2012 WL 760172 (S.D.N.Y.))

action required to support a retaliation claim." *Ford v. Fischer,* No. 09 Civ. 723(DNH)(ATB), 2011 WL 856416, at *8 (N.D.N.Y. Jan. 31, 2011); *see, e.g., Rivera v. Pataki,* No. 04 Civ. 1286(MBM), 2005 WL 407710, at *19 (S.D.N.Y. Feb.7, 2005) (several temporary incidents of interference with plaintiff's legal documents not an adverse action. Here, because Edwards has pled an injury in connection with this allegation—Defendant Campfield's allegedly retaliatory loss of his legal documents prevented him from prosecuting the NDNY action (Compl.¶ 36), which was subsequently dismissed for failure to prosecute, *see Selsky,* 2008 WL 190385, at *1—it contains sufficient facts to constitute an adverse action.

**c. Retaliatory Filing of Infractions**

Edwards alleges that Defendants Maynard, Musmacher, and Rosa issued false infractions against him on or about October 31, 2007 (Compl. ¶¶ 14–16; Dkt. No. 2–6 at 18) and September 24, 2008 (*Id.* 83, 87, 87b) in retaliation for filing grievances. While an "inmate has no general constitutional right to be free from being falsely accused in a misbehavior report[,]" *Boddie,* 105 F.3d at 862, a misbehavior report issued in retaliation for an inmate's exercise of a protected activity may constitute an adverse action. *See Gayle v. Gonyea,* 313 F.3d 677, 682 (2d Cir.2002) ("An allegation that a prison official filed false disciplinary charges in retaliation for the exercise of a constitutionally protected right, such as the filing of a grievance, states a claim under [Section] 1983.") (citation omitted); *see, e. g., Gill,* 389 F.3d at 384 (false misbehavior report and placement in keeplock constitutes adverse action); *Mateo,* 682 F.Supp.2d at 434 (false misbehavior report constitutes adverse action). Accordingly, Edwards' allegations that these Defendants filed false retaliatory infractions against him are sufficient to plead an adverse action.

**d. Retaliatory Transfers**

Edwards' allegations that Defendants Bailey, Bethacourt, Hannah, John Doe # 1, John Doe # 2, Rosa, and Shaw transferred Edwards between prison facilities in retaliation for submitting grievances are also sufficient to establish an adverse action at the motion to dismiss stage. (*See* Compl. ¶¶ 20, 34, 48, 52). While a "prisoner has no liberty interest in remaining at a particular correctional facility ... prison authorities may not transfer [him] in retaliation for the exercise of constitutionally protected

rights." *Davis v. Kelly,* 160 F.3d 917, 920 (2d Cir.1998) (citations omitted); *see, e.g., Soto v. Iacavino,* No. 01 Civ. 5850(JSM), 2003 WL 21281762, at *2 (S.D.N.Y. June 4, 2003) (prison housing transfer is adverse action for retaliation claim).

**e. Retaliatory Termination**

**\*17** Finally, Edwards' allegation that Defendant Rosa fired him from his position as a Suicide Prevention Aide states sufficient facts to constitute an adverse action. (Compl. ¶¶ 14–16; Dkt. No. 2–6 at 18). "[A] claim for relief may be stated under [S]ection 1983 if otherwise routine administrative decisions are made in retaliation for the exercise of constitutionally protected rights." *Gill v. Mooney,* 824 F.2d 192, 194 (2d Cir.1987) (citation omitted). More specifically, an inmate can bring a claim under Section 1983 for termination of employment in retaliation for his exercise of constitutionally protected rights. *See, e.g., Baker v. Zlochowon,* 741 F.Supp. 436, 439 (S.D.N.Y.1990). The termination of Edwards' job, if found to be retaliatory, could serve to "chill a person of ordinary firmness from continuing to engage" in a protected activity. *Thaddeus–X v. Blatter,* 175 F.3d 378, 397 (6th Cir.1999) (quoted in *Davis,* 320 F.3d at 353).

**3. Causal Connection**

Of his six allegations of retaliation that meet the adverse action requirement—those dated October 31, 2007, November 15, 2007, March 25, 2008, April 1, 2008, June 27, 2008, and September 24, 2008—all but one should be dismissed. Edwards has not alleged any facts, as he must, that his filing of grievances was a "substantial or motivating factor" for Defendants' actions. *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003) (citations omitted). In addressing the causal connection requirement, a court may consider: (1) the temporal proximity between the protected conduct and the alleged retaliatory act, (2) the inmate's prior disciplinary record, (3) vindication at a hearing on the matter, and (4) any statements by the defendants regarding their motives. *See Colon,* 58 F.3d at 872–73. However, "a complaint which alleges retaliation in wholly conclusory terms may safely be dismissed on the pleadings alone." *Flaherty,* 713 F.2d at 13.

With the exception of his claim arising on October 31, 2007, Edwards' allegations of retaliation are wholly conclusory. Edwards does not set forth any specific facts,

Page 17

Slip Copy, 2012 WL 760172 (S.D.N.Y.)

(Cite as: 2012 WL 760172 (S.D.N.Y.))

other than his repeated use of the word "retaliation," to support his suspicion of retaliation or to suggest that Defendants were motivated in any way by Edwards' filing grievance letters. On several occasions, Edwards appears to rely on the mere fact that the purported adverse actions took place after he filed a grievance. To infer causation from the very fact that one activity preceded another, however, is insufficient here to adequately plead retaliatory intent. Temporal proximity may serve as circumstantial evidence of retaliation, *see, e.g., Colon, 58 F.3d at 872,* and the Second Circuit has found that such proximity can establish causality. *See Espinal v. Goord, 558 F.3d 119, 129–30 (2d Cir.2009)* (causal connection present where six months passed between protected activity and retaliatory beating); but see *Sloane v. Mazzuca, No. 04 Civ. 8266(KMK), 2006 WL 3096031, at *14 (S.D.N.Y. Oct.31, 2006)* (temporal proximity insufficient by itself to prove causation) (citations omitted); *Nunez v. Goord, 172 F.Supp.2d 417, 431–32 (S.D.N.Y.2001)* (same). But in this case, Edwards' reliance on temporal proximity does not make his claims plausible, as he fails to differentiate between his seemingly innumerable grievances or provide specific factual allegations, including but not limited to concrete dates, that might demonstrate a specific grievance and a specific adverse action. *See, e.g., Andino v. Fischer, 698 F.Supp.2d 362, 385 (S.D.N.Y.2010)* (proximity between complaints and adverse actions the result of large number of grievances in short period of time).

**\*18** In addition to Edwards' failure to plead any facts suggesting retaliation, the facts that Edwards chose to include in the Complaint suggest a relationship between protected activity and adverse action that is too attenuated to plausibly constitute causation. For example, Edwards theorizes that on November 15, 2007 he was transferred by Defendant John Doe # 2 in retaliation for filing a grievance against Rosa, after Rosa informed John Doe # 1, who then informed John Doe # 2, of Edwards' use of the grievance mechanism. (Compl.¶ 20). However, absent any additional information, such as corroborating statements from other officers or inmates, it is simply not plausible to impute a retaliatory motive to John Doe # 2 by way of John Doe # 1 and Rosa. Edwards' allegations of March 25, 2008 suffer the same deficiency, as he aims to pin a

retaliatory motive not on the target of his protected activity, but on an entirely different Defendant. ( *Id.* ¶ 34). Apart from any apparent temporal proximity, therefore, Edwards' allegations are wholly conclusory and should be dismissed. *See, e .g., Sioleski v. McGrain, No. 10 Civ. 0665S (WMS), 2012 WL 32423, at *4 (W.D.N.Y. Jan.5, 2012); Douglas v. Smith, No. 05 Civ. 1000(LEK)(DRH), 2008 WL 434605, at *15 (N.D.N.Y. Feb. 14, 2008).*

By contrast, Edwards is able to state an actionable claim of retaliatory termination against Rosa based on his allegations of October 31, 2007. Edwards states that on September 18, 2007, he submitted a grievance letter regarding Defendant Rosa's alleged use of her personal cell phone while on duty, which Edwards contends is a "security breach." (Compl.¶ 7). Then, on October 31, 2007, while he was working as a Suicide Prevention Aide, Edwards alleges that Rosa stated, "Watch your mouth boy before I write you. You like writing anyway." (Dkt. No. 2–6 at 18). Edwards asked another officer for a grievance form, intending to submit another grievance against Rosa, at which point Rosa stated: "What lies are you going to write on me now stupid nigger. The cellphone lie didn't work nigger. All you are is nigger is a snitch don't worry, you're going to get yours. I'm going to make sure you get fuck up nigger." (*Id.*). Moments later, Rosa returned and asked for Edwards' identification card, stating, "I'm writing you up nigger. Two can play that game and also nigger you're fired. Morales get this nigger out of here now." (*Id.*).

These statements clearly suggest a retaliatory animus. *See, e.g., Baskerville v. Blot, 224 F.Supp.2d 723, 732–33 (S.D.N.Y.2002)* (defendant's comments during assault point to retaliatory animus). In mentioning the "cellphone lie," which likely refers to Edwards' September 18 grievance about Rosa's use of her personal cell phone, Rosa's comments establish a clear causal link between Edwards' protected activity and Rosa's decision to terminate Edwards from his job and issue an infraction against him. *See, e.g., Headley v. Fisher, No. 06 Civ. 6331(PAC)(KNF), 2008 WL 1990771, at *18 (S.D.N.Y. May 7, 2008)* (causal connection exists where officer referred to protected activity during retaliatory assault). Accordingly, Edwards has stated a plausible claim of retaliatory termination against Rosa, and Defendants'

Slip Copy, 2012 WL 760172 (S.D.N.Y.)

(Cite as: 2012 WL 760172 (S.D.N.Y.))

motion to dismiss that claim should be denied.

**L. Conspiracy**

*19 Edwards alleges four conspiracy claims pursuant to 42 U.S.C. §§ 1983, 1985, and 1986, specifically that (1) on October 31 and November 1, 2007, Rosa and Polak conspired to fire Edwards from his job as a Suicide Prevention Aide and issue an infraction against him (Compl.¶¶ 14–16); (2) as described in a complaint letter dated July 10, 2008, Defendant Johnson conspired with "the security staff to violate Edwards" constitutional rights by not filing his grievances ( *Id.* ¶ 50); (3) as described in a complaint letter dated August 28, 2008, Defendants Johnson and Sumpter conspired to deny Edwards access to the prison's grievance system ( *Id.* ¶ 69); and (4) as described in a September 24, 2008 grievance letter, Defendants Maynard and Musmacher conspired to issue threats of physical violence and submit a false infraction against Edwards. (*Id.* ¶ 83).

**1. Conspiracy Under Section 1983**

To state a conspiracy claim under Section 1983, a plaintiff must show "(1) an agreement between [two or more state actors or] a state actor and a private party; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Ciambriello v. Cnty. of Nassau,* 292 F.3d 307, 324–25 (2d Cir.2002) (citing *Pangburn v. Culbertson,* 200 F.3d 65, 72 (2d Cir.1999)). "[A] plaintiff must show that defendants acted in a willful manner, culminating in an agreement, understanding, or meeting of the minds, that violated [his] rights, privileges or immunities secured by the Constitution or federal courts." *Bussev v. Phillips,* 419 F.Supp.2d 569, 586–87 (S.D.N.Y.2006) (quotation marks and citations omitted). "[C]omplaints containing only conclusory, vague, or general allegations [of conspiracy] ... are properly dismissed; diffuse and expansive allegations are insufficient, unless amplified by specific instances of misconduct." *Ciambriello,* 292 F.3d at 325 (citation and quotation marks omitted). Finally, "[a] violated constitutional right is a natural prerequisite to a claim of conspiracy to violate such right." *Romer v. Morgenthau,* 119 F.Supp.2d 346, 363 (S.D.N.Y.2000) (citation omitted). If a plaintiff fails to show an underlying constitutional violation on which to base a Section 1983 conspiracy claim, the conspiracy claim fails as a matter of

law. *See, e.g., AK Tournament Play, Inc. v. Town of Wallkill,* No. 09 Civ. 10579(LAP), 2011 WL 197216, at *3–4 (S.D.N.Y. Jan.19, 2011), aff'd, 444 F. App'x 475 (2d Cir.2011).

Each of Edwards' conspiracy claims should be dismissed because he has failed to state any underlying constitutional violations, with the exception of his retaliatory termination claim against Rosa. Moreover, even if the Court were to find that Edwards could state plausible constitutional claims as a predicate for conspiracy, he fails to state any non-conclusory allegations pertaining to the existence of a conspiracy, a meeting of the minds to support a conspiracy claim, or any overt acts which would suggest the existence of a conspiracy. Edwards' statements that certain Defendants "conspired" with others is not, by itself, sufficient to state an actionable claim for conspiracy. *See Nealy v. Berger,* No. 08 Civ. 1322(JFB)(AKT), 2009 WL 704804, at *5 (E.D.N.Y. Mar. 16, 2009) ("The mere use of the term 'conspiracy' ... is clearly insufficient to satisfy Rule 12(b)(6) in connection with a Section 1983 conspiracy claim.") (citation omitted). The only claim for which Edwards alleges any facts is that Rosa and Polak conspired to retaliate against him. However, the statements that he attributes to Polak—"my girl said you are fired" and "you are not getting your job back" (Compl.¶ 15)—do not suggest any understanding, agreement, or meeting of the minds between these two Defendants. Polak's reinforcement of Rosa's decision to fire Edwards, at best, suggests only that Polak sided with Rosa's decision, but it is not sufficient to state a conspiracy claim. Absent any actionable allegations of a conspiratorial understanding between Polak and Rosa, Edwards' conspiracy claims fail.

**2. Conspiracy Under Section 1985**

*20 42 U.S.C. § 1985(2) and (3) also provide relief for claims of conspiracy. To plead a claim under Section 1985(2), a plaintiff must show "(1) a conspiracy (2) for the purpose of impeding, hindering, obstructing, or defeating, in any manner, (3) the due course of justice in any State or Territory, (4) with intent to deny to any citizen the equal protection of the laws, or to injure him or his property for lawfully enforcing, or attempting to enforce, the right of any person, or class of persons, to the equal protection of the laws." *Rodriguez v. City of New York,* No. 05 Civ.

Page 19

Slip Copy, 2012 WL 760172 (S.D.N.Y.)

(Cite as: 2012 WL 760172 (S.D.N.Y.))

10682(PKC) (FM), 2008 WL 4410089, at *15 (S.D.N.Y. Sept. 25, 2008) (citing 42 U .S.C. § 1985(2)). The elements of a claim under Section 1985(3) are: " '(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of equal protection of the laws, ...; (3) an act in furtherance of the conspiracy; (4) whereby a person is ... deprived of any right of a citizen of the United States.' " *Id.* (quoting *Brown v. City of Oneonta,* 221 F.3d 329, 341 (2d Cir.2000)).

As with Section 1983 conspiracy claims, Section 1985 claims require a showing of an underlying constitutional violation. *See, e.g., Okoh v. Sullivan,* No. 10 Civ. 2547(SAS), 2011 WL 672420, at *4 (S.D.N.Y. Feb.24, 2011), *aff'd,* 441 F. App'x 813 (2d Cir.2011); *Bishop v. Best Buy, Co.,* No. 08 Civ. 8427(LBS), 2010 WL 4159566, at *13 (S.D.N.Y. Oct.13, 2010). Because Edwards has not set forth sufficient facts to state any constitutional violations, with the exception of his retaliatory termination claim against Rosa, his Section 1985 claims should be dismissed as well. Even if the Court were to find any underlying constitutional violations, including the surviving retaliation claim, the Section 1985 claims should be dismissed because Edwards has failed to allege any facts, as he must, that Defendants' conspiracies were motivated not by any personal malice of the conspirators toward him, but rather by " 'some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' animus.' " *United Bhd. of Carpenters, Local 610 v. Scott,* 463 U.S. 825, 828–29, 103 S.Ct. 3352, 77 L.Ed.2d 1049 (1983) (citation omitted); *accord Mian v. Donaldson, Lufkin & Jenrette Secs. Corp.,* 7 F.3d 1085, 1088 (2d Cir.1993) (per curiam); *Okoh,* 2011 WL 672420, at *6.

### 3. Conspiracy Under Section 1986

To state a claim under Section 1986, a plaintiff must state a valid claim under Section 1985. "Section 1986 imposes liability on individuals who have knowledge of a conspiracy under [Section] 1985, but fail to take action to prevent them." *Jenkins v. N.Y. City Dep't of Educ.,* No. 10 Civ. 6159(BSJ)(THK), 2011 WL 5451711, at *5 (S.D.N.Y. Nov. 9, 2011) (citing 42 U.S.C. § 1986). A Section 1986 claim "must be predicated upon a valid [Section] 1985 claim." *Brown,* 221 F.3d at 341 (citation and quotation marks omitted). Because Edwards fails to

state a claim under Section 1985 and otherwise fails to make any allegations that certain Defendants had knowledge of a conspiracy but failed to prevent it, the Court should also dismiss his Section 1986 claim.

### M. Disability Discrimination Claim

**\*21** Edwards asserts that on five occasions he was discriminated against on the basis of an alleged disability in violation of Title II of the ADA. (Compl. ¶¶ 6, 17, 19, 30, 61). To state a claim under Title II, which applies to inmates in state prisons, *see United States v. Georgia* 546 U.S. 151, 153, 126 S.Ct. 877, 163 L.Ed.2d 650 (2006), a prisoner must show: (1) "he is a 'qualified individual' with a disability"; (2) "he was excluded from participation in a public entity's services, programs or activities or was otherwise discriminated against by a public entity"; and (3) "such exclusion or discrimination was due to his disability." *Phelan v. Thomas,* 439 F. App'x 48, 50 (2d Cir.2011) (citing *Hargrave v. Vermont,* 340 F.3d 27, 34–35 (2d Cir.2003)); *see* 42 U.S.C. § 12132.

Although Defendants have moved to dismiss the Complaint in its "entirety" (Def. Mem. at 49), they have failed to offer any specific arguments to dismiss Edwards' ADA claims. (*See* Def. Mem. at 3). Nevertheless, these claims should be dismissed. It appears from the Complaint that Edwards' alleged disability is that one of his arms is significantly shorter than the other, and his discrimination claims arise from Defendants' comments allegedly mocking this deformity. Leaving aside the question of whether Edwards' deformity falls under the ADA's definition of disability, Edwards fails to state that Defendants excluded him from participating in, or denied him the benefit of, any particular activity as a result of his alleged disability. Edwards' allegations of objectionable language are not sufficient to state a claim under the ADA.

### N. Edwards' Potential Recovery Is Limited to Nominal or Punitive Damages From Rosa

In his Complaint, Edwards seeks both money damages and injunctive relief. (Compl.¶ V). However, because of qualified immunity, Edwards can only obtain monetary damages from Defendant Rosa and, because of the PLRA, that recovery is limited to nominal or punitive damages. In addition, Edwards' request for injunctive relief is moot because he is no longer in prison.

### 1. Qualified Immunity Precludes Money Damages,

Slip Copy, 2012 WL 760172 (S.D.N.Y.)

(Cite as: 2012 WL 760172 (S.D.N.Y.))

**Except From Rosa**

Qualified immunity provides a basis to preclude monetary damages, but not injunctive relief. *See Morse v. Frederick,* 551 U.S. 393, 432, 127 S.Ct. 2618, 168 L.Ed.2d 290 (2007) (citation omitted). "Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd,* ––– U.S. ––––, ––––, 131 S.Ct. 2074, 2080, 179 L.Ed.2d 1149 (2011) (citing *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). A state actor is afforded qualified immunity if either "(a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." *Johnson v. Newburgh Enlarged Sch. Dist.,* 239 F.3d 246, 250 (2d Cir.2001) (citations and quotation marks omitted). Because Edwards has failed to plead facts showing that Defendants violated any constitutional right, with the exception of his claim for retaliatory termination against Rosa, Defendants are entitled to qualified immunity for each of Edwards's claims.

**\*22** However, as to Edwards' surviving retaliation claim, Defendant Rosa is not entitled to qualified immunity. Courts have long recognized, well before the time of Edwards' allegations, that inmates have a constitutional right to seek redress of grievances without suffering retaliation. *See Franco v. Kelly,* 854 F.2d 584, 589 (2d Cir.1988); *see, e.g., Baskerville,* 224 F.Supp.2d at 737–38 (no qualified immunity for retaliation claim because right to file grievances without retaliation is well-established); *Wells v. Wade,* 36 F.Supp.2d 154, 160 (S.D.N.Y.1999) (same). Here, Edwards has alleged intentional conduct by Rosa in response to a protected activity, adequately stating a cause of action for retaliation. Moreover, Defendants have offered no argument that Rosa's conduct was objectively reasonable. Accordingly, at the pleading stage, Rosa is not entitled to qualified immunity from monetary damages on Edwards' retaliatory termination claim against her.

**2. Any Money Damages from Rosa Are Limited to Nominal or Punitive Damages**

In light of the qualified immunity finding above,

Edwards' recovery of monetary damages, if any, is limited to Rosa. Because of the PLRA's physical injury requirement, however, that recovery from Rosa cannot include compensatory damages. Defendants argue that all of Edwards' claims are barred by the PLRA because he does not allege that he has suffered any physical injury. (Def. Mem. at 46–48). Section 1997e(e) of the PLRA provides that " '[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury.' " *Thompson v. Carter,* 284 F.3d 411, 416 (2d Cir.2002) (quoting 42 U.S.C. § 1997e(e)). The term "physical injury" is not statutorily defined; however, the injury complained of must be more than *de minimis* to meet the requirements of § 1997e(e). *See Liner v. Goord,* 196 F.3d 132, 135 (2d Cir.1999). Therefore, in the absence of a showing of physical injury, a prisoner cannot recover compensatory damages for mental or emotional injury. *Thompson,* 284 F.3d at 417. To recover punitive or nominal damages, however, a prisoner need not allege that he has sustained a physical injury. *Id.,* at 418; *see also Abreu v. Nicholls,* No. 04 Civ. 7778(DAB)(GWG), 2011 WL 1044373, at \*4 (S.D.N.Y. Mar. 22, 2011) (Report and Recommendation); *Walker v. Shaw,* No. 08 Civ. 10043(CM), 2010 WL 2541711, at \*15 (S.D.N.Y. June 23, 2010) (citing *Robinson v. Cattaraugus,* 147 F.3d 153, 162 (2d Cir.1998)).

Edwards does not allege that he has suffered any physical injury as a result of his alleged constitutional violations, including his allegation of excessive force, which does not mention any temporary or permanent physical injury as a result of Defendants' actions. *See supra* Section ILL The only injuries that Edwards complains about are the "loss of amenity" and "limited liberty" as a result of his segregated confinement, and emotional distress arising from the "embarrass[ment]" caused by Defendants' ridiculing his physical deformity. (Compl.¶ V). Neither of these injuries constitutes a physical injury under the PLRA. *See, e.g., Henry,* 2011 WL 3295986, at \*4 (no physical injury where inmate complained of embarrassment); *Wilson v. Phoenix House,* No. 10 Civ. 7364(DLC), 2011 WL 3273179, at \*3 (S.D.N.Y. Aug.1, 2011) (confinement not enough, by itself, to fulfill physical injury requirement). Accordingly, in the absence of any allegations of physical injury,

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 760172 (S.D.N.Y.)

(Cite as: 2012 WL 760172 (S.D.N.Y.))

Edwards' claims against Defendants (including his surviving retaliation claim against Rosa) should be dismissed insofar as he seeks compensatory damages, and he should be limited to seeking nominal or punitive damages from Rosa. *See, e.g., Brummell v. Stewart,* No. 09 Civ. 10326(PAC)(FM), 2011 WL 1306170, at *4 (S.D.N.Y. Mar. 24, 2011) (Report and Recommendation) (claims seeking compensatory damages dismissed because no allegation of physical injury suffered); *Kasiem v. Rivera,* No. 09 Civ. 9665(DLC), 2011 WL 166929, at *10 (S.D.N.Y. Jan.18, 2011) (request for compensatory damages for emotional injuries stricken from complaint).

**3. Edwards' Request for Injunctive Relief Is Moot**

**\*23** By letter dated December 11, 2011, Edwards informed the Court that he has been released from prison. (Dkt. No. 135). This factual development renders moot Edwards' request for injunctive relief. "The hallmark of a moot case or controversy is that the relief sought can no longer be given or is no longer needed." *Martin–Trigona v. Shiff,* 702 F.2d 380, 386 (2d Cir.1983). Under that principle, an inmate's request for injunctive and declaratory relief against correctional staff at a particular correctional institution becomes moot when the inmate is discharged. *See Muhammad v. City of NY. Dep't of Corr.,* 126 F.3d 119, 123 (2d Cir.1997); *see, e.g., Khalil v. Laird,* 353 F. App'x 620, 621 (2d Cir.2009) (injunctive and declaratory relief moot because inmate released from prison); *Sheppard v. Lee,* No. 10 Civ. 6696(GBD)(JLC), 2011 WL 5314450, at *4 n. 6 (S.D.N.Y. Nov. 7, 2011) (declaratory and injunctive relief claims moot because inmate no longer incarcerated) (Report and Recommendation), *adopted,* 2011 WL 6399516 (S.D.N.Y. Dec.20, 2011). Accordingly, because Edwards has been released from prison, his claims for injunctive relief should be dismissed.[FN14]

> FN14. In addition, Edwards cannot establish a likelihood of success on the merits or the possibility of irreparable injury as required for any injunctive relief. Even assuming he could however, and to the extent Edwards' claims for injunctive relief are not moot, the PLRA extends prospective relief "no further than necessary to correct the violation of the Federal right of a particular plaintiff[,]" 18 U.S.C. §

3626(a)(1)(A), and the relief Edwards seeks—terminating Defendants from their positions and enjoining them from future government employment—is not "narrowly drawn." *Id.; see also Barrington v. New York,* 806 F.Supp.2d 730, 750 (S.D.N.Y.2011) (proposed order directing installation of security cameras beyond narrow scope permitted by PLRA); *Easter v. CDC,* 694 F.Supp.2d 1177, 1188–90 (S.D.Cal.2010) (inmate not entitled to injunctive relief preventing officials from future supervision or control over him when inmate no longer in facility where attack took place, and no indication of imminent injury).

**III. *CONCLUSION***

For the foregoing reasons, I recommend that Defendants' motion to dismiss be granted as to Edwards' claims for verbal harassment, deprivation of access to free telephone calls, deprivation of access to legal services, mail tampering, denial of required food portions, unconstitutional strip search, violation of due process rights within the prison's disciplinary and grievance system, excessive force and denial of medical treatment, deprivation of access to the prison's grievance system, retaliation (against all Defendants except Rosa for Edwards' termination), conspiracy, and disability discrimination under the ADA. I further recommend that the motion to dismiss be denied only as to Edwards' retaliatory termination claim against Defendant Rosa to the extent Edwards seeks nominal or punitive damages against her.

***PROCEDURE FOR FILING OBJECTIONS***

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections. *See also* Fed.R.Civ.P. 6. Such objections, and any responses to such objections, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable Richard J. Sullivan and to the chambers of the undersigned, United States Courthouse, 500 Pearl Street, New York, New York, 10007. Any requests for an extension of time for filing objections must be directed to Judge Sullivan. **FAILURE TO FILE OBJECTIONS WITHIN**

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 760172 (S.D.N.Y.)

(Cite as: 2012 WL 760172 (S.D.N.Y.))

**FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW.** *See Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C.,* 596 F.3d 84, 92 (2d Cir.2010); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72. If Plaintiff does not have access to cases cited herein that are reported on LexisNexis or Westlaw, he should request copies from Defendants' counsel. *See Lebron v. Sanders,* 557 F.3d 76, 79 (2d Cir.2009).

S.D.N.Y.,2012.

Edwards v. Horn
Slip Copy, 2012 WL 760172 (S.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

2000 WL 362023

2000 WL 362023
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Marvin Joseph PITSLEY, Plaintiff,
v.
R. RICKS, First Deputy Superintendent,
Clinton Correctional Facility; and J.
Wood, Deputy Superintendent of Security,
Clinton Correctional Facility, Defendants.

No. 96–CV–0372NAMDRH.
|
March 31, 2000.

**Attorneys and Law Firms**

Marvin Joseph Pitsley, Attica Correctional Facility,
Attica, for Plaintiff, pro se.

MEMORANDUM–DECISION AND ORDER

MORDUE, District J.

Introduction

**\*1**  *Pro se* plaintiff, Marvin Joseph Pitsley ("plaintiff"
or "Pitsley"), an inmate in the custody of the New York
State Department of Correctional Services, commenced
this action on February 29, 1996, alleging a violation
of various constitutional rights. By decision and order
dated April 10, 1998, then District Judge Rosemary
Pooler dismissed all of plaintiff's claims except his
claim against defendants Ricks and Wood concerning
an alleged violation of Pitsley's First Amendment
right to communicate with his family and friends.
Thereafter, defendants Ricks and Wood moved for
summary judgment. In a Report–Recommendation dated
September 2, 1999, Magistrate Judge David Homer states
that "[w]hile the general right of inmates to reasonable
access to communications is well established, the
contours of the right with respect to telephones in particular are
uncertain." Dkt. no. 63, p. 6. Observing that the Supreme
Court and Second Circuit have not yet directly addressed
the topic of the constitutionality of restricted telephone
access, the Magistrate Judge, quoting *Carter v. O'Sullivan,*
924 F.Supp. 903, 909 (C.D.Ill.1996), recommends that
summary judgment be granted defendants on the grounds
of qualified immunity. [1]

Plaintiff filed timely objections to the Report–
Recommendation. Pursuant to 28 U.S.C. § 636(b)(1)(C),
a district court must make a *de novo* determination of the
portions of a Report–Recommendation that are objected
to. This Court will therefore consider plaintiff's arguments
as set forth in his Objections.

*Factual Background*

At the time in question, Pitsley was an inmate at the
Clinton Correctional Facility. He alleges that, on October
9, 1995, he lost his job at Clinton's tailor shop. As
a result, on October 16, 1995, Pitsley appeared before
Clinton's facility program committee where he was offered
a position in either the laundry or bath house. Dkt.
no. 52, Ex. H. He states that he refused to accept either of the new
positions offered to him because "he was not going to take
a job which could cause health problems." [2] Dkt. no. 1.,
p. 4. As a result of plaintiff's refusal, on October 16, 1995,
Pitsley was assigned to Limited Privileges Status ("L.
P. Status") at Clinton. L.P. Status circumscribes access
to various services and amenities available to inmates.
Among other items, inmates receive no pay and are not
allowed to participate in the Family Reunion Program,
the Home Phone Program, the Cell Study Program, the
Regular Library Program, special events, movies and all
evening programs. [3]  Under Clinton policy, full privileges
are restored once the inmate recommences participation
in prison programs.

Pitsley states that while confined on L.P. Status, he was
denied his First Amendment right to communicate with
family and friends. [4]  Specifically, Pitsley maintains that
while he was on L.P. Status, he was denied permission to
call his step daughter after she telephoned the facility to
advise that her son was in the hospital for major surgery.
Pitsley claims that he was also unable to correspond with
his family because he was earning no wages and had no
money available to purchase stamps. Dkt. no. 54, pp. 2,
4, 5, 11. He also alleges that he was denied permission to
telephone his attorney regarding important legal business
which resulted in his action being "denied by the trial
court." *Id.* at p. 5; *see also* dkt. no. 52, Pl. Int. Resp. No.
08 and attachments 04 and 05. [5]

2000 WL 362023

**\*2** Financial records show that from November 7, 1995 to February 14, 1996, Pitsley had a balance of \$.04 in his inmate account. On February 14, 1996, a deposit of \$8.25 was made into Pitsley's inmate account (an apparent refund from the State Comptroller). From that amount, Pitsley made commissary purchases and also purchased \$.79 worth of postage. As of March 28, 1996, however, Pitsley had a negative balance of \$2.46 in his inmate account. [6] Pitsley claims that afterwards, no other funds came into his possession while he was confined to L.P. Status at Clinton. Pitsley was eventually transferred to Auburn Correctional Facility on January 27, 1997. [7]

On February 22, 1996, Pitsley filed a grievance wherein he stated the following: "The facility can not purposely try to prevent an inmate access to his family without being liable in court. I want to be able to make a call to my family and attorney," or else the facility provide postage to write my family." Dkt. no. 52, Ex. A. Pitsley maintains that defendant Ricks denied the grievance. On appeal, the Department of Correctional Services' Central Office Review Committee sustained the decision made at the facility level and stated the following in relevant part: "Grievant is advised of FOMP # 324 which states in part, ... 'Limited Privilege Program will restrict your yard, movies, commissary, pay, phone home program, regular library, etc.' Free postage is available for legal mail only."

It is with this background that the Court reviews defendants' motion for summary judgment. [8]

DISCUSSION

1. Standards

A. SUMMARY JUDGMENT

Summary judgment is appropriate when the pleadings, affidavits, and other supporting papers indicate that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law. *Fed.R.Civ.P. 56; Anderson v. Liberty Lobby,* Inc., *477 U.S. 242, 247 (1986); Lang v. Retirement Living Pub. Co.,* 949 F.2d 576, 580 (2d Cir.1991). To defeat a motion for summary judgment the opposing party must do more than present evidence that is merely colorable, conclusory, or speculative, *Anderson,* 477 U.S. at 249–50 but rather, must demonstrate that there are issues of fact that must be

decided by a fact finder, because "they may reasonably be decided in favor of either party." *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990); *see Webber v. Hammack,* 973 F.Supp. 116, 121–23 (N.D.N.Y.1997).

B. SECTION 1983

In order to obtain relief under 42 U.S.C. § 1983 a plaintiff must establish that he was deprived of a right, privilege or immunity protected under the United States Constitution or by a federal statute by a person acting under state authority. *Parratt v. Taylor,* 451 U.S. 527, 535, (1981), overruled in part on other grounds, *Daniels v. Williams,* 474 U.S. 327, 330–31 (1986) (more than negligence required); *Rodriguez v. Phillips,* 66 F.3d 470, 473 (2d Cir.1995). The Fourteenth Amendment to the United States Constitution prohibits the depriving of an individual of a protected liberty interest without due process. *Hewitt v. Helms,* 459 U.S. 460, 466 (1983). The issues to be determined are, first, whether the plaintiff possessed a constitutionally protected liberty interest which was interfered with and second, whether the procedures followed were constitutionally sufficient. *Kentucky Dept. of Corrections v. Thompson,* 490 U.S. 454, 460, (1989); *Bedoya v. Coughlin,* 91 F.3d 349, 351–52 (2d Cir.1996). Constitutionally protected liberty interests of a prison inmate are limited to freedom from restraints which exceed his sentence in an unexpected manner or which impose a grievous or "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 482 (1995). Plaintiff has the burden of demonstrating the existence of a protected liberty interest and the infringement thereupon. *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996).

**\*3** So as to ensure that courts afford appropriate deference to prison officials in their management of correctional facilities and in their efforts to secure order, the Supreme Court has determined that prison regulations alleged to infringe constitutional rights are judged under a "reasonableness" test. *See e.g., Jones v. North Carolina Prisoners' Union,* 433 U.S. 119, 128 (1977). The Supreme Court has stated the standard as follows: "[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner,* 482 U.S. at 89; *Hayes v. Marriott,* 70 F.3d 1144, 1146 (10th Cir.1995).

In order to state a claim for deprivation of a constitutional right to communication, an inmate must make some

showing of prejudice or actual injury as a result of the prison officials' conduct. *See, e.g., Sands v. Lewis,* 886 F.2d 1166, 1171 (9th Cir.1989)(deprivation of telephone access). In a legal deprivation claim, an inmate must proffer specific instances of prejudice to his legal rights, such as missed filing deadlines or the denial of legal assistance to which he was entitled. *See Martin v. Davies,* 917 F .2d 336, 340 (7th Cir.1990).

## C. QUALIFIED IMMUNITY

Qualified immunity is an affirmative defense which "shields public officials from liability for their discretionary acts that do 'not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Hathaway v. Coughlin,* 37 F.3d 63, 67 (2d Cir.1994) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1995). Even if an inmate's federal rights have long been recognized, "qualified immunity is still available to an official if it was 'objectively reasonable for the public official to believe that his acts did not violate those rights.' " *Id.* (quoting *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991)).

## 2. The Reasonableness of Restrictions on Pitsley's Ability to Communicate

The Court notes that plaintiff's claim regarding inability to communicate through the mail is one alleging a constructive deprivation. That is, plaintiff does not allege that L.P. Status, by its terms, deprived him of the ability to communicate through the mail. To the contrary, defendants state that under the L.P. Status, "[i]nmates are still permitted to contact their family and friends by mail." Ricks Aff. at ¶ 7.

Plaintiff alleges that he had no money and, because of his L.P. Status, was incapable of earning any money. As such, plaintiff alleges that his indigence resulted from, or was perpetuated by, his L.P. Status. This, according to plaintiff, resulted in his inability to purchase stamps and communicate through the mail. As such, there is no evidence to suggest that plaintiff was deprived of all forms of communication as a result of his L.P. Status. There is support, however, for the argument that the *effect* of defendants' policies was to deprive him of all means of communication.

**\*4** The Supreme Court has recognized that "[p]rison walls do not form a barrier separating prison inmates from

the protections of the Constitution," *Turner v. Safley,* 482 U.S. 78, 84 (1987), "nor do they bar free citizens from exercising their own constitutional rights by reaching out to those on the 'inside.' " *Thornburgh v. Abbott,* 490 U.S. 401, 407 (1989). Accordingly, federal courts have held that "[a] prison inmate's rights to communicate with family and friends are essentially First Amendment rights subject to § 1983 protection." *Morgan v. LaVallee,* 526 F.2d 221, 225 (2d Cir.1975). However, because of security concerns which are inherent in correctional facilities, the First Amendment's protection of communication is not without restriction. *Martin v. Tyson,* 845 F .2d 1451, 1457 (7th Cir.1988), citing *Martin v. Brewer,* 830 F.2d 76, 78 (7th Cir.1987). For example, "[t]he exact nature of telephone service to be provided to inmates is generally to be determined by prison administrators, subject to court scrutiny for unreasonable restrictions." *Fillmore v. Ordonez,* 829 F.Supp. 1544, 1563–64 (D.Kan.1993), *aff'd,* 17 F.3d 1436 (10th Cir.1994).

The right to communication, grounded as it is in the First Amendment, is plainly a "liberty" interest within the meaning of the Fourteenth Amendment even though qualified of necessity by the circumstance of imprisonment, and, as such, it is protected from arbitrary governmental invasion. *Procunier v. Martinez,* 416 U.S. 396, 413 (1971), overruled on other grounds by *Thornburgh v. Abbott,* 490 U.S. 401 (1989). Under this umbrella, a hierarchy has developed amongst the type of protection afforded to the various modes of communication. For example, while inmates have a constitutionally protected interest in conducting non-legal correspondence, *Thornburgh v. Abbott,* 490 U.S. 401 (1989), such correspondence is not afforded the same degree of protection as legal correspondence. *See Todaro v. Bowman,* 872 F.2d 43, 49 (3rd Cir.1989) (requiring substantial governmental interest in censorship of legal mail). Similarly, telephone calls to and from attorneys have received a higher degree of protection from the courts than telephone privileges generally. *See Ramos v. Vaughn,* 1995 WL 386573 at *8 (E.D.Pa. June 27, 1995), *aff'd* 85 F.3d 612 (3rd Cir.1996).

Courts considering prison telephone restrictions have agreed that an inmate has no right to unlimited telephone use. *Washington v. Reno,* 35 F.3d 1093, 1100 (6th Cir.1994); *Benzel v. Grammar,* 869 F.2d 1105, 1108 (8th Cir.1989); *Lopez v. Reyes,* 692 F.2d 15, 17 (5th Cir.1982); *Fillmore v. Ordonez,* 829 F.Supp. 1544, 1563–

2000 WL 362023

64 (D.Kan.1993), aff'd. 17 F.3d 1436 (10th Cir.1994); *see also Strandberg v. City of Helena,* 791 F.2d 744, 747 (9th Cir.1986); *Gilday v. Dubois,* 124 F.3d 277, 293 (1st Cir.1997); *Martin v. Tyson,* 845 F.2d 1451, 1458 (7th Cir.1988).[9] Courts have likewise recognized reasonable restrictions on personal correspondence to and from inmates so as to effectuate the safety and security of particular correctional facilities. *See Turner,* 482 U.S. 78 (1987).

**\*5** Prison regulations imposing restrictions on inmate phone calls have generally been upheld because the restrictions have been interpreted as furthering a legitimate penological interest. However, in those circumstances where telephone restrictions have been upheld, the Courts have usually noted that the affected inmates have alternate means of communicating with the outside world, most often by use of the mail. *See, e.g., Rivera v. Senkowski,* 62 F.3d 80 (2d Cir.1995); *Acosta v. Brady,* 1999 WL 158471, \*7 (E.D .Pa. March 22, 1999). In this instance, and as stated, Pitsley has alleged not only that he was not able to place telephone calls to family and friends, but that he was also unable to write to them because he was indigent and received no pay or other money while on L.P. Status.[10]

While inmates have a constitutionally protected interest in conducting non-legal correspondence, *see Thornburgh v. Abbott,* 490 U.S. 401 (1989) & *Procunier v. Martinez,* 416 U.S. 396 (1974), the Constitution does not require the State to subsidize inmates to permit such correspondence to be conducted by mail "when other means of communication are available to the general prison population." *Dawes v. Carpenter,* 899 F.Supp. 892, 899 (N.D.N.Y.1995) (citing *Hershberger v. Scaletta,* 33 F.3d 955, 956 (8th Cir.1994)). In this case, however, Pitsley has offered evidence that he had no alternative means of communication because his confinement to L.P. Status prevents him from using the telephone and buying stamps. He therefore claims that the State must make available some means for him to communicate with the outside.

While the foregoing case law holds that prison officials may not terminate all forms of communication with the outside world, there is no case law addressing the unique factual circumstances of the present case. The Court has previously characterized plaintiff's complaint as one stating absolute prohibition of telephone communication coupled with an *effective* prohibition of communication

through the mail. The fact remains that L.P. Status, by its terms, allows inmates to communicate through the mail. It cannot, therefore, be accurately stated that the policy directly terminates all forms of communication in violation of clearly established law. Thus, because L.P. Status does not directly curtail all forms of communication, and because the law does not clearly address plaintiff's argument of indirect infringement, the Court concludes that the law is not clearly established and that prison officials were objectively reasonable for believing that their acts did not violate established rights.[11]

This Court also finds unpersuasive Pitsley complaints that he was not provided with a misbehavior report or disciplinary hearing prior to his assignment to L.P. Status. Assignment to L.P. Status, on the basis of procedures set forth in the Clinton Facility Operations Manual, without benefit of a misbehavior report or a hearing, but with notice and the opportunity to present one's views to the prison official who was charged with transferring an inmate to L.P. Status, has previously been determined not to violate due process. *Dixon v. Leonardo,* 866 F.Supp. 987 (N.D.N.Y.1995) (McAvoy, C.J .).

## CONCLUSION

**\*6** After careful review of the record, including the Report–Recommendation, I conclude that Pitsley's objections to the Report–Recommendation lack merit and I find that the remainder of the report-recommendation was not clearly erroneous. It is therefore,

ORDERED that the Report–Recommendation dated September 2, 1999, is approved, and it is further

ORDERED, that the Motion for Summary Judgment filed by Defendants Ricks and Woods is GRANTED, and it is further

ORDERED, that Plaintiff's action, No. 96–CV–0372 is DISMISSED.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2000 WL 362023

2000 WL 362023

Footnotes

1    As Magistrate Judge Homer commented, a public official is entitled to qualified immunity when, at the time the officer was acting, the right in question was not clearly established or, even if the right was established, it was not objectively reasonable for the official to have known that his conduct violated the right. *Connell v. Signoracci,* 153 F.3d 74, 80 (2d Cir.1988). In assessing whether the right was clearly established at the time defendants acted, courts "examine whether the right was defined with reasonable specificity; whether decisional law of the Supreme Court and the applicable circuit court supports its existence; and whether under preexisting law, a defendant official would have reasonably understood that his acts were unlawful." *Rodriguez v. Phillips,* 66 F.3d 470, 476 (2d Cir.1995).

2    Pitsley asserts that a previous decision to place him in the laundry had been reversed for medical reasons. From documentation submitted by defendants regarding Pitsley's job performance in September, 1995, it appears that Pitsley did suffer from health problems, though the extent of those problems is unclear from the record. Dkt. no.52, Ex. H.

3    According to a memorandum from defendant Woods, dated September 7, 1995, keeplock inmates, with the exception of those inmates like Pitsley who had their telephone privileges restricted, could make two phone calls per month. Dkt. no. 52, Pl. Int. Resp., attachment 08.

4    Pitsley claims that in June of 1996, he attempted to obtain release from L.P. Status by requesting other programming but that he was unsuccessful in his efforts.

5    The facility claims that permission to contact his attorney was not denied. Instead, Pitsley was required to have his attorney first write a letter to the facility and request permission to make a legal telephone call. Pitsley was also advised that, in any such request, his attorney should advise as to why a telephone call was necessary as opposed to communicating through the mail.

    Dkt. no. 52, Pl. Int. Resp. No. 08 and attachments 04 and 05.

6    The inmate correspondence program directive attached to defendants' motion papers, dkt. no. 52, Ex. G, provides for advances for personal postage to various categories of inmates who might not otherwise be able to purchase postage. Specifically, the Directive states that:

    Funds may be advanced to an inmate for postage for one first class one-ounce letter per month in the following circumstances:

    a. the inmate has been confined to SHU for discipline or administrative segregation for 30 days or more, and has a zero or negative account balance; or

    b. the inmate has been in keeplock status for 30 days or more, has lost telephone privileges, and has a zero or negative account balance; or

    c. the inmate has lost telephone privileges, has a zero or negative account balance, and has not refused to accept available programming assignments.

7    The Second Circuit has previously characterized the restrictions imposed by L.P. Status as minimal and not sufficiently serious to provide a basis for an Eighth Amendment claim based on deliberate indifference for deprivation of life's necessities, particularly in view of the fact that an inmate can remove himself from the status at any time by accepting a program assignment. *Rivera v. Senkowski,* 62 F.3d 80, 85 (2d Cir.1995).

8    Shortly after filing his grievance, Pitsley filed his complaint in this action. In his complaint Pitsley alleged that "[t]he facility is refusing to allow a call home and the facility does not provide for free postage except for legal mail so plaintiff has no way of contacting his family." Dkt. no. 1, p. 5. Judge Rosemary Pooler, presently sitting on the Second Circuit Court of Appeals, had previously been assigned to this case in her prior capacity as District Court Judge. While Judge Pooler characterized Pitsley's First Amendment claim as an alleged violation of Pitsley's right "to communicate with family and friends," Magistrate Judge Homer, in his Report–Recommendation on the instant motion for summary judgment, states that all claims apart from Pitsley's claim "concerning telephone privileges" have been dismissed. This interpretation by Magistrate Judge Homer of Pitsley's claim, as limited to telephone restrictions only, as opposed to Judge Pooler's prior characterization of Pitsley's First Amendment claim as a more comprehensive right to communicate with family and friends, is important as it obviously impacts the analysis to be accorded to defendants' motion for summary judgment. Furthermore, Pitsley's complaint and papers in opposition to defendants' motion are clearly not limited to restrictions on telephone access. This Court considers plaintiff's complaint in light of both alleged denial of telephone privileges and the right to communicate through use of the mail.

9    Moreover, the loss of various privileges, including telephone access, has not been viewed as resulting in the type of deprivation which could reasonably be viewed as imposing atypical and significant hardship on a prison inmate under the analysis set forth in *Sandin v. Conner,* 515 U.S. 472 (1995) and its progeny. *Frazier v. Coughlin,* 81 F.3d 313, 315–

2000 WL 362023

17 (loss of commissary, recreation, packages and telephone privileges while in SHU and later in Close Supervision Unit did not amount to atypical and significant deprivation); *DeMaio v. Kelly,* No. 95–CV–0329E(H), 1996 WL 685729, at * 2 (W.D.N.Y. Nov. 22, 1996) *Nogueras v. Coughlin,* No. 94 Civ. 4094(JSM), 1996 WL 487951, at *5 (S.D.N.Y.Aug.27, 1996); *Guzman v. Kelly,* No. 88–CV–1391E, 1996 WL 291985, *3 (W.D.N.Y. May 28, 1996); *Brooks v. DiFasi,* 1997 WL 436750, *2 (W.D.N.Y. July 30, 1997).

10     As stated, Pitsley claims that he was unable to contact his stepdaughter after she contacted the facility to advise that her son was about to undergo a serious operation. He also claims that obstacles in placing a telephone call to his attorney resulted in a legal action being dismissed. He argues that his attempts to have these matters rectified at the facility level went for naught as his grievance requesting permission to contact family and friends through the telephone or mail was denied.

11     The Court notes that plaintiff's inability to communicate with friends and family as a result of his indigence is, arguably, self imposed. That is, plaintiff maintained an $8.25 balance in his prisoner account shortly before filing the present action. Plaintiff spent only .$79 of this money on postage. Had plaintiff spent his money more wisely, he would have been able to communicate through the mail. Likewise, plaintiff could have used a single stamp to request someone from outside the prison to provide him with postage. Similarly, plaintiff may well have been able to obtain postage from his attorney, as plaintiff was able to communicate through the mail with his attorney.

       Furthermore, the Court notes that plaintiff's indigence was exacerbated as a result of his refusal to accept one of two jobs offered him by prison officials. As noted by the Second Circuit, an inmate can remove himself from L.P. Status at any time by accepting a program assignment. *Rivera v. Senkowski,* 62 F.3d 80, 85 (2d Cir.1995).

---

End of Document     © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Westlaw.

Slip Copy, 2011 WL 6739517 (N.D.N.Y.)

(Cite as: 2011 WL 6739517 (N.D.N.Y.))

H

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Sean E. McMAHON, Plaintiff,
v.
Officer FURA, Officer Patti, Officer Summers, City of
Syracuse, Defendants.
No. 5:10–CV–1063 (GHL).

Dec. 23, 2011.

Meggesto, Crossett & Valerino, LLP, James A. Meggesto,
Esq., of Counsel, Syracuse, NY, for Plaintiff.

Mary Anne Doherty, Esq., Corporation Counsel for the
City of Syracuse, James P. McGinty, Esq., Shannon T.
O'Connor, Esq., of Counsel, Syracuse, NY, for
Defendants.

### MEMORANDUM DECISION AND ORDER[FN1]

> **FN1.** This matter is before the Court by consent
> of both parties. (Dkt. No. 25.)

GEORGE H. LOWE, United States Magistrate Judge.

*1 In this action, Plaintiff Sean E. McMahon contends
that Defendant City of Syracuse Officers Patti, Fura, and
Summers[FN2] arrested him for violating an unconstitutional
city ordinance and used excessive force in effectuating
that arrest in violation of state and federal law. (Dkt. No.
1.) Currently pending before the Court is Defendants'
motion for summary judgment. (Dkt. No. 33.) Plaintiff has
opposed the motion. (Dkt.Nos.38–42.) Defendants have
filed a reply. (Dkt. No. 45.) For the reasons discussed
below, Defendants' motion is granted in part and denied in
part.

> **FN2.** Defendant Officers Carns, Cope, Novitsky,
> and Tassini were dismissed from this action with
> prejudice with Plaintiff's consent. (Dkt. No. 21 at
> 2.)

### I. FACTUAL AND PROCEDURAL SUMMARY

The facts in this case are, unless specifically noted,
undisputed.

On June 15, 2009, the Syracuse Police Department
assigned four units from the Crime Reduction Team to the
evening shift on the west side of the City of Syracuse,
specifically the area of Tallman and Rich Streets. (Dkt.
No. 33–14 ¶ 1; Dkt. No. 39 ¶ 1.) The Crime Reduction
Team is comprised of two-man units assigned to an area
of the city where there is a need for increased police
presence due to high crime. (Dkt. No. 33–14 ¶ 2; Dkt. No.
39 ¶ 1.) The four Crime Reduction Team units patrolling
the west side of the City of Syracuse on June 15, 2009,
were unit 524 (Officers Fura and Summers), unit 525
(Officers Patti and Copes), unit 527 (Officers Murphy and
Novitsky), and unit 528 (Officers Carns and Tassini).
(Dkt. No. 33–14 ¶ 4; Dkt. No. 39 ¶ 1.)

Defendant Officer Patti and Officer Cope responded
to a gambling complaint in the area of Onondaga Avenue
and Rich Street.[FN3] (Dkt. No. 33–14 ¶ 5; Dkt. No. 39 ¶ 1.)
After addressing the gambling complaint, Defendant Patti
and Officer Cope sat in their police car and watched a
crowd [FN4] of people on the sidewalk of Tallman and Rich
Streets. (Dkt. No. 33–14 ¶ 6; Dkt. No. 39 p 2.) Officers
Carns and Tassini also responded to the crowd gathered
on Tallman Street. (Dkt. No. 33–14 ¶ 7; Dkt. No. 39 ¶ 2.)
Defendant Patti observed that a member of the One Ten
gang was among the crowd.[FN5] (Dkt. No. 33–14 ¶ 8; Dkt.
No. 39 ¶ 2.) Plaintiff was with the group. (Dkt. No. 33–14
¶ 4; Dkt. No. 39 ¶ 1.)

> **FN3.** Defendants do not assert that this gambling
> complaint had any connection with Plaintiff or
> with the group of people with whom he was
> associating.

> **FN4.** Plaintiff objects to the word "crowd."
> Plaintiff states that the "term crowd is subjective
> at best, and in fact, there were only five (5)
> individuals standing on the sidewalk at the corner

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 6739517 (N.D.N.Y.)

(Cite as: 2011 WL 6739517 (N.D.N.Y.))

of Tallman and Rich Streets ...." (Dkt. No. 39 ¶ 2.)

FN5. Defendants do not assert that Plaintiff is a member of the One Ten gang.

Multiple units of the Crime Reduction Team approached the group gathered on the sidewalk on Tallman Street. (Dkt. No. 33–14 ¶ 9; Dkt. No. 39 ¶ 1.) When the officers approached the group, Plaintiff immediately started to run away. (Dkt. No. 33–14; Dkt. No. 39 ¶ 1.) Officer Cope, Officer Novitsky, and Defendant Patti chased Plaintiff, yelling at him to stop and that he was under arrest. (Dkt. No. 33–14 ¶ 13; Dkt. No. 39 ¶ 1.) Plaintiff ran from police FN6 and the police chasing him on foot were five to six blocks behind. (Dkt. No. 33–14 ¶ 11; Dkt. No. 39 ¶ 3.) Plaintiff did not respond to the verbal commands to stop running. (Dkt. No. 33–14 ¶ 17; Dkt. No. 39 ¶ 1.)

FN6. Plaintiff admits that he "did, in fact, run" but asserts that "the allegation that he ran 'from police' is subjective." (Dkt. No. 39 ¶ 3.)

Defendant Officers Summers and Fura were in their police car when they received a call over the radio about a foot pursuit. (Dkt. No. 33–14 ¶ 14; Dkt. No. 39 ¶ 1.) Defendants Summers and Fura saw a person running across Onondaga Street with police officers chasing behind him. (Dkt. No. 33–14 ¶ 15; Dkt. No. 39 ¶ 1.) Defendants Summers and Fura responded to the call. (Dkt. No. 33–14 ¶ 16; Dkt. No. 39 ¶ 1.)

**\*2** Plaintiff was running across the street with the officers chasing behind him when Defendants Summers and Fura turned their police car down Onondaga Street. (Dkt. No. 33–14 ¶ 18; Dkt. No. 39 ¶ 1.) Defendant Fura gave Plaintiff verbal commands to stop running from the police car. FN7 (Dkt. No. 33–14 ¶ 19.) On Fitch Street, Defendant Fura attempted to pull the police car onto the sidewalk to block Plaintiff's path and make him stop, however Plaintiff ran around the car and continued to run. FN8 (Dkt. No. 33–4 ¶ 20.)

FN7. Plaintiff denies this fact, citing to his deposition transcript. (Dkt. No. 39 ¶ 4.) The

cited portion of the deposition transcript states: "Q: ... You said you don't have a clear recollection of what happened when ... the police came in contact with you; is that a fair statement? A: Yes." (Dkt. No. 33–9 at 15:20–24.)

FN8. See note seven.

Defendants Fura and Summers exited their car and were able to catch Plaintiff. (Dkt. No. 33–14 ¶ 21; Dkt. No. 39 ¶ 1.) At his deposition, Defendant Fura testified that when he caught up with Plaintiff:

A: I grabbed the back of his shirt and attempted to pull him back. He pulled forward, at which time I delivered a strike to his right jaw area, and we both ended up falling to the ground, forward.

Q: And did you say anything to him?

A: I told him to put his hands behind his back. He was under arrest.

Q: What was he under arrest for, if you know?

A: At this time he was going to be under arrest for disorderly crowd.

Q: But you didn't know that at the time?

A: I didn't know specifically what the charge was.

Q: You told him he was under arrest, but you didn't know for what violation? Is that your testimony?

A: Correct.

    (Dkt. No. 33–12 at 6:8–24.)

    At his deposition, Defendant Summers testified that:

A: Officer Fura grabbed a hold of—got close to Mr. McMahon and grabbed a hold of him, and he pulled, and when he did, from what I can tell, I seen Mr. McMahon spin around and then go to the ground.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 6739517 (N.D.N.Y.)

(Cite as: 2011 WL 6739517 (N.D.N.Y.))

Q: You say you saw Officer Fura grab Mr. McMahon?

A: Well, his shirt. Clothing. Something of that nature. Because he pulled, and then he spun around. Like, he slipped out of his grasp or slips out of—but I just seen him spin around.

Q: Did he get grabbed from the front or from behind or from the side?

A: As I'm coming around the car—I coul[d]n't tell you. I know he was running. We were behind him, so it was either from the side, backside or something, because when he did, he went around like that, and he rolled into the—so I'd say it would have to be from the backside area.

Q: And Mr. McMahon ended up on the ground?

A: That's correct, sir.

Q: What action did you take then?

A: At that time I came around, and Officer Fura was trying to grab a hold of him. Mr. McMahon was pushing to get off the ground to get free again. He was advised to stop resisting and get on the ground and place his hands behind his back, at which time he didn't comply with that at all. I placed a strike to the shoulder blade to collapse the shoulder down to get on the ground so I can handcuff him. He continued to push off. I applied another strike. The strike hit the top of the shoulder, bounced off and cut his eyebrow.

Q: What happened next?

**\*3** A: At that point in time we were finally able to get him down on the ground and forcefully put his hands behind his back and get him cuffed, and that's when I noticed the weed in his hand, as I pulled his hand behind his back. I had to forcibly remove the marijuana from his hand.

Q: That was after he was handcuffed?

A: That was while he was handcuffed. Yes, sir.

(Dkt. No. 33–10 at 9:15–11:5.)

The unverified complaint, signed only by counsel, alleges that:

Defendant Fura punched Plaintiff in the face with his right fist causing the Plaintiff to fall to his stomach. Due to the strike, Plaintiff fell and hit his head on the pavement and sustained numerous injuries on his face and hands. While still lying face [ ] down, Plaintiff tried to move, and Officer Summers struck him near his left eyebrow again causing Plaintiff to sustain injuries. Defendants claimed Plaintiff was trying to resist and therefore ... Defendant Fura and Defendant Summers punched Plaintiff again in his face and body. They then forcefully placed Plaintiff's arms behind his back and handcuffed him.

(Dkt. No. 1 ¶¶ 8–10.)

Despite the allegations in the unverified complaint, the evidence developed during discovery shows that Plaintiff does not recall the actual stop by police. (Dkt. No. 33–14 ¶ 22; Dkt. No. 39 ¶ 1.) Plaintiff remembers running from police and the sound of sirens behind him. (Dkt. No. 33–14 ¶ 23; Dkt. No. 39 ¶ 1.) At his deposition, Plaintiff testified that "the one officer in the car, he tried to cut me off as I'm running, and I believe he was trying to run me over ... All four of the wheels busted or sounded like four of the wheels busted, and then ... that's when I believe I was tased." (Dkt. No. 33–9 at 14:3–9.) At his 50–h hearing, Plaintiff testified "I just remember it felt like I was being electrocuted ... So I must have been tased by ... an officer ." (Dkt. No. 33–8 at 23:23–24:18.) At his deposition, Plaintiff testified that he believed he had been tased because his "whole body shut down," but that he does not remember when that happened. (Dkt. No. 33–9 at 17:9–15.) Plaintiff remembers hitting the ground but does not remember what happened to make him fall. (Dkt. No. 33–9 at 15:5–15.) That is all that Plaintiff recalls before waking up in the hospital. (Dkt. No. 33–14 ¶ 24; Dkt. No. 39 ¶ 1.) Plaintiff does not recall the contact that he had with police once they were able to catch up with him. (Dkt. No. 33–14 ¶ 25; Dkt. No. 39 ¶ 1.)

Slip Copy, 2011 WL 6739517 (N.D.N.Y.)

(Cite as: 2011 WL 6739517 (N.D.N.Y.))

Neither Defendant Summers nor Defendant Fura was armed with a taser on June 15, 2009.[FN9] (Dkt. No. 33–14 ¶ 28; Dkt. No. 33–12 at 7:4–6.) Defendant Patti was armed with a taser, but testified at his deposition that he did not use it. (Dkt. No. 33–11 at 21:3–22:1 .) Defendant Fura arrested Plaintiff.[FN10] (Dkt. No. 33–14 ¶ 29.) Defendant Patti did not arrest Plaintiff.[FN11] (Dkt. No. 33–14 ¶ 30.)

FN9. See note seven.

FN10. See note seven.

FN11. See note seven.

Rural Metro took Plaintiff to the hospital. (Dkt. No. 33–14 ¶ 27; Dkt. No. 39 ¶ 1.) Plaintiff was released from the hospital at about 2:00 a.m. (Dkt. No. 33–8 at 27:19–21.) He got a ride home from a friend. *Id.* at 27:24–25. Plaintiff was never lodged in the Justice Center. *Id.* at 28:1–3.

**\*4** Plaintiff was issued appearance tickets for unlawful possession of marijuana, resisting arrest, and for violating the City of Syracuse's disorderly crowds ordinance.[FN12] (Dkt. No. 33–14 ¶ 31.)

FN12. Plaintiff admits that he was issued appearance tickets, but notes that he was charged with marijuana possession five minutes after being charged with the other two offenses. (Dkt. No. 39 ¶ 6 .)

The unverified complaint, signed only by counsel, alleges that "[t]he Honorable Vanessa Brogan dismissed all criminal charges against the plaintiff." (Dkt. No. 1 ¶ 17.) There is no evidence in the record before the Court either confirming or casting doubt on that assertion.

Plaintiff filed a notice of claim with the City of Syracuse on September 1, 2009. (Dkt. No. 33–5.) Plaintiff listed the nature of his claim as "[f]alse arrest, false imprisonment, excessive force, police brutality, violation of claimant's civil rights, and assault." *Id.*

Plaintiff filed his complaint in this Court on September 2, 2010. (Dkt. No. 1.) The complaint asserts the following causes of action: (1) a 42 U.S.C. § 1983 false arrest claim against Defendants Fura, Patti, and Summers; (2) a 42 U.S.C. § 1983 excessive force claim against Defendants Fura, Patti, and Summers; (3) a state law false imprisonment claim against Defendants Fura, Patti, and Summers; (4) a state law assault claim against Defendants Fura and Summers; (5) a state law negligence claim against Defendants Fura, Patti, and Summers; (6) a claim against the City of Syracuse regarding the constitutionality of Syracuse City Ordinance 16–2; (7) a *Monell* claim against the City of Syracuse regarding the hiring, supervising, and training of officers; and (8) a state law respondeat superior claim against the City of Syracuse. (Dkt. No. 1 ¶¶ 14, 18–37.) Plaintiff requests compensatory damages, punitive damages, attorney fees, costs, and "such other and further relief as may be just and proper under the circumstances, including but not limited to appropriate injunctive relief." *Id.* at 6.

Defendants moved to dismiss the complaint. (Dkt. No. 19.) Defendants argued that the complaint did not comply with Federal Rule of Civil Procedure 8(a)(2) because it set forth only conclusory allegations, that several officers should be dismissed because the complaint did not indicate that they were personally involved in the incident, and that any claims against the officers in their official capacities should be dismissed. *Id.* The Court denied Defendants' motion to dismiss on May 17, 2011, but dismissed the claims against Officers Carns, Cope, Novitsky, and Tassini with Plaintiff's consent. (Dkt. No. 21.)

Defendants now move for summary judgment. (Dkt. No. 33.) Plaintiff has opposed the motion. (Dkt.Nos.38–42.) Defendants have filed a reply. (Dkt. No. 45.)

## II. APPLICABLE LEGAL STANDARDS

### A. Legal Standard Governing Motions for Summary Judgment

Under Federal Rule of Civil Procedure 56, summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 6739517 (N.D.N.Y.)

(Cite as: 2011 WL 6739517 (N.D.N.Y.))

56(a). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. *Salahuddin v. Goord,* 467 F.3d 263, 272–73 (2d Cir.2006). Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin,* 467 F.3d at 272–73. The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Rather, a dispute regarding a material fact is *genuine* "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In determining whether a genuine issue of material [FN13] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.,* 542 F.3d 290, 309 (2d Cir.2008).

> FN13. A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson,* 477 U.S. at 248.

**B. Legal Standard Governing Motion to Dismiss for Failure to State a Claim**

**\*5** To the extent that a defendant's motion for summary judgment under Federal Rule of Civil Procedure 56 is based entirely on the allegations of the plaintiff's complaint, such a motion is functionally the same as a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). As a result, "[w]here appropriate, a trial judge may dismiss for failure to state a cause of action upon motion for summary judgment." *Schwartz v. Compagnise Gen. Transatlantique,* 405 F.2d 270, 273 (2d Cir.1968) (citations omitted); *accord, Katz v. Molic,* 128 F.R.D. 35, 37–38 (S.D.N.Y.1989) ("This Court finds that ... a conversion [of a Rule 56 summary judgment motion to a Rule 12(b)(6) motion to dismiss the complaint] is proper with or without notice to the parties."). Accordingly, it is appropriate to summarize the legal standard governing Federal Rule of Civil Procedure 12(b)(6) motions to dismiss.

A defendant may move to dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6) on the ground that the complaint fails to state a claim upon which relief can be granted. In order to state a claim upon which relief can be granted, a complaint must contain, *inter alia,* "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). The requirement that a plaintiff "show" that he or she is entitled to relief means that a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)) (emphasis added). "Determining whether a complaint states a plausible claim for relief ... requires the ... court to draw on its judicial experience and common sense.... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Id.* at 1950 (internal citation and punctuation omitted).

"In reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor ." *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (citation omitted). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 129 S.Ct. at 1949.

**III. ANALYSIS**

**A. Constitutionality of City Ordinance § 16–2**

Plaintiff was initially placed under arrest for violating Syracuse City Ordinance § 16–2, Disorderly Crowds. (Dkt. No. 33–12 at 6:8–24.) That ordinance states that "[p]ersons shall not collect in bodies or crowds in the streets or on the sidewalks for an unlawful purpose, or for any purpose to the annoyance or disturbance of citizens." The complaint alleges that the ordinance is unconstitutionally vague and unenforceable.[FN14] (Dkt. No.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 6739517 (N.D.N.Y.)

(Cite as: 2011 WL 6739517 (N.D.N.Y.))

1 ¶ 30.) Defendants' moving papers do not address this claim. (Dkt. No. 33–15.) Plaintiff's opposition papers focus largely on the issue. (Dkt. No. 42 at 3–5.) Defendants' reply papers address Plaintiff's arguments. (Dkt. No. 45–1 at 5–7.)

> FN14. The complaint does not allege that the ordinance is overbroad.

**\*6** Plaintiff argues that § 16–2 is unconstitutionally vague under *Coates v. City of Cincinnati,* 402 U.S. 611, 91 S.Ct. 1686, 29 L.Ed.2d 214 (1971). (Dkt. No. 42 at 4–5.) In *Coates,* the Supreme Court examined a loitering ordinance that made it a criminal offense for "three or more persons to assemble on any of the sidewalks and there conduct themselves in a manner annoying to persons passing by." *Coates,* 402 U.S. at 611 (punctuation omitted). Three individuals convicted under the ordinance appealed to the Supreme Court, arguing that the ordinance was facially unconstitutional. *Id.* at 612. The Court agreed, finding the ordinance both unconstitutionally vague and unconstitutionally overbroad. The Court stated that the "ordinance is unconstitutionally vague because it subjects the exercise of the right of assembly to an unas[c]ertainable standard, and unconstitutionally broad because it authorizes the punishment of constitutionally protected conduct." *Id.* at 614. Regarding vagueness, the Court explained that:

> Conduct that annoys some people does not annoy others. Thus, the ordinance is vague, not in the sense that it requires a person to conform his conduct to an imprecise but comprehensible normative standard, but rather in the sense that no standard of conduct is specified at all. As a result, men of common intelligence must necessarily guess at its meaning.

> It is said that the ordinance ... encompass[es] many types of conduct clearly within the city's constitutional power to prohibit. And so, indeed, it is. The city is free to prevent people from blocking sidewalks, obstructing traffic, littering streets, committing assaults, or engaging in countless other forms of antisocial conduct. It can do so through the enactment and enforcement of ordinances directed with reasonable specificity toward the conduct to be prohibited. *It cannot constitutionally do so*

> *through the enactment and enforcement of an ordinance whose violation may entirely depend upon whether or not a policeman is annoyed.*

> *Id.* at 614 (citations omitted) (emphasis added).

The Court also found that the statute was unconstitutional because it violated the constitutional right of free assembly and association. *Id.* at 615. The Court stated that:

> The First and Fourteenth Amendments do not permit a State to make criminal the exercise of the right of assembly simply because its exercise may be 'annoying' to some people If this were not the rule, the right of the people to gather in public places for social or political purposes would be continually subject to summary suspension through the good-faith enforcement of a prohibition against annoying conduct. And such a prohibition, in addition, contains an obvious invitation to discriminatory enforcement against those whose association together is 'annoying' because their ideas, their lifestyle, or their physical appearance is resented by the majority of their fellow citizens.

> *Id.* at 615–616.

**\*7** Plaintiff argues that § 16–2 "is nearly identical to the ordinance that was declared unconstitutional in *Coates* ... The wording regarding the annoyance is similar and should be declared unconstitutional for the same reasons set forth and relied upon in *Coates.*" (Dkt. No. 42 at 4–5.)

In their reply papers, Defendants argue that

> Plaintiff's reliance on *Coates* is misplaced. In *Coates,* the appellants had their convictions for violating an ordinance affirmed by the Supreme Court of Ohio. On appeal to the United States Supreme Court the issue before the court was whether the Cincinnati ordinance was constitutional on its face. Plaintiff argues that the Court in *Coates* held "that this ordinance was vague because conduct, which annoys some people, does not annoy others and therefore men of common intelligence would have to guess at the meaning of the ordinance." However, the holding in *Coates* was much narrower.

Slip Copy, 2011 WL 6739517 (N.D.N.Y.)

(Cite as: 2011 WL 6739517 (N.D.N.Y.))

The Court held that the ordinance was "unconstitutionally vague because it subjects the exercise of the right of assembly to an unascertainable standard, and unconstitutionally broad because it authorizes the punishment of constitutionally protected conduct." Here, Plaintiff is not seeking to overturn a conviction where he was exercising his First Amendment right to association or assembly.

More importantly, Section 16–2 of the Revised General Ordinances, General Prohibitions against disturbance of the public peace and quiet, explicitly states "persons shall not collect in bodies or crowds in the streets or on the sidewalks for any unlawful purpose, or for any purpose to the annoyance or disturbance of citizens." The use of the phrase "unlawful purpose" in the city of Syracuse's ordinance could easily fall under "antisocial conduct," which as the Court in *Coates* explicitly stated, "The city is free to prevent people from blocking sidewalks, obstructing traffic, littering streets, committing assaults, or engaging in other forms of antisocial conduct."

As such, Plaintiff's cases are not applicable to the present litigation. Plaintiff attempts to use cases centered on criminal conviction appeals to support his claims for civil liability on an unchallenged ordinance at the time of his arrest. Moreover, there is no evidence in the record that this ordinance was ever declared unconstitutional before Plaintiff's arrest.

(Dkt. No. 45–1 at 6–7.)

Defendants thus appear to argue that Plaintiff does not have standing to challenge the constitutionality of § 16–2 because he was not convicted of violating the ordinance. Defendants' argument is without merit. *See Naprstek v. City of Norwich*, 545 F.2d 815, 817 (2d Cir.1976) (minors and their parents had standing to challenge constitutionality of curfew ordinance which was applied to and enforced against person under circumstances identical to those in which the plaintiffs found themselves at the time of bringing the action, even though none of the plaintiffs had been arrested or fined or threatened with arrest or a fine); *Chapin v. Town of Southampton*, 457 F.Supp. 1170, 1172 (E.D.N.Y.1978)

(individual who had been arrested for nude sunbathing in violation of local ordinance had standing to challenge constitutionality of ordinance, even though charges had been dismissed). Here, Plaintiff was arrested for violating the ordinance. There is no indication in the record before the Court that the City of Syracuse intends to stop enforcing the ordinance. Therefore, Plaintiff has standing to challenge the ordinance.

**\*8** Defendants argue that § 16–2 is distinguishable from the ordinance discussed in *Coates* because it prohibits loitering for "an unlawful purpose." Section 16–2 would likely not be constitutionally infirm if it simply read "[p]ersons shall not collect in bodies or crowds in the streets or on the sidewalks for any unlawful purpose." However, the ordinance does not end there. It continues: *"or* for any purpose to the annoyance or disturbance of citizens." Thus, an individual may violate § 16–2 if he or she is perceived to have an annoying or disturbing purpose, even if everyone involved concedes that the purpose is lawful. The ordinance does not define what the terms "annoying" or "disturbing" mean. As the Supreme Court noted in *Coates*, what is unremarkable to one person may be annoying or disturbing to another. This is precisely the type of vagueness that the Supreme Court rejected as unconstitutional in *Coates*. Vague ordinances are subject to arbitrary and possibly discriminatory enforcement.

For these reasons, Defendants are not entitled to summary judgment of this claim. Plaintiff has not requested summary judgment on this claim. Therefore, the claim will proceed forward, possibly to be resolved through pretrial motions. The Court will conduct a telephone conference as soon as possible to discuss this issue and to schedule a trial date.

**B. 42 U.S.C. § 1983 Excessive Force Claim**

*1. Merits*

Plaintiff claims that Defendants Fura, Summers, and Patti violated his civil rights by subjecting him to excessive force.[FN15] (Dkt. No. 1 ¶¶ 14(c), 18–19.) Defendants move for summary judgment of this claim,[FN16] arguing that the force they used was objectively

Slip Copy, 2011 WL 6739517 (N.D.N.Y.)

(Cite as: 2011 WL 6739517 (N.D.N.Y.))

reasonable under the circumstances. (Dkt. No. 33–15 at 11–12.) Plaintiff argues that (1) no force was reasonable under the circumstances because the officers arrested him for violating an unconstitutional ordinance; or (2) summary judgment is not appropriate because reasonableness is a question of fact. (Dkt. No. 42 at 8.)

> FN15. The complaint does not use the phrase "excessive force," but asserts that the individual defendants violated Plaintiff's "rights under the Fourth and Fourteenth Amendments ... to be free from an unreasonable search and seizure of his person [resulting in] physical injuries to his person." (Dkt. No. 1 ¶ 14.) The Court has construed this as an excessive force claim.

> FN16. Defendants address the merits of the excessive force claim despite stating that "the complaint does not reveal a cause of action for excessive force." (Dkt. No. 33–15 at 11.)

a. *Legal Standard*

"The Fourth Amendment protects individuals from the government's use of excessive force while detaining or arresting individuals." *Jones v. Parmley,* 465 F.3d 46, 61 (2d Cir.2006) (citing *Thomas v. Roach,* 165 F.3d 137, 143 (2d Cir.1999)). "When determining whether police officers have employed excessive force in the arrest context, the Supreme Court has instructed that courts should examine whether the use of force is objectively reasonable 'in light of the facts and circumstances confronting them, without regard to the officers' underlying intent or motivation.' " *Jones,* 465 F.3d at 61 (quoting *Graham v. Connor,* 490 U.S. 386, 397, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)) (punctuation omitted). Among the most relevant facts and circumstances are (1) the severity of the crime allegedly committed; (2) the threat of danger to the officer and society; and (3) whether the suspect was resisting or attempting to evade arrest. *Thomas,* 165 F.3d at 143. Reasonableness is generally a question of fact. *See McKelvie v. Cooper,* 190 F.3d 58 (2d Cir.1999) (reversing magistrate judge's grant of summary judgment to officers of Fourth Amendment excessive force claim).

b. *Defendant Fura*

**\*9** In analyzing Plaintiff's excessive force claims, the Court is faced with a curious record because Plaintiff has no memory of his encounter with the police. Despite this oddity, the undisputed evidence shows that when Defendant Fura used force on Plaintiff, Plaintiff was suspected only of violating § 16–2. There is no evidence in the record that Defendant Fura believed that Plaintiff was armed or was otherwise a threat of danger to the officers or society. On the other hand, it is undisputed that Plaintiff ran away and did not stop when officers shouted at him. By his own testimony, Defendant Fura responded to Plaintiff's non-violent offense, lack of threat to the officers or society, and flight by grabbing Plaintiff and punching him in the jaw. (Dkt. No. 33–12 at 6:8–24.) A reasonable juror could find that Defendant Fura's actions were reasonable in light of Plaintiff's flight. Another reasonable juror could find that Defendant Fura's reaction was not reasonable in light of the minimal offense that Plaintiff had allegedly committed and the fact that Plaintiff was unarmed and had not threatened to hurt the officers or any other individuals. Thus, a question of triable fact exists as to whether Defendant Fura used excessive force.

c. *Defendant Summers*

Defendant Summers testified that when he arrived on the scene, Plaintiff was on the ground resisting Defendant Fura. (Dkt. No. 33–10 at 10:11–16.) When Plaintiff disregarded a verbal order to place his hands behind his back, Defendant Summers struck Plaintiff's shoulders twice, with one blow bouncing off of Plaintiff's shoulder and cutting his eyebrow. *Id.* at 10:16–21. As noted above, this is the only evidence in the record regarding the encounter between Defendant Summers and Plaintiff because Plaintiff does not remember the incident. A reasonable juror could not conclude that Defendant Summers acted unreasonably. Therefore, the excessive force claim against Defendant Summers is dismissed.

d. *Defendant Patti*

The complaint does not allege that Defendant Patti used any force against Plaintiff. (Dkt. No. 1.) Plaintiff's opposition papers do not discuss any use of force by Defendant Patti. (Dkt. No. 42.) Defendants assert that Defendant Patti "was not in any manner involved in the circumstances involved with Plaintiff's arrest." (Dkt. No.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 6739517 (N.D.N.Y.)

(Cite as: 2011 WL 6739517 (N.D.N.Y.))

33–15 at 1.) The evidence before the Court shows that Defendant Patti, among others, chased Plaintiff, yelling at him to stop and that he was under arrest. (Dkt. No. 33–14 ¶ 13; Dkt. No. 39 ¶ 1.) Plaintiff testified at his 50–h hearing that "it felt like I was being electrocuted ... So I must have been tased by ... an officer" and at his deposition that he believed he had been tased because his whole body shut down, but that he does not remember when that happened. (Dkt. No. 33–8 at 23:23–24:18; Dkt. No. 33–9 at 17:9–15.) Defendant Patti testified at his deposition that he was armed with a taser but that he did not use it. (Dkt. No. 33–11 at 21:3–22:1.)

**\*10** This evidence is insufficient to raise a triable issue of fact that Defendant Patti used any force against Plaintiff because it is entirely dependent on Plaintiff's own extremely incomplete testimony. In general, of course, "[c]redibility determinations ... are jury functions, not those of a judge." *Anderson,* 477 U.S. at 255. *See also Rule v. Brine, Inc.,* 85 F.3d 1002, 1011 (2d Cir.1996) ("Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment."). There is, however, a "narrow exception" to the general rule that credibility determinations are not to be made on summary judgment. *Jeffreys v. City of New York,* 426 F.3d 549, 554 (2d Cir.2005); *Blake v. Race,* 487 F.Supp.2d 187, 202 (E.D.N.Y.2007). In *Jeffreys,* the Second Circuit held that in the "rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete," the court may appropriately conclude at the summary judgment stage that no reasonable jury would credit the plaintiff's testimony. *Jeffreys,* 426 F.3d at 554.

In *Jeffreys,* the plaintiff, who alleged that police officers beat him and threw him out a window, confessed on at least three occasions that he had jumped out of a third-story window rather than having been thrown. *Id.* at 552. The plaintiff did not publicly state that he had been thrown out of a window by police officers until *nine months* after the incident. *Id.* The plaintiff could not identify any of the individuals whom he alleged participated in the attack or describe their ethnicities, physical features, facial hair, weight, or clothing on the night in question. *Id.*

The *Jeffreys* exception is most applicable where the plaintiff's version of events is contradicted by defense testimony. In *Jeffreys,* for instance, one of the arresting officers declared that, contrary to the plaintiff's version of events, he was the only officer who entered the room where the plaintiff was allegedly beaten and that he saw the plaintiff jump out the open window. *Jeffreys,* 426 F.3d at 551–52.

Here, Plaintiff testified that he "must have" been tased by "an officer." This incomplete testimony is contradicted by testimony by Defendant Patti, the only defendant who was armed with a taser, that he did not use his taser. No reasonable juror could credit a claim that Defendant Patti used force on Plaintiff. Indeed, as noted above, it is not even clear that Plaintiff *alleges* that Defendant Patti used force. Therefore, the excessive force claim against Defendant Patti is dismissed.

*2. Qualified Immunity*

Defendants argue that even if the court finds that Defendant Fura used excessive force, he is entitled to qualified immunity. (Dkt. No. 33–15 at 12.)

The qualified immunity inquiry generally involves two issues: (1) "whether the facts, viewed in the light most favorable to the plaintiff, establish a constitutional violation"; and (2) "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation confronted." *Sira v. Morton,* 380 F.3d 57, 68–69 (2d Cir.2004) (citations omitted), *accord, Higazy v. Templeton,* 505 F.3d 161, 169, n. 8 (2d Cir.2007) (citations omitted).

**\*11** In determining the second issue (i.e., whether it would be clear to a reasonable officer that his conduct was unlawful in the situation confronted), courts in the Second Circuit consider three factors: (1) whether the right in question was defined with 'reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful. *Jermosen v. Smith,* 945 F.2d 547, 550 (2d Cir.1991) (citations omitted), *cert. denied,* 503 U.S. 962, 112 S.Ct. 1565, 118 L.Ed.2d 211

Slip Copy, 2011 WL 6739517 (N.D.N.Y.)

(Cite as: 2011 WL 6739517 (N.D.N.Y.))

(1992).

In the excessive force context "the question for the purposes of qualified immunity is whether a reasonable officer could have believed that the use of force was objectively reasonable in light of the circumstances." *Lennon v. Miller,* 66 F.3d 416, 425 (2d Cir.1995). In excessive force cases, then, the analysis "converge[s] on one question: Whether in the particular circumstances faced by the officer, a reasonable officer would believe that the force employed would be lawful." *Cowan v. Breen,* 352 F.3d 756, 764 n. 7 (2d Cir.2003) (citation omitted).

If the facts showed that Defendant Fura merely grabbed Plaintiff to stop him from running, or even that he pushed Plaintiff to stop his flight, the Court would have no difficulty concluding that Defendant Fura was entitled to qualified immunity. However, the Court is unable to conclude as a matter of law that a reasonable officer would believe that punching a fleeing, non-violent suspect in the jaw would be lawful. Therefore, the excessive force claim against Defendant Fura will proceed to trial.

**C. False Arrest Claim**

Plaintiff alleges that Defendants Summers, Fura, and Patti violated his Fourth Amendment rights by subjecting him to "an unreasonable search and seizure of his person" and the "loss of his physical liberty." (Dkt. No. 1 ¶ 14.) Defendants move for summary judgment of this claim. (Dkt. No. 33–15 at 9–10.)

The elements of a Fourth Amendment false arrest claim under 42 U.S.C. § 1983 are the same as those for a false arrest claim under New York law. *Kraft v. City of New York,* 696 F.Supp.2d 403, (S.D.N.Y.2010). "To state a claim for false arrest under New York law, a plaintiff must show that (1) the defendant intended to confine the plaintiff; (2) the plaintiff was conscious of the confinement; (3) the plaintiff did not consent to the confinement; and (4) the confinement was not otherwise privileged." *Savino v. City of New York,* 331 F.3d 63, 75 (2d Cir.2003) (punctuation and citation omitted). Where an officer has probable cause to arrest a plaintiff, the confinement is privileged. *Id.* at 76. The burden of showing that there was probable cause for the arrest is on the officer. *Id.*

Defendants argue that Plaintiff cannot establish that he was falsely arrested because he was not aware of his confinement. (Dkt. No. 33–15 at 9–10.) Plaintiff's opposition papers do not address this argument.[FN17] (Dkt. No. 42.) It is undisputed that Plaintiff lost consciousness before Defendant Fura arrested him and did not regain consciousness until he was in the hospital. (Dkt. No. 33–14 ¶ 24; Dkt. No. 39 ¶ 1.) Thus, Plaintiff was not conscious of the confinement. Therefore, Defendants' motion for summary judgment dismissing this claim is granted.

> FN17. Regarding the false arrest claim, Plaintiff argues that Defendants did not have probable cause to arrest him because § 16–2 is unconstitutionally vague. (Dkt. No. 42 at 6.) Plaintiff's argument is without merit. *See Michigan v. DeFillippo,* 443 U.S. 31, 37, 99 S.Ct. 2627, 61 L.Ed.2d 343 (1979) ("Police are charged to enforce laws until and unless they are declared unconstitutional ... Society must be ill-served if police officers took it upon themselves to determine which laws are and which are not constitutionally entitled to enforcement.").

**D. City of Syracuse's Liability for Excessive Force and False Arrest**

**\*12** Plaintiff claims that the City of Syracuse is liable for any constitutional torts committed by the individual Defendants because it failed to exercise reasonable care in hiring its officers, inadequately supervised its officers, and inadequately trained its officers. (Dkt. No. 1 ¶¶ 32–34.) Defendants move for summary judgment of this claim. (Dkt. No. 33–15 at 14–16.) As Defendants correctly note (Dkt. No. 45–1 at 2), Plaintiff's opposition (Dkt. No. 42) does not address this argument.

In order "to hold a [municipality] liable under § 1983 for the unconstitutional actions of its employees, a plaintiff is required to ... prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Batista v. Rodriguez,* 702 F.2d 393, 397 (2d Cir.1983). An "official policy or custom" can be shown in several ways: (1) a formal policy officially endorsed by the municipality;

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 6739517 (N.D.N.Y.)

(Cite as: 2011 WL 6739517 (N.D.N.Y.))

(2) actions taken by government officials responsible for establishing municipal policies related to the particular deprivation in question; (3) a practice so consistent and widespread that it constitutes a custom or usage sufficient to impute constructive knowledge of the practice to policymaking officials; and (4) a failure by policymakers to train or supervise subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come in contact with the municipal employees. *Dorsett–Felicelli v. C'nty of Clinton,* 371 F.Supp.2d 183, 194 (N.D.N.Y.2005) (citing *Monell,* 436 U.S at 690, *Pembaur v. City of Cincinnati,* 475 U.S. 469, 483–84, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986), and *City of Canton v. Harris,* 489 U.S. 378, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)).

The record does not disclose any evidence that any official policy or custom of the City of Syracuse led to any deprivation of Plaintiff's constitutional rights. Therefore, Defendants' motion for summary judgment dismissing this claim is granted.

**E. State Law Claims**

1. *Negligence*

Plaintiff alleges that Defendants Patti, Fura, and Summers were negligent. (Dkt. No. 1 ¶¶ 25–27.) Defendants move for summary judgment of this claim, arguing that it is barred because Plaintiff did not mention negligence in the Notice of Claim he filed with the City of Syracuse. (Dkt. No. 33–15 at 13.) As Defendants correctly note (Dkt. No. 45–1 at 2), Plaintiff's opposition (Dkt. No. 42) does not address this argument.

New York General Municipal Law Section 50–e requires plaintiffs to submit a notice of claim to a municipality prior to bringing suit in court. The purpose of the claim requirement is to allow the defendant municipality to conduct a proper investigation and assess the merits of the claim. *Carhart v. Village of Hamilton,* 190 A.D.2d 973, 594 N.Y.S.2d 358 (3d Dept.1993). A theory of liability not mentioned in the notice of claim cannot be asserted later in litigation. *Olivera v. City of New York,* 270 A.D.2d 5, 704 N.Y.S.2d 42 (1st Dept.2000). Here, Plaintiff's notice of claim to the City of Syracuse mentions "[f]alse arrest, false imprisonment,

excessive force, police brutality, violation of claimant's civil rights, and assault." (Dkt. No. 33–5.) It does not mention negligence. Therefore, Defendants' motion for summary judgment dismissing Plaintiff's negligence claim is granted.

2. *False Imprisonment*

**\*13** Plaintiff alleges that Defendants Patti, Fura, and Summers falsely imprisoned him. (Dkt. No. 1 ¶¶ 20–22.) For the same reasons discussed above regarding Plaintiff's constitutional false arrest claim, Defendants' motion for summary judgment dismissing this claim is granted.

3. *Assault*

Plaintiff alleges that Defendants Fura and Summers assaulted him. (Dkt. No. 1 ¶¶ 23–24.) Defendants move for summary judgment dismissing this claim, arguing that the officers used only necessary force and that, even if they used unreasonable force, they are entitled to qualified immunity. (Dkt. No. 33–15 at 11–12.)

"[T]he test for whether a plaintiff can maintain ... a cause of action against law enforcement officials [for assault and battery] is whether the force used was 'reasonable,' the exact same test as the one used to analyze a Fourth Amendment excessive force claim." *Hogan v. Franco,* 896 F.Supp. 1313, 1315 n. 2 (N.D.N.Y.1995). Here, as discussed above, there is a triable issue of fact as to whether Defendant Fura used reasonable force but the undisputed facts show that Defendant Summers used reasonable force. Thus, the undisputed facts raise a triable issue of fact that Defendant Fura assaulted Plaintiff. Additionally, for the reasons discussed above regarding Plaintiff's constitutional excessive force claim, the Court cannot find as a matter of law at this time that Defendant Fura is entitled to qualified immunity. *Jones,* 465 F.3d at 63. Therefore, Defendants' motion for summary judgment of Plaintiff's state law claim for assault is granted as to Defendant Summers but denied as to Defendant Fura.

4. *Respondeat Superior*

Plaintiff claims that the City of Syracuse is liable under the theory of *respondeat superior* for Defendant Fura's alleged assault of Plaintiff. (Dkt. No. 1 ¶¶ 36–37.)

Slip Copy, 2011 WL 6739517 (N.D.N.Y.)

(Cite as: 2011 WL 6739517 (N.D.N.Y.))

Defendants do not address this claim in their motion for summary judgment, presumably relying on their substantive arguments regarding the individual Defendants to relieve the City of liability. Cities may be held vicariously liable for state law torts committed by police officers under a theory of *respondeat superior. See Williams v. City of White Plains,* 718 F.Supp.2d 374, 381 (S.D.N.Y.2010). Therefore, the *respondeat superior* claim against the City of Syracuse regarding Defendant Fura's alleged assault of Plaintiff will proceed to trial.

**ACCORDINGLY,** it is hereby

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 33) is ***GRANTED IN PART AND DENIED IN PART.*** The motion is granted as to all causes of action *except* (1) the claim against the City of Syracuse regarding the constitutionality of Ordinance § 16–2; (2) the excessive force claim against Defendant Fura; (3) the assault claim against Defendant Fura; and (4) the *respondeat superior* claim against the City of Syracuse regarding Defendant Fura's use of force. Those claims will proceed to trial; and it is further

**\*14 ORDERED** that a telephone conference be scheduled at the earliest possible convenience of the Court and the parties to schedule a trial date.

N.D.N.Y.,2011.

McMahon v. Fura
Slip Copy, 2011 WL 6739517 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

2012 WL 2178931
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Cesar MATEO, Plaintiff,
v.
Daniel F. MARTUSCELLO, Superintendent
of Coxsackie Corr. Facility, sued in both
individual and official capacity, Defendant.

Civ. No. 9:10–CV–1254 (MAD/RFT).
|
May 15, 2012.

**Attorneys and Law Firms**

Cesar Mateo, East Elmhurst, NY, pro se.

Hon. Eric T. Schneiderman, New York State Attorney General, Adam Silverman, Esq., Assistant Attorney General, of Counsel, Albany, NY, for Defendant.

## *REPORT–RECOMMENDATION and ORDER*

RANDOLPH F. TREECE, United States Magistrate Judge.

**\*1** *Pro se* Plaintiff Cesar Mateo brings this civil rights action, pursuant to 42 U.S.C. § 1983, alleging that the visitation policy at Coxsackie Correctional Facility ("Coxsackie") "is not in the best of [his] interest and does not maximize [his] rehabilitation process[.]" Dkt. No. 1, Compl., at ¶ 8. Pending before this Court is Defendant's Motion for Summary Judgment under Federal Rule of Civil Procedure 56(b). Dkt. No. 25. Plaintiff opposes the Motion. Dkt. No. 27. For the reasons that follow, this Court recommends that Defendant's Motion be **granted** and Plaintiff's Complaint be **dismissed** in its entirety.

## I. BACKGROUND

Plaintiff initiated this action on October 20, 2010, when he filed a Complaint against three named Defendants and several unnamed John Does, all of whom Plaintiff alleged violated his constitutional rights. *See* Compl. Upon granting Plaintiff permission to proceed with this matter *in forma pauperis,* the Honorable David N. Hurd, United States District Judge, pursuant to 28 U.S.C. § 1915(e), dismissed virtually all of Plaintiff's claims, except Plaintiff's challenge to Coxsackie's visitation policy. *See* Dkt. No. 9, Order, dated Jan. 13, 2011. Specifically, Plaintiff stated that he is only allowed to have two adult visitors on the weekends and holidays, that these visitors are not allowed to "switch or swap with other visitors waiting to visit [him]," and that this policy was unique only to Coxsackie. Compl. at ¶ 8. While Judge Hurd noted that "[i]t is well-settled that inmates do not enjoy an absolute right to visitation," the court ultimately held that "[P]laintiff's challenge to the visitation policy in effect at Coxsackie is not likely to survive; nevertheless, [it is] best to allow the [C]omplaint to proceed at this time and to obtain a response from [D]efendant Martuscello[,]" the Superintendent of Coxsackie. Dkt. No. 9, Order, at p. 10.

In response, Defendant Martuscello filed within his Motion for Summary Judgment a Statement of Material Facts, submitted in accordance with this District's Local Rule of Practice 7.1(a)(3), and his Declaration. *See* Dkt. Nos. 25–2, Def.'s Statement Pursuant to Rule 7.1(a)(3) [hereinafter "Def.'s 7.1 Statement"] & 25–3, Daniel F. Martuscello Decl., dated Feb. 2, 2012.

Plaintiff did not specifically controvert Defendant's 7.1 Statement nor submit evidence of his own, but rather filed an "Affirmation in Opposition to Defendant's Motion to Dismiss the Complaint." *See* Dkt. No. 27. However, the material facts here are not in dispute.

## II. DISCUSSION

### A. Standard of Review

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc .,* 477 U.S. 242, 247 (1986); *accord F.D.I. C. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994). The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with [ ] affidavits, if any," that there is no genuine issue of material fact. *F.D.I.C. v. Giammettei,* 34 F.3d at 54 (quoting

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). "When a party has moved for summary judgment on the basis of asserted facts supported as required by [Federal Rule of Civil Procedure 56(e) ] and has, in accordance with local court rules, served a concise statement of the material facts as to which it contends there exist no genuine issues to be tried, those facts will be deemed admitted unless properly controverted by the nonmoving party." Glazer v. Formica Corp., 964 F.2d 149, 154 (2d Cir.1992).

**\*2** To defeat a motion for summary judgment, the non-movant must set out specific facts showing that there is a genuine issue for trial, and cannot rest merely on allegations or denials of the facts submitted by the movant. FED. R. CIV. P. 56(c); see also Scott v. Coughlin, 344 F.3d 282, 287 (2d Cir.2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); Rexnord Holdings, Inc. v. Bidermann, 21 F.3d 522, 525–26 (2d Cir.1994).

When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. Nora Beverages, Inc. v. Perrier Group of Am., Inc., 164 F.3d 736, 742 (2d Cir.1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir.1994). Furthermore, where a party is proceeding pro se, the court must "read [his or her] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." Burgos v. Hopkins, 14 F.3 d 787, 790 (2d Cir.1994); accord, Soto v. Walker, 44 F.3d 169, 173 (2d Cir.1995). This liberal standard, however, does not excuse a pro se litigant from following the procedural formalities of summary judgment. Showers v. Eastmond, 2001 WL 527484, at \*2 (S.D.N.Y. May 16, 2001).

### B. Plaintiff's Claims

Again, pursuant to Judge Hurd's Order, Plaintiff's only remaining claim in this action is his claim against Superintendent Martuscello regarding the visitation policy in effect at Coxsackie Correctional Facility.

As an initial matter, this Court recognizes that Article III, Section 2 of the United States Constitution limits the subject matter of the federal courts to issues which present an actual "case or controversy." Spencer v. Kenna, 523 U.S. 1, 7 (1998); Linares v. Barkley, 2010 WL 4962998, at \*2 (N.D.N.Y. Oct. 8, 2010). A case is moot "when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." City of Erie v. Pap's A.M., 529 U.S. 277, 287 (2000) (internal quotation marks and citations omitted); Lavin v. United States, 299 F.3d 123, 128 (2d Cir.2002). "The hallmark of a moot case or controversy is that the relief sought can no longer be given or is no longer needed." Martin–Trigona v. Shiff, 702 F.2d 380, 386 (2d Cir.1983); see also Prins v. Coughlin, 76 F.3d 504, 506 (2d Cir.1996) ("A case is deemed moot where the problem sought to be remedied has ceased, and where there is no reasonable expectation that the wrong will be repeated.") (internal citation omitted).

**\*3** If a court determines an action is moot, it may still entertain such action if it is one that is "capable of repetition, yet evading review." Olmstead v. L.C. ex rel. Zimring, 527 U.S. 581, 594 n. 6 (1999). An otherwise moot claim is "capable of repetition" if 1) the duration of the challenged condition was too limited in duration to permit litigation prior to its cessation, and 2) if there is a reasonable expectation that the plaintiff will be subject to the same action again. Weinstein v. Bradford, 423 U.S. 147, 149 (1975).

Plaintiff is currently incarcerated at Sing Sing Correctional Facility. See New York State Department of Corrections and Community Supervision ("DOCCS"), Inmate Population Information Search, available at http:// nysdoccslookup.doccs.state.ny.us (last visited May 8, 2012, search for inmate name "Cesar Mateo"); see also Def.'s 7.1 Statement, at ¶ 3. Defendant attests that because "Plaintiff is no longer subject to the visitation restrictions in place at Coxsackie[,] there is no case or controversy present[.]" Dkt. No. 25–4, Def.'s Mem. of Law at p. 5. Plaintiff, on the other hand, aptly "rebut [s] this argument because as a prisoner in the State of New York [he] can be transferred back to [D]efendant's custody and housed at [ ] Coxsackie Correctional Facility[.]" Dkt. No. 27, Pl.'s Opp. at ¶ 8.

While "mere speculation that the parties will be involved in a dispute over the same issue does not rise to the level

2012 WL 2178931

of a reasonable expectation or demonstrated probability of recurrence," *Van Wie v. Pataki,* 267 F.3d 109, 115 (2d Cir.2001) (internal quotation omitted), the Court needs not decide this question now, as Plaintiff's claims regarding the visitation policy at Coxsackie plainly lack merit.

It is well-settled law that inmates do no enjoy an absolute right to visitation. *See Block v. Rutherford,* 468 U.S. 576, 589 (1984); *see also Jones v. North Carolina Prisoners' Labor Union, Inc.,* 433 U.S. 119, 125–26 (1977) (holding that one of the more obvious constitutional rights curtailed by confinement is the right to freely associate with those outside the penal institution); *Saxon v. Goord,* 2007 WL 1695582, at *4 (W.D.N.Y. June 7, 2007) ("It is well-established that contact visits are a *privilege* for inmates, not a *right.*") (emphasis in original); *Midalgo v.. Bass,* 2006 WL 2795332, at *16 (N.D.N.Y. Sept. 26, 2006) ("[F]amily visitations for inmates only constitute a privilege and not a right."). Rather, restrictions that are placed on an prison inmate's visitation rights "may be upheld if they are 'reasonably related to legitimate penological interests.' " *Hernandez v. McGinnis,* 272 F.Supp.2d 223, 226 (W.D.N.Y.2003) (quoting *Turner v. Safley,* 482 U.S. 78, 89 (1987)); *see also Overton v. Bazzetta,* 539 U.S. 126, 131–35 (2003) (noting that while the Court would neither hold nor imply that "any right to intimate association be altogether terminated by incarceration," the "freedom of association is among the rights least compatible with incarceration" and that visitation restrictions only must "bear[] a rational relation to legitimate penological interests").

*\*4* Plaintiff complains that unlike other DOCCS facilities where he has been confined, he is only allowed to have two adult visitors on the weekends and holy days, and that these visitors are not allowed to "switch or swap with other visitors waiting to visit [him]." Compl. at ¶ 8. However, Coxsackie has a limited amount of space where the over 1,000 inmates can receive visitors. Martuscello Decl. at ¶ 17. Further, more individuals choose to visit the correctional facility on the weekends than on the weekdays, and thus the number of visitors per inmate is limited to two on the weekends as opposed to the four adult visitors inmates may receive during the week. *Id.* at ¶¶ 15–16. Lastly, inmates are not permitted to exchange visitors under Coxsackie's visitation policy because that has "created a problem in the past because when permitted, it allowed an inmate to have multiple

visitors in one day and essentially provided those inmates the opportunity to have more daily visitors than was provided for in the [p]olicy .... [,] essentially provid[ing] inmates with a method to cheat the [p]olicy." *Id.* at ¶¶ 20–21. Any difference between Coxsackie's visitation program and those of other DOCCS facilities are "likely due to differences in other facility's physical size, inmate population, and visitation requests." *Id.* at ¶ 24.

Accordingly, Defendant's reasons for a limitation on the number of visitors an inmate may receive on the weekends, as well as the reasons for not permitting a visitor exchange program, are rationally related to the penological purposes of the prison system. As such, Plaintiff does not have a valid claim under § 1983 regarding Defendant's visitation policy. In light of this determination, and in awareness of the Supreme Court's "counsel [of] judicial restraint in the federal courts' review of prison policy and administration, noting that 'courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform,' " *Giano v. Senkowski,* 54 F.3d 1050, 1053 (2d Cir.1995) (quoting *Turner v. Safley,* 482 U.S. at 84), we conclude that no issue of material facts exists such that a reasonable jury could find that Plaintiff's constitutional rights were violated by Coxsackie's inmate visitation policy, and we recommend that Defendant's Motion for Summary Judgment be **granted.**

### III. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED,** that Defendant's Motion for Summary Judgment (Dkt. No. 25) be granted and this case be **dismissed;** and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report–Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW. Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y*

**Mateo v. Martuscello, Not Reported in F.Supp.2d (2012)**

2012 WL 2178931

*of Health and Human Servs .,* 892 F.2d 15 (2d Cir.1989));
*see also* 28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72 & 6(a).

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 2178931

---

**End of Document**                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 2178928
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Cesar MATEO, Plaintiff,
v.
Daniel F. MARTUSCELLO, Superintendent of
Coxsackie Correctional Facility, sued in both
individual and official capacity, Defendant.

No. 9:10–cv–1254 (MAD/RFT).
|
June 13, 2012.

**Attorneys and Law Firms**

Cesar Mateo, Ossining, NY, pro se.

Office of the New York State Attorney General, Michael
G. McCartin, AAG, of Counsel, Albany, NY, for
Defendant.

### DECISION AND ORDER

MAE A. D'AGOSTINO, District Judge.

 **\*1** Plaintiff commenced this action pursuant to 42 U.S.C.
§ 1983, alleging that the visitation policy at Coxsackie
Correctional Facility ("Coxsackie") "is not in the best of
[his] interest and does not maximize [his] rehabilitation
process[.]" *See* Dkt. No. 1 at ¶ 8. [1] Specifically, Plaintiff
claims that he is only allowed to have two adult visitors
on the weekends and holidays, that these visitors are not
allowed to "switch or swap with other visitors waiting to
visit [him]," and that this policy is unique to Coxsackie.
*See id.*

On February 3, 2012, Defendant filed a motion for
summary judgment. *See* Dkt. No. 25. In its motion,
Defendant argued that it is entitled to summary judgment
because (1) the visitation policies at issue are rationally
related to a legitimate penological interest and (2) this
action is moot because Plaintiff was transferred to Attica
Correctional Facility and, therefore, is no longer subject to
Coxsackie's visitation policy. *See* Dkt. No. 25–4. Plaintiff,
however, argues that this case is not moot because "as a
prisoner in the State of New York [he] can be transferred

back to [D]efendant's custody and housed at [ ] Coxsackie
Correctional Facility[.]" *See* Dkt. No. 27 at ¶ 8.

On May 15, 2012, Magistrate Judge Treece issued a
Report–Recommendation and Order recommending that
the Court grant Defendant's motion and dismiss Plaintiff's
complaint in its entirety. *See* Dkt. No. 32. Magistrate
Judge Treece declined to determine whether Plaintiff's
challenge is moot, "as Plaintiff's claims regarding the
visitation policy at Coxsackie plainly lack merit." *See id.* at
5–6. Specifically, Magistrate Judge Treece recommended
the Court find that Defendant's reasons for a limitation
on the number of visitors an inmate may receive on the
weekends and holidays, as well as the reasons for not
permitted a "visitor exchange program, are rationally
related to the penological purposes of the prison system."
*See id.* at 7. As such, Magistrate Judge Treece found that
Plaintiff does not have a valid claim under section 1983
regarding Defendant's visitation policy. *See id.* Plaintiff
did not object to Magistrate Judge Treece's Report–
Recommendation and Order.

When a party files specific objections to a magistrate
judge's report-recommendation, the district court makes
a *"de novo* determination of those portions of the
report or specified proposed findings or recommendations
to which objection is made." 28 U.S.C. § 636(b)(1).
However, when a party files "[g]eneral or conclusory
objections or objections which merely recite the same
arguments [that he presented] to the magistrate judge,"
the court reviews those recommendations for clear error.
*O'Diah v. Mawhir,* No. 9:08–CV–322, 2011 WL 933846,
\*1 (N.D.N.Y. Mar. 16, 2011) (citations and footnote
omitted). After the appropriate review, "the court may
accept, reject, or modify, in whole or in part, the findings
or recommendations made by the magistrate judge." 28
U.S.C. § 636(b) (1).

 **\*2** A litigant's failure to file objections to a magistrate
judge's report and recommendation, even when that
litigant is proceeding *pro se,* waives any challenge to
the report on appeal. *See Cephas v. Nash,* 328 F.3d 98,
107 (2d Cir.2003) (holding that, "[a]s a rule, a party's
failure to object to any purported error or omission in a
magistrate judge's report waives further judicial review of
the point" (citation omitted)). A *pro se* litigant must be
given notice of this rule; notice is sufficient if it informs
the litigant that the failure to timely object will result in
the waiver of further judicial review and cites pertinent

statutory and civil rules authority. *See Frank v. Johnson,* *968 F.2d 298, 299 (2d Cir.1992)*; *Small v. Sec'y of Health and Human Servs.,* *892 F.2d 15, 16 (2d Cir.1989)* (holding that a *pro se* party's failure to object to a report and recommendation does not waive his right to appellate review unless the report explicitly states that failure to object will preclude appellate review and specifically cites 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and former 6(e) of the Federal Rules of Civil Procedure).

Having reviewed Magistrate Judge Treece's May 15, 2012 Report–Recommendation and Order, the record, the parties' submissions and the applicable law, the Court finds that Magistrate Judge Treece correctly recommended that the Court should grant Defendant's motion for summary judgment and enter judgment in Defendant's favor. Additionally, the Court also finds that Plaintiff's transfer from Coxsackie to Attica Correctional Facility rendered this action moot. *See Ehrenberg v. Goord,* *7 Fed. Appx. 80, 83 (2d Cir.2001)* (finding a prisoner's challenge to a policy that was specific to inmates housed at the Elmira Correctional Facility to be moot when the prisoner had been transferred to a different prison facility after his action had been commenced).

Accordingly, the Court hereby

**ORDERS** that Magistrate Judge Treece's May 15, 2012 Report–Recommendation and Order is **ADOPTED in its**

entirety for the reasons stated therein and as set forth in this Order; and the Court further

**ORDERS** that Defendant's motion for summary judgment is **GRANTED;** and the Court further

**ORDERS** that Plaintiff's complaint is **DISMISSED** as moot, and, in the alternative, for the reasons set forth in Magistrate Judge Treece's May 15, 2012 Report–Recommendation and Order; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Defendant's favor and close this case; and the Court further

**CERTIFIES** that, pursuant to 28 U.S.C. § 1915(a)(3), any appeal taken from this Order would not be taken in good faith; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Order on the parties accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 2178928

Footnotes

1    Plaintiff filed his complaint on October 20, 2010 against three named Defendants and several unnamed John Does, all of whom allegedly violated Plaintiff's constitutional rights. *See* Dkt. No. 1. In a January 13, 2011 Order, District Judge David Hurd dismissed all claims except Plaintiff's challenge to Coxsackie's visitation policy against Defendant Martuscello.

---

**End of Document**                              © 2018 Thomson Reuters. No claim to original U.S. Government Works.



Not Reported in F.Supp.2d, 2003 WL 22299359 (N.D.N.Y.)

(Cite as: 2003 WL 22299359 (N.D.N.Y.))

C

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Troy GARRETT, Plaintiff,
v.
Edward REYNOLDS, Superintendent, Mohawk Corr. Facility; James A. Mance, Deputy Superintendent of Programs; John O'Reilly,[FN1] Deputy Superintendent; J. Burge, First Deputy; M. Maher, DSS; R. Centore, Correctional Officer, Defendants.

> FN1. In this case, the defendants maintain and the docket confirms that defendant John O'Reilly has never been served. Service must be made upon a defendant within 120 days of filing the complaint or any claims against that defendant will be dismissed. See Fed.R.Civ.P. 4(m). The original complaint, which named O'Reilly, was filed on November 26, 1999, and the amended complaint was filed on July 13, 2001. However, O'Reilly was never served. Since this defendant has never been served, this court lacks jurisdiction over him, and this court recommends the dismissal of this defendant.

No. Civ.9:99CV2065NAMGLS.

Oct. 7, 2003.
Troy Garrett, Peekskill, NY, Plaintiff, pro se.

Hon. Eliot Spitzer, Attorney General State of New York, Syracuse, NY, for the Defendants.

Maria Moran, Asst. Attorney General, of counsel.

REPORT-RECOMMENDATION

SHARPE, Magistrate J.

I. *Introduction* [FN2]

> FN2. This matter was referred to the undersigned for a Report-Recommendation by the Hon.

Norman A. Mordue, United States District Judge, pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.3(c).

**\*1** Plaintiff, *pro se* Troy Garrett filed an action under 42 U.S.C. § 1983 claiming that the defendants violated his civil rights when they retaliated against him for his activities as an IGRC representative by subjecting him to verbal harassment, physical abuse and subsequently, a transfer. Garrett also claims that the supervisory defendants failed to properly investigate his complaints and failed to train/supervise their employees. This court recommends denying the motion for summary judgment in part and granting it in part.

II. *Procedural History*

On July 13, 2001, Garrett filed an amended complaint against the defendants claiming that they violated his civil rights under the First, Sixth Eighth, and Fourteenth Amendments.[FN3] On September 28, 2001, the defendants filed a motion for summary judgment. On January 18, 2002, this court issued an order informing Garrett of his obligation to file a response and extended his time to respond for thirty days. On April 24, 2002, this court granted an additional sixty days to respond to the defendants' motion. Despite having been given multiple opportunities to respond, Garrett has failed to file a response.

> FN3. Although Garrett claims to be raising violations under the Sixth, Eighth, and Fourteenth Amendments, the only viable claim based on this court's interpretation of the complaint is under the First Amendment for retaliation.

III. *Facts* [FN4]

> FN4. The facts are taken from the defendants' statement of undisputed material facts since Garrett failed to file a response.

On June 17, 1999, Garrett filed a grievance against

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22299359 (N.D.N.Y.)

(Cite as: 2003 WL 22299359 (N.D.N.Y.))

Officer Kelley for verbal harassment.[FN5] This grievance was denied by the Central Office Review Committee (CORC) on July 21, 1999. On March 19, 2000, Garrett filed a grievance claiming that defendant Burge used intimidation tactics. Defendant Reynolds investigated the grievance and it was denied based on a finding that no harassment occurred. Garrett appealed to the CORC and they denied the grievance on April 5, 2000. On April 10, 2000, defendant Centore wrote a misbehavior report against Garrett for creating a disturbance and employee harassment. On April 12, 2000, Lieutenant Manell presided over Garrett's Tier 2 disciplinary hearing and he was found guilty of both charges. He was given a 21 day recreation penalty, and loss of packages and commissary. However, his recreation penalty was suspended and deferred. Garrett appealed the determination and it was affirmed on April 19, 2000.

> FN5. Not a party in this suit.

On April 17, 2000, Garrett filed a grievance against Centore for harassment. Burge denied his grievance on May 4, 2000, and subsequently, the CORC denied it. On May 12, 2000, Garrett sent a letter to Burge concerning further harassment by Centore. On May 16, 2000, Garrett filed another grievance against Centore for harassment. His grievance was denied on May 26, 2000. After Garrett appealed, his grievance was again denied by the CORC. On June 22, 2000, the Superintendent's Office received a letter from Garrett alleging that Centore threw a piece of paper with a picture of a plunger and the words "always gets the job done" into his cell. He wrote a grievance against Centore for harassment due to the paper that he threw into his cell. Burge forwarded the grievance to the CORC on August 10, 2000. The CORC accepted the grievance on August 30, 2000, in order to investigate.

**\*2** On June 23, 2000, the Inspector General's Office interviewed Garrett at the Mohawk Correctional Facility regarding his complaints of Centore. That same day, Captain Naughton filed an administrative segregation recommendation. On June 29, 2000, an administrative segregation hearing was held. On July 14, 2000, Garrett was transferred [FN6] to the Mid-State Correctional Facility.

> FN6. The defendants suggest that Garrett has

failed to exhaust his administrative remedies concerning his transfer. They claim that he agreed to the transfer and participated in the administrative hearing which resulted in his transfer. The issue of transfer will not be addressed in this Report-Recommendation because the court has insufficient information to determine whether he exhausted his remedies.

Finally, Garrett filed a claim alleging that his property was lost or damaged on October 8, 1999. However, he was paid $75.00 for this claim and he signed a release on December 13, 1999.

IV. *Discussion*

A. *Legal Standard*

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986); *accord F.D.I.C. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994). The moving party has the burden of demonstrating that there is no genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986); *Thomas v. Roach,* 165 F.3d 137, 142 (2d Cir.1999). "When a motion for summary judgment is made and supported ... an adverse party may not rest upon the mere allegations or denials of the ... pleading, but the adverse party's response, by affidavits or as otherwise provided in [Federal Rule of Civil Procedure 56(e) ], must set forth specific facts showing that there is a genuine issue for trial." *St. Pierre v. Dyer,* 208 F.3d 394, 404 (2d Cir.2000). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment[.]" *Rexford Holdings, Inc. v. Biderman,* 21 F.3d 522, 525 (2d Cir.1994)(alternation in original) (citation omitted). However, it is well settled that on a motion for summary judgment, the court must construe the evidence in the light most favorable to the non-moving party. *Tenenbaum v. Williams,* 193 F.3d 581, 593 (2d Cir.1999).

Furthermore, in a *pro se* case, the court must view the submissions by a more lenient standard than that accorded

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22299359 (N.D.N.Y.)

(Cite as: 2003 WL 22299359 (N.D.N.Y.))

to "formal pleadings drafted by lawyers." *Haines v. Kerner,* 404 U .S. 519, 520 (1972); *see Estelle v. Gamble,* 429 U.S. 97, 106 (1976); *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)(a court is to read a *pro se* party's "supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest"). Indeed, the Second Circuit has stated that "[i]mplicit in the right to self-representation is an obligation on the part of the court to make reasonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training." *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983). Any ambiguities and inferences drawn from the facts must be viewed in the light most favorable to the non-moving party. *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990); *see LaFond v. General Physics Serv. Corp.,* 50 F.3d 165, 171 (2d Cir.1995).

**\*3** This liberal standard, however, does not excuse a *pro se* litigant from following the procedural formalities of summary judgment. *Showers v. Eastmond,* 00 CIV. 3725, 2001 WL 527484, at \*2 (S.D.N.Y. May 16, 2001). More specifically, Local Rule 7.1(a)(3) of this court specifically provides that "any facts set forth in the [moving party's] Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party." Local Rule 7.1(a)(3) further requires that the "non-movant shall file a Statement of Material Fact which mirrors the movant's statement in matching numbered paragraphs and which set forth a specific reference to the record where the material fact is alleged to arise." The courts of the Northern District have adhered to a strict application of Local Rule 7.1(a)(3)'s requirement on summary judgment motions. *Giguere v. Racicot,* 00-CV-1178, 2002 WL 368534, at \*2 (N.D.N.Y. March 1, 2002)(interalia citing *Bundy Am. Corp. v. K-Z Rental Leasing, Inc.,* 00-CV-260, 2001 WL 237218, at \*1 (N.D.N.Y. March 9, 2001)).

Furthermore, this Circuit adheres to the view that nothing in Rule 56 imposes an obligation on the court to conduct a search and independent review of the record to find proof of a factual dispute. *Amnesty America v. Town of West Hartford,* 288 F.3d 467, 470 (2d Cir.2002). As long as the local rules impose a requirement that parties provide specific record citations in support of their statement of material facts, the court may grant summary judgment on that basis. *Id.* at 470-71.

In this case, Garrett did not file a response to the motion for summary judgment. Consequently, this court will accept the properly supported facts contained in the defendants' 7.1 Statement (*Dkt. No. 49* ) as true for purposes of this motion.[FN7] With this standard in mind, the court now turns to the sufficiency of Garrett's claims.

> [FN7]. The court notes that this does not apply to the various conclusions of law contained in the defendants' 7.1 Statement.

B. *Eleventh Amendment*

In Garrett's complaint, he raises claims against the defendants in their official and individual capacity. The Eleventh Amendment provides that: "[t]he judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. Amend. XI. Although the Amendment does not specifically prohibit suits against a state by its own citizens, the Supreme Court has consistently applied that immunity to such cases. *See Burnette v. Carothers,* 192 F.3d 52, 57 (2d Cir.1999)(citing *Edelman v. Jordan,* 415 U.S. 651, 662-63 (1974)). Moreover, it is well established that Eleventh Amendment immunity applies not only when a state is a named defendant, but when liability must be paid from state coffers. *See New York City Health & Hosp. Corp. v. Perales,* 50 F.3d 129, 134 (2d Cir.1995)(citing *Edelman,* 415 U .S. at 665); *Dawkins v. State of New York,* 93-CV-1298, 1996 WL 156764, at \*2 (N.D.N.Y. Mar. 28, 1996).

**\*4** In this case, Garrett raises claims against the defendants in their official and individual capacities. Since the Eleventh Amendment bars official capacity claims against these state officers, this court recommends dismissal of Garrett's claims against the defendants in their official capacity.

C. *Retaliation*

In this case, Garrett claims that during the course of his appointment as an IGRC representative, he has been subjected to repeated acts of harassment, both verbal and

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22299359 (N.D.N.Y.)

(Cite as: 2003 WL 22299359 (N.D.N.Y.))

physical, threatened with physical assaults, placed into disciplinary confinement in the SHU, and transferred.[FN8] The Second Circuit has held that retaliation against a prisoner for pursuing a grievance is actionable under § 1983. *Graham v. Henderson*, 89 F.3d 75, 80 (2d Cir.1996). Moreover, the Second Circuit has recognized both the near inevitability of decisions and actions by prison officials to which prisoners will take exception and the ease with which claims of retaliation may be fabricated. Thus, prisoners' claims of retaliation are examined with skepticism and particular care. *See Flaherty v. Coughlin*, 713 F.2d 10 (2d Cir.1983).

> FN8. This case turns on the interpretation of the complaint. Garret's complaint is not a model of clarity and as noted, he has failed to file a response to the motion for summary judgment. Nonetheless, a careful reading of Garrett's opening paragraph under the title "Facts" compels this court to interpret this complaint as one claiming retaliation for his activities and status as an IGRC representative.

In order for a plaintiff to prevail on a First Amendment retaliation claim, a plaintiff must advance non-conclusory allegations establishing: (1) that the speech or conduct at issue was protected; (2) that the defendant took adverse action against the plaintiff; and, (3) that there was a causal connection between the protected speech and the adverse action. *See Dawes v. Walker*,[FN9] 239 F.3d 489, 492 (2d Cir.2001) (citation omitted) *overruled on other grounds, Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002). If Garrett makes these showings, DOCS may evade liability if it demonstrates that it would have disciplined or transferred him " 'even in the absence of the protected conduct." ' *Bennett v. Goord*, 343 F.3d 133, 137 (2d Cir.2003) (citations omitted).

> FN9. Dawes' complaint was dismissed pursuant to Fed.R.Civ.P. 12(b)(6).

An inmate has a constitutional right to be protected from retaliation based upon his activities as an IGRC representative. *Alnutt v. Cleary*, 913 F.Supp. 160, 170 (W.D.N.Y.1996). However, a claim brought under "42 U.S.C. § 1983 is not designed to rectify harassment or verbal abuse." *Gill v. Hoadley*, 261 F.Supp 2d 113, 129

(N.D.N.Y.2003)(citing *Alnutt*, 913 F.Supp at 165-66)). Ordinarily, a claim for verbal harassment is not actionable under 42 U.S.C. § 1983. *Aziz Zarif Shabazz v. Picco*, 994 F.Supp. 460, 474 (S.D.N.Y.1998). Moreover, "verbal harassment or profanity alone, unaccompanied by an injury no matter how inappropriate, unprofessional, or reprehensible it might seem, does not constitute the violation of any federally protected right and therefore is not actionable under 42 U.S.C. § 1983." *Aziz Zarif Shabazz*, 994 F.Supp. at 474.

In this case, Garrett claims that defendant Centore harassed him for his activities as an IGRC representative. Garrett also claims that he was removed as an IGRC representative when he was transferred. In addition, Garrett claims that defendants Reynolds, Mance, Burger and Maher failed to properly investigate his allegations against Centore. Garrett claims that these defendants failed to properly investigate his claims in retaliation for his activities as an IGRC representative.

**\*5** More specifically, Garrett claims that Reynolds and Mance recalled IGRC passes for one day in order to interfere with an investigation inquiry into a correctional officer's conduct involving inmates who were left in the yard during inclement weather. Finally, Garrett claims that his property was destroyed while he was in the SHU.[FN10] Garrett filed grievances against Centore in April, May, and June of 2000. One of his complaints involved Centore throwing a folded piece of paper into his cell which had a picture of a plunger with the words "always gets the job done" on it. On June 23, 2000, he was placed in administrative segregation in the SHU. Three weeks later he was transferred.[FN11]

> FN10. However, the defendants provide the court with documents which show that he was paid $75.00 in settlement of this claim.

> FN11. The defendants maintain that Garrett failed to exhaust this claim. At this juncture, it is unclear whether or not he exhausted this claim. As such, this court cannot, as a matter of law, recommend dismissal because the court has insufficient information to determine this issue.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22299359 (N.D.N.Y.)

(Cite as: 2003 WL 22299359 (N.D.N.Y.))

Viewing the facts in the light most favorable to Garrett, the non-moving party, this court cannot, as a matter of law, find that Garrett fails to state a claim for which relief can be granted. He claims that he was retaliated against for his activities as an IGRC representative. As noted, verbal harassment alone will not constitute a violation of a prisoner's constitutional rights but in this case, it appears that he was transferred for his activities as an IGRC representative. The defendants rely on numerous grievances which were denied by the CORC to show that their actions were proper. They also claim that Garrett has failed to show injury, however, at this juncture of the litigation with virtually no discovery in this case, this court cannot recommend dismissal as a matter of law.

D. *Personal Involvement*

It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995)(*citation omitted* ). Since there is no respondeat superior liability, the defendant must be shown to have personal involvement in the alleged deprivation of rights. *Al- Jundi v. Estate of Rockefeller,* 885 F.2d 1060, 1065 (2d Cir.1989). Supervisory officials cannot be held liable under § 1983 solely for the acts of their subordinates. *See Monell v. Department of Social Serv.,* 436 U.S. 658, 690-695 (2d Cir.1978). However, a supervisory official can be held liable for constitutional violations if he or she: (1) directly participated in the violation; (2) failed to remedy the violation after learning of it through a report or appeal; (3) created a custom or policy fostering the violation after learning of it; or (4) was grossly negligent in supervising subordinates who caused the violation. *Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997) (citing *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986)).

Garrett contends that defendants Reynolds and Mance allowed staff members under their supervision to violate his rights. More specifically, Mance refused to properly investigate Garrett's complaints. Garrett also claims that defendant Burge refused to grant his request for redress against defendant Centore. Finally, Garrett claims that the defendants collectively failed to properly train and supervise their employees.

**\*6** The defendants contend that the claims against the supervisory defendants should be dismissed for lack of personal involvement. However, this court finds this contention without merit since it appears that all of the defendants were involved in the investigation process of Garrett's complaint and he accuses all of them of continuing the alleged constitutional violation by failing to properly investigate the grievances he filed. Accordingly, this court recommends denying the defendants' motion for summary judgment based on the lack of personal involvement.

WHEREFORE, for the foregoing reasons, it is hereby

RECOMMENDED, that Garrett's claims against the defendants in their official capacity under the Eleventh Amendment should be dismissed since these claims are barred; and it is further

RECOMMENDED, that defendant O'Reilly be dismissed since he was never served; and it is further

RECOMMENDED, that the defendants' motion for summary judgment be denied in all other respects; and it is further

ORDERED, that the Clerk of the Court serve a copy of this Report-Recommendation upon the parties by regular mail.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court within TEN days. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,2003.

Garrett v. Reynolds
Not Reported in F.Supp.2d, 2003 WL 22299359 (N.D.N.Y.)
END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22299359 (N.D.N.Y.)

(Cite as: 2003 WL 22299359 (N.D.N.Y.))

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case 9:14-cv-00626-BKS-DEP    Document 86    Filed 02/02/18    Page 225 of 359

Vazquez v. Southside United Housing Development Fund Corp., Not Reported in...

2009 WL 2596490

2009 WL 2596490
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

Esther VAZQUEZ, Plaintiff,
v.
SOUTHSIDE UNITED HOUSING
DEVELOPMENT FUND CORP., and Los
Sures Management Company, Defendants.

No. 06–CV–5997 (NGG)(LB).
|
Aug. 21, 2009.

**Attorneys and Law Firms**

Esther Vasquez, Kissimmee, FL, pro se.

Deborah S.K. Jagoda, Jason Steven Aschenbrand, Grissel Seijo, Winston & Strawn LLP, New York, NY, for Defendants.

**MEMORANDUM & ORDER**

NICHOLAS G. GARAUFIS, District Judge.

**\*1** *Pro se* plaintiff Esther Vazquez ("Plaintiff" or "Vazquez") asserts claims of employment discrimination on the basis of race, national origin, age, and disability under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e to 2000e–17, the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621–634, and the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12112–12117, against her former employer, defendants Southside United Housing Development Fund Corporation ("SUHDFC") and Los Sures Management Company ("Los Sures") (collectively, "Defendants" or "Southside") (*See* Docket Entry # 1, Complaint.) Plaintiff alleges that she suffered unlawful termination, retaliation, and a lack of accommodation for her disability as a result of the Defendants' discrimination. (*Id* . ¶ 4.) The court further construes Plaintiff's allegations to assert a hostile work environment claim. (*See* Compl. ¶ 8 & Attachment (citing "harassment" and "threat[s]").)

Defendants have moved for summary judgment on all claims. (*See* Docket Entry # 25, Defendants' Motion for Summary

Judgment; Docket Entry # 28, Defendants' Memorandum of Law in Support of Motion for Summary Judgment ("Def.Mem.").) For the reasons set forth below, Defendants' Motion is GRANTED in its entirety.

**I. BACKGROUND**

The following facts are undisputed unless otherwise noted. [2]

For thirteen years, Vazquez worked for Southside as a Property Manager, overseeing operations in its low to middle income housing properties in Williamsburg, Brooklyn. (Def. 56.1 Stmt. ¶¶ 4, 37; Docket Entry # 23, Affidavit in Opposition by Esther Vazquez, dated February 13, 2008 ("Vazquez Aff.") ¶ 2.) Vazquez is of Puerto Rican national origin, and was 64 years old at the time of her termination in November 2005. (Compl. ¶ 7 & Attachment *see* Vazquez Aff. ¶ 7; *see also* Docket Entry # 25 (Attachment 5), Affirmation of Jason Aschenbrand, dated December 21, 2007 ("Aschenbrand Aff."), Ex. L, New York State Division of Human Rights Charge of Discrimination Form dated June 6, 2006.)

Southside hired Vazquez on or about July 9, 1992. (Def. 56.1 Stmt. ¶ 4; Docket Entry # 25 (Attachment 1) Affidavit of David Pagan, dated December 12, 2007 ("Pagan Aff.") ¶ 5.) Throughout Vazquez's tenure, David Pagan served as the Administrator for Southside. (Def. 56.1 Stmt. ¶ 5; Pagan Aff. ¶ 1.) Plaintiffs immediate supervisor was Southside's Housing Director. (Def. 56.1 Stmt. ¶ 6; Pagan Aff. ¶ 7.) The position was originally held by Ana Bonano ("Bonano"), from approximately 1992–2004. (*Id.*) Bonano was succeeded by Rosemarie Pizarro ("Pizarro"), who served in the position for ten months in 2004.(*Id.*) Beginning in November 2004, Yanet Ciprian ("Ciprian") replaced Pizarro as Housing Director. (*Id.; see also* Docket Entry # 25 (Attachments 7–8), Deposition of Esther Vazquez, dated June 29, 2007 ("Vazquez Dep.") 42.)

**\*2** Plaintiff's claims center on allegations of discriminatory conduct by Ciprian from November 2004 through February 2005. Plaintiff asserts that she was "constantly harassed" by Ciprian, who pressured her "to retire so that she can replace me with someone who is younger, smarter and that could follow instructions in a faster manner."(Vazquez Aff. ¶ 3.) According to Vazquez, Ciprian called her "a stupid old woman, a [waste] of time and too old to perform my job duties," and told Vazquez that once she left Ciprian would "never hire another Puerto Rican" again. [3] (*Id* .)

Case 9:14-cv-00626-BKS-DEP    Document 86    Filed 02/02/18    Page 226 of 359

Vazquez v. Southside United Housing Development Fund Corp., Not Reported in...

2009 WL 2596490

From about October 22, 2004 until November 22, 2004, Plaintiff took a personal leave to care for her sister. (Def. 56.1 Stmt. ¶ 13.) Southside approved the leave. (*Id.*) While Plaintiff was away on leave, Ciprian took over as Housing Director. (*See* Def. 56.1 Stmt. ¶ 6; Pagan Aff. ¶ 7.) When Plaintiff returned, Ciprian issued a memorandum admonishing her for "many discrepancies with the tenant's files such as expired leases, incomplete or missing recertifications, missing files or documentation, Leases given to tenants without signature from the prior Directors or Mr. Pagan" in the files for two properties. (Aschenbrand Aff. Ex. D, Ciprian Memorandum dated November 30, 2004 ("November Memo").) Ciprian immediately removed Plaintiff from her duties managing five properties. (*Id.*) Ciprian informed Plaintiff that her "new assignment is to answer all repair calls, maintain a repair log of all complaints, issue work orders & distribute to the supers & keep copies of work orders by building."(*Id.*)

Plaintiff concedes that the November Memo reflected accurate criticisms. Plaintiff testified that at the time, "[a]ll the paperwork was all over" and "[t]here were missing files" due to revisions undertaken by Ciprian's predecessor, Pizarro. (Vazquez Dep. 269–70.) Plaintiff believes that the change in her responsibilities instituted by the November Memo was based upon her age and alleged disability since Ciprian "was calling me an old lady, that I don't know nothing, that my brains are so little that I can't understand anything."(*Id.* at 277.)Plaintiff does not assert that this change in responsibilities was connected to her race or national origin. (*Id.* at 278 (Q: "What connection does [the change in responsibilities] have to your race, your being Hispanic?"A: "I don't see the connection.").) The change in Plaintiff's responsibilities did not alter her salary or title. (*Id.* at 279.)

At some point, Vazquez submitted a statement in support of Ana Bonano, one of Ciprian's predecessors, in a proceeding ostensibly against Southside. (*See id.* at 67.)Around December 2004, Vazquez claims that Ciprian called her a "traitor" because she had supported Bonano in that proceeding. (*Id.*) Vazquez stated that Ciprian said "Mr. Pagan should lay you off" because she was a "traitor." (*Id.*) At her deposition, Vazquez could not identify any adverse actions taken in retaliation against her other than the offensive comments by Ciprian. (*See id.* at 69.)

**\*3** Sometime in December 2004, Vazquez asserts that Ciprian also told her: "You fucking old lady, I'm going to

do the impossible for you to get the hell out of here."(*Id.* at 108.)Vazquez asserts that Ciprian harassed her "almost every day" with offensive comments, such as telling Vazquez that she was "too old to be working there, that they need young blood, new people, young people."(*Id.* at 53.)Vazquez alleges generally that Ciprian "called [her] a whole lot of name[s]," including a "stupid Puerto Rican" and "a fucking spick." (*Id.* at 72.)Vazquez claims that Ciprian "said she would not hire any other Puerto Rican because they're all stupid."(*Id.* at 107.)

On January 25, 2005, Ciprian issued another memorandum to Vazquez, reiterating her new responsibilities and reprimanding Vazquez for excessive personal telephone calls. (Def. 56.1 Stmt. ¶ 19; Aschenbrand Aff. Ex. E, Ciprian Memorandum dated January 25, 2005 ("January Memo").) The January Memo stated, "Be aware that I have noticed that you are not Complying with your duties," and threatened in bold, "Let this memo serve you as a warning that failure to comply with your job duties, could result in disciplinary action against you."(Aschenbrand Aff. Ex. E.) Around this time, Vazquez asserts that Ciprian called her "a fucking Puerto Rican spick." (Vazquez Dep. 65.)

On February 18, 2005, Ciprian issued a "final warning" to Vazquez regarding her job performance. (Def. 56.1 Stmt. ¶ 21; Aschenbrand Aff. Ex. F, Ciprian Memorandum dated February 18, 2005 ("February Memo"); Vazquez Dep. 288.) The February Memo admonished Vazquez for "instigat[ing] matters" amongst the tenants, failing to log all incoming calls, and spending 30 minutes that day on a personal telephone call. (Aschenbrand Aff. Ex. F.) In closing, the February Memo declared: "Let this notice serve as a final warning that this type of behavior is totally unprofessional and will not be tolerated, if satisfactory improvement is not shown immediately you may be subjected to further disciplinary action that may lead to suspension or termination."(*Id.*)

The same day that Plaintiff received this final warning, Plaintiff began a leave of absence from Southside. (Def. 56.1 Stmt. ¶ 23; Pagan Aff. ¶ 10; Vazquez Dep. 294–95.) Plaintiff asserts that Ciprian's "daily abuse took its toll on [her] health" and that she had a "nervous breakdown" after an incident in which Ciprian grabbed papers from her, threw them, and repeatedly yelled at her, "You are so stupid, fucking old lady."(Vazquez Aff. ¶ 4; Vazquez Dep. 61–62.) According to Plaintiff, she left work on February 18, 2005 and sought "the care of a medical doctor who agreed that my condition was due to the situation [she] had to endure at [her] job."(Vazquez Aff. ¶ 3; Vazquez Dep. 294–

95.) On March 14, 2005, Plaintiff's physician, Dr. Victor Basbus noted that Plaintiff suffered from recurrent and severe depression, anxiety, insomnia, and nervousness, and declared that she was "unable to work." (Aschenbrand Aff. Ex. G, Notice and Proof of Claim for Disability Benefits Form, Def. 56.1 Stmt. ¶ 25, Vazquez Dep. 295–96.) Plaintiff remained on leave for more than eight months.

**\*4** Southside repeatedly requested further information from Plaintiff and Dr. Basbus regarding Plaintiff's ability to return to work, but received little information. (Pagan Aff. ¶ 10.) On March 30, 2005, Pagan wrote to Dr. Basbus seeking clarification as to when Plaintiff would be able to return to her job at Southside. (Def. 56 .1 Stmt. ¶ 26; Aschenbrand Aff. Ex. H, Letter dated March 30, 2005.) On April 29, 2005, Dr. Basbus advised in response that Plaintiff was "under psychiatric treatment" and was "unable to work at this time," citing her depression, insomnia, and "dizzy spells." (Aschenbrand Aff. Ex. I, Report by Dr. Basbus dated April 29, 2005; Vazquez Dep. 305–6; *see* Def. 56.1 Stmt. ¶ 27.)

In June 2005, Plaintiff visited Southside's offices and met with Aminta Hernandez, Southside's personnel officer at the time. (Def. 56.1 Stmt. ¶ 28; Vazquez Dep. 65, 317–18.) Hernandez provided Plaintiff with a letter requesting that Plaintiff authorize Dr. Basbus to notify Southside of Plaintiff s condition and the date she could be expected to return to her regular duties. (Def. 56.1 Stmt ¶ 28; Aschenbrand Aff. Ex. J, Letter from Aminta Hernandez dated June 3, 2005.) Plaintiff responded that Dr. Basbus had "put her on leave and [that she could not] come back until he gave [her] the clearance."(Def. 56.1 Stmt. ¶ 29; Vazquez Dep. 64.) Dr. Basbus never provided Plaintiff clearance to return to work, and on October 26, 2005, he again wrote in a medical report that Plaintiff suffered from depression, insomnia, and dizzy spells, along with arthritis, impaired vision, and lower back pain. (Aschenbrand Aff. Ex. K, Report by Dr. Basbus, dated October 26, 2005; Def. 56.1 Stmt. ¶¶ 31–32; Vazquez Dep. 338–40.) Dr. Basbus concluded on the form that Plaintiff was "unable to work at all." (Aschenbrand Aff. Ex. K.)

By early November 2005, Southside still did not know if and when Plaintiff would be able to return to work. (Def. 56.1 Stmt. ¶ 35; Pagan Aff. ¶ 11.) Southside viewed Plaintiff's absence as indefinite and decided that it could no longer hold the position open for her. (Def. 56.1 Stmt. ¶ 36; Pagan Aff. ¶ 11.) On November 3, 2005, Pagan terminated Vazquez's employment and sent her a letter informing her of the

decision. (Def. 56.1 Stmt. ¶ 37; *see* Pagan Aff. ¶ 11, Ex. C, Letter from David Pagan to Esther Vazquez, dated November 3, 2005 ("Nov. 3 Letter").) Pagan's letter informed Vazquez that since she had been "out on disability since February 24, 2005," a span of more than eight months, Southside found that it necessary to officially terminate Vazquez and declare her position vacant. (*See* Pagan Aff. ¶ 11 & Ex. C.) Pagan attests that he acted as the sole decisionmaker who terminated Vazquez, and that her race, national origin, age, and purported disability did not factor into his decision. (Pagan Aff. ¶ 12.) Ciprian played no role in the decision. (Def. 56.1 Stmt. ¶ 38; Pagan Aff. ¶ 12.)

**\*5** Defendants concede that Ciprian "adopted a demanding management style, which occasionally led to personality clashes with certain of her subordinates," including Plaintiff. (Def. 56.1 Stmt. ¶ 8.) Defendants claim that Ciprian "inherited a department in disarray" and needed to "remedy the dire situation in the department."(*Id.* ¶¶ 7–8.)

Southside Administrator Pagan asserts that "Plaintiff never complained to me that Ms. Ciprian had ever made any racist or ageist comments to her, harassed her or otherwise discriminated against her ."(Pagan Aff. ¶ 9.) According to Pagan, "[t]he only issues that plaintiff ever raised with me concerning Ms. Ciprian involved plaintiff's dislike of Ms. Ciprian's tough management style, and personality conflicts between plaintiff and Ms. Ciprian."(*Id.; see also* Def. 56.1 Stmt. ¶ 39–40.) Vazquez claims that when she approached Pagan with her complaints, he responded that Ciprian "was the supervisor in the second floor, that she's the one who has to decide what to do."(Vazquez Dep. 118.) Southside had a written policy regarding "Equal Employment Opportunities and No Harassment" (the "EEO Policy") that was created and distributed to "All Staff" as of August 18, 2004. (Pagan Aff. Ex. B.) The policy prohibited harassment based on "race, color, sex, religion, creed, national origin, alienage, ..., age, disability or handicap ... or any other legally protected status" and established a reporting mechanism for violations. (*Id.*) The reporting mechanism allowed employees to notify their supervisors or Pagan if issues arose in violation of the policy or the law, without regard to any "chain of command." (*Id.*) The policy advised employees to speak to "whomever you feel most comfortable with among your supervisor or the Administrator."(*Id.*)

From July 1998 until her termination in 2005, Vazquez was a member of Local 1102, RWDSU UFCW ("Local 1102"), and her terms and conditions of employment were governed

Case 9:14-cv-00626-BKS-DEP    Document 86    Filed 02/02/18    Page 228 of 359

Vazquez v. Southside United Housing Development Fund Corp., Not Reported in...

2009 WL 2596490

by the collective bargaining agreement ("CBA") in effect between Local 1102 and Southside. (Def. 56.1 Stmt. ¶ 9; *see also* Pagan Aff. Ex. A (attaching copies of relevant CBAs).) The CBA in effect between Plaintiff's union, Local 1102, and Southside set forth an anti-discrimination policy and a general grievance procedure. (Pagan Aff. Ex. A, Article 10 of CBA (discrimination policy), Article 5 (grievance procedure).) At some point prior to leaving Southside in February 2005, Vazquez spoke to A.J. Salgado, a Local 1102 representative, about her problems with Ciprian. (Vazquez Dep. 115–18.) Vazquez never filed a grievance regarding her treatment by Ciprian. (*Id.* at 274.)

Plaintiff asserts that as of February 2008, she was willing and able to work, but had not found gainful employment. (Vazquez Aff. ¶ 5.) She attests that she is "close to destitute and feel[s] that [she] could have been, until this day, a productive member of South Side United, a job that [she] loved with all [her] heart and gave [her] all to."(*Id.* ¶ 5.)

## II. STANDARD OF REVIEW

**\*6** Summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law."Fed.R.Civ.P. 56(c). The burden of showing the absence of any genuine dispute as to a material fact rests on the party seeking summary judgment. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).

The substantive law governing the case dictates which facts are material and "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."*Id.* at 251–252.A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."*Id.* at 248."Therefore, summary judgment is improper if there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party."*Lucente v. Int'l Bus. Machines Corp.,* 310 F.3d 243, 254 (2d Cir.2002) (citation omitted).

In ruling on a motion for summary judgment, the court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the

party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments...."*Wevant v. Okst,* 101 F.3d 845, 854 (2d Cir.1996) (citations omitted). Further, "in *pro se* cases, the court must view the submissions by a more lenient standard than that accorded to 'formal pleadings drafted by lawyers,' and should read a *pro se* party's 'supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest.'"*Vanhorne v. New York City Transit Auth.,* 273 F.Supp.2d 209, 213 (E.D.N.Y.2003) (internal citations omitted); *accord Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 474 (2d Cir.2006).

## III. DISCUSSION

### A. *Race, National Origin, and Age Discrimination Claims*

The ADEA and Title VII set forth parallel requirements for a plaintiff to establish a prima face case of discrimination. *See Nieves v. Angelo, Gordon, & Co.,* No. 07–cv–2330, 2009 WL 1910970, at \*2 (2d. Cir. July 6, 2009) (recognizing generally that "[t]he same standards and burdens apply to claims under both Title VII and the ADEA."). Under both statutes, a plaintiff must demonstrate that: 1) she belonged to a class protected by the statute; 2) she was qualified for the position; 3) she was subjected to an adverse employment action; and 4) the adverse action occurred under circumstances giving rise to an inference of discrimination. *See Terry v. Ashcroft,* 336 F.3d 128, 137–38 (2d Cir.2003) (citing *Roge v. NYP Holdings, Inc.,* 257 F.3d 164, 168 (2d Cir.2001) (enumerating elements of ADEA prima facie case) and *Collins v. New York City Transit Auth.,* 305 F.3d 113, 118 (2d Cir.2002) (setting forth elements of Title VII prima facie case)); *see also Cretella v. Liriano.* ——F.Supp.2d ——, No. 08–cv–1566(LTS)(THK), 2009 WL 1730993, at \*11 (S.D.N.Y. June 17, 2009) (applying the same four requirements to Title VII and ADEA claims). Claims under both statutes are analyzed under the burden-shifting framework of *McDonnell Douglas Corporation v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). If a plaintiff establishes a prima facie case under either statute, the burden shifts to the defendant to offer a legitimate, non-discriminatory rationale for its actions. *See Terry,* 336 F.3d at 138; *McDonnell Douglas Corp.,* 411 U.S. at 802 (setting forth burden-shifting analysis under Title VII); *Schnabel v. Abramson,* 232 F.3d 83, 87 (2d Cir.2000) (extending *McDonnell Douglas* burden-shifting analysis to the ADEA). Should a defendant offer a neutral explanation for its actions, the plaintiff may defeat summary judgment by offering evidence sufficient to show that the proffered neutral explanation was a pretext for discrimination. *See*

Case 9:14-cv-00626-BKS-DEP    Document 86    Filed 02/02/18    Page 229 of 359

Vazquez v. Southside United Housing Development Fund Corp., Not Reported in...

2009 WL 2596490

*Terry,* 336 F.3d at 138. The plaintiff bears the ultimate burden of persuasion to demonstrate that the adverse employment action resulted from discrimination. *See Back v. Hastings on Hudson Union Free School Dist.,* 365 F.3d 107, 123 (2d Cir.2004).

**\*7** Vazquez's age, race, and national origin discrimination claims are based on two alleged adverse employment actions: the change in her job responsibilities that occurred in November 2004, and the termination of her employment in November 2005. It is undisputed that Vazquez is a member of the classes protected by the statutes, and Defendants do not argue that she lacked any of the qualifications for her position. Nonetheless, Vazquez fails to demonstrate that a genuine issue of material fact exists that could support her claims of discrimination based upon age, race, or national origin with respect to either adverse action. As a result, the court GRANTS summary judgment to Defendants on Vazquez's claims of employment discrimination under the ADEA and Title VII.

**1. Change in Job Responsibilities**

An "adverse employment action" is one which is "more disruptive than a mere inconvenience or an alteration of job responsibilities."*Galabya v. New York City Bd. of Educ.,* 202 F.3d 636, 640 (2d Cir.2000) (*quoting Crady v. Liberty Nat'l Bank & Trust Co.,* 993 F.2d 132, 136 (7th Cir.1993)). A change in job responsibilities can constitute an adverse action where accompanied by "a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices ... unique to a particular situation."*Id.* (*quoting Crady,* 993 F.2d at 136).

Ciprian's November Memo presented the change in Plaintiff's job responsibilities and documented the reasons for the change. (*See* Aschenbrand Aff. Ex. D.) According to the November Memo, Ciprian removed Plaintiff from her duties managing five properties, and informed Plaintiff that she would "not be handling any Lease renewals, re-certifications, community room rentals, move-outs, etc."(*Id.*) Ciprian notified Plaintiff that her "new assignment is to answer all repair calls, maintain a repair log of all complaints, issue work orders & distribute to the supers & keep copies of work orders by building."(*Id.*) These were duties that Vazquez already handled as a Property Manager; the November Memo had the effect of limiting Vazquez's prior responsibilities. (*See* Vazquez Dep. 272.) Ciprian made clear that Vazquez's responsibilities had changed because her performance was perceived to be unsatisfactory. (*See* Aschenbrand Aff. Ex. D.) Plaintiff concedes that she did not suffer any changes in her compensation, her job title, or her reporting relationship as a result of the November 2004 change in job responsibilities. (*See* Vazquez Dep. 125, 279.)

Viewing the facts in the light most favorable to Vazquez, a reasonable finder of fact could conclude that November 2004 change in responsibilities constituted an adverse action because the November Memo may have "significantly diminished [her] material responsibilities" as a Property Manager at Southside. *See Galabya,* 202 F.3d at 640. Further, the record suggests that Ciprian made the decision to change Vazquez's responsibilities. Vazquez testified at her deposition that Ciprian made numerous racist and ageist remarks to her during the course of her tenure. (*See, e.g.,* Vazquez Dep. 53, 72, 107–08.) Vazquez's testimony presents sufficient evidence of Ciprian's alleged animus for a finder of fact to conclude that Vazquez was subject to adverse action under circumstances giving rise to an inference of discrimination. *Back.* 365 F.3d at 124 (evidence of discriminatory comments can constitute "direct evidence" adequate to make out a prima facie case, even where uncorroborated).

**\*8** Southside argues that even if Plaintiff has presented a prima facie case, Southside has articulated legitimate, non-discriminatory reasons for the change in Plaintiff's responsibilities. In the November Memo, Ciprian stated that she had found "many discrepancies with the tenant's files such as expired leases, incomplete or missing recertifications, missing files or documentation, Leases given to tenants without signature from the prior Directors or Mr. Pagan" in the files for two properties. Plaintiff concedes that "[a]ll the paperwork was all over" and "[t]here were missing files." (Vazquez Dep. 269–270.) Plaintiff stated that this disorganization was due to revisions undertaken by Ciprian's predecessor, Pizarro. (*Id.* at 269.)Regardless, Southside argues that it was "entitled to make a business decision to change plaintiff s job responsibilities to remedy these problems."(Def.Mem.11.)

Since Southside has proffered a neutral justification for the change in Plaintiff's responsibilities, "the burden shifts back to the plaintiff to demonstrate by competent evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination."*Patterson v. County of Oneida,* 375 F.3d 206, 221 (2d Cir.2004) (internal quotations omitted). At the summary judgment stage, plaintiff "must establish a genuine issue of material fact either through

Case 9:14-cv-00626-BKS-DEP   Document 86   Filed 02/02/18   Page 230 of 359

Vazquez v. Southside United Housing Development Fund Corp., Not Reported in...

2009 WL 2596490

direct, statistical or circumstantial evidence as to whether the employer's reason for [the adverse action] is false *and* as to whether it is more likely that a discriminatory reason motivated the employer to make the adverse decision." *Gallo v. Prudential Residential Serv., Ltd.,* 22 F.3d 1219, 1225 (2d Cir.1994) (emphasis in original). Because the standards for this showing diverge under the two statutes at issue, the court considers the evidence supporting Plaintiff's Title VII and ADEA claims separately at this stage.

**i. *Title VII***

To the extent Plaintiff asserts that the change in her job responsibilities violated Title VII, Plaintiff has failed to offer evidence that could refute Southside's proffered neutral justification. At her deposition, Plaintiff appeared to retract her allegations that the November 2004 change in her responsibilities was based upon her race and national origin. (*See* Vazquez Dep. 278 (stating "I don't see the connection" between the change in her responsibilities and her race or national origin).) Plaintiff has conceded that the criticisms contained in the November Memo were accurate. (*Id.* at 269–270.)In light of Plaintiff's own concessions, the court finds itself constrained to conclude that there is no genuine dispute of fact regarding a Title VII discrimination claim for the change in Plaintiff's job responsibilities.

The court further notes that Plaintiff has not put forward any evidence to demonstrate that similarly situated individuals were treated differently, or any other indicia suggesting this particular employment action was motivated by discrimination. The only available evidence raising Title VII concerns relates to the offensive remarks allegedly made by Ciprian, which Plaintiff appears to allege began only after the November Memo and her change in responsibilities. (Compl. ¶ 5 (citing approximate dates beginning in December of 2004).)

 **\*9** Summary judgment is GRANTED to Defendants insofar as Plaintiff relies upon Title VII liability for this claim.

**ii. *ADEA***

As in the Title VII context, Plaintiff must put forth "competent evidence" that Defendants' proffered justification was a pretext for discrimination to survive summary judgment on her ADEA claim. *Patterson,* 375 F.3d at 221. In addition, the Supreme Court recently held that plaintiffs bear a greater burden of persuasion at this stage on ADEA claims, in contrast to Title VII claims.[4] To establish liability under the ADEA, a "plaintiff must prove by a preponderance of the evidence (which may be direct or circumstantial), that age was the 'but-for' cause of the challenged employer decision."*Gross v. FBL Fin. Servs., Inc.,* —— U.S. ——, ——, 129 S.Ct. 2343, 2351, 174 L.Ed.2d 119 (2009).

Plaintiff's ADEA claim for the change in her job responsibilities fails to withstand summary judgment. Plaintiff concedes that the criticisms contained in the November Memo reflected legitimate concerns about the condition of the office files at the time. (Vazquez Dep. 269–270.) Plaintiff testified at her deposition that the change in job responsibilities was connected to her age because Ciprian "probably thought that I couldn't handle my position as it was" and that the change made it seem that Plaintiff "was the worse within her co-workers."(*Id.* at 276.)When asked whether she could offer any facts linking the decision to change her responsibilities to her age, Plaintiff testified simply: "That's my belief." (*Id.*) However, "a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment" in a discrimination action. *Holcomb v. Iona Coll.,* 521 F.3d 130, 137 (2d Cir.2008); *Martin v. MTA Bridges & Tunnels,* 610 F.Supp.2d 238, 251 (S.D.N.Y.2009) (plaintiff's "belief" that action was motivated by discrimination not sufficient to raise a genuine issue of fact).

The only other evidence in the record related to Plaintiff's age discrimination claims consists of offensive remarks allegedly made by Ciprian; the timing of these remarks appears to post-date the November Memo. The court finds that this evidence is insufficient to raise a genuine issue of fact as to whether Southside's stated reasons for the change in Plaintiff's responsibilities were merely a pretext concealing a motive of age discrimination. Given Plaintiff's concessions that the November Memo reflected accurate information and valid concerns, the court finds that a reasonable finder of fact could not conclude that "age was the 'but-for' cause of the challenged employer decision."*Gross,* 129 S.Ct. at 2351. The court GRANTS summary judgment to Defendants on Plaintiff's ADEA claim for the change in her job responsibilities.

**2. Termination**

Plaintiff's claims regarding her ultimate termination in November 2005 fail to set forth a prima face case of race, national origin, or age discrimination. Plaintiff has failed to raise an issue of fact that could suggest that her termination occurred under circumstances giving rise to an inference of discrimination. Southside terminated Plaintiff

Case 9:14-cv-00626-BKS-DEP    Document 86    Filed 02/02/18    Page 231 of 359

Vazquez v. Southside United Housing Development Fund Corp., Not Reported in...

2009 WL 2596490

because it could no longer maintain an open position for her while she took an indefinite leave. The undisputed evidence demonstrates that Southside went to great lengths to hold Plaintiff's position open for her during an eight-month absence. Southside made multiple attempts to ascertain whether Plaintiff would be willing and able to reclaim her job at some point; those inquiries went unanswered. (*See, e.g.,* Aschenbrand Aff. Ex. H, Letter from David Pagan dated March 30, 2005; Aschenbrand Aff. Ex. J, Letter from Aminta Hernandez dated June 3, 2005.) There is no evidence that Ciprian, the sole perpetrator of the alleged discrimination, had any part in the decision to terminate Plaintiff. (*See* Pagan Aff. ¶ 12.) Plaintiff's testimony shows that she endured unprofessional and demeaning treatment by Ciprian, but nothing in the record suggests that these events—occurring from November 2004 until February 2005—infected the decision by Pagan to terminate Plaintiff nearly a year later in November 2005. The facts surrounding the circumstances of Plaintiff s termination are undisputed, and they do not raise an inference of discrimination.

**\*10** The same undisputed facts show that, even if Plaintiff could set forth a prima facie case, Southside has offered a neutral justification for Plaintiff's termination. At the time of her termination, Plaintiff had been absent on leave for over eight months, with no indication from her or her physician as to when, if ever, she would be able to return to work. (*See* Pagan Aff. ¶¶ 10–11; Vazquez Dep. 160–62.) Southside was not required to hold Vazquez's position open for her under these circumstances. *See infra* Section III.B (citing cases and analyzing issue of Plaintiff's absence). Plaintiff has not put forth any competent evidence to rebut this neutral justification. As a result, the court GRANTS summary judgment to Defendants on Plaintiff's claims that her termination violated the ADEA and Title VII.

## B. *Disability Claims*

Plaintiff also asserts that her termination constituted disability discrimination in violation of the ADA. (Compl. ¶ 4 (citing termination and failure to accommodate disability).) To establish a prima facie case of disability discrimination, a plaintiff must show that: 1) her employer is subject to the ADA; 2) she was disabled within the meaning of the ADA; 3) she was otherwise qualified to perform the essential functions of her job, with or without reasonable accommodation; and 4) she suffered adverse employment action because of her disability. *See Sista v. CDC North America, Inc.,* 445 F.3d 161, 169 (2d Cir.2006); *Brady v. Wal–Mart Stores, Inc.,* 531 F.3d 127, 134 (2d Cir.2008). Once a plaintiff establishes a

prima facie case, the court analyzes her claim under the same *McDonnell Douglas* burden-shifting framework applicable to Title VII and ADEA claims. *See Sista,* 445 F.3d at 169;*see also supra* Section III.A.

Defendants appear to concede that they are subject to the ADA. Although the evidence of Plaintiff's condition is rather general and conclusory, the court assumes *arguendo* that Plaintiff could put forth facts demonstrating that she was "disabled" within the meaning of the ADA on account of her depression and related disorders. *See, e.g., Honeck v. Nicolock Paving Stones of New England, LLC,* 247 Fed. Appx. 306, 308 (2d Cir. Sept.19, 2007) (summary order) (depression can constitute disability within meaning of the ADA where it "substantially limits one or more of the major life activities"); *see also* 29 C.F.R. § 1630.2(g) (defining "disability" under the ADA). It is clear from the undisputed evidence that Southside terminated Plaintiff because of her failure to attend work, and to represent when, if ever, she could resume her job functions. Plaintiff attributes these deficiencies to her alleged disability.

The court finds that Plaintiff has failed to set forth a prima facie case of disability discrimination because she was not qualified to perform the essential functions of her job, with or without reasonable accommodation. Attendance at work was an essential function of Plaintiff's job. *See Ramirez v. New York City Bd. of Educ.,* 481 F.Supp.2d 209, 221 (E.D.N.Y.2007) (citing myriad cases and finding that attendance is typically an essential function of employment); *Bobrowsky v. New York City Bd. of Educ.,* No. 97–cv– 874(FB), 1999 WL 737919, at \*4 (E.D.N.Y. Sept. 16, 1999) (holding that the ADA does not require an employer to retain a person who fails to attend work because "attendance is an essential function of ... employment"), *aff'd,* 213 F.3d 625 (2d Cir.2000); *Mescall v. Marra,* 49 F.Supp.2d 365, 374 (S.D.N.Y.1999) (to be qualified for a job, "[i]n addition to possessing the skills necessary to perform the job in question, an employee must be willing and able to demonstrate those skills by coming to work on a regular basis.") (internal quotations omitted). Plaintiff and her physician consistently represented that she was "unable to work," and at the time of her termination, Plaintiff had not appeared for work for over eight months. (Aschenbrand Aff. Ex. I, Report by Dr. Basbus dated April 29, 2005; Aschenbrand Aff. Ex. K, Report by Dr. Basbus, dated October 26, 2005; *see* Pagan Aff. ¶ 11 & Ex. C.)

Case 9:14-cv-00626-BKS-DEP    Document 86    Filed 02/02/18    Page 232 of 359

Vazquez v. Southside United Housing Development Fund Corp., Not Reported in...

2009 WL 2596490

**\*11**  The ADA does not require an employer to maintain an employee's position while an employee unilaterally takes an indefinite leave of absence. *Parker v. Columbia Pictures Indus.,* 204 F.3d 326, 338 (2d Cir.2000) ("The duty to make reasonable accommodations does not, of course, require an employer to hold an injured employee's position open indefinitely while the employee attempts to recover"); *Wisenski v. Nassau Health Care Corp.,* 296 F.Supp.2d 367, 374 (E.D.N.Y.2003) (noting that "the ADA does not require an employer to grant an employee an indefinite leave of absence" and citing supporting authority from the Third, Fourth, Fifth, Seventh, and Tenth Circuits). The undisputed evidence demonstrates that Plaintiff never sought permission for a specified leave of absence, and that over the course of eight months, Southside repeatedly requested clarification as to when Plaintiff could resume her work. (*See, e.g.,* Letter from David Pagan dated March 30, 2005 (Aschenbrand Aff. Ex. H); Letter from Aminta Hernandez dated June 3, 2005 (Aschenbrand Aff. Ex. J).) Plaintiff and her physician, Dr. Basbus, neglected to respond to this question. On each occasion, Dr. Basbus simply responded that Plaintiff was "unable to work." (Report by Dr. Basbus dated April 29, 2005 (Aschenbrand Aff. Ex. I); Report by Dr. Basbus, dated October 26, 2005 (Aschenbrand Aff. Ex. K).) Southside was not obligated to accommodate this indefinite leave. *Cf. Rambacher v. Bemus Point Cent. Sch. Dist.,* 307 Fed. Appx. 541, 544 (2d Cir. Jan.22, 2009) (summary order) (where plaintiff suffering from depression took approved, limited period of medical leave and doctor opined that she would be able to return to duty "in a few months' time," question of plaintiff's qualification for job survived summary judgment).

Further, Plaintiff never requested an accommodation for her alleged disability, but instead simply left work on an indefinite leave. As Plaintiff explained: "I just went to the doctor, and the doctor sent the letter to the office stating that I cannot go to work."(Vazquez Dep. 64.) Since no accommodation was requested, Plaintiff cannot claim that she was denied reasonable accommodations for her disability. *See Rivera v. Apple Indus. Corp.,* 148 F.Supp.2d 202, 215 (E.D.N.Y.2001) (rejecting accommodation claim as a matter of law where no request was ever posed to employer); *Mazza v. Bratton,* 108 F.Supp.2d 167, 176 (E.D.N.Y.2000) (holding that a claim for disability discrimination based on a failure to accommodate a plaintiff "is not made out under the ADA unless the employee's request for a reasonable accommodation has been denied by the employer.").

The undisputed facts demonstrate that Plaintiff has failed to set forth a prima facie case of discrimination under the ADA. The court additionally notes that even if Plaintiff had demonstrated a prima facie case, Defendants have met their burden to show that Plaintiff was terminated due to legitimate, non-discriminatory reasons, and Plaintiff has failed to rebut those neutral justifications. As a result, the court GRANTS summary judgment to Defendants on Plaintiff's ADA claims.

## C. *Retaliation*

**\*12**  Plaintiff further claims that Ciprian retaliated against her because she assisted a former Southside employee, Ana Bonano, in a proceeding against Southside. Although the facts are unclear from the record, Vazquez alleges that in December 2004, Ciprian discovered that Vazquez submitted a written statement in support of Bonano's case and called her a "traitor." (*See* Vazquez Dep. 67 .) According to Vazquez, Ciprian said "Mr. Pagan should lay you off, you are not supposed to be working here; you are a traitor."(*Id.*) Vazquez has not identified any adverse actions taken in retaliation against her other than these offensive comments by Ciprian. (*See* Vazquez Dep. 68–69.) Specifically, Plaintiff does not assert that the change in her responsibilities or her termination were adverse actions taken in retaliation for her support of Bonano.

To establish a prima facie case of unlawful retaliation, a plaintiff must demonstrate that "(1) she was engaged in protected activity; (2) the employer was aware of the employee's participation in the protected activity; (3) the employer took action that a reasonable employee would have found materially adverse; and (4) a causal connection existed between the employee's protected activity and the adverse action taken by the employer."*Guarino v. St. John Fisher Coll.,* 321 Fed. Appx. 55, 58 (2d Cir. Apr.8, 2009) (*citing Kessler v. Westchester County Dep't of Soc. Servs.,* 461 F.3d 199, 205–206 (2d Cir.2006)). The *McDonnell Douglas* burden-shifting analysis governing employment discrimination claims also applies to retaliation claims. *See Terry,* 336 F.3d at 140–41 (citing cases and noting application to Title VII and ADEA). Viewing the facts in the light most favorable to Plaintiff, the court accepts that Plaintiff's testimony is sufficient to show that she engaged in a protected activity by serving as a witness for Bonano.

Plaintiff's retaliation claim fails to set forth a prima facie case because a reasonable employee would not have viewed Ciprian's comments, while unprofessional and offensive, as materially adverse actions. In *Burlington Northern & Santa*

2009 WL 2596490

*Fe Railway Company v. White,* 548 U.S. 53, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006), the Supreme Court held that in the context of retaliation claims, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." [5] *Id.* at 68 (internal citations omitted). While the Court found that the prohibitions on retaliation expanded beyond "discriminatory actions that affect the terms and conditions of employment," it also noted that an individual is protected "not from all retaliation, but from retaliation that produces an injury or harm." *Id.* at 64, 68. Courts interpreting *Burlington Northern* have held that empty verbal threats do not cause an injury, and therefore are not materially adverse actions, where they are unsupported by any other actions. *See Harris v. South Huntington Sch. Dist.,* No. 06–cv–3879 (DGT), 2009 WL 875538, at *19 (E.D.N.Y. Mar. 30, 2009) (finding no material adverse action where supervisor allegedly asked plaintiff to resign after he complained about other employees); *Pugni v. Reader's Digest Ass'n, Inc.,* No. 05–cv–8026 (CM), 2007 WL 1087183, at *23 (S.D.N.Y. Apr. 9, 2007) (threats that plaintiff's days at company "were numbered" were not viewed as materially adverse action where threat was never executed).

**\*13** The *Burlington Northern* inquiry is highly fact-specific. As the Court explained, "[c]ontext matters" and "the significance of any given act of retaliation will often depend upon the particular circumstances." 548 U.S. at 69. The heart of the inquiry is whether, under the particular circumstances, the challenged actions "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 68. Vazquez has presented no evidence that Ciprian's comments chilled her support of Bonano, or caused her to actually fear reprisal. The supervisor with ultimate authority to terminate Vazquez, David Pagan, was not implicated in these threats. The court finds that while these comments fit within a pattern of highly inappropriate behavior by Ciprian, there is insufficient evidence for a reasonable finder of fact to conclude that the comments would dissuade a reasonable worker from making or supporting a charge of discrimination. *See Harris,* 2009 WL 875538, at * 19; *Pugni,* 2007 WL 1087183, at *23. In fact, there is no evidence that Ciprian's comments served to dissuade Vazquez, as she ultimately filed her own complaint with the Equal Employment Opportunity Commission and eventually pursued this action. *See, e.g., McWhite v. New York City Hous. Auth.,* No. 05–cv–0991(NG)(LB), 2008 WL 1699446, at *13 (E.D.N.Y. Apr. 10, 2008) (noting that plaintiff's pursuit

of EEOC claim despite alleged retaliatory actions further indicated that plaintiff did not suffer materially adverse action).

As stated above, Plaintiff does not assert that the change in her responsibilities or her termination were retaliatory. The court notes that the record does not suggest any causal connection between the alleged protected activity undertaken by Vazquez and these adverse employment actions taken by Southside. The change in Vazquez's responsibilities was made prior to the allegedly retaliatory remarks by Ciprian, and there is no evidence that Ciprian knew of Plaintiff s alleged protected activity at that time. (*See* Aschenbrand Aff. Ex. D, November Memo.) Ciprian played no part in the decision to terminate Plaintiff, a decision that was made eleven months after Ciprian's alleged threats. (Def. 56.1 Stmt. ¶ 38; Pagan Aff. ¶ 12.) There is no evidence that Pagan, the decision-maker, even had knowledge of Plaintiff's alleged protected activity at the time of her termination.

Furthermore, even if Plaintiff could present a prima facie case of retaliation, Defendants have advanced legitimate, non-discriminatory reasons for each action, and Plaintiff has failed to rebut those neutral justifications. *See supra* Sections III.A. & III.B.

## D. *Hostile Work Environment*

The court construes Plaintiff's allegations of "harassment" and "threat[s]" by Ciprian as a hostile work environment claim. *See, e.g., McWhite,* 2008 WL 1699446, at *16 n. 7 (interpreting pro se complaint to raise hostile work environment claim in the context of Title VII and ADEA action); *Triestman,* 470 F.3d at 474 ("the submissions of a *pro se* litigant must be construed liberally and interpreted to raise the strongest arguments that they suggest.") (internal quotations omitted). To survive a motion for summary judgment on a hostile work environment claim, a plaintiff must demonstrate evidence: "(1) that the workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of his or her work environment, and (2) that a specific basis exists for imputing the conduct that created the hostile work environment to the employer." *Mack v. Otis Elevator Co.,* 326 F.3d 116, 122 (2d Cir.2003) (internal quotation marks and brackets omitted); *see also Martinez v. City of New York,* No. 08–cv–1624, 2009 WL 2171398, at *1 (2d Cir. July 22, 2009) (summary order) (a plaintiff must show that his or her "workplace was permeated with discriminatory intimidation, ridicule, and insult, that was sufficiently severe or pervasive

Case 9:14-cv-00626-BKS-DEP    Document 86    Filed 02/02/18    Page 234 of 359

Vazquez v. Southside United Housing Development Fund Corp., Not Reported in...

2009 WL 2596490

to alter the conditions of the victim's employment and create an abusive working environment."(citing *Hayut v. State Univ. of New York,* 352 F.3d 733, 745 (2d Cir.2003) (internal quotation marks omitted))).

### 1. Vazquez's Work Environment

**\*14** Viewing the facts in a light most favorable to Plaintiff, it is clear that Ciprian treated Plaintiff in a derogatory manner entirely inappropriate for the workplace. The court does not condone Ciprian's actions. However, Title VII and the anti-discrimination laws set forth here do not impose "a general civility code for the American workplace."*Burlington Northern,* 548 U.S. at 68 (quoting *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998))."[I]solated or episodic incidents involving racial slurs or other discriminatory conduct .... do[ ] not rise to the level of severity or pervasiveness needed to support a hostile work environment claim."*Smith v. New Venture Gear, Inc.,* 319 Fed. Appx. 52, 56 (2d Cir. Apr.26, 2009) (summary order). A "mere utterance of an ... epithet which engenders offensive feelings in an employee does not sufficiently affect the conditions of employment to implicate Title VII."*Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997) (internal quotation marks and citations omitted)."For racist comments, slurs, and jokes to constitute a hostile work environment, there must be more than a few isolated incidents of racial enmity, meaning that instead of sporadic racial slurs, there must be a steady barrage of opprobrious racial comments."*Id.* (internal quotation marks and citations omitted). Courts consider a host of factors to make this determination: "(1) the frequency of the discriminatory conduct; (2) its severity; (3) whether the conduct was physically threatening or humiliating, or a mere offensive utterance; (4) whether the conduct unreasonably interfered with the employee's work; and (5) what psychological harm, if any, resulted."*Richardson v. New York State Dep't of Corr. Serv.,* 180 F.3d 426, 437 (2d Cir.1999) (internal quotations omitted), *abrogated on other grounds by*Burlington Northern, 548 U.S. at 67–68;*see also Heba v. New York State Div. of Parole,* 537 F.Supp.2d 457, 467 (E.D.N.Y.2007) (applying these factors).

Vazquez's testimony demonstrates that Ciprian's conduct was reprehensible. According to Vazquez, Ciprian harassed her "almost every day" with offensive comments, such as telling Vazquez that she was "too old to be working there, that they need young blood, new people, young people."(Vazquez Dep. 53.) Sometime in December 2004, Vazquez asserts that Ciprian also told her: "You fucking old lady, I'm going to

do the impossible for you to get the hell out of here."(*Id.* at 108.)Vazquez alleges generally that Ciprian's abuse turned racist, and that Ciprian "called [her] a whole lot of name[s]," including a "stupid Puerto Rican," "a fucking spick," and "a fucking Puerto Rican spick." (*Id.* at 65, 72.)According to Vazquez, Ciprian called her "a stupid old woman, a [waste] of time and too old to perform my job duties," and "said she would not hire any other Puerto Rican because they're an stupid."(Vazquez Aff. ¶ 3; Vazquez Dep. 107.) Defendants do not put forward any evidence to controvert this testimony. Further, it is undisputed that Ciprian was Vazquez's supervisor during the time at issue. *See Mack,* 326 F.3d at 123 ("[I]t is only when a supervisor with immediate (or successively higher) authority over the employee has engaged in the complained of conduct, that the employer may be subject to vicarious liability."(internal quotation marks and citations omitted)).

**\*15** The statements of Jose Velazquez and Adelaida Miranda, ruled inadmissible by the court because they are unsworn, *see supra* n. 3. generally corroborate the existence of serious conflict between Vazquez and Ciprian. The court finds that the exclusion of the statements does not affect the court's decision here, because the court already views the facts in the light most favorable to Vazquez on summary judgment, and the statements offer little information beyond Vazquez's own testimony. [6]

Dr. Basbus was deposed to assess the alleged psychological harm suffered by Plaintiff on account of these events at Southside, but the minimal excerpts of his testimony provided to the court offer no insight into this question. (*See* Docket Entry # 25 (Attachment 9), Deposition of Dr. Basbus, dated July 21, 2007.) His written documentation of Vazquez's condition was similarly conclusory and offered no opinion as to the cause of her depression, anxiety, and other symptoms. (Aschenbrand Aff. Exs. G, I, & K.)

Generally, the hostile work environment claims that the Second Circuit has allowed to proceed beyond summary judgment have involved "more severe, sustained, and specific instances of alleged discrimination" than those present here. *Kemp v. A & J Produce Corp.,* 164 Fed. Appx. 12, 14 (2d Cir. Dec.7, 2005) (reviewing cases where hostile work environment claims withstood summary judgment). The egregious facts underlying these precedents set a high bar for hostile work environment claims. *See, e.g., Kemp v. A & J Produce Corp.,* No. 00–cv–06050 (ERK), 2005 WL 5421296, at \*19 (E.D.N.Y. June 7, 2005), *aff'd,*164 Fed.App.

Case 9:14-cv-00626-BKS-DEP   Document 86   Filed 02/02/18   Page 235 of 359

Vazquez v. Southside United Housing Development Fund Corp., Not Reported in...

2009 WL 2596490

12 (2d Cir.) (claim dismissed on summary judgment where a Caucasian supervisor "allegedly made numerous racial slurs such as calling African–Americans 'monkeys' or 'Kunta.' ").

In this case, however, Vazquez has testified that she suffered daily harassment involving the use of racial epithets by her supervisor, demonstrated that her supervisor altered her job responsibilities in a manner that could be considered a demotion, and provided documentary evidence that her supervisor explicitly threatened her job in writing on at least three occasions. Vazquez has testified that after 13 years of employment at Southside, these events traumatized her so deeply that she had a "nervous breakdown" and could no longer work. (Vazquez Aff. ¶ 4.) All of these incidents took place in the condensed time frame of three months. In light of Plaintiff's *pro se* status and the court's obligation to view the facts in the light most favorable to the Plaintiff on summary judgment, the court finds that a genuine issue of fact remains as to whether Ciprian's comments to Vazquez created a workplace so "permeated with discriminatory intimidation" that it "was sufficiently severe or pervasive to alter the conditions of his or her work environment."*Mack,* 326 F.3d at 122.

The cases cited by Defendants are distinguishable. In *Chandler v. American Eagle Airlines,* 251 F.Supp.2d 1173 (E.D.N.Y.2003), the plaintiff claimed that his supervisor and co-workers frequently made age-related comments, such as calling him "too slow" and a "fucking old man," made references to his erectile dysfunction and urination capabilities, and threatened him verbally and physically. *Id.* at 1184–85.In dismissing the claim, Judge Gershon noted that Chandler had testified that many of the comments had been "made in jest and were not discriminatory in nature" and that he had reported "no continuing fear ... nor an inability to perform his job duties" as a result of the allegedly hostile work environment he experienced over the course of four years. *Id.* at 1185–86.In the second case relied upon by Defendants, *Citroner v. Progressive Casualty Insurance Company,* 208 F.Supp.2d 328 (E.D.N.Y.2002), the plaintiff alleged that his supervisor had "mocked the Spanish language; left a Speedy Gonzalez doll on plaintiff's desk and referred to plaintiff as Speedy Gonzalez; told plaintiff either once or several times (plaintiff's testimony is inconsistent) to act more white and loose his cocky Spanish attitude; and passed gas one time near his face and made a comment about Hispanics and beans."*Id.* at 340.Despite these serious allegations, Judge Gershon found that a reasonable jury could not find for Citroner on his hostile work environment claim because, by Citroner's own account,

this alleged harassment had occurred for just one week before he was suspended for other reasons. *Id.* at 340–41.Citroner was ultimately terminated on unrelated grounds, because he had sexually harassed a coworker. *Id.* at 341.The court finds that, by contrast, the evidence presented by Vazquez is sufficient to raise a question of fact as to the severity and pervasiveness of the hostile work environment she endured.

**2. Southside's Liability**

 **\*16** Even if Plaintiff can demonstrate that she was subjected to hostile work environment, she must demonstrate that these conditions can be specifically imputed to Southside. As the Second Circuit has explained:

> Where the harassment is attributed to a supervisor with immediate or successively higher authority over the employee, a court looks first to whether the supervisor's behavior culminated in a tangible employment action against the employee; if it did, the employer will, *ipso facto,* be vicariously liable. In the absence of such tangible action, an employer will still be liable for a hostile work environment created by its supervisors unless it successfully establishes as an affirmative defense that (a) it exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.

*Petrosino v. Bell Atlantic,* 385 F.3d 210, 225 (2d Cir.2004) (internal quotation marks and citations omitted) (interpreting *Faragher v. City of Boca Raton,* 524 U.S. 775, 807, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998); *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 765, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998)). Southside asserts that it is entitled to assert this latter affirmative defense under *Faragher/Ellerth.*

This defense is only available if the supervisor's behavior never "culminated in a tangible employment action against the employee."*Petrosino,* 385 F.3d at 225. Tangible employment actions include "hiring, firing,

Case 9:14-cv-00626-BKS-DEP   Document 86   Filed 02/02/18   Page 236 of 359

Vazquez v. Southside United Housing Development Fund Corp., Not Reported in...

2009 WL 2596490

failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."*Ellerth,* 542 U.S. at 765. As set forth above, a reasonable finder of fact could conclude that the November 2004 change in Vazquez's job responsibilities constituted an adverse action. However, since this action coincided with the alleged commencement of Ciprian's harassment, it is difficult to say that the harassment "culminated" in this action. Ciprian also issued a total of three memoranda, roughly one per month, admonishing Vazquez for poor job performance, but Vazquez has conceded or at least failed to contest the accuracy of Ciprian's critiques. Further, it is questionable whether a poor performance review could qualify as a "tangible employment action." *See O'Dell v. Trans World Entm't Corp.,* 153 F.Supp.2d 378, 388 (S.D.N.Y.2001) (finding that a negative performance review could not constitute a tangible employment action for *Faragher/Ellerth* purposes).

To avail itself of the *Faragher/Ellerth* defense, Southside must show that "(a) that the employer exercised reasonable care to prevent and correct promptly any ... harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise."*Faragher,* 524 U.S. at 807. The court finds that Southside is entitled to invoke this defense in this case to bar Plaintiff's claims. Irrespective of whether a reasonable finder of fact could conclude that Ciprian's comments to Vazquez created a workplace so "permeated with discriminatory intimidation" that it "was sufficiently severe or pervasive to alter the conditions of his or her work environment,"*Mack,* 326 F.3d at 122, Vazquez's claim fails because she has not presented evidence demonstrating that she attempted to mitigate the situation by availing herself of Southside's anti-harassment procedures. *See McPherson v. NYP Holdings, Inc.,* 227 Fed. Appx. 51, 53 (2d Cir. June 27, 2007) (summary order).

**\*17** In August of 2004, prior to the alleged incidents, Southside promulgated and distributed a written policy regarding "Equal Employment Opportunities and No Harassment" (the "EEO Policy"). (Pagan Aff. Ex. B.) The policy expressly prohibited harassment based on "race, color, sex, religion, creed, national origin, alienage ... age, disability or handicap ... or any other legally protected status" and created a reporting mechanism that directed employees to notify their supervisors or Pagan if issues arose in violation of the policy or the law. (*Id.*)*Cf. Faragher,* 524 U.S. at 807

(defense unavailable where policy lacked "assurance that the harassing supervisors could be bypassed in registering complaints"). The collective bargaining agreement in effect between Plaintiff's union, Local 1102, and Southside also set forth an anti-discrimination policy and a general grievance procedure. (Pagan Aff. Ex. A, Article 10 of CBA (regarding discrimination), Article 5 (grievance procedure).)

To the extent the alleged incidents were not reported to Southside, "there is no way a reasonable trier of fact could impute these incidents" to Southside.*Smith,* 319 Fed. Appx. at 57. Vazquez claims that she approached Pagan twice with complaints, but he responded that Ciprian "was the supervisor in the second floor, that she's the one who has to decide what to do."(Vazquez Dep. 88, 118.) When asked what problems she raised with Pagan to which she did not receive a satisfactory response, Vazquez testified: "The problems there are the supervisor, that she was always on my case. I don't know."(*Id.* at 88.)Vazquez's testimony suggests that she failed to address her claims of race, national origin, and age discrimination in her complaints to Pagan. She never put her complaints in writing. (*Id.*) Southside Administrator Pagan attests that "Plaintiff never complained to me that Ms. Ciprian had ever made any racist or ageist comments to her, harassed her or otherwise discriminated against her."(Pagan Aff. ¶ 9.) Pagan acknowledges discussing conflicts between Ciprian and Vazquez, but has stated that "[t]he only issues that plaintiff ever raised with me concerning Ms. Ciprian involved plaintiff's dislike of Ms. Ciprian's tough management style, and personality conflicts between plaintiff and Ms. Ciprian."(*Id.; see also* Def. 56.1 Stmt. ¶¶ 39–40.)

Similarly, Vazquez testified that she notified A.J. Salgado, a representative of Local 1102, about her problems with Ciprian. (*Id.* at 115.)Salgado told her she had to respond to the memoranda issued by Ciprian. (*Id.*) Vazquez failed to act on Salgado's advice because she "got sick," "didn't want to bother," and "didn't go back to the office so [she] didn't answer the memorandum."(*Id.* at 116, 274.)It is unclear whether Vazquez specified that she suffered discrimination in these conversations; she testified only that "I told him about the way that she was treating me."(*Id.*) Vazquez also spoke to a Southside employee named Sonia Iglesias about the November Memo changing her job responsibilities, but she did not put forth any testimony or other evidence to show that her complaints to Iglesias raised the issue of discrimination on account of her race, national origin, or age. (*Id.* at 273.)

Case 9:14-cv-00626-BKS-DEP    Document 86    Filed 02/02/18    Page 237 of 359

Vazquez v. Southside United Housing Development Fund Corp., Not Reported in...

2009 WL 2596490

**\*18** The court finds that through the creation and dissemination of the EEO Policy, coupled with the protections of the CBA, Southside exercised reasonable care to prevent and promptly correct any harassing behavior. In the absence of any evidence that Vazquez notified Pagan, Local 1102 leaders, or anyone else in a position of authority that she was suffering harassment on account of her race, national origin, or age, the court finds that Vazquez "unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Faragher,* 524 U.S. at 807. Vazquez has failed to raise a genuine issue of fact that would allow a reasonable fact finder to conclude otherwise. Accordingly, her hostile work environment claim fails to withstand summary judgment.

## IV. CONCLUSION

For the reasons set forth above, Defendants' Motion for Summary Judgment is granted in its entirety. The Clerk of Court is directed to close the case.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 2596490

## Footnotes

1    SUHDFC is a non-profit corporation "dedicated to developing, preserving and rehabilitating new and existing low to middle income housing for the Williamsburg, Brooklyn community."(Docket Entry # 26, Defendants' Statement of Material Facts Submitted Pursuant to Local Civil Rule 56.1 ("Def. 56.1 Stmt.") ¶ 1.) Los Sures is a wholly-owned subsidiary of SUHDFC that manages the daily operations of housing owned by SUHDFC. (*Id.* ¶ 2.) Defendants characterize the entities as a single unit, identified as "Southside." (*See id.* at 1.) The court adopts Defendants' terminology for these entities.

2    While Plaintiff opposes the Defendants' Motion for Summary Judgment, she does not dispute the majority of facts set forth in Defendants' Rule 56.1 Statement. Pursuant to Local Rule S6.2, Defendants provided Plaintiff with notice of the consequences of failing to comply with Rule 56 of the Federal Rules of Civil Procedure and Local Rule 56.1, and included copies of those rules. (Docket Entry # 27, Notice to Pro Se Litigant Who Opposes a Motion for Summary Judgment ("Rule 56.2 Notice").) Plaintiff did not submit a Rule 56.1 Statement or a response to Defendants' 56.1 Statement. Since Plaintiff is *pro se,* the court has nonetheless reviewed the record submitted by the parties to determine whether there are disputed issues of material fact. *See Melendez v. DeVry Corp.,* No. 03–CV–1029 (NGG)(LB), 2005 WL 3184277, at *2 (E.D.N.Y. Nov. 29, 2005). The court will deem admitted only those facts in Defendants' Rule 56.1 Statement that are supported by admissible evidence and are not controverted by admissible evidence in the record.

3    Plaintiff has also submitted two notarized but unsworn statements, from Jose Velazquez and Adelaida Miranda, which support her allegations of verbal abuse against Ciprian. (*See* Letters from Jose Velazquez and Adelaida Miranda, attached to Vazquez Aff.) While the statements contain notary stamps, neither has a jurat "[t]he clause written at the foot of an affidavit, stating when, where, and before whom such affidavit was sworn," Black's Law Dictionary (8th ed.2004) —or any "sworn to" language. Nor do the statements declare that they were made under penalty of perjury as required for a declaration under 28 U.S.C. § 1746. Unsworn statements are inadmissible in evaluating a motion for summary judgment, but the court has nonetheless reviewed the statements and notes that the facts presented therein—assuming that Plaintiff could present them in an admissible form—do not affect the outcome of this decision. *See White v. Sears, Roebuck & Co.,* No. 07–cv–4286 (NGG)(MDG), 2009 WL 1140434, at *2–3 & n. 3–4 (E.D.N.Y. Apr. 27, 2009).

4    In the Title VII context, the law recognizes that a plaintiff can establish a "mixed-motives" case by "convinc[ing] the trier of fact that an impermissible criterion in fact entered into the employment decision."*Tyler v. BethlehemSteel Corp.,* 958 F.2d 1176, 1181 (2d Cir.1992). To succeed in a mixed-motive showing, the plaintiff must "prove that an illegitimate factor had a 'motivating' or 'substantial' role in the employment decision."*Id.* (*quoting Price Waterhouse v. Hopkins,* 490 U.S. 228, 258, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989)). If the plaintiff demonstrates that a discriminatory motive exists, even if a legitimate motive is also present, the burden of proof passes to the defendant to establish that it would have made the same decision without considering the illegitimate factor. *See id.*Since Plaintiff has conceded that she lacks evidence supporting a claim of race or national origin discrimination, the court does not reach this issue with respect to her claim for change in job responsibilities.

5    *Burlington Northern* involved the statutory interpretation of Title VII's retaliation provisions, set forth in 42 U.S.C. § 2000e– 3(a). Courts have nonetheless applied its holding to retaliation claims more generally. *See, e.g., Sekyere v. City of New York,* No. 05–cv–7192(BSJ)(DCF), 2009 WL 773311, at *6 (S.D.N.Y. Mar. 18, 2009) (discussing *Burlington Northern* in

Case 9:14-cv-00626-BKS-DEP    Document 86    Filed 02/02/18    Page 238 of 359

Vazquez v. Southside United Housing Development Fund Corp., Not Reported in...

2009 WL 2596490

the context of both Title VII and ADEA retaliation claims); *accord* Gomez–Perez v. Potter, —— U.S. ——, ——, 128 S.Ct. 1931, 1945, 170 L.Ed.2d 887 (2008) (Roberts, J. dissenting) (finding the anti-retaliation provisions of Title VII "materially indistinguishable" from their counterparts in the ADEA). Given the broad nature of Plaintiff s retaliation claim, the court analyzes it under the *Burlington Northern* standard.

6    For example, the inadmissible statement provided by Adelaida Miranda asserts that Ms. Miranda saw Ciprian's "verbal abuse" of Vazquez, and specifically witnessed Ciprian insult Vazquez by saying "this fucking old lady thinks she is the boss of the unit."(Docket Entry # 23, Statement of Adelaida Miranda, dated February 8, 2008.) Jose Velazquez's statement refers generally to "insults" by Ciprian such as being called "old," and his own feelings of intimidation by Ciprian. (Docket Entry # 23, Statement of Jose Velazquez, undated.) These statements support the view that Ciprian acted rudely and inappropriately towards Vazquez, facts already accepted by the court for the purposes of this motion. The statements, however, do little to demonstrate that Ciprian specifically displayed ageist or racist animus as opposed to personal dislike.

---

**End of Document**                                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW    © 2016 Thomson Reuters. No claim to original U.S. Government Works.    14

Davis v. Artuz, 133 F.3d 906 (1998)

1998 WL 29763

133 F.3d 906
Unpublished Disposition
NOTICE: THIS IS AN UNPUBLISHED OPINION.
(The Court's decision is referenced in a "Table of Decisions Without Reported Opinions" appearing in the Federal Reporter. See Federal Rule of Appellate Procedure 32.1 and this court's local Rule 32.1.1. for rules regarding the citation of unpublished opinions.)
United States Court of Appeals, Second Circuit.

Robert DAVIS, Plaintiff-Appellant,
v.
Christopher ARTUZ, Warden of Green Haven;
S. Daplan, Program Chairperson of Green
Haven Correctional Facility; M. McHale, Prison
Counselor Green Haven; D. Stevens, Nurse
Administrator, Green Haven; Elizabeth Weber,
Nurse at Green Haven, Defendants-Appellees.

No. 96-2911.
|
Jan. 27, 1998.

Appeal from the United States District Court for the Southern District of New York (Thomas P. Griesa, *Chief Judge* ).

**Attorneys and Law Firms**

APPEARING FOR APPELLANT:David S. Copeland, Kaye, Scholer, Fierman, Hays & Handler, New York, NY

FOR APPELLEES:Thomas D. Hughes, Assistant Solicitor General, Office Of The Attorney General, State of New York, New York, NY

Before: OAKES, PARKER and WOOD, [*] Circuit Judges.

**Opinion**

**\*1** This cause came on to be heard on the transcript of record from the United States District Court for the Southern District of New York and was argued by appellant and submitted by appellees.

ON CONSIDERATION WHEREOF, IT IS HEREBY ORDERED, ADJUDGED AND DECREED that the judgment of the district court is REVERSED AND REMANDED.

Robert Davis appeals from the judgment of the United States District Court for the Southern District of New York (Thomas P. Griesa, *Chief Judge* ) entered October 17, 1997, dismissing *sua sponte* pursuant to 28 U.S.C. § 1915(e)(2) Davis' pro se complaint which had been filed *in forma pauperis.* Davis' complaint asserts claims for monetary and equitable relief under 42 U.S.C. § 1983 against the Warden and four employees of Green Haven Correctional Facility ("Green Haven"), resulting from his termination from a job as a trained health assistant in the Unit of the Physically Disabled ("UPD") at Green Haven. The complaint also contains allegations of retaliatory termination, and possibly other physical forms of retaliation, which allegedly resulted from the fact that plaintiff reported violations of certain health, fire and safety regulations by a nurse working at the UPD. Davis is represented by counsel on appeal. The defendant has refused to appear or file a response in this case.

This Court has held that a *sua sponte* dismissal of a pro se prisoner petition before service of process and the filing of a response by the state is strongly disfavored. *See Bayron v. Trudeau,* 703 F.2d 43, 45 (2d Cir.1983); *Robles v. Coughlin,* 725 F.2d 12, 15 (2d Cir.1983). Dismissal of a pro se prisoner's complaint is warranted only when it appears that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *Bayron,* 703 F.2d at 46.

We find that the dismissal in this case was inappropriate. While a prisoner may not have a constitutional right to a specific job assignment, this Circuit has recognized that retaliation against a prisoner for pursuing a grievance violates the right to petition government for the redress of grievances guaranteed by the First and Fourteenth Amendments and is actionable under § 1983. *See Franco v. Kelly,* 854 F.2d 584, 589 (2d Cir.1988); *Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir.1996). We do not need to decide at this stage whether the filing of a grievance for conduct that does not affect a condition of confinement is constitutionally protected within the meaning of *Franco,* because there are insufficient facts in this case to determine the precise nature of plaintiff's grievance complaints. The court below dismissed the retaliatory claim as malicious, but we are unable to discern from the record before us whether this holding was proper. Consequently, we are unable to find that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief.

For the foregoing reasons, the judgement of the district court is reversed and remanded for further proceedings consistent with this order.

**\*2**  The judgment of the district court is REVERSED AND REMANDED.

**All Citations**

133 F.3d 906, 1998 WL 29763 (Table)

Footnotes

\*      Of the United States Court of Appeals for the Seventh Circuit, sitting by designation.

---

**End of Document**                          © 2018 Thomson Reuters. No claim to original U.S. Government Works.



Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

**C** Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Jerome WALDO, Plaintiff,
v.
Glenn S. GOORD, Acting Commissioner of New York
State Department of Correctional Services; Peter J.
Lacy, Superintendent at Bare Hill Corr. Facility;
Wendell Babbie, Acting Superintendent at Altona Corr.
Facility; and John Doe, Corrections Officer at Bare Hill
Corr. Facility, Defendants.
**No. 97-CV-1385 LEK DRH.**

Oct. 1, 1998.

Jerome Waldo, Plaintiff, pro se, Mohawk Correctional
Facility, Rome, for Plaintiff.

Hon. Dennis C. Vacco, Attorney General of the State of
New York, Albany, Eric D. Handelman, Esq., Asst.
Attorney General, for Defendants.

DECISION AND ORDER

KAHN, District J.

**\*1** This matter comes before the Court following a
Report-Recommendation filed on August 21, 1998 by the
Honorable David R. Homer, Magistrate Judge, pursuant to
28 U.S.C. § 636(b) and L.R. 72.3(c) of the Northern
District of New York.

No objections to the Report-Recommendation have been
raised. Furthermore, after examining the record, the Court
has determined that the Report-Recommendation is not
clearly erroneous. See Fed.R.Civ.P. 72(b), Advisory

Committee Notes. Accordingly, the Court adopts the
Report-Recommendation for the reasons stated therein.

Accordingly, it is

ORDERED that the Report-Recommendation is
APPROVED and ADOPTED; and it is further

ORDERED that the motion to dismiss by defendants is
GRANTED; and it is further

ORDERED that the complaint is dismissed without
prejudice as to the unserved John Doe defendant pursuant
to Fed.R.Civ.P. 4(m), and the action is therefore dismissed
in its entirety; and it is further

ORDERED that the Clerk serve a copy of this order on all
parties by regular mail.

IT IS SO ORDERED.
HOMER, Magistrate J.

REPORT-RECOMMENDATION AND ORDER [FN1]

FN1. This matter was referred to the undersigned
pursuant to 28 U.S.C. § 636(b) and
N.D.N.Y.L.R. 72.3(c).

The plaintiff, an inmate in the New York Department of
Correctional Services ("DOCS"), brought this pro se
action pursuant to 42 U.S.C. § 1983. Plaintiff alleges that
while incarcerated in Bare Hill Correctional Facility
("Bare Hill") and Altona Correctional Facility ("Altona"),
defendants violated his rights under the Eighth and
Fourteenth Amendments. [FN2] In particular, plaintiff alleges
that prison officials maintained overcrowded facilities
resulting in physical and emotional injury to the plaintiff

© 2010 Thomson Reuters. No Claim to Orig. US Gov.
Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

and failed to provide adequate medical treatment for his injuries and drug problem. Plaintiff seeks declaratory relief and monetary damages. Presently pending is defendants' motion to dismiss pursuant to Fed.R.Civ.P. 12(b). Docket No. 18. For the reasons which follow, it is recommended that the motion be granted in its entirety.

FN2. The allegations as to Bare Hill are made against defendants Goord, Lacy, and Doe. Allegations as to Altona are made against Goord and Babbie.

I. Background

Plaintiff alleges that on August 21, 1997 at Bare Hill, while he and two other inmates were playing cards, an argument ensued, and one of the two assaulted him. Compl., ¶ 17. Plaintiff received medical treatment for facial injuries at the prison infirmary and at Malone County Hospital. Id. at ¶¶ 18-19. On September 11, 1997, plaintiff was transferred to Altona and went to Plattsburgh Hospital for x-rays several days later. Id. at ¶ 21.

Plaintiff's complaint asserts that the overcrowded conditions at Bare Hill created a tense environment which increased the likelihood of violence and caused the physical assault on him by another inmate. Id. at ¶¶ 10-11. Additionally, plaintiff contends that similar conditions at Altona caused him mental distress and that he received constitutionally deficient medical treatment for his injuries. Id. at ¶¶ 21-22. The complaint alleges that Altona's lack of a drug treatment program and a dentist or specialist to treat his facial injuries constitutes cruel and unusual punishment under the Eighth and Fourteenth Amendments. Id. at ¶¶ 22, 27-28.

II. Motion to Dismiss

*2 When considering a Rule 12(b) motion, a court must assume the truth of all factual allegations in the complaint and draw all reasonable inferences from those facts in favor of the plaintiff. Leeds v. Meltz, 85 F.3d 51, 53 (2d Cir.1996). The complaint may be dismissed only when "it

appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Staron v. McDonald's Corp., 51 F.3d 353, 355 (2d Cir.1995) (quoting Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). "The issue is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims. Indeed, it may appear on the face of the pleading that a recovery is very remote and unlikely, but that is not the test." Gant v. Wallingford Bd. of Educ., 69 F.3d 669, 673 (2d Cir.1995) (citations omitted). This standard receives especially careful application in cases such as this where a pro se plaintiff claims violations of his civil rights. Hernandez v. Coughlin, 18 F.3d 133, 136 (2d Cir.), cert. denied,513 U.S. 836, 115 S.Ct. 117, 130 L.Ed.2d 63 (1994).

III. Discussion

A. Conditions of Confinement

Defendants assert that plaintiff fails to state a claim regarding the conditions of confinement at Bare Hill and Altona. For conditions of confinement to amount to cruel and unusual punishment, a two-prong test must be met. First, plaintiff must show a sufficiently serious deprivation. Farmer v. Brennan, 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (citing Wilson v. Seiter, 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)); Rhodes v. Chapman, 452 U.S. 347, 348 (1981)(denial of the "minimal civilized measure of life's necessities"). Second, plaintiff must show that the prison official involved was both "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]" and that the official drew the inference. Farmer, 511 U.S. at 837.

1. Bare Hill

In his Bare Hill claim, plaintiff alleges that the overcrowded and understaffed conditions in the dormitory-style housing "resulted in an increase in tension, mental anguish and frustration among prisoners, and dangerously increased the potential for violence." Compl.,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

¶ 11. Plaintiff asserts that these conditions violated his constitutional right to be free from cruel and unusual punishment and led to the attack on him by another prisoner. The Supreme Court has held that double-celling to manage prison overcrowding is not a per se violation of the Eighth Amendment. *Rhodes*, 452 U.S. at 347-48. The Third Circuit has recognized, though, that double-celling paired with other adverse circumstances can create a totality of conditions amounting to cruel and unusual punishment. *Nami v. Fauver*, 82 F.3d 63, 67 (3d Cir.1996). While plaintiff here does not specify double-celling as the source of his complaint, the concerns he raises are similar. Plaintiff alleges that overcrowding led to an increase in tension and danger which violated his rights. Plaintiff does not claim, however, that he was deprived of any basic needs such as food or clothing, nor does he assert any injury beyond the fear and tension allegedly engendered by the overcrowding. Further, a previous lawsuit by this plaintiff raised a similar complaint, that double-celling and fear of assault amounted to cruel and unusual punishment, which was rejected as insufficient by the court. *Bolton v. Goord*, 992 F.Supp. 604, 627 (S.D.N.Y.1998). The court there found that the fear created by the double-celling was not "an objectively serious enough injury to support a claim for damages." *Id.* (citing *Doe v. Welborn*, 110 F.3d 520, 524 (7th Cir.1997)).

**\*3** As in his prior complaint, plaintiff's limited allegations of overcrowding and fear, without more, are insufficient. *Compare Ingalls v. Florio*, 968 F.Supp. 193, 198 (D.N.J.1997) (Eighth Amendment overcrowding claim stated when five or six inmates are held in cell designed for one, inmates are required to sleep on floor, food is infested, and there is insufficient toilet paper) *and Zolnowski v. County of Erie*, 944 F.Supp. 1096, 1113 (W.D.N.Y.1996) (Eighth Amendment claim stated when overcrowding caused inmates to sleep on mattresses on floor, eat meals while sitting on floor, and endure vomit on the floor and toilets) *with Harris v. Murray*, 761 F.Supp. 409, 415 (E.D.Va.1990) (No Eighth Amendment claim when plaintiff makes only a generalized claim of overcrowding unaccompanied by any specific claim concerning the adverse effects of overcrowding). Thus, although overcrowding could create conditions which might state a violation of the Eighth Amendment, plaintiff has not alleged sufficient facts to support such a finding here. Plaintiff's conditions of confinement claim as to Bare

Hill should be dismissed.

2. Altona

Plaintiff also asserts a similar conditions of confinement claim regarding Altona. For the reasons discussed above, plaintiff's claim that he suffered anxiety and fear of other inmates in the overcrowded facility (Compl., ¶¶ 21-22) is insufficient to establish a serious injury or harm.

Plaintiff's second claim regarding Altona relates to the alleged inadequacies of the medical treatment he received. The government has an "obligation to provide medical care for those whom it is punishing by incarceration." *Estelle v. Gamble*, 429 U.S. 97, 103, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). The two-pronged *Farmer* standard applies in medical treatment cases as well. *Hemmings v. Gorczyk*, 134 F.3d 104, 108 (2d Cir.1998). Therefore, plaintiff must allege facts which would support a finding that he suffered a sufficiently serious deprivation of his rights and that the prison officials acted with deliberate indifference to his medical needs. *Farmer*, 511 U.S. at 834.

Plaintiff alleges that the medical treatment available at Altona was insufficient to address the injuries sustained in the altercation at Bare Hill. Specifically, plaintiff cites the lack of a dentist or specialist to treat his facial injuries as an unconstitutional deprivation. Plaintiff claims that the injuries continue to cause extreme pain, nosebleeds, and swelling. Compl., ¶¶ 22 & 26. For the purposes of the Rule 12(b) motion, plaintiff's allegations of extreme pain suffice for a sufficiently serious deprivation. *See Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir.1996).

Plaintiff does not, however, allege facts sufficient to support a claim of deliberate indifference by the named defendants. To satisfy this element, plaintiff must demonstrate that prison officials had knowledge of facts from which an inference could be drawn that a "substantial risk of serious harm" to the plaintiff existed and that the officials actually drew the inference. *Farmer*, 511 U.S. at 837. Plaintiff's complaint does not support, even when liberally construed, any such conclusion. Plaintiff offers

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

no evidence that the Altona Superintendent or DOCS Commissioner had any actual knowledge of his medical condition or that he made any attempts to notify them of his special needs. Where the plaintiff has not even alleged knowledge of his medical needs by the defendants, no reasonable jury could conclude that the defendants were deliberately indifferent to those needs. *See Amos v. Maryland Dep't of Public Safety and Corr. Services,* 126 F.3d 589, 610-11 (4th Cir.1997), *vacated on other grounds,*524 U.S. 935, 118 S.Ct. 2339, 141 L.Ed.2d 710 (1998).

**\*4** Plaintiff's second complaint about Altona is that it offers "no type of state drug treatment program for the plaintiff." Compl., ¶ 22. Constitutionally required medical treatment encompasses drug addiction therapy. *Fiallo v. de Batista,* 666 F.2d 729, 731 (1st Cir.1981); *Inmates of Allegheny County Jail v. Pierce,* 612 F.2d 754, 760-61 (3d Cir.1979). As in the *Fiallo* case, however, plaintiff falls short of stating an Eighth Amendment claim as he "clearly does not allege deprivation of essential treatment or indifference to serious need, only that he has not received the type of treatment which he desires." *Id.* at 731. Further, plaintiff alleges no harm or injury attributable to the charged deprivation. Plaintiff has not articulated his reasons for desiring drug treatment or how he was harmed by the alleged deprivation of this service. *See Guidry v. Jefferson County Detention Ctr.,* 868 F.Supp. 189, 192 (E.D.Tex.1994) (to state a section 1983 claim, plaintiff must allege that some injury has been suffered).

For these reasons, plaintiff's Altona claims should be dismissed.

B. Failure to Protect

Defendants further assert that plaintiff has not established that any of the named defendants failed to protect the plaintiff from the attack by the other inmate at Bare Hill. Prison officials have a duty "to act reasonably to ensure a safe environment for a prisoner *when they are aware* that there is a significant risk of serious injury to that prisoner." *Heisler v. Kralik,* 981 F.Supp. 830, 837 (S.D.N.Y.1997) (emphasis added); *see also Villante v. Dep't of Corr. of City of N.Y.,* 786 F.2d 516, 519 (2d

Cir.1986). This duty is not absolute, however, as "not ... every injury suffered by one prisoner at the hands of another ... translates into constitutional liability." *Farmer,* 511 U.S. at 834. To establish this liability, *Farmer's* familiar two-prong standard must be satisfied.

As in the medical indifference claim discussed above, plaintiff's allegations of broken bones and severe pain from the complained of assault suffice to establish a "sufficiently serious" deprivation. *Id.* Plaintiff's claim fails, however, to raise the possibility that he will be able to prove deliberate indifference to any threat of harm to him by the Bare Hill Superintendent or the DOCS Commissioner. Again, plaintiff must allege facts which establish that these officials were aware of circumstances from which the inference could be drawn that the plaintiff was at risk of serious harm and that they actually inferred this. *Farmer,* 511 U.S. at 838.

To advance his claim, plaintiff alleges an increase in "unusual incidents, prisoner misbehaviors, and violence" (Compl., ¶ 12) and concludes that defendants' continued policy of overcrowding created the conditions which led to his injuries. Compl., ¶ 10. The thrust of plaintiff's claim seems to suggest that the defendants' awareness of the problems of overcrowding led to knowledge of a generalized risk to the prison population, thus establishing a legally culpable state of mind as to plaintiff's injuries. Plaintiff has not offered any evidence, however, to support the existence of any personal risk to himself about which the defendants could have known. According to his own complaint, plaintiff first encountered his assailant only minutes before the altercation occurred. Compl., ¶ 17. It is clear that the named defendants could not have known of a substantial risk to the plaintiff's safety if the plaintiff himself had no reason to believe he was in danger. *See Sims v. Bowen,* No. 96-CV-656, 1998 WL 146409, at \*3 (N.D.N.Y. Mar.23, 1998)(Pooler, J.)("I conclude that an inmate must inform a correctional official of the basis for his belief that another inmate represents a substantial threat to his safety before the correctional official can be charged with deliberate indifference"); *Strano v. City of New York,* No. 97-CIV-0387, 1998 WL 338097, at \*3-4 (S.D.N.Y. June 24, 1998) (when plaintiff acknowledged attack was "out of the blue" and no prior incidents had occurred to put defendants on notice of threat or danger, defendants could not be held aware of any substantial risk

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

of harm to the plaintiff). Defendants' motion on this ground should, therefore, be granted.

### IV. Failure to Complete Service

**\*5** The complaint names four defendants, including one "John Doe" Correctional Officer at Bare Hill. Defendants acknowledge that service has been completed as to the three named defendants. Docket Nos. 12 & 13. The "John Doe" defendant has not been served with process or otherwise identified and it is unlikely that service on him will be completed in the near future. *See* Docket No. 6 (United States Marshal unable to complete service on "John Doe"). Since over nine months have passed since the complaint was filed (Docket No. 1) and summonses were last issued (Docket entry Oct. 21, 1997), the complaint as to the unserved defendant should be dismissed without prejudice pursuant to Fed.R.Civ.P. 4(m) and N.D .N.Y.L.R. 4.1(b).

### V. Conclusion

WHEREFORE, for the reasons stated above, it is

RECOMMENDED that defendants' motion to dismiss be GRANTED in all respects; and

IT IS FURTHER RECOMMENDED that the complaint be dismissed without prejudice as to the unserved John Doe defendant pursuant to Fed.R.Civ.P. 4(m) and N.D.N.Y.L.R. 4.1(b); and it is

ORDERED that the Clerk of the Court serve a copy of this Report-Recommendation and Order, by regular mail, upon parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. *Roldan v.*

*Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,1998.
Waldo v. Goord
Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

2013 WL 6169746
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Edward TREAT et al., Plaintiffs,

v.

CENTRAL NEW YORK PSYCHIATRIC
CENTER et. al, Defendants.

No. 9:12–cv–602 (GLS/DEP).
|
Nov. 20, 2013.

**Attorneys and Law Firms**

Edward Treat, Marcy, NY, pro se.

Larry Brown, Marcy, NY, pro se.

Myron Wright, Marcy, NY, pro se.

Richard Zimmer, Marcy, NY, pro se.

Hon. Eric T. Schneiderman, New York State Attorney General, Douglas J. Goglia, Assistant Attorney General, of Counsel, Albany, NY, for the Defendants.

*MEMORANDUM–DECISION AND ORDER*

GARY L. SHARPE, Chief Judge.

### I. *Introduction*

**\*1** Plaintiffs *pro se* Edward Treat, Larry Brown, Myron Wright, and Richard Zimmer commenced this action against defendants Central New York Psychiatric Center (CNYPC), the New York Office of Mental Health, Michael F. Hogan, Maureen Bosco, Barbara Miller, Marianne Madia, Anthony Gonzalez, James Morgan, Jeff Nowicki, Terri Maxymillain, Elaine Dziadyk, and Miya Burt, pursuant to 42 U.S.C. § 1983, alleging deprivation of their rights under the Eighth[1] and Fourteenth Amendments of the United States Constitution, section 504 of the Rehabilitation Act, 29 U.S.C. § 794, the New York State Constitution, and the New York State Mental Hygiene Law. (Compl., Dkt. No. 1.) Defendants filed a motion for summary judgment in lieu of an answer,

seeking dismissal of plaintiffs' claims as a matter of law. (Dkt. No. 27.)

In a Report–Recommendation and Order (R & R) dated August 28, 2013, Magistrate Judge David E. Peebles recommended that defendants' motion be granted, plaintiffs' federal claims be dismissed, and the court decline to exercise supplemental jurisdiction over the remaining state law claims.[2] (Dkt. No. 51.) Plaintiffs filed timely objections to the R & R. (Dkt. No. 52.) For the reasons that follow, the R & R is adopted in its entirety.

### II. *Background*

Plaintiffs are four convicted sex offenders who have been involuntarily committed to CNYPC for treatment under the Sex Offender Management and Treatment Act (SOMTA). (Compl.¶¶ 4, 10–17.) Plaintiffs primarily allege that the recently enacted bathroom and shower usage policies at CNYPC have deprived them of life's necessities and subjected them to overcrowding and inhumane conditions, in violation of their substantive due process rights under the Fourteenth Amendment. (*See generally* Compl.)

In May 2010, an emergency bathroom and shower policy was put in place due to several incidents occurring in the bathrooms, including voluntary and involuntary sexual activity, fights, and trafficking of contraband. (Dkt. No. 27, Attach. 4 ¶¶ 18–20.) Under the emergency policy, all of the bathrooms were monitored by Secure Treatment Care Aids (SCTAs) at all times, use of the bathrooms and shower rooms was restricted to one resident at a time, the bathroom in the treatment mall was to remain locked at all times when the SCTAs were unavailable to monitor, and residents were required to register in advance for fifteen minute shower time slots. (*Id.* ¶¶ 21–23.)

In July 2010, final "Resident Bathroom and Shower Policies" were implemented. (*Id.* ¶ 24.) These policies permitted multiple residents to use the bathrooms within the residential units between the hours of 7:00 a.m. and 11:00 p.m., but retained the single use practice during all other hours in the residential units and at all times in the treatment mall. (*Id.* ¶ 25.) The final policy also expanded the hours during which fifteen minute shower slots were available. (*Id.* ¶¶ 24, 26.)

Treat v. Central New York Psychiatric Center, Not Reported in F.Supp.2d (2013)

2013 WL 6169746

### III. *Standard of Review*

**\*2**  Before entering final judgment, this court routinely reviews all report and recommendation orders in cases it has referred to a magistrate judge. If a party has objected to specific elements of the magistrate judge's findings and recommendations, this court reviews those findings and recommendations *de novo. See Almonte v. N.Y. State Div. of Parole,* No. Civ. 904CV484GLS, 2006 WL 149049, at \*3, \*5 (N.D.N.Y. Jan. 18, 2006). In those cases where no party has filed an objection, only vague or general objections are filed, or a party resubmits the same papers and arguments already considered by the magistrate judge, this court reviews the findings and recommendations of the magistrate judge for clear error.[3] *See id.* at \*4–5.

### IV. *Discussion*

Plaintiffs filed both general and specific objections to the R & R. Plaintiffs' specific objections can succinctly be summarized as follows: (1) Judge Peebles erroneously determined that the bathroom and shower policies only minimally inconvenienced plaintiffs, (Dkt. No. 52 at 1–2); (2) Judge Peebles misapplied the standard of review by reviewing plaintiffs' complaint in the light most favorable to defendants, and erroneously concluded that the policies were implemented due to a legitimate emergency giving rise to security concerns, (*id.* at 2–3); and (3) Judge Peebles failed to review plaintiffs' claims regarding defendants' downgrading of their complaints of abuse, (*id.* at 3). Additionally, plaintiffs filed one general objection, contending that Judge Peebles failed to review their deliberate indifference claim and claims of inhumane and unsanitary conditions, (*id.* at 3, 4). Plaintiffs objections are without merit, and the court addresses each in turn.

#### A. *Specific Objections*

Plaintiffs filed three specific objections, which warrant *de novo* review. *Almonte,* 2006 WL 149049, at \*3, \*5.

##### 1. Inconvenience Imposed By Bathroom and Shower Policies

First, plaintiffs dispute Judge Peebles' finding that the bathroom and shower policies were merely a modest imposition on plaintiffs. (Dkt. No. at 1, 3.) Specifically, plaintiffs assert that, contrary to Judge Peebles' finding, they were required to wait longer than five or ten minutes to use the bathroom, and in several instances, they were required to wait twenty or forty minutes. (*Id.* at 1–2.) Additionally, plaintiffs argue that, also contrary to Judge Peebles' finding, they did claim that they were denied the right to shower daily, (*id.* at 2), and the new bathroom and shower policies caused "overcrowding conditions," (*id.* at 3). Whether plaintiffs waited five or forty minutes to use the bathroom, or showered every other day, rather than every day, however, plaintiffs have not pleaded facts that give rise to an unconstitutional deprivation of due process.[4]

Individuals in custody do not have a constitutional right to use the bathroom or to shower whenever they please. *See Odom v. Keane,* No. 95 Civ. 9941, 1997 WL 576088, at \*4–5 (S.D.N.Y. Sept. 17, 1997) (explaining that the plaintiff's claim that he was denied access to the bathroom for ten hours was not sufficient to survive summary judgment); *see also Davenport v. DeRobertis,* 844 F.2d 1310, 1316–17 (7th Cir.1988) (finding one shower per week for prisoners to be constitutionally sufficient); *Groves v. New York,* No. 9:09–CV–0412, 2010 WL 1257858, at \*8, n. 15 (N.D.N.Y. Mar. 1, 2010) (holding that CNYPC resident's two-hour lapse for request to use bathroom did not give rise to a constitutional violation); *Bourdon v. Roney,* No. 9:99–CV–0769, 2003 WL 2108177, at \*10–11 (N.D.N.Y. Mar. 6, 2003) (dismissing a pre-trial detainee plaintiff's claim where he was denied access to a bathroom for a maximum of three hours); *Beckford v. Portuondo,* 151 F.Supp.2d 204, 211 (N . D.N.Y.2001) ("Nowhere has it been held that prisoners are entitled to complete and unfettered access to water or showers."). Instead, state officials are required to provide housing under "humane conditions," and "adequate food, clothing, shelter, and medical care." *Farmer v. Brennan,* 511 U.S. 825, 832 (1994). Persons in custody are entitled to "[r]easonably adequate sanitation and the ability to eliminate and dispose of one's bodily wastes." *Odom,* 1997 WL 576088, at \*4–5.

**\*3**  Here, plaintiffs allege that they were forced to wait up to forty minutes to use the bathroom, (Compl.¶ 69), and that there were an insufficient number of shower slots, causing plaintiffs to occasionally wait until the next day to shower, (*id.* ¶¶ 140–41). Given that ten hours without

access to a bathroom has been held to be constitutionally sufficient, *Odom,* 1997 WL 576088, at *4–5, and that one shower per week has been held to pass constitutional muster, *Davenport,* 844 F.2d at 1316–17, the CNYCP's bathroom and shower policies do not violate plaintiffs' Fourteenth Amendment due process rights. Accordingly, plaintiffs have failed to allege a violation of their due process rights.

### 2. Application of the Standard of Review and Defendants' Legitimate Security Concerns

Second, plaintiffs contend that Judge Peebles misapplied the standard of review, and further object to Judge Peebles' finding that the bathroom and shower policies were the result of legitimate security concerns. (Dkt. No. 52 at 2, 3.) Plaintiffs' objections are without merit.

In analyzing the shower and bathroom policies, the court must balance plaintiffs' substantive rights against the state's interest in "maintaining institutional security and preserving internal order." *Ahlers v. Rabinowitz,* 684 F.3d 53, 61 (2d Cir.2012) (quoting *Bell v. Wolfish,* 441 U.S. 520, 546 (1979)). While individuals "who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than [prison inmates]," *Youngberg,* 457 U.S. at 321–22, "the state's interest in maintaining order and security is not punitive in purpose or character, and remains valid in institutions of civil confinement," *Ahlers,* 684 F.3d at 61. In balancing these competing interests, the defendants' decisions are afforded "a presumption of correctness." *Id.* (quotation marks omitted); *see Youngberg,* 457 U.S. at 324–25 ("The administrators, and particularly professional personnel ... should not be required to make each decision in the shadow of an action for damages.").

Here, defendants' reasons for implementing the bathroom and shower policies are compelling. Defendants stated that the policies were motivated by security concerns, including fighting, involuntary and voluntary sexual activity, and trafficking of contraband, such as tobacco, pornography, and weapons, in the bathrooms and showers. (Dkt. No. 27, Attach. 4 ¶¶ 18–20.) The Supreme Court has noted that policies designed to keep contraband out of jails and prisons have been upheld, *Florence v. Bd. of Chosen Freeholders of Cnty. of Burlington,* 132 S.Ct. 1510, 1516 (2012), and courts in this district have discussed the "societal interest in protecting the health, safety, and welfare of the patients and staff [in a state psychiatric

center] who would be detrimentally affected without sufficient precautionary measures," *Aiken v. Nixon,* 236 F.Supp.2d 211, 232 (N.D.N.Y.2002).

**\*4** Given these compelling state interests, and given "the presumption of correctness" afforded to defendants in this Circuit, the bathroom and shower policies do not violate the Constitution, and Judge Peebles did not err in his application of the standard of review. *Ahlers,* 684 F.3d at 61. Accordingly, plaintiffs have failed to allege a violation of their Fourteenth Amendment due process rights.

### 3. Downgrading of Plaintiffs' Complaints

Third, plaintiffs argue that Judge Peebles failed to review their claim that defendants denied them due process by repeatedly downgrading their complaints of abuse. (Dkt. No. 52 at 3.) Although the R & R does not address this claim, the claim fails nevertheless.

In the prison context, the law is well settled that inmates do not have a substantive constitutional right to grievance procedures. *Brown v. Hogan,* No. 9:07–CV–842, 2009 WL 3756595, at *3–4 (N.D.N.Y. Nov. 6, 2009) (citing *Torres v. Mazzuca,* 246 F.Supp.2d 334, 342 (S.D.N.Y.2003). Further, "a violation of the inmate grievance procedures does **not** give rise to a claim under section 1983." *Id.* at *3. In *Brown,* the court held that "even assuming that [residents] at CNYPC have the same rights as those confined pursuant to criminal convictions, there is no constitutional right to any grievance procedure, and assuming that a grievance procedure exists, there is no constitutional right, protecting the plaintiff from defendants' violation of that procedure." *Id.* at *4. Similarly, here, even accepting all of plaintiffs' allegations as true, there is no federal constitutional right protecting plaintiffs from defendants' violation of CNYPC's grievance procedure.[5] Accordingly, plaintiffs have failed to allege a violation of their Fourteenth Amendment due process rights.

### B. *Plaintiffs' General Objection*

Finally, plaintiffs object to the R & R on the basis that Judge Peebles failed to review their claim of deliberate indifference and failed to review their claims of inhumane and unsanitary conditions. (Dkt. No. 52 at 3, 4.) These are general objections, and the court reviews them for clear error. *Almonte,* 2006 WL 149049, at *4–5.

Treat v. Central New York Psychiatric Center, Not Reported in F.Supp.2d (2013)

2013 WL 6169746

Plaintiffs' objections are without merit. As an initial matter, Judge Peebles *did* address plaintiffs' claims that defendants acted with deliberate indifference and the conditions in which plaintiffs lived. (R & R at 14–20.) Further, because these objections merely raise arguments that plaintiffs previously addressed, these objections are general and do not warrant *de novo* review. *See Gusky v. Astrue,* No. 10–CV–00919MAT, 2013 WL 3776257, at \*3 (W.D.N.Y. July 2, 2013) ("[W]hen the objections simply reiterate previous arguments ... the Court should review the report for clear error."); *Almonte,* 2006 WL 149049, at \*4. The court, having carefully reviewed the record, finds no clear error in the R & R.

After careful consideration of the arguments advanced by plaintiffs in their responses to defendants' summary judgment motion and in their objections to the R & R, Judge Peebles' conclusion that summary judgment is appropriate is correct largely for the reasons stated in the R & R.

### V. *Conclusion*

 **\*5 WHEREFORE,** for the foregoing reasons, it is hereby

**ORDERED** that Magistrate Judge David E. Peebles' August 28, 2013 Report–Recommendation and Order (Dkt. No. 51) is **ADOPTED** in its entirety; and it is further

**ORDERED** that defendants' motion for summary judgment (Dkt. No. 27) is **GRANTED;** and it is further

**ORDERED** that plaintiffs' complaint (Dkt. No. 1) is **DISMISSED;** and it is further

**ORDERED** that the Clerk close this case; and it is further

**ORDERED** that the Clerk provide a copy of this MemorandumDecision and Order to the parties.

**IT IS SO ORDERED.**

### *REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

*Pro se* plaintiffs Edward Treat, Larry Brown, Myron Wright, and Richard Zimmer, four convicted sex offenders who have been involuntarily committed to the Central New York Psychiatric Center ("CNYPC") for treatment, have commenced this action, pursuant to 42 U.S.C. § 1983, against the New York Office of Mental Health ("OMH") and several OMH employees alleging deprivation of their civil rights. While their complaint advances other claims, including those based upon the New York State Constitution and various state laws and regulations, plaintiffs primarily allege that they have been deprived of life's necessities by virtue of recently enacted bathroom and shower usage policies at the CNYPC, in violation of their right to substantive due process under the Fourteenth Amendment to the United States Constitution. It is also alleged that employees at the CNYPC have violated section 504 of the Rehabilitation Act, 29 U.S.C. § 794, through the administration of a resident worker program.

In response to plaintiffs' complaint, defendants have filed a pre-answer summary judgment motion seeking dismissal of plaintiffs' claims as a matter of law. For the reasons set forth below, I recommend that the motion be granted, plaintiffs' federal claims be dismissed, and the court decline to exercise supplemental jurisdiction over the remaining state law claims.

### I. *BACKGROUND* [1]

The CNYPC is a mental health facility located in Marcy, New York, and operated by the OMH. Nowicki Decl. (Dkt. No. 27–4) at ¶ 2. Upon enactment of the Sex Offender Management and Treatment Act ("SOMTA"), which became effective on April 13, 2007, the CNYPC became designated as a "secure treatment facility" as defined under N.Y. Mental Hygiene Law ("MHL") §§ 7.18 and 10.03(o) for the purpose of administering a Sex Offender Treatment Program ("SOTP") under the SOMTA. *Id.* ¶¶ 4–6. Each SOTP participant at the CNYPC is an involuntarily committed, formerly incarcerated sex offender or violent offender who has committed a sexually motivated offense and has been found by a state court to be a dangerous sex offender requiring confinement. [2] *Id.* at ¶ 7.

Plaintiffs Edward Treat and Myron Wright are convicted felons who have been civilly committed to the CNYPC for the purpose of undergoing SOTP. Complaint (Dkt. No. 1)

at ¶¶ 10, 14. Plaintiffs Larry Brown and Richard Zimmer are currently civil detainees at the Center, awaiting trial to determine whether they, too, should be detained for the purpose of participating in SOTP. *Id.* at ¶¶ 12, 16.

 **\*6** OMH personnel and staff at the CNYPC assist SOTP-enrolled sex offenders in managing their deviant behavior, while at the same time insuring the operation of a secure facility that protects the community, the staff, and the residents themselves. Nowicki Decl. (Dkt. No. 27–4) at ¶¶ 8–9. SOTP participants are housed in seven residential units, each of which can accommodate approximately twenty-six patients. *Id.* at ¶ 14. Each residential unit includes a bathroom containing four toilet stalls and a urinal, and a residential shower room with two shower stalls, each equipped with a shower curtain. *Id.* at ¶ 15. In addition, there are bathrooms located in the CNYPC treatment mall and activity center; the layouts of those bathrooms are similar to those in the residential wards. *Id.*

Between the hours of 7:00 a.m. and 11:00 p.m., each residential ward, with the exception of the Making a Pro–Social Stance ("MAPSS") unit, which houses residents with high psychopathy (and is therefore more extensively staffed), is monitored by three Secure Care Treatment Aids ("SCTAs").[3] Nowicki Decl. (Dkt. No. 27–4) at ¶ 16. During the remaining hours, between 11:00 p.m. and 7:00 a.m., there are two SCTAs stationed in the regular residential units. *Id.*

Prior to May 2010, a number of incidents occurred in SOTP bathrooms, including voluntary and involuntary sexual activities in the bathroom and shower stalls, as well as several fights. Nowicki Decl. (Dkt. No. 27–4) ¶¶ 18, 19. Staff at the CNYPC also observed that residents were using bathrooms and showers to hide and pass contraband, including weapons, pornography, and tobacco all of which were found hidden in toilet paper dispensers, behind toilets, in garbage cans, and above tiles in the drop ceilings. *Id.* at ¶ 20. To address these incidents, on May 19, 2010, the CNYPC implemented an emergency policy for SOTP units that required the bathrooms in both the residential portions of the facility, as well as those in the treatment mall and activity center, be monitored by SCTAs at all times. *Id.* at ¶ 21. In addition, the use of bathrooms and shower rooms within the SOTP was restricted to one resident at a time. *Id.* Under the emergency policy, the bathroom in the treatment mall was to remain locked while residents were in treatment,

changing classrooms, being transported to and from the treatment mall, and at other times when SCTAs were unavailable to monitor the area. *Id.*

Shortly after implementation of the emergency policy, employees at the CNYPC determined that certain residents required greater access to bathrooms due to physical or medical problems, or mobility limitations. Nowicki Decl (Dkt. No. 27–4) at ¶ 22. For those residents, access to the bathrooms was allowed even if another resident was already present, provided that an SCTA remained present in the bathroom to continuously monitor the area. *Id.*

A similar emergency policy was implemented on May 24, 2010, governing access to the showers on the residential units. Nowicki Decl. (Dkt. No. 27–4) at ¶ 23. Pursuant to that new, emergency policy, only one resident was allowed into the shower room at a time, and residents were required to register in advance for fifteen minute shower time slots during specified periods when SCTAs would be available to monitor the shower room, thus excluding meal times and periods and when medications were dispensed. *Id.*

 **\*7** On July 13, 2010, final "Resident Bathroom and Shower Policies" were adopted at the CNYPC, replacing the emergency policies implemented in May 2010. Nowicki Decl. (Dkt. No. 27–4) at ¶ 24; Nowicki Decl. Exh. C (Dkt. No. 27–8). Under the new bathroom policy, multiple residents are permitted to simultaneously use the bathrooms within the residential units between the hours of 7:00 a.m. and 11:00 p.m. Nowicki Decl. (Dkt. No. 27–4) at ¶ 25. The single use practice, however, remains in effect under the new policy for the hours of 11:00 p.m. to 7:00 a.m. in the residential units, and at all times for the bathroom in the treatment mall. *Id.* Under the new policy, residents with medical issues who have obtained authorization from a CNYPC physician are allowed to access a bathroom, as needed, with staff approval. *Id.* The final shower policy expanded the hours during which fifteen-minute shower slots were available, including between 5:00 a.m. and 7:00 a.m., as well as during other times of the day when residents are not in programming, therapy, or meals. Nowicki Decl. (Dkt. No. 27–4) ¶¶ 24, 26; Nowicki Decl. Exh. D (Dkt. No. 27–9).

Unrelated to the bathroom and shower policies at the CNYPC are the opportunities available to SOTP residents

2013 WL 6169746

to participate in a work program. Nowicki Decl. (Dkt. No. 27–4) at ¶¶ 29–35. Residents at the CNYPC who are undergoing SOTP may qualify for the work program when they advance to a specified point in their treatment and programming, and are referred into the program by their primary therapist. *Id.* at ¶ 33. The resident's physician must approve a work referral before it is submitted. *Id* .

Under the work program, SOTP residents may be assigned to work in the copy center, furniture repair, sewing, laundry, on-mall janitorial, on-unit janitorial, and the library. Nowicki Decl. (Dkt. No. 27–4) at ¶ 34. Participation in the worker program is privilege that residents earn, and, as such, is neither a right nor a requirement for treatment. *Id.* at ¶ 32. By regulation, when residents volunteer to work, they are guaranteed payment of at least the prevailing federal minimum wage. *Id.* at ¶¶ 28. The work program at the CNYPC is so popular among SOTP residents that there is a waiting list to fill program jobs, which are limited in number. *Id.* at ¶ 35.

In their complaint in this action, plaintiffs intimate that they have been forced to work in order to allow the CNYPC to be profitable. *See generally* Complaint (Dkt. No. 1). As a result of that allegation, plaintiffs were removed from the SOTP work program and relieved of their jobs following commencement of the action, although they have been informed that, should they wish to voluntarily participate in the work program in the future, they remain free to do so. Nowicki Decl. (Dkt. No. 27–4) at ¶ 36; *see also* Brown Decl. Exh. 22 (Dkt. No. 39) at 72.

Among the complaints lodged by the plaintiffs in this action is the alleged inadequacy of vocational programs, including the lack of computer training, at the Center. *See, e.g.,* Complaint (Dkt. No. 1) at ¶¶ 63–65, 110–116; Brown Aff. (Dkt. No. 1) at ¶ 30. Generally, however, SOTP residents at the CNYPC are not allowed to use computers. Nowicki Decl. (Dkt. No. 27–4) at ¶ 38. While at one point there was a computer laboratory where residents could receive training in computer skills, because certain residents were found to be making improper use of the computers, the program was abandoned. *Id.* at ¶¶ 39–41.

## II. *PROCEDURAL HISTORY*

 **\*8**  Plaintiffs commenced this action on April 10, 2012. Dkt. No. 1. Named as defendants in plaintiffs' complaint are the OMH; Michael F. Hogan, Commissioner of the

OMH; Maureen Bosco, the Acting Executive Director of the CNYPC; Jeff Nowicki, the Chief of Mental Health Treatment Services for the SOTP at the CNYPC; Terri Maximillian, Director of Clinical Services for the SOTP at the CNYPC; Marianne Madia, a Nurse Administrator at the CNYPC; Anthony Gonzalez, Director of Risk Management at the CNYPC; James Morgan, Associate Director of Quality Management at the CNYPC; Elaine Dziadyk, Acting Deputy Director of Rehabilitative Services at the CNYPC; Miya L. Burt, a Psychiatric Nurse and Ward Supervisor at the CNYPC; and Barbara Miller, CNYPC's Director for Administrative Services. *Id.* at ¶¶ 18–37. Each of the individual defendants is sued only in his or her official capacity. *Id.* at ¶¶ 19–37. Plaintiffs' complaint asserts several federal and state claims, including (1) violation of the substantive due process clause of the Fourteenth Amendment to the United States Constitution; (2) violation of the due process clause of the New York State Constitution; (3) deprivation of the rights guaranteed under Article XVI I, Section 1 of the New York State Constitution; (4) violation of plaintiffs' right to equal protection under the Fourteenth Amendment (although plaintiffs identify this cause of action as violating their rights under the Eighth Amendment); (5) violation of section 504 of the Rehabilitation Act; and (6) violation of New York State Mental Hygiene Law and corresponding rules and regulations. *Id.* at 26–33.

Following an initial review of plaintiffs' complaint and accompanying *in forma pauperis* ("IFP") applications, Chief District Judge Gary L. Sharpe issued an order on June 21, 2012, (1) granting plaintiffs' IFP applications; (2) dismissing any claims arising under section 504 of the Rehabilitation Act and asserted against defendants Dziadyk, Maximillian and Nowicki in their individual capacities; (3) construing plaintiffs' Eighth Amendment (identified in the complaint as plaintiffs' fourth claim for relief) as a cause of action arising under the Fourteenth Amendment in light of the plaintiffs' status as civil detainees; and (4) denying plaintiffs' motion for class certification, without prejudice to renewal. Dkt. No. 7.

In response to plaintiffs' complaint, defendants filed a pre-answer motion for summary judgment on September 28, 2012. [4] Dkt. No. 27. In their motion, defendants argue that no reasonable factfinder could conclude that plaintiffs' rights under the Fourteenth Amendment and section 504 of the Rehabilitation Act have been

Treat v. Central New York Psychiatric Center, Not Reported in F.Supp.2d (2013)

2013 WL 6169746

violated by their conduct, and further seek dismissal of any damage claims under section 504 based upon the Eleventh Amendment. *Id.* Plaintiffs have since responded in opposition to defendants' motion. Dkt. Nos. 38–40. Defendants' motion, which is now fully briefed and ripe for determination, has been referred to me for the issuance of a report and recommendation, pursuant to 28 U .S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See* Fed.R.Civ.P. 72(b).

III. *BACKGROUND*

A. *Summary Judgement Standard*

**\*9** Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material facts and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82–83 (2d Cir.2004). A fact is "material" for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248; *see also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005) (citing *Anderson* ). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue, and the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4; *Sec. Ins. Co.,* 391 F .3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324; *Anderson,* 477 U.S. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the nonmoving party. *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137–38 (2d Cir.1998). The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades*

*Employers' Educ. Ass'n v. McGowan,* 311 F.3d 501, 507–08 (2d Cir.2002); *see also Anderson,* 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

B. *Plaintiff's Due Process Claim Arising Under the U.S. Constitution*

Plaintiffs' complaint asserts claims arising from alleged violations of their rights under a number of constitutional provisions, including the Eighth Amendment. Complaint (Dkt. No. 1) at 29–30.

When plaintiffs were released by the DOCCS into the CNYPC, they had finished serving their terms of imprisonment, and thus were no longer prison inmates. The Eighth Amendment, prohibiting cruel and unusual punishment of those convicted of crimes, therefore is not applicable under the circumstances, and plaintiffs' claim arises instead under the Fourteenth Amendment. *See Youngberg v. Romeo,* 457 U.S. 307, 315 (1982) (holding that the respondent, who was involuntarily committed to a state institution for the mentally retarded, had constitutionally protected liberty interests under the due process clause of the Fourteenth Amendment). "The Supreme Court has explained that 'when the State takes a person into its custody and holds [him] there against [his] will, the Constitution imposes upon it a corresponding duty to assume some responsibility for [his] safety and general well-being.' " *Beck v. Wilson,* 377 F.3d 884, 889 (8th Cir.2004) (quoting *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.,* 489 U.S. 189, 199–200 (1989)). In this case, plaintiffs' challenges to the various policies and practices referenced in their complaint must therefore be analyzed within the framework of the due process clause of the Fourteenth Amendment. *Sain v. Wood,* 512 F.3d 886, 893 (7th Cir.2008); *Dove v. City of New York,* No. 03–CV–5052, 2007 WL 805786, at \*7 (E.D.N.Y. Mar. 15, 2007). [5]

**\*10** Because the due process clause requires that civilly committed patients be provided with protections at least as extensive as those to which convicted prisoners are entitled, however, the Eighth Amendment provides a suitable starting point for analysis of plaintiffs' claims. *Sain,* 512 F.3d at 893. Under the Eighth Amendment, state officials are required to provide convicted inmates with housing under "humane conditions," and to afford them "adequate food, clothing, shelter, and medical care."

WESTLAW   © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 6169746

*Farmer v. Brennan,* 511 U.S. 825, 832 (1994); *see also Sain,* 512 F.3d at 893. A claim alleging that conditions of confinement violate the Eighth Amendment must satisfy both an objective and subjective requirement. *Leach v. Dufrain,* 103 F.Supp.2d 542, 546 (N.D.N.Y.2000) (Kahn, J.) (citing *Wilson v. Seiter,* 501 U.S. 294, 298, 297 (1991)). The plaintiff must establish that the conditions are "sufficiently serious" from an objective point of view, and additionally that prison officials acted with "deliberate indifference." [6] *Leach,* 103 F.Supp.2d at 546; *Waldo v. Goord,* No. 97–CV–1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J., *adopting report and recommendation by* Homer, M.J.); *see also Wilson,* 501 U.S. at 303. Deliberate indifference exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837; *Leach,* 103 F.Supp.2d at 546; *Waldo,* 1998 WL 713809, a *2.

In analyzing the shower and bathroom policies at issue in this case, the court must balance plaintiffs' substantive rights against the state's interest in " 'maintaining institutional security and preserving internal order.' " *Ahlers v. Robinowitz,* 684 F.3d 53, 61 (2d Cir.2012) (quoting *Bell v. Wolfish,* 441 U.S. 520, 546 (1979)). It is true that "[p]ersons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Youngberg,* 457 U.S. at 321–22. As the Second Circuit has noted, "[h]owever, the state's interest in maintaining order and security is not punitive in purpose or character, and remains valid in institutions of civil commitment." *Ahlers,* 684 F.3d at 61. In determining whether a proper balance of those competing considerations has been struck, a court must afford the defendants' decisions a "presumption of correctness." *Id.* (quotation marks omitted).

In this instance, the interests of the state, cited by defendants as the genesis of the emergency bathroom and shower policies in May 2010, and the new, permanent policies that took effect in July of 2010, are compelling. According to Jeff Nowicki, the Chief of Mental Health Treatment Services for the SOTP at the CNYPC, the modification of policies was motivated by security concerns, including concerns about residents fighting, engaging in both involuntary and voluntary

sexual activity, and trafficking of contraband inside the bathrooms and showers. These are legitimate security concerns that can justify the implementation of policies placing restrictions upon the use of bathroom and shower facilities within the Center. *See Bell,* 441 U.S. at 553 (finding a prison facility's policy prohibiting inmates from receiving packages from outside the facility containing food items or personal property justifiable based on evidence that the introduction of such packages would require an inordinate amount of time to inspect, increase the risk of inmate conflicts, and introduce a storage and sanitation problem into the facility); *accord, Florence v. Bd. of Chosen Freeholders of Cnty. of Burlington,* 132 S.Ct. 1510, 1516 (2012) ("Policies designed to keep contraband out of jails and prisons have been upheld in cases decided since *Bell.*").

**\*11** Balanced against these legitimate concerns is the relatively modest imposition upon the plaintiffs. Plaintiffs do not allege that they are denied the right to shower daily resulting from the revised policies. Instead, they complain that the requirement to sign up for an available time slot to shower some how violates their constitutional rights. Similarly, while plaintiffs do not contend that they are deprived of the opportunity to utilize a bathroom, they suggest that, on the occasions that they are required to wait as long as five or ten minutes, their rights are violated.[7] These contentions, however, are not unsupported by any applicable legal authority. *See Odom v. Keane,* No. 95–CV–9941, 1997 WL 576088, at *5 (S.D.N.Y. Sept. 17, 1997) (Sotomayor, J.) (finding that the plaintiff's conditions of confinement claim was legally deficient where there was evidence that his "toilet functioned approximately twelve hours every day, time enough to dispose of [his] bodily wastes"); *accord, McGee v. Pallito,* No. 10–CV–0011, 2011 WL 6291954, at *6 (D.Vt. Aug. 3, 2011). The constitution requires only "reasonably adequate sanitation and the ability to eliminate and dispose of one's bodily wastes without unreasonably risking contamination[.]" *Whitnack v. Douglas Cnty.,* 16 F.3d 954, 958 (8th Cir.1994). Having reviewed the record, I find that no reasonable factfinder could conclude that the CNYPC's bathroom and shower policies deprive the plaintiffs of the minimal civilized measure of life's necessities.[8] Accordingly, I recommend that plaintiffs' Fourteenth Amendment due process claim be dismissed.

2013 WL 6169746

## C. Section 504 of the Rehabilitation Act

Plaintiffs also assert a claim under the section 504 of the Rehabilitation Act. Complaint (Dkt. No. 1) at 30–31. In their motion, defendants request dismissal of this claim, arguing that plaintiffs' complaint fails to state a claim upon which relief may be granted, and the individual defendants are immune from suit under the Eleventh Amendment. Defs.' Memo. of Law (Dkt. No. 27–3) at 14–18.

### 1. Failure to State a Claim Upon Which Relief May Be Granted

Because a court "may dismiss for failure to state a cause of action upon motion for summary judgment," it is necessary to set forth the legal standard governing Rule 12(b)(6). *Schwartz v. Compagnie Gen. Transatlantique,* 405 F.2d 270, 273 (2d Cir.1968); *see also Katz v. Molic,* 128 F.R.D. 35, 39 (S.D.N.Y.1989) ("Therefore, that a summary judgment motion is being treated as a motion to dismiss for failure to state a claim does not require notice to the parties.").

A motion to dismiss a complaint, brought pursuant to Rule 12(b) (6) of the Federal Rules of Civil Procedure, calls upon a court to gauge the facial sufficiency of that pleading using a standard which, though unexacting in its requirements, "demands more than an unadorned, the-defendant-unlawfully-harmed me accusation" in order to withstand scrutiny. *Ashcroft v. Iqbal,* 556 U.S. at 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly,* 550 U.S. 554, 555 (2007)). Under Rule 8(a)(2) of the Federal Rules of Civil Procedure, "a pleading must contain a 'short and plain statement of the claim showing that the pleader is entitled to relief.' " *Iqbal,* 556 U.S. 677–78 (quoting Fed.R.Civ.P. 8(a)(2)). While modest in its requirements, that rule commands that a complaint contain more than mere legal conclusions. *See id.* at 679 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.").

**\*12** In deciding a Rule 12(b)(6) dismissal motion, the court must accept the material facts alleged in the complaint as true and draw all inferences in favor of the non-moving party. *Erickson v. Pardus,* 551 U.S. 89, 94 (2007) (citing *Twombly,* 550 U.S. at 555–56); *see also Cooper v. Pate,* 378 U.S. 546, 546 (1964); *Miller v. Wolpoff & Abramson, L.L.P.,* 321 F.3d 292, 300 (2d Cir.2003); *Burke v. Gregory,* 356 F.Supp.2d 179, 182

(N.D.N.Y.2005) (Kahn, J.). However, the tenet that a court must accept as true all of the allegations contained in a complaint does not apply to legal conclusions. *Iqbal,* 556 U.S. at 678.

To withstand a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face." *Iqbal,* 556 U.S. at 678 (quoting *Twombly,* 550 U.S. at 570); *see also Ruotolo v. City of New York,* 514 F.3d 184, 188 (2d Cir.2008). As the Second Circuit has observed, "[w]hile *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge plaintiffs' claims across the line from conceivable to plausible." *In re Elevator Antitrust Litig.,* 502 F.3d 47, 50 (2d Cir.2007) (quoting *Twombly,* 550 U.S. at 570) (alterations omitted).

When assessing the sufficiency of a complaint against this backdrop, particular deference should be afforded to a *pro se* litigant, whose complaint merits a generous construction by the court when determining whether it states a cognizable cause of action. *Erickson,* 551 U.S. at 94 (" '[A] *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." (quoting *Estelle v. Gamble,* 429 U.S. 97, 106 (1976)) (internal citation omitted)); *Sealed Plaintiff v. Sealed Defendant,* 537 F.3d 185, 191 (2d Cir.2008) ("[W]hen a plaintiff proceeds *pro se,* a court is obliged to construe his pleadings liberally." (internal quotation marks and alterations omitted)); *Kaminski v. Comm'r of Oneida Cnty. Dep't of Soc. Servs.,* 804 F.Supp.2d 100, 104 (N.D.N.Y.2011) (Hurd, J.) ("A pro se complaint must be read liberally.").

Turning to the legal authority governing plaintiffs' claims under the Rehabilitation Act, section 504 mandates that a person with a qualified disability may not be excluded from participation in, denied the benefits of, or otherwise discriminated against in connection with any program or activity receiving federal financial assistance.[9] 29 U.S.C. § 794; *see Bryant v. New York State Educ. Dep't,* 692 F.3d 202, 216 (2d Cir.2012). Pursuant to section 504, "reasonable accommodations must be offered to ensure meaningful access to the [federally funded] program, [but] the statutes do not require that substantial changes be made to the program itself." *Zahran ex rel. Zahran v. New York Dep't of Educ.,* 306 F.Supp.2d 204, 213 (N.D.N.Y.2004) (Hurd, J.) (citing *J.D. ex rel. J.D. v. Pawlet Sch. Dist.,* 224 F.3d 60, 70 (2d Cir.2000)). To

2013 WL 6169746

state a claim under section 504, a plaintiff's complaint must set forth allegations that plausibly suggest that (1) he is a person with a disability as defined under the Rehabilitation Act, (2) he has been denied the benefits of or excluded from participating in a federally funded program or special service, and (3) he was denied access based solely on his disability. *Bryant,* 692 F.3d at 216.

**\*13**  In this case, plaintiffs' section 504 claim arises from allegations that they have received inadequate vocational training while confined at the CNYPC. More specifically, they allege that they each meet the definition of "disabled" as it is defined in the Rehabilitation Act because they have "been diagnosed with a mental disability within the meaning of 29 U.S.C. § 705." Complaint (Dkt. No. 1) at 31. Plaintiffs' complaint also alleges that CNYPC residents "have the right to vocational training services[ ] that will enable them to live as independently as possible[, but that] ... Defendants exploit [residents] for their labor[ ] by instituting workprograms that generates profits[.]" *Id.* at ¶ 6. Finally, it is alleged that "[t]he violations of Plaintiffs' rights by Defendants include, but not limited to the failure of the CNYPC–SOTP to provide Plaintiffs with adequate and appropriate vocational training services, that benefits other recipients of public programs and services." *Id.* Accordingly, although this is far from clear, I have construed plaintiffs' Rehabilitation Act claim to encompass two components. First, they complain of being exploited by the alleged requirement that they work in programs for the sole purpose of generating profits for the CNYPC. The second aspect of the Rehabilitation Act claim challenges defendants' failure to provide adequate rehabilitative and vocational services.

The allegation that plaintiffs are forced to work while at the CNYPC is not cognizable under section 504. It fails to plausibly suggest that they are denied access to the work program (assuming, without deciding, that it constitutes a federally funded program) based on a disability. Instead, it is alleged that defendants *force* plaintiffs to participate in the work program for the benefit of the CNYPC, which is antithetical to a section 504 claim. [10]  Accordingly, I find that this allegation is insufficient to support a cognizable section 504 claim.

Plaintiffs' second basis for asserting a claim under the Rehabilitation Act fails for similar reasons. Assuming (without deciding) that plaintiffs satisfy the definition of disability under the Rehabilitation Act, none of the complaint's allegations plausibly suggest how defendants denied them access to the work program, or that they were denied access based on their disability. Moreover, the allegation that "others" receive benefits that plaintiffs are denied due to their alleged disability is conclusory and unsupported by any other allegations in the pleading. More specifically, plaintiffs fail to identify who the "others" are, or what benefits they receive that plaintiffs are denied. Accordingly, I find that these allegations are also insufficient to support a cognizable section 504 claim, and recommend that the claim be dismissed.

### 2. *Eleventh Amendment Immunity*

Because I find that plaintiff's section 504 claim fails to state a claim upon which relief may be granted, I will not address defendants' Eleventh Amendment immunity arguments.

### D. *Equal Protection*

**\*14**  Liberally construed, plaintiffs' fourth claim for relief includes an equal protection claim arising under the Fourteenth Amendment. Complaint (Dkt. No. 1) at 31. While defendants have not challenged this cause of action, the court may, *sua sponte,* determine whether a plausible equal protection claim has been stated in light of plaintiffs' IFP status. *See* 28 U.S.C. § 1915(e) ("[T]he court shall dismiss the case at any time if [it] determines that ... the action ... fails to state a claim on which relief may be granted[.]").

The equal protection clause of the Fourteenth Amendment directs state actors to treat similarly situated people alike. *City of Cleburne, Texas v. Cleburne Living Ctr.,* 473 U.S. 432, 439 (1985). To state a cognizable equal protection cause of action, a plaintiff must allege sufficient facts that plausibly suggest that he was treated differently than others similarly situated as a result of intentional or purposeful discrimination directed at an identifiable or suspect class. *Giano v. Senkowski,* 54 F.3d 1050, 1057 (2d Cir.1995).

In this instance, plaintiffs compare themselves to convicted state prisoners, and allege that state prisoners experience more favorable conditions than CNYPC residents. Complaint (Dkt. No. 1) at 31. Even assuming (without deciding) that the two groups—CNYPC residents that are civilly confined, and prison inmates penally confined—are similarly situated for purposes of

an equal protection analysis, plaintiffs' complaint fails to allege facts that plausibly suggest any disparity in the conditions experienced by the two groups as a result of purposeful discrimination directed at an identifiable suspect class. *See Taylor v. New York State Dep't of Corr. Servs.,* No. 07–CV–1288, 2009 WL 3522781, at *2 (N.D.N.Y. Oct. 29, 2001) (Mordue, J.) ("[S]ex offenders do not comprise a suspect or quasi-suspect class for equal protection purposes [.]"). Under a Rule 12(b)(6) analysis, it is not enough to conclusorily allege that plaintiffs experience housing conditions that are "substantially inferior" to those of a state prisoner. Complaint (Dkt. No. 1) at 31. Such an allegation, on its own, does not provide defendants with adequate notice as to what conditions plaintiffs complain of, or how state prisoners experience more favorable conditions. Accordingly, I recommend that plaintiffs' equal protection claim be dismissed.

### E. *Supplemental Jurisdiction*
In the event this report is adopted, all of plaintiffs' federal cause of actions will be dismissed, and all that will remain are the claims asserted under the New York State Constitution and state law. Under those circumstances, I would recommend that the court decline to exercise supplemental jurisdiction over the remaining state claims, pursuant to 28 U.S.C. § 1367. *Stephenson v. Albany Cnty. Policymakers,* No. 09–CV–0326, 2009 WL 2922805, at *2 (N.D.N.Y. Aug. 14, 2009) (Treece, M.J.) (citing 28 U.S.C. § 1367(c)(3)).

### IV. *SUMMARY AND RECOMMENDATION*
**\*15** At the heart of plaintiffs' claims in this action is their challenge to new policies adopted at the CNYPC for those receiving sex offender treatment, governing the use of facility bathrooms and showers. Because the policies were implemented due to legitimate security concerns of facility staff and residents, and result in only minimal inconvenience to plaintiffs, I recommend dismissal of plaintiff's constitutional challenge to those policies.

Plaintiffs' complaint also asserts a claim of disability discrimination under section 504 of the Rehabilitation Act, based upon defendants' alleged failure to provide proper vocational and other training to the plaintiffs. The Rehabilitation Act, however, does not affirmatively mandate that programs be provided to the disabled but instead merely prohibits the denial of participation in programs and receipt of benefits based upon disability. Since plaintiffs have failed to identify any programs of which they have been denied based upon their alleged disability, their Rehabilitation Act claims are also subject to dismissal.

Plaintiffs' complaint, liberally construed, also asserts an equal protection claim against defendants. That claim, however, is subject to dismissal because plaintiffs have failed to allege facts plausibly suggesting that they have been treated differently than other, similarly situated individuals based upon intentional or purposeful discrimination directed toward an identifiable or suspect class. Based upon the foregoing, and my recommendation that the court not exercise supplemental jurisdiction over the remaining state law and state constitutional claims, it is hereby respectfully

RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 27) be GRANTED, and that plaintiffs' complaint in this action be DISMISSED in its entirety, without prejudice to their right to commence an action in a state court of competent jurisdiction.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

### All Citations

Not Reported in F.Supp.2d, 2013 WL 6169746

---

Footnotes

1   At the outset, it should be noted that, although plaintiffs bring their claims concerning their conditions of confinement under the Eighth Amendment, their claims arise under the Fourteenth Amendment because they are involuntarily committed

residents of a state institution. *Youngberg v. Romeo,* 457 U.S. 307, 315 (1982) (holding that respondent, who was involuntarily committed to a state institution, had constitutionally protected liberty interests under the due process clause of the Fourteenth Amendment).

2     The Clerk is directed to link the R & R to this decision; familiarity therewith is presumed.

3     "[A] report is clearly erroneous if the court determines that there is a mistake of fact or law which is obvious and affects substantial rights." *Almonte,* 2006 W L 149049, at *6.

4     Fourteenth Amendment claims challenging the conditions of involuntary confinement have been analyzed in a manner similar to Eighth Amendment claims, under which the plaintiff must establish that the conditions are sufficiently serious, from an objective point of view, and that the official acted with "deliberate indifference." *Dove v. City of N.Y.,* No. 03–CV–5052, 2007 WL 805786, at *7–8 (E.D.N.Y. Mar. 15, 2007). Some courts, however, have applied a more narrow subjective standard, particularly against defendants who are "professionals," under which liability would attach only to conduct that constituted a "substantial departure from accepted professional judgment, practice, or standards." *Vallen v. Carrol,* No. 02–civ–5666, 2005 WL 2296620, at *8–9 (S.D.N.Y. Sept. 20, 2005) (quoting *Youngberg,* 457 U.S. at 323). The court, however, agrees with Judge Peebles that no reasonable factfinder could conclude that the bathroom and shower policies violate the Constitution under either standard, and it therefore is unnecessary to determine which standard should apply. (R & R at 16 n. 6.)

5     To the extent that these claims arise under New York State law, the court agrees with Judge Peebles and, after having disposed of all of the federal claims, declines to exercise supplemental jurisdiction over the remaining state law claims. (R & R at 28.)

1     In light of the procedural posture of the case the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in favor of the plaintiff. *Terry v. Ashcroft,* 336 F.3d 128, 137 (2d Cir.2003).

2     Under New York law, a "dangerous sex offender requiring confinement" is defined as a "detained sex offender suffering from a mental abnormality involving such a strong predisposition to commit sex offenses, and such an inability to control behavior, that the person is likely to be a danger to others and to commit sex offenses if not confined to a secure treatment facility." N.Y. MHL § 10.03(e). The MHL does not allow for indefinite confinement of a detained sex offender. Instead, the commissioner of the OMH is required to provide a civilly committed sex offender and his counsel with annual notice of the right to petition the court for discharge, and must assure that each person so confined receives an examination for evaluation of his mental condition at least once a year, calculated from the date on which the court last ordered or confirmed the need for civil confinement. N.Y. MHL § 10.09(a)-(b). The law also includes a provision for annual court review in the form of an evidentiary hearing to determine the necessity of continued retention. N.Y. MHL § 10.09(d).

3     None of the plaintiffs reside in the MAPSS unit. Nowicki Decl. (Dkt. No. 27–4) at ¶ 16.

4     Unlike its Rule 12(b) dismissal motion counterpart, a summary judgment motion does not have the effect of automatically staying the sequence of answering a plaintiff's complaint. *Compare* Fed.R.Civ.P. 12(b)(6) *with* Fed.R.Civ.P. 56. In light of the fact that, by moving for summary judgment, defendants are actively defending against plaintiff's claims, and in order to avoid any argument that they have defaulted, in my discretion, I will *sua sponte* order a stay of defendants' time to answer plaintiff's complaint until twenty-one days after a final determination is reached with respect to defendants' motion, in the event that the action survives. *Snyder v. Goord,* No. 05–CV–1284, 2007 WL 957530, at *5 (N.D.N.Y. Mar. 29, 2007) (McAvoy, J., *adopting report and recommendation by* Peebles, M. J.).

5     Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff. [Editor's Note: Attachments of Westlaw case copies deleted for online display.]

6     Applying the reasoning embodied in the Supreme Court's decision in *Youngberg,* some courts have applied a more narrow subjective standard, particularly against defendants who could be characterized as "professionals," under which liability would attach only to conduct that constituted a "substantial departure from accepted professional judgment, practice or standard" as distinct from the broader "deliberate indifference" standard. *Youngberg,* 457 U.S. at 323; *see Dove,* 2007 WL 805786, at *7–8; *Vallen v. Carrol,* No. 02–CV–5666, 2005 WL 2296620, at *8–9 (S.D.N.Y. Sept. 20, 2005). Like the courts in *Dove* and *Vallen,* however, I find it unnecessary to determine which of these standards of review should apply in the current action because I find that no reasonable factfinder could conclude that the policies challenged by plaintiffs in their complaint run afoul of the constitution under either.

7     The policy currently in place permits more than one CNYPC resident to utilize residential bathroom facilities, under supervision by an SCTA, between the hours of 7:00 a.m. and 11:00 p.m. In addition, the policy allows for accommodations for those residents with medical issues requiring more frequent bathroom breaks.

8     Additionally, although not dispositive of the inquiry, the CNYPC's resident bathroom policy was reviewed by the New York State Commission on Quality Care and Advocacy for Persons with Disabilities ("CQCAPD"), on request from the New

York State Inspector General, and found it to be acceptable. Nowicki Decl. (Dkt. No. 27–4) at ¶ 27; Nowicki Decl. Exh. E (Dkt. No. 27–10). Based upon that review, the CQCAPD concluded that the CNYPC

> has a rationale [sic] and defensible argument for the creation of [the policy,] ... which individuals identified by the treatment team as needing increased monitoring, will have a physician's order that they must enter one at a time to the bathroom on the treatment mall and/or the activity center. [Another of the CNYPC policies, entitled] Sex Offender Treatment Program Resident Rights[,] indicates that the patient rights includes that basic human needs will be met and residents' personal privacy is protected within the necessary constraints dictated by the need for safety and security. Nowicki Decl. Exh. E (Dkt. No. 27–10) at 1.

9    Specifically, section 504 provides, in relevant part, that

> [n]o otherwise qualified individual with a disability ... solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance[.]

29 U.S.C. § 794(a).

10    Plaintiffs' submissions in opposition to the pending motion could be regarded as asserting a retaliation claim, based upon their removal from the facility's work program following commencement of this suit. Because it is clear that the defendants were dropped based upon their complaints of being subjected to forced labor, and that plaintiffs can request re-entry into the program at any time on a voluntary basis, it would be disingenuous for them to argue that adverse action has been taken against them, as required for a retaliation claim.

---

End of Document                                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

Westlaw.

Not Reported in F.Supp., 1997 WL 576088 (S.D.N.Y.)

(Cite as: 1997 WL 576088 (S.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Jonathan ODOM, Plaintiff,
v.
John P. KEANE; Sgt. M. Cooper; Sgt. Leghorn; Sgt.
McClain; R.J. Colon; Officer K. Byrd, et al.,
Defendants.
No. 95 Civ. 9941(SS).

Sept. 17, 1997.

Jonathan Odom, pro se, Great Meadow Correctional
Facility, Comstock, N.Y., for plaintiff.

Dennis C. Vacco, Attorney General of the State of New
York, New York City, Michael B. Siller, Ass't. Attorney
General, for defendants.

**OPINION AND ORDER**

SOTOMAYOR, J.

**\*1** Plaintiff, Jonathan Odom, currently incarcerated at
Comstock Correctional Facility, brings this action pro se
under 42 U.S.C. § 1983, asserting that defendants violated
his rights under the First, Eighth, and Fourteenth
Amendments of the United States Constitution. Complaint
at ¶ 5. The gravamen of the Complaint concerns plaintiff's
allegations that on July 10, 1995, while incarcerated at
Sing Sing Correctional Facility, he was housed in an
unsanitary cell without a working toilet. Plaintiff also
contends that chronic plumbing problems in the cell
resulted in the toilet not flushing between the hours of
9:00 p.m. and 7:00 a.m. over a period of two months.
Plaintiff seeks monetary damages and injunctive relief.
Defendants move for summary judgment pursuant to
Fed.R.Civ.P. 56(b). Plaintiff has opposed defendants'
motion and cross-moved for summary judgment. For the
reasons set forth below, defendants' motion for summary
judgment is **granted;** plaintiff's cross motion for summary
judgment is **denied,** and the case is **dismissed** in its
entirety.

**BACKGROUND**

On July 10, 1995, plaintiff was placed in cell number
K–197 (now called K–21S). The toilet in the cell was not
working. A block plumber repaired the toilet several hours
after plaintiff reported the problem. Plaintiff also alleges
that the cell was filthy and that he was forced to clean it
himself with soap and his personal belongings. Finally,
plaintiff contends that even after the toilet was fixed, toilet
did not function between the hours of 9:00 p.m. and 7:00
a.m. from July 10, 1995 through September 1995. Plaintiff
charges that these cell conditions "resulted in the plaintiff
suffering actual damages including, but not limited to,
vomiting and being deprived of sleep due to the nauseous
smell coming from his cell toilet all night long, causing
him to be having migraine headaches, injury to plaintiff,
is pain and suffering and mental anguish." Complaint at ¶
20.

Plaintiff also contends that he made numerous
unheeded complaints about the malfunctioning toilet to the
defendants and other prison authorities. First, plaintiff
asserts that he informed Correction Officer Byrd, assigned
to K–Gallery, about the problem. Plaintiff contends that
defendant Byrd refused to cooperate because plaintiff
would not acquiesce to defendant Byrd's numerous
attempts to extort cigarettes from plaintiff. Plaintiff also
alleges that he submitted inmate grievances on different
occasions that detailed his problems with the cell's
plumbing and defendant Byrd, but that prison authorities
ignored his grievances.

Plaintiff submits as exhibits to his complaint a copy
of an inmate grievance complaint dated July 14, 1995, a
copy of a follow-up memorandum dated August 4, 1995,
regarding the status of his grievance; a memorandum
dated September 14, 1995 to John Keane, Superintendent
and Sergeant M. Cooper regarding the malfunctioning cell
plumbing; an inmate grievance complaint dated September
15, 1995, and a memorandum dated September 21, 1995,
to Governor Pataki, Philip Coombe, Brian Malone and
John Keane detailing allegations of "unprofessional"
behavior by defendant Byrd and complaining about the
malfunctioning plumbing.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 576088 (S.D.N.Y.)

(Cite as: 1997 WL 576088 (S.D.N.Y.))

**\*2** Defendants strongly dispute that they had notice of plaintiff's plumbing problems. Defendants agree that plaintiff's toilet was not operating on July 10, 1995, the day that plaintiff moved into the cell. In addition, they do not dispute that the cell was dirty. However, defendants contend, and plaintiff concedes, that Correction Officer Byrd dispatched a plumber to plaintiff's cell and that the toilet was repaired within several hours. Byrd Affidavit at ¶ 7. At plaintiff's request, the Court has personally reviewed the Complaint Log in K Block used between July 10 and September 30, 1995 and found one plumbing related entry for inmate K 197, presumably by plaintiff. The July 30, 1995, entry reads: "12:05 pm called about K197 O.I.C. McCarthy aware of plummbing (sic) difficulties."

Defendants also contend, despite plaintiffs assertions and documentary proof to the contrary, that plaintiff never submitted a grievance to prison officials concerning the continued malfunctioning of the toilet. In support of their position, they argue that extensive discovery has yielded no record of complaints. Assistant Attorney General Pamela M. McLaughlin avers that she conducted two searches for "documents from the Sing Sing Correctional Facility pertaining to any instance regarding plaintiffs claims of faulty plumbing or an unsanitary cell from July to September of 1995," that "turned up nothing." McLaughlin Aff. at ¶ 8. Ms. McLaughlin has also provided the Court a computer print out enumerating the grievances filed by plaintiff during this relevant period. *See* Notice of Motion, Exhibit C. The print out indicates that from 1993 through 1996 plaintiff submitted over 57 grievances, none of which concerned plumbing problems in plaintiff's cell. In his Affidavit, Correction Officer Byrd claims that, other than the initial complaint, "he received no further complaints from plaintiff regarding his toilet or other plumbing facilities."

On October 12, 1995, Deputy Commissioner Wayne Strack responded to plaintiff's September 21, 1995 memorandum stating:

Superintendent Keane has conducted an investigation into your allegation of unprofessional behavior at Sing Sing and has advised me that no evidence was found to

substantiate your claim. It was reported that you are constantly begging staff for cigarettes. The plumbing problem in your cell was repaired as soon as the block plumber became available. In the future, address your complaints at the facility level by contacting your area supervisor.

Defendants also dispute plaintiffs allegations of retaliation or extortion. Defendants point out that in a July 2, 1995 deposition, plaintiff characterized the acts of defendant Byrd as "not really retaliatory." Tr. at 9. Defendants also assert that plaintiff filed suit against defendant Byrd because of personal animosity toward this defendant unrelated to this action. As evidence, defendants note that plaintiff conceded that defendant Byrd "said something out of his mouth he wasn't supposed to say, so I told him I am going to lace him." Tr. at 9.

**THE STANDARD OF REVIEW: DISMISSAL UNDER FED.R.CIV.P. 56(b)**

**\*3** Summary judgment may not be granted unless the submissions of the parties taken together "show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Allen v. Coughlin,* 64 F.3d 77, 79 (2d Cir.1995). It is the moving party who bears the

initial responsibility ... of informing the court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact.

*Federal Deposit Ins. Corp. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). Once the moving party has provided sufficient evidence to support a motion for summary judgment, the opposing party must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on "mere allegations or denials" of the facts asserted by the movant. Fed.R.Civ.P. 56(e); *accord Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525–26 (2d Cir.1994).

When deciding a motion for summary judgment, this

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 576088 (S.D.N.Y.)

(Cite as: 1997 WL 576088 (S.D.N.Y.))

Court must "view the evidence in a light most favorable to the non-moving party and draw all reasonable inferences in its favor." *American Casualty Co. v. Nordic Leasing, Inc.,* 42 F.3d 725, 728 (2d Cir.1994). Where, as here, a party is proceeding pro se, this Court also has an obligation to "read [the pro se party's] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994); *accord, Soto v. Walker,* 44 F.3d 169 (2d Cir.1995). However, a pro se party's "bald assertion," completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment. *Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1995). Rather, to overcome a motion for summary judgment, the non-moving party must provide this Court with some basis to believe that his or her "version of relevant events is not fanciful." *Christian Dior–New York, Inc. v. Koret, Inc.,* 792 F.2d 34, 38 (2d Cir.1986); *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (a non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts"). Thus, in determining whether to grant summary judgment, this Court must determine (i) whether a factual dispute exists based on the evidence in the record, and (ii) whether, based on the substantive law at issue, the disputed facts are material.

## DISCUSSION

Defendants raise three grounds for dismissal: first, they argue that plaintiffs allegations are insufficient to prove a constitutional violation; second, defendants contend that plaintiff's claims of retaliation are wholly conclusory; and third, defendants assert that the complaint should be dismissed as to all defendants because of their lack of personal involvement. I discuss only defendants' first and second grounds for dismissal as my resolution of these grounds in defendants' favor obviates the need to reach defendants' personal involvement argument.

## THE EIGHTH AMENDMENT AND CRUEL AND UNUSUAL PUNISHMENT

**\*4** Plaintiffs claim is governed by the Eighth Amendment which prohibits cruel and unusual punishment. *Wilson v. Seiter,* 501 U.S. 294, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). To prevail on an Eighth Amendment claim, prisoners must satisfy a two prong test.

The objective prong of *Wilson* asks whether the seriousness of the prison condition rises to an unconstitutional level. In analyzing the objective component, the Supreme Court has stated that "only those deprivations denying 'the minimal civilized measures of life's necessities' are sufficiently to form the basis of an Eighth Amendment violation." *Id.;* (*quoting Rhodes v. Chapman,* 452 U.S. 337, 347, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981).) Although the Constitution " 'does not mandate comfortable prisons,' " *Wilson,* 501 U.S. at 297, "inmates are entitled to reasonably adequate sanitation, personal hygiene, and laundry privileges, particularly over a lengthy course of time." *Howard v. Adkison,* 887 F.2d 134, 137 (8th Cir.1989). The subjective prong of the *Wilson* test requires that defendants act with a state of mind evincing "deliberate indifference" to an inmate's health or safety. *Wilson,* 502 U.S. at 301. Pursuant to this standard, prison officials must know of, and disregard, an excessive risk to inmate health and safety. *Id.* at 1979. While the Eighth Amendment requires state prison officials to maintain "humane conditions of confinement," including adequate food, clothing, shelter and medical care, *Farmer v. Brennan,* 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994), conditions of confinement implicate the Eighth Amendment only when they exceed "contemporary bounds of decency of a mature, civilized society." *Lunsford v. Bennett,* 17 F.3d 1574, 1579 (7th Cir.1994).

Here, plaintiff presents the Court with three distinct Eighth Amendment claims concerning his prison conditions. The first and second claims arose on July 10, 1995, when plaintiff was placed in a cell that (1) was unsanitary, and (2) did not have a working toilet. The third claim relates to the alleged malfunctioning of the toilet during the two month period. The first two claims are insufficient to establish an Eighth Amendment violation because of the very short time these conditions existed and were endured by plaintiff. Indeed, both of these conditions were rectified by the end of the day. It is undisputed that defendants quickly repaired the toilet when plaintiff first complained that it was broken. Defendants' same day response belies plaintiff's assertion that his complaints fell on deaf ears. Plaintiff acknowledges that he cleaned his cell himself on July 10, 1995, using soap and personal

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 4

Not Reported in F.Supp., 1997 WL 576088 (S.D.N.Y.)

(Cite as: 1997 WL 576088 (S.D.N.Y.))

clothing. Complaint at ¶ 9. While an unsanitary cell may be deplorable, plaintiff has failed to allege a violation of constitutional magnitude. Similarly, the several hours plaintiff was without a working toilet does not rise to the level of cruel and unusual punishment. *Hutto*, 437 U.S. at 678 (conditions, such as a filthy cell, may "be tolerable for a few days and intolerably cruel for weeks or months."), *see also Miller v. Glanz*, 948 F.2d 1562, 1569–70 (10th Cir.1991) (plaintiff experienced only "momentary discomfort" when he was handcuffed in an "awkward position" for two hours); *Harris v. Fleming*, 839 F.2d 1232, 1235–36 (7th Cir.1988) (plaintiff "experienced considerable unpleasantness" for five days due to "filthy, roach-infested cell").

**\*5** Plaintiff's claim that his toilet did not flush between the hours of 9:00 p.m. and 7:00 a.m. for a period of several months also fails to state a constitutional violation. "[R]easonably adequate sanitation and the ability to eliminate and dispose of one's bodily wastes without unreasonably risking contamination are basic identifiable human needs of a prisoner protected by the Eighth Amendment...." *Whitnack v. Douglas County*, 16 F.3d 954, 958 (5th Cir.1994). Although it is difficult to fathom how one toilet flushing mechanism, and not all of the flushing mechanisms on one water line, could malfunction on a regular basis only between the hours of 9:00 p.m. and 7:00 a.m., this condition does not amount to cruel and unusual punishment. While I have no doubt that such a situation would be patently offensive to plaintiff, the fact that plaintiff was made uncomfortable by the stench, these conditions in and of themselves do not sustain a constitutional claim. *See Rhodes*, 452 U.S. at 347 (inconvenience is considered a part of the penalty criminal offenders pay for their offenses against society). Plaintiff's toilet functioned approximately twelve hours every day, time enough to dispose of plaintiff's bodily wastes. Plaintiff makes no assertion that he risked contamination by contact with human waste.

Plaintiff has failed to prove the objective component of his claim, as required by *Wilson*. It is unnecessary to reach the subjective component of *Wilson* because, without a constitutional violation, defendants clearly could not have acted with "deliberate indifference."

## RETALIATION AND CONSPIRACY

In a claim unrelated to plaintiff's malfunctioning toilet, plaintiff alleges that defendant Byrd retaliated against him by denying him food and water because plaintiff failed to "support [Byrd's] cigarette." Complaint at ¶ 13. Plaintiff reiterated this allegation in his opposition to defendants' motion for summary judgment. *See* Plaintiff's Memorandum in Opposition at ¶ 10. [FN1]

> FN1. In his memorandum in opposition to the defendants' motion for summary judgment, plaintiff contended, for the first time:
>
> > that these defendants as prison officials had conspired to concoct false allegations, deprived him of fair hearings, and subjected him to disciplinary action (April 13, 1994 to January 1, 1996) as reprisal in retaliation for his prior lawsuits against officers, agents, servants, and employees employed at Sing Sing Correctional Facility.
>
> Plaintiff's Memorandum in Opposition at ¶ 18. Plaintiff repeats this new allegation of retaliation in a letter dated August 20, 1997, which he has sent to the Court requesting that the Court listen to a tape of a superintendents' hearing held on July 8, 1997. The Complaint before this Court is limited to claims about the malfunctioning toilet and defendant Bryd. Plaintiff's new allegations relate to a "Corrections Officer named Michael Stormer", who is not a defendant in this action, and retaliation because plaintiff was "complaining of being denied to be issued supplies and cell clean up while in S.H.U." Plaintiff's Letter of August 20, 1997. Thus, Plaintiff's letter and the new allegations in his memorandum of law relate to matters outside the scope of the Complaint before the Court. This Court, therefore, does not address these allegations.

The Second Circuit has recognized that prison officials may not retaliate against prisoners for exercising their constitutional rights. *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir.1995), (*citing Franco v. Kelly*, 854 F.2d 584, 589 (2d Cir.1988)). Nevertheless, "because we recognize

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 576088 (S.D.N.Y.)

(Cite as: 1997 WL 576088 (S.D.N.Y.))

... the ease with which claims of retaliation may be fabricated, we examine prisoners claims of retaliation with care." *Colon,* 58 F.3d at 871, (*citing Flaherty v. Coughlin, 713 F.2d 10, 13 (2d Cir.1983)*). A plaintiff alleging retaliation "bears the burden of showing that the conduct at issue was constitutionally protected and that the protected conduct was a substantial or motivating fact in the prison officials' decision to discipline plaintiff." *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996), (*citing In Mount Healthy Sch. Dist. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977)).

Where retaliation claims may have merit, the prisoner making the claim must be accorded the full procedural and substantive safeguards available to other litigants. *Colon,* 58 F.3d at 872. "[A] retaliation claim supported by specific and detailed factual allegations which amounts to a persuasive case ought to be pursued with full discovery. However, a complaint which alleges retaliation in wholly conclusory terms may be safely dismissed on the pleadings alone." *Flaherty,* 713 F.2d at 13; *accord Colon,* 58 F.3d at 872.

**\*6** Here, plaintiff has failed to present any facts that defendant Byrd acted to deny plaintiff food or water or otherwise retaliate against him. Plaintiff admitted at his deposition that the acts of defendant Byrd were "not really retaliatory" and that defendant Byrd had "said something out of his mouth he wasn't supposed to say, so I told him I am going to lace him." In addition, defendant Byrd has submitted an affidavit in which he avers, "I would like the Court to know that I have no disciplinary files related to filing a false misbehavior report or false and misleading statement in a grievance or hearing." Despite plaintiffs assertions of "false charges" and "disciplinary action," plaintiff does not provide the Court with any indication that he was actually subject to such discipline by defendant Byrd. Any retaliation claim regarding plaintiffs plumbing problems must be dismissed because, as previously discussed, plaintiff has failed to allege the violation of an underlying constitutional right. *See Colon,* 58 F.3d at 872.

Claims of retaliation must be examined with skepticism and care. *Flaherty,* 713 F.2d at 13. Broad and unsubstantiated allegations of retaliation will not defeat a motion for summary judgment. *Id.* Plaintiff has not set forth any facts that evidence an agreement or understanding between defendant Byrd and any other defendant to retaliate against him. Plaintiff's argument that he has been effectively prevented from producing such evidence by the defendants' refusal to comply with discovery is unavailing. By Order dated March 19, 1997, I found that "the McLaughlin Affidavit responds fully to the Court's discovery order of January 23, 1997" and noted that "[d]efendants cannot produce documents they claim do not exist." Plaintiffs retaliation and conspiracy claims are dismissed in their entirety.

## CONCLUSION

For the reasons set forth above, plaintiff's cross motion for summary judgment is **DENIED** and defendants' motion for summary judgment is **GRANTED** in its entirety. The Clerk is directed to enter judgment for defendants dismissing the Complaint in its entirety.

**SO ORDERED.**

Dated: New York, New York September 15, 1997

S.D.N.Y.,1997.

Odom v. Keane
Not Reported in F.Supp., 1997 WL 576088 (S.D.N.Y.)
END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

1998 WL 259929

KeyCite Yellow Flag - Negative Treatment

Distinguished by Hart v. City of New York, S.D.N.Y., November 18, 2013

1998 WL 259929
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Charles WHITTED, Plaintiff,
v.
Susan LAZERSON, Civilian Cook, Defendant.

No. 96 Civ. 2746(AGS).
|
May 21, 1998.

OPINION AND ORDER

SCHWARTZ, J.

**\*1** Plaintiff, who is currently incarcerated, brings this action pursuant to 42 U.S.C. § 1983, alleging that his Eighth Amendment right to be free from cruel and unusual punishment was violated when defendant denied him access to the bathroom at Green Haven Correctional Facility ("Green Haven"). Currently before the Court is defendant's motion for summary judgment. For the reasons stated, this motion is granted.

**FACTUAL BACKGROUND**

The following facts are undisputed, except as otherwise noted.

During the period of November–December 1994, plaintiff Charles Whitted ("Whitted") was incarcerated at Green Haven and was working as a baker in the Green Haven Kitchen. Defendant Susan Lazerson is a head civilian cook at Green Haven. During the time period covered in the complaint, she was stationed in the Green Haven kitchen where plaintiff was working as a baker. Pursuant to Green Haven policy, inmates are confined to a locked "baker's room" while baking. The baker's room is locked to prevent inmates from stealing flour, cake mix, or utensils that could be used as weapons. Correctional Officers assigned to the kitchen area are available to let

the inmate out of the baker's room in order to use the bathroom.

Plaintiff alleges that during the time covered by the complaint, he repeatedly asked defendant to allow him out of the baker's room so that he could use the bathroom, but she refused. Defendant contends that she "constantly allowed plaintiff to go to the bathroom during his shifts" (Defendant's Statement Pursuant to Local Civil Rule 56.1) at ¶ 19) but concedes that on some occasions she was "too busy to unlock the gate and would inform plaintiff that he would have to wait a few minutes until she was free, or else ask someone else to unlock the gate" (Def. 56.1 at ¶ 20).

Plaintiff contends that as a result of defendant's failure to unlock the baker's room upon his request, he "was forced to hold his bowel movement at painful levels, and at times partially urinated and defecated in his clothing." (Complaint at 5–6). As a result, plaintiff claims he suffered "mental, physical and emotional pain and suffering." (Complaint at 5). However, he never sought treatment at the Facility Health Center.

**DISCUSSION**

Summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Federal Rule of Civil Procedure ("Fed.R.Civ.P.") 56(c). The moving party bears the initial burden of showing the absence of a genuine issue of material fact, which can be effected by pointing to the lack of evidence supporting an essential element of the non-moving party's claim. *Celotex Corp. v.. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). To avoid summary judgment, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 582, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Speculative and conclusory allegations are insufficient. *Allen v. Coughlin,* 64 F.3d 77, 80 (2d Cir.1995). When a plaintiff is proceeding pro se, the court must read his papers "liberally" and "interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994). However, a party's "bald assertion," completely unsupported by evidence, is not sufficient to overcome a motion for

1998 WL 259929

summary judgment. *Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1995).

**\*2** A prisoner alleging that a certain prison condition constitutes cruel and unusual punishment in violation of the Eighth Amendment must prove both an objective and a subjective element. *Wilson v. Seiter,* 501 U.S. 294, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). The objective element asks whether the seriousness of the prison condition rises to an unconstitutional level. The subjective element requires that the defendant act with a state of mind evincing "deliberate indifference" to the inmate's health or safety. *Id.* at 301.

With regard to the objective element, the Supreme Court has held that "[o]nly those deprivations denying the minimal measures of life's necessities' are sufficiently grave to form the basis of an Eighth Amendment violation." *Id.* at 298. (quoting *Rhodes v. Chapman,* 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981)). Crucial considerations in the determination of whether a particular condition is so serious as to invoke the Eighth Amendment include the duration of the condition and the potential for serious physical harm. As the Court of Appeals for the Second Circuit recently held in *Chance v. Armstrong,* No. 97–2028, 1998 WL 228075, \*3 (2d Cir. May 7, 1998),

> A prisoner who nicks himself shaving obviously does not have a constitutional right to cosmetic surgery. But if prison officials deliberately ignore the fact that a prisoner has a five-inch gash on his cheek that is becoming infected, the failure to provide appropriate treatment might well violate the Eighth Amendment.

In this case, plaintiff has failed to allege that the purportedly unconstitutional condition was of sufficient duration, or caused sufficiently serious injury, to state a viable claim under the Eighth Amendment. The complaint contains no allegation regarding the length of time plaintiff was prevented from using the toilet. In his deposition, plaintiff stated that he once had to wait "damn near hour and a half" at which point he urinated in his pants. (Affidavit of Evan A. Gordon ("Gordon Aff."), Ex. A at 21.) He also testified that he once defecated in his pants, but expressed confusion as to whether that was on

the same occasion that he urinated. (Gordon Aff., Ex. A at 21–22). However, plaintiff also testified that he has no bladder problem at all and no problem holding his urine (Gordon Aff., Ex. A at 19).

With regard to the alleged injuries, plaintiff testified that he endured no emotional or physical problems as a result of the incident and stated that he was not affected by the incident today. (Gordon Aff., Ex. A at 25). [1] Plaintiff also testified that he suffers from no medical problems today other than migraine headaches. (Def. Ex. A at 9–10).

Even when read liberally, with all reasonable inferences drawn in plaintiff's favor, the facts alleged do not present a viable claim under § 1983. The temporary deprivation of the right to use the toilet, in the absence of serious physical harm or a serious risk of contamination, simply does not rise to the level of an Eighth Amendment violation. As Judge Sotomayor held in *Odom v. Keane,* No. 95 Civ. 9941, 1997 WL 576088, at \*4–5 (S.D.N.Y. Sept.17, 1997), the absence of a working toilet in one's prison cell for approximately ten hours, absent an allegation that the prisoner risked contamination by contact with human waste, "does not rise to the level of cruel and unusual punishment." *See also Knop v. Johnson,* 977 F.2d 996, 1013–1014 (6th Cir.1992) (holding that prison did not violate the Eighth Amendment by failing to provide certain inmates "with regular access to bathroom facilities, forcing them to relieve themselves in their cells."). In this case, plaintiff has alleged that he was prevented from using the toilet for a period of approximately 90 minutes at most. He has not alleged that he suffered any serious injury, potential injury, or even risk of contamination, as a result thereof. In short, he has failed to allege that he was denied the "minimal measures of life's necessities" and has therefore failed to satisfy the objective element of a Section 1983 claim based on an alleged violation of the Eighth Amendment. Accordingly, I decline to reach the other issues presented by the parties' submissions.

### CONCLUSION

**\*3** For the reasons stated, defendant's motion for summary judgment is granted. The Clerk of Court is directed to close the case.

SO ORDERED.

1998 WL 259929

**All Citations**

Not Reported in F.Supp., 1998 WL 259929

Footnotes

1    In his opposition to defendants' motion, plaintiff stated that he made "mistakes" in answering questions at his deposition and explained that he attempted to change his deposition testimony to reflect that he had answered "yes" when asked if had suffered any emotional problems as a result of the incident. (Plaintiff's Affidavit in Opposition at ¶¶ 13–14). Plaintiff has offered no explanation of this "mistake" other than to say that he was "upset and unprepared" on the day of his deposition. Moreover, "a party may not, in order to defeat a summary judgment motion, create a material issue of fact by submitting an affidavit disputing his own prior sworn testimony." *Trans–Orient Marine Corp. v. Star Trading & Marine, Inc.,* 925 F.2d 566, 572–73 (2d Cir.1991). *See also Mack v. United States,* 814 F.2d 120, 124–25 (2d Cir.1987) ("[A] party's affidavit which contradicts his own prior deposition testimony should be disregarded on a motion for summary judgment").

---

**End of Document**        © 2018 Thomson Reuters. No claim to original U.S. Government Works.



Slip Copy, 2010 WL 4905240 (N.D.N.Y.)

(Cite as: 2010 WL 4905240 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Gary GILLARD, Plaintiff,
v.
Michael ROVELLI, et al., Defendants.
No. 9:09-CV-0860 (NAM/GHL).

Sept. 29, 2010.
Gary Gillard, Attica, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General for the State of New York, Roger W. Kinsey, Esq., of Counsel, Albany, Ny, for Defendants.

*REPORT-RECOMMENDATION and ORDER*

GEORGE H. LOWE, United States Magistrate Judge.

**\*1** This *pro se* prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has been referred to me for Report and Recommendation by the Honorable Norman A. Mordue, Chief United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). Plaintiff Gary Gillard alleges that Defendants subjected him to excessive force, threatened to tamper with his food and interfered with the delivery of sealed meals, denied him adequate medical care, and failed to properly respond to his grievances. Currently pending before the Court are Defendants' motion to vacate the text order entered March 10, 2010, (Dkt. No. 52), Plaintiff's objection to that request (Dkt. No. 55), Defendants' motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6) (Dkt. No. 42), and Plaintiff's cross-motion for summary judgment (Dkt. Nos. 72 and 77). For the reasons that follow, I order that Defendants' request to vacate the text order be granted, order that Plaintiff's objection to Defendants' request be denied, recommend that Defendants' motion to dismiss be granted in part and denied in part, and recommend that Plaintiff's

cross-motion for summary judgment be denied.
**I. BACKGROUND**

In broad terms, Plaintiff's complaint involves four issues: the use of excessive force against him by inmate Perez and several DOCS employees, the denial of medical care for ailments he suffered prior to the excessive force incident and injuries he sustained as a result of the excessive force incident, Defendants' threats to tamper with Plaintiff's food, and the handling of grievances Plaintiff filed as a result of these issues.
**A. Excessive Force, Associated Grievances, and Associated Medical Care.**

On December 24, 2008, Plaintiff wrote to Defendants David Rock (Superintendent of Great Meadow Correctional Facility), P. Heath (First Deputy Superintendent), and C.F. Kelly (Deputy of Security) advising them that there was a conspiracy between Defendant Correction Officer Michael Rovelli and other correctional officers to arrange a vigilante gang assault on or murder of Plaintiff. (Dkt. No. 1 ¶ 36.) On December 26, 2008, Plaintiff received a letter from a correctional facility specialist stating that his letter had been forwarded to Defendant David Rock. *Id.* ¶ 38. On January 3, 2009, Plaintiff received a letter from Captain Eastman acknowledging receipt of Plaintiff's complaint. (Dkt. No. 1 ¶ 40.)

On January 6, 2009, Plaintiff wrote a letter to Defendant Richard Roy of the Inspector General's office describing Defendant Rovelli's continued threats and harassment and expressing fear about what would happen to him when he was released from keeplock on January 10, 2009. *Id.* ¶ 41. On January 8, 2009, Vernon Fonda of the Inspector General's office informed Plaintiff that his grievance was being forwarded to Defendant David Rock for further action. *Id.* ¶ 42.

Plaintiff alleges that on February 4, 2009, an inmate "cut the plaintiff in the hearing room on behalf of Michael Rovelli." (Dkt. No. 1. ¶ 43.)

**\*2** On February 5, 2009, Defendant Rovelli told

Page 2

Slip Copy, 2010 WL 4905240 (N.D.N.Y.)

(Cite as: 2010 WL 4905240 (N.D.N.Y.))

Plaintiff that "it's not over yet mother fucker, go tell you rat bitch mother fucker remember it[']s not over." *Id.* Later that day, Defendant Rovelli shouted at Plaintiff "go rat [,] Gary you fuck[i]n' rat." *Id.* ¶ 44.

On February 11, 2009, Defendant Rovelli came to Plaintiff's cell and said "I have the power not you. I brought you back. It's not over yet and the next one will be better[,] you piece of shit." *Id.* ¶ 45. Thereafter, Defendant Rovelli had Defendant Correction Officer M. Rock assist him in denying food to Plaintiff in order to "keep him weak so he could not defend himself against the setup contract [h]it." *Id.* ¶ 46.

On April 25, 2009, Plaintiff went to the big recreation yard for the first time in about two months. *Id.* ¶ 47. Two inmates informed him that Defendant M. Rock had told Defendant Rovelli that Plaintiff was in the yard and that "today was a good day to get him ." *Id.* As Plaintiff walked around the yard, he noticed Defendant Rovelli glaring at him. *Id.* ¶ 48. Defendant Rovelli went to a table where Defendant inmate Eric Perez was sitting. *Id.* Shortly thereafter, Defendant Perez attacked Plaintiff without warning. *Id.* Plaintiff attempted to defend himself and hoped the officers would stop the attack. (Dkt. No. 1 ¶ 49.) Instead, Defendant Rovelli forced his knee into Plaintiff's head and said "I told you I would get you[.] You just got beat by a fagg[o]t[,] you can't fight." *Id.* Defendant Rovelli then instructed Defendant Corrections Officer Frank Flores to take Plaintiff "into beat up Room # 1[,] I'll be right there." *Id.* ¶ 50.

Once in the room, Plaintiff was placed with his toes and face to the wall. *Id.* ¶ 51. Defendant Sergeant Nicholas Deluca entered the room and said "Perez should have put [six] inches of ste[e]l into you, you piece of shit, but we will finish what he started." *Id.* ¶ 52. Then Defendant Rovelli came in, said "you can't fight, you got beat by a fagg[o]t," and slammed Plaintiff's face into the wall twice. *Id.* ¶ 53. Plaintiff's "lights went out" and he "could not see for a few seconds but heard [Defendant] Rovelli state his face was bleeding as well as the plaintiff[']s." *Id.* Plaintiff was then "beaten to the flo[or]" by Defendants Deluca and Flores and Defendant Correction Officer Shattuck as blood ran nonstop from two cuts around Plaintiff's right eye. *Id.* ¶ 54. Plaintiff tried to "cover up into the wall to

stop the blows from reaching [his] face," but Defendant Rovelli grabbed the hood of Plaintiff's sweat suit and exposed his face so that Defendant Rovelli and Defendants Deluca, Flores, and Shattuck could hit it. *Id.* ¶ 55. This continued for fifteen or twenty minutes. *Id.* Plaintiff's hands were cuffed behind his back the entire time. *Id.* Defendant Sergeant Colin Fraser, Defendant Sergeant Michael Hoy, and Defendant Correction Officer H. Foster joined in by kicking Plaintiff in the back, head, buttocks, legs, spine, and shoulders. *Id.* ¶ 56.

**\*3** Defendants Deluca and Shattuck forced Plaintiff onto his feet "due to the large amount of blood all over the floor and [P] laintiff' s clothing" and took him to a different room. *Id.* ¶ 57. There, Defendant Shattuck pinned Plaintiff against a sink and punched Plaintiff in the ribs and back while Defendant Deluca hit Plaintiff in the face, eyes, nose, and jaw. (Dkt. No. 1 ¶ 57.)

Once the blood was cleaned up in the first room, Defendants Deluca and Shattuck returned Plaintiff there and punched him in the face, knocking him to the floor. *Id.* ¶ 58. Defendants Deluca and Shattuck continued to kick and stomp Plaintiff's legs, ankles, ribs, and chest. *Id.* As this was happening, Defendant Fisher Nesmith opened the door and said "[A]re you done yet[?] If not, take your time." *Id.* ¶ 59. Defendant Nesmith then slammed the steel door into Plaintiff's head as he lay "on the floor bloody and broken up." *Id.*

After the beating was over, Plaintiff was taken to an examination room. There, Defendant J. Leos "did a vis[ua]l inspection" of Plaintiff and documented some of Plaintiff's injuries. *Id.* ¶ 60. Plaintiff alleges that these injuries included broken ribs, broken left hand, and broken eardrum. *Id.* ¶ 62. Defendant Leos did not say anything or ask any questions. *Id.* ¶ 60. He did not give Plaintiff any medical assistance other than to wash the blood off of Plaintiff's face and head. *Id.* Defendant Leos entered a false time on his report to "cover up for beating." *Id.* Defendant Nesmith then attempted to stitch the cuts around Plaintiff's eye, but Plaintiff refused treatment because Defendant Nesmith had participated in the use of excessive force. *Id.* ¶ 61.

Pictures were taken of Plaintiff's injuries. *Id.* ¶ 63.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 4905240 (N.D.N.Y.)

(Cite as: 2010 WL 4905240 (N.D.N.Y.))

Defendant Foster and Defendant Sergeant Nabozny then escorted Plaintiff to the Special Housing Unit ("SHU"). *Id.*

After the beating, Plaintiff saw Defendant Counselor Brian McAllister. *Id.* ¶ 65. Plaintiff asked Defendant McAllister to contact Plaintiff's family and inform them of his injuries. *Id.* Later, Plaintiff's family contacted the prison and Defendant McAllister refused to give them any information. *Id.* ¶ 66.

Sometime after the alleged use of excessive force, Plaintiff was taken to the medical unit, where he was seen by Defendant Janet Collins. (Dkt. No. 1 ¶ 70.) She informed him that his "left eardrum had a hole in it but it should heal in time" and gave him ibuprofen for pain. *Id.* Plaintiff asked for x-rays of his face, neck, back, and left hand and an H.I.V. test due to the "cutting" on February 4, 2009. *Id.* Defendant Collins told Plaintiff that the pain "was from getting old" and denied his request for x-rays. *Id.*

Plaintiff alleges that in order to cover up the use of excessive force, Defendant Lieutenant K.H. Smith, Defendant Lieutenant Peter Besson, and Defendants Kelly, Foster, Flores, Shattuck, Rovelli, Hoy, and Deluca filed false misbehavior reports charging Plaintiff with fighting, violent conduct, refusing a direct order, and assault on staff. *Id.* ¶ 67.

**\*4** Plaintiff filed three grievances regarding the use of excessive force and the medical care he received thereafter. *Id.* ¶ 68. No one responded. *Id.*

**B. Medical Issues Predating the Alleged Use of Excessive Force**

On October 20, 2008, Plaintiff filed a grievance because he was denied access to sick call. (Dkt. No. 1 ¶ 83.) Plaintiff alleges that his grievance was denied "at all levels of [a]ppeal." *Id.*

On March 26 and 29, 2009, Plaintiff submitted requests to be seen at sick call to receive medication and an AIDS/HIV test due to being cut by an inmate. *Id.* ¶¶ 84, 85.

On April 8, 2009 Plaintiff filed another grievance. *Id.*

¶ 86.

On April 10, 2009, Plaintiff was seen by Defendant Silverberg but was told it was a "[five] year physical" rather than an appointment to address Plaintiff's concerns. *Id.* ¶ 87. Plaintiff then refused treatment. *Id.* Afterward, Plaintiff filed another grievance regarding the denial of treatment for his medical concerns. (Dkt. No. 1 ¶ 88.)

On April 14, 2009, Plaintiff was seen by Defendant Lindemann who informed Plaintiff that because he refused the five year physical he would receive no more treatment. *Id.* ¶ 89. At Plaintiff's request Defendant Lindemann checked Plaintiff's throat but found nothing. *Id.* Plaintiff claims he had been "hacking all day every day" for "over [one] year." *Id.* Afterward, Plaintiff filed another grievance regarding medical care. *Id.* ¶ 90.

On April 17, 2009, Plaintiff received a response from the Superintendent's office stating that after a review of Plaintiff's medical records, Plaintiff had received the opportunity to address his concerns and had received "[a]dequate medical care as well as medication." *Id.* ¶ 93.

Plaintiff alleges that he was called to see Defendant Silverberg on April 24, 2009, but that he was "forced to sit 20 minutes" after the Defendant Nurse Labrum took his vitals by Defendant Silverberg, who "was in a room doing nothing just to make the plaintiff suffer." (Dkt. No. 1 ¶ 95.) When Defendant Silverberg "finally" called Plaintiff into the examination room, he said "so, we are going to look at your throat today." *Id.* ¶ 96. When Plaintiff asked "what about the ears, headaches, and HIV test," Defendant Silverberg said "only the throat[,] one thing at a time." *Id.* Plaintiff "objected and stated it's been over 1 year and every time is denied the review of issues and concern[ ]s of matters that are not getting check out ever." *Id.* Defendant Silverberg then looked into Plaintiff's throat and said he did not see anything. *Id.* ¶ 97. Plaintiff asked him to get "the stix" and look at the back of his throat. *Id.* Without putting on a glove, Defendant Silverberg grabbed a "stix," handled it from "one end to the other" and told Plaintiff to open his mouth. *Id* . When Plaintiff objected "to this unhygienic act," Defendant Silverberg "threw the stix to the floor and said do not come [b]ack ever to sick call." *Id.*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 4905240 (N.D.N.Y.)

(Cite as: 2010 WL 4905240 (N.D.N.Y.))

**\*5** Plaintiff alleges that Defendant David Rock was "continuously ... informed of the medical needs of the [P]laintiff and the deliberate black balling by [the] medical department, [but] has refused to stop, correct or grant any medical relief and continued to file false response[s] to all matters of concern thus causing the [P]laintiff to live in continued pain day and night without relief." (Dkt. No. 1 ¶ 98.)

**C. Issues with Plaintiff's Food**

After the use of excessive force, Defendant Deluca told Plaintiff that he should not eat prison food because "we control everything[,] even the inmates who make your food." *Id.* ¶ 64. Plaintiff went on a hunger strike because of this threat concerning his food. *Id.* ¶¶ 69, 78, 79. In response, Defendant Heath ordered that Plaintiff receive sealed kosher meals. *Id.* ¶ 69. On May 1, 2009, "the meals w[ ]ere stopped by someone overriding that order" and Plaintiff went back on hunger strike. *Id.* ¶ 71.

Defendant David Lindemann came to Plaintiff's cell on May 5, 2009, "threatening the plaintiff and demanding the plaintiff come to the gate or he will have the plaintiff [d]ragged to the [h]ospital to be force[ ] fe[ ]d." (Dkt. No. 1 ¶ 72.) A few minutes later, four officers and a sergeant ordered Plaintiff out of his cell and force-walked him to the medical unit. *Id.* Plaintiff was "force[d]" to see Defendant Doctor Howard Silverberg, who "has continued to file false information into plaintiff's medical file, refuse to give medical treatment or medication for [i]llness.... Silverberg ask[ed] [whether] I[was] going to eat the food I stated no he said Good we get to force feed you, you will not enjoy that I assure you and walked out ordering staff to place me in Isolation Room # 2." (Dkt. No. 1 ¶ 73.) Defendant Deluca came into the room. *Id.* ¶ 74. He said he hated Plaintiff and hoped that he would die. *Id.* He also informed Plaintiff that he "can't wait to start the force feeding as he will be there two times a day to put shit down the plaintiff's throat." (Dkt. No. 1 ¶ 74.) Defendant Heath came to the hospital "seeking to resolve the [h]unger [s]trike [i]ssue and state[d] what[ ]ever the doctor states will be the outcome if he orders medical meal when you will get it." *Id.* ¶ 75.

On "May 7, 2009, Doctor Carandy came to talk to

plaintiff with ... other officers [and] stated he would give [d]iet meal sealed exrays (sic) and medication for pain ... Carandy stated if we don[']t give him the meal it will only start the hunger strike all over again." (Dkt. No. 1 ¶ 76.)

On May 8, 2009, Defendant Nurse Terry "in retaliation stated the plaintiff refused [x-rays] and threatened him he would be out of there that day." *Id.* ¶ 77. Plaintiff was ultimately given sealed diet meals three times a day but was "forced to eat it with a tube of toothpaste due to officers refusing to give a spoon in [r]etaliation." *Id.* ¶ 78.

**\*6** On May 11, 2009, Plaintiff was returned to the SHU. *Id.* ¶ 79. Once Plaintiff was returned to the SHU, Defendant Deluca and Defendant Terry stopped deliveries of Plaintiff's special meals. *Id.* ¶ 76. Plaintiff "lived on water [,] milk[,] sugar and sealed [i]tems that came with different meals starving in fear of being poisoned." *Id.*

**II. DEFENDANTS' MOTION TO VACATE THE COURT'S MARCH 10, 2010, ORDER**

On February 5, 2010, Plaintiff requested the entry of default against Defendants Shattuck, Poirier, Fischer, Nesmith, Lindemann, Labrum, Kelly, Flores, and Aubin. (Dkt. No. 47.) On March 10, 2010, I granted Plaintiff's request in part and denied it in part. (Text Order of Mar. 10, 2010.) Noting that Defendants Kelly, Nesmith, Lindemann, Fischer, and Labrum are explicitly mentioned in Defendants' memorandum of law regarding motion to dismiss, I denied the request as to those Defendants. *Id.* However, I granted the request as to Defendants Flores, Shattuck, Aubin, and Poirier because they had not answered the complaint and were not mentioned in Defendants' notice of motion to dismiss (Dkt. No. 42), the proof of service of the motion to dismiss (Dkt. No. 42), or anywhere in Defendants' memorandum of law filed in support of the motion to dismiss (Dkt. No. 42-1). (Text Order of Mar. 10, 2010.) It was therefore "unclear whether [they] are included in the motion to dismiss." *Id.*

On March 12, 2010, Defendants filed a request to set aside the default. (Dkt. No. 52.) In that letter, defense counsel stated:

I had thought that by specifically indicating that the motion was being made on their behalf by expressly

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 4905240 (N.D.N.Y.)

(Cite as: 2010 WL 4905240 (N.D.N.Y.))

stating as much with the Court's electronic filing system, that it would be clear the motion was being made on behalf of all the persons I so designated ... I verily believed that by using the Court-supplied filing system and expressly indicating therein that I was filing the motion on behalf of all these 28 clients ... that those contemplating the motion would realize that the motion to dismiss was being made on behalf of all 28 of the individuals indicated. I did not realize that by expressly indicating that the motion was being filed on their behalf with the electric filing system that there could be confusion as to on whose behalf I was making the application.

*Id.* at 1.

The twenty-eight names that counsel listed in the entry on the Court's electronic filing system included two defendants (M. Rock <sup>FN1</sup> and Brian Fischer <sup>FN2</sup>) who have never been served. The list also included one Defendant (David Rock) for whom the Court did not receive an acknowledgment of service form until six weeks after the motion to dismiss was filed. (Dkt. No. 58.) Moreover, the list did not include one Defendant (Terry), who has not been served <sup>FN3</sup> but about whom defense counsel asserted arguments in the memorandum of law. (Dkt. No. 42-1 at 11.) Thus, the list that defense counsel cites as being "clear" was inaccurate and, thus, unreliable.

FN1. When Plaintiff completed USM-285 forms for service of the complaint, he indicated that Defendant M. Rock's true name was Todd Martineau. (Dkt. No. 11.) The Clerk advised Plaintiff that he would need to amend his complaint to substitute Todd Martineau's name before he could be served with the complaint. *Id.* To date, Plaintiff has not amended his complaint to name "Todd Martineau" or filed any forms requesting service on "M. Rock." Therefore, Defendant "M. Rock" has not been served and has not appeared in the action.

FN2. The summons for Defendant Fischer was returned unexecuted, accompanied by a note from the United States Marshal for the Northern District of New York indicating that Defendant

Fischer had not returned the Acknowledgment of Receipt of Summons and Complaint by Mail form within thirty days of the initial mailing of the summons. (Dkt. No. 62.) The note instructed Plaintiff to submit a new summons and complaint form to serve Defendant Fischer and warned that failure to do so could result in dismissal of the complaint against Defendant Fischer. *Id.*

FN3. The summons for Defendant Terry was returned unexecuted, accompanied by a note from the Inmate Records Coordinator stating that she was unable to identify Nurse Terry and would need more information. (Dkt. No. 29.) On February 3, 2010, the Clerk forwarded a copy of the note to Plaintiff and asked him to provide any additional information about the defendant to the Court. (Dkt. No. 46.)

**\*7** In light of this ambiguity, before granting the request for entry of default, the Court thoroughly reviewed Defendants' memorandum of law and found no mention of Defendants Flores, Shattuck, Aubin, or Poirier. The Court found this omission particularly striking in the case of Defendants Aubin and Poirier, who easily could have been included (as discussed more fully below) in the section of the memorandum of law discussing lack of personal involvement. Further, it appeared to the Court that Defendants' motion, despite not being labeled as such, was only a partial motion to dismiss because it did not assert any reasons for dismissing Plaintiff's excessive force claims. Thus, it was reasonable to conclude that perhaps the motion had not been filed on behalf of every Defendant. Based on this ambiguity, and the apparent confusion it caused Plaintiff (a *pro se* civil rights litigant, to whom I must grant special solicitude), entry of default was appropriate as of March 10, 2010.

However, I now grant Defendants' motion to set aside the default. Pursuant to Rule 55(c) of the Federal Rules of Civil Procedure, "[t]he court may set aside an entry of default for good cause ..." <sup>FN4</sup> It is well-settled in the Second Circuit that defaults are not favored, and that there is a strong preference for resolving disputes on their merits. *See Brien v. Kullman Indus., Inc.,* 71 F.3d 1073, 1077 (2d Cir.1995); *Traguth v. Zuck,* 710 F.2d 90, 94 (2d

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 4905240 (N.D.N.Y.)

(Cite as: 2010 WL 4905240 (N.D.N.Y.))

Cir.1983). In light of Defendants' clarification of their ambiguous motion, I find that they have established good cause to set aside the default, and I therefore order the Clerk to vacate the text order of March 10, 2010, and the entry of default (Dkt. No. 51).

> FN4. Rule 60(b) provides, *inter alia,* that in the case of "mistake, inadvertence, surprise or excusable neglect," a court may relieve a party from a final judgment, order or proceeding. Fed.R.Civ.P. 60(b).

### III. DEFENDANTS' MOTION TO DISMISS

### A. LEGAL STANDARD GOVERNING MOTIONS TO DISMISS FOR FAILURE TO STATE A CLAIM

A defendant may move to dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6) on the ground that the complaint fails to state a claim upon which relief can be granted. In order to state a claim upon which relief can be granted, a complaint must contain, *inter alia,* "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). The requirement that a plaintiff "show" that he or she is entitled to relief means that a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face.' " Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U .S. 544, 570 (2007)) (emphasis added). "Determining whether a complaint states a plausible claim for relief ... requires the ... court to draw on its judicial experience and common sense.... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not shown-that the pleader is entitled to relief." Id. at 1950 (internal citation and punctuation omitted).

**\*8** "In reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor ." *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (citation omitted). Courts are "obligated to construe a *pro se* complaint liberally." *Harris v. Mills,* 572 F.3d 66, 72 (2d Cir.2009). However, "the tenet that a court must accept as

true all of the allegations contained in the complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 129 S.Ct. at 1949.

### B. Medical Care

Plaintiff alleges that Defendants Silverberg, Nesmith, Lindemann, Labrum, Leos, and Collins violated his Eighth Amendment rights by failing to provide him with adequate medical care.[FN5] (Dkt. No. 1 ¶¶ 60, 61, 68, 70, 72-73, 76-77, 87-89, 94-98.) Plaintiff's claims against Defendants Leos, Nesmith, and Collins relate to medical care for injuries sustained as a result of the alleged use of excessive force. Plaintiff's claims against Defendants Silverberg, Lindemann, and Labrum relate to medical care prior to the incident. Defendants argue that Plaintiff has failed to state an Eighth Amendment claim.[FN6] (Dkt. No. 42-1 at 5-11.)

> FN5. Defendants' motion to dismiss does not explicitly address the Eighth Amendment medical claims against Defendants Labrum or Nesmith.

> FN6. Defendants assert that the complaint also alleges that Defendants McAllister, Deluca, Heath, and Holland violated Plaintiff's Eighth Amendment right to adequate medical care. (Dkt. No. 42-1 at 11.) The complaint does not appear to allege that Defendant McAllister was involved in Plaintiff's medical care. Rather, it alleges that Defendant McAllister was a corrections counselor (Dkt. No. 1 ¶ 31) who failed to inform Plaintiff's family about his injuries. (Dkt. No. 1 ¶¶ 65-66.) The complaint does not appear to allege that Defendant Deluca was involved in Plaintiff's medical care. Although allegations about him appear in a section of the complaint titled "Statement of Facts, Misuse of Force, Denial of Medical Care," those allegations involve excessive force, threats, false misbehavior reports, and issues with Plaintiff's food. (Dkt. No. 1 ¶¶ 52, 54-55, 57-58, 64, 67, 69, 74, 76.) The complaint does not appear to allege that Defendant Heath was involved in Plaintiff's medical care. Rather it alleges that he

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 4905240 (N.D.N.Y.)

(Cite as: 2010 WL 4905240 (N.D.N.Y.))

was informed about Defendant Rovelli's threats against Plaintiff and was involved in issues regarding Plaintiff's food. (Dkt. No. 1 ¶¶ 36, 39, 69, 75.) Regarding Defendant Holland, the complaint alleges only that he failed to investigate the "setup, [b]eating[,] and complaints." (Dkt. No. 1 ¶ 80.)

The Eighth Amendment imposes on jail officials the duty to "provide humane conditions of confinement" for prisoners. *Farmer v. Brennan,* 511 U.S. 825, 832 (1994). In fulfilling this duty, prison officials must ensure, among other things, that inmates receive adequate medical care. *Farmer,* 511 U.S. at 832 (citing *Hudson v. Palmer,* 468 U.S. 517, 526-27 (1984)). There are two elements to a prisoner's claim that prison officials violated his Eighth Amendment right to receive medical care: "the plaintiff must show that she or he had a serious medical condition and that it was met with deliberate indifference." *Caiozzo v. Koreman,* 581 F.3d 63, 72 (2d Cir.2009) (citation and punctuation omitted). "The objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberate indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind." *Smith v. Carpenter,* 316 F.3d 178, 183-84 (2d Cir.2003). Defendants argue that Plaintiff has not stated a claim as to either element. (Dkt. No. 42-1 at 10-11.) I will address Plaintiff's pre-excessive force claims and post-excessive force claims separately.

*1. Medical Care for Injuries Sustained in Alleged Excessive Force Incident*

Plaintiff alleges that Defendants Leos, Nesmith, and Collins were deliberately indifferent to the following injuries that Plaintiff sustained in the alleged excessive force incident: (1) a loss of consciousness that lasted for a few seconds; (2) two cuts around his right eye, which bled profusely; (3) broken ribs; (4) broken hand; and (5) broken ear drum. (Dkt. No. 1 ¶¶ 53, 54, 62, 70.)

**\*9** Defendants argue that the complaint fails to satisfy the objective prong of the Eighth Amendment inquiry because Plaintiff "fails to articulate a serious medical need." (Dkt. No. 42-1 at 10.) A "serious medical condition" is "a condition of urgency, one that may

produce death, degeneration, or extreme pain." *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J., dissenting) (citations omitted), *accord, Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1996), *cert. denied,* 513 U.S. 1154 (1995); *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). Relevant factors to consider when determining whether an alleged medical condition is sufficiently serious include, but are not limited to: (1) the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; (2) the presence of a medical condition that significantly affects an individual's daily activities; and (3) the existence of chronic and substantial pain. *Chance,* 143 F.3d at 702-03.

Defendants address only Plaintiff's allegation that he suffered two cuts around his eye, arguing without citation to authority that the allegation does not "present or describe a serious medical need ." (Dkt. No. 42-1 at 10.) I find that the complaint alleges facts plausibly suggesting that Plaintiff suffered injuries that could "produce death, degeneration, or extreme pain" as a result of the alleged use of excessive force. *See Jackson v. Johnson,* 118 F.Supp.2d 278, 291 (N.D.N.Y.2000) (loss of consciousness is a serious medical condition); *Ellis v. Guarino,* No. 03 Civ. 6562, 2004 U.S. Dist. LEXIS 16748, at\*33-34, 2004 WL 1879834, at \*11 (S.D.N.Y. Aug. 24, 2004) ("When Plaintiff arrived at the SHU followed the alleged attacks ... he allegedly had swelling on his face, contusions in both ears and on his forehead, abrasions on his shoulder, a one millimeter laceration in his right eye, and suffered from blurred vision, headaches, dizziness and ringing in his ears, the latter two of which continued for several days thereafter.... Such injuries clearly constitute a serious medical condition for Eighth Amendment purposes."); *Griffin v. Donelli,* No. 05-CV-1072 (TJM/DRH), 2010 U.S. Dist. LEXIS 125271, at \*22, 2010 WL 681394, at \*8 (N.D.N.Y. Feb. 24, 2010) (citing *Torres v. New York City Dep't of Corrs.,* No. 93-CV-6296 (MBM), 1995 U.S. Dist. LEXIS 1698, at \*4, 1995 WL 63159, at \*1 (S.D.N.Y. Feb. 15, 1995)) (stating that a broken rib "could present a serious medical need" if treatment was not properly administered); *Bryan v. Endell,* 141 F.3d 1290, 1291 (8th Cir.1998) (broken hand is a serious medical condition); *Odom v. Kerns,* No. 99-CV-10668, 2008 U.S. Dist. LEXIS 47336, at \*27-28,

Slip Copy, 2010 WL 4905240 (N.D.N.Y.)

(Cite as: 2010 WL 4905240 (N.D.N.Y.))

2008 WL 2463890, at * 8 (S.D.N.Y. June 18, 2008) (ruptured eardrum is a serious medical condition).

Defendants argue that Plaintiff's complaint does not state a claim as to the subjective Eighth Amendment prong because the "shear number of examinations, discussions and attempts to aid [P]laintiff forecloses any allegation of indifference, deliberate or otherwise...." (Dkt. No. 42-1 at 11.)

**\*10** Medical mistreatment rises to the level of deliberate indifference where it "involves culpable recklessness, i.e., an act or a failure to act ... that evinces 'a conscious disregard of a substantial risk of serious harm.' " _Chance,_ 143 F.3d at 703 (quoting _Hathaway v. Coughlin,_ 99 F.3d 550, 553 (2d Cir.1996)). Thus, to establish deliberate indifference, an inmate must prove that (1) a prison medical care provider was aware of facts from which the inference could be drawn that the inmate had a serious medical need; and (2) the medical care provider actually drew that inference. _Farmer,_ 511 U.S. at 837; _Chance,_ 143 F.3d at 702-703. The inmate then must establish that the provider consciously and intentionally disregarded or ignored that serious medical need. _Farmer,_ 511 U.S. at 835; _Ross v. Giambruno,_ 112 F.3d 505 (2d Cir.1997). An "inadvertent failure to provide adequate medical care" does not constitute "deliberate indifference." _Estelle v. Gamble,_ 429 U.S. 97, 105-06 (1976). Moreover, a complaint that "a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim ... under the Eighth Amendment." _Id._ at 106. Stated another way, "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner." _Id.; Smith,_ 316 F.3d at 184 ("Because the Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law, not every lapse in prison medical care will rise to the level of a constitutional violation.").

I find that Plaintiff has alleged facts plausibly suggesting that Defendant Leos was deliberately indifferent to his serious medical needs. Plaintiff alleges that "[a]fter the beating was over the plaintiff was ... taken to [an] exam room where J. Leos did a visual inspection of the plaintiff[']s body documenting some of the injur[ie]s

not saying anything of asking any questions and gave no medical assistance other than wash the blood off the face and head of the plaintiff." (Dkt. No. 1 ¶ 60.) Plaintiff alleges that Defendant Leos entered a false time on his medical note in order to cover up the beating. _Id._ Accepting Plaintiff's allegations that his ribs, hand, and eardrum were broken as a result of the alleged excessive force incident as true, as I must for the purposes of this motion, the complaint plausibly suggests that Defendant Leos was aware of facts from which he could have drawn the inference that Plaintiff had a serious medical need, actually drew that inference, and ignored that medical need. Therefore, I recommend that the Court deny Defendants' motion to dismiss the Eighth Amendment medical claim against Defendant Leos.

Plaintiff has not stated an Eighth Amendment medical claim against Defendant Nesmith or Defendant Collins. Plaintiff admits that he refused treatment when Defendant Nesmith attempted to stitch the cuts around Plaintiff's eye. (Dkt. No. 1 ¶ 61.) Given Plaintiff's allegations about Defendant Nesmith's earlier conduct, Plaintiff's refusal is understandable. However, it negates his allegation that Defendant Nesmith was deliberately indifferent to his serious medical needs. _See Rivera v. Goord,_ 253 F.Supp.2d 735, 756 (S.D.N.Y.2003). Plaintiff's allegations regarding Defendant Collins amount to mere disagreement regarding proper treatment, which is insufficient to establish deliberate indifference. _Estelle,_ 429 U.S. at 107 ("[T]he question of whether an X-ray-or additional diagnostic techniques or forms of treatment-is indicated is a classic example of a matter for medical judgment. A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment. At most it is medical malpractice...."). Therefore, I recommend that the Court grant Defendants' motion to dismiss the Eighth Amendment medical claim against Collins and that the Court _sua sponte_ dismiss the Eighth Amendment medical care claim against Defendant Nesmith.

**\*11** Where a _pro se_ complaint fails to state a cause of action, the court _generally_ "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." _Cuoco v. Moritsugu,_ 222 F.3d 99, 112 (2d Cir.2000) (internal quotation and citation

Slip Copy, 2010 WL 4905240 (N.D.N.Y.)

(Cite as: 2010 WL 4905240 (N.D.N.Y.))

omitted). However, an opportunity to amend is not required where "the problem with [the plaintiff's] causes of action is substantive" such that "[b]etter pleading will not cure it." *Cuoco*, 222 F.3d at 112 (citation omitted). Because Plaintiff has admitted that he refused care from Defendant Nesmith, I recommend that the Court dismiss the Eighth Amendment medical claim against Defendant Nesmith without leave to amend. However, I recommend that the medical claim against Defendant Collins be dismissed without prejudice.

2. *Medical Care For Conditions That Pre-Dated the Alleged Use of Excessive Force*

Plaintiff alleges that Defendants Silverberg, Lindemann, and Labrum were deliberately indifferent to medical conditions that predated the alleged use of excessive force. (Dkt. No. 1 ¶¶ 70, 87, 89, 95-97.) Those conditions were: (1) a need for H.I.V. testing "due to cutting on February 4, 2009"; (2) a need for asthma medication; (3) a "cough in throat due to bum[p]s growing in throat area" that lasted over a year; (4) a rash on his face; (5) a need for nose spray; (6) elbow pain that lasted for five years; (7) lower back and spine pain; (8) left ankle pain; and (9) a need for glasses. (Dkt. No. 1 ¶¶ 84-85, 89, 92.)

Defendants argue that these claims should be dismissed because Plaintiff has not sufficiently alleged any serious medical need or deliberate indifference. (Dkt. No. 42-1 at 5-11.) Defendants are correct. Plaintiff has not alleged facts plausibly suggesting that any of these conditions were injuries that a reasonable doctor or patient would find important and worthy of comment or treatment, that they affected his daily activities, or that they caused chronic and substantial pain. *Chance*, 143 F.3d at 702-03; *Sledge v. Kooi*, 564 F.3d 105, 107, 108 (2d Cir.2009) (asthma not a serious medical condition); *Lewal v. Wiley*, 29 Fed. App'x 26, 29 (2d Cir.2002) (persistent rash is not a serious medical condition); *Veloz v. New York*, 35 F.Supp.2d 305, 309, 312 (S.D.N.Y.1999) (prisoner's foot problem, which involved arthritis and pain, did not constitute a serious medical need); *Veloz v. New York*, 339 F.Supp.2d 505, 522-26 (S.D.N.Y.2004) (plaintiff's chronic back pain and mild to moderate degenerative arthritis of spinal vertebrae did not establish a serious medical need; *but see Sereika v. Patel*, 411 F.Supp.2d 397, 406

(S.D.N.Y.2006) (allegations of "severe pain ... [and] reduced mobility ..." in the shoulder are sufficient to raise a material issue of fact as to a serious medical need).

Even if Plaintiff had alleged facts plausibly suggesting the existence of a severe medical condition, I would recommend dismissing the claims against Defendants Lindemann, Labrum, and Silverberg because Plaintiff has not sufficiently alleged deliberate indifference. Plaintiff alleges merely that at his request, Defendant Lindemann checked his throat and found nothing. Although he told Plaintiff that Plaintiff could not receive further treatment, Plaintiff did in fact see a doctor again only ten days later. Regarding Defendant Labrum, Plaintiff alleges only that she took his vital signs and had him wait twenty minutes to see Defendant Silverberg. Although Plaintiff alleges that Defendant Silverberg behaved somewhat unprofessionally, these allegations as currently pleaded do not rise to the level of deliberate indifference. Therefore, I recommend that the Court dismiss the Eighth Amendment medical claims against Defendants Lindemann, Labrum, and Silverberg without prejudice.

C. Personal Involvement

**\*12** Defendants argue that the complaint does not plausibly allege that Defendants Fischer [FN7], Roy, David Rock, Heath, Nabozny, or Kelly [FN8] were personally involved in any alleged constitutional violation. (Dkt. No. 42-1 at 12-14.) With the exception of Defendant Kelly, Defendants are correct.

> FN7. As noted above, according to the Court's records Defendant Fischer has not been served in this action. (Dkt. No. 62.)

> FN8. Defendants also argue that "Plaintiff has merely alleged *respondeat superior* liability" against Defendant Collins and that Plaintiff "names Defendant Labrum but makes no further allegation." (Dkt. No. 42-1 at 12-13.) This is inaccurate. As discussed above, Plaintiff claims that each of these Defendants violated his Eighth Amendment right to adequate medical care.

" '[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 4905240 (N.D.N.Y.)

(Cite as: 2010 WL 4905240 (N.D.N.Y.))

damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). In order to prevail on a cause of action under 42 U .S.C. § 1983 against an individual, a plaintiff must show some tangible connection between the unlawful conduct and the defendant. *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986). If the defendant is a supervisory official, a mere "linkage" to the unlawful conduct through "the prison chain of command" (i.e., under the doctrine of *respondeat superior* ) is insufficient to show his or her personal involvement in that unlawful conduct. *Polk County v. Dodson,* 454 U.S. 312, 325 (1981); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501; *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985). In other words, supervisory officials may not be held liable merely because they held a position of authority. *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). Rather, supervisory personnel may be considered "personally involved" if they (1) directly participated in the violation, (2) failed to remedy that violation after learning of it through a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) had been grossly negligent in managing subordinates who caused the violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995).[FN9]

> **FN9.** The Supreme Court's decision in *Ashcroft v. Iqbal,* ---U.S. ----, 129 S.Ct. 1937 (2009) arguably casts in doubt the continued viability of some of the categories set forth in *Colon. See Sash v. United States,* 674 F.Supp.2d 531 (S.D.N.Y.2009). Here, the Court will assume *arguendo* that all of the *Colon* categories apply.

The complaint does not include any allegations about Defendants Fischer, Aubin, or Poirier.[FN10] Therefore, I recommend that the claims against these Defendants be dismissed for lack of personal involvement.

> **FN10.** As discussed above, Defendants did not explicitly argue that the action against Defendants Aubin and Poirier should be dismissed. Moreover, although Defendants

argue that Defendant Fischer was not personally involved, Defendant Fischer has not yet been served in this action. (Dkt. No. 62.) I recommend that the Court dismiss these Defendants *sua sponte* without prejudice.

Regarding Defendants Roy and Heath, the complaint alleges only that they failed to respond to Plaintiff's letters and grievances. (Dkt. No. 1 ¶¶ 36, 39, 41, 69, 75.) A prisoner's allegation that a supervisory official failed to respond to a grievance is insufficient to establish that the official "failed to remedy that violation after learning of it through a report or appeal" or "exhibited deliberate indifference ... by failing to act on information indicating that the violation was occurring." *Rivera v. Goord,* 119 F.Supp.2d 327, 344-45 (S.D.N.Y.2000). *See also Watson v. McGinnis,* 964 F.Supp. 127, 130 (S.D.N.Y.1997) ("The law is clear that allegations that an official ignored a prisoner's letter are insufficient to establish liability."). Similarly, "an allegation that an official ignored a prisoner's letter of protest and request for investigation of allegations made therein is insufficient to hold that official liable for the alleged violations ." *Johnson v. Wright,* 234 F.Supp.2d 352, 363 (S.D.N.Y.2002) (quoting *Greenwald v. Coughlin,* No. 93 Civ. 6551, 1995 U.S. Dist. LEXIS 5144, at *11, 1995 WL 232736, at * 4 (S.D.N.Y. Apr. 19, 1995)). Therefore, I recommend the claims against Defendants Roy and Heath be dismissed for lack of personal involvement.

**\*13** The complaint alleges that Defendant David Rock ignored several grievances (Dkt. No. 1 ¶¶ 36, 39) and that his response to a grievance regarding medical care pre-dating the excessive force incident was unsatisfactory (Dkt. No. 1 ¶ 93). As discussed in the previous paragraph, the allegation that Defendant David Rock failed to respond to grievances is insufficient to plausibly suggest that he was personally involved in any constitutional violation. As discussed above in Section III(B)(2), Plaintiff has not stated an Eighth Amendment claim regarding medical care pre-dating the excessive force incident. Thus, Defendant David Rock was not made aware of an Eighth Amendment medical violation and was not personally involved with any constitutional violation. Therefore, I recommend that the Court dismiss the claims against Defendant David Rock without prejudice.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 4905240 (N.D.N.Y.)

(Cite as: 2010 WL 4905240 (N.D.N.Y.))

Regarding Defendant Nabozny, the complaint alleges, in full, that "Pictures were taken of the plaintiff's injuries with 2 different cameras as the visual inspection and pictures being take[n] w[ ]ere all on video the the (sic) video escorted the plaintiff to ... Special Housing Unit by Defendant Foster and Defendant Nabozny." (Dkt. No. 1 ¶ 63) (syntax in original). This is insufficient to allege Defendant Nabozny's personal involvement in any constitutional violation and I therefore recommend that Defendants' motion to dismiss the claim against Defendant Nabozny be granted. Defendants argue that "Plaintiff has merely alleged *respondeat superior* liability" against Defendant Kelly. (Dkt. No. 42-1 at 13.) This is not accurate. The complaint alleges that Defendant Kelly participated in writing false misbehavior reports to cover up the excessive force incident. (Dkt. No. 1 ¶ 67.) This allegation is potentially sufficient to state a claim against Defendant Kelly for retaliation. *See Snyder v. McGinnis, No. 03-CV-0909, 2004 U .S. Dist. LEXIS 17976, at *24-26, 2004 WL 1949472, at *8 (W.D.N.Y. Aug. 31, 2004).* Therefore, I recommend that the Court deny Defendants' motion to dismiss the claim against Defendant Kelly for lack of personal involvement.

**D. Claim Against Defendant McAllister**

Plaintiff alleges that Defendant McAllister violated his legal rights by failing to communicate with his family regarding his injuries. (Dkt. No. 1 ¶¶ 65-66.) Defendants move to dismiss this claim, arguing that "[v]iolations of state law or regulations in themselves do not state a viable section 1983 claim." (Dkt. No. 42-1 at 14.) Neither Plaintiff nor Defendants have identified what policy Defendant McAllister's actions may have violated. In any case, I find that the complaint does not plausibly suggest that Defendant McAllister violated any constitutional right and therefore recommend that the Court grant Defendants' motion to dismiss the claim.

**E. Threats**

Plaintiff alleges that, at various times, Defendants Rovelli, Deluca, Lindemann, and Silverberg threatened him. (Dkt. No. 1 ¶¶ 43-45, 64, 72-74.) Defendants argue that Plaintiff's allegations that Defendants Deluca, Lindemann, and Silverberg threatened him do not state a constitutional claim. [FN11] (Dkt. No. 42-1 at 14-16.)

Defendants' motion does not address the allegations that Defendant Rovelli threatened Plaintiff.

> [FN11]. Defendants also characterize the allegations in Paragraph 75 of the complaint regarding Defendant Heath's statement that "what ever the doctor states will be the outcome if he orders medical meal you will get it" as an allegation that Defendant Heath threatened Plaintiff. (Dkt. No. 42-1 at 15.) It does not appear to the undersigned that Plaintiff alleges that Defendant Heath threatened him. However, to the extent that the complaint can be read to assert such a claim, I recommend that it be dismissed with prejudice.

**\*14** "It is well established that mere threatening language and gestures of a custodial officer do not ... amount to constitutional violations." *Alnutt v. Cleary,* 913 F.Supp. 160, 165 (W.D.N.Y.1996) (punctuation omitted). Therefore, to the extent that Plaintiff alleges that Defendants Rovelli, Deluca, Lindemann, and Silverberg violated his constitutional rights simply by threatening him, I recommend that the Court dismiss those claims with prejudice.

**F. Claim Against Defendant Holland**

The complaint alleges that Defendant Holland [FN12] was "allegedly investigating the setup, [b]eating and complaints which was not the fact at all." (Dkt. No. 1 ¶ 80.) Prisoners do not have a due process right to a thorough investigation of grievances. *Torres v. Mazzuca,* 246 F.Supp.2d 334, 341-42 (S.D.N.Y.2003).

> [FN12]. Defendant Holland is listed in the complaint as "Hollin." Defendants note that "Holland" is the correct spelling. (Dkt. No. 42-1 at 13 n. 2.)

The First Amendment protects a prisoner's right to meaningful access to the courts and to petition the government for the redress of grievances. *See Bill Johnson's Rest., Inc. v. NLRB,* 461 U.S. 731, 741, 103 S.Ct. 2161, 76 L.Ed.2d 277 (1983). However, inmate grievance programs created by state law are not required by the Constitution and consequently allegations that prison officials violated those

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 4905240 (N.D.N.Y.)

(Cite as: 2010 WL 4905240 (N.D.N.Y.))

procedures do[ ] not give rise to a cognizable § 1983 claim. *Cancel v. Goord,* No. 00 Civ.2042, 2001 WL 303713, *3 (S.D.N.Y. Mar. 29, 2001). If prison officials ignore a grievance that raises constitutional claims, an inmate can directly petition the government for redress of that claim. *See Flick v. Alba,* 932 F.2d 728, 729 (8th Cir.1991). "Therefore, the refusal to process an inmate's grievance or failure to see to it that grievances are properly processed does not create a claim under § 1983." *Cancel,* 2001 WL 303713, at *3; *see also Torres v. Mazzuca,* 246 F.Supp.2d 334, 342 (S.D.N.Y.2003); *Mahotep v. DeLuca,* 3 F.Supp.2d 385, 390 (W.D.N.Y.1998).

*Shell v. Brzezniak,* 365 F.Supp.2d 362, 369-370 (W.D.N.Y.2005). Therefore, I recommend that the Court dismiss the claim against Defendant Holland.

**G. Eleventh Amendment**

Plaintiff sues Defendants "in [their] individual and official capacities." (Dkt. No. 1 at 1-3.) Defendants move to dismiss the official-capacity claims, arguing that any claims for damages against them in their official capacities are barred by the Eleventh Amendment. (Dkt. No. 42-1 at 16-17.) Defendants are correct.

The Eleventh Amendment has long been construed as barring a citizen from bringing a suit against his or her own state in federal court, under the fundamental principle of "sovereign immunity." *See* U.S. Const. amend. XI ("The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."); *Hans v. Louisiana,* 134 U.S. 1, 10-21 (1890); *Idaho v. Coeur d'Alene Tribe of Idaho,* 521 U.S. 261, 267 (1997); *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 100 (1984). State immunity extends not only to the states, but to state agencies and to state officers who act on behalf of the state. *See Puerto Rico Aqueduct & Sewer Auth. v. Metcalf,* 506 U.S. 139, 142-47 (1993); *Pennhurst State Sch. & Hosp.,* 465 U.S. at 101-06.

**\*15** The Eleventh Amendment bars suits for damages against state officials acting in their official capacities.[FN13] All DOCS employees are state officials for the purposes

of the Eleventh Amendment. *See e.g. Davis v. New York,* 316 F.3d 93, 101 (2d Cir.2002); *Tolliver v. New York State Corr. Officers,* No. 99 CIV 9555, 2000 WL 1154311, at *2 (S.D.N.Y. Aug. 14, 2000) ("All of the defendants in this case are state officials because they are employees of the New York State Department of Correctional Services."). Therefore, I recommend that the Court dismiss the claims for damages against Defendants in their official capacities.

FN13. *See Ying Jing Gan v. City of New York,* 996 F.2d 522, 529 (2d Cir.1993) ("The immunity to which a state's official may be entitled in a § 1983 action depends initially on the capacity in which he is sued. To the extent that a state official is sued for damages in his official capacity, such a suit is deemed to be a suit against the state, and the official is entitled to invoke the Eleventh Amendment immunity belonging to the state."); *Severino v.. Negron,* 996 F.2d 1439, 1441 (2d Cir.1993) ("[I]t is clear that the Eleventh Amendment does not permit suit [under Section 1983] for money damages against state officials in their official capacities."); *Farid v. Smith,* 850 F.2d 917, 921 (2d Cir.1988) ("The eleventh amendment bars recovery against an employee who is sued in his official capacity, but does not protect him from personal liability if he is sued in his 'individual' or 'personal' capacity."); *see also Will v. Michigan Dept. of State Police,* 491 U.S. 58, 71 (1989) ( "Obviously, state officials literally are persons. But a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office.... As such, it is no different from a suit against the State itself.... We hold that neither a State nor its officials acting in their official capacities are 'persons' under § 1983."); *Kentucky v. Graham,* 473 U.S. 159, 165-66 (1985) ("As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity. It is *not* a suit against the official personally, for the real party in interest is the entity."); *see also*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 13

Slip Copy, 2010 WL 4905240 (N.D.N.Y.)

(Cite as: 2010 WL 4905240 (N.D.N.Y.))

*Holloway v. Selsky,* 05-CV-0501, 2007 WL 433375, at *4 (N.D.N.Y. Feb. 6, 2007) (Sharpe, J.) (citing cases).

**H. Conspiracy**

Plaintiff alleges that Defendants Rovelli, M. Rock, Perez, Flores, and Deluca conspired to use excessive force against him. (Dkt. No.1 ¶¶ 36, 41, 43-46, 48, 50, 52.) Defendants move to dismiss Plaintiff's conspiracy claims, arguing that they are barred by the intracorporate conspiracy doctrine. (Dkt. No. 42-1 at 19-20.) Defendants are correct.

The intracorporate conspiracy doctrine states that employees of a single corporate entity are legally incapable of conspiring together. *Bond v. Board of Educ. of City of New York,* 97-cv-1337, 1999 U.S. Dist. LEXIS 3164, at *5, 1999 WL 151702, at *2 (E.D.N.Y. Mar. 17, 1999). "This doctrine applies to public entities and their employees." *Lee v. City of Syracuse,* 603 F.Supp.2d 417, 442 (N.D.N.Y.2009) (citations omitted). There is an exception to the doctrine where "individuals pursue personal interests wholly separate and apart from the entity." *Orafan v. Goord,* 411 F.Supp.2d 153, 165 (N.D.N.Y.2006) (citation and quotation marks omitted), *vacated and remanded on other grounds, Orafan v. Rashid,* No. 06-2951, 249 Fed. App'x 217 (2d Cir. Sept. 28, 2007). "[P]ersonal bias does not constitute personal interest and is not sufficient to defeat the intracorporate conspiracy doctrine." *Everson v. New York City Transit Auth.,* 216 F.Supp.2d 71, 76 (E .D.N.Y.2002) (quoting *Bond,* 1999 WL 151702, at *2). However, in an unrelated action, I have found that a triable issue of fact exists regarding whether officers acted pursuant to their personal interests where a prisoner alleges that officers assaulted him in retaliation for participating in a federal lawsuit. *Medina v. Hunt,* No. 9:05-CV-1460, 2008 U.S. Dist. LEXIS 74205, 2008 WL 4426748 (N.D.N.Y. Sept. 25, 2008). Other courts have found that the personal interest exception applies, and thus allowed conspiracy claims to proceed, where it was alleged that officers conspired to cover up their use of excessive force. *Hill v. City of New York,* No.03 CV 1283, 2005 U.S. Dist. LEXIS 38926, 2005 WL 3591719, at *6 (E.D.N.Y. Dec. 30, 2005).

Here, Plaintiff has not alleged what motivated Defendants to conspire against him. "[A] complaint that

does not set forth factual allegations showing that any of the individual defendants acted with independent motives is subject to dismissal for failure to state a claim." *Freeman v. Santos,* No. 9:09-CV-0414, 2010 U .S. Dist. LEXIS 23742, at *8, 2010 WL 982893, at *3 (N.D.N.Y. Mar. 15, 2010) (quoting *Perrin v. Canandaigua City Sch. Dist.,* No. 09-CV-6153, 2008 U.S. Dist. LEXIS 95280, 2008 WL 5054241, at *2 (W.D .N.Y. Nov. 21, 2008)). [FN14] Therefore, I recommend that the Court dismiss Plaintiff's conspiracy claims without prejudice.

FN14. The Court will provide Plaintiff with a copy of this unpublished decision in accordance with the Second Circuit's decision in *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009).

**I. Pendent State Claims**

*16 Defendants argue that Plaintiff's state law claims should be dismissed pursuant to Section 24 of New York's Correction Law. (Dkt. No. 42-1 at 21-22.) Defendants are correct. That section provides as follows:

1. No civil action shall be brought in any court of the state, except by the attorney general on behalf of the state, against any officer or employee of the department, in his personal capacity, for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties by such officer or employee.

2. Any claim for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the duties of any officer or employee of the department shall be brought and maintained in the court of claims as a claim against the state.

N.Y. Correct. Law § 24(1)-(2). Effectively, this statute precludes inmates from bringing civil suits against "corrections officers in their personal capacities" in New York state courts. *Cepeda v. Coughlin,* 128 A.D.2d 995, 997 (N.Y.App.Div.3d Dept.1987). This bar also applies to pendent state law claims in federal court because "[i]n applying pendent jurisdiction, federal courts are bound to apply state substantive law to the state claim." *Baker v. Coughlin,* 77 F.3d 12, 15 (2d Cir.1996) (citations

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 4905240 (N.D.N.Y.)

(Cite as: 2010 WL 4905240 (N.D.N.Y.))

omitted). "If a state would not recognize a plaintiff's right to bring a state claim in state court, a federal court exercising pendent jurisdiction ... must follow the state's jurisdictional determination and not allow that claim to be appended to a federal law claim in federal court." *Baker, 77 F.3d at 15.*

In 2009, the United States Supreme Court held that section 24 is unconstitutional to the extent that it precludes inmates from pursuing § 1983 claims. *Haywood v. Drown, --- U.S. ----, 129 S.Ct. 2108 (2009).* However, at least two judges in this District have observed that because *Haywood* 's focus is on civil rights claims, the decision "does not affect the question of whether this Court has proper jurisdiction to hear [a] pendent state law claim." *Crump v. Ekpe,* No. 9:07-CV-1331, 2010 U.S. Dist. LEXIS 10799, at *61, 2010 WL 502762, at * 18 (N.D.N.Y. Feb. 8, 2010) (Kahn, J. and Peebles, M.J.); *May v. Donneli,* No. 9:06-CV-437, 2009 U.S. Dist. LEXIS 85495, at *13, 2009 WL 3049613, at *5 (N.D.N.Y. Sept. 18, 2009) (Sharpe, J. and Treece, M.J.).[FN15] Therefore, I recommend that the Court dismiss Plaintiff's pendent state law claims.

> FN15. The Court will provide Plaintiff with a copy of these unpublished decisions in accordance with the Second Circuit's decision in *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009).

**J. Claims Not Addressed by Defendants**

Defendants' motion to dismiss does not address Plaintiff's excessive force claims, retaliation claims, or Eighth Amendment conditions of confinement claims regarding the provision of food. I find that those claims are sufficient to survive *sua sponte* review and therefore recommend that Defendants be directed to answer those claims.

**IV. PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

**\*17** In his opposition to Defendants' motion to dismiss, Plaintiff purports to move for summary judgment against both the State Defendants and Defendant inmate Perez. (Dkt. Nos. 72 and 77.) As the state Defendants note (Dkt. No. 75), Plaintiff's "motion" is not accompanied by a notice of motion, a statement of material facts, or a

memorandum of law. In addition, Plaintiff did not serve the exhibits to his "motion" on Defendants. Therefore, I recommend that Plaintiff's motion for summary judgment (Dkt. Nos. 72 and 77) be denied.

**ACCORDINGLY,** it is

**ORDERED** that Defendants' request (Dkt. No. 52) to vacate the text order of March 10, 2010, is **GRANTED.** The Clerk is directed to vacate the text order and the entry of default (Dkt. No. 51); and it is further

**ORDERED** that Plaintiff's objection (Dkt. No. 55) to Defendants' request is **DENIED;** and it is further

**ORDERED** that the Clerk provide Plaintiff with copies of *Freeman v. Santos,* No. 9:09-CV-0414, 2010 U.S. Dist. LEXIS 23742, 2010 WL 982893, at *3 (N.D.N.Y. Mar. 15, 2010); *Crump v. Ekpe,* No. 9:07-CV-1331, 2010 U.S. Dist. LEXIS 10799, at *61, 2010 WL 502762, at* 18 (N.D.N.Y. Feb. 8, 2010); and *May v. Donneli,* No. 9:06-CV-437, 2009 U.S. Dist. LEXIS 85495, at *13, 2009 WL 3049613, at *5 (N.D.N.Y. Sept. 18, 2009) in accordance with the Second Circuit's decision in *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009); and it is further

**RECOMMENDED** that Defendants' motion to dismiss for failure to state a claim (Dkt. No. 42) be **GRANTED IN PART AND DENIED IN PART.** I recommend that the following claims be dismissed with prejudice: (1) the Eighth Amendment medical claim against Defendant Nesmith; (2) the claim against Defendant McAllister; (3) any claim that Defendants Rovelli, Deluca, Lindemann, and Silverberg violated Plaintiff's constitutional rights simply by threatening him; (4) the claim against Defendant Holland; (5) any claims for damages against Defendants in their official capacities; and (6) the pendent state law claims. I recommend that the following claims be dismissed without prejudice: (1) the Eighth Amendment medical claims against Defendants Collins, Lindemann, Labrum, and Silverberg; (2) the claims against Defendants Fischer, Roy, David Rock, Heath, and Nabozny; and (3) the conspiracy claims. I recommend that Defendants be directed to answer the Eighth Amendment medical care claim against Defendant Leos; and it is further

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 4905240 (N.D.N.Y.)

(Cite as: 2010 WL 4905240 (N.D.N.Y.))

**RECOMMENDED** that Defendants be directed to answer the following claims not addressed by their motion to dismiss: (1) the retaliation claims against Defendants Smith, Besson, Kelly, Foster, Flores, Shattuck, Rovelli, Hoy, and Deluca; (2) the excessive force claim against Defendants Rovelli, Deluca, Flores, Shattuck, Fraser, Hoy, Foster, and Nesmith; and (3) the Eighth Amendment conditions of confinement claims regarding issues with Plaintiff's food; and it is further

**RECOMMENDED** that Plaintiff's motion for summary judgment (Dkt. Nos. 72 and 77) be **DENIED.**

**\*18** Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.* *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a).

N.D.N.Y.,2010.

Gillard v. Rovelli
Slip Copy, 2010 WL 4905240 (N.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2010 WL 5147258 (N.D.N.Y.)

(Cite as: 2010 WL 5147258 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
**This decision was reviewed by West editorial staff
and not assigned editorial enhancements.**

United States District Court,

N.D. New York.
Gary GILLARD, Plaintiff,
v.
Michael ROVELLI, et al., Defendants.
No. 9:09-CV-0431 (TJM/DEP).

Dec. 13, 2010.
Gary Gillard, Attica, NY, pro se.

Michael G. McCartin, Office of Attorney General, The
Capitol Albany, NY, for Defendants.

### DECISION & ORDER

THOMAS J. McAVOY, Senior District Judge.

   **\*1** This *pro se* action brought pursuant to 42 U.S.C.
§ 1983 was referred to the Hon. David E. Peebles, United
States Magistrate Judge, for a Report and
Recommendation pursuant to 28 U.S.C. § 636(b) and
Local Rule 72.3(c). No objections to the
Report-Recommendation and Order dated August 30,
2010 have been filed, and the time to do so has expired.
Furthermore, after examining the record, this Court has
determined that the Report-Recommendation and Order is
not subject to attack for plain error or manifest injustice.
Accordingly, the Court adopts the
Report-Recommendation and Order for the reasons stated
therein.

   It is therefore,

   **ORDERED** that Defendants' motion to dismiss
(Dkt.# 27) is **GRANTED,** and all claims in this action
with the exception of those against Hamel and McNally
are **DISMISSED** with leave to replead consistent with
Magistrate Judge Peebles' Report and Recommendation.

*See* Rep. Rec., p. 23, n. 7.

### IT IS SO ORDERED.

N.D.N.Y.,2010.

Gillard v. Rovelli
Slip Copy, 2010 WL 5147258 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

2010 WL 681323
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Raymond GONZALES, Plaintiff,

v.

Dr. Lester WRIGHT, et al.,, Defendants.

No. 9:06–CV–1424 (JMH).

|

Feb. 23, 2010.

West KeySummary

1    **Civil Rights**

☞    Criminal Law Enforcement;Prisons

Prison officials' motion for summary
judgment was properly granted in prisoner's
§ 1983 action where prisoner failed to
demonstrate they were involved in any
alleged constitutional violation. Prisoner
failed to demonstrate prison superintendent
and deputy were personally involved in any
alleged constitutional violation for denial of
medical care and his claims against them were
properly dismissed. Additionally, prisoner
failed to allege any conduct by medical
director or facility health director regarding
his treatment, but merely named them in their
official capacity and for "responsibility of
medical care of inmates," but the fact that
they held positions of medical director and
facility health administrator was insufficient
to provide requisite personal involvement to
state a constitutional claim. 42 U.S.C.A. §
1983.

Cases that cite this headnote

**Attorneys and Law Firms**

Raymond Gonzales, Romulus, NY, pro se.

Roger W. Kinsey, Office of Attorney General, Albany,
NY, for Defendants.

**DECISION and ORDER**

HOOD, District Judge.

 **\*1** Raymond Gonzales complains in this action
brought pursuant to 42 U.S.C. § 1983 that, while he
was incarcerated at the Upstate Correctional Facility
("Upstate"), Defendants, various New York penal
officers and employees, denied him the protections of
the Fourth, Eighth and Fourteenth Amendments to the
United States Constitution.[1] The matter is before the
Court on Defendants' motion for summary judgment
pursuant to Fed.R.Civ.P. 56. (Dkt. No. 81). Plaintiff
having responded to the motion *sub judice* (Dkt. No. 88),
it is ripe for review.

**Plaintiff's Allegations**

Plaintiff claims that beginning shortly after his arrival on
July 3, 2006, in Building 10 SHU at Upstate Correctional
Facility, some unidentified "infections harmful chemical
substance" came out of the ventilation system. Although
Defendants John Finazzo and Gerald Caron looked for
the substance, they claimed not to see anything and
mocked him. (Dkt. No. 1, ¶¶ 38, 39). In response to
his ongoing complaints, Plaintiff claims that Defendants
James Spinner, Sheen Pombrio, Brian Grant, Michael
Riley, Scott Dumas, Jonathan Price, Jeffrey Hyde,
William Brown, and Lynn Furnace looked for the
substance, but claimed that they did not see nor find
anything. (Dkt. No. 1, ¶¶ 41, 42).

Plaintiff also claims that all the above-named Defendants,
along with Defendants Steven Salls, Jeffrey Bezio, Ricky
Colton, N. Guerin, Dean Sauther, Brian Bogardus,
Michael Welch, Michael Albert, and non-movant D.
Ravelle[2], made comments and placed "infections
harmful chemical substance" in the ventilation system in
retaliation for filing lawsuits at other facilities and that
Defendants Robert Woods and Norman Bezio directed
this conspiracy. (Dkt. No. 1, ¶¶ 45–50). Defendant
Bogardus is alleged to have gestured and looked with
satisfaction and gladness towards the ventilation system

2010 WL 681323

while delivering mail. (Dkt. No. 1, ¶ 55). Plaintiff also states that the above-named Defendants tried to poison his food with an unknown "infectious chemical substance." (Dkt. No. 1, ¶¶ 108–110)[3] .

Plaintiff further alleges that the above Defendants denied him access to the courts by denying him a pen needed to complete his 45 page, 177 paragraph complaint as well as legal work related to his other pending lawsuits. (Dkt. No. 1, ¶¶ 162–67). Plaintiff claims that he requested a pen from the correctional officers as supplies were given out and was repeatedly denied one. (Dkt. No. 1, ¶¶ 127, 129, 132, 162–67, 170–71).

Additionally, Plaintiff alleges that after his food was supposedly tainted he refused to return his food tray (Dkt. No. 1, ¶¶ 130, 168–69) which prompted a search of Plaintiff's cell. (Dkt. No. 1, ¶¶ 126, 134–41). Plaintiff further alleges that during the cell search, the officers damaged his legal documents in retaliation for his other lawsuits against DOCS employees at other correctional facilities. (Dkt. No. 1, ¶¶ 142–43). Plaintiff further alleges that the cell search was unlawful because he said he returned all the pieces of the broken food tray. Therefore, the officers had no right to conduct the search, and did it for the sole purpose of retaliation. (Dkt. No. 1, ¶¶ 142–43).

**\*2** Plaintiff alleges that due to the "infectious harmful chemicals," his face, chest, and other body parts became infected. (Dkt. No. 1, ¶ 43). Due to Plaintiff's alleged "infections, he made several sick call requests, requesting medical attention for his "infections." (Dkt. No. 1, ¶¶ 44, 74, 85). Plaintiff also wrote letters to Facility Health Service Director Wiessman requesting medical care. (Dkt. No. 1, ¶ 74). Plaintiff also wrote Lester Wright, the Associate Commissioner of Health Services/ Chief Medical Officer of New York State Department of Correctional Services at Albany, asking Wright to order Defendant Louise Tichenor to provide Plaintiff with medical care. (Dkt. No. 1, ¶ 78). Plaintiff claims that, although seen by Defendant Tichenor on July 14, 2006, he did not receive proper medical care. (Dkt. No. 1, ¶ 77). Thus, Plaintiff alleges that Defendant Evelyn Wiessman, failed to properly supervise Plaintiff's medical providers. (Dkt. No. 1, ¶ 7A).

Plaintiff also alleges that Defendant Tichenor failed to adequately examine him during his medical call out on July 14, 2006, asking with intrigue what had happened to

Plaintiff's skin, but failing to properly examine Plaintiff's chest, back, shoulders, testicles and penis. (Dkt. No. 1, ¶¶ 64, 66). Plaintiff also states that Defendant Tichenor prescribed him Loratadine, which Plaintiff refused to take because Plaintiff knew that he was given the medicine only to conceal and hide the evidence of the damage caused to him by the "infectious substances." (Dkt. No. 1, ¶¶ 68–69, 72). Plaintiff then states that he was given a prescription cream for his skin problem, but not enough of it. (Dkt. No. 1, ¶¶ 73, 75).

Plaintiff also alleges that Defendant Tichenor wrongfully discontinued and denied Plaintiff the nutritional supplement, Ensure, although Plaintiff acknowledges that he failed to comply with facility procedure by refusing to drink the Ensure in front of the Nurses. (Dkt. No. 1, ¶¶ 145–60).

Finally, Plaintiff alleges that nurses J. Chesbrough, R. Holmes, and Walsh failed to provide Plaintiff with non-prescription medication even though Plaintiff completed all required sick call procedures. (Dkt. No. 1, ¶¶ 85, 89–106). Plaintiff contends that all these Defendants were deliberately indifferent to his medical needs.

### Defendants' Statement of Material Facts

Defendants have provided a different view of what happened while Plaintiff was confined at Upstate, as detailed in their statement of material facts. Although quite lengthy, they are recounted in detail below to provide a better understanding of Defendants' position in the matter:

1. Plaintiff Raymond Gonzalez was seen on a nearly daily basis from his arrival at Upstate on or about July 3, 2006. Weissman Declaration, Exhibit 1.

2. On July 5, 2006, Plaintiff demanded that he be given skin cream and became very agitated when he was told that he had to wait until he was examined by the PA in order to receive the cream. Weissman Declaration, Exhibit 2.

**\*3** 3. Plaintiff also received an orientation on sick call procedure on July 5, 2006. Weissman Declaration, Exhibit 3.

4. On July 6, 2006, Plaintiff refused to drink his Ensure in the presence of the nurse and became very vulgar and abusive. As a result, Plaintiff received a misbehavior report. Weissman Declaration, Exhibit 4.

5. On July 6, 2006, it was once again explained to Plaintiff that medical procedure required that Plaintiff consume the Ensure in view of the nurse to insure that it was properly consumed. *Id.*

6. Plaintiff was also informed that Ensure and skin cream would be withheld pending an examination by the PA. *Id.*

7. Plaintiff was again seen on July 8, 2006 and July 10, 2006 and requested skin cream and indigestion aids. Plaintiff did not exhibit any symptoms and continued to be very demanding. Weissman Declaration, Exhibit 5.

8. On July 12, 2006, Plaintiff demanded Ensure, ibuprofen and hemorrhoid cream and refused hepatitis B vaccination. Weissman Declaration, Exhibit 6.

9. On July 14, 2006, Plaintiff was examined by the PA. Weissman Declaration, Exhibit 8.

10. On July 15, 2006, Plaintiff demanded the medication ordered by the PA. Weissman Declaration, Exhibit 7.

11. On July 17, 2006, Plaintiff refused to be weighed and refused medication for allergies. *Id.*

12. On July 19, 20, and 21, 2006 Plaintiff refused treatment, demanded to see Dr. Weissman and was vulgar and loud indicating he did not want further treatment from the PA. Weissman Declaration, Exhibit 9.

13. On July 24, 2006, Plaintiff refused to be examined and became verbally abusive, using the vilest of language, threats and sexually explicit rants. Weissman Declaration, Exhibit 10.

14. On July 25, 2006, the refusals and tirades were repeated and Plaintiff refused treatment. *Id.*

15. On July 26, 2006, Plaintiff once again refused to cooperate in his examination and treatment could not be provided. Once again, Plaintiff began to be verbally abusive, using the vilest of language, threats and sexually explicit rants. Weissman Declaration, Exhibit 11.

16. On July 27, 2006, Plaintiff rejected his medication by throwing it on the floor and indicating that he did not want to be examined or treated by the PA. *Id.*

17. On July 28, 2007, Plaintiff refused treatment yet again. Additionally, Plaintiff continued to express that he did not want what was being prescribed. Weissman Declaration, Exhibit 12.

18. On July 29, 2006, Plaintiff once again refused to be examined and insisted that he be given medication without examination. Plaintiff also persisted in his abusive and vulgar language until he was given a misbehavior report. Weissman Declaration, Exhibit 13.

19. On July 30, 2006, Plaintiff continued to refuse examination, making treatment impossible. Plaintiff also refused to consume Ensure as directed and treated the nurse to more vulgarity. *Id.*

20. On July 31, 2006, Plaintiff was again seen and reminded that he was required to consume the Ensure in the presence of the nurse or it would be discontinued. Examination revealed that Plaintiff's face was clear and had no redness, however, Plaintiff continued to insist that his face was real bad, dry and itching. Weissman Declaration, Exhibit 14.

**\*4** 21. On August 1, 2006, Plaintiff once again refused to consume Ensure in the presence of the nurse and was warned again that non-compliance would cause the Ensure to be stopped. Plaintiff continued to refuse to comply and the Ensure was ordered stopped. Weissman Declaration, Exhibits 15–16.

22. On August 2, 2006, Plaintiff again refused to be examined and became vulgar and abusive. An attempt to talk with Plaintiff about taking Ensure was met with more abuse and vulgarity. Plaintiff was finally given a misbehavior report when he began to threaten staff. Weissman Declaration, Exhibit 17.

23. On August 4, 2006, Plaintiff again refused to be examined and refused treatment. Once more the nurse was treated to a vulgar and threat filled tirade. *Id.*

24. On August 5, 2006, Plaintiff was non-compliant with sick call procedure. *Id.*

25. On August 6, 2006, Plaintiff again refused to be examined and refused treatment. Once more the

2010 WL 681323

nurse was treated to a vulgar and threat filled tirade. Weissman Declaration, Exhibit 18.

26. On August 7, 2006, Plaintiff's medicine was renewed and once again he was uncooperative and vulgar and received another misbehavior report. Weissman Declaration, Exhibit 19.

27. On August 9, 2006, the PA examined Plaintiff and Plaintiff was once more instructed that he must talk to and cooperate with the nurse in order to be treated. *Id.*

28. On August 8, 2006, Plaintiff refused to speak to the nurse and instead simply held up a piece of paper. Weissman Declaration, Exhibit 20.

29. On August 10, 2006, Plaintiff refused to speak to the nurse and instead simply held up a piece of paper. When told that he must cooperate, Plaintiff once more became enraged and vulgar and refused treatment. *Id.*

30. On August 12, 2006, Plaintiff failed to comply with sick call procedures. Weissman Declaration, Exhibit 21.

31. On August 13, 2006, Plaintiff failed to comply with sick call procedures and instead exposed himself and stood silently as the nurse tried to examine and find out symptoms. *Id.*

32. On August 14 and 16, 2006, once more Plaintiff refused to speak and held up a piece of paper when asked what he needed. The session was ended with a vulgar threat. Weissman Declaration, Exhibits 21 and 22.

33. On August 17, 2006, Plaintiff was treated for indigestion and allergies. Weissman Declaration, Exhibit 22.

34. On August 18 and 19, 2006, Plaintiff refused to speak to the nurse doing sick call[,] thus, refusing to be evaluated and instead held up a piece of paper. Weissman Declaration, Exhibits 22 and 23.

35. On August 21, 2006, Plaintiff allowed an evaluation and was found to be without nasal congestion and a minor rash for which he was given medication. It was noted that his face was clear of any rash. Weissman Declaration, Exhibit 24.

36. On August 22, 2006, Plaintiff was once again noncompliant and abusive rendering any attempt to examine and treat him as impossible. *Id.*

**\*5** 37. On August 23, 2006, Plaintiff was once again noncompliant and abusive rendering any attempt to examine and treat him as impossible. Medications were reordered in spite of Plaintiff's lack of cooperation. Weissman Declaration, Exhibit 25.

38. On August 24, 2006, Plaintiff complained of gas and a headache and allowed an evaluation and was treated for a headache and given antacid. *Id.*

39. On August 25 and 27, 2006, Plaintiff did not comply with sick call procedure and could not be evaluated or treated. Weissman Declaration, Exhibits 26 and 27.

40. On August 28, 2006, Plaintiff complained of gas and a headache and allowed an evaluation and was treated for a headache and given antacid. Weissman Declaration, Exhibit 27.

41. On August 31, 2006 and September 1, 2006, Plaintiff was once again non-compliant, vulgar and abusive rendering any attempt to examine and treat him as impossible. Weissman Declaration, Exhibits 27–28.

42. On September 4, 2006, Plaintiff complained that he had a rash on his face, chest and back. Plaintiff was examined and no rash was seen. *Id.*

43. On September 5, 2006, Plaintiff requested ibuprofen and nasal pills. Plaintiff was examined and no tenderness or redness was noted in his throat. Weissman Declaration, Exhibit 29.

44. On September 8, 2006, Plaintiff complained of gas and a rash on his testicles. Plaintiff was examined and irritation was noted and Plaintiff advised to keep clean and dry. *Id.*

45. On September 12, 2006, Plaintiff requested ibuprofen and nasal pills. Plaintiff was examined and given fluids and dispensed medications. Weissman Declaration, Exhibit 30.

46. On September 13, 2006, Plaintiff requested sinus medication and antacid. Plaintiff was examined and given antacid and sinus medication. Weissman Declaration, Exhibit 31.

47. On September 15, 2006, Plaintiff complained of a sore on his penis. Plaintiff was examined and irritation was noted but there was no evidence of a fungal infection or broken skin. Plaintiff was given bacitracin ointment to apply. *Id.*

48. On September 17, 2006, Plaintiff did not comply with sick call procedure and could not be evaluated or treated. *Id.*

49. On September 18, 2006, Plaintiff requested ibuprofen and hemorrhoid treatment. Plaintiff was examined and give ibuprofen and hemorrhoid medication. Weissman Declaration, Exhibit 32.

50. On September 20, 2006, Plaintiff requested ibuprofen and antacid. Plaintiff was examined and treated with ibuprofen, antacid and warm compresses to his back. Weissman Declaration, Exhibit 33.

51. On September 20, 2006, Plaintiff refused to go to the infirmary for examination of possible tuberculosis infection. Plaintiff became abusive and vulgar and received a misbehavior report. *Id.*

52. On September 21, 2006, Plaintiff again refused to be tested or evaluated. Weissman Declaration, Exhibit 34.

53. On September 28 and 30, 2006, Plaintiff did not comply with sick call procedure and could not be evaluated or treated. Weissman Declaration, Exhibit 35.

**\*6** 54. On October 3, 2006, Plaintiff complained of a headache, upset stomach and infected skin. Plaintiff was examined and given ibuprofen and antacid. Weissman Declaration, Exhibit 36.

55. On October 4, 2006, Plaintiff complained of a headache and gas. Plaintiff was examined and given ibuprofen and antacid. *Id.*

56. On October 6, 2006, Plaintiff's medications were renewed. *Id.*

57. On October 9, 2006, Plaintiff complained of a headache, cold sore and gas. Plaintiff was examined and given ibuprofen, cold sore medication and antacid. Weissman Declaration, Exhibit 37.

58. On October 10, 2006, Plaintiff complained of a headache and gas. Plaintiff was examined and given Tylenol and antacid. *Id.*

59. On October 11, 2006, Plaintiff complained of a headache, rash and gas. Plaintiff was examined and it was noted that his penis was irritated. Plaintiff was given ibuprofen, bacitracin ointment and antacid. *Id.*

60. On October 23, 2006, Plaintiff complained of infection on his back, chest and shoulders and demanded to see Dr. Weissman. Plaintiff was examined and no sores or rash was noted. The skin appeared dry and unremarkable. Plaintiff was given Tylenol and antacid. Weissman Declaration, Exhibit 38.

61. On October 24, 2006, Plaintiff complained of infection on his back, chest and shoulders and demanded to see Dr. Weissman. Plaintiff was examined and no sores or rash was noted, although a small patch of dryness was noted on Plaintiff's thigh. The skin appeared dry and unremarkable. Plaintiff was given Tylenol and antacid. *Id.*

62. On October 25, 2006, Plaintiff complained of an infected penis. Plaintiff was examined and there was no evidence of sores or breaks in the skin. Weissman Declaration, Exhibit 39.

63. October 26, 2006, Plaintiff refused to cooperate with lab tests and with a consultation. Plaintiff also complained of an infected groin, face chest and head. Plaintiff was examined and no infection was seen. Weissman Declaration, Exhibit 40.

64. On October 30, 2006, Plaintiff once again refused laboratory tests. *Id.*

65. On November 3, 2006, Plaintiff complained of gas and a lip injury. Plaintiff was examined and give[n] antacid and antibiotic cream for his lip. *Id.*

66. On November 4, 2006, Plaintiff did not comply with sick call procedure and could not be evaluated or treated. Weissman Declaration, Exhibit 41.

67. On November 5, 2006, Plaintiff complained of gas and a split lip. Plaintiff was examined and given antacid and bacitracin for his lip. *Id.*

2010 WL 681323

68. On November 6, 2006, Plaintiff complained of gas and infected skin. Plaintiff's wrist, face, head, chest and back were examined but no infection could be found. Plaintiff was given antacid for his gas. Plaintiff continued to request Ensure but it was not ordered. Weissman Declaration, Exhibit 42.

69. On November 8, 2006, Plaintiff complained of gas and a split lip. After examination Plaintiff was given triple antibiotic cream for his lip and antacid. *Id.*

**\*7** 70. On November 9, 2006, Plaintiff did not comply with sick call procedure and could not be evaluated or treated. *Id.*

71. On November 10, 2006, Plaintiff received his quarterly review and examination. Three issues were discussed. Plaintiff's lip was treated with bacitracin and antacids were given for his gas problem. It was determined that Ensure would not be restarted due to non-compliance with medical protocol. Weissman Declaration, Exhibit 43.

72. On November 11, 2006, Plaintiff reported stomach problems and requested lip cream. Following an examination it was determined that Plaintiff did not require additional lip cream and was give[n] Tylenol and antacid. *Id.*

73. On November 14, 2006, Plaintiff again requested antacid and lip cream. Following an examination, it was determined that Plaintiff did not require any treatment other than antacid. Weissman Declaration, Exhibit 44.

74. On November 15, 2006, Plaintiff did not comply with sick call procedure and could not be evaluated or treated. *Id.*

75. On November 17, 2006, Plaintiff reported stomach upset and general body aches. Following examination, Plaintiff was given antacid and analgesics for body pain. *Id.*

76. On November 18, 2006, Plaintiff did not comply with sick call procedure and could not be evaluated or treated. Weissman Declaration, Exhibit 45.

77. On November 19 and 21, 2006, Plaintiff requested antacids and ibuprofen. Plaintiff was examined and given antacid and Tylenol. Weissman Declaration, Exhibits 45 and 46.

78. On November 22, 2006, Plaintiff requested antacids and Tylenol. Plaintiff was examined and given antacids and Tylenol. Weissman Declaration, Exhibit 46.

79. On November 24, 2006, Plaintiff requested Ensure, lip cream and antacids. Plaintiff was examined and found to have no problems that required lip cream. Plaintiff was also informed that Ensure was suspended due to non-compliance. Tylenol and antacid was prescribed. Weissman Declaration, Exhibit 47.

80. On November 27, 2006, Plaintiff requested Ensure, lip cream and antacids. Plaintiff was examined and found to have no problems that required lip cream. Plaintiff was also informed that Ensure was suspended due to non-compliance. Tylenol and antacid was prescribed. *Id.*

81. On November 30, 2006, Plaintiff requested Ensure, lip cream and antacids. Plaintiff was examined and found to have no problems that required lip cream. Plaintiff was also informed that Ensure was suspended due to non-compliance. Tylenol and antacid was prescribed. Weissman Declaration, Exhibit 48.

82. Defendants Tichenor, Wash, Holmes and Chesbrough saw the Plaintiff for his sick call and also prescribed him medication which the Plaintiff refused. Complaint ¶ 72.

83. Plaintiff admits that every time he submitted a sick call, at the very least, the nurses would examine him. Dep. Pg. 30, ¶¶ 8–10.

84. Any lack of examination or treatment was due to Plaintiff's actions, either not responding to the nurse or creating a situation where evaluation and treatment was not possible. Weissman Declaration.

**\*8** 85. While Plaintiff claimed various needs, including a rash, examination failed to confirm any medical condition existed, thus rendering treatment unnecessary. Weissman Declaration.

86. Any deprivation that Plaintiff suffered was due to his own conduct. Weissman Declaration.

87. Plaintiff was not given Ensure due to his unwillingness to consume the Ensure as directed by staff. Weissman Declaration.

88. No reasonable health care professional, on the above record, would believe that any conduct by the staff involved, violated any right enjoyed by Plaintiff. Weissman Declaration.

89. On the contrary, all personnel involved exhibited extraordinary restraint and professionalism in the face of vile, uncooperative and potentially dangerous conduct by Plaintiff. Weissman Declaration.

90. Plaintiff never saw Superintendent Woods throw the chemicals on him, rather he imagined Woods did. Deposition at pg. 22, ¶¶ 14–17.

91. Plaintiff admits he did not see Deputy Superintendent Bezio ever throw any infectious chemical on him. Deposition at pg. 22, ¶¶ 18–20.

92. Plaintiff admits that he did not see Sergeant J. Bezio ever throw any infectious chemical on him. Deposition at pg. 22, ¶¶ 21–23.

93. Plaintiff admits that he did not see Sergeant Pombrio ever throw any infectious chemical on him. Deposition at pg. 22, ¶¶ 24–25; pg.23, ¶ 2.

94. Plaintiff admits that he did not see Sergeant Salls ever throw any infectious chemical on him. Deposition at pg. 23, ¶¶ 3–5.

95. Plaintiff admits that he did not see Sergeant Spinner ever throw any infectious chemical on him. Deposition at pg. 23, ¶¶ 6–8.

96. Plaintiff never saw any of the corrections staff throw any substance in his cell, rather he believes they did it through an apparatus, which he has never seen and never saw any of the defendants use. Deposition at pg. 23,¶¶ 9–17.

97. [Plaintiff] does not know who was throwing the beige substance at him but imagines it was Defendants, because they worked at Upstate. Deposition at pg. 24, ¶¶ 12–15.

98. Plaintiff has no knowledge of who was burning him with laser beams, because he had not seen the lasers or anyone use them. Deposition at pg. 24, ¶¶ 16–19.

99. Plaintiff never saw anyone throw chemical agents at him, and that he doesn't know who (if anyone) was throwing them, but that he assumes it is Defendants

because they work at the facility. Deposition at pg. 24, ¶¶ 20–25.

100. Plaintiff does not allege any conduct by Defendants Wright or Weissman regarding his treatment, but rather names them in their capacity as Defendant Weissman as Facility Health Director and Defendant Wright as Medical Director and for "responsibility of medical care of inmates". Complaint ¶¶ 4, 7A, 62; ¶¶ 78, 79; ¶¶ 82, 83.

101. Plaintiff never saw any defendant place anything in his food. Dep. Pg 34, ¶¶ 18–20; Dep. Pg. 35, ¶¶ 7–8.

102. Cell searches of Plaintiff's cell were made necessary by Plaintiff's behavior. Specifically, Plaintiff refused to return his tray after meals on several occasions and broke them into pieces. Dumas Declaration.

**\*9** 103. The broken pieces then had to be recovered and the tray reassembled to insure that all pieces were accounted for and out of the cell. Dumas Declaration.

104. The broken pieces present a safety and security issue. Dumas Declaration.

105. At no time did the staff involved enter the cell with the purpose of destroying Plaintiff's possessions but Plaintiff's own behavior required that the searches be made. Dumas Declaration.

106. Searches of his cell, delay in getting a pen and alleged destruction of his papers delayed Plaintiff's legal work, but it had no lasting impact, because any deadlines he missed, he got extended and Plaintiff was able to submit his legal papers to the court. Dep. Pg. 46, ¶¶ 3–15.

(Dkt. No. 88–1, ¶¶ 1–106).

Although Plaintiff has contested some of the facts asserted by Defendants in the motion now before the Court (Dkt. No. 88–2), his conclusory assertions do not preclude summary judgment. [4] The standard for granting summary judgment is well-known.

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.

2010 WL 681323

R. Civ. Pro. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In reviewing a motion for summary judgment, this Court must determine whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52. Furthermore, the evidence and all facts must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

**Personal Involvement**

To allege a constitutional violation under 42 U.S.C. § 1983, a pleading must state facts sufficient to support a finding that the defendant was personally involved in the alleged violation. *See Farrell v. Burke,* 449 F.3d 470, 484 (2d Cir.2006). For this reason, liability of a state official cannot be established under the doctrine of *respondeat superior. Iqbal,,* 129 S.Ct. at 1948.

"Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [section] 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994); *Johnson v. Newburgh Enlarged Sch. Dist.,* 239 F.3d 246, 254 (2d Cir.2001). Moreover, a plaintiff must allege personal acts of wrong on behalf of each Defendant he names in the complaint. *Blyden v. Mancusi,* 186 F.3d 252, 264 (2d Cir.1999).

In the present complaint, Plaintiff solely brings suit against Superintendents Woods, Deputy Superintendent for Security Bezio, Facility Medical Director Weissman and Lester Wright, the Medical Director of DOCS, alleging supervisory liability. Under 42 U.S.C. § 1983 liability cannot be imposed on a supervisory official on the theory of *respondeat superior. Id.* In order for a supervisory official to be involved in a constitutional violation, he or she must have (1) directly participated in the alleged constitutional violation; (2) learned of the violation through a report or appeal and failed to remedy the wrong; (3) created a policy or custom under which unconstitutional practices occurred or allowed the continuance of such a policy or custom; (4) been grossly negligent in supervising subordinates who committed the wrongful act; or (5) exhibited deliberate indifference to inmates' rights by failing to act on information indicating that unconstitutional acts were occurring. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995).

**\*10** In the instant case, Plaintiff has merely alleged *respondent superior* liability against Superintendents Woods, Deputy Superintendent for Security Bezio, Facility Medical Director Weissman and Lester Wright, the Medical Director of DOCS. The Superintendent's and Deputy Superintendent's delegation of medical judgment to appropriate staff was proper as the Second Circuit has cautioned that non-medical Defendants should not intercede in the medical care and treatment of an inmate. *Cuoco v. Moritsugu,* 222 F.3d 99, 111(2d Cir.2000) ("One can imagine the repercussions if non-medical prison officials were to attempt to dictate the specific medical treatment to be given particular prisoners...."). Concomitantly, the Second Circuit has also explicitly held the denial of a grievance on medical matter is insufficient to demonstrate personal involvement on behalf of a prison Superintendent. *Brock v. Wright,* 315 F.3d 158, 163 (2d Cir.2003). Similarly, the mere receipt of letters from an inmate by a facility Superintendent regarding a medical claim is insufficient to constitute personal liability. *Swindell v. Supple,* 2005 WL 267725, at \*11 (S.D.N.Y.2005); *Burgess v. Morse,* 259 F.Supp.2d 240, 250 (W.D.N.Y.2003). Therefore, Plaintiff cannot demonstrate that Superintendent Woods and Deputy Bezio were personally involved in any alleged constitutional violation for denial of medical care and his claims against them must be dismissed.

Plaintiff also names as Defendants Dr. Evelyn Weissman, Facility Health Director and Dr. Lester Wright, the Medical Director for the Department. Once again, Plaintiff does not allege any conduct by Defendants Wright or Weissman regarding his treatment, but rather names them in their capacity as Defendant Weissman, Facility Health Director, and Defendant Wright, Medical Director, and for "responsibility of medical care of inmates." The mere fact that Defendant Dr. Wright held the position of Medical Director and Defendant Dr. Weissman the title of Facility Health Administrator is insufficient to provide the requisite personal involvement to state an Eighth Amendment claim. *Hernandez v. Keane,* 341 F.3d 137, 145 (2d Cir.2003); *Swindell,* 2005 WL 267725, at \*9–10. Based on the above, the motion for summary judgment should be granted as to Defendants

Dr. Evelyn Weissman, Dr. Lester Wright, Robert Woods, and Norman Bezio.

### Medical Indifference

In *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), the Court recognized that the government has an obligation to provide medical care for those it incarcerates, because they are unable to obtain such care on their own, and held that a prisoner may have a claim for failure to do so under the Eighth Amendment. To prevail on an Eighth Amendment claim involving prison medical care, an inmate must establish that the Defendant acted with deliberate indifference to a serious medical need. *Wilson v. Seiter,* 501 U.S. 294, 294–95, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991); *West v. Atkins,* 487 U.S. 42, 46, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988). This indifference may be manifested by prison doctors in their response to a prisoner's needs, or by officers in intentionally denying or delaying access to medical care or treatment. *Estelle,* 429 U.S. at 104. The inmate must prove both the subjective and objective elements of a claim: (1) deliberate indifference, and (2) a serious medical need. *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). In the instant case, Plaintiff fails to satisfy either of these elements.

**\*11** A review of the record pertaining to Plaintiff's complaints to prison medical personnel reveals that he complained frequently of a rash or infection on various parts of his body including his face, around his testicles, and on his penis. There is nothing which would indicate that the rash was "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994). Throughout Plaintiff's complaint, he describes his rash, but never does he state that the rash caused him pain, much less extreme pain, that it was spreading anywhere else, besides the areas he already claimed, or that it was likely to produce death.

Even if the rash is a serious medical condition, the subjective element of the test is not met. To meet the subjective element, a prisoner must satisfy *Farmer v. Brennan's* test for deliberate indifference—the Defendant must know of and disregard an excessive risk to inmate health. A Defendant need not expressly intend to inflict pain—but Plaintiff must establish at least that a Defendant acted with the criminal recklessness discussed

in *Farmer v. Brennan. See Hathaway v.Coughlin,* 99 F.3d 550, 553 (2d Cir.1996); *Morales v. Mackalm,* 278 F.3d 126, 132 (2d. Cir.2002).

Turning to the deliberate indifference element, the record is replete with evidence that Defendant medical personnel examined Plaintiff (when they were allowed to) and prescribed appropriate topical and/or allergy medicines. Although Plaintiff may have desired some other type of medicine, that desire would have, at the very best, demonstrated negligence, not deliberate indifference.

The above analysis would apply with equal force to each medical condition reported. The medical personnel treated or attempted to treat every condition despite abusive conduct on Plaintiff's part. No Eighth Amendment violation on the part of the prison medical personnel is perceived.

### Powders and Lasers

Defendants J. Finazzo and G. Caron were called and requested by the Plaintiff to look into his room for substances coming from the ventilator and the roof of his cell. Both J. Finazzo and G. Caron are accused of reacting "in the shape of mockery" and said or showed to Plaintiff that they did not see the substance. Also at Plaintiff's request, Defendants J. Spinner, S. Pombrio, B. Grant, M. Riley, S. Dumas, J. Price, J. Hyde, W. Brown, and L Furnace, looked into the cell at the ventilator and the roof and "almost made the same gesture (as J. Finazzo and G. Caron)" and told the Plaintiff they did not see any substance. Plaintiff alleges that Defendant B. Bogardus, would, while collecting or delivering the mail, looked towards the ventilator and roof of Plaintiff's cell and made a "gesturing of satisfaction and gladness." Even if true, the above allegations by Plaintiff fail to state a claim with regard to looks and smirks. Looks and smirks are not actionable.

Plaintiff alleges that Defendants S. Salls, J. Hyde, J. Bezio, S. Pombrio, J. Spinner, R. Colton, N. Guerin, D. Sauther, G. Caron, M. Riley, B. Grant, S. Dumas, B. Bogardus, M. Welch, J. Price, M. Albert, D. Ravelle, L. Furnace, J. Finazzo and W. Brown allegedly threw infectious harmful chemicals upon the Plaintiff via ventilator and the roof of his cell with a machine-like system that was allegedly placed in the room above his cell. Plaintiff alleges that all

these actions were taken in retaliation for Plaintiff's other lawsuits against other DOC's employees, yet Plaintiff concedes in his deposition that he has no proof or evidence that any named Upstate employees had any knowledge of his other lawsuits. (Dkt. No. 81–3, Ex. A at 25, ¶¶ 2–10). Tellingly, all Defendants deny knowledge of any lawsuits brought by Plaintiff at other facilities.

**\*12** Equally demonstrative of the frivolous nature of the complaint, during his deposition, Plaintiff stated that he never saw Superintendent Woods throw the chemicals on him; rather he imagined Woods did. (Dkt. No. 81–3, Ex. A. at 22, ¶¶ 14–17). Additionally, Plaintiff admits he did not see Defendants Deputy Superintendent Bezio, Sergeant J. Bezio, Sergeant Pombrio, Sergeant Salls, Sergeant Spinner, ever throw any infectious chemical on him. (Dkt. No. 81–3, Ex. A at 22 ¶¶ 1–20,21–23, 24–25; 23, 2, 3–5, 6–8). In fact, Plaintiff admits that he never saw any of the corrections staff throw any substance in his cell, rather he believes they did it through an apparatus, which he has never seen and never saw any of the Defendants use. (Dkt. No. 81–3, Ex. A at 23, ¶¶ 9–17). Plaintiff further admits that he does not know who was throwing the beige substance at him but imagines it was them, because they work there. (Dkt. No. 81–3, Ex. A.24, ¶¶ 12–15). Plaintiff also admitted under oath that he has no knowledge of who was burning him with laser beams, because he had not seen the lasers or anyone use them. (Dkt. No. 81–3, Ex. A.24,¶¶ 16–19). Plaintiff testified that he never saw anyone throw chemical agents at him, and that he doesn't know who was throwing them, but that he assumes it is Defendants because they work at the facility. (Dkt. No. 81–3, Ex. A.24, ¶¶ 20–25). Similarly, while Plaintiff alleges that Defendants, M. Riley and B. Grant, on August 14th, placed "a strange harmful substance" in his lunch, he stated in his deposition that he never saw either Defendant place anything in his food on the day in question or on any other day for that matter. (Dkt. No. 81–3, Ex. A. 34, ¶¶ 18–20; 35, ¶¶ 7–8).

As the Second Circuit and New York District Courts have steadily recognized, it is utterly unjust to haul people into federal court to defend against, and disprove, delusions. *See, e.g. Pillay v. INS,* 45 F.3d 14, 17 (2nd Cir.1995); *Lewis v. New York,* 547 F.2d 4, 6 (2nd Cir.1976); *Tyler v. Carter,* 151 F.R.D. 537, 540 (S.D.N.Y.1993) (*sua sponte* dismissing complaint alleging conspiracy to enslave and oppress), *affd* 41 F.3d 1500 (2nd Cir.1994). A victimization fantasy, with no existence beyond Plaintiff's

insistence, cannot be allowed to pass review under Fed.R.Civ.P. 56(b). "Genuine issue of material fact" must mean substantially more. Plaintiff admitted under oath that he has no facts nor evidence which states the involvement of any Defendants in somehow infecting him with "infectious harmful chemicals," or laser beams. Plaintiff's complaints are mere surmise and consist of conclusory statements that contain no specific allegations of fact indicating a deprivation of rights. Accordingly, the motion for summary judgment should be granted on this issue.

### Retaliation

Plaintiff has charged that Defendants' actions were in retaliation for him bring lawsuits against other prison employees elsewhere in the New York penal system. The use of "buzz words" such as retaliation do not cure a pleading defect such as the one herein. *See Barr v. Abrams,* 810 F.2d 358, 362 (2d Cir.1986) (the Second Circuit has repeatedly held, "complaints relying on the civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning"); *see also, e.g., Boddiev. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997) ("unsupported, speculative, and conclusory" allegations should be dismissed); *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) ("[c]laims by prisoners that particular administrative decisions have been made for retaliatory purposes are prone to abuse. Virtually every prisoner can assert such a claim as to every decision which he or she dislikes); *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (where allegations of retaliation and conspiracy are "wholly conclusory," the complaint "can be dismissed on the pleadings alone"); *Justice v. Coughlin,* 941 F.Supp. 1312, 1316 (N.D.N.Y.1996) ("In recognition of the reality that retaliation claims can be fabricated easily, [inmates] bear a somewhat heightened burden of proof, and dismissal can be granted if the claim appears insubstantial"). Therefore, Plaintiff's claims based on some retaliatory animus shall be dismissed. *See Iqbal,* 129 S.Ct. at 1948–49.

### Cell Search

Gonzales v. Wright, Not Reported in F.Supp.2d (2010)
Case 9:14-cv-00626-BKS-DEP    Document 86    Filed 02/02/18    Page 293 of 359

2010 WL 681323

**\*13** Plaintiff further alleges that Defendants B. Grant, M. Riley, and M. Welch, under orders from N. Guerin, during a cell search to look for any remaining pieces of a tray broken by the Plaintiff, "did mess up, crush, spoil, destroy" legal documents and scattered shampoo on them as well. On September 8, 2006, Plaintiff alleges he asked Defendants D. Ravelle, Riley, Grant, S. Dumas and Albert for a pen throughout the day. Plaintiff alleges that no one gave Plaintiff a pen in retaliation for Plaintiff's refusal to hand in his empty food tray and, as a consequence, he broke it into pieces. Following Plaintiff's admitted refusal to give back the food tray, Defendant G. Caron and M. Albert asked Plaintiff to exit cell for a cell search. Plaintiff refused. Following his initial refusal, Defendants J. Hyde, G. Caron, S. Dumas, and M. Albert, requested that Plaintiff leave his cell for a cell search, but Plaintiff again admittedly refused. Following the second refusal to exit the cell, M. Tirone and J. Irvin came and asked Plaintiff to exit his cell for a cell search. Plaintiff agreed to do so.

During the ensuing cell search, Plaintiff alleges that Defendants G. Caron, S. Dumas, M. Albert, and an unknown officer, "did mess up, crush, spoil, destroy, and mix" Plaintiff's legal documents, with the consent of J. Hyde.

This aspect of the complaint has two aspects. The first, the legitimacy of the cell search, will not take long to address. Prison officials have every right to search a cell to retrieve broken pieces of a food tray, pieces which could easily be made into some form of a weapon. Plaintiff in this instance was simply removed from his cell while the search ensued.

"The Fourth Amendment proscription against unreasonable searches does not apply within the confines of the prison cell. The recognition of privacy rights for prisoners in their individual cells simply cannot be reconciled with the concept of incarceration and the needs and objectives of penal institutions." *Hudson v. Palmer,* 468 U.S. 517, 526, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984)." No constitutional violation is perceived.

The second aspect of the cell search which must be addressed is Plaintiff's claim regarding the destruction of his legal papers. This claim will not delay the Court long either.

Although Plaintiff claims that the destruction of his papers delayed his legal work, he admits that it had no lasting impact as any deadlines he missed he was able to get extended and was able to submit his legal papers to the court. Hence, as he had no actual injury even if the events as he saw them occurred, he is not entitled to relief on this aspect either. *See Lewis v. Casey,* 518 U.S. 343, 349, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996).

### Conclusion

Accordingly,

**IT IS ORDERED** Defendants' motion for summary judgment be, and the same here by is, **GRANTED.**

This the 22nd day of February, 2010.

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 681323

---

Footnotes

1    The Eleventh Amendment recognizes the fundamental principle of sovereign immunity. Thus, the Eleventh Amendment bars any suit in federal court against a state by citizens of another state. Further, the Supreme Court has held that the amendment also bars a citizen from bringing a suit against his or her own state in federal court. *Hans v. Louisiana,* 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890). Sovereign immunity under the Eleventh Amendment protects state agencies and department sas well as the state itself. As the Supreme Court has noted: "It is clear, of course, that in the absence of consent a suit in which the State or one of its agencies or departments is named as the Defendant is proscribed by the Eleventh Amendment.... This jurisdictional bar applies regardless of the relief sought." *Pennhurst State School & Hospital v. Halderman,* 465 U.S. 89, 100, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). Moreover, "[o]bviously, state officials literally are persons. But a suit against a state official in his official capacity is not a suit against the official but rather is a suit against the official's office. As such, it is no different from a suit against the State itself." *Will v. Michigan Dep't of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989).

2010 WL 681323

As Plaintiff is suing Defendants only in their official capacities, the action would be subject to dismissal on this ground alone. However, Plaintiff's failure to seek relief against Defendants in their individual capacities could be remedied through amendment.

2    Although named as a Defendant, D. Ravelle has never been served with process or appeared in this action. By separate order, Plaintiff will be required to show cause why this action should not be dismissed as to this Defendant pursuant to Fed.R.Civ.P. 4(m).

3    Additionally, though not in his complaint, Plaintiff also alleges that as a part of this conspiracy laser beams were shot at him through the lights in his cell. (Dkt. No. 81–3, Ex. A, 14.)

4    Had this matter been before the Court on a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), the teachings of *Ashcroft v. Iqbal,* ––– U.S. ––––, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009), would guide this Court. There, the Supreme Court wrote:

We turn to respondent's complaint. Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." As the Court held in *Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929, the pleading standard Rule 8 announces does not require "detailed factual allegations," but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation. *Id.,* at 555, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (citing *Papasan v. Allain,* 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986)). A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." 550 U.S., at 555, 127 S.Ct. 1955, 167 L.Ed.2d 929. Nor does a complaint suffice if it tenders "naked assertion[s]" devoid of "further factual enhancement." *Id.,* at 557, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929.

To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Id.,* at 570, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.,* at 556, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. *Ibid.* Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.' " *Id.,* at 557, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (brackets omitted).

*Id.* at 1949.

The undersigned strongly believes that Plaintiff's complaint would not survive under this standard either.

---

**End of Document**                                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 1135934
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Ronald LOADHOLT, Plaintiff,

v.

William LAPE, Superintendent of Coxsackie
Corr. Facility; Dr. Miller, Facility Health Services
Director; K. Cavanaugh, Psychological Services
Unit Chief; McDermott, Lieutenant; Dr. Schlenger,
Dental Health Services; J. Smith, Deputy
Superintendent of Health Services, Defendants.

Civ. No. 9:09–CV–0658 (LEK/RFT).
|
March 3, 2011.

**Attorneys and Law Firms**

Ronald Loadholt, Hempstead, NY, pro se.

Hon. Eric T. Schneiderman, New York State Attorney General, Cathy Y. Sheehan, Esq., Richard Lombardo, Esq., Assistant Attorney Generals, of Counsel, Albany, NY, for Defendants.

***REPORT–RECOMMENDATION and ORDER***

RANDOLPH E. TREECE, United States Magistrate Judge.

**\*1** *Pro se* Plaintiff Ronald Loadholt filed this civil rights action, pursuant to 42 U.S.C. § 1983, alleging that the Defendants violated his constitutional rights under the Eighth and Fourteenth Amendments. Dkt. No. 9, Second Am. Compl. Defendants bring a Motion to Dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), Dkt. No. 28, which Plaintiff opposes, Dkt. No. 36. For the reasons that follow, we recommend that Defendants' Motion be **granted** and Plaintiff's Second Amended Complaint be dismissed in its entirety.

## I. BACKGROUND

Plaintiff initiated this action on June 8, 2009, while an inmate at Coxsackie Correctional Facility, with the filing of a civil rights Complaint. *See* Dkt. No. 1. The Honorable Lawrence E. Kahn, Senior United States District Judge, found that both Plaintiff's Complaint and his subsequent Amended Complaint (Dkt. No. 7) could not proceed as drafted, but permitted Plaintiff, in light of his *pro se* status, the opportunity to amend his pleadings to cure various deficiencies therein. *See* Dkt. Nos. 6, Order, dated Aug. 12, 2009 & 8, Order, dated Sept. 29, 2009. In accordance with those Orders, Plaintiff filed his Second Amended Complaint with this Court on October 10, 2009. Dkt. No. 9.

On a motion to dismiss, the allegations of the complaint must be accepted as true. *See Cruz v. Beto,* 405 U.S. 319, 322 (1972). In light of the terse, sparse, and vague claims in Plaintiff's Second Amended Complaint, we now restate the allegations in full and verbatim:

> defendant McDermott refuse to give Plaintiff hearing assistance Plaintiff is Learning disable and refuse OMH testment of Plaintiff mental illness Dates 10/20/08, 12/5/08, 10/23/08 causing Plaintiff to lose freedom

> defendant K cavanaugh no Psychological crisis treatment or suicide prevention when Plaintiff stop eat And drink lost alot of weight pacing not sleeping, or showering Date 12–23–08 to 1–5–09 causing Plaintiff Mental condition to get even more bad coming close to dead phyical pain,

> defendant: Dr: Schlenger no dental services for tooth pain from 10–3–09 to 2–3–09 [1] wait at coxsaxie receive no dental services causing Plaintiff more pain and lost of tooth

> defendant: J SMITH refuse to remove Plaintiff from RMV and place (Plaintiff) in hospital after lose alot of weight to be force feeded Date 12–21–09 to 1–05–09 [2] causing mental and phyical pain

> defendant: William Lape

> not given Plaintiff hearing, or grievance or legal assistance from 10–20–08 to 2–3–09 causing mental and phyical pain

> defendant Dr Miller allow mental ill patients to lose alot of weight 12–23–08 to 1–5–09 place plaintiff on 3 floor and not on flat 10–5–09–2–2–09 [3] not

2011 WL 1135934

give better pain medical, cane, mattress, pillow, no medical accomodational better shoe's etc.

Second Am. Compl. at pp. 5–7.

## II. DISCUSSION

### A. Standard of Review

On a motion to dismiss, the allegations of the complaint must be accepted as true. *See Cruz v. Beto,* 405 U.S. 319, 322 (1972). The trial court's function "is merely to assess the legal feasability of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Geisler v. Petrocelli,* 616 F.2d 636, 639 (2d Cir.1980). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974) (*overruled on other grounds by Davis v. Scherer,* 468 U.S. 183 (1984)).

 **\*2** "Generally, in determining a 12(b)(6) motion, the court may only consider those matters alleged in the complaint, documents attached to the complaint, and matters to which the court may take judicial notice." *Spence v. Senkowski,* 1997 WL 394667, at \*2 (N .D.N.Y. July 3, 1997) (citing *Kramer v. Time Warner Inc.,* 937 F.2d 767, 773 (2d Cir.1991)). Moreover, "even if not attached or incorporated by reference, a document 'upon which [the complaint] *solely* relies and which is *integral to the complaint'* may be considered by the court in ruling on such a motion." *Roth v. Jennings,* 489 F.3d 499, 509 (2d Cir.2007) (emphasis in original) (quoting *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47 (2d Cir.1991)).

The court is bound to give the plaintiff the benefit of every reasonable inference to be drawn from the "well-pleaded" allegations of the complaint. *See Retail Clerks Intern. Ass'n, Local 1625, AFL–CIO v. Schermerhorn,* 373 U.S. 746, 754 n. 6 (1963); *see also Arar v. Ashcroft,* 532 F.3d 157, 168 (2d Cir.2008). Nevertheless, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal,* —— U.S. ——, 129 S.Ct. 1937, 1949 (2009). Therefore, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citation omitted).

A motion to dismiss pursuant to Rule 12(b)(6) may not be granted so long as the plaintiff's complaint includes "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007); *Ashcroft v. Iqbal,* —— U.S. ——, 129 S.Ct. at 1960 (citing *Twombly* ). [4] "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* —— U.S. ——, 129 S.Ct. at 1949. This plausibility standard "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* Thus, in spite of the deference the court is bound to give to the plaintiff's allegations, it is not proper for the court to assume that "the [plaintiff] can prove facts [which he or she] has not alleged, or that the defendants have violated the ... laws in ways that have not been alleged." *Assoc. Gen. Contractors of California, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 526 (1983). The process of determining whether a plaintiff has "nudged [his] claims ... across the line from conceivable to plausible," entails a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal,* —— U.S. ——, 129 S.Ct. at 1950–51.

With this standard in tow, we consider the plausibility of Plaintiff's Second Amended Complaint.

### B. Eighth Amendment

 **\*3** Plaintiff claims, albeit in a quite cursory manner, that the Defendants violated his constitutional rights under the Eighth Amendment by their deliberate indifference to his medical needs and by subjecting him to harsh and atypical prison conditions.

To state a claim under § 1983 for deprivation of medical treatment in violation of the Eighth Amendment, a plaintiff must show that the defendant acted with "deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 104 (1976). Thus, "[t]he deliberate indifference standard embodies both an objective and a subjective prong." *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994), *cert. denied,* 513 U.S. 1154 (1995). Under the objective prong, the alleged medical need must be "sufficiently serious." *Id.; Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998).

2011 WL 1135934

Under the subjective component, the plaintiff must demonstrate that the defendants acted with "a sufficiently culpable state of mind." *Hathaway v. Coughlin,* 37 F.3d at 66. This standard must be met for each claim against each individual Defendant in this action.

### 1. Defendant Cavanaugh

Plaintiff alleges that Defendant Cavanaugh did not provide "psychological crisis treatment or suicide prevention" after Plaintiff stopped eating, drinking, sleeping, or showering. Second Am. Compl. at p. 5. In accordance with the deliberate indifference standard, we will delve into Plaintiff's allegation to determine if this statement—Plaintiff's only mention of Defendant Cavanaugh—is enough to implicate both an objective substantial risk of serious harm and a sufficiently culpable state of mind.

"A serious medical condition must be 'a condition of urgency, one that may produce death, degeneration, or extreme pain.' " *Osacio v. Greene,* 2009 WL 3698382, at *4 (N.D.N.Y. Nov. 2, 2009) (quoting *Hathaway v. Coughlin,* 37 F.3d at 66). "Factors that have been considered in determining whether a condition is serious include '[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain.' " *Id.* (quoting *Chance v. Armstrong,* 143 F.3d at 702) (other citations omitted). The "factors listed above, while not the only ones that might be considered, are without a doubt highly relevant to the inquiry into whether a given medical condition is a serious one." *Chance v. Armstrong,* 143 F.3d at 703.

Here, the question is whether the deprivation of psychological treatment or suicide prevention procedures triggers an objectively serious risk of harm within the context of the Eighth Amendment. Taking the Plaintiff's claims as true, it appears he had a need for mental health services that went unmet. This Court, in accord with multiple decisions in this Circuit, recognizes that allegations of mental illness, especially when accompanied with suicidal ideation, state a plausible claim that Plaintiff's mental health needs were sufficiently serious. *See, e.g., Allah v. Kemp,* 2010 WL 1036802, at *6, n. 9 (N.D.N.Y. Feb. 25, 2010) (finding the failure to provide plaintiff with a mental health evaluation, notwithstanding

his attempted suicide three days earlier, was enough to meet the "sufficiently serious" standard); *Hamilton v. Smith,* 2009 WL 3199531, at *14 (N.D.N.Y. Jan. 13, 2009) (finding plaintiff's claimed history of suicidal thoughts sufficient to raise a question of fact as to serious medical need); *Covington v. Westchester Cnty. Dept. of Corrs.,* 2010 WL 572125, at *6 (S.D.N.Y. Jan. 25, 2010) (citing cases where courts have found that depression with suicidal ideation, or severe anxiety attacks, are sufficiently severe conditions to meet the objective prong of deliberate indifference); *see also Zimmerman v. Burge,* 2009 WL 3111429, at *8 (N.D.N.Y. Sept. 24, 2009) (reviewing published case law discussing whether depression either with or without suicidal ideation is a "sufficiently serious" medical condition). Therefore, Plaintiff's statement pertaining to Defendant Cavanaugh, though brief, is enough to satisfy the objective prong of the deliberate indifference standard.

**\*4** Regarding the subjective component, however, Plaintiff does not allege that Defendant Cavanaugh denied him medical services with any ill state of mind, or even that Cavanaugh was aware of the substantial medical risk. An official acts with the requisite deliberate indifference when that official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan,* 511 U.S. 825, 837 (1994).

Upon reading Plaintiff's Second Amended Complaint liberally, as well as his Opposition to Defendants' Motion to Dismiss, Dkt. No. 36, we conclude that Plaintiff makes no allegation as to Cavanaugh's awareness of Plaintiff's serious health risk. Thus, while mental illness and corresponding suicidal tendencies left untreated can be sufficiently serious to reach an Eighth Amendment claim, there are no facts in Plaintiff's pleading to allow this court to infer, let alone find, that Defendant Cavanaugh possessed the culpable state of mind required to allege deliberate indifference to a medical need. Accordingly, we recommend Plaintiff's claim against Defendant Cavanaugh be **dismissed.**

### 2. Defendant Miller

Plaintiff additionally alleges Eighth Amendment violations against Defendant Miller, who, according to the best interpretation this Court can muster, violated

Plaintiff's constitutional rights by allowing him to lose weight and by failing to give Plaintiff "better pain medica[tion], cane, mattress, pillow ... better shoes," and by placing Plaintiff on "3 floor and not on flat." Second Am. Compl. at p. 7.

This claim against Defendant Miller also fails to allege facts sufficient to survive Defendants' 12(b)(6) Motion to Dismiss. As with Defendant Cavanaugh, Plaintiff does not make any mention that Defendant Miller was aware of any serious risk to the Plaintiff, let alone that he acted with the requisite wantonness. Therefore, Plaintiff cannot claim Miller was deliberately indifferent to his medical needs.

Furthermore, to the extent that Plaintiff is claiming that the conditions of his confinement constituted cruel and unusual punishment in violation of the Eighth Amendment, this claim also falls short. In the context of an Eighth Amendment claim based on prison conditions, the prisoner must demonstrate that the deprivation is objectively sufficiently serious such that the plaintiff was "den[ied] the minimal civilized measure of life's necessities," and that the prison officials subjectively "knew of and disregarded an excessive risk to inmate health or safety." *Branham v. Meachum,* 77 F.3d 626, 630–31 (2d Cir.1996) (internal citations omitted).

Turning to the objective analysis, Plaintiff's allegations do not trigger the conclusion that Plaintiff was denied the minimal civilized measure of life's necessities, as the Constitution "does not mandate comfortable prisons," *Rhodes v. Chapman,* 452 U.S. 337, 349 (1981), but instead only requires that inmates not be deprived of their "basic human needs—*e.g.,* food, clothing, shelter, medical care, and reasonable safety," *Helling v. McKinney,* 509 U.S. 25, 32 (1993) (citation omitted). In accord, courts in this Circuit have found the deprivations of better pain medicine, a cane, a mattress, a pillow, or "better shoes," as the Plaintiff has alleged, do not meet, neither singularly nor collectively, the objective standard under the Eighth Amendment.[5] However, it is more complete to say that Plaintiff's failure to allege any facts indicating that Defendant Miller acted, or did not act, with a wanton state of mind, forecloses any colorable allegation that he was denied his constitutional rights under the Eighth Amendment regarding prison conditions. *See Vaughan v. Erno,* 8 F. App'x 145, 146–47 (2d Cir.2001) (finding complained conditions of confinement did not constitute

an Eighth Amendment violation because plaintiff failed to show defendants acted with deliberate indifference, even assuming that he sufficiently alleged a serious harm); *Carr v. Canty,* 2011 WL 309667, at *2 (S.D.N.Y. Jan. 19, 2011) (finding a plaintiff did not satisfy the deliberate indifference requirement of an Eighth Amendment claim regarding conditions of confinement because defendants responded to complaints of a wet and slippery floor "albeit, not in the manner in which [plaintiff] preferred" and took action to cover the water); *Hughes v. Butt,* 2009 WL 3122952, at *10 (N.D.N.Y. Sept. 28, 2009) (concluding that a defendant, who the plaintiff did not allege to have any visual indication or awareness that plaintiff needed a cane, back brace, or knee brace, did not act deliberately indifferent towards plaintiff); *Savage v. Brue,* 2007 WL 3047110, at *9 (N.D.N.Y. Oct. 18, 2007) (finding a nurse, who refused pain medication to an inmate confined in a special housing unit for forty-eight (48) hours with no mattress and back and neck pain due to a recent injury and who advised the inmate that he would need to "adjust to it," to be possibly negligent in her care, but not deliberately indifferent). Therefore, we recommend Plaintiff's claim against Defendant Miller be **dismissed.**

### 3. Defendant Schlenger

**\*5** Plaintiff also claims that Defendant Schlenger, presumably in his position as a doctor of dental health at Coxsackie, did not give Plaintiff "dental services for tooth pain from 10–3–09 to 2–3–09 ... causing Plaintiff more pain and los[s] of tooth." Second Am. Compl. at p. 6.

"Dental conditions, like other medical conditions, may be of varying severity." *Chance v. Armstrong,* 143 F.3d at 702. Thus, the constitutionality of a decision to leave a dental condition untreated will depend on the facts of the particular case. *Harrison v. Barkley,* 219 F.3d 132, 137–38 (2d Cir.2000). The Second Circuit has held, in the context of failing to treat a dental injury, that a "serious medical condition exists where 'the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain.' " *Id.* at 136 (finding that while a tooth cavity is not strictly a serious medical condition, it is a degenerative condition which "is likely to produce agony and to require more invasive and painful treatments" if left untreated) (quoting *Chance v. Armstrong,* 143 F.3d at 702).

2011 WL 1135934

However, Plaintiff does not allege any facts regarding any particular type of oral injury or condition that would aid this Court in its 12(b)(6) inquiry, but rather only "tooth pain," which eventually led to the loss of the tooth. Plaintiff also alleges no facts to suggest that Defendant Schlenger or anyone else should have been aware of his tooth pain. [6] This claim against Defendant Schlenger is utterly bereft of factual allegations which would allow for the Court to deduce the plausibility of a cognizable cause of action, *Ashcroft v. Iqbal,* ––– U.S. ––––, 129 S.Ct.1937, 1949 & 1960 (2009), or which would permit a defendant "to have a fair understanding of what the plaintiff is complaining about and to know whether there is a legal basis for recovery," *Ricciuti v. New York City Transit Auth.,* 941 F.2d 119, 123 (2d Cir.1991). Thus, because this claim is without factual allegations setting forth that Defendant Schlenger violated Plaintiff's constitutional rights, we recommend that this claim be **dismissed.**

### 4. Defendant Smith

Lastly, Plaintiff alleges that Defendant Smith, Deputy of Health Services, violated his rights under the Eighth Amendment by refusing to place him in a hospital after Plaintiff lost a lot of weight, resulting in "mental and physical pain." Second Am. Compl. at pp. 3 & 6.

In this case, unlike with Plaintiff's allegations against any of the previously considered Defendants, Plaintiff claims that "Smith refuse[d]" to act, which led to the alleged constitutional violation. As this Court is charged with the mandate of construing Plaintiff's claims leniently, we are willing to impute from the use of the word "refuse" enough to satisfy the wanton state of mind requirement of deliberate indifference. In order to "refuse" or decline to do something, one must necessarily be aware of the request or the issue, and subsequently choose not to act, implicating that Defendant Smith acted, or did not act, with a culpable mind set of more than mere negligence. Thus, Plaintiff has alleged enough, in this case, to satisfy the subjective prong of Eighth Amendment deliberate indifference.

**\*6** Regardless, Plaintiff's claim must fail, as he does not allege a sufficiently serious injury or risk of injury. He claims that Defendant Smith failed to place Plaintiff in a hospital due to Plaintiff's loss of weight. Plaintiff does not allege how much weight he lost, if that weight loss was dangerous to his health, or why he lost the

weight. [7] Notably, Plaintiff also does not state why hospitalization was warranted or necessary to remedy this weight loss, as opposed to another form of treatment. *See O'Connor v. McArdle,* 2006 WL 436091, at *5 ("It is well-established that mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, that fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation."). Therefore, there are no allegations in the pleading to "conclude that [P]laintiff's ... weight loss concerns represented a condition of urgency or resulted in degeneration or extreme pain sufficient to implicate an Eighth Amendment violation." *Evans v. Albany Cnty. Corr. Facility,* 2009 WL 1401645, at *10 (N.D.N.Y. May 14, 2009) (quoting *Bost v. Bockelmann,* 2007 WL 527320, at *8 (N.D.N.Y. Feb. 20, 2007)). Thus, while Plaintiff has alleged enough to satisfy the subjective prong of the Eighth Amendment deliberate indifference standard, his failure to allege a sufficiently serious medical condition means this claim should be **dismissed.**

### C. Due Process

While not explicitly stated in Plaintiff's pleadings, this Court concludes that, by liberally construing Plaintiff's Second Amended Complaint, some of his allegations concern a violation of his rights under the Due Process clause of the Fourteenth Amendment. Specifically, Plaintiff complains that Defendants Lape and McDermott acted in such a way that they violated his right to procedural due process. We will examine the claims against each Defendant *seriatim.*

### 1. Defendant Lape

Plaintiff claims, in cursory fashion, that Defendant Lape, who Plaintiff describes as the "superintendent" of Coxsackie, did "not give[ ] Plaintiff hearing, or grievance or legal assistance from 10–20–08 to 2–3–09 causing mental and physical pain." Second. Am. Compl. at pp. 1 & 6.

It is well-settled that the personal involvement of a defendant is a prerequisite for the assessment of damages in a § 1983 action. *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977). Furthermore, the doctrine of *respondeat superior* is inapplicable to § 1983 claims. *See Polk County v. Dodson,* 454 U .S. 312, 325 (1981) (internal

2011 WL 1135934

citations omitted); *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995). Thus, a defendant may not be liable for damages simply by virtue of holding a supervisory position, without more. *See, e.g., Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). Rather, the personal involvement of a supervisory defendant may be shown by evidence that:

> **\*7** (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d at 873.

Plaintiff does not explain what Defendant Lape purportedly did to deny Plaintiff of assistance in any hearing or grievance process, nor suggest facts that Lape himself was involved in any way in any constitutional violation. Rather, Plaintiff appears to be bringing legal action against Lape due to his supervisory position only. Because the "proper focus is the [D]efendant's direct participation in, and connection to, the constitutional deprivation," *McClary v. Coughlin,* 87 F.Supp.2d 205, 215 (W.D .N.Y.2000), and because one cannot be liable solely from holding a supervisory position, we find Plaintiff's claim against Defendant Lape should be **dismissed** for lack of personal involvement.

*2. Defendant McDermott*

Liberally construed, Plaintiff claims that Defendant McDermott refused to give Plaintiff "hearing assistance" or allow the Office of Mental Health to testify that Plaintiff is "learning disable[d]" and has a mental illness, which caused the Plaintiff to "lose freedom." Second Am. Compl. at p. 5.

In order to state a procedural due process claim pursuant to the Fourteenth Amendment, an inmate must show that he possessed an actual liberty or property interest, and that he was deprived of that interest without sufficient process. *See Shakur v. Selsky,* 391 F.3d 106, 118 (2d Cir.2004). Inmates' liberty interests are typically derived from two sources: the Due Process Clause of the Fourteenth Amendment, and state statute or regulations. *Arce v. Walker,* 139 F.3d 329, 333 (2d Cir.1998) (citing *Kentucky Dep't of Corr. v. Thompson,* 490 U.S. 454, 460 (1989)). With regard to liberty interests arising directly under the Due Process Clause, the Supreme Court has "narrowly circumscribed its scope to protect no more than the 'most basic liberty interests in prisoners.' " *Id.* (quoting *Hewitt v. Helms,* 459 U.S. 460, 467 (1983)). With regard to State created liberty interests, the Supreme Court held in *Sandin v. Conner* that state created liberty interests shall be limited to those deprivations which subject a prisoner to "atypical and significant hardship ... in relation to the ordinary incidents of prison life." 515 U.S. 472, 484 (1995).

Here, Plaintiff has not alleged enough facts to indicate a viable Due Process violation under the Constitution. He argues, in effect, that he did not receive a meaningful hearing because Defendant McDermott denied Plaintiff assistance in some unidentified hearing. The only liberty interest that Plaintiff alleged to have lost was the loss of freedom. *See* Second Am. Compl. at p. 5. Without specifics about the nature and conditions of the alleged loss of freedom, Plaintiff does not state an "atypical and significant hardship ... to which the conditions of the disciplinary segregation differ from other routine prison conditions and the duration of the disciplinary segregation compared to discretionary confinement." *Shuler v. Brown,* 2009 WL 790973, at \*7 (N.D.N.Y. Mar. 23, 2009) (quoting *Palmer v. Richards,* 364 F.3d 60, 64 (2d Cir.2004)). The loss of freedom, inherent in the "ordinary incidents of prison life," *Sandin v. Conner,* 515 U.S. at 483–86, does not constitute, without alleging more, an atypical and significant hardship on an inmate. Nor has he shown a deprivation of liberty under the Due Process Clause. Furthermore, this statement is devoid of any factual allegation that this Court could examine to determine if the procedure provided by the State to Plaintiff was in fact insufficient, or what the deprivation exactly was. Plaintiff does not specify what hearing or hearings he is

referring to, or even what the hearings were regarding. Therefore, because Plaintiff's naked assertions do not rise to the pleading standards required to withstand a Motion to Dismiss under Rule 12(b) (6), we recommend that the claim against Defendant McDermott be **dismissed.**

### D. Americans with Disability Act

**\*8** In his Second Amended Complaint, Plaintiff states that he has a cause of action under the Americans with Disability Act ("ADA"). Second Am. Compl. at p. 7. This claim is not supported with any facts, nor the names of the parties it is purportedly directed. Besides previously stating, with relation to his claims against Defendant McDermott, that he suffers from some type of learning disability, Plaintiff does not specifically allege what disability he suffers from, nor what he was denied. Furthermore, Plaintiff does not allege under which Title of the ADA he is suing under. Thus, for the preceding reasons and because the Plaintiff states no facts, allegations, nor specific discussion of this claim, we find that to the extent that Plaintiff is attempting to assert a claim under the ADA against any individual Defendant, the claim should be **dismissed.**

### III. CONCLUSION

While this Court recognizes the Second Circuit's preference to provide *pro se* plaintiffs with leave to amend their pleadings prior to dismissal, Loadholt has already been afforded two opportunities to amend his Complaint.

For the reasons stated herein, it is hereby

**RECOMMENDED,** that the Defendants' Motion to Dismiss (Dkt. No. 28) be **GRANTED** and Plaintiff's Second Amended Complaint (Dkt. No. 9) be **DISMISSED;** and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report–Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW. Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs .,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72, 6(a), & 6(e).

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 1135934

Footnotes

1    Without additional supporting facts or clarification, this Court is unsure whether Plaintiff means to claim the pertinent dates were from February 3, 2009 until October 3, 2009, and simply stated in reverse, or rather from October 3, 2008 until February 3, 2009, and simply inserted a typographical error. Regardless, ambiguity on the stated dates does not change this Court's analysis.

2    *See supra* note 1.

3    *See supra* note 1.

4    By its opinion in *Bell Atl. Corp. v. Twombly* and then again in *Ashcroft v. Iqbal,* the Supreme Court abrogated the often-cited language of *Conley v. Gibson* "that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Bell Atl. Corp. v. Twombly,* 550 U.S. 561 (2007) (quoting *Conley,* 355 U.S. 41, 45–46 (1957)). In so doing, the Court found that *Conley* "described the breadth of opportunity to prove what an adequate complaint claims, not the minimum standard of adequate pleading to govern a complaint's survival." *Id.* at 563.

5    *See Brown v. Eagen,* 2009 WL 815724, at \*9 (N.D.N.Y. Mar. 26, 2009) (stating that the prison officials have the broad discretion to determine the nature and character of the medical treatment afforded to inmates, as "[a]n inmate does not have the right to treatment of his choice") (citing, *inter alia, Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986)); *Williams v. Perlman,* 2009 WL 1652193, at \*6–7 (N.D.N.Y. Feb. 5, 2009) (finding a prisoner who specifically complained that his orthopedic shoes created "intense pain on [his] toes and arches" and caused him to develop painful callouses which

needed to be "lanced from [his] feet" did not adequately suggest in his complaint that his foot, ankle, or arch condition presented an issue of degeneration or extreme pain); *Borges v. McGinnis,* 2007 WL 1232227, at *4–6 (W.D .N.Y. Apr. 26, 2007) (find that an inmate given only a paper gown, slippers, a thin mattress, and no blanket, while confined for three days in a room with an open window that reduced the temperature to approximately 50 degrees, failed to meet the objective element of an Eighth Amendment violation); *Bell v. Artuz,* 1999 WL 253607, at *3–4 (S.D.N.Y. Apr. 29, 1999) (noting that no Eighth Amendment claim is implicated where prisoner alleges no pillows, a lack of space in double-occupancy cell, poor ventilation, asbestos on catwalk behind cells, no bacterial soap, and insufficient lighting); *Veloz v. New York,* 35 F.Supp.2d 305, 309 & 312 (S.D.N.Y.1999) (stating prisoner's foot condition, which involved increasing pain and required surgery, was not sufficiently serious); *Alston v. Howard,* 925 F.Supp. 1034, 1040 (S.D.N.Y.1996) (finding prisoner's ankle condition and resulting foot pain requiring the use of special footwear was not sufficiently serious).

6    Curiously, in opposing Defendants' request for dismissal, Plaintiff fails to mention Defendant Schlenger or allegations of facts supporting his claim of tooth pain, though he references his various other claims. *See* Dkt. No. 36.

7    The Court notes that Plaintiff mentions he "stop[ped] eat[ing] and drink[ing] lost alot [sic] of weight" in relation to a claim separate from his claim against Defendant Smith. Second Am. Compl. at p. 5.

---

**End of Document**                                      © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2009 WL 9054936
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Nicholas ZIMMERMAN, Plaintiff,

v.

John W. BURGE, et al., Defendants.

No. 9:06–CV–0176 (GLS/GHL).
|
April 20, 2009.

**Attorneys and Law Firms**

Nicholas Zimmerman, Auburn, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General for the State of New York, Heather R. Rubinstein, Esq., of Counsel: Syracuse, NY, for Defendants.

*REPORT–RECOMMENDATION*

GEORGE H. LOWE, United States Magistrate Judge.

**\*1** This *pro se* prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has been referred to me for Report and Recommendation by the Honorable Gary L. Sharpe, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). Plaintiff Nicholas Zimmerman alleges that Defendants Joe Wolczyk, Donald Selsky, Captain Rourke, Harold Graham, and Thomas Eagen [1] violated his Eighth Amendment rights by sentencing him to ten years of solitary confinement in the Special Housing Unit ("SITU") and refusing to allow him to participate in the Intermediate Care Program [2]. Currently pending before the Court is Defendants' partial motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. (Dkt. No. 42.)Defendants seek dismissal of (1) Plaintiff's claims against Defendants in their official capacities; and (2) Plaintiff's Eighth Amendment medical care claim. Defendants do not seek dismissal of Plaintiff's Eighth Amendment claim regarding his ten-year SITU confinement. For the reasons that follow, I recommend that Defendants' motion be granted.

**I. BACKGROUND**

**A. Summary of Plaintiff's Complaint**

Plaintiff's complaint is quite cursory. Regarding his Eighth Amendment medical care claim, Plaintiff alleges that:

> On October 25, 2005, Defendant[ ] Captain Rourke violated Plaintiff's Eighth Amendment rights to adequate medical care by refusing to allow Plaintiff to seek mental health by participating in the Intermediate Care Program.

> On November 10, 2005, Defendant Superintendent Graham violated Plaintiff's Eighth Amendment rights to adequate medical care by affirming Captain Rourke's decision to deny Plaintiff's admittance to the Intermediate Care Program.

> On December 14, 2005, Defendant Thomas Eagen violated Plaintiff's rights to adequate medical care by affirming Superintendent Graham's decision to deny Plaintiff's admittance to the Intermediate Care Program.

(Dkt. No. 1 at 5, ¶¶ 16–18.)

Plaintiff sues Defendants "in their individual capacities and in their official capacities as officials of the New York State Department of Corrections."(Dkt. No. 1 at 2.)

In his prayer for relief Plaintiff requests (1) a declaration that Defendants violated Plaintiff's constitutional rights; (2) an injunction requiring Defendants to place Plaintiff in the Intermediate Care Program; (3) the reversal and expungement or reduction of Plaintiff's ten-year SITU sentence; (4) $1 million in compensatory damages; (5) $200,000 in punitive damages from each Defendant; and (6) costs and attorney fees. (Dkt. No. 1 at 8.)

**B. Summary of Grounds in Support of Defendants' Motion**

Defendants argue that (1) the Eleventh Amendment bars Plaintiff's claims against Defendants in their official capacities; (2) Plaintiff does not allege sufficient personal involvement on the part of Defendants Rourke, Graham, or Eagen; (3) Plaintiff cannot prevail on his Eighth Amendment medical care claim because Defendants were not deliberately indifferent to a serious medical need; and (4) Defendants are entitled to qualified immunity. (Dkt. No. 42–4.)

**C. Summary of Plaintiff's Response to Defendants' Arguments**

2009 WL 9054936

**\*2** In response, Plaintiff argues that (1) even if the Eleventh Amendment bars his claims against Defendant in their official capacities, he has also sued them in their individual capacities; (2) Defendants were personally involved because they failed to remedy a wrong after learning of it; (3) Plaintiff suffered from depression and suicidal tendencies and Defendants' refusal to allow him to participate in the Intermediate Care Program constituted deliberate indifference; and (4) Defendants are not entitled to qualified immunity. (Dkt. No. 43.)

## II. APPLICABLE LEGAL STANDARDS

### A. Legal Standard Governing Motions for Summary Judgment

Under *Federal Rule of Civil Procedure 56*, summary judgment is warranted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."*Fed.R.Civ.P. 56(c)*. The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. *Major League Baseball Properties, Inc. v. Salvino,* 542 F.3d 290, 309 (2d Cir.2008). Only after the moving party has met this burden is the non-moving party required to produce evidence demonstrating that genuine issues of material fact exist.*Salahuddin v. Goord,* 467 F.3d 263, 272–73 (2d Cir.2006). The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." [3] Rather, "[a] dispute regarding a material fact is *genuine* if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." [4] In determining whether a genuine issue of material [5] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. [6]

### B. Legal Standard Governing Motion to Dismiss for Failure to State a Claim

To the extent that a defendant's motion for summary judgment under *Federal Rule of Civil Procedure 56* is based entirely on the plaintiff's complaint, such a motion is functionally the same as a motion to dismiss for failure to state a claim under *Federal Rule of Civil Procedure 12(b)(6)*. As a result, "[w]here appropriate, a trial judge may

dismiss for failure to state a cause of action upon motion for summary judgment."*Schwartz v. Compagnie General Transatlantique,* 405 F.2d 270, 273–74 (2d Cir.1968) [citations omitted]; *accord, Katz v. Molic,* 128 F.R.D. 35, 37–38 (S.D.N.Y.1989) ("This Court finds that ... a conversion [of a *Rule 56* summary judgment motion to a *Rule 12(b)(6)* motion to dismiss the complaint] is proper with or without notice to the parties."). Moreover, even where a defendant has not advanced such a failure-to-state-a-claim argument on a motion for summary judgment, a district court may, *sua sponte,* address whether a *pro se* prisoner has failed to state a claim upon which relief may be granted. [7] For these reasons, it is appropriate to briefly summarize the recently clarified legal standard governing *Federal Rule of Civil Procedure 12(b)(6)* motions to dismiss.

**\*3** Under *Federal Rule of Civil Procedure 12(b)(6)*, a defendant may move to dismiss a complaint for "failure to state a claim upon which relief can be granted."*Fed.R.Civ.P. 12(b)(6)*. It has long been understood that a defendant may base such a motion on either or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under *Federal Rule of Civil Procedure 8(a)(2)*; [8] or (2) a challenge to the legal cognizability of the claim. [9]

*Rule 8(a)(2)* requires that a pleading contain "a short and plain statement of the claim *showing* that the pleader is entitled to relief."*Fed.R.Civ.P. 8(a)*(2) [emphasis added]. By requiring this "showing," *Rule 8(a)(2)* requires that the pleading contain a short and plain statement that "give[s] the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." [10] The main purpose of this rule is to "facilitate a proper decision on the merits." [11] A complaint that fails to comply with this rule "presents far too heavy a burden in terms of defendants' duty to shape a comprehensive defense and provides no meaningful basis for the Court to assess the sufficiency of [plaintiff's] claims." [12]

The Supreme Court has long characterized this pleading requirement under *Rule 8(a)(2)* as "simplified" and "liberal," and has repeatedly rejected judicially established pleading requirements that exceed this liberal requirement. [13] However, it is well established that even this liberal notice pleading standard "has its limits." [14] As a result, several Supreme Court and Second Circuit decisions exist, holding that a pleading has failed to meet this liberal notice pleading standard. [15]

Most notably, in *Bell Atlantic Corporation v. Twombly,* the Supreme Court, in reversing an appellate decision holding that a complaint had stated an actionable antitrust claim under 15 U.S.C. § 1, "retire[d]" the famous statement by the Court in *Conley v. Gibson,* 355 U.S. 41, 45–46 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."127 S.Ct. 1955, 1968–69 [16] (2007). [17] Rather than turning on the *conceivability* of an actionable claim, the Court clarified, the Rule 8 "fair notice" standard turns on the *plausibility* of an actionable claim. *Id.* at 1965–74.

More specifically, the Court reasoned that, by requiring that a pleading "show [ ] that the pleader is entitled to relief,"Rule 8(a)(2) requires that the pleading give the defendant "fair notice" of (1) the nature of the claim and (2) the "grounds" on which the claim rests. *Id.* at 1965, n. 3 [citation omitted]. While this does not mean that a pleading need "set out in detail the facts upon which [the claim is based]," it does mean that the pleading must contain at least "some factual allegation[s]." *Id* .[citations omitted]. More specifically, the "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]," assuming (of course) that all the allegations in the complaint are true. *Id.* at 1965 [citations omitted]. What this means, on a practical level, is that there must be "plausible grounds to infer [actionable conduct]," or, in other words, "enough fact to raise a reasonable expectation that discovery will reveal evidence of [actionable conduct]."*Id* .

**\*4** As have other Circuits, the Second Circuit has repeatedly recognized that the clarified plausibility standard that was articulated by the Supreme Court in *Bell Atlantic* governs *all* claims, not merely antitrust claims brought under 15 U.S.C. § 1 (as were the claims in *Bell Atlantic* ). [18] The Second Circuit has also recognized that this *plausibility* standard governs claims brought even by *pro se* litigants (although the plausibility of those claims is be assessed generously, in light of the special solicitude normally afforded *pro se* litigants). [19]

It should be emphasized that Rule 8's plausibly standard, explained in *Bell Atlantic,* was in no way retracted or diminished by the Supreme Court's decision (two weeks later) in *Erickson v. Pardus,* in which the Court stated, "Specific facts are not necessary" to successfully state a claim under Rule 8(a) (2).*Erickson v. Pardus,* 127 S.Ct. 2197, 2200 (2007) [citation omitted]. That statement was merely an abbreviation

of the often-repeated point of law-first offered in *Conley* and repeated in *Bell Atlantic*-that a pleading need not "set out in detail the facts upon which [the claim is based]" in order to successfully state a claim. *Bell Atlantic,* 127 S.Ct. 1965, n. 3 (citing *Conley v. Gibson,* 355 U.S. 41, 47 [1957] ). That statement in no way meant that all pleadings may achieve the requirement of giving a defendant "fair notice" of the nature of the claim and the "grounds" on which the claim rests without ever having to allege any facts whatsoever. [20] There must still be enough facts alleged to raise a right to relief above the speculative level to a plausible level, so that the defendant may know what the claims are and the grounds on which they rest (in order to shape a defense).

Having said all of that, it should also be emphasized that, "[i]n reviewing a complaint for dismissal under Fed.R.Civ.P. 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor."? [21] "This standard is applied with even greater force where the plaintiff alleges civil rights violations or where the complaint is submitted *pro se.* [22] In other words, while all pleadings are to be construed liberally under Rule 8(e), *pro se* civil rights pleadings are to be construed with an *extra* degree of liberality.

For example, the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider a plaintiff's papers in opposition to a defendant's motion to dismiss as effectively amending the allegations of the plaintiff's complaint, to the extent that those factual assertions are consistent with the allegations of the plaintiff's complaint. [23] Moreover, "courts must construe *pro se* pleadings broadly, and interpret them to raise the strongest arguments that they suggest." [24] Furthermore, when addressing a *pro se* complaint, *generally* a district court "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." [25] Of course, an opportunity to amend is not required where the plaintiff has already amended his complaint. [26] In addition, an opportunity to amend is not required where "the problem with [plaintiff's] causes of action is substantive" such that "[b]etter pleading will not cure it." [27]

**\*5** However, while this special leniency may somewhat loosen the procedural rules governing the form of pleadings (as the Second Circuit has observed), [28] it does not

completely relieve a *pro se* plaintiff of the duty to satisfy the pleading standards set forth in Rules 8, 10 and 12.[29] Rather, as both the Supreme Court and Second Circuit have repeatedly recognized, the requirements set forth in Rules 8, 10 and 12 are procedural rules that even *pro se* civil rights plaintiffs must follow.[30] Stated more plainly, when a plaintiff is proceeding *pro se,* "all normal rules of pleading are not absolutely suspended."[31]

## III. ANALYSIS

### A. Claims Against Defendants in Their Official Capacities

Plaintiff's complaint names Defendants "in their individual capacities and in their official capacities as officials of the New York State Department of Corrections."(Dkt. No. 1 at 2.) Defendants argue that Plaintiff's claims against them in their official capacities are barred by the Eleventh Amendment. (Dkt. No. 42–4 at 3.) Defendants are correct.

The Eleventh Amendment has long been construed as barring a citizen from bringing a suit against his or her own state in federal court, under the fundamental principle of "sovereign immunity." *See* U.S. Const. amend XI ("The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."); *Hans v. Louisiana,* 134 U.S. 1, 10–21 (1890); *Idaho v. Coeur d'Alene Tribe of Idaho,* 521 U.S. 261, 267 (1997); *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 100 (1984). State immunity extends not only to the states, but to state agencies and to state officers who act on behalf of the state. *See Puerto Rico Aqueduct & Sewer Auth. v. Metcalf,* 506 U.S. 139, 142–47 (1993); *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 101–06 (1984). DOCS employees are state officials for the purposes of the Eleventh Amendment. *See e.g. Davis v. New York,* 316 F.3d 93, 101 (2 Cir.2002); *Tolliver v. N.Y. State Correctional Officers,* No. 99 CIV 9555, 2000 WL 1154311, at *2 (S.D.N.Y. Aug. 14, 2000) ("All of the defendants in this case are state officials because they are employees of the New York State Department of Correctional Services."). Where it has been successfully demonstrated that a defendant is entitled to sovereign immunity under the Eleventh Amendment, the federal court lacks subject matter jurisdiction over the case, and "the case must be stricken from the docket." *McGinty v. State of New York,* 251 F .3d 84, 100

(2d Cir.2001) (citation omitted); *see also* Fed.R.Civ.P. 12(h)(3).

Here, the face of the complaint alleges that Defendants are each "officials of the New York State Department of Corrections."(Dkt. No. 1 at 2.) Therefore, any claims against Defendants in their officials capacities are barred by the Eleventh Amendment. Accordingly, I recommend that the Court grant Defendants' motion and dismiss all claims against Defendants in their official capacities[32].

### B. Medical Care Claims

**\*6** Plaintiff alleges that Defendants violated his Eighth Amendment right to adequate medical care by refusing to allow him to participate in the Intermediate Care Program. (Dkt. No. 1 at 5.) The Intermediate Care Program is a program for prisoners with mental health issues that provides treatment, medication, group therapy, and other counseling. (Dkt. No. 42–5, P's Depo. at 35:22–36:6.)

To prevail on an Eighth Amendment claim of inadequate medical care, a plaintiff must show two things: (1) that the plaintiff had a *sufficiently serious* medical need; and (2) that the defendant was *deliberately indifferent* to that serious medical need. *Estelle v. Gamble,* 429 U.S. 97, 104 (1976); *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998).

Defendants argue that Plaintiff can establish neither that he suffered from a sufficiently serious medical need nor that Defendants were deliberately indifferent. (Dkt. No. 42–4 at 5–8.)I find that Plaintiff suffered from a sufficiently serious medical need but that Defendants were not deliberately indifferent to that need.

#### 1. *Serious Medical Need*

Defendants argue that Plaintiff cannot establish that he suffered from a sufficiently serious medical need because "Plaintiff acknowledges that his allegations are only with regard to his mental health treatment and not medical treatment."(Dkt. No. 42–4 at 6–7 .)

To be sufficiently serious for purposes of the Constitution, a medical condition must be "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J. dissenting) [citations omitted], *accord, Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1996), *cert. denied,* 513 U.S. 1154 (1995); *Chance,* 143 F.3d at 702.

Neither Defendants nor Plaintiff have provided the Court with any of Plaintiff's medical records to establish the precise nature of Plaintiff's mental health diagnosis. The evidence before the Court establishes that Plaintiff was initially prescribed the medication Celexa in February 2005 and has been compliantly taking it. (Dkt. No. 42–5, P's Depo. at 33:18–34:3; Dkt. No. 42–6 at 3, Intermediate Care Program Referral form.) Celexa is prescribed to treat major depression. *The PDR Pocket Guide to Prescription Drugs* 275 (Bette LaGow, ed., 7th ed.2005). Plaintiff states that he began having suicidal thoughts sometime prior to October 25, 2005. (Dkt. No. 43 at 3.) He attempted suicide on July 5, 2008, and October 12, 2008.*Id.* I find, based on the limited information in the record before me, that Plaintiff suffered from major depression with suicidal ideation at the time he was denied entrance into the Intermediate Care Program in September 2005.

Neither party has cited any case law discussing whether depression, either with or without suicidal ideation, is a "sufficiently serious" medical condition for Eighth Amendment purposes. I have independently researched the issue and located limited published case law on the subject. The First Circuit has found that depression combined with severe anxiety attacks or suicide attempts is a serious medical need. *Mahan v. Plymouth County House of Corrections,* 64 F.3d 14, 16, 18 (1st Cir.1995); *Torraco v. Maloney,* 923 F.2d 231, 235 n. 4 (1st Cir.1991). A District Court in Delaware has presumed that a combination of depression, anxiety, and post-traumatic stress disorder is a serious medical need. *Simpson v. Penobscot County Sheriff's Dept.,* 285 F.Supp.2d 75 (D.Me.2003). A District Court in North Dakota has held that self-diagnosed depression with suicidal ideation is not a serious medical condition for Eighth Amendment purposes, but depression that actually manifests in attempted suicide is sufficiently serious. *White v. Crow Ghost,* 456 F.Supp.2d 1096, 1102–03 (D.N.D.2006).

 **\*7** Here, Plaintiff was not merely self-diagnosed: prison officials prescribed Celexa to treat his depression. Although he did not attempt suicide until three years after he was denied admission to the Intermediate Care Program, these later attempts illustrate that his suicidal thoughts in 2005 were not ephemeral. In light of these facts, and because the summary judgment standard requires the Court to resolve all ambiguities and draw all reasonable inferences against the moving party, I will assume that Plaintiff suffered from a sufficiently serious medical need.

**2.** *Deliberate Indifference*

Defendants argue that even if Plaintiff had a serious medical need, they were not deliberately indifferent to it. (Dkt. No. 42–4 at 7–8.)Defendants are correct.

Defendants Rourke, Eagen, and Graham are not medical personnel. (Dkt. No. 42–5, P's Depo. at 45:25–46:7.) "Non-medical personnel engage in deliberate indifference where they intentionally delayed access to medical care when the inmate was in extreme pain and has made his medical problem known to attendant prison personnel."*Baumann v. Walsh,* 36 F.Supp.2d 508, 512 (N.D.N.Y.1999) (Scullin, J., adopting Report–Recommendation of Sharpe, M.J.). Here, Plaintiff was not denied access to mental health care. Beginning in February 2005, Plaintiff was seen by mental health providers once a month. (Dkt. No. 42–5, P's Depo. at 18:7–20:14.) As discussed above, he was also prescribed Celexa, an anti-depressant. While Plaintiff may have preferred to receive his mental health treatment through the Intermediate Care Program, he was not constitutionally entitled to his preferred care. "It is well established that mere disagreement over the proper treatment does not create a constitutional claim."*Chance v. Armstrong,* 143 F.3d 698, 703 (2d Cir.1998). Therefore, I find that there is no genuine issue of material fact showing that Defendants Rourke, Eagen, or Graham were deliberately indifferent to Plaintiff's serious medical need. Accordingly, I recommend that Defendants' motion for summary judgment dismissing Plaintiff's Eighth Amendment medical care claim be granted.

In light of my finding that Defendants are entitled to summary judgment dismissing Plaintiff's Eighth Amendment medical care claim on the constitutional merits, I decline to address Defendants' arguments regarding personal involvement and qualified immunity.

**ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' motion for partial summary judgment (Dkt. No. 42) be ***GRANTED.***It is recommended that the Court (1) dismiss Plaintiff's claims against all Defendants in their official capacities; and (2) dismiss Plaintiff's Eighth Amendment medical care claim against Defendants Rourke, Eagen, and Graham, thus terminating those Defendants from this litigation; and it is further

2009 WL 9054936

**RECOMMENDED** that this matter be set for a pretrial conference on Plaintiff's Eighth Amendment conditions of confinement claim against Defendants Wolczyk and Selsky.

**\*8** Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE*

REVIEW.Roldan v. Racette, 984 F.2d 85 (2d Cir.1993) (citing Small v. Secretary of Health and Human Services, 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

**All Citations**

Slip Copy, 2009 WL 9054936

Footnotes

1    The caption of Defendants' moving papers refers to this Defendant as "Egan." The body of Defendants' papers refer to him as "Eagan." In light of this discrepancy, I have used the spelling provided by Plaintiff in the complaint.

2    Plaintiff's complaint contained additional claims against additional Defendants. Those claims were dismissed on March 28, 2008. (Dkt. No. 35.)

3    *Matsushita,* 475 U.S. at 585–86; *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48 (1986); *see also*Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made [by a defendant] and supported as provided in this rule, the [plaintiff] may not rest upon the mere allegations ... of the [plaintiff's] pleading....").

4    *Ross v. McGinnis,* 00–CV–0275, 2004 WL 1125177, at *8 (W.D.N . Y. Mar. 29, 2004) [internal quotations omitted] [emphasis added].

5    A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986).

6    *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997) [citation omitted]; *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) [citation omitted].

7    The authority to conduct this *sua sponte* analysis is derived from two sources: (1) 28 U.S.C. § 1915(e)(2)(B)(ii), which provides that "the court shall dismiss [a] case [brought by a prisoner proceeding *in forma pauperis* ] at any time if the court determines that ... the action ... is frivolous or malicious[,] ... fails to state a claim on which relief may be granted[,] ... or ... seeks monetary relief against a defendant who is immune from such relief"; and (2) 28 U.S.C. § 1915A(b), which provides that, "[o]n review, the court shall ... dismiss the [prisoner's] complaint, or any portion of the complaint, if the complaint ... is frivolous, malicious, or fails to state a claim upon which relief may be granted ...."

8    *See*5C Wright & Miller, *Federal Practice and Procedure* § 1363 at 112 (3d ed. 2004) ("A motion to dismiss for failure to state a claim for relief under Rule 12(b)(6) goes to the sufficiency of the pleading under Rule 8(a)(2).") [citations omitted]; *Princeton Indus., Inc. v. Rem,* 39 B.R. 140, 143 (Bankr.S.D.N.Y.1984) ("The motion under F.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint as to whether the plaintiff has conformed to F.R.C.P. 8(a)(2) which calls for a 'short and plain statement' that the pleader is entitled to relief."); *Bush v. Masiello,* 55 F.R.D. 72, 74 (S.D.N.Y.1972) ("This motion under Fed.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint, determining whether the complaint has conformed to Fed.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement that the pleader is entitled to relief.' ").

9    *See Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 514 (2002) ( "These allegations give respondent fair notice of what petitioner's claims are and the grounds upon which they rest.... In addition, they state claims upon which relief could be granted under Title VII and the ADEA."); *Wynder v. McMahon,* 360 F.3d 73, 80 (2d Cir.2004) ("There is a critical distinction between the notice requirements of Rule 8(a) and the requirement, under Rule 12(b)(6), that a plaintiff state a claim upon which relief can be granted."); *Phelps v. Kapnolas,* 308 F.3d 180, 187 (2d Cir.2002) ("Of course, none of this is to say that a court should hesitate to dismiss a complaint when the plaintiff's allegation ... fails as a matter of law.") [citation omitted]; *Kittay v. Kornstein,* 230 F.3d 531, 541 (2d Cir.2000) (distinguishing between a failure to meet Rule 12 [b][6]'s requirement of stating a cognizable claim and Rule 8[a]'s requirement of disclosing sufficient information to put defendant on fair notice); *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.,* 379 F.Supp.2d 348, 370 (S.D.N.Y.2005) ("Although Rule 8 does not require plaintiffs to plead a theory of causation, it does not protect a legally insufficient claim [under Rule 12(b)(6) ].") [citation omitted]; *Util. Metal Research & Generac Power Sys.,* 02–CV–6205, 2004 U.S. Dist. LEXIS 23314, at *4–5 (E.D.N.Y. Nov. 18, 2004) (distinguishing between the legal sufficiency of the cause of action under Rule 12[b][6] and the sufficiency of the complaint under Rule 8[a] ); *accord, Straker v. Metro Trans. Auth.,* 331 F.Supp.2d 91, 101–102 (E.D.N.Y.2004); *Tangorre v. Mako's, Inc.,* 01–CV–4430, 2002 U.S. Dist. LEXIS 1658, at *6–7 (S.D.N.Y. Jan. 30, 2002)

(identifying two sorts of arguments made on a Rule 12[b] [6] motion-one aimed at the sufficiency of the pleadings under Rule 8 [a], and the other aimed at the legal sufficiency of the claims).

10    *Dura Pharm., Inc. v. Broudo,* 125 S.Ct. 1627, 1634 (2005) (holding that the complaint failed to meet this test) [citation omitted; emphasis added]; *see also Swierkiewicz,* 534 U.S. at 512 [citation omitted]; *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 168 (1993) [citation omitted].

11    *Swierkiewicz,* 534 U.S. at 514 (quoting *Conley,* 355 U.S. at 48); *see also Simmons v. Abruzzo,* 49 F.3d 83, 86 (2d Cir.1995) ("Fair notice is that which will enable the adverse party to answer and prepare for trial, allow the application of res judicata, and identify the nature of the case so it may be assigned the proper form of trial.") [citation omitted]; *Salahuddin v. Cuomo,* 861 F .2d 40, 42 (2d Cir.1988) ("[T]he principle function of pleadings under the Federal Rules is to give the adverse party fair notice of the claim asserted so as to enable him to answer and prepare for trial.") [citations omitted].

12    *Gonzales v. Wing,* 167 F.R.D. 352, 355 (N.D.N.Y.1996) (McAvoy, J.), *aff'd,*113 F.3d 1229 (2d Cir.1997) (unpublished table opinion); *accord, Hudson v. Artuz,* 95–CV–4768, 1998 WL 832708, at *2 (S.D.N.Y. Nov. 30, 1998), *Flores v. Bessereau,* 98–CV–0293, 1998 WL 315087, at *1 (N.D.N.Y. June 8, 1998) (Pooler, J .). Consistent with the Second Circuit's application of § 0.23 of the Rules of the U.S. Court of Appeals for the Second Circuit, I cite this unpublished table opinion, not as precedential authority, but merely to show the case's subsequent history. *See, e.g., Photopaint Technol., LLC v. Smartlens Corp.,* 335 F.3d 152, 156 (2d Cir.2003) (citing, for similar purpose, unpublished table opinion of *Gronager v. Gilmore Sec. & Co.,* 104 F.3d 355 [2d Cir.1996] ).

13    *See, e.g., Swierkiewicz,* 534 U.S. at 513–514 (noting that "Rule 8(a)(2)'s simplified pleading standard applies to all civil actions, with limited exceptions [including] averments of fraud or mistake.").

14    2 *Moore's Federal Practice* § 12.34[1][b] at 12–61 (3d ed.2003).

15    *See, e.g., Bell Atlantic Corp. v. Twombly,* 127 S.Ct. 1955, 1964–1974 (2007) (pleading did not meet Rule 8[a][2]'s liberal requirement); *accord, Dura Pharm.,* 125 S.Ct. at 1634–1635, *Christopher v. Harbury,* 536 U.S. 403, 416–422 (2002), *Freedom Holdings, Inc. v. Spitzer,* 357 F.3d 205, 234–235 (2d Cir.2004), *Gmurzynska v. Hutton,* 355 F.3d 206, 208–209 (2d Cir.2004). Several unpublished decisions exist from the Second Circuit affirming the Rule 8(a)(2) dismissal of a complaint after *Swierkiewicz. See, e.g., Salvador v. Adirondack Park Agency of the State of N.Y.,* No. 01–7539, 2002 WL 741835, at *5 (2d Cir. Apr. 26, 2002) (affirming pre-*Swierkiewicz* decision from Northern District of New York interpreting Rule 8[a][2] ). Although these decisions are not themselves precedential authority, *see*Rules of the U.S. Court of Appeals for the Second Circuit, § 0.23, they appear to acknowledge the continued precedential effect, after *Swierkiewicz,* of certain cases from within the Second Circuit interpreting Rule 8(a)(2).*See Khan v. Ashcroft,* 352 F.3d 521, 525 (2d Cir.2003) (relying on summary affirmances because "they clearly acknowledge the continued precedential effect" of *Domond v. INS,* 244 F.3d 81 [2d Cir.2001], after that case was "implicitly overruled by the Supreme Court" in *INS v. St. Cyr,* 533 U.S. 289 [2001] ).

16    All references to *Bell Atlantic* will cite the Supreme Court Reporter rather than the United States Reports. The United States Reports version of the case does not include page numbers at this time.

17    The Court in *Bell Atlantic* further explained: "The phrase is best forgotten as an incomplete, negative gloss on an accepted pleading standard: once a claim has been adequately stated, it may be supported by showing any set of facts consistent with the allegations in the complaint....*Conley,* then, described the breadth of opportunity to prove what an adequate complaint claims, not the minimum standard of adequate pleading to govern a complaint's survival."*Bell Atlantic,* 127 S.Ct. at 1969.

18    *See, e.g., Ruotolo v. City of New York,* 514 F.3d 184, 188 (2d Cir.2008) (in civil rights action, stating that "To survive a motion to dismiss, a complaint must plead 'enough facts to state a claim to relief that is plausible on its face.'") [citation omitted]; *Goldstein v. Pataki,* 07–CV–2537, 2008 U.S.App. LEXIS 2241, at *14 (2d Cir. Feb. 1, 2008) (in civil rights action, stating that "*Twombly* requires ... that the complaint's '[f]actual allegations be enough to raise a right to relief above the speculative level ....'") [internal citation omitted]; *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98, n. 2 (2d Cir.2007) ( "We have declined to read Twombly's flexible 'plausibility standard' as relating only to antitrust cases.") [citation omitted]; *Iqbal v. Hasty,* 490 F.3d 143, 157–58 (2d Cir.2007) (in prisoner civil rights action, stating, "[W]e believe the [Supreme] Court [in *Bell Atlantic Corp. v. Twombly* ] is ... requiring a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible*.") [emphasis in original].

19    *See, e.g., Jacobs v. Mostow,* 281 F. App'x 85, 87 (2d Cir. March 27, 2008) (in pro se action, stating, "To survive a motion to dismiss, a complaint must plead 'enough facts to state a claim to relief that is plausible on its face.'") [citation omitted] (summary order, cited in accordance with Local Rule 32.1[c][1] ); *Boykin v. KeyCorp.,* 521 F.3d 202, 215–16 (2d Cir.2008) (finding that borrower's *pro se* complaint sufficiently presented a "*plausible* claim of disparate treatment,"

under Fair Housing Act, to give lenders fair notice of her discrimination claim based on lenders' denial of her home equity loan application) [emphasis added].

20    For example, in *Erickson,* a district court had dismissed a *pro se* prisoner's civil rights complaint because, although the complaint was otherwise factually specific as to how the prisoner's hepatis C medication had been wrongfully terminated by prison officials for a period of approximately 18 months, the complaint (according to the district court) failed to allege facts plausibly suggesting that the termination caused the prisoner "substantial harm." 127 S.Ct. at 2199. The Supreme Court vacated and remanded the case because (1) under Fed.R.Civ.P. 8 and *Bell Atlantic,* all that is required is "a short and plain statement of the claim" sufficient to "give the defendant fair notice" of the claim and "the grounds upon which it rests," and (2) the plaintiff had alleged that the termination of his hepatitis C medication for 18 months was "endangering [his] life" and that he was still in need of treatment for [the] disease." *Id.* at 2200. While *Erickson* does not elaborate much further on its rationale, a careful reading of the decision (and the dissent by Justice Thomas) reveals a point that is perhaps so obvious that it did not need mentioning in the short decision: a claim of deliberate indifference to a serious medical need under the Eighth Amendment involves two elements, i.e., the existence of a sufficiently serious medical need possessed by the plaintiff, and the existence of a deliberately indifferent mental state possessed by prison officials with regard to that sufficiently serious medical need. The *Erickson* decision had to do with only the first element, not the second element. *Id.* at 2199–2200. In particular, the decision was merely recognizing that an allegation by a plaintiff that, during the relevant time period, he suffered from hepatis C is, in and of itself, a factual allegation plausibly suggesting that he possessed a sufficiently serious medical need; the plaintiff need not *also* allege that he suffered an independent and "substantial injury" as a result of the termination of his hepatis C medication. *Id.* This point of law is hardly a novel one. For example, numerous decisions, from district courts within the Second Circuit alone, have found that suffering from hepatitis C constitutes having a serious medical need for purposes of the Eighth Amendment. *See, e.g., Rose v. Alvees,* 01–CV–0648, 2004 WL 2026481, at *6 (W.D.N.Y. Sept. 9, 2004); *Verley v. Goord,* 02–CV–1182, 2004 WL 526740, at *10 n. 11 (S.D.N.Y. Jan. 23, 2004); *Johnson v. Wright,* 234 F.Supp.2d 352, 360 (S.D.N.Y.2002); *McKenna v. Wright,* 01–CV–6571, 2002 WL 338375, at *6 (S.D.N.Y. March 4, 2002); *Carbonell v. Goord,* 99–CV–3208, 2000 WL 760751, at *9 (S.D.N.Y. June 13, 2000).

21    *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (affirming grant of motion to dismiss) [citation omitted]; *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994).

22    *Hernandez,* 18 F.3d at 136 [citation omitted]; *Deravin v. Kerik,* 335 F.3d 195, 200 (2d Cir.2003) [citations omitted]; *Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 619 (2d Cir.1999) [citation omitted].

23    "Generally, a court may not look outside the pleadings when reviewing a Rule 12(b)(6) motion to dismiss. However, the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider plaintiff's additional materials, such as his opposition memorandum." *Gadson v. Goord,* 96–CV–7544, 1997 WL 714878, at *1, n. 2 (S.D.N.Y. Nov. 17, 1997) (citing, *inter alia, Gil v. Mooney,* 824 F.2d 192, 195 [2d Cir.1987] [considering plaintiff's response affidavit on motion to dismiss] ). Stated another way, "in cases where a pro se plaintiff is faced with a motion to dismiss, it is appropriate for the court to consider materials outside the complaint to the extent they 'are consistent with the allegations in the complaint.' " *Donhauser v. Goord,* 314 F.Supp.2d 119, 212 (N.D.N.Y.2004) (considering factual allegations contained in plaintiff's opposition papers) [citations omitted], *vacated in part on other grounds,* 317 F.Supp.2d 160 (N.D.N.Y.2004). This authority is premised, not only on case law, but on Rule 15 of the Federal Rules of Civil Procedure, which permits a plaintiff, as a matter of right, to amend his complaint once at any time before the service of a responsive pleading-which a motion to dismiss is not. *See Washington v. James,* 782 F.2d 1134, 1138–39 (2d Cir.1986) (considering subsequent affidavit as amending *pro se* complaint, on motion to dismiss) [citations omitted].

24    *Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000) (finding that plaintiff's conclusory allegations of a due process violation were insufficient) [internal quotation and citation omitted].

25    *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) [internal quotation and citation omitted]; *see also* Fed.R.Civ.P. 15(a) (leave to amend "shall be freely given when justice so requires").

26    *Yang v. New York City Trans. Auth.,* 01–CV–3933, 2002 WL 31399119, at *2 (E.D.N.Y. Oct. 24, 2002) (denying leave to amend where plaintiff had already amended complaint once); *Advanced Marine Tech. v. Burnham Sec., Inc.,* 16 F.Supp.2d 375, 384 (S.D.N.Y.1998) (denying leave to amend where plaintiff had already amended complaint once).

27    *Cuoco,* 222 F.3d at 112 (finding that repleading would be futile) [citation omitted]; *see also Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir.1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice.") (affirming, in part, dismissal of claim with prejudice) [citation omitted]; *see, e.g., See Rhodes v. Hoy,* 05–CV–0836, 2007 WL 1343649, at *3, 7 (N.D.N.Y. May 5, 2007) (Scullin, J., adopting Report–Recommendation of Peebles, M.J.) (denying *pro se* plaintiff opportunity to amend before dismissing

his complaint because the error in his complaint-the fact that plaintiff enjoyed no constitutional right of access to DOCS' established grievance process-was substantive and not formal in nature, rendering repleading futile); *Thabault v. Sorrell,* 07–CV–0166, 2008 WL 3582743, at *2 (D.Vt. Aug. 13, 2008) (denying *pro se* plaintiff opportunity to amend before dismissing his complaint because the errors in his complaint-lack of subject-matter jurisdiction and lack of standing-were substantive and not formal in nature, rendering repleading futile) [citations omitted]; *Hylton v. All Island Cob Co.,* 05–CV–2355, 2005 WL 1541049, at *2 (E.D.N.Y. June 29, 2005) (denying *pro se* plaintiff opportunity to amend before dismissing his complaint arising under 42 U.S.C. § 1983 because the errors in his complaint-which included the fact that plaintiff alleged no violation of either the Constitution or laws of the United States, but only negligence-were substantive and not formal in nature, rendering repleading futile); *Sundwall v. Leuba,* 00–CV–1309, 2001 WL 58834, at *11 (D.Conn. Jan. 23, 2001) (denying *pro se* plaintiff opportunity to amend before dismissing his complaint arising under 42 U.S.C. § 1983 because the error in his complaint-the fact that the defendants were protected from liability by Eleventh Amendment immunity-was substantive and not formal in nature, rendering repleading futile).

28   *Sealed Plaintiff v. Sealed Defendant # 1,* No. 06–1590, 2008 WL 3294864, at *5 (2d Cir. Aug. 12, 2008) ("[The obligation to construe the pleadings of *pro se* litigants liberally] entails, at the very least, a permissive application of the rules governing the form of pleadings.") [internal quotation marks and citation omitted]; *see also Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983) ("[R]easonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training ... should not be impaired by harsh application of technical rules.") [citation omitted].

29   *See Prezzi v. Schelter,* 469 F.2d 691, 692 (2d Cir.1972) (extra liberal pleading standard set forth in *Haines v. Kerner,* 404 U.S. 519 [1972], did not save *pro se* complaint from dismissal for failing to comply with Fed.R.Civ.P. 8] ); *accord, Shoemaker v. State of Cal.,* 101 F.3d 108 (2d Cir.1996) (citing *Prezzi v. Schelter,* 469 F.2d 691) [unpublished disposition cited only to acknowledge the continued precedential effect of *Prezzi v. Schelter,* 469 F.2d 691, within the Second Circuit]; *accord, Praseuth v. Werbe,* 99 F.3d 402 (2d Cir.1995).

30   *See McNeil v. U.S.,* 508 U.S. 106, 113 (1993) ("While we have insisted that the pleadings prepared by prisoners who do not have access to counsel be liberally construed ... we have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel."); *Faretta v. California,* 422 U.S. 806, 834, n. 46 (1975) ("The right of self-representation is not a license ... not to comply with relevant rules of procedural and substantive law."); *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006) (*pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law") [citation omitted]; *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983) (*pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law") [citation omitted]; *cf. Phillips v. Girdich,* 408 F.3d 124, 128, 130 (2d Cir.2005) (acknowledging that *pro se* plaintiff's complaint could be dismissed for failing to comply with Rules 8 and 10 if his mistakes either "undermine the purpose of notice pleading [ ]or prejudice the adverse party").

31   *Stinson v. Sheriff's Dep't of Sullivan Cty.,* 499 F.Supp. 259, 262 & n. 9 (S.D.N.Y.1980).

32   It is not clear from Defendants' papers whether they intended to move for summary judgment dismissing the claims against *all* of the remaining Defendants in their official capacities or whether they moved solely on behalf of Defendants Rourke, Eagen, and Graham. To the extent that Defendants neglected to explicitly move on behalf of Defendants Wolcyzk and Selsky, I recommend that the Court *sua sponte* dismiss any claims against those Defendants in their official capacities pursuant to 28 U.S.C. § 1915(e)(2)(B).

---

**End of Document**                                                                         © 2016 Thomson Reuters. No claim to original U.S. Government Works.

Westlaw.

Slip Copy, 2009 WL 3199520 (N.D.N.Y.)

(Cite as: 2009 WL 3199520 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Derrick HAMILTON, Plaintiff,
v.
J.T. SMITH, Superintendent, Shawangunk Correctional
Facility; J. Maly, Deputy Superintendent of Security;
William M. Gonzalez, Deputy Counsel; M. Genovese,
Medical Doctor; M. Skies, Registered Nurse; Donald
Selsky, Director of Special Housing; D. Parisi, Mail
Room Clerk; F. Chiapperino, Counselor; and Elaine
Davis, Steward, Attica Correctional Facility,
Defendants.
No. 9:06-CV-0805 (GTS/DRH).

Sept. 30, 2009.

West KeySummary**Federal Civil Procedure 170A**
&#9737;     **2491.5**

170A Federal Civil Procedure

    170AXVII Judgment
      170AXVII(C) Summary Judgment
        170AXVII(C)2 Particular Cases
          170Ak2491.5 k. Civil Rights Cases in
General. Most Cited Cases
    A genuine issue of material fact as to whether prison
officials intentionally interfered with a prisoner's ability to
receive mail addressed to him precluded summary
judgment in favor of the officials. The prisoner alleged
that the officials violated his First Amendment rights when
they confiscated mail addressed to him, including an
affidavit from a former inmate. The prisoner was placed
on mail watch and some of his mail was intercepted
because it allegedly did not comply with facility protocol,
but the officials failed to offer any explanation as to why
the documents were never returned to the sender. U.S.C.A.
Const.Amend. 1.

Derrick Hamilton, Wallkill, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General for the State
of New York, Christina L. Roberts-Ryba, Esq., Assistant
Attorney General, of Counsel, Albany, NY, for
Defendants.

**DECISION and ORDER**

Hon. GLENN T. SUDDABY, District Judge.
   **\*1** Currently pending before the Court, in this *pro se*
prisoner civil rights action filed by Derrick Hamilton
("Plaintiff") against nine employees of the New York State
Department of Correctional Services ("Defendants")
pursuant to 42 U.S.C. § 1983, are the following: (1)
Defendants' motion for summary judgment (Dkt. No. 51);
(2) United States Magistrate Judge David R. Homer's
Report-Recommendation recommending that Defendants'
motion be granted in part and denied in part (Dkt. No. 60);
(3) Plaintiff's Objections to the Report-Recommendation
(Dkt. No. 67); and (4) Defendants' Objections to the
Report-Recommendation (Dkt. No. 66). For the reasons
set forth below, the Report-Recommendation is accepted
and adopted as modified, and Defendants' motion is
granted in part and denied in part.

**I. RELEVANT BACKGROUND**

   On June 28, 2006, Plaintiff filed his Complaint
asserting claims against the following seven (7) employees
of Department of Correctional Services ("DOCS"): (1)
J.T. Smith, the Superintendent of Shawangunk
Correctional Facility (hereinafter, "Shawangunk C.F.");
(2) J. Maly, a Deputy Superintendent of Security of
Shawangunk C.F.; (3) William M. Gonzalez, Deputy
Counsel of DOCS; (4) M. Genovese, a medical doctor at
Shawangunk C.F.; (5), M. Skies, a registered nurse at
Shawangunk C.F.; (6) Donald Selsky, Director of Special
Housing of DOCS; and (7) D. Parisi, a mailroom clerk at
Shawangunk C.F. (Dkt. No. 1.)
   On December 8, 2006, Plaintiff filed an Amended
Complaint, naming two additional Defendants to the
action: (1) F. Chiapperino, a corrections counselor at
Shawangunk C.F.; and Elaine Davis, a steward at Attica
Correctional Facility ("Attica C.F."). (Dkt. No. 17.)

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3199520 (N.D.N.Y.)

(Cite as: 2009 WL 3199520 (N.D.N.Y.))

Generally, in his Amended Complaint, Plaintiff alleges that Defendants (1) violated his religious rights under the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), (2) violated his right to medical confidentiality under the Health Insurance Portability and Accountability Act ("HIPAA"), and (3) violated his civil rights under the First, Eighth and Fourteenth Amendments, including his right to be free from mail tampering, deliberate indifference to his serious medical needs, and inadequate prison conditions. (Dkt. No. 17.)

On July 31, 2008, Defendants filed a motion for summary judgment seeking dismissal of all claims against them, arguing that (1) Plaintiff failed to establish claims under RLUIPA, HIPAA, and the First, Eighth and Fourteenth Amendments, (2) Plaintiff failed to allege personal involvement against several Defendants, and (3) Defendants are entitled to qualified immunity. (Dkt. No. 51.)

On October 20, 2008, Plaintiff submitted his response to Defendants' motion, repeating the allegations made in his Amended Complaint. (Dkt. No. 58.)

On January 13, 2009, Magistrate Judge Homer issued a Report-Recommendation that recommended that Defendants' motion for summary judgment be denied as to the following claims: (1) Plaintiff's First Amendment Claim against Defendant Smith regarding the provision of meals which complied with both his health needs and his religious tenets; (2) Plaintiff's First Amendment Claim against Defendants Smith and Maly regarding mail tampering; and (3) Plaintiff's Fourteenth Amendment Claim against Defendants Maly and Selsky regarding the due process violation that occurred during Plaintiff's disciplinary rehearing where Plaintiff was precluded from calling certain witnesses. Magistrate Judge Homer further recommended that all remaining claims be dismissed and that all claims as to Defendants Gonzalez, Genovese, Skies, Parisi, Chiapperino and Davis be dismissed for lack of personal involvement. (Dkt. No. 60.)[FN1] Familiarity with the grounds of Magistrate Judge Homer's Report-Recommendation is assumed in this Decision and Order.

FN1. It should be noted that Defendant Davis

was recommended for dismissal in the ordering paragraph of the Report-Recommendation. (See Dkt. No. 60, at 48.) However, in reviewing Defendant Davis's involvement in events surrounding the disciplinary proceeding, Magistrate Judge Homer determined that Defendant Davis was directly involved in the disciplinary hearing, which forms the basis for Plaintiff's due process claim. (Id. at 45.) Thus, it appears that Defendant Davis was mistakenly included in the ordering paragraph recommending dismissal. (Id. at 46-47 [stating that qualified immunity would not extend to those Defendants who were involved in the events forming the basis for Plaintiff's Fourteenth Amendment claim].) As a result, the Court has included Defendant Davis in its analysis with respect to Plaintiff's Fourteenth Amendment claim.

## II. APPLICABLE LEGAL STANDARDS

### A. Standard of Review

*2 When specific objections are made to a magistrate judge's report-recommendation, the Court makes a *"de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." See 28 U.S.C. § 636(b)(1)(C).[FN2] When only general objections are made to a magistrate judge's report-recommendation, the Court reviews the report-recommendation for clear error or manifest injustice. See Brown v. Peters, 95-CV-1641, 1997 WL 599355, at *2-3 (N.D.N.Y. Sept.22, 1997) (Pooler, J.) [collecting cases], *aff'd without opinion,* 175 F.3d 1007 (2d Cir.1999).[FN3] Similarly, when a party makes no objection to a portion of a report-recommendation, the Court reviews that portion for clear error or manifest injustice. See Batista v. Walker, 94-CV-2826, 1995 WL 453299, at *1 (S.D.N.Y. July 31, 1995) (Sotomayor, J.) [citations omitted]; Fed.R.Civ.P. 72(b), Advisory Committee Notes: 1983 Addition [citations omitted]. After conducing the appropriate review, the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b) (1)(C).

Slip Copy, 2009 WL 3199520 (N.D.N.Y.)

(Cite as: 2009 WL 3199520 (N.D.N.Y.))

FN2. On *de novo* review, "[t]he judge may ... receive further evidence ...." 28 U.S.C. § 636(b)(1)(C). However, a district court will ordinarily refuse to consider arguments, case law and/or evidentiary material that could have been, but was not, presented to the Magistrate Judge in the first instance. *See, e.g ., Paddington Partners v. Bouchard,* 34 F.3d 1132, 1137-38 (2d Cir.1994) ("In objecting to a magistrate's report before the district court, a party has no right to present further testimony when it offers no justification for not offering the testimony at the hearing before the magistrate.") [internal quotation marks and citations omitted]; *Pan Am. World Airways, Inc. v. Int'l Bhd. of Teamsters,* 894 F.2d 36, 40, n. 3 (2d Cir.1990) (district court did not abuse its discretion in denying plaintiff's request to present additional testimony where plaintiff "offered no justification for not offering the testimony at the hearing before the magistrate").

FN3. *See also Vargas v. Keane,* 93-CV-7852, 1994 WL 693885, at *1 (S.D.N.Y. Dec.12, 1994) (Mukasey, J.) ("[Petitioner's] general objection [that a] Report ... [did not] redress the constitutional violations [experienced by petitioner] ... is a general plea that the Report not be adopted ... [and] cannot be treated as an objection within the meaning of 28 U.S.C. § 636."), *aff'd,* 86 F.3d 1273 (2d Cir.), *cert. denied,* 519 U.S. 895, 117 S.Ct. 240, 136 L.Ed.2d 169 (1996).

**B. Standard Governing Motion for Summary Judgment**

Magistrate Judge Homer correctly recites the legal standard governing a motion for summary judgment. (Dkt. No. 60, at 16-17.) As a result, this standard is incorporated by reference in this Decision and Order.

**III. ANALYSIS OF CLAIMS RECOMMENDED FOR TRIAL**

**A. Plaintiff's Claim Regarding His Meals**

In his Amended Complaint, Plaintiff alleges that

Defendant Smith, who is the Superintendent at Shawangunk C.F., failed to provide Plaintiff with meal options that accommodate both his therapeutic dietary needs as well as his religious tenets. (Dkt. No. 17, at 11.) In his Report-Recommendation, Magistrate Judge Homer recommends that this claim proceed to trial because he found that there was a genuine issue of material fact as to whether there was a legitimate penological interest for Shawangunk C.F.'s failure to provide Plaintiff with meals that accommodate both his religious and dietary needs. (Dkt. No. 60.)

In their objections, Defendants make the following four arguments: (1) "[w]hile Plaintiff claims that he requires low-sodium and low-cholesterol food, he presents absolutely no evidence aside from his speculation that the nutritional makeup of the Kosher meal (also known as a "Cold Alternative Diet" or "CAD") exceeds the sodium or cholesterol content plaintiff is recommended"; (2) "in coming to its conclusion, the Report ignored the fact that the CAD is provided to inmates who request it, due to religious reasons, through ministerial services staff and that Defendant Smith lacks control over the diet"; (3) "[w]hile the Report cites to the fact that the meals are provided to Shawangunk by outside providers, it [errs] by first agreeing that the Department of Correctional Services ('DOCS') lacks the ability to provide inmates with meals that are kosher and low in sodium and then incredibly finds Defendant Smith liable for this lack and for not creating an acceptable alternative"; and (4) "since there was no diet meeting Plaintiff's request available and Defendant Smith did not have any personal involvement in preparing or providing special diets, the claims must be dismissed as to Defendant Smith for lack of personal involvement." (Dkt. No. 66.)

**\*3** As an initial matter, the Court finds the first argument unpersuasive. In his declaration in opposition to Defendants' motion for summary judgment, Plaintiff swears that Defendant Genovese informed him that the CAD was high in sodium, and that he therefore had to change his diet. (Dkt. No. 58, Part 1, at ¶¶ 10-11.)

In addition, the Court finds the fourth argument unpersuasive. According to his declaration, Defendant Smith is the Superintendent at Shawangunk C.F. (Dkt. No.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3199520 (N.D.N.Y.)

(Cite as: 2009 WL 3199520 (N.D.N.Y.))

58, Part 3, at 10.) In this capacity, he is responsible for "all aspects of facility operations." (*Id* .) Based on this general characterization, the Court finds that there is a genuine issue of material fact as to whether Defendant Smith was responsible for implementing the facility's meal menus. Accordingly, the claims against Defendant Smith should not be dismissed for lack of personal involvement.

The Court analyzes Defendants' remaining two arguments as follows.

**1. Defendant's Argument Regarding Plaintiff's Claim Arising Under the First Amendment's Free Exercise Clause**

"The right of prison inmates to exercise their religious beliefs ... is not absolute or unbridled, and is subject to valid penological concerns, including those relating to institutional security." *Johnson v. Guiffere,* 04-CV-0057, 2007 WL 3046703, at *4 (N.D.N.Y. Oct.17, 2007) (Peebles, MJ) (citing *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 348 [1987] ) (other citation omitted). "A determination of whether the refusal to permit attendance at a religious service, for example, hinges upon the balancing of an inmate's First Amendment free exercise right, against institutional needs of officials tasked with the increasingly daunting task of operating prison facilities; that determination is one of reasonableness, taking into account whether the particular act affecting the constitutional right is reasonably related to legitimate penological interests." *Guiffere,* 2007 WL 3046703, at *4 (internal quotation marks and citations omitted)

"Undeniably, the reach of the First Amendment's free exercise clause extends beyond mere attendance at congregate religious services into other aspects of prison life including, pertinently, that of an inmate's diet and participation in religious meals." *Id.* (citations omitted). Accordingly, "[c]ourts have generally found that to deny prison inmates the provision of food that satisfies the dictates of their faith does unconstitutionally burden their free exercise rights." *Id.* (citation omitted). Having said that, because of the demands of prison officials to operate prison facilities in a certain manner, "[a] free exercise claim arising from such a denial brings into focus the tension between the right of prison inmates to freely enjoy and exercise their religious beliefs on the one hand, and the necessity of prison officials to further legitimate

penological interests on the other hand." *Id.* (citation omitted).

**\*4** When examining a plaintiff's free exercise claim, a court must undergo a three-part, burden shifting framework. *Id.* at *5 (citation omitted). "A party asserting a free exercise claim bears the initial burden of establishing that the disputed conduct infringes on his or her sincerely held religious beliefs." *Id.* (citations omitted). "Once a plaintiff has made this showing, the burden then shifts to the defendant to identify a legitimate penological purpose justifying the decision under scrutiny." *Id.* (citations omitted). "In the event such a penological interest is articulated, its reasonableness is then subject to analysis under the test set out by the Supreme Court in *Turner v. Safley,* 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987)." *Id.* (citations omitted).

"Under *Turner,* the court must determine whether the governmental objective underlying the regulations at issue is legitimate and neutral, and whether they are rationally related to that objective." *Id.* (internal quotation marks and citation omitted). "The court then asks whether the inmate is afforded adequate alternative means for exercising the right in question." *Id.* (citations omitted). "Lastly, the court must examine the impact that accommodation of the asserted constitutional right will have on others (guards and inmates) in the prison." *Id.* (internal quotation marks and citation omitted). "Decisions rendered since *Turner* have clarified that when applying this test, a court should examine the existence of alternative means of facilitating exercise of the right that have only a *de minimis* adverse effect on valid penological interests." *Id.* (internal quotation marks and citations omitted).

In their motion, Defendants suggest that, because Plaintiff converted to Judaism only to "learn about the religion" and because Plaintiff no longer practices Judaism, his beliefs were not serious. (Dkt. No. 51, Part 6, at 14.) While the facts suggested by Defendants may be true, the Second Circuit has encouraged "courts [to] resist the dangerous temptation to try to judge the significance of particular devotional obligations to an observant practitioner of faith." *McEachin v. McGuinnis,* 357 F.3d 197, 201 (2d Cir.2004). As a result, the Court finds that

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3199520 (N.D.N.Y.)

(Cite as: 2009 WL 3199520 (N.D.N.Y.))

Plaintiff has satisfied his burden in the first part of the above-described, burden-shifting inquiry.

In response, Defendants argue that officials have a legitimate penological interest in carrying out their responsibility for the daily preparation of meals for all inmates within their control. (Dkt. No. 51, Part 6, at 14.) Defendants further argue that "[i]t is a not a reasonable demand that prison officials supply every inmate with their personal diet request for every meal." (*Id.*) As a result, the Court finds that Defendants have satisfied their burden in the second part of the above-described, burden-shifting inquiry.

Because Defendants have articulated a justification for failing to provide Plaintiff with a diet that conforms to both his religious and therapeutic needs, the focus shifts back to Plaintiff to establish, through a weighing of the *Turner* factors, that "the policy is not reasonably related to legitimate penological interests ." *Guiffre,* 2007 WL 3046703, at *6. "Such an inquiry is particularly fact-laden, and generally ill-suited for resolution on motion for summary judgment." *Id.* Having said that, a court must also bear in mind that, "[w]hile all justifiable inferences must be drawn in the prisoner's favor with respect to matters of disputed fact, in disputed matters of professional judgment the court's inferences must accord deference to the views of prison authorities." *Furnace v. Arceo,* 06-CV-4609, 2008 WL 618907, at *7 (N.D.Cal. Mar.3, 2008) (citing *Beard v. Banks,* 126 S.Ct. 2572, 2578 [2006] ). Therefore, "[u]nless a prisoner can point to sufficient evidence regarding such issues of judgment to allow him to prevail on the merits, he cannot prevail at the summary judgment stage." *Banks,* 126 S.Ct. at 2578.

**\*5** As described above, the first *Turner* factor is whether the governmental objective underlying the regulations at issue is legitimate and neutral, and whether the regulations are rationally related to that objective. *Turner,* 482 U.S. at 89-90. Defendants argue, as did the defendants in *Arceo,* that two legitimate penological interests prevent them from providing [P]laintiff with a ... diet [that satisfies both his religious and therapeutic needs]: budgetary and administrative concerns. *Arceo,* 06-CV-4609, 2008 WL 618907, at *8. Furthermore, as did the defendants in *Arceo, "[i]n* support of their argument,

Defendants have presented [a] declaration [ ] attesting to the fact that all meals provided to inmates at [Shawangunk C.F.] are based on standardized menus generated by the [state]; this plan includes the [Shawangunk C.F.] alternative-entree meals that are provided to inmates who for religious reasons choose not to eat meat [or choose to eat only Kosher products]." ^FN4

> FN4. In particular, Defendant Smith states, in his declaration, that Plaintiff was offered the CAD after he submitted a form to change his religious affiliation to Judaism. (Dkt. No. 53, Part 3, at 14, ¶¶ 32-33 [Decl. of Joseph T. Smith].) Defendant Smith further states that the CAD is a diet that exists on a "state wide menu" which is "supplied to Shawangunk C.F. from the Oneida Correctional Facility Food Processing Plant, or other approved, outside vendors." (*Id.* at ¶ 34.) Finally, Defendant Smith states that "there is no CAD diet which conforms to therapeutic standards [i.e., which is low in fat, cholesterol, and sodium]." (*Id.* at ¶ 32, 35.)

Under the circumstances, this Court finds, as did the district court in *Arceo* that, "[e]ven where the marginal cost and administrative burden of providing a specialized religious diet would be small or negligible, a rational nexus exists between a prison's dietary policies and its legitimate administrative and budgetary concerns." *Arceo,* 2008 WL 618907, at *8 (citing *Shakur v. Schriro,* 514 F.3d 878, 886 [9th Cir.2008] ). For example, it is clear that a diet that complies with Plaintiff's therapeutic and religious needs cannot be prepared from any of the food menus available to Plaintiff. (Dkt. No. 53, Part 3, at 14, ¶¶ 32, 35 Decl. of Joseph T. Smith, testifying that "there is no CAD diet which conforms to therapeutic standards [i.e., which is low in fat, cholesterol, and sodium].") "[C]onsequently, the Court finds a common-sense connection exists between [D]efendants' policy of not providing [P]laintiff with a [specialized food menu] and their legitimate budgetary and administrative concerns." *Arceo,* 2008 WL 618907, at *8. In addition, "[P]laintiff has not presented evidence that refutes the connection [.]" *Id.* As a result, the Court finds that the first *Turner* factor weighs in favor of Defendants.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3199520 (N.D.N.Y.)

(Cite as: 2009 WL 3199520 (N.D.N.Y.))

The second *Turner* factor is "whether there are alternative means of exercising the right that remain open to prison inmates." *Turner,* 482 U.S. at 89-90. Here, there is no record evidence that indicates that there were not alternative means for Plaintiff to exercise his right to religious freedom. According to his own testimony, Plaintiff was given a Kosher diet that complied with the faiths of his religion. (Dkt. No. 51, Part 5, at 102-104.) In addition, Defendants have adduced evidence that (1) in addition to providing Plaintiff with the CAD, they provided Plaintiff with medications including Lipitor to manage his hypertension, which sometimes obviate the need for a low-sodium diet, and (2) "inmates are always free to augment their diet as they wish through packages and purchases at the commissary, unless such privileges have been revoked as part of disciplinary sanctions." (Dkt. No. 68, Part 3, ¶¶ 7-10 [Decl. of Maryann Genovese]; Dkt. No. 53, Part 3, at 14, ¶ 36 [Decl. of Joseph T. Smith].) Finally, Plaintiff has failed to offer any evidence that would suggest that Defendants prevented him from studying, praying, wearing whatever clothing he desired, or attending ceremonies and rituals.[FN5] As a result, the Court finds that the second *Turner* factor weighs in favor of Defendants.

> FN5. *See* Arceo, 2008 WL 618907, at *8 (noting that "the second *Turner* factor has been deemed satisfied where the prisoner retains 'the ability to participate in other significant rituals and ceremonies' of his faith, even if some aspects of religious practice are impinged upon"); *see also* O'Lone, 482 U.S. at 351-52 ("The record establishes that respondents are not deprived of all forms of religious exercise, but instead freely observe a number of their religious obligations. The right to congregate for prayer or discussion is 'virtually unlimited except during working hours,' and the state-provided imam has free access to the prison. Muslim prisoners are given different meals whenever pork is served in the prison cafeteria. Special arrangements are also made during the month-long observance of Ramadan, a period of fasting and prayer.").

**\*6** The third *Turner* factor requires the Court to consider "the impact accommodation of the asserted constitutional right will have on guards and other inmates and on the allocation of prison resources generally." *Turner,* 482 U.S. at 91. Defendants argue that providing Plaintiff with diet that conforms to both his therapeutic and religious needs will significantly impact both prison resources and prison officials, and that institutional budgetary concerns weigh in favor of maintaining the system in its current fashion. (Dkt. No. 51, Part 6, at 14.) Granted, Defendants have not offered any evidence that specifically describes the budgetary costs associated with adding new food options to prison menus, or other practical obstacles associated with providing a low-sodium CAD. (*See generally* Dkt. No. 51.) *Cf.* Arceo, 2008 WL 618907, at *9 (where defendants provided declarations showing that meal preparation at the facility "is a systematized process that involves many different departments and individuals.").

Having said that, Defendants have adduced evidence that (1) the CAD is a diet established as part of a "state wide menu," (2) the CAD is supplied by the Oneida Correctional Facility Food Processing Plant, or other approved outside vendors (presumably due in part to the special equipment and training required to prepare the CAD), and (3) no CAD has yet been created (within DOCS) that is low in fat, cholesterol, and sodium. (Dkt. No. 53, Part 3, at 14, ¶¶ 32-35 [Decl. of Joseph T. Smith].) Together, these facts suggest that there would be some added cost in developing a new low-sodium CAD. Moreover, Defendants have argued that this accommodation-providing Plaintiff with a meal option outside of the state-wide menu-could have "a significant 'ripple effect' on fellow inmates," *Turner,* 482 U.S. at 90, in that such an accommodation could open the door to the creation of various specialized menus for other inmates with different therapeutic and religious needs. (Dkt. No. 51, Part 6, at 14.) Based on this potential "ripple effect," the Court finds that it must be "deferential to the informed discretion of corrections officials." *Turner,* 482 U.S. at 90. Moreover, Plaintiff has failed to offer any evidence that Defendants' position is unreasonable.[FN6] As a result, the Court finds that the third *Turner* factor weighs in favor of Defendants.

> FN6. "The prisoner-plaintiff bears the burden of proving that the disputed regulation is

Slip Copy, 2009 WL 3199520 (N.D.N.Y.)

(Cite as: 2009 WL 3199520 (N.D.N.Y.))

unreasonable." *Giano v. Senkowski,* 54 F.3d 1050, 1054 (2d Cir.1995).

The fourth *Turner* factor requires the Court to consider the existence of alternative means of facilitating exercise of the right that have only a *de minimis* adverse effect on valid penological interests. "The burden is on the prisoner challenging the regulation, not on the prison officials, to show that there are obvious, easy alternatives to the regulation." *Arceo,* 2008 WL 618907, at \*9 (citing *O'Lone,* 482 U.S. at 350 [1987] ) (other citation omitted). Here, Plaintiff has not put forth a ready alternative to Defendants' religious-diet policy that would accommodate his right to a religious diet at a *de minimis* cost to Defendants' legitimate administrative and budgetary concerns. As a result, the Court finds that the fourth *Turner* factor weighs in favor of Defendants.

\*7 In sum, after considering each factor of the *Turner* test,[FN7] the Court finds that it was not unreasonable for Defendant Smith to follow a state-wide meal menu, which did not happen to satisfy both Plaintiff's dietary and therapeutic needs, given the legitimate penological concern of maintaining order. The Court makes this finding cognizant of the fact that "deference must be accorded prison authorities' views with respect to matters of professional judgment," *Beard v. Banks,* 548 U.S. 521, 126 S.Ct. 2572, 2574, 165 L.Ed.2d 697 (2006), understanding that "matters of professional judgment" include selecting inmate meal menus, given the budgetary expense and potential disorder associated with this task.[FN8]

FN7. It bears noting that the four *Turner* factors must be looked at as a whole when "determining the reasonableness of the regulation at issue." *Turner,* 482 U.S. at 89.

FN8. *See Kahane v. Carlson,* 527 F.2d 492, 496 (2d Cir.1975) (requiring, under the First Amendment, DOCS to provide "a diet sufficient to sustain the prisoner in good health without violating the Jewish dietary laws, without otherwise mandating specific items of diet"); *cf. Andreola v. Glass,* 04-CV-0282, 2008 WL 2937574, at \*1 (E.D.Wisc. July 23, 2008) (expressing doubt as to whether plaintiff's claim

that the Wisconsin Department of Corrections failed to "provide him with a kosher diet low in cholesterol and salt, pursuant to his doctor's orders regarding his cardiac health," established a cognizable claim under the First Amendment.

As a result, the Court grants Defendants' motion for summary judgment with regard to Plaintiff's claim under the First Amendment's Free Exercise Clause.

**2. Defendant's Argument Regarding Plaintiff's Claim Arising Under RLUIPA**

"Congress enacted the Religious Land Use and Institutionalized Persons Act ("RLUIPA") in response to the Supreme Court's holding in *City of Boerne v. Flores,* 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997), declaring unconstitutional the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb-1(b)." *Marria v. Broaddus,* 200 F.Supp.2d 280, 297 (S.D.N.Y.2002). "RLUIPA applies both to programs or activities that receive federal financial assistance and to substantial burdens on religious exercise having an effect on interstate commerce." *Broaddus,* 200 F.Supp.2d at 297 (citations omitted). "[A claim arising under] RLUIPA is an independent cause of action, with a slightly different standard and must be treated separately from the First Amendment claim." *Keesh v. Smith,* 04-CV-0779, 2007 WL 2815641, at \*11 (N.D.N.Y. Sept.25, 2007) (Mordue, J.) (citation omitted).

"Under RLUIPA, once a plaintiff produces prima facie evidence to support a free exercise violation, the plaintiff bears the burden of persuasion on whether the regulation substantially burdens the plaintiff's exercise of religion *and the state bears the burden of persuasion on all other elements.*" *Broaddus,* 200 F.Supp.2d at 297 (citation omitted; emphasis added). Stated another way, "RLUIPA imposes a more exacting standard on prison officials [than does the First Amendment], requiring that any substantial burden on an inmate's exercise of religion be warranted by a compelling governmental interest, and be the least restrictive means of accomplishing that interest." *Keesh,* 2007 WL 2815641, at \*11 (internal quotation marks and citations omitted). "By its terms, RLUIPA is to be construed to broadly favor protection of religious exercise." *Broaddus,* 200 F.Supp.2d at 297 (citing 42 U.S.C. § 2000cc-3 [g] ).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3199520 (N.D.N.Y.)

(Cite as: 2009 WL 3199520 (N.D.N.Y.))

The Supreme Court has defined substantial burden as "[w]here the state ... denies [an important benefit] because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Thomas v. Review Bd. of the Indiana Employ. Sec. Div.,* 450 U.S. 707, 717-18, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981). Here, there is no question that forcing an inmate to choose between his therapeutic dietary needs and his religious dietary needs creates a substantial burden on Plaintiff's ability to exercise his religion. Therefore, the Court must determine whether Defendants have demonstrated that (1) the substantial burden on Plaintiff's exercise of religion was warranted by a compelling governmental interest, and (2) following the state-wide menu option was the least restrictive means of accomplishing that interest.

**\*8** As the Supreme Court recently explained in its discussion of RLUIPA, " '[c]ontext matters' in the application of th[e compelling interest] standard." *Cutter v. Wilkinson,* 544 U.S. 709, 723, 125 S.Ct. 2113, 161 L.Ed.2d 1020 (2005) (quoting *Grutter v. Bollinger,* 539 U.S. 306, 327 [2003] ). In other words, RLUIPA should not be read "to elevate accommodation of religious observances over an institution's need to maintain order and safety." *Cutter,* 544 U.S. at 723. In addition, when reviewing a claim under RLUIPA, a court must afford "due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources." *Id.* (quoting Joint Statement 16699 [quoting S.Rep. No. 103-111, at 10, U.S.Code Cong. & Admin. News 1993, pp. 1892, 1899, 1900] ).

Here, the Court notes that Defendants Smith and Genovese have adduced some-albeit little-evidence in an effort to specifically establish that (1) the substantial burden on Plaintiff's exercise of religion was warranted by a *compelling governmental interest* (e.g., in controlling costs and/or maintaining order) at Shawangunk C.F., and (2) adhering to the state-wide menu option was the *least restrictive means* of accomplishing the above-referenced compelling governmental interest.FN9 A review of the declarations of Defendants Smith and Genovese reveals

why they adduced little such evidence: they argue, in pertinent part, that they lacked personal involvement in the RLUIPA violation alleged. (*See, e.g.,* Dkt. No. 51, Part 6, at 24 [Defs.' Memo. of Law].)

FN9. For example, with regard to the first referenced element, Defendants have adduced evidence that (1) the CAD is a diet established as part of a "state wide menu," (2) the CAD is supplied by the Oneida Correctional Facility Food Processing Plant, or other approved outside vendors (presumably due in part to the specialized nature of the CAD), and (3) no CAD has yet been created (within DOCS) that is low in fat, cholesterol, and sodium. (Dkt. No. 53, Part 3, at 14, ¶¶ 32-35 [Decl. of Joseph T. Smith].) Together, these facts suggest that there would be some added cost in developing a new low-sodium CAD. Moreover, with regard to the second referenced element, Defendants have adduced evidence that (1) in addition to providing Plaintiff with the CAD, they provided Plaintiff with medications including Lipitor to manage his hypertension, which sometimes obviate the need for a low-sodium diet, and (2) "inmates are always free to augment their diet as they wish through packages and purchases at the commissary, unless such privileges have been revoked as part of disciplinary sanctions." (Dkt. No. 68, Part 3, ¶¶ 7-10 [Decl. of Maryann Genovese]; Dkt. No. 53, Part 3, at 14, ¶ 36 [Decl. of Joseph T. Smith].)

Furthermore, they have adduced record evidence in support of that argument. More specifically, Defendant Smith, the highest-ranking official at Shawangunk C.F., swears that "[t]he [CAD] menus are not created at Shawangunk. Thus, I have no personal control over the contents of the [CAD] meals." (Dkt. No. 53, Part 3, at 14, ¶ 34 [Decl. of Joseph T. Smith].) Similarly, Defendant Genovese, a Clinical Physician at Shawangunk C.F., swears as follows:

As a Clinical Physician 2, I do not prescribe religious diets due to the fact that such diets are not prescribed by health care workers at DOCS. To receive a religious

Slip Copy, 2009 WL 3199520 (N.D.N.Y.)

(Cite as: 2009 WL 3199520 (N.D.N.Y.))

diet, inmates are required to complete paper work that is processed by the Ministerial Services, not the medical department. Therefore, I have never prescribed a religious diet to any inmate due to the fact that religious diets are not based on medical benefits or health criteria.... In this case ..., plaintiff was placed on a therapeutic diet on June 12, 2006. Plaintiff's diet was a 'Controlled A' which contains enhanced fiber, is low in fat, cholesterol, and sodium.... As a[C]linical [P]hysician 2, I am responsible solely for the prescription of therapeutic diets. No part of my job duties require, or allows, me to actually provide the diets as they are distributed by another department.... To the extent that plaintiff claims I violated his right to practice his religion, I reiterate that I at no time had [the] ability to prescribe religious diets.

**\*9** (Dkt. No. 68, Part 3, ¶¶ 6, 11, 14, 15 [Decl. of Maryann Genovese].) It should be noted that Defendant Genovese's testimony is consistent with four administrative decisions denying two of Plaintiff's grievances on the subject, which explain that, pursuant to DOCS Directive 4311, "Inmate requests for religious foods/diets[ ] shall not be prescribed by the health care provider." (Dkt. No. 58, Part 2, at 22, 24-26.) Finally, it should be noted that Plaintiff has failed to adduce any admissible record evidence controverting the record evidence adduced by Defendants Smith and Genovese.

After carefully reviewing the undisputed facts in the record, and the relevant case law, the Court agrees with Defendants Smith and Genovese: they lacked personal involvement in the RLUIPA violation alleged in this action, because (as the superintendent and a physician at Shawangunk C.F.) they lacked the authority to deviate from DOCS' state-wide Kosher menu in order to design, and prepare for Plaintiff, a new Kosher menu that was low in sodium.[FN10] *See Johnson v. Sisto,* 07-CV-1826, 2009 WL 2868724, at \*6 (E.D.Cal. Sept.2, 2009) ("Plaintiff has presented no evidence disputing the defendants' averments that they [are not liable under RLUIPA because they] do not create the menus and cannot order substitutions of [Rastafarian religious] menu items, nor has he named as defendants those in [the California Department of Corrections] responsible for establishing the system-wide religious diet plans."); *Acoolla v. Angelone,*

01-CV-1008, 2006 WL 938731, at \*13 (W.D.Va. Apr.10, 2006) ("Because the record indicates that decisions about [Virginia Department of Corrections] religious diets are centralized, ... it is clear that officers at individual prisons have no authority to provide [plaintiff] the relief he seeks [under RLUIPA].").[FN11]

**FN10.** Although Magistrate Judge Homer based his recommendation that Plaintiff's claims against Defendant Genovese be dismissed on this ground, Plaintiff failed to specifically challenge that recommendation in his Objections. (*Compare* Dkt. No. 60 at 43-44 *with* Dkt. No. 67.) As a result, this recommendation is subject only to clear-error review. *See, supra,* Part II.A. of this Decision and Order. However, the Court notes that this recommendation would survive even a *de novo* review, for the reasons stated above.

**FN11.** *Cf. Agrawal v. Keim,* 06-CV-0945, 2009 WL 309990, at \*2 (S.D.Ill. Feb.9, 2009) (dismissing prisoner's RLUIPA claim that a prison chaplain did not provide him with a Hindu vegetarian diet that contained dairy products, because "there is no evidence that [chaplain] was personally involved in the diet decisions"); *Williams v. Miller,* 04-CV-0342, 2007 WL 2893641, at \*8 (S.D.Ill. Sept.28, 2007) (dismissing prisoner's First Amendment claim that a prison chaplain did not provide him with a Kosher diet, because "[the chaplain] does not make policy for [the Illinois Department of Corrections], ..., and does not have any role in setting or modifying an inmate's diet"); *Ghashiyah v. Wisconsin Dept. of Corr.,* 01-CV-0010, 2007 WL 2822005, at \*12-13 & n. 16 (E.D.Wis. Sept.27, 2007) (dismissing prisoner's RLUIPA claim alleging that he was not provided with a halal meal free of contact with pork, because "it is undisputed that [none of the defendants] had any personal involvement with the food service policies at issue in [Oshkosh Correctional Institution] and [Racine Correctional Institution]"), *aff'd,* 278 F. App'x 654 (7th Cir.2008).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3199520 (N.D.N.Y.)

(Cite as: 2009 WL 3199520 (N.D.N.Y.))

The Court finds that the Second Circuit's recent decision in *Jova v. Smith,* No. 08-2816, 2009 WL 3068100 (2d Cir. Sept.28, 2009), is distinguishable for two reasons: (1) in addition to suing Joseph T. Smith, the plaintiffs in that case sued the DOCS Commissioner, Deputy Commissioner for Program Services, and Director of Ministerial & Family Services; and (2) neither the district court nor the Second Circuit in that case addressed the issue of whether Joseph T. Smith had the authority to design, and prepare for the plaintiffs, a new religious menu (especially one that fulfilled the plaintiffs' therapeutic dietary needs). *See Jova,* 2009 WL 3068100; *Keesh v. Smith,* 04-CV-0779, 2007 WL 2815641 (N.D.N.Y. Sept.25, 2007).

As a result, the Court grants Defendants' motion for summary judgment with regard to Plaintiff's RLUIPA claim.

**B. Plaintiff's First Amendment Claim Regarding Mail Tampering**

In his Amended Complaint, Plaintiff alleges that Defendants Smith and Maly confiscated legal and non-legal mail addressed to Plaintiff in violation of his First Amendment rights. (Dkt. No. 17.) In his Report-Recommendation, Magistrate Judge Homer recommends that this claim proceed to trial because there is a genuine issue of material fact as to whether Defendant Maly intentionally interfered with Plaintiff's ability to receive mail addressed to him (specifically, mail sent from Nicole Esters enclosing an affidavit from a former inmate, Mr. "D. Mathis"),[FN12] and whether Defendant Smith was negligent in his supervision of Defendant Maly and the procedures followed with respect to prison mail. (Dkt. No. 60.)

> FN12. In his affidavit, Mr. Mathis claims his DOCS identification number was 93-A-6702. (Dkt. No. 58, Part 4, at 50.) According to DOCS' on-line "Inmate Lookup" Service, that DOCS identification number belongs to an inmate named Daniere N. Mathis.

**\*10** In their objections, Defendants argue that "[t]he Report relies on conclusory allegations made by the plaintiff in finding that defendant Maly received an affidavit that was addressed to the plaintiff and failed to forward the affidavit to the plaintiff or mail it back to the sender." (Dkt. No. 66.) Defendants further argue that "the record is void of any proof whatsoever that such an affidavit existed or was ever in the possession of defendant Maly." (*Id.*) In addition, Defendants argue that "plaintiff fails to offer proof that the [Mathis] affidavit was packaged in a way that met the criteria of the Inmate Correspondence Program as set forth in DOCS directives." (*Id.*) With regard to Defendant Smith, Defendants argue that "[P]laintiff had no personal knowledge that defendant Smith allowed defendant Maly to confiscate his mail[, and] Plaintiff cannot establish that an investigation did not take place regarding his mail." (*Id.*)

According to Plaintiff, in December 2005, Nicole Saunders sent Plaintiff legal documents by Federal Express. (Dkt. No. 17, at ¶ 34.) Because the documents, which never reached Plaintiff, were assigned a tracking number, Saunders was able to determine that the documents reached Shawangunk C.F. (*Id.*) According to Plaintiff, Saunders contacted the facility, and was notified by the mail room that Defendant Maly was in possession of the documents, and that, if the documents did not comply with facility protocol, they would be sent back to her with a letter. (*Id.* at ¶ 35.) However, neither Saunders nor Plaintiff ever received the documents or a letter. (*Id.*)

It does not seem disputed that Plaintiff, along with certain other inmates, had been placed on mail watch at around the time that Saunders attempted to send these documents. However, even assuming that Plaintiff's mail was properly intercepted because it did not comply with facility protocol (which would have justified the non-delivery of the documents to Plaintiff), Defendants have failed to offer any explanation as to why the documents were never returned to the sender.

Moreover, in addition to this incident, Plaintiff's Amended Complaint (which is verified pursuant to 28 U.S.C. § 1746, and thus has the force and effect of an affidavit for purposes of a motion for summary judgment)[FN13] identifies at least three other incidents in a seven-month period, prior to when Plaintiff was allegedly on mail watch, in which mail was sent to Plaintiff, but was

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3199520 (N.D.N.Y.)

(Cite as: 2009 WL 3199520 (N.D.N.Y.))

neither received by Plaintiff or returned to the sender. (Dkt. No. 17, at 7-9; *see also* Dkt. No. 60, at 11-12.) One of the documents that Plaintiff never received (and that was never returned to sender) was Nicole Esters' first mailing of the Mathis affidavit on June 21, 2005, in which Mathis stated that his urine sample was switched with Plaintiff's urine sample, resulting in Plaintiff's positive drug test. (Dkt. No. 17, at 7; *see also* Dkt. No. 60, at 11-12.) [FN14]

> FN13. (Dkt. No. 17, at 37.) See *Patterson v. County of Oneida,* 375 F.3d 206, 219 (2d. Cir.2004) ("[A] verified pleading ... has the effect of an affidavit and may be relied upon to oppose summary judgment."); *Fitzgerald v. Henderson,* 251 F.3d 345, 361 (2d Cir.2001) (holding that plaintiff "was entitled to rely on [his verified amended complaint] in opposing summary judgment"), *cert. denied,* 536 U.S. 922, 122 S.Ct. 2586, 153 L.Ed.2d 776 (2002); *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1993) ("A verified complaint is to be treated as an affidavit for summary judgment purposes.") [citations omitted].

> FN14. It appears that Plaintiff received Nicole Esters' *second* mailing of that affidavit, in early July 2005. (*Compare* Dkt. No. 17, ¶¶ 30-31 [Plf.'s Am. Compl., alleging that Defendant Maly stole the affidavit [sent in July of 2005] and refused to provide it to Hamilton] *with* Dkt. No. 58, Part 4, at 49-51 [Plf.'s response papers, attaching letter from Plaintiff to Selsky dated 7/6/05, enclosing affidavit in question].)

**\*11** Under the circumstances, the Court finds that there is at least a genuine issue of material fact as to whether (1) Defendant Maly tampered with Plaintiff's mail, and (2) Plaintiff suffered any harm as a result of the alleged tampering. *Brown v. Kepiec,* 06-CV-1126, 2009 WL 818959, at \*4 (N.D.N.Y. Mar.25, 2009) (Suddaby, J.) ("To prevail on a First Amendment access-to-the-courts claim based on interference with legal mail under § 1983, a prisoner must make a showing that a prison official's deliberate and malicious interference caused an actual injury, such as the dismissal of a non-frivolous legal claim."); *cf. Morgan v. Montanye,* 516 F.2d 1367, 1371 (2d Cir.1975) (holding that a single instance of mail tampering which did not lead the plaintiff to suffer any damage was insufficient to support a constitutional challenge).

The Court makes this finding with some reservation given that Plaintiff's appeal of the decision to place him in SHU was decided by Defendant Selsky *before* the two dates on which Nicole Esters attempted to mail the Mathis affidavit to Plaintiff (so that Plaintiff could submit that affidavit to Selsky for consideration). [FN15] It is conceivable to the Court that such an anachronism might destroy the causal connection necessary for Plaintiff to succeed on a mail-tampering claim under the First Amendment. However, Defendants have not established that, if Plaintiff had received the Mathis affidavit during the few days after Nicole Esters mailed it on June 21, 2005, and had immediately sent it to Defendant Selsky for reconsideration of his decision of June 13, 2005, that decision would have remained the same. [FN16] As a result, the Court finds that this claim survives judgment as a matter of law, on the current record.

> FN15. The first time that Nicole Esters attempted to mail Plaintiff the affidavit in question was on or about June 21, 2005. (Dkt. No. 58, Part 3, at 2.) However, Plaintiff's appeal of the April 2005 decision to place him in SHU was modified by Defendant Selsky more than a week before that attempted mailing-on June 13, 2005. (Dkt. No. 17, at ¶ 26 [Plf.'s Verified Amended Complaint, asserting fact]; Dkt. No. 58, Part 4, at 49 [Plf.'s response papers, attaching contemporaneous letter from Plaintiff referencing date of decision].)

> FN16. *See, e.g., Dawes v. Coughlin,* 83 N.Y.2d 597, 612 N.Y.S.2d 337, 337-38, 634 N.E.2d 938 (N.Y.1994) (describing procedural history of case in which Donald Selsky granted the plaintiff "supplementary appeal," which served as a motion for reconsideration, and explaining that "[n]o provision exists ... concerning reconsideration of the Commissioner's decisions. Notwithstanding the absence of explicit statutory

Slip Copy, 2009 WL 3199520 (N.D.N.Y.)

(Cite as: 2009 WL 3199520 (N.D.N.Y.))

or regulatory authority permitting respondent to reconsider an apparently final prior determination, we conclude that respondent acted properly in this case.... In the absence of statutory or regulatory guidance, respondent is entitled to exercise some discretion in fashioning appropriate remedies ....") [citations omitted]; *cf. Miller v. Selsky,* 111 F.3d 7, 8 (2d Cir.1997) (describing procedural history of case in which Donald Selsky *sua sponte* reversed his prior ruling, apparently based on argument raised by the plaintiff in an Article 78 proceeding challenging Selsky's decision).

With regard to Defendant Smith, it is true that "[he] cannot be liable solely because he held a position of authority over other defendants." *Douglas v. Smith,* 05-CV-1000, 2008 WL 434605, at * 15 (N.D.N.Y. Feb.14, 2008) (Homer, MJ). However, liability may be imputed to Defendant Smith where his supervision amounts to gross negligence. *Murray v. Pataki,* 03-CV-1263, 2007 WL 956941, at *4 (N.D.N.Y. Mar.29, 2007) (Kahn, J.) ("[I]f a prisoner claims that a supervisory official failed to train or supervise subordinates because of gross negligence, supervisory liability may be imposed when an official has actual or constructive notice of unconstitutional practices and demonstrates gross or deliberate indifference by failing to act.") (internal quotation marks and citations omitted).

Here, Plaintiff alleges in his verified Amended Complaint that "[i]n July 2005, Hamilton complained to J.T. Smith about the unconstitutional theft of mail being implemented at Shawangunk." (Dkt. No. 17, at ¶ 31.) "Smith refused to correct the policy being instituted by J. Maly and allowed the theft of mail to continue." (*Id.*) This sworn allegation (which, again, has the force and effect of a statement in an affidavit) creates a genuine issue of material fact as to whether Defendant had notice of Defendant Maly's alleged behavior. In addition, because Plaintiff swears that some of the mail tampering occurred after he made Defendant Smith aware of the problem (*see* Dkt. No. 17, at ¶ 31-35), there is genuine issue of material fact as to whether Defendant Smith was grossly negligent in his supervision of Defendant Maly.

**\*12** For all of these reasons, Defendants' motion for summary judgment on this claim is denied.

**C. Plaintiff's Fourteenth Amendment Claim of Violation of Due Process**

In his Amended Complaint, Plaintiff alleges that Defendants Maly, Selsky and Davis violated his due process rights by precluding him from calling certain witnesses during Plaintiff's disciplinary rehearing, which resulted in Plaintiff being sentenced to twelve months in the Special Housing Unit ("SHU"). (Dkt. No. 17.) In his Report-Recommendation, Magistrate Judge Homer recommends that this claim proceed to trial because there is a genuine issue of material fact as to whether Defendant Maly violated Plaintiff's Fourteenth Amendment due process rights at his disciplinary hearing by refusing to call former inmate named Mathis (who Plaintiff claims possessed exculpatory evidence) and a substance abuse program representative (who Plaintiff claims could have provided mitigating evidence).[FN17] (Dkt. No. 60, at 9-11, 36-38.)

> FN17. The Witness Interview Notice, filled out by Defendant Maly, indicates that Plaintiff sought to call Counselor Williams, Counselor Bosland, and/or "someone from OMH." (Dkt. No. 68, Part 2, at 9.)

In their Objections to the Report-Recommendation, Defendants argue that Magistrate Judge Homer erred in his conclusion because (1) the record is clear that Defendant Maly attempted to contact Mathis, but was unsuccessful in locating him, and (2) Defendant Maly refused to allow other witnesses to testify at the second hearing only after interviewing these witnesses and determining that they lacked direct knowledge of the alleged incident. (Dkt. No. 66.)

On January 12, 2005, Plaintiff was selected for a random drug test. (Dkt. No. 58, Part 3, at 33.) Two separate urinalysis tests were positive for cannabinoids. (*Id.*) As a result, Plaintiff was reported for a violation of Rule 113.24. (*Id.*) On January 31, 2005, Defendant Davis conducted a superintendent's hearing at Attica C.F. and found Plaintiff guilty. (Dkt. No. 68, Part 7.) Plaintiff appealed this determination, and a rehearing was scheduled for April 12, 2005, at Shawangunk C.F. (Dkt.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3199520 (N.D.N.Y.)

(Cite as: 2009 WL 3199520 (N.D.N.Y.))

No. 58, Part 3, at 33.)

At his rehearing, Plaintiff requested that the hearing officer, Defendant Maly, allow him to call a former inmate (Mathis), who was recently released from prison, who could offer exculpatory evidence about Plaintiff's positive drug test. (Dkt. No. 51, at 96-98, 121-23 [Hamilton Dep. Tr.].) Defendant Maly interviewed some of the witnesses that Plaintiff requested, and found them to have no direct knowledge of the incident. (Dkt. No. 58, Part 3, at 10.) As a result, Defendant Maly determined that these witnesses were irrelevant, and accordingly denied Plaintiff's request to call them. (*Id.*) Defendant Maly also attempted to contact Mathis, but was unsuccessful in locating him. After interviewing the witnesses that he deemed irrelevant and attempting to contact Mathis to no avail, Defendant Maly proceeded with the hearing in Plaintiff's absence. (Dkt. No. 58, Part 3, at 34.) [FN18]

> [FN18.] Plaintiff refused to attend his hearing because he alleges that it was perfunctory. (Dkt. No. 58, Part 4, at 30-38.)

The Supreme Court has held that "an inmate facing disciplinary proceedings should be allowed to call witnesses and present documentary evidence in his defense when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals." *Wolff v. McDonnell,* 418 U.S. 539, 566, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). However, the Court also held that "the unrestricted right to call witnesses from the prison population carries obvious potential for disruption and for interference with the swift punishment that in individual cases may be essential to carrying out the correctional program of the institution." *Wolff,* 418 U.S. at 566. Furthermore, the Court in *Wolff* explained that "[w]e should not be too ready to exercise oversight and put aside the judgment of prison administrators ... [w]e must balance the inmates's interest [in avoiding the loss of a right or benefit] against the needs of the prison, and some amount of flexibility and accommodation is required." *Id.; see also Scott v. Kelly,* 962 F.2d 145, 147 (2d Cir.1992) (request for witnesses "can be denied on the basis of irrelevance or lack of necessity").

**\*13** "Emphasizing the caution courts should exercise

before challenging disciplinary hearings, the Supreme Court instructs, '[p]rison officials must have the necessary discretion to keep a prison disciplinary hearing within reasonable limits and ... to limit access to other inmates to collect statements or to compile other documentary evidence.' " *Dixon v. Goord,* 224 F.Supp.2d 739, 745-46 (S.D.N.Y.2002) (citing *Wolff,* 418 U.S. at 566). "Deference to prison administrators may mean upholding a denial of a request even in situations where the 'denied witness might have provided testimony to exculpate [the inmate],' or where the reviewing court might have ruled differently had it been conducting the hearing." *Dixon,* 224 F.Supp.2d at 746 (citing *Afrika v. Selsky,* 750 F.Supp. 595, 601 [S.D.N.Y.1990] ).

As an initial matter, the Court finds that Defendant Davis, who worked at Attica C.F. during the time in question, had no personal involvement in the disciplinary proceedings held in April 2005 at Shawangunk C.F., which give rise to Plaintiff's Fourteenth Amendment due process claims. As a result, Plaintiff's Fourteenth Amendment due process claim against Defendant Davis should be dismissed.

With regard to Defendant Maly, it is undisputed that he attempted to contact Mathis, using the telephone number provided to him by Plaintiff. (Dkt. No. 58, Part 3, at 13.) When Defendant Maly called that telephone number, "the local phone company responded that this number was disconnected." (*Id.*) In addition, Defendant Maly interviewed the witnesses that Plaintiff sought to call, and determined during these interviews that their testimony was irrelevant to the issue of whether Plaintiff tested positive for cannabinoids.

Even assuming that Mathis may have provided exculpatory testimony, it cannot be said that failure to call him (and the other requested witness) amounts to a violation of Plaintiff's due process rights given that Defendant Maly made efforts to contact Plaintiff's witnesses, and provided Plaintiff with an explanation (through the Witness Interview Notice Form) as to why they would not be testifying at his hearing.[FN19] The Court notes that, as previously stated, courts should exercise caution before challenging disciplinary hearings, and prison officials must have the necessary discretion to keep

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3199520 (N.D.N.Y.)

(Cite as: 2009 WL 3199520 (N.D.N.Y.))

a prison disciplinary hearing within reasonable limits. *Dixon,* 224 F.Supp.2d at 746. Here, the Court finds that such discretion is properly exercised in giving some deference to the hearing officer's judgment as to (1) what constitutes relevant testimony, and (2) what constitutes a reasonable period of time in which to conduct a disciplinary hearing. *Id.; Wolff,* 418 U.S. at 566.

> FN19. The Supreme Court has held that prison officials may be required to explain, in a limited manner, the reason why witnesses were not allowed to testify but that they may do so either by making the explanation a part of the 'administrative record' in the disciplinary proceeding, or by presenting testimony in court if the deprivation of a 'liberty' interest is challenged because of that claimed defect in the hearing. *Ponte v. Real,* 471 U.S. 491, 497, 105 S.Ct. 2192, 85 L.Ed.2d 553 (1985). "In other words, the prison officials may choose to explain their decision at the hearing, or they may choose to explain it 'later.' " *Ponte v. Real,* 471 U.S. at 497. "Explaining the decision at the hearing will of course not immunize prison officials from a subsequent court challenge to their decision, but so long as the reasons are logically related to preventing undue hazards to 'institutional safety or correctional goals,' " the explanation should meet the due process requirements as outlined in *Wolff. Id .*

For these reasons, the Court grants Defendants' motion for summary judgment with regard to Plaintiff's Fourteenth Amendment due process claims.

## IV. ANALYSIS OF REMAINING CLAIMS

The only Objections offered by Plaintiff to Magistrate Judge Homer's Report-Recommendation regarding the claims not discussed above in Part III of this Decision and Order are simply reiterations of Plaintiff's previous arguments of his claims regarding a denial of mental health treatment by Defendant Skies, contaminated drinking water and poor ventilation in the prison facility, and wrongful placement in CSU. (*See* Dkt. No. 67).

**\*14** After carefully reviewing all of the papers in this

action, including Magistrate Judge Homer's Report-Recommendation and Plaintiff's Objections thereto, the Court concludes that Magistrate Judge Homer's Report-Recommendation regarding the claims not discussed above in Part III of this Decision and Order is correct in all respects. Magistrate Judge Homer employed the proper standards, accurately recited the facts, and reasonably applied the law to those facts. As a result, the Court accepts and adopts the remainder of the Report-Recommendation for the reasons stated therein.

**ACCORDINGLY,** it is

**ORDERED** that United States Magistrate Judge David R. Homer's Report-Recommendation (Dkt. No. 60) is *ACCEPTED* and *ADOPTED* **as modified** by this Decision and Order; and it is further

**ORDERED** that Defendant's motion for summary judgment (Dkt. No. 51) is *DENIED* with respect to Plaintiff's First Amendment claims against Smith and Maly regarding the tampering with his legal mail, specifically the Mathis affidavit; and it is further

**ORDERED** that Defendant's motion for summary judgment (Dkt. No. 51) is *GRANTED* as to all other claims and Defendants; and it is further

**ORDERED** that Plaintiff's claims against Defendants Gonzalez, Genovese, Parisi, Selsky, Davis, and Chiapperino are *DISMISSED* in their entirety.

N.D.N.Y.,2009.

Hamilton v. Smith
Slip Copy, 2009 WL 3199520 (N.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Clark v. Westchester County, Not Reported in F.Supp. (1998)

1998 WL 214772

Case 9:14-cv-00626-BKS-DEP    Document 86    Filed 02/02/18    Page 326 of 359

1998 WL 214772
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Kenneth CLARK, Plaintiff,

v.

Westchester County, Westchester County
Department of Correction, Westchester
County Department of Correction Medical
Department, Officer Willis, Sergeant Simmons,
# 107, T.A.C. Team, aka "Ninja Turtles", and
John Does # 1 Through # 4, Defendants.

No. 96 CIV. 8381(DLC).
|
May 1, 1998.

**Attorneys and Law Firms**

John S. Pokalsky, New York, for plaintiff.

Alan D. Scheinkman, Westchester County Attorney, Kyle C. McGovern, Assistant County Attorney, White Plains, for defendants.

*OPINION and ORDER*

COTE, District J.

**\*1** On November 7, 1996, Kenneth Clark ("Clark") commenced this action as a consequence of the brutal mistreatment that he alleges he received while a pretrial detainee at the Westchester County Jail in Valhalla, New York, during two incidents on November 12, 1995 and February 3, 1996. Clark's original complaint named two individual defendants, Officer Peter Willis ("Willis") and Sergeant Ronnie Simmons ("Simmons"), as well as Westchester County, the Westchester County Department of Corrections, and the Westchester County Department of Corrections Medical Department. The initial pleading also listed four John Doe defendants who were part of a prison response team Clark identified as the "Ninja Turtles." Two matters are before the Court at this time: first, in a motion to amend dated January 6, 1998, Clark seeks to add as individual defendants those John Does he has now identified by name; second, the defendants have moved for summary judgment and have opposed the motion to dismiss. For the following reasons, the motion

for summary judgment is granted in part and in part denied, and the motion to amend is denied.

BACKGROUND

Briefly, Clark contends that he was beaten severely on November 12, 1995, after guards interrupted his visit with family and friends at the Westchester County Jail. According to the Complaint, Willis and other officers beat Clark while Simmons watched. Clark was thereafter examined by a nurse, who also mistreated him. Simmons, Willis, and others then refused Clark further medical treatment, and Simmons filed a false disciplinary report against him, which resulted in Clark being placed in solitary confinement.

Following this incident, Clark filed a notice of claim against Willis and others, which allegedly led Willis to threaten Clark. This in turn caused Clark to file another complaint, regarding Willis's threat. Consequently, on February 3, 1996, Willis and other officers attacked Clark in his cell and brutally beat him again. Clark alleges that the Westchester County doctor refused to treat him after this second beating, saying to the officers involved, "I'm not going to be responsible for what you did to him." Clark was then taken to the Grassland Hospital in Valhalla, from which he was later prematurely removed by unnamed officers.

The Complaint's first cause of action, based on all of the preceding events, charges both Willis and Simmons under 42 U.S.C. §§ 1983 and 1988, as well as the Fifth, Eighth, Ninth, and Fourteenth Amendments to the U.S. Constitution. It appears from this pleading that the following conduct is at stake: Willis's attack on Clark and Simmons's failure to protect Clark on November 12; both men's refusal to provide Clark with medical care after the November 12 incident; Simmons's filing of a false report; and Willis's retaliatory threat and subsequent retaliatory attack against Clark on February 3.[1] The second cause of action is brought under Section 1983 against the organizational defendants for official policies and customs that permitted the attacks to occur. Counts three to five plead state law claims sounding in assault, battery, and negligence.

Clark v. Westchester County, Not Reported in F.Supp. (1998)

1998 WL 214772

DISCUSSION

A. *Motion for Summary Judgment*

**\*2** The defendants' motion for summary judgment seeks dismissal of the entire action. Summary judgment may not be granted unless the submissions of the parties taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Rule 56(c),* Fed.R.Civ.P. The moving party bears the burden of demonstrating the absence of a material factual question, and in making this determination the Court must view all facts in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). When the moving party has asserted facts showing that the non-movant's claims cannot be sustained, the opposing party must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on "mere allegations or denials" of the facts asserted by the movant. *Rule 56(e),* Fed.R.Civ.P.; *accord Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525–26 (2d Cir.1994). In deciding whether to grant summary judgment, therefore, this Court must determine (1) whether a genuine factual dispute exists based on the evidence in the record, and (2) whether the fact in dispute is material based on the substantive law at issue.

To begin with, the defendants note correctly that Clark's claims, brought by him as a pretrial detainee, should have been asserted under the Fifth and Fourteenth Amendments, and not under the Eighth and Ninth Amendments. *See, e.g., Bryant v. Maffucci,* 923 F.2d 979, 983 (2d Cir.1991) (citing *Bell v. Wolfish,* 441 U.S. 520, 535 n. 16, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979)). [2] The claims based on the Eighth and Ninth Amendments are therefore dismissed.

The defendants further contend that under the Supreme Court's decision in *Sandin v. Conner,* 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), Clark's thirty day confinement in administrative keeplock, pending a hearing on disciplinary charges, was not a significant or atypical hardship, and therefore does not create a liberty interest sufficient to trigger the protections of the Due Process Clause. In any event, the defendants argue that Clark has not alleged that he was deprived of any of the

procedural protections guaranteed by *Hewitt v. Helms,* 459 U.S. 460, 468–69, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983). In response, Clark maintains that he was denied adequate notice of the charges against him in connection with the confinement, inasmuch as the written charges were "slid under the door [while Clark was] in solitary confinement." Clark also contends that the defendants' documents are in error in indicating that he "refused to sign, answer questions or make statement [sic]" at the time that he was served with such notice.

*Hewitt* requires only that an inmate "*receive some notice of the charges against him and an opportunity to present his views* to the prison official charged with deciding whether to transfer him to administrative segregation." 459 U.S. at 476 (emphasis added). As indicated by his memorandum in opposition to this motion, Clark does not dispute that he received such notice—it was slipped under the door to his cell. Rather, Clark's complaints appear to be that he was denied an opportunity to sign the form on which a prisoner customarily acknowledges service of the notice, and that the form erroneously reflects that he refused to sign the acknowledgment. But inasmuch as Clark is not disputing that he received pre-hearing notice of the charge against him—which the documents show was served on November 12, the day of the incident and eight days before the hearing—there is no issue of fact necessitating a trial of the procedural Due Process claim. Thus, without reaching the issue of whether 30 days of keeplock confinement creates a liberty interest for a pretrial detainee, it is appropriate to dismiss the Due Process claim relating to the administrative confinement and hearing process following the November attack because Clark has failed to establish a factual dispute as to whether he was deprived of any of the procedural protections to which he is entitled.

**\*3** The defendants argue that Clark's claims for deliberate indifference to his medical needs must be dismissed as well because (i) he has failed to demonstrate that he had any serious medical need that went untreated following the November incident; (ii) the nurse who examined Clark after that incident was not deliberately indifferent to his needs; (iii) his injuries following the February incident were not serious and were treated by the hospital staff; and (iv) his discharge from the hospital was based on the recommendation of the hospital staff. The defendants do not address the only claim regarding medical treatment as to which Clark names the individual defendants—his claim that they refused to provide him

Case 9:14-cv-00626-BKS-DEP    Document 86    Filed 02/02/18    Page 328 of 359

Clark v. Westchester County, Not Reported in F.Supp. (1998)

1998 WL 214772

access to medical care after the November attack—other than indirectly, by their contention that he had no serious medical need requiring such care at that time. [3]

Clark contends that he was in extreme pain following the November assault, that the evidence concerning the nature of the assault corroborates his claim of pain, and that he did not receive adequate medical treatment for that pain. The existence of pain may constitute a serious medical need. *See, e.g., Hathaway v. Coughlin,* 99 F.3d 550, 552 (2d Cir.1996). Because there is a disputed issue of fact as to whether Clark was in extreme pain that required more medical care than he received, and because the defendants do not contest that both Willis and Simmons were personally involved in the decision as to what medical care Clark could receive for his complaint of pain in November, summary judgment on this portion of Clark's claims for inadequate medical care is inappropriate. Nevertheless, because Clark failed to name either individual defendant in connection with his other medical care complaints, those other claims are dismissed as to the two individual defendants.

The defendants move to dismiss the excessive force claims on the ground that the force that was admittedly used in both November and February was not excessive under the circumstances. Summary judgment is likewise inappropriate on these claims because there are disputed issues of fact regarding the provocation for the incidents, the amount of force used, and the extent of the injuries to Clark. Alternatively, the two individual defendants contend that they are entitled to qualified immunity on the excessive force claims because the force they used was necessary and reasonable under the circumstances. Factual disputes about the nature and the degree of force used, as well as the necessity for the use of force, preclude a grant of qualified immunity prior to trial.

Relying on *Monell v. New York City Dep't of Soc. Servs.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the institutional defendants move for summary judgment as to all claims against them. They argue that Clark has failed to establish that these defendants had a policy or custom that resulted in the two attacks alleged in the Complaint. *See Board of County Comm'rs of Bryant County v. Brown,* 520 U.S. 397, ——– ———, 117 S.Ct. 1382, 1387–88, 137 L.Ed.2d 626 (1997); *Zanghi v. Incorporated Village of Old Brookville,* 752 F.2d 42, 45 (2d Cir.1985). Clark responds that he has carried his burden

of establishing a basis for his claim in three ways: (i) that the officers would not have acted as they did if they had been properly trained and supervised; (ii) that because the institutional defendants failed to respond to Clark's complaint about Willis's threat, they are responsible for Willis's subsequent February attack on Clark; and (iii) that Clark has identified three other inmates who were attacked by officers and thereafter refused medical care, just as he was.

**\*4** The Court concludes that Clark has carried his burden of raising a factual issue, requiring resolution at trial, concerning the training and supervision of officers engaged in physical confrontations with inmates, and the provision of medical care after the November attack. Clark has not, however, carried his burden of establishing any deliberate indifference to his serious medical needs after the February attack. He was taken to a hospital and treated following that incident, and he has failed to identify any serious medical need that went untreated or any adverse effect upon him from any delay in sending him to the hospital. Even with respect to the dispute regarding his discharge from the hospital, Clark has not identified any serious medical need that went unaddressed because of the discharge, whether premature or not, and whether or not occasioned by the hospital or the prison staff.

Finally, the defendants move to dismiss as a matter of law Clark's claims for punitive damages against the institutional defendants and against the individual defendants in their official capacity. The motion is granted under the doctrine established in *City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981), that " § 1983 plaintiffs may not recover punitive damages against a municipality." *Jefferson v. City of Tarrant,* 522 U.S. 75, ——, 118 S.Ct. 481, 485, 139 L.Ed.2d 433 (1997).

In sum, the summary judgment motion is granted except for the following claims: (1) that Simmons and Willis used excessive force or allowed its use in the November 1995 incident; (2) that Simmons and Willis interfered with Clark receiving proper medical attention after the November 1995 incident; (3) that Willis used excessive force or allowed its use in February 1996; and (4) that the County and its Department of Correction failed adequately to supervise and train its officers, and therefore are responsible for the use of excessive force by those officers in the November and February incidents and

Case 9:14-cv-00626-BKS-DEP   Document 86   Filed 02/02/18   Page 329 of 359

Clark v. Westchester County, Not Reported in F.Supp. (1998)

1998 WL 214772

for any interference with an injured inmate's receipt of medical care after the November incident.

B. *Motion to Amend*

Through a motion to amend his Complaint, Clark seeks to add as party defendants ten individuals who are alleged to have been members of a team that participated in the assaults on Clark in November and February. Clark also has moved for imposition of fees and costs associated with bringing this motion because the County has refused to consent to the amendment. In circumstances such as these, where consent to amend has been denied, the party seeking to amend its pleadings may do so "only by leave of court ... and leave shall be freely given when justice so requires." Rule 15(a), Fed.R.Civ.P. The Supreme Court has set forth clear guidelines on when courts should allow such amendments:

> In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be "freely given."

**\*5** *Rachman Bag Co. v. Liberty Mut. Ins. Co.,* 46 F.3d 230, 234 (2nd Cir.1995) (quoting *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962)). Refusal to grant leave to amend "without justification is 'inconsistent with the spirit of the Federal Rules.' " *Id.* (quoting *Foman,* 371 U.S. at 182). In other words, "[d]elay alone unaccompanied by such a 'declared reason' does not usually warrant denial of leave to amend." *Id.* at 234–35 (citation omitted).

A brief description of the procedural history behind the motion will assist in understanding its resolution. At a March 7, 1997 conference, the parties agreed to, and the Court set, a discovery cut-off of October 17, 1997. Through his First Request for Production of Documents, Clark asked for documents that would identify the so-called "Ninja Turtles" by March 28, 1997. Pursuant to this Court's direction, the defendants supplied—in a May 31 Response that plaintiff's counsel says he received at latest

in mid June—the names of those officers working on the "S.S.T." team during the relevant shifts. By way of an October 16, 1997 letter, plaintiff's counsel requested (and defense counsel consented to) an extension of discovery until November 14, which the Court approved through an October 16 endorsement. At a November 21 conference with counsel for both parties, the Court discussed a summary judgment motion that the defendants sought to bring, and set a briefing schedule for that motion. Clark's counsel made no mention at that time of a desire to amend the original pleadings, or of the need to add additional defendants to the action. At some point, discussions apparently took place between counsel regarding the defendants consenting to an amendment of the pleadings. On November 21, 1997, Clark requested in writing that the defendants notify him whether they would consent to the amendment of the pleadings or whether motion practice would be necessary. On December 5, 1997, the County advised plaintiff's counsel in writing that it could not stipulate to add individual defendants to the action. On December 9, 1997, plaintiff's counsel informed the Court for the first time of a desire to amend the pleadings to add additional defendants.

The defendants oppose the motion to amend on three grounds: (i) that it is untimely, coming after the close of discovery and more than six months after Clark learned the identity of the individuals he now wishes to add; (ii) that the amendment would severely prejudice the added defendants because they are being sued, *inter alia,* for punitive damages, as to which the County may not indemnify them; and (iii) that the state law claims against the proposed defendants do not relate back to the original complaint under Rule 15(c), Fed.R.Civ.P., and therefore are barred. With respect to the last argument, it is undisputed that under New York law, intentional torts are governed by a one year statute of limitations, and negligence claims against a municipality or its employees are governed by a statute of limitations of one year and ninety days.

**\*6** The Court finds that the motion to amend is untimely, for the following reasons, and therefore should be denied. First, discovery has long been closed; the addition of these defendants will require that it be reopened, at great prejudice and expense to the institutional defendants (let alone the newly added individual defendants), and thereby significantly delay the further conduct of the litigation. Second, and perhaps more important, Clark was given

1998 WL 214772

the identities of the individuals he now seeks to add as parties well within the discovery period—indeed, at least five months before the close of discovery—yet he has adduced no justification for his delay in seeking to add them. In these circumstances, their addition is untimely, and the motion to amend must therefore be denied.

CONCLUSION

For the reasons set forth above, the motion for summary judgment is granted in part and in part denied, and the motion to amend is denied. In addition, it is hereby

ORDERED that the further conduct of pretrial proceedings in this case shall be governed by the Pretrial Scheduling Order filed simultaneously with this Opinion.

SO ORDERED:

**All Citations**

Not Reported in F.Supp., 1998 WL 214772

Footnotes

1    Although the Complaint also asserts an Equal Protection claim, it does not identify any protected class to which Clark belongs, and in any event is not otherwise discussed by the parties. The Court shall assume that the Equal Protection claim is no longer being pursued.

2    The Ninth Amendment, concerning unenumerated rights, simply has no application in these circumstances.

3    In fact, it appears from the materials submitted in connection with the summary judgment motion that neither Willis nor Simmons refused Clark medical care after the November attack. Instead, it appears that the nurse who examined Clark refused his request to see a doctor. Because the defendants chose not to focus their motion on the issue of the personal involvement of the two individual defendants, however, Clark has not had an opportunity to identify all of the evidence that might bear on this issue.

---

**End of Document**                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.



Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

**C**  Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Lisa ELGAMIL, Plaintiff,
v.
SYRACUSE UNIVERSITY, Defendant.
**No. 99-CV-611 NPMGLS.**

Aug. 22, 2000.

Joch & Kirby, Ithaca, New York, for Plaintiff, Joseph
Joch, of counsel.

Bond, Schoeneck & King, LLP, Syracuse, New York, for
Defendant, John Gaal, Paul Limmiatis, of counsel.

MEMORANDUM-DECISION AND ORDER

MCCURN, Senior J.

INTRODUCTION

**\*1** Plaintiff brings suit against defendant Syracuse
University ("University") pursuant to 20 U.S.C. §
1681*etseq.* ("Title IX") claiming hostile educational
environment, and retaliation for complaints of same.
Presently before the court is the University's motion for
summary judgment. Plaintiff opposes the motion.

LOCAL RULES PRACTICE

The facts of this case, which the court recites below, are
affected by plaintiff's failure to file a Statement of Material
Facts which complies with the clear mandate of Local

Rule 7.1(a)(3) of the Northern District of New York. This
Rule requires a motion for summary judgment to contain
a Statement of Material Facts with specific citations to the
record where those facts are established. A similar
obligation is imposed upon the non-movant who

shall file a response to the [movant's] Statement of
Material Facts. The non-movant's response shall mirror the
movant's Statement of Material Facts by admitting and/or
denying each of the movant's assertions in matching
numbered paragraphs. Each denial shall set forth a specific
citation to the record where the factual issue arises.... *Any
facts set forth in the [movant's] Statement of material
Facts shall be deemed admitted unless specifically
controverted by the opposing party.*

L.R. 7.1(a)(3) (emphasis in original).

In moving for summary judgment, the University filed an
eleven page, twenty-nine paragraph Statement of Material
Facts, replete with citations to the record in every
paragraph. Plaintiff, in opposition, filed a two page, nine
paragraph statement appended to her memorandum of law
which failed to admit or deny the specific assertions set
forth by defendant, and which failed to contain a single
citation to the record. Plaintiff has thus failed to comply
with Rule 7.1(a)(3).

As recently noted in another decision, "[t]he Local Rules
are not suggestions, but impose procedural requirements
upon parties litigating in this District." *Osier v. Broome
County,* 47 F.Supp.2d 311, 317 (N.D.N.Y.1999). As a
consequence, courts in this district have not hesitated to
enforce Rule 7.1(a)(3) and its predecessor, Rule 7.1(f) [FN1]
by deeming the facts asserted in a movant's proper
Statement of Material Facts as admitted, when, as here, the
opposing party has failed to comply with the Rule.
*See,e.g.,Phipps v. New York State Dep't of Labor,* 53
F.Supp.2d 551, 556-57 (N.D.N.Y.1999); *DeMar v.
Car-Freshner Corp.,* 49 F.Supp.2d 84, 86
(N.D.N.Y.1999); *Osier,* 47 F. Supp .2d at 317;*Nicholson
v. Doe,* 185 F.R.D. 134, 135 (N.D.N.Y.1999);*TSI Energy,*

© 2010 Thomson Reuters. No Claim to Orig. US Gov.
Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

*Inc. v. Stewart and Stevenson Operations, Inc.*, 1998 WL 903629, at \*1 n. 1 (N.D. N.Y.1998); *Costello v.. Norton*, 1998 WL 743710, at \*1 n. 2 (N.D.N.Y.1998); *Squair v. O'Brien & Gere Engineers, Inc.*, 1998 WL 566773, at \*1 n. 2 (N.D.N.Y.1998). As in the cases just cited, this court deems as admitted all of the facts asserted in defendant's Statement of Material Facts. The court next recites these undisputed facts.

FN1. Amended January 1, 1999.

BACKGROUND

*2 Plaintiff became a doctoral student in the University's Child and Family Studies ("CFS") department in the Spring of 1995. Successful completion of the doctoral program required a student to (1) complete 60 credit hours of course work; (2) pass written comprehensive examinations ("comp.exams") in the areas of research methods, child development, family theory and a specialty area; (3) after passing all four comp. exams, orally defend the written answers to those exams; (4) then select a dissertation topic and have the proposal for the topic approved; and (5) finally write and orally defend the dissertation. Plaintiff failed to progress beyond the first step.

Each student is assigned an advisor, though it is not uncommon for students to change advisors during the course of their studies, for a myriad of reasons. The advisor's role is to guide the student in regard to course selection and academic progress. A tenured member of the CFS department, Dr. Jaipaul Roopnarine, was assigned as plaintiff's advisor.

As a student's comp. exams near, he or she selects an examination committee, usually consisting of three faculty members, including the student's advisor. This committee writes the questions which comprise the student's comp. exams, and provides the student with guidance and assistance in preparing for the exams. Each member of the committee writes one exam; one member writes two. Two evaluators grade each exam; ordinarily the faculty member who wrote the question, and one other faculty member

selected by the coordinator of exams.

Roopnarine, in addition to his teaching and advising duties, was the coordinator of exams for the entire CFS department. In this capacity, he was generally responsible for selecting the evaluators who would grade each student's comp. exam, distributing the student's answer to the evaluators for grading, collecting the evaluations, and compiling the evaluation results.

The evaluators graded an exam in one of three ways: "pass," "marginal" or "fail." A student who received a pass from each of the two graders passed that exam. A student who received two fails from the graders failed the exam. A pass and a marginal grade allowed the student to pass. A marginal and a fail grade resulted in a failure. Two marginal evaluations may result in a committee having to decide whether the student would be given a passing grade. In cases where a student was given both a pass and a fail, a third evaluator served as the tie breaker.

These evaluators read and graded the exam questions independently of each other, and no indication of the student's identity was provided on the answer. FN2 The coordinator, Roopnarine, had no discretion in compiling these grades-he simply applied the pass or fail formula described above in announcing whether a student passed or failed the comp. exams. Only after a student passed all four written exam questions would he or she be permitted to move to the oral defense of those answers.

FN2. Of course, as mentioned, because one of the evaluators may have written the question, and the question may have been specific to just that one student, one of the two or three evaluators may have known the student's identity regardless of the anonymity of the examination answer.

*3 Plaintiff completed her required course work and took the comp. exams in October of 1996. Plaintiff passed two of the exams, family theory and specialty, but failed two, child development and research methods. On each of the exams she failed, she had one marginal grade, and one failing grade. Roopnarine, as a member of her committee,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

authored and graded two of her exams. She passed one of them, specialty, and failed the other, research methods. Roopnarine, incidently, gave her a pass on specialty, and a marginal on research methods. Thus it was another professor who gave her a failing grade on research methods, resulting in her failure of the exam. As to the other failed exam, child development, it is undisputed that Roopnarine neither wrote the question, nor graded the answer.

Pursuant to the University's procedures, she retook the two exams she failed in January of 1997. Despite being given the same questions, she only passed one, child development. She again failed research methods by getting marginal and fail grades from her evaluators. This time, Roopnarine was not one of the evaluators for either of her exam questions.

After this second unsuccessful attempt at passing research methods, plaintiff complained to the chair of the CFS department, Dr. Norma Burgess. She did not think that she had been properly prepared for her exam, and complained that she could no longer work with Roopnarine because he yelled at her, was rude to her, and was otherwise not responsive or helpful. She wanted a new advisor. Plaintiff gave no indication, however, that she was being sexually harassed by Roopnarine.

Though plaintiff never offered any additional explanation for her demands of a new advisor, Burgess eventually agreed to change her advisor, due to plaintiff's insistence. In March of 1997, Burgess and Roopnarine spoke, and Roopnarine understood that he would no longer be advising plaintiff. After that time period, plaintiff and Roopnarine had no further contact. By June of that year, she had been assigned a new advisor, Dr. Mellisa Clawson.

Plaintiff then met with Clawson to prepare to take her research methods exam for the third time. Despite Clawson's repeated efforts to work with plaintiff, she sought only minimal assistance; this was disturbing to Clawson, given plaintiff's past failures of the research methods exam. Eventually, Clawson was assigned to write plaintiff's third research methods exam.

The first time plaintiff made any mention of sexual harassment was in August of 1997, soon before plaintiff made her third attempt at passing research methods. She complained to Susan Crockett, Dean of the University's College of Human Development, the parent organization of the CFS department. Even then, however, plaintiff merely repeated the claims that Roopnarine yelled at her, was rude to her, and was not responsive or helpful. By this time Roopnarine had no contact with plaintiff in any event. The purpose of plaintiff's complaint was to make sure that Roopnarine would not be involved in her upcoming examination as exam coordinator. Due to plaintiff's complaints, Roopnarine was removed from all involvement with plaintiff's third research methods examination. As chair of the department, Burgess took over the responsibility for serving as plaintiff's exam coordinator. Thus, Burgess, not Roopnarine, was responsible for receiving plaintiff's answer, selecting the evaluators, and compiling the grades of these evaluators;[FN3] as mentioned, Clawson, not Roopnarine, authored the exam question.

> [FN3.] Plaintiff appears to allege in her deposition and memorandum of law that Roopnarine remained the exam coordinator for her third and final exam. *See* Pl.'s Dep. at 278; Pl.'s Mem. of Law at 9. The overwhelming and undisputed evidence in the record establishes that Roopnarine was not, in fact, the coordinator of this exam. Indeed, as discussed above, the University submitted a Statement of Material Facts which specifically asserted in paragraph 18 that Roopnarine was removed from all involvement in plaintiff's exam, including the role of exam coordinator. *See* Def.'s Statement of Material Facts at ¶ 18 (and citations to the record therein). Aside from the fact that this assertion is deemed admitted for plaintiff's failure to controvert it, plaintiff cannot maintain, without any evidence, that Roopnarine was indeed her exam coordinator. Without more than broad, conclusory allegations of same, no genuine issue of material fact exists on this question.

**\*4** Plaintiff took the third research methods examination

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

in September of 1997. Clawson and another professor, Dr. Kawamoto, were her evaluators. Clawson gave her a failing grade; Kawamoto indicated that there were "some key areas of concern," but not enough for him to deny her passage. As a result of receiving one passing and one failing grade, plaintiff's research methods exam was submitted to a third evaluator to act as a tie breaker. Dr. Dean Busby, whose expertise was research, was chosen for this task. Busby gave plaintiff a failing grade, and began his written evaluation by stating that

[t]his is one of the most poorly organized and written exams I have ever read. I cannot in good conscience vote any other way than a fail. I tried to get it to a marginal but could not find even one section that I would pass.

Busby Aff. Ex. B.

The undisputed evidence shows that Clawson, Kawamoto and Busby each evaluated plaintiff's exam answer independently, without input from either Roopnarine or anyone else. Kawamoto and Busby did not know whose exam they were evaluating. FN4 Importantly, it is also undisputed that none of the three evaluators knew of plaintiff's claims of sexual harassment.

> FN4. Clawson knew it was plaintiff's examination because she was plaintiff's advisor, and wrote the examination question.

After receiving the one passing and two failing evaluations, Burgess notified plaintiff in December of 1997 that she had, yet again, failed the research methods exam, and offered her two options. Although the University's policies permitted a student to only take a comp. exam three times (the original exam, plus two retakes), the CFS department would allow plaintiff to retake the exam for a fourth time, provided that she took a remedial research methods class to strengthen her abilities. Alternatively, Burgess indicated that the CFS department would be willing to recommend plaintiff for a master's degree based on her graduate work. Plaintiff rejected both offers.

The second time plaintiff used the term sexual harassment in connection with Roopnarine was six months after she was notified that she had failed for the third time, in May of 1998. Through an attorney, she filed a sexual harassment complaint against Roopnarine with the University. This written complaint repeated her allegations that Roopnarine had yelled at her, been rude to her, and otherwise had not been responsive to her needs. She also, for the first time, complained of two other acts:

1. that Roopnarine had talked to her about his sex life, including once telling her that women are attracted to him, and when he attends conferences, they want to have sex with him over lunch; and

2. that Roopnarine told her that he had a dream in which he, plaintiff and plaintiff's husband had all been present.

Prior to the commencement of this action, this was the only specific information regarding sexual harassment brought to the attention of University officials.

The University concluded that the alleged conduct, if true, was inappropriate and unprofessional, but it did not constitute sexual harassment. Plaintiff then brought this suit. In her complaint, she essentially alleges two things; first, that Roopnarine's conduct subjected her to a sexually hostile educational environment; and second, that as a result of complaining about Roopnarine's conduct, the University retaliated against her by preventing her from finishing her doctorate, mainly, by her failing her on the third research methods exam.

*5 The University now moves for summary judgment. Primarily, it argues that the alleged conduct, if true, was not sufficiently severe and pervasive to state a claim. Alternatively, it argues that it cannot be held liable for the conduct in any event, because it had no actual knowledge of plaintiff's alleged harassment, and was not deliberately indifferent to same. Finally, it argues that plaintiff is unable to establish a retaliation claim. These contentions are addressed below.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

DISCUSSION

The principles that govern summary judgment are well established. Summary judgment is properly granted only when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). When considering a motion for summary judgment, the court must draw all factual inferences and resolve all ambiguities in favor of the nonmoving party. See Torres v. Pisano, 116 F.3d 625, 630 (2d Cir.1997). As the Circuit has recently emphasized in the discrimination context, "summary judgment may not be granted simply because the court believes that the plaintiff will be unable to meet his or her burden of persuasion at trial." Danzer v. Norden Sys., Inc., 151 F.3d 50, 54 (2d Cir.1998). Rather, there must be either an absence of evidence that supports plaintiff's position, see Norton v. Sam's Club, 145 F.3d 114, 117-20 (2d Cir.), cert. denied, 525 U.S. 1001 (1998), "or the evidence must be so overwhelmingly tilted in one direction that any contrary finding would constitute clear error." Danzer, 151 F.3d at 54. Yet, as the Circuit has also admonished, "purely conclusory allegations of discrimination, absent any concrete particulars," are insufficient to defeat a motion for summary judgment. Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir.1985). With these principles in mind, the court turns to defendant's motion.

*I. Hostile Environment*

Title IX provides, with certain exceptions not relevant here, that

[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

20 U.S.C. § 1681(a).

Recently, the Supreme Court reiterated that Title IX is enforceable through an implied private right of action, and that monetary damages are available in such an action.

See Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, , 118 S.Ct. 1989, 1994 (1998) (citing Cannon v. University of Chicago, 441 U .S. 677 (1979) and Franklin v. Gwinnett County Pub. Sch., 503 U.S. 60 (1992)).

A. Severe or Pervasive

Provided that a plaintiff student can meet the requirements to hold the school itself liable for the sexual harassment,[FN5] claims of hostile educational environment are generally examined using the case law developed for hostile work environment under Title VII. See Davis, 119 S.Ct. at 1675 (citing Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986), a Title VII case). Accord Kracunas v. Iona College, 119 F.3d 80, 87 (2d Cir.1997); Murray v. New York Univ. College of Dentistry, 57 F.3d 243, 249 (2d Cir.1995), both abrogated on other grounds by Gebser, 118 S.Ct. at 1999.

> FN5. In Gebser, 118 S.Ct. at 1999, and Davis v. Monroe County Bd. of Educ., 526 U.S. 629, , 119 S.Ct. 1661, 1671 (1999), the Supreme Court explicitly departed from the *respondeat superior* principles which ordinarily govern Title VII actions for purposes of Title IX; in a Title IX case it is now clear that a school will not be liable for the conduct of its teachers unless it knew of the conduct and was deliberately indifferent to the discrimination. Defendant properly argues that even if plaintiff was subjected to a hostile environment, she cannot show the University's knowledge and deliberate indifference. This argument will be discussed below.

> It bears noting that courts examining sexual harassment claims sometimes decide first whether the alleged conduct rises to a level of actionable harassment, before deciding whether this harassment can be attributed to the defendant employer or school, as this court does here. See, e.g., Distasio v. Perkin Elmer Corp., 157 F.3d 55 (2d Cir.1998). Sometimes, however, courts first examine whether the defendant can be held liable for the conduct,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

and only then consider whether this conduct is actionable. *See,e.g.,Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 767 n. 8 (2d Cir.1998). As noted in *Quinn,* the Circuit has not instructed that the sequence occur in either particular order. *Seeid.*

**\*6** In *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21-22 (1993), the Supreme Court stated that in order to succeed, a hostile environment claim must allege conduct which is so "severe or pervasive" as to create an " 'objectively' hostile or abusive work environment," which the victim also "subjectively perceive[s] ... to be abusive." *Richardson v. New York State Dep't of Corr. Servs.,* 180 F.3d 426, 436 (alteration in original) (quoting *Harris,* 510 U.S. at 21-22). From this court's review of the record, there is no dispute that plaintiff viewed her environment to be hostile and abusive; hence, the question before the court is whether the environment was "objectively" hostile. *Seeid.* Plaintiff's allegations must be evaluated to determine whether a reasonable person who is the target of discrimination would find the educational environment "so severe, pervasive, and objectively offensive, and that so undermines and detracts from the victim['s] educational experience, that [this person is] effectively denied equal access to an institution's resources and opportunities." *Davis,* 119 S.Ct. at 1675.

Conduct that is "merely offensive" but "not severe or pervasive enough to create an objectively hostile or abusive work environment-an environment that a reasonable person would find hostile or abusive" is beyond the purview of the law. *Harris,* 510 U.S. at 21. Thus, it is now clear that neither "the sporadic use of abusive language, gender-related jokes, and occasional testing," nor "intersexual flirtation," accompanied by conduct "merely tinged with offensive connotations" will create an actionable environment. *Faragher v. City of Boca Raton,* 524 U.S. 775, 787 (1998). Moreover, a plaintiff alleging sexual harassment must show the hostility was based on membership in a protected class. *SeeOncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 77 (1998). Thus, to succeed on a claim of sexual harassment, a plaintiff "must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted discrimina[tion] ... because of ... sex." *Id.* at 81 (alteration

and ellipses in original).

The Supreme Court has established a non-exclusive list of factors relevant to determining whether a given workplace is permeated with discrimination so severe or pervasive as to support a Title VII claim. *SeeHarris,* 510 U.S. at 23. These include the frequency of the discriminatory conduct, its severity, whether the conduct was physically threatening or humiliating, whether the conduct unreasonably interfered with plaintiff's work, and what psychological harm, if any, resulted from the conduct. *Seeid.;Richardson,* 180 F.3d at 437.

Although conduct can meet this standard by being either "frequent" or "severe," *Osier,* 47 F.Supp.2d at 323, "isolated remarks or occasional episodes of harassment will not merit relief [ ]; in order to be actionable, the incidents of harassment must occur in concert or with a regularity that can reasonably be termed pervasive." ' *Quinn,* 159 F.3d at 767 (quoting *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1305 n. 5 (2d Cir.1995)). Single or episodic events will only meet the standard if they are sufficiently threatening or repulsive, such as a sexual assault, in that these extreme single incidents "may alter the plaintiff's conditions of employment without repetition." *Id.Accord Kotcher v. Rosa and Sullivan Appliance Ctr., Inc.,* 957 F.2d 59, 62 (2d Cir.1992) ("[t]he incidents must be repeated and continuous; isolated acts or occasional episodes will not merit relief.").

**\*7** The University quite properly argues that the conduct plaintiff alleges is not severe and pervasive. As discussed above, she claims that she was subjected to behavior by Roopnarine that consisted primarily of his yelling at her, being rude to her, and not responding to her requests as she felt he should. This behavior is insufficient to state a hostile environment claim, despite the fact that it may have been unpleasant. *See,e.g.,Gutierrez v. Henoch,* 998 F.Supp. 329, 335 (S.D.N.Y.1998) (disputes relating to job-related disagreements or personality conflicts, without more, do not create sexual harassment liability); *Christoforou v. Ryder Truck Rental, Inc.,* 668 F.Supp. 294, 303 (S.D.N.Y.1987) ("there is a crucial difference between personality conflict ... which is unpleasant but legal ... [and sexual harassment] ... which is despicable and illegal."). Moreover, the court notes that plaintiff has

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

failed to show that this alleged behavior towards her was sexually related-an especially important failing considering plaintiff's own testimony that Roopnarine treated some males in much of the same manner. *See,e.g.,* Pl.'s Dep. at 298 ("He said that Dr. Roopnarine screamed at him in a meeting"). As conduct that is "equally harsh" to both sexes does not create a hostile environment, *Brennan v. Metropolitan Opera Ass'n, Inc.,* 192 F.3d 310, 318 (2d Cir.1999), this conduct, while demeaning and inappropriate, is not sufficiently gender-based to support liability. See *Osier,* 47 F.Supp.2d at 324.

The more detailed allegations brought forth for the first time in May of 1998 are equally unavailing. These allegations are merely of two specific, isolated comments. As described above, Roopnarine told plaintiff of his sexual interaction(s) with other women, and made a single, non-sexual comment about a dream in which plaintiff, plaintiff's husband, and Roopnarine were all present. Accepting as true these allegations, the court concludes that plaintiff has not come forward with evidence sufficient to support a finding that she was subject to abuse of sufficient severity or pervasiveness that she was "effectively denied equal access to an institution's resources and opportunities." *Davis,* 119 S.Ct. at 1675.

*Quinn,* a recent Second Circuit hostile work environment case, illustrates the court's conclusion well. There, plaintiff complained of conduct directed towards her including sexual touching and comments. She was told by her supervisor that she had been voted the "sleekest ass" in the office and the supervisor deliberately touched her breasts with some papers he was holding. 159 F.3d at 768. In the Circuit's view, these acts were neither severe nor pervasive enough to state a claim for hostile environment. *Seeid.* In the case at bar, plaintiff's allegations are no more severe than the conduct alleged in *Quinn,* nor, for that matter, did they occur more often. Thus, without more, plaintiff's claims fail as well.

**\*8** Yet, plaintiff is unable to specify any other acts which might constitute sexual harassment. When pressed to do so, plaintiff maintained only that she "knew" what Roopnarine wanted "every time [she] spoke to him" and that she could not "explain it other than that's the feeling [she] had." Pl.'s Dep. at 283-85, 287, 292. As defendant

properly points out, these very types of suspicions and allegations of repeated, but unarticulated conduct have been shown to be insufficient to defeat summary judgment. See *Meiri,* 759 F.2d at 998 (plaintiff's allegations that employer " 'conspired to get of [her];' that he 'misconceived [her] work habits because of his subjective prejudice against [her] Jewishness;' and that she 'heard disparaging remarks about Jews, but, of course, don't ask me to pinpoint people, times or places.... It's all around us,' " are conclusory and insufficient to satisfy the demands of Rule 56) (alterations and ellipses in original); *Dayes v. Pace Univ.,* 2000 WL 307382, at *5 (S.D.N.Y.2000) (plaintiff's attempts to create an appearance of pervasiveness by asserting "[t]he conduct to which I was subjected ... occurred regularly and over many months," without more "is conclusory, and is not otherwise supported in the record [and] therefore afforded no weight"); *Quiros v. Ciba-Geigy Corp.,* 7 F.Supp.2d 380, 385 (S.D.N.Y.1998) (plaintiff's allegations of hostile work environment without more than conclusory statements of alleged discrimination insufficient to defeat summary judgment); *Eng v. Beth Israel Med. Ctr.,* 1995 U.S. Dist. Lexis 11155, at *6 n. 1 (S.D.N.Y.1995) (plaintiff's "gut feeling" that he was victim of discrimination was no more than conclusory, and unable to defeat summary judgment). As plaintiff comes forward with no proper showing of either severe or pervasive conduct, her hostile environment claim necessarily fails.

B. Actual Knowledge / Deliberate Indifference

Even if plaintiff's allegations were sufficiently severe or pervasive, her hostile environment claim would still fail. As previously discussed, *seesupra* note 5, the Supreme Court recently departed from the framework used to hold defendants liable for actionable conduct under Title VII. See *Davis,* 119 S.Ct. at 1671; *Gebser,* 118 S.Ct. at 1999. Pursuant to these new decisions, it is now clear that in order to hold an educational institution liable for a hostile educational environment under Title IX, it must be shown that "an official who at minimum has authority to address the alleged discrimination and to institute corrective measures on the [plaintiff's] behalf *has actual knowledge of [the] discrimination* [.]" *Gebser,* 118 S.Ct. at 1999 (emphasis supplied). What's more, the bar is even higher: after learning of the harassment, in order for the school to be liable, its response must then "amount to deliberate

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

indifference to discrimination[,]" or, "in other words, [ ] *an official decision by the [school] not to remedy the violation."Id.* (Emphasis supplied). *AccordDavis,* 119 S.Ct. at 1671 ("we concluded that the [school] could be liable for damages only where the [school] itself intentionally acted in clear violation of Title IX by remaining deliberately indifferent to acts of teacher-student harassment of which it had actual knowledge."). This requires plaintiff to show that the school's "own deliberate indifference effectively 'cause[d]' the discrimination." *Id.* (alteration in original) (quoting *Gebser,* 118 S.Ct. at 1999). The circuits that have taken the question up have interpreted this to mean that there must be evidence that actionable harassment continued to occur *after* the appropriate school official gained actual knowledge of the harassment. *SeeReese v. Jefferson Sch. Dist.,* 208 F.3d 736, 740 (9th Cir.2000); *Soper v. Hoben,* 195 F.3d 845, 855 (6th Cir.1999); *Murreel v. School Dist. No. 1, Denver Colo.,* 186 F.3d 1238, 1246 (10th Cir.1999); *Wills v. Brown Univ.,* 184 F.3d 20, 26-27 (1st Cir.1999). There is no serious contention that plaintiff can satisfy this requirement.

**\*9** By the time plaintiff complained to Dean Crockett of sexual harassment in August of 1997, it is uncontested that her alleged harasser had no contact with her. Nor, for that matter, did he ultimately have any involvement in the third retake of her exam. She had a new advisor, exam committee and exam coordinator. Quite simply, by that point, Roopnarine had no involvement with her educational experience at all.[FN6] This undisputed fact is fatal to plaintiff's claim. As discussed above, the Supreme Court now requires some harm to have befallen plaintiff *after* the school learned of the harassment. As there have been no credible allegations of subsequent harassment, no liability can be attributed to the University.[FN7]*SeeReese,* 208 F.3d at 740 ("There is no evidence that any harassment occurred after the school district learned of the plaintiffs' allegations. Thus, under *Davis,* the school district cannot be deemed to have 'subjected' the plaintiffs to the harassment.").

FN6. Of course, plaintiff contends that the University had notice of the harassment prior to this time, through her complaints to Burgess that she no longer could work with Roopnarine, because he yelled at her, was rude to her, and

refused to assist her with various requests. But it is undisputed that she never mentioned sexual harassment, and provided no details that might suggest sexual harassment. Indeed, as pointed out by defendant, plaintiff *herself* admits that she did not consider the conduct sexual harassment until another person later told her that it might be, in June of 1997. *See* Pl.'s Dep. at 258-59, 340. As a result, plaintiff can not seriously contend that the University was on notice of the alleged harassment before August of 1997.

FN7. As mentioned previously, *seesupra* note 3, plaintiff maintains without any evidentiary support that Roopnarine played a role in her third exam. This allegation is purely conclusory, especially in light of the record evidence the University puts forward which demonstrates that he was not, in fact, involved in the examination.

As plaintiff's allegations of harassment are not severe or pervasive enough to state a claim, and in any event, this conduct can not be attributed to the University, her hostile environment claim is dismissed.

*II. Retaliation*

Plaintiff's retaliation claim must be dismissed as well. She cannot establish an actionable retaliation claim because there is no evidence that she was given failing grades due to complaints about Roopnarine. *SeeMurray,* 57 F.3d at 251 (retaliation claim requires evidence of causation between the adverse action, and plaintiff's complaints of discrimination). The retaliation claim appears to be based exclusively on plaintiff's speculative and conclusory allegation that Roopnarine was involved in or influenced the grading of her third research methods exam.[FN8] In any event, the adverse action which plaintiff claims to be retaliation must be limited to her failing grade on the third research methods exam, since plaintiff made no complaints of sexual harassment until August of 1997, long after plaintiff failed her second examination. *SeeMurray,* 57 F.3d at 251 (retaliation claim requires proof that defendant had knowledge of plaintiff's protected activity at the time of the adverse reaction); *Weaver v.*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

*Ohio State Univ.*, 71 F.Supp.2d 789, 793-94 (S.D.Ohio)
("[c]omplaints concerning unfair treatment in general
which do not specifically address discrimination are
insufficient to constitute protected activity"), *aff'd,* 194
F.3d 1315 (6th Cir.1999).

> **FN8.** As properly noted by defendant, *see* Def.
> Mem. of Law at 28 n. 14, plaintiff's complaint
> alleges that a number of individuals retaliated
> against her, but in her deposition she essentially
> conceded that she has no basis for making a
> claim against anyone other than Roopnarine and
> those who graded her third exam. *See* Pl.'s Dep.
> at 347-53.

The undisputed evidence establishes that Roopnarine had
no role in the selection of who would grade plaintiff's
exam. Nor, for that matter, did he grade the exam; this was
done by three other professors. Each of these professors
has averred that they graded the exam without any input or
influence from Roopnarine. More importantly, it is
undisputed that none of the three had any knowledge that
a sexual harassment complaint had been asserted by
plaintiff against Roopnarine, not surprising since two of
the three did not even know whose exam they were
grading. Plaintiff's inability to show that her failure was
causally related in any way to her complaint of harassment
is fatal to her retaliation claim.[FN9]

> **FN9.** Plaintiff's claim also fails to the extent that
> the school's refusal to let her take the research
> methods exam for a fourth time was the
> retaliatory act she relies upon. It is undisputed
> that the University's policies for CFS department
> students only allow a comp. exam to be given
> three times. *See* Gaal Aff. Ex. 53. Plaintiff
> cannot claim that the University's refusal to
> depart from its own policies was retaliation
> without some concrete showing that its refusal to
> do so was out of the ordinary, i.e., that it had
> allowed other students to take the exam a fourth
> time without a remedial course, when these other
> students had not engaged in some protected
> activity. *See* *Murray,* 57 F.3d at 251 (there is "no
> allegation either that NYU selectively enforced
> its academic standards, or that the decision in

[plaintiff's] case was inconsistent with these
standards.").

CONCLUSION

**\*10** For the aforementioned reasons, Syracuse University's
motion for summary judgment is GRANTED; plaintiff's
claims of hostile environment and retaliation are
DISMISSED.

IT IS SO ORDERED.

N.D.N.Y.,2000.
Elgamil v. Syracuse University
Not Reported in F.Supp.2d, 2000 WL 1264122
(N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov.
Works.

Westlaw.

Not Reported in F.Supp., 1998 WL 278264 (N.D.N.Y.)

(Cite as: 1998 WL 278264 (N.D.N.Y.))

H

Only the Westlaw citation is currently available.

United States District Court, N.D. New York.

Anthony ROBINSON, Plaintiff,

v.

Jane DELGADO, Hearing Officer and Lieutenant; and Donald Selsky, Director of Inmate Special Housing Program, Defendants.

No. 96-CV-169 (RSP/DNH).

May 22, 1998.

Anthony Robinson, Veterans Shelter, Brooklyn, for Plaintiff, Pro Se.

Hon. Dennis C. Vacco, Attorney General of the State of New York, Attorney for Defendants, Albany, Ellen Lacy Messina, Esq., Assistant Attorney General, of Counsel.

ORDER

POOLER, D.J.

*1 Anthony Robinson, a former inmate incarcerated by the New York State Department of Corrections ("DOCS"), sued two DOCS employees, alleging that they violated his right to due process in the course of a disciplinary proceeding and subsequent appeal. On September 9, 1997, defendants moved for summary judgment. Defendants argued that plaintiff failed to demonstrate that the fifty days of keeplock confinement that he received as a result of the hearing deprived him of a liberty interest within the meaning of the Due Process Clause. Plaintiff did not oppose the summary judgment motion, and Magistrate Judge David N. Hurd recommended that I grant it in a report-recommendation filed April 16, 1998. Plaintiff did not file objections.

Because plaintiff did not file objections, I "need only satisfy [myself] that there is no clear error on the face of the record in order to accept the recommendation." Fed.R.Civ.P. 72(b) advisory committee's note. After reviewing the record, I conclude that there is no clear error on the face of the record. After being warned by defendants' motion that he must offer proof in admissible form that his disciplinary confinement imposed an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life," Robinson failed to offer any such proof. *Sandin v. Conner*, 515 U.S. 472, 115 S.Ct. 2293, 2300, 132 L.Ed.2d 418 (1995). Consequently, he cannot maintain a due process challenge. *Id.* Therefore, it is

ORDERED that the report-recommendation is approved; and it is further

ORDERED that defendants' motion for summary judgment is granted and the complaint dismissed; and it is further

ORDERED that the Clerk of the Court serve a copy

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1998 WL 278264 (N.D.N.Y.)

(Cite as: 1998 WL 278264 (N.D.N.Y.))

of this order on the parties by ordinary mail.

HURD, Magistrate J.

REPORT-RECOMMENDATION

The above civil rights action has been referred to the undersigned for Report and Recommendation by the Honorable Rosemary S. Pooler, pursuant to the local rules of the Northern District of New York. The plaintiff commenced the above action pursuant to 42 U.S.C. § 1983 claiming that the defendants violated his Fifth, Eighth, and Fourteenth Amendment rights under the United States Constitution. The plaintiff seeks compensatory and punitive damages.

Presently before the court is defendants' motion for summary judgment pursuant to Fed. R. Civ. P. 56. However:

When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed. R. Civ. P 56(e).

In addition, "[f]ailure to file any papers as required by this rule shall, unless for good cause shown, be deemed by the court as consent to the granting or denial of the motion, as the case may be." L.R. 7.1(b)(3).

*2 The defendants filed their motion on September 9, 1997. The response to the motion was due on October 23, 1997. It is now five months beyond the date when the plaintiff's response was due, and he has failed to file any papers in opposition to defendants' motion.

Therefore, after careful consideration of the notice of motion, affirmation of Ellen Lacy Messina, Esq., with exhibits attached, and the memorandum of law; and there being no opposition to the motion; it is

RECOMMENDED that the motion for summary judgment be GRANTED and the complaint be dismissed in its entirety.

Pursuant to 28 U.S.C. § 636(b)(l), the parties have ten days within which to file written objections to the foregoing report. Frank v. Johnson, 968 F.2d 298, 300 (2d Cir.), cert. denied, 506 U.S. 1038, 113 S.Ct. 825, 121 L.Ed.2d 696(1992). Such objections shall be filed with the Clerk of the Court with a copy to be mailed to the chambers of the undersigned at 10 Broad Street, Utica, New York 13501. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(l); Fed.R.Civ.P. 72, 6(a), 6(e); Roldan v. Racette, 984 F.2d 85, 89 (2d Cir.1993); Small v. Secretary of HHS, 892 F.2d 15, 16 (2d Cir.1989); and it is

ORDERED, that the Clerk of the Court serve a copy of this Order and Report-Recommendation, by regular mail, upon the parties to this action.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 3

Not Reported in F.Supp., 1998 WL 278264 (N.D.N.Y.)

(Cite as: 1998 WL 278264 (N.D.N.Y.))


N.D.N.Y.,1998.

Robinson v. Delgado

Not Reported in F.Supp., 1998 WL 278264 (N.D.N.Y.)


END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1103045 (N.D.N.Y.)

(Cite as: 2011 WL 1103045 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Valery LATOUCHE, Plaintiff,
v.
Michael C. TOMPKINS, C.O., Clinton Correctional
Facility; Dean E. Laclair, C.O., Clinton Correctional
Facility; Jeffrey R. Ludwig, C.O ., Clinton Correctional
Facility; Michael B. King, Sgt., Clinton Correctional
Facility; D. Mason, C.O., Clinton Correctional Facility;
B. Malark, C.O., Clinton Correctional Facility; John
Reyell, C.O., Clinton Correctional Facility; Bob
Fitzgerald, R.N., Clinton Correctional Facility; John
Doe, C.O. (C.O. Gallery Officer Company Upper F–6);
John Doe, C.O. (Mess Hall Supervising C.O.),
Defendants.
No. 9:09–CV–308 (NAM/RFT).

March 23, 2011.
Valery LaTouche, Ossining, NY, pro se.

Eric T. Schneiderman, Attorney General for the State of
New York, Krista A. Rock, Esq., Assistant Attorney
General, of Counsel, Albany, NY, for Defendants.

### MEMORANDUM–DECISION AND ORDER

NORMAN A. MORDUE, Chief Judge.
### INTRODUCTION
**\*1** In this *pro se* action under 42 U.S.C. § 1983,
plaintiff, an inmate in the custody of the New York State
Department of Correctional Services ("DOCS"), claims
that defendants violated his Eighth Amendment rights as
a result of a physical altercation. Defendants moved for
summary judgment pursuant to Rule 56 of the Federal
Rules of Civil Procedure (Dkt. No. 46) and plaintiff
opposed the motion. (Dkt. No. 53). The motions were
referred to United States Magistrate Judge Randolph F.
Treece for a Report and Recommendation pursuant to 28
U.S.C. § 636(b)(1)(B) and Local Rule 72.3(c).

Magistrate Judge Treece issued a Report and
Recommendation (Dkt. No. 60) recommending that
defendants' motion be granted in part and denied in part.
Specifically, Magistrate Judge Treece recommended
awarding summary judgment dismissing the following: (1)
plaintiff's claims for monetary relief against all defendants
in their official capacity; (2) plaintiff's claims of medical
indifference against defendant Fitzgerald; and (3)
plaintiff's allegations of verbal harassment by defendant
Mason. Magistrate Judge Treece also recommended
denying defendants' motion for summary judgment on
plaintiff's excessive force claims against defendants
Tompkins, LaClair, Mason, Malark and Reyell and
plaintiff's failure to protect claims against defendants
Ludwig and King.

Defendants filed specific objections to portions of the
Report and Recommendation arguing: (1) that the
Magistrate Judge erred in "overlooking" plaintiff's failure
to comply with Local Rule 7.1(a) (3); (2) that the
Magistrate Judge erred when he failed to apply the
*Jeffreys* exception as plaintiff's testimony was incredible
as a matter of law; and (3) plaintiff's excessive force
claims against defendant Reyell are subject to dismissal
for lack of personal involvement. (Dkt. No. 61). Plaintiff
does not object to the Report and Recommendation. (Dkt.
No. 62).

In view of defendants' objections, pursuant to 28
U.S.C. § 636(b) (1)(c), this Court conducts a *de novo*
review of these issues. The Court reviews the remaining
portions of the Report–Recommendation for clear error or
manifest injustice. *See Brown v. Peters,* 1997 WL 599355,
*\*2–3 (N.D.N.Y.),* af'd without op., 175 F.3d 1007 (2d
Cir.1999); *see also Batista v. Walker,* 1995 WL 453299,
at *1 (S.D.N.Y.1995) (when a party makes no objection
to a portion of the report-recommendation, the Court reviews
that portion for clear error or manifest injustice). Failure
to object to any portion of a report and recommendation
waives further judicial review of the matters therein. *See
Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993).

### DISCUSSION

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1103045 (N.D.N.Y.)

(Cite as: 2011 WL 1103045 (N.D.N.Y.))

## I. Local Rule 7.1(a)(3)

The submissions of *pro se* litigants are to be liberally construed. *Nealy v. U.S. Surgical Corp.,* 587 F.Supp.2d 579, 583 (S.D.N.Y.2008). However, a *pro se* litigant is not relieved of the duty to meet the requirements necessary to defeat a motion for summary judgment. *Id.* (citing *Jorgensen v. Epic/Sony Records,* 351 F.3d 46, 50 (2d Cir.2003)). Where a plaintiff has failed to respond to a defendant's statement of material facts, the facts as set forth in defendant's Rule 7.1 statement will be accepted as true to the extent that (1) those facts are supported by the evidence in the record, and (2) the non-moving party, if he is proceeding *pro se,* has been specifically advised of the potential consequences of failing to respond to the movant's motion for summary judgment. *Littman v. Senkowski,* 2008 WL 420011, at *2 (N.D.N.Y.2008) (citing *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996)). [FN1]

FN1. Local Rule 7.1(a)(3) provides:

Summary Judgment Motions

Any motion for summary judgment shall contain a Statement of Material Facts. The Statement of Material Facts shall set forth, in numbered paragraphs, each material fact about which the moving party contends there exists no genuine issue. Each fact listed shall set forth a specific citation to the record where the fact is established. The record for purposes of the Statement of Material Facts includes the pleadings, depositions, answers to interrogatories, admissions and affidavits. It does not, however, include attorney's affidavits. *Failure of the moving party to submit an accurate and complete Statement of Material Facts shall result in a denial of the motion.*

The moving party shall also advise *pro se* litigants about the consequences of their failure to respond to a motion for summary judgment. See also L.R. 56.2.

The opposing party shall file a response to the Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises. The non-movant's response may also set forth any additional material facts that the non-movant contends are in dispute in separately numbered paragraphs. *The Court shall deem admitted any facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert.*

Local Rule 7.1(a)(3) (emphasis in original).

**\*2** The record herein contains few undisputed facts. Plaintiff and defendants disagree on many of the events that transpired and provide conflicting accounts of the circumstances surrounding the incident. In support of the motion, defendants properly filed a Statement of Material Facts pursuant to Local Rule 7.1 and notified plaintiff about the consequences of his failure to respond to the motion for summary judgment. Plaintiff does not dispute that he received such notification from defendants. Plaintiff responded with a handwritten "Statement of Facts", without citations to the record, and failed to specifically admit or deny defendants' factual statements as required by Local Rule 7.1. However, plaintiff also annexed a copy of his deposition transcript. In the deposition, upon questioning from defense counsel, plaintiff testified as follows:

Q. ... Have you read the complaint?

A. Yes, ma'am.

Q. So, you are aware of its contents?

A. Yes, ma'am.

Q. Did anyone help you prepare the complaint?

A. No, ma'am.

Q. Are there any statements contained in the complaint that you now wish to change or modify?

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1103045 (N.D.N.Y.)

(Cite as: 2011 WL 1103045 (N.D.N.Y.))

A. I'm not sure.

Q. Well, let me ask you this: So, do you adopt this document under oath as true to the best of your knowledge?

A. Yes, ma'am.

Transcript of Plaintiff's Deposition at 13.

A verified complaint may be treated as an affidavit for the purposes of a summary judgment motion and may be considered in determining whether a genuine issue of material fact exists. *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) (the plaintiff verified his complaint by attesting under penalty of perjury that the statements in the complaint were true to the best of his knowledge). Based upon the aforementioned colloquy, the Court deems plaintiff's complaint to be "verified" and as such, will treat the complaint as an affidavit. *See Torres v. Caron,* 2009 WL 5216956, at *3 (N.D.N.Y.2009). While plaintiff has not formally and technically complied with the requirements of Local Rule 7.1(a)(3), his opposition to defendants' motion contains sworn testimony. In light of his *pro se* status and the preference to resolve disputes on the merits rather than "procedural shortcomings", to the extent that plaintiff's "Statement of Facts" and assertions in the complaint do not contradict his deposition testimony, the Court will consider those facts in the context of the within motion. *See Mack v. U.S.,* 814 F.2d 120, 124 (2d Cir.1987); *see also Liggins v. Parker,* 2007 WL 2815630, at *8 (N.D.N.Y.2007) (citing *Lucas v. Miles,* 84 F.3d 532, 535 (2d Cir.1996)). The Court has reviewed plaintiff's complaint and compared the allegations with the testimony presented at his deposition and adopts Magistrate Judge Treece's summary of the "facts" as presented by both parties.[FN2]

> FN2. While the Court adopts Magistrate Judge Treece's recitation of defendants' and plaintiff's versions of the facts, the Court does not adopt the reasoning set forth in the Footnote 2 of the Report and Recommendation.

**II. *Jeffreys* Exception**

Defendants argue that the Court should apply *Jeffreys v. City of New York,* 426 F.3d 549, 554 (2d Cir.2005) and award summary judgment dismissing all claims of excessive force based upon plaintiff's implausible and contradictory claims.

**\*3** "It is a settled rule that '[c]redibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment' ". *McClellan v. Smith,* 439 F.3d 137, 144 (2d Cir.2006) (citing *Fischl v. Armitage,* 128 F.3d 50, 55 (2d Cir.1997) (unfavorable assessments of a plaintiff's credibility are not "within the province of the court on a motion for summary judgment")). A narrow exception to this general rule was created by the Second Circuit in *Jeffreys:*

> While it is undoubtedly the duty of district courts not to weigh the credibility of the parties at the summary judgment stage, in the rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether "the jury could reasonably find for the plaintiff," and thus whether there are any "genuine" issues of material fact, without making some assessment of the plaintiff's account. Under these circumstances, the moving party still must meet the difficult burden of demonstrating that there is no evidence in the record upon which a reasonable factfinder could base a verdict in the plaintiff's favor.

> *Id.* at 554 (internal citations and citations omitted).

Here, while plaintiff relies exclusively on his own testimony, for *Jeffreys* to apply, the testimony must also be "contradictory and incomplete". In this regard, defendants argue that plaintiff's allegations are contradicted by his prior accounts of the incident. Defendants cite to the record and argue that plaintiff told Fitzgerald that, "I hit the officer first" and that "I was hurt when I was subdued". Moreover, defendants point out that these statements were documented in an Inmate Injury Report executed by plaintiff.

Plaintiff does not deny making the aforementioned statements. However, in his deposition, plaintiff explained

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1103045 (N.D.N.Y.)

(Cite as: 2011 WL 1103045 (N.D.N.Y.))

those discrepancies and testified:

Q. —did Nurse Fitzgerald ask you any questions while he was examining you?

A. I think he asked me how am I feeling, how did this happen?

Q. And what did you say?

A. I told him I was nervous and that [sic] whatever officer D. Mason told me to tell him.

Q. What did you say?

A. I told him I was nervous and whatever officer D. Mason told me to tell him, which was that I got hurt being subdued—

Q. Which was—

A. —and that I started this.

Q. And is that the truth?

A. No.

Q. Why did you tell the nurse that?

A. Because I was being forced to.

Q. Forced to how?

A. By the officers that [sic] was there.

Q. Did you sign a form admitting that you hit the officer first and you were hurt when you were subdued?

A. Yes, ma'am.

Q. Why did you do that?

A. Because the [sic] officer D. Mason kept smacking me for me to do that.

Transcript of Plaintiff's Deposition at 53–54.

**\*4** In the Report and Recommendation, Magistrate Judge Treece concluded that plaintiff's "fear of retribution" was a plausible explanation for the discrepancies in his testimony. This Court agrees and adopts the Magistrate Judge's conclusions. *See Langman Fabrics v. Graff Californiawear, Inc.,* 160 F.3d 106, 112–13 (2d Cir.1998); *see also Cruz v. Church,* 2008 WL 4891165, at \*5 (N.D.N.Y.2008) ("[t]he Court notes that ... it would be have difficulty concluding that [the][p]laintiff's statement of June 5, 2005, and his statement of June 16, 2005, are wholly irreconcilable, given his proffered explanation that he made the statement of June 5, 2005, out of fear of retribution by [the] [d]efendants).

Defendants also argue that plaintiff cannot identify which individuals participated in the attack; that plaintiff's injuries are consistent with the brief use of force as described by defendants to subdue plaintiff; and that plaintiff's version is contradicted by defendants' affidavits. Magistrate Judge Treece found that plaintiff was able to identify some individuals involved in the assault which, "stands in stark contrast to the plaintiff in *Jeffreys* who was unable to identify any of the officers involved in the alleged assault". Upon review of the record, as it presently exists, the Court agrees and finds that plaintiff's testimony is not wholly conclusory or entirely inconsistent to warrant application of the *Jeffreys* exception. *See Percinthe v. Julien,* 2009 WL 2223070, at \*7 (S.D.N.Y.2009) (the court rejected the defendants' argument that the plaintiff's claims were subject to dismissal for implausibility as his injuries did not reflect the attack that he described and his description of the incident changed over time holding that the plaintiff's testimony, "[did] not reach the level of inconsistency and lack of substantiation that would permit the Court to dismiss on these grounds").

Magistrate Judge Treece provided an extensive summary of the record and applicable law and found that the evidence did not support deviating from the established rule that issues of credibility are not resolved on summary judgment. On review, the Court agrees with the Magistrate's recommendations and concludes that the *Jeffreys* exception does not apply. Accordingly, the Court accepts and adopts the Report and Recommendation on this issue.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1103045 (N.D.N.Y.)

(Cite as: 2011 WL 1103045 (N.D.N.Y.))

### III. Reyell's Personal Involvement

Defendants argue that the Magistrate Judge erred when he failed to dismiss the complaint against Reyell on the grounds that he was not personally involved in the attack. Defendants claim that the "RRO erroneously cites plaintiff's declaration as stating that 'it was defendant Reyell and another officer who removed the shirt' ". Defendants claim that the declaration and complaint clearly state that, "Officer Rock orchestrated the removal of plaintiff's shirt".[FN3] Defendants argue that the assertions in plaintiff's declaration (submitted in response to the motion for summary judgment) and complaint are contradicted by plaintiff's deposition testimony. Defendants claim that plaintiff testified that Reyell tried to cover up the incident by removing the shirt he was wearing.

>   FN3. Officer Rock is not a defendant herein.

**\*5** The Court has reviewed plaintiff's complaint, declaration and deposition transcript and finds defendants' summary of plaintiff's assertions to be inaccurate. In plaintiff's complaint, on page 8, plaintiff alleges:

>   Feeling extremely weak the claimant responded with a shake of his head. Once this performance was over with Correctional Officer R. Rock, the individual who held on to the photograph camera and who is responsible for capturing the claimant's injuries [sic] photos pointed to the claimant's bloodly [sic] stain kitchen white colored uniform [ ] as co-workers....

>   Correctional Officer D. Mason then roughly removed the article of clothing and with the help of on[e] other they discarded the item of clothings [sic].

In Paragraph 22 of plaintiff's declaration, he states:

>   Officer Rock, the individual who held the photograph camera and was responsible for capturing LaTouche injuries pointed to LaTouche [sic] bloody kitchen white colored uniform to his coworker asking them to remove the article of clothing before he take [sic] any pictures. Mason then roughly removed the clothing and with the help of an other [sic] officer they discarded the items of

clothing.

In his deposition, plaintiff testified:

Q. What about Defendant Reyell, why are you suing Reyell?

A. Because defendant Reyell, that's the officer that was holding the camera and he tried to cover up the incident.

Q. How so?

A. That's when him and the other officer that was there, when they was searching me, strip searching me they took my shirt and they kept screaming something about let's remove this bloodstained shirt, let's remove this bloodstained shirt, we can't have this for the camera.

          \* \* \*

Q. Reyell and another officer took your shirt off?

A. Yes, ma'am.

Q. Do you remember the other officer's name?

A. No, ma'am.

Transcript of Plaintiff's Deposition at 63–64.

Here, the Magistrate Judge stated that any inconsistency or discrepancy [in plaintiff's testimony], "go[es] to the weight ... accorded to plaintiff's testimony". The Court agrees. Any discrepancies or inconsistencies in plaintiff's testimony are for a jury to assess. In the Second Circuit case of *Fischl v. Armitage,* the plaintiff/inmate alleged that he was assaulted in his cell by other inmates. *Fischl,* 128 F.3d at 54. The district court dismissed the plaintiff's complaint as against one defendant based upon "inconsistent statements". *Id.* The Second Circuit vacated the judgment of the district court holding:

>   [T]he district court apparently questioned whether there had been an attack on Fischl at all, principally because of inconsistencies in his accounts of the event, his failure to report such an attack to prison workers in the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1103045 (N.D.N.Y.)

(Cite as: 2011 WL 1103045 (N.D.N.Y.))

area on that morning, and the failure of those workers to notice any indications that he had been beaten. That skepticism, however, rests on both a negative assessment of Fischl's credibility and the drawing of inferences adverse to Fischl.

**\*6** Likewise, inconsistent statements by Fischl as to, for example, whether it was five, six, or seven inmates who attacked him, and as to what he observed or overheard just prior to the attack, go to Fischl's credibility. While inconsistencies of this sort provide ammunition for cross-examination, and they may ultimately lead a jury to reject his testimony, they are not a proper basis for dismissal of his claim as a matter of law. The jury might well infer, for example, that while Fischl was under siege he was understandably unable to take an accurate census of the number of inmates holding him and kicking him in the face.

*Fischl,* 128 F.3d at 56.

In this matter, without a credibility assessment of plaintiff, the record does not warrant an award of summary judgment. Accordingly, the Court adopts the Magistrate's recommendation and denies summary judgment on this issue.

## CONCLUSION

It is therefore

**ORDERED** that the Report and Recommendation of United States Magistrate Judge Randolph F. Treece (Dkt. No. 60) is adopted; and it is further

**ORDERED** that for the reasons set forth in the Memorandum–Decision and Order herein, defendants' motion for summary judgment is granted in part and denied in part; and it is further

**ORDERED** that the Clerk provide copies of this Order to all parties.

**IT IS SO ORDERED.**

N.D.N.Y.,2011.

Latouche v. Tompkins
Not Reported in F.Supp.2d, 2011 WL 1103045 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Travelers Indem. Co. of Illinois v. Hunter Fan Co., Inc., Not Reported in F.Supp.2d (2002)

2002 WL 109567

KeyCite Yellow Flag - Negative Treatment

Distinguished by Donald v. Shinn Fu Co. of America, E.D.N.Y., September 4, 2002

2002 WL 109567
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

THE TRAVELERS INDEMNITY COMPANY
OF ILLINOIS a/s/o the following entity and
individuals: Milstein Properties, Inc., Helen
Abunasser, Jane Everett, Stella Friedman,
Zehava Mirkin, Arthur Nadaner, Lisa
Pettigrew, and Ziva Ben-Reuvan, Plaintiff,
v.
HUNTER FAN COMPANY, INC., Capitol Lighting
of Paramus, Inc., M. Fortunoff of Westbury Corp.,
and John Does "1" through "5", Defendants.
HUNTER FAN COMPANY,
INC., Third Party Plaintiff,
v.
Lionel HAMPTON, Lincoln Plaza Associates,
Milford Management Corp., One Lincoln
Plaza Condominium, 20 West 64th Street
Associates, Third Party Defendants.

No. 99 CIV 4863 JFK.
|
Jan. 28, 2002.

**Attorneys and Law Firms**

Robinson & Cole LLP, New York, NY, Michael B. Golden, for Plaintiff, of counsel.

D'Amato & Lynch, New York, NY, Lloyd Herman, for Defendant/Third Party Plaintiff Hunter Fan Co., Inc., of counsel.

Gulino & Ryan, P.C., New York, NY, Joseph J. Gulino, for Defendant Capitol Lighting of Paramus, Inc., of counsel.

Lambert & Weiss, New York, NY, Richard Lambert, for Third Party Defendant Lionel Hampton, of counsel.

Wilson, Elser, Moskowitz, Edelman & Dicker LLP, New York, NY, Eugene T. Boule, for Third Party Defendant Lincoln Plaza Associates, of counsel.

*OPINION and ORDER*

KEENAN, J.

**\*1** Before this Court are Cross Motions for summary judgment of Defendant/Third Party Plaintiff Hunter Fan and Defendant Capitol Lighting of Paramus. Hunter Fan moves to dismiss the claims of plaintiff The Travelers Indemnity Company of Illinois and all cross-claims and counter claims. Capitol Lighting moves to dismiss the claims of plaintiff Travelers Indemnity Company and seeks indemnification, costs and attorneys' fees from Hunter Fan. For the reasons outlined below, the Court denies all motions.

*Background*

Plaintiff the Travelers Indemnity Company of Illinois ("Travelers") was and still is an Illinois corporation with its principal place of business located in Hartford, Connecticut. *See* Am. Compl. ¶ 4. Defendant/Third Party Plaintiff Hunter Fan, Inc. ("Hunter") was and still is a Delaware corporation with its principal place of business located in Memphis, Tennessee. *See id.* ¶ 5. Defendant Capitol Lighting of Paramus, Inc. ("Capitol") was and still is a New Jersey corporation with its principal place of business located at Route 17, Paramus, New Jersey. *See id.* ¶ 7. Third Party Defendant Lionel Hampton ("Hampton") was, at all relevant times, the lessee and resident at 20 West 64th Street, Apt. 28K, New York, New York. *See id.* ¶ 12.

This Court has jurisdiction pursuant to 28 U.S.C. § 1332 because the action is between citizens of different states and the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs.

On January 7, 1997, a fire broke out in Hampton's apartment. The fire allegedly started in Hampton's bedroom when a halogen lamp fell over onto the bed setting fire to the bed linens. There is no evidence as to exactly how the lamp tipped over. The fire consumed Hampton's apartment and caused damage to the building, other apartments in the building, and three individuals. Travelers had issued property insurance policies to the owners and various tenants of the building, and pursuant

Case 9:14-cv-00626-BKS-DEP   Document 86   Filed 02/02/18   Page 350 of 359

Travelers Indem. Co. of Illinois v. Hunter Fan Co., Inc., Not Reported in F.Supp.2d (2002)

2002 WL 109567

to those policies paid out over one million dollars in claims arising from this fire. Travelers brought this subrogation action against Hunter and Capitol seeking reimbursement with interest of the amounts it had paid to settle these claims.

In its Amended Complaint, Travelers alleges that in or before February 1996, Hunter imported, distributed, and/or sold certain Halogen Adjustable Arm Torchiere Floor Lamps, model number 20727BL in black and model number 20727WH in white. Travelers alleges that Hunter distributed lamps to Defendant Capitol for resale to the public. Hampton's assistant Caprice Titone ("Titone") had purchased two lamps for Hampton, and purchased the fire-causing lamp (the "Lamp") at Capitol. Hampton's valet Rubin Cox ("Cox") assembled the Lamp. Hampton used both lamps in his bedroom in a position whereby the adjustable arm was horizontal to the floor allowing the shade and bulb to point toward the floor ("the downbridge position"). The first lamp fell over at least once burning a hole into the bedroom carpet. That lamp later broke and Hampton began to use the second lamp. Travelers alleges that the Lamp was defectively designed because, despite representations on the packaging, the Lamp did not meet applicable standards; the Lamp was inherently dangerous because the halogen bulb it required can reach temperatures of up to 970 degrees Fahrenheit; and the instructions furnished with the Lamp failed to warn of the Lamp's instability. Travelers asserts eight claims for relief including causes of action in strict liability, breach of warranty, and negligence. Hunter now moves for summary judgment to dismiss all claims brought by Travelers and all cross-claims and counter claims. Capitol moves to dismiss Travelers' claims and asserts claims for full indemnification and reimbursement of all costs, disbursements and legal fees from Hunter.

*Discussion*

**\*2** A motion for summary judgment may be granted under Fed.R.Civ.P. 56 if the entire record demonstrates that "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986). The moving parties bear the burden of proving that no material facts are in dispute. *Donahue v. Windsor Locks Bd. of Fire Comm'rs,* 834 F.3d 54, 57 (2d Cir.1987). When viewing the evidence, the Court must

"assess the record in the light most favorable to the non-movant and ... draw all reasonable inferences in its favor." *Delaware & Hudson Ry. Co. v. Consol. Rail Corp.,* 902 F.2d 174, 177 (2d Cir.1990); *McLee v. Chrysler Corp.,* 109 F.3d 130, 134 (2d Cir.1997). In determining whether a genuine issue of fact has been raised, a court "must resolve all ambiguities and draw all reasonable inferences against the moving party." *Donahue,* 834 F.3d at 57. Courts should "take care not to abort a genuine factual dispute prematurely and thus deprive a litigant of his day in court." *Id.* at 55. Once the movant shows that there are no genuine issues of material fact, the opposing party must produce sufficient evidence to permit a reasonable jury to return a verdict in its favor, identifying "specific facts showing that there is a genuine issue for trial." *Anderson,* 477 U.S. at 248, 256. If the court finds that there are factual disputes regarding material issues, summary judgment is not appropriate. *See id.* at 249; *see also Repp & K & R Music, Inc. v. Webber,* 132 F.3d 882, 890 (2d Cir.1997) ( "Clearly, the duty of a court on a motion for summary judgment is ... not to decide factual issues. In this regard, the court's task is issue identification, not issue resolution.").

### I. *Hunter's Motion for Summary Judgment*

#### A. *Product Identification* [1]
Hunter argues that it cannot be held liable because Travelers cannot prove that Hunter manufactured the Lamp. In a products liability action, the plaintiff bears the burden of proving that the defendant manufactured the product at issue. *See 210 E. 86 [th] St. Corp. v. Combustion Eng'g, Inc.,* 821 F.Supp. 125, 142 (S.D.N.Y.1993). A plaintiff must establish by competent proof that the defendant manufactured and placed the injury-causing defective product into the stream of commerce. *Healey v. Firestone Tire & Rubber Co.,* 87 N.Y.2d 596, 601 (N.Y.1996). The evidence of a manufacturer's identity must establish that it is "reasonably probable, not merely possible or evenly balanced" that defendant was the source of the offending product. *Id.* at 601-02; *Moffett v. Harrison & Burrowes Bridge Contractors, Inc.,* 266 A.D.2d 652, 654 (N.Y.App.Div.1999). A manufacturer's identity may be established by circumstantial evidence, even if the allegedly defective product no longer exists. *Healey,* 87 N.Y.2d at 601. However, speculative or conjectural evidence of a manufacturer's identity is not enough. *Id.* at 602; *see also Franklin v. Krueger Int'l, Inc.,* No. 96

2002 WL 109567

Civ. 2408, 1997 WL 691424, at *4 (S.D.N.Y. Nov. 5, 1997) (finding plaintiff's attorney's mere assertions that the defective chair resembled a chair manufactured by defendant shown in a photograph insufficient evidence).

*3 Hunter argues that its Model 20727 lamp is virtually identical to torchiere lamps manufactured or sold by numerous other companies and that there are several differences between Model 20727 and the Lamp, including differences in hole pattern and weight. Hunter claims that the marking "SF Made in Taiwan 211" found on the base of the Lamp is not used on Model 20727 lamps. Hunter claims it provides an Allen wrench and halogen bulb with every lamp and the absence of these items in the Lamp's packaging proves the Lamp was not a Hunter product. Capitol claims not to have sold any lamps during the relevant time period to Titone. Travelers has offered no evidence such as invoices, photos, other documents or deposition testimony to prove the Lamp's purchase thereby connecting it to a store and subsequently to a manufacturer.

Travelers responds that, while there is no receipt for the Lamp's purchase, there is a reimbursement check from Hampton to Titone dated March 1, 1996, indicating that the lamp was purchased before that date. (Titone Trans. at 65) Titone testified that she purchased two lamps for Hampton at Capitol and Fortunoff stores in New Jersey. Travelers argues that because Fortunoff was granted summary judgment and only Capitol remains as a distributor, Capitol sold the Hunter lamp during the relevant time period. Herman Lebersfeld, President of Capitol, testified that Capitol only sold lamps manufactured by Kenroy International, a subsidiary of Hunter. In particular, Capitol sold Hunter Model 20727 lamps during the relevant time period. (Lebersfeld Trans. at 20-22) Capitol cannot account for the sale of every Hunter lamp making it possible that one Model 20727 lamp was purchased by Titone. Travelers submits that it has not been established whether an Allen wrench came with the Lamp. Hampton's valet Rubin Cox assembled the lamp and testified that he does not remember seeing the wrench nor does he remember looking specifically for one. (Cox Trans. at 121) In addition, the physical evidence of the Lamp, including the measurements of almost all of Lamp components, match Hunter exemplar lamps. The diameter of the base of the Lamp and the base of both Hunter exemplar lamps is the same. (Crombie Aff. ¶ 8) The lower and upper support poles of Model 20727 have

the same diameter, length and weight as those of the Lamp. (Crombie Aff. ¶ 10)

Travelers has presented sufficient circumstantial evidence to create an issue of fact regarding whether Hunter was the manufacturer of the Lamp and Capitol was the distributor. Hampton's reimbursement check to Titone establishes a time frame for the Lamp's purchase, during which time Capitol cannot account for all of its sales of Model 20727 lamps. The similarity between the Lamp and Model 20727 has been shown to a "reasonable probability." Travelers has met its burden. Summary judgment is denied.

B. *Design Defect*
A defectively designed product is one which, when it leaves the seller's hands, is in a condition not reasonably contemplated by the ultimate consumer and is unreasonably dangerous for its intended use. *Voss v. Black & Decker Manuf. Co.,* 59 N.Y.2d 102, 107 (N.Y.1983). A product may be defective when it contains a manufacturing flaw, is defectively designed, or is not accompanied by adequate warnings. *Liriano v. Hobart Corp.,* 92 N.Y.2d 232, 237 (N.Y.1998).

1. Design Defect
*4 Travelers claims that the Lamp was defectively designed and inherently dangerous because the surface of the halogen bulb reaches temperatures of up to 970 degrees Farenheit, the Lamp does not include a heat shield or other protective device to prevent the bulb from making contact with flammable objects, and the Lamp's design caused it to be inherently unstable and susceptible to tipping over. *See* Am. Compl. ¶¶ 70, 76-77. Hunter argues that the Lamp's design was not faulty, but that Hampton's use of the lamp in the downbridge position was misuse which caused it to tip over and ignite the fire. The claims of design defect and product misuse are thus intertwined. Accordingly, because issues of fact remain on the claim of product misuse, *see infra* Part I.D., the design defect claim must also be submitted to a jury.

2. Duty to Warn
Travelers alleges that the instructions that accompanied the Lamp failed to adequately warn consumers of the dangers associated with its heat, lack of a protective shield or screen, and its instability. *See* Am. Compl. ¶¶ 84, 89-90.

Case 9:14-cv-00626-BKS-DEP Document 86 Filed 02/02/18 Page 352 of 359

Travelers Indem. Co. of Illinois v. Hunter Fan Co., Inc., Not Reported in F.Supp.2d (2002)

2002 WL 109567

Analyzing a failure to warn claim is an intensely fact-specific process which includes assessing the feasibility and difficulty of issuing warnings under the circumstances, the obviousness of the risk from actual use of the product, the knowledge of the particular product user, and proximate cause. *See Anderson v. Hedstrom Corp.,* 76 F.Supp.2d 422, 440 (S.D.N.Y.1999). A manufacturer may not be liable if the risks were sufficiently obvious to the user without a warning. Because of the factual nature of the inquiry, whether a danger is obvious is most often a jury question. *Id.* at 441; *Liriano,* 92 N.Y.2d at 309. Hunter argues that the danger here was obvious to Hampton based on his prior experience with the lamp falling over and burning a hole in the rug. However, courts have cautioned that judges should be wary of taking the issue of liability away from juries, even in situations where the relevant dangers might seem obvious. *Anderson,* 76 F.Supp.2d at 447. Therefore, whether the danger of using the lamp in the downbridge manner was an obvious danger should be determined by a jury.

A manufacturer has a duty to warn against latent dangers resulting from foreseeable uses of its product of which it knew or should have known, as well as a duty to warn of the danger of unintended uses of a product which are reasonably foreseeable. *Liriano,* 92 N.Y.2d at 237. A manufacturer may also be liable for failure to warn of foreseeable misuse. *Id.* at 240. Hunter argues that use in the downbridge position was not foreseeable because the Lamp was not depicted for use as a reading lamp. Hunter's expert Warren testified that proper use of the lamp was indicated by the diagrams, description as "torchiere" and the nature of the assembly. However, no language regarding what Hunter considered the "proper" configuration of its Model 20727 lamp is stated anywhere on the box, or anywhere on Hunter's Assembly Instructions. (Crombie Aff. ¶ 20) Paragraph 6 of Model 20727's Assembly Instructions states: "[t]he set screw is used to limit the movement of the arms. Raise the arm to a vertical position. Use the Allen wrench provided to turn in the set screw. To adjust the position of the arm assembly, loosen the adjusting handle, position the arms to the desired angle, then tighten the adjusting handle." Hunter's instructions allowed for adjustment to any position. The instructions do not warn against using the lamp in the downbridge position. Because the adequacy of warnings furnished by a manufacturer to avoid any foreseeable misuse by a consumer presents questions of fact, *Johnson v. Johnson Chem. Co., Inc.,* 588 N.Y.S .2d 607, 610 (N.Y.App.Div.1992), summary judgment is denied on this ground.

**\*5** Additionally, there is an issue of fact as to proximate cause. Travelers must show that the presence of a warning would have caused Hampton and his staff to change their behavior. Where "a warning would not have given [a user] any better knowledge of the [product's's] danger than he already had from prior use or than was readily discernible from observation, the absence of a warning could not have proximately caused his injuries." *Barnes v. Pine Tree Mach.,* 261 A.D.2d 295, 295-96 (N.Y.App.Div.1999). It is unknown whether, if Hunter had issued a warning against doing so, Hampton and his staff would not have used the lamp in the downbridge position. Hunter argues that the warning would not have had an effect because Hampton's prior experience with the first lamp falling over and burning the rug did not cause him to change his behavior. Hampton argues that because a serious fire did not result from these previous incidents, he was not aware of the possible damage. Further, because the first lamp ultimately broke, Hampton and his staff could have concluded that it fell over because it was always broken. Hunter contends that Cox's testimony regarding how similar he believed the two lamps to be shows that Hampton and his staff were aware of the dangers. (Cox. Trans. at 130) Therefore, there is an issue of fact as to what effect a warning would have had on the behavior of Hampton and his staff. Summary judgment is denied.

### C. *Subsequent modification*

Hunter argues that it cannot be held liable because Cox improperly assembled the Lamp by not using the Allen wrench it claims it provides with every Model 20727 lamp. Hunter argues that using the lamp in the downbridge position would not have been possible had the setscrews been properly tightened with the Allen wrench. Hunter argues that this faulty assembly and use of the lamp in as unintended manner constituted a subsequent modification to the lamp.

When a consumer makes a subsequent modification which *substantially alters* the product and is the proximate cause of plaintiff's injuries, the manufacturer cannot be held liable. *Robinson v. Reed-Prentice,* 49 N.Y.2d 471, 485 (N.Y.1980) (emphasis added). A user's substantial modifications of a product that render a safe product defective are not the manufacturer's responsibility. *Id.* at 479. Material alterations that destroy the "functional

Case 9:14-cv-00626-BKS-DEP Document 86 Filed 02/02/18 Page 353 of 359

Travelers Indem. Co. of Illinois v. Hunter Fan Co., Inc., Not Reported in F.Supp.2d (2002)

2002 WL 109567

utility of a key safety feature" are not a manufacturer's responsibility. *Id.* at 480. When a product's design incorporates a certain safety feature, a manufacturer may be held liable under a design defect theory even though the removal of that safety feature caused the accident, provided the product was purposefully manufactured to permit its use without the safety guard. *Lopez v. Precision Papers,* 67 N.Y.2d 871, 875 (N.Y.1986).

Hunter claims that the setscrews were a safety device; however, Hunter did not submit evidence that the setscrew was intended or marked as a safety device. There were no warnings or instructions regarding using the lamp in a particular manner. Further, it is unclear whether the Allen wrench was in the box of the lamp Hampton purchased allowing for the recommended assembly. Therefore, issues of fact remain regarding substantial modification and summary judgment is denied.

## D. *Product Misuse*

**\*6** Hunter claims that Hampton's use of the Lamp in the downbridge position constitutes misuse and absolves Hunter of liability. A manufacturer may be liable for failing to warn of foreseeable misuse of its product. *Liriano,* 700 N.E.2d at 304. Foreseeability requires knowledge of a certain misuse by the particular defendant or in the industry generally. *See Amatulli v. Delhi Constr. Corp.,* 77 N.Y.2d 525, 533 (N.Y.1991). Without evidence of knowledge, a defendant will not be held liable. *Id.* However, even when a consumer admits misuse, a question of fact remains regarding liability. The general rule is that there may be liability in such cases when it is proved that the abnormal use was reasonably foreseeable. *See Johnson Chem. Co.,* 588 N.Y.S.2d at 610, whether a particular misuse is reasonably foreseeable is ordinarily a jury question. *Id.* When a jury might conclude that plaintiff misused the product in a way which ought to have been foreseen by the defendants, an issue of fact has been demonstrated as to whether the warnings furnished by the defendant manufacturer were adequate. *Id.* Here, whether Hampton's use of the lamp was foreseeable and required a warning is a question of fact for the jury. Accordingly, summary judgment is denied.

## E. *Breach of Warranty*

Travelers has conceded to Hunter's arguments regarding the warranty claims. Accordingly, those claims are dismissed.

## F. *Capitol's Motion*

Capitol moved for summary judgment adopting Hunter's arguments on product identification and defectiveness, and making a separate argument on Travelers' negligence claim. Additionally, Capitol seeks indemnification and reimbursement from Hunter. In response, Hunter argues first that Capitol violated Local Civil Rule 56.1 by not submitting a sworn statement of material facts. Local Civil Rule 56.1 requires there "be annexed to the notice of motion [for summary judgment] a separate, short and concise statement of the material facts as to which the moving party contends there is no genuine issue to be tried. Failure to submit such a statement may constitute grounds for denial of the motion." Local Civ. R. 56.1(a). The rule further states that "[e]ach statement of material fact by a movant or opponent must be followed by citation to evidence which would be admissible, set forth as required by Federal Rule of Civil Procedure 56(e)." Local Civ. R. 56.1(d). Capitol submitted only the Declaration of its counsel Joseph J. Gulino in support of its motion which makes references to exhibits in two paragraphs when referring to its motion papers and to Lebersfeld's affidavit. (Gulino Decl. ¶¶ 5, 9)

Failure to comply with the requirements of Local Civil Rule 56.1 constitutes grounds for denial of a motion. *MTV Networks v. Lane,* 998 F.Supp. 390, 393 (S.D.N.Y.1998) (denying defendant's motion for summary judgment because his papers failed to establish the absence of a factual dispute); *see also Rossi v. New York City Police Dep't,* No. 94 Civ. 5113(JFK), 1998 WL 65999, at *4 (S.D.N.Y. Feb. 17, 1998) (denying plaintiff's motion for summary judgment for failure to comply with Local Civil Rule 56.1 by not annexing a short and concise statement of material facts). The moving party's failure to comply with the Rule is particularly troubling because the moving party bears the burden of demonstrating that there is no genuine issue of material fact. *Reiss, et al. v. County of Rockland,* No. 84 Civ.1906, 1985 WL 426, at *1 (S.D.N.Y. Mar. 19, 1985) (denying summary judgment where movant submitted no statement at all and granting leave to re-file in compliance with the rule). A court may decide not to consider any statements made by a party in their Rule 56.1 statement that are not supported by a citation to the record. *See Shepard v. Frontier Communication Servs.,* 92 F.Supp.2d 279, 284 (S.D.N.Y.2000) (granting defendants' motion for

Case 9:14-cv-00626-BKS-DEP    Document 86    Filed 02/02/18    Page 354 of 359

Travelers Indem. Co. of Illinois v. Hunter Fan Co., Inc., Not Reported in F.Supp.2d (2002)

2002 WL 109567

summary judgment where several statements of disputed facts were not supported by a citation to the record).

 **\*7** A district court has broad discretion whether to overlook a party's failure to comply with local court rules. *Holtz v. Rockefelier & Co., Inc.,* 258 F.3d 62, 73 (2d Cir.2001). While this Court could deny Capitol's motion on the basis of Capitol's failure to comply with Local Civil Rule 56.1, there is no need to do so on that basis as Capitol's motion is denied on other grounds.

### A. *Negligence*

Capitol argues that it is not liable in negligence because the lamp was sold in a sealed container and no alterations were made to the lamp. Under New York law, a retailer can be held liable in negligence if it fails to detect a dangerous condition that it could have discovered during a normal inspection while the product was in its possession. *See McLaughlin v. Mine Safety Appliances Co.,* 11 N.Y.2d 62, 68 (1962); *Schwartz v. Macrose Lumber & Trim Co.,* 270 N.Y.S.2d 875, 886-87 (N.Y.Sup.Ct.1966). A seller has a duty to give reasonable warnings of known latent dangers. *McLaughlin,* 11 N.Y.2d at 68-69. However, a retailer cannot be held liable for injuries sustained from the contents of a sealed product even though a testimony have uncovered a potential danger; no such obligation is imposed on a retailer. *Brownstone v. Times Square Stage Lighting Co., Inc.,* 333 N.Y.S.2d 781, 782 (N.Y.App.Div.1972); *Alfieri v. Cabot Corp.,* 235 N.Y.S.2d 753, 757 (N.Y.App.Div.1962), *aff'd* 13 N.Y.2d 1027 (N.Y.1963).

Lebersfeld testified that Capitol assembled several of its lamps, including Model 20727, as floor models for display and sale to customers. (Lebersfeld Trans. at 149-50, 160) Titone also testified that the lamps she purchased were on display in the store showrooms (Titone Trans. at p. 21, 38, 92) and that the salesperson demonstrated using the lamp with the bulb tilted toward either the ceiling or floor. (*Id.* at 24) Capitol claims the packages were sealed and it had no duty to inspect them. No evidence has been submitted regarding whether Capitol inspected the display lamps. An inspection of those lamps may have revealed a danger. Therefore an issue of fact remains as to whether Capitol met its duty to inspect. Summary judgment is denied.

### B. *Indemnification and Reimbursement*

Capitol argues that it is entitled to indemnification and reimbursement for fees, costs and disbursements from Hunter. Capitol argued that it engaged in no wrongdoing and full responsibility lies with Hunter. Capitol's motion for indemnification is premature.

Indemnity obligations can be created by contract or implied in law. Here there was no contractual agreement; the issue then is whether Capitol is entitled to common law indemnification. The right to indemnification may be implied by law to prevent an unfair result or the unjust enrichment of one party at the expense of another. *Cochrane v. Warwick Assoc., Inc.,* 723 N.Y.S.2d 506, 508 (N.Y.App.Div.2001). The right of common law indemnification belongs to parties found vicariously liable without proof of any negligence or active fault on their own part. *Colrer v. K Mart Corp.,* 709 N.Y.S.2d 758, 759 (N.Y.App.Div.2000). A finding that Capitol was negligent would preclude an indemnity award. Because an issue of fact remains as to Capitol's negligence, this Court cannot at this time find Hunter liable in indemnification. Capitol's motion is denied.

 **\*8** Capitol has moved to recover attorney's fees and costs incurred during this litigation. The universal rule is not to allow a litigant to recover damages for the amounts incurred in the successful prosecution or defense of its rights. *Mighty Midgets Inc. v. Centennial Ins. Co.,* 47 N.Y.2d 12, 21-22 (N.Y.1979). Under the American Rule, no attorneys' fees are recoverable absent express statutory authority for such an award. *See Pennsylvania v. Delaware Valley Citizens' Council for Clean Air,* 478 U.S. 616, 561-62 (1986); *Jane Doe v. Karadzic,* No. 93 Civ. 0878, 2001 WL 986545, at *2 (S.D.N.Y. Aug. 28, 2001). Here this is no statutory authority for an award. Therefore, Capitol's motion is denied.

### Conclusion

For the reasons outlined above, Hunter's and Capitol's Motions for summary Judgment are hereby denied. Capitol's motion for indemnification, and reimbursement for costs and fees is denied.

The parties are hereby given a Ready for Trial date of May 13, 2002. A copy of this Court's Pre-trial Requirements is forwarded to counsel with this Opinion.

2002 WL 109567

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2002 WL 109567

Footnotes

1   Capitol has adopted Hunter's arguments in its cross-motion for summary judgment. Therefore all references to and
    decisions made based on arguments made by Hunter will apply to Capitol.

---

**End of Document**                                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

Westlaw.

Not Reported in F.Supp., 1994 WL 23069 (S.D.N.Y.)
**(Cite as: 1994 WL 23069 (S.D.N.Y.))**

H

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
Dale HENDRICKSON, Plaintiff,
v.
UNITED STATES ATTORNEY GENERAL, G.L.
Hershberger, United States Bureau of Prisons, Gary
Morgan, Pamela Ashline, Kenneth Walicki, Hulet
Keith, Otisville Medical Department, Defendants.

No. 91 CIV. 8135.
Jan. 24, 1994.

MEMORANDUM AND ORDER

McKENNA, District Judge.

**\*1** On December 4, 1991, pro se plaintiff Dale
Hendrickson ("Plaintiff" or "Hendrickson"), an in-
mate then in confinement at the Federal Correction-
al Institution in Otisville, New York ("Otisville"),
filed this action for injunctive relief and damages
based upon alleged violations of his rights under
the United States Constitution, Amendments I, IV,
V, VI, IX, and XIII, and upon violations of various
laws and/or regulations governing prison adminis-
tration.FN1 The Complaint named as defendants
G.L. Hershberger ("Hershberger"), the United
States Attorney General ("Attorney General"), Gary
Morgan ("Morgan"), Pamela Ashline ("Ashline"),
Kenneth Walicki ("Walicki"), Hulett Keith
("Keith"), the Bureau of Prisons ("BOP"), and the
Otisville Medical Department ("OTV Medical De-
partment") (collectively "Defendants"). Defendants
moved for judgment on the pleadings pursuant to
Rule 12(c) of the Federal Rules of Civil Procedure,
or, in the alternative, for summary judgment pursu-
ant to Rule 56 of the Federal Rules of Civil Proced-
ure. For the reasons set out below, Defendants' Rule
12(c) motion is granted.

I.

Defendants move to dismiss Plaintiff's Com-
plaint, pursuant to Rule 12(c) of the Federal Rules
of Civil Procedure, for failure to state a claim upon

which relief can be granted. Rule 12(c) provides:

After the pleadings are closed but within such
time as not to delay the trial, any party may move
for judgment on the pleadings. If, on a motion for
judgment on the pleadings, matters outside the
pleadings are presented to and not excluded by
the court, the motion shall be treated as one for
summary judgment and disposed of as provided
in Rule 56, and all parties shall be given reason-
able opportunity to present all material made per-
tinent to such a motion by Rule 56.

Fed.R.Civ.P. 12(c). "[T]he same standards that
are employed for dismissing a complaint for failure
to state a claim under Fed.R.Civ.P. 12(b)(6) are ap-
plicable" to a Rule 12(c) motion to dismiss for fail-
ure to state a claim upon which relief can be gran-
ted. *See Ad–Hoc Comm. of the Baruch Black &
Hispanic Alumni Ass'n v. Bernard M. Baruch Col-
lege,* 835 F.2d 980, 982 (2d Cir.1987); *see also Vi-
acom Int'l. Inc. v. Time, Inc.,* 785 F.Supp. 371, 375
n. 11 (S.D.N.Y.1992); 5A Charles Wright and Ar-
thur R. Miller, *Federal Practice and Procedure* ¶
1367, at 515–16 (1990). Thus, the Court must read
the Complaint generously, drawing all reasonable
inferences from the complainant's allegations. *See
California Motor Transp. v. Trucking Unlimited,*
404 U.S. 508, 515 (1972). Moreover,
"consideration is limited to the factual allegations
in [the] amended complaint, which are accepted as
true, to documents attached to the complaint as an
exhibit or incorporated in it by reference, to matters
of which judicial notice may be taken, or to docu-
ments either in plaintiff['s] possession or of which
plaintiff[ ] had knowledge and relied on in bringing
suit." *Brass v. American Film Technologies, Inc.,*
987 F.2d 142 (2d Cir.1993); *accord Allen v. West-
point–Pepperell, Inc.,* 945 F.2d 40, 44 (2d
Cir.1991); *Cortec Indus., Inc. v. Sum Holding L.P.,*
949 F.2d 42, 47–48 (2d Cir.1991), *cert. denied,* 112
S.Ct. 1561 (1992); *Frazier v. General Elec. Co.,*
930 F.2d 1004, 1007 (2d Cir.1991). Defendants,
therefore, are entitled to dismissal for failure to

Not Reported in F.Supp., 1994 WL 23069 (S.D.N.Y.)
**(Cite as: 1994 WL 23069 (S.D.N.Y.))**

state a claim only if the Court finds beyond a doubt that "plaintiff can prove no set of facts" to support the claim that plaintiff is entitled to relief. *See Conley v. Gibson,* 355 U.S. 41, 45–46 (1957).

**\*2** Because the 3(g) statement and declarations submitted to this Court by Defendants have not been considered and are hereby excluded from the record, the Court renders its judgment on the pleadings pursuant to Rule 12(c).

II.

Drawing all inferences in favor of the Plaintiff, *Miller v. Polar Molecular Corp.,* 12 F.3d 1170, 1993 WL 527434 (2d Cir.), the facts are as follows.

During Hendrickson's confinement at Otisville, certain video tapes which had been supplied to him by the government were "systematically and maliciously confiscated"; audio tapes and legal materials also were removed from Plaintiff's possession while he was a pre-trial detainee at Otisville. In retaliation for his bringing legal materials into the Otisville compound area, Plaintiff claims, he was placed in administrative detention. Compl. at 1 (presumably ¶ A.)

Hendrickson also claims at various times to have been wrongly isolated from the general prison population based on alleged and allegedly erroneous OTV Medical Department claims that he had tuberculosis. *Id.* ¶ B. During these periods of medical confinement, Hendrickson claims that the "4A unit team" denied him personal visits, his right to send mail, and telephone communications and consultations necessary to his legal representation. *Id.* ¶ C.

Hendrickson claims that as part of his medical confinement he was "subjected to ruthless and inhumane [d]isciplinary action from the D[isciplinary] H [earing] O[fficer]," and was for 15 days placed in administrative detention and for 30 days deprived of commissary, visitation, and phone privileges. *Id.* ¶ D.

Hendrickson further alleges that commissary items that he had in his possession before entering medical confinement were wrongly confiscated from him, and while in such confinement he was assaulted and searched by the "OTV Riot Squad." *Id.* ¶ E. In addition, he claims, commissary receipts, as well as legal documents and other legal materials were confiscated from him. *Id.* ¶ F.

III.

Defendants argue that Plaintiff fails to state a claim for which relief may be granted. Of course, in considering a pro se pleading, the Court takes into consideration the special circumstances of pro se litigants. As the Second Circuit has often noted, "special solicitude should be afforded pro se litigants generally, when confronted with motions for summary judgment." *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988); *accord, e.g., Sellers v. M.C. Floor Crafters, Inc.,* 842 F.2d 639, 642 (2d Cir.1988); *Beacon Enters., Inc. v. Menzies,* 715 F.2d 757, 767 (2d Cir.1983). We apply the same solicitous standard to the instant motion to dismiss.

Plaintiff, however, has failed to present to this Court either a colorable theory of violation of legal duties or facts to support a claim that might be inferred from the pleadings. Even assuming the truth of Plaintiff's allegations, the Court is left without a cognizable claim before it.

**\*3** At the outset, the Court notes that to the extent that the Complaint seeks injunctive relief from conditions of Plaintiff's treatment while at Otisville as a pre-trial detainee, the claim is now moot as Plaintiff has since been transferred to the United States Penitentiary in Lompoc, California following his conviction at trial. Hendrickson's Complaint also fails to the extent that it seeks damages from the United States government or government officials in their official capacity. Because the United States government enjoys sovereign immunity, it can be sued only to the extent it so consents. *United States v. Mitchell,* 445 U.S. 535, 538 (1980) (quoting *U.S. v. Sherwood,* 312 U.S. 584, 586 (1941)). No such immunity has been waived in

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1994 WL 23069 (S.D.N.Y.)
**(Cite as: 1994 WL 23069 (S.D.N.Y.))**

suits for damages arising from constitutional violations. *Keene Corp. v. United States,* 700 F.2d 836, 845 n. 13 (2d Cir.), *cert. denied,* 464 U.S. 864 (1983). Thus, the only possible redress remaining available to Plaintiff for the harms alleged is a *Bivens* action [FN2] against government officials in their personal capacities for actions taken under the color of governmental authority.

As Defendants point out, however, Plaintiff has nowhere, other than in the caption of the Complaint, mentioned by name any of the individual named Defendants. Defs.' Mem.Supp.Mot.Dismiss or Summ.Jt. at 2. It is true that Plaintiff did in the body of the Complaint name the "4A Unit Team," the "DHO," and the "OTV Riot Squad," but these designations of group actions undifferentiated as to individuals and of official titles unconnected to any individual names do not allege the actionable *individual* behavior necessary to sustain a *Bivens* claim.

In a *Bivens* action, where Defendants are sued in their personal capacities, actionable behavior must be alleged as to individuals. *See, e.g., Ostrer v. Aronwald,* 567 F.2d 551, 553 (2d Cir.1977); *Barbera v. Smith,* 836 F.2d 96, 99 (2d Cir.1987), *cert. denied,* 489 U.S. 1065 (1989). A complaint that fails to make any specific factual allegations of "direct and personal responsibility on the part of any of the named defendants in regard to the loss of any of [plaintiff's] property" must be dismissed. *Lee v. Carlson,* 645 F.Supp. 1430, 1436 (S.D.N.Y.1986).

More importantly, the light in which a pro se complaint may be considered does not burn so brightly as to blind the court as to the rights of defendants who are entitled to have claims against them alleged with sufficient clarity as to make possible a defense. Even in a pro se complaint, claims must "specify in detail the factual basis necessary to enable [defendants] intelligently to prepare their defense ..." *Ostrer v. Aronwald,* 567 F.2d 551, 553 (2d Cir.1977). Otherwise, blameless parties would be subject to damages claims for free-floating innuendo. To be sufficient before the law, a complaint

must state precisely who did what and how such behavior is actionable under law. Although the Court may make special efforts to understand the underlying claim of a vague, confusing, or poorly crafted pro se complaint that it would not undertake in connection with a claim prepared by legal counsel, it cannot do so to the extent that this would work an injustice to defendants, whose rights also must be protected. A defendant who is alleged to be liable for his actions has a right to have the claims against him spelled out with a basic degree of clarity and particularity. *See supra* at 7. Although some of the harms alleged by Plaintiff might conceivably be of some substance, the Court cannot understand from the documents before it which defendants are alleged to have participated in which allegedly actionable behavior. The Court cannot on such a basis subject a party to potential liability. *See* Defs' Mot. at 9, 10.

*Summary and Order*

**\*4** For the reasons stated, Plaintiff has failed to plead a colorable case. Defendants' motion to dismiss is granted.

> FN1. The Complaint states only that "Bureau of Prison institutional Law" was violated; subsequent documents filed by Plaintiff imply the violation of specific prison policies. *See, e.g.,* Letter from Hendrickson to Judge McKenna of 10/13/93 at 2 (citing BOP Policy Statement 1315.3 purportedly concerning prisoner access to legal materials while in administrative detention).

> FN2. *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388 (1971).

S.D.N.Y.,1994.
Hendrickson v. U.S. Atty. Gen.
Not Reported in F.Supp., 1994 WL 23069 (S.D.N.Y.)

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1994 WL 23069 (S.D.N.Y.)
**(Cite as: 1994 WL 23069 (S.D.N.Y.))**

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.